UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS GROUP,
  INC. d/b/a/ PAR FUNDING,
FULL SPECTRUM PROCESSING, INC.,
ABETTERFINANCIALPLAN.COM LLC
  d/b/a/ A BETTER FINANCIAL PLAN,
ABFP MANAGEMENT COMPANY, LLC
  f/k/a/ PILLAR LIFE SETTLEMENT
  MANAGEMENT COMPANY, LLC,
ABFP INCOME FUND, LLC,
ABFP INCOME FUND 2, L.P.,
UNITED FIDELIS GROUP CORP.,
FIDELIS FINANCIAL PLANNING LLC,
RETIREMENT EVOLUTION GROUP, LLC,
RETIREMENT EVOLUTION INCOME
  FUND, LLC , f/k/a RE INCOME FUND, LLC,
RE INCOME FUND II,
LISA MCELHONE,
JOSEPH COLE BARLETA a/k/a/ JOE COLE,
JOSEPH W. LAFORTE a/k/a JOE MACK
  a/k/a/ JOE MACKI a/k/a JOE MCELHONE,
PERRY S. ABBONIZIO,
DEAN J. VAGNOZZI,
MICHAEL C. FURMAN,
and JOHN GISSAS

Defendants, and

THE L.M.E. FAMILY TRUST,

Relief Defendant.

_____/

**SEALED**

FILED BY____*MC*____D.C.

*Jul 27, 2020*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNDER SEAL**

**SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY *EX PARTE* MOTION
FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF**

**Table of Contents**

I. **INTRODUCTION** ...............................................................................................1

II. **DEFENDANTS AND RELIEF DEFENDANT**

    A. **Defendants** ..........................................................................................4

        *1. **The Par Funding Entities and Employees**

            a. Complete Business Solutions Group d/b/a Par Funding ................4

            b. Full Spectrum Processing, Inc. ..................................................6

            c. Lisa McElhone ........................................................................6

            d. Joseph La Forte a/k/a Joe Mack a/k/a Joe Macki

               a/k/a Joe McElhone ...............................................................7

            e. Joseph Cole Barleta a/k/a Joseph Cole a/k/a Joe Cole ..............8

            f. Perry Abbonizio ......................................................................8

        *2. **The "A Better Financial Plan" Companies and Owner**

            a. Dean Vagnozzi ........................................................................9

            b. ABFP Management Company, LLC...........................................10

            c. Abetterfinancialplan.com d/b/a A Better Financial Plan ...........10

            d. ABFP Income Fund, LLC.........................................................11

            e. ABFP Income Fund 2, LLC......................................................11

        *3. **The Florida Investment Firms, Agent Funds, and Owners**

            a. Michael Furman ......................................................................12

            b. United Fidelis Group LLC.........................................................12

            c. Fidelis Financial Planning LLC ................................................12

            d. John Gissas .............................................................................13

            e. Retirement Evolution Group, LLC ............................................13

            f. Retirement Evolution Fund f/k//a RE Income Fund....................13

            g. RE Income Fund 2 LLC............................................................13

    B. **Relief Defendant** LME 2017 Family Trust ...........................................14

III. **JURISDICTION AND VENUE**............................................................................14

IV. **THE FRAUDULENT PAR FUNDING SECURITIES OFFERING SCHEME**

    A. **Par Funding** ...........................................................................................15

    B. **Phase 1 of the Offering: Par Funding Issues Promissory Notes**

       **Directly to Investors**............................................................................16

    C. **Par Funding Learns It Is Under Investigation For State Securities Law**

       **Violations And Restructures Its Offering To Conceal Adverse Information** ..........18

D.   **<u>Phase 2 of the Offering</u>: Par Funding Uses Agent Investment Funds To Raise Investor Money And Issues Its Notes To The Agent Investment Funds**....................19

    1.   Vagnozzi and Par Funding's Roles In Creating, Managing, and Promoting The Agent Funds' Securities Offerings ..................................................19

    2.   Vagnozzi Offers and Sells Notes Through His Own Agent Funds: ABFP Income Fund and ABFP Income Fund 2 ........................................................21

    3.   Furman Offers and Sells Notes Through His Own Agent Fund: Fidelis Planning ........................................................................................................24

    4..  Gissas Offers and Sells Notes Through His Own Agent Funds: RE Income Fund and RE Income Fund 2 ..................................................................26

E.   **Phase 3 of the Offering: Par Funding, Vagnozzi, and Furman Offer "Exchange Notes"** ........................................................................................27

F.   **The Securities Offerings Are Ongoing and The ABFP Defendants Are Planning To Expand**....................................................................................29

G.   **Material Misrepresentations and Omissions in Connection With The Par Funding, ABFP, United Fidelis, and Retirement Evolution Offerings**...............32

    1.   False Claims about Par Funding's Rigorous Underwriting Process............................32

    2.   False and Misleading Claims about Par Funding's Loan Default Rate ......................35

    3.   False Claims that Par Funding Offers Insurance on Its Loans....................................38

    4.   Misrepresentations and Omissions about LaForte's Background ...............................39

    5.   Misrepresentations and Omissions about Par Funding's Regulatory History........................................................................................................41

    6.   Misrepresentations about the New Jersey Order .........................................................42

    7.   False Statements In Par Funding's S.E.C. Filings About McElhone and Cole's Receipt of Funds ...........................................................43

    8.   False Claims about LaForte's Personal Investment in Par Funding...........................44

    9.   Misrepresentations and Omissions about Vagnozzi's Regulatory History ................45

    10. Misrepresentations and Omissions about ABFPs Regulatory History .......................47

    11. Misrepresentations and Omissions about Abbonizio's Regulatory History ...............48

**VI. MEMORANDUM OF LAW**

A. **Standard for Obtaining a Temporary Restraining Order** ...............................................49

B. **The Commission Has Established *Prima Facie* Violations Of The Securities Laws** ....................................................................... 50

   *1.* The Offered Investments are Securities............................................. 50

      a. The Par Funding, ABFP Funds, Fidelis Financial Fund, and RE Fund Promissory Notes Are Securities ...................................... 50

         i. Defendants Self-Identified The Notes as Securities .............................. 50
         ii. The Promissory Notes Securities ..................................................... 50
         iii. The Notes Also Are Investment Contracts ........................................ 52

      b. The Limited Partnership Interests ABFP Offered Are Also Securities ................ 53

   *2.* All Defendants Are Violating Sections 5(a) and (c) of the Securities Act ................ 53

   *3.* Par Funding, Full Spectrum, ABFP, ABFP Management, McElhone, Cole, LaForte, Abbonizio, and Vagnozzi, United Fidelis and Furman Are Violating Securities Act Sections 17(a)(2) And Exchange Act Section 10(b) ........................... 55

      a. The Defendants Are Making Material Misrepresentations and Omissions....................................................................... 57

      b. The Misrepresentations and Omissions are Material............................................. 59

      c. The Defendants' Scheme Liability........................................................................ 61

      d. McElhone and LaForte Are Liable As Control Persons of Par Funding and Full Spectrum .............................................................. 63

      e. LaForte, McElhone, Cole, Abbonizio, Vagnozzi, And Furman Are Acting With The Requisite Scienter For Violations Of Securities Act Section 17(a)(1) and Exchange Act Section 10(b)(5) ................ 65

      f. Negligence Is Easily Demonstrated As To All Defendants For Violations of Securities Act Sections 17(a)(2) and (3) ......................................... 67

      g. The "In Connection With" Requirement Is Easily Met ....................................... 67

      h. The Defendants' Conduct Involved Interstate Commerce ................................... 68

C. **The Defendants Are Likely to Continue to Violate the Securities Laws** ..................... 68

**VII. RELIEF REQUESTED**

A. **An *Ex Parte* Temporary Restraining Order is Necessary** ................................................. 72

B. **An *Ex Parte* Freeze of Assets Is Necessary** ......................................................................... 73

C. **Sworn Accountings** ....................................................................................................................... 76

D. **An Order Prohibiting the Destruction of Records and Expediting Discovery** ............ 76

**VIII. CONCLUSION** ...................................................................................................................................... 77

# I.  INTRODUCTION

This case concerns a web of unregistered, fraudulent securities offerings that have raised more than $490 million from 1,200 investors nationwide.  At the center of this web are Lisa McElhone and her husband, convicted felon Joseph W. LaForte, a/k/a Joe Mack, a/k/a Joe Macki, a/k/a Joe McElhone.  The McElhone-LaForte duo is in the business of making opportunistic loans – some of which charge more than 400% interest – to small businesses across America.  They offer the loans through a company they control, Complete Business Solutions Group, Inc. d/b/a Par Funding ("Par Funding").

To fuel the Par Funding loans and enrich themselves, the Defendants operate a scheme wherein they raise investor money through unregistered securities offerings.  From August 2012 until approximately December 2017, Par Funding primarily issued promissory notes and offered them to the investing public directly and through a network of about sales agents.

This changed in early January 2018, when Par Funding learned it was under investigation by the Pennsylvania Department of Banking and Securities for violating state securities laws through its use of unregistered agents.  In February and October 2018, Par Funding told the Pennsylvania Securities Regulators it had terminated its agreements with the unregistered sales agents.  This was only half of the story.

In truth and unbeknownst to the Pennsylvania Securities Regulators, after learning of the investigation Par Funding implemented a new way to fuel its loans – namely, through so-called "Agent Funds" created for the purpose of issuing their own promissory notes, selling the notes to the investing public through unregistered securities offerings, and funneling investor funds to Par Funding.  Par Funding compensates the Agent Funds by issuing Par Funding promissory notes to the Agent Funds offering higher rates of return than what the Agent Funds are obligated to pay investors under the Agent Funds' promissory notes.  Par Funding has more than 40 Agent Funds operating today.

McElhone and Laforte orchestrate the scheme through Par Funding and McElhone's company, Full Spectrum Processing, Inc., whose employees and officers operate Par Funding.

LaForte, Full Spectrum CFO Joseph Cole Barleta, a/k/a Joe Cole, and Par Funding investment director and partial owner Perry S. Abbonizio solicit investors to invest in the securities.

Dean J. Vagnozzi, through his company ABetterFinancialPlan.com d/b/a A Better Financial Plan, recruits individuals to create the Agent Funds, offering them the opportunity to open a turnkey Agent Fund that issues and sells securities, complete with training, marketing materials, and an "Agent Guide," as well as a Private Placement Memorandum, corporate registration, and offering materials provided by Vagnozzi's attorney.  Vagnozzi manages the Agent Funds through his company ABFP Management Company, LLC, and Abbonizio oversees and coordinates the Agent Funds.

Vagnozzi, Michael C. Furman, and John Gissas each operate Agent Funds that raise money for Par Funding through unregistered securities offerings.  Vagnozzi operates ABFP Income Fund, LLC and ABFP Income Fund 2, L.P., which issue, offer, and sell promissory notes and limited partnership interests to investors.  Furman, through his company United Fidelis Group Corp., operates and manages Fidelis Financial Planning LLC, which issues, offers, and sells promissory notes to investors; and Gissas, through his company Retirement Evolution Group, LLC, operates Retirement Evolution Income Fund LLC and RE Income Fund 2, LLC, both of which issue, offer and sell promissory notes to investors.

The fraudulent scheme operates behind multiple veils of secrecy built of the Defendants' lies to conceal: (1) the true nature of Par Funding's loan practices; (2) Par Funding's true track record of issuing loans and the default rates of the loans; (3) the safety of investing in Par Funding's loans; (4) LaForte's criminal record, identity, and control of Par Funding; (5) three Cease-and-Desist Orders state securities regulators have entered against PAR Funding for violating state securities laws; (6) the true result of the New Jersey Division of Securities' investigation of Par Funding; (7) the fact that contrary to Par Funding's representations to the Commission in its filings, it diverts investor funds to McElhone and Cole, Par Funding's CFO, and also funnels money to L.M.E. 2017 Family Trust, which is McElhone's family trust; (8) the fact that contrary to his representations to investors, LaForte has never invested in Par Funding; (9) a Cease-and-Desist

2

Order and sanctions issued against Vagnozzi for violating state securities laws in connection with the Par Funding offering; (10) a Cease-and-Desist Order and sanctions issued against ABFP for violating state securities laws in connection with the Par Funding offering; and (11) a Cease-and-Desist Order and sanctions issued against Abbonizio for violating state securities laws in connection with the Par Funding offering.

These lies, and the scheme the Defendants employ to perpetuate them in the unregistered securities offerings, form the basis of this action. Each Defendant plays a critical and substantial role in the fraudulent scheme to misrepresent and conceal the truth. Each individual Defendant solicits investors to purchase securities – either through an Agent Fund or directly from Par Funding – by scheming and lying. And it continues to this day.

The Defendants' ongoing violations are egregious, and the Defendants have demonstrated they have no respect for the securities laws, investor funds, or the truth. There is grave concern that without the emergency relief requested, investor funds will be dissipated. Many of the individual Defendants are currently in the process of arranging financing and other details in their bid to acquire a bank in Dallas, Texas. Further, Par Funding recently transferred most of the proceeds in its bank account to the bank account held by another entity in Georgia.

Additionally, Par Funding, Vagnozzi, and Furman recently convinced investors to abandon their promissory notes and enter into new "Exchange Notes" offering investors a fraction of the investment returns, claiming Par Funding is insolvent or otherwise cannot make even monthly interest payments to investors due to a decrease in revenue caused by the COVID pandemic – thus allowing Par Funding and the Funds to retain more of the investment proceeds at the expense of the investors. Meanwhile, Par Funding, LaForte, Cole, Furman, and Abbonizio are continuing to solicit new investors and offering higher rates of return to these individuals while telling the new investors Par Funding is financially "pretty healthy." While the investors are now receiving lower interest returns under the "Exchange Notes," the Defendants have profited from the securities offerings. As with nearly every aspect of its operation, Par Funding has concealed the truth about executives' compensation. Even from the Commission. In filings with the Commission, Par

Funding has falsely indicated that McElhone and Cole are not receiving offering proceeds. McElhone has control over the Par Fund bank accounts and Cole is the CFO who signed the most recent Commission filing claiming he and McElhone were not receiving proceeds – despite the fact that he was siphoning off millions for his own benefit and that of McElhone.

The Defendants have a history of concealing, ignoring, and/or attempting to circumvent Orders issued by State Securities Regulators enjoining their securities law violations.  Less than two weeks ago, Vagnozzi consented to a Commission Order based on securities violations in connection with four other offerings unrelated to the instant case.  Within days of that Order being issued, Vagnozzi and ABFP issued a press release and emailed Par Funding investors to announce he intends to structure a public offering and that "[m]y staff and I feel that the results of this [Commission] investigation are the absolute best reason someone should invest with us…."

Based on the ongoing nature of the Defendants' violations and the scienter the Defendants have demonstrated through their willful and wanton disregard for the federal securities laws, the Defendants have shown they will continue to violate the law unless the Court grants the emergency relief the Commission seeks: (1) a Temporary Restraining Order against all Defendants; (2) an Order to Show Cause Why a Preliminary Injunction Should Not be Granted; (3) an Asset Freeze Order; (4) an Order Requiring Sworn Accountings; (5) an Order Prohibiting the Destruction of Documents; and (6) an Order Expediting Discovery.  Simultaneously, the Commission is filing a separate motion seeking the appointment of a Receiver to further protect investors.

## II.  DEFENDANTS AND RELIEF DEFENDANT

### A.  Defendants

#### 1.  *The Par Funding Entities and Employees*

##### a.  *Complete Business Solutions Group d/b/a Par Funding*

Par Funding is a Delaware company Lisa McElhone and her husband, Joseph LaForte, started in 2011,[1] which had its main office in Philadelphia until 2017 and currently has its sole

---

[1] **Exhibit 6**, Corporate Records; **Exhibit 17**, December 2019 LaForte Deposition, at 39:12-21;

office in Palm Beach Gardens, Florida.[2]  From no later than August 27, 2013 through present, Par Funding has done business using the fictitious name Par Funding.[3]  Par Funding provides short-term loans to small businesses and claims to have funded more than $600 million in loans.[4]  Lisa McElhone is Par Funding's President and sole employee.[5]   McElhone has ultimate decision-making authority for Par Funding.[6]  The L.M.E. 2017 Family Trust, for which McElhone is the Grantor, is Par Funding's sole owner.[7]

In 2018, the Commonwealth of Pennsylvania; acting through the Department of Banking and Securities, Bureau of Securities Compliance and Examinations ("Bureau"), conducted an investigation of certain securities-related activities of Par Funding.[8] Based on the results of its investigation, the Bureau concluded that Par Funding violated the Pennsylvania Securities Act of 1972, 70 P .S. § 1-301. ("Pennsylvania Securities Act").[9]  On November 28, 2018, Par Funding consented to the entry of an Order by the Pennsylvania Department of Banking and Securities imposing a $499,000 administrative assessment for violations of the Pennsylvania Securities Act through the use of an unregistered agent to offer and sell Par Funding notes in Pennsylvania.[10]

On December 27, 2018, the New Jersey Bureau of Securities issued a Cease and Desist Order against Par Funding, based on Par Funding's sale of unregistered securities in New Jersey and use of unregistered agents, in violation of the New Jersey securities laws.[11]

On February 25, 2020, the Texas State Securities Board issued an Emergency Cease and Desist Order against Par Funding and others, based on fraud and registration violations, and that

[2] **Exhibit 11**, 2020 Par Funding Form D Filing; **Exhibit 3**, Deposition of Cole, at 157:10-21; **Exhibit 4**, Par Funding Deposition, at 172:6-8.  **Exhibit 17**, LaBarre Deposition, at 60:8-13.
[3] **Exhibit 7**, PA Fictitious Name Filing, at p.1.
[4] **Exhibit 43**, Par Funding website capture, at pdf page 19 of 31; **Exhibit 25**, Renee Meyer Declaration, at ¶ 22 and Exh. E thereto (see pdf page 91 of 126).
[5] **Exhibit 4** at 172:21-173:2; **Exhibit 3**, 154:10-159:12.
[6] **Exhibit 3** at 224:17-225:16.
[7] **Exhibit 3**, at 109:6-110:2.
[8] **Exhibit 77**, Declaration of Lori Boyogueno, Exh. A thereto.
[9] **Exhibit 8**, Certified copy of Pennsylvania Cease-and-Desist Order, at introductory paragraph.
[10] *Id*. at ¶¶ 8-9.
[11] **Exhibit 9**, Authenticated December 2018 New Jersey Order against Par Funding.

matter is in active litigation.[12]  The Order finds that the respondents engaged in fraud for failing to disclose to investors the Pennsylvania and New Jersey Orders against Par Funding, the identity and management of Par Funding, and lawsuits filed against Par Funding for its lending practices.[13]

### b.  Full Spectrum Processing, Inc.

Full Spectrum is a Pennsylvania company created in 2016 and its primary place of business is in Philadelphia, Pennsylvania.[14]  Lisa McElhone is the sole owner of Full Spectrum.[15]  Since 2017, McElhone has used Full Spectrum to operate Par Funding, which has no employee other than McElhone.[16]  Full Spectrum is interchangeable with Par Funding, and operates Par Funding.[17]

### c.  Lisa McElhone

McElhone is a Florida resident.[18]  She created Par Funding,[19] is its Chief Executive Officer,[20] President[21] and sole employee,[22] and is also the sole owner of Full Spectrum.[23] McElhone is a signatory on all Par Funding bank accounts.[24]  On August 1, 2012, the Director for the Department of Consumer and Business Services for the State of Oregon issued a Cease-and-Desist Order against McElhone for providing debt management services without registering as a debt management services provider, in violation of the Oregon Mortgage Lender Law and Oregon statutes.[25]  McElhone consented to a permanent Cease-and-Desist Order on October 13, 2013.[26] Between July 2015 and October 2019, she received at least $11.3 million from Par Funding.[27]

---

[12] **Exhibit 37**, Certified February 2020 Texas Emergency Cease and Desist Order.
[13] *Id.* at ¶¶ 61-70.
[14] **Exhibit 1**, Certified Pennsylvania Business Records.
[15] **Exhibit 4**, Par Funding 30(b)(6) Deposition, at 56:2-18.
[16] *Id.* at 52:18-53:19; 172:6-173:2.
[17] **Exhibit 98.**
[18] **Exhibit 3**, at 158:2-159:1; **Exhibit 11**, Par Funding Form D filed in 2020.
[19] **Exhibit 6**.
[20] **Exhibit 12**, Lisa McElhone Linked In Profile.
[21]  **Exhibit 4** at 172:21-173:2.
[22] **Exhibit 3**, at 157:23-158:4.
[23] **Exhibit 4**, at 56:2-18.
[24] **Exhibit 13**, Declaration of Melissa White.
[25] **Exhibit 13**, Certified Oregon Cease-And-Desist Order.
[26] *Id.*
[27] **Exhibit 13** at ¶ 12.

### d. Joseph La Forte, a/k/a Joe Mack, a/k/a Joe Macki, a/k/a Joe McElhone

LaForte is a resident of Philadelphia, Pennsylvania[28] and the spouse of Lisa McElhone,[29] with whom he founded Par Funding.[30]  LaForte uses the aliases Joe Mack, Joe Macki,[31] and Joe McElhone.[32]  LaForte claims to be the owner of and to have started Par Funding,[33] and he runs the day-to-day operations.[34]  LaForte acts as the *de facto* CEO of Par Funding and Full Spectrum Abbonizio introduces LaForte to investors as Par Funding's president.[35]  LaForte also serves as Par Funding's Director of Sales through his employment with Recruiting and Marketing Resources.[36]  He works in the Full Spectrum office space in Philadelphia.[37]  From 1995 until 2000, LaForte worked for various broker-dealers.[38]  He obtained Series 7 and Series 63 securities licenses in 1996 and a Series 24 securities license in 1997; however, these licenses have expired.[39]  LaForte has never been registered with the Commission in any capacity.[40]

On October 4, 2006, LaForte was convicted of state charges in New York for grand larceny and money laundering, and on November 8, 2007 he was sentenced to three to ten years in prison and to pay restitution in the amount of $14.1 million.[41]  In 2009, LaForte pled guilty to federal criminal charges in the District of New Jersey for conspiracy to operate an illegal gambling

---

[28] **Exhibit 17**, at 39:19-40:1.

[29] *Id.* at 39:12-15.

[30] **Exhibit 3**, at 242:18-243:20; **Exhibit 136**, Transcript of Meeting, at 43:22-44:1.

[31] **Exhibit 17** at 74:6-16; **Exhibit 18**, Declaration of Kara DePietro, at ¶ 3 and pdf pg.9; **Exhibit 19**, Declaration of Michael Foti, at.

[32]  **Exhibit 136** at 43:22-44:1.

[33] **Exhibit 27**, Declaration of Christine Rainwater, authenticating Nov. 16, 2018 email from "Joe Mack;" **Exhibit 28**, at ¶¶ 2 & 3 and Exh. A thereto.  *See also* **Exhibit 20**, Transcript of November 2019 Sales Dinner, at 58:15-20, 60:12-17.

[34] **Exhibit 98**, Declaration of Loniese Jones.

[35] *Id.*; **Exhibit 20**, at 52:5-8 (referring to the subsequent speaker as the president of the company.

[36] **Exhibit 3**, at 163:24-164:6, 164:21-165:5, 321:11-18.

[37] **Exhibit 98**; **Exhibit 3**, at 20:15-22:5.

[38] **Exhibit 32**, CRD for LaForte, with FINRA certification.

[39] *Id.* at p.8.

[40] **Exhibit 21**, SEC Attestation regarding Joseph LaForte.

[41] **Exhibit 17**, at 132:2-133:23; **Exhibit 31**, Certified records, *Rice v. Joseph W. LaForte, et al,* Index No. 05-018891 (NY Supreme Court, Nassau County)..

business.[42]  He was released from jail in February 2011[43] and, as set forth above, founded Par Funding with McElhone in 2011, which occurred shortly thereafter while on supervised release.[44]

### e. Joseph Cole Barleta a/k/a Joseph Cole a/k/a Joe Cole

Cole is a resident of Philadelphia, Pennsylvania.[45]  He was employed by Par Funding as its CFO until 2017, when all Par Funding employees were converted to Full Spectrum employees.[46] Since 2017, he has been employed by Full Spectrum as Full Spectrum's CFO,[47] and through his employment at Full Spectrum has functioned as the CFO of Par Funding from 2017 through present.[48]  From July 2019 until October 2019, Cole has received at least $ 1,759,136.42 from Par Funding through payments, which included investor funds, to his company ALB Management Inc.[49]  An additional amount of about $14.4 million was transferred from Par Funding to Beta Abigail and New Field Ventures, LLC, companies in which Cole has an ownership or other beneficial interest, between July 2016 and November 2019.[50]

### f. Perry S. Abbonizio

Abbonizio lives in Pennsylvania.[51]  He claims to be an owner and managing partner of Par Funding[52] and he is responsible for bringing investment capital into Par Funding.[53]  He helps recruit and train Par Funding's Agent Fund managers,[54] provides information to potential investors

---

[42] **Exhibit 33**, Plea Agreement, *United States v. Joseph LaForte*, Case No. 09-cr-00941 (N.J.D.).
[43] **Exhibit 35**, Declaration from Ray Andjich.
[44] **Exhibit 34**, Judgment against LaForte showing term of supervised release, at p.3; **Exhibit 6**, showing date Par Funding was incorporated.
[45] **Exhibit 11**.
[46] **Exhibit 3** at 13:15-14:4.
[47] *Id.* at 14:2-4,
[48] *Id.* at 14:5-15:8.
[49] **Exhibit 13** at ¶ 13; **Exhibit 132**, Transcript of UC Undercover Meeting, at 123:4-15.
[50] **Exhibit 13** at ¶¶ 14-15; **Exhibit 131**, Par Funding Audited Financial Statements, at pdf page 20 ("Beta Abigail and New Field Ventures, LLC, Inc. are owned in part by the Company's Chief Financial Officer and Director of Investor Relations.").
[51] **Exhibit 22**.
[52] **Exhibit 23; Exhibit 152**, Transcript of January 16, 2020 Texas Board of Securities investigator call with Abbonezio, at 2:5-7, 3:15-4:1, and 4:23-5:1; **Exhibit 136**, at 44:16-17.
[53] **Exhibit 85**, Transcript of Undercover Par Funding Solicitation, at 136:5-10.
[54] **Exhibit 24**, Transcript of Beasley Deposition, at 6:6-13:7.

about Par Funding,[55] oversees the Agent Funds, and solicits investors.[56]  From February 2017 until October 2019, Par Funding paid Abbonizio at least 9,499,161.52 through his entity "New Field Ventures, LLC."[57] Abbonizio held Series 7, 63 and 65 securities licenses that have expired.[58]

From 1996 until 2015, Abbonizio was associated with various securities broker-dealers.[59] In 2015, the Financial Industry Regulatory Authority ("FINRA") sanctioned Abbonizio by consent in a regulatory action resulting in a four-month license suspension and $10,000 fine based on allegations that without providing notice to his FINRA member firm, he solicited his firm clients to purchase $625,000 in outside private placements and received compensation without firm knowledge/permission.[60]   In February 2020, the Texas Securities Board issued an Emergency Cease-And-Desist Order against Abbonizio for fraud violations in connection with the offer and sale of Par Funding promissory notes.[61]

### 2. *The "A Better Financial Plan" Companies and Owner*

#### a. *Dean J. Vagnozzi*

Vagnozzi lives in Pennsylvania and is the owner of ABFP and ABFP Management.[62]  He held Series 6 and 63 securities licenses, which have expired, and was associated with a FINRA-registered securities broker-dealer from February 2008 until February 2009.[63]   In addition to operating the ABFP entities and funds, Vagnozzi solicited investors to invest in Par Funding promissory notes pursuant to a so-called "finders agreement" from about August 2016 until December 2017.[64]  Since January 2018, he also recruited individuals to start Agent Funds for the

---

[55] **Exhibit 3** at 316:20-318:5.
[56] **Exhibit 18**; **Exhibit 20** at 49:9-59:9; **Exhibit 25**; **Exhibit 136** at 6:19-7:21.
[57] **Exhibit 13** at ¶ 15; **Exhibit 132**, Transcript of UC Undercover Meeting, at 123:4-20.
[58] **Exhibit 36**, Abbonizio CRD.
[59] *Id.*
[60] *Id.*
[61] **Exhibit 37**, Texas Cease-And-Desist Order
[62] **Exhibit 40**, at 11:12-14:22; 89:11-14.
[63] *Id.* at 31:11-32:4; 41:2-9.
[64] **Exhibit 159**, Vagnozzi 2019 transcript, at 364:25-365:19; **Exhibit 78**, Finders Agreements, at pdf page 2; **Exhibit 116**; **Exhibit 122**.

purpose of raising money for Par Funding, and has at least 30 individuals nationwide operating these investment firms which he manages through ABFP Management.[65]

On May 30, 2019, Vagnozzi, doing business as ABFP, entered a settlement with the Pennsylvania Department of Banking and Securities in connection with the sale of promissory notes Par Funding offered and sold.  In connection with that case, Vagnozzi agreed to pay a penalty of $490,000 for violations of the Pennsylvania Securities Act of 1972, 70 P.S. § 1-101, et. Seq.[66]   On July 14, 2020, the Commission instituted settled administrative proceedings with Vagnozzi for his offering and selling unregistered securities in violation of Section 5 of the Securities Act and acting as an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act, in connection with the sale of securities unrelated to the instant case.[67]

### b. ABFP Management Company, LLC

ABFP Management is a Delaware limited liability company located in Collegeville, Pennsylvania.[68]  It is wholly owned by Dean Vagnozzi.[69]  It is engaged in the business of, among things, providing management services related to organizing and operating companies formed for the purpose of raising funds from investors and using the investor funds to invest in alternative investments.[70]  ABFP Management provides these and other management services for the Par Funding Agent Funds in exchange for a portion of the investment returns.[71]

### c. Abetterfinancialplan.com d/b/a A Better Financial Plan ("ABFP")

ABFP is a Pennsylvania limited liability company Vagnozzi formed on November 12, 2010.[72]  It is located in King of Prussia, Pennsylvania.[73]  Vagnozzi owns and manages ABFP, and

---

[65] **Exhibit 156**, Texas Recording of Conversation with Beasley, June 13, 2019, at 4:16-6:18.
[66] **Exhibit 57**, Pennsylvania Order against Vagnozzi.
[67] **Exhibit 160**, Order, *In the Matter of ABetterFinancialPlan.com LLC d/b/a A Better Financial Plan and Dean J. Vagnozzi*, Securities Act Release No.10802 (July 14, 2020).
[68] **Exhibit 29**, Certified records for A Better Financial Plan Capital Management, LLC.
[69] **Exhibit 40**, November 15, 2018 Testimony of Dean Vagnozzi, at 14:13-22.
[70] **Exhibit 41**, ABFP Management's Management Agreement with Fidelis Financial, at ¶2.
[71] **Exhibit 41**; **Exhibit 42**, Merchant Growth Investment Fund Management Agreement.
[72] **Exhibit 44**, Certified records for abetterfinancialplan.com, LLC.
[73] *Id.*

he claims it is his corporate alter ego.[74]   ABFP is an investment firm that offers alternative investments involving assets unrelated to the stock market.[75]   ABFP has been soliciting investors for Par Funding since no later than April 4, 2017.[76]   ABFP has never been registered with the Commission.[77]   In February 2020, the Texas Securities Board issued an Emergency Cease-And-Desist Order against ABFP for fraud violations in connection with the offer and sale of Par Funding promissory notes.[78]   On July 14, 2020, the Commission instituted settled administrative proceedings with ABFP for its violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act in connection with the sale of securities unrelated to the instant case.[79]

### d.  ABFP Income Fund, LLC

ABFP Income Fund is a Delaware limited liability company created by Vagnozzi on January 12, 2018, with a principal place of business in King of Prussia, Pennsylvania.[80]   ABFP Income Fund claims that beginning no later than February 2, 2019, raised at least $22 million for Par Funding through the offer and sale of promissory notes to at least 99 investors.[81]   ABFP Income Fund has never been registered with the Commission.[82]

### e.  ABFP Income Fund 2, L.P.

ABFP Income Fund 2 is a Delaware limited partnership formed in 2018 with its principal place of business in King of Prussia, Pennsylvania.[83]   Vagnozzi, through ABFP Management, formed ABFP Income Fund 2 for the purpose of raising investor money to pool and invest in the promissory notes of merchant cash advance companies,[84] and specifically Par Funding.  ABFP

---

[74] **Exhibit 40,** at 12:14-24; 56:7-25
[75] **Exhibit 46**, ABFP website; **Exhibit 37**, Certified copy of February 2020 Texas Emergency Order Including Findings.
[76] **Exhibit 52**, ABFP Form D Filing.
[77] **Exhibit 47**, SEC Attestation for ABFP.
[78] **Exhibit 37**, Texas Cease-And-Desist Order
[79] **Exhibit 160**, July 14, 2020 Order.
[80] **Exhibit 39**, Certified Delaware Records for ABFP Investment Fund.
[81] **Exhibit 52**, Authenticated Form D Filing by ABFP Income Fund.
[82] **Exhibit 49**, SEC Attestation for ABFP Income Fund.
[83] **Exhibit 50**, ABFP Income Fund 2 Form D Filing.
[84] **Exhibit 55**, ABFP Income Fund 2 PPM at BFP062538 ("Fund" and "Offering" Sections).

Management is the General Partner of ABFP Income Fund 2.[85]   According to its Commission filings, beginning no later than August 8, 2018, Vagnozzi has raised at least $6 million for Par Funding, through the offer and sale of limited partnership interests in ABFP Income Fund II to at least 49 investors.[86]   ABFP Income Fund II has never been registered with the Commission.[87]

### 3.   *The Florida Investment Firms, Agent Funds, and Owners*

#### a.   *Michael Furman*

Furman is a resident of West Palm Beach, Florida.[88]   He is the President of Fidelis Financial, which he manages through his company United Fidelis Group.[89]   Furman is a certified public accountant licensed in Pennsylvania.[90]

#### b.   *United Fidelis Group LLC*

United Fidelis Group is a Delaware limited liability company formed on April 5, 2018.[91] Furman owns and operates United Fidelis Group.[92]   United Fidelis Group has never been registered with the Commission.[93]

#### c. *Fidelis Financial Planning LLC*

Fidelis is a Delaware Limited Liability Company formed in April 2018 and its principal address is in West Palm Beach, Florida.[94]   Michael Furman is the President of Fidelis[95] and United Fidelis Group is the sole manager of Fidelis.[96]   ABFP Management provides management services to Fidelis.[97]   Fidelis is a pooled financial fund[98] created for the purpose of raising investor funds

---

[85] *Id.*
[86] **Exhibit 50**, Certified Form D filing by ABFP Income Fund 2.
[87] **Exhibit 57**, SEC Attestation for ABFP Income Fund 2.
[88] **Exhibit 66**.
[89] **Exhibit 62**, Fidelis PPM, at pp.3, 4, 8.
[90] **Exhibit 65**, Furman CPA License record, with authenticating declaration.
[91] **Exhibit 63**, Certified corporate records from State of Delaware for United Fidelis Group.
[92] **Exhibit 62**, Fidelis PPM, at p.8.
[93] **Exhibit 67**, SEC Attestation regarding United Fidelis Group.
[94] **Exhibit 61**, Certified corporate records from State of Delaware for Fidelis; **Exhibit 64**.
[95] **Exhibit 62**, Fidelis PPM, at p.4.
[96] **Exhibit 62**, Fidelis PPM, at p.3.
[97] **Exhibit 41**, Management Services Agreement between Fidelis and ABFP Management.
[98] *Id.*

for Par Funding.  Since no later than August 9, 2018, Fidelis has raised more than $5.8 million from investors through the offer and sale of promissory notes.[99]  Fidelis has never been registered with the Commission.[100]

### d. John Gissas

Gissas is the President of Retirement Evolution.[101]  He has never been registered with the Commission in any capacity.

### e. Retirement Evolution Group, LLC

Retirement Evolution is a Florida limited liability company formed by John Gissas in April 2018, with its principal address in Wildwood, Florida.[102]

### f. Retirement Evolution Income Fund f/k/a RE Income Fund ("RE Income Fund")

RE Income Fund is a Delaware limited liability company formed in 2018 with its principal address in Wildwood, Florida.[103]  Since as early as May 2018, it has raised more than $5.4 million from at least 62 investors through the offer and sale of promissory notes.[104]

### g. RE Income Fund 2 LLC

RE Income Fund 2 is a Delaware Limited Liability Company formed in 2019.[105]  Its principal address is in Wildwood, Florida.[106]  Gissas is its President and sole manager.[107] RE Fund 2 is a pooled investment fund created for the purpose of raising funds for Par Funding.[108]  Since no later than August 1, 2019, RE Fund 2 has raised at least $150,000 from investors through the offer and sale of promissory notes.[109]

---

[99] **Exhibit 64**, Form D Filing for Fidelis Financial; Exhibit 62.
[100] **Exhibit 68**, SEC Attestation regarding Fidelis.
[101] **Exhibit 101**; **Exhibit 54**.
[102] **Exhibits 54 & 59**.
[103] **Exhibit 58**.
[104] *Id*.; **Exhibit 59**.
[105] **Exhibit 45**, Form D Filing; **Exhibit 101** and Exh. C thereto.
[106] *Id.*
[107] **Exhibit 101** at pdf pages 25, 26 & 31 of 66, **Exhibit 145**, RE Fund 2 Form D.
[108] **Exhibit 101**, **Exhibit 145**, RE Fund 2 Form D; **Exhibit 162**, RE Fund 2 PPM.
[109] **Exhibit 145**.

## B.  Relief Defendant

**LME 2017 FAMILY TRUST (the "Trust")**, as set forth above, owns PAR Funding and McElhone is the Grantor of the Trust.  Between July 2018 and September 2018, Par Funding transferred at least $14.3 of investor funds to the Trust for no legitimate purpose.[110]

## III.  JURISDICTION AND VENUE

The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and Section 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.  This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida.  Par Funding's sole office is located in the Southern District of Florida and Lisa McElhone, the CEO of Par Funding and sole owner of Full Spectrum, resides in the Southern District of Florida and works in the Par Funding office located in the Southern District of Florida.  Par Funding has also sold its promissory notes to investors located in Florida.[111]  Abbonizio has solicited Florida investors and participated in solicitation events and meetings in the Southern District of Florida on behalf of Par Funding and as a Full Spectrum employee.[112]  Cole is the CFO of Par Funding, which has its sole office in the Southern District of Florida.  As set forth above, Full Spectrum operates, and LaForte and McElhone control, Par Funding, and Cole, Abbonizio, and LaForte have solicited investors in the Southern District of Florida as recently as June 2020.[113]

Vagnozzi has solicited investors in the Southern District of Florida, both directly and through his ABFP companies and Agent Funds, and ABFP Management manages a South Florida Agent Fund.[114]  As set forth above, Furman resides in the Southern District of Florida and United

---

[110] **Exhibit 13** at ¶ 16.
[111] **Exhibit 75**, Par Funding Form D filing, 2019.
[112] **Exhibit 25**, Declaration of Renee Meyer; **Exhibit 129**.
[113]  **Exhibit 129**.
[114] **Exhibit 38; Exhibit 41**.

Fidelis and Fidelis Financial are located in the Southern District of Florida.  Investors residing in the Southern District of Florida have invested in Gissas' Retirement Evolution funds.[115]

In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.  THE FRAUDULENT PAR FUNDING SECURITIES OFFERING SCHEME

### A.  Par Funding

As set forth above, McElhone and her husband LaForte, a convicted felon, founded Par Funding in 2011 and control it together.  McElhone is the President, the signatory on the Par Funding bank accounts, and according to the Par Funding's most recent deposition under Federal Rule of Civil Procedure 30(b)(6), has ultimate authority over Par Funding.  LaForte acts as the *de facto CEO* and runs the day-to-day operations.[116]  Also as set forth above, Cole is the CFO of Full Spectrum and serves in that capacity as CFO of Par Funding, and Abbonizio is a part-owner of Par Funding whose responsibilities include investor solicitations.

Since no later than August 1, 2012, Par Funding has been in the business of funding short-term loans to small-sized businesses, which Par Funding refers to as "merchant cash advances." (the "Loans" or "MCAs").[117]  LaForte decides which Loans Par Funding will approve and fund,[118] and, as set forth above, Par Funding has purportedly funded more than $600 million in Loans.  Some of Par Funding's Loans carry interest rates of more than 400%.[119]  According to a recent expert witness analysis of the Loans issued to Texas small businesses, more than half of the Loans charge in excess of 95% interest.[120]  Since 2013, Par Funding has filed more than 2,000 lawsuits,

---

[115] **Exhibit 161**.
[116] **Exhibit 98**.
[117] **Exhibit 70**; **Exhibit 71**; **Exhibit 25** at Exh. E thereto.
[118] **Exhibit 98**.
[119] **Exhibit 76**, Expert report of Charles S. Lunden, at p. 10.
[120] *Id.*

seeking more than $300 million in missed Loan payments against small businesses who have allegedly defaulted on these Loans.[121]   To fund the Loans Par Funding raises investor money through the offer and sale of promissory notes.[122]

### B. Phase 1 of The Offering:  Par Funding Issues Promissory Notes Directly To Investors

From no later than August 2012 until December 2017, Par Funding sold promissory notes directly to investors.[123]  Par Funding issued promissory notes providing for a 12-month duration and stating the investor will receive a percentage of interest annually, ranging from 12% to 44%.[124] Investors signed a "Non-Negotiable Term Promissory Note" and an accompanying "Security Agreement" (collectively the "Par Funding Notes").[125]  Defendants McElhone and Cole signed the Par Funding Notes on behalf of Par Funding.[126]  The Par Funding Notes generally provide that the interest is paid over twelve months, and then the investor's principal investment is returned in full to the investor.[127]  The Security Agreement states that Par Funding grants a security interest to the investor in substantially all of Par Funding's assets, including, its accounts receivable.[128]

.      To locate and solicit investors, Par Funding contracted with sales agents through "Finders Agreements" Cole signed on behalf of Par Funding.[129]  The Finder's Agreements provide that once Par Funding receives investor funds, it will pay the agent a one-time distribution.[130]  Beginning no later than Fall 2016 until December 2017, Defendant Dean Vagnozzi was one such agent for Par

---

[121] **Exhibit 74**, Declaration of Crystal Ivory; **Exhibit 73,** Declaration of Ray Andjich.
[122] **Exhibit 88**, Letter from Par Funding, through its counsel, to Pennsylvania Securities Regulators, at p.2, ¶ 2; **Exhibit 20**, beginning at p.16.
[123] **Exhibit 75**, Par Funding 2019 Form D; **Exhibit 71**.
[124] **Exhibit 89**, Promissory Notes and Security Agreements.
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] **Exhibit 89**.
[129] **Exhibit 78**, Composite Exhibit of Finders Agreements.
[130] *Id.*

Funding.[131]  Vagnozzi and his company A Better Financial Plan raised about $20 million for Par Funding[132] in exchange for a commission equal to 6 or 7 percent of each investment he solicited.[133]

Defendant Michael Furman also solicited investors to purchase Par Funding Notes.  For example, in November 2017 Furman met with potential investors at his firm, United Fidelis Group, in West Palm Beach, Florida, and recommended the Par Funding investment.[134]  He told the potential investors that Par Funding made loans to small business and charged 36% interest on the loans.[135]  Furman distributed Par Funding marketing materials, including a brochure, and touted Par Funding's management expertise and its thorough due diligence in selecting borrowers.[136]  Furman also emphasized to their investors that their money would be safe and secure because the default rates on the Loans were 1% or less.[137]

Furman told the potential investors that the percentage of interest Par Funding would pay on its Notes would depend on the amount invested.[138]  He told them the higher the investment amount, the higher the interest rate and thus the return.[139]  He explained to the potential investors that if they invested $300,000-$400,000, Par Funding promised to pay the investors an annual return of 12.5% in monthly installments over one year.[140]  Furman provided potential investors with offering materials, including the Par Funding Note.

By December 2017, Par Funding had raised at least $482 million from investors.[141]  The investors purchased the Par Funding notes by sending funds directly to Par Funding or through self-directed IRA accounts.[142]

---

[131] **Exhibit 159**, 2019 Vagnozzi Testimony, at 364:25-365:19; **Exhibit 78**.
[132] **Exhibit 40**, 2018 Vagnozzi Testimony, at 251:14-25.
[133] **Exhibit 159**, 2019 Vagnozzi Testimony, at 368:9-18.
[134] **Exhibit 25**.
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] **Exhibit 11**, 2020 Form D; **Exhibit 13**, Davis Declaration, at ¶ 10.
[142] **Exhibit 108**.

### C. Par Funding Learns It Is Under Investigation For State Securities Law Violations And Begins Efforts To Restructure Its Offering To Conceal Adverse Information

Things changed in January 2018. On January 4, 2018, the Pennsylvania Securities Regulators issued a subpoena to Par Funding in connection with its investigation of Par Funding's use of unregistered Agents.[143] Par Funding, through its counsel, assured the Pennsylvania Securities Regulators that it was no longer using Agents to find investors.[144]

In truth, when Par Funding made this representation it had already restructured its offering by converting its Agents to Agent Fund managers the Agents created under the guidance of Defendant Vagnozzi and Abbonizio.[145] Par Funding put this structure into place in January 2018 after receiving the Pennsylvania Securities Regulators' subpoena and it continues to this day.[146] Under this new structure, Par Funding uses Agent Funds to offer and sell promissory notes the Agent Funds issue to investors. The Agent Funds then funnel investor money to Par Funding, which then issue Par Funding Notes to its Agent Funds.[147] Below is an illustration Vagnozzi's attorney showed existing investors in April 2020, explaining how the fund structure works with respect to the ABFP Income Fund:



---

[143] **Exhibit 77**, January 4, 2018 subpoena.

[144] **Exhibit 163** at page 2, ¶ 3 of the letter.

[145] **Exhibit 164**, January 11, 2018 email from Vagnozzi to "Finders" that Par Funding will only accept investor money through funds; **Exhibit 18** at ¶ 8 and Exh. A thereto (pdf page 6) ("Previously, those willing to place money with CBSG did so directly. However, as Perry discussed, in January of this year the investment structure has changed to a fund based platform.").

[146] *Id.* Vagnozzi proposed this structure in 2016 and 2017, but Par Funding only put it into place after it received the Pennsylvania subpoena. *See* **Exhibit 40**, at 244:19-249:5 (Vagnozzi first proposes fund model in 2016); **Exhibit 118** (proposes it again in 2017).

[147] **Exhibit 149**, Transcript of Vagnozzi & his attorney speaking to investors, at 10:25-11:25; 20:24-21:19.

The Agent Fund PPMs distributed to potential investors state that the Agent Fund is raising money to invest in a merchant cash advance or lending company, but do not disclose that this is Par Funding.[148]  Nor do the Agent Fund PPMs disclose Par Funding's regulatory history, that Par Funding is managed by a convicted felon, that Pennsylvania and New Jersey Securities Regulators filed actions against Par Funding and there are cease-and-desist Orders against Par Funding in those states, or any other adverse information about Par Funding.[149]  While the Agent Funds offer investors promissory notes in the Agent Funds, investors are told that profits will be generated by Par Funding's Loan business in which the Agent Funds invest.[150]

### D.  Phase 2 of the Offering: Par Funding Uses Agent Investment Funds To Raise Investor Money And Issues Its Notes To The Agent Investment Funds

Since January 2018, Par Funding has raised at least $350 million through Agent Funds.[151]

### 1.  Vagnozzi and Par Funding's Roles In Creating, Managing, and Promoting The Agent Funds' Securities Offerings

Vagnozzi is instrumental in recruiting people to start Agent Funds to provide funding to Par Funding.  He recruits individuals to start agent funds and he trains them.[152]  Once Vagnozzi successfully recruits Agents, he and Abbonizio train them how to raise money through securities offerings that will ultimately fuel Par Funding.  Vagnozzi teaches Agents how to open their own turnkey investment funds[153]  and provides them with an "Agent Guide" that instructs them how to create an Agent Fund, telling Agents they merely need to choose a name for an investment and send that name together with $5,000 money to Vagnozzi's attorney, who will then set up a fund, gets the corporate paperwork filed, drafts a PPM for the fund, and gets a tax identification number.[154]  The Agent Guide tells the Agents which banks to use to set up bank accounts and

---

[148] **Exhibit 25**, at Exh. C & D; **Exhibit 101**, at Exh. C; **Exhibits 113, 162 & 165**.
[149] *Id.*
[150] **Exhibit 25**, at ¶ 19; **Exhibit 20**; **Exhibit 101**, at ¶¶ 16 & 20.
[151] **Exhibit 13**, Davis Declaration, at ¶ 9.
[152] **Exhibit 24** at 6:6-13:7; **Exhibit 80** (starting more funds).
[153] **Exhibit 164**.
[154] **Exhibit 110**, Agent Guide.

directs them to add an ABFP employee as an authorized signer on the account[155]. According to the Agent Guide, ABFP Management then pays the investment expenses and payouts to the Agent Funds' investors.[156]  In the Agent Guide, Vagnozzi tells the Agents that ABFP Management will handle these tasks so the Agents "to focus on selling."[157]

Par Funding, through Abbonizio, and Vagnozzi also train the Agents at Par Funding's office[158] and Par Funding provides the Agents with marketing materials to solicit investors.[159] Vagnozzi and Abbonizio oversee the Agent Funds[160] and Vagnozzi manages them through his company ABFP Management in exchange for 25% of the Agent Funds' profits.[161]  There are about 40 Agent Funds raising investor money for Par Funding.[162] Par Funding and ABFP coordinate the issuance of the promissory notes.[163]

Par Funding, through LaForte, Cole, and Abbonizio, help solicit investors to invest in the Agent Funds by speaking at events the Agent Funds organize to raise money from potential investors.[164]  Abbonizio also helps the Agent Funds solicit investors through telephone calls and Abbonizio, Cole, and LaForte assist by soliciting investors during meetings the Agent Funds arrange at Par Funding's office.[165]

---

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] **Exhibit 24**, Interview of Agent Fund Manager Gary Beasley at 6:6-13:7; *See* **Exhibit 37**; **Exhibit 156** at pp.1-12 (Beasley explaining his recruitment and training)

[159] **Exhibit 24**, at 70:18-71:1, 106:6-107:16; **Exhibit 119**, Par Funding email attaching marketing Powerpoint brochure; **Exhibit 25**, at ¶¶ 20-22 & 27 and Exh. E thereto.

[160] **Exhibit 152**, at 2:5-4:19; **Exhibit 60; Exhibit 114-116; Exhibit 119-122;** Exhibit 164.G

[161] **Exhibit 41**, Fidelis-ABFP Management Contract; **Exhibit 24**,at 47:24-50:5 (Fund Manager Beasley explaining how they split the profits).

[162] **Exhibit 152**, at 2:5-4:19.

[163] **Exhibits 114, 115** & **117, 120, 121, 123**.

[164] **Exhibit 20** and exhibit thereto; *Id.* at Transcript of November 21, 2019 video recording, beginning at 16:25, Abbonizio, LaForte, and then Cole speak to investors at Vagnozzi's solicitation dinner; **Exhibit 101** (Abbonizio speaking at one of Gissa's solicitation events); **Exhibit 25** (Abbonizio speaking at one of Furman's events).

[165] **Exhibit 136** at 6:19-7:16 and 25:2-26:10; **Exhibit 152**; **Exhibits 125 & 126.**

The Agent Funds and ABFP Management make their profits based on the rates of return promised in the Par Funding Notes and the Agent Fund notes with the investors. Each Agent Fund sends Par Funding investor funds raised through the Agent Funds' securities offerings and upon receipt of the investor funds, Par Funding issues a Par Funding Note to the Agent Fund with a higher promised rate of rate than the Agent Fund promises to its investors in its own notes.[166] Par Funding pays an Agent Fund its monthly returns and the Agent Fund in turn pays its investors. The remainder (or the spread) is for the Agent Fund, and it is obligated under an agreement it signs with ABPF Management to pay ABFP Management 25% from this remaining amount.[167]

### 2. Vagnozzi Offers and Sells Notes Through His Own Agent Funds

In addition to managing Agent Funds, Vagnozzi offers and sells promissory notes through his own Agent Funds, ABFP Income Fund and ABFP Income Fund 2 (collectively, the "ABFP Funds"). The ABFP Funds each filed a Form D with the Commission giving notice of an exempt securities offering of either debt or equity securities in reliance on Rule 506(b).[168] The ABFP Funds' PPMs reflect that the ABFP Funds either enter into promissory notes with investors, promising annual returns as high as 15%, with monthly interest payments and full return of principal at the end of the typical 12-month term or sell investors interests in a limited partnership for $5,000 per single interest.[169] The ABFP Income Fund PPM states that investor funds will be used to invest in promissory notes with MCA companies.[170] The ABFP Income Fund 2 PPM states that investor money will be used 80% toward MCA promissory notes and 20% toward investment in one NYSE-traded equity.[171]

Investors either contribute directly to the ABFP Income Funds or through a self-directed IRA account at a Pennsylvania-based IRA administrator. Vagnozzi directs investors to open an

---

[166] **Exhibit 37**; **Exhibit 156** at pp.1-12 (Beasley explaining his recruitment and training).
[167] **Exhibit 110**, Agent Guide; **Exhibit 41**, ABFP Management Contract.
[168] **Exhibits 50 & 52.**
[169] **Exhibit 55** at page 1; **Exhibit 54** at page 1.
[170] **Exhibit 165**, ABFP Income Fund PPM p1.
[171] **Exhibit 55**, ABFP Income Fund 2 PPM p8.

account at the IRA administrator company, and investors contribute funds and receive their investment funds through this account.[172]

Vagnozzi and ABFP advertise the investment through radio, television ads, the Internet, the Facebook page for ABFP, one-on-one presentations at the ABFP office, and dinner seminars.[173]   For example, on November 21, 2019, Vagnozzi and ABFP hosted more than 300 investors and prospective investors for a dinner where they were solicited to invest in Par Funding through Vagnozzi's funds.[174]   Attendees were given a one-page flyer describing four investment opportunities, one of which was MCAs.[175]   The flyer described the MCA investment opportunity as having a 2% default rate and offering between 10-14% returns with principal returned in 1, 2, or 3 years.[176]   Vagnozzi spoke first at the November 2019 event and touted Par Funding's financial success.   He explained that Par Funding was buying a bank and was looking for investors to help – not because Par Funding couldn't write a check to buy the bank itself, but because bank regulations only let Par Funding be a 5% owner.[177]   Vagnozzi told the attendees that "[w]e have stock market alternative investments that are secure…" and that the MCA investment in Par Funding does not have "too much risk"[178] and the investment is "knocking it out of the park."[179]

Vagnozzi then introduced Abbonizio, who told the audience that Par Funding has a default rate of 1%, compared to an industry with an average default rate of 18.5%.   Abbonizio also told the audience to focus on the default rate because that is the most important part of the investment. Abbonizio then introduced LaForte, whom he referred to as the President.   LaForte told the audience that Par Funding is probably the most profitable cash advance company in the United

---

[172] **Exhibit 25**, Meyer Declaration.
[173] **Exhibit 128**, Transcript of ABFP Solicitation Meeting; **Exhibit 20** beginning at page 16; **Exhibit 109**; **Exhibit 25**; **Exhibit 101; Exhibit 1360; Exhibit 62**; **Exhibit 128**, at 9:8-9 ("We spend 18,000 on - - a week on radio.").
[174] **Exhibit 20**, beginning at Transcript page 16.
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*
[179] *Id.*

States and maybe in the world.  He also told the audience that he started the company about eight years ago with $500,000 of his own capital.  LaForte then introduced Cole, who touted Par Funding's financial health.[180]

During a sales pitch at ABFP's office on December 18, 2019, ABFP staff pitched an individual posing as an investor.  ABFP's sales agent began by telling the potential investor that "What we do is not risky."[181]  She explained that ABFP pools money from investors and then uses it to purchase a promissory note of $5 to $10 million twice a month depending on the note, and that investor money goes to support the company from which ABFP purchases the note.[182]

The ABFP sales agent described the Par Funding investment as "our probably most popular investment," and explained that it pays a 10 percent monthly return."[183]  She explained to the investor "Their business is essentially making opportunistic business loans that banks can't make because they take too long, have too much underwriting," and that they charge small businesses 35 percent interest on the Loans.[184]  She explained that "Your money goes into a pool, and then it goes into their pool of lending, and then that pool of lending pays interest."[185]  The sales agent touted that what is strong about the investment is its "really low default rate" of 1% on the Loans.[186]  The sales agent then showed the potential investor a video in which Vagnozzi pitches the investment (the "Vagnozzi Par Funding Marketing Video.").

In the Vagnozzi Par Funding Marketing Video, Vagnozzi calls it "an investment opportunity like no other," touts its double-digit growth, describes the Loans, and represents that they charge small businesses 35% interest, the small businesses they lend to are successful and financially sound, and "the Loan is usually paid back off in full in less than 100 days."[187]  Vagnozzi

---

[180]  *Id.* beginning on page 16 of the transcript begins the full presentation.
[181]  **Exhibit 128**, at 7:18-20.
[182]  *Id.* at 11:9-12:1 and 34:2-7 (identifying the company as "Complete") (Par Funding is a d/b/a for Complete Business Solutions Group); 41:2-4.
[183]  *Id.* at 15:24-16:9.
[184]  *Id.* at 16:10-19.
[185]  *Id.* at 42:11-13.
[186]  *Id.* at 16:21-17:6.
[187]  *Id.* at 34:2-36:18.

goes on to explain that the MCA company gets the money it loans out from "investors like you" and that it is so successful "they can afford to pay you double-digit investment returns."[188]

The sales agent closed the sales pitch meeting by repeating that Par Funding has "mastered their underwriting so that they know who they're lending to is legitimate.  And they withdraw that payment every day.  So they have really done a good job of protecting principal."[189]

During the November 21, 2019 solicitation dinner event, Vagnozzi told potential investors that he has taken more than 500 investors into an investment with Par Funding,[190] and by March 2020 Vagnozzi was claiming he had 600 investors who had invested in Par Funding through him.[191]

Through its securities offerings, ABFP Income Fund has raised at least $22 million from investors[192] and ABFP Income Fund 2 has raised at least $6.3 million from investors through their unregistered offerings.[193]

### 3.  Furman Offers and Sells Notes Through His Own Agent Fund: Fidelis Financial

Since no later than August 2018, Furman, through his companies Fidelis Financial and United Fidelis, has raised about $11.6 million for Par Funding through investments in Furman's Agent Fund, Fidelis Financial.[194]  Fidelis Financial enters into promissory notes with investors, promising annual returns as high as 15%, with monthly interest payments and full return of principal at the end of the typical 12-month term.[195] The Fidelis Financial PPM tells investors that Fidelis will invest their funds with a MCA business.[196]

---

[188]  *Id.* at 37:14-24.
[189]  *Id.* at 40:8-12.
[190]  *Id.* at 47:8-47:12.
[191]  **Exhibit 109 part 2,** at ¶ 16 and Exh. D thereto (last paragraph on p.2; pdf page 5 of 67)
[192]  **Exhibit 52**, ABFP Income Fund Form D Filing.
[193]  **Exhibit 50**, ABFP Income Fund 2 Form D Filing.
[194]  **Exhibit 64**, May 2018 Fidelis Form D filing and 2019 Amended Form D Filing.
[195]  **Exhibit 113**, Fidelis Financial PPM p.1; **Exhibit 62**, Delucco Declaration; **Exhibit 25**, Meyer Declaration.
[196]  **Exhibit 113**, Fidelis Financial PPM p.1.

Furman and United Fidelis advertise the investment Fidelis Financial investment through newspaper advertisements.[197]   He solicits investors via email, including by distributing the Vagnozzi Par Funding Marketing Video, and via telephone.[198]   He also puts potential investors in contact with Abbonizio, Cole, and LaForte, who continue the solicitation efforts.[199]   Furman touts Par Funding's purported 1% default rate and the underwriting efforts of Par Funding, and emphasizes that investor money is safe and secure.[200]   Sometimes Furman solicits investors to invest in ABFP Income Fund Notes through Fidelis.[201]   Furman also invites potential investors to solicitation dinners where Furman and/or Abbonizio solicit investors and distributed a Par Funding marketing brochure to potential investors.[202]  For example, during a January 2019 sales presentation dinner Furman hosted in West Palm Beach, Florida, Abbonizio touted the management at Par Funding and the management experience there, and told potential investors the Loans have a 1% default rate.[203]   At this same dinner, investors received a Par Funding marketing brochure, touting that Par Funding offers insurance on all its products, and that the investment is protected by Par Funding's "exceptional underwriting rigor" and "especially selective approach" to approving Loans.[204]

Furman, through his companies, transfers investor money to Par Funding.[205]   Furman, United Fidelis, and Fidelis have raised at about $11.6 million for Par Funding through the offer and sale of Fidelis notes.[206]

---

[197]  **Exhibit 62**, at ¶¶ 2-7; **Exhibit 103**, at ¶¶ 2-5 and Exh. A thereto.
[198]  **Exhibits 133** & **134; Exhibit 25** at ¶¶ 12-14 and Exh. B thereto.
[199]  **Exhibits 127, 129, 132**.
[200]  **Exhibit 25 at** ¶¶ 2-11; **Exhibit 103**, at ¶¶ 6 & 8.
[201]  **Exhibit 25** at Exh. C & D thereto.
[202]  *Id.* at ¶¶ 20-31 and Exh. E thereto; **Exhibit 103, ¶¶** 2-8.
[203]  *Id.* at ¶¶ 22 and 27-28 and Exh. E thereto (at pp. 14 and 17 of Exh. E).
[204]  *Id.* at Exh. E thereto.
[205]  **Exhibit 13**, at Table 3.
[206]  **Exhibit 13**, at Table 3 (amount as of December 2019); **Exhibit 64** ($5,838,000 raised by May 2019).

**4.  Gissas Offers and Sells Notes Through His Own Agent Funds:**
**RE Income Fund and RE Income Fund 2**

Gissas and his company Retirement Evolution raise money for Par Funding through the offer and sale of investments in Gissas' Agent Funds, RE Fund and RE Fund 2.[207]  Gissas appears to primarily target investors in the The Villages retirement community in Florida.[208]

Gissas and Retirement Evolution advertise the securities offerings on the RE Fund website, where they provide the RE Fund PPM.[209]  Gissas and Retirement Evolution also use newspaper advertisements, largely in The Villages retirement community in Florida, to invite the public to lunches and dinners where Gissas, sometimes with the assistance of Abbonizio, solicits the audience to invest in the RE Funds, which will invest in Par Funding Notes.[210]

For example, in August 2019 Gissas and Retirement Evolution hosted a dinner for 12 potential investors in Wildwood, Florida.[211]  Gissas gave an investor who attended the event an RE Fund 2 PPM and promissory note to review,[212] and told the investors who attended the event that the investment offered an 8% to 12% investment return through an investment in an MCA business in Philadelphia.[213] Abbonizio spoke to the investors at one of these events, where he was introduced as the 25% owner of Par Funding, and then touted Par Funding's low default rate.[214] At least one attendee at this event subsequently invested in Par Funding through the RE Fund 2 promissory note.[215]

Through the unregistered offerings, Gissas, Retirement Evolution, and the RE Funds raised at least $12 million from investors.[216]

---

[207]  **Exhibits 145, 51. 54, 58, 59,** and **101**.
[208]  **Exhibit 59**, Retirement Evolution Web Capture.
[209]  *Id.*
[210]  **Exhibit 101**, Lipowski Declaration and advertisement attached thereto, at ¶¶ 2 & 8 & Exh. A thereto.
[211]  *Id.* at ¶¶ 2, 3.
[212]  *Id.* at ¶ 17.
[213]  *Id.* at ¶¶ 3-5.
[214]  *Id.* at ¶¶ 8-13.
[215]  *Id.* at ¶¶ 14 & 20-21.
[216]  **Exhibits 51, 58 & 145** (Form D filings listing how much offerings have raised).

**E.  Phase 3 of the Offering: Par Funding, Vagnozzi, and Furman Offer "Exchange Notes"**

On March 12, 2020, Vagnozzi forwarded investors a message he received from Cole of that same date. [217]   According to Cole's message, the purpose of Cole writing Vagnozzi was to "update our partners." [218]   In the message, Cole states Par Funding believes the Coronavirus will have "no long term effects to [Par Funding's] projected growth and revenue.[219]  Cole further states in this same message that "There has been no noticeable effect to our client payments or default rates. We had our largest funding month by deal count in February and have confidence in being able to maintain consistent funding volume in the coming months." [220]

A mere two weeks later, Abbonizio and Furman forwarded investors a dramatically different message purporting to be from Par Funding that states "Over the past several months, Par Funding, like many other companies across the globe, has been severely impacted by the Coronavirus pandemic."[221]  Par Funding goes on to say it has "been forced to close our physical offices" and that "virtually all of [Par Funding's Loan borrowers] have called seeking a moratorium on payments and other restructured payment terms."[222]

Purportedly as the result of the Covid-19 Pandemic, some investors did not receive their monthly investment returns in at least March and April 2020.[223]  In April 2020, Furman emailed investors an email message purporting to be from Par Funding that states indicating that if investors do not accept an offering to replace their current promissory notes with "Exchange Offering Notes" offering significantly less interest and over a longer period of time, then Par Funding would file for bankruptcy.[224]  Par Funding, through Vagnozzi, Vagnozzi's attorney, and Furman, presented investors with an offer to either restructure their promissory notes into new notes that promised

---

[217] **Exhibit 109**, Beebe Declaration at ¶15 & Exh. D thereto.
[218] *Id.*
[219] *Id.*
[220] *Id.*
[221] *Id.* at ¶ 15 & Exh. C thereto; **Exhibit 25**, Meyer Declaration, at ¶ 36 Exh. G thereto (From Furman).
[222] *Id.*
[223] **Exhibit 14**, at ¶ 13; Exhibit 25 at ¶¶ 35-39.
[224] **Exhibit 25**, at ¶¶36-39 & Exh. G (second full paragraph on page 2 of 4 of April 15 email).

<u>4%</u> annual returns and return of principal in seven years (instead of notes that promised between 8-44% with return of principal in one year) or face non-payment on the existing notes.[225]

In an April 6, 2020 video Vagnozzi and Furman distributed to investors in April 2020, Vagnozzi's attorney recommends that investors accept the Exchange Offering notes and tells investors that he reviewed the Par Funding financials and agrees the Company is insolvent.[226] The attorney also tells investors that because Par Funding has not paid investors their returns in March, he obtained a UCC lien report against Par Funding and was "first in line" to collect for the investors.[227] He emphasized to investors that this was "a key point" because "not only are we getting a lien, we're getting a first position lien.  So we'll be first in line if there is a default." [228] Public records do not reflect any such lien was filed by Vagnozzi or his attorney against Par Funding, but do reflect a number of other liens against Par Funding in Pennsylvania alone that would preclude Vagnozzi's attorney's purported lien from being first in line.[229]

In a second email distributed by ABFP in late April, Vagnozzi and his attorney repeat their opinions that entering into the Exchange Notes is the best option.[230] The email included the offering materials, and in the video Vagnozzi's attorney walks investors through the offering materials.[231]

Based on representations by Par Funding and Vagnozzi's messages, the representations that Par Funding would otherwise default on payments altogether or enter bankruptcy, and based on Vagnozzi's attorney's recommendation, as a lawyer, that they accept the offering, investors

---

[225] **Exhibit 109** at ¶¶ 18-19 & Exh. G thereto. Par Funding also offers Exchange Notes at this time. **Exhibit 90.**
[226] **Exhibit 62**, at ¶¶ 11-2 and Exh. D & E thereto; **Exhibit 109**, at Exh. C thereto.
[227] **Exhibit 62** at Exh. E thereto, 28:2-29:1.
[228] *Id*.
[229] **Exhibit 167**, UCC Lien Dockets in Pennsylvania.
[230] **Exhibit 109**, at ¶¶ 11-12 and Exh. F & G thereto (2:2 - 4:11  in Exh. G).
[231] **Exhibit 109** at ¶¶ 18-20 and Exh. G thereto (attorney walking through materials, beginning at 4:18) and Exh. H and I thereto (offering materials).

opted for the Exchange Offering and entered into new promissory notes.[232]   Based on the representations made to them, investors felt they had no choice but to agree to the Exchange Offering and to replace their existing notes in the ABFP Funds and Fidelis Funds with new notes that offered less interest and thus a lower rate of return.[233] Meanwhile, unbeknownst to Furman and Vagnozzi's investors, the securities offerings through Par Funding, Gissas, and the RE Funds continued to pay investors and did not offer the Exchange Offering or interrupt monthly return payments to investors at all.[234]

### F.  The Securities Offerings Are Ongoing and Defendants Are Planning To Expand

While the Defendants are telling Par Funding and Agent Fund investors that Par Funding is insolvent, could not afford any payments for March and April 2020, and cannot afford to pay investors more than 4% on the promissory notes, Par Funding, LaForte, Cole, Abbonizio, and LaForte have been soliciting new investors to purchase promissory notes from Par Funding – notes that pay a 15% return.  To put this into perspective, in March 2019, a retired Palm City, Florida couple invested $600,000, through their retirement account, in Par Funding by purchasing a Fidelis Financial promissory note offering 15% interest for one year, with the return of their principal returned in March 2020.  When the note matured in early March 2020, the retired couple invested in Par Funding again, this time by purchasing a $500,000 Fidelis Financial promissory note and Par Funding returned all but $10,000 of the retirees' principal.  On March 26, 2020, Furman informed the retirees that Par Funding could not afford to pay them the remaining $10,000 in principal it still owed them on the March 2019 promissory note, and that it could not afford to pay them on the March 2020 promissory note.  Thus, the retirees did not receive the return of their principal and did not receive their monthly interest payments in March and April 2020.  According to Furman, Par Funding, Vagnozzi, and his attorney in the emails and videos through which they

---

[232] **Exhibit 25**, Meyer Declaration, at 35-41; **Exhibit 62**, DeLucco Declaration, at ¶ 14; **Exhibit 109** at ¶ 21.
[233] *Id.*
[234]  **Exhibit 101**; Exhibit 25 at ¶ 44.

communicated to the retirees, Par Funding was on the brink of financial ruin and the best chance of getting paid anything was to accept a new promissory note – the Exchange Note – offering a fraction of the interest on the investment.  In this case, the retirees would receive 4% interest rather than the 15% interest on the note they had purchased just weeks prior.  The retirees would have to accept less than 1/3 of what they purchased, or face getting nothing at all.  They felt they had no choice, and so they agreed to the Exchange Note offering.[235]

This story repeats itself hundreds of time around the country, with Agent Fund and Par Funding investors exchanging the promissory notes they purchased for notes offering lower interest rates – thus allowing Par Funding to retain more of their investment funds.

Unbeknownst to its current investors, Par Funding was, in fact, offering more investments, at higher interest rates of return – just to *other, new* investors.  Specifically, Furman, LaForte, Abbonizio, and Cole solicited two individuals posing as investors to invest in promissory notes.[236] Contrary to representations to the retirees that Par Funding could not afford to repay their retirement funds with the $10,000 it owed them, the Defendants offered the new investors a monthly return of more than 10 times that – $125,000 – every month, for 4 years.[237]  In June 2020, LaForte told individuals posing as new potential investors that Par Funding was "pretty healthy" post-COVID.[238]   When asked about whether Par Funding had many defaulted Loans in the preceding months due to COVID, LaForte represented "we came out of it pretty well"[239] and Cole told the investors that by the end of the third quarter (September), he thinks Par Funding will "be pretty close to where we were before.[240] LaForte explained that Par Funding lowered the amount it was paying everyone in the PPMs and Cole explained they decided in March to "pull the plug on the machine… for a little bit and let - - let the cash settle."[241]  In response to being asked if he

---

[235] **Exhibit 25**, at ¶ 1 and ¶¶ 20-41.
[236] **Exhibits 133, 134 & 126, 127, 129.**
[237] **Exhibit 125**.
[238] **Exhibit 129**, Part 1 at 21:1-5.
[239] *Id.* at 21:6-24:3.
[240] *Id.* at 25:14-26:8.
[241] *Id.* at 177:14-179:6.

was ever thinking "We are in danger here because of what's happening," LaForte said no because he knew he had enough revenue in January, February, and the beginning of March to weather the storm and he had his "anchor clients" who continued paying their Loans.[242]

Thus, Par Funding is far from nearly bankrupt as they told investors in order to solicit them to exchange their promissory notes for the Exchange Notes under which Par Funding and the Agent Funds pay investors significantly less money.  In fact, as LaForte divulged in June 2020, "we're sitting on about $40 million in cash reserves."[243]

On about July 8, 2020, Cole emailed the individuals posing as new investors Par Funding promissory notes and offering materials offering a 15% interest on a $10 million investment, with Par Funding paying the new investors $125,000 per month beginning August 10, 2020 and continuing for 4 years.[244]

Additionally, Gissas and Retirement Evolution appear to continue to actively solicit investors, with Retirement Evolution advertising in The Villages newspaper as recently as July 2020, for a luncheon seminar about alternative investments with annual returns of 8% and 10% paid monthly, scheduled for the week of July 13, 2020.[245]

As for Vagnozzi, three days after the Commission. entered a July 14, 2020 Consent Order against him and ABFP for engaging in unregistered securities offerings and acting as an unregistered broker-dealer in connection with offerings other than Par Funding that are not at issue in this case, Vagnozzi, emailed investors who had invested in Par Funding through the ABFP Income Funds:

---

[242] *Id.* at 298:7-299:6.
[243] *Id.* at 258:12-13.
[244] **Exhibits 124 & 125**.
[245] **Exhibit 109**, at ¶ 28.

- "My staff and I feel that the results of this [S.E.C.] investigation are the absolute best reason someone should invest with us…."
- "[T]he SEC reviewed all of ABFP's bank records and found that no investor funds were mishandled or misused. Also determined that all investments offered by ABFP were carried out in a manner consistent with the information provided to investors."
- "Three years of investigation, $300k spent on my end, and all they can say is they don't like my advertising methods and the fact that I served steak dinners in 2013 as a way for people to hear about our investments."[246]

This is not what the Order says.[247]  Vagnozzi mischaracterizes the Order to investors as a selling point for investing with him and ABFP, and in the same email message announces that he is forming a non-public company that he will soon advertise.[248]  Vagnozzi and ABFP also issued a press release about the Order, claiming that "the findings of these proceedings have also paved the way for the company to restructure as a public company, which will alleviate advertising restrictions in the future."[249]

## G. Material Misrepresentations and Omissions in Connection with The Par Funding, ABFP, United Fidelis, and Retirement Evolution Offerings

### 1. False Claims about Par Funding's Rigorous Underwriting Process

Because investor returns are purportedly generated by the interest small businesses pay on the Loans Par Funding makes, the success and profitability of the investment turns on Par Funding lending money to small businesses who pay back Loans with interest and do not default on the Loans.  As Abbonizio explained to one individual posing as an investor at a sales pitch in January 2020: "If you leave here and you remember nothing else. Why would I entrust the money?  Because

---

[246] **Exhibit 109**, Beebe Declaration, at ¶23 and Exh. J thereto.
[247] **Exhibit 160**, July 2014, 2020 Order.
[248] **Exhibit 109**, Beebe Declaration, at ¶23 and Exh. J thereto.
[249] *Id.*

they have an exemplary track record of underwriting, utilizing three components, taking three days and be more vigilant.  That's the crux of it."[250]

In the Par Funding brochure that Furman and Abbonizio, and Vagnozzi, through ABFP, distribute to potential investors, Par Funding details its supposedly rigorous underwriting process to approve merchant loans, calling it "Exceptional Underwriting Rigor."[251]  Par Funding claims that the underwriting process takes 48 to 72 hours and includes, among other things, an on-site inspection of each merchant before approving any Loan.[252]  According to the marketing materials, "There is no substitute for personal on-site merchant inspections," and "Visual confirmation of a business' viability yields the highest levels of confidence in the future viability of merchant partners."[253]  Par Funding emphasizes that the on-site inspection "…has been proven to enhance the low default Par Funding experience[s]."[254]

Furman touts the rigorous underwriting,[255] and Abbonizio also touts Par Funding's underwriting process to potential investors, both during one-on-one meetings with potential investors[256] and during solicitation events.[257]  For example, at the November 2019 solicitation dinner Vagnozzi and ABFP hosted, Abbonizio told potential investors that Par Funding has "rigorous standards" and "the best underwriting in the industry."[258] He also touted the underwriting at the January 2019 solicitation dinner in West Palm Beach.[259]  In August, 2019, Abbonizio told about a dozen potential investors in The Villages that Par Funding does an on-site inspection of small businesses 100% of the time before approving any Loan.[260]

---

[250] **Exhibit 136**, at 40:23-41:1.
[251]   **Exhibit 25**, at Exh. E thereto (pages 9 & 11 in brochure); **Exhibit 103**, at ¶ 5 & Exh. C thereto (pages 9 & 11; pdf pp. 16 and 18 of 24 in Exhibit 103).
[252] *Id.*
[253] *Id.* at p. 11.
[254] *Id.*
[255] **Exhibit 62**, at ¶ 6; **Exhibit 25**, at ¶ 7; **Exhibit 102**, at ¶ 6.
[256]   **Exhibit 136**, at 40:23-41:1.
[257]   **Exhibit 103,** at ¶ 6.
[258]   **Exhibit 20,** at 51.
[259]   **Exhibit 25,** at
[260]   **Exhibit 101**, at ¶ 12.

Similarly, in January 2020, Abbonizio told an undercover individual posing as an investor that Par Funding requires three days to complete an underwriting process on a Loan application because Par Funding conducts what he referred to as "the coup de grace" – a personal onsite inspection. He conveyed to her that because of this vigilant process, he felt confident telling her to invest her money in Par Funding.[261]

The representations about Par Funding's underwriting process are false. In truth, Par Funding does not conduct the rigorous underwriting process it claims it does.[262] In reality, Par Funding does not always conduct on-site inspections of small businesses prior to funding Loans, and approves Loans in less than 48 hours.[263] When Par Funding does conduct an on-site inspection, it sometimes does so after Par Funding has already approved and funded the Loan. For example, Par Funding executed a Loan agreement funded a Loan to a Texas small business on January 4, 2017 and that same day ordered the inspection to occur on January 5, 2017.[264] Further, at least one small business owner's experience was that the only time Par Funding visited his business, it was to threaten him with violence for missing payments.[265]

Contrary to the rigorous underwriting process Par Funding touts to investors, Par Funding approves and funds Loans to small businesses without obtaining information about the merchant's profit margins, expenses, or debts.[266] Even Par Funding's representation to potential investors that it assigns a liaison to each merchant to cultivate the relationship is false.[267] Recently, LaForte

---

[261] **Exhibit 136**, at 37:23-41:1.

[262] **Exhibit 98**, at ¶¶ 2 & 4.

[263] *Id.*; **Exhibit 91** at ¶¶ 2-6; **Exhibit 92** at ¶¶ 2-5; **Exhibit 93** at ¶¶ 2-5 & 7; **Exhibit 94** at ¶¶ 2-5 & 7; **Exhibit 95** at 2-4 & 6; **Exhibit 97** at 2-4 & 7; **Exhibit 100** at ¶¶ 2-5; **Exhibit 102** at ¶ 6; **Exhibit 105** at 2-4 & 6.

[264] **Exhibit 111**, January 5 Inspection report, showing date ordered: January 4; *Fleetwood v. Complete Business Solutions Group*, 18-cv-00268 (E.D. Pa.), at D.E. 1-12 ("On January 4, 2017 CBSG entered into a Factoring Agreement with Plaintiff Fleetwood Services, LLC….").

[265] **Exhibit 85**, at ¶ 7.

[266] **Exhibit 91** at ¶¶ 2-4 and 9-12; **Exhibit 92** at ¶¶ 2-4 and 7-10; **Exhibit 95** at ¶¶ 2-4 and 8; **Exhibit 97** at ¶¶ 2-4 & 9;  2-4 and **Exhibit 99** at ¶¶ 9-10; **Exhibit 100** at ¶¶ 2-4 and 8-11; **Exhibit 102** at ¶¶ 2-4 and 7-9; **Exhibit 105** at ¶¶ 2-3 & 8; **Exhibit 106** at ¶¶ 2-4 and 8-10.

[267] **Exhibit 92** at ¶ 11; **Exhibit 93** at ¶ 11; **Exhibit 94** at ¶ 11; **Exhibit 95** at ¶ 9; **Exhibit 99** at ¶ 11; **Exhibit 102** at ¶ 10; **Exhibit 105** at ¶ 9.

admitted that Par Funding has "probably a hundred anchor clients, meaning guys who I don't even have to underwrite really."  As LaForte explained these anchor clients: "They call my phone - - like, 'Yeah, send me a hundred.' And I just send a hundred."[268]  Clearly, the truth was concealed form investors.[269]

### 2. False and Misleading Claims about Par Funding's Loan Default Rate

LaForte, Abbonizio and Vagnozzi make false claims to prospective investors that Par Funding has a 1% loan default rate.   For example, on about June 5, 2018 LaForte met with a potential investor and pitched the Par Funding investment to her.[270] He told her that Par Funding's Loan default rate was less than 1%, and so there was virtually no risk to investment funds.[271]

As set forth above, Abbonizio made numerous representations to investors about Par Funding's Loan default rate of 1%.  Further, on January 7, 2020, Abbonizio told an undercover individual posing as a potential investor that Par Funding issues bad loans 1 percent of the time.[272] He explained that the defaults are "one percent of $500 million."[273]  Similarly, at a dinner for investors and potential investors on November 21, 2019, Abbonizio presented the investment. He told more 300 investors at this event that the 10% to 14% investment returns were "enticing," but it is only enticing if Par Funding does a good job at loaning money to borrowers.  He emphasized that Par Funding has "the best underwriting in the industry" that has "rigorous operational standards, almost seven years in the making."  Because of this, Abbonizio explained, they have a default rate that is "less than 1 percent."[274]  He also explained to the investors why this is so important – because if enough of the borrowers miss their payments to Par Funding, that could impede Par Funding's ability to pay Vagnozzi's fund to ultimately pay you."[275]

---

[268]  **Exhibit 129**, at 299:24-300:8.
[269]  **Exhibit 25** at ¶ 49; **Exhibit 62** at ¶ 18; **Exhibit 103** at ¶ 15.
[270]  **Exhibit 18 at ¶¶** 9-16.
[271]  *Id.* at ¶¶ 13, 14 & 16.
[272]  **Exhibit 136** at 28:3-29:5.
[273]  *Id.* at 47:21-23.
[274]  **Exhibit 20**, Transcript attached to Horner Declaration as Exh. A, at 51:5-52:19.
[275]  *Id.* at 52:2-4.

At this same dinner for 300 potential investors, Vagnozzi, through ABFP, also touted Par Funding's low default rate, giving potential investors an ABFP flyer describing the Par Funding "merchant cash advance" investment opportunity as having a 2% default rate.[276]   Similarly, Furman and United Fidelis tout on United Fidelis's website a 1.2% default rate for the Loan investment they offer, and, as set forth above Furman also tells investors Par Funding has a 1 % default rate during in-person meetings and solicitation events.[277]

These representations are false and misleading.  In reality, Par Funding has filed more than 2,000 collections lawsuits against small business borrowers for defaulting on Loans since 2013 alone.[278]  Par Funding claims to have funded $600 million in Loans.[279]  It has filed lawsuits seeking more than $300 million in defaulted Loan payments small businesses allegedly failed to repay Par Funding.[280]

In Fall 2017, Furman gave a Florida investor a Par Funding brochure claiming that Par Funding had provided "more than $220 million in business funding" since its inception in 2012 and told the investor Par Funding had a 1% default rate and was a safe and secure investment.[281]  However, by August 1, 2017, Par Funding had filed at least 241 lawsuits against small businesses for defaulting on their Loans, seeking more than $20 million in missed Loan payments – and that was only in the Pennsylvania Court of Pleas.[282]  Similarly, when Abbonizio and Vagnozzi touted Par Funding's low default rates to potential investors during an ABFP solicitation dinner on November 21, 2019, Par Funding had filed more than 1,000 lawsuits in Pennsylvania alone, seeking more than $147 million in missed Loan payments from small businesses.[283]  LaForte and

---

[276] **Exhibit 20**, Horner Declaration, at ¶¶ 3-4 and Exh. B & C thereto (pdf pp. 80-82).
[277] **Exhibit 25 at ¶¶ 2-11; Exhibit 103**, at ¶¶ 6 & 8.
[278] **Exhibit 74** at ¶ 5 (Pennsylvania, New York, and a Southern District of Florida lawsuit); **Exhibit 73** at ¶ 7(a) (Pennsylvania lawsuits).
[279] **Exhibit 43**, Par Funding Website, at pdf p.19 of 31 ("Our growth, at a glance"); **Exhibit 103**, at ¶ 5 and Exh. C thereto (on pdf p. 13 of 24 of Exhibit 103).
[280] **Exhibit 74** at ¶ 6 (total from various jurisdictions); **Exhibit 75** at ¶ 7(b) (Pennsylvania lawsuits).
[281] **Exhibit 25**, at ¶¶ 3-8 and Exh. A thereto, p.2.
[282] **Exhibit 73** at ¶ 7(c).
[283] *Id.* at ¶ 7(f).

Cole, Par Funding's CFO, was present when these representations were made to potential investors on November 21, 2019, and did not correct these false and misleading statements.[284]   When Abbonizio touted Par Funding's low default rates to an individual posing as a potential investor in January 2020, Par Funding had filed more than 1,200 lawsuits in Pennsylvania seeking more than 159 million in missed payments on defaulted Loans.[285]

Additionally, CFO Cole recently admitted that Par Funding calculates the default rate differently in its representations to investors by not including in the rate any Loan where the merchant is making even a partial payment or is speaking with Par Funding about the Loan.[286] Cole testified that if a merchant stops making payments on a $12 million Loan with Par Funding, that small business would not be disclosed in the default rate given to investors if it made even a $100, $200, or $500 monthly payment.[287]   For one small business that stopped making payments on a Loan to Par Funding in May 2019, Par Funding considered her in "legal default" and filed a Confession of Judgment against it, but did not include this default in the rate provided to investors until February 2020.[288]   For another small business borrower that Par Funding has sued for being in default on a $1.3 million Loan, Par Funding asked the small business owner in July 2020 to make a $500 payment over the phone, explaining that if the small business owner did this Par Funding would convert the negative $1.3 million to a positive $1.3 on the portfolio investors see.[289]

As is evidence in the recordings of the Defendants' sales pitches, they do not tell investors that Par Funding does not include all Loans that are in default in its so-called default rate.  Nor is there any disclosure of the more than 2,000 lawsuits Par Funding has litigated seeking more than $300 million in alleged missed Loan payments on the $600 million Par Funding tells investors it has Loaned to small business.

---

[284] **Exhibit 20**.
[285] *Id.* at 7(g).
[286] **Exhibit 3**, June 2020 Deposition, at 113:22-130:9.
[287] *Id.* at 116:15-117:1.
[288] *Id.* at 121:15-129:20.
[289] **Exhibit 130** at 14:12-15:8**.**

### 3. False Claims that Par Funding Offers Insurance on Its Loans

In the Par Funding brochure Par Funding distributes to potential investors through the Agent Funds, Par Funding claims to offer insurance on all of its products up to $150,000.[290]  Par Funding further claims that "[t]he insurance protects Par Funding in case of a default or non-payment."[291]  Furman also tells potential investors the Loans are insured and therefore protected in the event of default.[292]  LaForte has also represented to at least one investor that if a small business defaulted on a Loan, Par Funding had insurance to back up investor funds, thus reassuring the investor that her investment was safe and secure.[293]

These claims are false.  Par Funding did not offer small businesses insurance on the Loans, and thus investor funds were not protected by insurance.[294]  For example, during the more than two-year period spanning November 2015 through January 2018, Par Funding approved and funded 15 Loans to a small business located in Los Angeles, California (the "L.A. Small Business").[295]  The Loans totaled $6,126,054.13. At no time, on any of the 15 Loans approved over the course of these two years did Par Funding offer the L.A. Small Business insurance of any kind. On each of the 15 occasions when Par Funding approved and funded a Loan to the L.A. Small Business, Par Funding completed the underwriting in less than 48 hours, never offered the L.A. Small Business insurance of any kind, never conducted an in-person interview before giving the L.A. Small Business the Loans, never requested information about the L.A. Small Business's expenses, and never requested information about the L.A. Business's profit margins.

In sum, the representations to investors about the safety of the investment, through insurance and a rigorous underwriting process, are patently false.[296]

---

[290]  **Exhibit 25** at ¶¶ 28 & 50 and Exh. E thereto (pg.8 in brochure); **Exhibit 103**, at Exh. C thereto (p. 8 in brochure, pg.15 of 24 of the pdf).
[291]  *Id*.
[292]  **Exhibit 103**, at ¶ 6.
[293]  **Exhibit 18**, at ¶ 14.
[294]  **Exhibit 91** at ¶ 7; **Exhibit 92** at ¶ 6; **Exhibit 95** at ¶ 5; **Exhibit 97** at ¶ 5;  **Exhibit 99** at ¶ 6; **Exhibit 100** at ¶ 6; **Exhibit 102** at ¶ 5; **Exhibit 105** at ¶ 5; **Exhibit 106** at ¶ 6.
[295]  **Exhibit 106**.
[296]  **Exhibit 25**, at ¶¶ 49-50; **Exhibit 101**, at ¶ 24; **Exhibit 103**, at ¶¶ 15-16.

### 4.   Misrepresentations and Omissions about LaForte's Background

LaForte touts his financial and business acumen and his success through Par Funding, but fails to disclose his criminal history.[297] Similarly, the Par Funding website includes numerous articles featuring LaForte and his claimed business success, and directs readers to LaForte's "Forbes Council" profile, in which he describes himself as "…one of the small business industry's most distinguished and accomplished leaders."[298]  LaForte also holds himself out on his Linked In page as "one of the small business finance industry's most distinguished and accomplished leaders" and claims that he "maintains a stellar reputation amongst industry professionals, clients, and company employees."[299]

In truth, LaForte is a twice-convicted felon and prior to founding Par Funding with McElhone, was imprisoned and ordered to pay $14.1 million in restitution for grand larceny and money laundering.[300]  To conceal these facts, LaForte uses several aliases – Joe Mack, Joe Macki, and Joe McElhone because, as LaForte admitted to at least one individual, if people "google" his real name they will see his negative history.[301]  Par Funding and Cole actively assist LaForte in concealing his true identity, and thus his criminal background, by providing LaForte with a Par Funding email address bearing the name of his alias, joemack@parfunding.com,[302] and a Par Funding business card for his alias Joe Macki.[303]

Additionally, Cole has solicited at least one investor by touting the experience of Par Funding's management team while failing to disclose LaForte's criminal history,[304] despite knowing "from the first day" that LaForte has been convicted of crimes involving dishonesty.[305] Abbonizio also touts the Par Funding management and conceals LaForte's identity and criminal

---

[297] **Exhibit 18**, at ¶ 3; **Exhibit 20** at 56:2-62:15; 53:16-
[298] **Exhibits 83** & **84**.
[299] **Exhibit 81**.
[300] **Exhibits 31** & **33-35**.
[301] **Exhibit 19**, Declaration of Michael Foti.
[302] **Exhibit 19** at Exh. A thereto; **Exhibit 18**, at ¶¶ 2-3; **Exhibit 3**, at 318:6-16.
[303] **Exhibit 19** at Exh. A.
[304] **Exhibit 96**, at ¶¶ 3-6 & 10.
[305] **Exhibit 4**, Cole Deposition, at 41:18-43:18.

history from investors.  For example, at the November 2019 solicitation dinner, he introduced LaForte to the 300 potential investors and investors in attendance by telling them, "You're going to hear from the president of our company in a few moments, the gentleman that does the best job in multi-faceted businesses of exuding operational excellence."[306]  Likewise, at a Retirement Evolution solicitation with Gissas, Abbonizio touted Par Funding's managerial expertise and "great team" Par Funding had in place, but he failed to disclose the criminal record of Par Funding's *de facto* CEO.[307]  He did the same thing at a solicitation even for Fidelis Financial with Furman.[308]  Additionally, when an individual posing as an investor asked Abbonizio who the founders of Par Funding are, Abbonizio responded: "There's basically five of us. There's myself, Joe Cole, who is the CFO, Joel McElhone, and Lisa McElhone… and Lisa is the President of the company."[309]  He then went on to identify the fifth founder – "a family out of Manhattan.  They have $48 million with us."[310]  Joe or Joel McElhone is yet another alias used to conceal LaForte's identify from investors.  Furman and Vagnozzi also tout Par Funding's management expertise and experience to potential investors while failing to disclose LaForte and his criminal history.[311]

In its 2019 and 2020 Form D Filings with the Commission, Par Funding failed to identify LaForte in the Item 3 of the form requiring the disclosure of "Related Persons."[312]  The instructions accompanying Form D direct filers to provide the following information under "Related Persons":

> Enter the full name and address of each person having the specified relationships with any issuer and identify each relationship:
>
> • Each executive officer and director of the issuer and person performing similar functions (title alone is not determinative) for the issuer, such as the general and managing partners of partnerships and managing members of limited liability companies; and

---

[306] **Exhibit 20**, at 52:5-8.
[307] **Exhibit 101, at ¶¶** 10-11, 14 & 27;
[308] **Exhibit 25**, at ¶¶ 20-21, 25, 55.
[309] **Exhibit 136**, at 43:22-44:1.
[310] *Id.* at 44:16-22.
[311] **Exhibit 25**, at ¶¶ 6, 14; **Exhibit 104**, at ¶ 5.
[312] **Exhibits 11** & **75**.

• Each person who has functioned directly or indirectly as a promoter of the issuer within the past five years of the later of the first sale of securities or the date upon which the Form D filing was required to be made.

If necessary to prevent the information supplied from being misleading, also provide a clarification in the space provided.[313]

As set forth above, LaForte is identified controls Par Funding, runs the day-to-day operations, and functions as an executive officer of Par Funding.  Nonetheless, Par Funding fails to disclose LaForte's involvement in its filings with the Commission and also during its solicitation of investors.[314]

### 5.  Misrepresentations and Omissions about Par Funding's Regulatory History

LaForte touts to prospective investors Par Funding's success.  For example, in November 2019, LaForte told about 300 potential investors that Par Funding is "probably the most profitable cash advance company in the United States - - or maybe the world for that matter, pound for pound."[315]  Abbonizio solicits investors by touting Par Funding's success and its track record as a leader in the merchant cash industry,[316] and Furman touts Par Funding as well.[317]  Gissas advertises the Par Funding investment events by touting "the top company in the merchant cash sector."[318]

Similarly, Vagnozzi touts Par Funding's purported success. For example, in a 6-minute video, Vagnozzi tells potential investors he would like to introduce them to "one of the best merchant cash advance lenders that you can find" and characterizes it as "highly profitable."[319]  The video is widely distributed; it is posted on the Vimeo pages of ABFP and Vagnozzi, emailed to potential investors, and shown during sales pitches.[320]  In March 2020, Vagnozzi described the investment in Par Funding to an individual posing as a potential investor

---

[313]  **Exhibit 112**, Form D with instructions.
[314]  **Exhibit 25**, at ¶ 55; **Exhibit 62**, at ¶ 21; **Exhibit 101**, at ¶ 27; **Exhibit 103**, at ¶ 19; **Exhibit 104**, at ¶ 25; **Exhibit 109**, at ¶ 32; **Exhibit 96**, at ¶ 10.
[315]  **Exhibit 20**, at ¶¶ 3 & 4 and Exh. C thereto at 58:6-9.
[316]  **Exhibit 101,** at ¶¶ 10 & 13;
[317]  **Exhibit 103**, at ¶ 6;
[318]  **Exhibit 101**, at ¶¶ 2-8 and Exh. A thereto.
[319]  **Exhibit 143**, at 5:11-20.
[320]  **Exhibit 150**; **Exhibit 128; Exhibit 25** at Exh. B thereto (Vimeo Link at bottom of page).

as "like the crack-cocaine" of investments ABFP offers, adding "[a] check every month."[321]  On the ABFP website, Vagnozzi assures potential investors that he has attorneys, accountants, and operations staff thoroughly vet any and all opportunities ABFP offers.[322]

These Defendants tout Par Funding while failing to disclose that Par Funding has twice been sanctioned for violating state securities laws.  In November 2018, the Pennsylvania Securities Regulators filed a Consent Agreement and Order against Par Funding for violating the Pennsylvania Security Law prohibiting the use of unregistered sales agents in the offer and sale of securities, and fined Par Funding $499,000 (the "Pennsylvania Order").[323]  In December 2018, the New Jersey Bureau of Securities issued a Cease-and-Desist Order against Par Funding based on its offer and sale of unregistered securities (the "New Jersey Order").[324]  Both of these Orders were in effect when the Defendants touted Par Funding as an investment opportunity to potential investors, and both Orders remain in effect.  However, Par Funding, LaForte, Abbonizio, and Vagnozzi have failed to disclose these Orders while touting Par Funding.[325]

In February 2020, the Texas State Securities Board issued an Emergency Cease-and-Desist Order against Par Funding and others, alleging fraud and registration violations in connection with its securities offering through an Agent Fund in Texas (the "Texas Order").[326]  Undeterred, and as set forth above, Par Funding has continued soliciting investors and continued touting the success of Par Funding as recently as July 2020 without disclosing the Texas Order to potential investors.

### 6.  Misrepresentations about the New Jersey Order

Furman has misrepresented the New Jersey Order to at least one potential investor while soliciting her for the Par Funding investment through Fidelis.  For example, during a March 5,

---

[321] **Exhibit 135**, at 31:5-7.
[322]  **Exhibit 46**, at pdf page 19 ("What's the Catch?," last full paragraph on page cited).
[323] **Exhibit 8**.
[324] **Exhibit 9**.
[325]  **Exhibit 25**, at ¶¶ 42-43; **Exhibit 62**, at ¶ 15; **Exhibit 101**, at ¶ 22; **Exhibit 103**, at ¶ 12; **Exhibit 104**, at ¶ 18; **Exhibit 109**, at ¶ 24.
[326] **Exhibit 37**.

2020, with an individual posing as an investor, Furman represented that Pennsylvania sanctioned Par Funding, but then New Jersey determined that Par Funding had not violated the securities laws:

> New Jersey came in and fined them and then they said you're doing it right, and all of your books are good and we love it. We went through them, you know, and they retracted it and said you're good. We're not -- you know, you don't have any fine, you don't have any penalties, nothing.[327]

This is patently false.  In fact, the New Jersey Order remains in effect.[328]

### 7.  False Statements In Par Funding's Commission Filings About McElhone and Cole's Receipt of Funds

Par Funding has filed two false filings with the Commission. concerning its Par Funding Note offering and how investor funds would be used.  On February 12, 2019, Par Funding filed a Notice of Exempt Offering of Securities on Form D with the Commission, stating that it was a new notice for an offering of debt securities in reliance on the exemption under Rule 506(b) and that the first sale was on August 1, 2012.[329]  The filing discloses approximately $3.6 million Par Funding has paid in finders' fees, including to ABFP and Vagnozzi, and a total amount sold of approximately $227 million to 488 investors.[330]  In the Use of Proceeds section, the filing states that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or others listed in the filing's section for related persons, in which McElhone and Cole are listed as executive officers and directors.[331]

On April 28, 2020, Par Funding filed an amended Form D with the Commission with respect to the offering that began August 1, 2012, disclosing the total amount sold to the 488 investors was higher than it initially reported in 2019 - $378 million.[332]  This filing states that Par Funding has paid no finders' fees and commissions, and again states that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or

---

[327] **Exhibit 133**, at 17:19-18:22.
[328] **Exhibit 9**.
[329] **Exhibit 75**.
[330] *Id.*
[331] *Id.*
[332] **Exhibit 11**.

others listed in the filing's related persons section, which again includes McElhone and Cole.[333]
Cole signed the Amended Form D on behalf of Par Funding.[334]

The representations in both filings that Cole and McElhone would not receive any of the
gross proceeds of the securities offering are false.  McElhone received at least $11.3 million from
the offering between July 2015 and February 2020, which included investor funds.[335]  From July
2019 until October 2019, Cole has received at least $ 1,759,136.42 from Par Funding through
payments, which included investor funds, to his company ALB Management Inc.[336]  An additional
amount of about $14.4 million was transferred from Par Funding to Beta Abigail and New Field
Ventures, LLC, companies in which Cole has an ownership or other beneficial interest, between
July 2016 and November 2019.[337]  As set forth above, in a recent recorded conversation with an
individual posing as an investor, Cole admitted that Par Funding pays him through his consulting
firms and that the amounts are reflected in the "consulting" line on the Par Funding financial
statements.[338]

Thus, contrary to Cole and Par Funding's representations to the Commission, Par Funding
did pay McElhone and Cole.

### 8.  False Claims about LaForte's Personal Investment in Par Funding

LaForte falsely told prospective investors that he personally invested in Par Funding.  For
example, at the November 2019 solicitation dinner for ABFP, LaForte told about 300 investors
and potential investors that he had invested $500,000 of his own money in Par Funding to start
company.[339]  LaForte also claimed in an October 19, 2018 email to an existing investor inquiring

---

[333] *Id.*

[334] *Id.*

[335] **Exhibit 13** at ¶ 12.

[336] **Exhibit 13** at ¶ 13; **Exhibit 132**, Transcript of UC Undercover Meeting, at 123:4-15.

[337]  **Exhibit 13** at ¶¶ 14-15; **Exhibit 131**, Par Funding Audited Financial Statements, at pdf page
20 ("Beta Abigail and New Field Ventures, LLC, Inc. are owned in part by the Company's Chief
Financial Officer and Director of Investor Relations.").

[338] *See supra,* n. 49 & 50.

[339] **Exhibit 20**, at 60:12-13.

about her father investing, "… I would recommend he come to Par.  I have 80 million in the company myself.  So his money would be side by side w [sic] mine."[340]

LaForte's claims that he has invested money are false.  Not only did LaForte not invest his own money to start Par Funding,[341] but also he has in fact never invested in Par Funding.[342]

### 9.   Misrepresentations and Omissions about Vagnozzi's Regulatory History

While soliciting investors for the Par Funding investment through ABFP, Vagnozzi touts his financial and business acumen and his success through ABFP, but fails to disclose his regulatory history.  For example, at the November 2019 solicitation dinner, Vagnozzi touted his "proven track record," how investors have never missed a payment, and how well ABPF does for its investors.[343]  At this same dinner, Vagnozzi told the 300 investors and potential investors: "What I'm doing is legal, but most financial advisors don't have a set of you-know-what's to drop that license so they can do what I'm doing."[344]

In truth, just months before making this representation to potential investors, the Pennsylvania Securities Regulators sanctioned Vagnozzi for violating state securities laws.[345]

Vagnozzi has testified under oath that ABFP is his alter ego.[346] However, while playing up his supposed investment success with ABFP, including success through the Par Funding investment, Vagnozzi fails to disclose to investors the fact that he settled a regulatory action with the state of Pennsylvania in May 2019 ordering him to pay a $490,000 fine based on his sales of the Par Funding investment in violation of state law.[347]

Understanding that investors would want to know of unlawful activity when deciding with whom to invest, Vagnozzi publishes an article on the ABFP website addressing the issue head-on.

---

[340] **Exhibit 18**, DePietro Declaration at ¶¶ 3 & 18and Exh. C thereto (pdf pages 22-23 of 25).
[341] **Exhibit 17**, LaForte Deposition, at 36:24—37:2.
[342] **Exhibit 3**, Deposition of Par Funding Corporate Designee Cole, at 166:22-167:13-67; 313:8-316:13 (testifying that the representations appearing in the October 19, 2018 email are false).
[343] **Exhibit 20**, at 18:6-10.
[344] *Id.* as 23:17-20.
[345] **Exhibit 57**.
[346] **Exhibit 40**, 2018 Vagnozzi Deposition, at 56:7-24.
[347] **Exhibit 20**, November 2019 Transcript; **Exhibit 57**;

And lying about it.  Specifically, on the ABFP website, Vagnozzi has an article published entitled "What's the Catch? By Dean Vagnozzi." In it, he tells potential investors:

> I know that potential clients will inevitably wonder, "what's the catch?" Is Dean Vagnozzi a scam artist? Is A Better Financial Plan 1346 a fraud? Of course they would be skeptical! And so would I! So let me save you a lot of time. There is no catch.

> So stop looking for one. Stop googling, stop searching to see if Dean Vagnozzi is a scam, stop looking on the Better Business Bureau's website to see if A Better Financial Plan 1346 is a fraud. I have never had a criminal record in my life and I am very confident that there never will be.

> In fact, to the best of my knowledge, *the only law that I think I ever broke* was a speeding ticket that I received on the New Jersey Turnpike back when I was in my early 20's. That is about the only misdemeanor that I have ever been a part of. (Jeez, I sound like a lot of fun, don't I?)[348]

Vagnozzi concludes his article by further assuring potential investors, "I can assure you that my record is squeaky clean."[349]

In truth, not only was Vagnozzi sanctioned by the Pennsylvania Securities Regulators for violating the state securities laws in 2019; but also in February 2020 the Texas Securities Regulators entered an Emergency Cease and Desist Order against Vagnozzi's alter ego ABFP for, engaging in fraudulent conduct in connection with the Par Funding offering.[350]

Even after the Commission filed a Consent Order against Vagnozzi for his violations of the federal securities laws on July 14, 2020, Vagnozzi continues to publish the "What's the Catch?" article, "What's the Catch?" on the ABFP website.[351]  Further, as recently as July 23, 2020, the ABFP website homepage includes a photo of Vagnozzi standing with individuals with the caption "A Team You Can Trust."[352] This caption includes a hyperlink that takes the reader to a page that reads "About Dean Vagnozzi," which details Vagnozzi's successes and career path.[353]

---

[348]  **Exhibit 46**, at pdf pp 17 of 26 (emphasis added).
[349]  *Id.* at p. 20 of 26.
[350]  **Exhibit 37**.
[351]  *Id.*, Declaration of July 22, 2020 web capture; **Exhibit 160.**
[352]  **Exhibit 46** at pdf pp. 2-3 of 26.
[353]  *Id.* at pdf. pp. 4-11 of 26.

Notably missing is any mention of Vagnozzi's regulatory history and the Orders entered against him for violating Pennsylvania and Texas state securities laws in connection with the offer and sale of Par Funding securities, and violating federal securities laws in connection with the offer and sale of four other securities offerings.

### 10.  Misrepresentations and Omissions about ABFPs Regulatory History

ABFP's website homepage, www.abetterfinancialplan.com, features a representations that ABFP delivers 10-14% annual returns or better using investments "put together with one of Philadelphia's largest law firms."[354]  The website also re-publishes purported testimonials from investors touting ABFP, and Vagnozzi reassures investors that ABFP is not a fraud, that the investment with ABFP is safe, and that even his own parents have invested through ABFP.[355]  The website goes on to tell investors:

> With the help of Dean Vagnozzi'sattorney, John Pauciulo, and one of the largest law firms in the Philadelphia region, clients at ABFP are able to "invest like the big boys" by pooling their money together and creating **Private Placement Memorandums**, which then allows clients to invest in opportunities that they otherwise may not have access to. Each asset class comes with the Vagnozzi enforcement that the investment must be safe, liquid, and less volatile than anything put together by Wall Street.[356]

While touting the safety and success of ABFP, and that its investments are put together with "one of Philadelphia's largest law firms,' ABFP fails to disclose that the Texas Securities Regulators entered an Emergency Cease-and-Desist against ABFP in February 2020.  These representations on the website remain posted even after the Commission's July 14, 2020 Cease-and-Desist Order.

Additionally, in the Exchange Offering materials provided to investors in April 2020, ABFP disclosed as an investment risk the existence of lawsuits filed by small businesses based on Loan disputes.[357]  However, there is no disclosure of the existence of the case against ABFP, Par

---

[354]  *Id.* at pdf. P. 12 & 24-25 of 26.
[355]  *Id.* at pdf. pp. 18-19 of 26.
[356]  *Id.* at pdf p. 24 of 26.
[357]  **Exhibit 109** at ¶¶ 20-21 and Exh. H thereto at pdf pp. 40 of 67 (last full paragraph).

Funding, and Abbonizio in Texas. Nor is there is any disclosure of the Emergency Cease-and-Desist Order the Texas Regulators entered months before the Exchange Offering based on findings that ABFP, Par Funding, and Abbonizio made fraudulent and material misrepresentations and omissions to investors in connection with the Par Funding and Agent Fund offering, or that the fact that the action filed by the Texas Regulators was – and is – ongoing.

### 11. Misrepresentations and Omissions about Abbonizio's Regulatory History

Similarly, when ABFP and Par Funding offered the Exchange Offering in April 2020, the Texas Securities Regulators had issued the Emergency Cease-and-Desist Order against Par Funding and Abbonizio.[358] ABFP and Vagnozzi were aware of that Order, as ABFP is also a party to the Texas Action.[359] When offering the Exchange Notes, ABFP and Vagnozzi reassured investors about Par Funding's ability to rebound and recommence payments if investors accepted the Exchange Notes and touted the hardworking employees at Par Funding.[360] Par Funding's website continued advertising its purported "strong, dedicated team," which continues to this day.[361] At the time of Exchange Note offering, Abbonizio was a partial owner and manager of Par Funding who had solicited investors to make their initial investments in Par Funding through the Agent Funds, and Abbonizio continues his role at Par Funding today.

However, at no time did ABFP, Vagnozzi, or anyone at Par Funding disclose to investors that just months before the offering began, the Texas Securities Regulators issued an Emergency Cease-and-Desist Order against Abbonizio and Par Funding for, among other things, engaging in fraud in connection with the Par Funding offerings and Agent Fund solicitations.[362]

Instead, the Defendants chose to conceal the negative information from investors.

---

[358] **Exhibit 37**.
[359] *Id.*
[360] **Exhibit 109** at Exh. D thereto (pdf pp. 4-5).
[361] **Exhibit 43** at pdf pp. 18-19.
[362] *See*, *e.g.*, **Exhibit 25**, at ¶ 42.

## VI.  MEMORANDUM OF LAW

### A.  Standard for Obtaining a Temporary Restraining Order

Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t, and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d), provide that in Commission actions the Court shall grant injunctive relief upon a proper showing.[363]   This "proper showing" has been described as "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved."[364]

The Commission is entitled to a temporary restraining order if it establishes (1) a *prima facie* case showing the Defendants have violated the securities laws, and (2) a reasonable likelihood they will repeat the wrong.[365]

The Commission appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws."[366]   The Commission therefore faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements for an injunction imposed by traditional equity jurisprudence.[367]   Unlike private litigants, the Commission need not demonstrate irreparable harm or the unavailability of an adequate remedy at law.[368]   Nor is it required to show a balance of equities in its favor.[369]

---

[363] *SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2nd Cir. 1990); *SEC v. Lybrand*, No. 00 Civ.1387, 2000 WL 913894 *1, *9 (S.D.N.Y. July 6, 2000); *SEC v. Unique Fin. Concepts, Inc.*, 119 F. Supp. 2d 1332, 1338 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999).

[364] *SEC v. Gen. Refractories Co.*, 400 F. Supp. 1248, 1254 (D.D.C. 1975).

[365] *Unique Financial*, 119 F. Supp. 2d at 1338; *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2nd Cir. 1975).

[366] *Management Dynamics*, 515 F.2d at 808.

[367] *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944); accord *SEC v. International Loan Network, Inc.*, 770 F. Supp. 678, 688 (D.D.C. 1991), *aff'd*, 968 F.2d 1304 (D.C. Cir. 1992).

[368] *Unique Financial*, 119 F. Supp. 2d at 1338; *Lybrand*, 2000 WL 913894 at *9.

[369] *Unifund SAL*, 910 F.2d at 1036; *SEC v. Musella*, 578 F. Supp. 425, 434 (S.D.N.Y. 1984).

The Commission's evidence in this case warrants entry of the requested injunctive relief on all applicable grounds. The declarations, account records, and other exhibits attached to this motion demonstrate Hilton, Pacific, Rock Castle I, and Rock Castle II are violating the anti-fraud and registration provisions of the federal securities laws, and will continue to violate them if the Court does not immediately restrain and enjoin them.

**B.  The Commission Has Established *Prima Facie* Violations Of The Securities Laws**

The Commission has met its burden of establishing a *prima facie* showing of violations of the securities laws as alleged in the Complaint.

### 1.  The Offered Investments are Securities

#### a.  The Par Funding, ABFP Funds, Fidelis Financial Fund, and RE Fund Promissory Notes Are Securities

The promissory notes are securities. The Defendants self-identify the notes as securities in their S.E.C. filings. Further, promissory notes are presumed to be securities. Even if the Court found that these particular notes are not securities, they are still securities because they are investment contracts.

#### i.  Defendants Self-Identified The Notes as Securities

Par Funding, ABFP Income Fund, ABFP Income Fund 2, Fidelis Financial Planning, and RE Fund 2 each filed a Form D with the Commission self-identifying that they are offering debt securities (*i.e.,* promissory notes).

#### ii.  The Notes Are Also Securities Under *Reves* and the Family Resemblance Test

According to the Supreme Court in *Reves v. Ernst & Young*, Congress' purpose a "note" is presumed to be a security.[370] There are narrow categories that are plainly not securities (such as consumer financing notes, mortgage notes, and short-term commercial paper), or bears a strong "family resemblance" to those non-security instruments. *Id*. at 65-66; *SEC v. R.G. Reynolds*

---

[370] Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include "any note." Securities Act §2(a)(1); Exchange Act §3(a)(10).

*Enterprises, Inc.,* 952 F.2d 1125 (9th Cir. 1991).   *Reves* established a four-factor family resemblance test to determine whether a note bears a family resemblance to one of the identified instruments:   (1) the motivations of the buyer and seller; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) the existence of a risk-reducing factor such as an alternate regulatory regime.  *See id.* at 66-67.

The first *Reves* factor examines the transaction "to assess the motivations that would prompt a reasonable seller and buyer to enter into it."  *Reves*, 494 U.S. at 56.  The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security).  *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994) (holding that mortgage participations were securities under *Reves*): *Wallenbrock*, 313 F.3d at 538 ("buyers seeking to make a significant profit provided Wallenbrock with cash for its business of buying accounts receivable).   Here investors were clearly motivated to make an investment, the notes were marketed as investments.

The second factor is whether there is "common trading for speculation or investment" which is satisfied when the notes are "offered and sold to a broad segment of the public."  *Reves*, 494 U.S. at 68.  As set forth above, Par Funding claims to have 488 investors who have purchased a Par Funding Note and 1,200 who have invested in Par Funding through an Agent Fund.  Such a widespread distribution to an extremely large number of holders is more typical of a securities offering than of a borrower/lender relationship.  *Wright*, 972 F.2d 350, at *3 (notes sold to 200 investors constituted broad segment).

The next factor the court will analyze is the "reasonable expectations of the investing public" and whether there is a valuable return on an investment, as well as the length and characteristics of the note.  *See*, *e.g., Stoiber v. SEC*, 161 F.3d 745, at 751 (D.C. Cir. 1998) ("Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments.")  The Defendants offered investors high returns in exchange for using investor money to make loans to small businesses.  A reasonable investor

would believe that Notes were investments, particularly since the PPMs and marketing materials identify them as such.

The final factor is whether there are any risk-reducing factors, such as an alternative regulatory scheme. *Reves*, 494 U.S. at 69. Here, there simply is not an alternative regulatory regime or other risk-reducing factors. Accordingly, the notes are securities under *Reves* and thus subject to federal securities regulation.

### iii. The Notes Also Are Investment Contracts

The notes also qualify as investment contracts, and thus are securities for an additional reason. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts." In *SEC v. W.J. Howey Co*., 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract as (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999). The notes clearly involve an "investment of money." The common enterprise element can be established by broad vertical commonality, which requires only a showing that the investors are dependent for their returns upon the expertise or efforts of the investment promoter.[371] *SEC v. ETS Payphone, Inc.,* 300 F.3d 1281, 1284 (11th Cir. 2004), *re-aff'd by SEC v. ETS Payphones, Inc.* 408 F.3d 727, 732 (11th Cir. 2005). Here, investors were entirely dependent on Par Funding's efforts for their returns. Similarly, the third element – an expectation of profits based on the efforts of others – is satisfied here. The investors made passive investments and had no role in selecting or analyzing the underlying small businesses seeking cash advances.[372] The expected profitability of the investments, as well as the promise to pay returns, were derived solely from Par Funding's efforts in its Loan business. Once investors executed the notes, they had no control over how their

---

[371] The Commission does not require vertical or horizontal commonality per se, nor does it view a "common enterprise" as a distinct element of the term "investment contract." *In re Barkate*, 57 S.E.C. 488, 496 n.13 (Apr. 8, 2004) (Commission Opinion).

[372] **Exhibits 55, 59, 61, 113, 162, 165**; **Exhibit 25**, at ¶ 48; **Exhibit 62**, at ¶ 18; **Exhibit 96**, at ¶ 7; **Exhibit 101**, at ¶ 25; **Exhibit 103**, at ¶ 17; **Exhibit 104**, at ¶ 22; **Exhibit 109**, at ¶ 27 .

money would be used.  As such, the notes are investment contracts within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

### b. The Limited Partnership Interests ABFP Offered Are Also Securities

In addition to offering promissory notes, ABFP offered limited partnership interests.  The ABFP Funds self-identified their offerings as debt or equity securities in their Forms D filed with the Commission.  The ABFP limited partnership interests are also investment contracts under *Howey* for the reasons discussed above with respect to the notes.

### 2. All Defendants Are Violating Sections 5(a) and (c) of the Securities Act

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect.  Similarly, Section 5(c) prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed.  To establish a *prima facie* case under these provisions, the Commission must prove that: (a) no registration statement was in effect or had been filed as to the offering; (b) the defendants, directly or indirectly, sold or offered to sell the securities; and (c) the offer or sale was made through use of the interstate facilities or the mails.[373]  Once the Commission establishes a *prima facie* case for a violation, it is the Defendants' burden to prove that the securities offering qualified for a registration exemption.[374]  Scienter is not required to establish a violation of Section 5.[375]  Defendants are liable under Section 5 if they were a necessary participant or substantial factor in the illicit sale.[376]

In this case, the Commission can establish a *prima facie* case against all of the Defendants for violations of 5(a) and 5(c) of the Securities Act.   The Defendants are offering securities in the form of notes and partnership interests through interstate commerce, including the Internet, email,

---

[373] *Raiford v. Buslease, Inc.*, 825 F.2d 351, 353-54 (11th Cir. 1987); *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972); *SEC v. Chemical Trust*, No. 00-8015-CIV-Ryskamp, 2000 WL 33231600 at *9 (S.D. Fla. Dec. 19, 2000); *Unique Financial*, 119 F.Supp.2d at 1339.

[374] *See SEC v. Ralston Purina Co.*, 346 U.S. 199, 126 (1953).

[375] *See SEC v. Calvo*, 378 F.3d 1211; 1215 (11th Cir. 2004) ("Scienter is not a consideration.").

[376] *See id.* at 1215 ("To demonstrate that a defendant sold securities, the SEC must prove that the defendant was a "necessary participant" or "substantial factor" in the illicit sale.").

and telephone.  As set forth above, Par Funding used finders to solicit investors nationwide and later used the Agent Firms to continue the solicitation through investment fund offerings, including Fidelis, the ABFP Funds, and the RE Funds.  ABFP, the ABFP Fund, Vagnozzi, United Fidelis, Furman, Fidelis, Retirement Revolution, the RE Funds, and Gissas were necessary participants and substantial factors in the Par Funding offering in that they drew numerous prospective investors in to invest in Fidelis Financial and the RE Funds' for the ultimate purpose of raising money for Par Funding.  LaForte, Cole, Abbonizio, and Vagnozzi participated in seminar presentations soliciting investors and prospective investors for Par Funding and ABFP, and Abbonizio met with individual investors during in-person meetings to solicit them to invest.

ABFP Management was also a necessary participant and substantial factor in the Par Funding and ABFP Funds' offerings in that it controlled and managed the logistics of the money flow from many of the Agent Funds to Par Funding.  ABFP Management facilitated the creation of the PPMs through ABFP's attorney.  Full Spectrum, which has operated Par Funding since 2017, was a necessary participant and substantial factor in the Par Funding and Agent Funds' offerings in that it sent the Par Funding promissory notes to the Agent Funds for execution and coordinated the issuance of the promissory notes.  LaForte, McElhone, Cole and Abbonizio exercised control over Par Funding's business, including raising capital from investors, and over Full Spectrum's business.

No registration statement was in effect or had been filed with the Commission in connection with any of the promissory notes or limited partnership interests.[377]  Thus, the Commission has established a *prima face* case of Section 5 violations.

While the Commission need not demonstrate that no registration exemption applies and it is the Defendant's burden to prove one does, it bears noting that clearly no registration exemption exists here.  Par Funding, the ABFP Funds, and the RE Funds filed a Form D with the Commission claiming an exemption from registration under Rule 506(b) of Regulation D [17 C.F.R. §

---

[377] **Exhibits 50-52**, **54**, **56**, **58**, **64,** 75**, 145** (Filings showing the Funds did not register the offerings but instead claimed they were exempt from doing so).

230.506(b)].[378]   However, this exemption does not apply where there is a general solicitation, including but not limited to the use of "[a]ny advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio;" or "[a]ny seminar or meeting whose attendees have been invited by any general solicitation or general advertising. 17 C.F.R. § 230.502(c).  As set forth above, Par Funding used so-called finders to help solicit investors nationwide.  The Defendants advertised the investments in newspapers, on television and radio, through email messages, and on the Internet.  They held seminars and dinners for potential investors.  In sum, they engaged in precisely the activity that precludes the application of a registration exemption.

### 3. Par Funding, Full Spectrum, ABFP, ABFP Management, McElhone, Cole, LaForte, Abbonizio, Vagnozzi, United Fidelis and Furman Are Violating Securities Act Section And Exchange Act Section 10(b) And Rule 10b-5(b)

Par Funding, Full Spectrum, ABFP, ABFP Management, McElhone, Cole, LaForte, Abbonizio, and Vagnozzi, United Fidelis and Furman are violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.

Section 17(a) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, which proscribe fraudulent conduct in connection with the purchase or sale of securities, prohibit essentially the same type of conduct.[379]

Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, in connection with the purchase or sale or securities, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of any security.[380]   The Commission must also establish scienter and that the

---

[378] *Id.*
[379] *See SEC v. Monterosso*, 756 F.3d 1326, 1333-34 (11th Cir. 2014).
[380] 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

violations were made while using any means or instrumentality of interstate commerce.[381]  For the Commission's case, reliance, damages, and loss causation are not required elements.[382]

Section 17(a) of the Securities Act makes it unlawful to engage in certain conduct "directly or indirectly" in "the offer or sale of securities."[383]  Specifically, Section 17(a)(1) prohibits "employ[ing] any device, scheme, or artifice to defraud; Section 17(a)(2) prohibits "obtain[ing] money or property by means of any untrue statement of a material fact or any [material] omission;" and Section 17(a)(3) prohibits "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."[384].  A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) only require a showing of negligence.[385]

The antifraud provisions also reach beyond misrepresentations or omissions and encompass any wrongdoing by any person that rises to the level of a deceptive practice.[386]  A defendant engages in a fraudulent scheme in violation of the antifraud provisions of the securities laws and violates Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) when he commits any manipulative or deceptive act or acts that are part of a fraudulent or deceptive course of conduct, or are in furtherance of a scheme to defraud.[387]  To state a claim based on conduct violating these provisions, the Commission must establish: (1) the defendant committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter.[388]

---

[381] *SEC v. Corporate Relations Group*, No. 6:99-cv-1222, 2003 WL 25570113 at *7 (M.D. Fla. March 28, 2003).

[382] *SEC v. Morgan Keegan & Co.,* 678 F.3d 1233, 1244 (11th Cir. 2012).

[383] 15 U.S.C. § 77q(a).

[384] 15 U.S.C. § 77q(a)(1)-(3).

[385] *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

[386] *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 10 (1971); *see also In the Matter of Cady, Roberts & Co.,* 40 S.E.C. 907, 913 (1961) (the Commission has held that the subdivisions of Rule 10b-5, as well as Securities Act §17(a), should be considered "mutually supporting").

[387] *SEC v. Huff,* 758 F. Supp. 2d 1288, 1347-48 (S.D. Fla. 2010).

[388] *In re Alstom SA Securities Litigation,* 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005) (citing *In re Global Crossing*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004)).

### a.  The Defendants Are Making Material Misrepresentations and Omissions

As discussed above, the Defendants are making numerous material misrepresentations and omissions to investors.

Par Funding, McElhone, LaForte, Abbonizio, and Cole touted LaForte's management expertise and/or the success of Par Funding, but omitted LaForte's criminal history and Par Funding's regulatory history, which rendered those affirmative statements false and misleading. Relatedly, LaForte authors articles touting his business acumen that are ported on Par Funding's website, but fails to disclose that he is a convicted felon. McElhone, LaForte, Cole, Abbonizio, Vagnozzi, Gissas, and Furman touted the success of Par Funding to potential investors, but omitted Par Funding's regulatory history.  Furman made misrepresentations that the New Jersey Securities Regulators had "retracted" the Cease-and-Desist Order issued against Par Funding. Similarly, Vagnozzi also touted his own success without disclosing his regulatory history.  The omissions about LaForte's criminal background, and Par Funding's and Vagnozzi's regulatory histories made the positive statements misleading.[389]

Abbonizio and LaForte touted the Loan default rate, underwriting process, onsite merchant inspections, and insurance while knowing, or being severely reckless in not knowing, that the actual default rate was much higher than claimed and that Par Funding did not, in fact, conduct the rigorous underwriting process or onsite inspections it claimed it did prior to lending small businesses money through the Loans.  Par Funding made these same representations in its brochure, which it distributed to investors at solicitation events and meetings from at least August 2019 until July 2020, and which it provided to Vagnozzi and other Agent Fund managers for distribution to investors beginning in no later than March 2018.  McElhone, as Par Funding's CEO, and LaForte, as a control person, had control over Par Funding's website, marketing materials and

---

[389] *See, U.S. v. Bachynsky*, 415 F. App'x 167, 172 (11th Cir. 2011) (criminal defendant who "held himself out as both a legitimate businessman and a licensed and qualified medical expert" to solicit new investors in a medical company had a duty to disclose to them "that he had prior convictions and had lost his medical license").

Form D filings, and is responsible for the misrepresentations in those materials, which include that Par Funding offers small businesses insurance on the Loans, conducts on-site inspections prior to approving Loans, has a 1% default rate, and conducts a rigorous underwriting process prior to approving Loans.

As set forth above, McElhone and LaForte as Par Funding's control persons and Cole, as the 2020 filing he signed, falsely represented in the Par Funding Form D filings that Par Funding was not paying money to Par Funding principals and that Par Funding was not paying sales compensation.[390]   As Cole recently testified in private litigation, he is the CFO of Par Funding through his role as CFO of Full Spectrum, which operates Par Funding.   When he made these representations, he was acting in his capacity as CFO of Full Spectrum and of Par Funding, which itself has no employees other than McElhone.   Cole, as Par Funding's CFO, knew or was reckless in not knowing that contrary to the statement in the Form D, Par Funding had paid significant amounts to McElhone and Cole, through his companies.   Specifically, McElhone received at least $11.3 million from the offering between July 2015 and February 2020, which included investor funds.[391]   From July 2019 until October 2019, Cole has received at least $ 1,759,136.42 from Par Funding through payments, which included investor funds, to his company ALB Management Inc.[392]   An additional amount of about $14.4 million was transferred from Par Funding to Beta Abigail and New Field Ventures, LLC, companies in which Cole has an ownership or other beneficial interest, between July 2016 and November 2019.[393]

All of these actions violated Section 17(a)(2) of the Securities Act in that they "obtain[ed] money or property by means of any untrue statement of a material fact or any [material] omission."

---

[390] *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (holding that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it")

[391] **Exhibit 13** at ¶ 12.

[392] **Exhibit 13** at ¶ 13; **Exhibit 132**, Transcript of UC Undercover Meeting, at 123:4-15.

[393] **Exhibit 13** at ¶¶ 14-15; **Exhibit 131**, Par Funding Audited Financial Statements, at pdf page 20 ("Beta Abigail and New Field Ventures, LLC, Inc. are owned in part by the Company's Chief Financial Officer and Director of Investor Relations.").

15 U.S.C. § 77q(a)(2).   The misrepresentations and omissions enabled the Defendants to fraudulently persuade investors to invest in the promissory notes and limited partnership interests. Furthermore, the misstatements and omissions set forth above violated Section 10(b) and Rule 10b-5(b) of the Exchange Act in that they constituted untrue statements or omissions of material fact or material omissions.   Par Funding, Full Spectrum, ABFP, ABFP Management, United Fidelis, Retirement Evolution, McElhone, LaForte, Cole, Abbonizio, Vagnozzi, Furman and Gissas all obtained money through their misrepresentations.[394]

### b. The Misrepresentations and Omissions are Material

A false statement or omission must be material for a defendant to be liable for it. The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."[395]  Put another way, information is material if a reasonable investor would consider it significant to making an investment decision.[396]

"[I]f a [speaker] chooses to make a statement on a subject, having chosen to speak, the company is obligated to make a full and fair disclosure."[397]  Truthful statements can be misleading when someone omits to state a material fact without which the truthful statement, based on the circumstances, becomes misleading.[398]  "The test for materiality of an omission is 'whether a reasonable man would attach importance to the fact omitted in determining a course of action.'"[399] A false statement or omission need not be outcome determinative for it to be considered material; rather it simply must be significant to the investor's decision.[400]

---

[394] *See Supra*, n.368 (filings listing amount raised from investors); **Exhibit 13**.
[395] *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 766 (11th Cir. 2007) (citation omitted).
[396] *Basic v. Levinson,* 485 U.S. 224, 230 (1988).
[397] *Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1267 (S.D. Fla. 1995) (citing *Dominick v. Dixie Natl Life Ins. Co.*, 809 F. 2d 1559, 1571 (11th Cir. 1987) ([O]nce [defendant] undertook to speak, it was required to make a full and fair disclosure.")).
[398] 17 C.F.R. § 240.10b-5 (in the context of Rule 10b-5); *Harvey M. Jasper Retirement Trust*, 920 F. Supp. at 967.
[399] *Merchant Capital*, 483 F.3d at 768 (quoting *Kennedy v. Tallant*, 710 F.2d 711, 719 (11th Cir. 1983)).
[400] *SEC v. City of Miami,* 988 F. Supp. 2d 1343, 1357 (S.D. Fla. 2013) ("to be material, a fact need not be outcome-determinative, that is, it need not be important enough that it would necessarily

Under these standards, the Defendants' false statements and omissions are clearly material. Investors would certainly want to know about LaForte's criminal background. This information is unquestionably material because it reflects on the character and integrity of a person integral to the success or failure of the enterprise. *United States v. Hatfield*, 724 F.Supp. 2d 321, 328 (E.D.N.Y. 2010) ("It is well-settled that information impugning management's integrity is material to shareholders."). A reasonable investor would have wanted to know LaForte was running the day-to-day operations and controlling Par Funding, and that he was a convicted felon. And indeed, Par Funding investors did care and would not have invested had they known the truth.[401]

The failure to disclose the prior state regulatory actions against Par Funding, Vagnozzi, ABFP, and Abbonizio is a material omission.[402] A reasonable investor would have wanted to know that three states had issued Orders against Par Funding for securities law violations, and that Vagnozzi was sanctioned for securities law violations in connection with the Par Funding offering. And the Par Funding investors do care and would not have invested had they known.[403]

The Defendants' misrepresentations about the Loan default rate, the Loans being insured, and the rigorous underwriting process, including the onsite inspections of the small businesses, are material. As Abbonizio himself has explained, the underwriting process is the key to ensuring the Loans are made to small businesses who will pay back the Loans, and the 1% default rate is important for investors to consider because if the small businesses default on the Loans, Par Funding will not be able to pay investment returns.[404]

---

cause a reasonable investor to change his investment decision") (quoting *SEC v. Meltzer,* 440 F. Supp. 2d 179, 190 (E.D.N.Y. 2006)).

[401] **Exhibit 25**, at ¶ 55; **Exhibit 62**, at ¶ 21; **Exhibit 101**, at ¶ 27; **Exhibit 103**, at ¶ 19; **Exhibit 104**, at ¶ 25; **Exhibit 109**, at ¶ 32; **Exhibit 96**, at ¶ 10.

[402] *See Merchant Capital* at 771 (finding clear error where district court failed to find omission material because "[t]he existence of a state cease and desist order against identical instruments is clearly relevant to a reasonable investor, who is naturally interested in whether management is following the law in marketing the securities").

[403] *See* **Exhibit 25**, at ¶¶ 42-43; **Exhibit 62**, at ¶ 15; **Exhibit 101**, at ¶ 22; **Exhibit 103**, at ¶ 12; **Exhibit 104**, at ¶ 18; **Exhibit 109**, at ¶ 24.

[404] **Exhibit 20**, November 21, 2019 Dinner, at 51:17-52:4; **Exhibit 136** at 9:24-10:21.

Any reasonable investor would have wanted to know Par Funding was not conducting the underwriting process it claimed, doing the on-site inspections Par Funding touted as critical to its lending decision, and that the Loan default rate was about 10 times higher than what the Defendants claimed.[405]  Further, any reasonable investor would have wanted to know that contrary to the Defendants' representations that small businesses rarely defaulted on the Loans, in truth Par Funding had filed more than 2,000 lawsuits seeking to collect on more than $300 million in missed payments on the $600 million it had loaned.

Additionally, telling investors no proceeds were going to Cole or McElhone when in fact they had together received more than $15 million is material.  Misrepresentations regarding the use of investors' funds are material.[406]  Any reasonable investor would have wanted to know that Par Funding was making these payments to Cole and McElhone, and that the Form D filing with the Commission was not true.

### c.  The Defendants' Scheme Liability

All of the Defendants violated Sections 17(a)(1) and (3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c), by participating in a scheme to defraud and engaging in a fraudulent course of conduct.  As discussed above, to state a claim based on conduct violating these provisions, the Commission must establish: (1) the defendant committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter (except as to Section 17(a)(3), which requires only a showing of negligence).  *Alstom,* 406 F. Supp. 2d at 474.

A Defendant engages in a fraudulent scheme in violation of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) when he commits any manipulative or deceptive act or acts that are part of

---

[405] *See, e.g.*, **Exhibit 25**, at ¶¶ 45-46, 49, 50 & 53; **Exhibit 62**, at ¶¶ 17 & 18; **Exhibit 101**, at ¶ 24; **Exhibit 103**, at ¶ 14-16; **Exhibit 104**, at ¶ 21; **Exhibit 109**, at ¶ 26.

[406] *SEC v. Cochran*, 214 F.3d 1261, 1268 (10th Cir. 2000); *SEC v. Research Automation Corp.,* 585 F.2d 31, 35-36 (2nd Cir. 1978) (misleading statements and omissions about the use of investor funds were material as a matter of law).

a fraudulent or deceptive course of conduct, or are in furtherance of a scheme to defraud. The Defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme."[407] The language of Sections 17(a)(2) and (3), and Rule 10b(5)-a and c is "expansive" and these provisions "capture a wide range of conduct."

The Supreme Court has held that knowingly disseminating a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c) and Section 17(a)(1), even if the defendant is not a "maker" of the statement for purposes of Rule 10b-5(b), as that term has been defined in *Janus*.[17] The Court rejected the defendant's arguments that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct" and that all conduct relating to false statements must be charged under Rule 10b-5(b) (or, by extension, Section 17(a)(2)).[408] Rather, the Court emphasized, there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection.[409] The false statements and omissions described above alone provide a basis for scheme liability under Sections 17(a)(1) and (3), and Rules 10b-5(a) and (c).[410] However, in this instance, the Defendants have committed numerous deceptive and fraudulent acts beyond making misrepresentations and omissions, which can also give rise to scheme liability.[411]

---

[407] *Huff,* 758 F. Supp. 2d at 1347-48. *See also SEC v. Fraser*, 2010 U.S. Dist. LEXIS 7038 at *23 (D. Ariz. Jan. 28, 2010), quoting *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997).

[408] *Id.* at 1102-03.

[409] *Id.* at 1102 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983), for the proposition that "it is hardly a novel proposition that" different portions of the securities laws "prohibit some of the same conduct"). In *Malouf v. SEC*, the Tenth Circuit held that *Lorenzo* also governs interpretation of Section 17(a)(3). *Malouf,* 933 F.3d 1248, 1260 (10th Cir. 2019).

[410] *Affiliated Ute Citizens of Utah v. U.S.* 406 U.S. 128, 153 (1972) (liability under Rule 10b-5(a) and (c) established even though the case was one "involving primarily a failure to disclose" to investors); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158-59 (2008) (defendants' "deceptive acts" and "course of conduct included both oral and written statements, such as the backdated contracts").

[411] *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111-12 (2nd Cir. 1998) ("a primary violator is one who participated in the fraudulent scheme"); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471-72 (2nd Cir. 1996) (scheme liability extends to those "who had knowledge of the fraud and assisted in its perpetration"); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010).

Here, the Defendants all employed deceptive devices, including making materially false statements and omissions, in connection with, and in the offer and sale of the Notes, obtaining millions of dollars in proceeds from investors. First, as set forth in detail above, each of the Defendants made materially false or misleading statements to investors. Par Fuunding's marketing materials also contained the false statements about the underwriting process and insurance. Additionally, McElhone, LaForte, Abbonizio, and Cole actively and intentionally concealed from investors both LaForte's true involvement, identity, and control of Par Funding and his extensive criminal background. Finally, the Defendants coordinated an effort to raise investor funds through Agent Funds for more than two years to perpetuate the fraud. Par Funding could no longer rely on using finders, in light of the Pennsylvania Order and the New Jersey Order, yet continued to offer Par Funding Notes and the Agent Funds' promissory notes in the same manner as had been done through the finders without disclosing the existence of the regulatory orders. Each of these proposed defendants participated in the development and/or continued use of the Agent Funds, allowing Par Funding to continue to fraudulently raise investor funds.

All of these actions constitute manipulative or deceptive acts that are part of a fraudulent or deceptive course of conduct, or are in furtherance of a scheme to defraud in violation of Sections 17(a)(1) and (3) of the Securities Act and Rules 10b-5(a) and (c).

### d. McElhone and LaForte Are Liable As Control Persons of Par Funding and Full Spectrum

McElhone and LaForte are liable under Section 20(a) of the Exchange Act, which makes a person "who, directly or indirectly, controls any person liable under any provision of [the act] or of any rule or regulation thereunder ... liable jointly and severally with ... such controlled person." 15 U.S.C. § 78t(a). To plead a violation under Section 20(a), the Commission must allege "that (1) the defendant had the power to control the general affairs of the primary violator, and (2) the defendant had the power to control the specific corporate policy that resulted in the primary

violation."[412]   "The plaintiff must also establish that the controlled person violated the securities laws."[413]   A controlling person is liable if he "acted recklessly in failing to do what he could have done to prevent the violation."[414]

As set forth above in Section II, McElhone is the controlling officer and founder of Par Funding. She incorporated Par Funding and a signatory on each of Par Funding's bank accounts. In fact, the Par Funding bank records reflect that she signs almost every check paid from the account.  At least $11.3 million in investor funds were funneled to her, contrary to the statements Par Funding made in its Forms D filings that she did not receive any proceeds.

In a June 30, 2020 deposition, CFO Cole testified that McElhone is the ultimate decision maker for Par Funding.  At the very least, McElhone's control of CBSG and its bank accounts is sufficient to show that she had the power to control the general affairs of CBSG and the policies of the company that resulted in CBSG's violations of Section 10(b) of the Exchange Act and Rules 10b-5 thereunder. Similarly, McElhone is Full Spectrum's sole owner, and as such had the power to control the general affairs of Full Spectrum the policies of the company that resulted in CBSG's violations of Section 10(b) of the Exchange Act and Rules 10b-5 thereunder.

As set forth above, LaForte is also a control person of both Par Funding and Full Spectrum. LaForte founded Par Funding with McElhone and claims to be its owner.  He runs the day-to-day operations at Full Spectrum, which operates Par Funding, he has hiring and firing authority at Par Funding and Full Spectrum, and he decides which Loans to approve and fund.  His exercise of power to control the operations of Par Funding and Full Spectrum demonstrates that he had the power to control those companies' general affairs and the policies that resulted in their violations of Section 10(b) of the Exchange Act and Rules 10b-5 thereunder.

Thus, LaForte and McElhone are liable for Par Funding and Full Spectrum's violations.

---

[412] *Laperriere v. Vesta Ins. Group, Inc*., 526 F.3d 715, 723 (11th Cir. 2008); *Brown v. Enstar Group, Inc*., 84 F.3d 393, 396 (11th Cir. 1996).
[413] *Brown*, 84 F.3d at 396–97.
[414] *Id.*

### e. LaForte, McElhone, Cole, Abbonizio, Vagnozzi, And Furman Are Acting With The Requisite Scienter For Violations Of Securities Act Section 17(a)(1) and Exchange Act Section 10(b)(5)

Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud.[415]  Scienter can be established by a showing of knowing misconduct or severe recklessness.[416]  The Commission may establish scienter for violations of Sections 17(a) and 10(b) by showing defendants made representations to investors "without basis and in reckless disregard for their truth or falsity."[417]  The scienter of a control person or individual acting as an officer of a company is imputed to the entity.[418]

The evidence establishes that LaForte, McElhone, Cole, Abbonizio, Vagnozzi, and Furman have acted knowingly, or at a minimum recklessly, while making the misrepresentations and omissions discussed above.  Abbonizio, and LaForte knew or were reckless in not knowing that statements made regarding the underwriting process, insurance offering to all small businesses, and onsite inspections were false.  Abbonizio claims to own 25% of Par Funding and works in the Full Spectrum office from which it operates, and LaForte oversees the day-to-day operations of the underwriting department at Par Funding and decides which Loans to fund.  Accordingly, they knew or were reckless in not knowing that statements that Par Funding conducted rigorous underwriting and conducted an on-site inspection of the small businesses were false.   Similarly, as CEO with control over the Company, McElhone knew or was reckless in not knowing that these representations in the Par Funding brochure were false.  For these same reasons, Abbonizio was reckless in not knowing that his verbal representations to potential investors that Par Funding insured the Loans was false and conducted rigorous underwriting and on-site inspections was false. As officers of the company, Abbonizio and McElhone's scienter can be imputed to Par Funding,

---

[415] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).
[416] *SEC v. Carriba Air Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).
[417] *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 10 (D.D.C. 1998).
[418] *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972); *In re Sunbeam Sec. Litig.,* 89 F. Supp 2d 1326, 1340 (S.D Fla 1999) (officers' scienter is properly imputed to corporation).

as can LaForte's scienter as a *de facto* officer and an undisclosed control person of Par Funding. McElhone and LaForte's scienter can also be imputed to Full Spectrum as control persons.[419]

In Par Funding's Forms D, Cole and McElhone reported that they would not receive any of the gross proceeds of the offering and that there were no finders' fees. Cole, as CFO, and McElhone, as CEO and as a control person, knew or were reckless in not knowing that McElhone, her companies and Cole's companies received millions of dollar from Par Funding and that Par Funding had paid so-called finders' fees of at least $3.6 million plus an addition $1 million in payments labeled as "commissions" from July 2015 to February 2020.  As officers of the company, McElhone and Cole's scienter can be imputed to Par Funding and Full Spectrum.[420]

Vagnozzi touts his personal success, the success of ABFP, and success of Par Funding when soliciting investors, while failing to disclose his own regulatory history and that of Par Funding.  Vagnozzi has previously testified that ABFP is his corporate alter ego and people invest through ABFP because they are investing in Vagnozzi personally.  Thus, Vagnozzi acted at least recklessly in not disclosing his own and Par Funding's regulatory history.  Vagnozzi's scienter can be imputed to his ABFP, ABFP Management, and the ABFP Income Funds.

Furman touts the success of Par Funding to potential investors and told at least one potential investor, who was unbeknownst to him an someone posing as an investor, that New Jersey securities regulators had not only retracted the New Jersey Order against Par Funding for securities law violations, but had told Par Funding "all of your books are good and we love it… you're good," and had cancelled the monetary sanctions against Par Funding.  Furman had no reasonable basis for making this representation and knew or was reckless in not knowing his representation was false.  The New Jersey Order remains published on the New Jersey Board of Securities' website and remains in effect. Furman's scienter can be imputed to United Fidelis and Fidelis Financial.

---

[419] *Id.*
[420] *Id.*

### f.  Negligence Is Easily Demonstrated As To All Defendants For Violations Of Securities Act Sections 17(a)(2) and (3)

Because McElhone, LaForte, Cole, Abbonizio, Vagnozzi, and Furman acted with scienter, the lower standard of negligence required for violations of Sections 17(a)(2) and (3) is also met.[421]

Gissas was, at a minimum, negligent in his failure to tell investors about the two state orders against Par Funding.  Gissas touts the success of Par Funding to potential investors, but fails to disclose its regulatory history.  He advertises the RE Funds investment as being invested in a leading company in the merchant cash advance industry and tells investors that Par Funding has a strong track record and is successful in the industry.  He was raising money for Par Funding through Retirement Evolution when the New Jersey and Pennsylvania Orders were issued against Par Funding,[422] and the Orders are publicly available on the Internet.  Gissas knew or should have known about the existence of the two state orders, but omitted this information when touting the success of Par Funding to raise money into the RE Funds.  Gissas' negligence is imputed to Retirement Evolution, RE Fund and RE Fund 2.[423]

### g.  The "In Connection With" Requirement Is Easily Met

Because the Defendants are making misrepresentations and omissions in connection with the offer, purchase, and sale of the securities they are offering and selling to investors, their acts meet the "in connection with" requirement of Section 10(b) and Rule 10b-5.[424]

---

[421] Scienter is only required for Exchange Act Section 10(b) and Securities Act Section 17(a)(1); violations of Sections 17(a)(2) and (3) of the Securities Act do not require a finding of scienter. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).  Violations of Sections 17(a)(2) and (3) is established by showing negligence. *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3rd Cir. 1997).

[422] *See, e.g.,* **Exhibits 115, 117 & 142.**

[423] *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d at 1340.

[424] *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (courts should interpret the "in connection with" requirement broadly to effectuate the remedial purpose of the federal securities laws); *SEC v. Merkin,* 2012 WL 5245561 *8 (S.D. Fla. Oct. 3, 2012) (the "in connection with" requirement is satisfied if the SEC shows that the material misrepresentations were relayed to the public in a way that a reasonable investor would rely on them) (internal citation omitted).

### *h. The Defendants' Conduct Involved Interstate Commerce*

The Defendants' conduct has clearly involved the use of interstate commerce.  They advertise and tout the investments on the Internet, on Facebook pages, and through emails.  Investors wire investment funds to Par Funding and the Agent Fund Defendants.  Par Funding emails promissory notes to the Agent Funds, and the Agent Funds email promissory notes and offering materials to the investors.  Abbonizio and Furman also solicit investors via telephone.

For all the foregoing reasons, the Commission has established a prima facie case that the Defendants have violated and continue to violate the securities laws.

### C.  <u>The Defendants Are Likely to Continue to Violate the Securities Laws</u>

By making a *prima facie* showing that the Defendants are violating the federal securities laws, the Commission has met the first prong of the two-prong test to determine whether the Court should issue a temporary restraining order.  To meet the second prong, the Commission must show a "reasonable likelihood" of future violations.

In assessing whether there is a reasonable likelihood of future violations, courts look to the following factors: (1) the egregiousness of defendant's actions; (2) the isolated or recurrent nature of the infractton; (3) the degree of scienter involved; (4) the sincerity of a defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of the conduct: and (6) likelihood of opportunities for future violations.[425]   Past illegal conduct is highly suggestive of the likelihood of future violations.[426]

In this case, each of the factors weighs heavily in favor of the Court granting a temporary restraining order.   First, the Defendants' conduct is egregious.  They are soliciting investors in an unregistered and fraudulent securities offering scheme.  The Defendants lure investors through a series of misrepresentations and omissions about the success, safety, operations, and management of the Par Funding business, which is ultimately responsible for generating returns; the use of investor funds; the criminal history of Par Funding's control person; and the regulatory history of

---

[425] *Unique*, 119 F. Supp. 2d at 1340.
[426] *CFTC v. Matrix Trading Group*, 2002 WL 31936799 at *12 (S.D. Fla. Oct. 3, 2002).

Par Funding, ABFP, Abbonizio, and Vagnozzi, which includes Cease-and-Desist Orders issued in connection with the Par Funding securities offering.  Second, the conduct is not isolated.  It has spanned years.  The Defendants have together raised more than $482 million from the unsuspecting public.  Third, the Defendant's conduct involves a high degree of scienter.  They lied and omitted material facts with reckless abandon and engaged in a fraudulent scheme to raise money from investors using a structure engineered to conceal the truth from investors.

As to the fourth and fifth factors, the Defendants have not given any assurances against future misconduct and plainly do not believe their conduct is wrong.  Finally, unless this Court restrains and enjoins the Defendants, they will have the opportunity to continue exactly as they have been.

When it comes to Orders issued to enforce securities laws against the Defendants, they ignore the Order, lie about the Order, give false assurances that they will not violate again, and/or scheme to conceal the truth and circumvent the Order.  Pennsylvania issued an Order against Par Funding based on it securities law violations in connection with the offer and sale of Par Funding notes.  Par Funding assured the Regulators it had ended its violative practices.  In truth, the Defendants simply shifted their scheme, concealed the truth, and expanded the offering – all to continue their massive unregistered securities offering operation.

Next, New Jersey issued an Order against Par Funding based on its securities law violations in connection with offering Par Funding promissory notes.  The Defendants kept it a secret from investors, and Furman lied and told an individual posing as an investor that New Jersey had "retracted" its Order and essentially blessed the offering.  Incredibly, when Par Funding's ACH processing company, Actum, directly inquired of Par Funding about the New Jersey Order, Cole chose to lie.  On December 31, 2018, Actum wrote to Cole, "The Cease and Desist Order out of NJ has come to our attention and we'd like to get your response."  Cole responded that Par Funding intended to have the Order dismissed because the Par Funding promissory notes are not securities. Incredibly, Cole told Acum that this position "was further substantiated from the settlement we had with the PA Department of Banking last month. ***They concurred that the creditor note and***

*security agreements we issued are not securities* and we expect New Jersey to follow suit." Based on this response, Actum replied that it "finds the matter satisfactory at this time."[427]

In truth, The Pennsylvania Department of Banking and Securities did not concur that the notes and security agreements were not securities.  To the contrary, the Order, to which Par Funding consented, states: "Based on the results of its investigation, the Bureau [of Securities and Compliance and Enforcement of the Pennsylvania Department of Banking and Securities] has concluded that CBSG has engaged in certain securities-related activities in violation of Pennsylvania Securities Act of 1972, 70 P.S. § 1-301."  The Order goes on to state that Par Funding/CBSG violated the law by employing an unregistered agent to offer and sell promissory notes.[428]  The Order also states that Par Funding had ceased its Finders Agreements as of February 8, 2018 and "*[a]s of February 8, 2018, CBSG does not pay any compensation to any person in connection [with] the sale of the Notes*."[429]  Indeed, on February 5, 2018, Par Funding assured the Pennsylvania Regulators it had terminated its practice of using Finders.[430]

In truth, when Par Funding made these assurances to Pennsylvania, it had already converted its Finders into "Agents" who continued to sell the Notes through promissory notes and whom Par Funding compensated – and continues to compensate for funneling investor money to Par Funding. Specifically and as set forth above, the Agent Funds sell promissory notes to investors at one rate of interest, funnel the investor money to Par Funding, and Par Funding issues a promissory note to the Agent Fund that provides a higher rate of interest and thus a greater return.  Par Funding pays the Agent Funds each month and the Agent Funds distribute investors their portion of the

---

[427] **Exhibit 108**, at pdf pp. 12-14 of 71 (emphasis added).
[428] **Exhibit 8 at ¶** 5.
[429] *Id.* at ¶¶ 5-6 (emphasis added).
[430] **Exhibit 163**, February 5, 2018 Par Funding letter to Pennsylvania Regulators, at pdf pg. 3 of 9 ("CBSG has entered to contracts *with* "finders" who have received compensation for finding individuals who met the definition of Accredited Investor in Rule 501 of SEC Regulation D to purchase notes issued by CBSG.  Upon advice of counsel retained in the above-captioned matter, CBSG advises that it has terminated this practice with immediate effect and until CBSG has received further advice and direction from the Department.").

returns and pocket the remainder as their compensation, giving Vagnozzi a 25% cut as his compensation pursuant to a written agreement.

Next, in May 2019, Pennsylvania filed a consent Order against Vagnozzi for violating the registration requirements of the Pennsylvania Securities Act in connection with his offer of Par Funding Promissory Notes.[431] Undeterred, Vagnozzi continued his unregistered securities offerings, selling promissory notes in his own funds and funneling the money to Par Funding in exchange for more profitable promissory notes through which he was compensated.

In February 2020, the Texas Securities Regulators entered a Cease and Desist Order against Par Funding, Abbonizio, ABFP, and Vagnozzi for, among other things, engaging in fraud in connection with the offer and sale of promissory notes by not disclosing the New Jersey and Pennsylvania Orders and LaForte's history to investors.[432] This matter remains pending. And still, as set forth above, these Defendants continued their unregistered securities offerings and continued to conceal the regulatory history and LaForte's history to investors.

And most recently, on July 14, 2020, the Commission issued a consent Order against Vagnozzi and ABFP in connection with four offerings that are unrelated to the Par Funding offering in this case.[433] Just days later, Vagnozzi and ABFO issued a press release and emailed Par Funding investors, mischaracterizing what the Order states and incredibly, using the Order to solicit further investments from Par Funding investors.

It is clear the Defendants have no respect for the securities laws or Orders issued against them. They continue to solicit investors and engage in the offering, and the Defendants' history and the egregiousness of their conduct show that nothing short of the emergency relief sought in this case will protect investor funds.

---

[431] **Exhibit 9**.
[432] **Exhibit 37**.
[433] **Exhibit 160**.

## V.  **RELIEF REQUESTED**

### A.  **An *Ex Parte* Temporary Restraining Order is Necessary**

Through the facts and legal arguments set forth above, the Commission has met its burden of showing (1) there is *prima facie* evidence that all of the Defendants are violating the securities laws and (2) there is a reasonable likelihood they will continue to violate the law unless the Court immediately issues an *ex parte* temporary restraining order.  As our accompanying Certification Under Rule 65 as to why we are not providing the Defendants and Relief notice explains in more detail, we have grave concerns that they will dissipate investor assets if we do.

They currently control millions of dollars of investor funds, ABFP and Vagnozzi have announced they are planning to expand into a public offering, and Par Funding has already distributed investor funds to enrich McElhone and Cole – and lied about it to the Commission in their filings.  Par Funding, Furman, and Vagnozzi also solicited investors to exchange their promissory notes for notes offering a fraction of the investment returns – leaving the Agent Funds and Par Funding with significantly less debt to repay and more of the investment returns within their control.  Many of the Defendants currently have an application pending to purchase a bank in Bells, Texas, and as of July 10, 2020, they were still pursuing that process.[434]  Given the ongoing nature of the fraud the Defendants are committing and the significant risk of loss to the investors, we ask the Court to enter the attached proposed order granting this temporary restraining order and entering the asset freeze without notice to the Defendants to prevent them from transferring investor funds and further harming investors. There are concerns that more investors will be defrauded, since the Defendants continue to solicit investors.

We will immediately serve all Defendants and the Relief Defendant with the pleadings and orders, and the attached proposed order asks the Court to set a show cause hearing at which time the Defendants and Relief Defendant can appear and argue why the Court should not enter a preliminary injunction and further extend the asset freeze order.

---

[434] **Exhibit 126** at 87:16-24, 98:8-21, 99:22-100:2; **Exhibit 129** (Late-June meeting about bank).

## B. An *Ex Parte* Freeze of Assets Is Necessary

Pursuant to their general equity powers, federal courts may order ancillary relief to effectuate the purposes of the federal securities laws, both to preserve defendants' assets and ensure wrongdoers do not profit from their unlawful conduct.[435]  An asset freeze "facilitate[s] enforcement of any disgorgement remedy that might be ordered" and may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established."[436]  It is well recognized an asset freeze is sometimes necessary to ensure a future disgorgement order will not be rendered meaningless.[437]  When there are concerns that defendants might dissipate assets, or transfer or secret assets beyond the jurisdiction of the Court, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze.[438]  Here, there is great concern that the Defendants might dissipate assets.  Par Funding has already siphoned investor funds to McElhone and Cole while concealing this information from the Commission in their Form D filings.  As set forth in the Declaration from Melissa Davis filed with this Motion, in June 2020, Par Funding transferred millions from the Par Funding, leaving only thousands in its bank account.  Vagnozzi, Abbonizio, Cole, and LaForte currently attempting to acquire a bank in Dallas, Texas.  As Cole recently explained to two individuals posing as investors, they are buying a bank to "pump up our MCA business" and there are no usury laws in effect if they run Loans through this bank.[439]

---

[435] *See, e.g., Unifund SAL*, 910 F.2d at 1041; *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *Manor Nursing Centers,* 458 F.2d at 1103-04.  An asset freeze is appropriate "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005).

[436] *Unifund SAL*, 910 F.2d at 1041.

[437] *Manor Nursing Centers,* 458 F.2d at 1106; *United States v. Cannistraro*, 694 F. Supp. 62, 71-72 (D.N.J. 1988), *aff'd in part, vacated in part*, 871 F.2d 1210 (3d Cir. 1989); *SEC v. Vaskevitch*, 657 F. Supp. 312, 315 (S.D.N.Y. 1987).

[438] *Unifund SAL*, 910 F.2d at 1041-42; *SEC v. Tyler*, 2002 U.S. Dist. Lexis 2952 (N.D. Tex. February 22, 2002); *SEC v. Comcoa*, Ltd., 887 F. Supp. 1521, 1524 (S.D. Fla. 1995); *SEC v. Margolin*, 1992 U.S. Dist. Lexis 14872 at 19-20 (S.D.N.Y. Sept. 30, 1992); *SEC v. Grossman*, 1987 U.S. Dist. Lexis 1666 at *35-36 (S.D.N.Y. Feb 17, 1987).

[439] **Exhibit 129, part 2,** at 401:3-408:14, and 420:24-421:18.

The Court should impose an asset freeze against the following Defendants and Relief Defendants up to the amount of ill-gotten gains they received through their fraudulent and unregistered securities offerings:

- Par Funding, McElhone, and LaForte, jointly and severally, in the amount of $492,398,894.[440]

- Joint and several with Par Funding, McElhone, and LaForte:

  - Full Spectrum in the amount of $4,398,535[441]

  - ABFP in the amount of $1,914,045;[442]

  - ABFP Income Fund and ABFP, jointly and severally, in the amount of $25,487,690;[443]

  - ABFP Income Fund 2 in the amount of $13,252,600;[444]

  - Fidelis Financial and United Fidelis, jointly and severally, in the amount of $11,603,000;[445]

  - Retirement Evolution Group in the amount of $6.5 million;[446]

  - RE Fund in the amount of $5,450,000;[447]

  - RE Fund 2 in the amount of $150,000;[448]

  - Cole in the amount of $16,159,000;[449] and

  - Relief Defendant L.M.E. 2017 Family Trust in the amount of $14.3 million.[450]

---

[440] This is the amount raised from investors from July 2015 through the most recent bank statements available to us. **Exhibit 13** at ¶ 10. McElhone and LaForte are control persons.

[441] *Id.* at ¶ 11.

[442] **Exhibit 56**, Form D Filing of ABFP.

[443] Based on the amount ABFP raised through ABFP Income Fund that it funneled to Par Funding, **Exhibit 13** at ¶ 11**.**

[444] Based on the amount ABFP raised through ABFP Income Fund that it funneled to Par Funding. *Id.* at ¶ 11.

[445] This is the amount Fidelis Financial raised and funneled to Par Funding.  As Manager of Fidelis Financial, United Fidelis is jointly and severally liable for this amount. *Id.* at ¶ 11.

[446] *Id.* at ¶ 11.

[447] Based on the amount it admits it raised from investors in its Form D filing. **Exhibit 58**.

[448] Based on the amount it admits it raised from investors in its Form D filing, **Exhibit 145**.

[449] The amount, which included investor funds, received from Par Funding through Cole's "consulting" companies, as set forth above. *Id.* at ¶¶ 13-15.

[450] **Exhibit 13**, at ¶ 16.

The Commission is not seeking an asset freeze against Abbonizio, Vagnozzi, Furman or Gissas personally at this time because we are unable to determine at this stage what they received ill-gotten gains and requires expedited discovery on this and other matters in this case. We also require expedited discovery to determine how much ABFP Management received in ill-gotten gains from the unregistered offering fraud scheme.

Here, the evidence shows that Par Funding, directly and through its network of Agent Funds which includes Vagnozzi, Furman, and Gissas, has raised more than $482 million from about 1,200 investors nationwide and it is actively seeking investors. In June 2020, Par Funding emptied most of the balance in its bank account by transferring funds, including investor funds, to a company called "Par Fund Pref."[451] As set forth above, Relief Defendant is a Trust for which McElhone is the grantor. McElhone controls the Par Funding bank accounts and there have already been transfers of investor funds to the Trust with no legitimate basis. Cole, as CFO, signed the filing with the Commission stating that he and McElhone received no proceeds of the offerings, when in truth he has received millions of funds through "consulting" firms and as CFO, he knows or is reckless for not knowing Par Funding transferred $11.3 million to McElhone. Vagnozzi, ABFP, the ABFP Income Funds, United Fidelis, Fidelis Financial, Retirement Evolution, and the RE Funds have all raised money from investors by making materials misrepresentations and omissions in connection with unregistered securities offerings. The Defendants have continued their scheme despite numerous Orders from state securities regulators against Par Funding, ABFP, Vagnozzi, and/or Abbonizio for violating the securities laws in connection with the *very* securities offerings at issue in this case.

A freeze over the Defendants' current bank accounts, as well as any other assets they might possess, is necessary to protect the investors' funds. Given the egregious nature of this fraud, the fact that Par Funding has already dissipated investor proceeds while lying to the Commission in its Form D filings about who is receiving the proceedings of its offering, and lying to investors in

---

[451] *Id.* at ¶ 19.

order to lure them into contributing money in the offering, combined with the fact that any remaining assets are at risk, an order freezing assets to aid in the potential recovery and return of investor funds is necessary.

Accordingly, the Commission requests that this Court enter an Order granting an immediate asset freeze over any and all of the assets of Defendants and Relief Defendant, and thereafter, enter a preliminary injunction freezing assets through the conclusion of this action.

## C.  Sworn Accountings

Sworn accountings are necessary to enable the Commission and the Court to determine the amounts the Defendants have raised and spent in perpetration of their fraud, and to enable the Court to determine the proper amount of disgorgement.  Federal courts have frequently applied their broad powers in the context of Commission actions to prevent securities violators from enjoying the fruits of their misconduct.[452]  Here, an accounting is needed to determine: (1) the amount of the Defendants' unjust enrichment; (2) the disposition of the proceeds of the securities sales; and (3) the assets available for disgorgement.

## D.  An Order Prohibiting Destruction of Records And Expediting Discovery

Orders prohibiting the destruction of records and expediting discovery are both appropriate to prevent the destruction of documents before this Court can adjudicate the Commission's claims, and to ensure that whatever equitable relief might ultimately be appropriate is available.[453]  The Court should order expedited discovery so that the Commission may take meaningful discovery in the fourteen-day period between entry of the temporary restraining order and any hearing on the show-cause order why the Court should not grant a preliminary injunction.  Consequently, we ask the Court to enter an order allowing the parties to take depositions on two days notice and to serve written discovery requiring a response within two days.  In addition, to preserve the Commission's

---

[452] *Manor Nursing Centers*, 458 F.2d at 1104 ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable.  The deterrent effect of a Commission enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.").
[453] *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 881 (S.D. Fla. 1974).

ability to take effective discovery, the Court should order the Defendants and Relief Defendant not to alter or destroy relevant documents.

## VI.  CONCLUSION

For the foregoing reasons, the Court should grant the Commission's Motion for Temporary Restraining Order and Other Emergency Relief and issue the accompanying proposed Order.

July 24, 2020                                    Respectfully submitted,

By:       *s/Amie Riggle Berlin*
          Amie Riggle Berlin
          Senior Trial Counsel
          Florida Bar No. 630020
          Direct Dial: (305) 982-6322
          Direct email: berlina@sec.gov

          Attorney for Plaintiff
          **SECURITIES AND EXCHANGE
          COMMISSION**
          801 Brickell Avenue, Suite 1800
          Miami, Florida  33131
          Telephone: (305) 982-6300
          Facsimile:   (305) 536-4154

### Certificate of Conferral

This motion is filed *ex parte* and is being filed under seal.  Counsel did not confer with the Defendants or their counsel prior to filing for the reasons stated in the Rule 65 Cert. and in this Motion as to why *ex parte* and emergency relief is being sought.

*s/Amie Riggle Berlin*