Joseph LaForte

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - -

HMC INCORPORATED, et al.,          :CIVIL ACTION
                                   :NO. 19-3285
                    Plaintiffs,:
        vs.                        :
                                   :
COMPLETE BUSINESS SOLUTIONS        :
GROUP, INC., et al.,               :
                                   :
                    Defendants.:
- - - - - - - - - - - - - - - - - -

                    -   -   -

            THURSDAY, MARCH 5, 2020

                    -   -   -


            Oral deposition of JOSEPH LaFORTE,
taken pursuant to notice, held at WHITE AND WILLIAMS,
1800 One Liberty Place, 1650 Market Street,
Philadelphia, Pennsylvania, 19103 commencing at
11:17 a.m. before Shauna L. Detty, Court Reporter -
Notary Public there being present.

Joseph LaForte

```
                                                          Page 2
  1    A P P E A R A N C E S:

  2    ON BEHALF OF THE PLAINTIFFS:
       JUSTIN PROPER, ESQUIRE
  3    WILLIAM FEDULLO, ESQUIRE
       SHANE HESKIN, ESQUIRE
  4    WHITE AND WILLIAMS
       1800 ONE LIBERTY PLACE
  5    1650 MARKET STREET
       PHILADELPHIA, PENNSYLVANIA 19103
  6    Telephone: 215.864.7000
       Email: Properj@whiteandwilliams.com
  7

  8    ON BEHALF OF THE DEFENDANTS
       BRETT A. BERMAN, ESQUIRE
  9    FOX ROTHSCHILD, LLP
       101 PARK AVENUE, 17TH FLOOR
 10    NEW YORK, NEW YORK 10178
       Telephone: 212-878-7945
 11    Email: Bberman@foxrothschild.com

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

Joseph LaForte

```
                                                    Page 3
 1                    I N D E X

 2   WITNESS
     JOSEPH LaFORTE
 3     (Witness sworn.)

 4   DIRECT EXAMINATION BY                           PAGE

 5   Mr. Proper                                        4

 6                 E  X  H  I  B  I  T  S

 7   NUMBER              DESCRIPTION               PAGE

 8   LaForte-1     5/31/18 Merchant Agreement        27

 9   LaForte-2     Par Funding About Us Page         43

10   LaForte-3     Declaration of Lisa McElhone      50

11   LaForte-4     5/3/19 E-mail Exchange            82

12   LaForte-5     12/19/18 Agreement                87

13   LaForte-6     2/27/19 Agreement                 87

14   LaForte-7     Bank Statements                   87

15   LaForte-8     HMC, Inc. Funding Payment History 94

16   LaForte-9     Text Messages                    119

17   LaForte-10    5/2/19 E-mail Exchange (2 pages) 125

18   LaForte-11    5/2/19 E-mail Exchange (4 pages) 129

19

20

21

22

23

24
```

Joseph LaForte

Page 4

```
 1                        -  -  -
 2                 (It is agreed by and between counsel
 3     that reading, signing, sealing, filing, and
 4     certification are hereby waived and all objections,
 5     except as to the form of the questions, are reserved
 6     until the time of trial.)
 7                        -  -  -
 8         ...JOSEPH LaFORTE, after having been first duly
 9     sworn, was examined and testified as follows...
10                        -  -  -
11                 DIRECT EXAMINATION
12                        -  -  -
13     BY MR. PROPER:
14     Q.      Good morning, Mr. LaForte.
15     A.      How you doing?
16     Q.      We're here for your deposition in a lawsuit
17     between my client, HMC Incorporated, et al., versus
18     Complete Business Solutions Group Incorporated, et al.
19     I'm going to be asking you some questions today about
20     some of the issues that pertain to this lawsuit.  If
21     there's a point in time you need to take a break for
22     some reason, just let me know and I'll accommodate
23     that.  I just ask that you answer any questions that
24     are pending at the time of the request.
```

Joseph LaForte

```
                                                          Page 5
1                    Otherwise, if you don't have any
2    questions, are you ready to proceed?
3    A.      Yup.
4    Q.      Complete Business Solutions Group, is that a
5    d/b/a for Par Funding?
6    A.      Yes.
7    Q.      And is Par Funding a corporation?  Do you know
8    if they're incorporated?
9    A.      You just said it's a d/b/a, right?
10   Q.      Yeah.  Is --
11   A.      How could a d/b/a be a corporation?
12   Q.      Is Complete Business Solutions Group a d/b/a
13   for Par Funding or is Par Funding a d/b/a for --
14   A.      I just answered you.  It's CBSG d/b/a Par
15   Funding.
16   Q.      I was confused by --
17   A.      You got to read this before you come, though.
18   You got to be on point.  You got to know what you're
19   doing.  So come on.
20   Q.      When was CBSG incorporated?
21   A.      I don't know.
22   Q.      What state was CBSG incorporated in?
23   A.      I'm not positive.
24   Q.      What's your understanding as to where CBSG was
```

Joseph LaForte

Page 6

1    incorporated?

2    A.      I don't know.  I'm not the lawyer for the

3    firm.

4    Q.      Do you have any ownership interest in CBSG?

5    A.      No.

6    Q.      Are you an officer of CBSG?

7    A.      No.

8    Q.      Have you ever been an officer of CBSG?

9    A.      Nope.

10   Q.      Did you -- were -- strike that.

11           Were you involved in the formation of

12   the company?

13           MR. BERMAN:  Objection to form.

14           But you can answer.

15           THE WITNESS:  I don't know how to

16   answer that question.

17   BY MR. PROPER:

18   Q.      Are you one of the founders of the company?

19   A.      No.

20   Q.      Who is the founder of the company?

21   A.      I don't know what the word "founder" means.

22   It can mean a lot of different things.  I don't want to

23   answer the question incorrectly.

24   Q.      Did you provide any capital of your own when

Joseph LaForte

Page 7

1   the company was formed?

2   A.      No.

3   Q.      Do you know what capital was used to form

4   CBSG?

5   A.      No.

6   Q.      So just to be clear, you did not make any form

7   of capital contribution to start CBSG?

8   A.      No.  You just asked that.

9   Q.      Did your wife make any capital contribution --

10  A.      I can't speak for my wife.

11  Q.      I understand you can't speak for your wife,

12  but, to your knowledge, do you know whether or not your

13  wife, Lisa McElhone, provided any monies to start CBSG

14  back in 2012?

15  A.      I don't know.  I can't remember what I -- what

16  I did last week.  I wouldn't know if she put money in

17  or didn't put money in.  And I don't see how it's

18  relevant to this case right now.

19  Q.      Okay.  Whether it's relevant or not is a

20  separate issue.  I'm just asking you whether or not you

21  have a recollection one way or another whether or not

22  your wife provided any monies to form the company.

23  A.      We can talk about the Yankees, too.  I used to

24  play professional baseball.  You want to talk about the

Joseph LaForte

Page 8

1    Yankees?  I don't know.  We went over the same

2    questions last time I was here, so I guess you can just

3    read that deposition.

4    Q.     Whose idea was it to start a company that was

5    specializing or would specialize in merchant cash

6    advances?

7               MR. BERMAN:  Objection.

8               THE WITNESS:  I can't talk about ideas.

9    I don't know anybody's ideas or anybody's thoughts.  If

10   you want me to testify about somebody's thoughts or

11   ideas, that would be ridiculous.

12   BY MR. PROPER:

13   Q.     Did you have any role in the concept that CBSG

14   would provide merchant cash advances to businesses?

15              MR. BERMAN:  Objection.

16              THE WITNESS:  I don't know how to

17   answer the question.

18   BY MR. PROPER:

19   Q.     Do you know what a merchant cash advance is?

20   A.     Sure.

21   Q.     Did you know what a merchant cash advance was

22   in 2012?

23   A.     No.

24   Q.     When is the first time that you heard the

Joseph LaForte

Page 9

1   phrase "merchant cash advance"?

2   A.      I don't recall.  It's too long ago.

3   Q.      Did you have any involvement in CBSG when the

4   company was initially formed in 2012?

5   A.      What kind of -- I don't know.  I don't know

6   the -- I don't know what you mean.

7   Q.      Involvement of any kind --

8   A.      I'm an independent operator.  Remember, we

9   went over that in the last deposition.  I'm an

10  independent sales operator for another entity.  So you

11  keep talking to me about Par Funding and CBSG when I

12  don't work there, so I don't know.  I worked for

13  Recruiting and Marketing Resources, same as my last

14  testimony, and the scope of how these guys started the

15  company is, you know -- I don't know what their

16  thoughts were or what their ideas were.

17  Q.      The initial forms that CBSG used when they

18  advanced funds to businesses back in 2012, did you have

19  any involvement in creating those funds?

20              MR. BERMAN:  Objection.

21              MR. PROPER:  Strike that because I

22  used -- I botched the word.

23  BY MR. PROPER:

24  Q.      When CBSG started funding businesses in 2012,

Joseph LaForte

Page 10

1    did you have any role in creating the forms that were

2    used for those funding transactions?

3                    MR. BERMAN:  Objection.

4                    You can answer, if you understand.

5                    THE WITNESS:  I don't understand.

6    BY MR. PROPER:

7    Q.    Back in 2012, was the business of CBSG similar

8    to what it does now?

9                    MR. BERMAN:  Objection.

10                   You can answer, if you understand.

11                   THE WITNESS:  I don't think so.  Every

12   day, it changes.  The products change, everything

13   changes on a day-to-day basis.  Similar?  I mean,

14   you've been a lawyer for how many years?  It's similar.

15   I'm sure that the scope of the work that you guys do is

16   different.  Things change.  So I don't know how to

17   answer the question appropriately.

18   BY MR. PROPER:

19   Q.    Are you familiar with the forms that CBSG used

20   in 2012 to fund advances to businesses?

21   A.    I would not remember what they used in 2012 or

22   any other lender, what they used in 2012.

23   Q.    Were you involved in advances made by CBSG to

24   businesses in 2012?

Joseph LaForte

Page 11

1   A.      You asked me that already.  No.

2   Q.      And when I say "were you involved," I don't

3   mean in an employee/employer capacity.  I mean were you

4   involved as an ISO or in any way, shape or form with

5   transactions that CBSG had with businesses?

6   A.      I can't remember what I closed in 2012 with

7   any company.  CBSG, Par Funding, Yellowstone, On Deck

8   Capital, I couldn't remember what --

9   Q.      When is the first time that you started acting

10  in a sales capacity for CBSG, year?

11  A.      I don't act in a sales capacity for CBSG.  I

12  act in a sales capacity for Recruiting and Marketing

13  Resources.

14  Q.      When is the first time that in your capacity

15  as an employee of Recruiting and Marketing Resources

16  you started doing some business on behalf of Par

17  Funding?

18              MR. BERMAN:  Objection.

19              If you understand.  I mean, there's a

20  lot of problems with the question.

21              THE WITNESS:  Repeat the question.

22  BY MR. PROPER:

23  Q.      When is the first time that Recruiting and

24  Marketing Resources did some work for Par Funding?

Joseph LaForte

Page 12

1   A.      How do you mean -- what kind of work?

2   Q.      Any kind of work.

3   A.      I don't know -- I don't know how to answer the

4   question, work.

5   Q.      Well, what do you currently do in your

6   capacity with Recruiting and Marketing Resources on

7   behalf of Par Funding?

8                MR. BERMAN:  Objection.

9                You can answer, if you understand.

10               THE WITNESS:  The same as I explained

11   last -- in the last deposition.  If a -- I source deals

12   for many different companies.  I send deals to whomever

13   I think would fit the client's needs.  In that

14   capacity, I have a relationship with many different

15   lenders.

16   BY MR. PROPER:

17   Q.      Including Par?

18   A.      Many different lenders, including Par.

19   Q.      When did you start sourcing deals for Par?

20   A.      I don't recall.

21   Q.      Were you sourcing deals for Par in 2012?

22   A.      I don't recall.

23   Q.      Was Par providing merchant cash advances in

24   2012, to your knowledge?

Joseph LaForte

Page 13

1    A.      You'd have to ask Par.

2    Q.      So you don't know?

3    A.      You'd have to ask Par.

4    Q.      Is Par providing merchant cash advances today

5    to merchants?

6                   MR. BERMAN:  Objection; irrelevant.

7                   Don't answer.

8                   Today is absolutely irrelevant to this

9    case.  You know the relevant time period, which I let

10   you go a lot further than I wanted to, is February 2018

11   to October 2018.

12                  Don't answer about today.

13   BY MR. PROPER:

14   Q.      Mr. Berman is referring to a court order that

15   only pertains to a 30(b)(6) deposition, so --

16                  MR. BERMAN:  We don't agree.  Call the

17   judge.

18                  MR. PROPER:  Okay.  I'm not going to

19   call the judge.  You continue, just advise your client

20   not to answer, but I will reserve the right to seek

21   sanctions from The Court.

22                  MR. BERMAN:  Do what you have to do,

23   whatever you want.

24                  MR. PROPER:  Thanks, bro.

Joseph LaForte

Page 14

1           MR. BERMAN:  Call the judge.  He knows

2    we're at this deposition.  It's court ordered.

3           MR. PROPER:  I understand.  And you

4    have the order and instructions.  I'm not bothering the

5    judge again.  He's laid out the parameters and his

6    discovery order that he issued yesterday was limited to

7    a 30(b)(6) deposition.  It has nothing --

8           MR. BERMAN:  Take whatever position you

9    want.

10          MR. PROPER:  Please don't interrupt me.

11   It has nothing to do with today's deposition.

12          MR. BERMAN:  We don't agree, but that's

13   fine.  Take whatever position you want.  You're free to

14   call the judge.  He's here today for the hours that

15   were designated per a court order.  We're pretty clear

16   on what the case is about.  Today is absolutely

17   irrelevant to this case.

18   BY MR. PROPER:

19   Q.     Was CBSG providing merchant cash advances to

20   businesses in 2019?

21          MR. BERMAN:  Up until October of 2019,

22   you can answer.

23          MR. PROPER:  That's not my question.

24   BY MR. PROPER:

Joseph LaForte

Page 15

1   Q.      Was CBSG providing merchant cash advances to

2   businesses in 2019?

3              MR. BERMAN:  Same objection.

4              THE WITNESS:  I don't know.

5   BY MR. PROPER:

6   Q.      Has CBSG, to your knowledge, ever provided a

7   merchant cash advance to a business?

8   A.      Of course.

9   Q.      Do you know when CBSG first began providing

10  merchant cash advances to small businesses or any

11  business?

12             MR. BERMAN:  Objection.

13             You can answer.

14             THE WITNESS:  Say the question again.

15  BY MR. PROPER:

16  Q.      Do you know when CBSG first began to provide

17  merchant cash advances to businesses?

18  A.      No.  You'd have to ask CBSG.

19  Q.      Do you know whether CBSG has changed the

20  structure of its transactions with businesses since you

21  started sourcing deals for them?

22  A.      What transaction?

23  Q.      Any transaction with a business that you

24  sourced in your capacity as an employee of Recruiting

Joseph LaForte

Page 16

1    and Marketing Resources.

2                MR. BERMAN:  Objection.  Not a proper

3    question.

4                But you can answer.

5                THE WITNESS:  There's many different

6    products and services that CBSG offers and I'm sure

7    they change their products and services on a day-to-day

8    basis.  Similar to White & Williams, how you guys

9    change your products and services and employees, too.

10   So I'm sure, as a corporation, they change their

11   products and services.

12   BY MR. PROPER:

13   Q.    Okay.  So what products and services were

14   offered to businesses by CBSG in 2019?

15   A.    I don't have -- I don't speak for the company.

16   I don't know all the products and services.

17   Q.    Can you give me an example of some of the

18   products and services that CBSG offered to businesses

19   in 2019?

20   A.    The one with -- the one your client took from

21   HMC, we can talk about that.

22   Q.    Okay.  Can you give me some examples of

23   products and services other than the type of product

24   that was issued to my client?

Joseph LaForte

Page 17

1    A.      No, I'm not going to speak on behalf of

2    CBSG/Par Funding.

3    Q.      Okay.  So with respect to deals you sourced

4    with CBSG, were there instances where you were involved

5    in transactions that did not involve a merchant cash

6    advance?

7                 MR. BERMAN:  Objection.

8                 You can answer.

9                 THE WITNESS:  Yes.

10   BY MR. PROPER:

11   Q.      What other products and services that you were

12   involved with did CBSG offer to businesses?

13   A.      Invoice factoring, collateral.  Many different

14   products and services that they could offer.  It

15   depends.

16   Q.      What do you mean by "collateral"?

17   A.      Collateralized product obligations, invoice

18   factoring.  All different types of products that people

19   could expand their businesses with.

20   Q.      Can you just explain to me how a

21   collateral-based transaction would work with CBSG?

22   A.      I'm not good at them.  I can't explain it to

23   you.

24   Q.      Can you explain to me how an invoice factoring

Joseph LaForte

Page 18

1    arrangement from CBSG differs from a merchant cash

2    advance from CBSG?

3    A.     Well, I'll try.  Specific receivables are

4    different than future receivables.  In the case of your

5    client, there were specific receivables.  So we help

6    clients grow their businesses.  We take a specific

7    receivable.  We finance the customer in order for him

8    to obtain the business.  They go and procure the

9    receivable and they're supposed to give us back the

10   proportionate amount of that receivable in order for

11   them to enhance their business.

12   Q.     Were all of the transactions with my client

13   invoice factoring arrangements?

14   A.     I wouldn't know.

15   Q.     Did you do anything to prepare for today's

16   deposition?

17   A.     No.

18   Q.     Did you have any involvement with the

19   different transactions that my client entered into with

20   CBSG?

21   A.     I wouldn't bother reading it.

22   Q.     I'm sorry?

23   A.     I didn't even bother reading it.

24   Q.     Yeah, I'm just -- now we're talking about your

Page 19

1   memory.  Do you have any recollection of having a

2   personal involvement with any of the different

3   transactions that my client entered into with CBSG?

4                    MR. BERMAN:  Objection.

5                    But you can answer, if you understand.

6                    THE WITNESS:  Your client -- the

7   initial -- the initial transactions, I did have an

8   involvement in.  Kara was -- who your client -- client

9   by name -- Kara DiPietro was a friend.  I was -- helped

10  her immensely grow the business.  We identified

11  specific receivables.  We purchased those specific

12  receivables.  We went on websites and transferred those

13  receivables into our name.

14                   And over time and years, the

15  relationship blossomed.  She -- we let our guard down a

16  little bit and we didn't actually take those

17  receivables.  We only put them on the contract.  And

18  here we are today without our share of that specific

19  receivable, somewhere to the tune of $3 million.  So

20  your client came to our office unsolicited.  We invoice

21  factored her receivables.  When the invoice came in,

22  she kept all the money.  So that's -- that's how we're

23  in the situation we're in now.

24  BY MR. PROPER:

Joseph LaForte

Page 20

1   Q.    So when there's an invoice factoring

2   arrangement like the one you described and the

3   agreement states, for example, that you're taking

4   10 percent of a specific invoice, how do you go about

5   ensuring that you're only taking 10 percent of a

6   specific invoice as opposed to receivables from other

7   invoices?

8                     MR. BERMAN:  Objection.

9                     If you can understand the

10  multi-compound.

11                    THE WITNESS:  I don't understand, but

12  I'll try to answer it.

13  BY MR. PROPER:

14  Q.    Oh, if you don't understand, I wouldn't want

15  you to answer --

16  A.    I'll try to answer it anyway.

17                    On the contract, it has the specific

18  receivable.  The nature of the contract in dispute of

19  the transaction was not to steal the money that was

20  supposed to come to us.  Our share of the money, which

21  was that specific receivable for all her jobs, her

22  construction jobs, we gave her early payback options on

23  every single deal so in case that receivable came back

24  late, she would have a benefit.

Joseph LaForte

Page 21

1    Q.      So there's a specific invoice identified on

2    different agreements that you --

3    A.      Well, she did.

4    Q.      -- that CBSG purchased, correct?

5    A.      She did, yes.

6            MR. BERMAN:  Let him finish for her.

7    BY MR. PROPER:

8    Q.      Were there specific invoices that CBSG

9    purported to purchase in different transactions?

10   A.      Yes.

11   Q.      And those invoices are identified on the

12   different agreements, correct?

13   A.      Correct.

14   Q.      And under the agreement, you were entitled to

15   take a certain percentage of the revenues that were

16   generated by those invoices, right?

17           MR. BERMAN:  Objection to the "you."

18           But you can answer, if you can answer.

19           THE WITNESS:  Yes, it's similar to how

20   you guys operate.  So you guys work on contingency.

21   You guys put your time, effort in and cost into a

22   specific deal.  I'm sure there's a contingency on this

23   transaction.  You spend time/money for this gentleman

24   and you to sit here, and this court reporter to sit

Joseph LaForte

Page 22

1   here, you spend money.  At the end, if there's a profit

2   or when there's a profit, you can share in the profits.

3   And that's exactly what this was.  The only difference

4   between me and you is I put up -- we put up actual

5   cash.

6   BY MR. PROPER:

7   Q.      How does CBSG go about determining when monies

8   are coming in on a specific invoice that's

9   identified --

10  A.      Says it on the invoice.

11  Q.      So there's an invoice identified on an

12  agreement; I got it.

13          So how does CBSG determine when money

14  comes in on that invoice?

15  A.      We don't.

16  Q.      So how do you know when to take money?

17  A.      It's a daily ACH.  So the balance comes off

18  the amount of the invoice.  So if you read the

19  agreements, you can know.  It comes off the amount.  So

20  it's a fixed payback, just our share.

21          So think of it like this:  It's a

22  nonowner equity partnership with a company in order for

23  them to expand their businesses.  It's very American,

24  unlike you guys would think.  But if you help these --

Joseph LaForte

Page 23

1   if these clients want to expand their business, we take

2   a proportionate amount of the receivable, which is our

3   principal, and a profit back on each receivable.  It's

4   pretty simple.

5   BY MR. PROPER:

6   Q.      I understand the construct.

7   A.      Got it.  So why did you ask me, then?

8   Q.      I don't understand your answer.  I understand

9   the concept.

10  A.      I'm saying why did you ask me about the

11  construct if you -- if you understand it?

12              MR. BERMAN:  Just answer his questions.

13              THE WITNESS:  I'm trying.

14              MR. BERMAN:  I know.  No, no, and you

15  are.  So just let him ask the questions for you.

16  BY MR. PROPER:

17  Q.      So when CBSG purchases an invoice, is the

18  invoice -- strike that.

19              So when you purchase an invoice, are

20  there receivables already generated or are there

21  receivables that have to be collected or both?

22              MR. BERMAN:  Objection.

23              THE WITNESS:  I don't know.

24  BY MR. PROPER:

Joseph LaForte

Page 24

1    Q.      Because here's my confusion, and I'm hoping

2    you can alleviate it:  If you're purchasing

3    receivables, are those receivables that have already

4    been received by the business or are they receivables

5    that the business has not yet collected?

6                    MR. BERMAN:  Objection.

7                    You can answer, if you understand.

8                    THE WITNESS:  I don't know.

9    BY MR. PROPER:

10   Q.      What's the definition of a receivable?

11   A.      I don't even know what you're talking about

12   right now.

13   Q.      Do you know what a receivable is?

14   A.      If a job happens, which there's documents and

15   pictures and a whole bunch of things which we'll get

16   to, I'm sure, later down the road with your client's

17   deposition, there's documents that show the actual job

18   that needs to be done.  The client doesn't have the

19   money to do the job.

20   Q.      Because she hasn't been paid yet for it,

21   right?

22   A.      Of course.

23   Q.      Right.  That's what I'm getting at.

24   A.      Of course.

Joseph LaForte

Page 25

1    Q.      Right.

2    A.      So we pick -- give her the money to go do the

3    job.  And when the money comes back --

4    Q.      Exactly.

5    A.      -- we all make a profit.

6    Q.      So this is my question:  You, CBSG, enters

7    into an agreement with my client, right?

8                   MR. BERMAN:  Well, objection.  Who's

9    the "you, CBSG"?

10                  But you can answer, if that's a fair

11   question.

12                  THE WITNESS:  Uh-huh.

13   BY MR. PROPER:

14   Q.      CBSG enters into a relationship with my

15   client, purchases a specific invoice, for which monies

16   have not yet come in, right?

17                  MR. BERMAN:  Objection.

18   BY MR. PROPER:

19   Q.      That's what we just established, yes?

20                  MR. BERMAN:  Objection.

21   BY MR. PROPER:

22   Q.      She needs money --

23   A.      I'm assuming that.

24   Q.      -- because she hasn't --

Joseph LaForte

Page 26

1    A.      I'm assuming that.

2    Q.      -- gotten paid on the job.

3    A.      I'm assuming that.  What your client did with

4    their money, I don't know.

5    Q.      Got it.  So now you have an agreement, CBSG

6    has an agreement with my client to purchase receivables

7    that CBSG is hoping the business actually pays to my

8    client, right?  The business that owes the receivables

9    pays?

10                  MR. BERMAN:  Objection.  Ask a

11   question.

12                  MR. PROPER:  That's the construct.

13                  MR. BERMAN:  Is there a question?

14   BY MR. PROPER:

15   Q.      Here's my question:  You're only entitled to

16   take 10 percent of the receivables you purchase on a

17   specific invoice.  Why are you taking a fixed payment

18   before the receivables come in?

19                  MR. BERMAN:  Objection.

20                  THE WITNESS:  That's incorrect.  Those

21   are specific receivables that we owned and purchased.

22   Your client came unsolicited to our office and sold us

23   those receivables.

24   BY MR. PROPER:

Joseph LaForte

Page 27

1    Q.      Let's use a specific example.

2                    -   -   -

3                    (Whereupon, a 5/31/18 Agreement has been

4    marked as Exhibit LaForte-1 for identification.)

5                    -   -   -

6                    MR. PROPER:  You both have 5/31?  Just

7    want to make sure I gave you the right one.

8                    MR. BERMAN:  By "5/31," what do you

9    mean?

10                   MR. PROPER:  The date of the agreement,

11   5/31/18.

12                   MR. BERMAN:  Oh, yeah.  Why are these

13   not Bates stamped?

14                   MR. PROPER:  The ones that we printed.

15                   MR. BERMAN:  Right, but how do I know

16   this was produced in this case?  Are you making a

17   representation on the record this has all been

18   produced?

19                   MR. PROPER:  Yes --

20                   MR. BERMAN:  Okay.

21                   MR. PROPER:  -- to the best of my

22   knowledge and belief.

23   BY MR. PROPER:

24   Q.      Have you seen this document before today?

Joseph LaForte

Page 28

1    A.      Nope.

2    Q.      Were you involved in the particular

3    transaction that's identified in LaForte-1?

4    A.      I don't recall.

5    Q.      On Page 2 of the agreement, it sets forth the

6    terms of what's titled a "Factoring Agreement"; do you

7    see that?

8    A.      Uh-huh.

9    Q.      And it looks like that the invoice in question

10   is 2946-04; do you see that on Page 2?

11   A.      I see it.

12   Q.      Do you know how much was owed on 2946-04?

13   A.      I'm sure it's in her e-mails.

14   Q.      Okay.  What did CBSG do to determine what

15   monies were owed on invoice 2946-04?

16   A.      Probably not enough.

17   Q.      What did CBSG do to determine how much monies

18   have been paid in that invoice at the time this

19   agreement was executed?

20   A.      I wouldn't know what CBSG did on any specific

21   invoice.  I'm not an underwriter for the company.

22   Q.      What does CBSG do, to your knowledge, to

23   determine when monies are paid on this particular

24   invoice, 2946-04?

Joseph LaForte

Page 29

1   A.      What?  I don't understand.

2   Q.      How does CBSG determine when monies are paid

3   to HMC on invoice 2946-04?

4   A.      I don't know the answer to the question.

5   Q.      Because under this agreement, CBSG's entitled

6   to take 10 percent of the receipts for this particular

7   invoice, correct?

8   A.      Does it say that?

9           MR. BERMAN:  Are you making that

10  representation?

11  BY MR. PROPER:

12  Q.      I thought that's what you testified

13  previously, that it's your understanding that my

14  client --

15  A.      Does that say that, though?  You just mixed

16  that up, though.  You said this specific receivable.

17  Then you said receipts purchased.

18  Q.      I'm asking you, your understanding of this

19  agreement was CBSG buying an interest in this

20  particular invoice, 2946-04, or all of my client's

21  receivables?

22  A.      I can't speak for CBSG, but I would -- I don't

23  know.

24  Q.      So when you testified previously that CBSG was

Joseph LaForte

Page 30

1    acquiring a 10 percent interest in particular invoices,

2    does that apply to this transaction?

3              MR. BERMAN:  Objection;

4    mischaracterization.

5              THE WITNESS:  I didn't testify to that.

6    BY MR. PROPER:

7    Q.    You didn't testify to that?

8    A.    That CBSG bought 10 percent of the invoice?

9    Q.    Right.

10   A.    I don't know what that means.

11   Q.    You don't know what buying 10 percent of a

12   particular receivable due to an invoice --

13   A.    That's a holdback.  It's not 10 percent of the

14   receivable.  So, Jason --

15   Q.    Justin.

16   A.    Justin, whatever your name is.

17              If you're going to talk to me about

18   factoring agreements, you really have to be a little

19   bit more educated on what -- not 10 percent of the

20   receivable.  The holdback is the 10 percent of the

21   client's income.  That's what the holdback means.  It's

22   not 10 percent of the invoice.  So you really got to

23   educate yourself on the product.  10 percent means that

24   the client will, at minimum, pay 10 percent of their

Joseph LaForte

1   monthly income in order to pay off the invoice.

2   Q.      Where does it say that?

3   A.      In the whole document.  Read it.

4   Q.      Where?

5   A.      I don't know.  I'm not a lawyer, but that's

6   what it is.  10 percent is right here.  Daily specified

7   amount is 1907 on this invoice.  So that means that

8   10 percent, the specific percentage is of the client's

9   income, which was analyzed by underwriting.  So you're

10  asking me questions about underwriting that I can't

11  specifically answer on that specific day, but that's

12  what that manes.

13  Q.      What are you -- what are you looking at to

14  determine that it's not 10 percent of the specific

15  invoice that's being calculated but 10 of my client's

16  income?

17  A.      Because it's not.  It's in the document.

18  10 percent of the income.  Specified percentage,

19  10 percent.  Future receivables.  So future receipts of

20  seller's recourse.  Seller's recourse, right?  So

21  buying future receivables.  In this specific case, she

22  pledges this invoice, 2946-04.

23  Q.      Pledges it for what?

24  A.      To pay back the amount that she borrowed.  She

Joseph LaForte

Page 32

1    borrowed 173,000, I guess, right?  Owes 27; is that the

2    purchase price?

3    Q.     She pledges this invoice.  So does that mean

4    that CBSG only gets paid when my client gets paid on

5    this invoice?

6                    MR. BERMAN:  Objection.

7                    THE WITNESS:  I don't know how they

8    collect it.  I don't know that.

9    BY MR. PROPER:

10   Q.     That's my question to you.

11   A.     I don't know the answer to that.  I'm the

12   originator.  I don't know how to answer that, but I do

13   know how to read a contract.

14                   So if your client was -- in this case,

15   on that specific day, told CBSG/Par Funding that she

16   makes approximately $2,000 a day, 20 days in a month, I

17   guess that's how much, guys.  40 grand a month,

18   10 percent of that would mean your client's income was

19   probably around $400,000 a month, 10 percent.  So

20   that's how factoring works.  Keep writing, guys, so you

21   can learn.  So that's how -- that's how the contracts

22   work.

23                   So on that -- any given day -- and, by

24   the way, your client does do $400,000 a month.  As a

Joseph LaForte

Page 33

1    matter of fact, I received their bank statements a few

2    days ago looking for more cash advances and they're

3    doing $600,000 a month now.  So I'm sure at that time,

4    when her business was at her height, they were doing

5    more than $400,000 a month.  So that is a correct and

6    appropriate holdback.

7    Q.      How does CBSG determine what a business's

8    income is?

9    A.      I don't -- I don't underwrite for CBSG.  I

10   just know how to read a contract.

11   Q.      What is the -- what is the definition of

12   income in this agreement?  I don't even see the word

13   "income."

14   A.      I don't know.

15              MR. BERMAN:  Objection.

16   BY MR. PROPER:

17   Q.      What's the definition of income in this

18   agreement?  Educate me.

19   A.      I don't know.  I don't know definitions of

20   income.

21   Q.      Is there a definition of income in this

22   agreement, LaForte-1?

23   A.      So if you're eluding to the fact that how much

24   of it is profit, it's irrelevant.  It's future

Joseph LaForte

Page 34

1   receivables.  It's right here.  10 percent, that is a

2   specified percentage.  10 percent of their income.  She

3   must have proved out somewhere that she works more than

4   10 percent or I think her doors would probably be

5   closed at this point.

6   Q.      10 percent of what future receivable?

7   A.      Well, her future receivables, plus this --

8   plus this invoice was pledged.  This is a pledge.  The

9   invoice is pledged.

10  Q.      If you're purchasing 10 percent of future

11  receivables, you, being CBSG --

12  A.      We're not purchasing 10 percent of future

13  receivables.  You keep saying that.  That's incorrect.

14  Q.      What did you purchase --

15  A.      We're buying future receivables.  We're taking

16  back 10 percent of the client's income on a monthly

17  basis in order to pay back the money the client

18  procured.

19  Q.      So what receivables were purchased on

20  LaForte-1?

21  A.      I don't know.

22  Q.      Just the receivables --

23  A.      I told you I didn't even read this.

24  Q.      I'm asking you to look at it now, please.

Joseph LaForte

Page 35

1              Did CBSG just purchase receivables for

2    invoice 2946-04 or did it purchase all of my client's

3    receivables?

4    A.      Maybe both.

5              MR. BERMAN:  Objection.

6    BY MR. PROPER:

7    Q.      I'm asking --

8    A.      Maybe both.

9    Q.      -- what did it do?

10   A.      I don't know.  I'm not CBSG.  Maybe both.

11   Q.      Well, looking at the agreement, you said you

12   can read the agreement and I'm basically saying I don't

13   understand it --

14   A.      Maybe both.

15   Q.      -- and I'm asking you to educate me.

16   A.      I don't know.  Maybe both.  Ask them.

17   Q.      I'm not asking maybes, could have, would have,

18   should have's.

19   A.      I'm just saying --

20             MR. BERMAN:  He's a fact witness.  You

21   keep on asking him to testifying on behalf of --

22             COURT REPORTER:  Hold on a second.  I

23   can't get all of you talking over each other.  So if

24   you can try to just slow down a little bit.

Joseph LaForte

Page 36

1   BY MR. PROPER:

2   Q.      Do you know what receivables CBSG purchased on

3   this particular transaction, LaForte-1?

4   A.      I don't know.  Why don't you look in the book

5   of gratitude that your client gave us, the big book of

6   gratitude when she came to our office, and look and see

7   which job it was because I don't know.  There was 48

8   transactions.  I don't know which specific receivables

9   this is, Number 1; and Number 2, I'm not an underwriter

10  for the company, so how would I know?

11  Q.      And I still want to know your understanding as

12  to whether CBSG purchased invoice number 2946-04 or

13  they purchased something more than invoice 2946-04.

14              MR. BERMAN:  Objection.

15              THE WITNESS:  You keep asking me that.

16  I don't know.

17  BY MR. PROPER:

18  Q.      You don't know.

19              And it's your understanding that the

20  10 percent daily specified amount of 190739 is

21  10 percent of my client's daily income?

22  A.      Monthly income, not daily income.

23  Q.      Got it.

24  A.      Jason -- what's your name?  Justin?

Joseph LaForte

Page 37

1    Q.      It doesn't matter.

2    A.      Justin, you got to learn the business before

3    you represent these clients, especially if you're

4    taking money from them.  It's 10 -- let me teach you.

5    It's 10 percent of the monthly income.  So the judge

6    has -- I'm sure his time is very precious, as is ours.

7    So before we come to the depositions, you really got to

8    learn the business.  10 percent is a specified daily

9    amount according to how much the client is showing us

10   of how much they make on a monthly basis.

11   Q.      Okay.  So the 10 percent is the monthly gross

12   revenue?

13   A.      10 percent --

14   Q.      Is it monthly gross revenue?

15   A.      I'm not an underwriter, but it says 10 percent

16   gross -- I don't know.

17   Q.      You don't know the --

18   A.      I'm not an underwriter.  I don't know.  You're

19   asking me to formulate an opinion on how a company

20   underwrites.  There's companies all over the United

21   States that underwrite differently.  I don't know how

22   they come up with their decisions.

23   Q.      So you don't know how CBSG underwrote this

24   particular transaction?

Joseph LaForte

Page 38

1    A.      I have no idea.

2    Q.      Do you know what underwriter was involved in

3    this transaction?

4    A.      No.

5    Q.      Do you know who Dean Vagnozzi is?

6    A.      No.  Of course I know Dean Vagnozzi.  You

7    asked me that last time.  It was the same question.

8    Q.      What does Dean Vagnozzi do on -- what does

9    Dean Vagnozzi do on behalf of CBSG?

10   A.      Nothing.

11   Q.      He doesn't promote for CBSG?

12           MR. BERMAN:  Objection.

13           You can answer.

14           THE WITNESS:  Dean Vagnozzi does

15   nothing -- when you say does Dean do anything -- Dean

16   Vagnozzi is not an employee of CBSG.

17   BY MR. PROPER:

18   Q.      Does Dean Vagnozzi raise money for CBSG?

19   A.      Yes.

20   Q.      Okay.  Do you know how much money Dean

21   Vagnozzi raised for CBSG in 2019?

22   A.      No.

23   Q.      Did Dean Vagnozzi raise any money for CBSG, to

24   your knowledge, in 2019?

Joseph LaForte

Page 39

1    A.      I wouldn't know.  I don't know.

2    Q.      Does Dean Vagnozzi have a contract with CBSG,

3    to your knowledge?

4    A.      I wouldn't know that.  I'm not in -- I'm not

5    in the legal department.  I'm a sales rep for

6    Recruiting and Marking Resources.  I wouldn't know if

7    Dean Vagnozzi has a specific contract.  I know Dean and

8    that's --

9    Q.      Did you introduce Mr. Vagnozzi to CBSG?

10   A.      No.

11   Q.      Do you know how CBSG and Mr. Vagnozzi first

12   met?

13   A.      No.

14   Q.      Do you know when Mr. Vagnozzi first started

15   raising monies on behalf of CBSG?

16   A.      No.

17   Q.      When did you first meet Dean Vagnozzi?

18   A.      I don't remember.

19   Q.      Did you meet him on -- at a golf course?

20   A.      I don't remember.

21   Q.      Did you ever tell Mr. Vagnozzi that you were

22   in a business of lending money?

23   A.      I don't remember.

24   Q.      Did you ever tell Mr. Vagnozzi that you were

Joseph LaForte

Page 40

1   the owner of CBSG?

2   A.      I don't remember.

3   Q.      Did you ever tell Mr. Vagnozzi that CBSG loans

4   money to businesses at 35 percent interest rates?

5   A.      I don't remember.

6   Q.      Does CBSG loan money to businesses at

7   35 percent interest rates?

8   A.      There is no interest rates.  It's not a loan.

9   So when you go back to this, Justin/Jason, this

10  document right here says specifically -- and this is

11  another thing you guys need to really take a look at --

12  it's a purchase of future receivables.  It's not a

13  loan.

14              As a matter of fact, this has already

15  been brought up in about 230 different cases throughout

16  the United States, and all have been upheld.  So for

17  you to say that this is a loan is just not true.

18              As a matter of fact, a judge in New

19  York, one of your partners just told him it could never

20  be a loan.  So I -- if you are somehow insinuating that

21  these are loans, we can debate this all day, but what I

22  would suggest that you do is I suggest that you stop

23  pandering to the Courts and go to the legislative

24  branch of government and make it a law.  And if you do

Joseph LaForte

Page 41

1   make it a law, I'm sure myself and all the other

2   companies would be happy to comply with the law.

3                I mean, you started to do that.  You

4   started to go to the legislative branch of government

5   and they didn't do anything for you guys, but you

6   should stay that way.  You're trying to try -- make a

7   law through the judicial branch of government and it's

8   wrong.  So you're wasting time.  This is not a loan.

9   It's a purchase and sale of future receivables.  It

10  says it right here.

11  Q.      Has Par Funding ever loaned money to

12  businesses, to your knowledge?

13  A.      We don't loan money.  We purchase future

14  receivables.  I say "we."  I said, "we."  RMR, who I

15  work for, we go out and procure different receivables.

16  People sell their receivables the same way you sold

17  your receivables, your client sold their receivables to

18  you.  Because, technically, if you win this case for

19  $3 million, that would be a receivable.  You're putting

20  time in right now and you're spending money, which is a

21  good way of doing business.  It's American.  And you're

22  going to go sit here and this is going to be thousands

23  and thousands of dollars and when -- and if you ever

24  won this case, you would get a contingency fee on top

Joseph LaForte

Page 42

1    of the 30,000 you guys took from your client, by the

2    way, the 30,000 you charged the -- your client, Kara

3    DiPietro.

4    Q.     Do you know if Par Funding has ever loaned

5    money?

6    A.     We just went through all that.

7    Q.     That's a no?

8    A.     That's -- we just went through all that.  So

9    don't tell me how to answer.  Don't tell me what to

10   say.  Don't ever tell me what to say.  Watch your

11   mouth.  It's enough.

12              Now, I got a question for you.  When is

13   it okay for a client to take a cash advance?

14              MR. PROPER:  Can you mark this, please.

15              THE WITNESS:  When is it okay for a

16   client to take a cash advance?  Is it okay to get you

17   paid?  Because you dimwits, your client took a cash

18   advance in order to pay you last month.  Did you tell

19   the judge that?  Your client went out, borrowed $50,000

20   from a cash advance company and then wired the money to

21   White & Williams.  So it's okay when you guys -- the

22   hypocrisy that you guys -- the fraud and the hypocrisy

23   that you guys portray is ridiculous.

24              So you, Justin, Jason, whatever your

Joseph LaForte

Page 43

1    name is, in your Ivy League suit, just took $50,000

2    from a cash advance company, put it in your escrow

3    account or wherever you put it here.  I think you

4    should recuse yourself from the case if that's true.

5    Did you take a cash -- did you take money from

6    Ms. DiPietro in the form of cash advance?

7                    MR. PROPER:  Can you mark that as

8    Exhibit 2, please.

9                         -   -   -

10                    (Whereupon, a Par Funding About Us Page has

11   been marked as Exhibit LaForte-2 for identification.)

12                        -   -   -

13   BY MR. PROPER:

14   Q.     Have you ever seen Exhibit 2 before from Par

15   Funding's Facebook page?

16   A.     Par Funding, I don't even know if it has a

17   Facebook page.

18   Q.     I'm representing to you that I printed this

19   off of Par Funding's Facebook page.

20                    MR. BERMAN:  Did you produce this in

21   this case?

22                    MR. PROPER:  I don't know if it's been

23   requested and I don't know that it matters.  I'm asking

24   the witness a question about the Par Funding --

Joseph LaForte

Page 44

1          THE WITNESS:  I've never seen it, but

2    Facebook -- anybody can make a Facebook page for any

3    different business.  I've had -- I've had my own name,

4    five people with my own name.  You can put anything on

5    Facebook.  This is not even a -- I don't even want to

6    look at this.  This isn't an appropriate document.  I

7    can make a Facebook page today for White & Williams and

8    put this on there right now.  So this is -- I don't

9    know.  Why am I looking at this?

10   BY MR. PROPER:

11   Q.     Has Par Funding ever represented to the public

12   that Par Funding is not a merchant cash advance

13   company, to your knowledge?

14   A.     I wouldn't know what Par Funding represents

15   because I don't work for Par Funding.

16   Q.     Okay.  Do you know if Par Funding ever

17   represented on its Facebook page as shown on Exhibit --

18   A.     I don't even know about Par Funding's Facebook

19   page.  I don't even have a Facebook page.

20   Q.     Can you take a look --

21   A.     I don't even know how to use Facebook.  I

22   don't even know what Facebook is.

23   Q.     Can you take a look at Exhibit 2 where it

24   states, "Loan size, 5,000 to $150,000"; do you see

Joseph LaForte

Page 45

1    that?

2    A.      Yup.

3    Q.      Do you see where it says, "About us:  Par

4    Funding's goal is to get you the working capital you

5    need to run and grow your business and to do it while

6    providing the highest degree of personal professional

7    services"?

8    A.      I'll answer the question if you tell me if one

9    of the corporate members of our company and our

10   compliance department approved this.  Before that, I'm

11   not going to answer any questions about this garbage

12   right here that anybody, a competitor, anybody, you,

13   any of your clandestine operations could have put this

14   on my website.  That is not a document that I'll even

15   answer to because it's on Facebook.

16   Q.      What was your role --

17   A.      Is Facebook an official corporate website?  Is

18   that what you're saying?

19   Q.      What was your role with Par Funding's Facebook

20   page in 2012?

21   A.      Facebook.  We're talking about Facebook now.

22           MR. BERMAN:  Do you have any role with

23   Par Funding's Facebook page is the question.

24           THE WITNESS:  I don't have Facebook.  I

Joseph LaForte

Page 46

1    don't know how to use Facebook.

2    BY MR. PROPER:

3    Q.      Who is the compliance person --

4    A.      Do I look like a Facebook on here?

5    Q.      Who is the compliance person that Par Funding,

6    in 2012, that would have been responsible --

7    A.      I don't know any employees of Par Funding.

8    I'm not going to testify of things I don't know about

9    because I won't insult the judge.

10   Q.      If you could just let me finish my question

11   because --

12   A.      I have a question for you.  Did you take

13   $50,000 in cash advances?

14   Q.      In 2012, do you know who was responsible for

15   compliance at CBSG?

16   A.      Didn't we just answer that?

17               MR. BERMAN:  You don't know, so you can

18   say it again.

19               THE WITNESS:  I don't know.

20   BY MR. PROPER:

21   Q.    How many employees did CBSG have in 2012?

22   A.    Can we cut this short?  I don't know how many

23   employees CBSG has or didn't have.  I don't know.

24   Q.    In 2018, what role -- strike that.

Page 47

1                    In 2019, what role did Lisa McElhone

2    have in CBSG?

3    A.      I don't know.

4    Q.      Was Ms. McElhone the president of CBSG in

5    2019?

6    A.      I don't know.

7    Q.      Did Ms. McElhone work for CBSG in any capacity

8    in 2019?

9    A.      I don't know anything about any of these

10   questions about CBSG.  I don't work for CBSG.  I work

11   for Recruiting and Market Resources.

12   Q.      Yeah, I'm just wondering if you --

13   A.      We went over that already.

14   Q.      Okay.  I'm wondering if you knew --

15                    COURT REPORTER:  Hold on, please.  I

16   cannot get you both at the same time.  This transcript

17   is going to be a mess right now if this doesn't stop.

18   I'm trying my hardest, but this is getting really bad.

19                    MR. PROPER:  We'll give you a big tip

20   after.

21                    COURT REPORTER:  I know, but it doesn't

22   matter.  It's making my work way worse.

23   BY MR. PROPER:

24   Q.      If you could please try to let me finish my

Joseph LaForte

Page 48

1    question before you answer even if you anticipate it.

2                   MR. BERMAN:  And the same for you.

3                   MR. PROPER:  I have done that.

4    BY MR. PROPER:

5    Q.      Can you please let me know whether you know

6    whether your wife, Lisa McElhone, had any involvement

7    with CBSG in 2019.

8    A.      No.

9    Q.      You don't know or she didn't?

10   A.      I don't know any answers to these questions

11   about Par Funding/CBSG.

12   Q.      Did your wife own any businesses in 2019?

13   A.      I don't know what she owns and doesn't own.

14   Q.      Okay.  You ever hear of a company called

15   Lacquer Lounge?

16   A.      No, I never heard of Lacquer Lounge.

17   Q.      Is there a hair salon or nail salon that your

18   wife does own?  I may have the name wrong.

19   A.      Yeah, the name is Lacquer Lounge.  Don't ask

20   me ridiculous questions.  You're wasting time.  She

21   owns a nail salon in Old City.

22   Q.      When did she purchase the nail salon --

23   A.      I don't know.

24   Q.      -- in Old City?

Joseph LaForte

Page 49

1    A.      I don't know her business.

2    Q.      If you could please try to let me --

3    A.      We have a very --

4    Q.      -- ask my questions.

5    A.      We have a very private business relationship.

6    She doesn't tell me about her business.  I don't tell

7    her my business.  We have a very loving, beautiful

8    relationship, two dogs and a house.  We don't talk

9    business.

10              Did you guys really take $30,000 from

11   Kara DiPietro?  Do you guys -- do you idiots really

12   realize that she took a cash advance two days before

13   that in order to pay you guys?  Do you guys know that?

14   Why don't they recuse themselves?  Because you guys

15   benefited and guess what?  I don't -- I'm not even

16   against it.  I think it's American.  God bless you

17   guys.  You guys took a cash advance from -- your client

18   took a cash advance to pay you guys, big White &

19   Williams.  You guys should do your homework a little

20   bit better before you take money from these clients.

21   Q.      So just so we're clear, you are not a part of

22   the founding of CBSG, along with your wife, in 2012?

23   A.      We answered that question earlier.

24   Q.      Got it.  And do you know if your wife was the

Joseph LaForte

Page 50

1  person responsible for accounting for CBSG in 2012?

2  A.      We answered that question in the last

3  deposition.

4  Q.      Did you run the factoring side of the business

5  for CBSG in 2012?

6  A.      I never ran any business for CBSG.  I work for

7  Recruiting and Marketing Resources.

8  Q.      Go it.  And do you know if your wife ceased

9  having any involvement with CBSG when she purchased

10  Lacquer Lounge in 2012?

11  A.      I don't know.

12          MR. PROPER:  Okay.  Can you have this

13  marked, please, LaForte-3.

14                  -  -  -

15          (Whereupon, a Declaration of Lisa McElhone

16  has been marked as Exhibit LaForte-3 for

17  identification.)

18                  -  -  -

19  BY MR. PROPER:

20  Q.      Do you have any recollection of a lawsuit that

21  your wife and yourself were involved with in the United

22  States Bankruptcy Court for the Southern District of

23  California, Santa Ana Division involving South Coast

24  Behavioral Health?

Joseph LaForte

Page 51

1    A.      No.

2    Q.      Are you aware that there was an order for

3    contempt issued against you in connection with

4    violating a bankruptcy stay?

5    A.      No.

6    Q.      Okay.

7    A.      I don't handle the league, I guess.

8    Q.      Have you ever seen this declaration that was

9    submitted on behalf of your wife in connection with

10   this matter?

11   A.      No.  She doesn't show me her business.

12   Q.      Okay.  On Page 3, do you recognize that as

13   your wife's signature?

14   A.      I don't know.  I'm not going to -- I don't

15   know her signature.

16   Q.      Okay.  Are you aware that in this declaration,

17   your wife represented that, "Joseph LaForte and I are

18   married and live in Haverford, Pennsylvania"; is that

19   true?

20   A.      Yeah.

21   Q.      Okay.  Your wife then represents in Paragraph

22   5, "We founded Complete Business Solutions Group d/b/a

23   Par Funding in or around 2012."

24   A.      She just likes -- she probably just likes to

Joseph LaForte

Page 52

1    include me.  And she's being very nice.  For a nice

2    business that she started herself, she just likes to

3    include me.  I am her husband.

4    Q.      Okay.  I just want to ask specifically about

5    this representation.

6    A.      I don't think you should ask about my marital

7    life, though.  I don't really see how that's relevant

8    here.  What my wife says that we do together is

9    irrelevant.  It's HMC, you should represent them.  They

10   gave you 30,000 bucks.

11   Q.      Ms. McElhone represents in Paragraph 5 that,

12   "We founded Complete Business Solutions Group, d/b/a

13   Par Funding in or around 2012"; is that a true

14   statement?

15   A.      Whatever my wife says is a thousand percent

16   true.

17   Q.      Okay.

18   A.      So why don't we -- I'm not answering any of

19   these -- any more of these questions.

20   Q.      Okay.  So --

21   A.      Whatever my wife says is true.

22   Q.      Okay.  So you did -- you were part of the --

23   A.      Whatever my wife says is true.

24   Q.      "Mr. LaForte ran the factoring side of the

Joseph LaForte

Page 53

1   business and I handled the accounting for less than a

2   year"; is that true?

3   A.      Whatever my wife says is true.

4   Q.      Okay.  So just to be clear, you previously

5   testified under oath that you were not involved in any

6   aspect of CBSG's business and you repeatedly testified

7   to that.  Your wife states in this declaration that you

8   ran the factoring side of Complete Business Solutions

9   Group's business.  Which is true?

10              MR. BERMAN:  Objection.  That's not

11  what it says, so read the words.

12  BY MR. PROPER:

13  Q.      "Mr. LaForte ran the factoring side of the

14  business."  Did you run the factoring side of the

15  business?

16  A.      Whatever my wife says is true.

17  Q.      So that's true?

18  A.      She wants me to feel -- if she wants me to

19  feel like she makes me feel good, it's similar to this,

20  Jason --

21              What's his name?  Jason?

22              It's similar to your wife telling you

23  you look great today.  It's just a nice compliment she

24  probably just gave me.  She's very nice to me, my wife.

Joseph LaForte

Page 54

1    I'm really not that good in business, but she really

2    does try to help me along and try to put me onto

3    equally -- coequal with her.  It's very nice of her.

4    BY MR. PROPER:

5    Q.      What were you doing, exactly, in 2012 when you

6    were running the factoring side of the business?

7                    MR. BERMAN:  Objection.

8                    THE WITNESS:  What does the

9    factoring -- does it even mean, "the factoring side of

10   the business"?  What is the factoring side of the

11   business?

12   BY MR. PROPER:

13   Q.      This is what your wife said.  If you don't

14   understand what the factoring side of the business is,

15   then I guess you can't answer it.

16   A.      I can't answer it.

17   Q.      Okay.  So when you said that it must be true

18   that you were running the factoring side of the

19   business, you can't really say if that's true or not,

20   you don't even know what factoring side means?

21   A.      Not really, no.

22   Q.      Okay.  And then your wife states in Paragraph

23   6 that, "I hired Joe Cole, the current CFO of CBSG, to

24   replace me in 2012," do you know if that's true?

Joseph LaForte

Page 55

1    A.      I wouldn't know anything about her business.

2    Q.      Okay.  "At that time, I started a nail salon

3    called the Lacquer Lounge," and she puts the website

4    for Lacquer Lounge.  Is that true, to the best of your

5    knowledge?

6    A.      Whatever she says is a hundred percent true.

7    Q.      Okay.  And then she states in Paragraph --

8    A.      Great place, too.

9    Q.      And then she states in Paragraph 7, "I have

10   worked full time at the Lacquer Lounge since its

11   inception and have had no subsequent involvement in

12   CBSG despite the fact that I was never formally removed

13   as its president.  Is that a true statement?

14   A.      I don't know.

15   Q.      Okay.  Because Mr. Cole testified that he had

16   daily communications with your wife about running the

17   business and here your wife is saying that she has

18   nothing to do with the business.  Do you know why

19   Mr. Cole would say that?

20   A.      That's not what that says.

21   Q.      What does it say?

22   A.      That's not what it says.

23   Q.      "I have had no subsequent involvement in

24   CBSG" --

Joseph LaForte

Page 56

1   A.      Subsequent involvement, what does that mean?

2   Q.      It means after 2012, she hasn't been involved

3   in the business.  That's what it means.

4   A.      She was never formally removed as the

5   president.  She could -- listen, I don't know -- I

6   don't know where you -- I don't even know -- I don't

7   even know where you're going with this line of

8   questioning.  You have to ask these other -- these

9   other people.  I don't even know what this is.

10  Whatever my wife says is true.

11  Q.      So it's true that your wife has had nothing to

12  do with CBSG since she purchased Laquer Lounge?

13  A.      I don't know.

14  Q.      Got it.

15  A.      Is that illegal?  Is that illegal?  You

16  can't -- you have to work in the Laquer Lounge, girl.

17  Is that illegal?  Who the president is, who this and

18  that.  This poor client, I feel bad for the 30,000 they

19  paid.

20  Q.      Is your wife still the president of CBSG?

21  A.      I don't know.

22  Q.      What involvement, if any, did your wife have

23  with respect to the transactions with my client?

24  A.      I don't know.

Joseph LaForte

Page 57

1    Q.      Did you attend an event hosted by Dean

2    Vagnozzi at the Sheraton Valley Forge Hotel last year?

3    A.      Possibly.  I went to -- I go to a lot of

4    events.

5    Q.      Okay.  How often do you go to fundraising

6    events that Dean Vagnozzi hosts on behalf of CBSG?

7                    MR. BERMAN:  Objection.

8                    THE WITNESS:  I don't know.

9    BY MR. PROPER:

10   Q.      How many have you been to in the past two

11   years?

12   A.      I couldn't -- I couldn't answer that question.

13   Q.      More or less than one?

14   A.      I don't want to lie, so I don't know.

15   Q.      Okay.  How many events can you think of, as

16   you sit here today, that you've been to that

17   Mr. Vagnozzi has hosted where he's tried to solicit

18   monies on behalf of CBSG?

19   A.      I don't know.

20   Q.      Have you been to any?

21   A.      Yes.

22   Q.      More or less than one?

23   A.      I don't remember.

24   Q.      Okay.  Are you aware that we have video of you

Joseph LaForte

Page 58

1   speaking at one of these events?

2   A.      Great.

3   Q.      Have you seen the video?

4   A.      No.  I don't watch videos of myself.

5   Q.      Last November, did you speak to a room full of

6   investors and potential investors trying to raise

7   monies on behalf of CBSG?  Yes, no or you don't know?

8                MR. BERMAN:  Don't answer the question.

9   It's October 2019.

10               MR. PROPER:  You're directing him not

11   to answer the question?

12               MR. BERMAN:  I am.

13               MR. PROPER:  Okay.

14  BY MR. PROPER:

15  Q.      With respect to the event in November of 2019,

16  did you represent to the room full of investors that

17  you were the owner of CBSG?

18               MR. BERMAN:  Don't answer the question.

19               Call the judge.

20               MR. PROPER:  Okay.  I'm just going to

21  move for sanctions, but I'm going to establish --

22               MR. BERMAN:  Do whatever you want.

23               MR. PROPER:  -- how many questions

24  you're going to direct him not to answer.

Joseph LaForte

Page 59

1              MR. BERMAN:  Do whatever you want.

2    I've told you to call the judge at any time you want.

3    The judge made very clear --

4              MR. HESKIN:  That's not how it works.

5              MR. BERMAN:  -- the relevant time

6    period is October of 2019.  As the judge made very

7    clear at the last hearing, he's available at any time

8    for these phone calls.  Plus the basis for the

9    objection is a court order limiting the scope of

10   discovery in this case, so --

11             MR. PROPER:  I'm going to say it again.

12   The order you're reading from is limited to a 30(b)(6)

13   deposition.  It has nothing to do with this issue.

14             MR. BERMAN:  We're very comfortable if

15   there's any confusion, call the judge.  I welcome you

16   to do it.

17             MR. PROPER:  I don't have confusion

18   because I'm able to read an order and what the

19   limitations and scope of that order is.

20             MR. BERMAN:  Limitations in scope are

21   discovery in this case.  You interpret it however you

22   want to interpret it.

23             MR. PROPER:  I am.  I will.

24             MR. BERMAN:  We'll interpret it -- if

Joseph LaForte

Page 60

1    there's confusion, call the judge.

2    BY MR. PROPER:

3    Q.      Have you ever represented to an investor or

4    potential investor of CBSG that you owned the company?

5                      MR. BERMAN:  Objection.

6                      But answer, if you know.

7                      THE WITNESS:  No.

8    BY MR. PROPER:

9    Q.      To your knowledge, have you ever --

10   A.      I didn't represent that to anybody.

11   Q.      Have you ever told anyone, to your knowledge,

12   that you are an owner of CBSG?

13   A.      Doubt it, no.  Maybe I bragged a little.  Is

14   that what you're getting at, do I brag to people?

15   Q.      I'm not asking whether you brag --

16   A.      Do I brag around; is that what you're asking

17   me?  Am I a braggart?  No.

18   Q.      Okay.  Have you ever represented to an

19   investor or potential investor of CBSG at any time that

20   you owned the company?

21   A.      No.

22   Q.      Because that would be a lie, correct?

23   A.      Would it be a lie?

24   Q.      To say you own CBSG, that would be a false

Joseph LaForte

Page 61

1   statement, correct?

2   A.      I just said that, right?

3   Q.      Got it.

4   A.      Yeah.

5   Q.      You're agreeing with me, that would be a false

6   statement?

7   A.      It would be -- it would also be a false

8   statement for you to say you don't take fees from my

9   clients.  My clients, by the way.  That would be a lie,

10  too, right?

11              Remember you said in the deposition

12  last time, Shane, you guys don't take the fees?  You

13  took 30 grand from this lady.  Is that a lie?

14  Q.      Have you ever represented to an investor or

15  potential investor that you personally --

16  A.      I don't remember every conversation I've ever

17  had with anybody.  I talk to thousands of people.  I

18  don't remember what I said and didn't say.  Do I go

19  around saying I own Par Funding/CBSG?  No.  Do I own

20  Par Funding/CBSG?  No.  Those are the answers.  So

21  we're wasting time.

22  Q.      Just let -- if you could please let me finish

23  my question.

24  A.      You want to eat up the retainer fees.

Joseph LaForte

Page 62

1    Q.      Have you ever represented to an investor or

2    potential investor that you personally contributed

3    $500,000 of your own money to start CBSG?

4    A.      I don't know.

5    Q.      Have you ever said that?

6    A.      I don't know.

7    Q.      You wouldn't say that because it's not true,

8    right?

9    A.      When would I say it or why?  Give me a case.

10   Who?

11   Q.      I'm just asking --

12   A.      I can answer the question.  What's the name?

13   Who?  I'm asking you who the guy is so I can answer it

14   properly.  Maybe I don't even know what you're talking

15   about.  Who's the guy?  Who did I say it to so I can

16   answer it properly?

17   Q.      I asked a question.

18   A.      It's a general question.  I don't know what I

19   said and didn't say.

20              MR. BERMAN:  He doesn't know.

21   BY MR. PROPER:

22   Q.      But there's no reason you would ever represent

23   to anyone --

24   A.      I don't know what I said.  I don't know.

Joseph LaForte

Page 63

1    Q.      Can I finish my question, please.

2    A.      It's going to be "I don't know," so go.

3    Q.      There would be no reason that you would ever

4    represent to an investor or potential investor of CBSG

5    that you contributed $500,000 --

6    A.      I don't know.

7    Q.      -- to start the company because --

8    A.      I don't know.

9    Q.      -- you've never contributed monies to start

10   the company, right?

11   A.      I don't know.

12   Q.      I thought you testified before you've never

13   contributed monies --

14   A.      I don't know.

15            COURT REPORTER:  Hold on a second.

16   BY MR. PROPER:

17   Q.      Can I please finish my question.

18            COURT REPORTER:  I can't keep going

19   like this.  It's been the whole time.  You know, I'm

20   only one person.  I've been doing this 22 years.  This

21   is really out of control.

22   BY MR. PROPER:

23   Q.      Did you previously testify at this deposition

24   that you did not contribute any of your own money to

Joseph LaForte

Page 64

1    start CBSG?

2    A.      That's correct.

3    Q.      Okay.  So, to your knowledge, have you ever

4    tried to deceive an investor by representing that you

5    did contribute your own money to start the business?

6                      MR. BERMAN:  Objection.

7                      If you know.

8                      THE WITNESS:  Who?

9    BY MR. PROPER:

10   Q.      Any investor.

11   A.      Who?

12   Q.      Any investor.

13   A.      I don't know who.  I don't know.  I don't know

14   who these people are.  I don't know what you're talking

15   about, so I can't answer the question.

16   Q.      Do you know who an investor is?

17   A.      Do I know what an investor is?

18   Q.      Yes.

19   A.      No.  What's an investor?  It can be a lot of

20   different definitions, an investor.  What, venture

21   capital investor, equity investor, like your little

22   finance company you guys have invested in this deal?

23                      MR. HESKIN:  Just limit it to a person.

24                      THE WITNESS:  Let me answer your

Joseph LaForte

Page 65

1   question.  Tell me who -- tell me who it is and I'll

2   answer the question.

3   BY MR. PROPER:

4   Q.      I'm going to ask it differently.  Have you

5   ever represented to any person that invested his or her

6   own money in a fund created by or on behalf of CBSG for

7   merchant cash advances that you were an owner of the

8   business?

9                   MR. BERMAN:  Objection.

10                  THE WITNESS:  He just objected, right?

11                  MR. HESKIN:  You can answer.

12                  MR. BERMAN:  You can answer, if you

13  know.

14                  THE WITNESS:  I don't know.

15  BY MR. PROPER:

16  Q.      Did you ever or have you ever represented to

17  any individual that's contributed monies to a fund

18  created on or on behalf of CBSG for merchant cash

19  advances that you contributed your own money to start

20  the business?

21  A.      How can -- how could -- how come --

22  Q.      Why won't you answer my question?

23  A.      Why won't you recuse yourself?  You guys took

24  $30,000 from this client.  The client got the money

Joseph LaForte

Page 66

1    from a cash advance and wired you the money.  Why are

2    we here?

3    Q.      Why won't you answer my --

4    A.      For cash advances?

5    Q.      Why won't you answer my question?

6    A.      I have 50 times.  And in the last deposition,

7    same question.  So you're eating up the hours for the

8    client.  Me, I don't care.  This is like a brother to

9    me.  I don't care, but you're wasting time.  I don't

10   remember what I said.  I don't know, but why don't you

11   ask -- why don't you answer the question?  Why did you

12   take 30,000 from the client?  The client got a cash

13   advance two days before that.

14   Q.      Would there ever be a circumstance that you

15   would try to deceive someone that was interested in

16   investing money into CBSG by stating that you

17   contributed monies to form the business?

18                   MR. BERMAN:  Objection.

19                   THE WITNESS:  The only deception here

20   is your client coming to my office 50 times asking for

21   more capital.  That's the only deception.

22                   And the other deception is you probably

23   sent your client to go get another cash advance, by the

24   way, that guys -- hey, this guy testified in front of

Joseph LaForte

Page 67

1    Congress, Mr. Heskin here, that these cash advances is

2    the root of all evil.  What you did was you probably

3    hooked up your client with a cash advance from me to

4    get you paid.  So you're the hypocrisy.  So stop asking

5    me questions that are hypocritical.

6    BY MR. PROPER:

7    Q.    I still don't have an answer to my question.

8                MR. BERMAN:  He's answered it three

9    times.  He said "I don't know" --

10               MR. PROPER:  He has not answered my

11   question.

12               MR. BERMAN:  -- "I don't know.  He has

13   not.

14               THE WITNESS:  I don't know.

15               MR. BERMAN:  He'll say "I don't know" a

16   third time.

17               THE WITNESS:  I don't know.

18   BY MR. PROPER:

19   Q.    That wasn't my question.  You can't answer "I

20   don't know" to this because it's not a proper response.

21   What --

22   A.    I can say anything I want.  Don't you ever

23   tell me what to say.  Watch your mouth.  Don't ever

24   tell me what to say.  Don't ever tell me to put words

Joseph LaForte

Page 68

1   in my mouth, you or you.

2   Q.      Would there ever be a reason -- would there

3   ever be a reason why you --

4                   THE WITNESS:  Careful with me.

5   BY MR. PROPER:

6   Q.      Are you threatening Mr. Heskin?

7                   MR. BERMAN:  Let's just stop and ask

8   the question.

9                   THE WITNESS:  No, because of your

10  mouth.  Watch your mouth.  Be a gentleman.

11                  MR. BERMAN:  Answer the question.

12                  THE WITNESS:  Be a gentleman.  Your

13  tone -- the judge can't hear your tone, so don't set me

14  up, okay?  Because I'm not a lawyer, but I'm smart

15  enough to know what's on the record and how it reads.

16  Your tone is out of line.  Treat me with respect.  I

17  came here on my own merit.  I came here this morning to

18  waste more time and I don't need to be talked to like

19  this.  So be careful with your mouth means be careful

20  with your mouth.  That's what it means.

21  BY MR. PROPER:

22  Q.      I've treated you with respect.

23                  MR. BERMAN:  No, you're raising your

24  voice.

Joseph LaForte

Page 69

1                    THE WITNESS:  You're raising your

2     voice.

3                    MR. BERMAN:  You're treating him

4     disrespectfully.  You're asking the same question over

5     and over.  But ask a clear question, you'll get an

6     answer.

7                    MR. PROPER:  Your client called me or

8     my colleague or both a punk --

9                    MR. BERMAN:  Just ask a question.

10                   MR. PROPER:  -- but I'm disrespectful?

11                   COURT REPORTER:  I got to go off the

12    record.  I'm taking a break.

13                   MR. PROPER:  You got it.

14                        -   -   -

15                   (Whereupon, the court reporter

16    requested a break and a break was taken.)

17                        -   -   -

18                   MR. PROPER:  Just want to let the

19    record reflect that after the court reporter broke,

20    Mr. LaForte called me a fucking punk and he's leaning

21    across the table when he's answering questions and

22    pointing his finger at me in a way that I find to be

23    inappropriate and very aggressive.

24                   MR. BERMAN:  Okay.  And let's make a

Joseph LaForte

Page 70

1   clear record with you screaming and hollering at him

2   across the table with your eyes bolting out of your

3   head.  So records are made to be broken when you're

4   making stuff up.  So let's continue.

5                THE WITNESS:  And I double down, you

6   are a punk, so that's correct.

7                MR. BERMAN:  When you keep on yelling

8   at the witness --

9                THE WITNESS:  When you're yelling at me

10  and you're coming across the table at me.

11               MR. BERMAN:  Let's just continue.

12               THE WITNESS:  Because you wouldn't do

13  it if you weren't in the Ivy League room because you

14  would never do -- you would never behave that way.

15  That makes you a punk.  Because if you weren't in this

16  room, you would never do that.  That's why you're a

17  punk.

18               MR. PROPER:  What would you do to me?

19               THE WITNESS:  I'm not going to do --

20  that's why you're a punk.  That's why you're a punk.

21               MR. PROPER:  Why wouldn't I do it

22  outside of this room?

23               MR. BERMAN:  We're not going further

24  than this.

Joseph LaForte

Page 71

1            MR. PROPER:  What's that?

2            MR. BERMAN:  We're not doing it --

3    we're not doing any more on this.  Let's just continue

4    with the questions or we'll stop the deposition and

5    tell the judge why we stopped.

6            MR. PROPER:  I'm going to let the

7    record reflect because counsel has made statements

8    saying that I'm screaming and yelling, which is a

9    complete distortion of reality, I've been respectful to

10   Mr. LaForte this entire deposition.  I raised my voice

11   for the first time in response to Mr. Berman in a

12   statement that he made, which I apologize for letting

13   Mr. Berman and Mr. LaForte get the better of me in that

14   moment.  But Mr. LaForte, from the get go of this

15   deposition, has acted in a way that has been sarcastic

16   at the least, aggressive and threatening at the most,

17   and his repeated references to me as a punk --

18            THE WITNESS:  No, you're a bully.

19            MR. BERMAN:  Let's just -- let's

20   just -- let's just ask questions.

21            MR. PROPER:  No --

22            MR. BERMAN:  We're done with the

23   record.

24            MR. PROPER:  -- I'm not.  On and off

Joseph LaForte

Page 72

1    the record, I feel threatened; I do.  I feel threatened

2    and maybe that's because I'm a punk, but I don't think

3    it's -- I've never had a deposition this way in 20-plus

4    years.

5                    THE WITNESS:  Because you're a bully.

6    Because you bully people all day and you're not used to

7    having somebody who stands up to you because you're a

8    bully.  So what you do is you take money from my

9    clients, you take contingency fees from my clients, you

10   take money -- their clients take money for more cash

11   advances and you bully people around.  That's why

12   you're depositioning weak people, so you have somebody

13   to say the truth about you, that you're a bully.  And

14   your hypocrisy, by the way, is ridiculous.  Your

15   client -- this client took another cash advance, you

16   realize that, and you wired it into your account.  I

17   don't even know why I'm here.  Shouldn't you guys

18   recuse yourself for that?

19                    MR. BERMAN:  Let's just ask questions.

20   We heard your record.  We disagree with everything you

21   said.  You've been yelling since the beginning, but it

22   doesn't matter.

23                    THE WITNESS:  I put up with more from

24   you in this deposition than I've ever had in my life.

Joseph LaForte

Page 73

1              MR. PROPER:  And the fact that

2    Mr. Berman is condoning his client's behavior rather

3    than correcting it only gives me --

4              THE WITNESS:  I said no one corrects

5    me.  He can't correct me.  No one could correct me.

6    What do you mean?  No one is going to correct me.  He

7    can't correct me.

8              MR. BERMAN:  Let's -- what I'm doing is

9    I'm asking you to ask questions at a deposition.  It's

10   not about correcting.  I believe you've been yelling.

11   Let's just move on and ask questions.  That's what

12   we're here for.

13             MR. PROPER:  I've got witnesses from

14   the start of the deposition.

15             MR. BERMAN:  Do whatever you got to do.

16   Just ask questions.

17             MR. FEDULLO:  I will represent on the

18   record that Justin's statement is true and Mr. Berman's

19   statement is inaccurate.

20             THE WITNESS:  You work for the company.

21   I'm sure you -- I'm sure you say that on the record,

22   yes.

23             MR. BERMAN:  We're wasting time.  Ask

24   questions.

Joseph LaForte

Page 74

1   BY MR. PROPER:

2   Q.      What is CBSG's default rate in 2019?

3   A.      I don't know.

4   Q.      Have you ever represented to any investor or

5   potential investor that CBSG's default rate is 1 to

6   2 percent?

7   A.      I don't remember.

8   Q.      Do you know if anyone in your presence acting

9   on behalf of CBSG has represented that CBSG's default

10  rate is 1 to 2 percent?

11  A.      I don't remember.

12  Q.      What is CBSG default rate?

13  A.      I don't know.

14  Q.      Do you know if it's higher or lower than 1 to

15  2 percent?

16  A.      I don't know.  I don't work there.  Are you

17  looking to invest in the company, asking me what the

18  default rate is?

19  Q.      That's a good question.

20  A.      Yeah.

21  Q.      Do you have any monies invested in --

22  A.      I don't.

23  Q.      -- CBSG currently?

24  A.      I don't.

Page 75

1  Q.     Did you invest any monies in CBSG in 2019?

2  A.     No.

3  Q.     Have you ever represented to any investor or

4  potential investor that you have monies invested in

5  CBSG?

6  A.     I don't recall.

7  Q.     If you have never -- strike that.

8         Have you ever invested monies in CBSG?

9  A.     No.

10 Q.     If you've never invested in CB-- monies in

11 CBSG, then we can agree that there would be no

12 circumstance that you would be representing to

13 investors that you had invested money in the company?

14 A.     So you're referring to -- let me teach you

15 about finance a little bit more, guys, okay?  If you're

16 referring to retained earnings or any kind of retention

17 of earnings, the company can retain earnings without

18 actually putting up money.

19         COURT REPORTER:  The company can what?

20         THE WITNESS:  Can actually have

21 earned -- have retained earnings, which is money in the

22 company, without actually putting in money.  So I

23 don't -- that's probably what you're referring to.  So

24 if you're asking about investments, that's how it

Joseph LaForte

Page 76

1    works.  There's a lot of different ways that companies

2    can make money.  We could talk about that another time.

3    If you're not busy, come down to my office, I'll give

4    you a little lesson in finance.  But retained earnings

5    are much different than an investment, right?

6    BY MR. PROPER:

7    Q.      Well, what type of retained earnings do you

8    receive --

9    A.      I don't know.  I'm just letting you know.

10   Q.      Do you receive retained earnings from CBSG?

11   A.      I don't receive anything from CBSG except for

12   the money that I procure deals on as an independent

13   operator.

14   Q.      You mentioned that Kara DiPietro was a friend

15   of yours, correct?

16   A.      Uh-huh.

17   Q.      When did you --

18   A.      Yes, she was.

19   Q.      -- first meet?

20   A.      She was my friend.

21   Q.      When did you first meet Ms. DiPietro?

22   A.      I don't remember the day.

23   Q.      Did you know Ms. DiPietro before she entered

24   into a relationship with CBSG?

Joseph LaForte

Page 77

1    A.      No.

2    Q.      Were you the one that sourced an initial deal

3    between my client and CBSG?

4    A.      I don't recall that.

5    Q.      Do you know when my client first entered into

6    a business relationship with CBSG?

7    A.      I don't remember.

8    Q.      Do you know what the nature of my client's

9    business is?

10   A.      Yes.

11   Q.      What's your understanding?

12   A.      Construction buildout.

13   Q.      What does that mean, "construction buildout"?

14   A.      What is a law firm?  It's a SIC code, right?

15   You know what an SIC code is, Jason?  Do you know what

16   an SIC code is?

17   Q.      What's an SIC code?

18   A.      Do you know?  You should know.  You're

19   defending a client.  So if you're asking me what the

20   construction engineering or any of these things are,

21   you should know what your SIC code -- that's an SIC

22   code.  You asked me what the business does.  I gave it

23   to you -- I told you that's the SIC code.  Go and look

24   it up.  You have to do your homework before you come to

Joseph LaForte

Page 78

1    these things and know about the business, especially if

2    you're talking money from clients.

3    Q.      What's an SIC code?

4    A.      That's an SIC code.

5    Q.      What is it?

6    A.      You go look it up.  I'm not doing your job for

7    you.  You go look it up.

8    Q.      You're not going to answer my question?

9    A.      You look it up.

10   Q.      You're not going to answer my question?

11   A.      You look it up.  I'm not going to do your job

12   for you.  You got 30 grand.  I didn't get 30 grand for

13   this.

14   Q.      You're not going to answer that question?

15   A.      You look it up.  I answered the question,

16   which she does.

17   Q.      What's an SIC code?

18   A.      You look it up.  Learn.  Study.  You guys pass

19   the bar exam and never study again.

20   Q.      Think that's funny?

21               MR. BERMAN:  I just want you to ask

22   questions.

23               MR. PROPER:  I asked him what an SIC

24   code was.

Joseph LaForte

Page 79

1                    MR. BERMAN:  You're raising your voice

2     to me again?

3                    MR. PROPER:  Because you're smirking,

4     you're smiling and you're --

5                    THE WITNESS:  You're obnoxious and --

6                    COURT REPORTER:  I can't get you all at

7     the same time.

8                    MR. PROPER:  Okay.  It's not meant as a

9     threat.

10                   MR. BERMAN:  This is a deposition.

11                   MR. PROPER:  I understand that.

12                   MR. BERMAN:  Ask questions.  Stop

13    raising your voice at me and staring at me across the

14    table.  It doesn't intimidate me.  Doesn't intimidate

15    me.

16                   MR. PROPER:  I'm not -- I'm looking at

17    you because we're having a dialogue.

18                   MR. BERMAN:  I have no reason to have a

19    dialogue with you.  You're here to ask questions.

20    BY MR. PROPER:

21    Q.    What's an SIC code?

22    A.    Look it up.  Do your homework.

23    Q.    Is that a question?

24    A.    If you're representing your client, you should

Joseph LaForte

Page 80

1    know what an SIC code is, Jason.  Look it up.

2    Q.      That's not my name.

3    A.      We're not telling you.  What's your name?

4    Justin?  Justin, you should look it up.  Look up what

5    an SIC code is and then you could figure out what your

6    client does for a living.  It's your client.  You don't

7    know what they do?

8                    MR. PROPER:  I'm postponing the

9    deposition.  I've practiced law for 20 years.  I don't

10   need to be treated in the way that I've been treated.

11                   THE WITNESS:  And I agree.  And I've

12   never been spoken to like this in my life by you.

13   Never.  No one's ever spoken to me like this.

14                   MR. PROPER:  Spoken to you like what?

15   I've asked you questions.

16                   THE WITNESS:  Loud and obnoxious.

17   Raising your eyes, reaching across the table like --

18                   MR. PROPER:  I never reached across the

19   table.

20                   THE WITNESS:  Yes, you did.

21                   MR. PROPER:  I did not.

22                   MR. BERMAN:  Let's just answer -- ask

23   questions.

24                   MR. PROPER:  This deposition is over.

Joseph LaForte

Page 81

1    He gave me a pass.  It's the third time he's made a

2    threat at me in this deposition.

3                    MR. BERMAN:  There's been no threats.

4                    MR. PROPER:  There has been.

5                    THE WITNESS:  Do you lunge at -- do you

6    lunge at people?

7                    MR. PROPER:  I've never lunged at you.

8                    THE WITNESS:  Do you lunge at people?

9                    MR. BERMAN:  You did.

10                   MR. PROPER:  Mr. LaForte, I would never

11   lunge at you.

12                   THE WITNESS:  Did you lunge across the

13   table?

14                   MR. PROPER:  I did not.

15                   MR. BERMAN:  You sure you want to --

16   you sure you want to stop this deposition?

17                   MR. PROPER:  Yes, because I'm going to

18   the judge and we will get another deposition and it may

19   have to be Court supervised.

20                   THE WITNESS:  I'm right here for this

21   deposition.  Why are you leaving?  Why are you leaving

22   the deposition?

23                   MR. PROPER:  Because you are continuing

24   to threaten me --

Joseph LaForte

Page 82

1                    THE WITNESS:  That's not true.

2                    MR. PROPER:  -- in a way that's not

3       appropriate.

4                    THE WITNESS:  That is not true.

5                    MR. PROPER:  We can agree to disagree.

6                    THE WITNESS:  You just feel threatened

7       because you're wrong.

8                    MR. BERMAN:  Why don't you take a

9       break, Justin?  Let's finish this deposition while

10      we're here.  He's here today.

11                   MR. PROPER:  I'll take five minutes.

12                        -  -  -

13             (Whereupon, a break was held.)

14                        -  -  -

15             (Whereupon, a 5/31/19 E-mail Exchange has

16      been marked as Exhibit LaForte-4 for identification.)

17                        -  -  -

18      BY MR. PROPER:

19      Q.     Mr. LaForte, did you ever threaten to blow up

20      my client's house if she didn't repay the money?

21      A.     That's a ridiculous question, but I'm going to

22      elaborate on it.  Not only are you guys at White &

23      Williams lawyers, you guys are experts in -- you guys

24      are experts on law enforcement, too.  Your client

Joseph LaForte

Page 83

1    already contacted every law enforcement agency up and

2    down the East Coast.  So don't you think that law

3    enforcement is good at doing its job, Mr. Justin?

4    Because I'm still sitting here in front of you.  It's a

5    ridiculous allegation and I'm not going to even justify

6    it with an answer.

7    Q.      So you did not threaten to blow up my client's

8    house?

9    A.      Of course not.  Again, I think the law

10   enforcement does a pretty good job.  I'm sure they

11   looked at it.  I'm sure she called everyone up and --

12   everyone up and down the East Coast.  And, again, I'm

13   still sitting here, so, obviously, it's a stupid and

14   dumb allegation to make and I resent it.

15   Q.      Can I show you what's marked as LaForte-4?

16   There's an e-mail on the bottom of Page 1 from my

17   client to Joe Cole and it looks like you are cc'd on

18   this e-mail, joe@parfunding.com; is that correct?

19   A.      Yes.

20   Q.      Okay.  This is an e-mail dated Friday,

21   May 3rd, 2019, at 9:52 a.m.

22           Did you receive this e-mail?

23   A.      I can't even see it to know.  I open up

24   about -- a couple e-mails.  I don't really -- I don't

Joseph LaForte

Page 84

1    know if I received it.

2    Q.      Do you recall -- and I know that the print is

3    small, so I'll read the first paragraph or so if that

4    will help.

5              MR. BERMAN:  Very small.  Let him read

6    it to you.

7    BY MR. PROPER:

8    Q.      "Joe C., it's essential I understand how you

9    are determining our daily payment amount.  For the

10   12/19 contract and the 2/24 contract, daily payment

11   went from 3500 to 16,500 and $4583.00 to $19,995.  The

12   terms say 10 percent daily amount to be determined on

13   percent of income.  What income figure are you using?"

14   And there's more, but I'll stop there.

15              Do you recall receiving an e-mail from

16   Ms. DiPietro where she questioned how CBSG was

17   calculating the 10 percent of income?

18   A.      No.

19   Q.      Do you recall having any conversations with

20   Ms. DiPietro where she questioned how CBSG was

21   calculating the 10 percent of income?

22   A.      I probably had a conversation.  I don't

23   remember the exact scope of the conversation.

24   Q.      Did the daily payment for the 2,000 -- strike

Joseph LaForte

Page 85

1   that.

2                 Did the daily payment for the

3   December 2019 contract over time go from $3500 a day, a

4   business day, to $16,500 each business day?

5   A.      There was 48 contracts.  I don't know -- I

6   couldn't begin to remember about one specific contract.

7   Q.      Okay.  So with respect to this specific

8   contract, December of 2019, I believe it was the second

9   to the last one --

10  A.      Uh-huh.

11  Q.      -- do you know whether or not the daily

12  payment increased?

13  A.      I'm not in accounting.  I wouldn't know that.

14  Q.      Did you have any discussions with Mr. Cole

15  about whether or not the daily payment for the

16  December 2019 contract increased?

17  A.      I don't recall what happened in December of

18  2019.

19  Q.      Do you recall having discussions with anyone

20  about the increase of the daily payment in the 2019

21  contract between CBSG and my client?  And that's

22  December of 2019.

23                 MR. BERMAN:  Objection.

24                 You can answer.

Joseph LaForte

Page 86

1                    THE WITNESS:  I don't remember.

2     BY MR. PROPER:

3     Q.       So you don't know, sitting here today, whether

4     or not the daily payment for the December 2019 contract

5     increased over time or not?

6     A.       I have no idea.

7     Q.       Do you know what CBSG did to determine or how

8     CBSG did determine what the daily payment was for the

9     December 2019 contract?

10    A.       I don't remember the deal, no.

11    Q.       Do you know what CBSG did to ascertain what

12    the income was of my client's business in December of

13    2019?

14    A.       Nope.

15    Q.       Do you know what CBSG did to determine my

16    client's income in January of 2019?

17    A.       I don't know.

18    Q.       Do you know what income means for purposes of

19    either the December 2019 or the February 2020 contract?

20    A.       You asked me that question earlier.  Income

21    can mean a lot of different things.  I don't know how

22    CBSG did its underwriting on this file.

23    Q.       Are you aware that the 2000-- strike that.

24                    Are you aware that the December 2019

Joseph LaForte

Page 87

1   contract and the February 2020 contract both used

2   10 percent of my client's income to calculate the daily

3   payment?

4               MR. BERMAN:  Objection.

5               You can answer, if you understand.

6               THE WITNESS:  He's about to hand it to

7   me, so I guess that's the answer.

8                         -  -  -

9               (Whereupon, a 12/19/18 Agreement has been

10  marked as Exhibit LaForte-5, a 2/27/19 Agreement has

11  been marked as Exhibit LaForte-6, and Bank Statements

12  have been marked as Exhibit LaForte-7 for

13  identification.)

14                        -  -  -

15              MR. PROPER:  And I made a mistake on

16  the years.  I just want to make sure Mr. LaForte and I

17  are on the same page and none of his answers change.

18  When I referred to the December agreement, it was

19  December of 2018, not '19, and when I referred to the

20  February agreement, it was 2019, not 2020.

21  BY MR. PROPER:

22  Q.      With that correction, Mr. LaForte, do any of

23  your previous answers change?

24  A.      No.

Joseph LaForte

Page 88

1   Q.      So if you look at Page 2 of Exhibit 5,

2   Mr. LaForte, this is the December 2018 agreement.  The

3   middle of the page, in bold, states, "10 percent daily

4   specified amount to be determined on percentage of

5   income"; do you see that?

6   A.      Yes.

7   Q.      And then Exhibit 6 I believe has the same

8   language.  It's the first page of Exhibit 6.

9   "10 percent daily specified amount begins at $4,583 per

10  day" --

11  A.      Right.

12  Q.      -- "and increases based on percentage of

13  income."

14  A.      Right.

15  Q.      Can we agree that after the adjustment is

16  made, that the numbers -- that the daily payment for

17  Exhibits 5 and 6 should be the same because they're

18  both based upon 10 percent of income?

19              MR. BERMAN:  Objection.

20              You can answer.

21              THE WITNESS:  No.

22  BY MR. PROPER:

23  Q.      Why not?

24  A.      Because when your client proceeded to steal

Joseph LaForte

Page 89

1  the receivables that she -- that we sold, that we

2  purchased together, when she stole those, it becomes

3  her income.  So all the factoring agreements, when she

4  came up to my office and assigned to us, she stole from

5  us, now that becomes her income.  That belongs on her

6  balance sheet because we haven't gotten paid, so she

7  took it in as income.  So your numbers are incorrect.

8  Q.     So if I'm understanding what you're saying,

9  the monies that you advanced to my client, CBSG treated

10  as income?

11             MR. BERMAN:  Objection.

12             You can answer.

13             THE WITNESS:  Obviously, it would

14  become income if she took it from us, right?  And she

15  took the receivables.  These are specific receivables.

16  This is not a typical cash advance.  This is a specific

17  receivable that she sold to us.  It's on all of the

18  agreements unsolicited.

19  BY MR. PROPER:

20  Q.     So income, as you understand it and as CBSG

21  treated it, included any money that CBSG gave to my

22  client's business?

23             MR. BERMAN:  Objection.

24             THE WITNESS:  I wouldn't know how they

Joseph LaForte

Page 90

1    underwrote the file, again, but it would be obvious to

2    me, looking at this, since you're showing me this

3    stuff and I can make an opinion, an opinion would be

4    that, yes, she took all the income, didn't pay off the

5    income, so it becomes income.  Our share, a

6    proportionate part of the deal, was taken by her, so I

7    would imagine that would be purported as income.

8    BY MR. PROPER:

9    Q.      And so Exhibit 5 is December 19th, 2018, and

10   if you look at the bank statements, which is

11   Exhibit 7 --

12                MR. BERMAN:  Were these produced?  They

13   haven't been produced before today?

14                MR. HESKIN:  They're part of the

15   petition exhibits.  That's where we got them, so I'm

16   sure they've been produced.

17                MR. BERMAN:  Okay.

18   BY MR. PROPER:

19   Q.      So if you turn -- and I can show you this for

20   ease.  You can ignore my notes or not.  I don't care.

21   But on December 20, 2019, there was a debit of $3500

22   associated with this particular agreement.  Are you

23   aware of that?

24   A.      No.  How would I know?

Joseph LaForte

Page 91

1    Q.      Do you know how CBSG calculated the

2    3500-dollar daily payment for Exhibit 5, which began on

3    December 20, 2019?

4    A.      I have no idea.

5    Q.      And then CBSG continues to debit $3500 for

6    Exhibit 5 from December 19th through January 23rd.  And

7    we can go through.  You can flip through yourself or

8    accept my representation, but here's January 23rd and

9    $3500 is still being taken out each day.  You can see

10   the 22nd, $3500.  You can see the 18th, $3500 and so on

11   and so forth.

12   A.      Uh-huh.

13   Q.      On January 24th, CBSG, for this particular

14   agreement, begins debiting $12,337.

15               MR. BERMAN:  Are you representing that?

16               MR. PROPER:  That's my representation.

17               MR. BERMAN:  Okay.  So you can accept

18   the representation for answering this question.

19   Doesn't mean it's true, but you can accept it.

20               THE WITNESS:  Yeah.

21   BY MR. PROPER:

22   Q.      So do you know why CBSG increased the amount

23   of the daily payment for this agreement from $3500 to

24   $12,337?

Joseph LaForte

Page 92

1    A.      I have no idea.

2    Q.      Do you know what CBSG was doing to monitor my

3    client's income in order to calculate the daily

4    payment --

5    A.      I'm not in the underwriting department.  I

6    don't know.

7               MR. BERMAN:  Let him finish for her,

8    just for her.

9    BY MR. PROPER:

10   Q.      Do you know what my -- strike that.

11              Do you know what CBSG was doing to

12   monitor my client's income to ascertain the daily

13   payment from December 20, 2019, through January 24,

14   2019?

15   A.      No.

16   Q.      Now, CBSG debits $12,337 from my client's

17   account in connection with this agreement from

18   January 24, 2019, through February 14th, 2019.  You

19   could see the 12,000, Mr. LaForte -- the 12,337 is

20   still debited on the 14th.

21   A.      I know that your client took 25 million from

22   our company and paid back 21 million; therefore,

23   leaving us a deficit of $3 million.  That's the only

24   thing I know regarding these contracts.  I don't know.

Joseph LaForte

Page 93

1    It was unsolicited.  She solicited our company.  She

2    put together most of her own deals.  And the reason how

3    this sophisticated human being is able to do that is

4    because she's also in the cash advance business.  So

5    she, in herself, owns a cash advance company.  So not

6    only was she aware of every contract, she designed all

7    of them.  So I'm sure that they -- she knew exactly

8    what she was doing.  I can't testify to what these

9    charges are because I'm not an accountant and this is

10   foreign to me.  I don't know.

11   Q.      And I just have to ask the questions

12   notwithstanding.

13           On February 15th, 2019, I'm going to

14   represent to you that the daily payment for this

15   agreement increased to $14,525.  Do you know why it

16   increased?

17   A.      I wouldn't know.

18   Q.      Do you know what, if any, change in income

19   there was for my client's business?

20   A.      I'm not in underwriting.  I represent

21   Recruiting and Marketing Resources.  I'm not in

22   underwriting or an accountant, so I can't testify to

23   the answers to the questions -- in a lot of questions

24   you're giving me right now.

Joseph LaForte

Page 94

1    Q.      Did you have any discussions with anyone at

2    CBSG about these particular increases?

3    A.      I don't remember.

4    Q.      Do you have any e-mail communications, to your

5    knowledge, between yourself and anyone at CBSG

6    regarding these increases?

7    A.      I don't know.

8    Q.      Do you know if my client, as of February 15th,

9    2019, was meeting her obligations with respect to all

10   of the agreements that were outstanding at this time?

11   A.      I wouldn't know what dates your client stopped

12   making their obligations.  I don't --

13   Q.      Are you aware that at one point in time, I

14   believe it was December 18 -- December 17, 2018 --

15   actually, I take that back.  Strike that.

16              Are you aware that on November 8th,

17   2018, my client was charged a finance fee of

18   $472,356.60?

19   A.      No.

20                    -  -  -

21          (Whereupon, an HMC, Inc. Funding Payment

22   History has been marked as Exhibit LaForte-8 for

23   identification.)

24                    -  -  -

Joseph LaForte

Page 95

1                    MR. BERMAN:  Was this document

2    produced?

3                    MR. PROPER:  It's your document.

4                    MR. BERMAN:  No, we didn't produce any

5    documents in this case.  It's very confusing without

6    Bates stamps.

7                    MR. PROPER:  I don't know --

8                    MR. BERMAN:  Just ask the question.

9    BY MR. PROPER:

10   Q.    Do you recognize this as a CBSG document or is

11   this a spreadsheet from -- actually, it may not be the

12   transaction history.  So do we know what this is?

13                   MR. FEDULLO:  It's a spreadsheet that

14   was created by Kara.

15                   MR. PROPER:  I apologize.  I thought

16   this was the transaction history.  It's not.

17   BY MR. PROPER:

18   Q.    So do you know whether or not my client's

19   accounting entry that a finance fee of 472,356.60 was

20   imposed upon her company on November 8th, 2018?

21   A.    I'm not an accountant, but I will elaborate.

22   Q.    Yes.

23   A.    I'm not an accountant.  I'm just a -- I was a

24   college baseball player.  Played some minor league

Joseph LaForte

Page 96

1    baseball.  I don't really have a formal education.  But

2    I can tell you this:  She couldn't be assessed a fee if

3    she owes the company 3 million.  So, in my eyes, she

4    wasn't assessed anything.

5    Q.      Well, can't you be imposed a finance fee and

6    have that finance fee be added to any outstanding

7    monies that are owed?

8                    MR. BERMAN:  Objection.

9                    THE WITNESS:  It never happened.  She

10   paid -- she never paid it back, so what's the

11   difference?  I don't know about that, but she never

12   paid it back, so I'm not going to answer about why she

13   doesn't have a finance fee that was never paid.

14   BY MR. PROPER:

15   Q.      Yeah.  Do you know whether --

16   A.      If she paid the finance fee, we'd pay it back.

17   Q.      Do you know -- do you know whether, in

18   November of 2018, whatever monies my client owed CBSG

19   were increased by some $400,000 --

20   A.      I don't know.

21   Q.      -- to reflect finance fees?

22   A.      I don't know.

23   Q.      So you don't know anything about finance fees

24   that were --

Joseph LaForte

Page 97

1    A.      I don't know.

2    Q.      Just need to be able to finish because the

3    question right now reads, "Do you know anything about

4    finance fees that were --"

5                  MR. BERMAN:  Just let him finish asking

6    the question.

7                  THE WITNESS:  I answered the --

8                  MR. BERMAN:  I know, but he may have a

9    different question.

10                 THE WITNESS:  I answered the question

11   thoroughly on the finance fee.

12                 MR. BERMAN:  I know, but he may have a

13   new question.

14                 THE WITNESS:  All right.

15   BY MR. PROPER:

16   Q.      I know you answered what would have been my

17   full question; I get that.  There's just a tendency at

18   a deposition sometimes, particularly when we've gotten

19   to know each other a little, you anticipate where I'm

20   going, you answer the question --

21   A.      I don't know you, so don't make like we know

22   each other.  I don't know you.

23                 MR. BERMAN:  What's your question, so

24   can get this --

Joseph LaForte

Page 98

1              THE WITNESS:  Get to know you.

2              MR. BERMAN:  Let's ask the question.

3    Let's just ask the question.

4    BY MR. PROPER:

5    Q.     Do you know anything from any source about

6    whether my client's business was assessed a finance fee

7    whether or not charged or monies added to the

8    outstanding balance my client owed to CBSG?

9              MR. BERMAN:  Objection.

10             You can answer.

11             THE WITNESS:  I don't know.  Your

12   client designed most of the deals herself.  She's in

13   the cash advance business.  These are factored

14   agreements.  I don't know.  I don't -- I'm not an

15   accountant.  There's a lot of papers in front of me I

16   can't even see.  I can't testify to any of that.

17   Without any glasses, I can't see.

18   BY MR. PROPER:

19   Q.     Which document in particular can't you see?

20   A.     I don't know anything about the accounting.

21             MR. BERMAN:  Well, he told you on this

22   one, the e-mail, he couldn't see, which is, I think,

23   what he's talking about --

24             MR. PROPER:  I understand that.

Joseph LaForte

Page 99

1                    MR. BERMAN:  -- which is LaForte-4.

2     Just so we have a clear record what he's pointing to.

3     MR. PROPER:

4     Q.      I understand and I think you understand that I

5     need to establish, because the witness said something,

6     that are there any other documents, other than

7     Exhibit 4, that you're having difficulty reading?

8     A.      Even if I could read them, I'm not an

9     accountant.  I wouldn't even know what it meant.  I

10    don't know what any of this is.

11    Q.      Were you involved in negotiating any of the

12    agreements between CBSG and my client?

13    A.      I don't remember.

14    Q.      Were you involved in trying to collect monies

15    from my client on behalf of CBSG?

16    A.      Yes.

17    Q.      Was there a point in time where my client

18    represented to you that she was having difficulty

19    making the daily payments?

20    A.      I don't recall.

21    Q.      What role did you have in trying to enforce

22    the agreements --

23    A.      There never should have been any agreements.

24                    COURT REPORTER:  Hold on a second.

Joseph LaForte

Page 100

1              MR. BERMAN:  What role did you have to

2    try to enforce the agreements?

3              Right, that was the question?

4              And answer?

5              THE WITNESS:  I don't know what that

6    means, by "role."

7              MR. BERMAN:  Okay.  So he'll rephrase

8    the question.

9    BY MR. PROPER:

10   Q.    What discussions did you have with my client

11   in an effort to collect monies that you allege she owed

12   to CBSG or you believe she owed?

13   A.    No, she definitely owed.  Probably, if I could

14   remember the right way, what did you do with the

15   receivables that we purchased and that we owned and why

16   did you steal them from us and not pay them?  So if you

17   and I make an agreement and we say that we're going to

18   sell this pack of gum right here and we're going to

19   split it and you take all the gum, you stole it.  So

20   she stole the money because it specifically talks about

21   a receivable.

22   Q.    Well, wouldn't CBSG have been taking -- strike

23   that.

24              So on these agreements, so the February

Joseph LaForte

Page 101

1   agreement, if you look at Exhibit 6, states that the

2   daily payment's going to start at 4583 and increase

3   based upon percentage of income, right?  We established

4   that it's what it says?

5   A.      Okay.

6   Q.      So what would happen under this agreement, as

7   you understand it, if my client's income decreased?

8   Would the daily payment decrease?

9   A.      I don't know anything about how that works.

10  Q.      So under the -- under this agreement, I'm

11  going to represent to you that my client was charged

12  $19,995 a day beginning on April 16, 2019, under this

13  agreement.  So the daily payment increased from 4583 to

14  over $19,000.

15  A.      Did she pay back the receivable that we

16  financed?

17  Q.      Well, let's start with that premise.

18  A.      No, let's just talk about the first thing.

19  Did she pay back the receivable; in other words, when

20  she got the money, did she pay it back to us?

21  Q.      Do you know if the $19,995 that CBSG debited

22  on April 16th reflected 10 percent of my client's

23  income?

24  A.      Do you know?  I don't know.  Do you know if

Joseph LaForte

Page 102

1   she paid back that receivable, though?  In other words,

2   receivables that she came to my office 16 times and

3   pledged with my girls by buying them candies and

4   lunches every time she came, do you know if those

5   receivables were paid back?  I don't think so because

6   if they were paid back and we got our share, we

7   wouldn't be sitting here right now.  So she captured

8   the receivables and took the receivables.  So these

9   payments are irrelevant.  I don't know.

10  Q.      Do you know if CBSG was taking more money than

11  it was entitled to under these agreements?

12              MR. BERMAN:  Objection.

13              You can answer.

14              THE WITNESS:  No.

15  BY MR. PROPER:

16  Q.      Well, how can you say that CBSG wasn't taking

17  more money than it was entitled to when you don't know

18  how CBSG was calculating the 19,995-dollar daily

19  payment on --

20  A.      Because you have to learn finance again.

21  Q.      -- April 16, 2019?

22  A.      I'll give you a one-on-one class again.

23  Q.      Sure.

24  A.      If you look at the original agreements,

Joseph LaForte

Page 103

1    they're 22, 44, 66, 88 days because the receivable came

2    in.  She kept the receivable instead of giving us the

3    money.  She never would have had these balances.  So

4    she actually benefitted by keeping the money that

5    belonged to us, not only our profit share piece, but

6    also our principal over years in time.  So she

7    benefitted from this agreement way more.  If she chose

8    to pay it back, I don't know how she chose to pay it

9    back.  But if the receivable never came back to us and

10   it was a 45-day pay or a 90 pay and a year-and-a-half

11   goes by, don't you think she did pretty well with our

12   money, Jason.

13   Q.      It's Justin.

14   A.      Jason or Justin.

15   Q.      So if I'm understanding what you're saying,

16   when you provided or CBSG provided the advance, if the

17   monies don't come in, what does that mean?

18   A.      No, it doesn't mean anything.  I'm not

19   speaking on behalf of CBSG.  I'm using common sense.

20   Again, I'm not a lawyer, I'm not an accountant, but I'm

21   using common sense.

22   Q.      Does my client --

23   A.      You want to use the gum theory again?  We'll

24   use the gum theory again.  If you don't pay back what

Joseph LaForte

Page 104

1   you originally had pledged, that's called taking

2   something that doesn't belong to you.

3   Q.      Does my client still have to pay back the

4   money if the receivables never come in?

5                   MR. BERMAN:  Objection.

6                   THE WITNESS:  I wouldn't know the

7   answer to that.

8   BY MR. PROPER:

9   Q.      Well, under the agreement, who bears the risk

10  of loss if there's no receivable?

11  A.      I'm sure we'll get to those receivables on the

12  next deposition for your client.

13  Q.      Yeah, I'm just asking you if there are no

14  receivables, is it your testimony that my client still

15  owes the money?

16                  MR. BERMAN:  Objection.

17                  But you can answer.

18                  THE WITNESS:  Your client definitely

19  still has receivables because last week, she was

20  looking for more cash advances, which she also received

21  a few more cash advances.  Not only do I have the bank

22  statements, but she's doing very, very well with the

23  money that I gave her.

24                  And on top of that, she took another

Joseph LaForte

Page 105

1    cash advance and took some of that money and paid you

2    guys to litigate me via cash advance.  So cash advances

3    are her thing.  She knows exactly what she's doing.

4    She's very sophisticated.  You guys are very

5    sophisticated.  Used that money to get you guys paid.

6    It's America.  Very good.

7    BY MR. PROPER:

8    Q.    Why do you think that Ms. DiPietro obtained

9    financing from a litigation funder to pay our firm?

10              MR. BERMAN:  That's already said.

11              But you could answer.

12              THE WITNESS:  I didn't say that.  I

13   just said a cash advance, didn't I?

14   BY MR. PROPER:

15   Q.    I apologize.

16              Why do you believe that my client used

17   monies from a cash advance to pay our firm?

18   A.    They did.

19   Q.    How do you -- why do you think that?  Why do

20   you believe that?

21   A.    You'll find out.

22   Q.    I'm asking you --

23   A.    You'll find out.

24   Q.    -- what you know.

Joseph LaForte

Page 106

1  A.      You'll find out.  I don't have to tell you

2  anything.  You'll find out.  She took a cash advance to

3  pay you.  That's why I think these guys should be

4  recused from this case.  I don't know a lot about the

5  law, but if you're fighting against cash advances and

6  Mr. Heskin here is a mavin against the cash advance

7  business and he's telling his clients to go out and

8  take cash advances to get himself paid, that would seem

9  hypocritical to me, Your Honor.  I mean, I don't

10  understand why I'm here.  She's continuing to take cash

11  advances.

12            She owns a cash advance company called

13  Kenetic Capital and I don't know why I'm here.  This is

14  a sophisticated person.  I'm the fool to get scammed

15  and that's just what happens.  In life, that happens.

16  We're out $3 million, the company.  I lost all my

17  broker fees.  It happens.  The fact of the matter is if

18  she took a cash advance in order to pay you guys, shame

19  on you and you guys shouldn't be deceiving us.  The

20  fact of the matter is you guys are here for one reason.

21  Not to help your clients.  You're here to bilk them

22  with my money and other people's money.

23  Q.      What brokering fees did you lose?

24  A.      My fees.

Joseph LaForte

Page 107

1    Q.      How much did you lose?

2    A.      I don't remember.

3    Q.      Did you get paid --

4    A.      If the company loses money, I wouldn't expect

5    to get paid, right?  So similar to when you lose a

6    case, you still have to pay, right?

7    Q.      Did you get paid and then have to return money

8    to CBSG or were you owed money and then not paid --

9    A.      I don't remember.  Like when you -- like if

10   you lose this case, you'd have to return some of the

11   fees you guys are probably borrowing, right, to go pay

12   back the contingencies.  It's a similar thing.  It's

13   how it works.

14   Q.      Why do you believe that my client used cash

15   advance money to pay our firm?

16   A.      You'll find out later on.  I'm sure that

17   Mr. Berman wouldn't let me answer that question even

18   though he didn't object.

19   Q.      Unless Mr. Berman instructs you not to answer,

20   you have an obligation to answer my questions.

21   A.      I don't have an obligation to answer anything

22   you tell me.

23            MR. BERMAN:  Especially since the time

24   period you're talking about is well outside the scope

Joseph LaForte

Page 108

1    of this case, but he's giving you --

2                THE WITNESS:  I'm volunteering the

3    answer.  I gave you the answer already.

4    BY MR. PROPER:

5    Q.      You're seeking and have self-discovery in that

6    time period.  You're saying that those documents are

7    not --

8    A.      Justin --

9                MR. BERMAN:  I didn't say anything.

10   Your document requests are not yet due.  You served

11   them very untimely, so they're due the day before the

12   close of discovery.  We'll produce responsive

13   documents.

14               MR. PROPER:  Whether they're due or

15   not, this is a fact-finding deposition.  I'm entitled

16   to discover information your client is withholding.

17               MR. BERMAN:  He's told you many

18   times -- probably six times now, I've heard it --

19   that -- and I'm not here to testify for him, so I'll

20   just say what he said.  He told you that she took a

21   cash advance and, the next day, she wired the money to

22   your firm.

23               Right?

24               THE WITNESS:  Not the next day.  Not

Joseph LaForte

Page 109

1    the next day.  A few days.

2                    MR. PROPER:  Great.  Who is the company

3    just so --

4                    MR. BERMAN:  I don't know.  I just told

5    you what he said.

6                    MR. PROPER:  Yeah, I just want you

7    to -- it will be easier if I can ask you the questions.

8                    THE WITNESS:  You should know.  You

9    probably set up the financing for it.

10                   MR. BERMAN:  Just answer.  Who's the

11   company; do you know?

12                   THE WITNESS:  I don't know.

13                   MR. BERMAN:  Okay.

14   BY MR. PROPER:

15   Q.     How did you discover that my client took a

16   cash advance?

17   A.     Heard it.

18   Q.     Heard it from who?

19   A.     Heard about it.

20   Q.     From who?

21   A.     A bird.

22              If the client did take a cash advance

23   and did send you the money, Jason, would you recuse

24   yourself?  I mean, because you're part of the

Joseph LaForte

Page 110

1   hypocrisy, right?

2   Q.      It's Justin, Mr. LaForte.

3   A.      Justin, would you recuse yourself?  Shane,

4   would you recuse yourself if they did that?  You'd have

5   to.  It would be the laughing stock of the whole

6   industry.  Guys who are the biggest advocates against

7   cash advances are telling their clients to get cash

8   advances to pay them.  Wouldn't that be an interesting

9   document to produce?

10                  MR. HESKIN:  It would be.

11                  THE WITNESS:  Oh, it's coming.

12  BY MR. PROPER:

13  Q.      How do you know it's coming?  What do you know

14  that you're not telling us?

15  A.      I know a lot of things I would never tell you.

16  So that's none of your business.

17  Q.      So you're not going to answer any questions

18  that I may have with respect to how you're discovering

19  my client's activities?

20  A.      Let Ms. DiPietro answer the questions.  I'm

21  sure she's getting a deposition soon; is that correct?

22                  MR. BERMAN:  She is.

23  BY MR. PROPER:

24  Q.      So the answer to my question is you are

Joseph LaForte

Page 111

1    refusing to provide me with the information you know

2    about my --

3    A.      Who are you?  I don't have to tell you

4    anything.

5                   MR. BERMAN:  Let -- let -- we're not

6    doing --

7                   THE WITNESS:  You're supposed to ask me

8    the questions.  I'm answering questions.  I don't have

9    to provide you with anything.

10                   MR. BERMAN:  Well, let me say this:

11   Ask questions and he'll answer.

12                   MR. PROPER:  I've been asking

13   questions.

14                   MR. BERMAN:  So ask the question and

15   let him answer.

16                   MR. PROPER:  You don't like your client

17   refusing to answer questions; that's fine.  But don't

18   tell me how to conduct my deposition, please.

19                   MR. BERMAN:  I'm not, but I'm just

20   saying --

21                   MR. PROPER:  I'm asking questions.

22                   MR. BERMAN:  -- if you give me a

23   blanket, like, if I ask all these questions, I'm not

24   agreeing to that.  So ask questions.  He'll answer or

Joseph LaForte

Page 112

1    not, but I think he's answering -- I think he's

2    answered you he doesn't know that --

3                    MR. PROPER:  These are speaking

4    objections and aren't appropriate, so stop.

5                    MR. BERMAN:  Just ask questions.

6    BY MR. PROPER:

7    Q.      Which bird told you about my client's MCA

8    activity?

9                    MR. BERMAN:  And if you know, answer.

10   Just if you know, answer it.

11                   THE WITNESS:  I'm not answering.

12                   MR. BERMAN:  Okay.

13   BY MR. PROPER:

14   Q.      What are you doing to monitor my client's

15   business activities currently?

16   A.      Nothing.

17   Q.      What is CBSG -- what is CBSG doing to monitor

18   my client's business activities?

19   A.      Nothing.

20   Q.      What role did --

21   A.      Who is your client, just so I get a clear

22   picture?

23   Q.      HMC and Kara DiPietro.

24                   What role did you have with Bridge

Joseph LaForte

Page 113

1   Capital contacting my client?

2   A.      Jason --

3   Q.      Justin.

4   A.      Justin, let's -- HMC -- what's the name of the

5   company, HMC what?

6   Q.      What role did you have personally --

7   A.      What's the name of the company?

8              MR. BERMAN:  HMC Incorporated.

9   BY MR. PROPER:

10  Q.      What role did you have, Mr. LaForte,

11  personally, if any, in having representatives of Bridge

12  Capital contact my client?

13  A.      I never heard of the company.

14  Q.      How do you know that Ms. DiPietro wired any

15  monies to our law firm?

16  A.      Good guess.

17  Q.      Are you guessing or do you know?

18  A.      Not answering you.

19  Q.      You understand your counsel did not instruct

20  you not to answer?

21  A.      You understand that if you took -- if your

22  client took a cash -- another cash advance to pay you,

23  what a problem you have?  Why are you questioning me?

24  I'm not the one that took the cash advance in order to

Joseph LaForte

Page 114

1    pay you.  Why are you questioning me?

2    Q.      Do you have any information at all about any

3    of the increases in daily payments from my client?

4    A.      No.

5    Q.      Do you have any information at all about how

6    CBSG calculated or monitored the income of my client?

7    A.      No.

8    Q.      Do you have any information at all about what

9    reserves, if any, CBSG keeps with respect to MCA

10   transactions?

11               MR. BERMAN:  Objection.  You mean this

12   one?

13               MR. PROPER:  You can answer this one.

14               MR. BERMAN:  As to this.

15               MR. PROPER:  But there is no limitation

16   on this deposition.

17               MR. BERMAN:  We don't agree.

18               THE WITNESS:  I don't know what the

19   word means.

20               MR. BERMAN:  Just answer his question.

21   So the answer is "I don't know"?

22               THE WITNESS:  I don't know.

23   BY MR. PROPER:

24   Q.      Do you know if CBSG is audited by any third

Joseph LaForte

Page 115

1   party?

2   A.      I don't know.

3   Q.      Do you know if Mr. Vagnozzi represents on his

4   website that the agreements between CBSG and businesses

5   are loans?

6   A.      I wouldn't know.

7   Q.      Have you ever seen any of the videos that

8   Mr. Vagnozzi has on his website describing CBSG's

9   products?

10  A.      I don't go on websites.

11  Q.      Okay.  Have you ever been at an event where

12  Mr. Vagnozzi played videos where he is describing

13  CBSG's products?

14  A.      Maybe once.

15  Q.      Do you recall that in the videos that

16  Mr. Vagnozzi plays at these events, that he describes

17  CBSG's products as loans?

18  A.      No.

19  Q.      If you had been at an event and Mr. Vagnozzi

20  continuously represented to investors and potential

21  investors that CBSG charges 35 percent interest rates,

22  would you correct that?

23              MR. BERMAN:  Objection.

24              You can answer.

Joseph LaForte

Page 116

1          THE WITNESS:  Yes.

2    BY MR. PROPER:

3    Q.      Okay.  So you've never been at an event and

4    represented that CBSG charges 35 percent interest?

5    A.      If you're asking me if I correct people in

6    public forums, the answer to that is no, except for

7    you, who doesn't really understand the business.  But,

8    no, I don't have a common practice of correcting people

9    in public forums.  If a man said a word, I'm not going

10   to sit there and correct him, nor is it my obligation

11   to correct any word he uses.  Especially a slight

12   differential in a word, I'm not going to correct a man.

13   I don't do that.

14   Q.      Ms. DiPietro in Exhibit 4 -- and I'm reading

15   this because the print is small -- on May 3rd, 2019,

16   she writes in response to one of your e-mails, "Thank

17   you.  Yes, the only problem has been the rate of

18   increase in the two daily payments without warning, not

19   the total amount due.  I will send along an idea for

20   review in the next hour or so."  And then you respond

21   the same day, "Okay, I will work on it, but let's be

22   honest, it looks like you waited until you got all our

23   money first before you made a complaint about the

24   escalations, right?  You see how this looks to us

Joseph LaForte

Page 117

1    optically, right?  The payments have been increasing

2    every week since the first deal the same way.  Now your

3    funding is ended and you are complaining about

4    escalations.  See our point?"

5                    Do you remember sending that e-mail?

6    A.      Yup.

7    Q.      So you were aware at least in May of 2019

8    about the escalation of the daily payment?

9    A.      What kind of deal was that?  Did you study the

10   deal?  Did you study the deal?  They're tranche deals,

11   right?

12                   MR. FEDULLO:  I'm not being deposed.

13                   THE WITNESS:  If you study the deal, if

14   you look, the money is not given in full to the client.

15   It's tranched in a -- during a specific time period,

16   which I don't have in front of me.  So, obviously, if

17   she gets more capital, the payments go up.  She took

18   all the money first and then complained about the

19   payment.

20   BY MR. PROPER:

21   Q.      So you're saying that when CBSG is advancing

22   money in tranches --

23   A.      Uh-huh.

24   Q.      -- that after every advance --

Joseph LaForte

Page 118

1    A.      Right.

2    Q.      -- that's additional income and therefore the

3    daily payment necessarily will increase?

4    A.      Correct.

5    Q.      Now we're on the same page.

6    A.      It took three hours to get you there.

7    Q.      Listen, we -- I don't have a finance degree,

8    so I apologize.

9    A.      I know, but you're representing these people.

10   It gets confusing.

11   Q.      Is there anything in any of the agreements

12   that my client signed, to your knowledge, which advises

13   her that CBSG is going to treat the advances as income?

14   A.      I don't know.

15   Q.      And you don't know anything, just to be

16   clear -- and I'm asking these broadly so we can move

17   things along.  I'm trying to be as respectful as I can

18   of your time, Mr. LaForte.

19               Do you know anything generally about

20   how CBSG was monitoring the income of my client?  Like

21   were they reviewing bank statements?  Were they doing

22   some type of online monitoring?  Do you know anything

23   about that?

24   A.      No, but I can -- I'll elaborate.

Joseph LaForte

Page 119

1   Q.      Okay.

2   A.      It was a great relationship between us and

3   Ms. DiPietro.  Ms. DiPietro was -- came to our office

4   many times.  She was in the cash advance business.

5   There was a lot of trust placed on her that she would

6   borrow responsibly and that her receivables were real.

7   So I think that, in hindsight, that CBSG did a poor job

8   in monitoring her obvious misappropriation, if you

9   would, of funds.  So how they -- how they did that, I

10  don't know.  If it were me, I probably wouldn't have

11  done it that way, but that's what they chose to do.

12  Q.      And one other question before we mark some

13  text messages.  Do you know anything about how CBSG was

14  determining what payments were made on a particular

15  invoice?

16  A.      No.

17                       -   -   -

18          (Whereupon, Text Messages have been marked

19  as Exhibit LaForte-9 for identification.)

20                       -   -   -

21  BY MR. PROPER:

22  Q.      And just to be clear, you weren't involved in

23  the underwriting for any of these agreements?

24  A.      I'm not an underwriter.

Joseph LaForte

Page 120

1   Q.      And you don't know how the underwriting was

2   done?

3   A.      No.

4   Q.      Okay.  Are you familiar with these text

5   messages between yourself and my client?

6   A.      I can't see them.

7   Q.      Okay.  So I'll help with reading these.

8           On May 10th, it looks like you text my

9   client.  It says, "Type, incoming sender, Joe LaForte."

10  And the text says, "You need to call me."

11          Do you remember sending a text on or

12  about May 10th?

13  A.      I wouldn't know.  I don't even know if this is

14  my writing.

15  Q.      Okay.  Do you recall --

16  A.      And I wouldn't believe anything that is on any

17  of these pages, especially since she accused me of

18  trying to blow up her house and that was untrue,

19  obviously, because we discovered that already.  So why

20  would I believe any of this gibberish and nonsense?  So

21  I'm not going to answer to any of these questions.

22  Q.      Do you have any of your text messages with my

23  client?

24  A.      I don't know.

Joseph LaForte

Page 121

1   Q.      Did you text with my client?

2   A.      I don't know.

3   Q.      Did you tell my client on May 10, 2019, to get

4   her fat ass up and call you?

5   A.      I hope so.

6   Q.      Okay.  Did you tell my client in a text

7   message on May 10, 2019, "Okay, so you think I screwed

8   you.  Are you seriously nuts?  I am out millions.  I

9   trusted you with my family's money.  I never screwed

10  anyone, especially you.  Now I'm going to have to come

11  after you for the money."  Did you send that text?

12  A.      I don't know.

13  Q.      Were you out millions of dollars because of my

14  client?

15  A.      I don't know.

16  Q.      Did you trust my client with your family's

17  money?

18  A.      I don't have any family money.

19  Q.      Okay.  If you -- if we can verify that you

20  sent this text on May 10th --

21  A.      Call me back and I'll let you know.

22  Q.      Okay.  But would there be any reason why you

23  would tell my client that you trusted her with your

24  family's money --

Joseph LaForte

Page 122

1   A.      What's the difference?  What is it your

2   business what my family has?  Where are you going?

3   Q.      I'm just asking whether or not the money that

4   was advanced to my client included money from you or

5   any of your family.

6   A.      No.

7   Q.      Okay.  So if you had told my client --

8   A.      Is my wife considered my family?  How does

9   that work?  Is my wife considered family?

10  Q.      Yes.

11  A.      Oh, okay.  I didn't know because you guys

12  might run your lives differently than me, but my wife

13  is considered family.

14  Q.      So did your wife provide monies?

15  A.      I'm just asking you a question back; that's

16  all.  And you answered it.

17  Q.      Did your wife provide monies?

18  A.      No.

19  Q.      Is your wife currently the president of CBSG?

20  A.      I don't know.

21  Q.      Do you know who is --

22  A.      You asked me that earlier and you asked me

23  that at the last deposition.  You keep asking me the

24  same questions.

Joseph LaForte

Page 123

1  Q.      I thought at the last deposition you said she

2  was and she was actively involved in running the

3  company.

4  A.      Whatever.  I don't remember.

5  Q.      And today you said no.

6  A.      I don't remember.

7  Q.      Did you tell my client on May 10, 2019, at

8  1:27 p.m., "You keep clicking me and my A/R team is

9  contacting your clients as we speak."

10            Who is your A/R team?

11  A.      I don't know.

12  Q.      Do you have an A/R team?

13  A.      I don't know if this is mine, first of all.

14  So you need to go back and verify this, that it's mine,

15  and then I'll come back and answer questions about

16  this.  She's a liar, a known liar.  She said I tried to

17  blow up her house, which, obviously, isn't true because

18  I'm still sitting here with you.  So these all could

19  not be me, so why would I answer something that I

20  can't answer, that I can't know -- I don't even know if

21  it's me?  Anybody can put my name there.

22  Q.      Do you have an A/R team at CBSG?

23  A.      I don't know.  I don't have anything at CBSG.

24  I work at Recruiting and Marketing Resources.

Joseph LaForte

Page 124

1    Q.      Did you tell my client --

2    A.      Do you remember that from last time?

3    Q.      Did you tell my client that you have an A/R

4    team?

5    A.      I don't know.

6    Q.      Did you tell my client that you were out

7    millions of dollars?

8    A.      I don't know.

9    Q.      Did you tell my client in a text on May 10,

10   2019, at 1:29 p.m. to pick up coward?

11   A.      I don't know.  I can't -- I don't even know if

12   this is mine.

13   Q.      Did you text my client at 1:33 p.m. on

14   May 10th, 2019 --

15   A.      Can we get this over with and just say I don't

16   know what any of this is?

17              MR. BERMAN:  Let him just ask the

18   questions.  He's almost done.

19              THE WITNESS:  I don't know.

20   BY MR. PROPER:

21   Q.      "This is fraud on your part, straight up

22   robbery.  You're disgusting."  Did you tell that to my

23   client?

24   A.      I hope so.

Joseph LaForte

Page 125

1   Q.      Okay.  You think my client is disgusting?

2   A.      I think you're disgusting.  I think you guys

3   are disgusting for even taking this case.

4                   MR. BERMAN:  Let's keep the questions

5   going.

6                   MR. PROPER:  Why can't you tell your

7   client not to insult me?

8                   MR. BERMAN:  Well --

9                   THE WITNESS:  Because you took a cash

10  advance, buck.  You took a cash advance in order to

11  help this client.  And you made the client go take a

12  cash advance.  That's why you're asking about

13  disgusting, you're asking me dumb questions.  Do I

14  think somebody is disgusting?

15                  MR. BERMAN:  Let's just let him keep on

16  asking so we can finish this up.

17                  Keep on going, Justin, please.

18                  MR. PROPER:  Mark that, please.  I

19  think we're at 10.

20                          -  -  -

21                  (Whereupon, 5/2/19 E-mail Exchange (2 pages)

22  have been marked as Exhibit LaForte-10 for

23  identification.)

24                          -  -  -

Joseph LaForte

Page 126

1    BY MR. PROPER:

2    Q.      Mr. LaForte, this copy is a little better with

3    the font.

4                    Do you recall receiving an e-mail from

5    my client on May 2nd, 2019 --

6    A.      No.

7    Q.      -- which reads, in part, "I doubt you have had

8    time to review the e-mail I sent earlier, but, in

9    short, the way we structured the open six contracts

10   depleted our cash flow.  Do you have a second to

11   briefly" -- it says "glace," G-L-A-C-E.  I think she

12   means glance -- "at the info I sent earlier?  You will

13   see that the same amount of" -- dollar sign, dollar

14   sign -- "money coming in and virtually the same amount

15   of funding at a cost three times as much as before has

16   put us in a paycheck-to-paycheck situation."  And then

17   my client requests, and I quote, for the short term,

18   open paren, like until Monday, closed paren, comma, I

19   have a couple of ideas, colon, 1, open paren, freeze

20   dailies, semi colon, 2, period, closed paren, provide

21   funding, period.

22                   Do you recall my client advising both

23   Mr. Cole and yourself that my client was having money

24   problems and requested a freeze of the dailies?

Joseph LaForte

Page 127

1    A.      How could your client have any money problems

2    when she took all of our receivables?

3    Q.      Do you know what my client did with the

4    receivables that you advanced?

5    A.      I don't know.  I hope we find out.

6    Q.      Do you know if my client used it to make

7    payroll payments and pay monies that were owed?

8    A.      I don't know.  But if she did, that wasn't her

9    money to use.

10   Q.      My client wasn't entitled to use the money?

11   A.      Do you guys steal money?  Do you guys know

12   where your money comes from?  Do you guys take money

13   from cash advance companies?  She took money from a

14   cash advance and didn't pay it back.  And you guys --

15   basically, the same hypocrisy goes on for you guys.  So

16   I don't know what she did with her money.

17   Q.      Do you recall responding to my client on

18   May 2nd, 2019, at 3:40 p.m., "I cannot freeze my ACH

19   dailies.  We just completed millions of dollars at

20   350,000 a month.  I will work with you Monday, but

21   until then, I expect" -- it says or, but I think you

22   mean our -- contract to be adhered to."  Did I read

23   that correctly?

24   A.      Did you?  I guess you did.  I don't know.

Joseph LaForte

Page 128

1   Q.      Did you send this e-mail?

2   A.      I don't know.  Looks like it.

3   Q.      When you say, "We just completed millions of

4   dollars at 350,000 a month," who did you mean "we"?

5   A.      I don't know.

6   Q.      When you say, "I cannot freeze my ACH

7   dailies," who's "I" and "my"?

8   A.      So I represent Recruiting and Marketing

9   Resources.  I'm the broker on the transaction and this

10  is my client.

11  Q.      So --

12  A.      Unfortunately, it was a very bad transaction.

13  Q.      Why were you being consulted about these

14  issues?

15  A.      So let's go into this, Jason.

16  Q.      Justin.

17  A.      Justin.  So when you have -- when you're a

18  broker, you're responsible to maintain your client the

19  same way -- same as anybody else, okay?  So you're

20  trying to pin the fact that I am Par Funding.  I am

21  not.  I work for Recruiting and Marketing Resources.

22  When you refer a file over to a company, you do a

23  best-efforts job in trying to help maintain the client

24  for the lender for funding.  And that's my effort

Joseph LaForte

Page 129

1    there.

2              MR. PROPER:  Can you mark this as 11,

3    please.

4                        -  -  -

5              (Whereupon, a 5/2/19 E-mail Exchange (4

6    pages) have been marked as Exhibit LaForte-11 for

7    identification.)

8                        -  -  -

9    BY MR. PROPER:

10   Q.     There's an e-mail, Mr. LaForte, on the bottom

11   of the first page from Aida Lau.  Who is Ms. Lau?

12   A.     She's an employee of Par Funding.

13   Q.     And what does Ms. Lau do for Par Funding?

14   A.     I'm not sure.

15   Q.     Do you know how long she's worked for Par

16   Funding?

17   A.     I don't.

18   Q.     How many employees does Par Funding have?

19   A.     I don't know.

20   Q.     Do they have employees other than Ms. Lau?

21   A.     I'm sure they do.

22   Q.     What employee do you personally know at the

23   company?

24   A.     I don't know.

Joseph LaForte

Page 130

1   Q.      Can you think of anyone other than Ms. Lau?

2   A.      No.

3   Q.      Does Mr. Cole work for CBSG?

4   A.      I don't know.

5   Q.      Ms. Lau writes on May 2nd, 2019, at

6   10:18 p.m., "Hi, Kara.  Please let me know where I can

7   find the 10 percent increase on daily per draw.  I

8   couldn't find it.  I saw it's based on income."  And my

9   client responds at 10:21 p.m., "Income is revenue minus

10  expenses.  So should I pull a revenue minus expenses to

11  get the income amount?  Since it was in the contract

12  next to 10 percent, it looks like the income is the net

13  funding."

14               Do you agree or disagree with my

15  client's reading of the agreement that it's net

16  funding?

17  A.      I disagree.

18  Q.      Okay.  And at the top of the page, you

19  respond -- actually, I take that back.  Ms. Lau

20  responds --

21  A.      Anyone can make up any -- first of all,

22  anybody can make up any expenses.  It doesn't -- you

23  can't -- you can't do a revenue model based on

24  expenses.  Anybody can expense a company out as much as

Joseph LaForte

Page 131

1  they want.  Companies would never get paid.  That goes

2  with any factor.  This is a straight factor deal.

3              The fact of the matter is these are

4  leveraged by actual jobs.  We have proof.  We have the

5  jobs.  And for you to even say that -- for her to even

6  insinuate that it's net, how could you do that?  You

7  just take it all as expenses, no one would get paid.

8  Q.    If they were factored on specific jobs, then

9  isn't CBSG limited to taking monies that was received

10  on those particular jobs?

11  A.    Yes.

12  Q.    We agree on that?

13  A.    Yeah, they should take it on those jobs.  And

14  if the job is misperformed or something happens, that's

15  why you get keyman policies.  Then they should pay the

16  debt.

17  Q.    Okay.  Well, let's explore that.

18  A.    Let's say if you -- unless your client came in

19  and put a bunch of receivables on the books and

20  committed a fraud; is that what you're getting at?

21              MR. PROPER:  Can you read Mr. LaForte's

22  answer back, please.

23                          -  -  -

24              (Whereupon, the court reporter read the

Joseph LaForte

Page 132

1    record back as requested.)

2                          -   -   -

3    BY MR. PROPER:

4    Q.      So when you say if the job is misperformed or

5    something happens such that monies aren't paid on an

6    invoice, then what happens in terms of my client paying

7    a debt?  Where does --

8                    MR. BERMAN:  Objection.

9                    THE WITNESS:  I don't know.

10   BY MR. PROPER:

11   Q.      Is my client still obligated to pay the debt

12   at that point?

13                   MR. BERMAN:  Objection.

14                   THE WITNESS:  I don't know.  It's not

15   for me to say.  I'm not a lawyer.

16   BY MR. PROPER:

17   Q.      No, I'm just asking you.

18   A.      I'm not a lawyer.  I can't give an opinion.

19   Q.      Based upon your years working at Recruiting

20   and Marketing Resources and as an ISO --

21   A.      I cold call.  I'm not that smart.

22   Q.      Do you have an understanding as to what

23   happens if monies are not received on a particular

24   invoice --

Joseph LaForte

Page 133

1    A.      I have no idea how that would work.

2    Q.      -- in these agreements?

3    A.      I have no idea.  I'm not a lawyer.  This is

4    way out of my scope.

5    Q.      Do you know if CBSG was only taking

6    receivables for a particular invoice or if they were

7    taking a percentage of all my client's receivables?

8    A.      I have no idea.

9    Q.      And Ms. Lau responds to my client on May 2nd,

10   2019, at 11:32 p.m., "Joe said the agreements are

11   fixed.  You will need to come in and discuss about this

12   matter."

13              Do you know which Joe Ms. Lau was

14   speaking of?

15   A.      How could I testify to what Ms. Lau meant?

16   Q.      I'm asking you did -- well, let me ask it this

17   way:  Did Ms. Lau have a discussion with you where you

18   told Ms. Lau to explain to my client that the daily

19   payment is fixed?

20   A.      Could be anybody.  There's a lot of Joes in

21   the world.  I don't know who she meant.

22   Q.      Yeah, I'm just asking --

23   A.      I don't know.

24   Q.      -- do you recall?

Joseph LaForte

Page 134

1  A.      Yeah, I don't recall what happened on May 2nd

2  of 2019 with an e-mail that didn't even come through my

3  e-mail.  How would I know?  How do I know what she

4  meant?

5  Q.      Do you have any e-mail communications with

6  Ms. Lau about my client?

7  A.      No.

8  Q.      Did you look to see if you had any or you

9  remember that you didn't?

10  A.      I would doubt I have any.

11  Q.      Do you recall any conversations that you may

12  have had with Ms. Lau about my client?

13  A.      It's not a big topic of conversation, no.

14  Q.      Well, she owed CBSG a lot of money, didn't

15  she?

16  A.      Uh-huh, she did owe a lot of money.  She does

17  owe a lot of money, still.

18  Q.      And what efforts are you currently undertaking

19  to try to collect that money outside of this lawsuit?

20  A.      I wouldn't know anything about that.

21  Q.      How did you get a hold of my client's bank

22  statements recently?

23  A.      Next question.

24  Q.      Why won't you answer that question?

Joseph LaForte

Page 135

1   A.      I don't want to.

2   Q.      Are you refusing to answer my question --

3   A.      Yes.

4   Q.      -- how you ascertained --

5   A.      Yes.  Who said I asked for bank statements?

6   Did you say that?

7   Q.      I thought you testified --

8   A.      You're putting words in my mouth.  I never

9   testified about any bank statements, so don't put words

10  in my mouth.  Don't.  Enough.

11  Q.      Mr. LaForte --

12  A.      Don't put words in my mouth.

13  Q.      -- I could be mistaken.

14  A.      You are mistaken.  Read it back.

15  Q.      I would have to go back and look at the

16  transcript.

17  A.      You're mistaken.  You've been mistaken about

18  this the whole day.  So stop mistaking it and get it

19  right.  I never testified that I saw anybody's bank

20  statements.  You asked me about Bridge Capital.  I

21  didn't answer you.  I don't know anything about Bridge

22  Capital and I don't know anything about bank

23  statements.  I said a birdie told me.  And that's

24  exactly how I testified.  And then you asked me what

Joseph LaForte

Page 136

1   was the bird's name.

2   Q.      At that point, yes, I'm talking previously.

3   A.      You good?

4              MR. BERMAN:  Let's just finish up.

5   Next question.

6   BY MR. PROPER:

7   Q.      Is it your testimony under oath that you have

8   never obtained bank statements from my client --

9   A.      I'm not testifying to anything.

10  Q.      I'm asking you, under oath, did you obtain a

11  copy of my client's bank statements in the last

12  two months?

13  A.      I'm not answering you.

14             MR. HESKIN:  We want to reserve the

15  right and we're going to be bringing a motion to recall

16  him based on his refusal to answer.

17             MR. BERMAN:  Which questions?

18             MR. PROPER:  The ones he refused to

19  answer.

20                   -  -  -

21             (Whereupon, the deposition of

22         JOSEPH LaFORTE was concluded at

23         1:54 p.m.)

24                   -  -  -

Joseph LaForte

Page 137

1                    C E R T I F I C A T I O N

2

3

4          I hereby certify that the proceedings and

5     evidence noted are contained fully and accurately in

6     the stenographic notes taken by me upon the foregoing

7     matter on March 5, 2020, and that this is a correct

8     transcript of the same.

9

10

11

12                    *Shauna Detty*
           Shauna Detty
13         Court Reporter-Notary Public

14

15          (The foregoing certification of this transcript

16     does not apply to any reproduction of the same by any

17     means, unless under the direct control and/or

18     supervision of the certifying reporter.)

19

20

21

22

23

24

|  |  |  |  |
|---|---|---|---|
| **A** | 49:12,17,18 | 3:12,13 20:3 | 10:17 12:3,9 |
| **a.m** 1:17 83:21 | 66:1,13,23 | 21:14 22:12 | 13:7,12,20 |
| **A/R** 123:8,10,12 | 67:3 72:15 | 25:7 26:5,6 | 14:22 15:13 |
| 123:22 124:3 | 89:16 93:4,5 | 27:3,10 28:5,6 | 16:4 17:8 19:5 |
| **able** 59:18 93:3 | 98:13 103:16 | 28:19 29:5,19 | 20:12,15,16 |
| 97:2 | 105:1,2,13,17 | 33:12,18,22 | 21:18,18 23:8 |
| **absolutely** 13:8 | 106:2,6,12,18 | 35:11,12 87:9 | 23:12 24:7 |
| 14:16 | 107:15 108:21 | 87:10,18,20 | 25:10 29:4 |
| **accept** 91:8,17 | 109:16,22 | 88:2 90:22 | 31:11 32:11,12 |
| 91:19 | 113:22,24 | 91:14,23 92:17 | 38:13 42:9 |
| **accommodate** | 117:24 119:4 | 93:15 100:17 | 45:8,11,15 |
| 4:22 | 125:10,10,12 | 101:1,6,10,13 | 46:16 48:1 |
| **account** 43:3 | 127:13,14 | 103:7 104:9 | 54:15,16 57:12 |
| 72:16 92:17 | **advanced** 9:18 | 130:15 | 58:8,11,18,24 |
| **accountant** 93:9 | 89:9 122:4 | **agreements** 21:2 | 60:6 62:12,13 |
| 93:22 95:21,23 | 127:4 | 21:12 22:19 | 62:16 64:15,24 |
| 98:15 99:9 | **advances** 8:6,14 | 30:18 89:3,18 | 65:2,11,12,22 |
| 103:20 | 10:20,23 12:23 | 94:10 98:14 | 66:3,5,11 67:7 |
| **accounting** 50:1 | 13:4 14:19 | 99:12,22,23 | 67:19 68:11 |
| 53:1 85:13 | 15:1,10,17 | 100:2,24 | 69:6 78:8,10 |
| 95:19 98:20 | 33:2 46:13 | 102:11,24 | 78:14 80:22 |
| **accurately** 137:5 | 65:7,19 66:4 | 115:4 118:11 | 83:6 85:24 |
| **accused** 120:17 | 67:1 72:11 | 119:23 133:2 | 87:5,7 88:20 |
| **ACH** 22:17 | 104:20,21 | 133:10 | 89:12 96:12 |
| 127:18 128:6 | 105:2 106:5,8 | **Aida** 129:11 | 97:20 98:10 |
| **acquiring** 30:1 | 106:11 110:7,8 | **al** 1:4,7 4:17,18 | 100:4 102:13 |
| **act** 11:11,12 | 118:13 | **allegation** 83:5 | 104:7,17 |
| **acted** 71:15 | **advancing** | 83:14 | 105:11 107:17 |
| **acting** 11:9 74:8 | 117:21 | **allege** 100:11 | 107:19,20,21 |
| **ACTION** 1:4 | **advise** 13:19 | **alleviate** 24:2 | 108:3,3 109:10 |
| **actively** 123:2 | **advises** 118:12 | **America** 105:6 | 110:17,20,24 |
| **activities** 110:19 | **advising** 126:22 | **American** 22:23 | 111:11,15,17 |
| 112:15,18 | **advocates** 110:6 | 41:21 49:16 | 111:24 112:9 |
| **activity** 112:8 | **agency** 83:1 | **amount** 18:10 | 112:10 113:20 |
| **actual** 22:4 | **aggressive** 69:23 | 22:18,19 23:2 | 114:13,20,21 |
| 24:17 131:4 | 71:16 | 31:7,24 36:20 | 115:24 116:6 |
| **added** 96:6 98:7 | **ago** 9:2 33:2 | 37:9 84:9,12 | 120:21 123:15 |
| **additional** 118:2 | **agree** 13:16 | 88:4,9 91:22 | 123:19,20 |
| **adhered** 127:22 | 14:12 75:11 | 116:19 126:13 | 131:22 134:24 |
| **adjustment** | 80:11 82:5 | 126:14 130:11 | 135:2,21 |
| 88:15 | 88:15 114:17 | **Ana** 50:23 | 136:16,19 |
| **advance** 8:19,21 | 130:14 131:12 | **analyzed** 31:9 | **answered** 5:14 |
| 9:1 15:7 17:6 | **agreed** 4:2 | **and/or** 137:17 | 49:23 50:2 |
| 18:2 42:13,16 | **agreeing** 61:5 | **answer** 4:23 | 67:8,10 78:15 |
| 42:18,20 43:2 | 111:24 | 6:14,16,23 | 97:7,10,16 |
| 43:6 44:12 | **agreement** 3:8 | 8:17 10:4,10 | 112:2 122:16 |
|  |  |  | **answering** 52:18 |
|  |  |  | 69:21 91:18 |
|  |  |  | 111:8 112:1,11 |
|  |  |  | 113:18 136:13 |
|  |  |  | **answers** 48:10 |
|  |  |  | 61:20 87:17,23 |
|  |  |  | 93:23 |
|  |  |  | **anticipate** 48:1 |
|  |  |  | 97:19 |
|  |  |  | **anybody** 44:2 |
|  |  |  | 45:12,12 60:10 |
|  |  |  | 61:17 123:21 |
|  |  |  | 128:19 130:22 |
|  |  |  | 130:24 133:20 |
|  |  |  | **anybody's** 8:9,9 |
|  |  |  | 135:19 |
|  |  |  | **anyway** 20:16 |
|  |  |  | **apologize** 71:12 |
|  |  |  | 95:15 105:15 |
|  |  |  | 118:8 |
|  |  |  | **apply** 30:2 |
|  |  |  | 137:16 |
|  |  |  | **appropriate** |
|  |  |  | 33:6 44:6 82:3 |
|  |  |  | 112:4 |
|  |  |  | **appropriately** |
|  |  |  | 10:17 |
|  |  |  | **approved** 45:10 |
|  |  |  | **approximately** |
|  |  |  | 32:16 |
|  |  |  | **April** 101:12,22 |
|  |  |  | 102:21 |
|  |  |  | **arrangement** |
|  |  |  | 18:1 20:2 |
|  |  |  | **arrangements** |
|  |  |  | 18:13 |
|  |  |  | **ascertain** 86:11 |
|  |  |  | 92:12 |
|  |  |  | **ascertained** |
|  |  |  | 135:4 |
|  |  |  | **asked** 7:8 11:1 |
|  |  |  | 38:7 62:17 |
|  |  |  | 77:22 78:23 |
|  |  |  | 80:15 86:20 |
|  |  |  | 122:22,22 |
|  |  |  | 135:5,20,24 |

Joseph LaForte

**asking** 4:19 7:20
29:18 31:10
34:24 35:7,15
35:17,21 36:15
37:19 43:23
60:15,16 62:11
62:13 66:20
67:4 69:4 73:9
74:17 75:24
77:19 97:5
104:13 105:22
111:12,21
116:5 118:16
122:3,15,23
125:12,13,16
132:17 133:16
133:22 136:10
**aspect** 53:6
**ass** 121:4
**assessed** 96:2,4
98:6
**assigned** 89:4
**associated** 90:22
**assuming** 25:23
26:1,3
**attend** 57:1
**audited** 114:24
**available** 59:7
**AVENUE** 2:9
**aware** 51:2,16
57:24 86:23,24
90:23 93:6
94:13,16 117:7

——————
**B**
——————
**B** 3:6
**back** 7:14 9:18
10:7 18:9
20:23 23:3
25:3 31:24
34:16,17 40:9
92:22 94:15
96:10,12,16
101:15,19,20
102:1,5,6
103:8,9,9,24

104:3 107:12
121:21 122:15
123:14,15
127:14 130:19
131:22 132:1
135:14,15
**bad** 47:18 56:18
128:12
**balance** 22:17
89:6 98:8
**balances** 103:3
**bank** 3:14 33:1
87:11 90:10
104:21 118:21
134:21 135:5,9
135:19,22
136:8,11
**bankruptcy**
50:22 51:4
**bar** 78:19
**baseball** 7:24
95:24 96:1
**based** 88:12,18
101:3 130:8,23
132:19 136:16
**basically** 35:12
127:15
**basis** 10:13 16:8
34:17 37:10
59:8
**Bates** 27:13 95:6
**Bberman@fo...**
2:11
**bears** 104:9
**beautiful** 49:7
**began** 15:9,16
91:2
**beginning** 72:21
101:12
**begins** 88:9
91:14
**behalf** 2:2,8
11:16 12:7
17:1 35:21
38:9 39:15
51:9 57:6,18

58:7 65:6,18
74:9 99:15
103:19
**behave** 70:14
**behavior** 73:2
**Behavioral**
50:24
**belief** 27:22
**believe** 73:10
85:8 88:7
94:14 100:12
105:16,20
107:14 120:16
120:20
**belong** 104:2
**belonged** 103:5
**belongs** 89:5
**benefit** 20:24
**benefited** 49:15
**benefitted** 103:4
103:7
**Berman** 2:8
6:13 8:7,15
9:20 10:3,9
11:18 12:8
13:6,14,16,22
14:1,8,12,21
15:3,12 16:2
17:7 19:4 20:8
21:6,17 23:12
23:14,22 24:6
25:8,17,20
26:10,13,19
27:8,12,15,20
29:9 30:3 32:6
33:15 35:5,20
36:14 38:12
43:20 45:22
46:17 48:2
53:10 54:7
57:7 58:8,12
58:18,22 59:1
59:5,14,20,24
60:5 62:20
64:6 65:9,12
66:18 67:8,12

67:15 68:7,11
68:23 69:3,9
69:24 70:7,11
70:23 71:2,11
71:13,19,22
72:19 73:2,8
73:15,23 78:21
79:1,10,12,18
80:22 81:3,9
81:15 82:8
84:5 85:23
87:4 88:19
89:11,23 90:12
90:17 91:15,17
92:7 95:1,4,8
96:8 97:5,8,12
97:23 98:2,9
98:21 99:1
100:1,7 102:12
104:5,16
105:10 107:17
107:19,23
108:9,17 109:4
109:10,13
110:22 111:5
111:10,14,19
111:22 112:5,9
112:12 113:8
114:11,14,17
114:20 115:23
124:17 125:4,8
125:15 132:8
132:13 136:4
136:17
**Berman's** 73:18
**best** 27:21 55:4
**best-efforts**
128:23
**better** 49:20
71:13 126:2
**big** 36:5 47:19
49:18 134:13
**biggest** 110:6
**bilk** 106:21
**bird** 109:21
112:7

**bird's** 136:1
**birdie** 135:23
**bit** 19:16 30:19
35:24 49:20
75:15
**blanket** 111:23
**bless** 49:16
**blossomed** 19:15
**blow** 82:19 83:7
120:18 123:17
**bold** 88:3
**bolting** 70:2
**book** 36:4,5
**books** 131:19
**borrow** 119:6
**borrowed** 31:24
32:1 42:19
**borrowing**
107:11
**botched** 9:22
**bother** 18:21,23
**bothering** 14:4
**bottom** 83:16
129:10
**bought** 30:8
**brag** 60:14,15
60:16
**braggart** 60:17
**bragged** 60:13
**branch** 40:24
41:4,7
**break** 4:21
69:12,16,16
82:9,13
**BRETT** 2:8
**Bridge** 112:24
113:11 135:20
135:21
**briefly** 126:11
**bringing** 136:15
**bro** 13:24
**broadly** 118:16
**broke** 69:19
**broken** 70:3
**broker** 106:17
128:9,18

Joseph LaForte

**brokering**
106:23
**brother** 66:8
**brought** 40:15
**buck** 125:10
**bucks** 52:10
**buildout** 77:12
77:13
**bully** 71:18 72:5
72:6,8,11,13
**bunch** 24:15
131:19
**business** 1:6
4:18 5:4,12
10:7 11:16
15:7,11,23
18:8,11 19:10
23:1 24:4,5
26:7,8 33:4
37:2,8 39:22
41:21 44:3
45:5 49:1,5,6,7
49:9 50:4,6
51:11,22 52:2
52:12 53:1,6,8
53:9,14,15
54:1,6,10,11
54:14,19 55:1
55:17,18 56:3
64:5 65:8,20
66:17 77:6,9
77:22 78:1
85:4,4 86:12
89:22 93:4,19
98:6,13 106:7
110:16 112:15
112:18 116:7
119:4 122:2
**business's** 33:7
**businesses** 8:14
9:18,24 10:20
10:24 11:5
14:20 15:2,10
15:17,20 16:14
16:18 17:12,19
18:6 22:23

40:4,6 41:12
48:12 115:4
**busy** 76:3
**buying** 29:19
30:11 31:21
34:15 102:3

─────────
**C**
─────────
**C** 2:1 84:8 137:1
137:1
**calculate** 87:2
92:3
**calculated** 31:15
91:1 114:6
**calculating**
84:17,21
102:18
**California** 50:23
**call** 13:16,19
14:1,14 58:19
59:2,15 60:1
120:10 121:4
121:21 132:21
**called** 48:14
55:3 69:7,20
83:11 104:1
106:12
**calls** 59:8
**candies** 102:3
**capacity** 11:3,10
11:11,12,14
12:6,14 15:24
47:7
**capital** 6:24 7:3
7:7,9 11:8 45:4
64:21 66:21
106:13 113:1
113:12 117:17
135:20,22
**captured** 102:7
**care** 66:8,9
90:20
**careful** 68:4,19
68:19
**case** 7:18 13:9
14:16,17 18:4

20:23 27:16
31:21 32:14
41:18,24 43:4
43:21 59:10,21
62:9 95:5
106:4 107:6,10
108:1 125:3
**cases** 40:15
**cash** 8:5,14,19
8:21 9:1 12:23
13:4 14:19
15:1,7,10,17
17:5 18:1 22:5
33:2 42:13,16
42:17,20 43:2
43:5,6 44:12
46:13 49:12,17
49:18 65:7,18
66:1,4,12,23
67:1,3 72:10
72:15 89:16
93:4,5 98:13
104:20,21
105:1,2,2,13
105:17 106:2,5
106:6,8,10,12
106:18 107:14
108:21 109:16
109:22 110:7,7
113:22,22,24
119:4 125:9,10
125:12 126:10
127:13,14
**CB--** 75:10
**CBSG** 5:14,20
5:22,24 6:4,6,8
7:4,7,13 8:13
9:3,11,17,24
10:7,19,23
11:5,7,10,11
14:19 15:1,6,9
15:16,18,19
16:6,14,18
17:4,12,21
18:1,2,20 19:3
21:4,8 22:7,13

23:17 25:6,9
25:14 26:5,7
28:14,17,20,22
29:2,19,22,24
30:8 32:4 33:7
33:9 34:11
35:1,10 36:2
36:12 37:23
38:9,11,16,18
38:21,23 39:2
39:9,11,15
40:1,3,6 46:15
46:21,23 47:2
47:4,7,10,10
48:7 49:22
50:1,5,6,9
54:23 55:12,24
56:12,20 57:6
57:18 58:7,17
60:4,12,19,24
62:3 63:4 64:1
65:6,18 66:16
74:9,12,23
75:1,5,8,11
76:10,11,24
77:3,6 84:16
84:20 85:21
86:7,8,11,15
86:22 89:9,20
89:21 91:1,5
91:13,22 92:2
92:11,16 94:2
94:5 95:10
96:18 98:8
99:12,15
100:12,22
101:21 102:10
102:16,18
103:16,19
107:8 112:17
112:17 114:6,9
114:24 115:4
115:21 116:4
117:21 118:13
118:20 119:7
119:13 122:19

123:22,23
130:3 131:9
133:5 134:14
**CBSG's** 29:5
53:6 74:2,5,9
115:8,13,17
**CBSG/Par** 17:2
32:15
**cc'd** 83:17
**ceased** 50:8
**certain** 21:15
**certification** 4:4
137:15
**certify** 137:4
**certifying**
137:18
**CFO** 54:23
**change** 10:12,16
16:7,9,10
87:17,23 93:18
**changed** 15:19
**changes** 10:12
10:13
**charged** 42:2
94:17 98:7
101:11
**charges** 93:9
115:21 116:4
**chose** 103:7,8
119:11
**circumstance**
66:14 75:12
**City** 48:21,24
**CIVIL** 1:4
**clandestine**
45:13
**class** 102:22
**clear** 7:6 14:15
49:21 53:4
59:3,7 69:5
70:1 99:2
112:21 118:16
119:22
**clicking** 123:8
**client** 4:17 13:19
16:20,24 18:5

18:12,19 19:3
19:6,8,8,20
24:18 25:7,15
26:3,6,8,22
29:14 30:24
32:4,14,24
34:17 36:5
37:9 41:17
42:1,2,13,16
42:17,19 49:17
56:18,23 65:24
65:24 66:8,12
66:12,20,23
67:3 69:7
72:15,15 77:3
77:5,19 79:24
80:6,6 82:24
83:17 85:21
88:24 89:9
92:21 94:8,11
94:17 96:18
98:8,12 99:12
99:15,17
100:10 101:11
103:22 104:3
104:12,14,18
105:16 107:14
108:16 109:15
109:22 111:16
112:21 113:1
113:12,22
114:3,6 117:14
118:12,20
120:5,9,23
121:1,3,6,14
121:16,23
122:4,7 123:7
124:1,3,6,9,13
124:23 125:1,7
125:11,11
126:5,17,22,23
127:1,3,6,10
127:17 128:10
128:18,23
130:9 131:18
132:6,11 133:9

133:18 134:6
134:12 136:8
**client's** 12:13
24:16 29:20
30:21 31:8,15
32:18 34:16
35:2 36:21
73:2 77:8
82:20 83:7
86:12,16 87:2
89:22 92:3,12
92:16 93:19
95:18 98:6
101:7,22
110:19 112:7
112:14,18
130:15 133:7
134:21 136:11
**clients** 18:6 23:1
37:3 49:20
61:9,9 72:9,9
72:10 78:2
106:7,21 110:7
123:9
**close** 108:12
**closed** 11:6 34:5
126:18,20
**Coast** 50:23
83:2,12
**code** 77:14,15,16
77:17,21,22,23
78:3,4,17,24
79:21 80:1,5
**coequal** 54:3
**cold** 132:21
**Cole** 54:23
55:15,19 83:17
85:14 126:23
130:3
**collateral** 17:13
17:16
**collateral-based**
17:21
**Collateralized**
17:17
**colleague** 69:8

**collect** 32:8
99:14 100:11
134:19
**collected** 23:21
24:5
**college** 95:24
**colon** 126:19,20
**come** 5:17,19
20:20 25:16
26:18 37:7,22
65:21 76:3
77:24 103:17
104:4 121:10
123:15 133:11
134:2
**comes** 22:14,17
22:19 25:3
127:12
**comfortable**
59:14
**coming** 22:8
66:20 70:10
110:11,13
126:14
**comma** 126:18
**commencing**
1:16
**committed**
131:20
**common** 103:19
103:21 116:8
**communicatio...**
55:16 94:4
134:5
**companies**
12:12 37:20
41:2 76:1
127:13 131:1
**company** 6:12
6:18,20 7:1,22
8:4 9:4,15 11:7
16:15 22:22
28:21 36:10
37:19 42:20
43:2 44:13
45:9 48:14

60:4,20 63:7
63:10 64:22
73:20 74:17
75:13,17,19,22
92:22 93:1,5
95:20 96:3
106:12,16
107:4 109:2,11
113:5,7,13
123:3 128:22
129:23 130:24
**competitor**
45:12
**complained**
117:18
**complaining**
117:3
**complaint**
116:23
**complete** 1:6
4:18 5:4,12
51:22 52:12
53:8 71:9
**completed**
127:19 128:3
**compliance**
45:10 46:3,5
46:15
**compliment**
53:23
**comply** 41:2
**concept** 8:13
23:9
**concluded**
136:22
**condoning** 73:2
**conduct** 111:18
**confused** 5:16
**confusing** 95:5
118:10
**confusion** 24:1
59:15,17 60:1
**Congress** 67:1
**connection** 51:3
51:9 92:17
**considered**

**122:8,9,13**
**construct** 23:6
23:11 26:12
**construction**
20:22 77:12,13
77:20
**consulted**
128:13
**contact** 113:12
**contacted** 83:1
**contacting** 113:1
123:9
**contained** 137:5
**contempt** 51:3
**contingencies**
107:12
**contingency**
21:20,22 41:24
72:9
**continue** 13:19
70:4,11 71:3
**continues** 91:5
**continuing**
81:23 106:10
**continuously**
115:20
**contract** 19:17
20:17,18 32:13
33:10 39:2,7
84:10,10 85:3
85:6,8,16,21
86:4,9,19 87:1
87:1 93:6
127:22 130:11
**contracts** 32:21
85:5 92:24
126:9
**contribute** 63:24
64:5
**contributed**
62:2 63:5,9,13
65:17,19 66:17
**contribution** 7:7
7:9
**control** 63:21
137:17

conversation
61:16 84:22,23
134:13
conversations
84:19 134:11
copy 126:2
136:11
corporate 45:9
45:17
corporation 5:7
5:11 16:10
correct 21:4,12
21:13 29:7
33:5 60:22
61:1 64:2 70:6
73:5,5,6,7
76:15 83:18
110:21 115:22
116:5,10,11,12
118:4 137:7
correcting 73:3
73:10 116:8
correction 87:22
correctly 127:23
corrects 73:4
cost 21:21
126:15
counsel 4:2 71:7
113:19
couple 83:24
126:19
course 15:8
24:22,24 38:6
39:19 83:9
court 1:1,17
13:14,21 14:2
14:15 21:24
35:22 47:15,21
50:22 59:9
63:15,18 69:11
69:15,19 75:19
79:6 81:19
99:24 131:24
137:13
Courts 40:23
coward 124:10

created 65:6,18
95:14
creating 9:19
10:1
current 54:23
currently 12:5
74:23 112:15
122:19 134:18
customer 18:7
cut 46:22

**D**

D 3:1
d/b/a 5:5,9,11,12
5:13,14 51:22
52:12
dailies 126:20
126:24 127:19
128:7
daily 22:17 31:6
36:20,21,22
37:8 55:16
84:9,10,12,24
85:2,11,15,20
86:4,8 87:2
88:3,9,16 91:2
91:23 92:3,12
93:14 99:19
101:2,8,13
102:18 114:3
116:18 117:8
118:3 130:7
133:18
date 27:10
dated 83:20
dates 94:11
day 10:12 31:11
32:15,16,23
40:21 72:6
76:22 85:3,4,4
88:10 91:9
101:12 108:11
108:21,24
109:1 116:21
135:18
day-to-day

10:13 16:7
days 32:16 33:2
49:12 66:13
103:1 109:1
deal 20:23 21:22
64:22 77:2
86:10 90:6
117:2,9,10,10
117:13 131:2
deals 12:11,12
12:19,21 15:21
17:3 76:12
93:2 98:12
117:10
Dean 38:5,6,8,9
38:14,15,15,18
38:20,23 39:2
39:7,7,17 57:1
57:6
debate 40:21
debit 90:21 91:5
debited 92:20
101:21
debiting 91:14
debits 92:16
debt 131:16
132:7,11
deceive 64:4
66:15
deceiving
106:19
December 85:3
85:8,16,17,22
86:4,9,12,19
86:24 87:18,19
88:2 90:9,21
91:3,6 92:13
94:14,14
deception 66:19
66:21,22
decisions 37:22
Deck 11:7
declaration 3:10
50:15 51:8,16
53:7
decrease 101:8

decreased 101:7
default 74:2,5,9
74:12,18
Defendants 1:8
2:8
defending 77:19
deficit 92:23
definitely
100:13 104:18
definition 24:10
33:11,17,21
definitions
33:19 64:20
degree 45:6
118:7
department
39:5 45:10
92:5
depends 17:15
depleted 126:10
deposed 117:12
deposition 1:13
4:16 8:3 9:9
12:11 13:15
14:2,7,11
18:16 24:17
50:3 59:13
61:11 63:23
66:6 71:4,10
71:15 72:3,24
73:9,14 79:10
80:9,24 81:2
81:16,18,21,22
82:9 97:18
104:12 108:15
110:21 111:18
114:16 122:23
123:1 136:21
depositioning
72:12
depositions 37:7
described 20:2
describes 115:16
describing 115:8
115:12
**DESCRIPTI...**

3:7
designated
14:15
designed 93:6
98:12
despite 55:12
determine 22:13
28:14,17,23
29:2 31:14
33:7 86:7,8,15
determined
84:12 88:4
determining
22:7 84:9
119:14
Detty 1:17
137:12
dialogue 79:17
79:19
difference 22:3
96:11 122:1
different 6:22
10:16 12:12,14
12:18 16:5
17:13,18 18:4
18:19 19:2
21:2,9,12
40:15 41:15
44:3 64:20
76:1,5 86:21
97:9
differential
116:12
differently
37:21 65:4
122:12
differs 18:1
difficulty 99:7
99:18
dimwits 42:17
DiPietro 19:9
42:3 43:6
49:11 76:14,21
76:23 84:16,20
105:8 110:20
112:23 113:14

116:14 119:3,3
**direct** 3:4 4:11
58:24 137:17
**directing** 58:10
**disagree** 72:20
82:5 130:14,17
**discover** 108:16
109:15
**discovered**
120:19
**discovering**
110:18
**discovery** 14:6
59:10,21
108:12
**discuss** 133:11
**discussion**
133:17
**discussions**
85:14,19 94:1
100:10
**disgusting**
124:22 125:1,2
125:3,13,14
**dispute** 20:18
**disrespectful**
69:10
**disrespectfully**
69:4
**distortion** 71:9
**District** 1:1,2
50:22
**Division** 50:23
**document** 27:24
31:3,17 40:10
44:6 45:14
95:1,3,10
98:19 108:10
110:9
**documents**
24:14,17 95:5
99:6 108:6,13
**dogs** 49:8
**doing** 4:15 5:19
11:16 33:3,4
41:21 54:5

63:20 71:2,3
73:8 78:6 83:3
92:2,11 93:8
104:22 105:3
111:6 112:14
112:17 118:21
**dollar** 126:13,13
**dollars** 41:23
121:13 124:7
127:19 128:4
**doors** 34:4
**double** 70:5
**doubt** 60:13
126:7 134:10
**draw** 130:7
**due** 30:12
108:10,11,14
116:19
**duly** 4:8
**dumb** 83:14
125:13

───────
**E**
**E** 2:1,1 3:1,6
137:1
**e-mail** 3:11,17
3:18 82:15
83:16,18,20,22
84:15 94:4
98:22 117:5
125:21 126:4,8
128:1 129:5,10
134:2,3,5
**e-mails** 28:13
83:24 116:16
**earlier** 49:23
86:20 122:22
126:8,12
**early** 20:22
**earned** 75:21
**earnings** 75:16
75:17,17,21
76:4,7,10
**ease** 90:20
**easier** 109:7
**East** 83:2,12

**EASTERN** 1:2
**eat** 61:24
**eating** 66:7
**educate** 30:23
33:18 35:15
**educated** 30:19
**education** 96:1
**effort** 21:21
100:11 128:24
**efforts** 134:18
**either** 86:19
**elaborate** 82:22
95:21 118:24
**eluding** 33:23
**Email** 2:6,11
**employee** 11:15
15:24 38:16
129:12,22
**employee/emp...**
11:3
**employees** 16:9
46:7,21,23
129:18,20
**ended** 117:3
**enforce** 99:21
100:2
**enforcement**
82:24 83:1,3
83:10
**engineering**
77:20
**enhance** 18:11
**ensuring** 20:5
**entered** 18:19
19:3 76:23
77:5
**enters** 25:6,14
**entire** 71:10
**entitled** 21:14
26:15 29:5
102:11,17
108:15 127:10
**entity** 9:10
**entry** 95:19
**equally** 54:3
**equity** 22:22

64:21
**escalation** 117:8
**escalations**
116:24 117:4
**escrow** 43:2
**especially** 37:3
78:1 107:23
116:11 120:17
121:10
**ESQUIRE** 2:2,3
2:3,8
**essential** 84:8
**establish** 58:21
99:5
**established**
25:19 101:3
**et** 1:4,7 4:17,18
**event** 57:1 58:15
115:11,19
116:3
**events** 57:4,6,15
58:1 115:16
**evidence** 137:5
**evil** 67:2
**exact** 84:23
**exactly** 22:3
25:4 54:5 93:7
105:3 135:24
**exam** 78:19
**EXAMINATI...**
3:4 4:11
**examined** 4:9
**example** 16:17
20:3 27:1
**examples** 16:22
**Exchange** 3:11
3:17,18 82:15
125:21 129:5
**executed** 28:19
**Exhibit** 27:4
43:8,11,14
44:17,23 50:16
82:16 87:10,11
87:12 88:1,7,8
90:9,11 91:2,6
94:22 99:7

101:1 116:14
119:19 125:22
129:6
**exhibits** 88:17
90:15
**expand** 17:19
22:23 23:1
**expect** 107:4
127:21
**expense** 130:24
**expenses** 130:10
130:10,22,24
131:7
**experts** 82:23,24
**explain** 17:20,22
17:24 133:18
**explained** 12:10
**explore** 131:17
**eyes** 70:2 80:17
96:3

───────
**F**
**F** 137:1
**Facebook** 43:15
43:17,19 44:2
44:2,5,7,17,18
44:19,21,22
45:15,17,19,21
45:21,23,24
46:1,4
**fact** 33:1,23
35:20 40:14,18
55:12 73:1
106:17,20
128:20 131:3
**fact-finding**
108:15
**factor** 131:2,2
**factored** 19:21
98:13 131:8
**factoring** 17:13
17:18,24 18:13
20:1 28:6
30:18 32:20
50:4 52:24
53:8,13,14

54:6,9,9,10,14
54:18,20 89:3
**fair** 25:10
**false** 60:24 61:5
61:7
**familiar** 10:19
120:4
**family** 121:18
122:2,5,8,9,13
**family's** 121:9
121:16,24
**fat** 121:4
**February** 13:10
86:19 87:1,20
92:18 93:13
94:8 100:24
**FEDULLO** 2:3
73:17 95:13
117:12
**fee** 41:24 94:17
95:19 96:2,5,6
96:13,16 97:11
98:6
**feel** 53:18,19,19
56:18 72:1,1
82:6
**fees** 61:8,12,24
72:9 96:21,23
97:4 106:17,23
106:24 107:11
**fighting** 106:5
**figure** 80:5
84:13
**file** 86:22 90:1
128:22
**filing** 4:3
**finance** 18:7
64:22 75:15
76:4 94:17
95:19 96:5,6
96:13,16,21,23
97:4,11 98:6
102:20 118:7
**financed** 101:16
**financing** 105:9
109:9

**find** 69:22
105:21,23
106:1,2 107:16
127:5 130:7,8
**fine** 14:13
111:17
**finger** 69:22
**finish** 21:6 46:10
47:24 61:22
63:1,17 82:9
92:7 97:2,5
125:16 136:4
**firm** 6:3 77:14
105:9,17
107:15 108:22
113:15
**first** 4:8 8:24
11:9,14,23
15:9,16 39:11
39:14,17 71:11
76:19,21 77:5
84:3 88:8
101:18 116:23
117:2,18
123:13 129:11
130:21
**fit** 12:13
**five** 44:4 82:11
**fixed** 22:20
26:17 133:11
133:19
**flip** 91:7
**FLOOR** 2:9
**flow** 126:10
**follows** 4:9
**font** 126:3
**fool** 106:14
**foregoing** 137:6
137:15
**foreign** 93:10
**Forge** 57:2
**form** 4:5 6:13
7:3,6,22 11:4
43:6 66:17
**formal** 96:1
**formally** 55:12

56:4
**formation** 6:11
**formed** 7:1 9:4
**forms** 9:17 10:1
10:19
**formulate** 37:19
**forth** 28:5 91:11
**forums** 116:6,9
**founded** 51:22
52:12
**founder** 6:20,21
**founders** 6:18
**founding** 49:22
**FOX** 2:9
**fraud** 42:22
124:21 131:20
**free** 14:13
**freeze** 126:19,24
127:18 128:6
**Friday** 83:20
**friend** 19:9
76:14,20
**front** 66:24 83:4
98:15 117:16
**fucking** 69:20
**full** 55:10 58:5
58:16 97:17
117:14
**fully** 137:5
**fund** 10:20 65:6
65:17
**funder** 105:9
**funding** 3:9,15
5:5,7,13,13,15
9:11,24 10:2
11:7,17,24
12:7 17:2
32:15 41:11
42:4 43:10,16
43:24 44:11,12
44:14,15,16
46:5,7 51:23
52:13 94:21
117:3 126:15
126:21 128:20
128:24 129:12

129:13,16,18
130:13,16
**Funding's** 43:15
43:19 44:18
45:4,19,23
**Funding/CBSG**
48:11 61:19,20
**fundraising**
57:5
**funds** 9:18,19
119:9
**funny** 78:20
**further** 13:10
70:23
**future** 18:4
31:19,19,21
33:24 34:6,7
34:10,12,15
40:12 41:9,13

---

## G

**G-L-A-C-E**
126:11
**garbage** 45:11
**general** 62:18
**generally** 118:19
**generated** 21:16
23:20
**gentleman** 21:23
68:10,12
**getting** 24:23
47:18 60:14
110:21 131:20
**gibberish**
120:20
**girl** 56:16
**girls** 102:3
**give** 16:17,22
18:9 25:2
47:19 62:9
76:3 102:22
111:22 132:18
**given** 32:23
117:14
**gives** 73:3
**giving** 93:24

103:2 108:1
**glace** 126:11
**glance** 126:12
**glasses** 98:17
**go** 13:10 18:8
20:4 22:7 25:2
40:9,23 41:4
41:15,22 50:8
57:3,5 61:18
63:2 66:23
69:11 71:14
77:23 78:6,7
85:3 91:7
106:7 107:11
115:10 117:17
123:14 125:11
128:15 135:15
**goal** 45:4
**God** 49:16
**goes** 103:11
127:15 131:1
**going** 4:19 13:18
17:1 30:17
41:22,22 45:11
46:8 47:17
51:14 56:7
58:20,21,24
59:11 63:2,18
65:4 70:19,23
71:6 73:6 78:8
78:10,11,14
81:17 82:21
83:5 93:13
96:12 97:20
100:17,18
101:2,11
110:17 116:9
116:12 118:13
120:21 121:10
122:2 125:5,17
136:15
**golf** 39:19
**good** 4:14 17:22
41:21 53:19
54:1 74:19
83:3,10 105:6

113:16 136:3
**gotten** 26:2 89:6
    97:18
**government**
    40:24 41:4,7
**grand** 32:17
    61:13 78:12,12
**gratitude** 36:5,6
**great** 53:23 55:8
    58:2 109:2
    119:2
**gross** 37:11,14
    37:16
**Group** 1:7 4:18
    5:4,12 51:22
    52:12
**Group's** 53:9
**grow** 18:6 19:10
    45:5
**guard** 19:15
**guess** 8:2 32:1
    32:17 49:15
    51:7 54:15
    87:7 113:16
    127:24
**guessing** 113:17
**gum** 100:18,19
    103:23,24
**guy** 62:13,15
    66:24
**guys** 9:14 10:15
    16:8 21:20,20
    21:21 22:24
    32:17,20 40:11
    41:5 42:1,21
    42:22,23 49:10
    49:11,13,13,14
    49:17,17,18,19
    61:12 64:22
    65:23 66:24
    72:17 75:15
    78:18 82:22,23
    82:23 105:2,4
    105:5 106:3,18
    106:19,20
    107:11 110:6

122:11 125:2
127:11,11,12
127:14,15

---

**H**

**H** 3:6
**hair** 48:17
**hand** 87:6
**handle** 51:7
**handled** 53:1
**happen** 101:6
**happened** 85:17
    96:9 134:1
**happens** 24:14
    106:15,15,17
    131:14 132:5,6
    132:23
**happy** 41:2
**hardest** 47:18
**have's** 35:18
**Haverford**
    51:18
**he'll** 67:15 100:7
    111:11,24
**head** 70:3
**Health** 50:24
**hear** 48:14
    68:13
**heard** 8:24
    48:16 72:20
    108:18 109:17
    109:18,19
    113:13
**hearing** 59:7
**height** 33:4
**held** 1:14 82:13
**help** 18:5 22:24
    54:2 84:4
    106:21 120:7
    125:11 128:23
**helped** 19:9
**Heskin** 2:3 59:4
    64:23 65:11
    67:1 68:6
    90:14 106:6
    110:10 136:14

**hey** 66:24
**Hi** 130:6
**higher** 74:14
**highest** 45:6
**hindsight** 119:7
**hired** 54:23
**history** 3:15
    94:22 95:12,16
**HMC** 1:4 3:15
    4:17 16:21
    29:3 52:9
    94:21 112:23
    113:4,5,8
**hold** 35:22 47:15
    63:15 99:24
    134:21
**holdback** 30:13
    30:20,21 33:6
**hollering** 70:1
**homework**
    49:19 77:24
    79:22
**honest** 116:22
**Honor** 106:9
**hooked** 67:3
**hope** 121:5
    124:24 127:5
**hoping** 24:1
    26:7
**hosted** 57:1,17
**hosts** 57:6
**Hotel** 57:2
**hour** 116:20
**hours** 14:14
    66:7 118:6
**house** 49:8
    82:20 83:8
    120:18 123:17
**human** 93:3
**hundred** 55:6
**husband** 52:3
**hypocrisy** 42:22
    42:22 67:4
    72:14 110:1
    127:15
**hypocritical**

67:5 106:9

---

**I**

**idea** 8:4 38:1
    86:6 91:4 92:1
    116:19 133:1,3
    133:8
**ideas** 8:8,9,11
    9:16 126:19
**identification**
    27:4 43:11
    50:17 82:16
    87:13 94:23
    119:19 125:23
    129:7
**identified** 19:10
    21:1,11 22:9
    22:11 28:3
**idiots** 49:11
**ignore** 90:20
**illegal** 56:15,15
    56:17
**imagine** 90:7
**immensely**
    19:10
**imposed** 95:20
    96:5
**inaccurate**
    73:19
**inappropriate**
    69:23
**inception** 55:11
**include** 52:1,3
**included** 89:21
    122:4
**including** 12:17
    12:18
**income** 30:21
    31:1,9,16,18
    32:18 33:8,12
    33:13,17,20,21
    34:2,16 36:21
    36:22,22 37:5
    84:13,13,17,21
    86:12,16,18,20
    87:2 88:5,13

88:18 89:3,5,7
89:10,14,20
90:4,5,5,7 92:3
92:12 93:18
101:3,7,23
114:6 118:2,13
118:20 130:8,9
130:11,12
**incoming** 120:9
**incorporated**
    1:4 4:17,18 5:8
    5:20,22 6:1
    113:8
**incorrect** 26:20
    34:13 89:7
**incorrectly** 6:23
**increase** 85:20
    101:2 116:18
    118:3 130:7
**increased** 85:12
    85:16 86:5
    91:22 93:15,16
    96:19 101:13
**increases** 88:12
    94:2,6 114:3
**increasing** 117:1
**independent** 9:8
    9:10 76:12
**individual** 65:17
**industry** 110:6
**info** 126:12
**information**
    108:16 111:1
    114:2,5,8
**initial** 9:17 19:7
    19:7 77:2
**initially** 9:4
**insinuate** 131:6
**insinuating**
    40:20
**instances** 17:4
**instruct** 113:19
**instructions**
    14:4
**instructs** 107:19
**insult** 46:9 125:7

interest 6:4
  29:19 30:1
  40:4,7,8
  115:21 116:4
interested 66:15
interesting
  110:8
interpret 59:21
  59:22,24
interrupt 14:10
intimidate 79:14
  79:14
introduce 39:9
invest 74:17
  75:1
invested 64:22
  65:5 74:21
  75:4,8,10,13
investing 66:16
investment 76:5
investments
  75:24
investor 60:3,4
  60:19,19 61:14
  61:15 62:1,2
  63:4,4 64:4,10
  64:12,16,17,19
  64:20,21,21
  74:4,5 75:3,4
investors 58:6,6
  58:16 75:13
  115:20,21
invoice 17:13,17
  17:24 18:13
  19:20,21 20:1
  20:4,6 21:1
  22:8,10,11,14
  22:18 23:17,18
  23:19 25:15
  26:17 28:9,15
  28:18,21,24
  29:3,7,20 30:8
  30:12,22 31:1
  31:7,15,22
  32:3,5 34:8,9
  35:2 36:12,13

119:15 132:6
  132:24 133:6
invoices 20:7
  21:8,11,16
  30:1
involve 17:5
involved 6:11
  10:23 11:2,4
  17:4,12 28:2
  38:2 50:21
  53:5 56:2
  99:11,14
  119:22 123:2
involvement 9:3
  9:7,19 18:18
  19:2,8 48:6
  50:9 55:11,23
  56:1,22
involving 50:23
irrelevant 13:6
  13:8 14:17
  33:24 52:9
  102:9
ISO 11:4 132:20
issue 7:20 59:13
issued 14:6
  16:24 51:3
issues 4:20
  128:14
Ivy 43:1 70:13

―――――― J ――――――
January 86:16
  91:6,8,13
  92:13,18
Jason 30:14
  36:24 42:24
  53:20,21 77:15
  80:1 103:12,14
  109:23 113:2
  128:15
job 24:14,17,19
  25:3 26:2 36:7
  78:6,11 83:3
  83:10 119:7
  128:23 131:14

132:4
jobs 20:21,22
  131:4,5,8,10
  131:13
Joe 54:23 83:17
  84:8 120:9
  133:10,13
joe@parfundi...
  83:18
Joes 133:20
Joseph 1:13 3:2
  4:8 51:17
  136:22
judge 13:17,19
  14:1,5,14 37:5
  40:18 42:19
  46:9 58:19
  59:2,3,6,15
  60:1 68:13
  71:5 81:18
judicial 41:7
justify 83:5
Justin 2:2 30:15
  30:16 36:24
  37:2 42:24
  80:4,4 82:9
  83:3 103:13,14
  108:8 110:2,3
  113:3,4 125:17
  128:16,17
Justin's 73:18
Justin/Jason
  40:9

―――――― K ――――――
Kara 19:8,9
  42:2 49:11
  76:14 95:14
  112:23 130:6
keep 9:11 32:20
  34:13 35:21
  36:15 63:18
  70:7 122:23
  123:8 125:4,15
  125:17
keeping 103:4

keeps 114:9
Kenetic 106:13
kept 19:22 103:2
keyman 131:15
kind 9:5,7 12:1
  12:2 75:16
  117:9
knew 47:14 93:7
know 4:22 5:7
  5:18,21 6:2,15
  6:21 7:3,12,15
  7:16 8:1,9,16
  8:19,21 9:5,5,6
  9:12,15,15
  10:16 12:3,3
  13:2,9 15:4,9
  15:16,19 16:16
  18:14 22:16,19
  23:14,23 24:8
  24:11,13 26:4
  27:15 28:12,20
  29:4,23 30:10
  30:11 31:5
  32:7,8,11,12
  32:13 33:10,14
  33:19,19 34:21
  35:10,16 36:2
  36:4,7,8,10,11
  36:16,18 37:16
  37:17,18,21,23
  38:2,5,6,20
  39:1,1,4,6,7,11
  39:14 42:4
  43:16,22,23
  44:9,14,16,18
  44:21,22 46:1
  46:7,8,14,17
  46:19,22,23
  47:3,6,9,21
  48:5,5,9,10,13
  48:23 49:1,13
  49:24 50:8,11
  51:14,15 54:20
  54:24 55:1,14
  55:18 56:5,6,6
  56:7,9,13,21

56:24 57:8,14
  57:19 58:7
  60:6 62:4,6,14
  62:18,20,24,24
  63:2,6,8,11,14
  63:19 64:7,13
  64:13,13,14,16
  64:17 65:13,14
  66:10 67:9,12
  67:14,15,17,20
  68:15 72:17
  74:3,8,13,14
  74:16 76:9,9
  76:23 77:5,8
  77:15,15,18,18
  77:21 78:1
  80:1,7 83:23
  84:1,2 85:5,11
  85:13 86:3,7
  86:11,15,17,18
  86:21 89:24
  90:24 91:1,22
  92:2,6,10,11
  92:21,24,24
  94:7,8,11 95:7
  95:12,18 96:11
  96:15,17,17,20
  96:22,23 97:1
  97:3,8,12,16
  97:19,21,21,22
  98:1,5,11,14
  98:20 99:9,10
  100:5 101:9,21
  101:24,24,24
  102:4,9,10,17
  103:8 104:6
  105:24 106:4
  106:13 109:4,8
  109:11,12
  110:13,13,15
  111:1 112:2,9
  112:10 113:14
  113:17 114:18
  114:21,22,24
  115:2,3,6

118:9,14,15,19
118:22 119:10
119:13 120:1
120:13,13,24
121:2,12,15,21
122:11,20,21
123:11,13,20
123:20,23
124:5,8,11,11
124:16,19
127:3,5,6,8,11
127:16,24
128:2,5 129:15
129:19,22,24
130:4,6 132:9
132:14 133:5
133:13,21,23
134:3,3,20
135:21,22
**knowledge** 7:12
12:24 15:6
27:22 28:22
38:24 39:3
41:12 44:13
55:5 60:9,11
64:3 94:5
118:12
**known** 123:16
**knows** 14:1
105:3

**L**

**L** 1:17
**Lacquer** 48:15
48:16,19 50:10
55:3,4,10
**lady** 61:13
**LaFORTE** 1:13
3:2 4:8,14
51:17 52:24
53:13 69:20
71:10,13,14
81:10 82:19
87:16,22 88:2
92:19 110:2
113:10 118:18

120:9 126:2
129:10 135:11
136:22
**LaForte's**
131:21
**LaForte-1** 3:8
27:4 28:3
33:22 34:20
36:3
**LaForte-10** 3:17
125:22
**LaForte-11** 3:18
129:6
**LaForte-2** 3:9
43:11
**LaForte-3** 3:10
50:13,16
**LaForte-4** 3:11
82:16 83:15
99:1
**LaForte-5** 3:12
87:10
**LaForte-6** 3:13
87:11
**LaForte-7** 3:14
87:12
**LaForte-8** 3:15
94:22
**LaForte-9** 3:16
119:19
**laid** 14:5
**language** 88:8
**Laquer** 56:12,16
**late** 20:24
**Lau** 129:11,11
129:13,20
130:1,5,19
133:9,13,15,17
133:18 134:6
134:12
**laughing** 110:5
**law** 40:24 41:1,2
41:7 77:14
80:9 82:24
83:1,2,9 106:5
113:15

**lawsuit** 4:16,20
50:20 134:19
**lawyer** 6:2 10:14
31:5 68:14
103:20 132:15
132:18 133:3
**lawyers** 82:23
**league** 43:1 51:7
70:13 95:24
**leaning** 69:20
**learn** 32:21 37:2
37:8 78:18
102:20
**leaving** 81:21,21
92:23
**legal** 39:5
**legislative** 40:23
41:4
**lender** 10:22
128:24
**lenders** 12:15,18
**lending** 39:22
**lesson** 76:4
**let's** 27:1 68:7
69:24 70:4,11
71:3,19,19,20
72:19 73:8,11
80:22 82:9
98:2,3 101:17
101:18 113:4
116:21 125:4
125:15 128:15
131:17,18
136:4
**letting** 71:12
76:9
**leveraged** 131:4
**liar** 123:16,16
**Liberty** 1:15 2:4
**lie** 57:14 60:22
60:23 61:9,13
**life** 52:7 72:24
80:12 106:15
**likes** 51:24,24
52:2
**limit** 64:23

**limitation**
114:15
**limitations**
59:19,20
**limited** 14:6
59:12 131:9
**limiting** 59:9
**line** 56:7 68:16
**Lisa** 3:10 7:13
47:1 48:6
50:15
**listen** 56:5 118:7
**litigate** 105:2
**litigation** 105:9
**little** 19:16
30:18 35:24
49:19 60:13
64:21 75:15
76:4 97:19
126:2
**live** 51:18
**lives** 122:12
**living** 80:6
**LLP** 2:9
**loan** 40:6,8,13
40:17,20 41:8
41:13 44:24
**loaned** 41:11
42:4
**loans** 40:3,21
115:5,17
**long** 9:2 129:15
**look** 34:24 36:4
36:6 40:11
44:6,20,23
46:4 53:23
77:23 78:6,7,9
78:11,15,18
79:22 80:1,4,4
88:1 90:10
101:1 102:24
117:14 134:8
135:15
**looked** 83:11
**looking** 31:13
33:2 35:11

44:9 74:17
79:16 90:2
104:20
**looks** 28:9 83:17
116:22,24
120:8 128:2
130:12
**lose** 106:23
107:1,5,10
**loses** 107:4
**loss** 104:10
**lost** 106:16
**lot** 6:22 11:20
13:10 57:3
64:19 76:1
86:21 93:23
98:15 106:4
110:15 119:5
133:20 134:14
134:16,17
**Loud** 80:16
**Lounge** 48:15
48:16,19 50:10
55:3,4,10
56:12,16
**loving** 49:7
**lower** 74:14
**lunches** 102:4
**lunge** 81:5,6,8
81:11,12
**lunged** 81:7

**M**

**maintain** 128:18
128:23
**making** 27:16
29:9 47:22
70:4 94:12
99:19
**man** 116:9,12
**manes** 31:12
**March** 1:10
137:7
**marital** 52:6
**mark** 42:14 43:7
119:12 125:18

Joseph LaForte

129:2
**marked** 27:4
43:11 50:13,16
82:16 83:15
87:10,11,12
94:22 119:18
125:22 129:6
**Market** 1:15 2:5
47:11
**Marketing** 9:13
11:12,15,24
12:6 16:1 50:7
93:21 123:24
128:8,21
132:20
**Marking** 39:6
**married** 51:18
**matter** 33:1 37:1
40:14,18 47:22
51:10 72:22
106:17,20
131:3 133:12
137:7
**matters** 43:23
**mavin** 106:6
**maybes** 35:17
**MCA** 112:7
114:9
**McElhone** 3:10
7:13 47:1,4,7
48:6 50:15
52:11
**mean** 6:22 9:6
10:13 11:3,3
11:19 12:1
17:16 27:9
32:3,18 41:3
54:9 56:1 73:6
77:13 86:21
91:19 103:17
103:18 106:9
109:24 114:11
127:22 128:4
**means** 6:21
30:10,21,23
31:7 54:20

56:2,3 68:19
68:20 86:18
100:6 114:19
126:12 137:17
**meant** 79:8 99:9
133:15,21
134:4
**meet** 39:17,19
76:19,21
**meeting** 94:9
**members** 45:9
**memory** 19:1
**mentioned**
76:14
**merchant** 3:8
8:5,14,19,21
9:1 12:23 13:4
14:19 15:1,7
15:10,17 17:5
18:1 44:12
65:7,18
**merchants** 13:5
**merit** 68:17
**mess** 47:17
**message** 121:7
**messages** 3:16
119:13,18
120:5,22
**met** 39:12
**middle** 88:3
**million** 19:19
41:19 92:21,22
92:23 96:3
106:16
**millions** 121:8
121:13 124:7
127:19 128:3
**mine** 123:13,14
124:12
**minimum** 30:24
**minor** 95:24
**minus** 130:9,10
**minutes** 82:11
**misappropriat...**
119:8
**mischaracteri...**

30:4
**misperformed**
131:14 132:4
**mistake** 87:15
**mistaken** 135:13
135:14,17,17
**mistaking**
135:18
**mixed** 29:15
**model** 130:23
**moment** 71:14
**Monday** 126:18
127:20
**money** 7:16,17
19:22 20:19,20
22:1,13,16
24:19 25:2,3
25:22 26:4
34:17 37:4
38:18,20,23
39:22 40:4,6
41:11,13,20
42:5,20 43:5
49:20 62:3
63:24 64:5
65:6,19,24
66:1,16 72:8
72:10,10 75:13
75:18,21,22
76:2,12 78:2
82:20 89:21
100:20 101:20
102:10,17
103:3,4,12
104:4,15,23
105:1,5 106:22
106:22 107:4,7
107:8,15
108:21 109:23
116:23 117:14
117:18,22
121:9,11,17,18
121:24 122:3,4
126:14,23
127:1,9,10,11
127:12,12,13

127:16 134:14
134:16,17,19
**monies** 7:13,22
22:7 25:15
28:15,17,23
29:2 39:15
57:18 58:7
63:9,13 65:17
66:17 74:21
75:1,4,8,10
89:9 96:7,18
98:7 99:14
100:11 103:17
105:17 113:15
122:14,17
127:7 131:9
132:5,23
**monitor** 92:2,12
112:14,17
**monitored** 114:6
**monitoring**
118:20,22
119:8
**month** 32:16,17
32:19,24 33:3
33:5 42:18
127:20 128:4
**monthly** 31:1
34:16 36:22
37:5,10,11,14
**months** 136:12
**morning** 4:14
68:17
**motion** 136:15
**mouth** 42:11
67:23 68:1,10
68:10,19,20
135:8,10,12
**move** 58:21
73:11 118:16
**multi-compou...**
20:10

──── **N** ────
**N** 2:1 3:1 137:1
**nail** 48:17,21,22

55:2
**name** 19:9,13
30:16 36:24
43:1 44:3,4
48:18,19 53:21
62:12 80:2,3
113:4,7 123:21
136:1
**nature** 20:18
77:8
**necessarily**
118:3
**need** 4:21 40:11
45:5 68:18
80:10 97:2
99:5 120:10
123:14 133:11
**needs** 12:13
24:18 25:22
**negotiating**
99:11
**net** 130:12,15
131:6
**never** 40:19 44:1
48:16 50:6
55:12 56:4
63:9,12 70:14
70:14,16 72:3
75:7,10 78:19
80:12,13,18
81:7,10 96:9
96:10,11,13
99:23 103:3,9
104:4 110:15
113:13 116:3
121:9 131:1
135:8,19 136:8
**new** 2:10,10
40:18 97:13
**nice** 52:1,1
53:23,24 54:3
**nonowner** 22:22
**nonsense** 120:20
**Nope** 6:9 28:1
86:14
**Notary** 1:18

Joseph LaForte

noted 137:5
notes 90:20
    137:6
notice 1:14
notwithstandi...
    93:12
November 58:5
    58:15 94:16
    95:20 96:18
number 3:7 36:9
    36:9,12
numbers 88:16
    89:7
nuts 121:8

_____
O

O 137:1
oath 53:5 136:7
    136:10
object 107:18
objected 65:10
objection 6:13
    8:7,15 9:20
    10:3,9 11:18
    12:8 13:6 15:3
    15:12 16:2
    17:7 19:4 20:8
    21:17 23:22
    24:6 25:8,17
    25:20 26:10,19
    30:3 32:6
    33:15 35:5
    36:14 38:12
    53:10 54:7
    57:7 59:9 60:5
    64:6 65:9
    66:18 85:23
    87:4 88:19
    89:11,23 96:8
    98:9 102:12
    104:5,16
    114:11 115:23
    132:8,13
objections 4:4
    112:4
obligated 132:11

obligation
    107:20,21
    116:10
obligations
    17:17 94:9,12
obnoxious 79:5
    80:16
obtain 18:8
    136:10
obtained 105:8
    136:8
obvious 90:1
    119:8
obviously 83:13
    89:13 117:16
    120:19 123:17
October 13:11
    14:21 58:9
    59:6
offer 17:12,14
offered 16:14,18
offers 16:6
office 19:20
    26:22 36:6
    66:20 76:3
    89:4 102:2
    119:3
officer 6:6,8
official 45:17
Oh 20:14 27:12
    110:11 122:11
okay 7:19 13:18
    16:13,22 17:3
    27:20 28:14
    37:11 38:20
    42:13,15,16,21
    44:16 47:14
    48:14 50:12
    51:6,12,16,21
    52:4,17,20,22
    53:4 54:17,22
    55:2,7,15 57:5
    57:15,24 58:13
    58:20 60:18
    64:3 68:14
    69:24 75:15

79:8 83:20
    85:7 90:17
    91:17 100:7
    101:5 109:13
    112:12 115:11
    116:3,21 119:1
    120:4,7,15
    121:6,7,19,22
    122:7,11 125:1
    128:19 130:18
    131:17
Old 48:21,24
once 115:14
one's 80:13
one-on-one
    102:22
ones 27:14
    136:18
online 118:22
open 83:23
    126:9,18,19
operate 21:20
operations
    45:13
operator 9:8,10
    76:13
opinion 37:19
    90:3,3 132:18
opposed 20:6
optically 117:1
options 20:22
Oral 1:13
order 13:14 14:4
    14:6,15 18:7
    18:10 22:22
    31:1 34:17
    42:18 49:13
    51:2 59:9,12
    59:18,19 92:3
    106:18 113:24
    125:10
ordered 14:2
original 102:24
originally 104:1
originator 32:12
outside 70:22

107:24 134:19
outstanding
    94:10 96:6
    98:8
owe 134:16,17
owed 28:12,15
    96:7,18 98:8
    100:11,12,13
    107:8 127:7
    134:14
owes 26:8 32:1
    96:3 104:15
owned 26:21
    60:4,20 100:15
owner 40:1
    58:17 60:12
    65:7
ownership 6:4
owns 48:13,21
    93:5 106:12

_____
P

P 2:1,1
p.m 123:8
    124:10,13
    127:18 130:6,9
    133:10 136:23
pack 100:18
page 3:4,7,9
    28:5,10 43:10
    43:15,17,19
    44:2,7,17,19
    44:19 45:20,23
    51:12 83:16
    87:17 88:1,3,8
    118:5 129:11
    130:18
pages 3:17,18
    120:17 125:21
    129:6
paid 24:20 26:2
    28:18,23 29:2
    32:4,4 42:17
    56:19 67:4
    89:6 92:22
    96:10,10,12,13

96:16 102:1,5
    102:6 105:1,5
    106:8 107:3,5
    107:7,8 131:1
    131:7 132:5
pandering 40:23
papers 98:15
Par 3:9 5:5,7,13
    5:13,14 9:11
    11:7,16,24
    12:7,17,18,19
    12:21,23 13:1
    13:3,4 41:11
    42:4 43:10,14
    43:16,19,24
    44:11,12,14,15
    44:16,18 45:3
    45:19,23 46:5
    46:7 48:11
    51:23 52:13
    61:19,20
    128:20 129:12
    129:13,15,18
paragraph
    51:21 52:11
    54:22 55:7,9
    84:3
parameters 14:5
paren 126:18,18
    126:19,20
PARK 2:9
part 49:21 52:22
    90:6,14 109:24
    124:21 126:7
particular 28:2
    28:23 29:6,20
    30:1,12 36:3
    37:24 90:22
    91:13 94:2
    98:19 119:14
    131:10 132:23
    133:6
particularly
    97:18
partners 40:19
partnership

Joseph LaForte

22:22
**party** 115:1
**pass** 78:18 81:1
**pay** 30:24 31:1
  31:24 34:17
  42:18 49:13,18
  90:4 96:16
  100:16 101:15
  101:19,20
  103:8,8,10,10
  103:24 104:3
  105:9,17 106:3
  106:18 107:6
  107:11,15
  110:8 113:22
  114:1 127:7,14
  131:15 132:11
**payback** 20:22
  22:20
**paycheck-to-p...**
  126:16
**paying** 132:6
**payment** 3:15
  26:17 84:9,10
  84:24 85:2,12
  85:15,20 86:4
  86:8 87:3
  88:16 91:2,23
  92:4,13 93:14
  94:21 101:8,13
  102:19 117:8
  117:19 118:3
  133:19
**payment's** 101:2
**payments** 99:19
  102:9 114:3
  116:18 117:1
  117:17 119:14
  127:7
**payroll** 127:7
**pays** 26:7,9
**pending** 4:24
**Pennsylvania**
  1:2,16 2:5
  51:18
**people** 17:18

41:16 44:4
56:9 60:14
61:17 64:14
72:6,11,12
81:6,8 116:5,8
118:9
**people's** 106:22
**percent** 20:4,5
  26:16 29:6
  30:1,8,11,13
  30:19,20,22,23
  30:24 31:6,8
  31:14,18,19
  32:18,19 34:1
  34:2,4,6,10,12
  34:16 36:20,21
  37:5,8,11,13
  37:15 40:4,7
  52:15 55:6
  74:6,10,15
  84:12,13,17,21
  87:2 88:3,9,18
  101:22 115:21
  116:4 130:7,12
**percentage**
  21:15 31:8,18
  34:2 88:4,12
  101:3 133:7
**period** 13:9 59:6
  107:24 108:6
  117:15 126:20
  126:21
**person** 46:3,5
  50:1 63:20
  64:23 65:5
  106:14
**personal** 19:2
  45:6
**personally** 61:15
  62:2 113:6,11
  129:22
**pertain** 4:20
**pertains** 13:15
**petition** 90:15
**Philadelphia**
  1:16 2:5

**phone** 59:8
**phrase** 9:1
**pick** 25:2 124:10
**picture** 112:22
**pictures** 24:15
**piece** 103:5
**pin** 128:20
**place** 1:15 2:4
  55:8
**placed** 119:5
**Plaintiffs** 1:5 2:2
**play** 7:24
**played** 95:24
  115:12
**player** 95:24
**plays** 115:16
**please** 14:10
  34:24 42:14
  43:8 47:15,24
  48:5 49:2
  50:13 61:22
  63:1,17 111:18
  125:17,18
  129:3 130:6
  131:22
**pledge** 34:8
**pledged** 34:8,9
  102:3 104:1
**pledges** 31:22,23
  32:3
**plus** 34:7,8 59:8
**point** 4:21 5:18
  34:5 94:13
  99:17 117:4
  132:12 136:2
**pointing** 69:22
  99:2
**policies** 131:15
**poor** 56:18
  119:7
**portray** 42:23
**position** 14:8,13
**positive** 5:23
**Possibly** 57:3
**postponing** 80:8
**potential** 58:6

60:4,19 61:15
62:2 63:4 74:5
75:4 115:20
**practice** 116:8
**practiced** 80:9
**precious** 37:6
**premise** 101:17
**prepare** 18:15
**presence** 74:8
**present** 1:18
**president** 47:4
  55:13 56:5,17
  56:20 122:19
**pretty** 14:15
  23:4 83:10
  103:11
**previous** 87:23
**previously** 29:13
  29:24 53:4
  63:23 136:2
**price** 32:2
**principal** 23:3
  103:6
**print** 84:2
  116:15
**printed** 27:14
  43:18
**private** 49:5
**probably** 28:16
  32:19 34:4
  51:24 53:24
  66:22 67:2
  75:23 84:22
  100:13 107:11
  108:18 109:9
  119:10
**problem** 113:23
  116:17
**problems** 11:20
  126:24 127:1
**proceed** 5:2
**proceeded** 88:24
**proceedings**
  137:4
**procure** 18:8
  41:15 76:12

**procured** 34:18
**produce** 43:20
  95:4 108:12
  110:9
**produced** 27:16
  27:18 90:12,13
  90:16 95:2
**product** 16:23
  17:17 30:23
**products** 10:12
  16:6,7,9,11,13
  16:16,18,23
  17:11,14,18
  115:9,13,17
**professional**
  7:24 45:6
**profit** 22:1,2
  23:3 25:5
  33:24 103:5
**profits** 22:2
**promote** 38:11
**proof** 131:4
**proper** 2:2 3:5
  4:13 6:17 8:12
  8:18 9:21,23
  10:6,18 11:22
  12:16 13:13,18
  13:24 14:3,10
  14:18,23,24
  15:5,15 16:2
  16:12 17:10
  19:24 20:13
  21:7 22:6 23:5
  23:16,24 24:9
  25:13,18,21
  26:12,14,24
  27:6,10,14,19
  27:21,23 29:11
  30:6 32:9
  33:16 35:6
  36:1,17 38:17
  42:14 43:7,13
  43:22 44:10
  46:2,20 47:19
  47:23 48:3,4
  50:12,19 53:12

Joseph LaForte

54:4,12 57:9
58:10,13,14,20
58:23 59:11,17
59:23 60:2,8
62:21 63:16,22
64:9 65:3,15
67:6,10,18,20
68:5,21 69:7
69:10,13,18
70:18,21 71:1
71:6,21,24
73:1,13 74:1
76:6 78:23
79:3,8,11,16
79:20 80:8,14
80:18,21,24
81:4,7,10,14
81:17,23 82:2
82:5,11,18
84:7 86:2
87:15,21 88:22
89:19 90:8,18
91:16,21 92:9
95:3,7,9,15,17
96:14 97:15
98:4,18,24
99:3 100:9
102:15 104:8
105:7,14 108:4
108:14 109:2,6
109:14 110:12
110:23 111:12
111:16,21
112:3,6,13
113:9 114:13
114:15,23
116:2 117:20
119:21 124:20
125:6,18 126:1
129:2,9 131:21
132:3,10,16
136:6,18
**Properj@whit...**
2:6
**properly** 62:14
62:16

**proportionate**
18:10 23:2
90:6
**proved** 34:3
**provide** 6:24
8:14 15:16
111:1,9 122:14
122:17 126:20
**provided** 7:13
7:22 15:6
103:16,16
**providing** 12:23
13:4 14:19
15:1,9 45:6
**public** 1:18
44:11 116:6,9
137:13
**pull** 130:10
**punk** 69:8,20
70:6,15,17,20
70:20 71:17
72:2
**purchase** 21:9
23:19 26:6,16
32:2 34:14
35:1,2 40:12
41:9,13 48:22
**purchased** 19:11
21:4 26:21
29:17 34:19
36:2,12,13
50:9 56:12
89:2 100:15
**purchases** 23:17
25:15
**purchasing** 24:2
34:10,12
**purported** 21:9
90:7
**purposes** 86:18
**pursuant** 1:14
**put** 7:16,17
19:17 21:21
22:4,4 43:2,3
44:4,8 45:13
54:2 67:24

72:23 93:2
123:21 126:16
131:19 135:9
135:12
**puts** 55:3
**putting** 41:19
75:18,22 135:8

---

**Q**

**question** 6:16,23
8:17 10:17
11:20,21 12:4
14:23 15:14
16:3 25:6,11
26:11,13,15
28:9 29:4
32:10 38:7
42:12 43:24
45:8,23 46:10
46:12 48:1
49:23 50:2
57:12 58:8,11
58:18 61:23
62:12,17,18
63:1,17 64:15
65:1,2,22 66:5
66:7,11 67:7
67:11,19 68:8
68:11 69:4,5,9
74:19 78:8,10
78:14,15 79:23
82:21 86:20
91:18 95:8
97:3,6,9,10,13
97:17,20,23
98:2,3 100:3,8
107:17 110:24
111:14 114:20
119:12 122:15
134:23,24
135:2 136:5
**questioned**
84:16,20
**questioning**
56:8 113:23
114:1

**questions** 4:5,19
4:23 5:2 8:2
23:12,15 31:10
45:11 47:10
48:10,20 49:4
52:19 58:23
67:5 69:21
71:4,20 72:19
73:9,11,16,24
78:22 79:12,19
80:15,23 93:11
93:23,23
107:20 109:7
110:17,20
111:8,8,11,13
111:17,21,23
111:24 112:5
120:21 122:24
123:15 124:18
125:4,13
136:17
**quote** 126:17

---

**R**

**R** 2:1 137:1
**raise** 38:18,23
58:6
**raised** 38:21
71:10
**raising** 39:15
68:23 69:1
79:1,13 80:17
**ran** 50:6 52:24
53:8,13
**rate** 74:2,5,10
74:12,18
116:17
**rates** 40:4,7,8
115:21
**reached** 80:18
**reaching** 80:17
**read** 5:17 8:3
22:18 31:3
32:13 33:10
34:23 35:12
53:11 59:18

84:3,5 99:8
127:22 131:21
131:24 135:14
**reading** 4:3
18:21,23 59:12
99:7 116:14
120:7 130:15
**reads** 68:15 97:3
126:7
**ready** 5:2
**real** 119:6
**reality** 71:9
**realize** 49:12
72:16
**really** 30:18,22
37:7 40:11
47:18 49:10,11
52:7 54:1,1,19
54:21 63:21
83:24 96:1
116:7
**reason** 4:22
62:22 63:3
68:2,3 79:18
93:2 106:20
121:22
**recall** 9:2 12:20
12:22 28:4
75:6 77:4 84:2
84:15,19 85:17
85:19 99:20
115:15 120:15
126:4,22
127:17 133:24
134:1,11
136:15
**receipts** 29:6,17
31:19
**receivable** 18:7
18:9,10 19:19
20:18,21,23
23:2,3 24:10
24:13 29:16
30:12,14,20
34:6 41:19
89:17 100:21

101:15,19
102:1 103:1,2
103:9 104:10
**receivables** 18:3
18:4,5 19:11
19:12,13,17,21
20:6 23:20,21
24:3,3,4 26:6,8
26:16,18,21,23
29:21 31:19,21
34:1,7,11,13
34:15,19,22
35:1,3 36:2,8
40:12 41:9,14
41:15,16,17,17
89:1,15,15
100:15 102:2,5
102:8,8 104:4
104:11,14,19
119:6 127:2,4
131:19 133:6,7
**receive** 76:8,10
76:11 83:22
**received** 24:4
33:1 84:1
104:20 131:9
132:23
**receiving** 84:15
126:4
**recognize** 51:12
95:10
**recollection** 7:21
19:1 50:20
**record** 27:17
68:15 69:12,19
70:1 71:7,23
72:1,20 73:18
73:21 99:2
132:1
**records** 70:3
**recourse** 31:20
31:20
**Recruiting** 9:13
11:12,15,23
12:6 15:24
39:6 47:11

50:7 93:21
123:24 128:8
128:21 132:19
**recuse** 43:4
49:14 65:23
72:18 109:23
110:3,4
**recused** 106:4
**refer** 128:22
**references** 71:17
**referred** 87:18
87:19
**referring** 13:14
75:14,16,23
**reflect** 69:19
71:7 96:21
**reflected** 101:22
**refusal** 136:16
**refused** 136:18
**refusing** 111:1
111:17 135:2
**regarding** 92:24
94:6
**relationship**
12:14 19:15
25:14 49:5,8
76:24 77:6
119:2
**relevant** 7:18,19
13:9 52:7 59:5
**remember** 7:15
9:8 10:21 11:6
11:8 39:18,20
39:23 40:2,5
57:23 61:11,16
61:18 66:10
74:7,11 76:22
77:7 84:23
85:6 86:1,10
94:3 99:13
100:14 107:2,9
117:5 120:11
123:4,6 124:2
134:9
**removed** 55:12
56:4

**rep** 39:5
**repay** 82:20
**Repeat** 11:21
**repeated** 71:17
**repeatedly** 53:6
**rephrase** 100:7
**replace** 54:24
**reporter** 1:17
21:24 35:22
47:15,21 63:15
63:18 69:11,15
69:19 75:19
79:6 99:24
131:24 137:18
**Reporter-Not...**
137:13
**represent** 37:3
52:9 58:16
60:10 62:22
63:4 73:17
93:14,20
101:11 128:8
**representation**
27:17 29:10
52:5 91:8,16
91:18
**representatives**
113:11
**represented**
44:11,17 51:17
60:3,18 61:14
62:1 65:5,16
74:4,9 75:3
99:18 115:20
116:4
**representing**
43:18 64:4
75:12 79:24
91:15 118:9
**represents** 44:14
51:21 52:11
115:3
**reproduction**
137:16
**request** 4:24
**requested** 43:23

69:16 126:24
132:1
**requests** 108:10
126:17
**resent** 83:14
**reserve** 13:20
136:14
**reserved** 4:5
**reserves** 114:9
**Resources** 9:13
11:13,15,24
12:6 16:1 39:6
47:11 50:7
93:21 123:24
128:9,21
132:20
**respect** 17:3
56:23 58:15
68:16,22 85:7
94:9 110:18
114:9
**respectful** 71:9
118:17
**respond** 116:20
130:19
**responding**
127:17
**responds** 130:9
130:20 133:9
**response** 67:20
71:11 116:16
**responsible** 46:6
46:14 50:1
128:18
**responsibly**
119:6
**responsive**
108:12
**retain** 75:17
**retained** 75:16
75:21 76:4,7
76:10
**retainer** 61:24
**retention** 75:16
**return** 107:7,10
**revenue** 37:12

37:14 130:9,10
130:23
**revenues** 21:15
**review** 116:20
126:8
**reviewing**
118:21
**ridiculous** 8:11
42:23 48:20
72:14 82:21
83:5
**right** 5:9 7:18
13:20 21:16
24:12,21,23
25:1,7,16 26:8
27:7,15 30:9
31:6,20 32:1
34:1 40:10
41:10,20 44:8
45:12 47:17
61:2,10 62:8
63:10 65:10
76:5 77:14
81:20 88:11,14
89:14 93:24
97:3,14 100:3
100:14,18
101:3 102:7
107:5,6,11
108:23 110:1
116:24 117:1
117:11 118:1
135:19 136:15
**risk** 104:9
**RMR** 41:14
**road** 24:16
**robbery** 124:22
**role** 8:13 10:1
45:16,19,22
46:24 47:1
99:21 100:1,6
112:20,24
113:6,10
**room** 58:5,16
70:13,16,22
**root** 67:2

Joseph LaForte

Page 153

**ROTHSCHILD**
2:9
**run** 45:5 50:4
53:14 122:12
**running** 54:6,18
55:16 123:2

**S**

**S** 2:1 3:6
**sale** 41:9
**sales** 9:10 11:10
11:11,12 39:5
**salon** 48:17,17
48:21,22 55:2
**sanctions** 13:21
58:21
**Santa** 50:23
**sarcastic** 71:15
**saw** 130:8
135:19
**saying** 23:10
34:13 35:12,19
45:18 55:17
61:19 71:8
89:8 103:15
108:6 111:20
117:21
**says** 22:10 37:15
40:10 41:10
45:3 52:8,15
52:21,23 53:3
53:11,16 55:6
55:20,22 56:10
101:4 120:9,10
126:11 127:21
**scammed**
106:14
**scope** 9:14 10:15
59:9,19,20
84:23 107:24
133:4
**screaming** 70:1
71:8
**screwed** 121:7,9
**sealing** 4:3
**second** 35:22

63:15 85:8
99:24 126:10
**see** 7:17 28:7,10
28:11 33:12
36:6 44:24
45:3 52:7
83:23 88:5
91:9,10 92:19
98:16,17,19,22
116:24 117:4
120:6 126:13
134:8
**seek** 13:20
**seeking** 108:5
**seen** 27:24 43:14
44:1 51:8 58:3
115:7
**self-discovery**
108:5
**sell** 41:16 100:18
**seller's** 31:20,20
**semi** 126:20
**send** 12:12
109:23 116:19
121:11 128:1
**sender** 120:9
**sending** 117:5
120:11
**sense** 103:19,21
**sent** 66:23
121:20 126:8
126:12
**separate** 7:20
**seriously** 121:8
**served** 108:10
**services** 16:6,7,9
16:11,13,16,18
16:23 17:11,14
45:7
**set** 68:13 109:9
**sets** 28:5
**shame** 106:18
**Shane** 2:3 61:12
110:3
**shape** 11:4
**share** 19:18

20:20 22:2,20
90:5 102:6
103:5
**Shauna** 1:17
137:12
**sheet** 89:6
**Sheraton** 57:2
**short** 46:22
126:9,17
**show** 24:17
51:11 83:15
90:19
**showing** 37:9
90:2
**shown** 44:17
**SIC** 77:14,15,16
77:17,21,21,23
78:3,4,17,23
79:21 80:1,5
**side** 50:4 52:24
53:8,13,14
54:6,9,10,14
54:18,20
**sign** 126:13,14
**signature** 51:13
51:15
**signed** 118:12
**signing** 4:3
**similar** 10:7,13
10:14 16:8
21:19 53:19,22
107:5,12
**simple** 23:4
**single** 20:23
**sit** 21:24,24
41:22 57:16
116:10
**sitting** 83:4,13
86:3 102:7
123:18
**situation** 19:23
126:16
**six** 108:18 126:9
**size** 44:24
**slight** 116:11
**slow** 35:24

**small** 15:10 84:3
84:5 116:15
**smart** 68:14
132:21
**smiling** 79:4
**smirking** 79:3
**sold** 26:22 41:16
41:17 89:1,17
**solicit** 57:17
**solicited** 93:1
**Solutions** 1:6
4:18 5:4,12
51:22 52:12
53:8
**somebody** 72:7
72:12 125:14
**somebody's** 8:10
**soon** 110:21
**sophisticated**
93:3 105:4,5
106:14
**sorry** 18:22
**source** 12:11
98:5
**sourced** 15:24
17:3 77:2
**sourcing** 12:19
12:21 15:21
**South** 50:23
**Southern** 50:22
**speak** 7:10,11
16:15 17:1
29:22 58:5
123:9
**speaking** 58:1
103:19 112:3
133:14
**specialize** 8:5
**specializing** 8:5
**specific** 18:3,5,6
19:11,11,18
20:4,6,17,21
21:1,8,22 22:8
25:15 26:17,21
27:1 28:20
29:16 31:8,11

31:14,21 32:15
36:8 39:7 85:6
85:7 89:15,16
117:15 131:8
**specifically**
31:11 40:17
52:4 100:20
**specified** 31:6
31:18 34:2
36:20 37:8
88:4,9
**spend** 21:23
22:1
**spending** 41:20
**split** 100:19
**spoken** 80:12,13
80:14
**spreadsheet**
95:11,13
**stamped** 27:13
**stamps** 95:6
**stands** 72:7
**staring** 79:13
**start** 7:7,13 8:4
12:19 62:3
63:7,9 64:1,5
65:19 73:14
101:2,17
**started** 9:14,24
11:9,16 15:21
39:14 41:3,4
52:2 55:2
**state** 5:22
**statement** 52:14
55:13 61:1,6,8
71:12 73:18,19
**statements** 3:14
33:1 71:7
87:11 90:10
104:22 118:21
134:22 135:5,9
135:20,23
136:8,11
**states** 1:1 20:3
37:21 40:16
44:24 50:22

Joseph LaForte

53:7 54:22
55:7,9 88:3
101:1
**stating** 66:16
**stay** 41:6 51:4
**steal** 20:19
88:24 100:16
127:11
**stenographic**
137:6
**stock** 110:5
**stole** 89:2,4
100:19,20
**stop** 40:22 47:17
67:4 68:7 71:4
79:12 81:16
84:14 112:4
135:18
**stopped** 71:5
94:11
**straight** 124:21
131:2
**Street** 1:15 2:5
**strike** 6:10 9:21
23:18 46:24
75:7 84:24
86:23 92:10
94:15 100:22
**structure** 15:20
**structured**
126:9
**study** 78:18,19
117:9,10,13
**stuff** 70:4 90:3
**stupid** 83:13
**submitted** 51:9
**subsequent**
55:11,23 56:1
**suggest** 40:22,22
**suit** 43:1
**supervised**
81:19
**supervision**
137:18
**supposed** 18:9
20:20 111:7

**sure** 8:20 10:15
16:6,10 21:22
24:16 27:7
28:13 33:3
37:6 41:1
73:21,21 81:15
81:16 83:10,11
87:16 90:16
93:7 102:23
104:11 107:16
110:21 129:14
129:21
**sworn** 3:3 4:9

---

**T**

**T** 3:6 137:1,1
**table** 69:21 70:2
70:10 79:14
80:17,19 81:13
**take** 4:21 14:8
14:13 18:6
19:16 21:15
22:16 23:1
26:16 29:6
40:11 42:13,16
43:5,5 44:20
44:23 46:12
49:10,20 61:8
61:12 66:12
72:8,9,10,10
82:8,11 94:15
100:19 106:8
106:10 109:22
125:11 127:12
130:19 131:7
131:13
**taken** 1:14 69:16
90:6 91:9
137:6
**talk** 7:23,24 8:8
16:21 30:17
49:8 61:17
76:2 101:18
**talked** 68:18
**talking** 9:11
18:24 24:11

35:23 45:21
62:14 64:14
78:2 98:23
107:24 136:2
**talks** 100:20
**teach** 37:4 75:14
**team** 123:8,10
123:12,22
124:4
**technically**
41:18
**Telephone** 2:6
2:10
**tell** 39:21,24
40:3 42:9,9,10
42:18 45:8
49:6,6 65:1,1
67:23,24,24
71:5 96:2
106:1 107:22
110:15 111:3
111:18 121:3,6
121:23 123:7
124:1,3,6,9,22
125:6
**telling** 53:22
80:3 106:7
110:7,14
**tendency** 97:17
**term** 126:17
**terms** 28:6 84:12
132:6
**testified** 4:9
29:12,24 53:5
53:6 55:15
63:12 66:24
135:7,9,19,24
**testify** 8:10 30:5
30:7 46:8
63:23 93:8,22
98:16 108:19
133:15
**testifying** 35:21
136:9
**testimony** 9:14
104:14 136:7

**text** 3:16 119:13
119:18 120:4,8
120:10,11,22
121:1,6,11,20
124:9,13
**Thank** 116:16
**Thanks** 13:24
**theory** 103:23
103:24
**thing** 40:11
92:24 101:18
105:3 107:12
**things** 6:22
10:16 24:15
46:8 77:20
78:1 86:21
110:15 118:17
**think** 10:11
12:13 22:21,24
34:4 43:3
49:16 52:6
57:15 72:2
78:20 83:2,9
98:22 99:4
102:5 103:11
105:8,19 106:3
112:1,1 119:7
121:7 125:1,2
125:2,14,19
126:11 127:21
130:1
**third** 67:16 81:1
114:24
**thoroughly**
97:11
**thought** 29:12
63:12 95:15
123:1 135:7
**thoughts** 8:9,10
9:16
**thousand** 52:15
**thousands** 41:22
41:23 61:17
**threat** 79:9 81:2
**threaten** 81:24
82:19 83:7

**threatened** 72:1
72:1 82:6
**threatening** 68:6
71:16
**threats** 81:3
**three** 67:8 118:6
126:15
**THURSDAY**
1:10
**time** 4:6,21,24
8:2,24 11:9,14
11:23 13:9
19:14 21:21
28:18 33:3
37:6 38:7 41:8
41:20 47:16
48:20 55:2,10
59:2,5,7 60:19
61:12,21 63:19
66:9 67:16
68:18 71:11
73:23 76:2
79:7 81:1 85:3
86:5 94:10,13
99:17 102:4
103:6 107:23
108:6 117:15
118:18 124:2
126:8
**time/money**
21:23
**times** 66:6,20
67:9 102:2
108:18,18
119:4 126:15
**tip** 47:19
**titled** 28:6
**today** 4:19 13:4
13:8,12 14:14
14:16 19:18
27:24 44:7
53:23 57:16
82:10 86:3
90:13 123:5
**today's** 14:11
18:15

Joseph LaForte

**told** 32:15 34:23
40:19 59:2
60:11 77:23
98:21 108:17
108:20 109:4
112:7 122:7
133:18 135:23
**tone** 68:13,13,16
**top** 41:24 104:24
130:18
**topic** 134:13
**total** 116:19
**tranche** 117:10
**tranched** 117:15
**tranches** 117:22
**transaction**
15:22,23 17:21
20:19 21:23
28:3 30:2 36:3
37:24 38:3
95:12,16 128:9
128:12
**transactions**
10:2 11:5
15:20 17:5
18:12,19 19:3
19:7 21:9 36:8
56:23 114:10
**transcript** 47:16
135:16 137:8
137:15
**transferred**
19:12
**treat** 68:16
118:13
**treated** 68:22
80:10,10 89:9
89:21
**treating** 69:3
**trial** 4:6
**tried** 57:17 64:4
123:16
**true** 40:17 43:4
51:19 52:13,16
52:21,23 53:2
53:3,9,16,17

54:17,19,24
55:4,6,13
56:10,11 62:7
73:18 82:1,4
91:19 123:17
**trust** 119:5
121:16
**trusted** 121:9,23
**truth** 72:13
**try** 18:3 20:12
20:16 35:24
41:6 47:24
49:2 54:2,2
66:15 100:2
134:19
**trying** 23:13
41:6 47:18
58:6 99:14,21
118:17 120:18
128:20,23
**tune** 19:19
**turn** 90:19
**two** 49:8,12
57:10 66:13
116:18 136:12
**type** 16:23 76:7
118:22 120:9
**types** 17:18
**typical** 89:16
_____
**U**
**Uh-huh** 25:12
28:8 76:16
85:10 91:12
117:23 134:16
**understand** 7:11
10:4,5,10
11:19 12:9
14:3 19:5 20:9
20:11,14 23:6
23:8,8,11 24:7
29:1 35:13
54:14 79:11
84:8 87:5
89:20 98:24
99:4,4 101:7

106:10 113:19
113:21 116:7
**understanding**
5:24 29:13,18
36:11,19 77:11
89:8 103:15
132:22
**undertaking**
134:18
**underwrite** 33:9
37:21
**underwriter**
28:21 36:9
37:15,18 38:2
119:24
**underwrites**
37:20
**underwriting**
31:9,10 86:22
92:5 93:20,22
119:23 120:1
**underwrote**
37:23 90:1
**Unfortunately**
128:12
**United** 1:1 37:20
40:16 50:21
**unsolicited**
19:20 26:22
89:18 93:1
**untimely** 108:11
**untrue** 120:18
**upheld** 40:16
**use** 27:1 44:21
46:1 103:23,24
127:9,10
**uses** 116:11
_____
**V**
**Vagnozzi** 38:5,6
38:8,9,14,16
38:18,21,23
39:2,7,9,11,14
39:17,21,24
40:3 57:2,6,17
115:3,8,12,16

115:19
**Valley** 57:2
**venture** 64:20
**verify** 121:19
123:14
**versus** 4:17
**video** 57:24 58:3
**videos** 58:4
115:7,12,15
**violating** 51:4
**virtually** 126:14
**voice** 68:24 69:2
71:10 79:1,13
**volunteering**
108:2
**vs** 1:5
_____
**W**
**waited** 116:22
**waived** 4:4
**want** 6:22 7:24
8:10 13:23
14:9,13 20:14
23:1 27:7
36:11 44:5
52:4 57:14
58:22 59:1,2
59:22 61:24
67:22 69:18
78:21 81:15,16
87:16 103:23
109:6 131:1
135:1 136:14
**wanted** 13:10
**wants** 53:18,18
**warning** 116:18
**wasn't** 67:19
96:4 102:16
127:8,10
**waste** 68:18
**wasting** 41:8
48:20 61:21
66:9 73:23
**watch** 42:10
58:4 67:23
68:10

**way** 7:21 11:4
32:24 41:6,16
41:21 42:2
47:22 61:9
66:24 69:22
70:14 71:15
72:3,14 80:10
82:2 100:14
103:7 117:2
119:11 126:9
128:19 133:4
133:17
**ways** 76:1
**we'll** 24:15
47:19 59:24
71:4 103:23
104:11 108:12
**we're** 4:16 14:2
14:15 18:24
19:22,23 34:12
34:15,15 45:21
49:21 59:14
61:21 70:23
71:2,3,22
73:12,23 79:17
80:3 82:10
100:17,18
106:16 111:5
118:5 125:19
136:15
**we've** 97:18
**weak** 72:12
**website** 45:14,17
55:3 115:4,8
**websites** 19:12
115:10
**week** 7:16
104:19 117:2
**welcome** 59:15
**went** 8:1 9:9
19:12 42:6,8
42:19 47:13
57:3 84:11
**weren't** 70:13
70:15 119:22
**White** 1:14 2:4

Joseph LaForte

16:8 42:21
44:7 49:18
82:22
**wife** 7:9,10,11
7:13,22 48:6
48:12,18 49:22
49:24 50:8,21
51:9,17,21
52:8,15,21,23
53:3,7,16,22
53:24 54:13,22
55:16,17 56:10
56:11,20,22
122:8,9,12,14
122:17,19
**wife's** 51:13
**WILLIAM** 2:3
**Williams** 1:14
2:4 16:8 42:21
44:7 49:19
82:23
**win** 41:18
**wired** 42:20
66:1 72:16
108:21 113:14
**withholding**
108:16
**witness** 3:2,3
6:15 8:8,16
10:5,11 11:21
12:10 15:4,14
16:5 17:9 19:6
20:11 21:19
23:13,23 24:8
25:12 26:20
30:5 32:7
35:20 36:15
38:14 42:15
43:24 44:1
45:24 46:19
54:8 57:8 60:7
64:8,24 65:10
65:14 66:19
67:14,17 68:4
68:9,12 69:1
70:5,8,9,12,19

71:18 72:5,23
73:4,20 75:20
79:5 80:11,16
80:20 81:5,8
81:12,20 82:1
82:4,6 86:1
87:6 88:21
89:13,24 91:20
96:9 97:7,10
97:14 98:1,11
99:5 100:5
102:14 104:6
104:18 105:12
108:2,24 109:8
109:12 110:11
111:7 112:11
114:18,22
116:1 117:13
124:19 125:9
132:9,14
**witnesses** 73:13
**won** 41:24
**wondering**
47:12,14
**word** 6:21 9:22
33:12 114:19
116:9,11,12
**words** 53:11
67:24 101:19
102:1 135:8,9
135:12
**work** 9:12 10:15
11:24 12:1,2,4
17:21 21:20
32:22 41:15
44:15 47:7,10
47:10,22 50:6
56:16 73:20
74:16 116:21
122:9 123:24
127:20 128:21
130:3 133:1
**worked** 9:12
55:10 129:15
**working** 45:4
132:19

**works** 32:20
34:3 59:4 76:1
101:9 107:13
**world** 133:21
**worse** 47:22
**wouldn't** 7:16
18:14,21 20:14
28:20 39:1,4,6
44:14 55:1
62:7 70:12,21
85:13 89:24
93:17 94:11
99:9 100:22
102:7 104:6
107:4,17 110:8
115:6 119:10
120:13,16
134:20
**writes** 116:16
130:5
**writing** 32:20
120:14
**wrong** 41:8
48:18 82:7

_____

**X**

**X** 3:1,6

_____

**Y**

**Yankees** 7:23
8:1
**yeah** 5:10 18:24
27:12 47:12
48:19 51:20
61:4 74:20
91:20 96:15
104:13 109:6
131:13 133:22
134:1
**year** 11:10 53:2
57:2
**year-and-a-half**
103:10
**years** 10:14
19:14 57:11
63:20 72:4

80:9 87:16
103:6 132:19
**yelling** 70:7,9
71:8 72:21
73:10
**Yellowstone**
11:7
**yesterday** 14:6
**York** 2:10,10
40:19
**Yup** 5:3 45:2
117:6

_____

**Z**

_____

**0**

_____

**1**

**1** 36:9 74:5,10
74:14 83:16
126:19
**1:27** 123:8
**1:29** 124:10
**1:33** 124:13
**1:54** 136:23
**10** 20:4,5 26:16
29:6 30:1,8,11
30:13,19,20,22
30:23,24 31:6
31:8,14,15,18
31:19 32:18,19
34:1,2,4,6,10
34:12,16 36:20
36:21 37:4,5,8
37:11,13,15
84:12,17,21
87:2 88:3,9,18
101:22 121:3,7
123:7 124:9
125:19 130:7
130:12
**10:18** 130:6
**10:21** 130:9
**101** 2:9
**10178** 2:10
**10th** 120:8,12
121:20 124:14

**11** 129:2
**11:17** 1:17
**11:32** 133:10
**119** 3:16
**12,000** 92:19
**12,337** 91:14,24
92:16,19
**12/19** 84:10
**12/19/18** 3:12
87:9
**125** 3:17
**129** 3:18
**14,525** 93:15
**14th** 92:18,20
**150,000** 44:24
**15th** 93:13 94:8
**16** 101:12 102:2
102:21
**16,500** 84:11
85:4
**1650** 1:15 2:5
**16th** 101:22
**17** 94:14
**173,000** 32:1
**17TH** 2:9
**18** 94:14
**1800** 1:15 2:4
**18th** 91:10
**19** 87:19
**19-3285** 1:4
**19,000** 101:14
**19,995** 84:11
101:12,21
**19,995-dollar**
102:18
**1907** 31:7
**190739** 36:20
**19103** 1:16 2:5
**19th** 90:9 91:6

_____

**2**

**2** 3:17 28:5,10
36:9 43:8,14
44:23 74:6,10
74:15 88:1
125:21 126:20

Joseph LaForte

**2,000** 32:16
    84:24
**2/24** 84:10
**2/27/19** 3:13
    87:10
**20** 32:16 80:9
    90:21 91:3
    92:13
**20-plus** 72:3
**2000--** 86:23
**2012** 7:14 8:22
    9:4,18,24 10:7
    10:20,21,22,24
    11:6 12:21,24
    45:20 46:6,14
    46:21 49:22
    50:1,5,10
    51:23 52:13
    54:5,24 56:2
**2018** 13:10,11
    46:24 87:19
    88:2 90:9
    94:14,17 95:20
    96:18
**2019** 14:20,21
    15:2 16:14,19
    38:21,24 47:1
    47:5,8 48:7,12
    58:9,15 59:6
    74:2 75:1
    83:21 85:3,8
    85:16,18,20,22
    86:4,9,13,16
    86:19,24 87:20
    90:21 91:3
    92:13,14,18,18
    93:13 94:9
    101:12 102:21
    116:15 117:7
    121:3,7 123:7
    124:10,14
    126:5 127:18
    130:5 133:10
    134:2
**2020** 1:10 86:19
    87:1,20 137:7

**21** 92:22
**212-878-7945**
    2:10
**215.864.7000**
    2:6
**22** 63:20 103:1
**22nd** 91:10
**230** 40:15
**23rd** 91:6,8
**24** 92:13,18
**24th** 91:13
**25** 92:21
**27** 3:8 32:1
**2946-04** 28:10
    28:12,15,24
    29:3,20 31:22
    35:2 36:12,13
**2nd** 126:5
    127:18 130:5
    133:9 134:1

_____
**3**

**3** 19:19 41:19
    51:12 92:23
    96:3 106:16
**3:40** 127:18
**30** 61:13 78:12
    78:12
**30(b)(6)** 13:15
    14:7 59:12
**30,000** 42:1,2
    49:10 52:10
    56:18 65:24
    66:12
**35** 40:4,7 115:21
    116:4
**350,000** 127:20
    128:4
**3500** 84:11 85:3
    90:21 91:5,9
    91:10,10,23
**3500-dollar** 91:2
**3rd** 83:21
    116:15

_____
**4**

**4** 3:5,18 99:7
    116:14 129:5
**4,583** 88:9
**40** 32:17
**400,000** 32:19
    32:24 33:5
    96:19
**43** 3:9
**44** 103:1
**45-day** 103:10
**4583** 101:2,13
**4583.00** 84:11
**472,356.60**
    94:18 95:19
**48** 36:7 85:5

_____
**5**

**5** 1:10 51:22
    52:11 88:1,17
    90:9 91:2,6
    137:7
**5,000** 44:24
**5/2/19** 3:17,18
    125:21 129:5
**5/3/19** 3:11
**5/31** 27:6,8
**5/31/18** 3:8 27:3
    27:11
**5/31/19** 82:15
**50** 3:10 66:6,20
**50,000** 42:19
    43:1 46:13
**500,000** 62:3
    63:5

_____
**6**

**6** 54:23 88:7,8
    88:17 101:1
**600,000** 33:3
**66** 103:1

_____
**7**

**7** 55:9 90:11

_____
**8**

**82** 3:11
**87** 3:12,13,14

**88** 103:1
**8th** 94:16 95:20

_____
**9**

**9:52** 83:21
**90** 103:10
**94** 3:15