IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| HMC INCORPORATED and KARA DiPIETRO, individually, | : Civil Action<br>:<br>: No.  19-3285 |
| Plaintiffs, | : |
| v. | : |
| COMPLETE BUSINESS SOLUTIONS GROUP, INC., d/b/a PAR FUNDING and FAST ADVANCE FUNDING, INC., | : |
| Defendants. | : |

- - -

Tuesday, June 30, 2020

- - -

Remote deposition of JOSEPH LOUIS COLE BARLETA, taken stenographically, pursuant to notice, was held at 205 Arch Street, Philadelphia, Pennsylvania, beginning at 10:01 AM, on the above date, before Constance S. Kent, a Certified Court Reporter, Registered Professional Reporter and Notary Public.

* * *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 2

```
 1   A P P E A R A N C E S:
 2     WHITE & WILLIAMS
       BY:  SHANE R. HESKIN, ESQUIRE
 3     One Liberty Place
       1650 Market Street, Suite 1800
 4     Philadelphia, Pennsylvania  19103
       215.864.7000
 5     heskins@whiteandwilliams.com
       Counsel for Plaintiffs
 6
 7     FOX ROTHSCHILD
       BY:  BRETT ADAM BERMAN, ESQUIRE
 8     2000 Market Street, 20th Floor
       Philadelphia, Pennsylvania  19103
 9     215.299.2000
       bberman@foxrothschild.com
10     Counsel for Defendants
11
       ALSO PRESENT:
12
       Chelsea Lynch, Trial Technician
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1   NO.      DESCRIPTION          PAGE
 2   Exhibit 14  Complaint, Complete   368
              Business Solutions
 3            Group, Inc. V. HMC
              Incorporated
 4
     Exhibit 34  Agreement dated 12/19/18   446
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1          - - -
          I N D E X
 2          - - -
 3   Testimony of: JOSEPH LOUIS COLE
     BARLETA
 4
 5   By Mr. Heskin          6
 6
            - - -
 7       E X H I B I T S
            - - -
 8
```

```
 9   NO.      DESCRIPTION       PAGE
10   Exhibit 12  Response to Order to   238
              Show Case Filed by
11            Respondents, Lisa
              McElhone and Joseph
12            LaForte, Declaration of
              Lisa McElhone
13   Exhibit 4  Acknowledgement and   250
              Factoring Agreement
14
15   Exhibit 7  Spreadsheet       272
16   Exhibit 28  SEC Form D       280
17   Exhibit 1  Email string       307
18   Exhibit 20  The Marque, Joseph   336
              Barleta
19   Exhibit 31  Letter dated 10/24/19,  341
              Cole to HMC
20
     Exhibit 22  Email string       344
21
22   Exhibit 25  Email dated 5/3/19    345
23   Exhibit 29  Email string       348
24
```

Page 5

```
 1          - - -
 2   DEPOSITION SUPPORT INDEX
 3          - - -
 4   Direction to Witness Not to Answer
 5   Page Line    Page Line   Page Line
 6   8   4      76  15    80   7
     93  23    108   11    110  9
 7   111  7    123   24    130  14
     131  5    152   18    207  11
 8   210  4    211   7    211  17
     212  2    214   14    215  2
 9   216  5    226   23    228  16
     230  3    232   7    233  3
10   234  18   280   18    284  14
     291  3    291   24    292  5
11   292  16   295   18    296  11
     297  5    301   3    302  2
12   302  9    302   15    302  23
     303  14   303   19    305  16
13   340  4    342   11
14
15   Request for Production of Documents
     Page Line    Page Line   Page Line
16
     None
17
     Stipulations
18   Page Line    Page Line   Page Line
19   None
20   Question Marked
     Page Line    Page Line   Page Line
21
     None
22
23
24
```



Page 6

```
 1        JOSEPH LOUIS COLE BARLETA,
 2   having been first duly sworn, was
 3   examined and testified as follows:
 4                - - -
 5        E X A M I N A T I O N
 6                - - -
 7   BY MR. HESKIN:
 8        Q.   Good morning, how are you?
 9        A.   Doing well, thank you.
10        Q.   It's certainly interesting
11   times.
12             Where -- are you working
13   from home or are you working at the
14   office?
15        A.   I'm at the office.
16        Q.   Okay.  So CBSG hasn't closed
17   its offices yet?
18        A.   We're working at Full
19   Spectrum, no.
20        Q.   You're working at Full
21   Spectrum?
22        A.   Yeah.
23        Q.   And what address is that?
24        A.   I'm at 205 Arch Street.
```

Page 7

```
 1        Q.   Okay.  And how many offices
 2   does Full Spectrum have?
 3        A.   Two.
 4        Q.   Where is the other office?
 5        A.   20 North 3rd Street.
 6        Q.   Okay.  And who's -- who's
 7   the -- is that a lease or does Full
 8   Spectrum own that building?
 9        A.   They lease it.
10        Q.   Okay.  And how long have
11   they leased it?
12        A.   Since the beginning of 2017.
13        Q.   2017.  And Full Spectrum is
14   the one that leases it, right?
15        A.   Yes.
16        Q.   Okay.  And does Full
17   Spectrum lease it out to -- sublease it
18   out to anyone else?
19        A.   No.
20        Q.   What's the date of the
21   lease?
22        A.   I'm not sure, but it's
23   around the time -- beginning of 2017.
24        Q.   Okay.  What -- why did
```

Page 8

```
 1   the -- why did the -- in 2017, that's
 2   when the switch from CBSG to Full
 3   Spectrum took place; is that correct?
 4             MR. BERMAN:  I'm going to
 5   object and instruct him not to
 6   answer.  It has nothing to do with
 7   the relevant time period in this
 8   case.
 9             MR. HESKIN:  You're
10   instructing him not to answer?
11             MR. BERMAN:  I am.  This has
12   nothing to do with this case and
13   it has nothing to do with the
14   court order.  Look at the court
15   order.
16             MR. HESKIN:  Well, I can ask
17   him on my -- on his personal
18   knowledge, so --
19             MR. BERMAN:  You have my
20   instruction.
21             MR. HESKIN:  Okay.  You're
22   instructing him not to answer?
23   I'm asking him about --
24             MR. BERMAN:  Regarding
```

Page 9

```
 1   Full -- yes.  Regarding Full
 2   Spectrum's lease in 2017, look at
 3   the court order.  Relevant time
 4   period in this case is
 5   February 2018 to October 2019.
 6             Moreover, Full Spectrum is
 7   not a party, so I'm not really
 8   sure why you're asking about their
 9   lease either way.
10             So yeah, if you want to call
11   the judge, call the judge.
12             MR. HESKIN:  All right,
13   Brett.  You understand that's
14   there's a RICO allegation, right?
15             MR. BERMAN:  You have the
16   court order like I do.  Call the
17   judge.
18             MR. HESKIN:  Okay.  And you
19   understand that the court order --
20             MR. BERMAN:  I'm not -- let
21   me be clear, I'm not answering
22   your questions.
23             MR. HESKIN:  Okay.  All
24   right.
```



Page 10

1     MR. BERMAN:  Just so you
2  understand.
3     MR. HESKIN:  All right,
4  Brett.
5     MR. BERMAN:  You're free to
6  call the judge.  You have a court
7  order.
8     MR. HESKIN:  No, no, no
9  Brett.  I'm going to file a motion
10  for sanctions.  I just want to be
11  clear right now.
12     MR. BERMAN:  You can do --
13  you can do whatever you want.
14     MR. HESKIN:  You instruct
15  him not to answer at your own
16  risk.  I will be filing a motion
17  for sanction for your
18  obstructionist conduct, period.
19     MR. BERMAN:  And I will then
20  cross move for sanctions against
21  you for violation of a court
22  order.
23     Feel free to call the judge.
24     MR. HESKIN:  Got it.  I got

Page 11

1     it.  Okay.  Thank you, Brett.
2  BY MR. HESKIN:
3     Q.   So -- so Mr. Cole, are
4  you -- are you following your lawyer's
5  instruction not to answer?
6     A.   Yes, I'm following his
7  advice.
8     Q.   Okay.  When was -- so let me
9  get this straight.  Full Spectrum was in
10  operation during the time period of HMC,
11  right?
12     A.   Yes.
13     Q.   Did -- did HMC ever have any
14  direct communications with CBSG?
15     A.   Of course.
16     Q.   Who -- who did they have
17  direct communications with?
18     A.   They were in direct
19  communications with CBSG management.
20     Q.   Who is CBSG management?
21     A.   That is myself as CFO, Lisa
22  as president and Jamie as the treasurer.
23     Q.   Who is Jamie?
24     A.   Jamie McElhone is Lisa

Page 12

1  McElhone's sister.
2     Q.   Okay.  And where does she
3  live?
4     A.   She lives in Philadelphia.
5     Q.   Where does she work?
6     A.   She works for Full Spectrum
7  Processing.
8     Q.   Well, I just asked you did
9  she ever have any direct conversations or
10  communications with CBSG, and now you're
11  telling me that Jamie McElhone is a Full
12  Spectrum employee?
13     A.   Correct.  She has a position
14  as a director of CBSG and is an employee
15  of Full Spectrum.
16     Q.   So they're both?
17     A.   Correct.
18     Q.   And who does -- who does
19  Jamie receive her paycheck from?
20     A.   I'm sorry?  You broke up
21  there.
22     Q.   Sorry.  Who does she receive
23  her paycheck from?
24     A.   Full Spectrum Processing.

Page 13

1     Q.   And does she get paid at all
2  from CBSG?
3     A.   No.
4     Q.   And the same thing with
5  Lisa, is -- is she -- who does she get
6  paid by?
7     A.   She's paid by CBSG.
8     Q.   Does she work for Full
9  Spectrum?
10     A.   No, she's not an employee of
11  Full Spectrum.
12     Q.   And you're not an employee
13  of CBSG, correct?
14     A.   That's correct.
15     Q.   And you've never held
16  yourself out to be an employee of CBSG,
17  correct?
18     MR. BERMAN:  Objection to
19     form.
20     You can answer, Joe.
21     THE WITNESS:  No.
22  BY MR. HESKIN:
23     Q.   Never?
24     A.   I used to be an employee



Page 14

1   until their restructure.
2       Q.   Okay.  So after 2017, you
3   became CFO for Full Spectrum, correct?
4       A.   That's right.
5       Q.   And after 2017, would it be
6   correct to say that you were not the CFO
7   for CBSG?
8       A.   No.
9       Q.   That's not correct?
10      A.   That's not correct.  I had
11  the same director function as I had
12  before.
13      Q.   Okay.  Let me ask you this:
14  In 2017, were you the CFO for CBSG?
15      A.   Yes.
16      Q.   In 2018, were you the CFO
17  for CBSG?
18      A.   Yes.
19      Q.   2019, CFO for CBSG?
20      A.   Yes.
21      Q.   And today, are you the CFO
22  for CBSG?
23      A.   That's right.
24      Q.   Okay.  And -- but you're not

Page 15

1   paid by CBSG?
2       A.   No.
3       Q.   Okay.  So you just do it for
4   free?
5       A.   No.
6       Q.   Well, how you compensated?
7       A.   We have an operating
8   agreement at Full Spectrum with CBSG.
9       Q.   Okay.  And so during the
10  full time that you were -- how many --
11  strike that.
12          Did you have any direct
13  communications with Kara DiPietro?
14      A.   Yes.
15      Q.   And were you doing that as
16  Full Spectrum or were you doing that as
17  the CFO of CBSG?
18      A.   I was doing that as Full
19  Spectrum.
20      Q.   As Full Spectrum.
21      A.   Yes.
22      Q.   So when you were
23  communicating and having discussions with
24  Ms. DiPietro, you were having those

Page 16

1   conversations in the capacity of Full
2   Spectrum, correct?
3       A.   Right, under our operating
4   agreement.
5       Q.   So -- so none of your
6   communications, your direct
7   communications with Ms. DiPietro were in
8   your capacity as the CFO of CBSG,
9   correct?
10          MR. BERMAN:  Objection.
11          You can answer.
12          THE WITNESS:  No, that's
13  incorrect.  The operating
14  agreement we have is serving both
15  as an operator of Full Spectrum
16  and as my position as director and
17  CFO.
18  BY MR. HESKIN:
19      Q.   Okay.  Does -- does --
20  did -- in 2018 when my client's
21  agreements first began, was CBSG paying
22  Philadelphia taxes?
23          MR. BERMAN:  Objection.
24          THE WITNESS:  No.  There's

Page 17

1          no longer any nexus in
2          Philadelphia as of that time.
3   BY MR. HESKIN:
4       Q.   What do you mean by no
5   nexus?
6       A.   Financial nexus means
7   physical operations within the
8   jurisdiction.
9       Q.   Yeah.  And so if there were
10  physical operations by CBSG in 2018, 2019
11  and 2020, CBSG would be required to pay
12  Philadelphia taxes, correct?
13          MR. BERMAN:  Objection.
14          THE WITNESS:  Yes.
15  BY MR. HESKIN:
16      Q.   That's your understanding,
17  right?
18      A.   Yes.
19      Q.   Okay.  And -- and so is it
20  correct to say that during the entire
21  time period that my client's agreements
22  were in place, that there were no
23  physical operations occurring in the
24  state -- the Commonwealth of



Page 18

1  Pennsylvania?
2      MR. BERMAN: Objection.
3      THE WITNESS: You mean under
4  CBSG?
5  BY MR. HESKIN:
6      Q.  Under CBSG, yeah.
7      A.  Correct.
8      Q.  And Ms. DiPietro never had
9  any direct communications with Ms. --
10  Ms. Lisa McElhone; is that right?
11      A.  I'm not sure you about that.
12      Q.  Okay.  Are you aware of any?
13      A.  I am not aware of any.
14      Q.  Okay.  What did you do to
15  prepare for that topic?
16      A.  We didn't go over that.
17      Q.  Who didn't go over that?
18      A.  I did not go over in my
19  preparation, in discussion, go over that
20  topic.
21      Q.  Well, you're put up on the
22  topic of communications with my client,
23  right?
24      A.  Yes.

Page 19

1      Q.  Okay.  What did you do to --
2  to investigate the communications between
3  my client and your client?
4      MR. BERMAN: Objection to
5  the extent it calls for
6  attorney/client privileged
7  communications.
8      If it doesn't, you can
9  answer.
10      THE WITNESS: I'm sorry, I
11  don't understand that.
12  BY MR. HESKIN:
13      Q.  Sure.  What did you do to
14  educate yourself as to what
15  communications transpired between CBSG on
16  the one hand and HMS and Kara DiPietro on
17  the other hand?
18      MR. BERMAN: Objection.
19  Same objection to the extent it
20  calls for attorney/client,
21  attorney work product.
22  But otherwise you can
23  answer.
24      THE WITNESS: I went over

Page 20

1  personal emails I had with Kara, I
2  went over the agreements and
3  financial history of the payments
4  made by her entity.
5  BY MR. HESKIN:
6      Q.  Okay.
7      A.  I went over staff
8  communications with Full Spectrum
9  employees and the normal underwriting and
10  due diligence process for each one of her
11  transactions.
12      Q.  Did you speak to
13  Mr. LaForte?
14      A.  Yes.
15      Q.  When did you speak to -- and
16  so the record is clear, it's Joe LaForte,
17  right?
18      A.  That's right.
19      Q.  Joe LaForte, Jr.?
20      A.  I'm not sure about the
21  junior, but yes.
22      Q.  Okay.  I think we're
23  thinking of the same person.
24      When did you speak to Joe?

Page 21

1      A.  I spoke to him a few times
2  regarding this transaction.
3      Q.  How many?
4      A.  Regularly in the course of
5  the transaction, over the period of time
6  we had her as a --
7      Q.  About how many times?
8      A.  Regularly.  I mean, you're
9  talking about routine business regarding
10  our client communications.
11      Q.  Where did those
12  conversations take place?
13      A.  Usually over the phone.
14      Q.  Okay.  Where -- where does
15  Joe physically sit?
16      A.  He sits at the 20 North 3rd
17  Street office with our sales entity.
18      Q.  He sits where?  I'm sorry I
19  missed that.
20      A.  20 North 3rd Street office.
21      Q.  20 North 3rd Street.  And --
22  and that's a Full Spectrum office,
23  correct?
24      A.  There's multiple units.



Page 22

1    Three of them are for Full Spectrum, one
2    of them is for the sales entity.
3        Q.   What's the sales entity?
4        A.   Recruiting Marketing
5    Resources.
6        Q.   None of those offices is for
7    CBSG, correct?
8        A.   None, correct.
9        Q.   Okay.  And if -- and if one
10   of those offices were within the City of
11   Philadelphia, CBSG would have to pay
12   taxes, right?
13           MR. BERMAN:  Objection.
14           THE WITNESS:  Yes.
15   BY MR. HESKIN:
16       Q.   Okay.  And CBSG didn't pay
17   any Philadelphia taxes in -- hasn't paid
18   any Philadelphia taxes since 2017,
19   correct?
20           MR. BERMAN:  Objection.
21           THE WITNESS:  Well, recorded
22       for that period.  I'm not sure if
23       physical payments went out
24       subsequently.

Page 23

1    BY MR. HESKIN:
2        Q.   Yeah, sure.  The only reason
3    I'm -- I'm asking about is because
4    our firm has to make their big
5    Philadelphia payment this -- this month
6    and so it's -- it's a big one and so
7    that's why I'm interested so much in
8    that -- in tax payment.
9            So in any event -- all
10   right.  So CBSG doesn't have any office
11   in Pennsylvania at all, right?
12       A.   That's correct.
13       Q.   It's never had an office or
14   physical presence in -- in Pennsylvania
15   since 2017, correct?
16           MR. BERMAN:  Objection.
17           THE WITNESS:  Through the
18       end of 2016.
19   BY MR. HESKIN:
20       Q.   Okay.  That's correct.
21   So -- so as of January 1, 2017 to the
22   present, CBSG has had no physical
23   location in the Commonwealth of
24   Pennsylvania, correct?

Page 24

1        A.   That is correct.
2        Q.   Okay.  What -- what does
3    Jamie McElhone do for CBSG?
4        A.   She's the treasurer.
5        Q.   And where does she sit?
6        A.   20 North 3rd Street.
7        Q.   What are her -- and she sits
8    there as -- in her capacity at Full
9    Spectrum, right?
10       A.   That's right.
11       Q.   And what are her hours?
12   Does she come in every day?
13       A.   Yes.
14       Q.   She does?
15       A.   Yes.
16       Q.   Is she in the office today?
17       A.   Yes.
18       Q.   And can you just briefly
19   describe her duties and what her
20   day-to-day activities are?
21       A.   She handles cash management,
22   funding, wires, payments, just part of
23   the controls with the cash flow and bank
24   accounts that we have.

Page 25

1        Q.   Okay.  And she signed the
2    verification in support of the confession
3    of judgment that was -- was filed by CBSG
4    against my client, correct?
5        A.   I'm not sure.
6        Q.   You're not sure?
7        A.   No, but she is an authorized
8    signatory for CBSG.
9        Q.   Okay.  And did she review
10   HMC's financials and payments before she
11   signed the verification?
12           MR. BERMAN:  Objection.
13           THE WITNESS:  It was
14       reviewed by underwriting as
15       normal.
16   BY MR. HESKIN:
17       Q.   I didn't ask that.  I asked
18   whether or not Ms. McElhone did.
19       A.   I'm not sure.
20       Q.   Well, she's the one that
21   verified it, right?
22       A.   As part of our process
23   there's a file submitted and it's
24   reviewed and approved by underwriting



Page 26

1    first.
2        Q.   So if I -- if I put Jamie
3    McElhone on the stand to testify under
4    oath under penalties of perjury and I
5    asked her point-blank, Did you verify the
6    information contained in this confession
7    of judgment, what would her answer be?
8            MR. BERMAN:  Objection.
9            THE WITNESS:  I'm not sure
10           what her answer would be, but it
11           is part of routine procedures for
12           her to review the file.
13   BY MR. HESKIN:
14       Q.   Do you know one way or the
15   other whether or not she reviewed the
16   file before she verified under penalties
17   of perjury and affixed her signature to
18   the verification against my client,
19   whether she reviewed any of the
20   information?  Did she do that?
21       A.   I'm not sure.
22       Q.   You're not sure.  As the
23   corporate representative of CBSG, you're
24   not sure whether or not Ms. McElhone

Page 27

1    filed a false verification or a true and
2    correct verification, correct?
3            MR. BERMAN:  Objection,
4            given that's not within the scope.
5            But you can answer.
6            THE WITNESS:  I'm not sure.
7    BY MR. HESKIN:
8        Q.   Does -- does Jamie
9    McElhone -- when she affixes her
10   signature, is that a cut-and-paste job or
11   does she actually hand sign the -- the --
12   her signature on the verification?
13           MR. BERMAN:  Objection.
14   BY MR. HESKIN:
15       Q.   Or does someone do that for
16   her?
17           MR. BERMAN:  Objection.
18           THE WITNESS:  Usually
19           they're hand signed.  We also have
20           a DocuSign E signature there.
21   BY MR. HESKIN:
22       Q.   So if I were to hire a
23   handwriting expert and compare the
24   signatures on Ms. McElhone's

Page 28

1    verifications on the hundreds of
2    confessions of judgments that have been
3    filed by CBSG over the past year, and
4    including during the time period of my
5    client when Ms. McElhone also signed a
6    verification, they would all be
7    different, right, because those were each
8    uniquely signed?  Is that -- is that your
9    understanding?
10           MR. BERMAN:  Objection.
11           THE WITNESS:  You're going
12           to see differences unless they
13           were done with the DocuSign, which
14           is probably pretty common, too.
15   BY MR. HESKIN:
16       Q.   Well, which was it?  Does
17   she physically sign it and verify or does
18   someone DocuSign on her behalf where she
19   doesn't even know that these are being
20   filed on her behalf?
21           MR. BERMAN:  Objection.
22           THE WITNESS:  We do both.
23   BY MR. HESKIN:
24       Q.   You do both?

Page 29

1        A.   Yes.
2        Q.   Okay.  So I want -- when I
3    look at the hundreds of verifications
4    that were signed or purportedly signed by
5    Ms. McElhone, they're going to be
6    variations in them, correct?
7            MR. BERMAN:  Objection.
8            THE WITNESS:  Correct.  Yes.
9            I believe that's likely.
10   BY MR. HESKIN:
11       Q.   Okay.  And the one that was
12   signed against my client, was that
13   physically signed or was that a DocuSign?
14       A.   I'm not sure.
15       Q.   You're not sure?  Well, it
16   was done twice.  Was Ms. McElhone
17   informed that she was signing a
18   verification on two occasions?
19       A.   I'm not sure.
20       Q.   Okay.  And did Ms. McElhone
21   review the facts contained in the
22   complaint on both occasions?
23       A.   I'm not sure.
24       Q.   You're not sure?  Okay.



Page 30

```
 1          The verification claims that
 2   my client was -- was in breach of the
 3   agreement.  How was my client in breach
 4   of the agreement?
 5       A.   Your client was in breach of
 6   our MCA agreement by not making good on
 7   the payments.
 8       Q.   By not making good on the
 9   payments?
10       A.   That's right.
11       Q.   What -- what payment was due
12   that she didn't pay?
13       A.   We had a regular ACH debits
14   processed that came back as returned as
15   per the agreement.
16       Q.   Okay.  When -- when's the
17   date.  When's the first regularly
18   processed payment that didn't go through?
19       A.   You have that on the
20   discovery.  There were a number of small
21   returns, but the majority of these
22   occurred around May of last year.  That's
23   when there was significant issues from
24   her account with our MCA transactions.
```

Page 31

```
 1       Q.   Were you aware of that?
 2       A.   Of course.
 3       Q.   Okay.  And who authorized
 4   the filing of the COJ?
 5       A.   Kara authorized it.  It's
 6   part of the agreement.
 7       Q.   No, no, no.  Who authorized
 8   it on behalf of CBSG to file the
 9   confession of judgment and representing
10   under penalties of perjury that she had
11   breached the agreement?
12          MR. BERMAN:  Objection.
13   BY MR. HESKIN:
14       Q.   Who made that decision?
15          MR. BERMAN:  Objection.
16          THE WITNESS:  I'm not sure.
17   BY MR. HESKIN:
18       Q.   You're not sure.  As the CFO
19   you're not sure?
20       A.   I'm not sure.  That's
21   typically handled by the underwriter.
22       Q.   Well, who is the
23   underwriter?  Because we just took the
24   deposition of the underwriter yesterday
```

Page 32

```
 1   and she -- she claims she didn't make
 2   that decision.
 3          MR. BERMAN:  Objection.
 4   Mischaracterization.
 5          You can believe that he's
 6   characterizing people or not what
 7   they said since there's no
 8   transcript, but you can answer.
 9          THE WITNESS:  It's within
10   her department and her manager and
11   superiors that made the decision
12   to do so.
13   BY MR. HESKIN:
14       Q.   Who is her superior?
15       A.   At the time it's Tori and
16   Alex.
17       Q.   Tori who?
18       A.   Victoria Billarose.
19       Q.   Can you spell that?
20       A.   V-I-C-T-O-R-I-A, last
21   name --
22       Q.   I knew that, I meant the
23   last name.
24       A.   B-I-L-L-A-R-O-S-E.
```

Page 33

```
 1       Q.   Okay.  And who is the second
 2   person you identified?
 3       A.   Alex.
 4       Q.   Alex who?
 5       A.   Shlepin.
 6       Q.   Can you spell that?
 7       A.   S-H-L-E-P-I-N.
 8       Q.   And both of those persons I
 9   presume are employed by Full Spectrum,
10   correct?
11       A.   That's correct.
12       Q.   And the underwriter was
13   employed by Full Spectrum, correct?
14       A.   That's correct.
15       Q.   So if I asked Alex or
16   Victoria and I put them under -- under
17   oath, they're going to testify that
18   they're the ones that made the decision
19   to default -- to declare default on HMC?
20       A.   I believe they would be able
21   to detail that out specifically who made
22   the decision.
23       Q.   You don't know who made the
24   decision?
```



Page 34

1      A.   I don't know.  It's within
2  their department.
3      Q.   Okay.  So as the corporate
4  designee for CBSG, you -- as you sit here
5  today, you cannot identify the person who
6  is responsible for declaring a default
7  under the HMC agreements; is that right?
8          MR. BERMAN:  Are you
9      pointing to a specific thing we
10     agreed to for corporate designee
11     here?  And if so, identify it.
12     You're asking a question like
13     you actually -- that be would
14     something you identified as a
15     corporate designee topic.  You
16     didn't.
17         But to the extent he knows,
18     he can answer, but stop making
19     misrepresentations of what the
20     scope of the 30(b)(6) is.
21  BY MR. HESKIN:
22     Q.   Go ahead.  You can answer.
23     A.   Specifically I understand as
24  the corporate designee that that

Page 35

1  department made the decision to make
2  that.  I do not know specifically which
3  person within the department made the
4  decision to do so.
5      Q.   Did you ever have any
6  discussions with Mr. LaForte about
7  whether to declare default?
8      A.   No.
9      Q.   Are you aware of whether or
10 not Mr. LaForte is the one who personally
11 made that decision to declare a default?
12     A.   No.
13     Q.   Do you know if the person
14 who declared the default actually
15 reviewed the documents to determine
16 whether or not there's been a default?
17     A.   It's part of their normal
18 procedures to do so.
19     Q.   Okay.  And when -- when is
20 the date of default and what was the
21 reason?  So let's start with the first
22 one.
23         Please give me the date of
24 default.

Page 36

1      A.   I don't have the precise
2  date.  It's approximately May last year.
3      Q.   You don't know -- you can't
4  give me a date?
5      A.   I didn't memorize the dates
6  for the default.
7      Q.   Okay.  Well, how did -- how
8  did she default?  What was the default?
9      A.   The mechanism for default is
10 not making good on payments as arranged
11 under the agreement.
12     Q.   Is missing just one payment
13 a default?
14     A.   No.
15     Q.   Okay.  Is not making two
16 payments a default?
17     A.   No.
18     Q.   Is not making three payments
19 a default?
20     A.   No.
21     Q.   Is not making four payments
22 a default?
23     A.   Yes.
24     Q.   Yes.  So as of May, it's

Page 37

1  your testimony under oath that
2  Ms. DiPietro missed four consecutive
3  payments, is that -- is that your
4  testimony?
5          MR. BERMAN:  Objection.
6          THE WITNESS:  There was more
7      than four missed payments and
8      there was a cease of payments
9      altogether.
10         So when this client went
11     into default, we can normally
12     stave off the default status if
13     there's a negotiation or
14     agreement.  We're very flexible
15     with our clients in negotiating
16     terms.
17 BY MR. HESKIN:
18     Q.   Okay.
19     A.   So when you're saying that
20 this is a default after four payments, it
21 wasn't just after four, it was that there
22 was no communication to negotiate
23 alternative payments, reduced payments or
24 any sort of intent to continue making

MAGNA
LEGAL SERVICES

Page 38

```
 1   good on the obligations under the
 2   factoring agreement.
 3       Q.   Wow.  Wow.  Really?  So you
 4   weren't at that meeting where -- in -- on
 5   May 6th when my client actually traveled
 6   to Philadelphia to have an in-person
 7   meeting with -- with CBSG?
 8       A.   I had a meeting with Kara
 9   and her CFO.
10       Q.   Okay.  And that was on
11   May 6th, 2019, correct?
12       A.   Yeah, '19.
13       Q.   Yeah, '19, right?  And you
14   had an in-person meeting, right?
15       A.   That's right.
16       Q.   Okay.  And you're still
17   sitting here today testifying under oath
18   that she didn't have any communications
19   with you regarding a payment plan?
20       A.   There was nothing held after
21   the meeting that she made good on.
22       Q.   Got it.  And were you there
23   when Mr. LaForte handed her a -- an
24   agreement to sign?
```

Page 39

```
 1       A.   I'm not sure what you're
 2   referring to.
 3       Q.   The restructuring agreement
 4   that you forwarded to Ms. DiPietro, did
 5   he physically hand that to her?
 6       A.   I'm not sure.
 7       Q.   You're not sure?
 8       A.   No.
 9       Q.   Were you there when
10   Mr. LaForte threatened to blow up
11   Ms. DiPietro's house if she didn't sign
12   those papers?
13       MR. BERMAN:  Objection.
14       THE WITNESS:  No, I never
15   heard of that.
16   BY MR. HESKIN:
17       Q.   Were you there?
18       A.   No.
19       Q.   Were you there when
20   Mr. LaForte followed her out to her car?
21       A.   No.
22       Q.   Did you see Mr. LaForte
23   follow Ms. DiPietro out to her car?
24       A.   No.
```

Page 40

```
 1       Q.   All right.  Did Mr. LaForte
 2   stay in the meeting with you after
 3   Ms. DiPietro left or did he leave the
 4   meeting?
 5       A.   If you're referring to the
 6   meeting with her CFO and Kara, they left
 7   while we were still in the room.
 8       Q.   Okay.  So you're saying that
 9   Ms. DiPietro and Mr. Persing left the
10   room, and at all times Mr. LaForte was
11   there in your presence and you never saw
12   him leave the room, is that your
13   testimony?
14       A.   That's right.
15       Q.   That's right.  Okay.  All
16   right.
17       So you testified earlier
18   that missing the four payments was the
19   default, and you understand that there
20   were numerous agreements that were in
21   place in early May, right?
22       MR. BERMAN:  Objection.
23       THE WITNESS:  Yes.
24   BY MR. HESKIN:
```

Page 41

```
 1       Q.   Is it your testimony that
 2   Ms. -- that HMC that missed four payments
 3   under each and every one of those
 4   agreements in which you filed a
 5   confession of judgment under?
 6       MR. BERMAN:  Objection.
 7       THE WITNESS:  Yes.
 8   BY MR. HESKIN:
 9       Q.   Yes?
10       A.   Yes.
11       Q.   I'm going to look and I'm
12   going to find four missed payments under
13   each and every one of the agreements --
14       A.   Yes.
15       Q.   -- prior to the -- prior to
16   the date that you first filed the COJ,
17   correct?
18       A.   Yes.
19       Q.   Okay.  And that would be
20   reflected apparently on the accounting
21   sheet that was attached to the COJ,
22   right.
23       A.   Not necessarily.  We had a
24   subsequent payments missed after the COJ
```

Page 42

1  was filed, which is obviously an issue,
2  and no resolution was made after the
3  meeting.
4       Q.   Well, I'm just talking about
5  as of the date of the first filing, the
6  one that was verified by Jamie McElhone
7  under penalties of perjury, she
8  apparently verified under oath, according
9  to your testimony, that Ms. DiPietro
10  missed four payments under each and every
11  one of the agreements that were in place
12  prior to the date of filing, correct?
13       MR. BERMAN:  Objection.  Is
14    that a representation?
15       MR. HESKIN:  I'm asking.
16    It's a question.
17       MR. BERMAN:  You can answer
18    the question, but you don't have
19    to accept his representations.
20       THE WITNESS:  Yes.
21  BY MR. HESKIN:
22       Q.   She did.  She verified that
23  there were four missed payments under
24  each of those agreements, correct?

Page 43

1       A.   Yes.
2       Q.   Got it.  And does she do
3  that with respect to every verification
4  that she makes?
5       MR. BERMAN:  Objection.
6       THE WITNESS:  She -- as part
7    of our process with underwriting
8    reviews the default status before
9    making the filing.
10  BY MR. HESKIN:
11       Q.   So I just want to make sure
12  I got this straight:  Out of the many
13  hundreds, if not thousands, of COJs that
14  Ms. McElhone has signed and verified
15  under penalties of perjury, she's looked
16  at the accounting records and confirmed
17  that there had been four missed payments
18  or some other breach; is that correct?
19       MR. BERMAN:  Objection.  Is
20    that within the scope of your
21    questions about all the other
22    merchants or are you talking about
23    Ms. DiPietro now?
24       MR. HESKIN:  Practices and

Page 44

1  policies is the exact topic at the
2  court allowed me to answer.
3       MR. BERMAN:  Okay.  Joe, you
4  can answer.
5       THE WITNESS:  As part of her
6    process, she is supposed to review
7    those.
8  BY MR. HESKIN:
9       Q.   Well, I -- that's not quite
10  the answer.  I understand she's supposed
11  to.  My question is does she?  If I put
12  her under oath under penalties of perjury
13  and I show her the hundreds of thousands
14  of COJs that she apparently or
15  purportedly verified under oath, she's
16  going to say, Yeah, I -- yeah, I verified
17  each and every one of those defaults, is
18  that what she's going to tell me?
19       MR. BERMAN:  Objection.
20       THE WITNESS:  I believe she
21    would.
22  BY MR. HESKIN:
23       Q.   Okay.  And she wouldn't be
24  committing further perjury by doing that,

Page 45

1  correct?
2       MR. BERMAN:  Objection.
3       THE WITNESS:  Right.
4  BY MR. HESKIN:
5       Q.   Okay.  And just to be
6  crystal clear, the breach here in HMC was
7  the failure to make four ACH payments on
8  each of the agreements that were subject
9  to the COJ, correct?
10       MR. BERMAN:  Objection.
11       THE WITNESS:  Yes, and
12    failure to make any sort of any
13    modified payments and
14    restructuring the transactions.
15  BY MR. HESKIN:
16       Q.   And you understand that
17  Ms. DiPietro was trying to make other
18  arrangements, right?
19       MR. BERMAN:  Objection.
20       THE WITNESS:  She made a
21    deal to make those payments and
22    they never came through.
23  BY MR. HESKIN:
24       Q.   What was the deal?  Tell me



Page 46

```
 1   specifically the deal that you're
 2   referring to.  What deal was reached and
 3   how did she not follow through with it?
 4          MR. BERMAN:  Objection.
 5          You can answer.
 6          THE WITNESS:  In our meeting
 7       with her and her CFO Josh, we
 8       confirmed balances owed for all
 9       the transactions she has with our
10       company and a reasonable payment
11       plan.
12   BY MR. HESKIN:
13       Q.  What was it?  What was the
14   amount she agreed was owed and -- let's
15   start there.
16       A.  The discussed amount was
17   about 20 percent of the current daily
18   payments.
19       Q.  No, no, no.  I'm saying what
20   was the amount that was owed?
21       A.  We had approximately
22   $13 million in our reconciliation, she
23   was saying it was closer to 11.  We
24   agreed to reconcile the difference with
```

Page 47

```
 1   our accounting departments and had our
 2   accounting department communicate with
 3   her accounting department to get on the
 4   same page.
 5       Q.  Okay.  And when did that
 6   happen?
 7       A.  That happened after our
 8   meeting.
 9       Q.  Okay.  And what was the
10   final reconciliation?
11       A.  It was somewhere in the
12   middle.
13       Q.  Okay.  What was the number?
14       A.  In my head it was about
15   11-and-a-half million dollars.
16       Q.  And was that communicated in
17   writing?
18       A.  Yes, there's emails from
19   accounting to her CFO and the balances
20   were reconciled.  She understood very
21   specifically which items were being
22   accounted for and returned balances with
23   given the complexity of her transactions
24   with us.  She vouched for every single
```

Page 48

```
 1   one of those balances and had her CFO
 2   confirm with us.  We trued it up, we got
 3   on the same page, we understand the
 4   liability currently held by her entity,
 5   and the payment plan as arranged, we
 6   wanted to help her so that it would be
 7   physically feasible for her company to
 8   sustain those payments going forward.
 9       Q.  Was it in writing?
10       A.  It was in an email.
11       Q.  An email where Ms. DiPietro
12   confirms and agrees that that's the
13   amount that she owes?
14       A.  That's right.  Between her
15   and her accounting department, we had
16   confirmation on the current balances.
17   And this was the usual course of action
18   for all the precedent payments and
19   payoffs that she's had with all the other
20   contracts.
21       Q.  Okay.  What's the date of
22   the email?
23       A.  I'm not sure of the specific
24   date, but it was done after that meeting
```

Page 49

```
 1   in May.
 2       Q.  Did you review that email in
 3   preparation for today?
 4       A.  No, I did not.
 5       Q.  Okay.  So as -- as you sit
 6   here today, you can't point me to the
 7   specific email that you're referring to?
 8       A.  I'm saying there's a litany
 9   of emails with her communicating with her
10   accounting department -- accounting
11   departments as a general practice and her
12   understanding of how the transactions
13   work.
14       Q.  Okay.  So your -- your
15   testimony is based solely on memory, is
16   that your testimony?
17       A.  Yes, to the best of my
18   recollection.
19       Q.  Okay.  And you can't point
20   me to the email that supposedly your
21   memory is based, correct?
22       A.  Not one specific email.
23   Again, this is several communications
24   normally done with Kara and her
```

MAGNA
LEGAL SERVICES

1 accounting team.
2     Q.   Yeah.  And the agreement was
3 how much per day?
4     A.   I don't have the specific
5 dollar amounts.
6     Q.   Well, you said it was about
7 20 percent of what her dailies were
8 previously, right?
9     A.   Correct.
10    Q.   Okay.  And there was a
11 schedule that you provided to her that
12 required her to pay $350,000 per week
13 over the course of 35 weeks.
14         Do you recall that
15 agreement?
16    A.   Yes, that sounds about
17 right.
18    Q.   Okay.  And is that the -- is
19 that the schedule you're talking about?
20    A.   Yes.  I believe that's what
21 we were discussing, and we were
22 considering an even lower payment because
23 Kara made an assumption (sic) that she
24 still wanted to make a larger payment and

1 we said, It's absolutely not feasible for
2 her current cash flow.  We were trying to
3 give them a very comfortable payment
4 schedule given their receivables that we
5 had done factoring on.
6     Q.   So it's your testimony as
7 you're sitting here today that $350,000
8 is a 20 percent discount on what she was
9 previously paying?
10         MR. BERMAN:  Objection.
11         THE WITNESS:  I'm not sure
12         of the precise calculation on it,
13         but that's approximately correct,
14         yes.
15 BY MR. HESKIN:
16    Q.   I guess the math is the
17 math.
18    A.   That's right.
19    Q.   So 350,000, 20 percent, so
20 she was paying -- I'm not a math wizard,
21 but it sounds like she was paying
22 $1.5 million a week before that?
23    A.   No, I don't think it was
24 that high.  But it's on the payment

1 history.  You have that as part of the
2 discovery.
3     Q.   Yeah, $350,000 a week, is a
4 lot, isn't it?
5         MR. BERMAN:  Objection.
6         THE WITNESS:  For a
7         11-and-a-half million dollar
8         liability, it's in line.
9 BY MR. HESKIN:
10    Q.   Got it.  Is -- was $350,000
11 a week equivalent to 10 percent of her
12 receivables?
13         MR. BERMAN:  Objection.
14         THE WITNESS:  You're
15         referring to the funding ratio
16         from her contracts?
17 BY MR. HESKIN:
18    Q.   Yeah.  I'm saying, do you
19 know -- how much were her -- her revenues
20 per month?
21    A.   I don't know.
22    Q.   You don't know?
23    A.   I don't know.
24    Q.   You don't know?

1     A.   I don't know.
2     Q.   Okay.  So if you're taking
3 $350,000 a week, if you times that by
4 four weeks, that's -- four weeks in a
5 month, that's about $1.4 million a month,
6 right?
7     A.   Yes.
8     Q.   Okay.  And if CBSG is
9 supposed to be taking 10 percent of
10 her -- of her receivables, that must mean
11 that she's generating $14 million a month
12 in revenues; is that right?
13         MR. BERMAN:  Objection,
14         mischaracterization.
15         But you can answer, Joe.
16         THE WITNESS:  In her
17         underwriting matrix what -- we're
18         factoring based on the receivables
19         and cash flows of the business.
20         Those transactions are in
21         proportion to what is being
22         displayed on her statement.
23 BY MR. HESKIN:
24    Q.   Okay.

**MAGNA**
LEGAL SERVICES

1    A.   Our assumptions are that
2  with that revenue and the additional
3  factoring that she was doing, that she
4  was sustaining that with the receivables
5  she had coming into her business.
6    Q.   I'm not talking about cash
7  flow.  I'm talking about receivables
8  because you'll agree with me that the
9  contracts that she entered into, at least
10 on the face -- on their face, state that
11 they're a sale of receivables, right?
12   A.   That's correct.
13   Q.   And CBSG is buying 10
14 percent of her receivables, right?
15       MR. BERMAN:  Objection.
16       THE WITNESS:  Yes, there's a
17   factoring rate on the receivables
18   being presented.
19 BY MR. HESKIN:
20   Q.   I'm not talking about the
21 factoring rate.  I'm talking about the
22 paying buying 10 percent of her future
23 receivables, right?
24       MR. BERMAN:  Objection.

1  BY MR. HESKIN:
2    Q.   Right?
3    A.   Correct.
4    Q.   Okay.  And so in order for
5  CBSG to be asking Kara to pay $350,000 a
6  week which you signed off on, you
7  prepared and you sent to her, you must
8  have personally looked and looked at her
9  receivables and said, Hey, listen, she is
10 making 4 -- $14 million a month in
11 receivables, and therefore, she -- 10
12 percent of that is $350,000.
13       Did I get that right?  Is
14 that what happened here?
15       MR. BERMAN:  Objection.
16       THE WITNESS:  I did not
17   personally review that.  That is a
18   process of the underwriting
19   department to confirm receivables
20   as part of their approval process.
21 BY MR. HESKIN:
22   Q.   As you sit here today, are
23 you -- are you aware that Ms. DiPietro or
24 HMC generates $14 million in revenue per

1  month?
2    A.   I am not aware.
3    Q.   Do you know how much that
4  would be per year?
5    A.   I don't know.
6    Q.   It would be, again I'm not a
7  math wizard, but it sounds like it would
8  be about $158 million a year in revenue.
9  Does that sound right to you?
10   A.   Sure.
11   Q.   Okay.  Does -- at any point
12 in time did HMC generate $158 million in
13 revenue?
14   A.   I'm not sure.
15   Q.   Well, as corporate
16 representative who is being put up -- put
17 up for the transactions at issue and the
18 underwriting, what -- what was her annual
19 revenue in 2018?
20       MR. BERMAN:  You want to
21   direct him to a topic that you're
22   talking about about HMC's revenue?
23       MR. HESKIN:  I don't need
24   your coaching.

1        MR. BERMAN:  Joe -- there's
2   no coaching.
3        Joe, you can answer the
4   question.  It's not within the
5   designee notice, but answer.
6        THE WITNESS:  Sure.  So in
7   the underwriting procedures and in
8   the matrix that Kara understood
9   and that she qualified for, she
10  signed off on those transactions
11  after completing prior
12  transactions, which again she also
13  knows and understands because she
14  paid off several dozen -- more
15  than a dozen deals before this
16  point, that the receivables that
17  we were funding are proportionate
18  to her payments.
19       So there's collateral there
20  in the form of her receivables to
21  support the payments that she
22  signed off on these agreements.
23 BY MR. HESKIN:
24   Q.   So Joe, I understand what

MAGNA ▶
LEGAL SERVICES

Page 58

1    may have actually happened and what the
2    agreements said, but I'm just talking
3    about what the agreements actually said.
4    I understand that these agreements are a
5    complete and utter sham, but as per the
6    agreement, they say they're purchasing 10
7    percent of her receivables and she has to
8    pay back 10 percent of her receivables,
9    and my question is:  Under -- under
10   your -- under the strict terms of the
11   agreement, she would have to generate
12   $158 million of revenue in order for her
13   to be making payments of $350,000 a week,
14   right?
15          MR. BERMAN:  Joe, disregard
16       the first part about shams but you
17       can answer his actual question.
18          THE WITNESS:  Based on your
19       calculations, that would be the
20       assumption.
21   BY MR. HESKIN:
22       Q.    That would be the
23   assumption, that she's making
24   $158 million a year, right?

Page 59

1        A.    Yes.
2        Q.    And so if I look in the
3    underwriting file, I'm going to see that
4    underwriting confirmed that she was
5    making $158 million a year in revenue,
6    right?
7        A.    I'm not sure on the
8    underwriting file.  You gave me a
9    calculation that you came up with, and
10   I'm saying underwriting follows a
11   procedure in finding her receivables and
12   doing a calculation that is feasible with
13   her business.
14       Q.    Sure.  Joe, I just want to
15   make clear, I didn't just come up with
16   that number, that's a number that you
17   came up with.  That's a number that you
18   sent to my client, I have the email, I
19   have the agreement, and I had the payout
20   schedule where you sent her an
21   agreement --
22          MR. BERMAN:  Okay, let's ask
23       questions, Shane.  Questions, not
24       commentary.  Questions.

Page 60

1    BY MR. HESKIN:
2        Q.    -- $350,000 a week?
3          MR. BERMAN:  Questions.  Is
4       there a question there or is that
5       just a statement?
6    BY MR. HESKIN:
7        Q.    Do you recall sending her
8    that document?
9        A.    Yes, we had an agreement in
10   place that we sent her.
11       Q.    And -- and you prepared that
12   document, didn't you?
13       A.    Yes, our department prepared
14   the document.
15       Q.    Not the question.  You
16   personally prepared that document, didn't
17   you?
18       A.    I personally do not prepare
19   documents for our clients.  We have a
20   department that prepares it and I sign
21   off on it.
22       Q.    You don't prepare documents?
23       A.    I personally do not do the
24   paperwork in preparing a document for our

Page 61

1    company.
2        Q.    So -- so when -- I shouldn't
3    have an email where Joe LaForte tells my
4    client that you prepare documents for
5    that company.  I shouldn't have that
6    email if that's not true, right?
7          MR. BERMAN:  Objection.
8       Joe, you can answer if
9       there's anything in there to
10      answer.
11   BY MR. HESKIN:
12       Q.    I shouldn't have that email,
13   right?
14       A.    I mean, you're assuming that
15   I personally do all the document
16   preparations of the company?
17       Q.    No, not my assumption.  I
18   asked you whether or not you prepared
19   documents for the company, because I have
20   an email where Joe specifically tells my
21   client that you prepare documents for the
22   company.  Is that true or false or is Joe
23   lying to my client?
24       A.    I prepare documents for the



1  company.
2         MR. BERMAN:  Objection, but
3      okay.
4         THE WITNESS:  Yes, I prepare
5      documents for the company.
6  BY MR. HESKIN:
7      Q.   So you want to retract your
8  prior testimony where you say you don't
9  prepare any documents?
10     A.   No, I don't prepare
11 routinely all the documents for our
12 clients.
13     Q.   Well, now you're using
14 routinely.  Before you said you don't do
15 it at all.  So which is it?  Is it you
16 don't do it at all or you don't do it
17 routinely?
18        MR. BERMAN:  Objection.
19        THE WITNESS:  To clarify,
20     you asked if I prepared her
21     documents, which I understand are
22     her agreements.
23 BY MR. HESKIN:
24     Q.   Well, the transcript is

1  going to say what it says, but I'm pretty
2  sure you said you don't prepare any
3  documents, that someone else does that,
4  right?
5      A.   I do prepare documents.
6      Q.   So now you want to correct
7  your prior testimony and say that you do
8  prepare some documents, right?
9         MR. BERMAN:  It's
10     argumentative.  So the transcript
11     says what it says.  Ask a
12     question.
13        MR. HESKIN:  I'm asking a
14     clarifying question.
15        MR. BERMAN:  Okay.  Then ask
16     a question.  But you lied, this,
17     you're giving a lot of commentary.
18     Question, answer, question,
19     answer, right?  That's a
20     deposition under the federal
21     rules, not commentary.
22 BY MR. HESKIN:
23     Q.   Mr. Cole, you do prepare
24 legal documents on behalf of CBSG, don't

1  you?
2         MR. BERMAN:  Objection.
3         THE WITNESS:  That's right,
4      yes.
5  BY MR. HESKIN:
6      Q.   You do.  Okay.  Got it.
7      You're not a lawyer, right?
8      A.   No.
9      Q.   But you prepare legal
10 documents?
11     A.   Yes.
12     Q.   Okay.  And you reviewed
13 and -- did you prepare the document that
14 you sent to my client in May?
15     A.   I don't recall.
16     Q.   So now you don't recall,
17 right?  Before you said you didn't do it,
18 categorically didn't do it, and now
19 you're telling me you don't recall,
20 right?
21     A.   I don't know which document
22 you're specifically referring to.
23     Q.   I'm talking about the
24 restructured factoring agreement where

1  the weekly payments were $350,000 a week.
2  Who prepared that document?
3      A.   I did not prepare that
4  document.  That was prepared by
5  underwriting.
6      Q.   It wasn't prepared by
7  Mr. Hartley?
8      A.   By whom?
9      Q.   Hartley.  John Hartley?
10     A.   That sounds feasible, yeah.
11 The legal team often prepares
12 modification agreements for our clients.
13     Q.   Well, you're all over the
14 place.  First you said it was
15 underwriting and now you're saying it's
16 legal.  Which one is it?
17     A.   Both, underwriting and legal
18 prepare documents for our clients.
19     Q.   Okay.  Which one did it in
20 this case?
21     A.   In this case, it was
22 probably John Hartley.
23     Q.   Okay.  And who instructed
24 Mr. Hartley to do that?

MAGNA
LEGAL SERVICES

1       A.    Generally the credit
2  committee conveys the modification in
3  discussion with the clients.
4       Q.    And who is the credit
5  committee?
6       A.    Credit committee is Tori and
7  Alex.
8       Q.    Okay.  They were -- Tori and
9  Alex, they were the ones that made the
10  decision on -- on this agreement, is
11  that -- is that your testimony?
12       A.    That's correct.
13       Q.    Did they review the
14  agreement?
15       A.    Yes.
16       Q.    And they signed off on it?
17       A.    I believe so.
18       Q.    So if I call them at trial
19  and have them testify under oath, they're
20  going to -- they're going to confirm that
21  they looked at the revenue and saw that
22  Ms. DiPietro was generating $158 million
23  in revenue through HMC?
24            MR. BERMAN:  Objection.

1  BY MR. HESKIN:
2       Q.    Is that correct?
3       A.    I don't know if they're
4  reviewing that specific number.
5       Q.    Well, how did they come up
6  with $350,000?
7       A.    Because they negotiated a
8  deal.
9       Q.    Well, so that -- so they
10  negotiated a deal that was totally
11  untethered to her actual receivables, is
12  that your testimony?
13       A.    Often when we negotiate with
14  clients, we will come up with a number
15  that is feasible for the -- not
16  necessarily in line with their funding
17  and receivables.
18       Q.    Okay.  So in this case, was
19  it negotiated that Ms. -- that HMC would
20  pay more than 10 percent of her monthly
21  receivables?
22       A.    I don't know what you said.
23  That she would pay more than 10 percent?
24       Q.    Yes.

1       A.    No, again this was a
2  modification.  At this point in time we
3  were already 3-and-a-half million dollars
4  behind the client, monies provided to her
5  versus what she paid to us.
6       Q.    Hold on.  You were
7  3-and-a-half million dollars in
8  principal, correct?
9            MR. BERMAN:  Objection.
10            THE WITNESS:  In capital
11       provided to her company as part of
12       these factoring transactions.
13  BY MR. HESKIN:
14       Q.    Cash, right?
15       A.    Yes.
16       Q.    Okay.  You weren't
17  3-and-a-half million dollars behind on
18  payments, right?
19       A.    No, we were worried that
20  this client was going to default given
21  the exposure we had on her transaction.
22       Q.    Okay.  And so you decided
23  that you wanted more than the 10 percent
24  payments due to the rest of the default?

1            MR. BERMAN:  Objection.
2            THE WITNESS:  No, that's not
3       the objective here.  Our objective
4       is to cover the exposure.
5  BY MR. HESKIN:
6       Q.    Okay.  Even though under the
7  agreement she's only required to pay 10
8  percent of her -- of her revenue, right?
9            MR. BERMAN:  Objection.
10            THE WITNESS:  Again, under
11       modified negotiations, the terms
12       provided with the client are not
13       necessarily in line with the
14       factoring percentage on her
15       contract.
16  BY MR. HESKIN:
17       Q.    Okay.  So in other words,
18  you wanted her to pay more than 10
19  percent because you were worried about
20  her defaulting, right?
21            MR. BERMAN:  Objection.
22            THE WITNESS:  I'm not sure
23       if it's more than 10 percent of
24       her receivables.

MAGNA ▶
LEGAL SERVICES

1  BY MR. HESKIN:
2      Q.   You're not aware of what her
3  monthly or annual revenues are, correct?
4      A.   That's right.
5      Q.   Okay.  So if I asked you as
6  the corporate representative what her
7  monthly revenues were in February
8  of 2019, you're not going to know,
9  correct?
10     A.   Not specifically, no.
11     Q.   Okay.  What were her -- what
12 were her -- what were HMC's revenues in
13 January 2019?
14     A.   I don't know.
15     Q.   What were HMC's revenue in
16 February 2019?
17     A.   I do not know.
18     Q.   What were HMC's revenues in
19 March of 2019?
20     A.   I do not know.
21     Q.   What were HMC's revenues in
22 April 2019?
23     A.   I do not know.
24     Q.   What were HMC's revenues in

1  May 2019?
2      A.   I do not know.
3      Q.   What was HMC's income in
4  January 2019?
5      A.   I do not know.
6      Q.   What was HMC's income in
7  February 2019?
8      A.   I do not know.
9      Q.   What was HMC's income in
10 March 2019?
11     A.   I do not know.
12     Q.   What was HMC's income in
13 April 2019?
14     A.   I do not know.
15     Q.   What was HMC's income in
16 May 2019?
17     A.   I do not know.
18     Q.   Do you know whether or not
19 HMC paid more or less than 10 percent of
20 its monthly revenue in any of those
21 months?
22         MR. BERMAN:  Objection.
23         THE WITNESS:  I do not know.
24 BY MR. HESKIN:

1      Q.   Okay.  Got it.  Who would
2  know?
3      A.   The underwriting department.
4  The credit committee who negotiated the
5  modified payments with her.
6      Q.   How would they do that?
7      A.   Because negotiating the
8  client, they have an understanding of the
9  cash flow and come up with a deal that
10 would be feasible for them to run the
11 regular course of business while at the
12 same time satisfying liabilities as part
13 of our MCA agreement.
14     Q.   Did you speak with
15 underwriting in preparation for your
16 deposition today?
17     A.   I did briefly, yes.
18     Q.   Did you ask them what the
19 revenues were in any particular month?
20     A.   We did not cover them.
21     Q.   Did you ask them what the
22 income was in any particular month?
23     A.   No.
24     Q.   No?

1      A.   No.
2      Q.   What is income?
3      A.   Income is monies received
4  that are generated by your business from
5  whatever services or product it renders.
6      Q.   Okay.  Let me -- okay.
7  What's revenue?
8      A.   Same thing.
9      Q.   So you've got -- you've got
10 a financial background, right?
11     A.   Yes.
12     Q.   Yes?
13     A.   Yes.
14     Q.   Can you just tell me what --
15 what your financial background is?
16     A.   I worked in accounting since
17 I was 22.
18     Q.   Since you were 22?
19     A.   Yes.
20     Q.   And how old are you now?
21     A.   37.
22     Q.   Give me -- what's your
23 educational background?
24     A.   I went to University of

MAGNA ▶
LEGAL SERVICES

1  California Irvine, computer engineering.
2  At the same time I went to -- I worked at
3  a publicly-traded construction company in
4  their accounting department.
5      Q.  Got it.  And what did you do
6  after that?
7      A.  Continued working at that
8  company until 2009.
9      Q.  And after that?
10     A.  Moved to Philadelphia.
11     Q.  And who did you work for in
12 Philadelphia?
13     A.  The Business Solutions
14 Group.
15     Q.  Okay.  And you've worked for
16 them ever since?
17     A.  Since 2016, and 2017
18 subsequently into the processing entity
19 that services CBSG.
20     Q.  Okay.  And how did you --
21 all right.  I want to come back to that
22 so let me just make a note here.
23         Okay.  And you have
24 proficiency with accounting, right?

1      A.  Yes.
2      Q.  Do you have an accounting
3  background?
4      A.  Yes.
5      Q.  You've worked in accounting
6  for -- since you were 22, right?
7      A.  Yes.
8      Q.  Okay.  And you're the CFO of
9  how many different companies?
10     A.  I'm not sure.  Within the
11 scope of our processing agreement, we
12 also provide financial services not
13 including -- or including the capacity of
14 the CFO.
15     Q.  About how many companies are
16 you the CFO for?
17     A.  For Full Spectrum
18 Processing?
19     Q.  Yeah.  You personally.  I'm
20 talking about you personally.  I want to
21 get -- get your experience in accounting,
22 I want to get that on the record.
23         How many companies are you
24 the CFO for?

1      A.  Approximately 45.
2      Q.  45.  45 companies.  Wow.
3  I'm not -- can you -- I don't want you to
4  list all 45, but my guess is are all 45
5  of those companies owned by Lisa
6  McElhone?
7      A.  No.
8      Q.  How many of those 45
9  companies are owned by Ms. McElhone?
10     A.  Not very many.
11     Q.  Not very many?  How many?
12     A.  About maybe ten.
13     Q.  Ten?  Can you give me those
14 ten companies?
15         MR. BERMAN:  No, you don't
16 have to list that.
17         I'll instruct him not to
18 answer.
19         MR. HESKIN:  You're
20 instructing him not to answer?
21         MR. BERMAN:  I am.
22         MR. HESKIN:  Okay.
23 BY MR. HESKIN:
24     Q.  Are you following that

1  advice?
2      A.  Yes.  I don't feel --
3      Q.  I'm asking you to identify
4  the ten companies in which you are a CFO
5  on behalf of Ms. McElhone and you're
6  refusing to identify that?
7          MR. BERMAN:  Yes.
8          THE WITNESS:  Yes.
9  BY MR. HESKIN:
10     Q.  Okay.  So -- you're refusing
11 to identify any of the 45 companies
12 you're a CFO for?
13     A.  Complete Business Solutions
14 Group.
15     Q.  That's the only -- you'll
16 give me one -- one company name, that's
17 it?
18     A.  Full Spectrum Processing.
19     Q.  Two?
20     A.  Fast Advance Funding.
21     Q.  Which ones?
22     A.  Fast Advance Funding.
23     Q.  Any more?
24     A.  Is that good?

MAGNA
LEGAL SERVICES

Page 78

```
1           MR. BERMAN:  Yeah.
2           MR. HESKIN:  So Mr. Berman,
3   are you instructing him not to
4   provide any further companies of
5   the 45 that he's admitted that
6   he's a CFO for?
7           MR. BERMAN:  I'm instructing
8   you, Mr. Heskin, that you should
9   comply with the court order or
10  you'll be met with a sanctions
11  order.  But call the judge now.  I
12  welcome it because we're not
13  coming back.  So you're welcome at
14  any time -- we're not going to
15  Lisa McElhone's background beyond
16  the companies at issue of Kara
17  DiPietro.
18          You have a very clear scope
19  of order here dated March 4th,
20  2020.  Be guided by the court
21  order.
22          MR. HESKIN:  I got you.
23  Thank you, Mr. Berman, for that.  So
24          MR. BERMAN:  You got it.  So
```

Page 79

```
1   move on or call the judge or
2   whatever you want to do.  You have
3   our instruction.
4           MR. HESKIN:  Don't worry,
5   Mr. Berman, the time will come.
6           MR. BERMAN:  That's fine.
7   Make threats to me.  That's good,
8   too.
9           MR. HESKIN:  I'm not.  I'm
10  not making any threats.
11          MR. BERMAN:  You're welcome
12  to call the judge.  There's a
13  court order.
14  BY MR. HESKIN:
15      Q.   So during the time period in
16  which my clients were -- my client's
17  agreements were that place, which was
18  February 2018, and May -- actually, to
19  the present, how many -- how many
20  companies were you the CFO for?
21          MR. BERMAN:  Asked and
22  answered.  And there's a very
23  specific time period set forth in
24  the March 4th, 2020 order.  You
```

Page 80

```
1   should look at the order as to
2   what the scope of this deposition
3   is and the agreed upon topics.
4           MR. HESKIN:  I don't need
5   any more speaking objections.  I'm
6   asking --
7           MR. BERMAN:  It's not a
8   speaking objection.  I'm
9   instructing him not to answer the
10  question.
11          MR. HESKIN:  You're
12  instructing him not to answer?
13  Okay.  Good.
14  BY MR. HESKIN:
15      Q.   Are you following that
16  advice?
17      A.   Yes.
18      Q.   Okay.  You're not going to
19  tell me how many -- I'm not asking you to
20  identify the names, I'm asking how many
21  companies were you the CFO for the time
22  period February 2018 through May --
23  February 2018 through May 2019?
24          MR. BERMAN:  That's not the
```

Page 81

```
1   time period, but he answered it.
2           You can answer again, Joe,
3   how many.
4           THE WITNESS:  Approximately
5   45.
6   BY MR. HESKIN:
7       Q.   Okay.  How do you have --
8   how do you have time to be the CFO of 45
9   different companies?
10      A.   Full Spectrum Processing
11  provides services to many different
12  entities.  We have a big accounting
13  department with several CPAs and
14  accountants that facilitate information
15  for me to make decisions on.
16      Q.   Okay.  And how many hours of
17  day do you spend as the CFO for CBSG?
18      A.   I'm there whenever it's
19  needed.
20      Q.   How many hours per day?
21      A.   I'm on the clock 24 hours a
22  day.
23      Q.   Okay.  And how many of those
24  are actually working?
```



1    A.   About half.
2    Q.   About half?  So 12 hours a
3 day for CBSG?
4    A.   That's right.
5    Q.   Okay.  Doesn't leave a lot
6 of time for the other 44 companies, does
7 it?
8    A.   No, I'm on the clock for
9 CBSG and any of the other companies that
10 we have service agreements for.
11    Q.   Okay.  All right.  So you're
12 the CFO -- and just for the record, a CFO
13 is a chief financial officer, correct?
14    A.   That's right.
15    Q.   So you're the CFO for 45
16 companies during this time period, and
17 it's your testimony under oath that from
18 an accounting perspective, income is the
19 exact same thing as revenue?
20    A.   Yes.  That is from a GAAP
21 perspective.  You have to be very
22 specific on how you're using those words.
23 They're contextual.
24    Q.   Okay.  How do you use those

1 words?  How does income differ from
2 revenue under GAAP?
3    A.   It depends on what sort of
4 income you're referring to.  So revenue
5 generally is associated with gross
6 profits of the business.  To get an idea
7 of the revenues produced by that
8 business, the delta between that and
9 costs of goods sold and operating
10 expenses is your net income, your net
11 ordinary income, and any sort of taxes
12 and interest payable after that would be
13 then your true net income for that
14 business.
15    Q.   So just so I'm clear, under
16 GAAP, the income would be revenues minus
17 expenses?
18         MR. BERMAN:  Objection.
19         THE WITNESS:  Yeah.  What
20    I'm explaining to you is net
21    ordinary income.  It's generally
22    treated as revenue minus expenses.
23 BY MR. HESKIN:
24    Q.   And I -- I watch CNBC almost

1 every day.  When a company reports
2 earnings, there's a difference between
3 income and revenues, right?  They can --
4 they can, you know, be -- beat on income
5 but miss on revenue and their stock goes
6 down, right?  You know that distinction,
7 right?
8    A.   Yes.
9    Q.   Okay.  And the revenue is
10 basically the equivalent of receivables,
11 right?
12    A.   It's your gross profit, how
13 much money did you guys bring in as part
14 of your practice and products and
15 services.
16    Q.   Gross profit is their
17 income, right?
18    A.   It's their revenues.
19    Q.   No, no.  Revenue is how much
20 money they bring in as a result of sales.
21 For example, if I sell --
22         MR. BERMAN:  Is this a
23    question or is statement?
24    Question, answer, question,

1    answer.
2         MR. HESKIN:  I'm trying to
3    clarify it.
4 BY MR. HESKIN:
5    Q.   If I sell a widget for a
6 million dollars and it costs me $300,000
7 to make, the revenue is a million
8 dollars, right?
9    A.   Right.
10    Q.   And my income on that would
11 be $700,000, right?
12    A.   Right.  Assuming that 300
13 was your only expenses.
14    Q.   Sure.  I'm trying to basic
15 break it down so a jury can understand
16 it.
17    A.   And I'm clarifying for the
18 sake of, you know, semantics.  When it
19 comes to finance, a lot of people use
20 income and revenue interchangeably.  It
21 depends on the actual context and
22 application of those terms.
23    Q.   Okay.  Well, under GAAP,
24 right?

Page 86

1  A.  Yeah.
2  Q.  The definition would be used
3  as I'm using it, right?
4  A.  Right.  Under GAAP usually
5  we refer to revenue and gross profit as
6  top line in how much revenue a company
7  generated.
8  I usually refer to net
9  ordinary income as that revenue minus
10  cost of goods, minus SGNA, which is
11  operating expenses for a business.
12  We then refer to net income,
13  as opposed to ordinary net income, as
14  that number minus interest, taxes and
15  amortization.
16  Q.  Got it.  And that's
17  common -- commonly used in accounting,
18  right?
19  A.  Yes, that's the basics of
20  it.
21  Q.  That's the basics.  Got it.
22  And did -- did you ever see
23  an agreement where the word income was --
24  was used on any of the CBSG agreements

Page 87

1  with Ms. -- with HMC?
2  A.  No, income is not generally
3  used as a factor in considering what the
4  arrangement would be with our clients.
5  Q.  What is used?
6  A.  We use receivables.  We use
7  the factoring amount against those
8  receivables.
9  Q.  So as the 30(b)(6) witness
10  for CBSG, you're not aware of any
11  agreements between CBSG on the one hand
12  and HMC on the other, where the agreement
13  specifically referred to the term income,
14  correct?
15  A.  I'm not aware.
16  Q.  Not aware.  Got it.
17  And as the -- since you're
18  not aware of the word being used, I
19  assume you're not -- you're not able to
20  testify one way or the other how the word
21  income was used, correct?
22  A.  That's right, I'm not able
23  to.
24  Q.  Okay.  And what did you do,

Page 88

1  if anything, to investigate what the term
2  income meant on any of the agreements
3  between CBSG and HMC?
4  A.  I reviewed the factoring
5  agreements between us.
6  Q.  Okay.  Did any of the
7  agreements that you reviewed use the word
8  interest?
9  A.  No, not to my understanding.
10  We do not use the word interest.
11  Q.  Why not?
12  A.  Because it's not an
13  interest-bearing product.
14  Q.  So none of the agreements
15  that I have in my little pile here or my
16  little queue here should use the word
17  interest, right?
18  A.  Right.
19  Q.  And if it did use the word
20  interest, that would be a problem, right?
21  MR. BERMAN:  Objection.
22  THE WITNESS:  If it did, it
23  would be a misstatement on the
24  intended structure of the product.

Page 89

1  This is a factoring agreement and
2  it would conflict with the
3  structure of the agreement.
4  BY MR. HESKIN:
5  Q.  Okay.  And so -- let me ask
6  you this:  These are the -- the
7  agreements that my client entered into
8  with CBSG, they're the sale of future
9  receivables, right?
10  A.  Correct.
11  Q.  What happens if future
12  receivables aren't generated?
13  MR. BERMAN:  Objection.
14  THE WITNESS:  Then we'd go
15  into some sort of modification,
16  negotiation with the client.
17  BY MR. HESKIN:
18  Q.  Does the -- does the client
19  still have to pay if they don't generate
20  future receivables?
21  MR. BERMAN:  Objection.
22  THE WITNESS:  They're still
23  obligated to pay.
24  BY MR. HESKIN:

MAGNA ▶
LEGAL SERVICES

Page 90

1    Q.   Why?
2    A.   Because they're not out of
3  business yet, they're expected to
4  eventually have receivables again.  If
5  they file bankruptcy, that's a whole
6  different story, right?
7    Q.   Oh, good.  So if they file
8  for bankruptcy and they go out of
9  business, do they have to pay?
10        MR. BERMAN:  Objection.
11        THE WITNESS:  No.  I mean,
12     we get into whole -- the whole
13     bankruptcy proceedings and getting
14     were what we can from part of the
15     receivables that were collected by
16     the company.
17  BY MR. HESKIN:
18    Q.   But is filing for bankruptcy
19  a default under the agreement?
20    A.   Yes.
21    Q.   It is?
22    A.   Yes.
23    Q.   Why is it a default if they
24  just go out of business?

Page 91

1        MR. BERMAN:  Objection.
2        THE WITNESS:  They're not
3     necessarily out of business if
4     you're talking about Chapter 13.
5  BY MR. HESKIN:
6    Q.   Chapter 7.  Let's talk about
7  Chapter 7.  My client files for Chapter
8  7, they're operating at a net loss, they
9  can no longer pay rent, pay their
10  employees, buy -- buy products, so they
11  file for Chapter 7, throw up their hands
12  and say, Sorry, I'm out of business, is
13  that a default under the agreement?
14        MR. BERMAN:  Is this a
15     hypothetical?
16        MR. HESKIN:  I'm asking
17     how --
18        MR. BERMAN:  You can answer
19     the hypothetical with that
20     specific question.
21        MR. HESKIN:  Sure.
22  BY MR. HESKIN:
23    Q.   Is that a default?
24    A.   Yes.

Page 92

1    Q.   That is a default?
2    A.   Yes.
3    Q.   Why is it a default?
4    A.   Filing bankruptcy
5  constitutes a default under our
6  agreement.
7    Q.   And why would my -- under
8  that circumstance, my client would owe
9  the remaining balance under the
10  agreement, is that your position?
11        MR. BERMAN:  Objection.
12        THE WITNESS:  We still hold
13     the position that the outstanding
14     balance would still be a
15     receivable and we would get in
16     line along with everyone else as
17     part of any sort of reconciliation
18     in determining what recovered
19     assets we could have the
20     bankruptcy.
21  BY MR. HESKIN:
22    Q.   But you bought future
23  receivables, and if there are no future
24  receivables, you're entitled to nothing,

Page 93

1  right?
2        MR. BERMAN:  Objection.
3        THE WITNESS:  We are
4     entitled to whatever was recovered
5     by the client as part of our
6     receivables.  Until we reconcile
7     that as part of the bankruptcy
8     proceedings, we do not know what
9     receivables were received.
10  BY MR. HESKIN:
11    Q.   Okay.  But my client would
12  be -- so if my client got a million
13  dollars from you and they had to pay back
14  1.5 on Day 1, and then the very next week
15  it's hit with a pandemic and the state or
16  president issues a shutdown order and
17  says, No more businesses, you've got to
18  stop, cease doing business, please shut
19  down, my client's forced to go out of
20  business, is that a breach under the
21  agreement?
22        MR. BERMAN:  Objection.
23        Don't answer the question.
24        Do you want to know why,



1   Shane?  Because you're violating a
2   court order by asking questions
3   about things that are outside of
4   the time period about presidential
5   orders and government orders and
6   things to try to -- to obtain
7   improper discovery in a case
8   that's not before you.
9       So bring the motion.  It
10  will be met with a cross motion
11  for sanctions.
12      Don't answer the question.
13      And I'll cite it.
14  TourMappers, how about that, to
15  talk about another case that
16  you're attempting to use this case
17  for an improper purpose.
18      Bring it to the judge.  I'll
19  see you there.
20      MR. HESKIN:  Are you going
21  to -- are you saying he can't
22  answer my question?
23      MR. BERMAN:  I'm told him
24  not to answer the question.

1       MR. HESKIN:  Okay.
2   BY MR. HESKIN:
3       Q.   Let me ask you this one:
4   My -- my client gets hit with a
5   hurricane, state orders an evacuation,
6   owns a restaurant, can no longer operate.
7   Is that a breach?
8       MR. BERMAN:  Joe, if you can
9   answer these hypotheticals with
10  the vacuum he's giving, go ahead.
11      THE WITNESS:  In the context
12  you're providing, if he's not in
13  operations and is no longer
14  working, it depends.  I mean, do
15  they have reserves, do they
16  collect receivables ahead of time?
17  Just because you're not open
18  doesn't mean you can't collect
19  payments from your clients.  It
20  really depends on the business and
21  the context of it.
22      So it's kind of an open-
23  ended example you're providing.
24  BY MR. HESKIN:

1       Q.   Well, no, because I'm -- I'm
2   using the example of a restaurant, and
3   the restaurant is a point of sale.  So
4   point of sale, restaurant, shut down from
5   a hurricane, governor orders them to
6   evacuate, they just got a million dollars
7   from you on the week before, a week later
8   hurricane comes around, their business is
9   shutdown, wiped out by the hurricane and
10  they can no longer operate.  Do they
11  still owe CBSG the $1.5 million?
12      MR. BERMAN:  Objection on
13  many grounds, Joe, but if you can
14  answer with this limited fact set
15  of hypothetical, please.
16      THE WITNESS:  Yeah.
17  Hypothetically you would still
18  have the liability and we would
19  get into some sort of negotiation
20  to see when revenues could be
21  resumed and the status of the
22  company.
23  BY MR. HESKIN:
24      Q.   What if the company is shut

1   down, can never operate again,
2   $1.5 million.  Do they still owe the
3   $1.5 million?  Does the company still owe
4   it?  Let's start with that.
5       MR. BERMAN:  Objection.
6   Asked and answered and many other
7   objections.
8       But you can answer, Joe.
9       THE WITNESS:  Yeah.  Let me
10  just -- I'll get to it.  I think I
11  understand what Shane is getting
12  to here.
13      In that zero revenue
14  scenario where the business
15  experiences catastrophic losses
16  and is unable to sustain, assuming
17  that the next logical thing would
18  be a bankruptcy proceeding, we
19  would have the liability until it
20  was absolved by the bankruptcy
21  court.
22      So we'd get in line, see if
23  there was any receivables
24  collected in the time between when

Page 98

1    we funded and when the guy shut
2    down the business, and then we
3    would see what we end up with
4    there.  There would no doubt be a
5    loss in that scenario.
6  BY MR. HESKIN:
7    Q.  Okay.  So you would only be
8  putting in a claim for bankruptcy for the
9  10 percent of the receivables that you
10 purchased, right?
11         MR. BERMAN:  Objection.
12         THE WITNESS:  Our UCC
13         usually would reflect the entire
14         RTR value of that factoring
15         agreement based on the
16         underwriting.
17 BY MR. HESKIN:
18    Q.  So you would put in a claim
19 for the entire $1.5 million even though
20 you owed 10 percent of future
21 receivables that never came to fruition?
22         MR. BERMAN:  Objection.
23         THE WITNESS:  We put the
24         claim for the entire amount and we

Page 99

1         would recover what we could in
2         bankruptcy.
3  BY MR. HESKIN:
4    Q.  And then you'd go ahead and
5  seek it against the personal guarantor as
6  well, correct, for the balance?
7         MR. BERMAN:  Objection.
8         THE WITNESS:  Yeah,
9         depending on whatever assets the
10         business owners had as part of
11         their agreement, yes.
12 BY MR. HESKIN:
13    Q.  So the personal guarantor
14 would have to come out of his own
15 pockets, sell his house, whatever assets
16 he has to pay the full 1.5, right?
17         MR. BERMAN:  Objection.
18         THE WITNESS:  Correct.  If
19         they have a personal guarantee on
20         their agreement, they would be
21         liable for it personally.  That's
22         what a personal guarantee does.
23 BY MR. HESKIN:
24    Q.  And I think maybe we can

Page 100

1  short circuit all this because the point
2  I'm making is the $1.5 million is
3  absolutely repayable no matter what,
4  right?
5         MR. BERMAN:  Objection.
6         THE WITNESS:  In your
7         example, you said it's not
8         repayable really.  If it's a
9         bankruptcy, we're often at a loss.
10         The number one type of client we
11         lose money on is through
12         businesses that go out of
13         business.
14 BY MR. HESKIN:
15    Q.  Well, but that's just like
16 any type of loan.
17         MR. BERMAN:  Objection.
18 BY MR. HESKIN:
19    Q.  The question is:  You claim
20 it's all owed no matter what, right?
21         MR. BERMAN:  Objection.
22 BY MR. HESKIN:
23    Q.  No matter what happens, you
24 claim, either in bankruptcy or against

Page 101

1  the personal guarantor, that the full
2  $1.5 million is absolutely repayable no
3  matter what, right?
4         MR. BERMAN:  Objection.
5         THE WITNESS:  So unlike a
6         loan, which is time based and
7         there's amortization of costs for
8         the people that borrow money with
9         principal.  Ours is a fixed factor
10         rate, meaning that it's a steady
11         cost of capital for what was
12         financed, meaning that if six
13         months went by, two years went by,
14         we would have the same receivable
15         value on that agreement.  Whereas
16         a loan would amortize interest
17         throughout that entire period of
18         time because loans are based
19         precisely on time value.
20 BY MR. HESKIN:
21    Q.  That's a great point.  Thank
22 you.  Thank you so much for that answer.
23         All right.  I got it.
24 And -- but in either one of those



Page 102

1  situations, the client would owe the
2  $1.5 million no matter whether it takes a
3  year or two years to pay it back.  No
4  matter what, they have to pay back the
5  $1.5 million, right?
6           MR. BERMAN:  Objection.
7           THE WITNESS:  Assuming it
8      doesn't fall under the
9      qualifications of their liability
10     with the guarantee, yes.  But
11     there would be no interest accrued
12     on that during the time period.
13 BY MR. HESKIN:
14     Q.   Got it.  And under the terms
15 of your agreements, is there a set term?
16          MR. BERMAN:  Objection.
17          THE WITNESS:  There is a
18     daily installment and there is an
19     expected time to pay off the RTR.
20 BY MR. HESKIN:
21     Q.   Okay.
22     A.   There's no fixed term.
23     Q.   There's no fixed term?
24     A.   No.

Page 103

1      Q.   Don't the agreements
2  specifically state a fixed term?
3      A.   They do.
4      Q.   On the very face of the
5  agreement?
6      A.   They tell you exactly how
7  many installments are needed based on the
8  RTR projected, but I'm saying practically
9  when we get into issues with our clients,
10 we look at the receivables and see is
11 feasible.
12     Q.   Sure.  I didn't mean to cut
13 you off.  Go ahead.
14     A.   Yeah.  We're looking to see
15 what works for the client.  We want them
16 to make sure the business is still
17 healthy, they can continue to generate
18 revenue, because collecting more than
19 what the client can pay puts them in a
20 precarious position to pay the rest of
21 our money back as part of that
22 receivable.
23          So when you say -- let's say
24 there's a 100 payment term, if they get

Page 104

1  to the end of that transaction and
2  there's still a slow down in revenues and
3  their receivables, then it makes sense
4  for us to work out a deal to extend the
5  terms or reduce the payments to
6  facilitate the production or receivables
7  for that client.
8      Q.   Okay.  And I get how it may
9  work in practice, but my question is:
10 Just on the face of the agreement, if I
11 look at the four corners of the
12 agreement, it has a fixed term, right?
13          MR. BERMAN:  Objection.
14          THE WITNESS:  Yes, on the
15     agreement itself, there is a
16     defined term of how many
17     installments and how many -- and
18     how much money is to be paid on
19     each installment.
20 BY MR. HESKIN:
21     Q.   So on the face of the
22 agreement it says you are to pay X per
23 day and these are the amount of days you
24 have to pay it back, right?

Page 105

1          MR. BERMAN:  Objection.
2          THE WITNESS:  Yes.
3  BY MR. HESKIN:
4      Q.   Okay.  And even in the back,
5  it has a reference to the term of the
6  agreement, right?
7          MR. BERMAN:  Objection.
8  BY MR. HESKIN:
9      Q.   It's in several places,
10 right?
11          MR. BERMAN:  Objection.
12          THE WITNESS:  Yes.
13 BY MR. HESKIN:
14     Q.   Okay.  And so when you say
15 in practice you work with clients to come
16 up with a different payment schedule,
17 you're not required to do so under the
18 four corners of the agreement, right?
19          MR. BERMAN:  Objection.
20          THE WITNESS:  Right.  In
21     practice we often work with our
22     clients.  The customer service and
23     collections department have an
24     ability to come up with a payment

Page 106

1    plan that will make sense for the
2    business.
3    BY MR. HESKIN:
4        Q.   And if the -- and if the
5    client doesn't agree to a payment plan
6    that is workable with CBSG, then CBSG has
7    the right to file a confession of
8    judgment against the merchant, right?
9            MR. BERMAN:  Objection.
10           THE WITNESS:  Correct.  We
11       have the right to seek whatever
12       remedies under the agreement we
13       can to recover the receivable and
14       monies owed.
15   BY MR. HESKIN:
16       Q.   And in fact, CBSG regularly
17   does that, correct?
18       A.   Yes.
19       Q.   Files COJs where the
20   merchant says that they cannot make the
21   payments demanded of CBSG, correct?
22           MR. BERMAN:  Objection.
23           THE WITNESS:  Yes.  In the
24       applicable jurisdictions, yes.

Page 107

1    BY MR. HESKIN:
2        Q.   Okay.  Applicable
3    jurisdictions, the majority of them are,
4    if not all of them, are Pennsylvania,
5    correct?
6        A.   Yes.
7        Q.   And how many COJs has CBSG
8    filed against merchants since March of
9    this year?
10           MR. BERMAN:  Objection.
11       Don't answer the question.
12           MR. HESKIN:  You're
13       instructing him not to answer?
14           MR. BERMAN:  I am
15       absolutely.  Look at the court
16       order.
17           MR. HESKIN:  All right.
18       Let's take a break right now.
19       We'll come back in 15 minutes.
20       Let's say -- let's say 20 minutes.
21       I got to take a call.  We'll come
22       back at 11:50.
23           (Recess.)
24   BY MR. HESKIN:

Page 108

1        Q.   Mr. Cole, can you just -- do
2    you have -- can you just briefly explain
3    what your duties are as CFO for CBSG?
4        A.   Sure.  A lot of it has to do
5    with financial reporting and keeping
6    track of the metrics for the portfolio,
7    but that's not to say I'm not involved in
8    the day-to-day granular items, accounts
9    payable, obviously accounts receivable,
10   and just regular operations involving
11   finance.
12       Q.   Okay.  Are you -- do you
13   have any responsibilities for dealing
14   with investors in CBSG?
15       A.   Yeah, creditors, yeah.
16       Q.   I use the word investors,
17   you used the word creditors.  What's the
18   difference between the two?
19       A.   So the difference between
20   the two is an investor applies for some
21   sort of principal or equity stake.  When
22   you invest into a company listed on the
23   NASDAQ, you're buying an actual share of
24   the company.  Creditor is just a loan

Page 109

1    agreement effectively with people
2    providing money to the company in
3    exchange for a return, but there's no
4    equity ownership as part of the
5    transaction.
6        Q.   Okay.  So the sole owner of
7    CBSG is and always has been Lisa
8    McElhone?
9        A.   The family trust
10   technically.
11       Q.   She has a family trust?
12       A.   Yes.
13       Q.   Am I pronouncing her name
14   correctly?
15       A.   No.  I know who you're
16   referring to.
17       Q.   How do you pronounce it?
18       A.   McElhone.
19       Q.   McElhone?  Okay.  So there's
20   a family trust, and that's 100 percent
21   owned CBSG?
22       A.   That's correct.
23       Q.   And Ms. McElhone owns and
24   controls that family trust?

MAGNA ►
LEGAL SERVICES

Page 110

```
1        A.   She's the grantor of the
2   trust.
3        Q.   And who manages it?
4        A.   Trust entity.
5        Q.   Who is the trust entity?
6        A.   We have an attorney in
7   charge of the trust.
8        Q.   Who's that attorney?
9        MR. BERMAN:  Objection.  You
10  don't have to answer this.
11       MR. HESKIN:  Are you
12  instructing him not to answer?
13       MR. BERMAN:  I am.
14       MR. HESKIN:  Okay.
15  BY MR. HESKIN:
16       Q.   Do you know who Peter Bazio
17  or is Brezio, something like that?
18       A.   It doesn't ring a bell to
19  me.
20       Q.   Okay.  All right.  So
21  they're creditors, right?  So these
22  are -- how many creditors are there?
23       MR. BERMAN:  Objection.  If
24  you could point to me to where in
```

Page 111

```
1   your order you are allowed to go
2   into any of this because I see it
3   as being precluded, complete
4   business relationship --
5        MR. HESKIN:  I'm just asking
6   how -- how many.  You know, I --
7        MR. BERMAN:  Don't answer
8   the question.  It's in violation
9   of the court order.
10       MR. HESKIN:  Okay.
11  BY MR. HESKIN:
12       Q.   What -- what information is
13  shared --
14       MR. HESKIN:  So Mr. Berman,
15  are you saying that creditors are
16  the same thing as investors?
17       MR. BERMAN:  I think you
18  heard the testimony, and I think
19  the testimony is clear as is the
20  court order.
21       MR. HESKIN:  Well, he's
22  describing them as creditors.
23  The -- the --
24       MR. BERMAN:  Shane, it's
```

Page 112

```
1   precluded by court order.
2        MR. HESKIN:  So you're
3   testifying -- you're representing
4   that creditors are the same thing
5   as investors?
6        MR. BERMAN:  For the
7   purposes of what you're asking him
8   about, yes.
9        MR. HESKIN:  Okay.  Got it.
10       MR. BERMAN:  Or you can ask
11  him the question.  He's the fact
12  witness, but I'm saying your
13  questions are in violation of the
14  court order.
15       MR. HESKIN:  The court order
16  says investors --
17       MR. BERMAN:  Okay.  The
18  answer is the answer.  You're
19  asking questions in violation of a
20  court order.
21       MR. HESKIN:  Or you're
22  instructing him not to answer --
23       MR. BERMAN:  I'm absolutely
24  comfortable with my instruction.
```

Page 113

```
1   He has the instruction from me.
2   BY MR. HESKIN:
3        Q.   Okay.  So Joe, you're not
4   going to answer my question?  And again
5   my question is just how many creditors
6   are there for CBSG?
7        A.   Right, I'm not going to
8   answer.
9        Q.   Okay.  That's fine.
10       What do you tell the
11  creditors the nature of CBSG's business
12  is?
13       A.   We're in the business of
14  providing working capital for businesses
15  in the United States.
16       Q.   Do you tell them that these
17  are loans?
18       A.   No.
19       Q.   Do you tell them that they
20  have interest rates?
21       A.   No.
22       Q.   Does CBSG tell these
23  creditors that -- creditors/investors
24  that there's a default rate?
```

MAGNA
LEGAL SERVICES

Page 114

1    A.   Yes.
2    Q.   What does CBSG tell the
3  creditors/investors the default rate is
4  on their business?
5    A.   It depends on the point in
6  time.
7    Q.   Let's talk about between --
8  in 2018 and 2019, during the time period
9  of my client's --
10       MR. BERMAN:  Give him the
11       dates, February 2018 to
12       October 2019, Joe.
13       THE WITNESS:  Uh-huh.
14       You're talking about the --
15       and I guess it depends on --
16  BY MR. HESKIN:
17    Q.   The default rate.  Like what
18  were you telling investors that the
19  default rate is?
20    A.   The default rate
21  approximately at that time was about 4 to
22  5 percent on receivables.
23    Q.   So that's -- that's what
24  you're telling investors?

Page 115

1    A.   Right.  We also confirm
2  exposure and capital loss rate, which is
3  closer to about a point-and-a-half.
4    Q.   A point-and-a-half.  All
5  right.  And -- and what is your
6  definition of default?
7    A.   Definition of default are
8  clients recognizing their factoring
9  losses in their financials as determined
10  by the rate of nonpayment and what we
11  have in the pipeline for litigation.
12    Q.   So that doesn't -- do you
13  tell investors that, what that definition
14  is?
15    A.   We communicate -- I mean,
16  especially the technical ones, we get
17  into the whole GAAP jargon and going over
18  our audited financials.
19    Q.   And the default rate was 4
20  to 5 percent during this period?
21    A.   Right, it depends.
22    Q.   Is a client in default if
23  they miss four payments?
24       MR. BERMAN:  Objection.

Page 116

1       THE WITNESS:  Yes.
2  BY MR. HESKIN:
3    Q.   Okay.
4    A.   Let me clarify.  They're in
5  default legally.  They're not necessarily
6  recognized in our financials as factoring
7  losses yet.  There's a whole mechanism
8  there.
9    Q.   Is -- is HMC in default?
10    A.   Yes.
11    Q.   Is HMC in default as per
12  what you tell investors?
13    A.   Yes, both in the financials
14  and categorically in the legal realm.
15    Q.   Okay.  And if someone is
16  making small payments, even like, you
17  know, let's say they owe one point --
18  let's say though owe $12 million or
19  $11 million and they're making small
20  payments of 100 million -- or $100 or
21  $200 or $500 every month, is -- is that
22  considered to be in default under what
23  you tell investors?
24       MR. BERMAN:  Objection.

Page 117

1       THE WITNESS:  No.
2  BY MR. HESKIN:
3    Q.   That's not considered to be
4  in default?
5    A.   It's not considered in
6  default.
7    Q.   All right.  So I just want
8  to make sure.  So if I owe $12 million to
9  CBSG under the agreement, like HMC is
10  alleged to owe or close to 12 million,
11  and I stop making payments, correct?
12    A.   Right.
13    Q.   That's a default?
14    A.   Yes.
15    Q.   And that would be a default
16  that's told to investors, correct?
17    A.   Yes.
18    Q.   Okay.  But if CBSG -- if my
19  client just decided, You know what?  I'm
20  going to make $100 payment in June, July,
21  August or 500, that would not be
22  considered default, right?
23    A.   I mean, your hypothetical
24  assumption is we're accepting that sort

MAGNA
LEGAL SERVICES

Page 118

1  of a deal, and it would be very unlikely
2  we would.
3      Q.   Was HMC reported to
4  investors as a default?
5      A.   In a subsequent period it
6  was recognized as factoring losses,
7  that's one that ends up on our report for
8  financials sent to investors.
9      Q.   When?
10     A.   That was done at the --
11 well, it's outside the scope of our
12 conversation, but it was done at the
13 beginning of the year.
14     Q.   Beginning of 2020?
15     A.   Yes.
16     Q.   Why wasn't it reported in
17 May of 2020 when HMC stopped making
18 payments?
19         MR. BERMAN:  Objection.
20         THE WITNESS:  We had a long
21     series of negotiations trying to
22     work out the deal.
23 BY MR. HESKIN:
24     Q.   Working out a deal when

Page 119

1  we're in litigation, filed suit, and --
2      A.   Yeah.  I mean, legally it's
3  been in default that entire time.  The
4  recognition of the factoring losses
5  occurred --
6          THE REPORTER:  I'm sorry.
7      The end of your question, it faded
8      out.
9          MR. HESKIN:  The answer was
10     cut off.
11         THE WITNESS:  Oh, the
12     recognition of the factoring
13     losses occurred in the subsequent
14     period.
15 BY MR. HESKIN:
16     Q.   So I don't understand that.
17 My client stopped making payments in May
18 of 2019.  We filed a lawsuit by at least
19 June of 2019 alleging that they weren't
20 in breach and that CBSG has engaged in a
21 criminal RICO conspiracy, and yet you
22 didn't tell investors that they were in
23 default until 2020?
24     A.   Right.  We had discussions

Page 120

1  with the client and we were working it
2  out with litigation.  The recognition on
3  our financials occurred in the following
4  financial period.
5      Q.   What negotiations occurred
6  in June?
7      A.   We were working this out
8  during the time.
9      Q.   What negotiations were
10 happening in July?
11     A.   That's -- that's between
12 Brad and the client.
13     Q.   Well --
14     A.   You know better than I do.
15 I'm not the one conveying the
16 information, what the client will
17 negotiate.  I'm just recognizing revenue
18 into --
19     Q.   Well, you're the one that's
20 responsible for reporting to investors
21 whether a client is in default, right?
22     A.   Yes.
23         MR. BERMAN:  Objection.
24 BY MR. HESKIN:

Page 121

1      Q.   Okay.  And -- and you just
2  testified under oath that the reason you
3  didn't report to investors that my client
4  was in default until early 2020 was
5  because they were in negotiations for a
6  payment plan, right?
7      A.   That's correct.  As a part
8  of our financial -- audited financial
9  methodology, we had the ability to
10 consider clients, even if they're
11 underperforming, non-default for revenue
12 purposes into a subsequent period if it's
13 deemed by our collections and legal
14 department as not truly a default.
15     Q.   All right.  So my client
16 stopped making payments in May 2019, sued
17 your client --
18     A.   Yeah.
19     Q.   -- in June of 2019, and
20 hasn't made a payment since May of 2019.
21     A.   Yeah.
22     Q.   But you still didn't report
23 that to investors as being in default
24 because why?

MAGNA
LEGAL SERVICES

Page 122

1    MR. BERMAN:  Object to the
2  form.
3    THE WITNESS:  So keep in
4  mind, we're not sending default
5  numbers through our investors
6  on -- we're not sending the
7  audited financials to investors.
8  That's not a routine thing for us.
9  And reporting on default figures
10  are based on our financial
11  methodology.  So we had no
12  requirement to do so based on our
13  financial methodology.
14    This is not just your
15  client, it's the routine course of
16  our business of when we recognize
17  default, because you can have the
18  other argument saying, Oh, you
19  guys are probably going to collect
20  that, why would you write it off
21  for taxes?  You guys want to avoid
22  paying taxes on that investor or
23  that client?
24    So it's a little bit of

Page 123

1  balancing act both ways or we
2  truly want to recognize there's a
3  lost cause, and that's when we
4  right it off for the sake of
5  income.  We didn't want to be too
6  aggressive and do so in 2019.  If
7  that answers your question.
8  BY MR. HESKIN:
9    Q.   Well, what about the concern
10  of being truthful with the -- the
11  investors, is that a concern?
12    MR. BERMAN:  Objection.
13    THE WITNESS:  That's right.
14  They understand our financial
15  methodology.
16  BY MR. HESKIN:
17    Q.   So they understand that a
18  company can stop making payments, sue
19  your client alleging a RICO conspiracy,
20  file a counterclaim against CBSG claiming
21  that they owe my client money, and -- and
22  still not be in default.  That's --
23  that's the understanding?
24    MR. BERMAN:  Don't answer

Page 124

1  that.  That's in violation of the
2  court order.
3    MR. HESKIN:  How is that
4  a -- how is that a --
5    MR. BERMAN:  Look at what
6  you're allowed to ask with respect
7  to communications with investors
8  and you tell me how any of those
9  falls within the scope.  If I'm
10  wrong, I have the order right
11  here.
12    MR. HESKIN:  I'm allowed --
13  specifically allowed to ask what's
14  being told to investors.
15    MR. BERMAN:  No, you're not.
16  What it says is:
17    "The information Complete
18  Business Solutions Group shares
19  with potential and secured
20  investors regarding factoring loan
21  agreements.  Pursuant to Section
22  2(d) above, this matter does not
23  include specific communications
24  with specific investors."

Page 125

1    You're asking for
2  specific --
3    MR. HESKIN:  I'm not.  I'm
4  not asking for specific investors.
5  I'm asking generally what are they
6  telling them?
7    MR. BERMAN:  No, you are
8  not, you're asking specific
9  communications.  I'm not arguing
10  with you.  You have my
11  instruction.
12    MR. HESKIN:  -- with my
13  client what is being told to the
14  investors.
15    MR. BERMAN:  And I -- as I
16  asked you, show me where on the
17  order you're allowed to even talk
18  about that.
19    MR. HESKIN:  You can
20  instruct him not to answer --
21    MR. BERMAN:  Yup.
22    MR. HESKIN:  -- at your own
23  risk.
24    MR. BERMAN:  Listen, you

MAGNA
LEGAL SERVICES

Page 126

1    threatened me four times now.  You
2    can call the judge any time you
3    want.  Keep on threatening me.
4    It's really inappropriate in the
5    deposition.
6        I'm really okay with my
7    position.  I read you the court
8    order.  If you think it's wrong,
9    tell me.  I'm happy to reconsider
10   right now.
11       MR. HESKIN:  I think you're
12   wrong.
13       MR. BERMAN:  Where in the
14   order allows you to do it?
15       MR. HESKIN:  I'm allowed to
16   ask him what information is being
17   shared with investors.
18       MR. BERMAN:  Where are
19   you -- where are you looking to
20   make that statement?
21       MR. HESKIN:  Listen, I've
22   read the order, I've pointed it
23   out.
24       MR. BERMAN:  You did not,

Page 127

1    you did not point out anything.
2        MR. HESKIN:  I'm not
3    debating.
4        MR. BERMAN:  You got it.  I
5    just read you the applicable
6    provision.  That's my instruction.
7        MR. HESKIN:  You're
8    instructing him not to answer my
9    question?
10       MR. BERMAN:  You heard my
11   instruction four times now and I
12   read you the applicable section of
13   the court order.
14   BY MR. HESKIN:
15       Q.   I'm going to ask you the
16   question again.
17       Did CBSG -- when did CBSG
18   inform investors that my client was in
19   default?
20       MR. BERMAN:  Objection.
21   You can answer, Joe, because
22   I think you've answered it.  But
23   you can answer that one again.
24       THE WITNESS:  Yeah, I

Page 128

1    never -- we recognized the default
2    in 2020.  We never specifically
3    identified that client as being in
4    default.  It's not part of our
5    practice there.
6    BY MR. HESKIN:
7        Q.   So as of today you've never
8    informed investors that my client is in
9    default?
10       MR. BERMAN:  Objection.
11   You don't have -- you
12   answered it, so --
13       THE WITNESS:  Yeah.  I mean,
14   we don't get into specific clients
15   that go into default.  We're
16   looking at this as a large
17   portfolio when there's, you know,
18   thousands of clients.  We don't
19   say that one particular client is
20   in default.  We say, Here are the
21   numbers that represent our
22   defaults.
23   BY MR. HESKIN:
24       Q.   Okay.  And as of today, is

Page 129

1    my client in default or being considered
2    in default per your investors?
3        A.   Yes.
4        Q.   Yes.  And when was it first
5    brought or considered as being in
6    default?
7        MR. BERMAN:  Objection.
8    BY MR. HESKIN:
9        Q.   In 2020?
10       A.   No, it was considered in
11   default legally in -- last year, at
12   around probably May or June, right when
13   we got into this nonpayment situation.
14       Q.   My question is about what
15   you're telling investors.
16       A.   Yeah, financially it was
17   recognized as part of our default
18   methodology in this current year.
19       Q.   What month?
20       A.   February.
21       Q.   And what happened in
22   February to make the determination that
23   HMC was suddenly in default?
24       A.   It was deemed by our

Page 130

1  collections, customer service and legal
2  team to be noncollectible, and there was
3  no likelihood, and this is under our
4  financial guidelines, of being able to
5  recover the asset in a near future point
6  in time.
7      Q.   And who made that decision?
8      A.   That is an accounting
9  decision. I made that decision.
10     Q.   You made the decision?
11     A.   I made the decision after
12 conferring with legal.
13     Q.   Legal in-house or --
14         MR. BERMAN:  You don't have
15     to answer that.  Calls for
16     attorney/client communication --
17     attorney/client --
18         MR. HESKIN:  I'm asking who.
19         MR. BERMAN:  Yeah.  Calls
20     for attorney/client privileged
21     communication.  You're asking
22     directly about communications with
23     legal to make decisions about this
24     case.

Page 131

1         No, don't answer it.
2  BY MR. HESKIN:
3      Q.   You're not going to tell me
4  who you discussed it with?
5         MR. BERMAN:  Yeah, don't
6     answer it.
7  BY MR. HESKIN:
8      Q.   Were they actually an
9  attorney admitted to practice law in the
10 Commonwealth of Pennsylvania?
11         MR. BERMAN:  You can answer
12     whether you met with an attorney,
13     but you're not saying who, when,
14     where or what.
15         THE WITNESS:  Yes, with an
16     attorney that was admitted in PA.
17 BY MR. HESKIN:
18     Q.   And not disbarred?
19     A.   Right.
20     Q.   Did you -- did you ever
21 discuss this matter with Mr. Ring?
22     A.   No.
23     Q.   You know who Dan Ring,
24 right?

Page 132

1      A.   Yes.
2      Q.   He was acting as your
3  general counsel with this matter, right?
4         MR. BERMAN:  Objection.
5  BY MR. HESKIN:
6      Q.   Right?
7      A.   Dan Ring was an attorney
8  representing CBSG, yes.
9      Q.   During this time period,
10 right, May of 2019, right?
11     A.   He was with us for two
12 months because he -- yeah.
13     Q.   Because what?
14     A.   Because he had an issue with
15 his CLE class that he didn't take.
16     Q.   He wasn't actually a
17 licensed practicing attorney, right?
18         MR. BERMAN:  Objection to
19     the extent it calls for
20     attorney/client, attorney work
21     product.
22         If that's where you form
23     your knowledge, you don't need to
24     answer.

Page 133

1         MR. HESKIN:  It's a matter
2     of public record.
3         MR. BERMAN:  Okay.  You
4     heard my instruction.  If you know
5     it from a public record, answer
6     it, Joe, but it's from
7     communications with attorneys, you
8     don't have to answer it.  And I'm
9     sure Mr. Heskin wouldn't disagree
10    with that basic legal principle.
11 BY MR. HESKIN:
12     Q.   Go ahead and answer it.
13     A.   Yes, it was from a public
14 record.
15     Q.   And how long -- how long did
16 Mr. Ring act as the general counsel for
17 CBSG while he was not licensed to
18 practice in the Commonwealth of
19 Pennsylvania?
20         MR. BERMAN:  Objection.
21         THE WITNESS:  He was
22     employed for two months under FSP,
23     and served as counsel through
24     CBSG, along with the other

MAGNA
LEGAL SERVICES

Page 134

```
1        attorneys on staff.
2   BY MR. HESKIN:
3        Q.   And he specifically
4   represented and made communications with
5   my client during this time period, didn't
6   he?
7        A.   Yes.
8        Q.   And his signature line
9   represented that he was the general
10  counsel of CBSG, correct?
11       MR. BERMAN:  Objection.
12  BY MR. HESKIN:
13       Q.   Correct?
14       A.   Yes.
15       Q.   And at that time he was not
16  licensed to practice law in the
17  Commonwealth of Pennsylvania, correct?
18       MR. BERMAN:  Objection.
19       THE WITNESS:  Yes.
20  BY MR. HESKIN:
21       Q.   Did you report it?  Did
22  anyone report that to the Pennsylvania
23  Ethics Bar?
24       MR. BERMAN:  Objection to
```

Page 135

```
1        the extent it calls for
2        attorney --
3   BY MR. HESKIN:
4        Q.   That he was practicing law
5   without a license while he was disbarred?
6        MR. BERMAN:  Objection, to
7        the extent it calls for
8        attorney/client work product.
9        THE WITNESS:  No, he was,
10       terminated.
11  BY MR. HESKIN:
12       Q.   The answer is what?
13       A.   No, he was terminated.
14       Q.   Okay.  Can you complete your
15  answer?
16       A.   Talking to me?
17       Q.   Joe.  To Joe.
18       A.   My last response was no, he
19  was terminated.
20       Q.   Okay.  Who is responsible
21  for generating the payment history for a
22  merchant that goes into default and has a
23  COJ filed against them, who is
24  responsible for that?
```

Page 136

```
1        MR. BERMAN:  Objection.
2        THE WITNESS:  That's the
3   accounting department.
4   BY MR. HESKIN:
5        Q.   You're in the accounting
6   department, right?
7        A.   Yes.
8        Q.   You're the head of the
9   accounting department, right?
10       A.   Yes.
11       Q.   So you're responsible for
12  generating that?
13       A.   Yes, my department generates
14  it.
15       Q.   Okay.
16       MR. HESKIN:  Could the court
17  reporter pull up Exhibit No. 14?
18  BY MR. HESKIN:
19       Q.   Can the witness see that?
20  This is the confession of judgment that
21  was filed against my client, right?
22       A.   Yes.
23       Q.   And did you approve this
24  filing?
```

Page 137

```
1        A.   Yes.
2        Q.   Do you see the date,
3   October 3rd, 2019?
4        A.   Yes.
5        Q.   Did you review this before
6   it was filed?
7        A.   Yes.
8        Q.   You did?  You did, correct?
9        A.   Yes.
10       Q.   Did you review the entire
11  file?
12       A.   Yes.
13       Q.   Okay.  And this was after
14  the first confession of judgment had
15  already been vacated, correct?
16       A.   I believe so, yes.
17       Q.   And this was after my client
18  stopped making payments in May of 2019,
19  correct?
20       A.   Yes.
21       Q.   And this was after my client
22  sued CBSG in June of 2019, correct?
23       A.   Yes.
24       Q.   Okay.
```

**MAGNA**
LEGAL SERVICES

1        MR. HESKIN:  Can you scroll
2  down to the next page?  Next page.
3  Next page.
4  BY MR. HESKIN:
5     Q.   All right.  Do you see that,
6  it's signed by Jamie McElhone?
7     A.   Yes.
8     Q.   Did you give this document
9  to Ms. McElhone to sign?
10    A.   John gave it to Jamie to
11  sign.
12    Q.   Is that a wet ink signature
13  or is that a --
14    A.   That looks like a wet ink
15  signature to me.
16    Q.   Wet ink?  Okay.  Not a
17  DocuSign?
18    A.   Yes.
19    Q.   Got it.  Thank you.
20       MR. HESKIN:  Can you go to
21  the next page?  All right.  Notice
22  of right.  Next page.  Next page.
23  All right.  Next page.
24  BY MR. HESKIN:

1     Q.   And again, this is a wet ink
2  signature?
3    A.   It looks like it.
4    Q.   Are you sure about that?
5    A.   I'm not 100 percent sure,
6  but I'm saying it looks like it to me.
7    Q.   Okay.  You don't know one
8  way or the other?
9    A.   Right.
10    Q.   If I had a handwriting
11  expert compare this signature to the one
12  above it and they were exactly identical,
13  that would be a problem, right?
14    A.   I'm not sure.
15    Q.   You don't think -- so if
16  this is a cut-and-paste job, that would
17  be a problem, wouldn't it?
18      MR. BERMAN:  Objection.
19  BY MR. HESKIN:
20    Q.   Do you want to maybe --
21  maybe you might want to compare the
22  signatures.  Take a good look at this
23  one.  See where the J at the bottom cross
24  sects and circles the J and goes through

1  the M in this signature?  Do you see
2  that?
3    A.   Yup.
4    Q.   Okay.  Let's go back up to
5  the next one above it.
6      MR. HESKIN:  Can we go back
7  a couple?
8      THE TRIAL TECH:  I think I
9  can do a -- cut the screen in
10  half.
11      MR. HESKIN:  Why don't you
12  do that, yeah.
13      THE TRIAL TECH:  Okay.
14      MR. HESKIN:  Okay?  Can you
15  move them closer?
16      THE TRIAL TECH:  I think
17  that's as close as we can go.
18  BY MR. HESKIN:
19    Q.   Can you see them?
20    A.   I can see them, yeah,
21  partially.
22    Q.   Can you --
23      MR. HESKIN:  Is there a way
24  to move the -- the video screen so

1  that -- oh, there you go.  And do
2  the other one next to it or at the
3  bottom?
4      THE TRIAL TECH:  Absolutely.
5  BY MR. HESKIN:
6    Q.   Do you see that?
7    A.   Yes.
8    Q.   It looks remarkably similar,
9  no?
10    A.   Yeah, I can't tell.
11    Q.   Are you sure that
12  Ms. McElhone actually signed this and
13  this wasn't a cut-and-paste job?
14      MR. BERMAN:  Objection.
15      THE WITNESS:  I am not sure.
16  BY MR. HESKIN:
17    Q.   Huh?
18    A.   I am not sure.
19    Q.   Was Ms. McElhone in the
20  office at the time this was filed?
21    A.   I'm not sure.
22    Q.   Are you -- are you aware of
23  the odds of someone making two signatures
24  that -- in wet ink that are exactly

MAGNA
LEGAL SERVICES

Page 142

1  identical?
2      A.   No.
3      Q.   Do you know it's almost
4  impossible?
5      A.   No, I don't know that.
6      Q.   Okay.  So you understand
7  that she testified or her signature
8  appears on this under penalties of
9  perjury, right, and falsification --
10 let's read this:
11        "Signor understands the
12 statements herein are made subject to,"
13 let's pull that up.  "Made subject to the
14 penalties of 18," I can't really see
15 that, "relating to unsworn falsifications
16 to authorities."  Right?
17        Do you see that?
18     A.   Right.
19     Q.   Did she sign this?
20     A.   It looks like it.
21     Q.   It looks like it.  It looks
22 like she signed it twice, doesn't it?
23     A.   Yup.
24     Q.   Exactly the same, huh?

Page 143

1      A.   Yeah.
2      Q.   Okay.  So if I ask her --
3  put her on the stand at trial and ask her
4  whether or not she physically signed
5  this, she's going to tell me she did,
6  right?
7      A.   I'm not sure.
8      Q.   You're not sure?
9      A.   No.
10     Q.   This doesn't trouble you at
11 all?
12     A.   I'm not sure.  I can't
13 interpret that.
14     Q.   Okay.  It troubles me.
15        MR. BERMAN:  Go ahead,
16     Shane.
17 BY MR. HESKIN:
18     Q.   You're in the accounting
19 department, right?
20        MR. BERMAN:  No one wants to
21     hear your commentary.  Ask a
22     question.
23 BY MR. HESKIN:
24     Q.   You authorized this, right?

Page 144

1      A.   No.
2      A.   I thought just a few
3  words -- a few minutes back you said you
4  authorized the filing of this document
5  and you reviewed it and you reviewed the
6  whole thing?
7      A.   Yes, I reviewed the whole
8  thing.
9      Q.   Okay.  And you were
10 including these signatures?
11     A.   Right.  I authorized it in
12 the sense that I confirmed with legal
13 that it was fine to file.
14     Q.   Okay.  All right.
15     A.   I did not review the
16 signatures.
17     Q.   Okay.  Are you going to --
18 are you okay with this?  Are you going to
19 do anything to correct this?
20     A.   I'm okay with it.  As I
21 understand it, they're both signed
22 documents.
23     Q.   Okay.  All right.
24        MR. HESKIN:  Can we go back

Page 145

1        to the screen we were at before.
2  BY MR. HESKIN:
3      Q.   And I assume when I look at
4  the other judgments that were actually
5  filed by CBSG during this same time
6  period, none of these signatures are
7  going to be identical to this because
8  that would really be impossible, right?
9      A.   I'm not sure.
10     Q.   Wouldn't that be a problem
11 if I go back and I look at the other COJs
12 and find out that these wet ink
13 signatures are exactly the same?
14        MR. BERMAN:  Objection.  Do
15     you have a question about this
16     case?  Because I think that's what
17     your deposition is.
18 BY MR. HESKIN:
19     Q.   During this time period.  I
20 want to know if this was actually --
21        MR. BERMAN:  Okay, Shane.
22 BY MR. HESKIN:
23     Q.   -- sworn to under oath by
24 Ms. McElhone or if this was a

MAGNA
LEGAL SERVICES

Page 146

1   cut-and-paste job by someone in your
2   accounting department?
3      A.   This is not prepared by
4   accounting, this is a legal function.
5   John Hartley prepared this document.
6      Q.   Okay. I thought I heard
7   earlier that accounting was responsible
8   for it.
9      A.   No, you said payment
10  history.
11     Q.   Okay.
12        MR. HESKIN:  Can we go back
13     to the full document now?  I'm
14     glad you talked about that.
15        MR. BERMAN:  You like to
16     hear yourself talk with
17     commentary.  Is this what this is?
18        MR. HESKIN:  He raised a
19     good point. I'm glad.
20        MR. BERMAN:  Yeah.
21        MR. HESKIN:  Go to the next
22     page.  Next page.
23  BY MR. HESKIN:
24     Q.   Do you see any problems --

Page 147

1        MR. HESKIN:  No, no, no.
2     Keep it there.
3   BY MR. HESKIN:
4      Q.   Do you see any problems on
5   this page?
6      A.   No.
7      Q.   No -- no problems on this
8   page?
9      A.   No.
10     Q.   Is that your answer, there's
11  no problems on this page?
12     A.   No, none that I understand
13  as a problem.
14     Q.   Do you see the certification
15  of addresses?
16     A.   Yes.
17     Q.   "The undersigned hereby
18  certifies of record that the precise
19  addresses of defendant is HMC."
20        Do you see that?
21     A.   Yes.
22     Q.   And then below it --
23        MR. HESKIN:  Can you
24     highlight that for me?  Not that

Page 148

1     one, the address of plaintiff.
2        THE WITNESS:  Yeah, I see
3     it.
4   BY MR. HESKIN:
5      Q.   Any problems with that?
6      A.   No.
7      Q.   No problem with that?
8      A.   No.
9      Q.   You testified earlier today
10  that CBSG doesn't have a physical
11  presence in Philadelphia.
12     A.   It does not have a physical
13  presence in Philadelphia.  The servicing
14  entity which services CBSG has a physical
15  presence in Philadelphia and facilitates
16  communications on behalf of CBSG using
17  that address.
18     Q.   But this is a certification
19  of address.  It says that the
20  plaintiff -- the plaintiff is not Full
21  Spectrum, right?
22     A.   Right.
23     Q.   Who is -- who is the
24  plaintiff?

Page 149

1      A.   CBSG.
2      Q.   And where does CBSG have an
3   office?
4      A.   Florida.
5      Q.   Doesn't have an office at 20
6   North 3rd Street, does it?
7      A.   No.
8      Q.   This is a false
9   certification, isn't it?
10        MR. BERMAN:  Objection.  I
11     think he's answered this.
12        But you can answer again.
13        THE WITNESS:  No, I don't
14     believe so.
15  BY MR. HESKIN:
16     Q.   Why isn't it false?  If
17  Complete Business Solutions Group does
18  not have a physical presence in the
19  Commonwealth of Pennsylvania, how is this
20  not a fraudulent representation to the
21  court of Philadelphia?
22        MR. BERMAN:  Objection.
23        But you can answer it again
24     for the third time.

Page 150

1    THE WITNESS:  Under our
2    operating agreements, they have
3    the capacity to serve documents
4    for CBSG by Full Spectrum.
5 BY MR. HESKIN:
6    Q.    That's not Complete Business
7 Solutions Group's address, correct?
8    A.    Correct.  There's no
9 physical lease or address legally there
10 for CBSG.  It's being conducted by our
11 servicing entity located at that address.
12    Q.    Does this say that?
13    A.    No, it's just an address.
14    Q.    Okay.  It's just an address?
15    A.    Yeah, you're not going to
16 put in the relationship for the servicing
17 entity on an address line.
18    Q.    Do you have an understanding
19 of whether or not there's a requirement
20 under the Pennsylvania Rules of Civil
21 Procedure that the plaintiff actually
22 be -- have a physical presence in the
23 Commonwealth of Pennsylvania in order to
24 file a confession of judgment against

Page 151

1 someone?
2    MR. BERMAN:  Objection.  Are
3    you asking for a legal conclusion
4    on that?
5    MR. HESKIN:  I'm asking for
6    his understanding.
7    MR. BERMAN:  You're asking
8    him a legal question with a legal
9    conclusion after he's answered
10    your question multiple times.  You
11    don't like it so you want to keep
12    making up laws, but that's fine.
13 BY MR. HESKIN:
14    Q.    Do you have that
15 understanding?
16    A.    No, I do not.
17    Q.    Okay.  And is -- how many
18 times between February of 2018 and May
19 of -- or October of 2019 has CBSG
20 represented to the Commonwealth of
21 Pennsylvania that it has a physical
22 location located in Philadelphia?
23    MR. BERMAN:  Objection.
24    THE WITNESS:  I don't think

Page 152

1    we represent we have a physical
2    location in Philadelphia, just a
3    servicing agreement with our
4    operating entity.
5 BY MR. HESKIN:
6    Q.    And you'll agree with me
7 that -- that doesn't say that Complete
8 Business Solutions has a servicing agent
9 at that location, right?
10    MR. BERMAN:  Objection.
11    But you can answer it, Joe.
12    THE WITNESS:  Yeah, it does
13    not say that.
14 BY MR. HESKIN:
15    Q.    Okay.  Is CBSG still making
16 this representation to the courts of
17 Pennsylvania?
18    MR. BERMAN:  Objection.  You
19    don't have to answer that.
20    MR. HESKIN:  Are you
21    instructing him not to answer?
22    MR. BERMAN:  I am.  Read the
23    order.
24    MR. HESKIN:  Got it.

Page 153

1 BY MR. HESKIN:
2    Q.    Do you have any problem with
3 this representation to the court, do you
4 think it's accurate?
5    A.    No, I have no problem.
6    Q.    You think it's accurate?
7    A.    Yes, under our operating
8 agreement.
9    Q.    Under your operating
10 agreement, Complete Business Solutions
11 Group is located at 20 North 3rd Street?
12    A.    No, the operating agreement
13 reflects that the servicing entity is
14 located there and it can represent via
15 mailing where it is located.
16    Q.    So it does -- so CBSG does
17 have a physical location in --
18    MR. BERMAN:  Objection.
19    THE WITNESS:  No, the -- by
20    this, I mean the operating entity,
21    Full Spectrum Processing.
22 BY MR. HESKIN:
23    Q.    Isn't this just a scam to
24 evade paying property taxes and taxes to

MAGNA ◆
LEGAL SERVICES

Page 154

```
1    the City of Philadelphia?
2         MR. BERMAN:  Objection.
3    BY MR. HESKIN:
4         Q.  Isn't it?
5         A.  Taxes?
6         Q.  No, income taxes to the City
7    of Philadelphia.
8         A.  No, it's not a scam.
9         Q.  It's not a scam?  Well, what
10   actually happens in Florida?
11        A.  We have a business -- an
12   office in Florida.
13        Q.  What happens there?
14        A.  You need to be more clear
15   about what "happens there" means.
16        Q.  Does anything happen there?
17   I mean, you've got an office there.  Is
18   it an office that's just a mail drop or
19   do people actually go there and work?
20        A.  We have an office and we had
21   people at the time that were working
22   there, yes.
23        Q.  Who?  Who works there?
24        A.  Lisa works there.
```

Page 155

```
1         Q.  Did she work there from
2    February 2018 until October of 2019?
3         A.  Yes.
4         Q.  Every day?
5         A.  No.
6         Q.  How often?
7         A.  For the duration of the time
8    that we had an office in Miami.
9         Q.  What did she actually do
10   there for CBSG?
11        A.  She worked with our sales
12   organization located there.
13        Q.  Okay.  And what were her
14   responsibilities?
15        A.  Facilitate communications
16   and manage operations with those
17   individuals in that entity.
18        Q.  Okay.  And how many hours a
19   day did she spend physically at the
20   office in Florida?
21        A.  I'm not saying she's
22   regularly in the office every day, I'm
23   saying when she is there, that's what she
24   does.
```

Page 156

```
1         Q.  How often is she there?
2         A.  A few times a month.
3         Q.  A few times a month?
4         A.  Yes.
5         Q.  What's the address in
6    Florida where she worked out of between
7    February '18 and October 2019?
8         A.  For that time period, the
9    office was, to the best of my
10   recollection, 30900 Northeast Boulevard
11   in Aventura, and I forget the suite
12   number.  But it's 3500 or the third
13   floor.
14        Q.  Is that a virtual office
15   space?
16        A.  A physical office.
17        Q.  Okay.  It was a bulk office
18   space, right, where it's shared with
19   other companies, right?
20        A.  We had a lease exclusive to
21   our unit.
22        Q.  How big was it?
23        A.  About 2,500 square feet.
24        Q.  Okay.  And the only person
```

Page 157

```
1    that worked there was Lisa?
2         A.  Yes, but we also had sales
3    reps that were working for that office
4    employed under a separate entity.
5         Q.  Okay.  So let me get this
6    straight: It's a Delaware -- CBSG is a
7    Delaware corporation, right?  Just
8    incorporated in Delaware, right?
9         A.  Yes.
10        Q.  Okay.  And during the entire
11   time that my client entered into the
12   agreements with CBSG from February 2018
13   through roughly May of 2019, CBSG had one
14   office located in Florida, correct?
15        A.  That's correct.
16             MR. BERMAN:  Objection.
17   BY MR. HESKIN:
18        Q.  And that was their only
19   physical location, correct?
20             MR. BERMAN:  Objection.
21             THE WITNESS:  Yes.
22   BY MR. HESKIN:
23        Q.  And CBSG's only employee was
24   Ms. McElhone, correct?
```

MAGNA
LEGAL SERVICES

Page 158

1    A.   That's right.
2    Q.   Okay.  And Ms. McElhone
3  worked out of Florida, correct?
4    A.   Yes.
5    Q.   And she is the sole owner of
6  the company, correct?
7        MR. BERMAN:  Objection.
8        THE WITNESS:  We went over
9     that.  It's the trust that owns
10    it.
11  BY MR. HESKIN:
12    Q.   Okay.  And the trust is in
13  her name only, correct?
14    A.   She's the grantor of the
15  trust.
16    Q.   She's the manager of the
17  trust, right?
18    A.   No, we went over that as
19  well, there's an attorney.
20    Q.   Okay.  And she makes the
21  decisions, correct, for CBSG?
22    A.   Yes.
23    Q.   And she's a resident of
24  Florida?

Page 159

1    A.   Yes.
2    Q.   Because Florida doesn't have
3  state income tax, correct?
4    A.   I'm not sure.
5    Q.   All right.  So she's a
6  resident of Florida, CBSG has a Florida
7  office and only one office in Florida,
8  correct?
9    A.   Yes.
10    Q.   And its only employee works
11  out of Florida, correct?
12    A.   Yes.
13    Q.   Okay.  And its sales staff
14  works out of Florida, right?
15        MR. BERMAN:  Objection.
16        THE WITNESS:  It's not its
17     sales staff, there's a third-party
18     sales entity that worked out of
19     that office.
20  BY MR. HESKIN:
21    Q.   What's the name of it?
22    A.   There were a couple that
23  went in.
24    Q.   Okay.  And who -- who

Page 160

1  runs -- and how many different aspects of
2  CBSG are there?  Does it just do
3  factoring?
4    A.   Yes.
5    Q.   It doesn't also run other
6  businesses that it acquires through these
7  factoring agreements?
8    A.   No.
9    Q.   It doesn't do that?
10    A.   No, it does not do that.
11    Q.   Who is Anthony Ron?
12    A.   Anthony is an FSB employee.
13    Q.   What's his real name?
14    A.   Anthony Ron Fazio.
15    Q.   And what's his role at CBSG,
16  if any?
17    A.   He does not work for CBSG.
18    Q.   He does not work for -- got
19  it.  He works for Full Spectrum, right?
20    A.   That's correct.
21    Q.   Does he do collections on
22  behalf of CBSG?
23    A.   Yes, through Full Spectrum.
24    Q.   And does Full Spectrum

Page 161

1  manage businesses on behalf of CBSG?
2    A.   No.
3    Q.   Had CBSG ever acquired a
4  small business as a result of defaulting
5  on a factoring agreement?
6    A.   No.
7    Q.   Did CBSG ever try and enter
8  into a partnership with my client?
9    A.   No.
10    Q.   Never proposed an ownership
11  interest in HMC?
12    A.   No.
13    Q.   Okay.  And I assume that
14  CBSG has never engaged in loan-to-own
15  tactics, right?
16    A.   No.
17    Q.   It's never tried to seek
18  ownership of a company as a result of
19  defaulting on one of the factoring
20  agreements, right?
21    A.   No, it has not.
22    Q.   You're not aware of that?
23    A.   No.
24    Q.   Okay.  How many Anthonys

MAGNA
LEGAL SERVICES

Page 162

```
1   work at Full Spectrum?
2       MR. BERMAN:  Objection.  Are
3   you now limiting it to
4   February 2018 to --
5       MR. HESKIN:  Yes,
6   absolutely.
7       MR. BERMAN:  Okay.
8       THE WITNESS:  In
9   Philadelphia, there's a lot of
10  Anthonys.
11  BY MR. HESKIN:
12      Q.   I know there's Anthony Fazio
13  and then there's other Anthony that comes
14  up.  I don't know if they're one and the
15  same.
16      A.   Unless I'm remembering
17  incorrect, I think Anthony Fazio is the
18  only employee of Full Spectrum named
19  Anthony.
20      Q.   Okay.  So maybe they are one
21  and the same.
22          So Anthony Ron goes by both
23  Anthony Ron and Anthony Fazio?
24      A.   It's my understanding his
```

Page 163

```
1   full name is Anthony Ron Fazio.
2       Q.   And has Mr. Fazio ever been
3   convicted of a crime?
4       A.   Not to my knowledge.
5       Q.   You're not aware of any
6   criminal convictions of Mr. Fazio?
7       A.   No.
8       Q.   And you are aware that
9   Mr. LaForte has criminal convictions,
10  right?
11      A.   Yes.
12      Q.   And does Mr. LaForte have
13  any managerial responsibilities over CBSG
14  through his relationship with Full
15  Spectrum?
16      A.   No.
17          MR. BERMAN:  Objection.
18  BY MR. HESKIN:
19      Q.   No?
20      A.   No.
21      Q.   Does Mr. LaForte do anything
22  on behalf of Full Spectrum for CBSG?
23      A.   No.
24      Q.   Does Mr. LaForte have any
```

Page 164

```
1   involvement in CBSG?
2       A.   He works through our sales
3   entity.
4       Q.   What's that?
5       A.   Recruiting and Marketing
6   Resources.
7       Q.   Okay.  And does Mr. LaForte,
8   through Recruiting and Marketing
9   Resources, have any managerial
10  responsibilities of CBSG?
11          MR. BERMAN:  Objection.
12          THE WITNESS:  No.
13  BY MR. HESKIN:
14      Q.   No?  Does Mr. LaForte have
15  any responsibility for CBSG?
16          MR. BERMAN:  Objection.
17          THE WITNESS:  No.
18  BY MR. HESKIN:
19      Q.   Through any entity?
20      A.   No.
21      Q.   Does Mr. LaForte have any
22  involvement of any kind with CBSG?
23      A.   Yes, through the sales
24  entity.
```

Page 165

```
1       Q.   Okay.  Can you describe
2   that, what those responsibilities
3   involve?
4       A.   He's director of sales and
5   manages relations with our clients.
6       Q.   And is he an owner of CBSG?
7       A.   No.
8       Q.   And you're aware that he
9   holds himself out to investors as an
10  owner of the company, right?
11          MR. BERMAN:  Objection.
12          THE WITNESS:  Yes.
13  BY MR. HESKIN:
14      Q.   Yes?
15      A.   Yes, he's represented that
16  before.
17      Q.   To investors?
18      A.   Yes.
19      Q.   And you know that's false,
20  right?
21      A.   Yes.
22      Q.   And he knows that's false,
23  right?
24      A.   Yes.
```

Page 166

1    MR. BERMAN:  Shane, could
2  you just take this exhibit down so
3  we can actually see each other?
4    MR. HESKIN: I'm sorry.  I
5  want to go back to it.
6    MR. BERMAN:  Yeah, that's
7  fine.
8    MR. HESKIN:  But we can take
9  it down for now.
10 BY MR. HESKIN:
11   Q.   All right.  I think that's
12 all I need to know on that.
13        And does Mr. LaForte
14 represent to investors that he has his
15 own money invested in CBSG?
16    MR. BERMAN:  Objection.
17    THE WITNESS:  Not to my
18  understanding.
19 BY MR. HESKIN:
20   Q.   What's that?
21   A.   Not to my understanding.
22   Q.   Does Mr. LaForte have money
23 invested in CBSG?
24   A.   No.

Page 167

1   Q.   No?
2   A.   No.
3   Q.   Does Mr. LaForte have money
4  invested in the MCA fund?
5   A.   No.
6   Q.   If he told investors that he
7  has $80 million invested in CBSG, that
8  would be a false representation, correct?
9    MR. BERMAN:  Objection.
10    THE WITNESS:  Yes.
11 BY MR. HESKIN:
12   Q.   That would be false?
13   A.   Yes.
14   Q.   That would be knowingly
15 false, correct?
16    MR. BERMAN:  Objection.
17    THE WITNESS:  Yes.
18  Technically it's incorrect.
19 BY MR. HESKIN:
20   Q.   Okay.  Let's go back to
21 the -- let's go back to -- let me ask you
22 this:  Has Mr. LaForte ever made the
23 representation that he owns CBSG to
24 investors in front of you?

Page 168

1   A.   Yes.
2   Q.   Did you correct that
3  representation?
4   A.   No, not immediately.
5   Q.   Why not?
6   A.   Because we're in front of
7  other people.
8   Q.   You didn't see a problem
9  with that?
10   A.   No.
11    MR. HESKIN:  Let's go back
12  to that other exhibit.  All right.
13  Let's go down to the next page.
14 BY MR. HESKIN:
15   Q.   And then it says again,
16 plaintiff is Complete Business Solutions
17 Group, Inc., doing business at 20 North
18 3rd Street, Philadelphia, Pennsylvania
19 19106.
20        Do you see that?
21   A.   Yes.
22   Q.   You reviewed and approved
23 this filing, didn't you?
24   A.   Yes.

Page 169

1   Q.   Is that a knowingly false
2  statement?
3   A.   No, it's through our
4  servicing entity.
5   Q.   Complete Business Solutions
6  Group is a servicing entity?
7   A.   No, through our servicing
8  entity, as I explained, using that
9  address.
10   Q.   They're not actually located
11 at 20 North 3rd Street, right?
12   A.   Correct.
13    MR. HESKIN:  Go to the next
14  page.
15 BY MR. HESKIN:
16   Q.   Paragraph 12 says:
17    "Defendant is in default of
18 continuing interest at the rate of 6
19 percent per annum in the amount of" --
20    MR. HESKIN:  Can you undo
21  that because I can't see it that
22  way.
23 BY MR. HESKIN:
24   Q.   "In the amount of 279,531

Page 170

1    from May 9, and as of the filing of the
2    complaint in confession of judgment."
3          Do you see that?
4       A.  Yes.
5       Q.  $279,000, that's the amount
6    they're in default?
7       A.  Yes.  For that line item.
8       Q.  Okay.  Did you confirm that?
9       A.  Yes.
10      Q.  That's a true statement?
11      A.  Yes.
12      Q.  You reviewed it?
13      A.  Yes.
14      Q.  And as the 30(b)(6)
15   representative, you agree with that
16   statement?
17      A.  Yes.
18      Q.  That's truthful and
19   accurate?
20      A.  Yes.
21      Q.  Okay.  And then 13, it says:
22        "Attorney's fees in the
23   amount of 578,396, and a domestication
24   fee in the amount of $650 are owed by

Page 171

1    defendant to plaintiff pursuant to the
2    agreements."
3          Do you see that?
4       A.  Yes.
5       Q.  Where in the agreement does
6    it say they're entitled to a $650
7    domestication fee?
8       A.  It doesn't say that specific
9    amount.  It lists remedies as part of
10   legal and proceedings related to
11   collections.
12      Q.  Okay.  Did -- did CBSG
13   actually domesticate the judgment in
14   Maryland?
15         MR. BERMAN:  Objection.
16         THE WITNESS:  I'm not sure.
17   BY MR. HESKIN:
18      Q.  Well, as of this date,
19   right, you're representing that this fee
20   has been incurred or will be incurred,
21   right?
22      A.  Yes.
23      Q.  This is October of 2019 and
24   we're now in July 30th -- or June 30th,

Page 172

1    2020.  Has this fee been incurred?
2       A.  Only as part of this
3    proceeding, not on the books.
4       Q.  But -- no, did -- was the
5    $650 domestication fee actually incurred
6    by CBSG?
7          MR. BERMAN:  Objection.
8    BY MR. HESKIN:
9       Q.  You approved this.
10      A.  Yeah, there's certainly
11   fees.  I'm not sure specifically that
12   amount is the precise amount that we had
13   incurred.  I believe it's the amount
14   detailed as a part of our schedule of
15   fees associated with collection remedies
16   through this agreement.
17      Q.  I got it.  So I'll look at
18   the schedule of fees and I'll see a $650
19   domestication fee, is that your
20   testimony?
21         MR. BERMAN:  Objection.
22         THE WITNESS:  That isn't the
23      amount, but it's the amount it's
24      describing.

Page 173

1    BY MR. HESKIN:
2       Q.  Okay.  So are you taking the
3    position that you're entitled to a $650
4    domestication fee even if you don't
5    domesticate the fee?
6       A.  It's attorneys' fees and a
7    domestication fee.  So the attorneys' fee
8    is in the amount of that $578,000 number
9    and a domestication fee in the amount of
10   650.
11      Q.  As of October of 2019, the
12   date of this confession, had CBSG
13   actually occurred $578,000 in attorneys'
14   fees?
15         MR. BERMAN:  Objection.
16         THE WITNESS:  We incurred
17      fees, yes.
18   BY MR. HESKIN:
19      Q.  $578,000 in attorneys' fees
20   as of October 2019?  Really?
21      A.  Yeah.  We paid fees to our
22   lawyers, yeah.
23      Q.  Okay.  So I just want to
24   make sure I got this right.  You're the

MAGNA
LEGAL SERVICES

44 (Pages 170 to 173)

Page 174

1   one that approved this filing, right?
2   Right?
3       A.   Yes.
4       Q.   You read it?
5       A.   Yes.
6       Q.   You approved it, right?
7       A.   Yes.
8       Q.   You're in accounting, right?
9       A.   Yes.
10      Q.   You're the CFO of the
11  company, right?
12      A.   Right.
13      Q.   You're representing here or
14  CBSG is representing here that attorneys'
15  fee in the amount of $578,000 have been
16  incurred.
17          Do you see that?
18          MR. BERMAN:  Objection.
19          THE WITNESS:  Yes.
20  BY MR. HESKIN:
21      Q.   And you're representing
22  under oath right now that that -- that as
23  of the filing of this date, CBSG had
24  incurred $578,000 in attorneys' fees?

Page 175

1           MR. BERMAN:  Objection.
2   BY MR. HESKIN:
3       Q.   Correct?
4       A.   Not -- not necessarily
5   incurred, but there's a reserve for that
6   and related costs estimated for this
7   client.
8       Q.   Does it say that?
9       A.   No.  That's the definition
10  of why we have that amount.
11      Q.   Well, how did you come up
12  with that amount?
13      A.   It's based on the
14  proportionality of the referables in
15  question and the extent of the case.
16      Q.   Okay.  Well -- well, who
17  calculated that?
18      A.   That was done with legal and
19  accounting.
20      Q.   And how was it calculated?
21      A.   Based on a reasonable
22  estimate on cost of proceedings required
23  to do the litigation.  I believe we'll
24  actually be in excess of that amount.

Page 176

1       Q.   You're going to be in excess
2   of $600,000 to litigate this case?
3       A.   Yes.
4       Q.   Have you incurred $578,000
5   in fees to this date as we sit here to
6   date?
7       A.   Yes.
8       Q.   You have?  On this account?
9       A.   I don't know if it's
10  specifically to this account, but we've
11  definitely incurred that in general fees.
12      Q.   Well, I'm not talking about
13  general.  I'm talking about with respect
14  to this particular litigation, has CBSG
15  come -- remotely come close to spending
16  $578,000 in attorneys' fees?  Because
17  that's what it represented to the court.
18          MR. BERMAN:  Shane, read the
19      language.  But whatever.
20          Joe, objection.  Answer the
21      question.
22          THE WITNESS:  Yes.  In my
23      understanding when you would
24      calculate all the in-house counsel

Page 177

1       and third-party counsel retained
2       to work on this on a per hour
3       litigation cost, we have incurred
4       578, and we'll likely incur more
5       than that by the time we're done
6       with the proceedings.
7   BY MR. HESKIN:
8       Q.   On this particular case,
9   right?
10      A.   On this particular case,
11  yes.
12      Q.   All right.
13          MR. HESKIN:  Let's go to the
14      next one go back real quick.
15      Let's go back.  I'm sorry.
16  BY MR. HESKIN:
17      Q.   It says here:
18          "16.  See Exhibit H for each
19  factoring agreements' payment history."
20          Do you see that?
21      A.   Yes.
22      Q.   Who prepared Exhibit H, that
23  would be accountant, right?
24      A.   Where is Exhibit A?

**MAGNA**
LEGAL SERVICES

Page 178

1    Q.   H.
2    A.   Oh, H.  I don't see it.
3    Q.   All right.  It's the
4  factoring agreement payment history,
5  right?
6    A.   That's an accounting
7  function.
8    Q.   And that's within your
9  department, right?
10    A.   Yes.
11    Q.   Your responsibility, you're
12  the head of that department?
13    A.   Yes.
14    Q.   Okay.
15    MR. HESKIN:  Can you go to
16  the next page?  And next page?
17  BY MR. HESKIN:
18    Q.   Do you see verification?  We
19  already discussed that, right?
20    A.   Yes.
21    Q.   This is yet another one that
22  seems to have the exact same signature,
23  right?
24    A.   Yes.

Page 179

1    Q.   So that's three in the same
2  document that has identical signatures,
3  right?
4    A.   It looks similar to me, yes.
5    Q.   Okay.  And again, this is
6  verified under penalties related to
7  unsworn falsification to authorities,
8  right?
9    A.   Right.
10    Q.   Okay.
11    MR. HESKIN:  Next one.
12  That's Exhibit A.  Let's keep
13  ongoing.  Go all the way to the
14  end.  I want to see if we can get
15  to Exhibit H.  Scroll all the way
16  down to the end.  Go to the last
17  page.  Can you go to the last page
18  of the document?  Just quickly
19  going?
20    THE TRIAL TECH:  Trying.
21    MR. HESKIN:  This is the one
22  I wanted to go to.  So go back a
23  few.  All right.  So this is good.
24  All right.  Go to the -- yeah,

Page 180

1  keep on going back.  Back, back,
2  back, back, back, back, back.
3  Okay.  That's good.
4  BY MR. HESKIN:
5    Q.   So this is Exhibit H.
6  Do you see that?
7    A.   Yes.
8    Q.   And this is a document that
9  was filed with the Philadelphia Court of
10  Common Pleas under penalties of false
11  sworn statements, right?  Right?
12    A.   Yes.
13    Q.   Okay.  And this was reviewed
14  by you, right?
15    A.   Yes.
16    Q.   And this is an accounting
17  document that would have been prepared by
18  someone underneath you or by you, right?
19    A.   Yes.
20    Q.   Okay.
21    MR. HESKIN:  Can you go to
22  the next page?
23  BY MR. HESKIN:
24    Q.   All right.  And this will

Page 181

1  reflect -- we talked earlier about
2  various agreements and that at the time
3  that this was filed originally in May
4  of 2019, that there had been four missed
5  payments on each of the agreements,
6  right?
7    MR. BERMAN:  Objection.
8  BY MR. HESKIN:
9    Q.   Right?
10    A.   No, you're making that
11  assumption.
12    Q.   No, I'm --
13    A.   You defined a default as
14  being four missed payments and then
15  you're assuming that's what occurred with
16  every single one of these deals.
17    Q.   I'm sure the record is
18  clear.  If you want to retract your
19  statement now, you can.
20    MR. BERMAN:  Okay.  Listen,
21  objection.  Mischaracterization.
22  Do you have a question you want to
23  ask him?
24  BY MR. HESKIN:

MAGNA
LEGAL SERVICES

Page 182

```
 1      Q.   Sure.  Can you -- can you --
 2  here's exhibit -- on this loan, which
 3  is --
 4          MR. BERMAN:  Objection.
 5  BY MR. HESKIN:
 6      Q.   -- 8/28/18, can you show me
 7  how many missed payments there were?
 8          MR. BERMAN:  Objection.
 9          THE WITNESS:  This doesn't
10      show it on this page.
11          MR. HESKIN:  Okay.  Let's go
12      to the next page.
13  BY MR. HESKIN:
14      Q.   Do you see that finance fee?
15      A.   Yes.
16      Q.   What's your understanding of
17  a finance fee?
18      A.   It's a fee negotiated with
19  the client usually as part of a
20  restructure and modification.
21      Q.   You're an accountant, right?
22      A.   Yes.
23      Q.   What's your understanding of
24  what a finance fee is?
```

Page 183

```
 1      A.   It's a fee assessed that we
 2  have as part of negotiations with our
 3  clients.
 4      Q.   It's not a factor rate is
 5  it?
 6      A.   No, it's a fixed fee.
 7      Q.   Okay.  And did you get an
 8  agreement from HMC that authorized that
 9  finance fee?
10      A.   No, I believe there were
11  communications with the client.
12      Q.   Who came up with the amount
13  of that finance fee?
14      A.   It was discussed with the
15  client.
16      Q.   And -- it was?  When?
17      A.   Subsequently and several
18  times after confirming via phone and
19  email on her current balances, especially
20  when we had a meeting in May to go over
21  the entire history of her payments and
22  total outstanding balances.
23      Q.   Well, this is dated
24  November 8, '18, right?
```

Page 184

```
 1      A.   That's right.  Kara knew
 2  about this.
 3      Q.   Oh, she did?  Did she know
 4  about it in November of '18?
 5      A.   Yes.  She's very diligent
 6  about reconciling her accounts and fees
 7  assessed.
 8      Q.   Okay.  And I suppose there's
 9  an email communicating that finance fee
10  to her?
11      A.   It may just be verbal, but
12  there should be documentation for the
13  communication of the reconciliation on
14  those fees.
15      Q.   Okay.  How was it
16  calculated?
17      A.   It was based on the total
18  outstanding, not just this transaction.
19      Q.   Well, what's the formula?
20      A.   There isn't a formula.  A
21  negotiation is verbally conducted over
22  the phone.
23      Q.   And so it's CBSG's word
24  versus Kara's word, right?
```

Page 185

```
 1      A.   Right.  But at the end of
 2  the day, they were in agreement, and she
 3  confirmed the total outstanding balances.
 4      Q.   Where was -- who -- who
 5  negotiated that fee with HMC?
 6      A.   It was likely through Joe
 7  and Kara's conversations.
 8      Q.   Well, not likely.  As the
 9  30(b)(6) rep, who had that conversation?
10      A.   We had several people
11  involved with communications with her
12  company, both in accounting,
13  underwriting, sales, and her accounting
14  department along with her.
15      Q.   In November of '18 when that
16  $472,356.60 finance fee was charged to my
17  client's account, who made the
18  determination to charge it and who that
19  had conversation with my client?
20          MR. BERMAN:  Objection.
21          THE WITNESS:  I believe the
22      determination was made between
23      Kara and the sales representative
24      Joe.
```

MAGNA
LEGAL SERVICES

Page 186

1  BY MR. HESKIN:
2      Q.   Okay.  And it's your
3  testimony as CBSG's 30(b)(6) witness that
4  Kara agreed to the finance fee?
5      A.   Yes, along with several
6  other expenses as part of this history of
7  transactions we've had with her.
8      Q.   And you understand that she
9  in this litigation vehemently disagrees
10  with that?
11          MR. BERMAN:  Objection.
12  BY MR. HESKIN:
13      Q.   Right?
14      A.   She did not show any
15  disagreement when it was confirmed with
16  her and her accounting team before.
17      Q.   Where in the agreement does
18  it allow for a finance fee?
19      A.   The finance fee is allowed
20  under the schedule of fees in the back of
21  the agreement under the appendix.
22      Q.   Okay.  So that's where I'm
23  going to find this?
24      A.   They have the capacity to

Page 187

1  negotiate these fees.
2      Q.   Okay.  So I'm going to find
3  it in the schedule?
4      A.   Yes.
5          MR. BERMAN:  Objection.
6  BY MR. HESKIN:
7      Q.   Okay.  And there's a formula
8  there?
9      A.   No, there is no formula.  As
10  I said, it's a negotiation.
11      Q.   Okay.  And this negotiation
12  was it memorialized in writing?
13      A.   It was especially for
14  subsequent transactions is included and
15  part of the transaction on the subsequent
16  MCA agreement.
17      Q.   With respect to this
18  specific agreement, was it ever
19  memorialized in writing that my client
20  accepted this fee?
21      A.   Not to my understanding.
22      Q.   Did you understand that in
23  the agreement it says that any
24  modifications to the agreement must be in

Page 188

1  writing?
2          MR. BERMAN:  Objection.
3          THE WITNESS:  Yes.
4  BY MR. HESKIN:
5      Q.   Okay.  But the modification
6  was never provided in writing, right?
7          MR. BERMAN:  Objection.
8          THE WITNESS:  I'm not sure.
9  BY MR. HESKIN:
10      Q.   Well, as the 30(b)(6) rep,
11  are you aware of any writing
12  memorializing this modification to the
13  agreement?
14      A.   I'm not aware.
15      Q.   All right.  So we looked at
16  the first page, no missed payments,
17  second page, no missed payments.
18          MR. HESKIN:  Can we go to
19      the next page?
20  BY MR. HESKIN:
21      Q.   Do you see any missed
22  payments here?
23      A.   No.
24          MR. HESKIN:  Go to the next

Page 189

1      page.
2  BY MR. HESKIN:
3      Q.   Any missed payments?
4      A.   No.
5          MR. HESKIN:  Go to the next
6      page.
7  BY MR. HESKIN:
8      Q.   Any missed payments?
9      A.   No.
10      Q.   This is through May 7, '19,
11  right?
12      A.   Yes.
13          MR. HESKIN:  Go to the next
14      page.
15  BY MR. HESKIN:
16      Q.   Do you see the full payments
17  going through May 16, 2019?
18      A.   Yes.
19      Q.   Okay.  And --
20      A.   Those last three payments
21  were returned.  So effectively, the last
22  effective payment was 5/13/19.
23      Q.   Got it.  There hasn't been
24  four missed payments, right?

MAGNA ▶
LEGAL SERVICES

Page 190

1    A.   No, there are more than four
2  missed payments.  What the schedule
3  doesn't reflect are the daily
4  requirements for these payments to be
5  made.
6    Q.   Okay.  What --
7    A.   The payments were required
8  to replace the ones that were missed
9  along with the additional payments
10  subsequent to those payments.
11    Q.   Okay.  So --
12    A.   We're talking about hundreds
13  of missed payments at this point.
14    Q.   There are hundreds of missed
15  payments?
16    A.   Yes.
17    Q.   On this agreement?
18    A.   You have a daily obligation,
19  and you made a payment last effective
20  5/13, and then the next effective payment
21  was 7/5.
22    Q.   Okay.  I'm not talking about
23  that.  I'm talking about as of the date
24  of the original filing, which was -- I

Page 191

1  believe it was on May 16th or May 19th.
2    A.   Uh-huh.
3    Q.   There weren't four missed
4  payments, correct?
5    MR. BERMAN:  Objection.
6    THE WITNESS:  There's
7    missing payments no matter how you
8    cut it there.
9  BY MR. HESKIN:
10    Q.   There weren't four, correct?
11    A.   I'm not sure on the specific
12  dates because the obligations are just
13  business dates.  So if it's a 5/19
14  business date and the last effective
15  payment was done on 5/13, there could be
16  four missed payments then.
17    Q.   Okay.  So are you -- are you
18  claiming that there were four missed
19  payments at the time of the first COJ
20  filing?
21    A.   It looks like there were,
22  but I'm unable to see based on the
23  business dates on that calendar time.
24    Q.   Do you see anything that

Page 192

1  troubles you about this document?
2    A.   No.
3    Q.   No?
4    A.   No.
5    Q.   Do you know this document
6  was filed in October of 2019?
7    A.   No, I didn't know the
8  specific date.
9    Q.   Well, I think it's October
10  something of 2019.
11    A.   Right.
12    Q.   Maybe October 16th.  And
13  this was something that generated by
14  your department, right?
15    A.   Yes.
16    Q.   We talked earlier about how
17  if a client is continuing to make small
18  payments on a loan even though they're in
19  legal default, that you wouldn't consider
20  that to be in default with respect to the
21  investors, correct?
22    MR. BERMAN:  Objection.
23    THE WITNESS:  Correct, they
24    were not considered in default,

Page 193

1    right.
2  BY MR. HESKIN:
3    Q.   Yeah.  Isn't there something
4  strange here?  Last three entries?
5    A.   No, not to my understanding.
6    Q.   Not -- to your
7  understanding?  You don't find that
8  strange?
9    A.   No.
10    Q.   Did my client make a payment
11  of $560 on July 5th, 2019?
12    A.   Yes, that's what we have
13  recorded.
14    Q.   It is.  That's not a
15  fraudulent entry?
16    A.   No.
17    MR. BERMAN:  Objection.
18    THE WITNESS:  My
19    understanding is that was made.
20  BY MR. HESKIN:
21    Q.   How did you get your
22  understanding?
23    A.   From the people making the
24  collections on those payments.

MAGNA
LEGAL SERVICES

Page 194

1  Q. You understand that
2  Ms. DiPietro had filed an action in June
3  of '19 and that we actually were in
4  litigation as of June and she stopped
5  making payments in May, right?
6       MR. BERMAN: Objection.
7       THE WITNESS: No.
8  BY MR. HESKIN:
9  Q. Oh. How in the world did
10 she start making these random payments
11 all of a sudden in small amounts in July,
12 August, September? Doesn't that seem odd
13 to you?
14 A. No, I don't know how they
15 were made.
16 Q. And I wonder, I just wonder
17 if we ran this again and we -- we went
18 through October '19, November '19,
19 December '19, whether or not there were
20 going to be other mysterious payments
21 reflected in your book.
22      MR. BERMAN: Is that a
23 question?
24      MR. HESKIN: Is it?

Page 195

1       MR. BERMAN: I don't know.
2  I don't hear a question. I hear
3  musing, but I hear you.
4  BY MR. HESKIN:
5  Q. You don't think that's odd?
6  A. No.
7  Q. Is this a pattern -- is this
8  common practice amongst CBSG to fabricate
9  payments that one actually made?
10      MR. BERMAN: Objection.
11      THE WITNESS: No.
12 BY MR. HESKIN:
13 Q. It's not a common?
14 A. It's not a common practice,
15 no.
16 Q. You don't think this is a
17 fabricated payment history?
18 A. No, I do not think so.
19 Q. You reviewed it and you
20 authorized this, right?
21 A. Yes.
22 Q. You think my client made a
23 $50 payment on September 4, 2019?
24 A. The payment is more than

Page 196

1  that because you're looking at one deal
2  out of the numerous deals she has.
3  Q. All right. You think my
4  client made a -- whatever payment during
5  the pendency of litigation when she's
6  saying that you owe them money?
7  A. Yes.
8  Q. Okay. What did you do to
9  prepare for -- for that topic, the
10 payments made?
11 A. I reviewed this schedule
12 along with the others.
13 Q. So if I were to request bank
14 statements from CBSG, they'd show a wire
15 or some sort of deposit or payment from
16 my client to your client on these dates?
17      MR. BERMAN: Objection.
18      THE WITNESS: Yes.
19 BY MR. HESKIN:
20 Q. And you reviewed them and
21 confirmed that those payments were
22 actually made?
23 A. Yes.
24 Q. You have?

Page 197

1  A. Yes.
2  Q. You've confirmed that my
3  client made a payment on July 5th, 2019
4  to CBSG? That's your testimony under
5  oath?
6       MR. BERMAN: Objection.
7       THE WITNESS: Yes.
8  BY MR. HESKIN:
9  Q. And your testimony under
10 oath is that my client made a payment on
11 August 2nd, 2019 in the amount of $250?
12 That's your testimony under oath?
13      MR. BERMAN: Objection.
14      THE WITNESS: It's not 250.
15 Again, it's going to be multiple
16 payments, multiple deals that we
17 divide the payments to.
18 BY MR. HESKIN:
19 Q. I'm going to find a payment
20 coming out of my client's bank account
21 showing that she made a payment while
22 she's in the pendency of litigation,
23 right?
24 A. It was recorded at the time.

MAGNA ▶
LEGAL SERVICES

Page 198

1    I don't know when it came out of her
2    account.
3        Q.   Did you produce your --
4    CBSG's bank statements reflecting these
5    payments in this litigation?
6        A.   I'm not sure.
7        Q.   Have you seen the actual
8    physical payment?  You said you confirmed
9    it.
10       A.   No, I don't process the
11   actual physical payments myself.
12       Q.   How was it paid?  Was it
13   paid by check, was it paid by wire, ACH?
14       A.   I'm not sure.
15       Q.   But you confirmed it so how
16   do you know it happened?
17       A.   We reconciled the account.
18   We have audited financials.  Lots of
19   people take a look at this and make sure
20   those are recorded and reconciled every
21   month.
22       Q.   Were these payments provided
23   to Clifton?
24       MR. BERMAN:  Who?

Page 199

1    BY MR. HESKIN:
2        Q.   Clifton, your auditor.
3        A.   Yes.  They took a look at
4    it, yes.
5        Q.   You provided -- so when
6    Clifton audits your books, do they look
7    at the actual bank statements or do they
8    just trust what you provide them in the
9    sheets?
10       A.   They look at the bank
11   statements.  It's a financial audit.
12       Q.   So Clifton, if I were to
13   subpoena Clifton and put them under oath,
14   they would confirm that these payments
15   were made?
16       A.   Yes.
17       Q.   Okay.  Got it.  And just for
18   the record, Clifton, what's their full
19   name?
20       A.   The accounting firm is
21   called Clifton Larson Allen.
22       Q.   Okay.  What are their
23   responsibilities?
24       A.   To do financial audits for

Page 200

1    our company, CBSG.
2        Q.   Okay.  And those audits are
3    used to provide to investors, correct?
4        A.   No.  We do not generally
5    provide our audited financial statements
6    to investors.
7        Q.   Okay.  Who do you -- who do
8    you provided audited financial statements
9    to?
10       A.   They're for internal use.
11       Q.   They're not provided to any
12   tax authorities?
13       A.   They could be if they
14   requested it, but they are not.
15       Q.   Are they used for tax
16   purposes?
17       A.   No.
18       Q.   How are the MCA agreements
19   accounted for on the books and records of
20   CBSG?
21       MR. BERMAN:  Which ones are
22   you referring to?  Are you talking
23   about Kara?
24       MR. HESKIN:  I'm just

Page 201

1    talking about generally.
2        MR. BERMAN:  General
3    practices and procedures?
4        MR. HESKIN:  Yeah.
5        MR. BERMAN:  Okay.
6        You can answer that, Joe.
7        THE WITNESS:  They're
8    recorded under GAAP guidance.
9    BY MR. HESKIN:
10       Q.   Okay.  And they're recorded
11   as a receivable or liability?
12       A.   For what, the merchant
13   assets, the receivables that we are
14   purchasing from Kara?
15       Q.   Yup.
16       A.   Of course they're recorded
17   as a receivable.
18       Q.   They're recorded as an asset
19   or a receivable or both?
20       A.   A receivable is an asset.
21       Q.   Okay.  And how is the
22   payment to Ms. DiPietro or HMC or a
23   merchant recorded?
24       MR. BERMAN:  Objection.

MAGNA
LEGAL SERVICES

Page 202

1    THE WITNESS:  You need to
2 clarify what you mean there.
3 BY MR. HESKIN:
4    Q.   The principal, how is that
5 recorded, an expense?
6    A.   No.  Why would you record a
7 payment as an expense?  That's a --
8    Q.   You're giving them money,
9 right?  You're giving them a million
10 dollars, how do you -- how do you record
11 that on your books?
12    A.   It's a receivable.
13    Q.   By giving away a million?
14 I'm talking about when you fund someone,
15 you give them a million dollars and then
16 you get back 1.5.
17    A.   Yes.
18    Q.   When you get back the 1.5,
19 you're saying that's -- that's a
20 receivable, I get that.
21    A.   Yes.
22    Q.   How are you accounting for
23 the million dollars that you're giving?
24    A.   That's part of the

Page 203

1 receivable.
2    Q.   I'm not following that.
3 Isn't that a cost or an expense?
4    A.   No.  If you put out an
5 asset, you have a contra asset on your
6 books.  A contra asset is satisfied by
7 the receivable, both the portion for the
8 contra asset and the income portion in
9 the receivable.
10    We send a million bucks out,
11 $500,000 markup in your example.
12    Q.   Yup.
13    A.   A million five coming back.
14    Q.   Sure.
15    A.   The income portion is 500,
16 the receivable portion is 1.5, and the
17 portion sent out is the contra asset.
18    Q.   So when -- how do you
19 account for the --
20    A.   You're going to see $500,000
21 of revenue, not including any kind of
22 deferral adjustments, and $1 million
23 receivable as part of the invoice.
24    Q.   Isn't the amount that you're

Page 204

1 giving the merchant an expense or a cost?
2    A.   No, it's not a cost.  A cost
3 is an actual --
4    Q.   You're giving them a million
5 dollars.  It's cash out the door, right?
6    A.   That is not a cost, that's a
7 liability by the client.  It's booked as
8 a receivable.
9    Q.   The money that you're giving
10 them is booked as a receivable?
11    A.   Yeah.  I mean, this is kind
12 of basic.  The -- I don't know if you
13 want me to answer in a metaphor or
14 explain that further.
15    Q.   That's fine.  However you
16 can explain it, I just don't get it.  I
17 mean, just from a practical sense the way
18 I'm looking at it --
19    A.   Pretend I'm in a rental car
20 business and I've got a $50,000 car that
21 I rent out.  I've given them $50,000, but
22 I expect, I don't know, $500 for the
23 rental income, right?  So on my assets I
24 have an exposure of $50,000 for that

Page 205

1 receivable, right?  They've got to give
2 me back the car, I'm out 50 grand if they
3 take the car and crash it or whatever,
4 and it's not covered under insurance.  So
5 on my balance sheet I'm reporting a
6 receivable for that total amount, plus
7 the $500 revenue.
8    In my example to you, a
9 million dollars is similar to a car.
10 You're taking this, you're using it, it's
11 part of a liability to you for a
12 receivable on our end.  There's no
13 expense there.  An expense is defined by
14 capital outflows that are part of running
15 a business.  That's not part of running
16 the business, that's effectively the
17 rental car we have on this.  It's not a
18 perfect analogy, but the treatment of it
19 is not as an expense.
20    Q.   Okay.
21    A.   And no accountant is going
22 recognize outgoing factoring money as
23 anything else but a receivable.
24    Q.   Okay.  I guess -- I guess

MAGNA
LEGAL SERVICES

Page 206

1 the experts are going to have to wrestle
2 that one down because --
3 A. That's standard, you know,
4 AICPA guidance on that.
5 Q. Yeah. I'm sure -- I'm sure
6 you're right. It's just too complicated
7 to for me to understand so --
8 A. It's not a cost because it's
9 capital outflow, is not as part of
10 running the business. It's effectively
11 the balance -- it's a balance sheet
12 transaction. It's going from your cash
13 to your funding receivables, contra
14 asset, back into receivables. Those are
15 your journal entries.
16 Q. Okay.
17 A. As part of that last journal
18 entry where you're putting it back into
19 receivables, that's when you book the
20 finance fee income as part of the $1.5
21 million receivable.
22 Against that, let's say
23 there's 1,000 payments or 100 payments,
24 you get 100 -- you know, $15,000 payments

Page 207

1 against that to make it whole.
2 Q. Yeah. And I saw something
3 in your expert report in this case, or
4 maybe it was were Fleetwood, but the --
5 you know, what was the -- at the end of
6 the day, what -- what does CBSG's balance
7 sheet look like? For example, at the end
8 of 2018 when -- during the timeframe of
9 my client, did -- did CBSG's liabilities
10 exceed its assets?
11 MR. BERMAN: Objection. You
12 don't have to answer that.
13 MR. HESKIN: I'm trying to
14 figure out how these are recorded.
15 MR. BERMAN: That's not your
16 question. So ask a question
17 that's confined within what the
18 court allowed. Asking about their
19 profitability, which is what you
20 just asked, is not allowed.
21 BY MR. HESKIN:
22 Q. Theoretically you are, the
23 way you're describing that, saying that
24 these are all booked as receivables and

Page 208

1 not as costs, so theoretically your books
2 should show that you guys have net gains
3 and net profits on your balance sheets,
4 that you're positive, not negative,
5 right?
6 MR. BERMAN: You -- just to
7 be clear on my instruction, and
8 the same instruction I'll give
9 here, you can discuss the
10 accounting treatment of income and
11 losses. You do not need to answer
12 a question about the end result of
13 the books and records of CBSG.
14 So you can answer that.
15 THE WITNESS: Go ahead, if
16 you want to clarify.
17 BY MR. HESKIN:
18 Q. Yeah. What does it look
19 like? I mean, does -- so at the end of
20 the day, are the -- when you're treating
21 it like this, do you have net -- because
22 when you treat it this way, your
23 receivables should exceed your costs,
24 right?

Page 209

1 A. The receivables should
2 always exceed the cost.
3 Q. Yeah.
4 A. I mean, if you're going to
5 net a profit, your receivables should
6 always exceed your costs, but I think
7 you're mixing up balance sheet items from
8 income statement items. They're two
9 separate things. There is no cost to
10 sending money out. I can give you a
11 million bucks, I'm going to charge you a
12 fee associated with that million bucks.
13 The only expense on your end is that fee,
14 not the million dollars. That's a
15 balance sheet liability. You have to
16 book that as a liability. That's
17 standard practice for accounting.
18 You're not going to be able
19 to take a tax write off because you
20 borrowed a million dollars and now you
21 paid it back as an expense, you're only
22 going to be able to write off the expense
23 portion of that transaction.
24 Q. All right. So how does CBSG

MAGNA
LEGAL SERVICES

Page 210

1  convey that to its investors?  Do they
2  convey, tell investors that they're
3  solvent or insolvent?
4          MR. BERMAN:  Objection.
5          You don't have to answer
6      that.
7          MR. HESKIN:  I'm perfectly
8      allowed to ask what information
9      they're telling their investors.
10         MR. BERMAN:  No, you're not.
11         MR. HESKIN:  I'm --
12         MR. BERMAN:  It says the
13     information, complete -- shares
14     the potential and secured
15     investors regarding factoring loan
16     agreements.
17         So if you want to ask that,
18     that's not your question though.
19     You're asking about the balance
20     sheet.  That's a different
21     question.  That you're not allowed
22     to ask.
23  BY MR. HESKIN:
24     Q.   Are you -- are you refusing

Page 211

1  to answer that question?
2          MR. BERMAN:  Maybe the court
3      reporter can read back the
4      question.
5          (Pertinent portion of the
6      record is read.)
7          MR. BERMAN:  Yes, you don't
8      have to answer that.  That's my
9      instruction.
10  BY MR. HESKIN:
11     Q.   I'm asking you personally,
12  not on behalf of CBSG.  Have you ever
13  been present when CBSG has represented
14  whether it's solvent or insolvent to
15  investors?
16         MR. BERMAN:  Yes, that's my
17     same instruction.  You don't have
18     to answer that question.
19  BY MR. HESKIN:
20     Q.   Are you refusing to answer
21  that question?
22         MR. BERMAN:  I gave him that
23     instruction.
24  BY MR. HESKIN:

Page 212

1      Q.   Is CBSG presently solvent?
2          MR. BERMAN:  You absolutely
3      don't need to answer that.  Same
4      instruction per the court order.
5          MR. HESKIN:  You're saying
6      that I cannot ask -- when my
7      client has a claim against your
8      client for many millions of
9      dollars, I can't ask whether or
10     not your client is currently
11     solvent?
12         MR. BERMAN:  You can't ask
13     it even if there -- if there was a
14     court order not in place, but here
15     thankfully I don't need to get
16     into mental gyrations with you
17     like that.  There's a court order.
18         So no, you're not allowed to
19     talk about any more on investors
20     than what I already read to you
21     per the court order.  If you have
22     a problem, the judge I'm sure is
23     available.
24         MR. HESKIN:  You understand

Page 213

1  that I have a claim for punitive
2  damages in this case?
3          MR. BERMAN:  Yeah.  You have
4      a court order here on this point.
5      So you had all the opportunity in
6      the world to make arguments to the
7      judge about that.  The judge
8      issued an order dated March 4th,
9      2020.
10         MR. HESKIN:  Yup.  And I
11     don't see anything in there that
12     prohibits me from asking whether
13     or not they are solvent.
14         MR. BERMAN:  You can -- I'm
15     not going any further.  I read you
16     the --
17         MR. HESKIN:  You're
18     instructing him not to answer.
19     You say you have a court order.
20     Show me the provision in the court
21     order that prevents me from asking
22     him about solvency.
23         MR. BERMAN:  What you're
24     asking about is communications

MAGNA ▶
LEGAL SERVICES

Page 214

```
1      with investors about whether or
2   not they're solvent.
3        MR. HESKIN:  That is not my
4   question.  I'm asking right now --
5        MR. BERMAN:  No, that was
6   your question.  So if you have
7   something else you want to ask,
8   ask and I'll decide how to
9   instruct him.  Your question dealt
10  with what did they tell investors.
11  BY MR. HESKIN:
12      Q.   Is CBSG solvent as you sit
13  here today?
14        MR. BERMAN:  You don't have
15  to answer that question because
16  it's not in the relevant time
17  period per the court order.
18  BY MR. HESKIN:
19      Q.   Was CBSG solvent in 2018?
20        MR. BERMAN:  You can answer
21  that, Joe, generally.
22        THE WITNESS:  Yes.
23  BY MR. HESKIN:
24      Q.   What was CBSG's net worth in
```

Page 215

```
1   2018?
2        MR. BERMAN:  Don't answer
3   the question.
4   BY MR. HESKIN:
5      Q.   Was CBSG solvent in 2019?
6      A.   Yes.
7      Q.   Is CBSG currently solvent?
8        MR. BERMAN:  Don't answer
9   the question.
10        MR. HESKIN:  On what basis
11  are you instructing him?
12        MR. BERMAN:  There's a court
13  order.
14        You know what, Joe?  Answer
15  it.  I don't want to get into a
16  fight about it.  Is solvent or
17  not?  How about that?
18        THE WITNESS:  Yes.
19        MR. HESKIN:  Thank you.
20  BY MR. HESKIN:
21      Q.   How do you know that?
22      A.   Because we look at the
23  financials on a regular basis.  We
24  understand and track the health of the
```

Page 216

```
1   company day-to-day.
2      Q.   Okay.  Has CBSG had to
3   layoff any employees due to the pandemic?
4        MR. BERMAN:  Objection.
5        You don't have to answer
6   that.
7        MR. HESKIN:  It goes to
8   punitive damages.
9        MR. BERMAN:  You don't have
10  to answer that.  There's a court
11  order about the time period of
12  relevance in this case.
13        Don't answer it.
14        MR. HESKIN:  All right.
15  Let's just take a quick break.
16  We'll come back in 15.  Let's go
17  'til 1:40.
18        MR. BERMAN:  How long do you
19  think you're going to be?
20        MR. HESKIN:  All day.
21        MR. BERMAN:  When you
22  continue asking questions that
23  have no relevance about pandemic
24  time periods, I guess that's why
```

Page 217

```
1   we'd be wasting time.
2        MR. HESKIN:  We'll be here
3   all day.
4        MR. BERMAN:  That's great.
5        MR. HESKIN:  Thank you.
6   1:40.
7        (Recess.)
8   BY MR. HESKIN:
9      Q.   I want to just go back to
10  when you first came to CBSG back in 2012.
11  Since that time -- how were you first
12  hired by CBSG?  Who was your contact?
13  Was it Lisa?
14      A.   No.  I spoke with Joe.
15      Q.   How did you meet Joe?
16      A.   Let's see what did I do?  I
17  responded to an ad for employment on
18  line.  He responded to my resume and said
19  that his wife has this business in
20  Philadelphia, he'd like to bring me in
21  for an interview.
22      Q.   Okay.  And that business was
23  founded at sometime around 2012?
24      A.   Yes.
```

MAGNA
LEGAL SERVICES

Page 218

```
1        Q.   The same time that you --
2   was CBSG already founded at that time or
3   did you guys create it together?
4        A.   No, it was already founded.
5        Q.   It was already founded?
6   Okay.
7             Did you ever speak with
8   Lisa?
9        A.   Yes.
10       Q.   When's the first time you
11  met Lisa?
12       A.   My interview.
13       Q.   Okay.  Where was your
14  interview, was it in Pennsylvania?
15       A.   Yes.
16       Q.   And was Joe there?
17       A.   Yes.
18       Q.   Who -- anyone else?
19       A.   Yes.
20       Q.   Who?
21       A.   A bunch of people.
22  Employees of the business.
23       Q.   Okay.  In the timeframe 2018
24  to 2019, did you have frequent
```

Page 219

```
1   conversations with Lisa?
2        A.   Yes.
3        Q.   How many?
4        A.   Every day.
5        Q.   Concerning -- you spoke to
6   Lisa every day?
7        A.   Yeah.
8        Q.   And specifically with
9   respect to the operation and management
10  of CBSG?
11       A.   Yes.
12       Q.   And those communications
13  were by phone I assume since she lives in
14  Florida, right?
15       A.   Phone, email, yeah.
16       Q.   Okay.  But they -- those
17  communications would occur from you being
18  in Philadelphia and her being in Florida,
19  right?
20       A.   Yes.
21       Q.   Okay.  And -- so you have --
22  are you in email contact with her every
23  day?
24       A.   Yes.
```

Page 220

```
1        Q.   Concerning the factoring of
2   CBSG's business?
3        A.   The factoring?
4        Q.   Yeah, the factoring.  Isn't
5   that what you guys do, the sale of
6   receivables is the factoring.
7        A.   Yeah, yeah.
8        Q.   Say that again?
9        A.   Yes.  It's the general
10  course of doing business.
11       Q.   You understand what
12  factoring is?
13       A.   You said the factoring of
14  CBSG.  I didn't know what you meant by
15  that.
16       Q.   My bad.  So you'll agree
17  with me that, you know, CBSG's principal
18  if not sole purpose of business is
19  factoring, right?
20       A.   Yes.
21       Q.   Okay.  And it's been doing
22  factoring since 2012 when it first
23  incepted?
24       A.   Yes.
```

Page 221

```
1        Q.   That's all it does, right,
2   is factoring?
3        A.   That's right.
4        Q.   What did you do -- so you're
5   answering my question on personal
6   knowledge yourself, right, that you
7   personally have direct email
8   conversations or communications with Lisa
9   on a daily basis, correct?
10       A.   That's right.
11       Q.   Okay.  So if I were to look
12  at your emails, I'd find emails, text
13  messages, et cetera, between you and Lisa
14  every day?
15       A.   Yes.
16       Q.   And they would relate to the
17  management and control of CBSG, correct?
18       A.   Of course.
19       Q.   Okay.  And if I subpoenaed
20  your phone records.  I'd find numerous
21  phone records of you having conversations
22  with Lisa on a daily basis, right?
23       A.   Yes.
24       Q.   Actively involved, right?
```

Page 222

1       A.   Of course.
2       Q.   And she is actively involved
3   from Florida, which is her place of
4   residency, right?
5       A.   Yes.
6       Q.   And she makes decisions on
7   behalf of CBSG, right?
8       A.   That's right.
9       Q.   And she decides what
10  investments to enter into or -- correct?
11      A.   I'm not sure what you mean.
12      Q.   I get confused, too, because
13  we're talking about investments versus
14  creditors, you know.  Who is going to
15  fund CBSG.  She makes those decisions,
16  right?
17      A.   You're saying she makes
18  decisions in regards to people who lend
19  money to CBSG?
20      Q.   Yes.
21      A.   Yes.
22      Q.   All right.  And she's been
23  intimately involved in that, correct?
24      A.   Yes.

Page 223

1       Q.   And she would have done that
2   from Florida, right?
3       A.   Yeah.  I mean, she's up
4   here, too, but it's back and forth.
5       Q.   But when she's here in
6   Florida -- when she's up here in
7   Pennsylvania, she has a house in
8   Pennsylvania, right?
9       A.   Right.
10      Q.   And she -- does she still
11  operate Lacquer Lounge?
12      A.   Yes.
13      Q.   That's her principal
14  business, isn't it?
15          MR. BERMAN:  Objection.
16          THE WITNESS:  One of them.
17  BY MR. HESKIN:
18      Q.   One of them?
19      A.   Yes.
20      Q.   Okay.  And she still does --
21  is active in the daily management of
22  Lacquer Lounge, correct?
23      A.   I mean, not necessarily
24  daily management.  There's people that

Page 224

1   run it, she just checks in.
2       Q.   Are you the CFO of Lacquer
3   Lounge?
4       A.   Yes, through the agreement.
5   The same as with CBSG.
6       Q.   So Lacquer Lounge is run
7   through Recruiting Management Resources
8   or is it run through Full Spectrum?
9       A.   That's right.  Full Spectrum
10  provides the accounting for Lacquer
11  Lounge.
12      Q.   And you in turn do it on its
13  behalf, correct?
14      A.   Yeah, on -- on the operating
15  agreement's behalf.  We do the
16  accounting.
17      Q.   Got it.  Is there anyone
18  other than Lisa who makes decisions on
19  behalf of CBSG?
20          MR. BERMAN:  Objection.
21          THE WITNESS:  No.
22  BY MR. HESKIN:
23      Q.   She's the sole decision
24  maker?

Page 225

1       A.   No.  Directors and myself,
2   Jamie and her.
3       Q.   Well, I just asked you if
4   there's anyone else who makes decisions
5   on behalf of CBSG and you said no.
6       A.   I'm not sure what you meant.
7       Q.   Okay.  So --
8       A.   The directors of the company
9   are Lisa, myself and Jamie.  Those are
10  the only decision makers in the business.
11  We do have departments, and it depends on
12  how granular you want to get about
13  decisions, you know.
14      Q.   She has -- she has ultimate
15  say, correct?
16      A.   Of course.
17      Q.   So if she says you should
18  invest in this company or you should take
19  money from that company, she's the
20  ultimate backstop, she's the one that
21  makes that decision, right?
22          MR. BERMAN:  Objection.
23          THE WITNESS:  Yeah, I'm not
24  sure what you mean by invest.

MAGNA
LEGAL SERVICES

Page 226

1 BY MR. HESKIN:
2     Q.   It's get money to fund CBSG.
3 She's the ultimate decision maker?
4     A.   If we borrow money from
5 someone, she knows every single person
6 before we do a loan.
7     Q.   Does she sign off on it?
8     A.   No, I sign that.
9     Q.   You sign it on behalf of
10 CBSG?
11     A.   That's right.
12     Q.   Have you ever heard of A
13 Better Financial Plan?
14     A.   Yes.
15     Q.   Who is A Better Financial
16 Plan?
17         MR. BERMAN:  Objection.
18 Generally as long as it complies
19 with the scope of the order.
20 BY MR. HESKIN:
21     Q.   Go ahead.
22     A.   What's that?
23         MR. BERMAN:  I might add,
24 the scope of order does not allow

Page 227

1 him to talk about any investors
2 with specificity under CBSG.  So
3 that's covered.
4     You don't have to answer it.
5         MR. HESKIN:  I'm just asking
6 who they are.
7         MR. BERMAN:  Right.  My
8 point was, Joe, if it complies
9 with the scope of the order, you
10 can answer his direct question.
11         THE WITNESS:  If it's not
12 specific to -- if it is
13 specifically pertaining to an
14 investor, then I should not or I
15 can't?
16         MR. BERMAN:  His general
17 question was, who is, I think, who is A
18 Better Financial Plan?  That's his
19 question.
20         THE WITNESS:  A Better
21 Financial Plan is an investment
22 custodian in Ambler.
23 BY MR. HESKIN:
24     Q.   Not an investor, right?

Page 228

1         MR. BERMAN:  Investor in?
2 Are you asking if he's --
3         MR. HESKIN:  My
4 understanding is that, they're a
5 broker.  They're the ones that are
6 responsible for telling and
7 communicating information to other
8 investors?
9         MR. BERMAN:  Again, if this
10 is talking about specific
11 investments in --
12         MR. HESKIN:  No, no.
13         MR. BERMAN:  You can be cute
14 with your words.  You're asking
15 about investors in CBSG.
16         Don't answer the question.
17         MR. HESKIN:  My
18 understanding, Brett, is that A
19 Better Financial Plan is not an
20 investor.  They are simply --
21         MR. BERMAN:  You have my
22 instruction.
23         MR. HESKIN:  They're a
24 broker who conveys information to

Page 229

1 the actual investors.
2         MR. BERMAN:  Got it.  You
3 have my instruction.
4         MR. HESKIN:  Am I right or
5 am I wrong?
6         MR. BERMAN:  Are you asking
7 about their role at CBSG?  If
8 that's what you're asking --
9         MR. HESKIN:  I'm asking him
10 in good faith to tell me who A
11 Better Financial Plan is.  I know
12 who they are and I'm asking it in
13 good faith.  I think the answer is
14 correct, it's within the scope
15 so...
16         MR. BERMAN:  Yeah.  My
17 instruction is if you're talking
18 about anything to do with specific
19 investors or vehicles of investors
20 into CBSG, do not answer the
21 question, Mr. Cole.
22         THE WITNESS:  All right.  I
23 can't answer it then.
24 BY MR. HESKIN:



Page 230

```
 1        Q.   You can't answer it because
 2   A Better Financial Plan is an investor?
 3            MR. BERMAN:  Objection.
 4        Don't answer questions about
 5        specific investors.  Look at the
 6        court order.  He has my answer.
 7   BY MR. HESKIN:
 8        Q.   Who is Chessler Holdings?
 9            MR. BERMAN:  Objection.  If
10        it's also talking about specific
11        investors in the group, I would
12        not answer.
13   BY MR. HESKIN:
14        Q.   Can you answer my question?
15        A.   Chessler Holdings is a fund
16   in Sarasota.
17        Q.   Is a what?
18        A.   It's a fund in Sarasota.
19        Q.   Okay.  And how are they
20   related to CBSG?
21        A.   They are not.
22        Q.   They don't have any
23   involvement in CBSG whatsoever?
24        A.   No.
```

Page 231

```
 1        Q.   Have they ever?
 2        A.   No.
 3        Q.   Is there a reason why on
 4   their website they purport to have an
 5   interest in Par Funding?
 6        A.   We've been in discussions.
 7            MR. BERMAN:  He asked you a
 8        very specific question, and if
 9        this deals with a specific
10        investment in CBSG or anything
11        beyond the time scope of the
12        period set forth in Judge
13        Sanchez's order, do not answer the
14        question.
15            THE WITNESS:  Oh, yeah.  I
16        can't answer that then.
17   BY MR. HESKIN:
18        Q.   Okay.  Was Chessler Holdings
19   involved with any of the agreements
20   involving my client, HMC?
21        A.   No.
22        Q.   Where is Chessler Holdings
23   located?
24        A.   Sarasota.
```

Page 232

```
 1        Q.   Have you had direct
 2   conversations with Chessler Holdings?
 3            MR. BERMAN:  Joe, don't
 4        answer the question pursuant to
 5        the court order.
 6   BY MR. HESKIN:
 7        Q.   Are you refusing to answer?
 8        A.   Yes.
 9            MR. BERMAN:  Pursuant to a
10        court order.  I'm instructing him
11        not to answer.
12            MR. HESKIN:  We can agree to
13        disagree with that.
14            MR. BERMAN:  The order says
15        what it says.  You're violating
16        the court order by asking these
17        questions.
18            MR. HESKIN:  I don't know
19        that I am.
20            MR. BERMAN:  I'm pretty sure
21        you are.  I wouldn't be giving the
22        instruction not to answer.  I
23        follow court orders.
24            MR. HESKIN:  We can agree to
```

Page 233

```
 1        disagree with that.
 2            MR. BERMAN:  That's fine.
 3        Do whatever you need to do.  Call
 4        the judge now if you'd like.
 5   BY MR. HESKIN:
 6        Q.   Who is Colin Parone?
 7        A.   Colin Parone?  Oh, he was an
 8   employee for Full Spectrum.
 9        Q.   You say he was, as in the
10   past tense?
11        A.   Yes, he was terminated.
12        Q.   He's no longer an employee?
13        A.   Yes.
14        Q.   When was he terminated?
15        A.   A few months ago.
16        Q.   Why was he terminated?
17        A.   What's that?
18            MR. BERMAN:  Hold on.  You
19        said he was terminated a few
20        months ago as an employee?  Don't
21        answer the question.
22   BY MR. HESKIN:
23        Q.   Are you refusing to answer
24   whether --
```

MAGNA
LEGAL SERVICES

Page 234

1       MR. BERMAN:  Yes, pursuant
2   to a court order, yes.
3       MR. HESKIN:  We can disagree
4   with your interpretation of that.
5       MR. BERMAN:  That's great.
6   Don't answer the question.
7       THE WITNESS:  It's outside
8   of the scope, right?  This is only
9   through the end of 2019.
10       MR. BERMAN:  Correct.  He
11   can agree or disagree.  He's
12   violating a court order by wasting
13   our time asking these questions.
14  BY MR. HESKIN:
15       Q.   You do understand you're
16  being put up in your personal individual
17  capacity as well, right?
18       MR. BERMAN:  You have -- you
19   have our position.  Call the judge
20   if you're in disagreement.
21       MR. HESKIN:  You're accusing
22   me of violating a court order.
23       MR. BERMAN:  You are.
24       MR. HESKIN:  The court order

Page 235

1   is specifically related solely to
2   the deposition of the 30(b)(6)
3   deposition of CBSG.
4       Now, if you wanted a court
5   order preventing me from getting
6   into these questions for a
7   percipient fact witness --
8       MR. BERMAN:  Got it.
9       MR. HESKIN:  -- perhaps you
10   should have gotten that order, but
11   you don't have it.
12       MR. BERMAN:  Got it.
13       MR. HESKIN:  We'll deal with
14   that later.
15       MR. BERMAN:  You can do
16   whatever you want.
17       You know what?  Just to
18   avoid wasting anybody's time,
19   because this is your position and
20   it is a global position in this
21   deposition, call the judge now.
22   This deposition is not being held
23   open.
24       MR. HESKIN:  You can take a

Page 236

1   risk.
2       MR. BERMAN:  I got it.
3       MR. HESKIN:  You can
4   instruct him not to answer, go for
5   it.  Good luck with it.
6       MR. BERMAN:  I'm very
7   comfortable with my position,
8   Shane.  I will tell him what not
9   to answer.  We will absolutely
10   cross move for sanctions against
11   you.  Do whatever you've got to
12   do.
13       MR. HESKIN:  Oh, now you're
14   threatening me.
15       MR. BERMAN:  You threatened
16   me with sanctions five times
17   today, maybe six if I didn't count
18   correctly.
19       Do whatever you've got to
20   do.  You're violating a court
21   order.
22       MR. HESKIN:  Okay.  I got
23   it.  Thank you -- thanks for --
24   for accusing me of violating a

Page 237

1   court order that I'm not
2   violating.  That's okay.  Got it.
3       MR. BERMAN:  Call the judge
4   whenever you want.  I welcome it.
5   You know you're going to lose so
6   you don't want to call the judge,
7   you just want to threaten me and
8   my client.  So ask your next
9   question.
10       MR. HESKIN:  Mr. Berman, the
11   time will come.  This will all
12   shake out in the end.
13       MR. BERMAN:  You got it.
14   Keep on making threats against me
15   personally.
16       MR. HESKIN:  I'm not
17   threatening.  It will shake out.
18   One side will be right and one
19   side will be wrong.
20       MR. BERMAN:  Got it.  Any
21   motion will be cross met for a
22   motion for sanctions.  You have my
23   word.
24       MR. HESKIN:  You got it.

MAGNA
LEGAL SERVICES

Page 238

1       Can we get back to the
2   deposition now?
3           MR. BERMAN:  You're the only
4   one who is distracting us from the
5   deposition.
6           MR. HESKIN:  Oh, I got it.
7   I got it.  I got it.
8           All right.  So let's pull up
9   Exhibit No. 12.  Let's see if
10  Mr. Cole has any problems with
11  this document.
12  BY MR. HESKIN:
13      Q.   Do you have that?
14      A.   Yes.
15      Q.   Ever seen this document?
16      A.   Yes.
17      Q.   You're aware of this
18  document?
19      A.   Yes.
20      Q.   Did you authorize its
21  filing?
22          MR. BERMAN:  Hold on a
23  second.  Did you authorize its
24  filing.  I'm sorry.  I'm not

Page 239

1   seeing where this is anything on
2   your corporate designee notice.
3           MR. HESKIN:  Personally.
4           MR. BERMAN:  I don't care.
5   Personally, not personally, you're
6   asking questions about another
7   case.
8           MR. HESKIN:  I'm asking if
9   he authorized this.
10  BY MR. HESKIN:
11      Q.   Did you authorize the filing
12  of this?
13          MR. BERMAN:  You can answer
14  that, Joe.
15          THE WITNESS:  Yes.
16  BY MR. HESKIN:
17      Q.   Did you read it?
18      A.   Yes.
19      Q.   You read it from front to
20  back?
21      A.   Yes.
22      Q.   Did you read it before the
23  testimony you just gave five minutes ago?
24      A.   Yes.

Page 240

1           MR. HESKIN:  Can we scroll
2   down a few pages, get to the
3   affidavit of Lisa McElhone?  Right
4   there.  There you go.
5   BY MR. HESKIN:
6       Q.   You read this, too, before
7   its filing?
8       A.   Yes.
9       Q.   Is it a truthful and
10  accurate affidavit made under penalties
11  of perjury?
12      A.   Yes.
13      Q.   It is.  Okay.  Let's --
14  let's look at it.
15          You just testified five, ten
16  minutes ago that you're on the phone
17  every day with Lisa McElhone concerning
18  the factoring side of CBSG, right?
19      A.   Yes.
20      Q.   All right.  And that she's
21  the sole decision maker, right?
22      A.   No, you said the effective
23  decision maker for the company.
24      Q.   Yeah, right.  She is, right?

Page 241

1       A.   Not the sole, because we
2   make decisions outside of Lisa's purview.
3       Q.   Okay.  Can you look at
4   paragraph 4?
5       A.   Yes.
6       Q.   Is that a true -- true
7   statement?
8       A.   Yes.
9       Q.   I thought we just talked
10  about numerous times that Ms. McElhone
11  lives in Florida?
12      A.   They have multiple
13  properties.
14      Q.   Does she pay taxes in the
15  Commonwealth of Pennsylvania?  Or does --
16      A.   I don't know about her
17  personal income taxes.
18      Q.   You just testified earlier
19  that she lives in Florida.
20      A.   Yes.
21      Q.   She's a Florida resident,
22  right?
23      A.   Yes.
24      Q.   And this -- this says that

MAGNA
LEGAL SERVICES

Page 242

```
1   she lives in Pennsylvania.  How can you
2   reconcile the two?
3       A.   She has a property in both
4   locations.
5       Q.   Okay.  Where does she live?
6       A.   She's a legal resident of
7   Florida.
8       Q.   Got it.  Okay.  Paragraph
9   5 -- well, let's talk about
10  paragraph 4.  It says:
11          "Joseph LaForte and I are
12  married and live in Haverford,
13  Pennsylvania."
14          Is that a truthful
15  statement?
16      A.   Yes, they have a house
17  there.
18      Q.   Number 5.  "We" -- we, you
19  know what the word we means, right, it
20  means me and Joe, right?  "We founded
21  Complete Business Solutions Group in or
22  around 2012."
23          Is that a truthful
24  statement?
```

Page 243

```
1       A.   Yes.
2       Q.   Okay.  So Joe LaForte was a
3   founder of CBSG?
4       A.   Not legally.  He was never
5   an owner of CBSG.  They did it in
6   conjunction with the sales entity.
7       Q.   So legally is this a
8   truthful statement?
9       A.   Legally, no.
10      Q.   Okay.  You know this was a
11  declaration filed under penalties of
12  perjury with a court of law, right?
13      A.   Right.  My interpretation of
14  it is that he was part of setting up the
15  company, but it doesn't say that his name
16  is on the ownership of that business.
17      Q.   Okay.  So he really is a
18  founder but just not -- not from a legal
19  standpoint?
20      A.   Sure.
21      Q.   He effectively runs CBSG,
22  right?
23      A.   No.  On the sales side.
24      Q.   He runs it?
```

Page 244

```
1       A.   You keep going back to that.
2   It's the sales entity versus the fund
3   itself.
4       Q.   Okay.  All right.  Let's
5   continue.  Be --
6           MR. HESKIN:  No, no, go
7   back.  This going to be a while.
8       Sorry.  Thank you.
9   BY MR. HESKIN:
10      Q.   So they founded it in 2012
11  and then it says:
12          "Mr. LaForte ran the
13  factoring side of the business and I
14  handled the accounting for less than a
15  year."
16          Do you see that?
17      A.   That's right.
18      Q.   Is that true?
19      A.   Yes.
20      Q.   Got it.  Now it says:
21          "I hired Joe Cole, the
22  current CFO of CBSG, to replace me in
23  2012.  At that time, I started a nail
24  salon called the Lacquer Lounge."
```

Page 245

```
1           That's a truthful statement,
2   right?
3       A.   Yup.
4       Q.   Can you just were read
5   paragraph 7, just read it -- read it out
6   loud to all of us on the phone or on the
7   video?
8       A.   "I have worked full time at
9   Lacquer Lounge since its inception and
10  have no subsequent involvement in CBSG
11  despite the fact I was never formally
12  removed as its president."
13      Q.   Any problems with that
14  statement?
15      A.   It conflicts with my daily
16  accounts and reporting to her that I do.
17      Q.   Wow, really?  So this is a
18  knowingly false statement that was
19  submitted to a court under your approval?
20          MR. BERMAN:  Objection.
21  BY MR. HESKIN:
22      Q.   You testified earlier you
23  read this from front to back and approved
24  the filing of it, right?
```

Page 246

1      A.   Yes.
2      Q.   And you know personally that
3  Ms. McElhone is involved in the business
4  on a daily basis, that they have emails
5  tracking and confirming her daily
6  payments that I'm going to be able to
7  subpoena your records and emails and I'm
8  going to be able to subpoena your phone
9  records and show that Ms. McElhone filed
10 a knowingly false affidavit, right?
11          MR. BERMAN:  Yeah, okay.  Is
12      that a question about anything
13      relevant in this case or do you
14      want to just continue nonsense?
15 BY MR. HESKIN:
16      Q.   Is it true?
17          MR. BERMAN:  Is it true that
18      you're going to subpoena his
19      records, is that what you're
20      talking about?
21          MR. HESKIN:  I'm asking a
22      question.
23 BY MR. HESKIN:
24      Q.   Is it true?

Page 247

1          MR. BERMAN:  Is it true that
2      you're going to subpoena his
3      records?
4          MR. HESKIN:  Stop, stop with
5      the coaching objection.
6          MR. BERMAN:  Is it -- is it
7      true is not a question.  What's
8      your question?
9  BY MR. HESKIN:
10      Q.   The documents that you just
11 testified under oath are going to
12 directly contradict the sworn testimony
13 that Ms. McElhone gave to the California
14 District Court, correct?
15          MR. BERMAN:  Objection.
16 BY MR. HESKIN:
17      Q.   Or were you making
18 misrepresentations under it?
19      A.   No, it conflicts with my
20 testimony.
21      Q.   What's that?
22      A.   No, it conflicts with my
23 testimony.
24      Q.   This conflicts with it?

Page 248

1      A.   Yes.
2      Q.   Okay.  So your testimony was
3  truthful, correct?
4      A.   Yes.
5      Q.   And you'll agree that
6  paragraph 7 is an untruthful statement?
7          MR. BERMAN:  Objection.
8          THE WITNESS:  Paragraph 7 --
9      yes.
10 BY MR. HESKIN:
11      Q.   Okay.  Is 9 -- paragraph 9 a
12 truthful statement?
13      A.   Only in the context of the
14 sales capacity that Joe has with
15 Recruiting and Marketing.
16      Q.   Well, it specifically states
17 that it's her understanding, and she's
18 the owner, the sole owner of CBSG, that
19 Mr. LaForte, her husband, is responsible
20 for evaluating and closing merchant cash
21 advance transactions at CBSG.
22      A.   It's true.  The deals that
23 originate from the sales entity end up
24 being closed at CBSG.  They have no

Page 249

1  physical involvement in the closing of it
2  in CBSG, but the origination from the
3  sales entity occurs from his end.
4          MR. HESKIN:  Okay.  Can we
5      go to the next page?
6  BY MR. HESKIN:
7      Q.   What's the status of this
8  contempt motion?
9      A.   I'm not sure.
10      Q.   CBSG was sanctioned for
11 violating a stay order, right?
12          MR. BERMAN:  Objection.
13 BY MR. HESKIN:
14      Q.   Right?
15      A.   Yes.
16      Q.   Several hundred thousand
17 dollars, right?
18      A.   That's right.
19      Q.   Has CBSG paid it?
20      A.   Let me just remember where
21 we ended up.  We had funds sent to the
22 court pending follow-up on the sanction
23 and I'm unsure of how that ended up yet.
24 I think it's still outstanding to my

Page 250

1  recollection.
2       MR. HESKIN:  Can you go to
3  the next page?
4  BY MR. HESKIN:
5       Q.   And do you know if
6  Ms. McElhone -- is that her signature?
7       A.   Yes, I believe that is it.
8       Q.   Was that an ink signature?
9       A.   It looks like it to me.
10      Q.   Okay.  And this was signed
11 on August 12, 2019, correct?
12      A.   Yes.
13      MR. HESKIN:  I want to pull
14  up another exhibit but I'm having
15  a problem.
16      THE TRIAL TECH:  Do you want
17  me to stop sharing, this take
18  exhibit down?
19      MR. HESKIN:  You can take
20  that one down.  Let me get to --
21  can you pull up Exhibit 4?
22      THE TRIAL TECH:  Sharing
23  now.
24 BY MR. HESKIN:

Page 251

1       Q.   We've got -- okay.
2       MR. HESKIN:  We've got --
3  okay.  Can you go to the next
4  page?
5  BY MR. HESKIN:
6       Q.   So we talked earlier today
7  about how these agreements aren't loans
8  and there shouldn't be any reference to
9  interest, correct?
10      A.   Yes.
11      MR. HESKIN:  Can the
12  videographer pull up the middle
13  portion of that right there?
14  Yeah.  That's good.
15 BY MR. HESKIN:
16      Q.   Are my eyes wrong or is the
17 word interest used?
18      A.   Yes, they erroneously used
19 the word interest.
20      Q.   Why would they do that?
21      A.   They're using it as a means
22 of describing how the factoring
23 transaction works for the client's
24 purposes.

Page 252

1       Q.   So the client understands
2  that it's interest?
3       A.   That it's in effect similar
4  to an interest product, meaning that
5  they're only paying the fee portion of
6  the transaction.
7       Q.   Okay.  And they understand
8  that principal is the amount they
9  receive?
10      A.   The purchase price, right.
11      Q.   Yeah.  The words here are
12 principal, right?
13      A.   Yes.
14      Q.   And you understand that the
15 words principal and interest are used in
16 loans, right?
17      A.   Yes.
18      Q.   And my eyes aren't deceiving
19 me here that the plain language says
20 principal and interest, right?
21      A.   That's right.
22      Q.   And it has a term, right?
23      A.   The term is still based on
24 the factoring rate.

Page 253

1       Q.   Okay.  And it says principal
2  is be returned or we reassess the
3  factoring rate, right?
4       A.   That's correct.
5       Q.   Okay.  And so if -- I
6  thought earlier you said there was just a
7  fixed payment, that the -- that there's a
8  factor rate and it doesn't matter how
9  long the term is, whether it goes beyond
10 it, it's fixed?
11      A.   There is.  This is an
12 unusual transaction to say the least.
13      Q.   Okay.  And it says:
14      "Principal to be returned or
15 we will reassess the factor rate."
16      Do you see that?
17      A.   Yes.
18      Q.   And how is the factor rate
19 to be reassessed?
20      A.   Based on whatever the factor
21 rate is on outstanding funding provided.
22      Q.   Okay.  And what's the factor
23 rate here?
24      A.   I don't have the factor rate

Page 254

1  visible from here.
2      Q.   Is the factor rate stated
3  anywhere in the agreement?
4      A.   Not that I can see from
5  reading this.
6      Q.   How do I know from reading
7  the four corners of this agreement how
8  the factor rate is supposed to be
9  reassessed?
10     A.   So Kara had multiple deals
11 with us.  The impetus for this
12 transaction was she had individual
13 purchase order receivables as listed in
14 those invoices to secure the funding so
15 that if she were to receive the payments
16 for those individuals invoices, she would
17 pay us back the amount that's being
18 referred to as interest.
19         The factor rates are based
20 on prior transactions from the numerous
21 deals that she's done with us.  So she's
22 gotten to the point where we regularly do
23 deals with her so often that she has a
24 normal factor rate as expected from the

Page 255

1  prior transactions.
2      Q.   Got it.  So if I looked at
3  every transaction, it's going to have the
4  exact same factor rate no matter what the
5  term is?
6      A.   In relative time.  In the
7  most recent deals that were around this
8  time, it should be a similar structure,
9  yes.
10     Q.   Well, how was the factor
11 rate determined on this deal?
12     A.   The factor rate is
13 negotiated just like other terms.
14     Q.   So I'll find an email saying
15 what the factor rate is?
16     A.   Yeah.  I mean, she said that
17 these were receivables, she's going to
18 get assessed at 6,000, you know, dollar
19 amount listed there every day, until she
20 collects on those receivables and pays us
21 back.
22         The end of the story is we
23 never got the funds from the proceeds on
24 those receivables that we factored.

Page 256

1      Q.   So are these invoices what's
2  being purchased or are these invoices
3  security?
4      A.   Those invoices are what
5  we're -- she was purchasing for the
6  purposes of this factoring agreement.
7      Q.   She's purchasing invoices?
8      A.   No, we're purchasing
9  invoices.  Those are her client
10 receivables that she's collecting to
11 repay us on the basis of this factoring
12 agreement.  In the end, she collected
13 that but never remitted the proceeds to
14 us to satisfy the factoring agreement.
15     Q.   All right.  If I were to
16 look at those invoices and add them up,
17 I'm going to come up with an amount
18 that's 10 percent of a receipt's
19 purchased amount?
20     A.   No, that's incorrect.
21         MR. BERMAN:  Objection.
22         THE WITNESS:  And this is --
23 to clarify your further
24 assumption -- your assumption

Page 257

1  earlier that it's just 10 percent
2  of revenue.  This particular deal,
3  Kara wanted the -- for that
4  amount, so that it's just a
5  $1.8 million advance on those
6  specific receivables for her
7  company and that she would pay a
8  $6,000 -- that 6,000 amount for
9  44 days.  She would receive all
10 that money back and then we'll get
11 the funds from that -- the
12 receivables.
13 BY MR. HESKIN:
14     Q.   How is that different from a
15 loan?
16     A.   Because it's based
17 specifically on invoice factoring that
18 she has a receivable.  A loan is based on
19 providing capital with no actual
20 factoring involved.  There's no
21 receivable explained in the loan.
22     Q.   Well, how is this not just
23 merely security?  She has to -- she gets
24 1.8 and she has to pay back 2.1, right?

MAGNA ▶
LEGAL SERVICES

1       A.   So the basis of a factoring
2   transaction always has to do with a
3   merchant's receivables.  These are the
4   individual receivables that a factor rate
5   is being applied on.
6       Q.   Got it.
7       A.   So the transaction is when
8   your factor receivable is received, you
9   then remit that to the finance company
10  providing the capital for it.  We sent
11  her a million eight, we did not get a
12  million eight back, and that's why we
13  were reassessing the factor rate based on
14  her prior rate.
15      Q.   But isn't what she's
16  supposed to pay back is 10 percent of
17  each one of these invoices?
18          MR. BERMAN:  Objection.
19          THE WITNESS:  No, and again
20  this is really an unusual
21  structure that Kara was really in
22  charge of forcing the underwriter
23  to put this document together, we
24  recommended it to underwriting at

1       the end of the day when this went
2       through, but at least we
3       understood the nature of the
4       transaction confirming what was
5       owed and how it was to be repaid.
6   BY MR. HESKIN:
7       Q.   So the question is, is CBSG
8   really purchasing receipts here or is
9   there --
10      A.   Factoring since these are --
11          THE REPORTER:  I'm sorry.  I
12      didn't hear the end of your
13      question at all.
14  BY MR. HESKIN:
15      Q.   Or are the invoices merely
16  security for what's being advanced?
17      A.   They are purchasing those
18  invoices.
19      Q.   Okay.
20      A.   If you're considering
21  security in terms of collateral as you
22  would in a loan product, like you put
23  your house as collateral or any assets as
24  collateral, the principal provided is

1   independent of that.  That's a
2   contingency.  Meaning I get to collect
3   that if you default.  You've got to pay
4   back the money, I don't care where the
5   money comes from.
6          In a factoring transaction,
7   you have specific receivables identified
8   by Kara that she's saying, When these
9   come in, you get the money and proceeds
10  from that.  You can charge me the $6,000
11  amount for the 44 days that I expect for
12  these receivables to come in, and I'll
13  make your 1.8 whole because you're giving
14  me the time value of that money upfront
15  so she can do whatever she needs to do,
16  providing whatever $1.8 million
17  opportunity opens up in her business.
18      Q.   Okay.  I got it.  That's how
19  it probably should work, right?  But how
20  did it actually work?
21      A.   That mechanism is what
22  defines the difference between factoring
23  and loans.
24      Q.   You're right.  Absolutely.

1   100 percent.
2          And the question is:  Here,
3   what does the 10 percent mean?  Specified
4   percentage, 10 percent.  What does that
5   represent?
6       A.   Yeah.  And I have to -- I
7   have to explain that that and the word
8   interest and the word principal were put
9   together haphazardly to reflect the
10  transaction.
11          As I described, we both have
12  an understanding of the intent of this
13  factoring agreement.  Everything else in
14  the factoring agreement, the body of the
15  language, refers to those specific
16  invoices to the point where we actually
17  have copies of those invoices knowing
18  what we were factoring.
19          I don't think there's any
20  ambiguity about it on Kara's end,
21  especially since this is her, you know,
22  15th or 14th deal, whatever it was, after
23  she's paid off several of these deals.  I
24  don't think she can claim that she

Page 262

1  doesn't understand how the transaction
2  works when she's fully taken and paid off
3  several factoring agreements over the
4  course of, whatever, two year
5  relationship we've had.
6      Q.   Well, you understand she
7  filed a lawsuit disputing the way you are
8  interpreting that, right?
9          MR. BERMAN:  Objection.
10         THE WITNESS:  Yes, I
11   understand.
12  BY MR. HESKIN:
13     Q.   All right.  And so you're
14  saying the 10 percent daily, or the
15  specified percentage of 10 percent, that
16  just doesn't mean anything?
17     A.   That doesn't mean anything.
18  That normally is part of her agreements.
19  I believe underwriting made an error
20  including that from a prior version
21  because, you know, we use templates used
22  by prior agreements with merchants so we
23  don't have to remake a contract from
24  scratch and they included that.  It's

Page 263

1  basically a fragment that has no
2  pertinent applicability to the terms of
3  this purchase.
4      Q.   Okay.  So what should this
5  specified percentage be?
6      A.   There is no specified
7  percentage.
8      Q.   Got it.
9      A.   That's your 1.8, and if you
10  take every one of those invoices and
11  tally them up, she knows exactly, that's
12  the 1.8 that we intended to factor.
13     Q.   All right.  So if I added up
14  all these invoices, right, I'd come up
15  with 2.107, right?
16     A.   Right.
17     Q.   And you're giving her
18  1.8 million in exchange for the 2.1,
19  right?
20     A.   Correct.
21     Q.   And she's to pay that over
22  44 days irrespective of whether or not
23  she collects on those invoices within the
24  44 days, right?

Page 264

1          MR. BERMAN:  Objection.
2          THE WITNESS:  No, that's --
3  and then that's the after 44 days
4  contingency.  So we're saying you
5  can pay a fixed fee for that
6  amount of time, but after 44 days,
7  if you do not collect on these
8  receivables, which she sold to us
9  as something right around the
10  corner, money coming into her big
11  operation, you can then go ahead
12  and reassess it at the same factor
13  rate you've done for the last two
14  years.
15  BY MR. HESKIN:
16     Q.   Okay.  And -- and who did
17  the calculations and where can I find a
18  written copy of those calculations?
19     A.   The calculations were done
20  in underwriting as usual.
21     Q.   Your calculations were in
22  underwriting?  So I'll go to this file
23  and I'll see the calculations for that?
24     A.   And the support.  Obviously

Page 265

1  these underwriters used a matrix and go
2  into it.
3          The point to make with the
4  Kara on this deal was really guided by
5  the merchant.  This is an unusual
6  relationship because of how used to
7  working with Kara we had become.  She
8  really decided the terms she wanted to
9  work with, and at the end of the day we
10  went with it because she's been, up until
11  the end of it, a really good client.
12     Q.   Okay.  So just -- just so
13  I'm clear, the specified percentage of 10
14  percent, that's false, correct?
15         MR. BERMAN:  Objection.
16         THE WITNESS:  Yes, that
17  should not be on there.
18  BY MR. HESKIN:
19     Q.   Okay.  But it is.  And
20  the --
21     A.   It has no relevance to the
22  calculations.
23     Q.   Got it.  Got it.  And the
24  6,606 for 44 days, interest only,

Page 266

```
 1   that's -- that's wrong, too, right?
 2        A.    It describes the payment
 3   structure to Kara.  As she understands
 4   it.  It should read fee only rather than
 5   the word interest because it's a fixed
 6   fee for that amount of time.  We did not
 7   amortize that in any way akin to a loan
 8   on the financials.
 9        Q.    Well, who wrote interest
10   only, the underwriter?
11        A.    Yes, the underwriter for
12   this agreement.
13        Q.    Okay.  Do you think the
14   underwriter had an understanding of what
15   the true nature of this transaction was?
16        A.    Yes.
17        Q.    And she characterized it as
18   principal and interest, right?
19           MR. BERMAN:  Objection.
20           THE WITNESS:  Right.  But
21        not using the correct language.
22        It's not interest and it's not
23        principal.
24   BY MR. HESKIN:
```

Page 267

```
 1        Q.    Got it.  So interest is a
 2   mistake, right?  Didn't mean that, right?
 3        A.    Right.
 4        Q.    And then principal, oops,
 5   you didn't mean that either, right?
 6        A.    Correct, that's coming from
 7   Kara.  She took her words verbatim and
 8   said, Oh, can you just make it interest
 9   only based on how she understood the
10   factoring fees to work.
11        Q.    So she understood this to be
12   a loan?
13        A.    No.  Nothing in the body of
14   this understands it as a fee.
15        Q.    You just described -- you
16   just described to me what she understood,
17   and in your own words, you can
18   make it interest only.  That sounds like
19   a loan to me.  She understood this to be
20   a loan?
21        A.    No, it's a fixed cost.
22   There's no interest component, there's no
23   amortization or change in amount based on
24   time.
```

Page 268

```
 1        Q.    I got it.  You just said
 2   that she understood it to be interest,
 3   right?
 4        A.    Right.  There's no APR or
 5   anything like you would find in a loan.
 6   The rest of the agreement is still the
 7   same as all the other agreements.
 8        Q.    There's no APR?
 9        A.    That's correct.
10        Q.    Are you sure about that?
11        A.    Yes, as a mechanism of the
12   factoring agreement, there's no APR
13   calculated as a loan.
14        Q.    Really.  Of course an APR
15   would be associated with a loan, right?
16        A.    And time.  Keep in mind the
17   time element that's associated with
18   income received for a loan.
19        Q.    All right.  So we were
20   talking about APR, right?
21        A.    Yes.
22        Q.    And APR would never be used
23   in connection with a factoring agreement,
24   right?
```

Page 269

```
 1        A.    That's right.
 2        Q.    Be unheard of, right?
 3           MR. BERMAN:  Objection.
 4   BY MR. HESKIN:
 5        Q.    And it would be totally
 6   inconsistent with a factoring agreement,
 7   right, because APRs are only used with
 8   loans, right?
 9           MR. BERMAN:  Objection.
10   BY MR. HESKIN:
11        Q.    Right?
12        A.    Yes.
13        Q.    Got it.  What's the APR on
14   this agreement?
15        A.    The what?
16        Q.    What is the APR on this
17   agreement?
18        A.    There is no APR on this
19   agreement, just a factor rate.
20        Q.    And if there were an APR,
21   that would make it a loan, right?
22           MR. BERMAN:  Objection.
23           THE WITNESS:  Correct.
24   BY MR. HESKIN:
```

MAGNA ▶
LEGAL SERVICES

Page 270

1    Q.   And you understand that the
2  State of Florida has usury laws, right?
3    A.   Yes.
4    Q.   And it's a crime in the
5  State of Florida to charge excess
6  interest beyond the amount -- interest
7  amount permitted under Florida law,
8  right?
9         MR. BERMAN:  Objection.
10         THE WITNESS:  Correct.
11  BY MR. HESKIN:
12    Q.   It's a crime, right?
13    A.   Yes.
14    Q.   And CBSG is based out of
15  Florida, right?
16    A.   Yes.
17    Q.   Got it.  And Ms. McElhone is
18  the owner of CBSG and she lives in
19  Florida, right?
20    A.   Yes.
21    Q.   And all of your
22  communications are with her when she's in
23  Florida, right?
24    A.   Yes.

Page 271

1    Q.   Got it.  So you wouldn't
2  want this to be characterized as a loan,
3  right, because if it was characterized as
4  a loan, Ms. McElhone would be in a lot of
5  trouble, right?
6         MR. BERMAN:  Objection.
7  BY MR. HESKIN:
8    Q.   Right?  She'd be committing
9  a felony in the State of Florida,
10  right --
11         MR. BERMAN:  Are you asking
12    him to give you a legal conclusion
13    that supports your --
14         MR. HESKIN:  I'm asking his
15    understanding.
16         MR. BERMAN:  -- case across
17    the board.  Is that what you're
18    asking for?  This could be, like,
19    Oh, my God, the ah-ha moment?
20         MR. HESKIN:  I'm asking him
21    his understanding in how these
22    things are structured and why
23    they're structured --
24         MR. BERMAN:  No, that's not

Page 272

1  what you're asking.  You're asking
2  legal conclusions and scary
3  questions, like -- okay.  Did you
4  get what you want?  You're asking
5  the same questions over and over
6  again.
7         MR. HESKIN:  I am getting
8  what I want, thank you.
9         MR. BERMAN:  I'm happy
10  you're happy.
11  BY MR. HESKIN:
12    Q.   You can answer my question.
13    A.   Yes.
14    Q.   Thank you.  All right.
15    So let's look at something.
16         MR. HESKIN:  Can we pull up
17  Exhibit No. 7?
18         THE TRIAL TECH:  I'm not
19  sure I have an Exhibit No. 7.
20         MR. HESKIN:  Do you have
21  Exhibit No. 8?
22         THE TRIAL TECH:  Hold on one
23  second.  Oh, yeah, I have
24  Exhibit 7.

Page 273

1         MR. HESKIN:  Okay.  Can we
2  pull that up?
3         THE TRIAL TECH:  Sure.  One
4  second.  Do you see that?
5         MR. HESKIN:  I believe we
6  can.  Can you scroll down to the
7  bottom?  All the way down.  I want
8  to see the -- go up.
9  BY MR. HESKIN:
10    Q.   Mr. Cole, have you seen this
11  document before?
12    A.   No, I have not seen this
13  document before.
14    Q.   Do you know who prepared it?
15    A.   No, I do not.
16    Q.   Do you see the APR column in
17  the factor rate?
18    A.   I see the factor rate.
19  You're referring to percentage under
20  Column O?
21    Q.   Yeah.
22    A.   Yes, I see that.
23    Q.   And next to the factor rate
24  it has an APR, right?

MAGNA
LEGAL SERVICES

Page 274

1    A.   Yeah.  They're labeling it
2  as an APR.  That is inaccurate.
3    Q.   Well, this is a document
4  that was produced by CBSG and designated
5  confidential.
6        Do you see that at the top?
7    A.   Yes.
8    Q.   So this is a CBSG-created
9  document, right?
10       MR. BERMAN:  No, no, don't
11       make false representations.  These
12       are documents I believe that were
13       produced by Kara that were then
14       produced back to you is my
15       understanding.  So don't make
16       representations that may not be
17       true.  Ask threshold questions.
18  BY MR. HESKIN:
19   Q.   Do you know if this was
20  created by Kara or with CBSG?
21   A.   I do not know.
22   Q.   Okay.  And do you know when
23  this document was created?
24   A.   No.

Page 275

1    Q.   And do you see that the
2  factor rate is -- changes from 1.4 to
3  1.16?
4    A.   I don't see the top of this.
5  I don't know where you're referring to.
6  I see 1.4 and 1.5 at the bottom.
7    Q.   Okay.  Was the typical
8  factor rate 1.4 on all of CBSG -- CBSG's
9  deals with HMC?
10   A.   The base factor rate was,
11  but she had discounted payback rates for
12  shorter durations of time which she
13  almost always took advantage of.
14   Q.   Okay.  So my question was
15  this:  If this was a document created by
16  Kara, how come CBSG is designating it
17  confidential?  It's her document.  How
18  can CBSG in good faith designate it
19  confidential?
20       MR. BERMAN:  Are you asking
21       me that question?
22       MR. HESKIN:  I'm asking Joe.
23       MR. BERMAN:  He doesn't
24       designate documents confidential.

Page 276

1        THE WITNESS:  Yeah, I don't
2        understand what this means.
3  BY MR. HESKIN:
4    Q.   Is this a confidential
5  document?  I can go -- I can go share
6  this with anyone?
7    A.   I'm not sure in the context
8  of the case what that means.
9    Q.   Okay.  So is this a
10  document, and you've been produced on
11  their discovery responses, is this a
12  document that is -- was generated and
13  created by CBSG or is it a document
14  that -- that was created by Kara and
15  she's free to share it with whoever she
16  wants?
17   A.   I'm not sure.
18   Q.   You're not sure?
19   A.   Yeah, I don't know who
20  created this.
21   Q.   Okay.  And you do see the
22  words APR, right?
23   A.   Right, which wouldn't be
24  something I'd do.  That's in conflict of

Page 277

1  having a factor rate.  Why would you put
2  an APR along the same lines as a factor
3  rate?
4    Q.   All right.  So if I did a
5  search of all of your business records, I
6  wouldn't find the word APR anywhere,
7  right?
8    A.   No.  If it was used, it's
9  just an approximation for an annual
10  return on the factor.  It would not be
11  legally in effect an APR rate used on the
12  deal.
13   Q.   And have you -- has CBSG
14  ever represented to investors that the
15  interest rate on -- on these agreements
16  is 30 percent?
17   A.   No, I would not -- and if
18  they had, it would be a misnomer.  It has
19  to be a factor rate.
20   Q.   So when A Better Financial
21  Plan represents on its websites that
22  these MCAs are loans, is that a true
23  statement or a false statement?
24   A.   That's a false statement.

MAGNA
LEGAL SERVICES

Page 278

1     Q.   Okay.  And when A Better
2   Financial Plan represents to investors
3   that these provide interest rates of
4   30 percent, is that a true statement or a
5   false statement?
6         MR. BERMAN:  Objection.
7         THE WITNESS:  I'm not sure
8     what that means.  You're saying
9     that the deals that we fund are
10    providing an interest rate of
11    30 percent?
12  BY MR. HESKIN:
13    Q.   Yeah.  That these MCAs are
14  loans with interest rates of 30 percent?
15    A.   Interest rate is incorrect.
16    Q.   Interest rate is incorrect.
17  So that's a blatant misrepresentation
18  that A Better Financial Plan is making to
19  investors, correct?
20        MR. BERMAN:  Objection.
21        THE WITNESS:  It's a common
22    mistake that people who don't
23    understand the factoring business
24    make.

Page 279

1   BY MR. HESKIN:
2     Q.   Okay.  So you're admitting
3   that they're false misrepresentations
4   being made --
5     A.   It's inaccurate.  The factor
6   rate is not an interest rate.
7     Q.   And A Better Financial Plan
8   is making those representations on behalf
9   of CBSG, right?
10        MR. BERMAN:  Objection.
11        THE WITNESS:  No, they
12    better not be.
13  BY MR. HESKIN:
14    Q.   Well, you have a contract
15  with A Better Financial Plan, don't you?
16        MR. BERMAN:  Objection.
17        And don't answer that if
18    this deals with the investor
19    relationship.
20        THE WITNESS:  No, I'm not
21    going to answer that.
22        MR. HESKIN:  How about this?
23    Let's go to exhibit -- hold on.
24    Exhibit 28.  If you can pull that

Page 280

1   up.
2         THE TRIAL TECH:  Okay.  One
3   second.
4         MR. BERMAN:  Question, Jim
5   (sic).  Was this produced in this
6   case?
7         MR. HESKIN:  Probably.
8         MR. BERMAN:  Well, I don't
9   see a Bates stamp.  Can you go to
10  the bottom of the page?
11        MR. HESKIN:  Listen, we
12  dumped everything we had.
13        MR. BERMAN:  No, no, no.
14  The documents are Bates stamped in
15  this case so we'll ask questions
16  about Bates stamped documents.
17        MR. HESKIN:  Feel free to
18  bring it up.
19        MR. BERMAN:  No, no, no.
20  I'm not bringing it up.  I'm going
21  to tell him not to answer.
22  Discovery is closed, and if you
23  didn't produce this document and
24  want to use it now in the case,

Page 281

1   that's a problem for you.
2         MR. HESKIN:  Brett, Brett,
3   it's a publicly available
4   document.
5         MR. BERMAN:  That's an
6   irrelevant answer.
7         MR. HESKIN:  Instruct him
8   not to answer on that basis.
9         MR. BERMAN:  I'll wait to
10  get a question from you.
11        MR. HESKIN:  Good luck on
12  that.
13        MR. BERMAN:  Okay.  You got
14  it.
15        MR. HESKIN:  And actually,
16  this is a document that probably
17  should have been produced by you,
18  Mr. Berman.
19        MR. BERMAN:  No, I don't
20  think so.
21        MR. HESKIN:  I think it
22  should have because this is a --
23        MR. BERMAN:  I have zero
24  desire to engage in a discovery



Page 282

```
1        discussion with you right now.  I
2    ask a question for the deposition.
3        If you have a problem, file
4    a motion.
5    BY MR. HESKIN:
6        Q.   All right.  Who is Michael
7    Ferman?
8        A.   Michael Ferman is a manager
9    of an investment entity.
10       Q.   Of who?
11       A.   An investment entity.  I
12   forget the name.
13       Q.   Okay.  You're familiar with
14   an SEC Form D, right?
15       A.   A little bit.
16       Q.   A little bit.  You signed
17   one, right?
18       A.   The Form Ds are filled out
19   by securities counsel and I sign off on
20   it.
21       Q.   Did you review it before you
22   signed it?
23       A.   Yes.
24       Q.   Okay.  And are you aware
```

Page 283

```
1    that you signed one disclosing that A
2    Better Financial Plan was a -- a broker
3    of securities for -- for CBSG?  Do you
4    recall that?
5        A.   A broker of securities?
6        Q.   Yeah.  This is a securities
7    disclosure, isn't it?
8        A.   Yes, but in the form of the
9    entity that they had.
10       Q.   Sure.  And CBSG pays A
11   Better Financial Plan a commission,
12   correct?
13       MR. BERMAN:  No, don't
14   answer the question.
15   BY MR. HESKIN:
16       Q.   That's not true?
17       MR. BERMAN:  Actually, Joe,
18   don't even answer any questions
19   about this document because I see
20   it's dated May 26, 2020.  That's
21   outside of the scope of this case.
22   So don't answer any questions.
23       MR. HESKIN:  You're
24   instructing him not to answer?
```

Page 284

```
1        MR. BERMAN:  I am.
2        MR. HESKIN:  Okay.  Let's
3    take a break here.  The court
4    reporter probably could use a
5    rest.
6        So we never took a lunch
7    break.  Do you guys want to take
8    time to get something to eat or
9    should we just come back in
10   15 minutes.
11       MR. BERMAN:  That's not a
12   question for 3 o'clock in the
13   afternoon, but okay.
14       (Recess.)
15   BY MR. HESKIN:
16       Q.   So I just wanted to direct
17   your attention to this Form D.  You
18   signed this, right?
19       A.   Yup.
20       Q.   Okay.  And it identifies A
21   Better Financial Plan as a broker, right?
22       Well, let's just start with,
23   this is an SEC disclosure, correct?
24       A.   Yes.
```

Page 285

```
1        Q.   And on the first page under
2    point 2, it says:
3        "Principal place of business
4    and contact information."
5        Do you see that?
6        A.   That's right.
7        Q.   Principal place of business,
8    right?
9        A.   Right.
10       Q.   And it lists Complete
11   Business Solutions Group, Inc., with an
12   address of 20 North 3rd Street.
13       Do you see that?
14       A.   Yes.
15       Q.   That's a knowingly false
16   statement; isn't it?
17       A.   It's again by -- under the
18   operating agreement that we've had with
19   the processing entity.
20       Q.   Is that -- is that what you
21   think the SEC is going to believe?
22       A.   Yes, we're allowed to
23   service it through a third party.
24       Q.   Does the SEC know this?
```

Page 286

1    A.   Yes, we disclosed that.
2        Q.   You disclosed that CBSG is
3    not actually located at 20 North 3rd
4    Street?
5        A.   Yes, it has a form filing in
6    Florida.
7        Q.   It has a form filing in
8    Florida.  This is not really, even though
9    under No. 2 it says principal place of
10   business and you identify 20 North 3rd
11   Street, that's really not it, right?
12       A.   Correct.  That's only the
13   operating entity.
14       Q.   Got it.  So if I'm looking
15   at this and I'm an investor and I look at
16   this and I see that the principal place
17   of business is for Complete Business
18   Solutions Group is 20 North 3rd Street,
19   that would be -- that would be incorrect,
20   right?
21       A.   Correct.
22       Q.   It's not their principal
23   place of business.  Got it.  Okay.  And
24   then it says, under related persons, it

Page 287

1    lists Lisa, it lists you, right?
2    Correct?
3        A.   Yes.
4        Q.   Okay.  And it lists you as
5    an executive officer and director, is
6    that true?
7        A.   That's correct.
8        Q.   Even though you're not paid
9    by CBSG?
10       A.   Correct.
11       Q.   Okay.  And it also lists
12   Jamie McElhone?
13       A.   Right.
14       Q.   As an executive officer and
15   director?
16       A.   That's right.
17       Q.   And it has her address at
18   2646 Sartain Street?
19       A.   Right.
20       Q.   That's where -- that's where
21   she resides, I take it?
22       A.   Right.
23       Q.   And you reviewed this,
24   right?

Page 288

1    A.   Yes.
2        Q.   And it says:  "Issuer size,
3    declined to disclose."
4        Right?
5        A.   I don't see that.
6        Q.   It's on page 4.  It's not --
7        MR. HESKIN:  Go to page 4
8    under 6 where it says Federal
9    Exceptions and Exclusions.
10       THE WITNESS:  Uh-huh.
11   BY MR. HESKIN:
12       Q.   And it says you're exempt
13   under Rule 506(b).
14       Do you see that?
15       A.   Yup.
16       Q.   And is that true and
17   correct, that CBSG is exempt under Rule
18   506(b)?
19       A.   That's correct.
20       Q.   What's that?
21       A.   Yes, that's correct.
22       Q.   And you're filing this
23   because you're offering securities,
24   right?

Page 289

1        MR. BERMAN:  Objection.
2        THE WITNESS:  No, it's
3    the -- it's the notes that we have
4    that they understand fall under
5    that category, 506(b).
6    BY MR. HESKIN:
7        Q.   And it's a debt that you're
8    issuing, right?
9        A.   That's right, it's a debt
10   instrument.
11       Q.   And then it says, Minimum
12   Investment.  If this is debt, why does it
13   say minimum investment is $250,000.
14       A.   That's the language they use
15   in this form.  There is no other term for
16   loan.
17       Q.   Well, I'm more concerned
18   about the minimum accepted is $250,000.
19   Is that right?
20       A.   Yes.
21       Q.   Well, Better Financial Plan
22   is advertising day and night on the radio
23   that you only need 50,000 to 100,000 to
24   invest; is that right?

**MAGNA**
LEGAL SERVICES

Page 290

1          MR. BERMAN:  Objection.  You
2     don't have to answer that.
3     BY MR. HESKIN:
4          Q.   Is the minimum investment
5     $250,000?
6          A.   Yes.
7          Q.   Okay.  And then it's got
8     Sales Compensation, and it lists A Better
9     Financial Plan, right?
10          A.   I don't see where that is.
11          Q.   Okay.  So go to page 5 under
12     12?
13          A.   Oh, that right there?
14          Q.   Yeah.
15          A.   Yes.
16          Q.   Okay.  And you're familiar
17     with A Better Financial Plan, right?
18          A.   Yes.
19          Q.   And who -- who do you
20     regularly have contact with at A Better
21     Financial Plan?
22          MR. BERMAN:  Objection.  You
23     don't have to answer that.
24     BY MR. HESKIN:

Page 291

1          Q.   During the time period.
2     Who -- who did you --
3          MR. BERMAN:  Objection.  You
4     don't have to answer that.
5     BY MR. HESKIN:
6          Q.   Go ahead.  You can answer.
7          A.   I don't have to answer.
8          Q.   Are you familiar with Dean
9     Vagnozzi (ph)?
10          A.   Yes.
11          Q.   Okay.  And do you regularly
12     have conversations with -- or
13     communications with Dean Vagnozzi?
14          MR. BERMAN:  Objection.  You
15     don't have to answer that.
16          MR. HESKIN:  On what basis?
17          MR. BERMAN:  On the basis of
18     the court order that talks about
19     the only set of communication with
20     respect to potential and secured
21     investors and it talks that you do
22     not need to include specific
23     communications with specific
24     investors.  So that's the basis.

Page 292

1          MR. HESKIN:  He's not an
2     investor.  It says right here he's
3     a salesperson, and salespersons
4     are the ones that are
5     communicating information to the
6     investors.  So that's exactly what
7     I'm entitled to.
8          MR. BERMAN:  Yeah, I got
9     you.  My instruction stands.
10          MR. HESKIN:  You're still
11     refusing to allow him to answer
12     even though A Better Financial
13     Plan is the one that's making
14     communications to investors,
15     right?
16          MR. BERMAN:  Yeah, you got
17     it.  That's my instruction.
18          MR. HESKIN:  And I'm
19     entitled to -- specifically
20     entitled to ask about
21     communications to investors,
22     right?
23          MR. BERMAN:  No, you are not
24     allowed to talk about specific

Page 293

1     communications to specific
2     investors.
3          MR. HESKIN:  I'm not.
4          MR. BERMAN:  So you flipped
5     that on its head.  It's:
6          "Pursuant to Section 2(d)
7     above, this matter does not
8     include specific communications
9     with specific investors."
10          MR. HESKIN:  Yeah.  And I'm
11     not asking about specific
12     investors.  I'm asking about
13     communications that A Better
14     Financial Plan gives generally to
15     investors.
16          MR. BERMAN:  That's not your
17     question.
18          MR. HESKIN:  That's my --
19     that is my question.
20          MR. BERMAN:  That was not
21     your question.
22     BY MR. HESKIN:
23          Q.   Mr. Cole, A Better Financial
24     Plan provides information to investors on

MAGNA
LEGAL SERVICES

Page 294

1   behalf of CBSG, correct?
2       A.   No.
3       Q.   No?
4       A.   No.
5       Q.   They provide information to
6   investors, correct?
7       A.   No.  Well, investors, yes,
8   but not our investors.
9       Q.   Well, A Better Financial
10  Plan -- well, this is a filing by CBSG,
11  right?
12      A.   Yes.
13      Q.   And you're paying A Better
14  Financial Plan to go out and get
15  investors for CBSG, right?
16          MR. BERMAN:  Yeah.  You
17      don't have to answer that
18      question.
19          THE WITNESS:  No, I won't
20      answer it.
21  BY MR. HESKIN:
22      Q.   Okay.  What does A Better
23  Financial Plan do?
24          MR. BERMAN:  Generally or

Page 295

1       for CBSG?
2           MR. HESKIN:  Generally.
3           MR. BERMAN:  If you know
4       generally what they do.
5   BY MR. HESKIN:
6       Q.   What do they do generally
7   for CBSG?
8           MR. BERMAN:  That's
9       different.  No, don't answer the
10      question.
11  BY MR. HESKIN:
12      Q.   So -- all right.  Maybe this
13  answers it for me.  Does A Better
14  Financial Plan provide sales for CBSG?
15      A.   I don't know what you mean
16  by sales.
17      Q.   Well, it says -- it lists
18  right here, A Better Financial Plan,
19  they're a broker or dealer, right?
20      A.   Yes.
21      Q.   Okay.  What are they, are
22  they a broker or a dealer?
23      A.   They're allowed to do both.
24      Q.   Okay.  And they are

Page 296

1   brokering, they're not an investor
2   themselves, right?
3           MR. BERMAN:  You don't have
4       to answer that, Joe.
5           THE WITNESS:  No, I won't
6       answer that.
7   BY MR. HESKIN:
8       Q.   Okay.  Have you seen A
9   Better Financial Plan's videos that are
10  on their website?
11      A.   No, I have not.
12      Q.   You haven't seen the videos
13  where Dean Vagnozzi calls MCAs loans 50
14  times?
15      A.   No, I have not.
16      Q.   If Dean Vagnozzi is out
17  there describing to investors that CBSG's
18  factoring agreements are loans with
19  interest rates of 30 percent, would that
20  be a true or false statement?
21      A.   That would be false.
22      Q.   Okay.  And CBSG is not aware
23  that these representations are being made
24  publicly?

Page 297

1       A.   They're not aware.
2       Q.   Okay.  Has Dean Vagnozzi
3   ever made that representation in front of
4   you?
5       A.   I've corrected him, yes.
6       Q.   He has made that
7   representation?
8       A.   Yeah.  The guy uses the loan
9   word and doesn't understand the product
10  properly, and I had to correct him and
11  explain factoring.
12      Q.   Okay.  And did you ever
13  correct him in front of investors?
14      A.   No.
15      Q.   Did he ever make that
16  representation in front of investors?
17      A.   He may have.  I'm not sure.
18      Q.   As you sit here today, were
19  you ever aware of a time period when Dean
20  Vagnozzi told investors that CBSG's MCA
21  products were loans?
22      A.   Yes, he has before.
23      Q.   Okay.  And did you correct
24  him in front of those investors?

MAGNA ▶
LEGAL SERVICES

Page 298

1    A.   No.
2    Q.   Okay.  Did Dean Vagnozzi
3  ever represent to investors that CBSG's
4  MCA loans had interest rates of
5  30 percent?
6    A.   Yes.
7    Q.   And you witnessed this,
8  correct?
9    A.   Yes.
10    Q.   Okay.  Did Dean Vagnozzi
11  ever represent to investors that the
12  default rate of the CBSG's MCAs were
13  between 2 and 4 percent?
14    A.   Yes.
15    Q.   Is that a true and correct
16  statement?
17    A.   It depends on the time.
18    Q.   Is it a true and correct
19  statement for the time period relevant to
20  this litigation, February 2018 to
21  October 2019?
22    A.   Yes, it's a good
23  approximation.
24    Q.   Two to 4 percent?

Page 299

1    A.   Yes.
2    Q.   As we defined it earlier
3  today?
4    A.   As we defined it earlier
5  today, yes.
6    Q.   Who is Lindsey Blake?
7    A.   We're not supposed to talk
8  about -- I mean --
9       MR. BERMAN:  I --
10       MR. HESKIN:  He's identified
11  specifically right here as a
12  broker or dealer, not an investor.
13  BY MR. HESKIN:
14    Q.   Is that a true or false
15  statement?
16       MR. BERMAN:  Where are you
17  looking?
18       MR. HESKIN:  I'm looking on
19  page 6, Recipient, Lindsey Blake,
20  broker or dealer, X.
21       MR. BERMAN:  If he's asking
22  about Lindsey Blake as investor or
23  having to do --
24       MR. HESKIN:  Ah.

Page 300

1       MR. BERMAN:  You don't have
2  to answer.
3       MR. HESKIN:  I'm asking --
4  I'm asking --
5  BY MR. HESKIN:
6    Q.   In your representation that
7  you filed with the SEC that Lindsey Blake
8  is a broker or dealer of securities on
9  behalf of CBSG.
10       Do you see that?
11    A.   Yes.
12    Q.   Okay.  Is that true?
13       MR. BERMAN:  You can just
14  answer that question.  If you
15  know.
16       THE WITNESS:  Yeah, they're
17  not any longer.  They did before.
18  BY MR. HESKIN:
19    Q.   Why are they no longer?
20    A.   Because we don't have that
21  legal structure with them any longer.
22    Q.   Why not?  Did something
23  happen?
24       MR. BERMAN:  Yeah, you don't

Page 301

1  have to answer that question.
2       THE WITNESS:  No, I won't
3  answer that question.
4  BY MR. HESKIN:
5    Q.   Okay.  Does Lindsey Blake
6  have a criminal history?
7       MR. BERMAN:  You don't have
8  to answer that question.
9  BY MR. HESKIN:
10    Q.   Does -- did CBSG ever
11  disclose to its investors that Lindsey
12  Blake has a criminal history?
13       MR. BERMAN:  You don't have
14  to answer that question.
15  BY MR. HESKIN:
16    Q.   During the time period of
17  February 2018 and October of 2019, did
18  CBSG ever disclose to any of its
19  investors that Lindsey Blake had a
20  criminal history?
21       MR. BERMAN:  You don't have
22  to answer that question.
23  BY MR. HESKIN:
24    Q.   During the same time period,

MAGNA
LEGAL SERVICES

Page 302

```
 1    did CBSG ever disclose to investors that
 2    Joe LaForte has a criminal history?
 3         A.   No.
 4         Q.   Did CBSG, during the same
 5    relevant time period, ever disclose to
 6    any of its investors that anyone
 7    associated or affiliated with CBSG had a
 8    criminal back -- a criminal history?
 9         A.   No.
10         Q.   Was CBSG ever investigated
11    for failing to make those disclosures?
12         MR. BERMAN:  You don't have
13    to answer that question.
14    BY MR. HESKIN:
15         Q.   During the relevant time
16    period.
17         MR. BERMAN:  You don't have
18    to answer that question.
19         MR. HESKIN:  Well, let's
20    look at the order.
21         MR. BERMAN:  It says with
22    respect to the use of factoring or
23    loan agreements.  That's not what
24    you're asking about.
```

Page 303

```
 1         If you're asking about that,
 2    of course we'll comply with the
 3    court order.
 4         MR. HESKIN:  I am allowed to
 5    ask during the relevant time
 6    period investigations.  Relating to the
 7         MR. BERMAN:  Relating to the
 8    use of factoring or loan
 9    agreements.
10         MR. HESKIN:  Okay.
11    BY MR. HESKIN:
12         Q.   And are these -- are these
13    securities for the sole purpose of
14    funding the MCA agreements?
15         A.   No.
16         Q.   They're not?
17         A.   No.
18         Q.   What are they -- what's the
19    purpose?
20         A.   The notes are provided as
21    capital for the business for general use.
22         Q.   Capital for CBSG, right?
23         A.   Yes.
24         Q.   And they use those funds to
```

Page 304

```
 1    fund MCA agreements, right?
 2         A.   Along with every other cash
 3    flow-related activity the business has.
 4         Q.   But they -- they use those
 5    funds to fund MCA agreements, correct?
 6         A.   Not exclusively.
 7         Q.   Did they use those funds to
 8    fund the agreements at issue in this
 9    case?
10         A.   No.
11         Q.   They didn't?  Where did the
12    funds come for the MCA agreements at
13    issue in this case?
14         MR. BERMAN:  You don't have
15    to answer that question.
16         THE WITNESS:  I won't answer
17    the question.
18    BY MR. HESKIN:
19         Q.   Okay.  Who is Alvin
20    Holdings?
21         A.   It's an entity in Texas.
22         Q.   What do they do?
23         A.   They invest in various
24    deals.
```

Page 305

```
 1         Q.   MCA deals?
 2         A.   No.
 3         Q.   Do they broker securities
 4    for CBSG?
 5         A.   No.
 6         Q.   And why are they listed on
 7    this SEC disclosure form?
 8         A.   They do not any longer.  You
 9    said do they.
10         Q.   Did they at the time of
11    this?
12         A.   Yes.
13         Q.   All right.  What -- what's a
14    finder's fee?
15         A.   Finder's fee is defined as a
16    compensation for bringing in capital.
17         Q.   Okay.  And if you look at
18    Item No. 15 on page 12, how did you come
19    up with that number, $3.6 million?
20         A.   That fee is proportionate
21    for amounts paid.
22         Q.   Paid to whom?
23         A.   Huh?
24         Q.   Paid to whom.
```

Page 306

```
1        A.   To the brokers.
2        Q.   Which would include A Better
3   Financial Plan, right?
4        A.   Yes.
5        Q.   And the lawyer, in-house
6   counsel at the time this form was filed
7   was Cynthia Clark; is that correct?
8        A.   Yes.
9        Q.   And was she the general
10  counsel at this time?
11       A.   Yes.
12       Q.   The relevant period is
13  February 12th, 2019, correct?
14       A.   Yes.
15       Q.   And this was directly the
16  time period in which my client was being
17  funded, right?
18       A.   Yes.
19       Q.   Okay.  And so you're saying
20  none of these funds were used to fund my
21  client's agreements?
22       A.   No, not directly.
23       Q.   Indirectly were they used?
24       A.   They could have.
```

Page 307

```
1        Q.   Does CBSG have a line of
2   credit to -- did they use a line of
3   credit to fund any of my client's loans?
4        A.   No.
5        Q.   Does CBSG have a line of
6   credit?
7        A.   No.
8        Q.   Has CBSG ever had a line of
9   credit?
10       A.   No.
11       Q.   What was the answer, I'm
12  sorry?
13       A.   No.
14       Q.   Did it ever -- if it never
15  had a line of credit, I assume it never
16  had a $50 million line of credit, right?
17       A.   Right.
18            MR. HESKIN:  Can you pull up
19       Exhibit No. 1?
20  BY MR. HESKIN:
21       Q.   Have you ever seen this
22  email before?
23       A.   No, I have not.
24       Q.   Okay.  You can go to the
```

Page 308

```
1   second email chain dated October 19,
2   2018.  Do you see that?
3            Have you had a chance to
4   read that?
5            MR. BERMAN:  What?
6   BY MR. HESKIN:
7        Q.   The second email.
8        A.   The second email.  Yes, I
9   see it.
10       Q.   Okay.  And this is an email
11  from Joe LaForte, right?
12       A.   That's right.
13       Q.   Is there a reason why his
14  email says Joe Mack?
15       A.   That's what he goes by.
16       Q.   Is there a reason why his
17  email says Par Funding if he's not
18  employed by Par Funding?
19       A.   Our brokers use Par Funding
20  domain names for their emails.
21       Q.   Do recipients know that he's
22  not really employed by Par Funding?
23       A.   No, they don't know the
24  relationship between brokers and MCA
```

Page 309

```
1   companies.
2        Q.   Okay.  And is that
3   intentional?
4        A.   No.
5        Q.   It's not intentional?  Then
6   why not -- why doesn't this say Full
7   Spectrum Processing or Recruiting and
8   Marketing Resources because that's really
9   what he works for, right?
10       A.   No, he works for Recruiting
11  and Marketing Resources.  It makes it
12  easier for them to work with a company by
13  having that email address.
14       Q.   Why is it easier?  Because
15  they -- because they're misled about who
16  he actually works for?
17       A.   No, because it makes it less
18  complicated for them to understand that
19  they're talking to representatives of the
20  company rather than a broker.
21       Q.   So less complicated for them
22  to -- it's more complicated for them to
23  know the truth?
24       A.   For them to understand that
```

Page 310

1   there's a broker involved, yes.
2       Q.   So you don't want them to
3   know there's a broker involved, right?
4       A.   Yes.
5       Q.   So you're intentionally
6   misleading people to believe there's no
7   broker involved, right?
8           MR. BERMAN:  Objection.
9           THE WITNESS:  It isn't to
10      mislead the client, it's to make
11      their relationship easier to
12      convey.
13  BY MR. HESKIN:
14      Q.   To knowingly keep them in
15  the dark that they're employed by Par
16  Funding when they're actually employed by
17  Recruiting and Marketing Resources,
18  right?
19          MR. BERMAN:  Objection.
20          THE WITNESS:  No, we have
21      email accounts both ways.  These
22      guys often send deals from the
23      broker entity directly.  It so
24      happens that Kara, the

Page 311

1       relationship was inside of Par
2       Funding.  There's no need for it
3       to go through the broker entity.
4   BY MR. HESKIN:
5       Q.   That's interesting.  So --
6   so did -- did you search for emails from
7   Joe in the Recruiting and Marketing
8   Resources email?
9       A.   No.
10      Q.   Why not?
11      A.   I didn't need to.
12      Q.   Did you search for his AOL
13  account for responsive emails?
14      A.   No.
15      Q.   Did you put a litigation
16  hold on his emails?
17      A.   Yes.
18      Q.   Did you put a litigation
19  hold on anyone's emails?
20      A.   Not to my understanding.
21      Q.   Are you aware whether or not
22  there's a litigation hold on documents
23  related to this litigation?
24      A.   No.

Page 312

1       Q.   Has a litigation hold been
2   provided to anyone that worked on the HMC
3   account?
4       A.   No, not to my knowledge.
5       Q.   Who would be responsible for
6   that?
7       A.   I'm not sure.
8       Q.   You never received a
9   litigation hold instruction, right?
10      A.   Not that I remember.
11      Q.   Okay.  Let's look at this.
12  So this is Joe Mack.  We can -- we can
13  agree that the Joe@ParFunding is one
14  misrepresentation, correct?
15      A.   No.
16      Q.   Not -- not a
17  misrepresentation?
18      A.   No, it's not -- its
19  intension isn't to misrepresent.  It's
20  for communication with our clients.
21      Q.   I didn't say whether it was
22  intentional or unintentional.  It's a
23  flat-out misrepresentation, right?
24  Because he's not at ParFunding.com,

Page 313

1   right?
2           MR. BERMAN:  Objection.
3           THE WITNESS:  No, he's not a
4       ParFunding.Com.
5   BY MR. HESKIN:
6       Q.   Okay.  We can agree on that.
7   All right.
8           And here's Joe saying:
9           "I can get him 12 percent
10  for 24 months, interest payable monthly,
11  140K a month, balloon at 24th month."
12          And he says:
13          "Just got audited financials
14  done."
15          That would be something you
16  would have done, right?
17      A.   Yes.
18      Q.   Okay.  And he says here:
19          "We have $270 million in
20  advances working with Par and I have
21  several other funds."
22          Is that a true and correct
23  statement?
24      A.   I'm not sure what he means

Page 314

1  by, "I have several other funds."
2      Q.   Well, what about the $270
3  million in advances?  As of October 19,
4  2018, did Par Funding have $270 million
5  in advances working?
6      A.   Yes, that's a good
7  approximation for that period of time.
8      Q.   Okay.  And it states here:
9          "I have 80 million in the
10 company myself."
11         Is that a true and correct
12 statement?
13     A.   No.
14     Q.   It's not?  So this is an
15 email that is being sent on Par Funding
16 email representing that this is coming
17 from Par Funding and that Joe Mack is not
18 only associated or working for Par
19 Funding, but that he has $80 million in
20 the company himself, right?
21     A.   I don't understand your
22 question.
23     Q.   Am I right with that
24 characterization, that Joe Mack or Joe

Page 315

1  LaForte is representing -- well, it's
2  actually -- I think we talked about three
3  misrepresentations.
4          First of all, his name is
5  not Joe Mack, right?  That's a false
6  represent -- that's a knowingly false
7  representation, right?
8          MR. BERMAN:  Objection.
9  BY MR. HESKIN:
10     Q.   Right?
11     A.   I've already said that's
12 what he goes by.
13     Q.   One misrepresentation.
14         Second misrepresentation
15 that he's Joe@ParFunding.com, correct?
16 Knowingly false representation, right?
17         MR. BERMAN:  Objection.
18 BY MR. HESKIN:
19     Q.   That's two, right?
20     A.   Yes.
21     Q.   Three, that he has 80
22 million in the company itself, right?
23 That's the third misrepresentation,
24 right?

Page 316

1          MR. BERMAN:  Objection.
2          THE WITNESS:  Yes.
3  BY MR. HESKIN:
4      Q.   Okay.  And that his money
5  would be side-by-side with mine.
6          Do you see that?
7      A.   Right.
8      Q.   That's another
9  misrepresentation, right?
10     A.   Yes.
11     Q.   Because Joe doesn't have any
12 money, right?
13     A.   Right.
14     Q.   Do you have any idea why he
15 would be making all these false
16 representations --
17     A.   No.
18     Q.   -- to my client?
19     A.   No.
20     Q.   Who is Perry?
21     A.   Perry is a consultant for
22 the company.
23     Q.   Okay.  And what does he do
24 for the company?

Page 317

1      A.   He communicates with
2  investors.
3      Q.   So he's responsible for
4  telling -- making -- telling investors
5  about what CBSG does, right?
6      A.   Yes, he provides information
7  to them.
8      Q.   Okay.  Perry doesn't
9  actually work for Par Funding, right?
10     A.   Perry does not directly work
11 for Par Funding.
12     Q.   He's a consultant, right?
13 Right?
14     A.   Yes.
15     Q.   Any reason why Perry
16 Abbonizio would be representing to people
17 that he also works at Par Funding?
18     A.   It depends on his
19 interpretation of how a consulting
20 agreement works.
21     Q.   Well, how about him having a
22 Par Funding email?
23     A.   Yes, he is a representative
24 of Par Funding and has a Par Funding

MAGNA
LEGAL SERVICES

Page 318

1 email.
2     Q.   And that's something that
3 Par Funding would authorize him to do,
4 right?
5     A.   Yes.
6     Q.   I can't just get a Par
7 Funding email and call it
8 Shane@Parfunding.com, right?
9     A.   Right.
10    Q.   I'd have to get
11 authorization from Par Funding, right?
12    A.   Yes.
13    Q.   And who at Par Funding
14 authorized Perry and Joe to have Par
15 Funding emails?
16    A.   I authorized it.
17    Q.   You authorized it?
18    A.   Yes.
19    Q.   How many other people did
20 you authorize to have Par Funding emails
21 that don't have any affiliation with Par
22 Funding?
23        MR. BERMAN:  Objection.
24        THE WITNESS:  I don't know.

Page 319

1 BY MR. HESKIN:
2     Q.   Is it more than a dozen?
3     A.   I don't know.
4     Q.   How many people have Par
5 Funding emails?
6     A.   I don't know.
7     Q.   You understand that there
8 should be only one person with a Par
9 Funding email, right?
10    A.   No.  We have, under our
11 operating agreement, capacity to service
12 the company and they often use Par
13 Funding emails for that.
14    Q.   And that's right in the
15 agreement?  If I read the agreement, it's
16 going to say that they're authorized to
17 use Par Funding and misrepresent to
18 people that they're really with Par
19 Funding?
20    A.   No.
21    Q.   I didn't think so.  Okay.
22        And so just so we're clear,
23 you were fully aware that Perry
24 Abbonizio's in communication with my

Page 320

1 client and Joe Mack representing himself
2 as being with Par Funding, right?
3     A.   Yes.
4     Q.   Got it.
5        MR. HESKIN:  Did you hear my
6 Alexa?  Let's pull up Exhibit 7.
7 BY MR. HESKIN:
8     Q.   Have you seen this document?
9     A.   I have not.
10    Q.   This post says it's written
11 by Joseph LaForte.
12        Do you see that?
13    A.   Yes.
14    Q.   And it says that he's the
15 director of sales at Par Funding.
16        Do you see that?
17    A.   Yes.
18    Q.   And that he's generated over
19 a billion dollars in sales for clients in
20 his career.
21        Do you see that?
22    A.   Yes.
23    Q.   Are those truthful
24 statements?

Page 321

1     A.   Yes.
2     Q.   He's the director of sales
3 at Par Funding?
4     A.   They're a broker entity.
5     Q.   I thought he's employed by
6 Recruiting and Marketing Resources?
7     A.   Right.  We don't have a
8 director of sales at Par Funding, we work
9 with our close broker entity who serves
10 in that function.
11    Q.   So Par Funding doesn't have
12 a director of sales, yet it's a truthful
13 statement to say that Joe LaForte is the
14 director of sales at Par Funding, right?
15    A.   He's a director of sales by
16 function with Par Funding just because of
17 the operating agreement we have with our
18 sales entity.
19    Q.   Okay.  Is the guy with the
20 period, is that Joe LaForte?
21    A.   No.
22    Q.   Who is that guy?
23    A.   It looks like stock footage.
24    Q.   Okay.  That's not really Joe

MAGNA
LEGAL SERVICES

Page 322

1  LaForte, right?
2      A.   No.
3      Q.   Why are -- why is Joe
4  LaForte trying to lead people to believe
5  that this is -- this is him?
6          MR. BERMAN:  Objection.
7          THE WITNESS:  I think it's
8      just a use of stock photo.  I
9      think no one believes that that's
10     the guy.
11 BY MR. HESKIN:
12     Q.   Is this really an article
13 that was on Forbes.com?
14     A.   I would assume so.
15     Q.   So if I go on Forbes.com,
16 I'm going to find this article on there?
17     A.   Yes.  I have not seen this
18 article myself, but I would assume it is
19 on there.
20     Q.   So if I called up Forbes,
21 they're going to say that they wrote this
22 article and that Forbes is
23 misrepresenting to people that this
24 picture is really Joe LaForte?  You

Page 323

1  really think that Forbes is that
2  incompetent?
3          MR. BERMAN:  Objection.
4          THE WITNESS:  I have no
5      reason to believe otherwise.
6  BY MR. HESKIN:
7      Q.   Really.  You think that
8  Forbes Magazine is going to write an
9  article and depict the wrong person on
10 their article?
11     A.   No.
12     Q.   But that's exactly what this
13 is, right?
14     A.   No.
15     Q.   It's not?  That's not Joe
16 LaForte, right?
17     A.   It's not.
18     Q.   Okay.  But it appears on --
19 apparently it appears on Forbes's website
20 as an article being written by Forbes,
21 right?
22     A.   No.
23     Q.   No?  Who is it written by?
24     A.   It says at the top, Written

Page 324

1  by --
2      Q.   By who?
3      A.   It says Joseph LaForte is
4  the author.
5      Q.   So Joe wrote this?
6      A.   Yes, it looks like it.
7      Q.   Joe -- Joe wrote all of this
8  and he picked the picture and did all
9  this, is that -- is that your testimony?
10     A.   I'm not sure.
11     Q.   I highly doubt that's true.
12         MR. BERMAN:  Is that meant
13     to insult him or just to put a
14     statement otherwise?  I mean...
15         MR. HESKIN:  I can't imagine
16     that Joe wrote this, but we'll
17     find out.
18         MR. BERMAN:  You already
19     asked him these questions, but
20     okay.
21         MR. HESKIN:  Go to the next
22     page.  I think it's 8 of 36.
23 BY MR. HESKIN:
24     Q.   Another post.  Have you ever

Page 325

1  seen this document?
2      A.   I have not.
3      Q.   Again, Joe LaForte --
4  written by Joe LaForte, director of sales
5  Par Funding.
6          Do you see that?
7      A.   Yes.
8      Q.   That's not him, right?
9      A.   Who are you asking?  Do you
10 think he's the woman?
11     Q.   The picture.  That's not him
12 in the picture, right?
13     A.   No, again that's stock
14 footage.
15     Q.   Okay.
16         MR. BERMAN:  Shane, do you
17     have any questions that you want
18     to ask about Kara DiPietro or do
19     you just want to continue this?
20         MR. HESKIN:  Go to page 11.
21 BY MR. HESKIN:
22     Q.   Joe LaForte, Par Funding,
23 executive director of sales and
24 operations, Miami, Florida.

Page 326

1    Do you see that?
2    A.   Yes.
3    Q.   That's interesting, isn't
4 it?
5    A.   Are you asking me if it's
6 interesting?
7    Q.   Yes.  Is it accurate?
8    A.   Yes.
9    Q.   It is accurate.  So Par
10 Funding has an office in Miami?
11    A.   Yes.
12    Q.   And that's where Joe LaForte
13 works out of?
14    A.   No.
15    Q.   Well, it says here he's in
16 Miami, doesn't it?
17    A.   Yes.
18    Q.   Okay.  And it also says he's
19 the executive director of sales and
20 operations, right?
21    A.   Right, I've already
22 explained that.
23    Q.   Okay.  Well, if he's a
24 director, isn't that something you have

Page 327

1 to disclose on your SEC Form D that you
2 signed?
3    A.   No.
4    Q.   No?  You don't have to
5 disclose all of your directors on the
6 Form D?
7    MR. BERMAN:  Objection.
8 BY MR. HESKIN:
9    Q.   You identified the three.
10    A.   That's not legally who is
11 the director of CBSG.
12    Q.   Okay.  So this isn't true,
13 he's not really a director, right, even
14 though he's --
15    A.   I've already explained, he
16 serves a function through our sales
17 entity.
18    Q.   Okay.  Well, he's
19 representing that he's the director of
20 sales operations at Par Funding, but
21 you're not disclosing it to the SEC.  Is
22 there a reason for it?
23    A.   Because it's not really
24 legally valid that he's a sales director

Page 328

1 at Par Funding.  He's not on operating
2 agreements or corporate documents.
3    Q.   So -- all right.  If you go
4 to page 14.  Do you see the education
5 portion of this?
6    A.   Yes, I see that.
7    Q.   If I went to Belmont Abbey
8 College am I going to find an MBA for Joe
9 LaForte?
10    A.   I don't know.
11    Q.   You don't know?  It says
12 right here he's got a master's, an MBA
13 from Belmont Abbey College from 1990 to
14 1992.  Is that true?
15    A.   I don't know.
16    Q.   If I want to Rollins
17 College, am I going to find a bachelor's
18 degree that he earned that one year?
19    A.   I don't know.
20    Q.   Do you know whether or not
21 that's a truthful statement?
22    A.   I don't know.
23    Q.   Okay.  All right.
24    MR. HESKIN:  So go to page

Page 329

1    15.
2 BY MR. HESKIN:
3    Q.   It looks like Joe's got a
4 Twitter -- Twitter feed as well?  He
5 represents here that he's the vice
6 president at Par Funding; is that right?
7    A.   He's not a vice president of
8 Par Funding.
9    Q.   Do you understand why he's
10 representing that on his Twitter feed?
11    A.   It's the same thing I
12 explained before with our relationship to
13 the sales entity.
14    Q.   Do you have any vice
15 presidents at Par Funding?
16    A.   No.
17    Q.   Oh, okay.  Sir, you
18 testified earlier that CBSG only does
19 factoring, right?
20    A.   Correct.
21    Q.   All right.  What's Par
22 Funding's Farm Factory?
23    A.   I don't know.
24    Q.   You don't know?

Page 330

```
1        A.   I don't know.
2        Q.   Well, can you turn to page
3  23?  Does this refresh your memory of
4  what Par Funding Farm Factory is?
5        A.   No.
6        Q.   You've never seen that?
7        A.   No.
8        Q.   Does it exist?
9        A.   No.
10       Q.   No, it's not a new program
11 that offers business planning?
12       A.   No.
13       Q.   Does Par Funding offer
14 business advice to small businesses?
15       A.   In the spirit of our
16 product, we give guidance to make sure
17 that the factoring transactions make
18 sense for our clients.
19       Q.   And this is directly during
20 the period of my client's agreements,
21 right, June 12th, 2019?
22       A.   That's about when they
23 stopped paying us.
24       Q.   Yeah.  Did Par Funding ever
```

Page 331

```
1  give my client business advice?
2        A.   I believe that there were a
3  lot of conversations between Joe and Kara
4  in regards to how her business should be
5  run and Kara --
6        Q.   Okay.  Go ahead.
7        A.   And Kara was very
8  appreciative of advice provided to her by
9  Joe.
10       Q.   Worked out well, right?
11       A.   She said that she would not
12 have grown her business the way she had
13 without the assistance of the factoring
14 product.
15       Q.   Sure.  And was that
16 statement before or after CBSG confessed
17 judgment against her, froze her bank
18 accounts and sent out 4,000 UCC notices
19 to various entities, is that before or
20 after?
21       MR. BERMAN:  Objection.
22       THE WITNESS:  Yes, that was
23   before she defaulted on her
24   transactions.
```

Page 332

```
1  BY MR. HESKIN:
2        Q.   Got it.  And you're aware
3  that CBSG sent out 4,000 UCC notices,
4  right?
5        A.   I am not aware.
6        Q.   You're not aware of that?
7        A.   I'm not aware of the total
8  count.
9        Q.   Okay.  You're aware they
10 sent out UCC notices, right?
11       A.   Right.
12       MR. HESKIN:  All right.
13   I've got to take a break real
14   quick.  Let's come back in 15.  So
15   come back at 4:10.
16       (Recess.)
17 BY MR. HESKIN:
18       Q.   All right.  So welcome back.
19       Joe, is there any reason why
20 everyone at Par Funding uses fake names?
21       A.   I don't know what you mean.
22       Q.   Well, your name is not
23 really Joe Cole, is it?
24       A.   It is.
```

Page 333

```
1        Q.   Your name -- your last name
2  is Cole?
3        A.   No, it's my middle name.
4        Q.   Okay.  Your real name is
5  Joseph Barleta, right?
6        A.   Joseph Louis Cole Barleta.
7        Q.   Okay.  And why do you use
8  the word Cole?
9        A.   Because it's easier to
10 understand and remember.
11       Q.   Okay.  Do you always use the
12 word -- the name as Joe Cole?  What's it
13 say on your license?
14       A.   Joseph L. Cole Barleta.
15       Q.   And do you always represent
16 yourself as Joe Cole on media, et cetera?
17       A.   It depends on the document,
18 but generally, yes.
19       Q.   Why does it depend on the
20 document?
21       A.   It didn't require full
22 names.
23       Q.   So you don't ever go by Joe
24 Barleta?
```

Page 334

1      A.   My mom calls me that.
2      Q.   Okay.  Well, you don't call
3  yourself Joe Barleta, right?
4      A.   No.
5      Q.   And Joe Mack is not really
6  Joe Mack, right?
7      A.   No.  I don't know where he
8  got the nickname from.
9      Q.   Okay.  And Anthony Ron,
10  that's not really his name, right?
11     A.   I believe Ron is his middle
12  name as well.
13     Q.   Okay.  So he doesn't use
14  his -- his real first and last name,
15  right?
16     A.   Anthony is his real first
17  name.
18     Q.   Okay.  A lot of people
19  misrepresent themselves as being employed
20  by Par Funding.  You wouldn't do that,
21  right?
22     A.   I was employed by Funding --
23  by Par Funding and still a director of
24  it.

Page 335

1      Q.   Okay.
2      A.   So if you asked me if I
3  worked for Par Funding I would say yes
4  without getting into the nuances of what
5  a director in the company means.
6      Q.   What are the nuances?
7      A.   A director is in charge of
8  certain aspects of the business, not
9  necessarily an employee, that whole
10  conversation.
11     Q.   What's Capital Source 2000?
12     A.   Capital Source 2000 is a
13  company I have outside of Par Funding.
14     Q.   And you're the owner of
15  Capital Source?
16     A.   One of the owners.
17     Q.   Who is the other owner?
18     A.   William Bromley.
19     Q.   All right.  Well, you
20  wouldn't -- you wouldn't misrepresent to
21  people that Par Funding is based in
22  Philadelphia, would you?
23     A.   We have operations through
24  our operating agreement with the

Page 336

1  processing entity in Philadelphia.
2      Q.   Yeah.  But I mean, we talked
3  about this ad nauseam today.  Par Funding
4  is not based in Philadelphia, right?
5      A.   Correct.
6      Q.   Okay.
7         MR. HESKIN:  Can you pull up
8      Exhibit No. 20, please?
9  BY MR. HESKIN:
10     Q.   What is The Marque?
11     A.   That's a profile.
12     Q.   Did you write it?
13     A.   Nope, it's a professional
14  that wrote that.
15     Q.   Did they contact you?
16     A.   Yes.
17     Q.   And you gave them the
18  information for it?
19     A.   Yes.
20     Q.   And -- and you reviewed it
21  before it was published, right?
22     A.   Yes.
23     Q.   And if I go on that website
24  right now, which I just did, I'd find the

Page 337

1  exact same information, right?
2      A.   That's correct.
3      Q.   Okay.  Any reason why you're
4  representing that Par Funding is based in
5  Philadelphia?
6      A.   It's where we operate
7  through the Full Spectrum operating
8  entity.
9      Q.   Well, let's look at what you
10  say here on here under Biography, second
11  paragraph:
12         "Since 2012, Joseph has also
13  served as the chief financial officer for
14  Complete Business Solutions Group, Inc.,
15  a commercial factoring company based in
16  Philadelphia."
17         Do you see that?
18     A.   Yes.
19     Q.   It's not true, is it?
20     A.   It was originally based in
21  Philadelphia.  Subsequently moved to
22  Florida.
23     Q.   So that statement, as we
24  stand here today, is incorrect, right?

MAGNA ▶
LEGAL SERVICES

Page 338

1     A.   Yeah.  I mean, you're
2  talking about an old profile, right?
3     Q.   This is an old profile?
4     A.   I don't know the last time
5  they updated this thing was.
6     Q.   When did you do this
7  profile?
8     A.   It was a while ago.
9     Q.   Well, it couldn't have been
10 too far, it talks about your positions
11 include CFO at Full Spectrum Processing,
12 that --
13    A.   Yeah, they update the copy
14 on it.  The writer does.
15    Q.   That happened in 2017,
16 right?
17    A.   Correct.
18    Q.   Okay.  So they got that
19 updated information, right?
20    A.   Yes.
21    Q.   Okay.  And Vision Solar,
22 what's that?
23    A.   That is a solar panel
24 construction company in New Jersey.

Page 339

1     Q.   Who owns that?
2        MR. BERMAN:  You don't have
3  to answer these questions.
4  BY MR. HESKIN:
5     Q.   Are you refusing to answer?
6        MR. BERMAN:  Yeah, I'm
7  telling him not to answer.
8  BY MR. HESKIN:
9     Q.   Okay.
10       MR. BERMAN:  This is not an
11 asset deposition of Joe Cole.
12 It's actually harassing.
13 BY MR. HESKIN:
14    Q.   What's your role at Vision
15 Solar?
16       MR. BERMAN:  You don't have
17 to answer that question.
18       MR. HESKIN:  You're
19 instructing him not to answer?
20       MR. BERMAN:  I'm instructing
21 him you have zero good faith basis
22 as part of the HMC versus Complete
23 Business Group, Inc., to be
24 talking about Joe Cole's role with

Page 340

1  a solar company in New Jersey,
2  yes.  This is harassing.
3        MR. HESKIN:  Okay.  It's
4  actually impeachment for his prior
5  testimony that Par Funding doesn't
6  loan-to-own.
7        MR. BERMAN:  I have no idea
8  what you're talking about.  That
9  has nothing --
10       MR. HESKIN:  I know you
11 don't, so that's why your
12 objection is baseless.
13       MR. BERMAN:  Listen, you can
14 call it whatever you want.  You're
15 not going to go into ownership
16 information of his assets.  Ask
17 him a question that you can
18 impeach.
19       MR. HESKIN:  This isn't his
20 asset, this is owned by Lisa
21 McElhone, isn't it?
22       MR. BERMAN:  That's none of
23 your business.  It's none of your
24 business.

Page 341

1  BY MR. HESKIN:
2     Q.   Is it or is it not true that
3  Vision Solar was obtained -- was a prior
4  merchant agreement -- was a merchant
5  customer of CBSG?
6        MR. BERMAN:  Yes.  Your
7  questions are directly violative
8  of a court order.
9        Do not answer the question.
10       MR. HESKIN:  Okay.  Got it.
11 BY MR. HESKIN:
12    Q.   And if you look -- look at
13 page 2, it lists separately CBSG and Par
14 Funding, right?
15    A.   Yes.
16    Q.   Aren't they one and the
17 same?
18    A.   Yes.
19    Q.   Is there a reason why you
20 did it twice?
21    A.   No.
22       MR. HESKIN:  All right.
23 Let's pull up Exhibit No. 31.
24 BY MR. HESKIN:

MAGNA
LEGAL SERVICES

Page 342

1    Q.   Have you seen this document
2  before?
3    A.   Yes.
4    Q.   You signed it, right?
5    A.   Correct.
6    Q.   Do you typically
7  misrepresent the location of CBSG, is
8  this a common practice of yours?
9    A.   Same thing with the
10 operating agreement we have in
11 Philadelphia.
12   Q.   Okay.  So you think that's a
13 truthful and accurate statement --
14   A.   Yes.
15   Q.   -- at the top?
16   A.   Yes.
17   Q.   That CBSG is located at 20
18 North 3rd Street?
19   A.   Yes, by proxy with our
20 operating agreement with the processing
21 entity.
22   Q.   Even though CBSG doesn't pay
23 taxes to Philadelphia, right?
24   A.   Correct.

Page 343

1    Q.   Okay.  Does the City of
2  Philadelphia know that CBSG's
3  representing that it's located at 20
4  North 3rd Street?
5        MR. BERMAN:  Objection.
6        THE WITNESS:  I don't know.
7  BY MR. HESKIN:
8    Q.   Okay.  All right.  Can you
9  again state for the record who -- who
10 this Clifton Larson Allen is?
11   A.   That is a financial auditor.
12   Q.   Okay.  And the information
13 provided in here is from you, right?
14   A.   From our department, yes.
15   Q.   And it's dated October 24th,
16 2019, right?
17   A.   Yes.
18   Q.   Is the information in here
19 true and correct?
20   A.   Yes.
21   Q.   Yes?
22   A.   Yes.
23   Q.   Okay.  This is for the
24 December 19th, 2018 agreement, right?

Page 344

1    A.   Correct.
2    Q.   And it states here that the
3  daily specified payment is $3,500, right?
4    A.   Correct.
5    Q.   And that's a required
6  payment, right?
7    A.   Yes.
8    Q.   And it's a fixed payment,
9  isn't it?
10   A.   It is.
11   Q.   It is.  In fact, I have an
12 email from Joe confirming that these
13 payments are fixed, right?
14   A.   Correct.
15   Q.   Okay.
16        MR. HESKIN:  Can you pull
17   up -- let me just see.  I want to
18   pull up this one first.  Pull up
19   Exhibit No. 22.
20 BY MR. HESKIN:
21   Q.   Have you seen this document?
22   A.   No.
23   Q.   This is an email from Aida
24 Lau, right?

Page 345

1    A.   Yes.
2    Q.   And again it says that she's
3  at Par Funding, right?
4    A.   Yes.
5    Q.   Not really true, right?
6    A.   She's an operator out of
7  Full Spectrum.  Again, the same service
8  agreement that we have.
9    Q.   Okay.  And here she is
10 confirming that the Joe says the
11 agreements are fixed, you need to come
12 and discuss about this, right?
13   A.   Yes.
14   Q.   And that's your
15 understanding as well, right?
16   A.   Yes.
17   Q.   Okay.
18        MR. HESKIN:  Let's pull up
19   Exhibit No. 29.  Well, before we
20   get to 29.  Let's go to -- yeah,
21   let's go to Exhibit 25.
22 BY MR. HESKIN:
23   Q.   Have you ever seen this
24 document before?

Page 346

1    A.   Yes.
2    Q.   It's inconsistent with the
3  testimony you just gave me, isn't it?
4    A.   Let me read it.  Oh, this
5  was in communications with Kara letting
6  her know we didn't want to do an
7  additional deal.
8    Q.   Well, this is on the 12/19
9  contract?
10   A.   Yes.
11   Q.   The daily payment went from
12  3,500, which you said was fixed --
13   A.   Right.
14   Q.   -- to 16,500.  Do you see
15  that?
16   A.   Yup.
17   Q.   What's the basis for doing
18  that?
19   A.   There's multiple payments
20  that we were processing for her at the
21  time.  She was confused about how those
22  payments are being reconciled and applied
23  to her different deals.
24   Q.   Really?  Are you sure about

Page 347

1  that?
2    A.   Yes.
3    Q.   And what's the basis for
4  that?
5    A.   Because Kara's bookkeeper
6  and her accounting know-how on this is
7  not very good.
8    Q.   Really?  So you're not --
9  you don't -- you didn't speak to Joe --
10  Joe LaForte about this, did you?
11   A.   No, that's an email from her
12  to me copying her accountant, Aida and
13  Joe.
14   Q.   Are you aware that Joe
15  instructed Aida to increase the payments?
16       MR. BERMAN:  Objection.
17       THE WITNESS:  No.
18  BY MR. HESKIN:
19   Q.   You're not aware of that?
20   A.   No.
21   Q.   Who directed the payments to
22  be increased from 3,500 to 16,500?
23   A.   I directed it.
24   Q.   You directed it?

Page 348

1    A.   Aida reports to me.
2    Q.   Okay.  You directed it?
3    A.   Yes.
4    Q.   And how did you come up from
5  the number increasing it from $3,500 to
6  16,500?
7    A.   Because like your other
8  transaction, she was passed on the
9  regular fee portion and we had to
10  reassess the factor rate on that
11  transaction.
12   Q.   That's your testimony?
13   A.   That's correct.
14       MR. HESKIN:  Let's pull up
15  Exhibit No. 29.
16  BY MR. HESKIN:
17   Q.   Have you ever seen this
18  document?
19   A.   No.
20   Q.   Who is John Hartley?
21   A.   John Hartley is counsel for
22  FSP.
23   Q.   For who?
24   A.   Full Spectrum Processing.

Page 349

1    Q.   And he's actually counsel
2  for -- acts as counsel on behalf of CBSG,
3  right?
4    A.   Correct.
5    Q.   Okay.  And what does he say
6  the reason for the payments is?
7        MR. BERMAN:  Objection, that
8  would call for attorney/client
9  privileged communication.
10       MR. HESKIN:  No, it's not.
11  It's right here in writing and
12  it's an email --
13       MR. BERMAN:  I
14  misunderstood.  You actually want
15  him to read the email to you and
16  say what John Hartley said.  I'm
17  sorry, I didn't realize that would
18  be your question.
19       So Joe, yeah, please look at
20  the email and tell him what the
21  email says.
22       THE WITNESS:  John Hartley's
23  email reads:
24       "Joshua, Regarding your

MAGNA
LEGAL SERVICES

Page 350

```
1        question, under both the
2    August 24th, 2018 and October 3rd,
3    2018 agreement" --
4  BY MR. HESKIN:
5        Q.   And I'm not talking about
6    that one, I'm talking about
7    December 19th, which is the second
8    paragraph.
9        A.   You want me just to read the
10   second paragraph?
11       Q.   You don't have to read it
12   out loud.  Just tell me -- tell me if
13   that's consistent with what you just told
14   me under oath.  Which story is correct,
15   the one you just told me or the one that
16   Hartley told Krakowski back May 14th,
17   2019, when this actually transpired?
18       A.   I agree.  It's based on the
19   agreement having the ability to increase
20   the payment.
21       Q.   That's not what you just
22   testified to.
23       A.   That what I concurred on my
24   agreement, too.  It was listed on there
```

Page 351

```
1    as an ability for us to raise payment.
2        Q.   Okay.  And it's saying
3    that -- first of all, your testimony
4    again is all over the, place but that's
5    fine.
6            Second of all --
7        MR. BERMAN:  Are you making
8    a statement to him or are you
9    like -- are you -- you don't like
10   his answers, you just make
11   statements.
12       MR. HESKIN:  No, I love
13   them.  Don't worry, I love his
14   answers.
15       MR. BERMAN:  I love you that
16   love it.  Shane, I mean, you love
17   it when you have a client that has
18   no damages.  But keep on going.
19   Keep on making the insulting
20   statements about everyone at the
21   company.  It's okay.  And make up
22   lies about racketeering claims
23   against certain individuals.  Just
24   keep on going.
```

Page 352

```
1        Ask questions, it's a
2    deposition.
3        MR. HESKIN:  Good.
4  BY MR. HESKIN:
5        Q.   So which is true, the
6    testimony you gave me five minutes ago or
7    what's stated here by her?
8        A.   Both.  I don't see -- don't
9    see an incongruent statement here with
10   the one that I said.
11       Q.   Here it says that the
12   increases were based on an increase in
13   income, right?
14       A.   Are you asking me to read
15   this again?
16       Q.   I'm -- am I reading that
17   correctly?
18       A.   No, it doesn't say it's
19   based on an increase in income.
20       Q.   It says:
21           "Because the daily amount
22   could be increased based on a percentage
23   of income."
24           Do you see that?
```

Page 353

```
1        A.   Yes.
2        Q.   Okay.  So I'd assume that
3    when they increased from 3,500 to $19,000
4    a day, there must have been a
5    corresponding increase in income, right?
6        A.   Yes.
7        Q.   And you're the one that
8    calculated it.  You just testified five
9    minutes ago you calculated it, right?
10       A.   Yes, based on the agreement
11   that that was the reason why we could
12   increase the rate.
13       Q.   Okay.
14       MR. BERMAN:  Shane, Shane,
15   Shane.  Shane, before you ask a
16   question, I have to take a call
17   for one second.  All right.
18       MR. HESKIN:  Sure.
19       MR. BERMAN:  Okay.  Thanks.
20       (Recess.)
21  BY MR. HESKIN:
22       Q.   Sir -- so Joe, you testified
23   earlier that you made the calculation to
24   increase the payments.  What information
```

Page 354

1  did you base it on?  What information did
2  you have to base the calculation?
3      A.   That was based on the same
4  information John Hartley is referring to
5  on the agreement.
6      Q.   Okay.  What specific
7  information did you have?  Did you have
8  their bank statements?
9      A.   I'd have to refer back to
10  what it said on the agreement.
11      Q.   Well, it says income,
12  remember, can increase it based on
13  income?
14      A.   Yes.
15      Q.   And I want to know, you're
16  the one that made the decision to
17  increase it, you're the one that
18  increased it from 3,500 to $19,000 a day.
19  Actually, I think it was $20,000 a day.
20  What did you base it on?
21      A.   It was based on the
22  agreement.
23      Q.   Okay.  I got -- I got the
24  agreement, but what financial

Page 355

1  information?  Hartley says it was because
2  there was an increase in income.  What
3  did you have in your -- in front of you
4  that showed that the income increased by
5  a factor of six in less than a month?
6          MR. BERMAN:  Objection.
7          THE WITNESS:  I'd have to
8      refer to the agreement and the
9      information provided by the
10      customer department.
11  BY MR. HESKIN:
12      Q.   You're the 30(b)(6), you
13  should have reviewed and educated
14  yourself on it.  What's CBSG's position
15  on what the basis was for increasing the
16  daily payments from 3,500 to nearly
17  $20,000 a day?
18      A.   Based on a percentage of
19  income as detailed on the agreement.
20      Q.   Okay.  And what information
21  did CBSG -- you, since you're the one
22  that did it, what information did you
23  have that showed such a drastic increase
24  in income?

Page 356

1          MR. BERMAN:  Objection.
2  BY MR. HESKIN:
3      Q.   What did you review?
4      A.   We have to -- we would have
5  had the client information and
6  communications from the client.
7      Q.   I'm asking you not what
8  would you have done, what did you do?
9  What did you review?  So I can make the
10  same calculation, I can go look at the
11  bank statement, I can go look at the
12  income statement, whatever statement you
13  looked at and compare and do the math and
14  come up with these numbers?
15      A.   Yeah, it would be based on
16  that information.
17      Q.   On the bank statements?
18      A.   On whatever they provided to
19  me at the time.
20      Q.   So I'll be able to see an
21  email from -- that your lawyers produced
22  showing the bank statements that you
23  looked at to make that calculation?
24      A.   It's not necessarily the

Page 357

1  bank statements, it's whatever current
2  information is being communicated by the
3  client in our underwriting customer
4  service department.
5      Q.   Well, I'm asking you
6  specifically what you based it on.  You
7  just said bank statements.  So I should
8  be able to look at the bank statements,
9  see it in your email, see some record of
10  it in the underwriting file or whatever
11  that you made the calculation that the --
12  an increase by 6, 7 percent -- six, seven
13  times, right?
14      A.   I didn't say bank statement,
15  you said bank statement.
16      Q.   Oh, I said it.  So when we
17  go back and look at the transcript, I'm
18  not going to find the word bank statement
19  from you?
20      A.   You brought it up, yes.
21      Q.   Well, then if -- it wasn't
22  the bank statements, right?  Okay.  So
23  now we're taking -- you didn't look at
24  the bank statements, right?  You didn't

MAGNA
LEGAL SERVICES

Page 358

1   look at the bank statements?
2       A.   I don't recall what was
3   reviewed.
4       Q.   What was reviewed?
5       A.   I said I don't recall what
6   was reviewed.
7       Q.   Well, what's CBSG's
8   corporate position as to what they based
9   it on?
10      A.   It was based on --
11      Q.   If you don't know, that's
12  fine, that's great.  Is it CBSG's
13  corporate position that they don't know
14  what they based the increase on, is that
15  their corporate position?
16          MR. BERMAN:  Objection.
17          THE WITNESS:  No.
18  BY MR. HESKIN:
19      Q.   Okay.  Well, what did they
20  base it on?
21      A.   I'm saying the decision was
22  based on the agreement and documentation
23  provided by our customer service
24  underwriting department when we increased

Page 359

1   that payment.
2       Q.   Okay.  And what specific
3   information was provided to you since
4   you're the one that made that
5   calculation?
6       A.   I don't recall what the
7   specific information was.
8       Q.   Okay.  So you can't identify
9   to me as you sit here today why you
10  authorized an increase from 3,500 to
11  $19,995 a day in the span of less than a
12  month?
13      A.   I don't recall the specific
14  information reviewed to make that
15  decision.
16      Q.   As you sit here today, do
17  you -- are you aware that HMC's income
18  increased by seven times, 700 percent in
19  the span of a month?
20      A.   No, I'm not aware of that.
21      Q.   Is that what you thought
22  when you increased it from 3,500 to
23  nearly $20,000 a day?
24      A.   We had a discussion with her

Page 360

1   and her numbers.
2       Q.   So I'm going to find an
3   email that says that, Yeah, go ahead and
4   increase my payments to 20,000 a day?
5       A.   The information she provided
6   to us from emails and verbal
7   communications.  This is how we're
8   receiving this information.  That's how
9   it's typically done.
10      Q.   We just look at the email
11  from Kara to you saying, What are you
12  doing, you increased it from 3,500 to
13  $16,000, what are you basing it on?
14      A.   We're basing it on --
15      Q.   Right?  So she wasn't in
16  agreement.
17      A.   Yeah.
18      Q.   So you didn't get that
19  information from my client, right,
20  because she's disagreeing with it, right?
21  Right?
22      A.   That's the only source of
23  information.  We don't have any other
24  source of information other than what's

Page 361

1   provided to us from their communications.
2       Q.   Okay.  And the information
3   that my client is saying that she gave
4   you doesn't support an increase of
5   700 percent in payments, right?
6           MR. BERMAN:  Objection.
7           THE WITNESS:  The
8       information provided by Kara
9       supports, based on the document
10      that we have with that
11      transaction, the basis to increase
12      the payment.  There's no doubt
13      about that.
14  BY MR. HESKIN:
15      Q.   Okay.  And you can't point
16  to the document that supports your
17  increase, right?
18      A.   The merchant agreement.
19      Q.   Okay.  That's the legal --
20  purported legal basis, but I want to know
21  what document can you point me to that
22  demonstrates that HMC's income increased
23  700 percent in the span of a month?
24      A.   That's not what I'm saying.

Page 362

1  You're saying that their income increased
2  by 700 percent in the span of a month.
3      Q.   That's what your
4  calculations did.  It went from $3,500 a
5  day to $19,995 a day.  So apparently the
6  income must have correspondedly increased
7  by that amount, right?
8      A.   You're citing that in
9  hypothetical, not the actual transaction.
10     Q.   I'm trying to get inside
11 your head, so you tell me what you were
12 thinking when you did it.  You're the one
13 that did it.  Tell me.
14     A.   The decision was based on
15 the merchant agreement that she had
16 executed with us that we provided in
17 discovery and the communications we had
18 with her and her company.
19     Q.   Okay.  Got it.  And you
20 can't point me to a document, right?
21     A.   No, I don't have a specific
22 document to point to.
23     Q.   Not bank statements, right?
24 You didn't look at her bank statements,

Page 363

1  right?
2      MR. BERMAN:  Objection.
3      THE WITNESS:  I did not look
4      at her bank statements.
5  BY MR. HESKIN:
6      Q.   Did you look at her -- what
7  other than bank statements would you look
8  at?  Tell me what are the -- what's the
9  world of possibilities that you could
10 have looked at in order to determine that
11 her -- her income increased by
12 700 percent?
13     MR. BERMAN:  Objection.
14     THE WITNESS:  Again, I'm not
15     saying that her income increased
16     by 700 percent.
17 BY MR. HESKIN:
18     Q.   Well, the payments did.
19     MR. BERMAN:  Objection.
20     THE WITNESS:  That payment
21     increased, yes.
22 BY MR. HESKIN:
23     Q.   By 700 percent?
24     A.   3,500 to 19,000, correct.

Page 364

1      Q.   Yeah.  And so tell me
2  what -- what document -- what's the world
3  of documents that you had to look at that
4  justified you making an ACH withdrawal of
5  19,995?  That's a wire transfer that you
6  authorized, you calculated and you did
7  it.  What did you base it on?
8      MR. BERMAN:  You mean other
9      than the multiple times he's
10     answered this question for you?
11     MR. HESKIN:  I want to know
12     what he looked at.
13     MR. BERMAN:  Well, you've
14     asked him the same question and
15     he's answered you over and over
16     again, with discussions with
17     counsel.  So do you want him to
18     just repeat that again or do you
19     want a different question?
20     MR. HESKIN:  I want the
21     world of possibilities.
22     MR. BERMAN:  Joe, answer
23     again just like you did three
24     times.

Page 365

1      THE WITNESS:  The discussion
2      with the client and the numbers
3      provided by them.
4  BY MR. HESKIN:
5      Q.   Okay.  What numbers were
6  provided from my client and when did they
7  provide them to you?
8      A.   The numbers provided by
9  their client were their internal cash
10 flow revenue numbers, internal financials
11 and Josh, her CFO, and her regularly
12 communicated that to our team, both in
13 accounting and underwriting.
14     Q.   Okay.  And where in the
15 agreement did it say that you could
16 increase the payment in a matter of
17 weeks?
18     A.   It's detailed on the
19 agreement provided.
20     Q.   Okay.  How many times did
21 you make that calculation?
22     A.   How many times did I
23 calculate what the rate of increase was?
24     Q.   Yeah, how many times?

MAGNA ▶
LEGAL SERVICES

Page 366

1    A.   One time.
2    Q.   One time?
3    A.   This specific payment or
4  other deals?
5    Q.   No, this -- this deal, how
6  many times did you make a calculation
7  saying that this should be increased?
8    A.   Yeah, one time.  We don't
9  have to redo it.  It's a fairly
10  straightforward agreement.
11    Q.   So one time, that's your
12  testimony?
13    A.   That I looked at it.  You
14  can be sure that other departments and
15  other personnel looked at it as well.
16    Q.   How many times was it
17  increased?
18    A.   How many times was what
19  increased?
20    Q.   The daily payment increased.
21    A.   For this transaction?
22    Q.   Yeah.  You said you only had
23  to do it once, right?
24    A.   Yeah, for this specific

Page 367

1  payment.  We calculated it that day.
2    Q.   Well, it started at 3,500,
3  right?
4    A.   Yes.
5    Q.   So under the terms of
6  agreement, how frequently would you
7  assess that?
8    A.   I don't recall.
9    Q.   Well, what's it say under
10  the agreement?
11    A.   I don't have the agreement
12  in front of me.
13    Q.   Okay.  Well, let's pull up
14  the agreement.
15    THE TRIAL TECH:  What
16    exhibit number is that?
17    MR. HESKIN:  I'm looking for
18    it.  Hold on.  I might not have
19    it.  Here it is.  I'm going to
20    email it to you right now.
21    THE TRIAL TECH:  All right.
22    MR. HESKIN:  Let's take a
23    five-minute break and I'll send it
24    to you.

Page 368

1    THE TRIAL TECH:  Okay.
2    MR. HESKIN:  Try Exhibit 14.
3    Keep on going.  This is it.
4    THE TRIAL TECH:  Okay.
5    MR. HESKIN:  All right.  Go
6    all the way -- keep ongoing.  Next
7    page.  Next page, next page, next
8    page, next page.  Actually, go
9    back.  Go back.  I think it's
10    right there.  That one right
11    there.  So this actually doesn't
12    even list the December '19
13    agreement on it.  All right.
14    Let's go to -- instead we'll
15    use -- I think it's the last
16    exhibit I gave you guys.  Can you
17    pull that up?
18    THE TRIAL TECH:  The one you
19    just sent over or the one before
20    that?
21    MR. HESKIN:  Try the one
22    before.  Yup, I think this is it.
23  BY MR. HESKIN:
24    Q.   Okay.  All right.  Joe, have

Page 369

1  you seen these?
2    A.   Yes.
3    Q.   Okay.  So this is page 2 of
4  each of the factoring agreements.  Are
5  you familiar with this?
6    A.   Yes.
7    Q.   Okay.  And on this first
8  one, it says here the --
9    MR. HESKIN:  If you can blow
10    that up a little bit, the purchase
11    price in the middle?
12  BY MR. HESKIN:
13    Q.   Is 862, and your specified
14  percentage is 10 percent.
15    Do you see that?
16    A.   Yes.
17    Q.   So CBSG is buying 10 percent
18  of HMC's receivables in this agreement,
19  right?
20    MR. BERMAN:  Objection.
21    THE WITNESS:  Yes.
22  BY MR. HESKIN:
23    Q.   Yes.  Okay.  And the daily
24  amount is $7,812, right?

**MAGNA**
**LEGAL SERVICES**

Page 370

1    A.   Correct.
2    Q.   And that's supposed to
3  represent a good faith estimate of the 10
4  percent, right?
5    A.   Right.
6       MR. BERMAN:  Objection.
7  BY MR. HESKIN:
8    Q.   Right?  Okay.  And that's
9  how I understand it as well.
10      And this is -- the 167 days
11 is how many days it's anticipated to be
12 paid off on?
13   A.   167 installments, correct.
14   Q.   That's business days,
15 correct?
16   A.   Correct.
17   Q.   So as of February 15th,
18 2018, 10 percent of HMC's daily
19 receivables is estimated at $7,800 a day,
20 right?
21   A.   As of the time that they
22 underwrote this file, correct.
23   Q.   Got it.  Okay.
24      MR. HESKIN:  Can we go to

Page 371

1    the next page?
2  BY MR. HESKIN:
3    Q.   So this is a month later,
4  right?  March 16th, 2018.
5    A.   Yes.
6    Q.   All right.
7       MR. HESKIN:  Can you blow up
8    the middle portion again?
9  BY MR. HESKIN:
10   Q.   Now, 10 percent of their
11 daily receivables is only 27,000 --
12 2,750, right?
13   A.   It's not total daily
14 receivables.  It's for what was being
15 underwritten.
16   Q.   Explain that to me.
17   A.   When we look at merchant
18 receivables, we have a basis on whatever
19 cash flow they're receiving from their
20 clients.  Like the original one that you
21 showed me details out 10 percent of that
22 $800,000 number, there can be specific
23 receivables assigned to each one of these
24 deals, meaning if we know that there's

Page 372

1  one receivable item on their AR schedule
2  that happens to be a $275,000 contract
3  for the business, we'll base our funding
4  from that total.
5    Q.   Okay.  Well, this agreement
6  doesn't say that, does it?
7    A.   I'm explaining to you,
8  that's what the 10 percent basis is.
9    Q.   Well --
10   A.   The purchase price and not a
11 receivable.
12   Q.   Well, this agreement says
13 it's buying 10 percent of all of HMC's
14 receivables, doesn't it?
15   A.   No.
16   Q.   No?  It doesn't say that?
17   A.   No, I'm saying in
18 underwriting we go through and identify
19 specific receivables such as the one you
20 detailed out those invoices for.
21 Remember the 10 percent that you pointed
22 out that was incorrect?
23   Q.   Yeah.
24   A.   We are basing that on actual

Page 373

1  invoices that the client has and we're
2  applying a factor rate to it to collect
3  on so that we can be made whole when we
4  advance this money.
5    Q.   So this 10 percent of what?
6    A.   Of an underwritten
7  receivable that they went through for
8  this deal.
9    Q.   Where am I going to find in
10 this agreement where the -- those
11 receivables are?  Because the agreement
12 says you're purchasing 10 percent of all
13 of the receivables.
14      MR. BERMAN:  Objection.
15 BY MR. HESKIN:
16   Q.   Right?  That's what the
17 contract says, right?
18      MR. BERMAN:  Objection.
19      THE WITNESS:  Yeah, what I'm
20 saying is in actual practical
21 day-to-day, when you have multiple
22 deals like Kara does, it isn't
23 just a single agreement that
24 applies anymore.  You're talking

Page 374

```
1    about the entirety of all these
2    different deals.
3         Kara is an industrious
4    business owner.  She's got
5    multiple contracts, multiple
6    clients she is working on, and
7    she's asking for cash flow from
8    those receivables to be advanced
9    to her as part of this agreement.
10   BY MR. HESKIN:
11        Q.   But that's not what the
12   actual agreement says, right?
13        A.   What I'm describing to you
14   is what the agreement says when it
15   pertains to a client that has multiple
16   large factoring agreements with us.  It's
17   not just a one-and-done, this is a
18   complex system of deals we did with
19   Kara's entity that we've done for a
20   couple years.
21        Q.   Well, right now this is just
22   two deals, right?
23        A.   Correct.
24        Q.   We're through two, and in
```

Page 375

```
1    the first agreement you purchased 10
2    percent, right?
3         A.   Yes.
4         Q.   And 10 percent of her
5    receivables in February of 2018 was about
6    $7,800, right?
7         A.   Yeah, based on that one
8    deal, right.
9         Q.   Okay.
10        A.   Do you see the contingency
11   on this entity or this deal?
12        Q.   Okay.  And then a month
13   later it's now 2,750, right?
14        A.   No, what I'm saying is on a
15   per deal basis, we're looking at specific
16   receivables and I'm trying to describe to
17   you how this is being calculated.
18        Q.   Yeah.
19        A.   The number of deals that
20   Kara has with the company.
21        Q.   So what actually happened is
22   different than what the agreement
23   actually says, right?
24        A.   No, it still covers the
```

Page 376

```
1    agreement, we still have the basic
2    purchase and we're trying to cover 10
3    percent of receivables, but when you have
4    multiple large dollar contracts, we silo
5    each transaction out for that one
6    receivable.
7         Obviously Kara is making
8    more than 275,000 in receivables and in
9    the other contracts, they have very
10   healthy numbers, they had strong
11   underwriting.
12        So the hypothetical here as
13   detailed in this installment program is
14   that the expected turnaround on the
15   receivable that we detailed, if it's
16   received in a shorter period of time,
17   we're buying less of it, and it's done in
18   a longer period of time, we're buying
19   more of it because we expect her to make
20   the decision as a competent business
21   person to -- when to leverage the MCA
22   money.  That's the spirit of this
23   transaction.
24        Q.   Okay.  Can you read for me
```

Page 377

```
1    the first paragraph under purchase and
2    sale of future receivable seller
3    recourse?  Can you just read for me that
4    first sentence, tell me what that means?
5    It's totally different from what you just
6    explained.
7         THE TRIAL TECH:  Do you want
8    me to blow that up so you can read
9    it better?
10        THE WITNESS:  Yeah, if you
11   could, please.
12        "Seller and merchant hereby
13   sells, assigns and transfers to
14   CBSG, making CBSG the absolute
15   owner in consideration of the
16   funds provided, purchase price.
17   As specified below, all of seller
18   and merchant's future receipts,
19   accounts, contract rights and
20   other obligations arising from or
21   relating to the payment of monies
22   from seller and merchant's
23   customers and/or third party
24   payors, collectively the receipts,
```

Page 378

```
1       defined as all payments made by
2       cash, check, credit, debit card,
3       electronic transfer or other form
4       of monetary payment in the
5       ordinary course of the merchant's
6       business until such time as the
7       receipts purchased amount has been
8       delivered by seller/merchant to
9       CBSG."
10 BY MR. HESKIN:
11      Q.   Okay.  So in the first
12 contract, HMC already sold all of its
13 receivables to CBSG, right?
14      A.   No.  By this portion of
15 it --
16      Q.   That's not what that says.
17 Hereby sells, assigns transfers all of
18 the receivables, right?
19      A.   Right, under the context of
20 this funding.
21      Q.   It's purchasing all of them,
22 right?
23      A.   No.
24      Q.   It's not?
```

Page 379

```
1       A.   It's not.
2       Q.   So it doesn't really say --
3  what it says, "Hereby sells, assigns and
4  transfers to CBSG all of seller's future
5  receipts," that doesn't really mean that?
6       A.   No, and I think you're being
7  deliberately dense.  I keep explaining to
8  you how each individual deal is
9  transacted on the funding receivables for
10 different receivables the client has.
11      Business does not have a
12 static revenue curve, right?  They're
13 going to have more deals coming in,
14 they're going to have different
15 transactions coming through.
16      Kara provided to us document
17 that she has new receivables, new
18 projects, new lines of revenue from her
19 business, so when we do these factoring
20 agreements, they're individually
21 considered to facilitate working capital
22 for her to do those transactions with.
23      Q.   Okay.  And it's not --
24 that's inconsistent with what's stated at
```

Page 380

```
1  the front of the agreement, though,
2  right?
3       A.   It is exactly what I'm
4  describing is that we're financing a part
5  of that receivable.  Whatever that
6  project is, call it 275, call it
7  $800,000, this individual factoring
8  agreement is reflected with that amount.
9       Q.   Where are the invoices that
10 are -- that are being bought?  Where is
11 that identified at?
12      A.   So in the other agreement
13 you showed me, you had the list of
14 invoices.  You submitted a list of PO
15 numbers, receivables that we were
16 supposed to get, but it turns out she
17 liquidated the collateral that we funded,
18 unbeknownst to us, and collected
19 receivables without remitting it to us.
20      Q.   I got it, and my question is
21 on this agreement.  I understand you want
22 to talk about a different agreement, but
23 I'm talking about --
24      A.   I'm trying to answer all
```

Page 381

```
1  your questions.  I'm trying to answer,
2  this agreement, that agreement --
3       Q.   Yeah.
4       A.   -- and the details are being
5  provided by Kara.  I'm saying
6  specifically this agreement.  Your other
7  agreement had a Schedule A to it.
8       Q.   We can get to the next
9  agreement, but I'm talking about this
10 agreement, and you said there are certain
11 receivables that are being purchased,
12 that there's certain invoices, where?
13 Where is it identified?  It's not
14 identified here, right?
15      A.   It's identified as part of
16 our underwriting process.
17      Q.   But it's not in the
18 contract, right?
19      A.   It's not in the body of the
20 contract.  We have a whole underwriting
21 package that identifies this, and
22 sometimes they have individually
23 identified receivables like in the other
24 example you provided.
```

MAGNA
LEGAL SERVICES

Page 382

1    Q.   Okay.  So somewhere, if I
2  look at the underwriting file which has
3  been produced, I'm going to see that
4  there were specific receivables and
5  invoices that were specifically bought
6  for each one of these transactions,
7  right?
8    A.   Her accountant, CFO Josh
9  provided the receivables schedule, he had
10  intimate knowledge of the type of
11  business she's in, just like our other
12  merchants, specifically what receivables
13  we're financing as part of this --
14    Q.   Here's my question:  If
15  you're buying a receivable that's tied to
16  an invoice on day one, right?  You're
17  buying it for a purchase price and you're
18  supposedly buying that -- 10 percent of
19  that invoice and that receivable hasn't
20  come in on day two, where is that money
21  coming from?
22    MR. BERMAN:  Objection.
23    THE WITNESS:  It comes from
24    the routine cash flow of the

Page 383

1    business.
2  BY MR. HESKIN:
3    Q.   So it's coming from some
4  other invoice, right?
5    MR. BERMAN:  Objection.
6    THE WITNESS:  I don't know
7    where the regular cash flow for
8    each deal comes in from.  The
9    company is a healthy company that
10    has regular cash flow that we look
11    at in the underwriting.
12  BY MR. HESKIN:
13    Q.   So you're getting paid from
14  receipts that are coming from invoices
15  that you didn't purchase, right?  Has to
16  be.
17    A.   No, it's a purchase of
18  future receivables.
19    Q.   Okay.
20    A.   Whatever the other
21  receivables that are coming in and cash
22  flow for the business, the merchant has
23  obligations specified on here, defined as
24  all payments made by cash, check, credit,

Page 384

1  debit card, electronic transfers or other
2  form of monetary payment as listed in
3  this agreement.
4    Q.   Got it.  So on day one
5  you're purchasing -- and you're telling
6  me that you're purchasing specific
7  invoices.  Kara is saying, Hey, listen
8  I've got this job on day one, fund me for
9  it.  You say, Okay, great, I'm going to
10  buy that invoice for, you know, let's
11  call it the Pennsylvania job, and on day
12  two, she has to pay back a daily payment,
13  right?
14    A.   Sure.
15    MR. BERMAN:  Objection.
16  BY MR. HESKIN:
17    Q.   Okay.  And she hasn't been
18  paid yet for that invoice that you
19  bought, right?
20    MR. BERMAN:  Objection.
21    THE WITNESS:  Right.
22  BY MR. HESKIN:
23    Q.   So she's got to make that
24  payment from a different invoice, right?

Page 385

1  From an invoice you didn't purchase,
2  right?
3    A.   From whatever cash flow the
4  business has.
5    Q.   So you're being paid back
6  with funds other than the receipts that
7  you purchased.  It has to be that way,
8  right?
9    MR. BERMAN:  Objection.
10    THE WITNESS:  That's not the
11    only origination of a cash flow
12    for a business.
13  BY MR. HESKIN:
14    Q.   So you're being paid through
15  receipts that you didn't purchase,
16  correct?
17    MR. BERMAN:  Objection.
18    THE WITNESS:  No.
19  BY MR. HESKIN:
20    Q.   It has to be that way,
21  right?
22    A.   No.
23    Q.   No?  So where -- where -- on
24  day -- on day two of the agreement, where

MAGNA
LEGAL SERVICES

Page 386

1  is that money coming from?  Is it coming
2  from the receipts you purchased or is it
3  coming from other receipts?
4      A.   You know there's more cash
5  flow than receipts, right, for a
6  business?  Retained earnings, other
7  loans, income that the business already
8  had.
9      Q.   You're telling me that you
10 bought invoices, that you bought specific
11 invoices in connection with each one of
12 these agreements.
13     A.   Right.
14     Q.   So when day two comes around
15 and the invoice that you have -- that you
16 purchased hasn't had any payment made on
17 it, but there's a daily payment required,
18 by common sense, that money has to come
19 from somewhere else, correct?
20     A.   Correct.
21     Q.   Okay.  That's all I'm trying
22 to --
23     A.   No, you're saying it's
24 coming from another invoice and other

Page 387

1  receivables, and I'm saying a company has
2  cash outside of -- she had a zero dollar
3  bank account when we did this deal.
4      Q.   It's coming from some other
5  source than the receivable you actually
6  purchased, right?
7          MR. BERMAN:  Objection.
8          THE WITNESS:  It could, but
9      that's why we have this verbiage
10     in the agreement, right?  We're
11     saying assigning of all future
12     receipts, accounts, anything
13     coming in by check, cash, credit
14     card, electronic payments.
15 BY MR. HESKIN:
16     Q.   No, no, no.  You're saying
17 you're selling it, selling all future,
18 right?  And you did that how many times?
19 You bought her future receivables 60
20 times?
21     A.   No.
22     Q.   Well, you got -- in each one
23 of these agreements, you state, "Seller/
24 merchants hereby sells assigns and

Page 388

1  transfer to CBSG all future receipts."
2      A.   Yeah.
3      Q.   And you do it several times
4  in the same day, right?
5      A.   You did -- the client knows
6  exactly when the payments start and where
7  the cash comes from.
8      Q.   I get all that, but how --
9  how are you purchasing receivables that
10 you already -- you already bought?
11     A.   The contract that you're
12 inferring to says -- it doesn't say that
13 we have to wait for receivables to come
14 in before we're paid on this, right?  Did
15 you read that somewhere?
16     Q.   On day one you're buying all
17 their future receivables, right?
18     A.   Buying future receivables.
19 Day one, we expect a payment the
20 following business day as part of this
21 agreement.  Our contract doesn't say I
22 need to wait for that receivable to come
23 in before you make payments, right?
24     Q.   I'm not talking about that.

Page 389

1  I'm talking about --
2      A.   You're putting words in my
3  mouth and saying that she somehow needs
4  to get payments from this one factoring
5  agreement that we have before we're
6  supposed to collect anything.  Obviously
7  there's horizons on this.  That's why
8  there's options for her to pay that back.
9  She's a business owner.  She's a smart
10 lady, Kara.
11     Q.   See, we're going backwards.
12 I'm going on -- I'm not going back about
13 where the funds come from.  I'm going on
14 day one -- on the first agreement you're
15 buying all of her receivables, right?
16 That's what this says?
17     A.   Yes.
18     Q.   A month later, right, you
19 enter into other factoring agreement and
20 again it says in the agreement you're
21 buying all of her receivables, right?
22     A.   Buying the receivables we
23 underwrote for this deal, and I described
24 to you earlier how we handle this for

MAGNA
LEGAL SERVICES

Page 390

```
 1  clients' multiple concurrent factoring
 2  deals.  It's always going to be based on
 3  that individual deal's underwriting.
 4      Q.   I'm just reading -- I
 5  understand what you're saying is in the
 6  underwriting file.  I'm just reading the
 7  contract.  And each one of those says
 8  you're buying 100 percent of her
 9  receivables.
10      So my question is:  How can
11  you buy receivables that you already
12  bought?  How do you buy them again?
13      A.   I'm explaining to you how
14  this is treated when there's multiple
15  contracts.  It isn't just a one-and-done
16  everything that your company gets it.
17  There's no fixed amount.
18      I think you have false
19  assumption that somehow receivables are a
20  fixed value for a company and they don't
21  grow and contract depending on the
22  business volume the company has.  From a
23  practical standpoint, each new
24  transaction that comes in is reviewed,
```

Page 391

```
 1  Josh identifies the receivables on their
 2  schedule, they have more receivables that
 3  come in, they make good on paying off old
 4  obligations, and then we keep doing new
 5  deals.
 6      Kara is a master at this
 7  agreement.  She's done 19 deals with us,
 8  paid off most of them.
 9      Q.   19?
10      A.   Yeah, whatever the amount
11  is, whatever we have.  It's something
12  like 19 deals.
13      Q.   I think you've got triple
14  that.  I think it was more like 60.
15      A.   No, I think we have a
16  disagreement there.
17      Q.   Really?
18      A.   Yeah.
19      Q.   You're not aware that there
20  were about 60 different agreements?
21      A.   You're talking about brand
22  new agreements or agreements including
23  reloads?
24      Q.   I'm talking about --
```

Page 392

```
 1      A.   That's different.
 2      Q.   There's 60 factoring
 3  agreements that I have.
 4      A.   Yeah, but I'm treating that
 5  differently.  If we have a reloaded deal
 6  and they take a balance from an existing
 7  contract and bring it into a new
 8  contract, it's not really new deals, it's
 9  the same receivables.  That's what I've
10  been trying to explain to you.
11      Q.   What do you mean by a
12  reloaded deal?
13      A.   So let's say Kara has an
14  outstanding receivable --
15      Q.   Yeah.
16      A.   -- that we have a prior
17  contract on.
18      Q.   Yeah.
19      A.   And they take the existing
20  balance from that transaction, which
21  we've done a few times with her, and load
22  it into a new factoring agreement.  Those
23  receivables from the original factoring
24  agreement are carried over into the next
```

Page 393

```
 1  agreement, right?  We're not coming up
 2  with brand new receivables, there may be
 3  new opportunities and other things the
 4  business is doing, but those balances are
 5  carried over as part of the new deal, the
 6  new updated balance.  So that's not
 7  really a fresh new contract.  There's
 8  no -- you know, brand new agreements
 9  coming from nothing.  There's an existing
10  precedent contract it's pointing to.
11      Q.   That makes no sense
12  whatsoever.  So she's selling --
13      A.   It's because you don't
14  understand our contract.
15      Q.   -- again receivables that
16  you already purchased?
17      A.   I don't understand your
18  question.
19      Q.   You're saying you're
20  reloading it, you're moving receivables
21  that she had already sold to you into a
22  new agreement, so she's selling to you
23  twice, receivables that you already
24  bought?
```

**MAGNA**
**LEGAL SERVICES**

Page 394

1    A.   No, that's incorrect.
2    Q.   Okay.  But you're charging a
3  new factor rate for receivables that you
4  already bought, right?
5    A.   No, there's new money being
6  provided.
7    Q.   Okay.
8    A.   To expand on whatever -- so
9  let's say -- let's just say
10  hypothetically they had a contract, she
11  did a $400,000 contract, and there was a
12  change order and now it becomes 500,000
13  and she paid down that original factoring
14  agreement that reflected a portion of
15  that original $400,000 contract, she
16  could take that same receivable with the
17  expanded scope of the project for the
18  business and ask for more money to revise
19  the existing factoring agreement.  That's
20  not a brand new factoring agreement,
21  that's like a change order in a
22  construction job.
23    Q.   Got it.  We'll do this the
24  hard way.  All right.  So we're on

Page 395

1  agreement 2 and it says 10 percent
2  specified percentage, and the first
3  paragraph says they're purchasing all of
4  their receivables.  But your testimony is
5  that, on this agreement that we're
6  looking at right now, it's not really all
7  of her future receivables, it's some
8  specified invoice that's contained in
9  the underwriting file?
10    A.   No, that language covers all
11  her receivables, everything coming in.
12  That's all that does, right, it gives us
13  the right to collect those receivables.
14    Q.   Okay.  It says you're
15  purchasing all, right?
16    A.   Yes.
17    Q.   And what's the specified
18  percentage of 10 mean?
19    A.   I'm saying that 10 percent
20  is a basis for whatever project that this
21  factoring agreement reflects.
22    Q.   What's 10 percent mean,
23  what's it reflective of?
24    A.   If she has a million dollar

Page 396

1  contract and we're buying 10 percent,
2  we're buying 10 percent of that
3  receivable.
4    Q.   Okay.  That makes sense.
5    A.   Buying $100,000.
6    Q.   So for every single one of
7  these I'm going to be able to go through
8  and find that, right?  So you have -- in
9  your underwriting file, you're going to
10  be able to show me, when it comes time at
11  trial, in the underwriting file the
12  invoices that support this, right?
13    A.   You're going to be able to
14  see in the underwriting file the basis
15  for that factoring transaction.
16    Q.   Sure.  And it's going to be
17  different than the ones that were
18  provided just less than a month ago,
19  right?
20    A.   Correct.
21    Q.   Okay.  Got it.  I got it.
22  Let's go to the next one.
23        MR. HESKIN:  Next page,
24  please?  Can you highlight the

Page 397

1  middle portion?
2  BY MR. HESKIN:
3    Q.   Again it's 10 percent?
4    A.   Yup.
5    Q.   Right?
6    A.   Yes.
7    Q.   For 22 days, right?
8    A.   Yes.
9    Q.   And what -- what are the --
10  so if I look at this, I'm going to find
11  $2.5 million of invoices that -- or
12  actually more than that, right, about
13  it's 275, so I'm going to find
14  $2.75 million worth of invoices that are
15  being purchased, right?
16    A.   This was something unique to
17  Kara's transactions with us.  She wanted
18  us, for the sake of own her
19  reconciliation with her, to list the
20  specific invoice.  That 294601-01 at the
21  bottom of that?
22    Q.   Yup.
23    A.   She's saying, and this
24  demonstrates what I've been trying to

Page 398

1  explain, that that is the particular
2  invoice we have a right to collect on for
3  this transaction.
4      Q.  Got it.  Okay.  Good.  And
5  so that invoice is going to be, since
6  you're only purchasing 10 percent of that
7  invoice, is going to be $2.75 million,
8  right?
9      A.  Whatever the value is that
10 they agreed upon.
11     Q.  10 percent.  Right?
12     A.  Yes.
13     Q.  Because you're getting
14 275,000, and 10 percent would be 2.7
15 million, 2.75 million, right?
16     A.  Yes.
17     Q.  That's -- so if I look at
18 that invoice, that's what it should be,
19 right?
20     A.  Yes.
21     Q.  Okay.  Got it.
22         MR. HESKIN:  Next -- next
23     page?  If you could highlight that
24     again.

Page 399

1  BY MR. HESKIN:
2      Q.  We're going to have the same
3  thing again, right?  I'm going to look at
4  that invoice 2946 --
5      A.  Exactly.  So going back to
6  what I was explaining, this is the
7  individual factoring agreement for that
8  particular invoice.
9      Q.  Got it.
10     A.  Merchants may only have one,
11 and literally is all of the receivables
12 of whatever we are purchasing from it.
13 You're referring to that invoice number
14 that we have --
15     Q.  I got it.  I'm going to look
16 at that invoice and it's going to be
17 $3.1 million, right?
18     A.  Right, or whatever they
19 agreed to as part of the holdback for
20 that.
21     Q.  No, no.  You just testified
22 it's 10 percent, you're purchasing 10
23 percent of that receivable.  10 percent
24 would be 3 million -- of 3 million -- 3.1

Page 400

1  would be $313,000, right?
2      A.  Yeah, but that's the basis
3  of it.
4      Q.  Yeah, I got it.
5      A.  I kept trying to explain
6  basis to you and I don't think it's
7  sticking for whatever reason.
8      Q.  I know you're buying 10
9  percent.
10     A.  You're trying to lock me
11 into a statement.
12         THE REPORTER:  All right,
13     everybody.  This is the court
14     reporter.  You guys are really
15     talking over each other.
16 BY MR. HESKIN:
17     Q.  So let's start clean.  The
18 specified percentage is 10 percent of the
19 invoice you're buying, right?
20     A.  10 percent is the basis for
21 the invoice we're buying.  That's
22 negotiated with the client.
23     Q.  It's 10 percent on all of
24 these, right?

Page 401

1      A.  It's 10 percent as a basis.
2  So that's -- I don't want to argue about
3  it because you're not getting what I'm
4  trying to explain.  The basis -- again
5  it's not a fixed number.  Invoices
6  change.  There can be more receipts, for
7  whatever order the project can be of
8  greater value down the road because
9  there's a change order.  We have payback
10 options on this because of that.  You see
11 the four different payment amounts that
12 she could have to do with this deal
13 depending on how long it goes.  This is
14 something Kara wanted as part of the
15 agreement so she's not paying additional
16 fees for the invoice she's factoring
17 given the variability of the receivable.
18     Q.  What does your underwriter
19 times -- multiply 10 percent by?
20     A.  You're not getting it,
21 Shane.  I'm telling you.
22     Q.  I am.  The invoice amount,
23 if it's a million dollars, and you're
24 buying 10 percent of that invoice, should

MAGNA
LEGAL SERVICES

Page 402

1  be $100,000, right?
2      A.  And you keep trying to tie
3  this back to a fixed amount. I'm saying
4  it's not fixed. A basis is variable. We
5  have ten points. A contract can be
6  changed. This invoice can be underpaid
7  and overpaid, right? So you can't just
8  say 10 percent of a contract when they're
9  negotiating every single deal
10  individually and it's not a precise
11  10.00 percent of that particular invoice.
12      Q.  What did you calculate to
13  come up with $313,000? You had -- it's
14  10 percent of something, so what number
15  did you use? You had to come up with
16  that number from something, right?
17      A.  I feel like I'm not getting
18  through to you. I don't know why.
19      Q.  You're definitely not.
20  Because I just want to know what you
21  times 10 percent through to come up with
22  313 and the daily specified amount of
23  $3,000?
24      A.  Let me explain three things:

Page 403

1  The basis for the amount is underwriting.
2  They go through whatever the invoice is
3  to figure that amount. That's where
4  we're getting the 313. 10 percent is
5  basis number, it's not a fixed I'm going
6  to get a perfect ten point calculation on
7  the invoice given with variability of
8  invoices in her business. And lastly,
9  this is individually tailored for every
10  single invoice because we have to go
11  through and underwrite that deal with her
12  CFO.
13      So it's not a perfect 10
14  percent. There's isn't X variable I can
15  multiply against to get a perfect 313.
16  By the very definition of this contract,
17  you're seeing the variability with her
18  receivables to begin with. You see the
19  payment schedules for different lengths
20  of time and how many installments it will
21  take, and that's what I'm trying to get
22  through to you. It's not a perfect ten
23  point calculation.
24      Q.  Okay. It's based off the --

Page 404

1  it should be roughly 10 percent of that
2  invoice, right?
3      A.  Use the word roughly and
4  you're close.
5      Q.  Okay. So it should
6  basically be roughly 10 percent of this
7  invoice 2946?
8      A.  Sure.
9      Q.  Okay. See how easy that
10  was?
11      A.  It's not. I would rather
12  cut off a finger than talk to you.
13      Q.  Let's get to the next one.
14      MR. HESKIN:  Can you pull up
15      the middle portion again?
16  BY MR. HESKIN:
17      Q.  Okay. This has invoice No.
18  50. This is what's being purchased,
19  right?
20      A.  Correct. Whatever her
21  accountant identified as invoice No. 50
22  as part of the underwriting package.
23      Q.  And so the invoice for No.
24  50 should be approximately $4.2 million,

Page 405

1  right?
2      A.  Right. That's the basis
3  that they're talking about for the
4  underwriting process.
5      Q.  Okay. So I'll go to the
6  underwriting file, I'll find an invoice
7  for some, give-or-take, $4.2 million?
8      A.  Yes.
9      Q.  Okay. Got it.
10      MR. HESKIN:  Next?
11  BY MR. HESKIN:
12      Q.  And the same thing here?
13      A.  Yes.
14      Q.  Invoice 51, I'm going to
15  find an invoice for roughly $4.2 million?
16      A.  Yes.
17      Q.  Got it.
18      MR. HESKIN:  Next?
19  BY MR. HESKIN:
20      Q.  Same thing, I'm going to
21  find an invoice for roughly $5.6 million,
22  invoice No. 52, it should be in the
23  underwriting file, $5.6 million?
24      A.  Right. You should have

Page 406

```
1    copies of all these individual factoring
2    invoices that we're funding.
3        Q.   Got it.  Got it.
4            MR. HESKIN:  All right.
5        Next one.
6    BY MR. HESKIN:
7        Q.   Same thing here, I'm going
8    to find an invoice that 2807-11 is going
9    to be roughly $2.6 million, right?
10       A.   Correct.  An interesting
11   thing on this one, it's agreement 104,
12   meaning that Kara had the intention to
13   fund and do factoring transactions for
14   several invoices that she had for
15   merchant payments coming in.
16       Q.   Got it.  They might be in
17   here.
18           MR. HESKIN:  The next one?
19           THE WITNESS:  I want you to
20       understand that that's the crux of
21       this relationship, it's all these
22       different invoices coming in that
23       we're financing individually.
24       It's not an easy ten
```

Page 407

```
1        across the board with everything
2        what she makes with HMC.
3    BY MR. HESKIN:
4        Q.   So 2806-11, it's going to be
5    roughly 2.6?
6        A.   Same thing.
7            MR. HESKIN:  Okay.  Next
8        one.
9    BY MR. HESKIN:
10       Q.   And the exact same thing,
11   it's going to be 2.6?
12       A.   That's right.
13       Q.   That's going to be --
14   invoice number is going to be 2946-02,
15   right?
16       A.   Correct.
17       Q.   Okay.
18           MR. HESKIN:  Next one.
19   BY MR. HESKIN:
20       Q.   And it's the same invoice,
21   just broken up.  Why are they broken up
22   in -- in four different tranches?
23       A.   Given the variability of the
24   collectible receivable.  She's giving
```

Page 408

```
1    herself some flexibility if it's going to
2    take more time.
3        Q.   But it's all the same
4    invoice number?
5        A.   Correct.  It's the same
6    invoice, same receivables, but do you
7    understand that when they bill, there's a
8    time element to them basing it on their
9    receivable.
10       Q.   Got it.  And so --
11       A.   -- the longer the billing is
12   going to be higher for that receivable,
13   right?
14       Q.   I got it.  So when I add up
15   the totals to these invoices, it should
16   be $10 million, right, for all four?
17       A.   Yeah.  For you're saying the
18   last four agreements that we did in
19   December or --
20       Q.   Yeah.  These last four we
21   looked at, agreement --
22       A.   Yeah, they're part of the
23   same group, right.
24       Q.   Okay.  Got it.
```

Page 409

```
1            MR. HESKIN:  Next one?
2    BY MR. HESKIN:
3        Q.   So those invoice numbers,
4    and there's going to be two of these
5    identical, they should add up to about
6    $6 million, right?
7        A.   Correct.  We identified
8    individual invoices for this factoring
9    agreement.
10           MR. HESKIN:  Okay.  Go to
11       the next one?
12   BY MR. HESKIN:
13       Q.   Same thing, same answer?
14       A.   Correct.
15       Q.   Those invoices, they'll
16   total cumulatively 6 million?
17       A.   Correct.
18       Q.   Okay.
19           MR. HESKIN:  Next one?
20   BY MR. HESKIN:
21       Q.   And this is 29406-04, and it
22   looks like this is 1 of 3, right?
23       A.   Yes.
24       Q.   And so for this particular
```

**MAGNA** ▶
LEGAL SERVICES

Page 410

```
 1    agreement I'm going to look at, if
 2    there's three of them, you times it by
 3    three, it's roughly 7.5 million?
 4        A.   It depends on the values of
 5    the other invoices.  They're not the same
 6    amount.
 7        Q.   Okay.  But as far as this
 8    invoice, it should be roughly
 9    2.4 million, right?
10        A.   Right.  Approximate basis
11    for the transaction.
12        Q.   Okay.
13            MR. HESKIN:  Next, please?
14    BY MR. HESKIN:
15        Q.   Same thing, right?
16        A.   Yes.
17            MR. HESKIN:  All right.
18    Let's go to the next one?
19    BY MR. HESKIN:
20        Q.   This is 3 of 3, same thing?
21        A.   Yes.
22        Q.   They're all equal, correct?
23        A.   Yes.
24        Q.   Okay.
```

Page 411

```
 1            MR. HESKIN:  Next one,
 2    please?
 3    BY MR. HESKIN:
 4        Q.   Isn't this exact same thing
 5    we just did?
 6        A.   That one --
 7        Q.   Just got a different invoice
 8    number?
 9        A.   Yes.
10        Q.   All right.
11            MR. HESKIN:  So let's go to
12    the next one.
13    BY MR. HESKIN:
14        Q.   This is 2 of 3.  So again,
15    we're going to be talking about, if you
16    times it by three, roughly $7.5 million?
17        A.   Right.
18        Q.   Okay.
19            MR. HESKIN:  We can go to
20    the next one, please.
21    BY MR. HESKIN:
22        Q.   Same -- same thing,
23    7.5 million between the three of them?
24        A.   Yes.
```

Page 412

```
 1        Q.   Got it.
 2            MR. HESKIN:  Go to the next
 3    one.
 4    BY MR. HESKIN:
 5        Q.   There are no invoice on this
 6    one, right?
 7        A.   Correct.
 8        Q.   So what are you buying?
 9        A.   So this is that example I
10    discussed earlier where you have an
11    existing advance and you're adding on
12    $500,000 to it.  It's the same receivable
13    that we're financing under this new
14    agreement that carries that existing
15    agreement over.
16        Q.   Okay.  But you're getting
17    $500,000 in new money, right?
18        A.   Right, and then there's a
19    new RTR or the receipts purchase total.
20        Q.   There's a new fee added to
21    it, roughly $200,000, $240,000, right?
22        A.   Right, the fees are in
23    addition to the payoff on the existing
24    plus the new capital.
```

Page 413

```
 1        Q.   Okay.  But what invoices are
 2    you purchasing?
 3        A.   The ones from the existing
 4    one.
 5        Q.   But you're getting new
 6    money, where's the $500,000 coming from?
 7        A.   That's why I'm going back to
 8    it.  Remember I said the invoices are
 9    variable and additional capital may be
10    needed for certain projects.
11        Q.   So those other invoices
12    would justify an increase of roughly, is
13    that 50 million?
14        A.   No.  Again, the contract
15    value and the money is being requested
16    for that.
17        Q.   Is it 5 million?  10 percent
18    of -- another $5 million?
19        A.   You really have to check the
20    underwriting file for that.  Again, don't
21    get hung up on the fixed 10 percent, it's
22    a rough approximation for the basis on
23    these factoring agreements.
24        Q.   Okay.  But you've got
```

Page 414

1    $500,000 of new money, there's got to be
2    $5 million worth of additional invoice
3    that are --
4         A.   There would more detail in
5    the underwriting file.
6         Q.   Okay.  So there's another
7    $5 million here somewhere?
8         A.   Right.
9         Q.   Okay.  Got it.
10              MR. HESKIN:  If we can go to
11   the next one?
12   BY MR. HESKIN:
13        Q.   Okay.  So this has the new
14   invoice number, right?
15        A.   Yup.
16        Q.   This is 1 of 9?
17        A.   Correct.
18        Q.   So we're talking about a
19   project that's roughly $40 million,
20   right, if there's nine of these?
21        A.   I don't know what those
22   other agreements are like.
23        Q.   We'll go through them.  But
24   just for this one, it's 4.6 million?

Page 415

1         A.   Yeah, the amount they agreed
2    to was this total, right.
3         Q.   So it's $4.6 million worth
4    of invoices that supposedly support this.
5              MR. HESKIN:  Let's go to the
6    next one.
7    BY MR. HESKIN:
8         Q.   This is 3 of 9.  This is
9    only 28,000 so we're -- they're
10   different, right?
11        A.   Yeah.  It's a different
12   invoice number, it's a different amount.
13        Q.   All right.  So this one
14   would be roughly 280,000, right?
15        A.   Again, don't get hung up on
16   a fixed 10 percent.  It's not always
17   going to be the perfect base for that.
18        Q.   I get it.  Just roughly it
19   should be about 280, right, if I look at
20   invoice No. 3002, No. 20, right?
21        A.   Yeah, focus on the
22   underwriting, look at that invoice.
23        Q.   Got it.
24        A.   Look at what we agreed to

Page 416

1    when they decided to do this transaction,
2    every single one just like, you know,
3    we're going over.  There was a
4    discussion, an agreement, a review,
5    invoices, and a detail out on what was to
6    be paid back.
7         Q.   Got it.
8              MR. HESKIN:  Go to the next
9    agreement, please?  This one is 4
10   of 9.  We can go to the next.  One
11   this is 5.  You can skip this one.
12   Go to the -- let's try to get past
13   these.  So let's try -- there's
14   seven, eight, nine --
15            THE WITNESS:  It's all the
16   same idea.  There's individual
17   invoices.
18   BY MR. HESKIN:
19        Q.   Yeah, but it's not all the
20   same?
21              MR. BERMAN:  How much longer
22   do you have here?  We're going on
23   our eighth hour.
24              MR. HESKIN:  We're not on

Page 417

1    our eighth hour, but I'm almost
2    done.
3         If you can just highlight
4    that again, I'm just going to go
5    through this document and I'm
6    done.
7    BY MR. HESKIN:
8         Q.   Okay.  And this is the same
9    concept, right?
10        A.   That's right.  They agreed
11   to that invoice number, to purchase that
12   150,000.
13        Q.   Okay.  And so there should
14   be, you know, the receipts purchased
15   amounts 210,000, so I'd be looking at
16   invoices totally approximately
17   $2 million, right?
18        A.   Right.  Just whatever is on
19   that invoice number.
20        Q.   All right.
21              MR. HESKIN:  So let's skip
22   through the next eight.  Now,
23   let's look at this one.
24   BY MR. HESKIN:

MAGNA
LEGAL SERVICES

Page 418

1    Q.   This is a big one, right?
2    A.   Yup.
3    Q.   So --
4    A.   It's the same though.  It's
5  the same looking at those deals, looking
6  at the factor in advance, and
7  understanding that Kara went through each
8  of these deals to confirm with
9  underwriting that's what she wanted on
10 those transactions.  We don't routinely
11 put these installment breakdowns on our
12 transactions.  This is uniquely developed
13 for Kara.
14    Q.   What's Advance No. 2.
15 What's that mean?
16    A.   I'm not sure, but that's
17 sounds like it's referring to the basis
18 for this invoice.
19    Q.   I'm not sure I'm following
20 that.
21    A.   I'm not sure --
22    Q.   What does Advance No. 2
23 mean?
24    A.   I'm not sure.

Page 419

1    Q.   What does Factor No. 36
2  mean?
3    A.   I'm not sure.
4    Q.   Okay.  But there should be
5  invoices about $10 million supporting
6  this, right?
7    A.   I'm not sure.
8    Q.   Okay.
9       MR. HESKIN:  Let's go to the
10 next one.
11 BY MR. HESKIN:
12    Q.   And this basically has an
13 invoice that should correspond with
14 roughly $5.6 million, right?
15    A.   Yes, same methodology.
16    Q.   Okay.
17       MR. HESKIN:  Let's go to the
18 next agreement, please?
19 BY MR. HESKIN:
20    Q.   And this -- is this a repeat
21 or is this --
22    A.   It looks like the same one,
23 huh?
24    Q.   Yeah.

Page 420

1       THE TRIAL TECH:  Maybe it's
2  a repeat.
3       MR. HESKIN:  All right.
4  Let's go to the next one.  Thank
5  you.
6  BY MR. HESKIN:
7    Q.   Okay.  So this is -- I
8  should look at Invoices 24605 and 0607
9  and it should be about $4.2 million,
10 right?
11    A.   Right.  That determines the
12 basis for this factoring amount.
13    Q.   Got it.
14       MR. HESKIN:  Go to the next
15 one, please.
16 BY MR. HESKIN:
17    Q.   Same thing, just look at the
18 invoice, it should be about 4.2 million?
19    A.   Yes, same thing.
20    Q.   Okay.
21       MR. HESKIN:  We can look at
22 the next one.
23 BY MR. HESKIN:
24    Q.   Same thing, right?  Right,

Page 421

1  Joe?
2    A.   Yes.
3       MR. HESKIN:  All right.  We
4  can go to the next one.
5  BY MR. HESKIN:
6    Q.   Same thing, correct?
7    A.   Correct.
8       MR. HESKIN:  All right.  We
9  can go to the next one.
10 BY MR. HESKIN:
11    Q.   This one is Invoice
12 41250-00, should be about 3.5 million,
13 right?
14    A.   Again, basis on that
15 invoice, but right.
16    Q.   Yeah.  I got it.
17       MR. HESKIN:  All right.  So
18 if we can go to the next one,
19 please?
20       THE WITNESS:  And that's the
21 big one.  That's the one we had
22 all these individual purchase
23 orders that Kara collected on that
24 we did not receive.

Page 422

1  BY MR. HESKIN:
2      Q.   Okay.  And this is the one
3  that incorrectly calls it principal and
4  interest, right?
5      A.   Correct.
6      Q.   Okay.  And there should be
7  about $20 million of -- of receipts total
8  there, right?
9      A.   Whatever those total amounts
10  end up being.  I wouldn't get, you know,
11  hung up on the 10 percent basis, which
12  again is just a guidance on the original
13  underwriting.
14      Q.   Okay.
15          MR. HESKIN:  Next one,
16      please?
17          THE WITNESS:  Yeah, that's
18      the same thing.
19  BY MR. HESKIN:
20      Q.   All right.  And this one
21  again incorrectly uses the word
22  principal?
23      A.   Correct.
24      Q.   Okay.

Page 423

1          MR. HESKIN:  Go to the next
2      one.
3          THE WITNESS:  So this one
4      goes back to the original form
5      with identifying the invoice
6      first.
7  BY MR. HESKIN:
8      Q.   Invoice and then whatever
9  deal No. 44 is?
10      A.   Correct.
11      Q.   You don't know what deal No.
12  44 is?
13      A.   I'm not sure.
14      Q.   All right.
15          MR. HESKIN:  If we can go to
16      the next one, please?
17  BY MR. HESKIN:
18      Q.   Same thing, right?
19      A.   Correct.
20      Q.   All right.
21          MR. HESKIN:  Let's go to the
22      next one.
23          THE WITNESS:  Yup.
24  BY MR. HESKIN:

Page 424

1      Q.   This is a pretty big one.
2  This is probably $14 million in receipts
3  purchased?
4      A.   Again, you'd have to go back
5  to the underwriting file to verify the
6  basis for it.
7      Q.   There's no specific invoice
8  here, right?
9      A.   Yeah, this one is missing
10  the specific invoice so we really have to
11  go back to the underwriting file.  It's
12  even more important for this one.
13      Q.   Okay.  If I look at the
14  underwriting file, I should see invoices
15  for $14 million, right?
16      A.   Again, not to get hung up on
17  a fixed ten point calculation, but you
18  have to identify what the basis is from
19  the underwriting discussion when they did
20  this deal.
21      Q.   It's going to be roughly 14
22  million, right?
23      A.   Sure, roughly.
24      Q.   Okay.

Page 425

1          MR. HESKIN:  We can go to
2      the next 1, please.
3          THE WITNESS:  And this is
4      with the other advance company.
5  BY MR. HESKIN:
6      Q.   Fast Advanced Funding?
7      A.   Correct.
8      Q.   Well, this is buying 10
9  percent of what?
10      A.   Their receivable.
11      Q.   Of what receivable?
12      A.   It's identified in the
13  underwriting based on the underwriting
14  matrix and cash flow of the business.
15      Q.   Well, it's certainly not
16  buying receipts that were already sold to
17  the CBSG, right?
18      A.   No, those are separate.  And
19  unlike the other ones that identify the
20  specific invoices, this has to be based
21  on the underwriting cash flow matrix for
22  that deal.
23      Q.   Well, explain that.
24      A.   They have to go through the

Page 426

1   average balances in their account for the
2   last four months, you have to get a good
3   feel for the specific cash flow business
4   as -- to ascertain a feasible number for
5   them to work with.
6        Q.   So their average daily
7   balance would be 10 percent of 499 -- or
8   it would be 499, right, $5,000?
9        A.   Not daily, monthly balances.
10       Q.   Yeah, monthly?
11       A.   You said daily.  There's a
12  big difference.
13       Q.   Their average receipts would
14  be $50,000 per day, right?
15       A.   Let me give you an example
16  from an underwriting perspective.
17            Let's say they take the last
18  three months' of bank statements for this
19  merchant.  Minus any other liabilities
20  from MCA transactions and/or loans,
21  what's the average basic deposit amount
22  in cash flow the business has.  So let's
23  say in this case it was $5 million a
24  month, it would do a 10 percent basis to

Page 427

1   determine that we're willing to provide
2   an advance on cash flow and funding
3   receivables to the tune of 10 percent of
4   that average basis for the last three
5   months.  So if that $10 million, this is
6   where you get to your neat and tidy
7   calculation of 10 percent, you can make
8   the assumption that we should only do
9   about $500,000.  We'll go lower than that
10  just to make sure that they're not biting
11  off more than they can chew based on
12  their receivables purchased.
13       Q.   Well, there are 22 business
14  days in a month, right?
15       A.   Not a perfect 22 business
16  days.
17       Q.   22, 23, right?  What do
18  you -- what do you use?
19       A.   I'm saying a calendar month.
20       Q.   What you do is you take the
21  average per month, let's say it's
22  100,000, and you divide by 22 or 23.
23  What do you use, do or 23?
24       A.   We don't use either.  We

Page 428

1   look at the total bank statement cash
2   inflows from a business.
3        Q.   Yeah.
4        A.   It's never going to be a
5   perfect $5 million on a 10 percent basis,
6   but it's going to be an average of at
7   least the last three months, if not the
8   last four or five months, right?
9        Q.   Yup.
10       A.   And we want to use a
11  reasonable number for them to use as a
12  basis for the advance amount, so we're
13  not going to give them half of their
14  monthly cash flows as an advance, that
15  would be too aggressive.  It wouldn't
16  make any sense to give them, let's say in
17  this example, 2-and-a-half-and-a-half
18  million dollars.  There's no way it would
19  be feasible for them to work with that
20  number.  But from our historic average
21  with a very low default rate, we find
22  that a number closer to 10 percent is
23  feasible depending on the business.  We
24  have to look at each deal individually

Page 429

1   and look at how the business revenues are
2   generated and individual cash flow for
3   every transaction.
4            That's a good approximation
5   on what we use that 10 percent basis for.
6   That's really the value in that number.
7        Q.   I want -- I want you to
8   remember what you just testified to.
9            What's the -- what is the
10  date of this agreement?
11            MR. HESKIN:  If you can put
12       the top of that?
13            THE WITNESS:  It's the 5th
14       of December 2018.
15  BY MR. HESKIN:
16       Q.   Fifth of December, 2018.
17  Got it.  12/18.  Got it.
18            So as of December '18, 10
19  percent of their daily specified amount
20  which would be tied to all the formula
21  you just did, right?
22       A.   Right.
23       Q.   Would be about $5,000 per
24  day, right?

MAGNA
LEGAL SERVICES

Page 430

1      A.   Correct.  And I meant that
2  as an example to demonstrate how it's
3  structured.
4      Q.   Well, they did that, right?
5  They must have made those calculations
6  and --
7      A.   I'm explaining to you how
8  they come up with the underwriting matrix
9  and what this 10 percent basis is used
10 for.
11     Q.   Okay.  Roughly $5,000 for 10
12 percent, right, in December 5th, 2018,
13 right?
14     A.   Correct, that's right.
15     Q.   Okay.  And you would -- it's
16 the same underwriters that are doing this
17 for cash --
18     A.   Same underwriting
19 department, I don't know if it's the same
20 underwriter.
21     Q.   Okay.  Same underwriting
22 department?
23     A.   Yeah.  They should have
24 consistent results, yeah.

Page 431

1      Q.   Okay.  They should have
2  consistent results, right?
3      A.   Right.
4      Q.   Okay.  All right.  So let's
5  just remember that on December 5th, 2018,
6  10 percent -- and this is 10 percent of
7  her revenues, right?  Bank statements,
8  what the bank statements show?
9      A.   Cash flow.
10     Q.   Cash flow.  Should be $5,000
11 a day, right?
12     A.   Right.
13     Q.   Got it.
14          MR. HESKIN:  If we can go to
15     the next one, please?
16 BY MR. HESKIN:
17     Q.   This is the tricky one,
18 right?  This is the December 19th one,
19 right?  What's the date of this one?
20 Yup, this is the December 19th one,
21 right?
22     A.   Yup.
23     Q.   Right?
24     A.   Yes.

Page 432

1      Q.   Okay.  So it states here
2  that the purchase price is 3.89, and that
3  the purchased amount is $5.4 million,
4  right?
5      A.   Right.
6      Q.   So that would have to be
7  pledging approximately $50 million of
8  receipts, right?
9      A.   That's incorrect.
10     Q.   It's not.  Okay.  What's it
11 pledging?
12     A.   This is a consolidation
13 deal.  You see the line there that says
14 weekly payment funding?
15     Q.   Yup.
16     A.   The objective of this
17 structure in our factoring agreements is
18 to be able to lower the overall exposure
19 for capital provided to a client by
20 distributing it over a longer period of
21 time.  It helps the client collect on
22 existing receivables and be able to,
23 similar to a reload, get additional
24 capital while at the same time making

Page 433

1  good on repaying the prior receivables.
2      Q.   Got it.  So what --
3      A.   The money we funded Kara at
4  this point, we were really worried that
5  giving her additional money would
6  increase our exposure, how much capital
7  we're out of pocket.  So this was the
8  reason for this structure.  The 10
9  percent basis has the least amount of
10 relevance to this because that was just a
11 by-product of prior transactions with
12 her.
13     Q.   What are you purchasing?
14     A.   It's the same receivable,
15 we're talking about the future
16 receivables of her company.
17     Q.   Wait, so you're repurchasing
18 receivables you already purchased?
19     A.   Correct.  And you really
20 want to refer to the consolidation
21 schedule, meaning existing -- treat this
22 like a reload.  There's existing advances
23 already provided that we're restructuring
24 to make it more affordable for her to

MAGNA
LEGAL SERVICES

Page 434

```
 1   work with.
 2       Q.   And you're charging her an
 3   extra 2.4 million, $2.5 million?
 4       A.   It's still the same
 5   proportionate rate we had before, it's
 6   just being taken over a much longer
 7   period of time.  The idea here is to
 8   spread out the funding and the exposure
 9   risk since we're already out.  As you
10   know, where this deal ends up, she
11   collected $3-and-a-half million more than
12   we got paid back.
13       Q.   So all the prior agreements
14   should be paid off through this
15   agreement, right?
16       A.   I don't believe it's all the
17   prior agreements, but I believe it's a
18   good portion of it.
19       Q.   Well, where am I going to
20   find that?
21       A.   It will as part of her body
22   of agreements that we've done.
23       Q.   Where am I going to find out
24   that this is paying off other factoring
```

Page 435

```
 1   agreements?
 2       A.   Beyond that, the attachment.
 3   There should be detail on there.  We go
 4   through that very carefully with the
 5   merchants.
 6       Q.   So to be clear, this is not
 7   a purchase and sale of future receipts,
 8   right?
 9       A.   It's a purchase and sale of
10   the existing, again reloads, right?  We
11   have an existing transaction.
12       Q.   Yeah, I get it.
13       A.   It's brought into a new deal
14   with additional capital for an expansion
15   on the original obligation she has under
16   the factoring agreement.  So additional
17   receivables that the company will have.
18       Q.   You're rebuying receivables
19   that you already purchased, right?
20       A.   No, we are still getting
21   money for those purchased receivables,
22   we're extending the amount of receivables
23   that we're purchasing.  We said, Okay,
24   Kara, we want to get -- we want to
```

Page 436

```
 1   provide additional working capital, but
 2   in order for us to do that, we need to
 3   buy additional future receivables your
 4   business is generating.  So it's not
 5   necessarily those individual invoices
 6   anymore, it's on the general pool of her
 7   company's receivables.
 8       Q.   Okay.  And how did you
 9   determine --
10       A.   I made a distinction between
11   those and the regular invoices we had
12   because structurally it's a lot
13   different.  We're not laying out that
14   whole amount of money either, it's going
15   to be distributed over a long period of
16   time so we're careful about the amount of
17   money we're providing to minimize the
18   risk on exposure being that, as you know,
19   we're already out a lot of capital with
20   this company.
21       Q.   How much did she get under
22   this deal?  How much cash is she getting?
23       A.   Under this transaction --
24   hold on a second.  Do you have the
```

Page 437

```
 1   schedule that goes with it?
 2       Q.   I couldn't find it.  It's
 3   somewhere.
 4       A.   There's a supporting
 5   schedule that breaks this all out.  It
 6   will be very transparent with that.
 7       Q.   Okay.  And how did you come
 8   up with the specified amount?
 9       A.   The specified amount is
10   broken out in that agreement as well.
11       Q.   It is?
12       A.   Yes.
13       Q.   And it says here that it
14   should be determined on percentage of
15   income, right?
16       A.   Correct.  Same legal
17   structure as all the other agreements.
18       Q.   And this is the agreement
19   that went from $3,500 per day to 19,995,
20   right?
21       A.   Correct.
22       Q.   So --
23       A.   And I want to refer to that
24   schedule because that really explains the
```

Page 438

1  entire story based on what she provided
2  to us in her discussions with our
3  underwriting and customer service
4  department, and the numbers we got from
5  her CFO Josh.
6      Q.   Say that again?
7      A.   This is based on the
8  conversations she had with our accounting
9  and underwriting staff along with the
10  numbers provided by her CFO Josh.
11     Q.   So how much in receivables
12  are you actually purchasing through this
13  agreement?
14     A.   I'd have to take look at
15  that agreement, the detail on this.
16     Q.   Okay.  But it's -- it's not
17  $5.4 million in receipts, right, because
18  you had already purchased those?
19         MR. BERMAN:  Objection.
20         THE WITNESS:  Correct.
21         They're not purchasing another
22         5.4, you're taking whatever we had
23         rights to already and you're
24         adding on to that the additional

Page 439

1      capital we are providing to Kara.
2  BY MR. HESKIN:
3      Q.   Okay.
4      A.   It's the same money we had
5  before, right?  This isn't any new --
6  we're not laying out this new capital
7  altogether, there's new capital being
8  added on top of her existing liabilities
9  from the existing factoring agreements.
10     Q.   Okay.  And where is the 10
11  percent of the income, what does that
12  mean?
13     A.   At this point, the 10
14  percent really isn't just based on 10
15  percent of cash flows any longer.  I'm
16  not explaining this, but that larger
17  agreement that had multiple invoices
18  listed, it really is just a basic rough
19  guideline on what her cash flow basis is.
20  It isn't necessarily going to calculate
21  to a clean ten points of revenues.  We're
22  just prolonging the deal, buying
23  additional receivables for a longer
24  period of time.

Page 440

1      So if 10 percent represents
2  $50 million, it's not $50 million day
3  one, it's $50 million over a longer
4  period of time.
5      Q.   All right.  So --
6      A.   Does that makes sense as far
7  as, you know, we are calculating a
8  portion of the holdback in her
9  receivables?
10     Q.   It's based on a percentage
11  of income, right?  The 10 percent daily
12  specified amount is supposed to be based
13  on her income, right?
14     A.   In this case, we take the
15  existing receivables that we already
16  financed adding on to it, and we're
17  extending the scope of time for her
18  receivables to come into her business and
19  collecting that at a longer pace.
20     Q.   Okay.  All right.  So
21  just -- so we're clear --
22     A.   I don't want -- $50 million
23  receivable that this is based on that's
24  currently sitting in receivables, it's a

Page 441

1  longer scope of time that the cash flows
2  are going to come in.
3      Q.   This agreement is dated
4  December 19th, 2018, right?
5      A.   Yes.
6      Q.   And the agreement for Fast
7  Advance Funding that we looked about
8  earlier was dated just two weeks earlier,
9  it was dated December 5th, 2018, right?
10     A.   A separate agreement, a
11  separate company.
12     Q.   And it did 10 percent, and
13  it looked at her average receivables and
14  that amount, her daily amount, came out
15  to be $5,000 per day, right?
16     A.   Right.
17     Q.   So shouldn't this be roughly
18  $5,000 per day?
19     A.   No.  That's what I keep
20  trying to explain to you.
21     Q.   Why isn't it 5,000 per day,
22  what should it be?
23     A.   Because there's a separate
24  existing agreement that we already had

**MAGNA** ▶
**LEGAL SERVICES**

Page 442

1    with her.  There's already ongoing
2    receivables that we're collecting.
3            To go back to your point,
4    you're saying that the current invoice
5    that we're purchasing receivables on is
6    being paid by prior deals, we're
7    collecting on those deals.  This is
8    extending those original transactions
9    that we had factored already.
10    Q.   So how much -- how much is
11    collected on day one?  What's the daily
12    amount?
13    A.   It's on that detail.  I keep
14    going back if you want to have a relevant
15    conversation.
16        MR. HESKIN:  All right.
17    This is my last area of
18    questioning we're almost done.  So
19    let's take a ten minute break and
20    we should just wrap this up shortly.
21    Okay?
22        THE WITNESS:  All right.
23        (Recess.)
24        MR. HESKIN:  Can you pull up

Page 443

1        the exhibit I just sent you?
2    BY MR. HESKIN:
3    Q.   This is the copy of the --
4    of the factoring agreement.  Have you
5    seen this before, the one we were just
6    discussing?
7    A.   Yes.
8    Q.   Okay.  Can you show me in
9    here where it specific -- where the --
10    where the payment schedule it?
11    A.   It should be towards the
12    end.
13    Q.   Okay.  Can you show me
14    exactly where it is?
15    A.   If you want to flip through
16    it.  I'm looking for a thing that
17    basically looks like a big spreadsheet.
18    Q.   This is what was filed as a
19    true and correct copy of the agreement by
20    CBSG.
21    A.   Right.
22    Q.   The confession of judgment.
23    A.   Well, that's the detail on
24    those invoices that you're talking about.

Page 444

1    Q.   Where is it?
2    A.   That's not it though.  Is
3    that it?
4        THE TRIAL TECH:  I believe
5    that's the last page.
6        MR. BERMAN:  Just for
7    clarity of record, this is -- I'm
8    assuming, Shane, just so he knows
9    what he's looking at, this is the
10    attachment to the confession of
11    judgment or is this something
12    else?
13        MR. HESKIN:  Yeah, I believe
14    so.
15        MR. BERMAN:  Okay.
16        THE WITNESS:  That's missing
17    the consolidation schedule
18    referred to on that last
19    agreement.
20    BY MR. HESKIN:
21    Q.   Okay.  And the consolidation
22    schedule, that's where it would have
23    the -- the income, how the income is
24    calculated?

Page 445

1    A.   It would have the breakdown
2    for existing funding that we've done
3    through prior factoring agreements, the
4    additional capital being provided on a
5    weekly basis, and the payments collected
6    in relation to that capital.
7    Q.   And it's not attached to the
8    confession of judgment, correct?
9    A.   I'm not --
10    Q.   All right.  I hate to do
11    this.  I've got to find this.
12        MR. HESKIN:  Brett, do you
13    have a copy of it?
14        MR. BERMAN:  I don't have
15    any.  That's not my forte to get
16    documents like that.
17        MR. HESKIN:  Sorry.  I don't
18    know why this is such a problem,
19    but it's not anywhere I can find
20    it.
21        Give me another five
22    minutes.  I apologize to everyone.
23    I've got to find this.
24        (Recess.)

Page 446

1      MR. HESKIN:  So what exhibit
2  number is this?
3      THE TRIAL TECH:  I have it
4  written down as 34.
5      MR. HESKIN:  Okay.
6  BY MR. HESKIN:
7      Q.   So Joe, what is this
8  exhibit?
9      A.   This exhibit is HMC's
10  records breaking down the daily payment
11  amounts and was the point of negotiation
12  when we were talking to Kara and Josh
13  about their payment history with us.
14      Q.   Okay.  And this is
15  specifically about the 12/19 agreement,
16  right?
17      A.   Yes.  That's just this deal,
18  correct.
19      Q.   All right.  And according to
20  this deal, this is what, in the middle
21  column, the daily payment contract says
22  3,500, right?
23      A.   Yes.
24      Q.   And that's based on 10

Page 447

1  percent of her income, right?
2      A.   Well, again, this is the one
3  that skewed away from the original
4  underwriting.  This is by far the most
5  complicated given the litany of funding
6  that was associated with it.
7      Q.   Okay.  So -- so in December,
8  it's $3,500 every day, right?
9      A.   Yes.
10      Q.   In January, it's $3,500
11  every day?
12      A.   Yes.
13      Q.   Okay.
14      MR. HESKIN:  So can you --
15  can the court reporter or the
16  technician just go to the next
17  set?  There you go, yup.  Thanks.
18  BY MR. HESKIN:
19      Q.   And then up until January
20  23, it's at $3,500 a day.  Do you see
21  that?
22      A.   Yes.
23      Q.   And then it jumps from 123
24  to 124 from 3,500 a day to 12,337, right?

Page 448

1      A.   Right.  That's how you end
2  up with the $19,000 payment.
3      Q.   Well, why did it jump from
4  3,500 to 12,337?
5      A.   Again, that's the detail
6  that we have on this agreement and how
7  this transaction was structured.
8      Q.   Okay.  Well, I mean, I
9  looked at the agreement.  I don't see a
10  schedule.  All I see is in the front of
11  the agreement it says increased based on
12  income.
13      So who -- who authorized the
14  jump from $3,500 a day on 1/23 to 12,337
15  on 1/24?
16      A.   That's the basis of the
17  agreement.
18      Q.   Where -- where in the
19  agreement does it say that that's
20  allowed?
21      A.   Based on the communications
22  with Kara and the information we received
23  from her team, we made the decision to
24  increase it from the agreement we had

Page 449

1  with her.
2      Q.   Okay.  So what information
3  on 1/24 justified an increase of roughly
4  400 percent?
5      MR. BERMAN:  Objection.
6      THE WITNESS:  We're treading
7      the same ground, Shane.  This
8      isn't anything new.  We're just
9      going to keep going back to the
10      same information.
11  BY MR. HESKIN:
12      Q.   Okay.  So just so I'm clear,
13  you made this calculation, right?
14      A.   This calculation was part of
15  the agreement that she signed off on.
16  It's detailed in that schedule for her
17  funding.
18      Q.   And who made the calculation
19  that the daily payment should now be
20  12,337 on 1/24?  That would be you,
21  right?
22      A.   We made the calculations,
23  yes.
24      Q.   You did?

MAGNA
LEGAL SERVICES

Page 450

1      A.   I didn't specifically make
2  that individual calculation on the
3  funding schedule.  I don't prepare the
4  numbers.
5      Q.   But did her income increase
6  by 400 percent in one day?
7      A.   I don't know.
8      Q.   Well, according to the
9  agreement it says, increase is based on
10 income, right?
11     A.   Yes.
12     Q.   So by any plain reading of
13 income, the income must have, according
14 to you, in order to justify a 400 percent
15 increase, it must have increased by
16 400 percent, right?
17     A.   You'd have to look at the
18 funding schedule.  In this agreement
19 we're adding -- we're providing her
20 weekly capital as part of the transaction
21 which is detailed on that list.
22     Q.   Why would the funding
23 schedule have anything to do with
24 percentage of her income?

Page 451

1      A.   Because it was structured
2  and agreed upon in that manner.
3      Q.   That you get to increase the
4  payment by 400 percent?
5      A.   Correct.
6      Q.   And that's going to be on
7  some schedule that no one can find?
8      A.   It was provided.  She signed
9  off on it.
10     Q.   Well, the -- the copy that
11 you -- your company filed with the
12 Philadelphia Court of Common Pleas that
13 said this is a true and correct copy,
14 doesn't have that schedule.  We looked at
15 it, right?
16     A.   It's not on there.  It
17 should have been provided.
18     Q.   But your lawyer,
19 Mr. Hartley, said this is a true and
20 correct copy, right?
21     A.   Yes.
22     Q.   And you've looked at it and
23 you don't see that schedule, right?
24     A.   Right.

Page 452

1      Q.   And if you look at the
2  numbering, it's 1 of 22, and I went
3  through and there's no pages, I don't see
4  a schedule, right?
5      A.   Yup.
6      Q.   Okay.  So unless we can --
7  you can come up with some document, some
8  schedule that I haven't seen, and that
9  your lawyer represented didn't exist to
10 the Court of Common Pleas, what we're
11 left with is what's been filed -- what we
12 have seen here today, right?
13     A.   Sure.
14     Q.   Okay.  And in that document,
15 there's nothing in there justifying an
16 increase of 400 percent, right?
17     A.   Like the other deals we had,
18 the basis is on the underwriting in the
19 background on the deal itself.  There's
20 supporting documents as part of the
21 underwriting file.  If it's not attached
22 to this -- to this agreement, the other
23 underwriting criteria we have is part of
24 the transaction, it doesn't necessarily

Page 453

1  say that it's not valid, that there isn't
2  a payable for that amount.  It just so
3  happens the details on the receivable and
4  how we're collecting it are itemized on
5  that schedule.
6      Q.   Well, I'm looking at the
7  front of the agreement and it says the
8  daily --
9      A.   She's got to pay us back a
10 good amount of money.
11     Q.   The daily amount is based on
12 the percentage of income, right?
13     A.   Right.
14     Q.   And so when -- on day one
15 the percentage of income was 3,500,
16 right?
17     A.   Right.
18     Q.   And now just over a month
19 later, because this -- this started
20 December 19th, right?
21     A.   Yup.
22     Q.   Just a month later, it went
23 from 3,500 to 12,000.  That's nearly a
24 400 percent increase, right?

MAGNA ►
LEGAL SERVICES

Page 454

1    A.   Correct.
2    Q.   So you're telling me that
3  their income increased by nearly
4  400 percent, right?
5        MR. BERMAN:  Objection.
6        THE WITNESS:  No, I'm not
7    telling you that.
8  BY MR. HESKIN:
9    Q.   You're not telling me that?
10   A.   No, I'm not saying that.
11   Q.   Okay.
12       MR. BERMAN:  But Shane, I do
13   have to say, you've asked all
14   these questions already.
15       MR. HESKIN:  Yeah.  I just
16   can't figure it out.
17       MR. BERMAN:  Right, but you
18   got your answers, so you're just
19   asking the same questions you
20   previously asked at 6:45 at night.
21       MR. HESKIN:  All right.
22  BY MR. HESKIN:
23   Q.   Let's look at the -- let's
24  look at what happened.  So we got 1/24

Page 455

1  for a period of -- to 2/14, it looks like
2  another 20 days or so, you collect 12,037
3  and then it increases to 14,525.
4        Do you see that?
5    A.   Yes.
6    Q.   Okay.  What's the basis for
7  that increase?
8    A.   It's on a schedule.
9    Q.   It's on a schedule that no
10  one can find right?
11   A.   No, we have it.  You don't
12  have it.
13   Q.   Okay.  And --
14   A.   Kara should have it, she
15  went over it with Josh.
16   Q.   Okay.  Maybe we'll find it.
17  Maybe we'll find it.
18        And so you're saying my
19  client has it, but here's an exhibit that
20  she prepared and obviously doesn't agree
21  with that and she -- she met with you and
22  said, Hey, listen, this is not what we
23  agreed to, this is how much we should
24  have been charged, $3,500 a day, and

Page 456

1  you're charging me, why?  You're charging
2  12,000, you're charging me 14, 16, 19.
3        So obviously she doesn't
4  have the schedule that you're saying
5  exists, right?  Because if she had it,
6  she would just look at the schedule and
7  say, You know what, you're right?
8    A.   That's incorrect.  That's
9  not what the meeting was about.
10   Q.   Okay.  Well, she had a
11  meeting with you, right?
12   A.   Yes.
13   Q.   She's telling you this is
14  what the agreement calls for, 3,500 per
15  day, right?
16   A.   No.
17   Q.   That's not what she's saying
18  there?
19   A.   No.
20   Q.   What's she saying?
21   A.   The meeting was to cover all
22  her transactions and to work on doing a
23  deal.  It was a negotiation.
24   Q.   It's a negotiation.  So

Page 457

1  she's not -- she's not telling you during
2  this meeting that you've overcharged me
3  by over a million dollars, right?
4    A.   She's not disputing that we
5  overcharged her.  She said, We need to
6  get on the same page on the balances for
7  all the transactions and come up with a
8  plan that's feasible for the business.
9    Q.   Okay.  So she sits down with
10  you, she presents this schedule and says,
11  You should have been charging me $3,500 a
12  day, but you --
13   A.   No, she never said.
14   Q.   Isn't that what this says?
15   A.   No.
16   Q.   Look at the heading at the
17  top.
18   A.   You're asking me if she said
19  you should not have charged me the
20  $19,000.  $3,500 a day.  That is not
21  factually correct.
22   Q.   Let's look at the top.
23       MR. HESKIN:  Can the
24  technician highlight the top of

**MAGNA** ▶
**LEGAL SERVICES**

Page 458

1       the page?  The heading at the top.
2       Yup.
3    BY MR. HESKIN:
4       Q.   Daily payment contract.
5    That's what she's saying is $3,500 per
6    day, CBSG daily ACH debit amounts.
7           Do you see that?
8       A.   Yup.
9       Q.   So she's alleging that the
10   contract only allows 3,500, isn't she?
11      A.   So look at your bottom right
12   on there, the draw schedule.
13      Q.   Yup.
14      A.   Similar to what I'm
15   describing on the agreement we had.  They
16   definitely got that because that schedule
17   is based entirely on that other schedule
18   that I'm referring to.
19      Q.   Okay.
20      A.   But you're seeing additional
21   funds we're providing to HMC over the
22   life of this deal so that when we provide
23   additional capital, you can see it lined
24   up there with those dates, we're able to

Page 459

1    increase the payments proportionate to
2    the additional capital we're providing
3    for additional receivables that are being
4    financed.
5       Q.   What -- how does that
6    correspond to income?  It says the daily
7    payments are supposed to increase based
8    on the income, right?
9       A.   Additional receivables that
10   she's making based on this agreement that
11   we can provide more capital to buy more
12   receivables which would correlate to the
13   increase in payments.
14          There's no surprise to her,
15   if you're trying to paint this in a way
16   that she thinks she doesn't know where
17   those additional payments are coming
18   from.
19      Q.   Okay.
20      A.   She understands that.
21      Q.   Got it.  So on 1/4, you guys
22   fund with her $550,000 in additional
23   money, right?  Right?
24      A.   Yes.

Page 460

1       Q.   Let's look at the schedule.
2    On 1/4, how much did the daily amount
3    increase?
4       A.   Nothing, it's still the
5    3,500.
6       Q.   I thought you just said two
7    minutes ago that it was supposed to
8    increase every time she got more money
9    from you?
10      A.   It goes up over time.  I'm
11   not saying it's a direct correlation with
12   the schedule on the right.
13      Q.   Okay.  And so on 1/4, she
14   got more money but the daily payment
15   didn't increase?
16      A.   Yeah.  Her detailing this
17   out shows that she understands exactly
18   how this agreement works.
19      Q.   No, it doesn't.
20      A.   Yes, it does.  The schedule
21   of payments going out, this is provided
22   by them, understanding and confirming
23   that her accountant knows exactly what
24   payments were coming in.  Why wouldn't

Page 461

1    they be able to understand that the
2    payments funded on that draw schedule
3    correlate to the increase in the daily
4    ACH from additional receivables, so
5    rather than breaking it out into, you
6    know, seven or eight more deals, we just
7    decided to do this schedule that
8    increases over time.
9           That's the way she wanted it
10   and she instructed us to structure this
11   deal that we came in agreement to.
12      Q.   You're purchasing 10 percent
13   of what?
14      A.   No.  Again you're hung up on
15   this 10 percent like you're expecting a
16   flat ten point calculation from a
17   receivable basis.  This negotiation is
18   outside of that.  Even if we had that 10
19   percent basis, that's always been the
20   basis for her deals.  But this
21   negotiation, it's a very complicated
22   transaction with multiple tranches of
23   capital coming in to purchase additional
24   receivables was developed and negotiated

Page 462

1  by Kara.  There should be no ambiguity
2  about that.
3      Q.   This is what she's saying.
4  Dated 12/19/18, contract date, 12/9/18,
5  contract amount, 3.8 million, daily
6  payment stated in the contract, 3,500,
7  income payment options specified 10
8  percent.  Right?  That's her
9  understanding of the deal, right?
10     A.   No.
11     Q.   She's not saying that?
12     A.   She's not.  She has this
13 deal.  This is what I'm explaining to you
14 that you're failing to produce the
15 schedule.  She has the entire structure
16 of when deals -- when this capital is
17 going to come her way, when the payment
18 increases occur, and it's only after we
19 gave her the last tranche of capital
20 before we had any issues with this
21 client.
22     Q.   All right.  I'm just telling
23 you what she's claiming on this piece of
24 paper.  Isn't it true that she's saying

Page 463

1  that the daily payment should be 3,500 or
2  10 percent?
3      A.   That's not correct.  She is
4  factually inaccurate and she understands
5  how this deal was structured.
6      Q.   I don't care whether she's
7  right or wrong, I just want to know, this
8  is what she's saying and this is what she
9  told you at that meeting.
10     A.   No, not during the meeting.
11 Again, the meeting was to discuss all of
12 the advances that she has with our
13 company.
14     Q.   Okay.  As for this
15 particular one?
16     A.   They came in to try to do a
17 negotiation, do an additional deal to
18 potentially get more capital and we
19 responded, We're already in this too
20 deep, we need to lower the payment.  We
21 agreed because we want you to sustain
22 your business for us to be able to
23 collect those receivables.
24     Q.   All right.  I got it.

Page 464

1      Just so I'm clear, that the
2  entire basis for you increasing this
3  amount is found somewhere on a schedule
4  that I've never seen?
5      A.   That your client has seen
6  and has detailed out right here with the
7  funding provided.
8      Q.   Okay.
9      A.   Because the funding amounts
10 aren't provided on that version of the
11 schedule you provided either, right?  How
12 are they getting the numbers if they
13 don't have the schedule that went along
14 with that contract?
15     Q.   Okay.  So you've got that
16 schedule, and you know, it either exists
17 or it doesn't exist.
18     A.   I'm looking at it right now
19 on my computer.
20     Q.   You have it?  Then share it
21 with us.  Email it -- email it to the
22 court reporter and we'll look at it right
23 now together.
24     A.   You have the payment

Page 465

1  schedule already.
2      Q.   Well, you've got this
3  agreement that you prepared for and
4  you're relying upon for your testimony,
5  email it to the court reporter and
6  we'll --
7          MR. BERMAN:  Shane, let
8  me -- let me put you on mute and
9  I'm going to call Joe for one
10 second.  Okay?
11         MR. HESKIN:  Sure.
12         MR. BERMAN:  Your question
13 is not pending anymore, correct?
14         MR. HESKIN:  No.
15         (Recess.)
16 BY MR. HESKIN:
17     Q.   Okay.  All right, Joe.  Can
18 you please -- is this the document you
19 were referring to earlier?
20     A.   It's a sample of the weekly
21 funding we were describing.
22     Q.   Where are the daily payments
23 on this?
24     A.   This one does not have the

MAGNA
LEGAL SERVICES

Page 466

1   daily payments.  It's a sample of how
2   wires were scheduled to complete the
3   funding for HMC.
4       Q.   Okay.  But -- but the
5   document that you're talking about, would
6   it have a payment schedule, too?
7       A.   Yeah, the one that was with
8   that deal specifically should have the
9   increased detail on that payment.
10      Q.   They should have it, right?
11      A.   Right.  But the point of
12  this document in reviewing what we're
13  doing with the funding to this client,
14  this is normally included in these MCA
15  agreements listing out the wires received
16  every week so there's no ambiguity on
17  their end when capital was coming in.
18  This one so happened to have a fixed
19  payment so it didn't need to have a
20  breakdown on the increasing payments
21  because it was the same amount the whole
22  time.
23      Q.   What does exposure mean?
24      A.   Exposure means capital out

Page 467

1   versus capital in.  This was a mechanism
2   for us to limit our exposure with all the
3   deals we had with Kara, especially down
4   the road with that last transaction.  So
5   you can see that week one we fund
6   137,000, we collect five installments of
7   that 700 -- 7,812 payment on the top
8   right.
9       Q.   Got it.
10      A.   We fund another 48,000, we
11  collect another 7,812 in the top right.
12  The exposure is a sum of the payments
13  wired out versus payments collected.  So
14  by week two, we wired out a total of
15  approximately 2 -- or 197 -- what is
16  that, $187,000, right?  187 minus ten
17  installments of the 78 equals that 185
18  balance, right?  Not balance, but the
19  exposure on that capital.
20      So all-in-all we funded
21  $108,000 more than we received.  And this
22  doesn't break even until we're done
23  funding her at the bottom of the list
24  where you see on week -- 7/23, we're

Page 468

1   ahead on the total capital sent out.  We
2   collected more than what we sent out.
3       Q.   And so as of 10/22/18,
4   you're plus -- you're in the black
5   $538,000, right?
6       A.   Correct.
7       Q.   Okay.  And what's your
8   current exposure?
9       A.   This one is paid off.  It
10  was done.  It was satisfied as of
11  12/5/18.
12      Q.   12/5/18?
13      A.   Yes.
14      Q.   But overall, isn't it true
15  that CBSG has received more than
16  $2 million in payments than it gave HMC?
17      A.   No, not at all, we're behind
18  on the exposure 3-and-a-half million
19  dollars.
20      Q.   Okay.  And what document --
21      A.   We gave Kara 3-and-a-half
22  million dollars more than she gave to us,
23  not including any factor for your income.
24      Q.   Okay.  And what document did

Page 469

1   you review to come up with that number?
2       A.   We didn't have a document to
3   review.  That's a calculation we did
4   internally.
5       Q.   When did you do that?
6       A.   It's on your payment
7   schedules.  If you net out on those
8   payment histories the amounts paid versus
9   amounts funded, you'll come up with that
10  same number.  And that's not even talking
11  about the 11-and-a-half million dollar
12  outstanding balance.  If she collected
13  11-and-a-half million dollars, we would
14  get our 3-and-a-half million dollars back
15  and $8 million of income for the total
16  amount of money we funded to her.
17      Q.   And that --
18      A.   We haven't even broken even
19  with Kara yet.  She's still out more than
20  we received.
21      Q.   And do you understand that
22  she disputes that payment schedule, that
23  there were wires --
24      A.   She didn't dispute it when

MAGNA ▶
LEGAL SERVICES

Page 470

1  we met with her CFO in our meeting.
2  Again, we got to the same numbers, we
3  weren't too far off, we ended at that
4  11-and-a-half million dollars number as
5  the true outstanding balance, and that's
6  where it went sideways. She pulled the
7  plug on payments, she did not make good
8  on any other further payments. She
9  decided to go to legal with it.
10      She knows she's ahead
11  3-and-a-half million dollars no matter
12  how you cut it.
13      Q.   Do you have an email where
14  she -- that memorializes her agreement to
15  the 11.5?
16      A.   Yes.
17      Q.   You do?
18      A.   Oh, we should have
19  communications confirming that. I have
20  several messages back and forth with her
21  accounting department. Time and again,
22  her CFO and her confirmed this is the
23  current outstanding balance.
24      In fact, even before we did

Page 471

1  another funding, we trued it up. When
2  she did this last agreement saying you're
3  taking existing balances and putting them
4  into new agreement with new capital, we
5  always have to true up the existing
6  balances. If she's not on the same page
7  with that, we're not going to do that
8  next deal.
9      So we confirm with her, Hey,
10  Kara, this is the current balance, we're
11  going to give you this additional
12  capital, here's what it's going to owe.
13  When you collect your receivables, you
14  have to turn over that capital.
15      Q.   All right. So --
16      A.   This deal is evidence that
17  she understands exactly what the
18  structure is in liabilities. Just keep
19  in mind, she paid off most of these
20  deals. She was a great client up until
21  this went sideways because she understood
22  the product, she customized it to fit her
23  business needs, and she paid us back
24  those prior deals.

Page 472

1      Q.   Okay. And I'm just trying
2  to figure out what you said earlier with
3  these re -- re-upped deals where you
4  combine the deals together.
5      So are you using this new
6  agreement to pay off the old agreements
7  and you just combine them in one, is that
8  what you're doing?
9      A.   Yeah, in effect you can call
10  it a payoff. You're taking the existing
11  factoring agreement and you're bringing
12  it into a new transaction. You're
13  confirming the balances owed and the new
14  payment schedule as a negotiation for
15  subsequent payments to be collected.
16      Q.   Okay. And that's perfectly
17  okay?
18      A.   Yes, she agreed to it
19  several times.
20      Q.   Okay. And you're okay --
21  your auditors are okay with that?
22      A.   Are you asking if our
23  auditors are okay with the legal
24  structure of our agreement?

Page 473

1      Q.   If your auditors are okay
2  with using a new factoring agreement to
3  pay off old factoring agreements?
4      A.   Yes, they're okay with the
5  mechanism for subsequent agreements
6  replacing existing agreements.
7      Q.   So they're okay with a new
8  agreement repurchasing receivables that
9  were already purchased by CBSG?
10      A.   Correct.
11      Q.   Just to be clear, you would
12  be taking funds that are not generated
13  from future receivables to pay off
14  receivables that you purchased, and so
15  you're getting paid off from -- not from
16  those receivables you purchased, but
17  you're getting paid off from yourself?
18      MR. BERMAN:  Objection,
19      form.
20      THE WITNESS:  No, that's
21  incorrect.
22  BY MR. HESKIN:
23      Q.   So I've got an agreement,
24  right?

MAGNA
LEGAL SERVICES

Page 474

1    A.   That's not correct.
2    Q.   Tell me how I'm wrong.
3    A.   You have a commitment for
4  those receivables on the last
5  transaction. You're expanding the
6  commitment for additional receivables as
7  part of additional funding. You're
8  carrying over the remaining liability for
9  the original commitment and building upon
10  it with additional capital provided to
11  Kara, meaning that we have the right to
12  additional receivables the company will
13  now generate under the subsequent
14  agreement.
15        The financial auditors
16  signed off on the structure and the legal
17  on these documents.
18    Q.   When?
19    A.   As part of our audit.
20    Q.   When?
21    A.   For 2017 we had our audit
22  completed at the start of -- at the end
23  of 2018. We just had 2018 under QC
24  review, and we expect 2019 to be

Page 475

1  completed by the end of the year.
2    Q.   Okay. Just so I understand
3  this correctly, the money that's going --
4  where is the money coming from to pay off
5  the first agreement?
6    A.   The money coming from -- to
7  payoff the first agreement?
8    Q.   Yup. So if I got two
9  agreements, the first one -- the second
10  one is paying off the first, right?
11  Where is the money coming from to pay off
12  the first? It's coming from CBSG, right?
13    A.   Depends on which agreement
14  you're referring to and what the business
15  operations cash flows are like.
16    Q.   Well, I'm just talking about
17  when you do one of these consolidations
18  where you're paying off an old one, where
19  is the actual money coming from to pay
20  off the first agreement? It's not coming
21  from the receivables of the business --
22    A.   Operations of the business.
23    Q.   -- it's coming from you,
24  CBSG, right?

Page 476

1    A.   No, it's not coming from us.
2  I mean, it can if they put that in the
3  same account that they're paying us back
4  from. We actually wire to different
5  accounts specifically for that reason.
6        But if the business is
7  generating revenues -- remember, we're
8  only buying a portion of the receivables.
9  They're getting revenues from other deals
10  that we're not buying into. This is why
11  we don't fund 100 percent of receivables
12  or even 50 percent. It doesn't make any
13  sense for us to buy out the entire
14  receivables, otherwise, what's the
15  utility of the business we're doing
16  business with?
17    Q.   Let's just try and keep it
18  simple. I've got an agreement -- let's
19  take the first agreement. I get 100,000,
20  I have to pay back 150. I pay it off for
21  a while through receivables, $75,000 left
22  that I owe. Right?
23    A.   Okay.
24    Q.   Then I enter into a new

Page 477

1  agreement with CBSG for an additional
2  100 -- $200,000. Let's say it's another
3  $200,000. I owe 75 from the last one,
4  right?
5    A.   Right.
6    Q.   How does that $75,000 get
7  paid off if I -- if I consolidate it with
8  the second?
9    A.   It doesn't matter if it's a
10  reload or if it's the same transaction.
11  There's cash flow coming in from the
12  business outside of what we're providing.
13  Again, we're only funding a small portion
14  of the overall monthly statement cash
15  flow. If we're basing a 10 percent basis
16  on the funding amount for our
17  receivables, they should have plenty of
18  other capital from other deals that we
19  did not purchase the future receivables
20  on for that to occur.
21    Q.   You're making no sense
22  whatsoever. They owed $75,000, how is
23  that money getting paid?
24        MR. BERMAN: He just

**MAGNA**
LEGAL SERVICES

Page 478

1     answered that.  Objection.
2          But Shane, it's 7:15 at
3     night.  So are you finishing this
4     up now?  We're been here since ten
5     o'clock this morning.
6          MR. HESKIN:  Very close.
7     BY MR. HESKIN:
8          Q.   Where is that money -- how
9     is it getting paid off?
10         A.   This is what I just
11    explained.  You understand there's more
12    receivables out there than what we're
13    financing, right?
14         Q.   Okay.
15         A.   I'm not getting every single
16    dollar that the company gets.  They have
17    a healthy payroll, they have SGNA, they
18    have rents, they have all sorts of bills
19    that the company needs to operate.
20    There's revenues, Kara takes a nice fat
21    salary.  There's revenue outside of what
22    we're financing.
23         Q.   Where is the $75,000 coming
24    from?  The company pays the 75,000 or

Page 479

1     does CBSG pay the 75?
2          A.   No, the 75,000 is not
3     physically paid off when we do a
4     subsequent deal.  It's an expansion of
5     the receivables commitment that she's
6     making subsequently after the first
7     transaction.  I don't get 75 grand back
8     when we do that reload.  We're still on
9     the hook for that.  She has to receive
10    that in future receivables from her
11    merchants.  We're saying we agree to
12    provide additional capital to purchase
13    additional receivables that your company
14    is going to receive in the future.  It's
15    up to you to make good on that under this
16    new agreement when you collect that
17    receivable.
18         Q.   But when you do the new
19    agreement, right, the deal No. 2, right,
20    that extinguishes deal No. 1, right?
21    Deal No. 1 is paid off, right?
22         A.   It's not physically paid
23    off.  I'm not getting cash in hand to pay
24    that off.

Page 480

1          Q.   I got it.  But I no longer
2     owe money under that agreement, right?
3          A.   You do.  You carry over --
4     well, yeah.  Legally the -- that
5     agreement is complete.
6          Q.   Paid, right?
7          A.   But the liability as part of
8     the next agreement, which is a carryover
9     subsequent agreement, which I'm sure
10    you've come across before.
11         Q.   Yeah, but --
12         THE REPORTER:  Guys, really,
13    one at a time.
14         THE WITNESS:  Go ahead,
15    Shane.  You go first.
16    BY MR. HESKIN:
17         Q.   When I do the refactoring,
18    or whatever you want to call it, at that
19    point in time, I no longer legally owe
20    any money under the first agreement,
21    correct?
22         A.   Correct.
23         Q.   I didn't pay that off with
24    receivables of my own, right?

Page 481

1          A.   No.
2          Q.   How did it get paid then?
3          A.   Liability for those future
4     receivables is carried over into the
5     subsequent agreement.  Future receivables
6     like the original agreement will pay that
7     off.
8          MR. HESKIN:  Can the
9     technician please pull up the
10    email I just sent?
11    BY MR. HESKIN:
12         Q.   Can you read that second
13    paragraph?  The second full paragraph.
14         A.   Okay.
15         Q.   Did you write this email?
16         A.   Yes.
17         Q.   Is this email consistent
18    with what we just spent 20 minutes
19    debating over?
20         A.   Yes.
21         Q.   Okay.
22         A.   You can't apply funds
23    allocated for client funding against the
24    balances.  We're not going to take our

MAGNA
LEGAL SERVICES

Page 482

1  own money and pay back your last
2  receivable.  You're renegotiating the
3  next contract.  That's exactly what I'm
4  describing.
5      Q.   Okay.  So this is exactly
6  what you've been trying to tell me for
7  the last 20 minutes.  Maybe I'm dense.
8      A.   Yeah, you are dense.  And
9  she called me after this and said she
10 understood.
11     Q.   Okay.  I guess I'm the dense
12 one.  That's fine.
13         MR. HESKIN:  All right.
14 Well, that's all I have.  Thank
15 you very much for your time.
16         Thank you everyone for being
17 so patient.
18         And those are all the
19 questions I have.
20         Brett, do you have anything?
21         MR. BERMAN:  No, nothing.
22         Thank you everyone.  Have a
23 good night.  I appreciate it.
24         THE REPORTER:  Mr. Berman,

Page 483

1  do you need a copy of the
2  transcript?
3          MR. BERMAN:  Not as quickly
4  as Mr. Heskin does, but I need a
5  copy, yes.
6          THE REPORTER:  Thank you.
7          (Witness excused.)
8          (Deposition concluded at
9  approximately 7:17 PM.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 484

1
2              CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  within deposition is a true and accurate
7  transcript of the stenographic notes of
8  the testimony given by the witness.
9
10
11
12
13
   Constance S. Kent, CCR, RPR, CLR
14 Certified Court Reporter
   Registered Professional Reporter
15 Certified LiveNote Reporter
   and Notary Public
16 Dated: 7/1/20
17
18
19
20         (The foregoing certification
21 of this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)

Page 485

1              LAWYER'S NOTES
2  PAGE  LINE  NOTATION
3  _____  _____
4  _____  _____
5  _____  _____
6  _____  _____
7  _____  _____
8  _____  _____
9  _____  _____
10 _____  _____
11 _____  _____
12 _____  _____
13 _____  _____
14 _____  _____
15 _____  _____
16 _____  _____
17 _____  _____
18 _____  _____
19 _____  _____
20 _____  _____
21 _____  _____
22 _____  _____
23 _____  _____
24 _____  _____

Page 484

1

2                       CERTIFICATE

3

4

5            I HEREBY CERTIFY that the

6    witness was duly sworn by me and that the

7    within deposition is a true and accurate

8    transcript of the stenographic notes of

9    the testimony given by the witness.

10

11

12       *Constance S. Kent* 

13

         Constance S. Kent, CCR, RPR, CLR

14       Certified Court Reporter

         Registered Professional Reporter

15       Certified LiveNote Reporter

         and Notary Public

16       Dated:  7/1/20

17

18

19

20            (The foregoing certification

21    of this transcript does not apply to any

22    reproduction of the same by any means,

23    unless under the direct control and/or

24    supervision of the certifying reporter.)

**A**

**Abbey** 328:7,13
**Abbonizio**
317:16
**Abbonizio's**
319:24
**ability** 105:24
121:9 350:19
351:1
**able** 33:20 87:19
87:22 130:4
209:18,22
246:6,8 356:20
357:8 396:7,10
396:13 432:18
432:22 458:24
461:1 463:22
**absolute** 377:14
**absolutely** 51:1
100:3 101:2
107:15 112:23
141:4 162:6
212:2 236:9
260:24
**absolved** 97:20
**accept** 42:19
**accepted** 187:20
289:18
**accepting** 117:24
**account** 30:24
176:8,10
185:17 197:20
198:2,17
203:19 311:13
312:3 387:3
426:1 476:3
**accountant**
177:23 182:21
205:21 347:12
382:8 404:21
460:23
**accountants**
81:14
**accounted** 47:22
200:19

**accounting** 41:20
43:16 47:1,2,3
47:19 48:15
49:10,10 50:1
73:16 74:4,24
75:2,5,21 81:12
82:18 86:17
130:8 136:3,5,9
143:18 146:2,4
146:7 174:8
175:19 178:6
180:16 185:12
185:13 186:16
199:20 202:22
208:10 209:17
224:10,16
244:14 347:6
365:13 438:8
470:21
**accounts** 24:24
108:8,9 184:6
245:16 310:21
331:18 377:19
387:12 476:5
**accrued** 102:11
**accurate** 153:4,6
170:19 240:10
326:7,9 342:13
484:7
**accusing** 234:21
236:24
**ACH** 30:13 45:7
198:13 364:4
458:6 461:4
**Acknowledge...**
3:13
**acquired** 161:3
**acquires** 160:6
**act** 123:1 133:16
**acting** 132:2
**action** 1:4 48:17
194:2
**active** 223:21
**actively** 221:24
222:2
**activities** 24:20

**activity** 304:3
**acts** 349:2
**actual** 58:17
67:11 85:21
108:23 198:7
198:11 199:7
204:3 229:1
257:19 362:9
372:24 373:20
374:12 475:19
**ad** 217:17 336:3
**ADAM** 2:7
**add** 226:23
256:16 408:14
409:5
**added** 263:13
412:20 439:8
**adding** 412:11
438:24 440:16
450:19
**addition** 412:23
**additional** 54:2
190:9 346:7
401:15 413:9
414:2 432:23
433:5 435:14
435:16 436:1,3
438:24 439:23
445:4 458:20
458:23 459:2,3
459:9,17,22
461:4,23
463:17 471:11
474:6,7,10,12
477:1 479:12
479:13
**address** 6:23
148:1,17,19
150:7,9,11,13
150:14,17
156:5 169:9
285:12 287:17
309:13
**addresses** 147:15
147:19
**adjustments**

203:22
**admitted** 78:5
131:9,16
**admitting** 279:2
**advance** 1:9
77:20,22
248:21 257:5
373:4 412:11
418:6,14,22
425:4 427:2
428:12,14
441:7
**advanced** 259:16
374:8 425:6
**advances** 313:20
314:3,5 433:22
463:12
**advantage**
275:13
**advertising**
289:22
**advice** 11:7 77:1
80:16 330:14
331:1,8
**affidavit** 240:3
240:10 246:10
**affiliated** 302:7
**affiliation** 318:21
**affixed** 26:17
**affixes** 27:9
**affordable**
433:24
**afternoon** 284:13
**agent** 152:8
**aggressive** 123:6
428:15
**ago** 233:15,20
239:23 240:16
338:8 352:6
353:9 396:18
460:7
**agree** 54:8 106:5
152:6 170:15
220:16 232:12
232:24 234:11
248:5 312:13

313:6 350:18
455:20 479:11
**agreed** 34:10
46:14,24 80:3
186:4 398:10
399:19 415:1
415:24 417:10
451:2 455:23
463:21 472:18
**agreement** 3:13
4:4 15:8 16:4
16:14 30:3,4,6
30:15 31:6,11
36:11 37:14
38:2,24 39:3
50:2,15 58:6,11
59:19,21 60:9
64:24 66:10,14
69:7 72:13
75:11 86:23
87:12 89:1,3
90:19 91:13
92:6,10 93:21
98:15 99:11,20
101:15 103:5
104:10,12,15
104:22 105:6
105:18 106:12
109:1 117:9
152:3 153:8,10
153:12 161:5
171:5 172:16
178:4 183:8
185:2 186:17
186:21 187:16
187:18,23,24
188:13 190:17
224:4 254:3,7
256:6,12,14
261:13,14
266:12 268:6
268:12,23
269:6,14,17,19
285:18 317:20
319:11,15,15
321:17 335:24



341:4 342:10
342:20 343:24
345:8 350:3,19
350:24 353:10
354:5,10,22,24
355:8,19
358:22 360:16
361:18 362:15
365:15,19
366:10 367:6
367:10,11,14
368:13 369:18
372:5,12
373:10,11,23
374:9,12,14
375:1,22 376:1
380:1,8,12,21
380:22 381:2,2
381:6,7,9,10
384:3 385:24
387:10 388:21
389:5,14,19,20
391:7 392:22
392:24 393:1
393:22 394:14
394:19,20
395:1,5,21
399:7 401:15
406:11 408:21
409:9 410:1
412:14,15
416:4,9 419:18
429:10 434:15
435:16 437:10
437:18 438:13
438:15 439:17
441:3,6,10,24
443:4,19
444:19 446:15
448:6,9,11,17
448:19,24
449:15 450:9
450:18 452:22
453:7 456:14
458:15 459:10
460:18 461:11

465:3 470:14
471:2,4 472:6
472:11,24
473:2,8,23
474:14 475:5,7
475:13,20
476:18,19
477:1 479:16
479:19 480:2,5
480:8,9,20
481:5,6
**agreements**
16:21 17:21
20:2 34:7 40:20
41:4,13 42:11
42:24 45:8
57:22 58:2,3,4
62:22 65:12
79:17 82:10
86:24 87:11
88:2,5,7,14
89:7 102:15
103:1 124:21
150:2 157:12
160:7 161:20
171:2 177:19
181:2,5 200:18
210:16 231:19
251:7 262:3,18
262:22 268:7
277:15 296:18
302:23 303:9
303:14 304:1,5
304:8,12
306:21 328:2
330:20 345:11
369:4 374:16
379:20 386:12
387:23 391:20
391:22,22
392:3 393:8
408:18 413:23
414:22 432:17
434:13,17,22
435:1 437:17
439:9 445:3

466:15 472:6
473:3,5,6 475:9
**agreement's**
224:15
**agrees** 48:12
**Ah** 299:24
**ahead** 34:22
95:10,16 99:4
103:13 133:12
143:15 208:15
226:21 264:11
291:6 331:6
360:3 468:1
470:10 480:14
**ah-ha** 271:19
**AICPA** 206:4
**Aida** 344:23
347:12,15
348:1
**akin** 266:7
**Alex** 32:16 33:3,4
33:15 66:7,9
**Alexa** 320:6
**allegation** 9:14
**alleged** 117:10
**alleging** 119:19
123:19 458:9
**Allen** 199:21
343:10
**allocated** 481:23
**allow** 186:18
226:24 292:11
**allowed** 44:2
111:1 124:6,12
124:13 125:17
126:15 186:19
207:18,20
210:8,21
212:18 285:22
292:24 295:23
303:4 448:20
**allows** 126:14
458:10
**all-in-all** 467:20
**alternative** 37:23
**altogether** 37:9

439:7
**Alvin** 304:19
**ambiguity**
261:20 462:1
466:16
**Ambler** 227:22
**amortization**
86:15 101:7
267:23
**amortize** 101:16
266:7
**amount** 46:14,16
46:20 48:13
87:7 98:24
104:23 169:19
169:24 170:5
170:23,24
171:9 172:12
172:12,13,23
172:23 173:8,9
174:15 175:10
175:12,24
183:12 197:11
203:24 205:6
252:8 254:17
255:19 256:17
256:19 257:4,8
260:11 264:6
266:6 267:23
270:6,7 352:21
362:7 369:24
378:7 380:8
390:17 391:10
401:22 402:3
402:22 403:1,3
410:6 415:1,12
420:12 426:21
428:12 429:19
432:3 433:9
435:22 436:14
436:16 437:8,9
440:12 441:14
441:14 442:12
453:2,10,11
460:2 462:5
464:3 466:21

469:16 477:16
**amounts** 50:5
194:11 305:21
401:11 417:15
422:9 446:11
458:6 464:9
469:8,9
**analogy** 205:18
**and/or** 377:23
426:20 484:23
**annual** 56:18
70:3 277:9
**annum** 169:19
**answer** 5:4 8:6
8:10,22 10:15
11:5 13:20
16:11 19:9,23
26:7,10 27:5
32:8 34:18,22
42:17 44:2,4,10
46:5 53:15 57:3
57:5 58:17 61:8
61:10 63:18,19
76:18,20 80:9
80:12 81:2
84:24 85:1
91:18 93:23
94:12,22,24
95:9 96:14 97:8
101:22 107:11
107:13 110:10
110:12 111:7
112:18,18,22
113:4,8 119:9
123:24 125:20
127:8,21,23
130:15 131:1,6
131:11 132:24
133:5,8,12
135:12,15
147:10 149:12
149:23 152:11
152:19,21
176:20 201:6
204:13 207:12
208:11,14



210:5 211:1,8
211:18,20
212:3 213:18
214:15,20
215:2,8,14
216:5,10,13
227:4,10
228:16 229:13
229:20,23
230:1,4,6,12,14
231:13,16
232:4,7,11,22
233:21,23
234:6 236:4,9
239:13 272:12
279:17,21
280:21 281:6,8
283:14,18,22
283:24 290:2
290:23 291:4,6
291:7,15
292:11 294:17
294:20 295:9
296:4,6 300:2
300:14 301:1,3
301:8,14,22
302:13,18
304:15,16
307:11 339:3,5
339:7,17,19
341:9 364:22
380:24 381:1
409:13
**answered** 79:22
81:1 97:6
127:22 128:12
149:11 151:9
364:10,15
478:1
**answering** 9:21
221:5
**answers** 123:7
295:13 351:10
351:14 454:18
**Anthony** 160:11
160:12,14

162:12,13,17
162:19,22,23
162:23 163:1
334:9,16
**Anthonys** 161:24
162:10
**anticipated**
370:11
**anybody's**
235:18
**anymore** 373:24
436:6 465:13
**anyone's** 311:19
**AOL** 311:12
**apologize** 445:22
**apparently** 41:20
42:8 44:14
323:19 362:5
**appears** 142:8
323:18,19
**appendix** 186:21
**applicability**
263:2
**applicable**
106:24 107:2
127:5,12
**application** 85:22
**applied** 258:5
346:22
**applies** 108:20
373:24
**apply** 481:22
484:21
**applying** 373:2
**appreciate**
482:23
**appreciative**
331:8
**approval** 55:20
245:19
**approve** 136:23
**approved** 25:24
168:22 172:9
174:1,6 245:23
**Approximate**
410:10

**approximately**
36:2 46:21
51:13 76:1 81:4
114:21 404:24
417:16 432:7
467:15 483:9
**approximation**
277:9 298:23
314:7 413:22
429:4
**APR** 268:4,8,12
268:14,20,22
269:13,16,18
269:20 273:16
273:24 274:2
276:22 277:2,6
277:11
**April** 70:22
71:13
**APRs** 269:7
**AR** 372:1
**Arch** 1:16 6:24
**area** 442:17
**argue** 401:2
**arguing** 125:9
**argument** 122:18
**argumentative**
63:10
**arguments** 213:6
**arising** 377:20
**arranged** 36:10
48:5
**arrangement**
87:4
**arrangements**
45:18
**article** 322:12,16
322:18,22
323:9,10,20
**ascertain** 426:4
**asked** 12:8 25:17
26:5 33:15
61:18 62:20
70:5 79:21 97:6
125:16 207:20
225:3 231:7

324:19 335:2
364:14 454:13
454:20
**asking** 8:23 9:8
23:3 34:12
42:15 55:5
63:13 77:3 80:6
80:19,20 91:16
94:2 111:5
112:7,19 125:1
125:4,5,8
130:18,21
151:3,5,7
207:18 210:19
211:11 213:12
213:21,24
214:4 216:22
227:5 228:2,14
229:6,8,9,12
232:16 234:13
239:6,8 246:21
271:11,14,18
271:20 272:1,1
272:4 275:20
275:22 293:11
293:12 299:21
300:3,4 302:24
303:1 325:9
326:5 352:14
356:7 357:5
374:7 454:19
457:18 472:22
**aspects** 160:1
335:8
**assess** 367:7
**assessed** 183:1
184:7 255:18
**asset** 130:5
201:18,20
203:5,5,6,8,17
206:14 339:11
340:20
**assets** 92:19 99:9
99:15 201:13
204:23 207:10
259:23 340:16

**assigned** 371:23
**assigning** 387:11
**assigns** 377:13
378:17 379:3
387:24
**assistance** 331:13
**associated** 83:5
172:15 209:12
268:15,17
302:7 314:18
447:6
**assume** 87:19
145:3 161:13
219:13 307:15
322:14,18
353:2
**assuming** 61:14
85:12 97:16
102:7 181:15
181:11 256:24
256:24 390:19
427:8
**assumptions** 54:1
**assumptions** 54:1
**attached** 41:21
445:7 452:21
**attachment**
435:2 444:10
**attempting** 94:16
**attention** 284:17
**attorney** 19:21
110:6,8 131:9
131:12,16
132:7,17,20
135:2 158:19
**attorneys** 133:7
134:1 173:6,7
173:13,19
174:14,24
176:16
**Attorney's**
170:22
**attorney/client**



19:6,20 130:16
130:17,20
132:20 135:8
349:8
**audit** 199:11
474:19,21
**audited** 115:18
121:8 122:7
198:18 200:5,8
313:13
**auditor** 199:2
343:11
**auditors** 472:21
472:23 473:1
474:15
**audits** 199:6,24
200:2
**August** 117:21
194:12 197:11
250:11 350:2
**author** 324:4
**authorities**
142:16 179:7
200:12
**authorization**
318:11
**authorize** 238:20
238:23 239:11
318:3,20
**authorized** 25:7
31:3,5,7 143:24
144:4,11 183:8
195:20 239:9
318:14,16,17
319:16 359:10
364:6 448:13
**available** 212:23
281:3
**Aventura** 156:11
**average** 426:1,6
426:13,21
427:4,21 428:6
428:20 441:13
**avoid** 122:21
235:18
**aware** 18:12,13

31:1 35:9 55:23
56:2 70:2 87:10
87:15,16,18
141:22 161:22
163:5,8 165:8
188:11,14
238:17 282:24
296:22 297:1
297:19 311:21
319:23 332:2,5
332:6,7,9
347:14,19
359:17,20
391:19

---

**B**

**B** 3:7
**bachelor's**
328:17
**back** 30:14 58:8
74:21 78:13
93:13 102:3,4
103:21 104:24
105:4 107:19
107:22 140:4,6
144:3,24
145:11 146:12
166:5 167:20
167:21 168:11
177:14,15
179:22 180:1,1
180:1,2,2,2,2,2
186:20 202:16
202:18 203:13
205:2 206:14
206:18 209:21
211:3 216:16
217:9,10 223:4
238:1 239:20
244:1,7 245:23
254:17 255:21
257:10,24
258:12,16
260:4 274:14
284:9 302:8
332:14,15,18

350:16 354:9
357:17 368:9,9
384:12 385:5
389:8,12 399:5
402:3 413:7
416:6 423:4
424:4,11
434:12 442:3
442:14 449:9
453:9 469:14
470:20 471:23
476:3,20 479:7
482:1
**background**
73:10,15,23
75:3 78:15
452:19
**backstop** 225:20
**backwards**
389:11
**bad** 220:16
**balance** 92:9,14
99:6 205:5
206:11,11
207:6 208:3
209:7,15
210:19 392:6
392:20 393:6
426:7 467:18
467:18 469:12
470:5,23
471:10
**balances** 46:8
47:19,22 48:1
48:16 183:19
183:22 185:3
393:4 426:1,9
457:6 471:3,6
472:13 481:24
**balancing** 123:1
**balloon** 313:11
**bank** 24:23
196:13 197:20
198:4 199:7,10
331:17 354:8
356:11,17,22

357:1,7,8,14,15
357:18,22,24
358:1 362:23
362:24 363:4,7
387:3 426:18
428:1 431:7,8
**bankruptcy** 90:5
90:8,13,18 92:4
92:20 93:7
97:18,20 98:8
99:2 100:9,24
**Bar** 134:23
**Barleta** 1:15 3:3
3:18 6:1 333:5
333:6,14,24
334:3
**base** 275:10
354:1,2,20
358:20 364:7
372:3 415:17
**based** 49:15,21
53:18 58:18
98:15 101:6,18
103:7 122:10
122:12 175:13
175:21 184:17
191:22 252:23
253:20 254:19
257:16,18
258:13 267:9
267:23 270:14
335:21 336:4
337:4,15,20
350:18 352:12
352:19,22
353:10 354:3
354:12,21
355:18 356:15
357:6 358:8,10
358:14,22
361:9 362:14
375:7 390:2
403:24 425:13
425:20 427:11
438:1,7 439:14
440:10,12,23

446:24 448:11
448:21 450:9
453:11 458:17
459:7,10
**baseless** 340:12
**basic** 85:14
133:10 204:12
376:1 426:21
439:18
**basically** 84:10
263:1 404:6
419:12 443:17
**basics** 86:19,21
**basing** 360:13,14
372:24 408:8
477:15
**basis** 215:10,23
221:9,22 246:4
256:11 258:1
281:8 291:16
291:17,24
339:21 346:17
347:3 355:15
361:11,20
371:18 372:8
375:15 395:20
396:14 400:2,6
400:20 401:1,4
402:4 403:1,5
405:2 410:10
413:22 418:17
420:12 421:14
422:11 424:6
424:18 426:24
427:4 428:5,12
429:5 430:9
433:9 439:19
445:5 448:16
452:18 455:6
461:17,19,20
464:2 477:15
**Bates** 280:9,14
280:16
**Bazio** 110:16
**bberman@fox...**
2:9



**beat** 84:4
**began** 16:21
**beginning** 1:18
7:12,23 118:13
118:14
**behalf** 28:18,20
31:8 63:24 77:5
148:16 160:22
161:1 163:22
211:12 222:7
224:13,15,19
225:5 226:9
279:8 294:1
300:9 349:2
**believe** 29:9 32:5
33:20 44:20
50:20 66:17
137:16 149:14
172:13 175:23
183:10 185:21
191:1 250:7
262:19 273:5
274:12 285:21
310:6 322:4
323:5 331:2
334:11 434:16
434:17 444:4
444:13
**believes** 322:9
**bell** 110:18
**Belmont** 328:7
328:13
**Berman** 2:7 8:4
8:11,19,24 9:15
9:20 10:1,5,12
10:19 13:18
16:10,23 17:13
18:2 19:4,18
22:13,20 23:16
25:12 26:8 27:3
27:13,17 28:10
28:21 29:7
31:12,15 32:3
34:8 37:5 39:13
40:22 41:6
42:13,17 43:5

43:19 44:3,19
45:2,10,19 46:4
51:10 52:5,13
53:13 54:15,24
55:15 56:20
57:1 58:15
59:22 60:3 61:7
62:2,18 63:9,15
64:2 66:24 68:9
69:1,9,21 71:22
76:15,21 77:7
78:1,2,7,23,24
79:5,6,11,21
80:7,24 83:18
84:22 88:21
89:13,21 90:10
91:1,14,18
92:11 93:2,22
94:23 95:8
96:12 97:5
98:11,22 99:7
99:17 100:5,17
100:21 101:4
102:6,16
104:13 105:1,7
105:11,19
106:9,22
107:10,14
110:9,13,23
111:7,14,17,24
112:6,10,17,23
114:10 115:24
116:24 118:19
120:23 122:1
123:12,24
124:5,15 125:7
125:15,21,24
126:13,18,24
127:4,10,20
128:10 129:7
130:14,19
131:5,11 132:4
132:18 133:3
133:20 134:11
134:18,24
135:6 136:1

139:18 141:14
143:15,20
145:14,21
146:15,20
149:10,22
151:2,7,23
152:10,18,22
153:18 154:2
157:16,20
158:7 159:15
162:2,7 163:17
164:11,16
165:11 166:1,6
166:16 167:9
167:16 171:15
172:7,21
173:15 174:18
175:1 176:18
181:7,20 182:4
182:8 185:20
186:11 187:5
188:2,7 191:5
192:22 193:17
194:6,22 195:1
195:10 196:17
197:6,13
198:24 200:21
201:2,5,24
207:11,15
208:6 210:4,10
210:12 211:2,7
211:16,22
212:2,12 213:3
213:14,23
214:5,14,20
215:2,8,12
216:4,9,18,21
217:4 223:15
224:20 225:22
226:17,23
227:7,16 228:1
228:9,13,21
229:2,6,16
230:3,9 231:7
232:3,9,14,20
233:2,18 234:1

234:5,10,18,23
235:8,12,15
236:2,6,15
237:3,10,13,20
238:3,22 239:4
239:13 245:20
246:11,17
247:1,6,15
248:7 249:12
256:21 258:18
262:9 264:1
265:15 266:19
269:3,9,22
270:9 271:6,11
271:16,24
272:9 274:10
275:20,23
278:6,20
279:10,16
280:4,8,13,19
281:5,9,13,18
281:19,23
283:13,17
284:1,11 289:1
290:1,22 291:3
291:14,17
292:8,16,23
293:4,16,20
294:16,24
295:3,8 296:3
299:9,16,21
300:1,13,24
301:7,13,21
302:12,17,21
303:7 304:14
308:5 310:8,19
313:2 315:8,17
316:1 318:23
322:6 323:3
324:12,18
325:16 327:7
331:21 339:2,6
339:10,16,20
340:7,13,22
341:6 343:5
347:16 349:7

349:13 351:7
351:15 353:14
353:19 355:6
356:1 358:16
361:6 363:2,13
363:19 364:8
364:13,22
369:20 370:6
373:14,18
382:22 383:5
384:15,20
385:9,17 387:7
416:21 438:19
444:6,15
445:14 449:5
454:5,12,17
465:7,12
473:18 477:24
482:21,24
483:3
**best** 49:17 156:9
**better** 120:14
226:13,15
227:18,20
228:19 229:11
230:2 277:20
278:1,18 279:7
279:12,15
283:2,11
284:21 289:21
290:8,17,20
292:12 293:13
293:23 294:9
294:13,22
295:13,18
296:9 306:2
377:9
**beyond** 78:15
231:11 253:9
270:6 435:2
**big** 23:4,6 81:12
156:22 264:10
418:1 421:21
424:1 426:12
443:17
**bill** 408:7



Billarose 32:18
billing 408:11
billion 320:19
bills 478:18
Biography 337:10
bit 122:24 282:15 282:16 369:10
biting 427:10
black 468:4
Blake 299:6,19 299:22 300:7 301:5,12,19
blatant 278:17
blow 39:10 369:9 371:7 377:8
board 271:17 407:1
body 261:14 267:13 381:19 434:21
book 194:21 206:19 209:16
booked 204:7,10 207:24
bookkeeper 347:5
books 172:3 199:6 200:19 202:11 203:6 208:1,13
borrow 101:8 226:4
borrowed 209:20
bottom 139:23 141:3 273:7 275:6 280:10 397:21 458:11 467:23
bought 92:22 98:20 380:10 382:5 384:19 386:10,10 387:19 388:10 390:12 393:24 394:4

Boulevard 156:10
Brad 120:12
brand 391:21 393:2,8 394:20
breach 30:2,3,5 43:18 45:6 93:20 95:7 119:20
breached 31:11
break 85:15 107:18 216:15 284:3,7 332:13 367:23 442:19 467:22
breakdown 445:1 466:20
breakdowns 418:11
breaking 446:10 461:5
breaks 437:5
Brett 2:7 9:13 10:4,9 11:1 228:18 281:2,2 445:12 482:20
Brezio 110:17
briefly 24:18 72:17 108:2
bring 84:13,20 94:9,18 217:20 280:18 392:7
bringing 280:20 305:16 472:11
broke 12:20
broken 407:21 407:21 437:10 469:18
broker 228:5,24 283:2,5 284:21 295:19,22 299:12,20 300:8 305:3 309:20 310:1,3 310:7,23 311:3 321:4,9

brokering 296:1
brokers 306:1 308:19,24
Bromley 335:18
brought 129:5 357:20 435:13
bucks 203:10 209:11,12
building 7:8 474:9
bulk 156:17
bunch 218:21
business 1:8 4:2 21:9 53:19 54:5 59:13 72:11 73:4 74:13 77:13 83:6,8,14 86:11 90:3,9,24 91:3,12 93:18 93:20 95:20 96:8 97:14 98:2 99:10 100:13 103:16 106:2 111:4 113:11 113:13 114:4 122:16 124:18 149:17 150:6 152:8 153:10 154:11 161:4 168:16,17 169:5 191:13 191:14,23 204:20 205:15 205:16 206:10 217:19,22 218:22 220:2 220:10,18 223:14 225:10 242:21 243:16 244:13 246:3 260:17 277:5 278:23 285:3,7 285:11 286:10 286:17,17,23 303:21 304:3 330:11,14

331:1,4,12
335:8 337:14
339:23 340:23
340:24 370:14
372:3 374:4
376:20 378:6
379:11,19
382:11 383:1
383:22 385:4
385:12 386:6,7
388:20 389:9
390:22 393:4
394:18 403:8
425:14 426:3
426:22 427:13
427:15 428:2
428:23 429:1
436:4 440:18
457:8 463:22
471:23 475:14
475:21,22
476:6,15,16
477:12
businesses 93:17
100:12 113:14
160:6 161:1
330:14
buy 91:10,10
384:10 390:11
390:12 436:3
459:11 476:13
buying 54:13,22
108:23 369:17
372:13 376:17
376:18 382:15
382:17,18
388:16,18
389:15,21,22
390:8 396:1,2,5
400:8,19,21
401:24 412:8
425:8,16
439:22 476:8
476:10
by-product
433:11

B-I-L-L-A-R-... 32:24

___

**C**

C 2:1
calculate 176:24 365:23 402:12 439:20
calculated 175:17,20 184:16 268:13 353:8,9 364:6 367:1 375:17 444:24
calculating 440:7
calculation 51:12 59:9,12 353:23 354:2 356:10 356:23 357:11 359:5 365:21 366:6 403:6,23 424:17 427:7 449:13,14,18 450:2 461:16 469:3
calculations 58:19 264:17 264:18,19,21 264:23 265:22 362:4 430:5 449:22
calendar 191:23 427:19
California 74:1 247:13
call 9:10,11,16 10:6,23 66:18 78:11 79:1,12 107:21 126:2 233:3 234:19 235:21 237:3,6 318:7 334:2 340:14 349:8 353:16 380:6,6 384:11 465:9 472:9 480:18



**called** 199:21
244:24 322:20
482:9
**calls** 19:5,20
130:15,19
132:19 135:1,7
296:13 334:1
422:3 456:14
**capacity** 16:1,8
24:8 75:13
150:3 186:24
234:17 248:14
319:11
**capital** 68:10
101:11 113:14
115:2 205:14
206:9 257:19
258:10 303:21
303:22 305:16
335:11,12,15
379:21 412:24
413:9 432:19
432:24 433:6
435:14 436:1
436:19 439:1,6
439:7 445:4,6
450:20 458:23
459:2,11
461:23 462:16
462:19 463:18
466:17,24
467:1,19 468:1
471:4,12,14
474:10 477:18
479:12
**car** 39:20,23
204:19,20
205:2,3,9,17
**card** 378:2 384:1
387:14
**care** 239:4 260:4
463:6
**career** 320:20
**careful** 436:16
**carefully** 435:4
**carried** 392:24

393:5 481:4
**carries** 412:14
**carry** 480:3
**carrying** 474:8
**carryover** 480:8
**case** 3:10 8:8,12
9:4 65:20,21
67:18 94:7,15
94:16 130:24
145:16 175:15
176:2 177:8,10
207:3 213:2
216:12 239:7
246:13 271:16
276:8 280:6,15
280:24 283:21
304:9,13
426:23 440:14
**cash** 24:21,23
51:2 53:19 54:6
68:14 72:9
204:5 206:12
248:20 304:2
365:9 371:19
374:7 378:2
382:24 383:7
383:10,21,24
385:3,11 386:4
387:2,13 388:7
425:14,21
426:3,22 427:2
428:1,14 429:2
430:17 431:9
431:10 436:22
439:15,19
441:1 475:15
477:11,14
479:23
**catastrophic**
97:15
**categorically**
64:18 116:14
**category** 289:5
**cause** 123:3
**CBSG** 6:16 8:2
11:14,19,20

12:10,14 13:2,7
13:13,16 14:7
14:14,17,19,22
15:1,8,17 16:8
16:21 17:10,11
18:4,6 19:15
22:7,11,16
23:10,22 24:3
25:3,8 26:23
28:3 31:8 34:4
38:7 53:8 54:13
55:5 63:24
74:19 81:17
82:3,9 86:24
87:10,11 88:3
89:8 96:11
106:6,6,16,21
107:7 108:3,14
109:7,21 113:6
113:22 114:2
117:9,18
119:20 123:20
127:17,17
132:8 133:17
133:24 134:10
137:22 145:5
148:10,14,16
149:1,2 150:4
150:10 151:19
152:15 153:16
155:10 157:6
157:12,13
158:21 159:6
160:2,15,17,22
161:1,3,7,14
163:13,22
164:1,10,15,22
165:6 166:15
166:23 167:7
167:23 171:12
172:6 173:12
174:14,23
176:14 195:8
196:14 197:4
200:1,20
208:13 209:24

211:12,13
212:1 214:12
214:19 215:5,7
216:2 217:10
217:12 218:2
219:10 220:14
221:17 222:7
222:15,19
224:5,19 225:5
226:2,10 227:2
228:15 229:7
229:20 230:20
230:23 231:10
235:3 240:18
243:3,5,21
244:22 245:10
248:18,21,24
249:2,10,19
259:7 270:14
270:18 274:4
274:20 275:8
275:16,18
276:13 277:13
279:9 283:3,10
286:2 287:9
288:17 294:1
294:10,15
295:1,7,14
296:22 300:9
301:10,18
302:1,4,7,10
303:22 305:4
307:1,5,8 317:5
327:11 329:18
331:16 332:3
341:5,13 342:7
342:17,22
349:2 355:21
369:17 377:14
377:14 378:9
378:13 379:4
388:1 425:17
443:20 458:6
468:15 473:9
475:12,24
477:1 479:1

**CBSG's** 113:11
157:23 184:23
186:3 198:4
207:6,9 214:24
220:2,17 275:8
296:17 297:20
298:3,12 343:2
355:14 358:7
358:12
**CBSG-created**
274:8
**CCR** 484:13
**cease** 37:8 93:18
**certain** 335:8
351:23 381:10
381:12 413:10
**certainly** 6:10
172:10 425:15
**CERTIFICATE**
484:2
**certification**
147:14 148:18
149:9 484:20
**Certified** 1:19
484:14,15
**certifies** 147:18
**CERTIFY** 484:5
**certifying** 484:24
**cetera** 221:13
333:16
**CFO** 11:21 14:3
14:6,14,16,19
14:21 15:17
16:8,17 31:18
38:9 40:6 46:7
47:19 48:1 75:8
75:14,16,24
77:4,12 78:6
79:20 80:21
81:8,17 82:12
82:12,15 108:3
174:10 224:2
244:22 338:11
365:11 382:8
403:12 438:5
438:10 470:1



470:22
chain 308:1
chance 308:3
change 267:23
394:12,21
401:6,9
changed 402:6
changes 275:2
Chapter 91:4,6,7
91:7,11
characterization
314:24
characterized
266:17 271:2,3
characterizing
32:6
charge 110:7
185:18 209:11
258:22 260:10
270:5 335:7
charged 185:16
455:24 457:19
charging 394:2
434:2 456:1,1,2
457:11
check 198:13
378:2 383:24
387:13 413:19
checks 224:1
Chelsea 2:12
Chessler 230:8
230:15 231:18
231:22 232:2
chew 427:11
chief 82:13
337:13
circles 139:24
circuit 100:1
circumstance
92:8
cite 94:13
citing 362:8
City 22:10 154:1
154:6 343:1
Civil 1:4 150:20
claim 98:8,18,24

100:19,24
212:7 213:1
261:24
claiming 123:20
191:18 462:23
claims 30:1 32:1
351:22
clarify 62:19
85:3 116:4
202:2 208:16
256:23
clarifying 63:14
85:17
clarity 444:7
Clark 306:7
class 132:15
CLE 132:15
clean 400:17
439:21
clear 9:21 10:11
20:16 45:6
59:15 78:18
83:15 111:19
154:14 181:18
208:7 265:13
319:22 435:6
440:21 449:12
464:1 473:11
client 18:22 19:3
19:3 21:10 25:4
26:18 28:5
29:12 30:2,3,5
37:10 38:5
59:18 61:4,21
61:23 64:14
68:4,20 69:12
72:8 89:7,16,18
91:7 92:8 93:5
93:11,12 95:4
100:10 102:1
103:15,19
104:7 106:5
115:22 117:19
119:17 120:1
120:12,16,21
121:3,15,17

122:15,23
123:19,21
125:13 127:18
128:3,8,19
129:1 134:5
136:21 137:17
137:21 157:11
161:8 175:7
182:19 183:11
183:15 185:19
187:19 192:17
193:10 195:22
196:4,16,16
197:3,10 204:7
207:9 212:7,8
212:10 231:20
237:8 252:1
256:9 265:11
306:16 310:10
316:18 320:1
331:1 351:17
356:5,6 357:3
360:19 361:3
365:2,6,9 373:1
374:15 379:10
388:5 400:22
432:19,21
455:19 462:21
464:5 466:13
471:20 481:23
clients 37:15
60:19 62:12
65:12,18 66:3
67:14 79:16
87:4 95:19
103:9 105:15
105:22 115:8
121:10 128:14
128:18 165:5
183:3 312:20
320:19 330:18
371:20 374:6
390:1
client's 16:20
17:21 79:16
93:19 114:9

185:17 197:20
251:23 306:21
307:3 330:20
Clifton 198:23
199:2,6,12,13
199:18,21
343:10
clock 81:21 82:8
close 117:10
140:17 176:15
321:9 404:4
478:6
closed 6:16
248:24 280:22
closer 46:23
115:3 140:15
428:22
closing 248:20
249:1
CLR 484:13
CNBC 83:24
coaching 56:24
57:2 247:5
COJ 31:4 41:16
41:21,24 45:9
135:23 191:19
COJs 43:13
44:14 106:19
107:7 145:11
Cole 1:15 3:3,19
6:1 11:3 63:23
108:1 229:21
238:10 244:21
273:10 293:23
332:23 333:2,6
333:8,12,14,16
339:11
Cole's 339:24
Colin 233:6,7
collateral 57:19
259:21,23,24
380:17
collect 95:16,18
122:19 260:2
264:7 373:2
389:6 395:13

398:2 432:21
455:2 463:23
467:6,11
471:13 479:16
collected 90:15
97:24 256:12
380:18 421:23
434:11 442:11
445:5 467:13
468:2 469:12
472:15
collectible
407:24
collecting 103:18
256:10 440:19
442:2,7 453:4
collection 172:15
collections
105:23 121:13
130:1 160:21
171:11 193:24
collectively
377:24
collects 255:20
263:23
College 328:8,13
328:17
column 273:16
273:20 446:21
combine 472:4,7
come 24:12 59:15
67:5,14 72:9
74:21 79:5
99:14 105:15
105:24 107:19
107:21 175:11
176:15,15
216:16 237:11
256:17 260:9
260:12 263:14
275:16 284:9
304:12 305:18
332:14,15
345:11 348:4
356:14 382:20
386:18 388:13



388:22 389:13
391:3 402:13
402:15,21
430:8 437:7
440:18 441:2
452:7 457:7
462:17 469:1,9
480:10
**comes** 85:19 96:8
162:13 260:5
382:23 383:8
386:14 388:7
390:24 396:10
**comfortable** 51:3
112:24 236:7
**coming** 54:5
78:13 197:20
203:13 264:10
267:6 314:16
379:13,15
382:21 383:3
383:14,21
386:1,1,3,24
387:4,13 393:1
393:9 395:11
406:15,22
413:6 459:17
460:24 461:23
466:17 475:4,6
475:11,12,19
475:20,23
476:1 477:11
478:23
**commentary**
59:24 63:17,21
143:21 146:17
**commercial**
337:15
**commission**
283:11
**commitment**
474:3,6,9 479:5
**committee** 66:2,5
66:6 72:4
**committing**
44:24 271:8

**common** 28:14
86:17 180:10
195:8,13,14
278:21 342:8
386:18 451:12
452:10
**commonly** 86:17
**Commonwealth**
17:24 23:23
131:10 133:18
134:17 149:19
150:23 151:20
241:15
**communicate**
47:2 115:15
**communicated**
47:16 357:2
365:12
**communicates**
317:1
**communicating**
15:23 49:9
184:9 228:7
292:5
**communication**
37:22 130:16
130:21 184:13
291:19 312:20
319:24 349:9
**communications**
11:14,17,19
12:10 15:13
16:6,7 18:9,22
19:2,7,15 20:8
21:10 38:18
49:23 124:7,23
125:9 130:22
133:7 134:4
148:16 155:15
183:11 185:11
213:24 219:12
219:17 221:8
270:22 291:13
291:23 292:14
292:21 293:1,8
293:13 346:5

356:6 360:7
361:1 362:17
448:21 470:19
**companies** 75:9
75:15,23 76:2,5
76:9,14 77:4,11
78:4,16 79:20
80:21 81:9 82:6
82:9,16 156:19
309:1
**company** 46:10
48:7 61:1,5,16
61:19,22 62:1,5
68:11 74:3,8
77:16 84:1 86:6
90:16 96:22,24
97:3 108:22,24
109:2 123:18
158:6 161:18
165:10 174:11
185:12 200:1
216:1 225:8,18
225:19 240:23
243:15 257:7
258:9 309:12
309:20 314:10
314:20 315:22
316:22,24
319:12 335:5
335:13 337:15
338:24 340:1
351:21 362:18
375:20 383:9,9
387:1 390:16
390:20,22
425:4 433:16
435:17 436:20
441:11 451:11
463:13 474:12
478:16,19,24
479:13
**company's** 436:7
**compare** 27:23
139:11,21
356:13
**compensated**

15:6
**compensation**
290:8 305:16
**competent**
376:20
**complaint** 4:2
29:22 170:2
**complete** 1:8 4:2
58:5 77:13
111:3 124:17
135:14 149:17
150:6 152:7
153:10 168:16
169:5 210:13
242:21 285:10
286:17 337:14
339:22 466:2
480:5
**completed**
474:22 475:1
**completing** 57:11
**complex** 374:18
**complexity** 47:23
**complicated**
206:6 309:18
309:21,22
447:5 461:21
**complies** 226:18
227:8
**comply** 78:9
303:2
**component**
267:22
**computer** 74:1
464:19
**concept** 417:9
**concern** 123:9,11
**concerned**
289:17
**concerning** 219:5
220:1 240:17
**concluded** 483:8
**conclusion** 151:3
151:9 271:12
**conclusions**
272:2

**concurred**
350:23
**concurrent** 390:1
**conduct** 10:18
**conducted**
150:10 184:21
**conferring**
130:12
**confessed** 331:16
**confession** 25:2
26:6 31:9 41:5
106:7 136:20
137:14 150:24
170:2 173:12
443:22 444:10
445:8
**confessions** 28:2
**confidential**
274:5 275:17
275:19,24
276:4
**confined** 207:17
**confirm** 48:2
55:19 66:20
115:1 170:8
199:14 418:8
471:9
**confirmation**
48:16
**confirmed** 43:16
46:8 59:4
144:12 185:3
186:15 196:21
197:2 198:8,15
470:22
**confirming**
183:18 246:5
259:4 344:12
345:10 460:22
470:19 472:13
**confirms** 48:12
**conflict** 89:2
276:24
**conflicts** 245:15
247:19,22,24
**confused** 222:12



346:21
**conjunction**
243:6
**connection**
268:23 386:11
**consecutive** 37:2
**consider** 121:10
192:19
**consideration**
377:15
**considered**
116:22 117:3,5
117:22 129:1,5
129:10 192:24
379:21
**considering**
50:22 87:3
259:20
**consistent** 350:13
430:24 431:2
481:17
**consolidate** 477:7
**consolidation**
432:12 433:20
444:17,21
**consolidations**
475:17
**conspiracy**
119:21 123:19
**Constance** 1:19
484:13
**constitutes** 92:5
**construction**
74:3 338:24
394:22
**consultant**
316:21 317:12
**consulting**
317:19
**contact** 217:12
219:22 285:4
290:20 336:15
**contained** 26:6
29:21 395:8
**contempt** 249:8
**context** 85:21

95:11,21
248:13 276:7
378:19
**contextual** 82:23
**contingency**
260:2 264:4
375:10
**continue** 37:24
103:17 216:22
244:5 246:14
325:19
**Continued** 74:7
**continuing**
169:18 192:17
**contra** 203:5,6,8
203:17 206:13
**contract** 69:15
262:23 279:14
346:9 372:2
373:17 377:19
378:12 381:18
381:20 388:11
388:21 390:7
390:21 392:7,8
392:17 393:7
393:10,14
394:10,11,15
396:1 402:5,8
403:16 413:14
446:21 458:4
458:10 462:4,5
462:6 464:14
482:3
**contracts** 48:20
52:16 54:9
374:5 376:4,9
390:15
**contradict**
247:12
**control** 221:17
484:23
**controls** 24:23
109:24
**conversation**
118:12 185:9
185:19 335:10

442:15
**conversations**
12:9 16:1 21:12
185:7 219:1
221:8,21 232:2
291:12 331:3
438:8
**convey** 210:1,2
310:12
**conveying** 120:15
**conveys** 66:2
228:24
**convicted** 163:3
**convictions** 163:6
163:9
**copies** 261:17
406:1
**copy** 264:18
338:13 443:3
443:19 445:13
451:10,13,20
483:1,5
**copying** 347:12
**corner** 264:10
**corners** 104:11
105:18 254:7
**corporate** 26:23
34:3,10,15,24
56:15 70:6
239:2 328:2
358:8,13,15
**corporation**
157:7
**correct** 8:3 12:13
12:17 13:13,14
13:17 14:3,6,9
14:10 16:2,9
17:12,20 18:7
21:23 22:7,8,19
23:12,15,20,24
24:1 25:4 27:2
27:2 29:6,8
33:10,11,13,14
38:11 41:17
42:12,24 43:18
45:1,9 49:21

50:9 51:13
54:12 55:3 63:6
66:12 67:2 68:8
70:3,9 82:13
87:14,21 89:10
99:6,18 106:10
106:17,21
107:5 109:22
117:11,16
121:7 134:10
134:13,17
137:8,15,19,22
144:19 150:7,8
157:14,15,19
157:24 158:3,6
158:13,21
159:3,8,11
160:20 167:8
167:15 168:2
169:12 175:3
191:4,10
192:21,23
200:3 221:9,17
222:10,23
223:22 224:13
225:15 229:14
234:10 247:14
248:3 250:11
251:9 253:4
263:20 265:14
266:21 267:6
268:9 269:23
270:10 278:19
283:12 284:23
286:12,21
287:2,7,10
288:17,19,21
294:1,6 297:10
297:13,23
298:8,15,18
304:5 306:7,13
312:14 313:22
314:11 315:15
329:20 336:5
337:2 338:17
342:5,24

343:19 344:1,4
344:14 348:13
349:4 350:14
363:24 370:1
370:13,15,16
370:22 374:23
385:16 386:19
386:20 396:20
404:20 406:10
407:16 408:5
409:7,14,17
410:22 412:7
414:17 421:6,7
422:5,23
423:10,19
425:7 430:1,14
433:19 437:16
437:21 438:20
443:19 445:8
446:18 451:5
451:13,20
454:1 457:21
463:3 465:13
468:6 473:10
474:1 480:21
480:22
**corrected** 297:5
**correctly** 109:14
236:18 352:17
475:3
**correlate** 459:12
461:3
**correlation**
460:11
**correspond**
419:13 459:6
**correspondedly**
362:6
**corresponding**
353:5
**cost** 86:10 101:11
175:22 177:3
203:3 204:1,2,2
204:6 206:8
209:2,9 267:21
**costs** 83:9 85:6



101:7 175:6 208:1,23 209:6

**counsel** 2:5,10 132:3 133:16 133:23 134:10 176:24 177:1 282:19 306:6 306:10 348:21 349:1,2 364:17

**count** 236:17 332:8

**counterclaim** 123:20

**couple** 140:7 159:22 374:20

**course** 11:15 21:4 31:2 48:17 50:13 72:11 122:15 201:16 220:10 221:18 222:1 225:16 262:4 268:14 303:2 378:5

**court** 1:1,20 8:14 8:14 9:3,16,19 10:6,21 44:2 78:9,20 79:13 94:2 97:21 107:15 111:9 111:20 112:1 112:14,15,20 124:2 126:7 127:13 136:16 149:21 153:3 176:17 180:9 207:18 211:2 212:4,14,17,21 213:4,19,20 214:17 215:12 216:10 230:6 232:5,10,16,23 234:2,12,22,24 235:4 236:20 237:1 243:12 245:19 247:14 249:22 284:3

291:18 303:3 341:8 400:13 447:15 451:12 452:10 464:22 465:5 484:14

**courts** 152:16

**cover** 69:4 72:20 376:2 456:21

**covered** 205:4 227:3

**covers** 375:24 395:10

**CPAs** 81:13

**crash** 205:3

**create** 218:3

**created** 274:20 274:23 275:15 276:13,14,20

**credit** 66:1,4,6 72:4 307:2,3,6 307:9,15,16 378:2 383:24 387:13

**Creditor** 108:24

**creditors** 108:15 108:17 110:21 110:22 111:15 111:22 112:4 113:5,11,23 222:14

**creditors/inves...** 113:23 114:3

**crime** 163:3 270:4,12

**criminal** 119:21 163:6,9 301:6 301:12,20 302:2,8,8

**criteria** 452:23

**cross** 10:20 94:10 139:23 236:10 237:21

**crux** 406:20

**crystal** 45:6

**cumulatively** 409:16

**current** 46:17 48:16 51:2 129:18 183:19 244:22 357:1 442:4 468:8 470:23 471:10

**currently** 48:4 212:10 215:7 440:24

**curve** 379:12

**custodian** 227:22

**customer** 105:22 130:1 341:5 355:10 357:3 358:23 438:3

**customers** 377:23

**customized** 471:22

**cut** 103:12 119:10 140:9 191:8 404:12 470:12

**cute** 228:13

**cut-and-paste** 27:10 139:16 141:13 146:1

**Cynthia** 306:7

**D**

**D** 3:1,15 282:14 284:17 327:1,6

**dailies** 50:7

**daily** 46:17 102:18 190:3 190:18 221:9 221:22 223:21 223:24 245:15 246:4,5 262:14 344:3 346:11 352:21 355:16 366:20 369:23 370:18 371:11 371:13 384:12 386:17 402:22 426:6,9,11

429:19 440:11 441:14 442:11 446:10,21 449:19 453:8 453:11 458:4,6 459:6 460:2,14 461:3 462:5 463:1 465:22 466:1

**damages** 213:2 216:8 351:18

**Dan** 131:23 132:7

**dark** 310:15

**date** 1:18 7:20 30:17 35:20,23 36:2,4 41:16 42:5,12 48:21 48:24 137:2 171:18 173:12 174:23 176:5,6 190:23 191:14 192:8 429:10 431:19 462:4

**dated** 3:19,21 4:4 78:19 183:23 213:8 283:20 308:1 343:15 441:3,8,9 462:4 484:16

**dates** 36:5 114:11 191:12,13,23 196:16 458:24

**day** 24:12 50:3 81:17,20,22 82:3 84:1 93:14 104:23 155:4 155:19,22 185:2 207:6 208:20 216:20 217:3 219:4,6 219:23 221:14 240:17 255:19 259:1 265:9 289:22 353:4 354:18,19

355:17 359:11 359:23 360:4 362:5,5 367:1 370:19 382:16 382:20 384:4,8 384:11 385:24 385:24 386:14 388:4,16,19,20 389:14 426:14 429:24 431:11 437:19 440:2 441:15,18,21 442:11 447:8 447:11,20,24 448:14 450:6 453:14 455:24 456:15 457:12 457:20 458:6

**days** 104:23 257:9 260:11 263:22,24 264:3,6 265:24 370:10,11,14 397:7 427:14 412:16 455:2

**day-to-day** 24:20 108:8 216:1 373:21

**deal** 45:21,24 46:1,2 67:8,10 72:9 104:4 118:1,22,24 196:1 235:13 255:11 257:2 261:22 265:4 277:12 346:7 366:5 373:8 375:8,11,15 379:8 383:8 387:3 389:23 392:5,12 393:5 401:12 402:9 403:11 423:9 423:11 424:20 425:22 428:24 432:13 434:10



435:13 436:22
439:22 446:17
446:20 452:19
456:23 458:22
461:11 462:9
462:13 463:5
463:17 466:8
471:8,16 479:4
479:19,20,21
**dealer** 295:19,22
299:12,20
300:8
**dealing** 108:13
**deals** 57:15
181:16 196:2
197:16 231:9
248:22 254:10
254:21,23
255:7 261:23
275:9 278:9
279:18 304:24
305:1 310:22
346:23 366:4
371:24 373:22
374:2,18,22
375:19 379:13
390:2 391:5,7
391:12 392:8
418:5,8 442:6,7
452:17 461:6
461:20 462:16
467:3 471:20
471:24 472:3,4
476:9 477:18
**dealt** 214:9
**deal's** 390:3
**Dean** 291:8,13
296:13,16
297:2,19 298:2
298:10
**debating** 127:3
481:19
**debit** 378:2 384:1
458:6
**debits** 30:13
**debt** 289:7,9,12

**deceiving** 252:18
**December**
194:19 343:24
350:7 368:12
408:19 429:14
429:16,18
430:12 431:5
431:18,20
441:4,9 447:7
453:20
**decide** 214:8
**decided** 68:22
117:19 265:8
416:1 461:7
470:9
**decides** 222:9
**decision** 31:14
32:2,11 33:18
33:22,24 35:1,4
35:11 66:10
130:7,9,9,10,11
224:23 225:10
225:21 226:3
240:21,23
354:16 358:21
359:15 362:14
376:20 448:23
**decisions** 81:15
130:23 158:21
222:6,15,18
224:18 225:4
225:13 241:2
**declaration** 3:11
243:11
**declare** 33:19
35:7,11
**declared** 35:14
**declaring** 34:6
**declined** 288:3
**deemed** 121:13
129:21
**deep** 463:20
**default** 33:19,19
34:6 35:7,11,14
35:16,20,24
36:6,8,8,9,13

36:16,19,22
37:11,12,20
40:19 43:8
68:20,24 90:19
90:23 91:13,23
92:1,3,5 113:24
114:3,17,19,20
115:6,7,19,22
116:5,9,11,22
117:4,6,13,15
117:22 118:4
119:3,23
120:21 121:4
121:14,23
122:4,9,17
123:22 127:19
128:1,4,9,15,20
129:1,2,6,11,17
129:23 135:22
169:17 170:6
181:13 192:19
192:20,24
260:3 298:12
428:21
**defaulted** 331:23
**defaulting** 69:20
161:4,19
**defaults** 44:17
128:22
**defendant** 147:19
169:17 171:1
**Defendants** 1:11
2:10
**deferral** 203:22
**defined** 104:16
181:13 205:13
299:2,4 305:15
378:1 383:23
**defines** 260:22
**definitely** 176:11
402:19 458:16
**definition** 86:2
115:6,7,13
175:9 403:16
**degree** 328:18
**Delaware** 157:6

157:7,8
**deliberately**
379:7
**delivered** 378:8
**delta** 83:8
**demanded**
106:21
**demonstrate**
430:2
**demonstrates**
361:22 397:24
**dense** 379:7
482:7,8,11
**department**
32:10 34:2 35:1
35:3 47:2,3
48:15 49:10
55:19 60:13,20
72:3 74:4 81:15
105:23 121:14
136:3,6,9,13
143:19 146:2
178:9,12
185:14 192:14
343:14 355:10
357:4 358:24
430:19,22
438:4 470:21
**departments**
47:1 49:11
225:11 366:14
**depend** 333:19
**depending** 99:9
390:21 401:13
428:23
**depends** 83:3
85:21 95:14,20
114:5,15
115:21 225:11
298:17 317:18
333:17 410:4
475:13
**depict** 323:9
**deposit** 196:15
426:21
**deposition** 1:14

5:2 31:24 63:20
72:16 80:2
126:5 145:17
235:2,3,21,22
238:2,5 282:2
339:11 352:2
483:8 484:7
**describe** 24:19
165:1 375:16
**described** 261:11
267:15,16
389:23
**describes** 266:2
**describing**
111:22 172:24
207:23 251:22
296:17 374:13
380:4 458:15
465:21 482:4
**DESCRIPTION**
3:8 4:1
**designate** 275:18
275:24
**designated** 274:4
**designating**
275:16
**designee** 34:4,10
34:15,24 57:5
239:2
**desire** 281:24
**despite** 245:11
**detail** 33:21
414:4 416:5
435:3 438:15
442:13 443:23
448:5 466:9
**detailed** 172:14
355:19 365:18
372:20 376:13
376:15 449:16
450:21 464:6
**detailing** 460:16
**details** 371:21
381:4 453:3
**determination**
129:22 185:18



185:22
determine 35:15
363:10 427:1
436:9
determined
115:9 255:11
437:14
determines
420:11
determining
92:18
developed 418:12
461:24
differ 83:1
difference 46:24
84:2 108:18,19
260:22 426:12
differences 28:12
different 28:7
75:9 81:9,11
90:6 105:16
160:1 210:20
257:14 295:9
346:23 364:19
374:2 375:22
377:5 379:10
379:14 380:22
384:24 391:20
392:1 396:17
401:11 403:19
406:22 407:22
411:7 415:10
415:11,12
436:13 476:4
differently 392:5
diligence 20:10
diligent 184:5
DiPIETRO 1:4
15:13,24 16:7
18:8 19:16 37:2
39:4,23 40:3,9
42:9 43:23
45:17 48:11
55:23 66:22
78:17 194:2
201:22 325:18

DiPietro's 39:11
direct 11:14,17
11:18 12:9
15:12 16:6 18:9
56:21 221:7
227:10 232:1
284:16 460:11
484:23
directed 347:21
347:23,24
348:2
Direction 5:4
directly 130:22
247:12 306:15
306:22 310:23
317:10 330:19
341:7
director 12:14
14:11 16:16
165:4 287:5,15
320:15 321:2,8
321:12,14,15
325:4,23
326:19,24
327:11,13,19
327:24 334:23
335:5,7
directors 225:1,8
327:5
disagree 133:9
232:13 233:1
234:3,11
disagreeing
360:20
disagreement
186:15 234:20
391:16
disagrees 186:9
disbarred 131:18
135:5
disclose 288:3
301:11,18
302:1,5 327:1,5
disclosed 286:1,2
disclosing 283:1
327:21

disclosure 283:7
284:23 305:7
disclosures
302:11
discount 51:8
discounted
275:11
discovery 30:20
52:2 94:7
276:11 280:22
281:24 362:17
discuss 131:21
208:9 345:12
463:11
discussed 46:16
131:4 178:19
183:14 412:10
discussing 50:21
443:6
discussion 18:19
66:3 282:1
359:24 365:1
416:4 424:19
discussions 15:23
35:6 119:24
231:6 364:16
438:2
displayed 53:22
dispute 469:24
disputes 469:22
disputing 262:7
457:4
disregard 58:15
distinction 84:6
436:10
distracting 238:4
distributed
436:15
distributing
432:20
District 1:1,2
247:14
divide 197:17
427:22
document 60:8
60:12,14,16,24

61:15 64:13,21
65:2,4 138:8
144:4 146:5,13
179:2,18 180:8
180:17 192:1,5
238:11,15,18
258:23 273:11
273:13 274:3,9
274:23 275:15
275:17 276:5
276:10,12,13
280:23 281:4
281:16 283:19
320:8 325:1
333:17,20
342:1 344:21
345:24 348:18
361:9,16,21
362:20,22
364:2 379:16
417:5 452:7,14
465:18 466:5
466:12 468:20
468:24 469:2
documentation
184:12 358:22
documents 5:15
35:15 60:19,22
61:4,19,21,24
62:5,9,11,21
63:3,5,8,24
64:10 65:18
144:22 150:3
247:10 274:12
275:24 280:14
280:16 311:22
328:2 364:3
445:16 452:20
474:17
DocuSign 27:20
28:13,18 29:13
138:17
doing 6:9 15:15
15:16,18 44:24
54:3 59:12
93:18 168:17

220:10,21
346:17 360:12
391:4 393:4
430:16 456:22
466:13 472:8
476:15
dollar 50:5 52:7
255:18 376:4
387:2 395:24
469:11 478:16
dollars 47:15
68:3,7,17 85:6
85:8 93:13 96:6
202:10,15,23
204:5 205:9
209:14,20
212:9 249:11
320:19 401:23
428:18 457:3
468:19,22
469:13,14
470:4,11
domain 308:20
domesticate
171:13 173:5
domestication
170:23 171:7
172:5,19 173:4
173:7,9
door 204:5
doubt 98:4
324:11 361:12
dozen 57:14,15
319:2
drastic 355:23
draw 458:12
461:2
drop 154:18
Ds 282:18
due 20:10 30:11
68:24 216:3
duly 6:2 484:6
dumped 280:12
duration 155:7
durations 275:12
duties 24:19



108:3
d/b/a 1:9

**E**

E 2:1,1 3:1,7 6:5
  27:20
earlier 40:17
  146:7 148:9
  181:1 192:16
  241:18 245:22
  251:6 253:6
  257:1 299:2,4
  329:18 353:23
  389:24 412:10
  441:8,8 465:19
  472:2
early 40:21 121:4
earned 328:18
earnings 84:2
  386:6
easier 309:12,14
  310:11 333:9
EASTERN 1:2
easy 404:9
  406:24
eat 284:8
educate 19:14
educated 355:13
education 328:4
educational
  73:23
effect 252:3
  277:11 472:9
effective 189:22
  190:19,20
  191:14 240:22
effectively 109:1
  189:21 205:16
  206:10 243:21
eight 258:11,12
  416:14 417:22
  461:6
eighth 416:23
  417:1
either 9:9 100:24
  101:24 267:5

427:24 436:14
  464:11,16
electronic 378:3
  384:1 387:14
element 268:17
  408:8
email 3:16,20,21
  3:22 48:10,11
  48:22 49:2,7,20
  49:22 59:18
  61:3,6,12,20
  183:19 184:9
  219:15,22
  221:7 255:14
  307:22 308:1,7
  308:8,10,14,17
  309:13 310:21
  311:8 314:15
  314:16 317:22
  318:1,7 319:9
  344:12,23
  347:11 349:12
  349:15,20,21
  349:23 356:21
  357:9 360:3,10
  367:20 464:21
  464:21 465:5
  470:13 481:10
  481:15,17
emails 20:1 47:18
  49:9 221:12,12
  246:4,7 308:20
  311:6,13,16,19
  318:15,20
  319:5,13 360:6
employed 33:9
  33:13 133:22
  157:4 308:18
  308:22 310:15
  310:16 321:5
  334:19,22
employee 12:12
  12:14 13:10,12
  13:16,24
  157:23 159:10
  160:12 162:18

233:8,12,20
  335:9
employees 20:9
  91:10 216:3
  218:22
employment
  217:17
ended 95:23
  249:21,23
  470:3
ends 118:7
  434:10
engage 281:24
engaged 119:20
  161:14
engineering 74:1
enter 161:7
  222:10 389:19
  476:24
entered 54:9 89:7
  157:11
entire 17:20
  98:13,19,24
  101:17 119:3
  137:10 157:10
  183:21 438:1
  462:15 464:2
entirely 458:17
entirety 374:1
entities 81:12
  331:19
entitled 92:24
  93:4 171:6
  173:3 292:7,19
  292:20
entity 20:4 21:17
  22:2,3 48:4
  74:18 110:4,5
  148:14 150:11
  150:17 152:4
  153:13,20
  155:17 157:4
  159:18 164:3
  164:19,24
  169:4,6,8 243:6

244:2 248:23
  249:3 282:9,11
  283:9 285:19
  286:13 304:21
  310:23 311:3
  321:4,9,18
  327:17 329:13
  336:1 337:8
  342:21 374:19
  375:11
entries 193:4
  206:15
entry 193:15
  206:18
equal 410:22
equals 467:17
equity 108:21
  109:4
equivalent 52:11
  84:10
erroneously
  251:18
error 262:19
especially 115:16
  183:19 187:13
  261:21 467:3
ESQUIRE 2:2,7
estimate 175:22
  370:3
estimated 175:6
  370:19
et 221:13 333:16
Ethics 134:23
evacuate 96:6
evacuation 95:5
evade 153:24
evaluating
  248:20
event 23:9
eventually 90:4
everybody
  400:13
evidence 471:16
exact 44:1 82:19
  178:22 255:4
  337:1 407:10

411:4
exactly 103:6
  139:12 141:24
  142:24 145:13
  263:11 292:6
  323:12 380:3
  388:6 399:5
  443:14 460:17
  460:23 471:17
  482:3,5
examined 6:3
example 84:21
  95:23 96:2
  100:7 203:11
  205:8 207:7
  381:24 412:9
  426:15 428:17
  430:2
exceed 207:10
  208:23 209:2,6
Exceptions 288:9
excess 175:24
  176:1 270:5
exchange 109:3
  263:18
Exclusions 288:9
exclusive 156:20
exclusively 304:6
excused 483:7
executed 362:16
executive 287:5
  287:14 325:23
  326:19
exempt 288:12
  288:17
exhibit 3:9,13,14
  3:15,16,17,19
  3:20,21,22 4:2
  4:4 136:17
  166:2 168:12
  177:18,22,24
  179:12,15
  180:5 182:2
  238:9 250:14
  250:18,21
  272:17,19,21



272:24 279:23
279:24 307:19
320:6 336:8
341:23 344:19
345:19,21
348:15 367:16
368:2,16 443:1
446:1,8,9
455:19
**exist** 330:8 452:9
464:17
**existing** 392:6,19
393:9 394:19
412:11,14,23
413:3 432:22
433:21,22
435:10,11
439:8,9 440:15
441:24 445:2
471:3,5 472:10
473:6
**exists** 456:5
464:16
**expand** 394:8
**expanded** 394:17
**expanding** 474:5
**expansion** 435:14
479:4
**expect** 204:22
260:11 376:19
388:19 474:24
**expected** 90:3
102:19 254:24
376:14
**expecting** 461:15
**expense** 202:5,7
203:3 204:1
205:13,13,19
209:13,21,22
**expenses** 83:10
83:17,22 85:13
86:11 186:6
**experience** 75:21
**experiences**
97:15
**expert** 27:23

139:11 207:3
**experts** 206:1
**explain** 108:2
204:14,16
261:7 297:11
371:16 392:10
398:1 400:5
401:4 402:24
425:23 441:20
**explained** 169:8
257:21 326:22
327:15 329:12
377:6 478:11
**explaining** 83:20
372:7 379:7
390:13 399:6
430:7 439:16
462:13
**explains** 437:24
**exposure** 68:21
69:4 115:2
204:24 432:18
433:6 434:8
436:18 466:23
466:24 467:2
467:12,19
468:8,18
**extend** 104:4
**extending** 435:22
440:17 442:8
**extent** 19:5,19
34:17 132:19
135:1,7 175:15
**extinguishes**
479:20
**extra** 434:3
**eyes** 251:16
252:18

—————
**F**
**fabricate** 195:8
**fabricated**
195:17
**face** 54:10,10
103:4 104:10
104:21

**facilitate** 81:14
104:6 155:15
379:21
**facilitates** 148:15
**fact** 96:14 106:16
112:11 235:7
245:11 344:11
470:24
**factor** 87:3 101:9
183:4 253:8,15
253:18,20,22
253:24 254:2,8
254:19,24
255:4,10,12,15
258:4,8,13
263:12 264:12
269:19 273:17
273:18,23
275:2,8,10
277:1,2,10,19
279:5 348:10
355:5 373:2
394:3 418:6
419:1 468:23
**factored** 255:24
442:9
**factoring** 3:13
38:2 51:5 53:18
54:3,17,21
64:24 68:12
69:14 87:7 88:4
89:1 98:14
115:8 116:6
118:6 119:4,12
124:20 160:3,7
161:5,19
177:19 178:4
205:22 210:15
220:1,3,4,6,12
220:13,19,22
221:2 240:18
244:13 251:22
252:24 253:3
256:6,11,14
257:17,20
258:1 259:10

260:6,22
261:13,14,18
262:3 267:10
268:12,23
269:6 278:23
296:18 297:11
302:22 303:8
329:19 330:17
331:13 337:15
369:4 374:16
379:19 380:7
389:4,19 390:1
392:2,22,23
394:13,19,20
395:21 396:15
399:7 401:16
406:1,13 409:8
413:23 420:12
432:17 434:24
435:16 439:9
443:4 445:3
472:11 473:2,3
**Factory** 329:22
330:4
**facts** 29:21
**factually** 457:21
463:4
**faded** 119:7
**failing** 302:11
462:14
**failure** 45:7,12
**fairly** 366:9
**faith** 229:10,13
275:18 339:21
370:3
**fake** 332:20
**fall** 102:8 289:4
**falls** 124:9
**false** 27:1 61:22
149:8,16
165:19,22
167:8,12,15
169:1 180:10
245:18 246:10
265:14 274:11
277:23,24

278:5 279:3
285:15 296:20
296:21 299:14
315:5,6,16
316:15 390:18
**falsification**
142:9 179:7
**falsifications**
142:15
**familiar** 282:13
290:16 291:8
369:5
**family** 109:9,11
109:20,24
**far** 338:10 410:7
440:6 447:4
470:3
**Farm** 329:22
330:4
**Fast** 1:9 77:20,22
425:6 441:6
**fat** 478:20
**Fazio** 160:14
162:12,17,23
163:1,2,6
**feasible** 48:7 51:1
59:12 65:10
67:15 72:10
103:11 426:4
428:19,23
457:8
**February** 9:5
70:7,16 71:7
79:18 80:22,23
114:11 129:20
129:22 151:18
155:2 156:7
157:12 162:4
298:20 301:17
306:13 370:17
375:5
**federal** 63:20
288:8
**fee** 170:24 171:7
171:19 172:1,5
172:19 173:4,5



173:7,7,9
174:15 182:14
182:17,18,24
183:1,6,9,13
184:9 185:5,16
186:4,18,19
187:20 206:20
209:12,13
252:5 264:5
266:4,6 267:14
305:14,15,20
348:9 412:20
**feed** 329:4,10
**feel** 10:23 77:2
280:17 402:17
426:3
**fees** 170:22
172:11,15,18
173:6,14,17,19
173:21 174:24
176:5,11,16
184:6,14
186:20 187:1
267:10 401:16
412:22
**feet** 156:23
**felony** 271:9
**Ferman** 282:7,8
**Fifth** 429:16
**fight** 215:16
**figure** 207:14
403:3 454:16
472:2
**figures** 122:9
**file** 10:9 25:23
26:12,16 31:8
59:3,8 90:5,7
91:11 106:7
123:20 137:11
144:13 150:24
264:22 282:3
357:10 370:22
382:2 390:6
395:9 396:9,11
396:14 405:6
405:23 413:20

414:5 424:5,11
424:14 452:21
**filed** 3:10 25:3
27:1 28:3,20
41:4,16 42:1
107:8 119:1,18
135:23 136:21
137:6 141:20
145:5 180:9
181:3 192:6
194:2 243:11
246:9 262:7
300:7 306:6
443:18 451:11
452:11
**files** 91:7 106:19
**filing** 10:16 31:4
42:5,12 43:9
90:18 92:4
136:24 144:4
168:23 170:1
174:1,23
190:24 191:20
238:21,24
239:11 240:7
245:24 286:5,7
288:22 294:10
**filled** 282:18
**final** 47:10
**finance** 85:19
108:11 182:14
182:17,24
183:9,13 184:9
185:16 186:4
186:18,19
206:20 258:9
**financed** 101:12
440:16 459:4
**financial** 17:6
20:3 73:10,15
75:12 82:13
108:5 120:4
121:8,8 122:10
122:13 123:14
130:4 199:11
199:24 200:5,8

226:13,15
227:18,21
228:19 229:11
230:2 277:20
278:2,18 279:7
279:15 283:2
283:11 284:21
289:21 290:9
290:17,21
292:12 293:14
293:23 294:9
294:14,23
295:14,18
296:9 306:3
337:13 343:11
354:24 474:15
**financially**
129:16
**financials** 25:10
115:9,18 116:6
116:13 118:8
120:3 122:7
198:18 215:23
266:8 313:13
365:10
**financing** 380:4
382:13 406:23
412:13 478:13
478:22
**find** 41:12 145:12
186:23 187:2
193:7 197:19
221:12,20
255:14 264:17
268:5 277:6
322:16 324:17
328:8,17
336:24 357:18
360:2 373:9
396:8 397:10
397:13 405:6
405:15,21
406:8 428:21
434:20,23
437:2 445:11
445:19,23

451:7 455:10
455:16,17
**finder's** 305:14
305:15
**finding** 59:11
**fine** 79:6 113:9
144:13 151:12
166:7 204:15
233:2 351:5
358:12 482:12
**finger** 404:12
**finishing** 478:3
**firm** 23:4 199:20
**first** 6:2 16:21
26:1 30:17
35:21 41:16
42:5 58:16
65:14 129:4
137:14 188:16
191:19 217:10
217:11 218:10
220:22 285:1
315:4 334:14
334:16 344:18
351:3 369:7
375:1 377:1,4
378:11 389:14
395:2 423:6
475:5,7,9,10,12
475:20 476:19
479:6 480:15
480:20
**fit** 471:22
**five** 203:13
236:16 239:23
240:15 352:6
353:8 428:8
445:21 467:6
**five-minute**
367:23
**fixed** 101:9
102:22,23
103:2 104:12
183:6 253:7,10
264:5 266:5
267:21 344:8

344:13 345:11
346:12 390:17
390:20 401:5
402:3,4 403:5
413:21 415:16
424:17 466:18
**flat** 461:16
**flat-out** 312:23
**Fleetwood** 207:4
**flexibility** 408:1
**flexible** 37:14
**flip** 443:15
**flipped** 293:4
**floor** 2:8 156:13
**Florida** 149:4
154:10,12
155:20 156:6
157:14 158:3
158:24 159:2,6
159:6,7,11,14
219:14,18
222:3 223:2,6
241:11,19,21
242:7 270:2,5,7
270:15,19,23
271:9 286:6,8
325:24 337:22
**flow** 24:23 51:2
54:7 72:9
365:10 371:19
374:7 382:24
383:7,10,22
385:3,11 386:5
425:14,21
426:3,22 427:2
429:2 431:9,10
439:19 477:11
477:15
**flows** 53:19
428:14 439:15
441:1 475:15
**flow-related**
304:3
**focus** 415:21
**follow** 39:23 46:3
232:23



MAGNA ➤
LEGAL SERVICES

**followed** 39:20
**following** 11:4,6
  76:24 80:15
  120:3 203:2
  388:20 418:19
**follows** 6:3 59:10
**follow-up** 249:22
**footage** 321:23
  325:14
**Forbes** 322:20,22
  323:1,8,20
**Forbes's** 323:19
**Forbes.com**
  322:13,15
**forced** 93:19
**forcing** 258:22
**foregoing** 484:20
**forget** 156:11
  282:12
**form** 3:15 13:19
  57:20 122:2
  132:22 282:14
  282:18 283:8
  284:17 286:5,7
  289:15 305:7
  306:6 327:1,6
  378:3 384:2
  423:4 473:19
**formally** 245:11
**formula** 184:19
  184:20 187:7,9
  429:20
**forte** 445:15
**forth** 79:23 223:4
  231:12 470:20
**forward** 48:8
**forwarded** 39:4
**found** 464:3
**founded** 217:23
  218:2,4,5
  242:20 244:10
**founder** 243:3,18
**four** 36:21 37:2,7
  37:20,21 40:18
  41:2,12 42:10
  42:23 43:17

45:7 53:4,4
104:11 105:18
115:23 126:1
127:11 181:4
181:14 189:24
190:1 191:3,10
191:16,18
254:7 401:11
407:22 408:16
408:18,20
426:2 428:8
**FOX** 2:7
**fragment** 263:1
**fraudulent**
  149:20 193:15
**free** 10:5,23 15:4
  276:15 280:17
**frequent** 218:24
**frequently** 367:6
**fresh** 393:7
**front** 167:24
  168:6 239:19
  245:23 297:3
  297:13,16,24
  355:3 367:12
  380:1 448:10
  453:7
**froze** 331:17
**fruition** 98:21
**FSB** 160:12
**FSP** 133:22
  348:22
**full** 6:18,20 7:2,7
  7:13,16 8:2 9:1
  9:1,6 11:9 12:6
  12:11,15,24
  13:8,11 14:3
  15:8,10,16,18
  15:20 16:1,15
  20:8 21:22 22:1
  24:8 33:9,13
  75:17 77:18
  81:10 99:16
  101:1 146:13
  148:20 150:4
  153:21 160:19

160:23,24
162:1,18 163:1
163:14,22
189:16 199:18
224:8,9 233:8
245:8 309:6
333:21 337:7
338:11 345:7
348:24 481:13
**fully** 262:2
  319:23
**function** 14:11
  146:4 178:7
  321:10,16
  327:16
**fund** 167:4
  202:14 222:15
  226:2 230:15
  230:18 244:2
  278:9 304:1,5,8
  306:20 307:3
  384:8 406:13
  459:22 467:5
  467:10 476:11
**funded** 98:1
  306:17 380:17
  433:3 461:2
  467:20 469:9
  469:16
**funding** 1:9,9
  24:22 52:15
  57:17 67:16
  77:20,22
  206:13 231:5
  253:21 254:14
  303:14 308:17
  308:18,19,22
  310:16 311:2
  314:4,15,17,19
  317:9,11,17,22
  317:24,24
  318:3,7,11,13
  318:15,20,22
  319:5,9,13,17
  319:19 320:2
  320:15 321:3,8

321:11,14,16
325:5,22
326:10 327:20
328:1 329:6,8
329:15 330:4
330:13,24
332:20 334:20
334:22,23
335:3,13,21
336:3 337:4
340:5 341:14
345:3 372:3
378:20 379:9
406:2 425:6
427:2 432:14
434:8 441:7
445:2 447:5
449:17 450:3
450:18,22
464:7,9 465:21
466:3,13
467:23 471:1
474:7 477:13
477:16 481:23
**Funding's** 329:22
**funds** 249:21
  255:23 257:11
  303:24 304:5,7
  304:12 306:20
  313:21 314:1
  377:16 385:6
  389:13 458:21
  473:12 481:22
**further** 44:24
  78:4 204:14
  213:15 256:23
  470:8
**future** 54:22 89:8
  89:11,20 92:22
  92:23 98:20
  130:5 377:2,18
  379:4 383:18
  387:11,17,19
  388:1,17,18
  395:7 433:15
  435:7 436:3

473:13 477:19
479:10,14
481:3,5

_____
**G**

**GAAP** 82:20
  83:2,16 85:23
  86:4 115:17
  201:8
**gains** 208:2
**general** 49:11
  132:3 133:16
  134:9 176:11
  176:13 201:2
  220:9 227:16
  303:21 306:9
  436:6
**generally** 66:1
  83:5,21 87:2
  125:5 200:4
  201:1 214:21
  226:18 293:14
  294:24 295:2,4
  295:6 333:18
**generate** 56:12
  58:11 89:19
  103:17 474:13
**generated** 73:4
  86:7 89:12
  192:13 276:12
  320:18 429:2
  473:12
**generates** 55:24
  136:13
**generating** 53:11
  66:22 135:21
  136:12 436:4
  476:7
**getting** 90:13
  97:11 235:5
  272:7 335:4
  383:13 398:13
  401:3,20
  402:17 403:4
  412:16 413:5
  435:20 436:22



464:12 473:15
473:17 476:9
477:23 478:9
478:15 479:23
**give** 35:23 36:4
51:3 73:22
76:13 77:16
114:10 138:8
202:15 205:1
208:8 209:10
271:12 330:16
331:1 426:15
428:13,16
445:21 471:11
**given** 27:4 47:23
51:4 68:20
204:21 401:17
403:7 407:23
447:5 484:9
**gives** 293:14
395:12
**give-or-take**
405:7
**giving** 63:17
95:10 202:8,9
202:13,23
204:1,4,9
232:21 260:13
263:17 407:24
433:5
**glad** 146:14,19
**global** 235:20
**go** 18:16,17,18,19
30:18 34:22
89:14 90:8,24
93:19 95:10
99:4 100:12
103:13 111:1
128:15 133:12
138:20 140:4,6
140:17 141:1
143:15 144:24
145:11 146:12
146:21 154:19
166:5 167:20
167:21 168:11

168:13 169:13
177:13,14,15
178:15 179:13
179:16,17,22
179:22,24
180:21 182:11
183:20 188:18
188:24 189:5
189:13 208:15
216:16 217:9
226:21 236:4
240:4 244:6
249:5 250:2
251:3 264:11
264:22 265:1
273:8 276:5,5
279:23 280:9
288:7 290:11
291:6 294:14
307:24 311:3
322:15 324:21
325:20 328:3
328:24 331:6
333:23 336:23
340:15 345:20
345:21 356:10
356:11 357:17
360:3 368:5,8,9
368:14 370:24
372:18 396:7
396:22 403:2
403:10 405:5
409:10 410:18
411:11,19
412:2 414:10
414:23 415:5
416:8,10,12
417:4 419:9,17
420:4,14 421:4
421:9,18 423:1
423:15,21
424:4,11 425:1
425:24 427:9
431:14 435:3
442:3 447:16
447:17 470:9

480:14,15
**God** 271:19
**goes** 84:5 135:22
139:24 162:22
216:7 253:9
308:15 315:12
401:13 423:4
437:1 460:10
**going** 8:4 10:9
28:11 29:5
33:17 41:11,12
44:16,18 48:8
59:3 63:1 66:20
66:20 68:20
70:8 78:14
80:18 94:20
113:4,7 115:17
117:20 122:19
127:15 131:3
143:5 144:17
144:18 145:7
150:15 176:1
179:19 180:1
186:23 187:2
189:17 194:20
197:15,19
203:20 205:21
206:1,12 209:4
209:11,18,22
213:15 216:19
222:14 237:5
244:1,7 246:6,8
246:18 247:2
247:11 255:3
255:17 256:17
279:21 280:20
285:21 319:16
322:16,21
323:8 328:8,17
340:15 351:18
351:24 357:18
360:2 367:19
368:3 373:9
379:13,14
382:3 384:9
389:11,12,12

389:13 390:2
396:7,9,13,16
397:10,13
398:5,7 399:2,3
399:5,15,16
403:5 405:14
405:20 406:7,8
407:4,11,13,14
408:1,12 409:4
410:1 411:15
413:7 415:17
416:3,22 417:4
424:21 428:4,6
428:13 434:19
434:23 436:14
439:20 441:2
442:14 449:9,9
451:6 460:21
462:17 465:9
471:7,11,12
475:3 479:14
481:24
**good** 6:8 30:6,8
36:10 38:1,21
77:24 79:7
80:13 90:7
139:22 146:19
179:23 180:3
229:10,13
236:5 251:14
265:11 275:18
281:11 298:22
314:6 339:21
347:7 352:3
370:3 391:3
398:4 426:2
429:4 433:1
434:18 453:10
470:7 479:15
482:23
**goods** 83:9 86:10
**gotten** 235:10
254:22
**government** 94:5
**governor** 96:5
**grand** 205:2

479:7
**grantor** 110:1
158:14
**granular** 108:8
225:12
**great** 101:21
217:4 234:5
358:12 384:9
471:20
**greater** 401:8
**gross** 83:5 84:12
84:16 86:5
**ground** 449:7
**grounds** 96:13
**group** 1:8 4:3
74:14 77:14
124:18 149:17
153:11 168:17
169:6 230:11
242:21 285:11
286:18 337:14
339:23 408:23
**Group's** 150:7
**grow** 390:21
**grown** 331:12
**guarantee** 99:19
99:22 102:10
**guarantor** 99:5
99:13 101:1
**guess** 51:16 76:4
114:15 205:24
205:24 216:24
482:11
**guidance** 201:8
206:4 330:16
422:12
**guided** 78:20
265:4
**guideline** 439:19
**guidelines** 130:4
**guy** 98:1 297:8
321:19,22
322:10
**guys** 84:13
122:19,21
208:2 218:3



220:5 284:7
310:22 368:16
400:14 459:21
480:12
gyrations 212:16

**H**

H 3:7 177:18,22
178:1,2 179:15
180:5
half 82:1,2
140:10 428:13
hand 19:16,17
27:11,19 39:5
87:11 479:23
handed 38:23
handle 389:24
handled 31:21
244:14
handles 24:21
hands 91:11
handwriting
27:23 139:10
haphazardly
261:9
happen 47:6
154:16 300:23
happened 47:7
55:14 58:1
129:21 198:16
338:15 375:21
454:24 466:18
happening
120:10
happens 89:11
100:23 154:10
154:13,15
310:24 372:2
453:3
happy 126:9
272:9,10
harassing 339:12
340:2
hard 394:24
Hartley 65:7,9,9
65:22,24 146:5

348:20,21
349:16 350:16
354:4 355:1
451:19
Hartley's 349:22
hate 445:10
Haverford
242:12
head 47:14 136:8
178:12 293:5
362:11
heading 457:16
458:1
health 215:24
healthy 103:17
376:10 383:9
478:17
hear 143:21
146:16 195:2,2
195:3 259:12
320:5
heard 39:15
111:18 127:10
133:4 146:6
226:12
held 1:16 13:15
38:20 48:4
235:22
help 48:6
helps 432:21
Heskin 2:2 3:5
6:7 8:9,16,21
9:12,18,23 10:3
10:8,14,24 11:2
13:22 16:18
17:3,15 18:5
19:12 20:5
22:15 23:1,19
25:16 26:13
27:7,14,21
28:15,23 29:10
31:13,17 32:13
34:21 37:17
39:16 40:24
41:8 42:15,21
43:10,24 44:8

44:22 45:4,15
45:23 46:12
51:15 52:9,17
53:23 54:19
55:1,21 56:23
57:23 58:21
60:1,6 61:11
62:6,23 63:13
63:22 64:5 67:1
68:13 69:5,16
70:1 71:24
76:19,22,23
77:9 78:2,8,22
79:4,9,14 80:4
80:11,14 81:6
83:23 85:2,4
89:4,17,24
90:17 91:5,16
91:21,22 92:21
93:10 94:20
95:1,2,24 96:23
98:6,17 99:3,12
99:23 100:14
100:18,22
101:20 102:13
102:20 104:20
105:3,8,13
106:3,15 107:1
107:12,17,24
110:11,14,15
111:5,10,11,14
111:21 112:2,9
112:15,21
113:2 114:16
116:2 117:2
118:23 119:9
119:15 120:24
123:8,16 124:3
124:12 125:3
125:12,19,22
126:11,15,21
127:2,7,14
128:6,23 129:8
130:18 131:2,7
131:17 132:5
133:1,9,11

134:2,12,20
135:3,11 136:4
136:16,18
138:1,4,20,24
139:19 140:6
140:11,14,18
140:23 141:5
141:16 143:17
143:23 144:24
145:2,18,22
146:12,18,21
146:23 147:1,3
147:23 148:4
149:15 150:5
151:5,13 152:5
152:14,20,24
153:1,22 154:3
157:17,22
158:11 159:20
162:5,11
163:18 164:13
164:18 165:13
166:4,8,10,19
167:11,19
168:11,14
169:13,15,20
169:23 171:17
172:8 173:1,18
174:20 175:2
177:7,13,16
178:15,17
179:11,21
180:4,21,23
181:8,24 182:5
182:11,13
186:1,12 187:6
188:4,9,18,20
188:24 189:2,5
189:7,13,15
191:9 193:2,20
194:8,24 195:4
195:12 196:19
197:8,18 199:1
200:24 201:4,9
202:3 207:13
207:21 208:17

210:7,11,23
211:10,19,24
212:5,24
213:10,17
214:3,11,18,23
215:4,10,19,20
216:7,14,20
217:2,5,8
223:17 224:22
226:1,20 227:5
227:23 228:3
228:12,17,23
229:4,9,24
230:7,13
231:17 232:6
232:12,18,24
233:5,22 234:3
234:14,21,24
235:9,13,24
236:3,13,22
237:10,16,24
238:6,12 239:3
239:8,10,16
240:1,5 244:6,9
245:21 246:15
246:21,23
247:4,9,16
248:10 249:4,6
249:13 250:2,4
250:13,19,24
251:2,5,11,15
257:13 259:6
259:14 262:12
264:15 265:18
266:24 269:4
269:10,24
270:11 271:7
271:14,20
272:7,11,16,20
273:1,5,9
274:18 275:22
276:3 278:12
279:1,13,22
280:7,11,17
281:2,7,11,15
281:21 282:5



283:15,23
284:2,15 288:7
288:11 289:6
290:3,24 291:5
291:16 292:1
292:10,18
293:3,10,18,22
294:21 295:2,5
295:11 296:7
299:10,13,18
299:24 300:3,5
300:18 301:4,9
301:15,23
302:14,19
303:4,10,11
304:18 307:18
307:20 308:6
310:13 311:4
313:5 315:9,18
316:3 319:1
320:5,7 322:11
323:6 324:15
324:21,23
325:20,21
327:8 328:24
329:2 332:1,12
332:17 336:7,9
339:4,8,13,18
340:3,10,19
341:1,10,11,22
341:24 343:7
344:16,20
345:18,22
347:18 348:14
348:16 349:10
350:4 351:12
352:3,4 353:18
353:21 355:11
356:2 358:18
361:14 363:5
363:17,22
364:11,20
365:4 367:17
367:22 368:2,5
368:21,23
369:9,12,22

370:7,24 371:2
371:7,9 373:15
374:10 378:10
383:2,12
384:16,22
385:13,19
387:15 396:23
397:2 398:22
399:1 400:16
404:14,16
405:10,11,18
405:19 406:4,6
406:18 407:3,7
407:9,18,19
409:1,2,10,12
409:19,20
410:13,14,17
410:19 411:1,3
411:11,13,19
411:21 412:2,4
414:10,12
415:5,7 416:8
416:18,24
417:7,21,24
419:9,11,17,19
420:3,6,14,16
420:21,23
421:3,5,8,10,17
422:1,15,19
423:1,7,15,17
423:21,24
425:1,5 429:11
429:15 431:14
431:16 439:2
442:16,24
443:2 444:13
444:20 445:12
445:17 446:1,5
446:6 447:14
447:18 449:11
454:8,15,21,22
457:23 458:3
465:11,14,16
473:22 478:6,7
480:16 481:8
481:11 482:13

483:4
heskins@white...
2:5
**Hey** 55:9 384:7
455:22 471:9
**high** 51:24
**higher** 408:12
**highlight** 147:24
396:24 398:23
417:3 457:24
**highly** 324:11
**hire** 27:22
**hired** 217:12
244:21
**historic** 428:20
**histories** 469:8
**history** 20:3 52:1
135:21 146:10
177:19 178:4
183:21 186:6
195:17 301:6
301:12,20
302:2,8 446:13
**hit** 93:15 95:4
**HMC** 1:4 3:19
4:3 11:10,13
33:19 34:7 41:2
45:6 55:24
56:12 66:23
67:19 71:19
87:1,12 88:3
116:9,11 117:9
118:3,17
129:23 147:19
161:11 183:8
185:5 201:22
231:20 275:9
312:2 339:22
378:12 407:2
458:21 466:3
468:16
**HMC's** 25:10
56:22 70:12,15
70:18,21,24
71:3,6,9,12,15
359:17 361:22

369:18 370:18
372:13 446:9
**HMS** 19:16
**hold** 68:6 92:12
233:18 238:22
272:22 279:23
311:16,19,22
312:1,9 367:18
436:24
**holdback** 399:19
440:8
**Holdings** 230:8
230:15 231:18
231:22 232:2
304:20
**holds** 165:9
**home** 6:13
**hook** 479:9
**horizons** 389:7
**hour** 177:2
416:23 417:1
**hours** 24:11
81:16,20,21
82:2 155:18
**house** 39:11
99:15 223:7
242:16 259:23
**huh** 141:17
142:24 305:23
419:23
**hundred** 249:16
**hundreds** 28:1
29:3 43:13
44:13 190:12
190:14
**hung** 413:21
415:15 422:11
424:16 461:14
**hurricane** 95:5
96:5,8,9
**husband** 248:19
**hypothetical**
91:15,19 96:15
117:23 362:9
376:12
**hypothetically**

96:17 394:10
**hypotheticals**
95:9

**I**

**idea** 83:6 316:14
340:7 416:16
434:7
**identical** 139:12
142:1 145:7
179:2 409:5
**identified** 33:2
34:14 128:3
260:7 299:10
327:9 380:11
381:13,14,15
381:23 404:21
409:7 425:12
**identifies** 284:20
381:21 391:1
**identify** 34:5,11
77:3,6,11 80:20
286:10 359:8
372:18 424:18
425:19
**identifying** 423:5
**imagine** 324:15
**immediately**
168:4
**impeach** 340:18
**impeachment**
340:4
**impetus** 254:11
**important**
424:12
**impossible** 142:4
145:8
**improper** 94:7
94:17
**inaccurate** 274:2
279:5 463:4
**inappropriate**
126:4
**incepted** 220:23
**inception** 245:9
**include** 124:23



291:22 293:8
306:2 338:11
**included** 187:14
262:24 466:14
**including** 28:4
75:13,13
144:10 203:21
262:20 391:22
468:23
**income** 71:3,6,9
71:12,15 72:22
73:2,3 82:18
83:1,4,10,11,13
83:16,21 84:3,4
84:17 85:10,20
86:9,12,13,23
87:2,13,21 88:2
123:5 154:6
159:3 203:8,15
204:23 206:20
208:10 209:8
241:17 268:18
352:13,19,23
353:5 354:11
354:13 355:2,4
355:19,24
356:12 359:17
361:22 362:1,6
363:11,15
386:7 437:15
439:11 440:11
440:13 444:23
444:23 447:1
448:12 450:5
450:10,13,13
450:24 453:12
453:15 454:3
459:6,8 462:7
468:23 469:15
**incompetent**
323:2
**incongruent**
352:9
**inconsistent**
269:6 346:2
379:24

**incorporated** 1:4
4:3 157:8
**incorrect** 16:13
162:17 167:18
256:20 278:15
278:16 286:19
337:24 372:22
394:1 432:9
456:8 473:21
**incorrectly** 422:3
422:21
**increase** 347:15
350:19 352:12
352:19 353:5
353:12,24
354:12,17
355:2,23
357:12 358:14
359:10 360:4
361:4,11,17
365:16,23
413:12 433:6
448:24 449:3
450:5,9,15
451:3 452:16
453:24 455:7
459:1,7,13
460:3,8,15
461:3
**increased** 347:22
352:22 353:3
354:18 355:4
358:24 359:18
359:22 360:12
361:22 362:1,6
363:11,15,21
366:7,17,19,20
448:11 450:15
454:3 466:9
**increases** 352:12
455:3 461:8
462:18
**increasing** 348:5
355:15 464:2
466:20
**incur** 177:4

**incurred** 171:20
171:20 172:1,5
172:13 173:16
174:16,24
175:5 176:4,11
177:3
**independent**
260:1
**INDEX** 5:2
**Indirectly** 306:23
**individual**
234:16 254:12
258:4 379:8
380:7 390:3
399:7 406:1
409:8 416:16
421:22 429:2
436:5 450:2
**individually** 1:5
379:20 381:22
402:10 403:9
406:23 428:24
**individuals**
155:17 254:16
351:23
**industrious**
374:3
**inferring** 388:12
**inflows** 428:2
**inform** 127:18
**information** 26:6
26:20 81:14
111:12 120:16
124:17 126:16
210:8,13 228:7
228:24 285:4
292:5 293:24
294:5 317:6
336:18 337:1
338:19 340:16
343:12,18
353:24 354:1,4
354:7 355:1,9
355:20,22
356:5,16 357:2
359:3,7,14

360:5,8,19,23
360:24 361:2,8
448:22 449:2
449:10
**informed** 29:17
128:8
**ink** 138:12,14,16
139:1 141:24
145:12 250:8
**inside** 311:1
362:10
**insolvent** 210:3
211:14
**installment**
102:18 104:19
376:13 418:11
**installments**
103:7 104:17
370:13 403:20
467:6,17
**instruct** 8:5
10:14 76:17
125:20 214:9
236:4 281:7
**instructed** 65:23
347:15 461:10
**instructing** 8:10
8:22 76:20 78:3
78:7 80:9,12
107:13 110:12
112:22 127:8
152:21 213:18
215:11 232:10
283:24 339:19
339:20
**instruction** 8:20
11:5 79:3
112:24 113:1
125:11 127:6
127:11 133:4
208:7,8 211:9
211:17,23
212:4 228:22
229:3,17
232:22 292:9
292:17 312:9

**instrument**
289:10
**insult** 324:13
**insulting** 351:19
**insurance** 205:4
**intended** 88:24
263:12
**intension** 312:19
**intent** 37:24
261:12
**intention** 406:12
**intentional** 309:3
309:5 312:22
**intentionally**
310:5
**interchangeably**
85:20
**interest** 83:12
86:14 88:8,10
88:17,20
101:16 102:11
113:20 161:11
169:18 231:5
251:9,17,19
252:2,4,15,20
254:18 261:8
265:24 266:5,9
266:18,22
267:1,8,18,22
268:2 270:6,6
277:15 278:3
278:10,14,15
278:16 279:6
296:19 298:4
313:10 422:4
**interested** 23:7
**interesting** 6:10
311:5 326:3,6
406:10
**interest-bearing**
88:13
**internal** 200:10
365:9,10
**internally** 469:4
**interpret** 143:13
**interpretation**



234:4 243:13
317:19
**interpreting**
262:8
**interview** 217:21
218:12,14
**intimate** 382:10
**intimately**
222:23
**invest** 108:22
225:18,24
289:24 304:23
**invested** 166:15
166:23 167:4,7
**investigate** 19:2
88:1
**investigated**
302:10
**investigations**
303:6
**investment**
227:21 231:10
282:9,11
289:12,13
290:4
**investments**
222:10,13
228:11
**investor** 108:20
122:22 227:14
227:24 228:1
228:20 230:2
279:18 286:15
292:2 296:1
299:12,22
**investors** 108:14
108:16 111:16
112:5,16
114:18,24
115:13 116:12
116:23 117:16
118:4,8 119:22
120:20 121:3
121:23 122:5,7
123:11 124:7
124:14,20,24

125:4,14
126:17 127:18
128:8 129:2,15
165:9,17
166:14 167:6
167:24 192:21
200:3,6 210:1,2
210:9,15
211:15 212:19
214:1,10 227:1
228:8,15 229:1
229:19,19
230:5,11
277:14 278:2
278:19 291:21
291:24 292:6
292:14,21
293:2,9,12,15
293:24 294:6,7
294:8,15
296:17 297:13
297:16,20,24
298:3,11
301:11,19
302:1,6 317:2,4
**invoice** 203:23
257:17 382:16
382:19 383:4
384:10,18,24
385:1 386:15
386:24 395:8
397:20 398:2,5
398:7,18 399:4
399:8,13,16
400:19,21
401:16,22,24
402:6,11 403:2
403:7,10 404:2
404:7,17,21,23
405:6,14,15,21
405:22 406:8
407:14,20
408:4,6 409:3
410:8 411:7
412:5 414:2,14
415:12,20,22

417:11,19
418:18 419:13
420:18 421:11
421:15 423:5,8
424:7,10 442:4
**invoices** 254:14
254:16 256:1,2
256:4,7,9,16
258:17 259:15
259:18 261:16
261:17 263:10
263:14,23
372:20 373:1
380:9,14
381:12 382:5
383:14 384:7
386:10,11
396:12 397:11
397:14 401:5
403:8 406:2,14
406:22 408:15
409:8,15 410:5
413:1,8,11
415:4 416:5,17
417:16 419:5
420:8 424:14
425:20 436:5
436:11 439:17
443:24
**involve** 165:3
**involved** 108:7
185:11 221:24
222:2,23
231:19 246:3
257:20 310:1,3
310:7
**involvement**
164:1,22
230:23 245:10
249:1
**involving** 108:10
231:20
**in-house** 130:13
176:24 306:5
**in-person** 38:6
38:14

**irrelevant** 281:6
**irrespective**
263:22
**Irvine** 74:1
**issue** 42:1 56:17
78:16 132:14
304:8,13
**issued** 213:8
**Issuer** 288:2
**issues** 30:23
93:16 103:9
462:20
**issuing** 289:8
**item** 170:7
305:18 372:1
**itemized** 453:4
**items** 47:21
108:8 209:7,8

---

**J**

**J** 139:23,24
**Jamie** 11:22,23
11:24 12:11,19
24:3 26:2 27:8
42:6 138:6,10
225:2,9 287:12
**January** 23:21
70:13 71:4
447:10,19
**jargon** 115:17
**Jersey** 338:24
340:1
**Jim** 280:4
**job** 27:10 139:16
141:13 146:1
384:8,11
394:22
**Joe** 13:20 20:16
20:19,24 21:15
44:3 53:15 57:1
57:3,24 58:15
59:14 61:3,8,20
61:22 81:2 95:8
96:13 97:8
113:3 114:12
127:21 133:6

135:17,17
152:11 176:20
185:6,24 201:6
214:21 215:14
217:14,15
218:16 227:8
232:3 239:14
242:20 243:2
244:21 248:14
275:22 283:17
296:4 302:2
308:11,14
311:7 312:12
313:8 314:17
314:24,24
315:5 316:11
318:14 320:1
321:13,20,24
322:3,24
323:15 324:5,7
324:7,16 325:3
325:4,22
326:12 328:8
331:3,9 332:19
332:23 333:12
333:16,23
334:3,5,6
339:11,24
344:12 345:10
347:9,10,13,14
349:19 353:22
364:22 368:24
421:1 446:7
465:9,17
**Joe's** 329:3
**Joe@ParFundi...**
312:13
**Joe@ParFundi...**
315:15
**John** 65:9,22
138:10 146:5
348:20,21
349:16,22
354:4
**Joseph** 1:14 3:3
3:11,17 6:1



324:3 333:5,6
333:14 337:12
**Josh** 46:7 365:11
382:8 391:1
438:5,10
446:12 455:15
**Joshua** 349:24
**journal** 206:15
206:17
**Jr** 20:19
**judge** 9:11,11,17
10:6,23 78:11
79:1,12 94:18
126:2 212:22
213:7,7 231:12
233:4 234:19
235:21 237:3,6
**judgment** 25:3
26:7 31:9 41:5
106:8 136:20
137:14 150:24
170:2 171:13
331:17 443:22
444:11 445:8
**judgments** 28:2
145:4
**July** 117:20
120:10 171:24
193:11 194:11
197:3
**jump** 448:3,14
**jumps** 447:23
**June** 1:12 117:20
119:19 120:6
121:19 129:12
137:22 171:24
194:2,4 330:21
**junior** 20:21
**jurisdiction** 17:8
**jurisdictions**
106:24 107:3
**jury** 85:15
**justified** 364:4
449:3
**justify** 413:12
450:14

**justifying** 452:15

**K**

**Kara** 1:4 15:13
19:16 20:1 31:5
38:8 40:6 49:24
50:23 55:5 57:8
78:16 184:1
185:23 186:4
200:23 201:14
254:10 257:3
258:21 260:8
265:4,7 266:3
267:7 274:13
274:20 275:16
276:14 310:24
325:18 331:3,5
331:7 346:5
360:11 361:8
373:22 374:3
375:20 376:7
379:16 381:5
384:7 389:10
391:6 392:13
401:14 406:12
418:7,13
421:23 433:3
435:24 439:1
446:12 448:22
455:14 462:1
467:3 468:21
469:19 471:10
474:11 478:20
**Kara's** 184:24
185:7 261:20
347:5 374:19
397:17
**keep** 122:3 126:3
147:2 151:11
179:12 180:1
237:14 244:1
268:16 310:14
351:18,19,24
368:3,6 379:7
391:4 402:2
441:19 442:13

449:9 471:18
476:17
**keeping** 108:5
**Kent** 1:19 484:13
**kept** 400:5
**kind** 95:22
164:22 203:21
204:11
**knew** 32:22
184:1
**know** 26:14
28:19 33:23
34:1 35:2,13
36:3 52:19,21
52:22,23,24
53:1 56:3,5
64:21 67:3,22
70:8,14,17,20
70:23 71:2,5,8
71:11,14,17,18
71:23 72:2 84:4
84:6 85:18 93:8
93:24 109:15
110:16 111:6
116:17 117:19
120:14 128:17
131:23 133:4
139:7 142:3,5
145:20 162:12
162:14 165:19
166:12 176:9
184:3 192:5,7
194:14 195:1
198:1,16
204:12,22
206:3,24 207:5
215:14,21
220:14,17
222:14 225:13
229:11 232:18
235:17 237:5
241:16 242:19
243:10 246:2
250:5 254:6
255:18 261:21
262:21 273:14

274:19,21,22
275:5 276:19
285:24 295:3
295:15 300:15
308:21,23
309:23 310:3
318:24 319:3,6
328:10,11,15
328:19,20,22
329:23,24
330:1 332:21
334:7 338:4
340:10 343:2,6
346:6 354:15
358:11,13
361:20 364:11
371:24 383:6
384:10 386:4
393:8 400:8
402:18,20
414:21 416:2
417:14 422:10
423:11 430:19
434:10 436:18
440:7 445:18
450:7 456:7
459:16 461:6
463:7 464:16
**knowing** 261:17
**knowingly**
167:14 169:1
245:18 246:10
285:15 310:14
315:6,16
**knowledge** 8:18
132:23 163:4
221:6 312:4
382:10
**knows** 34:17
57:13 165:22
226:5 263:11
388:5 444:8
460:23 470:10
**know-how** 347:6
**Krakowski**
350:16

**L**

**L** 333:14
**labeling** 274:1
**Lacquer** 223:11
223:22 224:2,6
224:10 244:24
245:9
**lady** 389:10
**LaForte** 3:11
20:13,16,19
35:6,10 38:23
39:10,20,22
40:1,10 61:3
163:9,12,21,24
164:7,14,21
166:13,22
167:3,22
242:11 243:2
244:12 248:19
302:2 308:11
315:1 320:11
321:13,20
322:1,4,24
323:16 324:3
325:3,4,22
326:12 328:9
347:10
**language** 176:19
252:19 261:15
266:21 289:14
395:10
**large** 128:16
374:16 376:4
**larger** 50:24
439:16
**Larson** 199:21
343:10
**lastly** 403:8
**Lau** 344:24
**law** 131:9 134:16
135:4 243:12
270:7
**laws** 151:12
270:2
**lawsuit** 119:18



262:7
lawyer 64:7
  306:5 451:18
  452:9
lawyers 173:22
  356:21
lawyer's 11:4
  485:1
laying 436:13
  439:6
layoff 216:3
lead 322:4
lease 7:7,9,17,21
  9:2,9 150:9
  156:20
leased 7:11
leases 7:14
leave 40:3,12
  82:5
left 40:3,6,9
  452:11 476:21
legal 1:23 63:24
  64:9 65:11,16
  65:17 116:14
  121:13 130:1
  130:12,13,23
  133:10 144:12
  146:4 151:3,8,8
  171:10 175:18
  192:19 242:6
  243:18 271:12
  272:2 300:21
  361:19,20
  437:16 470:9
  472:23 474:16
legally 116:5
  119:2 129:11
  150:9 243:4,7,9
  277:11 327:10
  327:24 480:4
  480:19
lend 222:18
lengths 403:19
Letter 3:19
letting 346:5
let's 35:21 46:14

59:22 91:6 97:4
  103:23 107:18
  107:20,20
  114:7 116:17
  116:18 140:4
  142:10,13
  167:20,21
  168:11,13
  177:13,15
  179:12 182:11
  206:22 216:15
  216:16 217:16
  238:8,9 240:13
  240:14 242:9,9
  244:4 272:15
  279:23 284:2
  284:22 302:19
  312:11 320:6
  332:14 337:9
  341:23 345:18
  345:20,21
  348:14 367:13
  367:22 368:14
  384:10 392:13
  394:9,9 396:22
  400:17 404:13
  410:18 411:11
  415:5 416:12
  416:13 417:21
  417:23 419:9
  419:17 420:4
  423:21 426:17
  426:22 427:21
  428:16 431:4
  442:19 454:23
  454:23 457:22
  460:1 476:17
  476:18 477:2
leverage 376:21
liabilities 72:12
  207:9 426:19
  439:8 471:18
liability 48:4
  52:8 96:18
  97:19 102:9
  201:11 204:7

205:11 209:15
  209:16 474:8
  480:7 481:3
liable 99:21
Liberty 2:3
license 135:5
  333:13
licensed 132:17
  133:17 134:16
lied 63:16
lies 351:22
life 458:22
likelihood 130:3
limit 467:2
limited 96:14
limiting 162:3
Lindsey 299:6,19
  299:22 300:7
  301:5,11,19
line 5:5,5,5,15,15
  5:15,18,18,18
  5:20,20,20 52:8
  67:16 69:13
  86:6 92:16
  97:22 134:8
  150:17 170:7
  217:18 307:1,2
  307:5,8,15,16
  432:13 485:2
lined 458:23
lines 277:2
  379:18
liquidated
  380:17
Lisa 3:10,12
  11:21,24 13:5
  18:10 76:5
  78:15 109:7
  154:24 157:1
  217:13 218:8
  218:11 219:1,6
  221:8,13,22
  224:18 225:9
  240:3,17 287:1
  340:20
Lisa's 241:2

list 76:4,16
  368:12 380:13
  380:14 397:19
  450:21 467:23
listed 108:22
  254:13 255:19
  305:6 350:24
  384:2 439:18
listen 55:9
  125:24 126:21
  181:20 280:11
  340:13 384:7
  455:22
listing 466:15
lists 171:9 285:10
  287:1,1,4,11
  290:8 295:17
  341:13
litany 49:8 447:5
literally 399:11
litigate 176:2
litigation 115:11
  119:1 120:2
  175:23 176:14
  177:3 186:9
  194:4 196:5
  197:22 198:5
  298:20 311:15
  311:18,22,23
  312:1,9
little 88:15,16
  122:24 282:15
  282:16 369:10
live 12:3 242:5,12
LiveNote 484:15
lives 12:4 219:13
  241:11,19
  242:1 270:18
load 392:21
loan 100:16
  101:6,16
  108:24 124:20
  182:2 192:18
  210:15 226:6
  257:15,18,21
  259:22 266:7

267:12,19,20
  268:5,13,15,18
  269:21 271:2,4
  289:16 297:8
  302:23 303:8
loans 101:18
  113:17 251:7
  252:16 260:23
  269:8 277:22
  278:14 296:13
  296:18 297:21
  298:4 307:3
  386:7 426:20
loan-to-own
  161:14 340:6
located 150:11
  151:22 153:11
  153:14,15
  155:12 157:14
  169:10 231:23
  286:3 342:17
  343:3
location 23:23
  151:22 152:2,9
  153:17 157:19
  342:7
locations 242:4
lock 400:10
logical 97:17
long 7:10 118:20
  133:15,15
  216:18 226:18
  253:9 401:13
  436:15
longer 17:1 91:9
  95:6,13 96:10
  233:12 300:17
  300:19,21
  305:8 376:18
  408:11 416:21
  432:20 434:6
  439:15,23
  440:3,19 441:1
  480:1,19
look 8:14 9:2
  29:3 41:11 59:2



80:1 103:10
104:11 107:15
124:5 139:22
145:3,11
172:17 198:19
199:3,6,10
207:7 208:18
215:22 221:11
230:5 240:14
241:3 256:16
272:15 286:15
302:20 305:17
312:11 337:9
341:12,12
349:19 356:10
356:11 357:8
357:17,23
358:1 360:10
362:24 363:3,6
363:7 364:3
371:17 382:2
383:10 397:10
398:17 399:3
399:15 410:1
415:19,22,24
417:23 420:8
420:17,21
424:13 428:1
428:24 429:1
438:14 450:17
452:1 454:23
454:24 456:6
457:16,22
458:11 460:1
464:22
**looked** 43:15
55:8,8 66:21
188:15 255:2
356:13,23
363:10 364:12
366:13,15
408:21 441:7
441:13 448:9
451:14,22
**looking** 103:14
126:19 128:16

196:1 204:18
286:14 299:17
299:18 367:17
375:15 395:6
417:15 418:5,5
443:16 444:9
453:6 464:18
**looks** 138:14
139:3,6 141:8
142:20,21,21
179:4 191:21
250:9 321:23
324:6 329:3
409:22 419:22
443:17 455:1
**lose** 100:11 237:5
**loss** 91:8 98:5
100:9 115:2
**losses** 97:15
115:9 116:7
118:6 119:4,13
208:11
**lost** 123:3
**lot** 52:4 63:17
82:5 85:19
108:4 162:9
271:4 331:3
334:18 436:12
436:19
**Lots** 198:18
**loud** 245:6
350:12
**Louis** 1:14 3:3
6:1 333:6
**Lounge** 223:11
223:22 224:3,6
224:11 244:24
245:9
**love** 351:12,13,15
351:16,16
**low** 428:21
**lower** 50:22
427:9 432:18
463:20
**luck** 236:5
281:11

**lunch** 284:6
**lying** 61:23
**Lynch** 2:12

## M

**M** 6:5 140:1
**Mack** 308:14
312:12 314:17
314:24 315:5
320:1 334:5,6
**Magazine** 323:8
**MAGNA** 1:23
**mail** 154:18
**mailing** 153:15
**majority** 30:21
107:3
**maker** 224:24
226:3 240:21
240:23
**makers** 225:10
**making** 30:6,8
34:18 36:10,15
36:18,21 37:24
43:9 55:10
58:13,23 59:5
79:10 100:2
116:16,19
117:11 118:17
119:17 121:16
123:18 137:18
141:23 151:12
152:15 181:10
193:23 194:5
194:10 237:14
247:17 278:18
279:8 292:13
316:15 317:4
351:7,19 364:4
376:7 377:14
432:24 459:10
477:21 479:6
**manage** 155:16
161:1
**management**
11:19,20 24:21
219:9 221:17

223:21,24
224:7
**manager** 32:10
158:16 282:8
**managerial**
163:13 164:9
**manages** 110:3
165:5
**manner** 451:2
**March** 70:19
71:10 78:19
79:24 107:8
213:8 371:4
**Marked** 5:20
**Market** 2:3,8
**Marketing** 22:4
164:5,8 248:15
309:8,11
310:17 311:7
321:6
**markup** 203:11
**Marque** 3:17
336:10
**married** 242:12
**Maryland** 171:14
**master** 391:6
**master's** 328:12
**math** 51:16,17,20
56:7 356:13
**matrix** 53:17
57:8 265:1
425:14,21
430:8
**matter** 100:3,20
100:23 101:3
102:2,4 124:22
131:21 132:3
133:1 191:7
253:8 255:4
293:7 365:16
470:11 477:9
**MBA** 328:8,12
**MCA** 30:6,24
72:13 167:4
187:16 200:18
297:20 298:4

303:14 304:1,5
304:12 305:1
308:24 376:21
426:20 466:14
**MCAs** 277:22
278:13 296:13
298:12
**McElhone** 3:11
3:12 11:24
12:11 18:10
24:3 25:18 26:3
26:24 27:9 28:5
29:5,16,20 42:6
43:14 76:6,9
77:5 109:8,18
109:19,23
138:6,9 141:12
141:19 145:24
157:24 158:2
240:3,17
241:10 246:3,9
247:13 250:6
270:17 271:4
287:12 340:21
**McElhone's** 12:1
27:24 78:15
**mean** 17:4 18:3
21:8 53:10
61:14 90:11
95:14,18
103:12 115:15
117:23 119:2
128:13 153:20
154:17 202:2
204:11,17
208:19 209:4
222:11 223:3
223:23 225:24
255:16 261:3
262:16,17
267:2,5 295:15
299:8 324:14
332:21 336:2
338:1 351:16
364:8 379:5
392:11 395:18



395:22 418:15
418:23 419:2
439:12 448:8
466:23 476:2
**meaning** 101:10
101:12 252:4
260:2 371:24
406:12 433:21
474:11
**means** 17:6
154:15 242:19
242:20 251:21
276:2,8 278:8
313:24 335:5
377:4 466:24
484:22
**meant** 32:22 88:2
220:14 225:6
324:12 430:1
**mechanism** 36:9
116:7 260:21
268:11 467:1
473:5
**media** 333:16
**meet** 217:15
**meeting** 38:4,7,8
38:14,21 40:2,4
40:6 42:3 46:6
47:8 48:24
183:20 456:9
456:11,21
457:2 463:9,10
463:11 470:1
**memorialized**
187:12,19
**memorializes**
470:14
**memorializing**
188:12
**memorize** 36:5
**memory** 49:15
49:21 330:3
**mental** 212:16
**merchant** 106:8
106:20 135:22
201:12,23

204:1 248:20
265:5 341:4,4
361:18 362:15
371:17 377:12
383:22 406:15
426:19
**merchants** 43:22
107:8 262:22
382:12 387:24
399:10 435:5
479:11
**merchant's** 258:3
377:18,22
378:5
**merely** 257:23
259:15
**messages** 221:13
470:20
**met** 78:10 94:10
131:12 218:11
237:21 455:21
470:1
**metaphor** 204:13
**methodology**
121:9 122:11
122:13 123:15
129:18 419:15
**metrics** 108:6
**Miami** 155:8
325:24 326:10
326:16
**Michael** 282:6,8
**middle** 47:12
251:12 333:3
334:11 369:11
371:8 397:1
404:15 446:20
**million** 46:22
47:15 51:22
52:7 53:5,11
55:10,24 56:8
56:12 58:12,24
59:5 66:22 68:3
68:7,17 85:6,7
93:12 96:6,11
97:2,3 98:19

100:2 101:2
102:2,5 116:18
116:19,20
117:8,10 167:7
202:9,13,15,23
203:10,13,22
204:4 205:9
206:21 209:11
209:12,14,20
257:5 258:11
258:12 260:16
263:18 305:19
307:16 313:19
314:3,4,9,19
315:22 395:24
397:11,14
398:7,15,15
399:17,24,24
401:23 404:24
405:7,15,21,23
406:9 408:16
409:6,16 410:3
410:9 411:16
411:23 413:13
413:17,18
414:2,7,19,24
415:3 417:17
419:5,14 420:9
420:18 421:12
422:7 424:2,15
424:22 426:23
427:5 428:5,18
432:3,7 434:3,3
434:11 438:17
440:2,2,3,22
457:3 462:5
468:16,18,22
469:11,13,14
469:15 470:4
470:11
**millions** 212:8
**mind** 122:4
268:16 471:19
**mine** 316:5
**minimize** 436:17
**minimum** 289:11

289:13,18
290:4
**minus** 83:16,22
86:9,10,14
426:19 467:16
**minute** 442:19
**minutes** 107:19
107:20 144:3
239:23 240:16
284:10 352:6
353:9 445:22
460:7 481:18
482:7
**mischaracteriz...**
32:4 53:14
181:21
**mislead** 310:10
**misleading** 310:6
**misled** 309:15
**misnomer** 277:18
**misrepresent**
312:19 319:17
334:19 335:20
342:7
**misrepresentat...**
278:17 312:14
312:17,23
315:13,14,23
316:9
**misrepresentat...**
34:19 247:18
279:3 315:3
**misrepresenting**
322:23
**missed** 21:19
37:2,7 41:2,12
41:24 42:10,23
43:17 181:4,14
182:7 188:16
188:17,21
189:3,8,24
190:2,8,13,14
191:3,16,18
**missing** 36:12
40:18 191:7
424:9 444:16

**misstatement**
88:23
**mistake** 267:2
278:22
**misunderstood**
349:14
**mixing** 209:7
**modification**
65:12 66:2 68:2
89:15 182:20
188:5,12
**modifications**
187:24
**modified** 45:13
69:11 72:5
**mom** 334:1
**moment** 271:19
**monetary** 378:4
384:2
**money** 84:13,20
100:11 101:8
103:21 104:18
109:2 123:21
166:15,22
167:3 196:6
202:8 204:9
205:22 209:10
222:19 225:19
226:2,4 257:10
260:4,5,9,14
264:10 316:4
316:12 373:4
376:22 382:20
386:1,18 394:5
394:18 412:17
413:6,15 414:1
433:3,5 435:21
436:14,17
439:4 453:10
459:23 460:8
460:14 469:16
475:3,4,6,11,19
477:23 478:8
480:2,20 482:1
**monies** 68:4 73:3
106:14 377:21



month 23:5
52:20 53:5,5,11
55:10 56:1
72:19,22
116:21 129:19
156:2,3 198:21
313:11,11
355:5 359:12
359:19 361:23
362:2 371:3
375:12 389:18
396:18 426:24
427:14,19,21
453:18,22
monthly 67:20
70:3,7 71:20
313:10 426:9
426:10 428:14
477:14
months 71:21
101:13 132:12
133:22 233:15
233:20 313:10
426:2,18 427:5
428:7,8
morning 6:8
478:5
motion 10:9,16
94:9,10 237:21
237:22 249:8
282:4
mouth 389:3
move 10:20 79:1
140:15,24
236:10
moved 74:10
337:21
moving 393:20
multiple 21:24
151:10 197:15
197:16 241:12
254:10 346:19
364:9 373:21
374:5,5,15
376:4 390:1,14
439:17 461:22

multiply 401:19
403:15
musing 195:3
mute 465:8
mysterious
194:20

**N**

N 2:1 3:1 6:5,5
nail 244:23
name 32:21,23
77:16 109:13
158:13 159:21
160:13 163:1
199:19 243:15
282:12 315:4
332:22 333:1,1
333:3,4,12
334:10,12,14
334:17
named 162:18
names 80:20
308:20 332:20
333:22
NASDAQ 108:23
nature 113:11
259:3 266:15
nauseam 336:3
near 130:5
nearly 355:16
359:23 453:23
454:3
neat 427:6
necessarily 41:23
67:16 69:13
91:3 116:5
175:4 223:23
335:9 356:24
436:5 439:20
452:24
need 56:23 80:4
132:23 154:14
166:12 202:1
208:11 212:3
212:15 233:3
289:23 291:22

311:2,11
345:11 388:22
436:2 457:5
463:20 466:19
483:1,4
needed 81:19
103:7 413:10
needs 260:15
389:3 471:23
478:19
negative 208:4
negotiate 37:22
67:13 120:17
187:1
negotiated 67:7
67:10,19 72:4
182:18 185:5
255:13 400:22
461:24
negotiating 37:15
72:7 402:9
negotiation 37:13
89:16 96:19
184:21 187:10
187:11 446:11
456:23,24
461:17,21
463:17 472:14
negotiations
69:11 118:21
120:5,9 121:5
183:2
net 83:10,10,13
83:20 86:8,12
86:13 91:8
208:2,3,21
209:5 214:24
469:7
never 13:15,23
18:8 23:13
39:14 40:11
45:22 97:1
98:21 128:1,2,7
161:10,14,17
188:6 243:4
245:11 255:23

256:13 268:22
284:6 307:14
307:15 312:8
330:6 428:4
457:13 464:4
new 330:10
338:24 340:1
379:17,17,18
390:23 391:4
391:22 392:7,8
392:22 393:2,3
393:5,6,7,8,22
394:3,5,20
412:13,17,19
412:20,24
413:5 414:1,13
435:13 439:5,6
439:7 449:8
471:4,4 472:5
472:12,13
473:2,7 476:24
479:16,18
nexus 17:1,5,6
nice 487:20
nickname 334:8
night 289:22
454:20 478:3
482:23
nine 414:20
416:14
noncollectible
130:2
nonpayment
115:10 129:13
nonsense 246:14
non-default
121:11
Nope 336:13
normal 20:9
25:15 35:17
254:24
normally 37:11
49:24 262:18
466:14
North 7:5 21:16
21:20,21 24:6

149:6 153:11
168:17 169:11
285:12 286:3
286:10,18
342:18 343:4
Northeast 156:10
Notary 1:21
484:15
NOTATION
485:2
note 74:22
notes 289:3
303:20 484:8
485:1
notice 1:16 57:5
138:21 239:2
notices 331:18
332:3,10
November
183:24 184:4
185:15 194:18
nuances 335:4,6
number 30:20
47:13 59:16,16
59:17 67:4,14
86:14 100:10
156:12 173:8
242:18 305:19
348:5 367:16
371:22 375:19
399:13 401:5
402:14,16
403:5 407:14
408:4 411:8
414:14 415:12
417:11,19
426:4 428:11
428:20,22
429:6 446:2
469:1,10 470:4
numbering 452:2
numbers 122:5
128:21 356:14
360:1 365:2,5,8
365:10 376:10
380:15 409:3



438:4,10 450:4
464:12 470:2
**numerous** 40:20
196:2 221:20
241:10 254:20

---

**O**

**O** 6:5 273:20
**oath** 26:4 33:17
37:1 38:17 42:8
44:12,15 66:19
82:17 121:2
145:23 174:22
197:5,10,12
199:13 247:11
350:14
**object** 8:5 122:1
**objection** 13:18
16:10,23 17:13
18:2 19:4,18,19
22:13,20 23:16
25:12 26:8 27:3
27:13,17 28:10
28:21 29:7
31:12,15 32:3
37:5 39:13
40:22 41:6
42:13 43:5,19
44:19 45:2,10
45:19 46:4
51:10 52:5,13
53:13 54:15,24
55:15 61:7 62:2
62:18 64:2
66:24 68:9 69:1
69:9,21 71:22
80:8 83:18
88:21 89:13,21
90:10 91:1
92:11 93:2,22
96:12 97:5
98:11,22 99:7
99:17 100:5,17
100:21 101:4
102:6,16
104:13 105:1,7

105:11,19
106:9,22
107:10 110:9
110:23 115:24
116:24 118:19
120:23 123:12
127:20 128:10
129:7 132:4,18
133:20 134:11
134:18,24
135:6 136:1
139:18 141:14
145:14 149:10
149:22 151:2
151:23 152:10
152:18 153:18
154:2 157:16
157:20 158:7
159:15 162:2
163:17 164:11
164:16 165:11
166:16 167:9
167:16 171:15
172:7,21
173:15 174:18
175:1 176:20
181:7,21 182:4
182:8 185:20
186:11 187:5
188:2,7 191:5
192:22 193:17
194:6 195:10
196:17 197:6
197:13 201:24
207:11 210:4
216:4 223:15
224:20 225:22
226:17 230:3,9
245:20 247:5
247:15 248:7
249:12 256:21
258:18 262:9
264:1 265:15
266:19 269:3,9
269:22 270:9
271:6 278:6,20

279:10,16
289:1 290:1,22
291:3,14 310:8
310:19 313:2
315:8,17 316:1
318:23 322:6
323:3 327:7
331:21 340:12
343:5 347:16
349:7 355:6
356:1 358:16
361:6 363:2,13
363:19 369:20
370:6 373:14
373:18 382:22
383:5 384:15
384:20 385:9
385:17 387:7
438:19 449:5
454:5 473:18
478:1
**objections** 80:5
97:7
**objective** 69:3,3
432:16
**obligated** 89:23
**obligation** 190:18
435:15
**obligations** 38:1
191:12 377:20
383:23 391:4
**obstructionist**
10:18
**obtain** 94:6
**obtained** 341:3
**obviously** 42:1
108:9 264:24
376:7 389:6
455:20 456:3
**occasions** 29:18
29:22
**occur** 219:17
462:18 477:20
**occurred** 30:22
119:5,13 120:3
120:5 173:13

181:15
**occurring** 17:23
**occurs** 249:3
**October** 9:5
114:12 137:3
151:19 155:2
156:7 171:23
173:11,20
192:6,9,12
194:18 298:21
301:17 308:1
314:3 343:15
350:2
**odd** 194:12 195:5
**odds** 141:23
**offer** 330:13
**offering** 288:23
**offers** 330:11
**office** 6:14,15 7:4
21:17,20,22
23:10,13 24:16
141:20 149:3,5
154:12,17,18
154:20 155:8
155:20,22
156:9,14,16,17
157:3,14 159:7
159:7,19
326:10
**officer** 82:13
287:5,14
337:13
**offices** 6:17 7:1
22:6,10
**oh** 90:7 119:11
122:18 141:1
178:2 184:3
194:9 231:15
233:7 236:13
238:6 267:8
271:19 272:23
290:13 329:17
346:4 357:16
470:18
**okay** 6:16 7:1,6
7:10,16,24 8:21

9:18,23 11:1,8
12:2 14:2,13,24
15:3,9 16:19
17:19 18:12,14
19:1 20:6,22
21:14 22:9,16
23:20 24:2 25:1
25:9 29:2,11,20
29:24 30:16
31:3 33:1 34:3
35:19 36:7,15
37:18 38:10,16
40:8,15 41:19
44:3,23 45:5
47:5,9,13 48:21
49:5,14,19
50:10,18 53:2,8
53:24 55:4
56:11 59:22
62:3 63:15 64:6
64:12 65:19,23
66:8 67:18
68:16,22 69:6
69:17 70:5,11
72:1 73:6,6
74:15,20,23
75:8 76:22
77:10 80:13,18
81:7,16,23 82:5
82:11,24 84:9
85:23 87:24
88:6 89:5 93:11
95:1 98:7
102:21 104:8
105:4,14 107:2
108:12 109:6
109:19 110:14
110:20 111:10
112:9,17 113:3
113:9 116:3,15
117:18 121:1
126:6 128:24
133:3 135:14
135:20 136:15
137:13,24
138:16 139:7



140:4,13,14
142:6 143:2,14
144:9,14,17,18
144:20,23
145:21 146:6
146:11 150:14
151:17 152:15
155:13,18
156:17,24
157:5,10 158:2
158:12,20
159:13,24
161:13,24
162:7,20 164:7
165:1 167:20
170:8,21
171:12 173:2
173:23 175:16
178:14 179:5
179:10 180:3
180:13,20
181:20 182:11
183:7 184:8,15
186:2,22 187:2
187:7,11 188:5
189:19 190:6
190:11,22
191:17 196:8
199:17,22
200:2,7 201:5
201:10,21
205:20,24
206:16 216:2
217:22 218:6
218:13,23
219:16,21
220:21 221:11
221:19 223:20
225:7 230:19
231:18 236:22
237:2 240:13
241:3 242:5,8
243:2,10,17
244:4 246:11
248:2,11 249:4
250:10 251:1,3

252:7 253:1,5
253:13,22
259:19 260:18
263:4 264:16
265:12,19
266:13 272:3
273:1 274:22
275:7,14 276:9
276:21 278:1
279:2 280:2
281:13 282:13
282:24 284:2
284:13,20
286:23 287:4
287:11 290:7
290:11,16
291:11 294:22
295:21,24
296:8,22 297:2
297:12,23
298:2,10
300:12 301:5
303:10 304:19
305:17 306:19
307:24 308:10
309:2 312:11
313:6,18 314:8
316:4,23 317:8
319:21 321:19
321:24 323:18
324:20 325:15
326:18,23
327:12,18
328:23 329:17
331:6 332:9
333:4,7,11
334:2,9,13,18
335:1 336:6
337:3 338:18
338:21 339:9
340:3 341:10
342:12 343:1,8
343:12,23
344:15 345:9
345:17 348:2
349:5 351:2,21

353:2,13,19
354:6,23
355:20 357:22
358:19 359:2,8
361:2,15,19
362:19 365:5
365:14,20
367:13 368:1,4
368:24 369:3,7
369:23 370:8
370:23 372:5
375:9,12
376:24 378:11
379:23 382:1
383:19 384:9
384:17 386:21
394:2,7 395:14
396:4,21 398:4
398:21 403:24
404:5,9,17
405:5,9 407:7
407:17 408:24
409:10,18
410:7,12,24
411:18 412:16
413:1,24 414:6
414:9,13 417:8
417:13 419:4,8
419:16 420:7
420:20 422:2,6
422:14,24
424:13,24
430:11,15,21
431:1,4 432:1
432:10 435:23
436:8 437:7
438:16 439:3
439:10 440:20
442:21 443:8
443:13 444:15
444:21 446:5
446:14 447:7
447:13 448:8
449:2,12 452:6
452:14 454:11
455:6,13,16

456:10 457:9
458:19 459:19
460:13 463:14
464:8,15
465:10,17
466:4 468:7,20
468:24 472:1
472:16,17,20
472:20,21,23
473:1,4,7 475:2
476:23 478:14
481:14,21
482:5,11
**old** 73:20 338:2,3
391:3 472:6
473:3 475:18
**once** 366:23
**ones** 33:18 66:9
77:21 115:16
190:8 200:21
228:5 292:4
396:17 413:3
425:19
**one-and-done**
374:17 390:15
**ongoing** 179:13
368:6 442:1
**oops** 267:4
**open** 95:17,22
235:23
**opens** 260:17
**operate** 95:6
96:10 97:1
223:11 337:6
478:19
**operating** 15:7
16:3,13 83:9
86:11 91:8
150:2 152:4
153:7,9,12,20
224:14 285:18
286:13 319:11
321:17 328:1
335:24 337:7
342:10,20
**operation** 11:10

219:9 264:11
**operations** 17:7
17:10,23 95:13
108:10 155:16
325:24 326:20
327:20 335:23
475:15,22
**operator** 16:15
345:6
**opportunities**
393:3
**opportunity**
213:5 260:17
**opposed** 86:13
**options** 389:8
401:10 462:7
**order** 3:9 8:14,15
9:3,16,19 10:7
10:22 55:4
58:12 78:9,11
78:19,21 79:13
79:24 80:1
93:16 94:2
107:16 111:1,9
111:20 112:1
112:14,15,20
124:2,10
125:17 126:8
126:14,22
127:13 150:23
152:23 212:4
212:14,17,21
213:4,8,19,21
214:17 215:13
216:11 226:19
226:24 227:9
230:6 231:13
232:5,10,14,16
234:2,12,22,24
235:5,10
236:21 237:1
249:11 254:13
291:18 302:20
303:3 341:8
363:10 394:12
394:21 401:7,9



436:2 450:14
**orders** 94:5,5
95:5 96:5
232:23 421:23
**ordinary** 83:11
83:21 86:9,13
378:5
**organization**
155:12
**original** 190:24
371:20 392:23
394:13,15
422:12 423:4
435:15 442:8
447:3 474:9
481:6
**originally** 181:3
337:20
**originate** 248:23
**origination** 249:2
385:11
**outflow** 206:9
**outflows** 205:14
**outgoing** 205:22
**outside** 94:3
118:11 234:7
241:2 283:21
335:13 387:2
461:18 477:12
478:21
**outstanding**
92:13 183:22
184:18 185:3
249:24 253:21
392:14 469:12
470:5,23
**overall** 432:18
468:14 477:14
**overcharged**
457:2,5
**overpaid** 402:7
**owe** 92:8 96:11
97:2,3 102:1
116:17,18
117:8,10
123:21 196:6

471:12 476:22
477:3 480:2,19
**owed** 46:8,14,20
100:20 106:14
170:24 259:5
472:13 477:22
**owes** 48:13
**owned** 76:5,9
109:21 340:20
**owner** 109:6
158:5 165:6,10
243:5 248:18
248:18 270:18
335:14,17
374:4 377:15
389:9
**owners** 99:10
335:16
**ownership** 109:4
161:10,18
243:16 340:15
**owns** 95:6 109:23
158:9 167:23
339:1
**o'clock** 284:12
478:5

_____
**P**
**P** 2:1,1
**PA** 131:16
**pace** 440:19
**package** 381:21
404:22
**page** 3:8 4:1 5:5
5:5,5,15,15,15
5:18,18,18,20
5:20,20 47:4
48:3 138:2,2,3
138:21,22,22
138:23 146:22
146:22 147:5,8
147:11 168:13
169:14 178:16
178:16 179:17
179:17 180:22
182:10,12

188:16,17,19
189:1,6,14
249:5 250:3
251:4 280:10
285:1 288:6,7
290:11 299:19
305:18 324:22
325:20 328:4
328:24 330:2
341:13 368:7,7
368:7,8,8 369:3
371:1 396:23
398:23 444:5
457:6 458:1
471:6 485:2
**pages** 240:2
452:3
**paid** 13:1,6,7
15:1 22:17
57:14 68:5
71:19 104:18
173:21 198:12
198:13,13
209:21 249:19
261:23 262:2
287:8 305:21
305:22,24
370:12 383:13
384:18 385:5
385:14 388:14
391:8 394:13
416:6 434:12
434:14 442:6
468:9 469:8
471:19,23
473:15,17
477:7,23 478:9
479:3,21,22
480:6 481:2
**paint** 459:15
**pandemic** 93:15
216:3,23
**panel** 338:23
**paper** 462:24
**papers** 39:12
**paperwork** 60:24

**Par** 1:9 231:5
308:17,18,19
308:22 310:15
311:1 313:20
314:4,15,17,18
317:9,11,17,22
317:24,24
318:3,6,11,13
318:14,20,21
319:4,8,12,17
319:18 320:2
320:15 321:3,8
321:11,14,16
325:5,22 326:9
327:20 328:1
329:6,8,15,21
330:4,13,24
332:20 334:20
334:23 335:3
335:13,21
336:3 337:4
340:5 341:13
345:3
**paragraph**
169:16 241:4
242:8,10 245:5
248:6,8,11
337:11 350:8
350:10 377:1
395:3 481:13
481:13
**ParFunding.com**
312:24 313:4
**Parone** 233:6,7
**part** 24:22 25:22
26:11 31:6
35:17 43:6 44:5
52:1 55:20
58:16 68:11
72:12 84:13
90:14 92:17
93:5,7 99:10
103:21 109:4
121:7 128:4
129:17 171:9
172:2,14

182:19 183:2
186:6 187:15
202:24 203:23
205:11,14,15
206:9,17,20
243:14 262:18
339:22 374:9
380:4 381:15
382:13 388:20
393:5 399:19
401:14 404:22
408:22 434:21
449:14 450:20
452:20,23
474:7,19 480:7
**partially** 140:21
**particular** 72:19
72:22 128:19
176:14 177:8
177:10 257:2
398:1 399:8
402:11 409:24
463:15
**partnership**
161:8
**party** 9:7 285:23
377:23
**passed** 348:8
**patient** 482:17
**pattern** 195:7
**pay** 17:11 22:11
22:16 30:12
50:12 55:5 58:8
67:20,23 69:7
69:18 89:19,23
90:9 91:9,9
93:13 99:16
102:3,4,19
103:19,20
104:22,24
241:14 254:17
257:7,24
258:16 260:3
263:21 264:5
342:22 384:12
389:8 453:9



472:6 473:3,13
475:4,11,19
476:20,20
479:1,23
480:23 481:6
482:1
**payable** 83:12
108:9 313:10
453:2
**payback** 275:11
401:9
**paycheck** 12:19
12:23
**paying** 16:21
51:9,20,21
54:22 122:22
153:24 252:5
294:13 330:23
391:3 401:15
434:24 475:10
475:18 476:3
**payment** 23:5,8
30:11,18 36:12
38:19 46:10
48:5 50:22,24
51:3,24 103:24
105:16,24
106:5 117:20
121:6,20
135:21 146:9
177:19 178:4
189:22 190:19
190:20 191:15
193:10 195:17
195:23,24
196:4,15 197:3
197:10,19,21
198:8 201:22
202:7 253:7
266:2 344:3,6,8
346:11 350:20
351:1 359:1
361:12 363:20
365:16 366:3
366:20 367:1
377:21 378:4

384:2,12,24
386:16,17
388:19 401:11
403:19 432:14
443:10 446:10
446:13,21
448:2 449:19
451:4 458:4
460:14 462:6,7
462:17 463:1
463:20 464:24
466:6,9,19
467:7 469:6,8
469:22 472:14
**payments** 20:3
22:23 24:22
25:10 30:7,9
36:10,16,18,21
37:3,7,8,20,23
37:23 40:18
41:2,12,24
42:10,23 43:17
45:7,13,21
46:18 48:8,18
57:18,21 58:13
65:1 68:18,24
72:5 95:19
104:5 106:21
115:23 116:16
116:20 117:11
118:18 119:17
121:16 123:18
137:18 181:5
181:14 182:7
183:21 188:16
188:17,22
189:3,8,16,20
189:24 190:2,4
190:7,9,10,13
190:15 191:4,7
191:16,19
192:18 193:24
194:5,10,20
195:9 196:10
196:21 197:16
197:17 198:5

198:11,22
199:14 206:23
206:23,24
246:6 254:15
344:13 346:19
346:22 347:15
347:21 349:6
353:24 355:16
360:4 361:5
363:18 378:1
383:24 387:14
388:6,23 389:4
406:15 445:5
459:1,7,13,17
460:21,24
461:2 465:22
466:1,20
467:12,13
468:16 470:7,8
472:15
**payoff** 412:23
472:10 475:7
**payoffs** 48:19
**payors** 377:24
**payout** 59:19
**payroll** 478:17
**pays** 255:20
283:10 478:24
**penalties** 26:4,16
31:10 42:7
43:15 44:12
142:8,14 179:6
180:10 240:10
243:11
**pendency** 196:5
197:22
**pending** 249:22
465:13
**Pennsylvania** 1:2
1:17 2:4,8 18:1
23:11,14,24
107:4 131:10
133:19 134:17
134:22 149:19
150:20,23
151:21 152:17

168:18 218:14
223:7,8 241:15
242:1,13
384:11
**people** 32:6
85:19 101:8
109:1 154:19
154:21 168:7
185:10 193:23
198:19 218:21
222:18 223:24
278:22 310:6
317:16 318:19
319:4,18 322:4
322:23 334:18
335:21
**percent** 46:17
50:7 51:8,19
52:11 53:9
54:14,22 55:12
58:7,8 67:20,23
68:23 69:8,19
69:23 71:19
98:9,20 109:20
114:22 115:20
139:5 169:19
256:18 257:1
258:16 261:1,3
261:4 262:14
262:15 265:14
277:16 278:4
278:11,14
296:19 298:5
298:13,24
313:9 357:12
359:18 361:5
361:23 362:2
363:12,16,23
369:14,17
370:4,18
371:10,21
372:8,13,21
373:5,12 375:2
375:4 376:3
382:18 390:8
395:1,19,22

396:1,2 397:3
398:6,11,14
399:22,23,23
400:9,18,20,23
401:1,19,24
402:8,11,14,21
403:4,14 404:1
404:6 413:17
413:21 415:16
422:11 425:9
426:7,24 427:3
427:7 428:5,22
429:5,19 430:9
430:12 431:6,6
433:9 439:11
439:14,15
440:1,11
441:12 447:1
449:4 450:6,14
450:16 451:4
452:16 453:24
454:4 461:12
461:15,19
462:8 463:2
476:11,12
477:15
**percentage** 69:14
261:4 262:15
263:5,7 265:13
273:19 352:22
355:18 369:14
395:2,18
400:18 437:14
440:10 450:24
453:12,15
**percipient** 235:7
**perfect** 205:18
403:6,13,15,22
415:17 427:15
428:5
**perfectly** 210:7
472:16
**period** 8:7 9:4
10:18 11:10
17:21 21:5
22:22 28:4



79:15,23 80:22
81:1 82:16 94:4
101:17 102:12
114:8 115:20
118:5 119:14
120:4 121:12
132:9 134:5
145:6,19 156:8
214:17 216:11
231:12 291:1
297:19 298:19
301:16,24
302:5,16 303:6
306:12,16
314:7 321:20
330:20 376:16
376:18 432:20
434:7 436:15
439:24 440:4
455:1
**periods** 216:24
**perjury** 26:4,17
31:10 42:7
43:15 44:12,24
142:9 240:11
243:12
**permitted** 270:7
**Perry** 316:20,21
317:8,10,15
318:14 319:23
**Persing** 40:9
**person** 20:23
33:2 34:5 35:3
35:13 156:24
226:5 319:8
323:9 376:21
**personal** 8:17
20:1 99:5,13,19
99:22 101:1
221:5 234:16
241:17
**personally** 35:10
55:8,17 60:16
60:18,23 61:15
75:19,20 99:21
211:11 221:7

237:15 239:3,5
239:5 246:2
**personnel** 366:15
**persons** 33:8
286:24
**perspective**
82:18,21
426:16
**pertaining**
227:13
**pertains** 374:15
**pertinent** 211:5
263:2
**Peter** 110:16
**ph** 291:9
**Philadelphia**
1:17 2:4,8 12:4
16:22 17:2,12
22:11,17,18
23:5 38:6 74:10
74:12 148:11
148:13,15
149:21 151:22
152:2 154:1,7
162:9 168:18
180:9 217:20
219:18 335:22
336:1,4 337:5
337:16,21
342:11,23
343:2 451:12
**phone** 21:13
183:18 184:22
219:13,15
221:20,21
240:16 245:6
246:8
**photo** 322:8
**physical** 17:7,10
17:23 22:23
23:14,22
148:10,12,14
149:18 150:9
150:22 151:21
152:1 153:17
156:16 157:19

198:8,11 249:1
**physically** 21:15
28:17 29:13
39:5 48:7 143:4
155:19 479:3
479:22
**picked** 324:8
**picture** 322:24
324:8 325:11
325:12
**piece** 462:23
**pile** 88:15
**pipeline** 115:11
**place** 2:3 8:3
17:22 21:12
40:21 42:11
60:10 65:14
79:17 212:14
222:3 285:3,7
286:9,16,23
351:4
**places** 105:9
**plain** 252:19
450:12
**plaintiff** 148:1,20
148:20,24
150:21 168:16
171:1
**Plaintiffs** 1:6 2:5
**plan** 38:19 46:11
48:5 106:1,5
121:6 226:13
226:16 227:18
227:21 228:19
229:11 230:2
277:21 278:2
278:18 279:7
279:15 283:2
283:11 284:21
289:21 290:9
290:17,21
292:13 293:14
293:24 294:10
294:14,23
295:14,18
306:3 457:8

**planning** 330:11
**Plan's** 296:9
**Pleas** 180:10
451:12 452:10
**please** 35:23
93:18 96:15
336:8 349:19
377:11 396:24
410:13 411:2
411:20 416:9
419:18 420:15
421:19 422:16
423:16 425:2
431:15 465:18
481:9
**pledging** 432:7
432:11
**plenty** 477:17
**plug** 470:7
**plus** 205:6
412:24 468:4
**PM** 483:9
**PO** 380:14
**pocket** 433:7
**pockets** 99:15
**point** 49:6,19
56:11 57:16
68:2 96:3,4
100:1 101:21
110:24 114:5
116:17 127:1
130:5 146:19
190:13 213:4
227:8 254:22
261:16 265:3
285:2 361:15
361:21 362:20
362:22 403:6
403:23 424:17
433:4 439:13
442:3 446:11
461:16 466:11
480:19
**pointed** 126:22
372:21
**pointing** 34:9

393:10
**points** 402:5
439:21
**point-and-a-half**
115:3,4
**point-blank** 26:5
**policies** 44:1
**pool** 436:6
**portfolio** 108:6
128:17
**portion** 203:7,8
203:15,16,17
209:23 211:5
251:13 252:5
328:5 348:9
371:8 378:14
394:14 397:1
404:15 434:18
440:8 476:8
477:13
**position** 12:13
16:16 92:10,13
103:20 126:7
173:3 234:19
235:19,20
236:7 355:14
358:8,13,15
**positions** 338:10
**positive** 208:4
**possibilities**
363:9 364:21
**post** 320:10
324:24
**potential** 124:19
210:14 291:20
**potentially**
463:18
**practical** 204:17
373:20 390:23
**practically** 103:8
**practice** 49:11
84:14 104:9
105:15,21
128:5 131:9
133:18 134:16
195:8,14



209:17 342:8
practices 43:24
201:3
practicing
132:17 135:4
precarious
103:20
precedent 48:18
393:10
precise 36:1
51:12 147:18
172:12 402:10
precisely 101:19
precluded 111:3
112:1
preparation
18:19 49:3
72:15
preparations
61:16
prepare 18:15
60:18,22 61:4
61:21,24 62:4,9
62:10 63:2,5,8
63:23 64:9,13
65:3,18 196:9
450:3
prepared 55:7
60:11,13,16
61:18 62:20
65:2,4,6 146:3
146:5 177:22
180:17 273:14
455:20 465:3
prepares 60:20
65:11
preparing 60:24
presence 23:14
40:11 148:11
148:13,15
149:18 150:22
present 2:11
23:22 79:19
211:13
presented 54:18
presently 212:1

presents 457:10
president 11:22
93:16 245:12
329:6,7
presidential 94:4
presidents
329:15
presume 33:9
Pretend 204:19
pretty 28:14 63:1
232:20 424:1
preventing 235:5
prevents 213:21
previously 50:8
51:9 454:20
price 252:10
369:11 372:10
377:16 382:17
432:2
principal 68:8
101:9 108:21
202:4 220:17
223:13 252:8
252:12,15,20
253:1,14
259:24 261:8
266:18,23
267:4 285:3,7
286:9,16,22
422:3,22
principle 133:10
prior 41:15,15
42:12 57:11
62:8 63:7
254:20 255:1
258:14 262:20
262:22 340:4
341:3 392:16
433:1,11
434:13,17
442:6 445:3
471:24
privileged 19:6
130:20 349:9
probably 28:14
65:22 122:19

129:12 260:19
280:7 281:16
284:4 424:2
problem 88:20
139:13,17
145:10 147:13
148:7 153:2,5
168:8 212:22
250:15 281:1
282:3 445:18
problems 146:24
147:4,7,11
148:5 238:10
245:13
procedure 59:11
150:21
procedures 26:11
35:18 57:7
201:3
proceeding 97:18
172:3
proceedings
90:13 93:8
171:10 175:22
177:6
proceeds 255:23
256:13 260:9
process 20:10
25:22 43:7 44:6
55:18,20
198:10 381:16
405:4
processed 30:14
30:18
processing 12:7
12:24 74:18
75:11,18 77:18
81:10 153:21
285:19 309:7
336:1 338:11
342:20 346:20
348:24
produce 198:3
280:23 462:14
produced 83:7
274:4,13,14

276:10 280:5
281:17 356:21
382:3
product 19:21
73:5 88:13,24
132:21 135:8
252:4 259:22
297:9 330:16
331:14 471:22
production 5:15
104:6
products 84:14
91:10 297:21
professional 1:20
336:13 484:14
proficiency 74:24
profile 336:11
338:2,3,7
profit 84:12,16
86:5 209:5
profitability
207:19
profits 83:6
208:3
program 330:10
376:13
prohibits 213:12
project 380:6
394:17 395:20
401:7 414:19
projected 103:8
projects 379:18
413:10
prolonging
439:22
pronounce
109:17
pronouncing
109:13
properly 297:10
properties
241:13
property 153:24
242:3
proportion 53:21
proportionality

175:14
proportionate
57:17 305:20
434:5 459:1
proposed 161:10
provide 75:12
78:4 199:8
200:3,5 278:3
294:5 295:14
365:7 427:1
436:1 458:22
459:11 479:12
provided 50:11
68:4,11 69:12
188:6 198:22
199:5 200:8,11
253:21 259:24
303:20 312:2
331:8 343:13
355:9 356:18
358:23 359:3
360:5 361:1,8
362:16 365:3,6
365:8,19
377:16 379:16
381:5,24 382:9
394:6 396:18
432:19 433:23
438:1,10 445:4
451:8,17
460:21 464:7
464:10,11
474:10
provides 81:11
224:10 293:24
317:6
providing 95:12
95:23 109:2
113:14 257:19
258:10 260:16
278:10 436:17
439:1 450:19
458:21 459:2
477:12
provision 127:6
213:20



proxy 342:19
public 1:21 133:2
133:5,13
484:15
publicly 281:3
296:24
publicly-traded
74:3
published 336:21
pull 136:17
142:13 238:8
250:13,21
251:12 272:16
273:2 279:24
307:18 320:6
336:7 341:23
344:16,18,18
345:18 348:14
367:13 368:17
404:14 442:24
481:9
pulled 470:6
punitive 213:1
216:8
purchase 252:10
254:13 263:3
369:10 372:10
376:2 377:1,16
382:17 383:15
383:17 385:1
385:15 412:19
417:11 421:22
432:2 435:7,9
461:23 477:19
479:12
purchased 98:10
256:2,19 375:1
378:7 381:11
385:7 386:2,16
387:6 393:16
397:15 404:18
417:14 424:3
427:12 432:3
433:18 435:19
435:21 438:18
473:9,14,16

purchasing 58:6
201:14 256:5,7
256:8 259:8,17
373:12 378:21
384:5,6 388:9
395:3,15 398:6
399:12,22
413:2 433:13
435:23 438:12
438:21 442:5
461:12
purport 231:4
purported
361:20
purportedly 29:4
44:15
purpose 94:17
220:18 303:13
303:19
purposes 112:7
121:12 200:16
251:24 256:6
pursuant 1:16
124:21 171:1
232:4,9 234:1
293:6
purview 241:2
put 18:21 26:2
33:16 44:11
56:16,16 98:18
98:23 143:3
150:16 199:13
203:4 234:16
258:23 259:22
261:8 277:1
311:15,18
324:13 418:11
429:11 465:8
476:2
puts 103:19
putting 98:8
206:18 389:2
471:3

_____
Q
_____

QC 474:23

qualifications
102:9
qualified 57:9
question 5:20
34:12 42:16,18
44:11 57:4 58:9
58:17 60:4,15
63:12,14,16,18
63:18 80:10
84:23,24,24
91:20 93:23
94:12,22,24
100:19 104:9
107:11 111:8
112:11 113:4,5
119:7 123:7
127:9,16
129:14 143:22
145:15 151:8
151:10 175:15
176:21 181:22
194:23 195:2
207:16,16
208:12 210:18
210:21 211:1,4
211:18,21
214:4,6,9,15
215:3,9 221:5
227:10,17,19
228:16 229:21
230:14 231:8
231:14 232:4
233:21 234:6
237:9 246:12
246:22 247:7,8
259:7,13 261:2
272:12 275:14
275:21 280:4
281:10 282:2
283:14 284:12
293:17,19,21
294:18 295:10
300:14 301:1,3
301:8,14,22
302:13,18
304:15,17

314:22 339:17
340:17 341:9
349:18 350:1
353:16 364:10
364:14,19
380:20 382:14
390:10 393:18
465:12
questioning
442:18
questions 9:22
43:21 59:23,23
59:24 60:3 94:2
112:13,19
216:22 230:4
232:17 234:13
235:6 239:6
272:3,5 274:17
280:15 283:18
283:22 324:19
325:17 339:3
341:7 352:1
381:1 454:14
454:19 482:19
queue 88:16
quick 177:14
216:15 332:14
quickly 179:18
483:3
quite 44:9

_____
R
_____

R 2:1,2
racketeering
351:22
radio 289:22
raise 351:1
raised 146:18
ran 194:17
244:12
random 194:10
rate 54:17,21
101:10 113:24
114:3,17,19,20
115:2,10,19
169:18 183:4

252:24 253:3,8
253:15,18,21
253:23,24
254:2,8,24
255:4,11,12,15
258:4,13,14
264:13 269:19
273:17,18,23
275:2,8,10
277:1,3,11,15
277:19 278:10
278:15,16
279:6,6 298:12
348:10 353:12
365:23 373:2
394:3 428:21
434:5
rates 113:20
254:19 275:11
278:3,14
296:19 298:4
ratio 52:15
reached 46:2
read 126:7,22
127:5,12
142:10 152:22
174:4 176:18
211:3,6 212:20
213:15 239:17
239:19,22
240:6 245:4,5,5
245:23 266:4
308:4 319:15
346:4 349:15
350:9,11
352:14 376:24
377:3,8 388:15
481:12
reading 254:5,6
352:16 390:4,6
450:12
reads 349:23
real 160:13
177:14 332:13
333:4 334:14
334:16



**realize** 349:17
**really** 9:7 38:3
  95:20 100:8
  126:4,6 142:14
  145:8 173:20
  243:17 245:17
  258:20,21
  259:8 265:4,8
  265:11 268:14
  286:8,11
  308:22 309:8
  319:18 321:24
  322:12,24
  323:1,7 327:13
  327:23 332:23
  334:5,10 345:5
  346:24 347:8
  379:2,5 391:17
  392:8 393:7
  395:6 400:14
  413:19 424:10
  429:6 433:4,19
  437:24 439:14
  439:18 480:12
**realm** 116:14
**reason** 23:2
  35:21 121:2
  231:3 308:13
  308:16 317:15
  323:5 327:22
  332:19 337:3
  341:19 349:6
  353:11 400:7
  433:8 476:5
**reasonable** 46:10
  175:21 428:11
**reassess** 253:2,15
  264:12 348:10
**reassessed**
  253:19 254:9
**reassessing**
  258:13
**rebuying** 435:18
**recall** 50:14 60:7
  64:15,16,19
  283:4 358:2,5

359:6,13 367:8
**receipts** 259:8
  377:18,24
  378:7 379:5
  383:14 385:6
  385:15 386:2,3
  386:5 387:12
  388:1 401:6
  412:19 417:14
  422:7 424:2
  425:16 426:13
  432:8 435:7
  438:17
**receipt's** 256:18
**receivable** 92:15
  101:14 103:22
  106:13 108:9
  201:11,17,19
  201:20 202:12
  202:20 203:1,7
  203:9,16,23
  204:8,10 205:1
  205:6,12,23
  206:21 257:18
  257:21 258:8
  372:1,11 373:7
  376:6,15 377:2
  380:5 382:15
  382:19 387:5
  388:22 392:14
  394:16 396:3
  399:23 401:17
  407:24 408:9
  408:12 412:12
  425:10,11
  433:14 440:23
  453:3 461:17
  479:17 482:2
**receivables** 51:4
  52:12 53:10,18
  54:4,7,11,14,17
  54:23 55:9,11
  55:19 57:16,20
  58:7,8 59:11
  67:11,17,21
  69:24 84:10

87:6,8 89:9,12
89:20 90:4,15
92:23,24 93:6,9
95:16 97:23
98:9,21 103:10
104:3,6 114:22
201:13 206:13
206:14,19
207:24 208:23
209:1,5 220:6
254:13 255:17
255:20,24
256:10 257:6
257:12 258:3,4
260:7,12 264:8
369:18 370:19
371:11,14,18
371:23 372:14
372:19 373:11
373:13 374:8
375:5,16 376:3
376:8 378:13
378:18 379:9
379:10,17
380:15,19
381:11,23
382:4,9,12
383:18,21
387:1,19 388:9
388:13,17,18
389:15,21,22
390:9,11,19
391:1,2 392:9
392:23 393:2
393:15,20,23
394:3 395:4,7
395:11,13
399:11 403:18
408:6 427:3,12
432:22 433:1
433:16,18
435:17,18,21
435:22 436:3,7
438:11 439:23
440:9,15,18,24
441:13 442:2,5

459:3,9,12
461:4,24
463:23 471:13
473:8,13,14,16
474:4,6,12
475:21 476:8
476:11,14,21
477:17,19
478:12 479:5
479:10,13
480:24 481:4,5
**receive** 12:19,22
  252:9 254:15
  257:9 421:24
  479:9,14
**received** 73:3
  93:9 258:8
  268:18 312:8
  376:16 448:22
  466:15 467:21
  468:15 469:20
**receiving** 360:8
  371:19
**Recess** 107:23
  217:7 284:14
  332:16 353:20
  442:23 445:24
  465:15
**Recipient** 299:19
**recipients** 308:21
**recognition**
  119:4,12 120:2
**recognize** 122:16
  123:2 205:22
**recognized** 116:6
  118:6 128:1
  129:17
**recognizing**
  115:8 120:17
**recollection**
  49:18 156:10
  250:1
**recommended**
  258:24
**reconcile** 46:24
  93:6 242:2

**reconciled** 47:20
  198:17,20
  346:22
**reconciliation**
  46:22 47:10
  92:17 184:13
  397:19
**reconciling** 184:6
**reconsider** 126:9
**record** 20:16
  75:22 82:12
  133:2,5,14
  147:18 181:17
  199:18 202:6
  202:10 211:6
  343:9 357:9
  444:7
**recorded** 22:21
  193:13 197:24
  198:20 201:8
  201:10,16,18
  201:23 202:5
  207:14
**records** 43:16
  200:19 208:13
  221:20,21
  246:7,9,19
  247:3 277:5
  446:10
**recourse** 377:3
**recover** 99:1
  106:13 130:5
**recovered** 92:18
  93:4
**Recruiting** 22:4
  164:5,8 224:7
  248:15 309:7
  309:10 310:17
  311:7 321:6
**redo** 366:9
**reduce** 104:5
**reduced** 37:23
**refactoring**
  480:17
**refer** 86:5,8,12
  354:9 355:8



433:20 437:23
**referables** 175:14
**reference** 105:5
    251:8
**referred** 87:13
    254:18 444:18
**referring** 39:2
    40:5 46:2 49:7
    52:15 64:22
    83:4 109:16
    200:22 273:19
    275:5 354:4
    399:13 418:17
    458:18 465:19
    475:14
**refers** 261:15
**reflect** 98:13
    181:1 190:3
    261:9
**reflected** 41:20
    194:21 380:8
    394:14
**reflecting** 198:4
**reflective** 395:23
**reflects** 153:13
    395:21
**refresh** 330:3
**refusing** 77:6,10
    210:24 211:20
    232:7 233:23
    292:11 339:5
**regarding** 8:24
    9:1 21:2,9
    38:19 124:20
    210:15 349:24
**regards** 222:18
    331:4
**Registered** 1:20
    484:14
**regular** 30:13
    72:11 108:10
    215:23 348:9
    383:7,10
    436:11
**regularly** 21:4,8
    30:17 106:16

155:22 254:22
    290:20 291:11
    365:11
**relate** 221:16
**related** 171:10
    175:6 179:6
    230:20 235:1
    286:24 311:23
**relating** 142:15
    303:7 377:21
**relation** 445:6
**relations** 165:5
**relationship**
    111:4 150:16
    163:14 262:5
    265:6 279:19
    308:24 310:11
    311:1 329:12
    406:21
**relative** 255:6
**relevance** 216:12
    216:23 265:21
    433:10
**relevant** 8:7 9:3
    214:16 246:13
    298:19 302:5
    302:15 303:5
    306:12 442:14
**reload** 432:23
    433:22 477:10
    479:8
**reloaded** 392:5
    392:12
**reloading** 393:20
**reloads** 391:23
    435:10
**relying** 465:4
**remaining** 92:9
    474:8
**remake** 262:23
**remarkably**
    141:8
**remedies** 106:12
    171:9 172:15
**remember**
    249:20 312:10

333:10 354:12
    372:21 413:8
    429:8 431:5
    476:7
**remembering**
    162:16
**remit** 258:9
**remitted** 256:13
**remitting** 380:19
**Remote** 1:14
**remotely** 176:15
**removed** 245:12
**renders** 73:5
**renegotiating**
    482:2
**rent** 91:9 204:21
**rental** 204:19,23
    205:17
**rents** 478:18
**rep** 185:9 188:10
**repaid** 259:5
**repay** 256:11
**repayable** 100:3
    100:8 101:2
**repaying** 433:1
**repeat** 364:18
    419:20 420:2
**replace** 190:8
    244:22
**replacing** 473:6
**report** 118:7
    121:3,22
    134:21,22
    207:3
**reported** 118:3
    118:16
**reporter** 1:20,21
    119:6 136:17
    211:3 259:11
    284:4 400:12
    400:14 447:15
    464:22 465:5
    480:12 482:24
    483:6 484:14
    484:14,15,24
**reporting** 108:5

120:20 122:9
    205:5 245:16
**reports** 84:1
    348:1
**represent** 128:21
    152:1 153:14
    166:14 261:5
    298:3,11 315:6
    333:15 370:3
**representation**
    42:14 149:20
    152:16 153:3
    167:8,23 168:3
    297:3,7,16
    300:6 315:7,16
**representations**
    42:19 274:11
    274:16 279:8
    296:23 316:16
**representative**
    26:23 56:16
    70:6 170:15
    185:23 317:23
**representatives**
    309:19
**represented**
    134:4,9 151:20
    165:15 176:17
    211:13 277:14
    452:9
**representing**
    31:9 112:3
    132:8 171:19
    174:13,14,21
    314:16 315:1
    317:16 320:1
    327:19 329:10
    337:4 343:3
**represents**
    277:21 278:2
    329:5 440:1
**reproduction**
    484:22
**reps** 157:3
**repurchasing**
    433:17 473:8

**request** 5:15
    196:13
**requested** 200:14
    413:15
**require** 333:21
**required** 17:11
    50:12 69:7
    105:17 175:22
    190:7 344:5
    386:17
**requirement**
    122:12 150:19
**requirements**
    190:4
**reserve** 175:5
**reserves** 95:15
**residency** 222:4
**resident** 158:23
    159:6 241:21
    242:6
**resides** 287:21
**resolution** 42:2
**Resources** 22:5
    164:6,9 224:7
    309:8,11
    310:17 311:8
    321:6
**respect** 43:3
    124:6 176:13
    187:17 192:20
    219:9 291:20
    302:22
**responded**
    217:17,18
    463:19
**Respondents**
    3:10
**response** 3:9
    135:18
**responses** 276:11
**responsibilities**
    108:13 155:14
    163:13 164:10
    165:2 199:23
**responsibility**
    164:15 178:11



responsible 34:6
120:20 135:20
135:24 136:11
146:7 228:6
248:19 312:5
317:3
responsive
311:13
rest 68:24 103:20
268:6 284:5
restaurant 95:6
96:2,3,4
restructure 14:1
182:20
restructured
64:24
restructuring
39:3 45:14
433:23
result 84:20
161:4,18
208:12
results 430:24
431:2
resume 217:18
resumed 96:21
retained 177:1
386:6
retract 62:7
181:18
return 109:3
277:10
returned 30:14
47:22 189:21
253:2,14
returns 30:21
revenue 54:2
55:24 56:8,13
56:19,22 58:12
59:5 66:21,23
69:8 70:15
71:20 73:7
82:19 83:2,4,22
84:5,9,19 85:7
85:20 86:5,6,9
97:13 103:18

120:17 121:11
203:21 205:7
257:2 365:10
379:12,18
478:21
revenues 52:19
53:12 70:3,7,12
70:18,21,24
72:19 83:7,16
84:3,18 96:20
104:2 429:1
431:7 439:21
476:7,9 478:20
review 25:9
26:12 29:21
44:6 49:2 55:17
66:13 137:5,10
144:15 282:21
356:3,9 416:4
469:1,3 474:24
reviewed 25:14
25:24 26:15,19
35:15 64:12
88:4,7 144:5,5
144:7 168:22
170:12 180:13
195:19 196:11
196:20 287:23
336:20 355:13
358:3,4,6
359:14 390:24
reviewing 67:4
466:12
reviews 43:8
revise 394:18
re-upped 472:3
RICO 9:14
119:21 123:19
right 7:14 9:12
9:14,24 10:3,11
11:11 14:4,23
16:3 17:17
18:10,23 20:17
20:18 22:12
23:10,11 24:9
24:10 25:21

28:7 30:10 34:7
38:13,14,15
40:1,14,15,16
40:21 41:22
45:3,18 48:14
50:8,17 51:18
53:6,12 54:11
54:14,23 55:2
55:13 56:9
58:14,24 59:6
61:6,13 63:4,8
63:19 64:3,7,17
64:20 68:14,18
69:8,20 70:4
73:10 74:21,24
75:6 82:4,11,14
84:3,6,7,11,17
85:8,9,11,12,24
86:3,4,18 87:22
88:17,18,20
89:9 90:6 93:1
98:10 99:16
100:4,20 101:3
101:23 102:5
104:12,24
105:6,10,18,20
106:7,8,11
107:17,18
110:20,21
113:7 115:1,5
115:21 117:7
117:12,22
119:24 120:21
121:6,15 123:4
123:13 124:10
126:10 129:12
131:19,24
132:3,6,10,10
132:17 136:6,9
136:21 138:5
138:21,22,23
139:9,13 142:9
142:16,18
143:6,19,24
144:11,14,23
145:8 148:21

148:22 152:9
156:18,19
157:7,8 158:1
158:17 159:5
159:14 160:19
161:15,20
163:10 165:10
165:20,23
166:11 168:12
169:11 171:19
171:21 173:24
174:1,2,6,8,11
174:12,22
177:9,12,23
178:3,5,9,19,23
179:3,8,9,23,24
180:11,11,14
180:18,24
181:6,9 182:21
183:24 184:1
184:24 185:1
186:13 188:6
188:15 189:11
189:24 192:11
192:14 193:1
194:5 195:20
196:3 197:23
202:9 204:5,23
205:1 206:6
208:5,24
209:24 214:4
216:14 219:14
219:19 220:19
221:1,3,6,10,22
221:24 222:4,7
222:8,16,22
223:2,8,9 224:9
225:21 226:11
227:7,24 229:4
229:22 234:8
234:17 237:18
238:8 240:3,18
240:20,21,24
240:24 241:22
242:19,20
243:12,13,22

244:4,17 245:2
245:24 246:10
249:11,14,17
249:18 251:13
252:10,12,16
252:20,21,22
253:3 256:15
257:24 260:19
260:24 262:8
262:13 263:13
263:14,15,16
263:19,24
264:9 266:1,18
266:20 267:2,2
267:3,5 268:3,4
268:15,19,20
268:24 269:1,2
269:7,8,11,21
270:2,8,12,15
270:19,23
271:3,5,8,10
272:14 273:24
274:9 276:22
276:23 277:4,7
279:9 282:1,6
282:14,17
284:18,21
285:6,8,9
286:11,20
287:1,13,16,19
287:22,24
288:4,24 289:8
289:9,19,24
290:9,13,17
292:2,15,22
294:11,15
295:12,18,19
296:2 299:11
303:22 304:1
305:13 306:3
306:17 307:16
307:17 308:11
308:12 309:9
310:3,7,18
312:9,23 313:1
313:7,16



314:20,23
315:5,7,10,16
315:19,22,24
316:7,9,12,13
317:5,9,12,13
318:4,8,9,11
319:9,14 320:2
321:7,14 322:1
323:13,16,21
325:8,12
326:20,21
327:13 328:3
328:12,23
329:6,19,21
330:21 331:10
332:4,10,11,12
332:18 333:5
334:3,6,10,15
334:21 335:19
336:4,21,24
337:1,24 338:2
338:16,19
341:14,22
342:4,23 343:8
343:13,16,24
344:3,6,13,24
345:3,5,12,15
346:13 349:3
349:11 352:13
353:5,9,17
357:13,22,24
360:15,19,20
360:21 361:5
361:17 362:7
362:20,23
363:1 366:23
367:3,20,21
368:5,10,10,13
368:24 369:19
369:24 370:4,5
370:8,20 371:4
371:6,12
373:16,17
374:12,21,22
375:2,6,8,13,23
378:13,18,19

378:22 379:12
380:2 381:14
381:18 382:7
382:16 383:4
383:15 384:13
384:19,21,24
385:2,8,21
386:5,13 387:6
387:10,18
388:4,14,17,23
389:15,18,21
393:1 394:4,24
395:6,12,13,15
396:8,12,19
397:5,7,12,15
398:2,8,11,15
398:19 399:3
399:17,18
400:1,12,19,24
402:1,7,16
404:2,19 405:1
405:2,24 406:4
406:9 407:12
407:15 408:13
408:16,23
409:6,22 410:9
410:10,15,17
411:10,17
412:6,17,18,21
412:22 414:8
414:14,20
415:2,10,13,14
415:19,20
417:9,10,17,18
417:20 418:1
419:6,14 420:3
420:10,11,24
420:24 421:3,8
421:13,15,17
422:4,8,20
423:14,18,20
424:8,15,22
425:17 426:8
426:14 427:14
427:17 428:8
429:21,22,24

430:4,12,13,14
431:2,3,4,7,11
431:12,18,19
431:21,23
432:4,5,8
434:15 435:8
435:10,19
437:15,20
438:17 439:5
440:5,11,13,20
441:4,9,15,16
442:16,22
443:21 445:10
446:16,19,22
447:1,8,24
448:1 449:13
449:21 450:10
450:16 451:15
451:20,23,24
452:4,12,16
453:12,13,16
453:17,20,24
454:4,17,21
455:10 456:5,7
456:11,15
457:3 458:11
459:8,23,23
460:12 462:8,9
462:22 463:7
463:24 464:6
464:11,18,22
465:17 466:10
466:11 467:8
467:11,16,18
468:5 471:15
473:24 474:11
475:10,12,24
476:22 477:4,5
478:13 479:19
479:19,20,21
480:2,6,24
482:13
**rights** 377:19
438:23
**ring** 110:18
131:21,23

132:7 133:16
**risk** 10:16 125:23
236:1 434:9
436:18
**road** 401:8 467:4
**role** 160:15 229:7
339:14,24
**Rollins** 328:16
**Ron** 160:11,14
162:22,23
163:1 334:9,11
**room** 40:7,10,12
**ROTHSCHILD**
2:7
**rough** 413:22
439:18
**roughly** 157:13
404:1,3,6
405:15,21
406:9 407:5
410:3,8 411:16
412:21 413:12
414:19 415:14
415:18 419:14
424:21,23
430:11 441:17
449:3
**routine** 21:9
26:11 122:8,15
382:24
**routinely** 62:11
62:14,17
418:10
**RPR** 484:13
**RTR** 98:14
102:19 103:8
412:19
**Rule** 288:13,17
**rules** 63:21
150:20
**run** 72:10 160:5
224:1,6,8 331:5
**running** 205:14
205:15 206:10
**runs** 160:1
243:21,24

**S**

**S** 1:19 2:1 3:7
484:13
**sake** 85:18 123:4
397:18
**salary** 478:21
**sale** 54:11 89:8
96:3,4 220:5
377:2 435:7,9
**sales** 21:17 22:2,3
84:20 155:11
157:2 159:13
159:17,18
164:2,23 165:4
185:13,23
243:6,23 244:2
248:14,23
249:3 290:8
295:14,16
320:15,19
321:2,8,12,14
321:15,18
325:4,23
326:19 327:16
327:20,24
329:13
**salesperson**
292:3
**salespersons**
292:3
**salon** 244:24
**sample** 465:20
466:1
**Sanchez's** 231:13
**sanction** 10:17
249:22
**sanctioned**
249:10
**sanctions** 10:10
10:20 78:10
94:11 236:10
236:16 237:22
**Sarasota** 230:16
230:18 231:24
**Sartain** 287:18



**satisfied** 203:6
468:10
**satisfy** 256:14
**satisfying** 72:12
**saw** 40:11 66:21
207:2
**saying** 37:19 40:8
46:19,23 49:8
52:18 59:10
65:15 94:21
103:8 111:15
112:12 122:18
131:13 139:6
155:21,23
196:6 202:19
207:23 212:5
222:17 255:14
260:8 262:14
264:4 278:8
306:19 313:8
351:2 358:21
360:11 361:3
361:24 362:1
363:15 366:7
372:17 373:20
375:14 381:5
384:7 386:23
387:1,11,16
389:3 390:5
393:19 395:19
397:23 402:3
408:17 427:19
442:4 454:10
455:18 456:4
456:17,20
458:5 460:11
462:3,11,24
463:8 471:2
479:11
**says** 63:1,11,11
93:17 104:22
106:20 112:16
124:16 148:19
168:15 169:16
170:21 177:17
187:23 210:12

225:17 232:14
232:15 241:24
242:10 244:11
244:20 252:19
253:1,13 285:2
286:9,24 288:2
288:8,12
289:11 292:2
295:17 302:21
308:14,17
313:12,18
320:10,14
323:24 324:3
326:15,18
328:11 345:2
345:10 349:21
352:11,20
354:11 355:1
360:3 369:8
372:12 373:12
373:17 374:12
374:14 375:23
378:16 379:3
388:12 389:16
389:20 390:7
395:1,3,14
432:13 437:13
446:21 448:11
450:9 453:7
457:10,14
459:6
**scam** 153:23
154:8,9
**scary** 272:2
**scenario** 97:14
98:5
**schedule** 50:11
50:19 51:4
59:20 105:16
172:14,18
186:20 187:3
190:2 196:11
372:1 381:7
382:9 391:2
433:21 437:1,5
437:24 443:10

444:17,22
448:10 449:16
450:3,18,23
451:7,14,23
452:4,8 453:5
455:8,9 456:4,6
457:10 458:12
458:16,17
460:1,12,20
461:2,7 462:15
464:3,11,13,16
465:1 466:6
469:22 472:14
**scheduled** 466:2
**schedules** 403:19
469:7
**scope** 27:4 34:20
43:20 75:11
78:18 80:2
118:11 124:9
226:19,24
227:9 229:14
231:11 234:8
283:21 394:17
440:17 441:1
**scratch** 262:24
**screen** 140:9,24
145:1
**scroll** 138:1
179:15 240:1
273:6
**search** 277:5
311:6,12
**SEC** 3:15 282:14
284:23 285:21
285:24 300:7
305:7 327:1,21
**second** 33:1
188:17 238:23
272:23 273:4
280:3 308:1,7,8
315:14 337:10
350:7,10 351:6
353:17 436:24
465:10 475:9
477:8 481:12

481:13
**section** 124:21
127:12 293:6
**sects** 139:24
**secure** 254:14
**secured** 124:19
210:14 291:20
**securities** 282:19
283:3,5,6
288:23 300:8
303:13 305:3
**security** 256:3
257:23 259:16
259:21
**see** 28:12 39:22
59:3 86:22
94:19 96:20
97:22 98:3
103:10,14
111:2 136:19
137:2 138:5
139:23 140:1
140:19,20
141:6 142:14
142:17 146:24
147:4,14,20
148:2 166:3
168:8,20
169:21 170:3
171:3 172:18
174:17 177:18
177:20 178:2
178:18 179:14
180:6 182:14
188:21 189:16
191:22,24
203:20 213:11
217:16 238:9
244:16 253:16
254:4 264:23
273:4,8,16,18
273:22 274:6
275:1,4,6
276:21 280:9
283:19 285:5
285:13 286:16

288:5,14
290:10 300:10
308:2,9 316:6
320:12,16,21
325:6 326:1
328:4,6 337:17
344:17 346:14
352:8,9,24
356:20 357:9,9
369:15 375:10
382:3 389:11
396:14 401:10
403:18 404:9
424:14 432:13
447:20 448:9
448:10 451:23
452:3 455:4
458:7,23 467:5
467:24
**seeing** 239:1
403:17 458:20
**seek** 99:5 106:11
161:17
**seen** 198:7
238:15 273:10
273:12 296:8
296:12 307:21
320:8 322:17
325:1 330:6
342:1 344:21
345:23 348:17
369:1 443:5
452:8,12 464:4
464:5
**sell** 84:21 85:5
99:15
**seller** 377:2,12,17
377:22 387:23
**seller's** 379:4
**seller/merchant**
378:8
**selling** 387:17,17
393:12,22
**sells** 377:13
378:17 379:3
387:24



MAGNA
LEGAL SERVICES

semantics 85:18
send 203:10
    310:22 367:23
sending 60:7
    122:4,6 209:10
sense 104:3 106:1
    144:12 204:17
    330:18 386:18
    393:11 396:4
    428:16 440:6
    476:13 477:21
sent 55:7 59:18
    59:20 60:10
    64:14 118:8
    203:17 249:21
    258:10 314:15
    331:18 332:3
    332:10 368:19
    443:1 468:1,2
    481:10
sentence 377:4
separate 157:4
    209:9 425:18
    441:10,11,23
separately
    341:13
September
    194:12 195:23
series 118:21
serve 150:3
served 133:23
    337:13
serves 321:9
    327:16
service 82:10
    105:22 130:1
    285:23 319:11
    345:7 357:4
    358:23 438:3
services 1:23
    73:5 74:19
    75:12 81:11
    84:15 148:14
servicing 148:13
    150:11,16
    152:3,8 153:13

169:4,6,7
serving 16:14
set 79:23 96:14
    102:15 231:12
    291:19 447:17
setting 243:14
seven 357:12
    359:18 416:14
    461:6
SGNA 86:10
    478:17
shake 237:12,17
sham 58:5
shams 58:16
Shane 2:2 59:23
    94:1 97:11
    111:24 143:16
    145:21 166:1
    176:18 236:8
    325:16 351:16
    353:14,14,15
    353:15 401:21
    444:8 449:7
    454:12 465:7
    478:2 480:15
Shane@Parfu...
    318:8
share 108:23
    276:5,15
    464:20
shared 111:13
    126:17 156:18
shares 124:18
    210:13
sharing 250:17
    250:22
sheet 41:21 205:5
    206:11 207:7
    209:7,15
    210:20
sheets 199:9
    208:3
She'd 271:8
Shlepin 33:5
short 100:1
shorter 275:12

376:16
shortly 442:20
show 3:10 44:13
    125:16 182:6
    182:10 186:14
    196:14 208:2
    213:20 246:9
    396:10 431:8
    443:8,13
showed 355:4,23
    371:21 380:13
showing 197:21
    356:22
shows 460:17
shut 93:18 96:4
    96:24 98:1
shutdown 93:16
    96:9
sic 50:23 280:5
side 237:18,19
    240:18 243:23
    244:13
sideways 470:6
    471:21
side-by-side
    316:5
sign 27:11 28:17
    38:24 39:11
    60:20 138:9,11
    142:19 226:7,8
    226:9 282:19
signatory 25:8
signature 26:17
    27:10,12,20
    134:8 138:12
    138:15 139:2
    139:11 140:1
    142:7 178:22
    250:6,8
signatures 27:24
    139:22 141:23
    144:10,16
    145:6,13 179:2
signed 25:1,11
    27:19 28:5,8
    29:4,4,12,13

43:14 55:6
    57:10,22 66:16
    138:6 141:12
    142:22 143:4
    144:21 250:10
    282:16,22
    283:1 284:18
    327:2 342:4
    449:15 451:8
    474:16
significant 30:23
signing 29:17
Signor 142:11
silo 376:4
similar 141:8
    179:4 205:9
    252:3 255:8
    432:23 458:14
simple 476:18
simply 228:20
single 47:24
    181:16 226:5
    373:23 396:6
    402:9 403:10
    416:2 478:15
Sir 329:17
    353:22
sister 12:1
sit 21:15 24:5
    34:4 49:5 55:22
    176:5 214:12
    297:18 359:9
    359:16
sits 21:16,18 24:7
    457:9
sitting 38:17 51:7
    440:24
situation 129:13
situations 102:1
six 101:12 236:17
    355:5 357:12
size 288:2
skewed 447:3
skip 416:11
    417:21
slow 104:2

small 30:20
    116:16,19
    161:4 192:17
    194:11 330:14
    477:13
smart 389:9
solar 338:21,23
    339:15 340:1
    341:3
sold 83:9 264:8
    378:12 393:21
    425:16
sole 109:6 158:5
    220:18 224:23
    240:21 241:1
    248:18 303:13
solely 49:15
    235:1
Solutions 1:8 4:2
    74:13 77:13
    124:18 149:17
    150:7 152:8
    153:10 168:16
    169:5 242:21
    285:11 286:18
    337:14
solvency 213:22
solvent 210:3
    211:14 212:1
    212:11 213:13
    214:2,12,19
    215:5,7,16
somewheres
    47:11 388:15
sorry 12:20,22
    19:10 21:18
    91:12 119:6
    166:4 177:15
    238:24 244:8
    259:11 307:12
    349:17 445:17
sort 37:24 45:12
    83:3,11 89:15
    92:17 96:19
    108:21 117:24
    196:15


MAGNA
LEGAL SERVICES

sorts 478:18
sound 56:9
sounds 50:16
  51:21 56:7
  65:10 267:18
  418:17
source 335:11,12
  335:15 360:22
  360:24 387:5
space 156:15,18
span 359:11,19
  361:23 362:2
speak 20:12,15
  20:24 72:14
  218:7 347:9
speaking 80:5,8
specific 34:9
  48:23 49:7,22
  50:4 67:4 79:23
  82:22 91:20
  124:23,24
  125:2,4,8
  128:14 171:8
  187:18 191:11
  192:8 227:12
  228:10 229:18
  230:5,10 231:8
  231:9 257:6
  260:7 261:15
  291:22,23
  292:24 293:1,8
  293:9,11 354:6
  359:2,7,13
  362:21 366:3
  366:24 371:22
  372:19 375:15
  382:4 384:6
  386:10 397:20
  424:7,10
  425:20 426:3
  443:9
specifically 33:21
  34:23 35:2 46:1
  47:21 61:20
  64:22 70:10
  87:13 103:2

124:13 128:2
134:3 172:11
176:10 219:8
227:13 235:1
248:16 257:17
292:19 299:11
357:6 381:6
382:5,12
446:15 450:1
466:8 476:5
specificity 227:2
specified 261:3
  262:15 263:5,6
  265:13 344:3
  369:13 377:17
  383:23 395:2,8
  395:17 400:18
  402:22 429:19
  437:8,9 440:12
  462:7
Spectrum 6:19
  6:21 7:2,8,13
  7:17 8:3 9:6
  11:9 12:6,12,15
  12:24 13:9,11
  14:3 15:8,16,19
  15:20 16:2,15
  20:8 21:22 22:1
  24:9 33:9,13
  75:17 77:18
  81:10 148:21
  150:4 153:21
  160:19,23,24
  162:1,18
  163:15,22
  224:8,9 233:8
  309:7 337:7
  338:11 345:7
  348:24
Spectrum's 9:2
spell 32:19 33:6
spend 81:17
  155:19
spending 176:15
spent 481:18
spirit 330:15

376:22
spoke 21:1
  217:14 219:5
spread 434:8
spreadsheet 3:14
  443:17
square 156:23
staff 20:7 134:1
  159:13,17
  438:9
stake 108:21
stamp 280:9
stamped 280:14
  280:16
stand 26:3 143:3
  337:24
standard 206:3
  209:17
standpoint
  243:19 390:23
stands 292:9
start 35:21 46:15
  97:4 194:10
  284:22 388:6
  400:17 474:22
started 244:23
  367:2 453:19
state 17:24 54:10
  93:15 95:5
  103:2 159:3
  270:2,5 271:9
  343:9 387:23
stated 254:2
  352:7 379:24
  462:6
statement 53:22
  60:5 84:23
  126:20 169:2
  170:10,16
  181:19 209:8
  241:7 242:15
  242:24 243:8
  245:1,14,18
  248:6,12
  277:23,23,24
  278:4,5 285:16

296:20 298:16
298:19 299:15
313:23 314:12
321:13 324:14
328:21 331:16
337:23 342:13
351:8 352:9
356:11,12,12
357:14,15,18
400:11 428:1
477:14
statements
  142:12 180:11
  196:14 198:4
  199:7,11 200:5
  200:8 320:24
  351:11,20
  354:8 356:17
  356:22 357:1,7
  357:8,22,24
  358:1 362:23
  362:24 363:4,7
  426:18 431:7,8
states 1:1 113:15
  248:16 314:8
  344:2 432:1
static 379:12
status 37:12 43:8
  96:21 249:7
stave 37:12
stay 40:2 249:11
steady 101:10
stenographic
  484:8
stenographically
  1:15
sticking 400:7
Stipulations 5:17
stock 84:5 321:23
  322:8 325:13
stop 34:18 93:18
  117:11 123:18
  247:4,4 250:17
stopped 118:17
  119:17 121:16
  137:18 194:4

330:23
story 90:6 255:22
  350:14 438:1
straight 11:9
  43:12 157:6
straightforward
  366:10
strange 193:4,8
Street 1:17 2:3,8
  6:24 7:5 21:17
  21:20,21 24:6
  149:6 153:11
  168:18 169:11
  285:12 286:4
  286:11,18
  287:18 342:18
  343:4
strict 58:10
strike 15:11
string 3:16,20,22
strong 376:10
structurally
  436:12
structure 88:24
  89:3 255:8
  258:21 266:3
  300:21 432:17
  433:8 437:17
  461:10 462:15
  471:18 472:24
  474:16
structured
  271:22,23
  430:3 448:7
  451:1 463:5
subject 45:8
  142:12,13
sublease 7:17
submitted 25:23
  245:19 380:14
subpoena 199:13
  246:7,8,18
  247:2
subpoenaed
  221:19
subsequent 41:24



118:5 119:13
121:12 187:14
187:15 190:10
245:10 472:15
473:5 474:13
479:4 480:9
481:5
**subsequently**
22:24 74:18
183:17 337:21
479:6
**sudden** 194:11
**suddenly** 129:23
**sue** 123:18
**sued** 121:16
137:22
**suit** 119:1
**suite** 2:3 156:11
**sum** 467:12
**superior** 32:14
**superiors** 32:11
**supervision**
484:24
**support** 5:2 25:2
57:21 264:24
361:4 396:12
415:4
**supporting** 419:5
437:4 452:20
**supports** 271:13
361:9,16
**suppose** 184:8
**supposed** 44:6,10
53:9 254:8
258:16 299:7
370:2 380:16
389:6 440:12
459:7 460:7
**supposedly** 49:20
382:18 415:4
**sure** 7:22 9:8
18:11 19:13
20:20 22:22
23:2 25:5,6,19
26:9,21,22,24
27:6 29:14,15

29:19,23,24
31:16,18,19,20
39:1,6,7 43:11
48:23 51:11
56:10,14 57:6
59:7,14 63:2
69:22 75:10
85:14 91:21
103:12,16
108:4 117:8
133:9 139:4,5
139:14 141:11
141:15,18,21
143:7,8,12
145:9 159:4
171:16 172:11
173:24 181:17
182:1 188:8
191:11 198:6
198:14,19
203:14 206:5,5
212:22 222:11
225:6,24
232:20 243:20
249:9 268:10
272:19 273:3
276:7,17,18
278:7 283:10
297:17 312:7
313:24 324:10
330:16 331:15
346:24 353:18
366:14 384:14
396:16 404:8
418:16,19,21
418:24 419:3,7
423:13 424:23
427:10 452:13
465:11 480:9
**surprise** 459:14
**sustain** 48:8
97:16 463:21
**sustaining** 54:4
**switch** 8:2
**sworn** 6:2 145:23
180:11 247:12

484:6
**system** 374:18
**S-H-L-E-P-I-N**
33:7

---
**T**

**T** 3:7 6:5
**tactics** 161:15
**tailored** 403:9
**take** 21:12
107:18,21
132:15 139:22
166:2,8 198:19
205:3 209:19
216:15 225:18
235:24 250:17
250:19 263:10
284:3,7 287:21
332:13 353:16
367:22 392:6
392:19 394:16
403:21 408:2
426:17 427:20
438:14 440:14
442:19 476:19
481:24
**taken** 1:15 262:2
434:6
**takes** 102:2
478:20
**talk** 91:6 94:15
114:7 125:17
146:16 212:19
227:1 242:9
292:24 299:7
380:22 404:12
**talked** 146:14
181:1 192:16
241:9 251:6
315:2 336:2
**talking** 21:9 42:4
43:22 50:19
54:6,7,20,21
56:22 58:2
64:23 75:20
91:4 114:14

135:16 176:12
176:13 190:12
190:22,23
200:22 201:1
202:14 222:13
228:10 229:17
230:10 246:20
268:20 309:19
338:2 339:24
340:8 350:5,6
373:24 380:23
381:9 388:24
389:1 391:21
391:24 400:15
405:3 411:15
414:18 433:15
443:24 446:12
466:5 469:10
475:16
**talks** 291:18,21
338:10
**tally** 263:11
**tax** 23:8 159:3
200:12,15
209:19
**taxes** 16:22 17:12
22:12,17,18
83:11 86:14
122:21,22
153:24,24
154:5,6 241:14
241:17 342:23
**team** 50:1 65:11
130:2 186:16
365:12 448:23
**TECH** 140:8,13
140:16 141:4
179:20 250:16
250:22 272:18
272:22 273:3
280:2 367:15
367:21 368:1,4
368:18 377:7
420:1 444:4
446:3
**technical** 115:16

**technically**
109:10 167:18
**technician** 2:12
447:16 457:24
481:9
**tell** 44:18 45:24
73:14 80:19
103:6 113:10
113:16,19,22
114:2 115:13
116:12,23
119:22 124:8
126:9 131:3
141:10 143:5
210:2 214:10
229:10 236:8
280:21 349:20
350:12,12
362:11,13
363:8 364:1
377:4 474:2
482:6
**telling** 12:11
64:19 114:18
114:24 125:6
129:15 210:9
228:6 317:4,4
339:7 384:5
386:9 401:21
454:2,7,9
456:13 457:1
462:22
**tells** 61:3,20
**templates** 262:21
**ten** 76:12,13,14
77:4 240:15
402:5 403:6,22
406:24 424:17
439:21 442:19
461:16 467:16
478:4
**tense** 233:10
**term** 87:13 88:1
102:15,22,23
103:2,24
104:12,16



105:5 252:22
252:23 253:9
255:5 289:15
**terminated**
135:10,13,19
233:11,14,16
233:19
**terms** 37:16
58:10 69:11
85:22 102:14
104:5 255:13
259:21 263:2
265:8 367:5
**testified** 6:3
40:17 121:2
142:7 148:9
240:15 241:18
245:22 247:11
329:18 350:22
353:8,22
399:21 429:8
**testify** 26:3 33:17
66:19 87:20
**testifying** 38:17
112:3
**testimony** 3:3
37:1,4 40:13
41:1 42:9 49:15
49:16 51:6 62:8
63:7 66:11
67:12 82:17
111:18,19
172:20 186:3
197:4,9,12
239:23 247:12
247:20,23
248:2 324:9
340:5 346:3
348:12 351:3
352:6 366:12
395:4 465:4
484:9
**Texas** 304:21
**text** 221:12
**thank** 6:9 11:1
78:23 101:21

101:22 138:19
215:19 217:5
236:23 244:8
272:8,14 420:4
482:14,16,22
483:6
**thankfully**
212:15
**thanks** 236:23
353:19 447:17
**theoretically**
207:22 208:1
**they'd** 196:14
**thing** 13:4 34:9
73:8 82:19
97:17 111:16
112:4 122:8
144:6,8 329:11
338:5 342:9
399:3 405:12
405:20 406:7
406:11 407:6
407:10 409:13
410:15,20
411:4,22
420:17,19,24
421:6 422:18
423:18 443:16
**things** 94:3,6
209:9 271:22
393:3 402:24
**think** 20:22
51:23 97:10
99:24 111:17
111:18 126:8
126:11 127:22
139:15 140:8
140:16 145:16
149:11 151:24
153:4,6 162:17
166:11 192:9
195:5,16,18,22
196:3 209:6
216:19 227:17
229:13 249:24
261:19,24

266:13 281:20
281:21 285:21
315:2 319:21
322:7,9 323:1,7
324:22 325:10
342:12 354:19
368:9,15,22
379:6 390:18
391:13,14,15
400:6
**thinking** 20:23
362:12
**thinks** 459:16
**third** 149:24
156:12 285:23
315:23 377:23
**third-party**
159:17 177:1
**thought** 144:2
146:6 241:9
253:6 321:5
359:21 460:6
**thousand** 249:16
**thousands** 43:13
44:13 128:18
**threaten** 237:7
**threatened** 39:10
126:1 236:15
**threatening**
126:3 236:14
237:17
**threats** 79:7,10
237:14
**three** 22:1 36:18
179:1 189:20
193:4 315:2,21
327:9 364:23
402:24 410:2,3
411:16,23
426:18 427:4
428:7
**threshold** 274:17
**throw** 91:11
**tidy** 427:6
**tie** 402:2
**tied** 382:15

429:20
**time** 7:23 8:7 9:3
11:10 15:10
17:2,21 21:5
28:4 32:15
56:12 68:2
72:12 74:2
78:14 79:5,15
79:23 80:21
81:1,8 82:6,16
94:4 95:16
97:24 101:6,18
101:19 102:12
102:19 114:6,8
114:21 119:3
120:8 126:2
130:6 132:9
134:5,15
141:20 145:5
145:19 149:24
154:21 155:7
156:8 157:11
177:5 181:2
191:19,23
197:24 214:16
216:11,24
217:1,11 218:1
218:2,10
231:11 234:13
235:18 237:11
244:23 245:8
255:6,8 260:14
264:6 266:6
267:24 268:16
268:17 275:12
284:8 291:1
297:19 298:17
298:19 301:16
301:24 302:5
302:15 303:5
305:10 306:6
306:10,16
314:7 338:4
346:21 356:19
366:1,2,8,11
370:21 376:16

376:18 378:6
396:10 403:20
408:2,8 432:21
432:24 434:7
436:16 439:24
440:4,17 441:1
460:8,10 461:8
466:22 470:21
480:13,19
482:15
**timeframe** 207:8
218:23
**times** 6:11 21:1,7
40:10 53:3
126:1 127:11
151:10,18
156:2,3 183:18
236:16 241:10
296:14 357:13
359:18 364:9
364:24 365:20
365:22,24
366:6,16,18
387:18,20
388:3 392:21
401:19 402:21
410:2 411:16
472:19
**today** 14:21
24:16 34:5
38:17 49:3,6
51:7 55:22
72:16 128:7,24
148:9 214:13
236:17 251:6
297:18 299:3,5
336:3 337:24
359:9,16
452:12
**told** 94:23 117:16
124:14 125:13
167:6 297:20
350:13,15,16
463:9
**top** 86:6 274:6
275:4 323:24



342:15 429:12
439:8 457:17
457:22,24
458:1 467:7,11
**topic** 18:15,20,22
34:15 44:1
56:21 196:9
**topics** 80:3
**Tori** 32:15,17
66:6,8
**total** 183:22
184:17 185:3
205:6 332:7
371:13 372:4
409:16 412:19
415:2 422:7,9
428:1 467:14
468:1 469:15
**totally** 67:10
269:5 377:5
417:16
**totals** 408:15
**TourMappers**
94:14
**track** 108:6
215:24
**tracking** 246:5
**tranche** 462:19
**tranches** 407:22
461:22
**transacted** 379:9
**transaction** 21:2
21:5 68:21
104:1 109:5
184:18 187:15
206:12 209:23
251:23 252:6
253:12 254:12
255:3 258:2,7
259:4 260:6
261:10 262:1
266:15 348:8
348:11 361:11
362:9 366:21
376:5,23
390:24 392:20

396:15 398:3
410:11 416:1
429:3 435:11
436:23 448:7
450:20 452:24
461:22 467:4
472:12 474:5
477:10 479:7
**transactions**
20:11 30:24
45:14 46:9
47:23 49:12
53:20 56:17
57:10,12 68:12
186:7 187:14
248:21 254:20
255:1 330:17
331:24 379:15
379:22 382:6
397:17 406:13
418:10,12
426:20 433:11
442:8 456:22
457:7
**transcript** 32:8
62:24 63:10
357:17 483:2
484:8,21
**transfer** 364:5
378:3 388:1
**transfers** 377:13
378:17 379:4
384:1
**transparent**
437:6
**transpired** 19:15
350:17
**traveled** 38:5
**treading** 449:6
**treasurer** 11:22
24:4
**treat** 208:22
433:21
**treated** 83:22
390:14
**treating** 208:20

392:4
**treatment** 205:18
208:10
**trial** 2:12 66:18
140:8,13,16
141:4 143:3
179:20 250:16
250:22 272:18
272:22 273:3
280:2 367:15
367:21 368:1,4
368:18 377:7
396:11 420:1
444:4 446:3
**tricky** 431:17
**tried** 161:17
**triple** 391:13
**trouble** 143:10
271:5
**troubles** 143:14
192:1
**true** 27:1 61:6,22
83:13 170:10
241:6,6 244:18
246:16,17,24
247:1,7 248:22
266:15 274:17
277:22 278:4
283:16 287:6
288:16 296:20
298:15,18
299:14 300:12
313:22 314:11
324:11 327:12
328:14 337:19
341:2 343:19
345:5 352:5
443:19 451:13
451:19 462:24
468:14 470:5
471:5 484:7
**trued** 48:2 471:1
**truly** 121:14
123:2
**trust** 109:9,11,20
109:24 110:2,4

110:5,7 158:9
158:12,15,17
199:8
**truth** 309:23
**truthful** 123:10
170:18 240:9
242:14,23
243:8 245:1
248:3,12
320:23 321:12
328:21 342:13
**try** 94:6 161:7
368:2,21
416:12,13
463:16 476:17
**trying** 45:17 51:2
85:2,14 118:21
179:20 207:13
322:4 362:10
375:16 376:2
380:24 381:1
386:21 392:10
397:24 400:5
400:10 401:4
402:2 403:21
441:20 459:15
472:1 482:6
**Tuesday** 1:12
**tune** 427:3
**turn** 224:12
330:2 471:14
**turnaround**
376:14
**turns** 380:16
**twice** 29:16
142:22 341:20
393:23
**Twitter** 329:4,4
329:10
**two** 7:3 29:18
36:15 77:19
101:13 102:3
108:18,20
132:11 133:22
141:23 209:8
242:2 262:4

264:13 298:24
315:19 374:22
374:24 382:20
384:12 385:24
386:14 409:4
441:8 460:6
467:14 475:8
**type** 100:10,16
382:10
**typical** 275:7
**typically** 31:21
342:6 360:9

---

**U**

**UCC** 98:12
331:18 332:3
332:10
**Uh-huh** 114:13
191:2 288:10
**ultimate** 225:14
225:20 226:3
**unable** 97:16
191:22
**unbeknownst**
380:18
**underneath**
180:18
**underpaid** 402:6
**underperformi...**
121:11
**undersigned**
147:17
**understand** 9:13
9:19 10:2 19:11
34:23 40:19
44:10 45:16
48:3 57:24 58:4
62:21 85:15
97:11 119:16
123:14,17
142:6 144:21
147:12 186:8
187:22 194:1
206:7 212:24
215:24 220:11
234:15 252:7



252:14 262:1,6
262:11 270:1
276:2 278:23
289:4 297:9
309:18,24
314:21 319:7
329:9 333:10
370:9 380:21
390:5 393:14
393:17 406:20
408:7 461:1
469:21 475:2
478:11
**understanding**
17:16 28:9
49:12 72:8 88:9
123:23 150:18
151:6,15
162:24 166:18
166:21 176:23
182:16,23
187:21 193:5,7
193:19,22
228:4,18
248:17 261:12
266:14 271:15
271:21 274:15
311:20 345:15
418:7 460:22
462:9
**understands**
57:13 142:11
252:1 266:3
267:14 459:20
460:17 463:4
471:17
**understood**
47:20 57:8
259:3 267:9,11
267:16,19
268:2 471:21
482:10
**underwrite**
403:11
**underwriter**
31:21,23,24

33:12 258:22
266:10,11,14
401:18 430:20
**underwriters**
265:1 430:16
**underwriting**
20:9 25:14,24
43:7 53:17
55:18 56:18
57:7 59:3,4,8
59:10 65:5,15
65:17 72:3,15
98:16 185:13
258:24 262:19
264:20,22
357:3,10
358:24 365:13
372:18 376:11
381:16,20
382:2 383:11
390:3,6 395:9
396:9,11,14
403:1 404:22
405:4,6,23
413:20 414:5
415:22 418:9
422:13 424:5
424:11,14,19
425:13,13,21
426:16 430:8
430:18,21
438:3,9 447:4
452:18,21,23
**underwritten**
371:15 373:6
**underwrote**
370:22 389:23
**undo** 169:20
**unheard** 269:2
**unintentional**
312:22
**unique** 397:16
**uniquely** 28:8
418:12
**unit** 156:21
**United** 1:1

113:15
**units** 21:24
**University** 73:24
**unsure** 249:23
**unsworn** 142:15
179:7
**untethered** 67:11
**untruthful** 248:6
**unusual** 253:12
258:20 265:5
**update** 338:13
**updated** 338:5,19
393:6
**upfront** 260:14
**use** 82:24 85:19
87:6,6 88:7,10
88:16,19 94:16
108:16 200:10
262:21 280:24
284:4 289:14
302:22 303:8
303:21,24
304:4,7 307:2
308:19 319:12
319:17 322:8
333:7,11
334:13 368:15
402:15 404:3
427:18,23,24
428:10,11
429:5
**uses** 297:8
332:20 422:21
**usual** 48:17
264:20
**usually** 21:13
27:18 86:4,8
98:13 182:19
**usury** 270:2
**utility** 476:15
**utter** 58:5

_____
**V**
_____
**v** 1:7 4:3
**vacated** 137:15
**vacuum** 95:10

**Vagnozzi** 291:9
291:13 296:13
296:16 297:2
297:20 298:2
298:10
**valid** 327:24
453:1
**value** 98:14
101:15,19
260:14 390:20
398:9 401:8
413:15 429:6
**values** 410:4
**variability**
401:17 403:7
403:17 407:23
**variable** 402:4
403:14 413:9
**variations** 29:6
**various** 181:2
304:23 331:19
**vehemently**
186:9
**vehicles** 229:19
**verbal** 184:11
360:6
**verbally** 184:21
**verbatim** 267:7
**verbiage** 387:9
**verification** 25:2
25:11 26:18
27:1,2,12 28:6
29:18 30:1 43:3
178:18
**verifications**
28:1 29:3
**verified** 25:21
26:16 42:6,8,22
43:14 44:15,16
179:6
**verify** 26:5 28:17
424:5
**version** 262:20
464:10
**versus** 68:5
184:24 222:13

244:2 339:22
467:1,13 469:8
**vice** 329:5,7,14
**Victoria** 32:18
33:16
**video** 140:24
245:7
**videographer**
251:12
**videos** 296:9,12
**violating** 94:1
232:15 234:12
234:22 236:20
236:24 237:2
249:11
**violation** 10:21
111:8 112:13
112:19 124:1
**violative** 341:7
**virtual** 156:14
**visible** 254:1
**Vision** 338:21
339:14 341:3
**volume** 390:22
**vouched** 47:24
**V-I-C-T-O-R-I...**
32:20

_____
**W**
_____
**wait** 281:9
388:13,22
433:17
**want** 9:10 10:10
10:13 29:2
43:11 56:20
59:14 62:7 63:6
74:21 75:20,22
76:3 79:2 93:24
103:15 117:7
122:21 123:2,5
126:3 139:20
139:21 145:20
151:11 166:5
173:23 179:14
181:18,22
204:13 208:16



210:17 214:7
215:15 217:9
225:12 235:16
237:4,6,7
246:14 250:13
250:16 271:2
272:4,8 273:7
280:24 284:7
310:2 325:17
325:19 328:16
340:14 344:17
346:6 349:14
350:9 354:15
361:20 364:11
364:17,19,20
377:7 380:21
401:2 402:20
406:19 428:10
429:7,7 433:20
435:24,24
437:23 440:22
442:14 443:15
463:7,21
480:18
**wanted** 48:6
50:24 68:23
69:18 179:22
235:4 257:3
265:8 284:16
397:17 401:14
418:9 461:9
**wants** 143:20
276:16
**wasn't** 37:21
65:6 118:16
132:16 141:13
357:21 360:15
**wasting** 217:1
234:12 235:18
**watch** 83:24
**way** 9:9 26:14
87:20 139:8
140:23 169:22
179:13,15
204:17 207:23
208:22 262:7

266:7 273:7
331:12 368:6
385:7,20
394:24 428:18
459:15 461:9
462:17
**ways** 123:1
310:21
**website** 231:4
296:10 323:19
336:23
**websites** 277:21
**week** 50:12 51:22
52:3,11 53:3
55:6 58:13 60:2
65:1 93:14 96:7
96:7 466:16
467:5,14,24
**weekly** 65:1
432:14 445:5
450:20 465:20
**weeks** 50:13 53:4
53:4 365:17
441:8
**welcome** 78:12
78:13 79:11
237:4 332:18
**went** 19:24 20:2
20:7 22:23
37:10 73:24
74:2 101:13,13
158:8,18
159:23 194:17
259:1 265:10
328:7 346:11
362:4 373:7
418:7 437:19
452:2 453:22
455:15 464:13
470:6 471:21
**weren't** 38:4
68:16 119:19
191:3,10 470:3
**wet** 138:12,14,16
139:1 141:24
145:12

**we'll** 107:19,21
175:23 177:4
216:16 217:2
235:13 257:10
280:15 303:2
324:16 368:14
372:3 394:23
414:23 427:9
455:16,17
464:22 465:6
**we're** 6:18 20:22
37:14 53:17
78:12,14 100:9
103:14 113:13
117:24 119:1
122:4,6 128:15
168:6 171:24
177:5 190:12
222:13 256:5,8
264:4 285:22
299:7 319:22
357:23 360:7
360:14 373:1
374:24 375:15
376:2,17,18
380:4 382:13
387:10 388:14
389:5,11 393:1
394:24 395:5
396:1,2 399:2
400:21 403:4
406:2,23
411:15 412:13
414:18 415:9
416:3,22,24
427:1 428:12
433:7,15,23
434:9 435:22
435:23 436:13
436:16,17,19
439:6,21
440:16,21
442:2,5,6,18
449:6,8 450:19
450:19 452:10
453:4 458:21

458:24 459:2
463:19 466:12
467:22,24
468:17 471:7
471:10 476:7
476:10,15
477:12,13,15
478:4,12,22
479:8,11
481:24
**we've** 176:10
186:7 231:6
251:1,2 262:5
285:18 374:19
392:21 434:22
445:2
**whatsoever**
230:23 393:12
477:22
**when's** 30:16,17
218:10
**WHITE** 2:2
**widget** 85:5
**wife** 217:19
**William** 335:18
**WILLIAMS** 2:2
**willing** 427:1
**wiped** 96:9
**wire** 196:14
198:13 364:5
476:4
**wired** 467:13,14
**wires** 24:22
466:2,15
469:23
**withdrawal**
364:4
**witness** 5:4 13:21
16:12,24 17:14
18:3 19:10,24
22:14,21 23:17
25:13 26:9 27:6
27:18 28:11,22
29:8 31:16 32:9
37:6 39:14
40:23 41:7

42:20 43:6 44:5
44:20 45:3,11
45:20 46:6
51:11 52:6,14
53:16 54:16
55:16 57:6
58:18 62:4,19
64:3 68:10 69:2
69:10,22 71:23
77:8 81:4 83:19
87:9 88:22
89:14,22 90:11
91:2 92:12 93:3
95:11 96:16
97:9 98:12,23
99:8,18 100:6
101:5 102:7,17
104:14 105:2
105:12,20
106:10,23
112:12 114:13
116:1 117:1
118:20 119:11
122:3 123:13
127:24 128:13
131:15 133:21
134:19 135:9
136:2,19
141:15 148:2
149:13 150:1
151:24 152:12
153:19 157:21
158:8 159:16
162:8 164:12
164:17 165:12
166:17 167:10
167:17 171:16
172:22 173:16
174:19 176:22
182:9 185:21
186:3 188:3,8
191:6 192:23
193:18 194:7
195:11 196:18
197:7,14 201:7
202:1 208:15



214:22 215:18
223:16 224:21
225:23 227:11
227:20 229:22
231:15 234:7
235:7 239:15
248:8 256:22
258:19 262:10
264:2 265:16
266:20 269:23
270:10 276:1
278:7,21
279:11,20
288:10 289:2
294:19 296:5
300:16 301:2
304:16 310:9
310:20 313:3
316:2 318:24
322:7 323:4
331:22 343:6
347:17 349:22
355:7 358:17
361:7 363:3,14
363:20 365:1
369:21 373:19
377:10 382:23
383:6 384:21
385:10,18
387:8 406:19
416:15 421:20
422:17 423:3
423:23 425:3
429:13 438:20
442:22 444:16
449:6 454:6
473:20 480:14
483:7 484:6,9
**witnessed** 298:7
**wizard** 51:20
56:7
**woman** 325:10
**wonder** 194:16
194:16
**word** 86:23 87:18
87:20 88:7,10

88:16,19
108:16,17
184:23,24
237:23 242:19
251:17,19
261:7,8 266:5
277:6 297:9
333:8,12
357:18 404:3
422:21
**words** 69:17
82:22 83:1
144:3 228:14
252:11,15
267:7,17
276:22 389:2
**work** 12:5 13:8
19:21 49:13
74:11 104:4,9
105:15,21
118:22 132:20
135:8 154:19
155:1 160:17
160:18 162:1
177:2 260:19
260:20 265:9
267:10 309:12
317:9,10 321:8
426:5 428:19
434:1 456:22
**workable** 106:6
**worked** 73:16
74:2,15 75:5
155:11 156:6
157:1 158:3
159:18 245:8
312:2 331:10
335:3
**working** 6:12,13
6:18,20 74:7
81:24 95:14
113:14 118:24
120:1,7 154:21
157:3 265:7
313:20 314:5
314:18 374:6

379:21 436:1
**works** 12:6
103:15 154:23
154:24 159:10
159:14 160:19
164:2 251:23
262:2 309:9,10
309:16 317:17
317:20 326:13
460:18
**world** 194:9
213:6 363:9
364:2,21
**worried** 68:19
69:19 433:4
**worry** 79:4
351:13
**worth** 214:24
397:14 414:2
415:3
**wouldn't** 44:23
133:9 139:17
145:10 192:19
232:21 271:1
276:23 277:6
334:20 335:20
335:20 422:10
428:15 460:24
**Wow** 38:3,3 76:2
245:17
**wrap** 442:20
**wrestle** 206:1
**write** 122:20
209:19,22
323:8 336:12
481:15
**writer** 338:14
**writing** 47:17
48:9 187:12,19
188:1,6,11
349:11
**written** 264:18
320:10 323:20
323:23,24
325:4 446:4
**wrong** 124:10

126:8,12 229:5
237:19 251:16
266:1 323:9
463:7 474:2
**wrote** 266:9
322:21 324:5,7
324:16 336:14
www.MagnaL...
1:24

**X**

**X** 3:1,7 6:5
104:22 299:20
403:14

**Y**

**yeah** 6:22 9:10
17:9 18:6 23:2
38:12,13 44:16
44:16 50:2 52:3
52:18 65:10
75:19 78:1
83:19 86:1
96:16 97:9 99:8
103:14 108:15
108:15 119:2
121:18,21
127:24 128:13
129:16 130:19
131:5 132:12
140:12,20
141:10 143:1
146:20 148:2
150:15 152:12
166:6 172:10
173:21,22
179:24 193:3
201:4 204:11
206:5 207:2
208:18 209:3
213:3 219:7,15
220:4,7,7 223:3
224:14 225:23
229:16 231:15
240:24 246:11
251:14 252:11

255:16 261:6
272:23 273:21
274:1 276:1,19
278:13 283:6
290:14 292:8
292:16 293:10
294:16 297:8
300:16,24
330:24 336:2
338:1,13 339:6
345:20 349:19
356:15 360:3
360:17 364:1
365:24 366:8
366:22,24
372:23 373:19
375:7,18
377:10 381:3
388:2 391:10
391:18 392:4
392:15,18
400:2,4 408:17
408:20,22
415:1,11,21
416:19 419:24
421:16 422:17
424:9 426:10
428:3 430:23
430:24 435:12
444:13 454:15
460:16 466:7
472:9 480:4,11
482:8
**year** 28:3 30:22
36:2 56:4,8
58:24 59:5
102:3 107:9
118:13 129:11
129:18 244:15
262:4 328:18
475:1
**years** 101:13
102:3 264:14
374:20
**yesterday** 31:24
**yup** 125:21 140:3



142:23 201:15
203:12 213:10
245:3 284:19
288:15 346:16
368:22 397:4
397:22 414:15
418:2 423:23
428:9 431:20
431:22 432:15
447:17 452:5
453:21 458:2,8
458:13 475:8

**Z**

**zero** 97:13
281:23 339:21
387:2

**$**

**$1** 203:22
**$1.4** 53:5
**$1.5** 51:22 96:11
97:2,3 98:19
100:2 101:2
102:2,5 206:20
**$1.8** 257:5 260:16
**$10** 408:16 419:5
427:5
**$100** 116:20
117:20
**$100,000** 396:5
402:1
**$108,000** 467:21
**$11** 116:19
**$12** 116:18 117:8
**$12,000** 453:23
**$13** 46:22
**$14** 53:11 55:10
55:24 424:2,15
**$15,000** 206:24
**$158** 56:8,12
58:12,24 59:5
66:22
**$16,000** 360:13
**$187,000** 467:16
**$19,000** 353:3

354:18 448:2
457:20
**$19,995** 359:11
362:5
**$2** 417:17 468:16
**$2.5** 397:11 434:3
**$2.6** 406:9
**$2.75** 397:14
398:7
**$20** 422:7
**$20,000** 354:19
355:17 359:23
**$200** 116:21
**$200,000** 412:21
477:2,3
**$240,000** 412:21
**$250** 197:11
**$250,000** 289:13
289:18 290:5
**$270** 313:19
314:2,4
**$275,000** 372:2
**$279,000** 170:5
**$3,000** 402:23
**$3,500** 344:3
348:5 362:4
437:19 447:8
447:10,20
448:14 455:24
457:11,20
458:5
**$3-and-a-half**
434:11
**$3.1** 399:17
**$3.6** 305:19
**$300,000** 85:6
**$313,000** 400:1
402:13
**$350,000** 50:12
51:7 52:3,10
53:3 55:5,12
58:13 60:2 65:1
67:6
**$4.2** 404:24 405:7
405:15 420:9
**$4.6** 415:3

**$40** 414:19
**$400,000** 394:11
394:15
**$472,356.60**
185:16
**$5** 413:18 414:2,7
426:23 428:5
**$5,000** 426:8
429:23 430:11
431:10 441:15
441:18
**$5.4** 432:3 438:17
**$5.6** 405:21,23
419:14
**$50** 195:23
307:16 432:7
440:2,2,3,22
**$50,000** 204:20
204:21,24
426:14
**$500** 116:21
204:22 205:7
**$500,000** 203:11
203:20 412:12
412:17 413:6
414:1 427:9
**$538,000** 468:5
**$550,000** 459:22
**$560** 193:11
**$578,000** 173:8
173:13,19
174:15,24
176:4,16
**$6** 409:6
**$6,000** 257:8
260:10
**$600,000** 176:2
**$650** 170:24
171:6 172:5,18
173:3
**$7,800** 370:19
375:6
**$7,812** 369:24
**$7.5** 411:16
**$700,000** 85:11
**$75,000** 476:21

477:6,22
478:23
**$8** 469:15
**$80** 167:7 314:19
**$800,000** 371:22
380:7

**0**

**0607** 420:8

**1**

**1** 3:16 23:21
93:14 307:19
409:22 414:16
425:2 452:2
479:20,21
**1,000** 206:23
**1.16** 275:3
**1.4** 275:2,6,8
**1.5** 93:14 99:16
202:16,18
203:16 275:6
**1.8** 257:24 260:13
263:9,12,18
**1/23** 448:14
**1/24** 448:15
449:3,20
454:24
**1/4** 459:21 460:2
460:13
**1:40** 216:17
217:6
**10** 52:11 53:9
54:13,22 55:11
58:6,8 67:20,23
68:23 69:7,18
69:23 71:19
98:9,20 256:18
257:1 258:16
261:3,4 262:14
262:15 265:13
369:14,17
370:3,18
371:10,21
372:8,13,21
373:5,12 375:1

375:4 376:2
382:18 395:1
395:18,19,22
396:1,2 397:3
398:6,11,14
399:22,22,23
400:8,18,20,23
401:1,19,24
402:8,14,21
403:4,13 404:1
404:6 413:17
413:21 415:16
422:11 425:8
426:7,24 427:3
427:7 428:5,22
429:5,18 430:9
430:11 431:6,6
433:8 439:10
439:13,14
440:1,11
441:12 446:24
461:12,15,18
462:7 463:2
477:15
**10.00** 402:11
**10/22/18** 468:3
**10/24/19** 3:19
**10:01** 1:18
**100** 103:24
109:20 116:20
139:5 206:23
206:24 261:1
390:8 476:11
477:2
**100,000** 289:23
427:22 476:19
**104** 406:11
**108** 5:6
**11** 5:6,7,11,13
46:23 325:20
**11-and-a-half**
47:15 52:7
469:11,13
470:4
**11.5** 470:15
**11:50** 107:22



**110** 5:6
**111** 5:7
**12** 3:9 82:2
  117:10 169:16
  238:9 250:11
  290:12 305:18
  313:9
**12th** 306:13
  330:21
**12,000** 456:2
**12,037** 455:2
**12,337** 447:24
  448:4,14
  449:20
**12/18** 429:17
**12/19** 346:8
  446:15
**12/19/18** 4:4
  462:4
**12/5/18** 468:11
  468:12
**12/9/18** 462:4
**123** 5:7 447:23
**124** 447:24
**13** 91:4 170:21
**130** 5:7
**131** 5:7
**137,000** 467:6
**14** 4:2 5:7,8,10,12
  136:17 328:4
  368:2 424:21
  456:2
**14th** 261:22
  350:16
**14,525** 455:3
**140K** 313:11
**15** 5:6,12 107:19
  216:16 284:10
  305:18 329:1
  332:14
**15th** 261:22
  370:17
**150** 476:20
**150,000** 417:12
**152** 5:7
**16** 5:9,11,12

177:18 189:17
  456:2
**16th** 191:1
  192:12 371:4
**16,500** 346:14
  347:22 348:6
**1650** 2:3
**167** 370:10,13
**17** 5:8
**18** 5:7,10,10,11
  142:14 156:7
  183:24 184:4
  185:15 429:18
**1800** 2:3
**185** 467:17
**187** 467:16
**19** 5:12 38:12,13
  189:10 194:3
  194:18,18,19
  308:1 314:3
  368:12 391:7,9
  391:12 456:2
**19th** 191:1
  343:24 350:7
  431:18,20
  441:4 453:20
**19,000** 363:24
**19,995** 364:5
  437:19
**19-3285** 1:5
**19103** 2:4,8
**19106** 168:19
**197** 467:15
**1990** 328:13
**1992** 328:14

_____

**2**

**2** 5:8,8,11 285:2
  286:9 298:13
  341:13 369:3
  395:1 411:14
  418:14,22
  467:15 479:19
**2nd** 197:11
**2(d)** 124:22 293:6
**2,500** 156:23

**2,750** 371:12
  375:13
**2-and-a-half-a...**
  428:17
**2.1** 257:24 263:18
**2.107** 263:15
**2.4** 410:9 434:3
**2.6** 407:5,11
**2.7** 398:14
**2.75** 398:15
**2/14** 455:1
**20** 3:17 7:5 21:16
  21:20,21 24:6
  46:17 50:7 51:8
  51:19 107:20
  149:5 153:11
  168:17 169:11
  285:12 286:3
  286:10,18
  336:8 342:17
  343:3 415:20
  455:2 481:18
  482:7
**20th** 2:8
**20,000** 360:4
**2000** 2:8 335:11
  335:12
**2009** 74:8
**2012** 217:10,23
  220:22 242:22
  244:10,23
  337:12
**2016** 23:18 74:17
**2017** 7:12,13,23
  8:1 9:2 14:2,5
  14:14 22:18
  23:15,21 74:17
  338:15 474:21
**2018** 9:5 14:16
  16:20 17:10
  56:19 79:18
  80:22,23 114:8
  114:11 151:18
  155:2 157:12
  162:4 207:8
  214:19 215:1

218:23 298:20
  301:17 308:2
  314:4 343:24
  350:2,3 370:18
  371:4 375:5
  429:14,16
  430:12 431:5
  441:4,9 474:23
  474:23
**2019** 9:5 14:19
  17:10 38:11
  70:8,13,16,19
  70:22 71:1,4,7
  71:10,13,16
  80:23 114:8,12
  119:18,19
  121:16,19,20
  123:6 132:10
  137:3,18,22
  151:19 155:2
  156:7 157:13
  171:23 173:11
  173:20 181:4
  189:17 192:6
  192:10 193:11
  195:23 197:3
  197:11 215:5
  218:24 234:9
  250:11 298:21
  301:17 306:13
  330:21 343:16
  350:17 474:24
**2020** 1:12 17:11
  78:20 79:24
  118:14,17
  119:23 121:4
  128:2 129:9
  172:1 213:9
  283:20
**205** 1:16 6:24
**207** 5:7
**210** 5:8
**210,000** 417:15
**211** 5:8,8
**212** 5:8
**214** 5:8

**215** 5:8
**215.299.2000** 2:9
**215.864.7000** 2:4
**216** 5:9
**22** 3:20 73:17,18
  75:6 344:19
  397:7 427:13
  427:15,17,22
  452:2
**226** 5:9
**228** 5:9
**23** 5:6,9,12 330:3
  427:17,22,23
  447:20
**230** 5:9
**232** 5:9
**233** 5:9
**234** 5:10
**238** 3:9
**24** 5:7,10 81:21
  313:10
**24th** 313:11
  343:15 350:2
**24605** 420:8
**25** 3:21 345:21
**250** 3:13 197:14
**26** 283:20
**2646** 287:18
**27,000** 371:11
**272** 3:14
**275** 380:6 397:13
**275,000** 376:8
  398:14
**279,531** 169:24
**28** 3:15 279:24
**28,000** 415:9
**280** 3:15 5:10
  415:19
**280,000** 415:14
**2806-11** 407:4
**2807-11** 406:8
**284** 5:10
**29** 3:22 345:19,20
  348:15
**291** 5:10,10
**292** 5:10,11



**29406-04** 409:21
**2946** 399:4 404:7
**2946-02** 407:14
**294601-01**
　397:20
**295** 5:11
**296** 5:11
**297** 5:11

**3**

**3** 5:9,9,10,11
　284:12 399:24
　399:24 409:22
　410:20,20
　411:14 415:8
**3rd** 7:5 21:16,20
　21:21 24:6
　137:3 149:6
　153:11 168:18
　169:11 285:12
　286:3,10,18
　342:18 343:4
　350:2
**3,500** 346:12
　347:22 353:3
　354:18 355:16
　359:10,22
　360:12 363:24
　367:2 446:22
　447:24 448:4
　453:15,23
　456:14 458:10
　460:5 462:6
　463:1
**3-and-a-half** 68:3
　68:7,17 468:18
　468:21 469:14
　470:11
**3.1** 399:24
**3.5** 421:12
**3.8** 462:5
**3.89** 432:2
**30** 1:12 277:16
　278:4,11,14
　296:19 298:5
**30th** 171:24,24

**30(b)(6)** 34:20
　87:9 170:14
　185:9 186:3
　188:10 235:2
　355:12
**300** 85:12
**3002** 415:20
**301** 5:11
**302** 5:11,12,12,12
**303** 5:12,12
**305** 5:12
**307** 3:16
**30900** 156:10
**31** 3:19 341:23
**313** 402:22 403:4
　403:15
**336** 3:17
**34** 4:4 446:4
**340** 5:13
**341** 3:19
**342** 5:13
**344** 3:20
**345** 3:21
**348** 3:22
**35** 50:13
**350,000** 51:19
**3500** 156:12
**36** 324:22 419:1
**368** 4:2
**37** 73:21

**4**

**4** 3:13 5:6,8,13
　55:10 114:21
　115:19 195:23
　241:4 242:10
　250:21 288:6,7
　298:13,24
　416:9
**4th** 78:19 79:24
　213:8
**4,000** 331:18
　332:3
**4.2** 420:18
**4.6** 414:24
**4:10** 332:15

**400** 449:4 450:6
　450:14,16
　451:4 452:16
　453:24 454:4
**41250-00** 421:12
**44** 82:6 257:9
　260:11 263:22
　263:24 264:3,6
　265:24 423:9
　423:12
**446** 4:4
**45** 76:1,2,2,4,4,8
　77:11 78:5 81:5
　81:8 82:15
**48,000** 467:10
**499** 426:7,8

**5**

**5** 5:7,9,10,11
　114:22 115:20
　242:9,18
　290:11 413:17
　416:11
**5th** 193:11 197:3
　429:13 430:12
　431:5 441:9
**5,000** 441:21
**5.4** 438:22
**5/13** 190:20
　191:15
**5/13/19** 189:22
**5/19** 191:13
**5/3/19** 3:21
**50** 205:2 296:13
　404:18,21,24
　413:13 476:12
**50,000** 289:23
**500** 117:21
　203:15
**500,000** 394:12
**506(b)** 288:13,18
　289:5
**51** 405:14
**52** 405:22
**578** 177:4
**578,396** 170:23

**6**

**6** 3:5 169:18
　288:8 299:19
　357:12 409:16
**6th** 38:5,11
**6,000** 255:18
　257:8
**6,606** 265:24
**6:45** 454:20
**60** 387:19 391:14
　391:20 392:2
**624-6221** 1:24
**650** 173:10

**7**

**7** 3:14 5:6,7,8,9
　91:6,7,8,11
　189:10 245:5
　248:6,8 272:17
　272:19,24
　320:6 357:12
**7,812** 467:7,11
**7.5** 410:3 411:23
**7/1/20** 484:16
**7/23** 467:24
**7/5** 190:21
**7:15** 478:2
**7:17** 483:9
**700** 359:18 361:5
　361:23 362:2
　363:12,16,23
　467:7
**75** 477:3 479:1,7
**75,000** 478:24
　479:2
**76** 5:6
**78** 467:17

**8**

**8** 5:6 183:24
　272:21 324:22
**8/28/18** 182:6
**80** 5:6 314:9
　315:21
**862** 369:13
**866** 1:24

**9**

**9** 5:6,12 170:1
　248:11,11
　414:16 415:8
　416:10
**93** 5:6

