Joseph Barleta

Page 1

          IN THE UNITED STATES DISTRICT COURT

             EASTERN DISTRICT OF PENNSYLVANIA

                  - - -

 FLEETWOOD SERVICES,   :CIVIL ACTION
 LLC, ROBERT L.        :
 FLEETWOOD, and        :
 PAMELA A. FLEETWOOD,  :
 Individually and on   :
 behalf of all others  :NO.  18-CV-00268
 similarly situated,   :(JS)
          Plaintiffs   :
                       :
      vs.              :
                       :
 COMPLETE BUSINESS     :
 SOLUTIONS GROUP,      :
 INC. D/B/A Par        :
 Funding; JOHN AND     :
 JANE DOES,            :
          Defendant.   :


                  - - -

          Oral Deposition of JOSEPH LEWIS

COLE BARLETA, taken pursuant to notice,

held at WHITE AND WILLIAMS, LLP, 1800 One

Liberty Place, 1650 Market Street,

Philadelphia, Pennsylvania 19102, on

February 11, 2020, beginning at 10:00 a.m.,

before Kathleen Jastrzembski, Court

Reporter-Notary Public, there being

present.

                  - - -

Joseph Barleta

```
                                                      Page 2

  1    APPEARANCES:

  2

  3              WHITE AND WILLIAMS, LLP
                 BY:  JUSTIN PROPER, ESQUIRE
  4                   SHANE HESKIN, ESQUIRE
                 1800 One Liberty Place
  5              1650 Market Street
                 Philadelphia, PA 19103
  6              Phone:  215-864-7142
                 Representing the Defendant
  7

  8              FOX ROTHSCHILD, LLP
                 BY:  BRETT BERMAN, ESQUIRE
  9              2000 Market Street
                 Floor 20th Floor
 10              Phone:  215-299-2842
                 Bberman@foxrothschild.com
 11              Representing the Defendant

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

Joseph Barleta

Page 3

```
 1                  I N D E X
                      - - -
 2   Witness

 3       JOSEPH LEWIS COLE BARLETA

 4   EXAMINATION BY:                  PAGE

 5       Mr. Proper                   5

 6
                 E X H I B I T S
 7                   - - -

 8   NUMBER           DESCRIPTION           PAGE

 9   P-8              Notice of Deposition  5

10   P-9              Letter                59

11   P-10             Email                 144

12   P-11             Email                 149

13   P-12             Email                 150

14   P-13             Control Sheet         187

15

16

17

18

19

20

21

22

23

24
```

Joseph Barleta

Page 4

| 1 | | LITIGATION SUPPORT INDEX | | |
|---|---|---|---|---|
| 2 | | Direction to Witness Not to Answer | | |
| 3 | Page | Line | Page | Line |
| 4 | 32 | 23 | 61 | 5 |
| 5 | 33 | 6 | 61 | 12 |
| 6 | 34 | 18 | 62 | 23 |
| 7 | 39 | 16 | 101 | 7 |
| 8 | 41 | 16 | 110 | 2 |
| 9 | 54 | 6 | 172 | 15 |
| 10 | 59 | 9 | | |
| 11 | 59 | 18 | | |
| 12 | | | | |
| 13 | | Request for Production of Documents | | |
| | Page | Line | Page | Line |
| 14 | 186 | 3 | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | Stipulations | | |
| | Page | Line | Page | Line |
| 18 | 5 | 1 | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

Joseph Barleta

Page 5

```
 1                  - - -

 2           THE COURT REPORTER: Usual

 3  stipulations?

 4           ALL COUNSEL:  Yes.

 5                  - - -

 6           (It is hereby stipulated and

 7  agreed by and between counsel for

 8  respective parties that reading, signing,

 9  sealing, certification and filing are

10  waived and that all objections, except as

11  to the form of questions, be reserved until

12  the time of trial.)

13                  - - -

14           JOSEPH LEWIS COLE BARLETA, after

15  having been first duly sworn, was examined

16  and testified as follows:

17                  - - -

18                  EXAMINATION

19                  - - -

20           (Whereupon the court reporter

21  marked P-8 for purposes of identification.)

22                  - - -

23  BY MR. PROPER:

24  Q.       Good morning, Mr. Cole.
```

Joseph Barleta

Page 6

1    A.          Good morning.

2    Q.          You are here as a corporate

3    designee for Complete Business Solutions

4    Group, correct?

5    A.          Yes.

6    Q.          Do you have an understanding of

7    what a corporate designee deposition is?

8    A.          Yes.

9    Q.          What is that understanding?

10   A.          I represent the company under

11   this court matter.

12   Q.          Okay, and I have in front of you

13   what's been marked as Plaintiff's-8 for

14   identification.  Have you seen this

15   document before?

16   A.          Yes.

17   Q.          When did you first receive this

18   document?

19   A.          It was a while ago.

20   Q.          Okay.  What did you do when you

21   received it?

22   A.          I followed up with counsel.

23   Q.          Did you read the entirety of

24   Exhibit-8?

Joseph Barleta

1   A.        That's right.

2   Q.        Can you take a look at page two,

3   please?

4   A.        (Witness complies).

5   Q.        Actually, there's an initial

6   notice.  So it's identified page two, but

7   it's actually four of the document.

8   A.        Okay.

9   Q.        My apologizes, turn back one

10  page.  Excellent.  So with respect to topic

11  one, the marketing, soliciting,

12  underwriting and funding of each Merchant

13  Agreement between You and Fleetwood.  Can

14  you tell me what you did to testify in that

15  topic?

16  A.        We reviewed all of our procedures

17  and discussed specifically this file that

18  we underwrote.

19  Q.        What specific procedures are you

20  referring to?

21  A.        The origination and underwriting

22  of each file.

23  Q.        Did you review a written policy?

24  A.        Yes.

Joseph Barleta

Page 8

1    Q.        Can you explain to me each and

2    every written policy that you reviewed?

3    A.        We would have to refer to the

4    specific documents in detail, but we do

5    have a general underwriting policy and

6    origination policy.

7    Q.        Okay, stop there.  When you would

8    say, I would have to refer a specific

9    document, what did you mean by that?

10   A.        Depends on how granular you

11   needed the steps.

12   Q.        Okay, so you mean that if I

13   needed to get granular and ask you specific

14   questions about that particular

15   underwriting policy, I would need to refer

16   you to the policy itself, right?

17   A.        It depends on how granular.

18   Q.        Okay.  What if the policy hadn't

19   been produced in the litigation, what am I

20   supposed to do then?

21   A.        I should be able to cover this

22   discussion.

23   Q.        How many different policies did

24   you review concerning underwriting and

Joseph Barleta

Page 9

1  origination?

2  A.          We have one.

3  Q.          You have one.  How many pages is

4  that document?

5  A.          It's a big document.  I can't say

6  specifically how many pages it is.

7  Q.          I don't recall seeing any

8  document of any kind concerning

9  underwriting an origination.  Do you know

10  if that document you're referring to has

11  been produced in this lawsuit?

12  A.          I don't know.

13  Q.          What types of things are covered

14  in that document?

15  A.          Procedures for file origination

16  and our standard underwriting practice.

17  Q.          File origination and standard

18  underwriting practice.  Who created that

19  document?

20  A.          It's created by several employees

21  over a period of time.

22  Q.          When was the document first

23  created?

24  A.          It was created 2013.

Joseph Barleta

Page 10

1   Q.        Okay.  I need to ask some

2   questions about it because I have never

3   seen it, it would have been helpful.

4           MR. HESKIN:  Was it produced to

5   day?

6           MR. BERMAN:  I have no idea.

7           MR. HESKIN:  I know there was a

8   production this morning.

9           MR. PROPER:  Well, we asked for

10  the document in our original request.

11          MR. HESKIN:  Well, I know we

12  requested it.  I just know there was a

13  production this morning, but we'll deal

14  with it.  Obviously we're going to reserve

15  our right to recall the witness.

16          MR. PROPER:  Sure.

17  BY MR. PROPER:

18  Q.        So it was created in 2013.  Whose

19  decision was it to implement written

20  origination and underwriting guidelines?

21          MR. BERMAN:  Objection.  You can

22  answer.

23          THE WITNESS:  It was decided by

24  management.

Joseph Barleta

Page 11

1    BY MR. PROPER:

2    Q.        Who specifically at management

3    made that decision?

4    A.        Our head underwriter.

5    Q.        Who was your head underwriter at

6    the time?

7    A.        That would have been Susan.

8    Q.        Who Susan?

9    A.        Graesar.

10   Q.        How do you spell her last name?

11   A.        I believe it's G-R-A-E-S-E-R.

12   Q.        Is Ms. Graesar still employed by

13   CBSG?

14   A.        No.

15   Q.        When did she leave employment

16   with CBSG?

17   A.        About two or three years ago.

18   Q.        Who took over a head underwriter

19   for CBSG upon Ms. Graeser's departure?

20   A.        Tory Villarose.

21   Q.        How do you spell Ms. Villarose's

22   last name?

23   A.        V-I-L-L-A-R-O-S-E.

24   Q.        Is Ms. Villarose still employed

Joseph Barleta

Page 12

1    by CBSG?

2    A.        Yes.

3    Q.        Is she still employed as the head

4    underwriter?

5    A.        Yes.

6    Q.        What are her responsibilities as

7    head underwriter for CBSG?

8    A.        She's supervising underwriting,

9    and as part of our credit committee.

10   Q.        When was the credit committee

11   formed?

12   A.        Near inception when we first

13   started.

14   Q.        When did you first start?

15   A.        The end of 2012.

16   Q.        Can you tell me the names of the

17   individuals that were originally on the

18   credit committee for CBSG at the formation

19   of the company?

20   A.        Yes.  Credit committee was Lisa.

21   Q.        Lisa who?

22   A.        McElhone.  Jamie McElhone.

23   Q.        Anyone else?

24   A.        No.

Joseph Barleta

Page 13

1  Q.        Has anyone -- strike that.

2            Has the composition of the credit

3  committee changed since that time?

4  A.        Yes.

5  Q.        When did it change, and how did

6  it change?

7  A.        It changed a few times.  We had

8  different employees some in.

9  Q.        Can you tell me some of the other

10 individuals that were on the credit

11 committee and what periods of time they

12 served?

13 A.        We had Susan Graesar as part of

14 the credit committee, that was

15 approximately from 2013 to 2017.

16 Q.        Was she on the committee with

17 Lisa and Jamie McElhone?

18 A.        Yes.

19 Q.        Okay.  About how about Ms.

20 Graesar left?

21 A.        Tory took over.  They had some

22 overlap, she was part of the credit

23 committee.  Tory has been with us since

24 2014, I believe, and promoted to that

Joseph Barleta

Page 14

1    position after two years.

2    Q.        Is she still on the credit

3    committee?

4    A.        Yes.

5    Q.        Is anyone else on the credit

6    committee other than those three women?

7    A.        Yes.

8    Q.        Who else?

9    A.        Alexander Shelpin.

10   Q.        How do you spell Alexander's last

11   name?

12   A.        S-H-E-L-P-I-N.

13   Q.        Okay.  When did she get appointed

14   to the committee?

15   A.        That was about two years ago.

16   Q.        Okay.  Anyone else?

17   A.        No.

18   Q.        What does the credit committee

19   do?

20   A.        It provides final approval for

21   every file that comes in.

22   Q.        What information does the credit

23   committee review in making finale

24   determinations on each file that comes in?

Joseph Barleta

1          MR. BERMAN:  Objection.  You can

2    answer.

3          THE WITNESS:  They review the

4    entire underwriting file associated for

5    each transaction.

6    BY MR. PROPER:

7    Q.       Okay.  Is there a standard

8    underwriting file for each transaction?

9    A.       No, there are different elements

10   depending on the client.

11   Q.       Okay.  Is there a standard

12   underwriting policy that your underwriters

13   are supposed to follow as part of the

14   document I haven't yet seen?

15         MR. BERMAN:  Objection.

16         THE WITNESS:  There are general

17   guidelines.

18   BY MR. PROPER:

19   Q.       Okay.  Are those general

20   guidelines that your underwriters are

21   expected to follow when underwriting a

22   file?

23   A.       Yes.

24   Q.       Okay, and can you walk me through

Joseph Barleta

Page 16

1   all of the underwriting guidelines that

2   your underwriters are expected to follow?

3   A.      Yes.

4   Q.      Go ahead.

5   A.      Initial applications are received

6   from our ISO's.

7   Q.      Is there a form application?

8   A.      There's a standard application,

9   although ISO's submit different information

10  and it's pretty inconsistent depending on

11  which ISO we're working with.

12  Q.      Well, how many different form

13  applications do you approve your ISO's to

14  use?

15  A.      Our ISO's don't use -- our

16  applications, we may give them a copy of

17  our application, we generally send it to

18  them ourselves, the client.

19  Q.      Does -- strike.  Is each

20  applicant required to fill out a CBSG

21  application?

22  A.      No.

23  Q.      Okay, so they can either fill out

24  a CBSG application or an ISO application?

Joseph Barleta

1          MR. BERMAN:  Objection.  You can

2    answer.

3          THE WITNESS:  No.

4    BY MR. PROPER:

5    Q.        So is an application required for

6    each file?

7    A.        Yes.

8    Q.        Okay.  Tell me each and every

9    application that may be used?

10   A.        We have the CBSG application.  We

11   have our individual ISO application.

12   Q.        Who created the individual ISO

13   application?

14   A.        That's the ISO's themselves.

15   Q.        Got it.  Does the individual ISO

16   that uses this application have to submit

17   it to CBSG for approval?

18   A.        No.

19   Q.        Go ahead.

20   A.        We often proceed a file without

21   the application.  We may take information

22   verbally and put it into our CRM directly.

23   Q.        And the CRM is?

24   A.        CRM on our online platform we use

Joseph Barleta

Page 18

1    to manage our clients.

2    Q.        And when you verbally take an

3    application, are your underwriters using

4    your form to ask questions of the

5    applicant?

6    A.        No, they don't necessarily use

7    the form to ask questions from the

8    applicant.  They may take it also verbally.

9    Q.        When one of your underwriters

10   takes an application verbally, what

11   questions is the underwriter asking?

12   A.        They verify the submitted items

13   as part of the application such as banking

14   information, company information, and

15   ownership information.

16   Q.        Okay.  I'll talk about each of

17   those.  Is every applicant required to

18   submit banking information?

19   A.        Yes.

20   Q.        Okay.  What type of banking

21   information is required of every applicant?

22   A.        Bank statements.

23   Q.        For how long?

24   A.        For at least three months.

Joseph Barleta

Page 19

1   Q.          What is your underwriting

2   guidelines say in terms of the requirement

3   of applicants to submit bank statements?

4   A.          We prefer at least three months.

5   Actually, minimum three months and

6   preferably six months.

7   Q.          And that's a written policy?

8   A.          That's right.

9   Q.          And your underwriters are

10  expected to follow that, correct?

11  A.          Yes.

12  Q.          How about the second factor you

13  said, was it owner information?

14  A.          That's right.

15  Q.          What type of owner information?

16  A.          The incorporation documents and

17  proof of ownership in the business.

18  Q.          Is every applicant expected to

19  provide that information?

20  A.          Yes.

21  Q.          Is there a written underwriting

22  guideline requiring that information to be

23  submitted by applicants?

24  A.          Yes.

Joseph Barleta

Page 20

1   Q.          Okay.  What was the third one?

2   A.          The information about the

3   business itself.

4   Q.          What type of information?

5   A.          Industry type.  Revenues,

6   specifically cash flow for the prior three

7   months and the review of the statements.

8   Q.          What type of revenue information

9   is an applicant required to submit in

10  addition to bank statements?

11  A.          Financials, accounts receivables,

12  statements, the types --

13  Q.          Is --

14              MR. BERMAN:  Let him finish.  You

15  keep interrupting.

16              THE WITNESS:  The types of

17  invoices received to get an understanding

18  of their business in industry.

19  BY MR. PROPER:

20  Q.          Is there a written underwriting

21  guideline requiring that information?

22  A.          There is for financials.  There

23  is not for invoices.

24  Q.          Okay, s what type of financial

Joseph Barleta

Page 21

1   information specifically do you require

2   applicants to submit?

3           MR. BERMAN:  Objection.  Asked

4   and answered.

5           MR. HESKIN:  It's not a proper

6   objection.

7           MR. BERMAN:  I'll object how I

8   want, thanks.  You can answer.

9           MR. HESKIN:  No, you won't.  You

10  will not give speaking objections.  If we

11  need to call up Judge Sanchez to stop your

12  speaking objections, we will.

13          MR. BERMAN:  Call.  Call now.  Do

14  whatever you want.

15          MR. HESKIN:  Continue it.  You're

16  warned.  Continue it.

17          MR. BERMAN:  Shane, I don't go

18  with warnings.  I'll object.  You have a

19  problem, call the Judge.  Call it what you

20  want.  I'll object however I want.

21  BY MR. PROPER:

22  Q.      Do you require applicants to

23  submit profit and loss statements

24  specifically?

Joseph Barleta

Page 22

1    A.         No.

2    Q.         Do you require applicants to

3    submit tax turns?

4    A.         No.

5    Q.         Do you require applicants to

6    submit balance sheets?

7    A.         No.

8    Q.         Okay.  What specific financial

9    documents do you require applicants to

10   submit?

11   A.         We generally will take account

12   receivable aging reports, which is the

13   focus for our underwriting.

14   Q.         When you reviewed my clients

15   file, did my client submit accounts receive

16   aging reports?

17   A.         Yes.

18   Q.         Okay.  What specifically are you

19   referring to as an accounts receivable

20   aging report?

21   A.         It's a list of outstanding

22   invoices for their business detailing the

23   revenues being produced by the company

24   currently, which we base our factoring

Joseph Barleta

Page 23

1   transaction on.

2   Q.        Okay.  Would those be existing

3   receivables or future receivables that

4   you're obtaining information about?

5   A.        Existing receivables and future

6   receivables.

7   Q.        What type of future receivable

8   would the client provide?

9   A.        Future receivables are determined

10  by their projected business that we discuss

11  with them.

12  Q.        What type of projections do you

13  do to estimate what a future might be for

14  an applicant?

15  A.        We compare prior invoices to what

16  the client currently is pursuing with

17  billable -- with invoices not currently

18  billed yet to get an idea of their

19  projected revenue for the length of the

20  factoring transaction.

21  Q.        What type of internal documents

22  are created to prepare that projection?

23  A.        We have an underwriting matrix.

24  Q.        Do you know if the underwriting

Joseph Barleta

Page 24

1   matrix that was used for my clients

2   application were produced in this

3   litigation?

4   A.          I do not know.

5   Q.          What does an underwriting matrix

6   look like?

7   A.          It's a spreadsheet that details

8   their bank statement and deposit averages,

9   and the collected receivables.  The

10  objective of the spreadsheet is to

11  understand the cash flow for the business

12  and to compare it to prior months?

13  Q.          Because the cash flow is securing

14  the advance, correct?

15          MR. BERMAN:  Objection.  You can

16  answer.

17          THE WITNESS:  That is not true.

18  BY MR. PROPER:

19  Q.          Okay.  We'll get to that.  Does

20  the credit committee -- strike that.  Are

21  there notes of the credit committee

22  meetings?

23  A.          No, there generally no notes.

24  Q.          Do you attend the credit

Joseph Barleta

Page 25

1    committee meetings?

2    A.        I do not.

3    Q.        Are there any documents created

4    to reflect what happens at a credit

5    committee meeting?

6    A.        No.

7    Q.        How frequently does a credit

8    committee meet?

9    A.        Everyday.

10   Q.        Is there an agenda for credit

11   committee meetings?

12   A.        There is no agenda.

13   Q.        Are there emails exchanged

14   concerning the meetings?

15   A.        They're generally verbal.  There

16   may be some.

17   Q.        What did you do, if anything, to

18   determine whether or not there are credit

19   committee documents specific to my client's

20   transaction?

21   A.        We went over communications that

22   we had, and we reviewed the file itself

23   where we often make notes on that file from

24   the credit committee.

Joseph Barleta

Page 26

1    Q.        Were there any such notes?

2    A.        I believe so.

3    Q.        What specific notes from the

4    credit committee do you recall seeing?

5    A.        We would have to review the

6    application.  Those were noted directly on

7    the file freehand.

8    Q.        Well, I haven't seen freehand

9    notes from a credit committee, so you're

10   gonna have to help me.  Can you tell me in

11   a little more detail, as part of your

12   preparation for this deposition what credit

13   committee notes you recalled seeing?

14   A.        There were notes on the bank

15   statements themselves highlighting certain

16   items of coming in for the clients

17   receivables.  The deposit, transfers

18   between the accounts, part of their general

19   day do day cash flow.

20   Q.        What were the nature of the

21   notes?

22   A.        The notes just highlight the

23   items that are coming in to help the credit

24   committee just make a decision on the file.

Joseph Barleta

Page 27

1   Q.        Were there concerns expressed by

2   the credit committee?

3   A.        No.

4   Q.        Were there notes of any kind in

5   terms of the nature of my clients

6   receivables; good, bad or otherwise?

7            MR. BERMAN:  Objection.  You can

8   answer.

9            THE WITNESS:  Yes.

10  BY MR. PROPER:

11  Q.        What were some of comments that

12  were made by the credit committee

13  concerning my clients business and/or

14  receivables?

15  A.        The consistency of their

16  deposits.

17  Q.        Was it a good note or a bad note?

18  A.        It was positive.

19  Q.        What specifically did the credit

20  committee note?

21  A.        That the deposits for this client

22  were consistent for the reviewed months on

23  the bank statements.

24  Q.        Anything else?

Joseph Barleta

Page 28

1   A.        It also noted debits for other

2   transactions that they had, which we

3   reviewed as part of the consolidation for

4   thi client specifically.

5   Q.        What other debits are you

6   referring to?

7   A.        Other factoring transactions the

8   client had.

9   Q.        And who were the agreements with?

10  A.        Those are in the documents we

11  provided already.

12  Q.        Okay.  Do you recall any of the

13  other companies that my clients had

14  agreements with?

15  A.        I don't recall their names

16  specifically.

17  Q.        Are there common MCA companies

18  that you see your customers dealing with

19  before they come to you?

20  A.        There's a lot in the industry.

21  We can note there's some that we see once

22  in a while, but no consistency between file

23  to file.

24  Q.        It's common for an applicant to

Joseph Barleta

Page 29

1    have existing MCA agreements in place when

2    they come to you, correct?

3    A.        No.

4    Q.        It's not common?

5    A.        It can be either or.  There are

6    clients with no MCA transactions

7    beforehand.

8    Q.        What percentage of the applicants

9    would you estimate have existing MCA

10   agreements in place when they apply for

11   funding with CBSG?

12   A.        We would have to review our

13   funding list.

14   Q.        So you don't know the answer to

15   that question one way or the other?

16   A.        No.

17   Q.        And you said you would have to

18   review what?

19   A.        We would have to review our

20   funding list, our history of funding.

21   Q.        What is a funding list exactly?

22   Other than a history of funding, can you

23   give me a little more info?

24   A.        Just a list of deals we've done.

Joseph Barleta

Page 30

1   Q.       And is that something you can

2   easily print out?

3   A.       No.

4   Q.       How would you print out a list of

5   the deals that you've done this, so called,

6   funding list?

7   A.       We don't print it out, we use it

8   online.

9   Q.       Walk me through how you would go

10  about pulling the funding list, what would

11  you do?  Go onto your computer and do what?

12  A.       We'd log to our system.  We would

13  run the report.

14  Q.       How do you run the report?  What

15  do you have to?

16  A.       There our CRM.

17  Q.       When you say run the report, what

18  does that mean?

19  A.       Specify perimeters, period of

20  time, basically what information you want

21  to include on the list.

22  Q.       Okay, and what search would you

23  have to do to determine whether or not an

24  applicant had an existing MCA agreement in

Joseph Barleta

Page 31

1    place at the time they came to CBSG for

2    funding?

3    A.        We would have to reference the

4    file and see if it was part of a

5    consolidation list.

6    Q.        Is every applicant that has an

7    MCA agreement in place required to

8    consolidate that agreement in order to get

9    funding?

10   A.        No, it's a case by case basis.

11   Q.        All right, so there may be

12   instances where there's not a consolidation

13   transaction, but you simply provide the

14   customer funding and the customer continues

15   with the agreement that it has in place

16   with some other MCA agreement, correct?

17             MR. BERMAN:  Objection.  You can

18   answer.

19             THE WITNESS:  That's right.  It

20   depends on the need of the business.

21   BY MR. PROPER:

22   Q.        So you can't just do a search and

23   consolidation and accurately answer whether

24   or not an applicant had an existing MCA

Joseph Barleta

Page 32

1    agreement, correct?

2             MR. BERMAN:  Objection.  You can

3    answer.

4             THE WITNESS:  It would have to be

5    that information plus pulling the

6    information for other clients that had

7    MCA's, there's other perimeters involved

8    with that report.  If we were to get that

9    specific?

10   BY MR. PROPER:

11   Q.        Yeah, I want to get that

12   specific.  How would you get that specific

13   and find out even if a customer had one

14   existing MCA agreement with another company

15   and they were not looking to consolidate,

16   they just wanted another MCA agreement with

17   CBSG?

18   A.        In that case, which is a report

19   we don't normally run, we would have to

20   pull the files directly.

21   Q.        How many customers does CBSG

22   currently have?

23             MR. BERMAN:  Objection.  Don't

24   answer.

Joseph Barleta

Page 33

1          MR. PROPER:  Joe LaForte

2    represented at an investor event, I believe

3    you attended, that there were 3500

4    customers.  Was that an accurate statement,

5    or not.

6          MR. BERMAN:  Objection.  Don't

7    answer.

8    BY MR. PROPER:

9    Q.       Who is Joe LaForte?

10   A.       He's the sales director for one

11   of our ISO's.

12   Q.       Sales director which for ISO?

13   A.       Recruiting and Marketing

14   Resources.

15   Q.       Do you have a written agreement

16   with Recruiting and Marketing Resources?

17   A.       Yes.

18   Q.       Has that agreement been produced

19   in this case?

20   A.       I don't know.

21   Q.       It hasn't.  Do you know why it

22   hasn't?

23   A.       I don't know.

24   Q.       Was Mr. LaForte involved in the

Joseph Barleta

Page 34

1   formation of CBSG?

2   A.         No.

3   Q.         Has Mr. LaForte ever been

4   employed at CBSG?

5   A.         No.

6   Q.         Ever Mr. LaForte ever had an

7   ownership interest in CBSG?

8   A.         No.

9   Q.         Has Mr. LaForte ever been at

10  CBSG?

11  A.         No.

12  Q.         Has Mr. LaForte ever had an

13  ownership interest ata CBSG?

14  A.         No.

15  Q.         Did you attend an investor event

16  on November 21 at the Sheraton Hotel in

17  Valley Forge, Pennsylvania?

18             MR. BERMAN:  Objection.  Don't

19  answer.

20             MR. PROPER:  That's not a proper

21  objection.

22             MR. BERMAN:  Call the Judge.

23             MR. PROPER:  I will.  Because

24  I've got case law that says I can ask a

Joseph Barleta

Page 35

1    witness questions in an individual capacity

2    at a 30B.6, it doesn't have to be within

3    the topic.  So I'm happy to call the Judge

4    on this.

5              MR. BERMAN:  Call the Judge.

6              MR.  PROPER:  It Also goes to

7    creditability and goes to --

8              MR. BERMAN:  Call the Judge.

9    Call the Judge.

10             MR. PROPER:  -- also to the

11   organization of the company.

12             MR. BERMAN:  Call the Judge.

13   BY MR. PROPER:

14   Q.        Are you aware that Mr. LaForte

15   represented0 to my client that he was the

16   owner of CBSG?

17   A.        I am aware.

18   Q.        You are aware of that?

19   A.        (Witness nods.)

20   Q.        When did you learn of that?

21   A.        When reviewing the case file.

22   Q.        What specifically did you review

23   where you saw that Mr. LaForte was telling

24   my client that he owned CBSG?

Joseph Barleta

Page 36

```
1   A.          There were communications via
2   email.
3   Q.          What specific email are you
4   referring to?
5   A.          There was something we came
6   across.
7   Q.          I don't recall that specific
8   email.  Do you recall anything additional
9   about that?
10  A.          I don't.
11  Q.          You saw an email from who to who
12  where Mr. LaForte represented he was the
13  owner of CBSG?
14  A.          I don't recall.
15  Q.          When did you see the email?
16  A.          In discussions with our counsel.
17  Q.          Okay.  Was there a bates number
18  on the email that you saw?
19  A.          No.  Not that I recall.
20  Q.          Was it an internal email or was
21  it a communication between my client and
22  Mr. LaForte?
23  A.          I don't remember.
24  Q.          So Mr. LaForte was representing
```

Joseph Barleta

Page 37

1   that he was the owner of CBSG in that email

2   you saw.  Was that an accurate or

3   inaccurate statement?

4   A.        You know, now that I've mentioned

5   it, I don't know if it was this specific

6   file.  I can't say with confidence.

7   Q.        You saw some email where Mr.

8   LaForte represented to somebody that he

9   owns CBSG, that's what you remember?

10  A.        Yes.

11  Q.        Is that a truthful or not a

12  truthful statement that me made?

13  A.        It is not a truthful statement.

14  Q.        Do you know if Mr. LaForte is

15  regularly representing to the public that

16  he's the owner of CBSG?

17  A.        We often see our ISO burgers do

18  that.

19  Q.        Your ISO who?

20  A.        Our ISO reps.  The people talking

21  to the clients.  Their job is to talk to

22  the clients and determine, you know,

23  provide information.  They always represent

24  they're some kind of managerial or

Joseph Barleta

Page 38

1    ownership position in the business.

2    Q.        Which one of your ISO's, other

3    than Mr. LaForte, is telling applicants

4    that they own CBSG?

5    A.        It's common practice in the

6    industry.

7    Q.        Give me the name of one other

8    person that represents to applicants that

9    they own CBSG that you personally recall

10   seeing?

11            MR. BERMAN:  Objection.  It's

12   beyond the scope of this case, but you can

13   answer.

14            THE WITNESS:  If I had to pull

15   one out of the hat, Darren Dorval.

16   BY MR. PROPER:

17   Q.        What is CBSG's position with

18   respect to ISO's providing false

19   information to your customers?

20   A.        It is something we clarify before

21   we fully complete the transaction.

22   Q.        When did you first learn that Mr.

23   LaForte was telling people that he owned

24   CBSG?

Joseph Barleta

Page 39

1    A.        I don't recall.

2    Q.        Have you known this for a week, a

3    month, a year, five years?  How long has he

4    been doing it?

5    A.        It's common place in the

6    business, it's just a generally understood

7    tactic used by sales reps.

8    Q.        I don't care about anyone other

9    than Mr. LaForte.

10   A.        Uh-huh.

11   Q.        So how long has he been

12   representing to people that he owns CBSG?

13   A.        I don't know.

14   Q.        Does he represent to investors

15   that he owns CBSG?

16             MR. BERMAN:  Objection.  Don't

17   answer the question.

18   BY MR. PROPER:

19   Q.        Have you ever been in a public

20   even where Mr. LaForte has represented

21   himself as the owner of CBSG?

22   A.        No, not that I recall.

23   Q.        Okay, so let me be clear.  You

24   don't recall any instance where you

Joseph Barleta

Page 40

1    attended an event where Mr. LaForte

2    represented to the public that he was the

3    owner of CBSG?

4              MR. BERMAN:  Was it done with a

5    special tone to get a different answer?

6              THE WITNESS:  No, I don't recall.

7    BY MR. PROPER:

8    Q.        If you had heard Mr. LaForte

9    represent to the public that he was the

10   owner of CBSG, would you have corrected

11   that statement?

12   A.        If I had, yes.

13   Q.        Because that's important to

14   correct, right?

15   A.        Yes.

16   Q.        You don't want to lead people

17   with the misimpression that the ownership

18   includes Mr. LaForte, correct?

19             MR. BERMAN:  Objection.  You can

20   answer.

21             THE WITNESS:  It depends on the

22   context.

23   BY MR. PROPER:

24   Q.        Well, how about the context that

Joseph Barleta

Page 41

1    Mr. LaForte doesn't have the cleanest

2    background in the world?

3              MR. BERMAN:  Objection.

4              THE WITNESS:  It's irrelevant to

5    the business.

6    BY MR. PROPER:

7    Q.        It's irrelevant to the business.

8    Is it irrelevant to the fact that you're

9    trying to acquire a bank that Mr. LaForte

10   is an owner with a criminal background?

11             MR. BERMAN:  Objection.  Don't

12   answer the question.

13   BY MR. PROPER:

14   Q.        Is CBSG trying to acquire a bank?

15             MR. PROPER:  Objection.  Don't

16   answer the question.

17   BY MR. PROPER:

18   Q.        What is you understanding of Mr.

19   LaForte's criminal background?

20   A.        Not much.  He had some issues

21   over a decade ago.

22   Q.        Did the issues involve fraud and

23   dishonesty?

24   A.        I'm not aware of the particular

Joseph Barleta

Page 42

1   details.

2   Q.      You never did a background check

3   on this person that's holding himself o ut

4   to be an owner of CBSG and your sales rep?

5   A.      No, I have not.

6           MR. BERMAN:  Objection.  You can

7   finish your answer.

8           THE WITNESS:  No, we haven't.

9   BY MR. PROPER:

10  Q.      When did you first learn Mr.

11  LaForte may have been involved in some

12  crimes of dishonesty?

13          MR. BERMAN:  Objection.  You can

14  answer.

15          THE WITNESS:  We knew this from

16  the first day.

17  BY MR. PROPER:

18  Q.      Do you know that he was convicted

19  of running an illegal gambling operation?

20  A.      No.

21  Q.      Did you know he was convicted of

22  mortgage fraud?

23  A.      I had some details, I don't know

24  the specifics.

Joseph Barleta

Page 43

1    Q.        You're involved in a business

2    that involves providing money to your

3    customers, right?

4    A.        Yes.

5    Q.        And the individuals that are your

6    ISO's and sales agents are representing

7    CBSG, correct?

8              MR. BERMAN:  Objection.  You can

9    answer.

10             THE WITNESS:  Yes.

11   BY MR. PROPER:

12   Q.        You have written agreements with

13   these individuals, correct?

14   A.        Correct.

15   Q.        And you expect them to represent

16   your business in a way that's truthful and

17   honest, correct?

18   A.        Not necessarily.

19   Q.        Okay, so when do you expect your

20   representatives to be honest and when are

21   you okay with them not being honest?

22             MR. BERMAN:  Objection.

23             THE WITNESS:  It wasn't matter

24   for the origination of the file.  We verify

Joseph Barleta

Page 44

1    what the transaction is after the ISO rep

2    turns in a client or a lead.

3    BY MR. PROPER:

4    Q.        So you're saying that it doesn't

5    matter if your ISO's lie or not in terms of

6    the application process?

7              MR. BERMAN:  Objection.  You can

8    answer.

9              THE WITNESS:  It's irrelevant

10   because we go over the actual terms per

11   client withe the underwriting department,

12   and we clarify any ambiguities that a rep

13   may have made.

14   BY MR. PROPER:

15   Q.        How do you know what

16   representations a rep made so that they --

17   strike that.

18             How do you know what

19   representations the ISO made that would

20   require correction?

21   A.        We don't.  We go through the

22   specifics of the contract, how the deals

23   are being funded, and what receivables are

24   being factored.

Joseph Barleta

Page 45

1  Q.        Do you have a common practice,

2  since it's common for ISO's to represent

3  that they're owners of the business to tell

4  the customers who the owners are?

5  A.        No, we don't need to do.

6  Q.        So it's not a material

7  consideration for a customer who owns a

8  business?

9            MR. BERMAN:  Objection.

10           THE WITNESS:  No.

11  BY MR. PROPER:

12  Q.        Customers don't care whether the

13  business is owned by a convicted felon or

14  not, right?

15  A.        They don't.

16  Q.        That's not material to a decision

17  in your experience, right?

18  A.        Yes.

19  Q.        How many of your customers have

20  you asked whether or not they care whether

21  or not an owner is a convicted felon?

22  A.        It's not a standard practice for

23  us.

24  Q.        Why does Mr. LaForte not use his

Joseph Barleta

Page 46

1  real name?

2  A.        I don't know.

3  Q.        Do you know he goes by Joe Mack

4  in his business with PAR, correct?

5  A.        Sometimes.

6  Q.        Well, when does he use his real

7  name and when does he use Joe Mack?

8  A.        It's on him to use whatever he

9  wants on his signature.  He's just an ISO.

10 Q.        What name does he use in internal

11 correspondence with CBSG?

12 A.        I've seen both.

13 Q.        You never asked him why he's

14 using an alias?

15 A.        No.  He's already disclosed any

16 issues in his past beforehand.

17 Q.        Who has disclosed what issues in

18 his past beforehand?

19 A.        As I mentioned when we first

20 started the business when I got involved in

21 CBSG this was disclosed.

22 Q.        Did he disclose it to you

23 personally?

24 A.        Yes.

Joseph Barleta

Page 47

1   Q.        This was a disclosure made for

2   what purpose?

3   A.        Transparency, and to build trust.

4   Q.        At that point in time, was Mr.

5   LaForte involved with CBSG's business?

6   A.        No.  Only as a third party ISO

7   broker we worked with.

8   Q.        So before he was approved as a

9   third party ISO, did he make a disclosure

10  about his background?

11  A.        Yes.

12  Q.        And the disclosure would have

13  been largely immaterial because his wife

14  presumably would have known what his

15  criminal background was, right?

16            MR. BERMAN:  Objection.

17            THE WITNESS:  Yes.

18  BY MR. PROPER:

19  Q.        And Lisa McElhone is Mr.

20  LaForte's wife?

21  A.        Yes.

22  Q.        Is she an owner of the business?

23  A.        Yes.

24  Q.        Is she the sole owner?

Joseph Barleta

Page 48

1    A.        Yes.

2    Q.        Does she work at an office for

3    CBSG?

4    A.        Yes.

5    Q.        Which office?

6    A.        We have a few offices.

7    Q.        What office does she work out of

8    primarily?

9    A.        She's at the office on 3rd

10   Street.

11   Q.        How long have you had an office

12   on 3rd Street?

13   A.        Two and a half years now.

14   Q.        Any idea why Mr. LaForte

15   testified that CBSG did not have an office

16   in Philadelphia?

17            MR. BERMAN:  Objection you can

18   answer.

19            THE WITNESS:  Because it's our

20   operating entity that primarily resides

21   there, which handles files for CBSG.

22   BY MR. PROPER:

23   Q.        Which entity are you referring

24   to?

Joseph Barleta

Page 49

1    A.        FSP.

2    Q.        What does FSP refer to?

3    A.        Full Spectrum Processing.

4    Q.        Whose name is on the lease for

5    the 3rd Street location, Full Spectrum

6    Processing or CBSG?

7              MR. BERMAN:  Objection.  You can

8    answer.

9              THE WITNESS:  It's Full Spectrum

10   Processing.

11   BY MR. PROPER:

12   Q.        When you testified that CBSG has

13   a presence on 3rd Street, what did you mean

14   by that?

15   A.        That we have personnel that

16   handles files for CBSG there.

17   Q.        Which CBSG employee works at the

18   3rd Street?

19   A.        Only Lisa.

20   Q.        Does CBSG represent to customers

21   that it has an office on 3rd Street in

22   Philadelphia?

23   A.        No.

24   Q.        It's not on the top of every

Joseph Barleta

Page 50

1    agreement?

2    A.        Should be our Florida domicile.

3    There may be prior agreements using the old

4    address.

5    Q.        There's a prior agreement, in

6    fact, the agreement with my client that has

7    141 North 2nd Street.  Did you have a

8    presence there at some point?

9    A.        Yes, we did.

10   Q.        And then I see actually on the

11   schedule A for a different agreement, let

12   me show you what I'm referring to.  That

13   has the North 3rd Street address, correct?

14   A.        Right.

15   Q.        So this is a more recent

16   agreement, I assume, after your location

17   change, right?

18   A.        Yes.

19   Q.        So you are representing to

20   customers on every one of your agreements

21   that you have an office on North 3rd

22   Street, at least after you moved there,

23   right?

24             MR. BERMAN:  Objection.

Joseph Barleta

Page 51

1           THE WITNESS:  For mailing

2   correspondence.

3   BY MR. PROPER:

4   Q.      Is that a truthful statement?  Is

5   that a real office?

6   A.      Yes.

7           MR. BERMAN:  Objection.

8           THE WITNESS:  Yes.

9   BY MR. PROPER:

10  Q.      So you share an office with Full

11  Spectrum?

12  A.      We are not in the office with

13  Full Spectrum.  We are operating -- we are

14  having Full Spectrum process files for

15  CBSG.

16  Q.      Okay, so I just want to

17  understand.  Have you been to the North 3rd

18  Street office?

19  A.      Yes.

20  Q.      How many times?

21  A.      Several.

22  Q.      How many times have you been

23  there over the last month?

24  A.      At least ten time.

Joseph Barleta

Page 52

1    Q.        Okay.  Do you work out of that

2    office?

3    A.        No.

4    Q.        What office do you work out of?

5    A.        205 Arch Street.

6    Q.        How long have you had an office

7    at 205 Arch Street?

8    A.        Approximately three years.

9    Q.        Is CBSG a tenant at 205 Arch

10   Street?

11   A.        No.

12   Q.        So with respect to 205 Arch

13   Street, do you work at that location as an

14   employee of CBSG or some other business?

15   A.        Some other business.

16   Q.        What other business is that?

17   A.        Full Spectrum Processing.

18   Q.        Are you an employee of both Full

19   Spectrum and CBSG?

20   A.        No.

21   Q.        Are you an employee of CBSG?

22   A.        No.

23   Q.        Have you ever been an employee of

24   CBSG?

Joseph Barleta

Page 53

1    A.          Yes.

2    Q.          What period of time were you

3    employed by CBSG?

4    A.          From the end of 2012 to the end

5    of 2016.

6    Q.          What was your position during

7    that period of time?

8    A.          CFO.

9    Q.          And in 2016 what happened?

10   A.          We moved all our personnel in

11   Philadelphia to Full Spectrum Processing

12   and began working under our operating

13   agreement.

14   Q.          When you say you moved all your

15   personnel, does that mean one day a bunch

16   of people were employees of CBSG and the

17   next day they're employees of Full

18   Spectrum?

19   A.          That's correct.

20   Q.          Did these individuals job titles

21   change from one day to the next?

22   A.          No.

23   Q.          Did the responsibilities change

24   in any way?

Joseph Barleta

Page 54

1   A.        Yes.

2   Q.        Okay.  So how did the

3   responsibilities of the employees change

4   from when they worked at CBSG to when they

5   worked at Full Spectrum?

6             MR. BERMAN:  Objection.  Don't

7   answer these questions.  You can raise it

8   with the Judge.  You're going well beyond

9   the scope of a 30B6.

10            MR. PROPER:  Which I'm permitted

11  to do.

12            MR. HESKIN:  Goes to corporate --

13            MR. BERMAN:  Not in this limited

14  deposition.

15            MR. PROPER:  It goes go to

16  corporate organization.

17            MR. BERMAN:  Which you took out

18  of your 30B6.

19            MR. PROPER:  No, I did not.

20            MR. BERMAN:  You did.  We'll have

21  the Judge in a minute, so you can raise

22  that then if you want.

23            MR. PROPER:  I will.

24            MR. BERMAN:  Okay.

Joseph Barleta

Page 55

1   BY MR. PROPER:

2   Q.        What are your roles and

3   responsibilities at Full Spectrum?

4   A.        I'm in charge of accounting,

5   payroll, HR and IT.

6   Q.        Does CBSG have its own accounting

7   department?

8   A.        No.

9   Q.        Does it have its own payroll

10  department?

11  A.        No.

12  Q.        How about HR and IT?

13  A.        No.

14  Q.        So Full Spectrum is a consultant,

15  or an outside vendor for CBSG with respect

16  to these activities, correct?

17           MR. BERMAN:  Objection.  You can

18  answer.

19           THE WITNESS:  Servicing entity.

20           MR. PROPER:  It's a servicing

21  entity.

22  BY MR. PROPER:

23  Q.        And you said there's a written

24  agreement between CBSG and Full Spectrum?

Joseph Barleta

1    A.        Yes.

2    Q.        Were you involved in the decision

3    to form Full Spectrum?

4    A.        Yes.

5    Q.        What was the reason that Full

6    Spectrum was formed?

7    A.        Because it services other

8    entities, and it's not solely CBSG's

9    managing.

10   Q.        Does Ms. McElhone have any

11   ownership interest in Full Spectrum?

12   A.        Yes.

13   Q.        Did she have an ownership at the

14   time the servicing agreement came into

15   play?

16   A.        Yes.

17   Q.        Do you know what percent?

18   A.        100 percent.

19   Q.        Does Full Spectrum do or perform

20   services for companies other than CBSG?

21   A.        Yes.

22   Q.        Does CBSG have its own

23   underwriting department?

24   A.        No.

Joseph Barleta

Page 57

1    Q.        Who does underwriting for CBSG

2    currently?

3    A.        Full Spectrum.

4    Q.        How long has Full Spectrum

5    performed the underwriting?

6    A.        Since 2017.

7    Q.        Did CBSG have underwriters prior

8    to 2017?

9    A.        Yes.

10   Q.        At the time my client entered

11   into an agreement with CBSG, was CBSG

12   performing the underwriting internally or

13   in-house?

14   A.        I'm sorry, can you clarify.

15   Q.        At the time my client entered

16   into an agreement with CBSG, did a CBSG

17   employee perform the underwriting?

18   A.        No.

19   Q.        Who performed the underwriting?

20   A.        A Full Spectrum Processing

21   employee.

22   Q.        Do you recall what the date was

23   that Full Spectrum took over?

24   A.        January 1, 2017.

Joseph Barleta

Page 58

1   Q.        Who was the employee of Full

2   Spectrum that underwrote my clients?

3   A.        Susan Graesar.

4   Q.        In --

5                    - - -

6             (Phone call with the Judge.)

7                    - - -

8             (Whereupon a short recess was

9   taken.)

10                   - - -

11  BY MR. PROPER:

12  Q.        So since January 2017 you have

13  not been employed by CBSG, correct?

14  A.        Correct.

15  Q.        And since January of 2017, have

16  you represented to the public that you are

17  an employee of CBSG?

18            MR. BERMAN:  Objection.

19            THE WITNESS:  Not necessarily an

20  employee, but an operator servicing it.

21  BY MR. PROPER:

22  Q.        Do you routinely correspond with

23  CBSG customers using CBSG letterhead?

24  A.        No, I don't, but the company

Joseph Barleta

Page 59

 1   does.

 2                  - - -

 3               (Whereupon the court reporter

 4   marked P-9 for purposes of identification.)

 5                  - - -

 6   BY MR. PROPER:

 7   Q.        Is this a letter you sent, Mr.

 8   Cole, on October 24, 2019?

 9               MR. BERMAN:  Objection.  Don't

10   answer the questions about this document.

11   This is related to an unrelated merchant.

12   You heard the Judge's instruction.  You're

13   free to call him again.

14   BY MR. PROPER

15   Q.        Did you represent in this

16   instance that you were a representative of

17   CBSG?

18               MR. BERMAN:  Objection.  Don't

19   answer the question.

20   BY MR. PROPER:

21   Q.        Are you a representative of CBSG?

22   A.        Yes.

23   Q.        In what capacity are you a

24   representative of CBSG?

Joseph Barleta

Page 60

1   A.          I'm a decision maker in the

2   business.

3   Q.          Explain that.  What do you mean

4   you're a decision maker in CBSG's business?

5   A.          I'm a director of the company.

6   Q.          You're not an employee CBSG,

7   you're a director?

8   A.          Correct.

9   Q.          Are you paid by CBSG for being a

10  director?

11  A.          No.

12  Q.          You're volunteering as a

13  director?

14  A.          Yes.

15  Q.          What other directors are there at

16  CBSG?

17  A.          Lisa and Jamie McElhone.

18  Q.          What are your roles and

19  responsibilities as a director of CBSG?

20  A.          I am in charge of the accounting,

21  treasurer.

22  Q.          Are you involved in working with

23  third party auditors?

24  A.          Yes.

Joseph Barleta

Page 61

1   Q.        Is CBSG an audited company?

2   A.        Yes.

3   Q.        And who performs the audits?

4   A.        Current?

5             MR. BERMAN:  Objection.  Don't

6   answer the question.

7   BY MR. PROPER:

8   Q.        Do the audits provide any

9   information with respect to common and

10  typical practices at CBSG in terms of

11  underwriting files?

12            MR. BERMAN:  Objection.  Don't

13  answer the question.

14            Feel free to call the Court,

15  we're here today.

16  BY MR. PROPER:

17  Q.        One of the topics, can you look

18  at the 30B6 notice?  What is topic one

19  again?  Can you read that, please?

20  A.        "Broker" as used herein.

21            MR. BERMAN:  These here.

22            THE WITNESS:  Oh, Topic one.  Got

23  it.

24            Marketing, soliciting,

Joseph Barleta

Page 62

1   underwriting and funding of each Merchant

2   Agreement between You and Fleetwood.

3   BY MR. PROPER:

4   Q.          Do the audit reports contain any

5   information with respect to the marketing,

6   soliciting, underwriting and funding of the

7   merchant agreements between CBSG and my

8   client?

9   A.          Our financial audits?

10  Q.          Yeah, is there any information

11  about common practices that would pertain

12  to the transactions between CBSG and my

13  client?

14  A.          Let me think about that.  It says

15  generally how it's produced in business,

16  meaning working with ISO's.  It doesn't get

17  into detail about how those procedures are

18  carried.

19  Q.          Right.  So what general

20  information does the audit contain with

21  respect to CBSG's policies and procedures

22  with respected to underwriting?

23          MR. BERMAN:  Objection.  Don't

24  answer the question.  He can answer about

Joseph Barleta

Page 63

1   the Fleetwood.  Read the topic and his

2   question.

3   BY MR. PROPER:

4   Q.        I thought you just testified that

5   that generally policy would have pertained

6   to my clients transaction, yes?

7   A.        No, in general, not specifically

8   to Fleetwood.

9   Q.        I understand.  Would that general

10  policy pertain to all of your customers,

11  including Fleetwood?

12  A.        No.  Not necessarily.

13  Q.        Okay, so what ways would it

14  pertain and what ways would it necessarily

15  not pertain?

16  A.        General policy means this is what

17  the company uses as a standard practice for

18  underwriting.  It may or may not pertain to

19  this client specifically because it's not

20  necessarily used for every client.

21  Q.        But it may pertain?

22  A.        May pertain, sure.

23  Q.        Okay, so what information in the

24  audit report may pertain to Fleetwood.

Joseph Barleta

Page 64

1            MR. BERMAN:  Objection.  You can

2    answer about Fleetwood, sure.

3            THE WITNESS:  Just the general

4    origination of how the deal came in,

5    through an ISO and how it was serviced by

6    Full Spectrum Processing.  There is no

7    information about the specific methodology

8    used for either.

9    BY MR. PROPER:

10   Q.        Is there a written underwriting

11   guideline that Full Spectrum uses?

12   A.        They have a checklist.

13   Q.        Is Full Spectrum expected to

14   follow the organization and underwriting

15   guideline that you testified about earlier

16   in the deposition?

17   A.        Yes.

18   Q.        Okay, and in addition to that

19   document, Full Spectrum has some checklist?

20   A.        No, no, I'm talking about the

21   same instrument.  It is a checklist.  It's

22   the guidelines that they have to review for

23   files.

24   Q.        Is there a shorthand version that

Joseph Barleta

Page 65

1   Full Spectrum underwriters use when

2   underwriting my clients deal?

3   A.          No, it's the same thing.  It's

4   one instrument that they use.

5   Q.          As part of the underwriting

6   guidelines, are underwriters expected to

7   pull a Dun and Bradstreet report?

8              MR. BERMAN:  Are you talking

9   about the Fleetwood's?  Objection.  Limit

10  your question to Fleetwood's.

11  BY MR. PROPER:

12  Q.          Was there an underwriting policy

13  in place in January of 2017?  I thought you

14  said there was.

15  A.          Yes.

16  Q.          And I thought you said that

17  underwriters were expected to follow that

18  policy, yes?

19  A.          Yes.

20  Q.          And my clients deal was in 2017,

21  right?

22  A.          I don't recall.

23  Q.          Okay.  I'm going to ask you to

24  assume that for purposes of the next

Page 66

1    question.  That if my clients deal was in

2    January of 2017, the guidelines would have

3    pertained to my clients deal, right?

4              MR. BERMAN:  Objection.

5              THE WITNESS:  Yes.

6    BY MR. PROPER:

7    Q.        Okay, so back to where I was.

8    A.        I don't recall if Dun and

9    Bradstreet was part of the checklist.

10   Q.        Don't have the document.

11   A.        Yeah, we would have to refer to

12   the document, the underwriting file itself.

13   Q.        Okay.  So it may have been

14   required for my clients deal, it might not

15   have been required for my clients deal, I

16   would have to look at the document that I

17   don't have to find out the answer.  Is that

18   what you're telling me?

19   A.        No.  You don't need to look at

20   the document, we generally had Dun and

21   Bradstreet reports at that time pulled.

22   Q.        Okay.  When you say generally,

23   when would a Dun and Bradstreet report been

24   pulled during that time period, and when

Joseph Barleta

Page 67

1  wouldn't it be pulled?

2          MR. BERMAN:  Objection.  You can

3  answer about the Fleetwood's.

4          MR. PROPER:  Just to be clear.

5  You're instructing your witness to answer

6  no questions about whether or not a

7  particular policy extended beyond my

8  clients?

9          MR. BERMAN:  I'm --

10         MR. PROPER:  Just so I'm clear.

11  So it's your position that for commonality

12  purposes, that it's not relevant whether

13  other transactions were similar my clients

14  transaction?  Just so we can --

15         MR. BERMAN:  If you want to refer

16  me to which of the topics you're talking

17  about?

18         MR. PROPER:  Talking about

19  underwriting, one.

20         MR. BERMAN:  Okay, that says the

21  Fleetwood's.  So yes, if you're referring

22  to that topic I will instruct him to only

23  answer to the Fleetwood's.  If you

24  disagree, call the Judge.  I'm looking at

Joseph Barleta

Page 68

1   your topics.

2          MR. PROPER:  Just to be clear,

3   you're limiting this deposition to only

4   questions about Fleetwood, not any other

5   merchant.

6          MR. BERMAN:  I'm limiting this

7   deposition to your 30B6 notice, and if you

8   want a clarification of scope, as you're

9   well aware, we had many letters back and

10  forth where your old response, which I

11  have, your old 30B6 had the marketing,

12  soliciting, underwriting and funding of

13  each Merchant Agreement, that was rejected

14  by the Court based on the letters that

15  came, or didn't have to be because you

16  changed it and you then changed modified it

17  say between You and Fleetwood.

18          So if you want the Court to

19  sanction you going beyond your 30B6, let's

20  get the Judge on the phone and ask him the

21  question.

22          I'm not limiting anything but a

23  30B6 notice you gave.

24          MR. HESKIN:  Based on your

Joseph Barleta

Page 69

1   objections.

2           MR. PROPER:  I understand.

3   You're saying you're not allowing the

4   witness to answer --

5           MR. BERMAN:  No, I'm going by

6   your 30B6 notice that says between You and

7   the Fleetwood's.

8           MR. HESKIN:  Then instruct him

9   not to answer.

10          MR. BERMAN:  I'm instructing him

11  this is what he's here for.

12          MR. HESKIN:  Based on your

13  objection.

14          MR. BERMAN:  Ask whatever

15  questions you want.  We will take it

16  objection by objection.  I'm not giving you

17  any blanket objections.  I'm not here to do

18  that.  Question by question.

19          MR. HESKIN:  We got it.

20          MR. BERMAN:  If you have a

21  problem, call the Judge.

22          MR. PROPER:  You're objecting,

23  it's good.

24  BY MR. PROPER:

Joseph Barleta

Page 70

1  Q.       So the underwriting policy that

2  was in place in January 17, you don't

3  specifically remember whether there's

4  anything about Dun and Bradstreet, right?

5  A.       Right.

6  Q.       Was the underwriting guidelines

7  changed at some point in time?

8  A.       The underwriting guidelines are

9  modified over time depending on the

10  policies of the department.

11  Q.       When a modification to the

12  underwriting guidelines occurs, walk me

13  through that process?  Is there a

14  supplement?  Is there a new policy that's

15  created with the change?  How is that

16  change communicated to the underwriters?

17  A.       The underwriting manager and

18  credit committee discuss potential changes

19  for their policies, and they implement it

20  when needed.

21  Q.       How is it implemented?

22  A.       It's given to all the

23  underwriters to use going forward.

24  Q.       What's given?

Joseph Barleta

Page 71

1   A.          The checklist, the updated

2   checklist.

3   Q.          Maybe we're having a disconnect.

4   Is the checklist included somewhere within

5   the underwriting guidelines?

6   A.          No.  I'm saying there's only one

7   document.  The policy, the checklist, that

8   they review for every file is the same

9   document.

10  Q.          There's a big underwriting

11  guideline, right?  You said it was a big

12  document, the origination and underwriting

13  policy?

14  A.          No.

15  Q.          You didn't testify earlier in the

16  deposition that the underwriting, the

17  origination and underwriting document was

18  big?

19  A.          No, the application files are

20  big, there's a lot of stuff in there, but

21  the specific checklist that they review is

22  not that long.

23  Q.          I'm not talking about the

24  checklist.  We can go back and when we have

Joseph Barleta

Page 72

1    a break, I'll pull it.  But I thought you

2    testified earlier in the deposition, I

3    asked you how big the origination and

4    underwriting guidelines were, and you said

5    they were big and you couldn't be expected

6    to remember everything in there, and it got

7    to a granular level you wouldn't be able to

8    answer the questions.  Am I thinking of a

9    different deposition or am I at the right

10   one?

11   A.        No, I misunderstood then.  I

12   meant the entire underwriting file is a big

13   file.  There's a lot stuff in there and if

14   you need to get granular, you would have to

15   go through the file.

16             MR. BERMAN:  I want to be clear

17   for the deposition because I didn't know

18   about this checklist either before today,

19   so I do want to get you that checklist

20   while we're sitting here at a break.  He's

21   going to get it for me, so you tell me when

22   we can take a break so I can get that.

23   BY MR. PROPER:

24   Q.        Is it your testimony under oath

Joseph Barleta

Page 73

1    that the only origination and underwriting

2    guideline is the checklist?

3    A.       Yes.

4    Q.       No other document relating to

5    underwriting?

6    A.       Well, there's other documents

7    relating to underwriting, but it's not

8    necessarily a procedures manual if that's

9    what you're talking about.

10   Q.       I want you to tell me every

11   written piece of paper that underwriters

12   are expected to rely upon when underwriting

13   a file?

14            MR. BERMAN:  Objection.  You can

15   answer.

16            THE WITNESS:  We have our

17   merchant applications.  We have our

18   underwriting checklist.  We have our

19   underwriting reports, which are including,

20   you know, site inspections and on line

21   credit verification for the business and

22   its owners.  We have the bank statements

23   produced for the business.  We have the

24   financials included as part of the

Joseph Barleta

Page 74

1    document.  We also have the underwriting

2    matrix that I mentioned before where they

3    calculate the cash flow worthiness of the

4    business and the receivables.

5            We have any other relevant

6    company information such as invoices, or

7    client list, or particular information

8    about that industry that the underwriters

9    use to make a decision before moving

10   forward with a factoring transaction.

11   Q.        Okay.  So, do you recall since

12   January of 2015 how many iterations of the

13   underwriting checklist there have been?

14   A.        I don't recall.

15   Q.        What have you done in preparation

16   for this deposition to determine what

17   information is on the checklist, and when

18   changes were made to that checklist?

19   A.        We reviewed the client file.

20   Q.        Anything other than that?

21   A.        No, just that client file.

22   Q.        The underwriting report, you

23   mentioned some things that were in the

24   underwriting report.  What were those

Joseph Barleta

Page 75

1    again?

2    A.          What underwriting report?  Are

3    you referring to the matrix?

4    Q.          No, I thought you said that there

5    was an underwriting report that would

6    include a site inspection?

7    A.          Yes, there are site inspections.

8    You check the Yelp pages for these business

9    to make sure they're in good shape.

10   Q.          Was there a site inspection done

11   on my clients business?

12   A.          I believe so, yes.

13   Q.          Was that part of the policy that

14   was in place at the time to do a site

15   inspection?

16   A.          It is one of the items on the

17   checklist.

18   Q.          Has that policy changed, that a

19   site inspection is required?

20   A.          It's never required, it's often

21   done depending on the client, the industry,

22   the regionality.  There's a couple

23   considerations for the business.

24   Q.          So does a checklist have some

Joseph Barleta

Page 76

1    information about site inspections?

2    A.        Just says it's a thing they need

3    to go over if need.  The underwriting and

4    the credit committee needs to make a

5    decision on whether or not to run it.

6    Q.        But it's often run?

7    A.        Yes.

8    Q.        Okay, and you said -- is the Dun

9    and Bradsheet report also often run?

10   A.        No, we stopped using that one.

11   Q.        When did you stop using Dun and

12   Bradstreet?

13   A.        I want to say two years ago.

14   Q.        How about Experian or some type

15   of credit report?

16   A.        We still run Experian.

17   Q.        Okay.  Was there an Experian

18   credit report pulled from my client's deal?

19   A.        Yes.

20   Q.        Was that part of some policy that

21   was in place at the time?

22   A.        It's on the checklist.

23   Q.        Okay.  Has the checklist changed

24   to take off any necessity for pulling a

Joseph Barleta

Page 77

1  credit report, or is that still required?

2  A.       It's still required.

3  Q.       Okay.  And bank statements are on

4  the checklist?

5  A.       Of course.

6  Q.       And that's still required?

7  A.       Yes.

8  Q.       Okay.  So the things that are

9  always required as part of the underwriting

10  would be the credit report, right?

11  A.       Yes.

12  Q.       Three to six months of bank

13  statements?

14  A.       Yes.

15  Q.       The underwriting matrix, is that

16  always done?

17  A.       No.  I mean we have exceptions to

18  that.

19  Q.       Is that often done?

20  A.       Yes.

21  Q.       Is that typically done?

22  A.       Yes.

23  Q.       Okay.  What else is typically

24  done when underwriting an file?  We got the

Joseph Barleta

Page 78

1    bank statements, the credit report, the

2    underwriting matrix, the site inspection.

3    Any other financials other than bank

4    statements?

5    A.          Typically look at their AR.

6    Q.          You typically look at their AR?

7    A.          Yes.  The tax returns and

8    financials are not necessarily a component,

9    they are sometimes included.

10   Q.          Client list, is that typically

11   requested?

12   A.          Yes.

13   Q.          Okay.  Do you typically request

14   whether the applicant has other MCA

15   agreements in place?

16   A.          Yes.

17   Q.          Any other information on the

18   checklist that underwriters typically

19   follow when underwriting a deal that we

20   haven't already discussed?

21   A.          Online social media pieces, we

22   check that.

23   Q.          Okay.  Was there anything that

24   was done in underwriting my client's deal

Joseph Barleta

Page 79

1    that was not typical?

2    A.          No.

3    Q.          So my clients underwriting

4    process was pretty typical for what you

5    would do for any applicant; is that fair?

6    A.          It really depends on the

7    business.  We have to look at that specific

8    business in Texas and that industry.

9    Q.          Yeah, so was that -- was the

10   underwriting that was done for my clients

11   business typical of what the policies would

12   require in terms of underwriting?

13              MR. BERMAN:  Objection.

14              THE WITNESS:  No.  There were

15   specific questions asked about that client

16   about their business and industry that we

17   had to understand before proceeding with

18   the funding.

19   BY MR. PROPER:

20   Q.          What specific questions?

21   A.          The revenue window of the year,

22   when you guys are the most busy with the

23   business.

24   Q.          Don't you ask that of every

Joseph Barleta

Page 80

1    applicant, or isn't that part of every

2    underwriting file, is to look at bank

3    statements and determine whether or not the

4    revenue is fluctuating from month to month

5    for seasonality?

6    A.       Not necessarily.  Landscapers are

7    extremely seasonal.  From our

8    understanding, they require that a lot more

9    than other types of businesses, let's say

10   dentist.  They're less seasonal because

11   people are checking their teeth all year.

12   Q.       Yeah.  When you're looking at

13   three to six months of bank statements, is

14   one of the things that is being looked at

15   consistency of revenue?

16   A.       Yes.

17   Q.       And in my clients case, you are

18   look at consistency of revenue, right?

19   A.       Yes.

20   Q.       So that wasn't unique, right?

21   A.       No.  Every business is going to

22   have revenue, obviously you want to look at

23   that.

24   Q.       So what specifically in my

Joseph Barleta

Page 81

1    clients underwriting file was unique and

2    different than any other underwriting file

3    in terms of the questions and policies and

4    procedures that you follow?

5              MR. BERMAN:  Objection.

6              MR. PROPER:  You can answer.

7              THE WITNESS:  So during the

8    merchant interview, which is a standard

9    thing that they do, they had to understand

10   the seasonality aspect of their landscaping

11   business, that is not a usual thing that

12   they need to go over, again depending on

13   the industry and the merchant business

14   type.

15   BY MR. PROPER:

16   Q.        Whose landscaping business are

17   you referring to?

18   A.        The Fleetwood's.

19   Q.        Okay.  Tell me your understanding

20   of what specific type of landscaping the

21   company does?

22   A.        Golf courses.

23   Q.        Okay, so you're saying that t

24   were some specific questions about the

Joseph Barleta

Page 82

1   nature of my clients business?

2   A.        Yes.  Our credit, and one of the

3   things we developed was that they really

4   get an understanding of the business when

5   they're doing the underwriting.  They want

6   to know the idiosyncrasies about that

7   clients business before they proceed.

8   Q.        Is that something that's common

9   in the underwriting process, to find out

10  the idiosyncrasies of the borrower?

11  A.        It depends on the business.

12  Q.        Don't you want to know everything

13  you can know about a borrower before you

14  enter into a transaction with them?

15          MR. BERMAN:  Objection.  You can

16  answer.

17          THE WITNESS:  No, not

18  necessarily.

19  BY MR. PROPER:

20  Q.        So are you an algorithmic or a

21  non-algorithmic lender?

22  A.        Non-algorithmic.

23  Q.        So as a non-algorithmic lender,

24  it's not important for you to know

Joseph Barleta

Page 83

1    everything you can about the nature of the

2    borrower's business?

3    A.        It is important, but there are

4    questions asked specifically for that

5    industry and business type.

6    Q.        Right, so you may ask a question

7    of a landscaper that may be different than

8    an automobile repair shop?

9    A.        Sure.

10   Q.        But the nature of the questions

11   are designed to find out how that business

12   operates and how they generate revenue,

13   right?

14            MR. BERMAN:  Objection.  You can

15   answer.

16            THE WITNESS:  The questions

17   aren't always asked.  We don't need to ask

18   the dentist how to drill a tooth, we just

19   need to know the revenue basis.  There's

20   cash flow based underwriting and it's

21   consistent.

22   BY MR. PROPER

23   Q.        Now, the cash flow based

24   underwriting, do you perform cash based

Joseph Barleta

Page 84

1    underwriting for every transaction?

2    A.        Yes.

3    Q.        That's what you do, right, you're

4    doing cash based underwriting, right?

5    A.        No, we're doing receivables based

6    underwriting, and cash flow is a

7    consideration as part of it.

8    Q.        Right.  The revenue of a business

9    is their cash flow, right?

10   A.        No.

11   Q.        How is a business's revenue that

12   comes in the door different than their cash

13   flow?

14   A.        Revenue can be produced without

15   cash coming in.  You can have it accrued as

16   receivables, but it doesn't mean they're

17   making deposits everyday.

18   Q.        So you're looking at both

19   receivables and cash flow, right?

20   A.        Revenue and cash flow.

21   Q.        Do you look at revenue and cash

22   flow for every transaction?

23   A.        Yes, that's very important.

24   Q.        Got it.  And you looked at

Joseph Barleta

Page 85

1    revenue and cash flow in my clients

2    transaction?

3    A.        That's correct.

4    Q.        And you also look at the debt to

5    income ratio of the applicant, right?

6    A.        No, we don't look at it that way.

7    Q.        Okay, so if Mr. LaForte testified

8    at his deposition that it was really

9    important to check the borrower's debt to

10   income ratio, you would not agree with

11   that?

12            MR. BERMAN:  Objection.

13            THE WITNESS:  He's a sales rep.

14   If it's an analysis he's making as a sales

15   rep, that's on him, but that's not our

16   standard underwriting practices.

17   BY MR. PROPER:

18   Q.        Got it.  So there's no analysis

19   done of the borrower's debt to income

20   ratio?

21   A.        It's not conducted in the usual

22   DTI comparison.

23   Q.        That's not part of the

24   underwriting matrix?

Joseph Barleta

Page 86

1    A.         No.

2    Q.         What else does my client do in

3    terms of its business?  You said

4    landscaping for golf courses.  Can you just

5    generally tell me your understanding of my

6    clients business?

7    A.         Also servicing for landscaping.

8    Q.         What do you mean servicing for

9    landscaping?

10   A.         Taking care of the landscaping.

11   Q.         What do you mean taking care of

12   the landscaping?

13   A.         Of the landscaping that they

14   produce.  There's some servicing to it.

15   Q.         I'm not following you.  Can you

16   give me an example of some of the things my

17   client would do?

18   A.         If they need to follow up with a

19   client and patch something up, they do

20   that.  There's a service aspect to their

21   business.

22   Q.         Service aspect meaning the golf

23   course may retain my client to go and

24   generally maintain the golf course?

Joseph Barleta

Page 87

1    A.          They may.  They may have to do a

2    follow up on that client's billables.  If

3    there's anything wrong, obviously they want

4    to keep their clients happy because they're

5    running a good business.

6    Q.          Is my client involved in the

7    design at all of golf courses?

8    A.          Not that I know of.

9    Q.          Is it involved in constructing

10   golf courses?

11   A.          No.

12   Q.          Is it important when underwriting

13   a file to fully understand the type of

14   business and work that an applicant

15   performs?

16   A.          In general, yes.

17   Q.          What did you do to educate

18   yourself on the nature of my client's

19   business?

20   A.          I looked at the underwriting

21   file.

22   Q.          What specifically in the

23   underwriting file do you recall seeing that

24   discussed or described the nature of my

Joseph Barleta

Page 88

1    client's business?

2    A.          Just the industry type that's

3    listed on the CRM.

4    Q.          When you say the industry type,

5    what does the underwriting file say about

6    my client's industry?

7    A.          Landscaping, golf related.

8    Q.          Is the underwriting decision --

9    strike that.

10              How important is understanding

11   correctly what a business does in making an

12   underwriting decision?

13   A.          It's very important.

14   Q.          So it's typical for every

15   underwriting file to ask questions to

16   understand what the applicant does, right?

17   A.          Yes.  You need to know what type

18   of business they're in.

19   Q.          And those questions were asked in

20   underwriting my client's deal, right?

21   A.          This's correct.

22   Q.          Did you review an AR report for

23   my client's business?

24   A.          Yes.

Joseph Barleta

Page 89

1    Q.        Okay.  Did you review a client

2    list for my client's business?

3    A.        Yes.

4    Q.        And you reviewed the credit

5    report, right?

6    A.        Yes.

7    Q.        And you reviewed online social

8    media, right?

9    A.        Yes.

10   Q.        And you performed a site

11   inspection, correct?

12   A.        I don't remember specifically if

13   there was one done for them.

14   Q.        Okay, and you required my client

15   to submit bank statements, correct?

16   A.        Yes.

17   Q.        And my client submitted an

18   application, correct?

19   A.        Yes.

20   Q.        And my client provided

21   information about outstanding MCA

22   agreements, correct?

23   A.        Yes.

24   Q.        So, so far everything that was

Joseph Barleta

Page 90

1   done to underwrite my client's file would

2   be things that would be typically done when

3   underwriting a file, correct?

4           MR. BERMAN:  Objection.

5           THE WITNESS:  Most of those

6   elements are included as part of the

7   underwriting package, yes.

8   BY MR. PROPER:

9   Q.       So what are the items that I just

10  mentioned are not part of the underwriting

11  package?

12  A.       They may have gone into more of

13  the AR than other clients.

14  Q.       Did they?  When you say may have?

15  A.       Yes, they did.

16  Q.       So how did the underwriters delve

17  deeper into the AR for my client than

18  typically would be required to perform

19  under the policies?

20  A.       They looked at individual clients

21  that that client had.

22  Q.       What individual clients -- strike

23  that.

24           What individual clients of

Joseph Barleta

Page 91

1   Fleetwood did CBSG look into?

2   A.        The ones listed on the

3   receivables schedule.

4   Q.        What does the receivables

5   schedule look like?

6   A.        It's a financial report prepared

7   by the client in the form of listing their

8   balances owed by different clients.

9   Q.        Is that type of AR report

10  requested typically of customers?

11  A.        Yes.  It depends on the business.

12  Again, a dentist isn't going to have an AR

13  schedule, they're not going to need to know

14  individual clients.

15  Q.        But if a customer has an AR

16  schedule, you want to see it?

17  A.        Again, it depends on the

18  business.  It really is a case by case

19  basis.

20  Q.        Okay.  Is there an underwriting

21  checklist that differs by region?

22  A.        No.

23  Q.        So the underwriting checklist

24  that's used for a Pennsylvania business

Joseph Barleta

Page 92

1    would be used for a California business, a

2    Florida business, and a Texas business?

3              MR. BERMAN:  Objection.  You can

4    answer.

5              THE WITNESS:  In different

6    states, yes.  It's the same list they go

7    over.

8    BY MR. PROPER:

9    Q.        Same checklist, 50 states?

10   A.        Sure.

11   Q.        Got it.  Is there a -- strike

12   that.

13             Was there a term for my clients

14   transaction.

15             MR. BERMAN:  Objection.

16   BY MR. PROPER:

17   Q.        You can answer.

18   A.        A term for the transaction?

19   Q.        Yeah, the money that you gave to

20   my client, was there a pay back term?

21   A.        The details on the factoring

22   agreement are determined per client on the

23   factoring agreement themselves.  Meaning

24   that there are a number of payments

Joseph Barleta

Page 93

1    required to satisfy the RTR.

2    Q.        Is that a term or that's not a

3    term?

4              MR. BERMAN:  Objection.  You can

5    answer.

6              THE WITNESS:  It's terms in the

7    sense of how many installments are required

8    to have it paid back, yes.

9    BY MR. PROPER:

10   Q.        Are you familiar with the concept

11   term of a loan?

12   A.        Yes, I'm familiar with the terms

13   of a loan, which is not what we are

14   providing in this transaction.

15   Q.        Right.  So, is there a specific

16   number of days that my client had to repay

17   the monies you gave to its business?  Yes

18   or no?

19             MR. BERMAN:  Objection.

20             THE WITNESS:  No.

21   BY MR PROPER:

22   Q.        So if I'm using the word, term,

23   to connote the period of time someone is

24   required to pay back money, there is no

Joseph Barleta

Page 94

1    term in my clients agreement, correct?

2              MR. BERMAN:  Objection.

3              THE WITNESS:  Correct.

4    BY MR. PROPER:

5    Q.        I'm going to hand you what's been

6    marked as P-2 in a prior deposition.  Do

7    you recognize P-2?

8    A.        Yes.

9    Q.        And what is P-2?

10   A.        It's a Factoring Agreement for

11   Fleetwood.

12   Q.        Is this a form agreement that you

13   use?

14   A.        Yes.

15   Q.        Is this the same -- strike that.

16             Is the agreement that you use for

17   Fleetwood the same form that you use for

18   all of your merchant transactions.

19             MR. BERMAN:  Objection.

20             THE WITNESS:  The factoring

21   agreement structure is the same.  The

22   specific terms detailed on the purchase

23   price and pay back details vary.

24   BY MR. PROPER:

Joseph Barleta

Page 95

1    Q.        Got it.  So I think I understood

2    your answer, I just want to make sure.  So,

3    can you point out to me on P-2 what terms

4    would change from deal to deal, and what

5    language would be the same for every

6    transaction?

7              MR. BERMAN:  Objection.

8              MR. PROPER:  You can answer.

9              THE WITNESS:  So, the primary

10   item that would change is the fourth

11   paragraph detailing the purchase price.

12   Obviously sizes of transactions are

13   different depending on the industry and

14   clients receivables.

15   BY MR. PROPER:

16   Q.        Okay.

17   A.        And to go back to the

18   underwriting point I made before, the

19   percentage, here the non specified

20   percentage is based on the cash flow basis

21   for that client, meaning are they able to

22   sustain based on the receivables the amount

23   of payments they are planning to pay back.

24   Q.        Which number are you referring

Joseph Barleta

Page 96

1   to?

2   A.          The 25 percent.

3   Q.          Okay, so is it your testimony

4   that the daily payment under this

5   agreement, which is how much?

6   A.          $5,000.75.

7   Q.          That should, based upon your

8   underwriting, approximate 25 percent of the

9   daily receipts for this business?

10  A.          No, not necessarily.

11  Q.          Okay.  How do you come up with

12  the daily payment in relation to the

13  specified percentage, which in this case

14  was 25 percent?

15  A.          So the daily payment is an amount

16  that underwriting decides is -- that is

17  sustainable under our client's

18  underwriting, the cash flow percentage.

19  The 25 percent listed on there is a

20  guideline for them to use, but doesn't

21  necessarily reflect that precise

22  percentage.  It may be higher or lower

23  depending on the clients worthiness for the

24  factoring agreement.  If they're confident

Joseph Barleta

Page 97

1    or not, or worried about it.  There's

2    different criteria for the underwriting.

3    Q.        So in this particular case, was

4    the $5,000.25 -- strike that.  Was the

5    $5,000.75 daily payment 25 percent of my

6    clients expected future receivables?

7    A.        No.

8    Q.        Okay.  Was it less or was it

9    more?

10   A.        It should be less.

11   Q.        Do you know how much less?

12   A.        No, not specifically.

13   Q.        Is there something in the

14   underwriting matrix that would tell you how

15   much 25 percent of the future expected

16   receivables should be on a daily basis?

17   A.        Yes.

18   Q.        And do you know what that number

19   is?

20   A.        I don't, but that underwriting

21   matrix that's objective, as I mentioned, it

22   is to determine proportionality with their

23   cash flow.

24   Q.        Okay.  The 110 days is not a

Joseph Barleta

Page 98

1   term, correct?

2   A.        That's correct.

3   Q.        Can you turn to the second to the

4   last page of exhbiit-2.

5            MR. BERMAN:  I also just wanted

6   to tell you to check your email, you have

7   the checklist he referred to.

8   BY MR. PROPER:

9   Q.        Are you familiar with schedule A?

10  A.        Yes.

11  Q.        Is schedule A a common schedule

12  for your MCA agreements?

13  A.        Yes.

14  Q.        Okay, and I want to direct your

15  attention to the middle of the page, and it

16  has some language, I think it's right under

17  specified percentage, 25 percent.  Do you

18  see that?

19  A.        Yes.

20  Q.        What does that say?

21  A.        Specified --

22  Q.        The line right under that?

23  A.        Underneath specified percentage?

24  Q.        Yeah.

Joseph Barleta

Page 99

```
 1    A.        The term of MCA consolidation

 2    program?

 3    Q.        Yeah, what does that mean?

 4              MR. BERMAN:  Objection.  You can

 5    answer.

 6              THE WITNESS:  So a consolidation

 7    program, they have to establish a number of

 8    installments that it's going to be paid

 9    back under.

10    BY MR. PROPER:

11    Q.        So when this says term of MCA

12    consolidation program, does that mean my

13    client was required to pay back the money

14    you gave to its business in 110 days?

15              MR. BERMAN:  Objection.

16              THE WITNESS:  Not in a 110

17    calendar days, but in 110 installments

18    reflected as business days.

19    BY MR. PROPER:

20    Q.        Business days, so let me ask that

21    in a clearer way.  My client, under this

22    arrangement, was required to pay back the

23    money you gave to its business in 110

24    business days, correct?
```

Joseph Barleta

Page 100

1          MR. BERMAN:  Objection.

2          THE WITNESS:  The -- yes.

3     BY MR. PROPER:

4     Q.        And the 110 business days under

5     schedule A is referred to as the term of

6     MCA consolidation program, correct?

7     A.        On this, yes.

8     Q.        And every schedule A that you use

9     has this same form language, where the term

10    of the MCA consolidation program, that

11    number would be taken from page one of the

12    agreement, correct?

13         MR. BERMAN:  Objection.

14         THE WITNESS:  Not necessarily.

15    It depends on the client, and it depends on

16    the transaction.

17    BY MR. PROPER:

18    Q.        Right.  Does every agreement have

19    a daily specified amount, and the days that

20    this specified amount has to be repaid?

21    A.        No.

22    Q.        Okay.  So you're telling me that

23    some agreements may require a daily payment

24    of some amount, but not say for how long?

Joseph Barleta

Page 101

1    A.        No, there's different structures.

2    Q.        So it may not be daily, it may be

3    weekly or biweekly?

4    A.        Sure.

5    Q.        What percentage of your deals are

6    daily would you say?

7              MR. BERMAN:  Objection.  Don't

8    answer.

9    BY MR. PROPER:

10   Q.        Was it typical for you to enter

11   into payback arrangements where the

12   merchant was repaying you on a daily

13   business basis?

14             MR. BERMAN:  Objection.

15             THE WITNESS:  Can you restate

16   that?

17   BY MR. PROPER:

18   Q.        Yeah, was it typical in terms of

19   the arrangement my client had where you

20   were debiting Fleetwood's account every

21   business day?  Was that something that was

22   a typical arrangement with other merchants?

23             MR. BERMAN:  Objection.

24             THE WITNESS:  Yes.

Joseph Barleta

Page 102

1    BY MR. PROPER:

2    Q.        Okay.  So provided that the

3    agreement was predicated upon business

4    days, the term of the agreement as

5    reflected on schedule A would have the

6    number of business days that would be

7    required to repay the purchased amount,

8    correct?

9              MR. BERMAN:  Objection.

10             THE WITNESS:  Yes.

11   BY MR. PROPER:

12   Q.        Got it.  And if you provide money

13   to a business, you expect that business to

14   repay that money during -- strike that.

15             When you provide money to a

16   business, you expect the business to pay

17   that money over the term specified in the

18   agreement, correct.

19             MR. BERMAN:  Objection.

20             THE WITNESS:  It depends on the

21   business.  In general, that's what we

22   anticipate, but we have a provision for

23   under performance built into the business

24   model.

Joseph Barleta

Page 103

1   BY MR. PROPER:

2   Q.        What is the provision for under

3   performance?

4   A.        So if there's any issues with

5   that client's receivables.  Obviously there

6   is a percentage of default in the business,

7   we have to factor that in.

8   Q.        What is -- is the failure to make

9   a payment specified in the agreement in the

10  event of default?

11          MR. BERMAN:  Objection.

12          THE WITNESS:  Yes.

13  BY MR. PROPER:

14  Q.        Okay.  Is a client indicating to

15  you that they don't have money in their

16  account sufficient to make a daily or

17  weekly payment as may be required by an

18  agreement in the event of default?

19          MR. BERMAN:  Objection.

20          THE WITNESS:  I'm sorry?

21  BY MR. PROPER:

22  Q.        Let's talk about a daily payment.

23  A.        Okay.

24  Q.        If a client sends you an email

Joseph Barleta

Page 104

1   and says:  Don't debit by account today,

2   there's no money in it.  Would that

3   technically be an event of default under

4   the agreement?  I know you may work with

5   the client?

6              MR. BERMAN:  Objection.

7              THE WITNESS:  No.

8   BY MR. PROPER:

9   Q.         If a client writes to you and

10  says, there's no money in my account, and

11  you're unable to debit my client's account,

12  as that an event of default under the

13  agreement?

14             MR. BERMAN:  Objection.

15  BY MR. PROPER:

16  Q.         I thought you just said the

17  failure to make a payment is an event of

18  default?

19  A.         No, if they have four returned

20  payments.

21  Q.         Okay.

22  A.         We work with our clients.

23  Q.         I understand.  So, if you tried

24  to debit my clients account one time and

Joseph Barleta

Page 105

1  there's no money, is that an event of

2  default?

3  A.        No.

4           MR. BERMAN:  Objection.

5  BY MR. PROPER:

6  Q.        Two times, is that an event of

7  default?

8           MR. BERMAN:  Objection.

9           THE WITNESS:  No.

10  BY MR. PROPER:

11  Q.        Three times, is that an event of

12  default?

13  A.        No.

14           MR. BERMAN:  Objection.

15  BY MR. PROPER:

16  Q.        Four times, is that an event of

17  default?

18  A.        Yes.

19           MR. BERMAN:  Objection.

20  BY MR. PROPER:

21  Q.        Now, you said you're willing to

22  work with your customers, correct?

23  A.        Of course.

24  Q.        And there were some instances

Joseph Barleta

Page 106

1    where my client wrote to CBSG and advised

2    you that she did not have sufficient monies

3    in her account to make the daily payment.

4    You recall that, right?

5    A.        Yes.

6    Q.        And in those instances, would she

7    have been in default had you tried to debit

8    her account four times unsuccessfully?

9              MR. BERMAN:  Objection.

10             THE WITNESS:  Yes.

11   BY MR. PROPER:

12   Q.        So rather than put her in

13   default, did you work with my client?

14   A.        Yes.

15   Q.        On how many occasions did my

16   client write to CBSG and advise you that

17   she didn't have enough receipts to pay you?

18             MR. BERMAN:  Objection.

19             THE WITNESS:  There were several

20   correspondences back and forth discussing

21   her ability to pay, and also to try to get

22   another MCA deal.

23   BY MR. PROPER:

24   Q.        Okay.

Joseph Barleta

Page 107

1   A.        And restructure the payment,

2   which I believe they ended up doing

3   subsequently after about 30 days or so.

4   Q.        Okay.  Is there anything in --

5   just to circle back.  On Exhibit-2 you

6   mention the things that changed from

7   agreement to agreement, I think you said it

8   was the fourth paragraph on the first page.

9   A.        Correct.

10  Q.        Is the rest of the agreement

11  standard form language that is in all of

12  these agreements?

13          MR. BERMAN:  Objection.

14          THE WITNESS:  Yes.  Except for

15  the consolidation case, which may or may

16  not apply if it's part of the agreement.

17  BY MR. PROPER:

18  Q.        Just refer to where on the

19  agreement is the consolidation piece?

20  A.        In discussing the consolidation

21  program, which isn't always the case

22  depending the deal.

23  Q.        Okay, so some deals you may not

24  be using -- strike that.  Some deals the

Joseph Barleta

Page 108

1    business may not be using funds to payoff

2    existing MCA agreements, right?

3    A.        Correct.

4    Q.        Is there anything in the form

5    agreement that we're talking about that

6    discusses this workout arrangement when a

7    borrower doesn't have money and you're

8    working with them?

9    A.        No.

10   Q.        Do you have any written policies

11   and procedures, whether in collections or

12   anywhere else that talk about the types of

13   things you're willing to do when a business

14   doesn't have money to pay you?

15            MR. BERMAN:  Objection.

16            THE WITNESS:  No.

17   BY MR. PROPER:

18   Q.        Who is the person or persons at

19   CBSG or Full Spectrum that are empowered to

20   make modifications to an agreement?

21   A.        That would be the collections

22   department.

23   Q.        Okay.  Is the collections

24   department out sourced?

Joseph Barleta

Page 109

1   A.        No.

2   Q.        Who are the current employees in

3   CBSG's collections department?

4   A.        It has none.

5   Q.        It has none currently?

6   A.        Right.

7   Q.        Was there a collections

8   department with actual employees back in

9   January of 2017?

10  A.        No.

11  Q.        Is there a collections department

12  at CBSG currently?

13  A.        No.

14  Q.        Who handles collections for CBSG

15  currently?

16  A.        Full Spectrum Processing.

17  Q.        Prior to January 2017, did CBSG

18  have a collections department?

19  A.        Yes.

20  Q.        How many individuals were in the

21  collections department at the end of 2016,

22  ballpark?

23  A.        Two or three.

24  Q.        Who are the current employees of

Joseph Barleta

Page 110

1   Full Spectrum that handle collections?

2          MR. BERMAN:  Objection.  Don't

3   answer the question.

4   BY MR. PROPER:

5   Q.       Is there a collections policy?

6   A.       No.

7   Q.       Is there any policy at CBSG that

8   talks about finance charges?

9   A.       No.

10  Q.       Did CBSG charge my client finance

11  fees?

12  A.       Yes.

13  Q.       Do you recall how much, in total,

14  my client was charged in finance fees?

15  A.       About $14,000.

16  Q.       Okay.  I'm going to show what's

17  been marked as Exhibit-45 in a prior

18  deposition?

19         MR. BERMAN:  Just to be clear,

20  these are the exhibits that I used at the

21  Fleetwood's deposition?

22         MR. PROPER:  Yes.  I was just

23  about to do that, thank you.

24  BY MR. PROPER:

Joseph Barleta

Page 111

1    Q.        Have you seen this document

2    before?

3    A.        Yes.

4    Q.        Did you review this document in

5    preparation for your deposition?

6    A.        Yes.

7    Q.        Okay.  What is this document?

8    A.        This is a payment history for the

9    client including any returns, holds, or

10   fees charged additionally.

11   Q.        Okay.  Why were additional fees

12   charged to my client?

13   A.        The client requested a

14   modification to their payment amount.  They

15   negotiated verbally that wouldn't be able

16   to facilitate that at an additional cost.

17   Q.        What's the thought process from

18   CBSG's prospective on charging a finance

19   fee when there's a modification done?

20   A.        There is negotiation in extending

21   the amount of days for the pay back of the

22   RTR.

23   Q.        So is the finance fee based upon

24   an expected adjusted to the term?

Joseph Barleta

Page 112

1          MR. BERMAN:  Objection.

2          THE WITNESS:  No.

3   BY MR. PROPER:

4   Q.       So how did you, for instance,

5   calculate a finance charge on February 3,

6   2017 -- strike that.

7          Off the record.

8                    - - -

9          (Whereupon a short recess was

10  taken.)

11                   - - -

12  BY MR. PROPER:

13  Q.       Taking a look at the second page

14  of Exhibit-45, there's a reference on March

15  17, 2017 to a finance fee in the amount of

16  $7,001.  Do you see that?

17  A.       Sure.

18  Q.       How was that finance fee

19  calculated?

20  A.       They negotiated.

21  Q.       Who negotiated it?

22  A.       The collector or customer service

23  rep that's discussing with the client.

24  Q.       Who was the specific person that

Joseph Barleta

Page 113

1  was negotiating this fee with my client?

2  A.        I don't recall who specifically

3  discussed this fee.

4  Q.        Do you have some document that

5  would reflect communications between some

6  person and my client about this fee?

7  A.        No, there's no documentation

8  about that.

9  Q.        Do you have a case management

10  system where CBSG representatives type in

11  notes to reflect the sum and substance of

12  conversations they have with customers?

13  A.        No.

14  Q.        Did you speak to someone at CBSG

15  or Full Spectrum about this particular fee?

16  A.        No.

17  Q.        You testified previously that

18  this was a fee negotiated with my client,

19  correct?

20  A.        Correct.

21  Q.        What's the basis for you making

22  that statement?

23  A.        Basis on review of this file and

24  discussion with the department.

Joseph Barleta

Page 114

1  Q.        Who specifically did you discuss

2  this with?

3  A.        The collections department.

4  Q.        Who specifically in the

5  collections department?

6  A.        Anthony Fazio.

7  Q.        And Mr. Fazio was the one that

8  spoke to my client?

9  A.        I don't know.

10  Q.        Did Mr. Fazio communicate to you

11  something about this particular fee?

12  A.        That it was done as a negotiation

13  with the client in order for them to pay a

14  reduced payment after the $5,000 amount.

15  Q.        What information was Mr. Fazio

16  relying upon?

17  A.        That's discussions within their

18  department.

19  Q.        So you don't know the name of the

20  person specifically that this alleged

21  conversation with my client?

22  A.        No, we have a large collections

23  department.

24  Q.        Did you review any documents that

Joseph Barleta

Page 115

1    referenced this alleged negotiation with my

2    client?

3    A.         No.

4    Q.         Are there any written documents

5    that you came across that reference an

6    alleged negotiation of this fee with my

7    client?

8    A.         No.

9    Q.         So this $7,001 would have been

10   added to the total repayment amount due and

11   owing under the agreement, correct?

12   A.         That's correct.  It's a fixed

13   amount added to the balance directly.

14   Q.         So the balance went from

15   $309,338.25 to $316,339.25, correct?

16   A.         Correct.

17   Q.         And it's your testimony that

18   there would be no written document sent to

19   the customer advising him or her about the

20   imposition of a finance fee, correct?

21          MR. BERMAN:  Objection.

22          THE WITNESS:  There was.  This

23   was done two days.  They have access to

24   their online log in, so they can go and

Joseph Barleta

Page 116

1   review their payment history and any

2   associated fees with their balance.  And we

3   also supply current balance letters and

4   payoff letters.  I believe five were

5   produced with this particular client to

6   confirm that this fee was assessed as part

7   of their negotiation.

8   BY MR. PROPER:

9   Q.        The payoff letter -- is the

10  payoff letter Exhibit-45 or some other

11  document?

12  A.        It's a different payoff letter

13  every time they request it.

14  Q.        Is the payoff letter just a

15  letter advising my client what the amount,

16  the total fixed amount due under the

17  agreement is at that point in time?

18  A.        It can, and it's often provided

19  with a payment history with the current

20  balance for the client.

21  Q.        In my client's case, was she just

22  given a document setting forth the amount

23  that had to be repaid, or did it also

24  attach a detailed breakdown of payments and

Joseph Barleta

Page 117

1    fees that were imposed like Exhibit-45?

2              MR. BERMAN:  Objection.

3              THE WITNESS:  I'm unsure, at

4    least it was the balance for the current

5    date.

6    BY MR. PROPER:

7    Q.         If it was just a balance, then

8    the balance wouldn't reflect the imposition

9    of a finance fee on a particular date,

10   right?

11             MR. BERMAN:  Objection.

12             THE WITNESS:  Right, but they

13   have access to their client portal, which

14   they often look up and we can verify that

15   they have accessed it.

16   BY MR. PROPER:

17   Q.         Were you able to verify that my

18   client accessed the client portal?

19   A.         No, I don't have verification

20   specifically for this.

21   Q.         Does that mean you looked and my

22   client didn't access the client portal?

23   A.         No, I didn't look.

24   Q.         So you had the means to know

Joseph Barleta

Page 118

1    whether my client looked for information on

2    the client portal, but at this point you

3    haven't done that, right?

4    A.        They often do.  It's assumed that

5    they do because they refer to specific

6    items in their discussions with

7    collections.

8    Q.        Just to take us out of

9    assumptions, do you know for a fact, one

10   way or another, whether or not my client

11   accessed the client portal?

12   A.        Yes.

13   Q.        You know for a fact it did or it

14   did not?

15   A.        It did based on our discussions

16   with collections.

17   Q.        So let's talk about the basis for

18   that answer.  You said you know my client

19   did based upon discussions with

20   collections.  So what discussions with

21   collections are you referring to that makes

22   you certain that my client accessed the

23   client portal?

24   A.        In reviewing this payment history

Joseph Barleta

Page 119

1   with collections as part of preparation for

2   this, we went over the story of the client

3   on their returns, the fees assessed, and

4   any help payments that they had.  So there

5   was a discussion about the general history

6   of this client, and the payments that they

7   were making.

8   Q.        As part of this discussion, did

9   you instruct somebody to look for

10  verification whether or not my client

11  accessed the client portal?

12  A.        We didn't need to.  They

13  generally all log on to the portal.

14  Q.        So it was based upon someone's

15  assumption in the collections department?

16  A.        No, it's standard practice.

17  Almost everyone logs into the portal.

18  Q.        How do you know my client fell

19  within the "almost everyone"?

20  A.        Because they were citing specific

21  dates and payment amounts on the portal in

22  negotiations with our collections

23  department.

24  Q.        What specific document are you

Joseph Barleta

Page 120

1    referring to that my client was referencing

2    the payment of a $7,000 finance fee?

3    A.        The payment history available on

4    the portal.

5    Q.        And the document that you are

6    relying upon to show that my client

7    accessed the portal is what?

8    A.        I don't have a document.  I'm

9    talking about the verbal discussions we had

10   with collections with regards to this

11   client, and the assessment for the fees

12   that they paid off.

13   Q.        Got it.  Who was at this meeting

14   with the collections department, you and

15   who else?

16   A.        Me and Fazio.

17   Q.        You and Fazio.  Was Fazio the

18   person dealing directly with my client or

19   no?

20   A.        No.

21   Q.        So you've got second hand

22   information that makes you certain that my

23   client accessed the portal when you could

24   have verified this very easily, but decided

Joseph Barleta

Page 121

1   not to, right?

2          MR. BERMAN:  Objection.

3          THE WITNESS:  It wouldn't have

4   been easy.  We shifted to a new client

5   portal that we're currently using.  It's

6   not the same system in 2017.

7   BY MR. PROPER:

8   Q.        How long would it have taken you

9   to find out if my client accessed the

10  client portal?

11  A.        It depends.  We would have to

12  figure out the IT logistics behind it.

13  Q.        Ballpark?  You speak to someone

14  in your IT department.  How long do you

15  think it would have taken?

16  A.        It really does depend on the

17  structure because we have never gone back

18  into that old collections portal.

19  Q.        Got it.

20  A.        It's been decommissioned, and

21  it's archived.

22  Q.        Okay.  How about on February --

23  strike that.

24          How about on May 1, 2017 my

Joseph Barleta

Page 122

1    client was charged $4,000.  Why?

2    A.        It's the same nature.  They had a

3    discussion on what they were looking for as

4    far as payments, and they agreed to that

5    amount.

6    Q.        Why was there a need for a

7    finance fee at all?

8    A.        Because the amount of

9    installments required to pay back the RTR

10   was increased.

11   Q.        Why was it increased?

12   A.        Because we agreed that the

13   payment would be reduced in order for this

14   thing to make sense mathematically on the

15   total RTR required to be paid back, we

16   would do that.  We also got into a

17   discussion of helping them find an SBA deal

18   to payoff this transaction.

19   Q.        Why did the payment need to be

20   reduced at all?

21   A.        Because at the request of the

22   client.

23   Q.        Why did the client request a

24   reduction?

Joseph Barleta

Page 123

1    A.        The client does it for different

2    reasons.

3    Q.        Why did this client do it?

4    A.        The clients often do it because

5    they want to pay back a different deal or

6    they have other use for their capital in

7    their business that makes sense to them.

8    Q.        Yeah, I'm not talking about

9    anyone but my client.  What did you do in

10   anticipation of this deposition to

11   determine why my client was asking for a

12   reduced payment on May 1, 2017?

13   A.        We reviewed our discussions with

14   collections in regards to those finance

15   fees.

16   Q.        So, what did my client tell

17   collections on or about May 1, 2017 about

18   her financial condition of the business?

19   A.        She was not specific.

20   Q.        Did my client ever advise CBSG

21   orally or in writing that my client didn't

22   have enough money to make the May payment?

23   A.        Yes.

24   Q.        So she was specific that she

Joseph Barleta

Page 124

1    didn't have money in her account, and

2    that's why the reduction happened?

3    A.        Not necessarily.  A client will

4    often say that they don't have money in the

5    account, and then we go and check it and

6    they have capital in the account.

7    Q.        Okay.  In this particular case,

8    on or about May of 2017, did my client

9    advise CBSG or Full Spectrum that it did

10   not have sufficient funds in its account to

11   make the daily payment?

12   A.        Yes.

13   Q.        Okay, and did my client also make

14   the same representation to you in March of

15   2017 that she did not have sufficient funds

16   to make the daily payment?

17   A.        Yes.

18   Q.        Okay.  And what, if anything, did

19   your collections department do to verify

20   whether or not my client was being honest

21   with you?

22   A.        They verified the client

23   balances.

24   Q.        Okay, and when collections

Joseph Barleta

Page 125

1    verified the collection balances in March

2    and May of 2017, did you confirm that my

3    client was being honest or dishonest about

4    not having enough money to make the daily

5    payment?

6              MR. BERMAN:  Objection.

7              THE WITNESS:  They were.

8    BY MR. PROPER:

9    Q.          They were what?

10   A.          That there was not sufficient

11   funds to run it.

12   Q.          And based upon your investigation

13   checking the accounts, did you confirm that

14   my client was being truthful with you?

15   A.          Yes.

16   Q.          Okay.  So, my client tells you in

17   March and May, I don't have enough money, I

18   can't make the daily payment.  You look

19   into it and confirm that was an accurate

20   and truthful statement, yes?

21   A.          Yes.

22   Q.          And that's when the negotiation

23   took place and you said, okay, you still

24   got to make some payments, but we're

Joseph Barleta

Page 126

1   willing to work with you and we're going to

2   reduce the payment for some period of time,

3   right?

4   A.        Correct.  Or hold it in the case

5   of 4/11/17.

6   Q.        Got it.  But in order to work

7   with the customer, in this case my client,

8   you needed to make some additional monies

9   because you're effectively extending the

10  term?

11  A.        No.

12            MR. BERMAN:  Objection.

13            THE WITNESS:  No.  We were

14  financing receivables as part of that

15  negotiation.  She was saying there would be

16  more money from the receivables we factored

17  coming in subsequently.

18  BY MR. PROPER:

19  Q.        Right, but the reason you're

20  charging the finance fee is because you're

21  getting paid back in a longer period of

22  time, right?

23            MR. BERMAN:  Objection.

24            THE WITNESS:  No.  It's because

Joseph Barleta

Page 127

1    of the exact same structure that the

2    initial deal was struck.

3    BY MR. PROPER:

4    Q.        So the finance fee is charged for

5    what purpose?

6    A.        Because there is an extension to

7    the number of installments on her

8    receivables that would be coming in.

9    Q.        I thought that's what I just

10   said.  Okay.

11   A.        Let me just clarify.  It's not a

12   time basis.  We're very particular about

13   that because it's not being amortized or

14   accrued on some kind of actual calculation

15   based on a percentage.  It is based on the

16   cash flow and receivables that were

17   originally factored, and if there was a

18   delay in that receivables based on the cash

19   flow coming in for the business, we will

20   extend the receivables and the amount of

21   installments out as if we renegotiated the

22   original contract.

23   Q.        So under the original agreement,

24   my client was required to pay you the money

Joseph Barleta

Page 128

1    in 111 business days, we went over this.

2              MR. BERMAN:  Objection.

3              THE WITNESS:  No.  You keep tying

4    it back to time.  I don't think you

5    understand.

6    BY MR. PROPER:

7    Q.        I'm sorry?

8    A.        You keep tying it back to time.

9    It's not the amount of days, it's the

10   amount of installments on the RTR.

11   Q.        How many installments were there

12   on the RTR for this deal?

13   A.        110.

14   Q.        Was it a fixed amount?

15   A.        It was a fixed amount.

16   Q.        Okay.  And then the fixed amount

17   of 110 days, business days when my client

18   didn't have funds to make a daily payment

19   and that fixed period had to be extended,

20   more money was needed?

21             MR. BERMAN:  Objection.

22             THE WITNESS:  No, not more money.

23   BY MR. PROPER:

24   Q.        Well, what is the finance fee but

Joseph Barleta

Page 129

1   more money?

2   A.      It's a restructure on the

3   original payment terms for the factored

4   receivables.

5   Q.      Where in the agreement does it

6   talk about finance fees?

7   A.      It's under the collections

8   expenses on schedule A.

9   Q.      Can you just read me the specific

10  language you're referring to?

11  A.      You're missing program fee

12  discussion on this service agreement.

13  Q.      I thought I had everything.  What

14  am I missing?

15  A.      It's additional language we had

16  on subsequent versions of this schedule.

17  It's not included on here regarding that

18  finance fee in particular.  It's part of a

19  renegotiation of the third paragraph with

20  recourse of the receivables.

21  Q.      I want to understand something.

22  Are you saying that I'm missing a page or

23  that the form was subsequently amended to

24  add language about these fees?

Joseph Barleta

Page 130

1    A.        The subsequent form elaborated on

2    how this was negotiated for the receivables

3    under the paragraph 3.

4    Q.        Okay.  Can you just point to me

5    where in the agreement that my client

6    executed there's language about these

7    finance fees?

8    A.        There is language about the

9    factoring of the receivables under

10   paragraph 3, which was the point of

11   negotiation with the collector.

12   Q.        Just read to me whatever language

13   you're relying upon that entitles you to

14   charge a finance fee when my client didn't

15   have sufficient monies to make a daily

16   payment.

17            MR. BERMAN:  Objection.

18            THE WITNESS:  It's paragraph 3.

19   BY MR. PROPER:

20   Q.        Just what language?

21   A.        Factoring agreement with

22   recourse.  The purchase amount shall paid

23   to CBSG by seller or merchants irrevocably

24   authorizing only one depositing account

Joseph Barleta

Page 131

1   acceptable to CBSG to remit the daily

2   specified amount from the seller or

3   merchants receipts until such discernable

4   as CBSG receives payment in full for the

5   receipts purchased amount.

6           The discussion with the

7   collectors were additional receivables as

8   part of this negotiation.

9   BY MR. PROPER:

10  Q.       So when you just read that

11  language from P-2, what is your

12  understanding as to what that language

13  obligates Fleetwood to do and entitles CBSG

14  to do if that doesn't take place?

15          MR. BERMAN:  Objection.

16          THE WITNESS:  To negotiate if

17  additional receivables would be part of

18  paying back the original RTR due to changes

19  on the agreed upon term.

20  BY MR. PROPER:

21  Q.       What is RTR?

22  A.       Right to receivables.

23  Q.       Okay.

24  A.       The $14,000 that was additional

Joseph Barleta

Page 132

1   on top of the original agreement reflects

2   the additional right to receivable

3   negotiated upon with the collector.

4   Q.        Is there a specific formula in

5   the agreement, P-2, that sets forth how

6   you're going to calculate the additional

7   fees?

8   A.        There isn't.  I have to stress,

9   it is a negotiation with the business

10  owner.

11  Q.        Okay.  Is there something in the

12  agreement that advises a customer that if

13  they don't have money to make the daily

14  payment and they have to restructure the

15  agreement, that there's going to be some

16  type of fee imposed?

17            MR. BERMAN:  Objection.

18            THE WITNESS:  No.

19  BY MR. PROPER:

20  Q.        Can you look at paragraph 4.1 of

21  Exhibit P-2, please?

22  A.        Yep.

23  Q.        It says modification agreements?

24  A.        Uh-huh.

Joseph Barleta

Page 133

1    Q.        No modification amendment waiver

2    or consent of any provision of this

3    agreement shall be effective unless the

4    same shall be in writing and signed by

5    purchaser.  Did I read that correctly?

6    A.        Yes.

7    Q.        As part of your preparation for

8    this deposition, do you have a signed

9    document where my client agreed to pay

10   $7,001 on March 17, 2017?

11            MR. BERMAN:  Objection.

12            THE WITNESS:  It's at the

13   discretion of CBSG.

14   BY MR. PROPER:

15   Q.        Where does it say that this

16   provision is at CBSG's discretion?

17   A.        I have to review this.

18   Q.        Yeah.

19   A.        This is under appendix A under

20   the fee structure.  In part of additional

21   service fees and also the returns that they

22   have -- that they had as far as the

23   rejected ACH.  In regards to the --

24   Q.        I'm sorry, what are you relying

Joseph Barleta

Page 134

1   upon for your statement that a modification

2   agreement, which requires a writing signed

3   by the purchaser, is at the discretion of

4   CBSG?

5   A.          You're missing a page.

6   Q.          What am I missing, and I can get

7   someone to get it for you?

8   A.          No.  Sorry, I thought the bottom

9   of this was cut off.  Under page two of the

10  agreement under 1.4 Future purchaser

11  reserves the right to rescind the offer to

12  make any purchase amounts hereunder in its

13  sole discretion.  This was the point that

14  we use as a negotiation for the client in

15  determining if additional purchase of

16  receivables are warranted to resolve

17  requests from the client on any reduction

18  of payment or holds.

19  Q.          Okay.  What additional

20  receivables do you claim were sold in March

21  or May of 2017?

22  A.          The standard receivables as part

23  of their normal course of business.

24  Q.          I thought 1.4 said there were

Joseph Barleta

Page 135

1    talks about the sale of additional

2    receivables, no?

3    A.          They talked about it on the

4    phone, that in order to facilitate an

5    additional purchase of receivables or

6    modification of your payment, which is

7    again, a fixed piece on this contract, they

8    negotiated and agreement upon that future

9    receivables would be required to extent the

10   RTR needed to pay back this transaction.

11   It's a modification of RTR.

12   Q.          Where does 1.4 use the word,

13   modification of an existing agreement?

14   A.          They didn't.  This was the point

15   of negotiation that they had.  That's the

16   basis for having that negotiation.

17   Q.          So you're relying upon 1.4 of the

18   agreement for the imposition of finance

19   fees, just so I'm clear?

20   A.          Yes, primarily.

21   Q.          Was there anything else?

22   A.          There may be and have to discuss

23   this further.

24   Q.          Where specifically on page two

Joseph Barleta

Page 136

1    are you looking at.  I got it.

2    A.        The details under the terms of

3    the agreement.

4    Q.        So the section titled Future

5    Purchases?

6    A.        Yes.

7    Q.        You're relying upon to charge

8    finance fees to modify an existing

9    agreement?

10            MR. BERMAN:  Objection.

11            THE WITNESS:  Yes.

12   BY MR. PROPER:

13   Q.        Got it.  We can agree that you

14   don't have any actual document between you

15   and my client where you advise my client of

16   finance fees, correct?

17   A.        Correct.

18   Q.        And -- but this was CBSG's policy

19   whenever an agreement was modified in this

20   nature, right, additional fees would have

21   to be charged?

22            MR. BERMAN:  Objection.

23            THE WITNESS:  No, there is no

24   policy for that.  It's a case by case

Joseph Barleta

Page 137

1   negotiation with the client, and they were

2   provided this detail and subsequent payoff

3   letters that they requested, and ultimately

4   paid off?

5   BY MR. PROPER:

6   Q.        Which payoff letter advised my

7   client that $22,000 in finance fees were

8   charged?

9   A.        The amounts reflected in the

10  payoff letters.

11  Q.        Was there any document that was

12  specifically sent to my client informing

13  Fleetwood that $22,000 in finance fees were

14  charged?

15  A.        No, that was primarily

16  communicated over the phone.  There was

17  access, again, to this online portal that

18  allowed them to access in detail.

19  Q.        Got it.  Now, you talked about

20  $14,000, so I just want to go through the

21  math.  March 17, $7,001 was charged to

22  extend my clients payment, right?

23  A.        Uh-huh.

24  Q.        Yes?

Joseph Barleta

Page 138

1   A.          Yes.

2   Q.          And May 1 it was $4,000?

3   A.          Yes.

4   Q.          And on May 12 it was another

5   $4,000?

6   A.          Yes.

7   Q.          May 17, $3,200?

8   A.          Yes.

9   Q.          And June 21 was $4,000, right?

10  A.          Correct.

11  Q.          And if we add that up, $7,000

12  plus $4,000 is roughly 11, plus 4 is 15,

13  plus 3200 is $18,200, plus $4,000 is like

14  $22,000 and change, change, right?

15  A.          Uh-huh.

16  Q.          Yes?

17  A.          Yes.

18  Q.          So we can agree that over $22,000

19  in finance charges were assessed to my

20  client because she didn't have money to

21  make a daily payment, right?

22  A.          No.

23              MR. BERMAN:  Objection.

24  BY MR. PROPER:

Joseph Barleta

Page 139

1    Q.        Why -- go ahead.

2    A.        So if you look at the bottom

3    total on this payment schedule, they had a

4    payoff of $85,907.95.

5    Q.        Yeah.

6    A.        Which netted out to a surplus of

7    $14,000 on top of their original pay back

8    of $547,600.

9    Q.        Meaning what?

10   A.        Meaning that based on this

11   accounting, that there were finance fees

12   which may have been incorrectly listed as

13   return payments.

14   Q.        So you're saying with the final

15   payoff there was an adjustment made, and my

16   client was credited money?

17   A.        Correct.

18   Q.        How much was my client credited?

19   A.        The delta from what we're seeing

20   are finance fees in the $14,000 as you've

21   approximated as 20 something.

22   Q.        Okay, so the finance fees were

23   actually what that were imposed?

24   A.        There's a $14,000 net payment

Joseph Barleta

Page 140

1    higher than the original RTR on this, on

2    their final payoff letter.

3    Q.        Why was the adjustment made?

4    A.        Because of the finance fees

5    assessed, and she agreed in getting that

6    payoff done.

7    Q.        Did my client agree to pay the

8    $22,000, and then you gave her a credit for

9    some reason or she didn't agree to the

10   $22,000 and there was a mistake?  I'm

11   trying to find out what was going on.

12           MR. BERMAN:  Objection.

13           THE WITNESS:  Payoff letter she

14   received.  I'm assuming your client is

15   doing their accounting on this as well, and

16   negotiating with our collectors.  That

17   amount is what we received as a final

18   payment.  That final payment is $14,000

19   more than the original $547,600 RTR.  There

20   was an understanding on the final payoff

21   letter between us and the client for that

22   amount.  If there's any errors, our

23   standard procedure is to reconcile that

24   with the client on the final payoff.

Joseph Barleta

Page 141

1   BY MR. PROPER:

2   Q.        So my client paid $14,000 more

3   than what the agreement required her to

4   pay?

5           MR. BERMAN:  Objection.

6           THE WITNESS:  Correct, and that's

7   a net out of the fees.  Not just finance

8   fees, but the return payments as well.

9   BY MR. PROPER:

10  Q.        Well, how much were the return

11  payment fees?

12  A.        $100.

13  Q.        So most of the $14,000 were the

14  finance fees?

15  A.        Yes.

16  Q.        Okay.  What is Joe LaForte's role

17  with my client when she doesn't have money

18  to make a daily payment?

19  A.        Often clients are will talk to

20  brokers they worked with in negotiating the

21  original deal.

22  Q.        Does Mr. LaForte have a Par

23  Funding email address?

24  A.        Yes, he does.

Joseph Barleta

Page 142

1  Q.        When do you allow non employees

2  of Par Funding to have a Par Funding email?

3  A.        All the time.

4  Q.        How many of your ISO's have Par

5  Funding emails?

6  A.        A few of them.

7  Q.        Which ones?

8            MR. BERMAN:  Objection.  You

9  don't have to answer that.

10  BY MR. PROPER:

11  Q.        So you are permitting Mr. LaForte

12  to represent to my client that he's

13  employed by PAR Funding?

14            MR. BERMAN:  Objection.

15            THE WITNESS:  Yes.

16  BY MR. PROPER:

17  Q.        And what role did Mr. LaForte

18  have in agreeing to reduce my clients

19  payments in charging her finance fees?

20  A.        They often work with the

21  collectors in tandem with the client.

22  Q.        Why was Mr. LaForte contacted?

23  Who contacted him?

24  A.        The collections department.  It

Joseph Barleta

Page 143

1   depends on every client and who has the

2   best rapport in order to negotiate the

3   terms for payment.

4   Q.        Do you know who specifically

5   asked Mr. LaForte to get involved in

6   dealing with my client?

7   A.        No.

8   Q.        What was his role specifically

9   with the modifications?

10  A.        He may have negotiated on behalf

11  of the collector, or conveyed information

12  to the collections department.

13  Q.        Do you know or are you guessing?

14  A.        I don't know specifically.

15  Q.        Okay.  Did you speak to Mr.

16  LaForte in preparation for today's

17  deposition?

18  A.        No.

19  Q.        If he was involved with the

20  modifications, is there a reason you didn't

21  communicate with him?

22  A.        No.

23                    - - -

24                    (Whereupon the court reporter

Joseph Barleta

Page 144

1  marked P-10 for purposes of

2  identification.)

3               - - -

4  BY MR. PROPER:

5  Q.        Did you review Mr. LaForte's

6  deposition transcript?

7  A.        Yes.

8  Q.        Was there anything that Mr.

9  LaForte testified to at his deposition that

10 you believe to have been inaccurate?

11            MR. BERMAN:  Did you hear his

12 question?

13            THE WITNESS:  Yes, I heard it.

14 BY MR. PROPER:

15 Q.        Was there anything you recall

16 from Mr. LaForte's deposition that you

17 believe to be inaccurate?

18 A.        No.

19 Q.        Okay.  Is Mr. LaForte authorized

20 to direct your collections department in

21 whether to make a modification or not?

22 A.        No.

23 Q.        Can you look at an email dated

24 March 17, 2017, which coincides with one of

Joseph Barleta

Page 145

1    the finance fees?

2    A.        Yes.

3    Q.        Mr. LaForte writes an email to

4    Ken Calcagnini?

5    A.        Yes.

6    Q.        And Susan at PAR Funding is

7    copied on this email, correct?

8    A.        Yes.

9    Q.        And the email has a subject line:

10   Call me please, thanks.  And Joe writes to

11   Ken and CCing Susan:  Okay.  Call this

12   bitch and tell her it starts that Monday.

13   That the ach carrier takes a day.  Make

14   some shit up.  Keep in mind we are doing

15   her a favor.  But she owes a ton.  Did I

16   read that will correctly?

17   A.        Yes.

18   Q.        Mr. LaForte seems to be directing

19   PAR Funding in terms of the modification

20   process, no?

21   A.        Yes.  Sales reps often use this

22   kind of communication with the company, but

23   it's not necessarily a directive that

24   decision is made internally in the

Joseph Barleta

Page 146

1    collections department.

2    Q.       Does Susan respond to Mr.

3    LaForte?

4    A.       She writes in her response email:

5    I will call her.

6    Q.       It common for Mr. LaForte to make

7    modification decisions and instruct

8    collections to act in accordance with his

9    direction?

10           MR. BERMAN:  Objection.

11           THE WITNESS:  No, it's not

12   common.

13   BY MR. PROPER:

14   Q.       Was it a fair statement on March

15   17, 2017 that the bitch owes you a ton of

16   money?

17   A.       I wouldn't use uncouth language.

18   Q.       To you condone your

19   representatives to "make some shit up" when

20   dealing with your customers?

21   A.       In communications internally

22   between our ISO reps and our staff, we

23   often speak in that manner.

24   Q.       Did Susan make some stuff up when

Joseph Barleta

Page 147

1   she spoke to my client?

2   A.        What do you mean make some stuff

3   up?

4   Q.        I don't know, Mr. LaForte was

5   telling her to make some shit up.  I'm just

6   asking whether, in fact, she did when she

7   contacted my client as she said she was

8   going to do?

9   A.        No.  She discussed it per the

10  regular procedures we have in our internal

11  communications with our clients.

12  Q.        What were the regular policies

13  that she was instructed to follow?

14  A.        That is to address things in a

15  professional manner, and also discuss the

16  fees associated with here account in a

17  standard -- in manner consistent with our

18  department, our communication policy.

19  Q.        Did you speak to Susan about what

20  the nature of her conversation was with my

21  client in March of 2017?

22  A.        No.

23  Q.        So how do you know that she

24  didn't "make some shit up" if you never

Joseph Barleta

Page 148

1    spoke to her and asked her what she told my

2    client?

3    A.        I spoke with other members in the

4    department.

5    Q.        So your preparation for this

6    deposition was to speak to someone other

7    than Susan about what Susan said to my

8    client in March of 2017?

9    A.        She was a terminated employee.

10   Q.        Got it.  When was Susan

11   terminated?

12   A.        She left the company

13   approximately two and a half years ago.

14   Q.        Did she voluntarily or was she

15   fired?

16             MR. BERMAN:  Objection.  You

17   don't have to answer.

18   BY MR. PROPER:

19   Q.        Was she fired for reasons having

20   to do with Fleetwood?

21   A.        No.

22   Q.        Was she fired for lying to

23   customers?

24   A.        No.

Joseph Barleta

Page 149

```
 1                - - -

 2                (Whereupon the court reporter

 3   marked P-11 for purposes of

 4   identification.)

 5                - - -

 6   BY MR. PROPER:

 7   Q.        Just for the record, those are my

 8   underlines.  They are not yours.

 9                This is an email from my client

10   to Joe Mack, which is Joe@PARFunding.com.

11   Do you see that?

12   A.        Uh-huh.

13   Q.        This is bates number

14   CBSG(Fleetwood)0000899.  And my client

15   writes:  Hi, Joe.  Two things please.  Can

16   you give me a ten day payoff of my loan and

17   do I get a break for paying this off early.

18   Did I read this correctly?

19   A.        Yes.

20   Q.        There's two additional -- three

21   additional lines that I'm not asking

22   questions about.

23   A.        Sure.

24   Q.        I didn't see a response to this
```

Joseph Barleta

Page 150

1    particular email.  Do you know if Mr. Mack,

2    or Mr. LaForte responded to this email?

3    A.          I don't know.

4    Q.          Okay.  Do you know if anyone

5    respond to this email and advised my client

6    of apparently mistaken belief that this was

7    a loan?

8    A.          There should be correspondence

9    from either the accounting department or

10   underwriting department.

11   Q.          Okay.  Did you see any such

12   correspondence in your preparation for this

13   deposition?

14   A.          No.  It's likely verbal.

15   Q.          Okay.

16   A.          And the issuance of the payoff

17   letters are usually what proceed the verbal

18   conversations.

19              - - -

20              (Whereupon the court reporter

21   marked P-12 for purposes of

22   identification.)

23              - - -

24   BY MR. PROPER:

Joseph Barleta

Page 151

1    Q.        Here is an email from my client

2    to Ken Jenkins at ken@parfunding.com and

3    Aida at aida@parfunding.com dated June 5,

4    2017.  Do you see that?

5    A.        Yes.

6    Q.        It says bates number

7    CBSG(Fleetwood)000741.  Who are Ken and

8    Aida?

9    A.        Ken is the collections manager at

10   that time, and Aida is an accountant.

11   Q.        Are they employees of PAR

12   Funding?

13   A.        No.

14   Q.        They're employees at Full

15   Spectrum?

16   A.        That's correct.

17   Q.        And my client writes:  Hi all, is

18   it possible to reduce the payment to 3K

19   this week?  Our loan that is to pay you off

20   has been delayed and need to pay vendors.

21   Need to know.  Thanks.

22             Did I rad that correctly?

23   A.        Yes.

24   Q.        Do you have some email responding

Joseph Barleta

Page 152

1    to my client's apparent misapprehension

2    that she was about to pay off a loan with

3    you?

4              MR. BERMAN:  Objection.

5              THE WITNESS:  No, this is

6    referring to a loan that was coming to her

7    to pay us off.

8    BY MR. PROPER:

9    Q.        Okay.  What was your role in the

10   SBA loan that my client secured to payoff

11   the money you gave to her?

12   A.        I believe she was introduced to

13   the entity that ended up facilitating the

14   SBA loan.

15   Q.        Say that again.

16   A.        I believe she was provided the

17   company that ended up financing her SBA

18   loan.

19   Q.        Who at CBSG helped my client with

20   that?

21   A.        I'm not sure.

22   Q.        What is the basis for your belief

23   that CBSG was the introducing party?

24   A.        This is the discussion we had in

Joseph Barleta

Page 153

1    regards to the preparation for the

2    deposition.

3    Q.        Discussion with who?

4    A.        Discussions with our collection

5    staff.

6    Q.        Who specifically in your

7    collection staff told you that CBSG helped

8    my client get an SBA loan?

9    A.        Fazio.

10   Q.        Fazio.  Were our clear with my

11   client when she contacted you that if she

12   didn't make her payments that she would be

13   in default under the agreement?

14            MR. BERMAN:  Objection.

15            THE WITNESS:  Yes.

16   BY MR. PROPER:

17   Q.        And that would be standard that

18   when any customer contacts you and says, I

19   don't have money, the response is going to

20   be you either have to pay us or enter into

21   an agreement or you're going to be in

22   default, right.

23            MR. BERMAN:  Objection.

24            THE WITNESS:  Some sort of

Joseph Barleta

Page 154

1    negotiation is taken.

2    BY MR. PROPER:

3    Q.        And if a business is unable to

4    make any payment through some type of

5    modification and there's four NSF's, 0that

6    business is in default, correct?

7            MR. BERMAN:  Objection.

8            THE WITNESS:  It's in default,

9    yes.

10   BY MR. PROPER:

11   Q.        And then there's remedies in the

12   agreement that CBSG has in the event of a

13   default, correct?

14   A.        Yes.

15   Q.        And what are some of those

16   remedies?

17   A.        The first, we always have a

18   negotiation with the client.

19   Q.        Assume the negotiation doesn't

20   result in an agreement about a reduced

21   payment.

22   A.        Then we exercise the remedies as

23   detailed in the factoring agreement.

24   Q.        And what are the common remedies

Joseph Barleta

Page 155

1    that you would pursue in that circumstance?

2    A.        End up in litigation.

3    Q.        Would that frequently involve a

4    confession of judgment being filed?

5              MR. BERMAN:  Objection.  You

6    don't have to answer that question.

7    BY MR. PROPER:

8    Q.        The remedies under the agreement,

9    do they include the filing of a confession

10   of judgment?

11   A.        Yes.

12   Q.        And the remedies under my clients

13   agreement, also include executing on the

14   UCC lien that was filed, correct?

15             MR. BERMAN:  Objection.

16             THE WITNESS:  Yes.

17   BY MR. PROPER:

18   Q.        And the remedies would include

19   going after my clients personally because

20   they executed personal guarantees, correct?

21   A.        If in default, yes.

22   Q.        And these are common remedies

23   that are in every agreement, right?

24             MR. BERMAN:  Objection.

Joseph Barleta

Page 156

1          THE WITNESS:  Yes, on the

2    standard factoring agreement, yes.

3    BY MR. PROPER:

4    Q.        If my client didn't generate any

5    receivables from day one, you would have

6    the right to go after my client personally

7    under this agreement?

8    A.        Yes.

9    Q.        And this form agreement that

10   we've spoken about, how long has this

11   agreement been in use?

12   A.        This draft or this --

13   Q.        This form with all the different

14   form language that's in my clients

15   agreement, how long has that been in use?

16          MR. BERMAN:  Objection.

17          THE WITNESS:  We've had a form of

18   this agreement since 2012.

19   BY MR. PROPER:

20   Q.        Okay.

21   A.        But it has been revised heavily.

22   Q.        The version, say from January of

23   2015 to present, has your form always had

24   an attorney's fee provision that would

Joseph Barleta

Page 157

1    entitle CBSG to attorney's fee that are

2    incurred to enforce the agreement?

3           MR. BERMAN:  Objection.  You

4    don't have to answer what the present is.

5    If you want to answer to '17, if you even

6    know, answer it.

7           THE WITNESS:  I believe it did at

8    that time.

9    BY MR. PROPER:

10   Q.       So from 2015 through 2017, there

11   was that attorney's fee provision that was

12   only for CBSG's benefit, correct?

13          MR. BERMAN:  Objection.

14          THE WITNESS:  Yes.

15   BY MR. PROPER:

16   Q.       Okay, and then there was also on

17   all these form agreements during that time

18   period -- and all my questions now are

19   going to be during that 2015 and 2017 time

20   period.

21   A.       Sure.

22   Q.       All the agreements had class

23   action waivers, correct?

24   A.       Yes.

Joseph Barleta

Page 158

1   Q.        And all the agreements had choice

2   of law provisions, correct?

3   A.        That's correct.

4   Q.        And all the agreements had choice

5   of venue provisions, correct?

6   A.        Yes.

7   Q.        And all the agreements had --

8   were the attorney's fees, choice of law,

9   choice of venue, class action waivers all

10  the same form agreement during this time

11  period?

12          MR. BERMAN:  Objection.

13          THE WITNESS:  From?

14  BY MR. PROPER:

15  Q.        '15 to '17.

16  A.        There were certainly

17  modifications made during that time.

18  Q.        What were the nature of the

19  modifications?

20  A.        There were done -- listing what

21  sort of fees would be part of the MCA

22  agreement.

23  Q.        What do you mean?

24  A.        The amount of the fees, perhaps.

Joseph Barleta

Page 159

1    Q.        So all the agreements had certain

2    language about fees, right?

3    A.        Yes.

4    Q.        What fees are you talking about?

5    A.        The ACH fees, default fees,

6    collections fees, program fees, origination

7    fees.

8    Q.        So all of them had some ability

9    for CBSG to re-coop fees, the amounts of

10   the fees may have changed, right?

11            MR. BERMAN:  Objection.

12            THE WITNESS:  Yes.

13   BY MR. PROPER:

14   Q.        And all of the agreements had the

15   schedule A in the form of that agreement,

16   right?

17   A.        In some form, yes.

18   Q.        And all of the agreements had the

19   language that if there's four NFS's, the

20   business is in default, correct?

21   A.        I can't say with certainty, I

22   would have to look at those.  Especially in

23   the early 2015 there may have been

24   significant differences for that.

Joseph Barleta

Page 160

1   Q.        But you don't know one way of the

2   other?

3   A.        Right.

4   Q.        But we have since obtained

5   agreements during that time period, so we

6   can look at those forms and see if there's

7   any changes, right?

8   A.        Since 2017?

9   Q.        Are you aware that recently

10  within the last three or four days, your

11  attorneys on your behalf have produced the

12  agreements with the Texas merchants that

13  are part of the proposed class in this

14  case?

15  A.        Yes.

16  Q.        So we don't necessarily need you

17  to answer whether changes have been made,

18  we can look at those agreements and see

19  whether there's been any changes in the

20  language, right?

21  A.        Yes.

22  Q.        So we can compare attorney's

23  fees, provisions, and class waivers, and

24  choice of law, and we can see if those

Joseph Barleta

Page 161

1    forms are the same with respect to those

2    provisions, correct?

3    A.        Of course.

4    Q.        And we can look at the agreements

5    and see if they're the same with respect to

6    all of this form language, right?

7             MR. BERMAN:  Objection.  Tell him

8    it's redacted, right?  You're making

9    representations, so tell him what the

10   agreements show.  You're saying you can see

11   things, he's testified as to certain

12   things.  So do want to tell him what's

13   redacted?

14            MR. PROPER:  Do I want to tell

15   him that the customers names are redacted?

16            MR. BERMAN:  And, I don't know,

17   other identifying information?

18            MR. PROPER:  Well, you want to

19   answer, go ahead.

20            MR. BERMAN:  I'm not answering,

21   but he's not a lawyer.

22            MR. PROPER:  So put on the record

23   what's been redacted so we're clear.

24            MR. BERMAN:  All identifying

Joseph Barleta

Page 162

1    information from those agreements have been

2    redacted.

3              MR. PROPER:  Has the form

4    language been redacted?

5              MR. BERMAN:  You have the

6    agreements.

7              MR. PROPER:  No, I'm asking you.

8    You did the redaction.

9              MR. BERMAN:  I made my statement.

10   I didn't do the redaction.

11             MR. PROPER:  I'm representing to

12   you that none of the form language has been

13   redacted.

14   BY MR. PROPER:

15   Q.        So, assuming that none of the

16   form language has been redacted, we can

17   look at the different clauses and see if

18   they're the same from my client's agreement

19   for the rest of the proposed class, right?

20   A.        Yes.

21   Q.        Okay.  Are you aware of any

22   material differences in the form language

23   starting on page two of Exhibit P-2 under

24   the terms of enrollment and program between

Joseph Barleta

Page 163

1   '15 and '17.

2   A.       Page two of P-2?

3   Q.       Yeah.  Are you aware of any

4   changes from '15 to '17 with respect to

5   clause 1.1?

6   A.       No.

7   Q.       How about clause 1.2, are you

8   aware of any changes?

9   A.       No.

10  Q.       1.3?

11  A.       No.

12  Q.       1.4?

13  A.       No.

14  Q.       1.5?

15  A.       No.

16  Q.       1.6?

17  A.       No.

18  Q.       How about 1.7, 1.8, 1.9 or 1.10,

19  any changes?

20  A.       No, I don't have any.

21  Q.       How about the power of attorney

22  provision in 1.11, any changes?

23  A.       No.

24  Q.       How about anything on the

Joseph Barleta

Page 164

1   remainder of page 2 of P-2, page 3, or page

2   4?

3   A.          There was language changed on

4   part 3, the event of default and remedies.

5   Q.          What specifically?

6   A.          The detail of the remedies

7   referenced in section 4.2.1 were modified.

8   Q.          When and how?

9   A.          We would have to get into that

10  with the prior iteration of the contract.

11  Q.          What's your general understanding

12  of when and what was changed?

13  A.          The actual remedies themselves

14  and the types of fees assessed.

15  Q.          Was the provision that it was an

16  event of default if the merchant, I'm

17  referring to 3.1C, merchant shall admit in

18  writing its inability to pay it debts or

19  shall make a general assignment for the

20  benefit of creditors, or any proceeding

21  shall be instituted by or against merchants

22  seeking adjudicate bankrupt or insolvent,

23  or seeking reorganization, arrangement,

24  adjustment, or composition of it or its

Joseph Barleta

Page 165

1   debts.  Was that provision changed or

2   modified at all from '15 to '17?

3   A.         I believe so, yes.

4   Q.         When and how?

5   A.         I believe it was done with our

6   counsel at the time, Norm Vals.  We had a

7   specific meeting with regards to the event.

8          MR. BERMAN:  Don't talk about

9   counsel discussions.

10         THE WITNESS:  Sure.

11  BY MR. PROPER:

12  Q.         What was changed?

13  A.         The specific events of default

14  and what constituted it.

15  Q.         Was this provision removed at

16  some point in time?

17  A.         It was not removed, it was

18  modified.

19  Q.         Modified how?

20  A.         The specific terms of what

21  constituted the event of default.

22  Q.         So in this agreement with my

23  client, my client was in default if it

24  admitted in writing that it was insolvent,

Joseph Barleta

Page 166

1   or a proceeding voluntary or involuntary

2   and bankruptcy was filed?

3   A.       Yes.

4   Q.       How was that requirement changed?

5   A.       This requirement is likely still

6   there from the prior version.

7   Q.       Got it.  Was the requirement that

8   the business sign a security agreement, or

9   rather the owners of the business sign a

10  security agreement, was that standard from

11  '15 to '17?

12          MR. BERMAN:  Objection.

13          THE WITNESS:  No, it wasn't at

14  the beginning of '15.

15  BY MR. PROPER:

16  Q.       When was the security agreement

17  included to the form?

18  A.       It would have at the same time we

19  revised the defaults.

20  Q.       Which was when in '15?

21  A.       It wasn't in '15, it was sometime

22  in 2016.  I want to say later in the year.

23  Q.       So the first time CBSG started

24  using security agreements as part of its

Joseph Barleta

Page 167

1    form agreement was some time in 2016?

2    A.        I believe so.

3    Q.        How about personal guarantees,

4    how long had that been used?

5    A.        That should have there from 2015

6    to 2017.

7    Q.        And the disclosure for confession

8    of judgments, was that used during that

9    entire period?

10   A.        Yes, but there was modifications

11   to the language as well.

12   Q.        What type of modifications?

13   A.        I don't think it was anything

14   substantial.

15   Q.        And then there's the fee

16   structure on page 12, which lays out, among

17   other things, the NSF fee and the up to

18   four times only before default is declared

19   language.  Was the form in appendix A the

20   same form used during this entire period,

21   from '15 to '17?

22   A.        That's what I was referring to as

23   some of those amounts were adjusted.

24   Q.        I understand.  So, for instance,

Joseph Barleta

Page 168

1   the risk assessment fee, or the UCC fee, or

2   the origination fee, the amounts of those

3   fees may have changed?

4   A.        Yes.

5   Q.        Understood.  Otherwise the form

6   remained the same?

7   A.        Yes, largely.

8   Q.        And how about the first page of

9   P-2, the language under this is a factoring

10  agreement with recourse.  Did that language

11  in the form stay the same during this

12  period?

13  A.        No, there were changes to that as

14  well.

15  Q.        What changes?

16  A.        I would have to get into the

17  older version, the highlighted.

18  Q.        What is your understanding of the

19  changes?

20  A.        The changes were done to clarify

21  what the structure of the contract was with

22  factoring.

23  Q.        Was there any change to the

24  requirement that you read earlier in the

Joseph Barleta

Page 169

1   first sentence that the business was, I'm

2   paraphrasing, absolutely required to repay

3   the monies until the receipts purchase

4   amount was paid in full?

5   A.          No, I don't believe so.

6   Q.          So that language about absolutely

7   repaying the monies you're giving to the

8   borrowers stayed the same?

9   A.          Yes.

10  Q.          Okay.  How about the form in

11  terms of the purchase price specified

12  percentage, the daily amount, and the

13  receipts purchased amount?  I know the

14  amounts change from agreement to agreement,

15  but was the form the same with that type of

16  information?

17  A.          It's effectively the same

18  structure.

19  Q.          Okay.  Do you know whether or not

20  it's common in the MCA industry for all of

21  these agreements to have class action

22  waivers and choice of law provisions a type

23  of form language your agreements have?

24          MR. BERMAN:  Objection.

Joseph Barleta

Page 170

1                  THE WITNESS:  I'm not aware if

2     it's standard practice for everyone, but it

3     is in ours.

4     BY MR. PROPER:

5     Q.          Did you review any of the other

6     agreements that my client had with MCA

7     companies in this case, like Yellowstone

8     and Snap and some of the others?

9     A.          No.

10    Q.          Okay, so you're not aware, as you

11    sit here today, whether or not those

12    agreements also contain action waivers?

13    A.          I am not aware.

14    Q.          Can you explain to me your

15    understanding of the reconciliation

16    provision in the agreement?

17                MR. BERMAN:  You're referring to

18    Exhibit-2?

19                MR. PROPER:  Yes.

20    BY MR. PROPER:

21    Q.          Do you know what a reconciliation

22    provision is?

23    A.          You mean determining the

24    accounting behind the clients receivables.

Joseph Barleta

Page 171

1    Q.        I'm just asking do you know what

2    I mean by a reconciliation provision?

3    A.        No.

4    Q.        Okay.  Have you personally ever

5    been involved in a reconciliation with a

6    merchant?

7    A.        Yes.

8              MR. BERMAN:  You don't have to

9    answer that.

10   BY MR. PROPER:

11   Q.        Are you aware of how many Texas

12   businesses CBSG has identified as being

13   part of the proposed class?

14   A.        No.

15   Q.        At some point in time was the

16   form agreement that my client used --

17   strike that.

18             Let's take a quick break.

19                  - - -

20             (Whereupon a short recess was

21   taken.)

22                  - - -

23   BY MR. PROPER:

24   Q.        So, does CBSG have offices other

Joseph Barleta

Page 172

1   than the North 3rd Street?

2   A.        CBSG doesn't have an office on

3   North 3rd Street.

4   Q.        Oh, it doesn't.  Okay.

5   A.        So yes it does, in Florida.

6   Q.        Okay, so tell me everyplace CBSG

7   has an office?

8   A.        Just Florida.

9   Q.        How many employees of CBSG work

10  out of the Florida office?

11  A.        Just Lisa when she's down there.

12  Q.        How many employes does CBSG

13  currently have?

14  A.        One.

15            MR. BERMAN:  Don't answer.

16  BY MR. PROPER:

17  Q.        Just Lisa.  What are Lisa's

18  responsibilities?  Actually, let me ask a

19  different question.  What is Lisa's title

20  with CBSG?

21  A.        She's the President.

22  Q.        And what are Lisa's -- I'll be

23  more formal.  What are Ms. McElhone's

24  responsibilities as President of CBSG?

Joseph Barleta

Page 173

1   A.        General oversight of the

2   business.

3   Q.        What sole, if any, did Ms.

4   McElhone have with this transaction?

5   A.        No direct involvement with that

6   specific transaction.

7   Q.        Was Ms. McElhone consulted with

8   respect to my clients request to reduce

9   payments?

10  A.        No.

11  Q.        There was a reference in one of

12  the email that my client was told was going

13  to be a credit committee meeting with

14  respect to one of her requests.  Do you

15  recall that email?

16  A.        Yes.

17  Q.        Okay.  Ms. McElhone is on the

18  credit committee, correct?

19  A.        Yes.

20  Q.        Did you ask Ms. McElhone whether

21  she had any memory of the credit committee

22  meeting where my client came up?

23  A.        I asked her.

24  Q.        Okay, and was her response?

Joseph Barleta

Page 174

1   A.        It wasn't one of the matters she

2   reviewed in the credit committed.

3   Q.        How does that work that there was

4   a credit committee meeting, but she

5   wouldn't have been involved with my clients

6   request?

7   A.        The credit committee makes

8   decisions.  It doesn't have to be the

9   entire committee for every decision.

10  Q.        Was she not at that particular

11  meeting, or were files split up and

12  decisions made independently?  I just don't

13  understand the process.

14          MR. BERMAN:  Do you want to ask

15  what the process is as to Fleetwood?

16          MR. PROPER:  That was my

17  question.  Maybe it was in artful, which is

18  possible.

19  BY MR. PROPER:

20  Q.        So with respect to the my clients

21  deal and the credit committee meeting that

22  took place regarding her request for a

23  modification, was Ms. McElhone present that

24  the meeting or not?

Joseph Barleta

Page 175

1              MR. BERMAN:  Objection.

2              THE WITNESS:  No.

3      BY MR. PROPER:

4      Q.       Who was present at the meeting?

5      A.       Susan.

6      Q.       Just Susan?

7      A.       To my understanding it was

8      primarily Susan reviewing the file, yes.

9      Q.       Was Susan conducting the meeting

10     herself, or how does that work?

11     A.       The credit committee members can

12     approve a file themselves after reviewing

13     with the underwriting.

14     Q.       So Susan made the independent

15     decision to approve each of the various

16     modifications that we've already discussed,

17     right?

18              MR. BERMAN:  Objection.

19              THE WITNESS:  Yes.

20     BY MR. PROPER:

21     Q.       And she's empowered being on the

22     committee to make those types of

23     adjustments, right?

24     A.       That's right.

Joseph Barleta

Page 176

1   Q.        So Ms. McElhone did not have any

2   actual involvement with my client?

3   A.        No direct involvement with the

4   client.

5   Q.        Is she involved at all with the

6   underwriting of CBSG deals?

7   A.        Yes.

8   Q.        Just walk me through, as

9   President, the types of things she's

10  overseeing?

11  A.        She sees the general health of

12  the company, the financials -- in regards

13  to underwriting or the whole?

14  Q.        The whole.  What does she do?

15  A.        Looks at the day-to-day cash

16  balances of the business.  Makes sure that

17  things are being taken care of as far as

18  the operations from very high level

19  prospective.

20  Q.        How frequently do you have email

21  and/or direct communications with Ms.

22  McElhone?

23            MR. BERMAN:  Objection.

24            THE WITNESS:  Every single day.

Joseph Barleta

Page 177

1    BY MR. PROPER:

2    Q.        And how frequently does she work

3    out of the Florida office?

4    A.        Once every couple months,

5    something like that.

6    Q.        Where does she work otherwise?

7    A.        20 North 3rd Street.

8    Q.        Which is the Full Spectrum

9    office?

10   A.        That's correct.

11   Q.        Does she just squat there or does

12   she pay rent?  What's their arrangement?  I

13   know she owns Full Spectrum, so --

14   A.        Are you asking if Full Spectrum

15   has a lease?

16   Q.        No.  Let me ask it this way.

17   When Ms. McElhone is using an office at

18   Full Spectrum, is she there as an owner of

19   Full Spectrum, an owner of CBSG, or both?

20   A.        Both.

21             MR. BERMAN:  Objection.

22   BY MR. PROPER:

23   Q.        And is CBSG incorporated in

24   Delaware?

Joseph Barleta

Page 178

1          MR. BERMAN:  Objection.

2          THE WITNESS:  Yes.

3    BY MR. PROPER:

4    Q.          Is Jamie McElhone employed by

5    Full Spectrum or CBSG?

6    A.          Yes.

7    Q.          What does she so?

8    A.          She is part of the underwriting

9    and processing department.

10   Q.          What is her title?

11   A.          It's on the corporate

12   organization, directors.  I believe it's

13   secretary.

14   Q.          She's one of the directors?

15   A.          Yes.

16   Q.          When you say the corporate

17   origination, what did you say?

18   A.          I'm just thinking of the charter

19   documents.

20   Q.          Okay.  Is this Full Spectrum or

21   CBSG?

22   A.          CBSG.

23   Q.          The three directors are you, Lisa

24   McElhone and Jamie McElhone, right?

Joseph Barleta

Page 179

1    A.        Yes.

2    Q.        Are they sisters?

3    A.        Yes.

4    Q.        What does Recruiting and

5    Marketing Resources do for CBSG?

6    A.        They're an ISO.

7    Q.        They're an ISO like any other

8    ISO?

9    A.        Yes.

10   Q.        Was Recruiting and Marketing

11   Resources involved with my clients

12   transaction?

13   A.        Yes.

14   Q.        What was the nature of their

15   involvement?

16   A.        They often coordinate with other

17   ISO's and introduce deals to underwriters.

18   Q.        So are they -- strike that.

19             So you can have two ISO's

20   involved in a transaction?

21   A.        No, only one ISO gets paid for

22   the origination.

23   Q.        Who was paid for the origination

24   in my client's deal?

Joseph Barleta

Page 180

1    A.          Prime Time.

2    Q.          Was Recruiting and Marketing

3    Resources paid?

4    A.          No.

5    Q.          What did Recruiting and Marketing

6    Resources do, if anything, with respect to

7    my clients transaction?

8    A.          Not much really.  It's mostly

9    between us and Prime Time.

10   Q.          Why when my client request a

11   modification was Mr. LaForte involved as

12   opposed to Prime Time?

13   A.          Joe's role often deals with

14   talking to some of the other ISO's.  He

15   knows us the best.

16   Q.          Why does Mr. LaForte know you the

17   best, why do you say that?

18   A.          We've been working that ISO for a

19   long time.

20   Q.          Where is Recruiting and Marketing

21   Resources located?

22   A.          In an adjacent office in a

23   separate unit in the building.

24   Q.          What's the physical address, do

Joseph Barleta

Page 181

1    you know?

2    A.       Unit 202.

3    Q.       Same address, different unit?

4    A.       Yes.

5    Q.       Do you have a written agreement

6    with Recruiting and Marketing Resources?

7    A.       Yes.

8    Q.       Does that agreement discuss

9    general policies that would have pertained

10   to my clients agreement?

11   A.       No.

12   Q.       Does it discuss how Recruiting

13   and Marketing Resources will be paid?

14   A.       Yes.

15   Q.       Does it discuss the nature of the

16   products and services that CBSG offers?

17   A.       Very briefly.  Just talks about

18   the product itself.

19   Q.       But it does have language about

20   the product that my client secured from

21   your company, right, same product?

22   A.       Yes.

23   Q.       What other documents do you have

24   that would describe the nature of the

Joseph Barleta

Page 182

1    product that my client had with your

2    business?

3    A.        You mean --

4    Q.        Well, we talked about policies

5    and procedures, I'm just talking about what

6    other documents you may use in marketing or

7    otherwise that would describe the nature of

8    the agreement that my client had with your

9    business?

10            MR. BERMAN:  Objection.  I'll

11   instruct him not to answer anything about

12   marketing or advertising materials pursuant

13   to court order.

14            MR. PROPER:  That pertains

15   specifically to my client?

16            MR. BERMAN:  Look at the order.

17            MR. PROPER:  Refresh my memory.

18            MR. BERMAN:  It says advertising,

19   marketing materials, and none of these

20   documents are relevant to the limited

21   precertification discovery that is

22   appropriate at this stage.

23            MR. PROPER:  Thank you.

24   BY MR. PROPER:

Joseph Barleta

Page 183

1   Q.        What interactions did CBSG have

2   with Prime Time?  And when I say CBSG, I'm

3   including Full Spectrum in that question.

4   A.        We talked directly to the broker

5   at Prime Time.

6   Q.        Who was the broker at prime time?

7   A.        I don't recall.

8   Q.        Were there email communications

9   between you and Prime Time concerning my

10  client's deal?

11  A.        Yes.

12  Q.        Okay.  How many emails were

13  there?

14  A.        I don't recall, there was a few.

15  Q.        Do you know if those emails have

16  been produced in this litigation?

17  A.        I'm not aware.

18  Q.        What were the nature of those

19  emails?

20  A.        To outline the sort of deal they

21  were looking for.

22            MR. PROPER:  They may have been

23  produced, I just don't recall, so if you

24  could look into that.

Joseph Barleta

Page 184

1          MR. BERMAN:  We produced

2    everything that's responsive.

3          MR. HESKIN:  Except for you

4    produced today.

5          MR. BERMAN:  It's a form for

6    them, so I wanted to make sure you had it

7    so we didn't have any call backs.  With

8    respect to Prime Time, as you're aware,

9    Prime Time has represented to us in

10   response to a subpoena, they have zero

11   responsive document wit respect to the

12   Fleetwood's other than in the confidential

13   settlement agreement.

14          In this case, maybe ask a

15   question, how are documents delivered from

16   the broker to the company, and that may get

17   you the answer you want because it was

18   produced.

19          MR. PROPER:  I don't want the

20   answer I want, I want the answer that's

21   true.

22          MR. BERMAN:  That should get you

23   the answer to what the communications would

24   be and the structure.

Joseph Barleta

Page 185

1          MR. PROPER:  Well, your client

2    just testified there were emails internally

3    between CBSG --

4          MR. BERMAN:  He didn't say that.

5    BY MR. PROPER:

6    Q.       Did you review emails between

7    CBSG and Fleetwood concerning my clients

8    deal?  Yes or no?

9    A.       Fleetwood?

10   Q.       Strike that.  Did you review

11   emails between CBSG and Prime Time relating

12   to my clients agreement?  Yes or no?

13   A.       Yes.

14   Q.       More than one email?

15   A.       I don't recall.

16   Q.       Okay, but you recall seeing at

17   least one email between CBSG and Prime

18   Time?

19   A.       I wasn't sure if was between CBSG

20   and us, or the broker.

21   Q.       But you saw something between

22   CBSG and the broker?

23   A.       On the bottom it said Prime Time.

24          MR. PROPER:  I'll do a search,

Joseph Barleta

Page 186

1    and if I missed it, I missed it.  If I

2    didn't, then you're mistaken and I ask for

3    the production.

4              MR. BERMAN:  Why I'm clear about

5    it is, anything he's talking about he

6    looked at from me, and anything I showed

7    him was produced.  So that's why I'm pretty

8    clear that whatever I gave him was produced

9    in this case.

10   BY MR. PROPER:

11   Q.        When did you review the emails?

12   A.        As part of the -- I don't recall

13   specifically.  We've had several meetings

14   about this.  It wasn't when we went over

15   the deposition documents.

16             MR. BERMAN:  But if you can't

17   find it, let me know and I'll look.

18   There's no reason to belabor this.

19             MR. PROPER:  I'm not accusing

20   anybody.  I'm fairly familiar with the

21   documents, I just don't recall.

22             MR. BERMAN:  Let me know.

23             MR. PROPER:  There's also a lot

24   of documents, so I could be wrong.

Joseph Barleta

Page 187

1   BY MR. PROPER

2   Q.        Do you have a written ISO

3   agreement with Prime Time?

4   A.        Yes.

5   Q.        Is it the same form ISO agreement

6   you had with R&R?

7   A.        It should be, yes.

8   Q.        So that agreement also would have

9   some general information about the services

10  that CBSG provides, right?

11  A.        That's right.

12  Q.        The same services that you

13  purport to have provided to my client,

14  right?

15  A.        Yes.

16              - - -

17          (Whereupon the court reporter

18  marked P-13 for purposes of

19  identification.)

20              - - -

21  BY MR. PROPER:

22  Q.        Mr. Cole, I'm going to show you

23  what's been marked as Exhibit-13.  Is it

24  your testimony that the only origination

Joseph Barleta

Page 188

1    and underwriting policy, guideline, or

2    documents you have is this one page

3    document?

4    A.       Yes.

5    Q.       So I'm going to review your

6    deposition, and if you testified about a

7    bigger document, you were talking generally

8    about the underwriting file, not

9    specifically about a policy?

10   A.       That's right.  That's a

11   clarification I wanted to make.

12   Q.       What does a holdback under 30

13   percent mean?

14   A.       A holdback under 30 percent is

15   the amount of cash deposits that need to b

16   held back to pay for other liabilities that

17   this company has.

18   Q.       Give me an example, please?

19   A.       Let's say they have mortgage

20   payments, let's say they have receivables

21   or even another MCA deal, all that would be

22   held back outside of the cash flow

23   calculation that underwriting uses to

24   underwrite the particular merchant.

Joseph Barleta

Page 189

 1   Q.        Was that used with my clients

 2   deal?

 3   A.        Yes.

 4   Q.        And that's standard to use in all

 5   the transactions between '15 and '17?

 6   A.        That's correct.

 7   Q.        Was the same underwriting control

 8   sheet used between 2015 and 2017?

 9   A.        There may have been modifications

10   to the format of this.

11   Q.        Do you recall anything material

12   taking place?

13   A.        No.

14   Q.        Neither CBSG nor Full Spectrum

15   has a collections policy?

16   A.        That's right.

17   Q.        Neither CBSG nor Full Spectrum

18   has any document laying out what

19   constitutes a default under your

20   agreements?

21            MR. BERMAN:  Objection.

22   BY MR. PROPER:

23   Q.        Outside the agreement itself?

24   A.        Outside the agreement, no.

Joseph Barleta

Page 190

1    Q.        Where -- strike that.

2              Is there a completed underwriting

3    control sheet for my clients deal?

4    A.        I'm not sure.  I would have to

5    check the file.

6    Q.        I know that hasn't been produced.

7    There should be though, right?

8    A.        I'm not sure.

9    Q.        You didn't come across one in

10   preparation for your deposition?

11   A.        Not that I remember.

12             MR. PROPER:  We ask for the

13   production of a completed underwriting

14   control sheet.

15             MR. BERMAN:  We gave the

16   underwriting file.

17             MR. PROPER:  You weren't aware of

18   this particular form, so maybe you

19   overlooked that too.  I'm just asking you

20   to take another look since you missed this.

21             MR. BERMAN:  I will take a look,

22   but that's why I gave you this today

23   because we gave you the underwriting file.

24   So you have what we have.  Since his

Joseph Barleta

Page 191

1    testimony was clear, I wasn't going to

2    allow you to have any come back points, so

3    I got you what he was referring to so you

4    can ask anything you want about it today.

5              MR. PROPER:  We're good.  Thanks.

6                   - - -

7              (Whereupon the witness was

8    excused and the deposition ended at 1:17.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Joseph Barleta

1            C E R T I F I C A T I O N

2

3

4

5          I hereby certify that the

6   proceedings and evidence noted are

7   contained fully and accurately in the

8   stenographic notes taken by me upon the

9   foregoing matter on February 11, 2020, and

10  that this is a correct transcript of the

11  same.

12

13

14

15          Kathleen Jastrzembski
            Court Reporter and
16          Notary Public

17

18

19          (The foregoing certification of

20  this transcript does not apply to any

21  reproduction of the same by any means,

22  unless under the direct control and/or

23  supervision of the certifying reporter.)

24

Joseph Barleta

Page 193

1          INSTRUCTIONS TO WITNESSES

2          Read your deposition over carefully.

3    It is your right to read your deposition

4    and make changes in form or substance.  You

5    should assign a reason in the appropriate

6    column on the errata sheet for any change

7    made.  After making any change in form or

8    substance which has been noted on the

9    following errata sheet along with the

10   reason for any change, sign your name on

11   the errata sheet and date it.  Then sign

12   your deposition at the end of your

13   testimony in the space provided.  You are

14   signing it subject to the changes you have

15   made in the errata sheet, which will be

16   attached to the deposition before filing.

17   You must sign it in front of a witness.

18   Have the witness sign in the space

19   provided.  The witness need not be a notary

20   public.  Any competent adult may witness

21   your signature. Return the original errata

22   sheet & transcript to deposing attorney,

23   (attorney asking questions) promptly!

24          Court rules require filing within

Joseph Barleta

Page 194

1   30 days after you receive the deposition.

2   Thank you.

3          I have read the foregoing

4   deposition and the answers given by me are

5   true and correct, to the best of my

6   knowledge and belief.

7

8

9

10         _____

           JOSEPH LEWIS COLE BARLETA

11

12

13   _____

     WITNESS TO SIGNATURE

14   _____

15   ADDRESS

16

17

                 My Commission Expires

18

                 ....................

19

20

21

22

23

24

Joseph Barleta

Page 195

1                         ERRATA SHEET

2    PAGE LINE #    CHANGE      REASON THEREFORE

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

Joseph Barleta

**A**

**a.m** 1:19
**ability** 106:21
159:8
**able** 8:21 72:7
95:21 111:15
117:17
**absolutely** 169:2
169:6
**acceptable**
131:1
**access** 115:23
117:13,22
137:17,18
**accessed** 117:15
117:18 118:11
118:22 119:11
120:7,23 121:9
**account** 22:11
101:20 103:16
104:1,10,11,24
106:3,8 124:1
124:5,6,10
130:24 147:16
**accountant**
151:10
**accounting** 55:4
55:6 60:20
139:11 140:15
150:9 170:24
**accounts** 20:11
22:15,19 26:18
125:13
**accrued** 84:15
127:14
**accurate** 33:4
37:2 125:19
**accurately** 31:23
192:7
**accusing** 186:19
**ach** 133:23
145:13 159:5
**acquire** 41:9,14
**act** 146:8
**action** 1:4
157:23 158:9

169:21 170:12
**activities** 55:16
**actual** 44:10
109:8 127:14
136:14 164:13
176:2
**add** 129:24
138:11
**added** 115:10,13
**addition** 20:10
64:18
**additional** 36:8
111:11,16
126:8 129:15
131:7,17,24
132:2,6 133:20
134:15,19
135:1,5 136:20
149:20,21
**additionally**
111:10
**address** 50:4,13
141:23 147:14
180:24 181:3
194:15
**adjacent** 180:22
**adjudicate**
164:22
**adjusted** 111:24
167:23
**adjustment**
139:15 140:3
164:24
**adjustments**
175:23
**admit** 164:17
**admitted** 165:24
**adult** 193:20
**advance** 24:14
**advertising**
182:12,18
**advise** 106:16
123:20 124:9
136:15
**advised** 106:1
137:6 150:5

**advises** 132:12
**advising** 115:19
116:15
**agenda** 25:10,12
**agents** 43:6
**aging** 22:12,16
22:20
**ago** 6:19 11:17
14:15 41:21
76:13 148:13
**agree** 85:10
136:13 138:18
140:7,9
**agreed** 5:7 122:4
122:12 131:19
133:9 140:5
**agreeing** 142:18
**agreement** 7:13
30:24 31:7,8
31:15,16 32:1
32:14,16 33:15
33:18 50:1,5,6
50:11,16 53:13
55:24 56:14
57:11,16 62:2
68:13 92:22,23
94:1,10,12,16
94:21 96:5,24
100:12,18
102:3,4,18
103:9,18 104:4
104:13 107:7,7
107:10,16,19
108:5,20
115:11 116:17
127:23 129:5
129:12 130:5
130:21 132:1,5
132:12,15
133:3 134:2,10
135:8,13,18
136:3,9,19
141:3 153:13
153:21 154:12
154:20,23
155:8,13,23

156:2,7,9,11
156:15,18
157:2 158:10
158:22 159:15
162:18 165:22
166:8,10,16
167:1 168:10
169:14,14
170:16 171:16
181:5,8,10
182:8 184:13
185:12 187:3,5
187:8 189:23
189:24
**agreements** 28:9
28:14 29:1,10
43:12 50:3,20
62:7 78:15
89:22 98:12
100:23 107:12
108:2 132:23
157:17,22
158:1,4,7
159:1,14,18
160:5,12,18
161:4,10 162:1
162:6 166:24
169:21,23
170:6,12
189:20
**ahead** 16:4
17:19 139:1
161:19
**Aida** 151:3,8,10
**aida@parfun...**
151:3
**Alexander** 14:9
**Alexander's**
14:10
**algorithmic**
82:20
**alias** 46:14
**alleged** 114:20
115:1,6
**allow** 142:1
191:2

**allowed** 137:18
**allowing** 69:3
**ambiguities**
44:12
**amended** 129:23
**amendment**
133:1
**amortized**
127:13
**amount** 95:22
96:15 100:19
100:20,24
102:7 111:14
111:21 112:15
114:14 115:10
115:13 116:15
116:16,22
122:5,8 127:20
128:9,10,14,15
128:16 130:22
131:2,5 140:17
140:22 158:24
169:4,12,13
188:15
**amounts** 119:21
134:12 137:9
159:9 167:23
168:2 169:14
**analysis** 85:14
85:18
**and/or** 27:13
176:21 192:22
**answer** 4:2
10:22 15:2
17:2 21:8
24:16 27:8
29:14 31:18,23
32:3,24 33:7
34:19 38:13
39:17 40:5,20
41:12,16 42:7
42:14 43:9
44:8 48:18
49:8 54:7
55:18 59:10,19
61:6,13 62:24

62:24 64:2
66:17 67:3,5
67:23 69:4,9
72:8 73:15
81:6 82:16
83:15 92:4,17
93:5 95:2,8
99:5 101:8
110:3 118:18
142:9 148:17
155:6 157:4,5
157:6 160:17
161:19 171:9
172:15 182:11
184:17,20,20
184:23
**answered** 21:4
**answering**
161:20
**answers** 194:4
**Anthony** 114:6
**anticipate**
102:22
**anticipation**
123:10
**anybody** 186:20
**apologizes** 7:9
**apparent** 152:1
**apparently**
150:6
**APPEARAN...**
2:1
**appendix**
133:19 167:19
**applicant** 16:20
18:5,8,17,21
19:18 20:9
23:14 28:24
30:24 31:6,24
78:14 79:5
80:1 85:5
87:14 88:16
**applicants** 19:3
19:23 21:2,22
22:2,5,9 29:8
38:3,8

**application** 16:7
16:8,17,21,24
16:24 17:5,9
17:10,11,13,16
17:21 18:3,10
18:13 24:2
26:6 44:6
71:19 89:18
**applications**
16:5,13,16
73:17
**apply** 29:10
107:16 192:20
**appointed** 14:13
**appropriate**
182:22 193:5
**approval** 14:20
17:17
**approve** 16:13
175:12,15
**approved** 47:8
**approximate**
96:8
**approximated**
139:21
**approximately**
13:15 52:8
148:13
**AR** 78:5,6 88:22
90:13,17 91:9
91:12,15
**Arch** 52:5,7,9,12
**archived** 121:21
**arrangement**
99:22 101:19
101:22 108:6
164:23 177:12
**arrangements**
101:11
**artful** 174:17
**asked** 10:9 21:3
45:20 46:13
72:3 79:15
83:4,17 88:19
143:5 148:1
173:23

**asking** 18:11
123:11 147:6
149:21 162:7
171:1 177:14
190:19 193:23
**aspect** 81:10
86:20,22
**assessed** 116:6
119:3 138:19
140:5 164:14
**assessment**
120:11 168:1
**assign** 193:5
**assignment**
164:19
**associated** 15:4
116:2 147:16
**assume** 50:16
65:24 154:19
**assumed** 118:4
**assuming**
140:14 162:15
**assumption**
119:15
**assumptions**
118:9
**ata** 34:13
**attach** 116:24
**attached** 193:16
**attend** 24:24
34:15
**attended** 33:3
40:1
**attention** 98:15
**attorney** 163:21
193:22,23
**attorney's**
156:24 157:1
157:11 158:8
160:22
**attorneys**
160:11
**audit** 62:4,20
63:24
**audited** 61:1
**auditors** 60:23

**audits** 61:3,8
62:9
**authorized**
144:19
**authorizing**
130:24
**automobile** 83:8
**available** 120:3
**averages** 24:8
**aware** 35:14,17
35:18 41:24
68:9 160:9
162:21 163:3,8
170:1,10,13
171:11 183:17
184:8 190:17

---

**B**

**b** 3:6 188:15
**back** 7:9 66:7
68:9 71:24
92:20 93:8,24
94:23 95:17,23
99:9,13,22
106:20 107:5
109:8 111:21
121:17 122:9
122:15 123:5
126:21 128:4,8
131:18 135:10
139:7 188:16
188:22 191:2
**background**
41:2,10,19
42:2 47:10,15
**backs** 184:7
**bad** 27:6,17
**balance** 22:6
115:13,14
116:2,3,20
117:4,7,8
**balances** 91:8
124:23 125:1
176:16
**ballpark** 109:22
121:13

**bank** 18:22 19:3
20:10 24:8
26:14 27:23
41:9,14 73:22
77:3,12 78:1,3
80:2,13 89:15
**banking** 18:13
18:18,20
**bankrupt**
164:22
**bankruptcy**
166:2
**BARLETA** 1:15
3:3 5:14
194:10
**base** 22:24
**based** 68:14,24
69:12 83:20,23
83:24 84:4,5
95:20,22 96:7
111:23 118:15
118:19 119:14
125:12 127:15
127:15,18
139:10
**basically** 30:20
**basis** 31:10
83:19 91:19
95:20 97:16
101:13 113:21
113:23 118:17
127:12 135:16
152:22
**bates** 36:17
149:13 151:6
**Bberman@fo...**
2:10
**began** 53:12
**beginning** 1:19
166:14
**behalf** 1:6
143:13 160:11
**belabor** 186:18
**belief** 150:6
152:22 194:6
**believe** 11:11

13:24 26:2
33:2 75:12
107:2 116:4
144:10,17
152:12,16
157:7 165:3,5
167:2 169:5
178:12
**benefit** 157:12
164:20
**BERMAN** 2:8
10:6,21 15:1
15:15 17:1
20:14 21:3,7
21:13,17 24:15
27:7 31:17
32:2,23 33:6
34:18,22 35:5
35:8,12 38:11
39:16 40:4,19
41:3,11 42:6
42:13 43:8,22
44:7 45:9
47:16 48:17
49:7 50:24
51:7 54:6,13
54:17,20,24
55:17 58:18
59:9,18 61:5
61:12,21 62:23
64:1 65:8 66:4
67:2,9,15,20
68:6 69:5,10
69:14,20 72:16
73:14 79:13
81:5 82:15
83:14 85:12
90:4 92:3,15
93:4,19 94:2
94:19 95:7
98:5 99:4,15
100:1,13 101:7
101:14,23
102:9,19
103:11,19
104:6,14 105:4

105:8,14,19
106:9,18
107:13 108:15
110:2,19 112:1
115:21 117:2
117:11 121:2
125:6 126:12
126:23 128:2
128:21 130:17
131:15 132:17
133:11 136:10
136:22 138:23
140:12 141:5
142:8,14
144:11 146:10
148:16 152:4
153:14,23
154:7 155:5,15
155:24 156:16
157:3,13
158:12 159:11
161:7,16,20,24
162:5,9 165:8
166:12 169:24
170:17 171:8
172:15 174:14
175:1,18
176:23 177:21
178:1 182:10
182:16,18
184:1,5,22
185:4 186:4,16
186:22 189:21
190:15,21
**best** 143:2
180:15,17
194:5
**beyond** 38:12
54:8 67:7
68:19
**big** 9:5 71:10,11
71:18,20 72:3
72:5,12
**bigger** 188:7
**billable** 23:17
**billables** 87:2

**billed** 23:18
**bitch** 145:12
146:15
**biweekly** 101:3
**blanket** 69:17
**borrower** 82:10
82:13 108:7
**borrower's** 83:2
85:9,19
**borrowers** 169:8
**bottom** 134:8
139:2 185:23
**Bradsheet** 76:9
**Bradstreet** 65:7
66:9,21,23
70:4 76:12
**break** 72:1,20
72:22 149:17
171:18
**breakdown**
116:24
**BRETT** 2:8
**briefly** 181:17
**broker** 47:7
61:20 183:4,6
184:16 185:20
185:22
**brokers** 141:20
**build** 47:3
**building** 180:23
**built** 102:23
**bunch** 53:15
**burgers** 37:17
**business** 1:9 6:3
19:17 20:3,18
22:22 23:10
24:11 27:13
31:20 38:1
39:6 41:5,7
43:1,16 45:3,8
45:13 46:4,20
47:5,22 52:14
52:15,16 60:2
60:4 62:15
73:21,23 74:4
75:8,11,23

79:7,8,11,16
79:23 80:21
81:11,13,16
82:1,4,7,11
83:2,5,11 84:8
86:3,6,21 87:5
87:14,19 88:1
88:11,18,23
89:2 91:11,18
91:24 92:1,2,2
93:17 96:9
99:14,18,20,23
99:24 100:4
101:13,21
102:3,6,13,13
102:16,16,21
102:23 103:6
108:1,13 123:7
123:18 127:19
128:1,17 132:9
134:23 154:3,6
159:20 166:8,9
169:1 173:2
176:16 182:2,9
**business's** 84:11
**businesses** 80:9
171:12
**busy** 79:22

─────────
C
─────────

**C** 192:1,1
**Calcagnini**
145:4
**calculate** 74:3
112:5 132:6
**calculated**
112:19
**calculation**
127:14 188:23
**calendar** 99:17
**California** 92:1
**call** 21:11,13,13
21:19,19 34:22
35:3,5,8,9,12
58:6 59:13
61:14 67:24

69:21 145:10
145:11 146:5
184:7
**called** 30:5
**capacity** 35:1
59:23
**capital** 123:6
124:6
**care** 39:8 45:12
45:20 86:10,11
176:17
**carefully** 193:2
**carried** 62:18
**carrier** 145:13
**case** 31:10,10
32:18 33:19
34:24 35:21
38:12 80:17
91:18,18 96:13
97:3 107:15,21
113:9 116:21
124:7 126:4,7
136:24,24
160:14 170:7
184:14 186:9
**cash** 20:6 24:11
24:13 26:19
74:3 83:20,23
83:24 84:4,6,9
84:12,15,19,20
84:21 85:1
95:20 96:18
97:23 127:16
127:18 176:15
188:15,22
**CBSG** 11:13,16
11:19 12:1,7
12:18 16:20,24
17:10,17 29:11
31:1 32:17,21
34:1,4,7,10,13
35:16,24 36:13
37:1,9,16 38:4
38:9,24 39:12
39:15,21 40:3
40:10 41:14

42:4 43:7
46:11,21 48:3
48:15,21 49:6
49:12,16,17,20
51:15 52:9,14
52:19,21,24
53:3,16 54:4
55:6,15,24
56:20,22 57:1
57:7,11,11,16
57:16 58:13,17
58:23,23 59:17
59:21,24 60:6
60:9,16,19
61:1,10 62:7
62:12 91:1
106:1,16
108:19 109:12
109:14,17
110:7,10
113:10,14
123:20 124:9
130:23 131:1,4
131:13 133:13
134:4 152:19
152:23 153:7
154:12 157:1
159:9 166:23
171:12,24
172:2,6,9,12
172:20,24
176:6 177:19
177:23 178:5
178:21,22
179:5 181:16
183:1,2 185:3
185:7,11,17,19
185:22 187:10
189:14,17
**CBSG's** 38:17
47:5 56:8 60:4
62:21 109:3
111:18 133:16
136:18 157:12
**CBSG(Fleetw...**
149:14

**CBSG(Fleetw...**
151:7
**CCing** 145:11
**certain** 26:15
118:22 120:22
159:1 161:11
**certainly** 158:16
**certainty** 159:21
**certification** 5:9
192:19
**certify** 192:5
**certifying**
192:23
**CFO** 53:8
**change** 13:5,6
50:17 53:21,23
54:3 70:15,16
95:4,10 138:14
138:14 168:23
169:14 193:6,7
193:10 195:2
**changed** 13:3,7
68:16,16 70:7
75:18 76:23
107:6 159:10
164:3,12 165:1
165:12 166:4
168:3
**changes** 70:18
74:18 131:18
160:7,17,19
163:4,8,19,22
168:13,15,19
168:20 193:4
193:14
**charge** 55:4
60:20 110:10
112:5 130:14
136:7
**charged** 110:14
111:10,12
122:1 127:4
136:21 137:8
137:14,21
**charges** 110:8
138:19

**charging** 111:18
126:20 142:19
**charter** 178:18
**check** 42:2 75:8
78:22 85:9
98:6 124:5
190:5
**checking** 80:11
125:13
**checklist** 64:12
64:19,21 66:9
71:1,2,4,7,21
71:24 72:18,19
73:2,18 74:13
74:17,18 75:17
75:24 76:22,23
77:4 78:18
91:21,23 92:9
98:7
**choice** 158:1,4,8
158:9 160:24
169:22
**circle** 107:5
**circumstance**
155:1
**citing** 119:20
**CIVIL** 1:4
**claim** 134:20
**clarification**
68:8 188:11
**clarify** 38:20
44:12 57:14
127:11 168:20
**class** 157:22
158:9 160:13
160:23 162:19
169:21 171:13
**clause** 163:5,7
**clauses** 162:17
**cleanest** 41:1
**clear** 39:23 67:4
67:10 68:2
72:16 110:19
135:19 153:10
161:23 186:4,8
191:1

**clearer** 99:21
**client** 15:10
16:18 22:15
23:8,16 27:21
28:4,8 35:15
35:24 36:21
44:2,11 50:6
57:10,15 62:8
62:13 63:19,20
74:7,19,21
75:21 78:10
79:15 86:2,17
86:19,23 87:6
89:1,14,17,20
90:17,21 91:7
92:20,22 93:16
95:21 99:13,21
100:15 101:19
103:14,24
104:5,9 106:1
106:13,16
110:10,14
111:9,12,13
112:23 113:1,6
113:18 114:8
114:13,21
115:2,7 116:5
116:15,20
117:13,18,18
117:22,22
118:1,2,10,11
118:18,22,23
119:2,6,10,11
119:18 120:1,6
120:11,18,23
121:4,9,10
122:1,22,23
123:1,3,9,11
123:16,20,21
124:3,8,13,20
124:22 125:3
125:14,16
126:7 127:24
128:17 130:5
130:14 133:9
134:14,17

136:15,15
137:1,7,12
138:20 139:16
139:18 140:7
140:14,21,24
141:2,17
142:12,21
143:1,6 147:1
147:7,21 148:2
148:8 149:9,14
150:5 151:1,17
152:10,19
153:8,11
154:18 156:4,6
165:23,23
170:6 171:16
176:2,4 180:10
181:20 182:1,8
182:15 185:1
187:13
**client's** 25:19
76:18 78:24
87:2,18 88:1,6
88:20,23 89:2
90:1 96:17
103:5 104:11
116:21 152:1
162:18 179:24
183:10
**clients** 18:1
22:14 24:1
26:16 27:5,13
28:13 29:6
32:6 37:21,22
58:2 63:6 65:2
65:20 66:1,3
66:14,15 67:8
67:13 75:11
79:3,10 80:17
81:1 82:1,7
85:1 86:6 87:4
90:13,20,22,24
91:8,14 92:13
94:1 95:14
96:23 97:6

104:22,24
123:4 137:22
141:19 142:18
147:11 155:12
155:19 156:14
170:24 173:8
174:5,20
179:11 180:7
181:10 185:7
185:12 189:1
190:3
**coincides** 144:24
**Cole** 1:15 3:3
5:14,24 59:8
187:22 194:10
**collected** 24:9
**collection** 125:1
153:4,7
**collections**
108:11,21,23
109:3,7,11,14
109:18,21
110:1,5 114:3
114:5,22 118:7
118:16,20,21
119:1,15,22
120:10,14
121:18 123:14
123:17 124:19
124:24 129:7
142:24 143:12
144:20 146:1,8
151:9 159:6
189:15
**collector** 112:22
130:11 132:3
143:11
**collectors** 131:7
140:16 142:21
**column** 193:6
**come** 28:19 29:2
96:11 190:9
191:2
**comes** 14:21,24
84:12
**coming** 26:16,23

84:15 126:17
127:8,19 152:6
**comments** 27:11
**Commission**
194:17
**committed**
174:2
**committee** 12:9
12:10,18,20
13:3,11,14,16
13:23 14:3,6
14:14,18,23
24:20,21 25:1
25:5,8,11,19
25:24 26:4,9
26:13,24 27:2
27:12,20 70:18
76:4 173:13,18
173:21 174:4,7
174:9,21
175:11,22
**common** 28:17
28:24 29:4
38:5 39:5 45:1
45:2 61:9
62:11 82:8
98:11 146:6,12
154:24 155:22
169:20
**commonality**
67:11
**communicate**
114:10 143:21
**communicated**
70:16 137:16
**communication**
36:21 145:22
147:18
**communicatio...**
25:21 36:1
113:5 146:21
147:11 176:21
183:8 184:23
**companies**
28:13,17 56:20
170:7

**company** 6:10
12:19 18:14
22:23 32:14
35:11 58:24
60:5 61:1
63:17 74:6
81:21 145:22
148:12 152:17
176:12 181:21
184:16 188:17
**compare** 23:15
24:12 160:22
**comparison**
85:22
**competent**
193:20
**complete** 1:9 6:3
38:21
**completed** 190:2
190:13
**complies** 7:4
**component** 78:8
**composition**
13:2 164:24
**computer** 30:11
**concept** 93:10
**concerning** 8:24
9:8 25:14
27:13 183:9
185:7
**concerns** 27:1
**condition**
123:18
**condone** 146:18
**conducted** 85:21
**conducting**
175:9
**confession** 155:4
155:9 167:7
**confidence** 37:6
**confident** 96:24
**confidential**
184:12
**confirm** 116:6
125:2,13,19
**connote** 93:23

**consent** 133:2
**consideration**
45:7 84:7
**considerations**
75:23
**consistency**
27:15 28:22
80:15,18
**consistent** 27:22
83:21 147:17
**consolidate** 31:8
32:15
**consolidation**
28:3 31:5,12
31:23 99:1,6
99:12 100:6,10
107:15,19,20
**constituted**
165:14,21
**constitutes**
189:19
**constructing**
87:9
**consultant** 55:14
**consulted** 173:7
**contacted**
142:22,23
147:7 153:11
**contacts** 153:18
**contain** 62:4,20
170:12
**contained** 192:7
**context** 40:22,24
**Continue** 21:15
21:16
**continues** 31:14
**contract** 44:22
127:22 135:7
164:10 168:21
**control** 3:14
189:7 190:3,14
192:22
**conversation**
114:21 147:20
**conversations**
113:12 150:18

**conveyed** 143:11
**convicted** 42:18
42:21 45:13,21
**coordinate**
179:16
**copied** 145:7
**copy** 16:16
**corporate** 6:2,7
54:12,16
178:11,16
**correct** 6:4
19:10 24:14
29:2 31:16
32:1 40:14,18
43:7,13,14,17
46:4 50:13
53:19 55:16
58:13,14 60:2
85:3 88:21
89:11,15,18,22
90:3 94:1,3
98:1,2 99:24
100:6,12 102:8
102:18 105:22
107:9 108:3
113:19,20
115:11,12,15
115:16,20
126:4 136:16
136:17 138:10
139:17 141:6
145:7 151:16
154:6,13
155:14,20
157:12,23
158:2,3,5
159:20 161:2
173:18 177:10
189:6 192:10
194:5
**corrected** 40:10
**correction** 44:20
**correctly** 88:11
133:5 145:16
149:18 151:22
**correspond**

58:22
**correspondence**
46:11 51:2
150:8,12
**corresponden...**
106:20
**cost** 111:16
**counsel** 5:4,7
6:22 36:16
165:6,9
**couple** 75:22
177:4
**course** 77:5
86:23,24
105:23 134:23
161:3
**courses** 81:22
86:4 87:7,10
**court** 1:1,20 5:2
5:20 6:11 59:3
61:14 68:14,18
143:24 149:2
150:20 182:13
187:17 192:16
193:24
**cover** 8:21
**covered** 9:13
**created** 9:18,20
9:23,24 10:18
17:12 23:22
25:3 70:15
**credit** 12:9,10
12:18,20 13:2
13:10,14,22
14:2,5,18,22
24:20,21,24
25:4,7,10,18
25:24 26:4,9
26:12,23 27:2
27:12,19 70:18
73:21 76:4,15
76:18 77:1,10
78:1 82:2 89:4
140:8 173:13
173:18,21
174:2,4,7,21

175:11
**creditability**
35:7
**credited** 139:16
139:18
**creditors** 164:20
**crimes** 42:12
**criminal** 41:10
41:19 47:15
**criteria** 97:2
**CRM** 17:22,23
17:24 30:16
88:3
**current** 61:4
109:2,24 116:3
116:19 117:4
**currently** 22:24
23:16,17 32:22
57:2 109:5,12
109:15 121:5
172:13
**customer** 31:14
31:14 32:13
45:7 91:15
112:22 115:19
126:7 132:12
153:18
**customers** 28:18
32:21 33:4
38:19 43:3
45:4,12,19
49:20 50:20
58:23 63:10
91:10 105:22
113:12 146:20
148:23 161:15
**cut** 134:9

**D**

**D** 3:1
**D/B/A** 1:10
**daily** 96:4,9,12
96:15 97:5,16
100:19,23
101:2,6,12
103:16,22

106:3 124:11
124:16 125:4
125:18 128:18
130:15 131:1
132:13 138:21
141:18 169:12
**Darren** 38:15
**date** 57:22 117:5
117:9 193:11
**dated** 144:23
151:3
**dates** 119:21
**day** 10:5 26:19
26:19 42:16
53:15,17,21
101:21 145:13
149:16 156:5
176:24
**day-to-day**
176:15
**days** 93:16
97:24 99:14,17
99:18,20,24
100:4,19 102:4
102:6 107:3
111:21 115:23
128:1,9,17,17
160:10 194:1
**deal** 10:13 64:4
65:2,20 66:1,3
66:14,15 76:18
78:19,24 88:20
95:4,4 106:22
107:22 122:17
123:5 127:2
128:12 141:21
174:21 179:24
183:10,20
185:8 188:21
189:2 190:3
**dealing** 28:18
120:18 143:6
146:20
**deals** 29:24 30:5
44:22 101:5
107:23,24

176:6 179:17
180:13
**debit** 104:1,11
104:24 106:7
**debiting** 101:20
**debits** 28:1,5
**debt** 85:4,9,19
**debts** 164:18
165:1
**decade** 41:21
**decided** 10:23
120:24
**decides** 96:16
**decision** 10:19
11:3 26:24
45:16 56:2
60:1,4 74:9
76:5 88:8,12
145:24 174:9
175:15
**decisions** 146:7
174:8,12
**declared** 167:18
**decommission...**
121:20
**deeper** 90:17
**default** 103:6,10
103:18 104:3
104:12,18
105:2,7,12,17
106:7,13
153:13,22
154:6,8,13
155:21 159:5
159:20 164:4
164:16 165:13
165:21,23
167:18 189:19
**defaults** 166:19
**Defendant** 1:12
2:6,11
**Delaware**
177:24
**delay** 127:18
**delayed** 151:20
**delivered** 184:15

**delta** 139:19
**delve** 90:16
**dentist** 80:10
83:18 91:12
**department**
44:11 55:7,10
56:23 70:10
108:22,24
109:3,8,11,18
109:21 113:24
114:3,5,18,23
119:15,23
120:14 121:14
124:19 142:24
143:12 144:20
146:1 147:18
148:4 150:9,10
178:9
**departure** 11:19
**depend** 121:16
**depending**
15:10 16:10
70:9 75:21
81:12 95:13
96:23 107:22
**depends** 8:10,17
31:20 40:21
79:6 82:11
91:11,17
100:15,15
102:20 121:11
143:1
**deposing** 193:22
**deposit** 24:8
26:17
**depositing**
130:24
**deposition** 1:14
3:9 6:7 26:12
54:14 64:16
68:3,7 71:16
72:2,9,17
74:16 85:8
94:6 110:18,21
111:5 123:10
133:8 143:17

148:6 150:13
153:2 186:15
188:6 190:10
191:8 193:2,3
193:12,16
194:1,4
**deposits** 27:16
27:21 84:17
188:15
**describe** 181:24
182:7
**described** 87:24
**DESCRIPTI...**
3:8
**design** 87:7
**designed** 83:11
**designee** 6:3,7
**detail** 8:4 26:11
62:17 137:2,18
164:6
**detailed** 94:22
116:24 154:23
**detailing** 22:22
95:11
**details** 24:7 42:1
42:23 92:21
94:23 136:2
**determinations**
14:24
**determine** 25:18
30:23 37:22
74:16 80:3
97:22 123:11
**determined** 23:9
92:22
**determining**
134:15 170:23
**developed** 82:3
**differences**
159:24 162:22
**different** 8:23
13:8 15:9 16:9
16:12 40:5
50:11 72:9
81:2 83:7
84:12 91:8

92:5 95:13
97:2 101:1
116:12 123:1,5
156:13 162:17
172:19 181:3
**differs** 91:21
**direct** 98:14
144:20 173:5
176:3,21
192:22
**directing** 145:18
**direction** 4:2
146:9
**directive** 145:23
**directly** 17:22
26:6 32:20
115:13 120:18
183:4
**director** 33:10
33:12 60:5,7
60:10,13,19
**directors** 60:15
178:12,14,23
**disagree** 67:24
**discernable**
131:3
**disclose** 46:22
**disclosed** 46:15
46:17,21
**disclosure** 47:1
47:9,12 167:7
**disconnect** 71:3
**discovery**
182:21
**discretion**
133:13,16
134:3,13
**discuss** 23:10
70:18 114:1
135:22 147:15
181:8,12,15
**discussed** 7:17
78:20 87:24
113:3 147:9
175:16
**discusses** 108:6

**discussing**
106:20 107:20
112:23
**discussion** 8:22
113:24 119:5,8
122:3,17
129:12 131:6
152:24 153:3
**discussions**
36:16 114:17
118:6,15,19,20
120:9 123:13
153:4 165:9
**dishonest** 125:3
**dishonesty**
41:23 42:12
**DISTRICT** 1:1
1:2
**document** 6:15
6:18 7:7 8:9
9:4,5,8,10,14
9:19,22 10:10
15:14 59:10
64:19 66:10,12
66:16,20 71:7
71:9,12,17
73:4 74:1
111:1,4,7
113:4 115:18
116:11,22
119:24 120:5,8
133:9 136:14
137:11 184:11
188:3,7 189:18
**documentation**
113:7
**documents** 4:12
8:4 19:16 22:9
23:21 25:3,19
28:10 73:6
114:24 115:4
178:19 181:23
182:6,20
184:15 186:15
186:21,24
188:2

**doing** 39:4 82:5
84:4,5 107:2
140:15 145:14
**domicile** 50:2
**door** 84:12
**Dorval** 38:15
**draft** 156:12
**drill** 83:18
**DTI** 85:22
**due** 115:10
116:16 131:18
**duly** 5:15
**Dun** 65:7 66:8
66:20,23 70:4
76:8,11

**E**

**E** 3:1,6 192:1
**earlier** 64:15
71:15 72:2
168:24
**early** 149:17
159:23
**easily** 30:2
120:24
**EASTERN** 1:2
**easy** 121:4
**educate** 87:17
**effective** 133:3
**effectively** 126:9
169:17
**either** 16:23
29:5 64:8
72:18 150:9
153:20
**elaborated**
130:1
**elements** 15:9
90:6
**email** 3:11,12,13
36:2,3,8,11,15
36:18,20 37:1
37:7 98:6
103:24 141:23
142:2 144:23
145:3,7,9

146:4 149:9
150:1,2,5
151:1,24
173:12,15
176:20 183:8
185:14,17
**emails** 25:13
142:5 183:12
183:15,19
185:2,6,11
186:11
**employed** 11:12
11:24 12:3
34:4 53:3
58:13 142:13
178:4
**employee** 49:17
52:14,18,21,23
57:17,21 58:1
58:17,20 60:6
148:9
**employees** 9:20
13:8 53:16,17
54:3 109:2,8
109:24 142:1
151:11,14
172:9
**employes** 172:12
**employment**
11:15
**empowered**
108:19 175:21
**ended** 107:2
152:13,17
191:8
**enforce** 157:2
**enrollment**
162:24
**enter** 82:14
101:10 153:20
**entered** 57:10
57:15
**entire** 15:4
72:12 167:9,20
174:9
**entirety** 6:23

entities 56:8
entitle 157:1
entitles 130:13
131:13
entity 48:20,23
55:19,21
152:13
errata 193:6,9
193:11,15,21
195:1
errors 140:22
Especially
159:22
ESQUIRE 2:3,4
2:8
establish 99:7
estimate 23:13
29:9
event 33:2 34:15
40:1 103:10,18
104:3,12,17
105:1,6,11,16
154:12 164:4
164:16 165:7
165:21
events 165:13
everyday 25:9
84:17
everyplace
172:6
evidence 192:6
exact 127:1
exactly 29:21
EXAMINATI...
3:4 5:18
examined 5:15
example 86:16
188:18
Excellent 7:10
exceptions 77:17
exchanged
25:13
excused 191:8
executed 130:6
155:20
executing

155:13
exercise 154:22
exhbiit-2 98:4
Exhbiit 132:21
162:23
Exhibit-13
187:23
Exhibit-2 107:5
170:18
Exhibit-45
110:17 112:14
116:10 117:1
Exhibit-8 6:24
exhibits 110:20
existing 23:2,5
29:1,9 30:24
31:24 32:14
108:2 135:13
136:8
expect 43:15,19
102:13,16
expected 15:21
16:2 19:10,18
64:13 65:6,17
72:5 73:12
97:6,15 111:24
expenses 129:8
Experian 76:14
76:16,17
experience
45:17
Expires 194:17
explain 8:1 60:3
170:14
expressed 27:1
extend 127:20
137:22
extended 67:7
128:19
extending
111:20 126:9
extension 127:6
extent 135:9
extremely 80:7
————————
F

F 192:1
facilitate 111:16
135:4
facilitating
152:13
fact 41:8 50:6
118:9,13 147:6
factor 19:12
103:7
factored 44:24
126:16 127:17
129:3
factoring 22:24
23:20 28:7
74:10 92:21,23
94:10,20 96:24
130:9,21
154:23 156:2
168:9,22
failure 103:8
104:17
fair 79:5 146:14
fairly 186:20
false 38:18
familiar 93:10
93:12 98:9
186:20
far 89:24 122:4
133:22 176:17
favor 145:15
Fazio 114:6,7,10
114:15 120:16
120:17,17
153:9,10
February 1:19
112:5 121:22
192:9
fee 111:19,23
112:15,18
113:1,3,6,15
113:18 114:11
115:6,20 116:6
117:9 120:2
122:7 126:20
127:4 128:24
129:11,18

130:14 132:16
133:20 156:24
157:1,11
167:15,17
168:1,1,2
Feel 61:14
fees 110:11,14
111:10,11
116:2 117:1
119:3 120:11
123:15 129:6
129:24 130:7
132:7 133:21
135:19 136:8
136:16,20
137:7,13
139:11,20,22
140:4 141:7,8
141:11,14
142:19 145:1
147:16 158:8
158:21,24
159:2,4,5,5,6,6
159:7,9,10
160:23 164:14
168:3
fell 119:18
felon 45:13,21
figure 121:12
file 7:17,22 9:15
9:17 14:21,24
15:4,8,22 17:6
17:20 22:15
25:22,23 26:7
26:24 28:22,23
31:4 35:21
37:6 43:24
66:12 71:8
72:12,13,15
73:13 74:19,21
77:24 80:2
81:1,2 87:13
87:21,23 88:5
88:15 90:1,3
113:23 175:8
175:12 188:8

190:5,16,23
filed 155:4,14
166:2
files 32:20 48:21
49:16 51:14
61:11 64:23
71:19 174:11
filing 5:9 155:9
193:16,24
fill 16:20,23
final 14:20
139:14 140:2
140:17,18,20
140:24
finale 14:23
finance 110:8,10
110:14 111:18
111:23 112:5
112:15,18
115:20 117:9
120:2 122:7
123:14 126:20
127:4 128:24
129:6,18 130:7
130:14 135:18
136:8,16 137:7
137:13 138:19
139:11,20,22
140:4 141:7,14
142:19 145:1
financial 20:24
22:8 62:9 91:6
123:18
financials 20:11
20:22 73:24
78:3,8 176:12
financing
126:14 152:17
find 32:13 66:17
82:9 83:11
121:9 122:17
140:11 186:17
finish 20:14 42:7
fired 148:15,19
148:22
first 5:15 6:17

Joseph Barleta

9:22 12:12,14
38:22 42:10,16
46:19 107:8
154:17 166:23
168:8 169:1
**five** 39:3 116:4
**fixed** 115:12
116:16 128:14
128:15,16,19
135:7
**Fleetwood** 1:4,5
1:5 7:13 62:2
63:1,8,11,24
64:2 68:4,17
91:1 94:11,17
131:13 137:13
148:20 174:15
185:7,9
**Fleetwood's**
65:9,10 67:3
67:21,23 69:7
81:18 101:20
110:21 184:12
**Floor** 2:9,9
**Florida** 50:2
92:2 172:5,8
172:10 177:3
**flow** 20:6 24:11
24:13 26:19
74:3 83:20,23
84:6,9,13,19
84:20,22 85:1
95:20 96:18
97:23 127:16
127:19 188:22
**fluctuating** 80:4
**focus** 22:13
**follow** 15:13,21
16:2 19:10
64:14 65:17
78:19 81:4
86:18 87:2
147:13
**followed** 6:22
**following** 86:15
193:9

**follows** 5:16
**foregoing** 192:9
192:19 194:3
**Forge** 34:17
**form** 5:11 16:7
16:12 18:4,7
56:3 91:7
94:12,17 100:9
107:11 108:4
129:23 130:1
156:9,13,14,17
156:23 157:17
158:10 159:15
159:17 161:6
162:3,12,16,22
166:17 167:1
167:19,20
168:5,11
169:10,15,23
171:16 184:5
187:5 190:18
193:4,7
**formal** 172:23
**format** 189:10
**formation** 12:18
34:1
**formed** 12:11
56:6
**forms** 160:6
161:1
**formula** 132:4
**forth** 68:10
106:20 116:22
132:5
**forward** 70:23
74:10
**four** 7:7 104:19
105:16 106:8
154:5 159:19
160:10 167:18
**fourth** 95:10
107:8
**FOX** 2:8
**fraud** 41:22
42:22
**free** 59:13 61:14

**freehand** 26:7,8
**frequently** 25:7
155:3 176:20
177:2
**front** 6:12
193:17
**FSP** 49:1,2
**full** 49:3,5,9
51:10,13,14
52:17,18 53:11
53:17 54:5
55:3,14,24
56:3,5,11,19
57:3,4,20,23
58:1 64:6,11
64:13,19 65:1
108:19 109:16
110:1 113:15
124:9 131:4
151:14 169:4
177:8,13,14,18
177:19 178:5
178:20 183:3
189:14,17
**fully** 38:21
87:13 192:7
**funded** 44:23
**funding** 1:11
7:12 29:11,13
29:20,20,21,22
30:6,10 31:2,9
31:14 62:1,6
68:12 79:18
141:23 142:2,2
142:5,13 145:6
145:19 151:12
**funds** 108:1
124:10,15
125:11 128:18
**further** 135:23
**future** 23:3,5,7,9
23:13 97:6,15
134:10 135:8
136:4

_____

**G**

**G-R-A-E-S-E-R**
11:11
**gambling** 42:19
**general** 8:5
15:16,19 26:18
62:19 63:7,9
63:16 64:3
87:16 102:21
119:5 164:11
164:19 173:1
176:11 181:9
187:9
**generally** 16:17
22:11 24:23
25:15 39:6
62:15 63:5
66:20,22 86:5
86:24 119:13
188:7
**generate** 83:12
156:4
**getting** 126:21
140:5
**give** 16:16 21:10
29:23 38:7
86:16 149:16
188:18
**given** 70:22,24
116:22 194:4
**giving** 69:16
169:7
**go** 16:4 17:19
21:17 30:9,11
44:10,21 54:15
71:24 72:15
76:3 81:12
86:23 92:6
95:17 115:24
124:5 137:20
139:1 156:6
161:19
**goes** 35:6,7 46:3
54:12,15
**going** 10:14 54:8
65:23 68:19
69:5 70:23

72:21 80:21
91:12,13 94:5
99:8 110:16
126:1 132:6,15
140:11 147:8
153:19,21
155:19 157:19
173:12 187:22
188:5 191:1
**golf** 81:22 86:4
86:22,24 87:7
87:10 88:7
**gonna** 26:10
**good** 5:24 6:1
27:6,17 69:23
75:9 87:5
191:5
**Graesar** 11:9,12
13:13,20 58:3
**Graeser's** 11:19
**granular** 8:10
8:13,17 72:7
72:14
**Group** 1:10 6:4
**guarantees**
155:20 167:3
**guessing** 143:13
**guideline** 19:22
20:21 64:11,15
71:11 73:2
96:20 188:1
**guidelines** 10:20
15:17,20 16:1
19:2 64:22
65:6 66:2 70:6
70:8,12 71:5
72:4
**guys** 79:22

_____

**H**

**H** 3:6
**half** 48:13
148:13
**hand** 94:5
120:21
**handle** 110:1

handles 48:21
49:16 109:14
happened 53:9
124:2
happens 25:4
happy 35:3 87:4
hat 38:15
head 11:4,5,18
12:3,7
health 176:11
hear 144:11
heard 40:8
59:12 144:13
heavily 156:21
held 1:16 188:16
188:22
help 26:10,23
119:4
helped 152:19
153:7
helpful 10:3
helping 122:17
hereunder
134:12
HESKIN 2:4
10:4,7,11 21:5
21:9,15 54:12
68:24 69:8,12
69:19 184:3
Hi 149:15
151:17
high 176:18
higher 96:22
140:1
highlight 26:22
highlighted
168:17
highlighting
26:15
history 29:20,22
111:8 116:1,19
118:24 119:5
120:3
hold 126:4
holdback
188:12,14

holding 42:3
holds 111:9
134:18
honest 43:17,20
43:21 124:20
125:3
Hotel 34:16
HR 55:5,12

I
idea 10:6 23:18
48:14
identification
5:21 6:14 59:4
144:2 149:4
150:22 187:19
identified 7:6
171:12
identifying
161:17,24
idiosyncrasies
82:6,10
illegal 42:19
immaterial
47:13
implement
10:19 70:19
implemented
70:21
important 40:13
82:24 83:3
84:23 85:9
87:12 88:10,13
imposed 117:1
132:16 139:23
imposition
115:20 117:8
135:18
in-house 57:13
inability 164:18
inaccurate 37:3
144:10,17
inception 12:12
include 30:21
75:6 155:9,13
155:18

included 71:4
73:24 78:9
90:6 129:17
166:17
includes 40:18
including 63:11
73:19 111:9
183:3
income 85:5,10
85:19
inconsistent
16:10
incorporated
177:23
incorporation
19:16
incorrectly
139:12
increased
122:10,11
incurred 157:2
independent
175:14
independently
174:12
INDEX 4:1
indicating
103:14
individual 17:11
17:12,15 35:1
90:20,22,24
91:14
Individually 1:6
individuals
12:17 13:10
43:5,13 53:20
109:20
industry 20:5,18
28:20 38:6
74:8 75:21
79:8,16 81:13
83:5 88:2,4,6
95:13 169:20
info 29:23
information
14:22 16:9

17:21 18:14,14
18:15,18,21
19:13,15,19,22
20:2,4,8,21
21:1 23:4
30:20 32:5,6
37:23 38:19
61:9 62:5,10
62:20 63:23
64:7 74:6,7,17
76:1 78:17
89:21 114:15
118:1 120:22
143:11 161:17
162:1 169:16
187:9
informing
137:12
initial 7:5 16:5
127:2
insolvent 164:22
165:24
inspection 75:6
75:10,15,19
78:2 89:11
inspections
73:20 75:7
76:1
installments
93:7 99:8,17
122:9 127:7,21
128:10,11
instance 39:24
59:16 112:4
167:24
instances 31:12
105:24 106:6
instituted
164:21
instruct 67:22
69:8 119:9
146:7 182:11
instructed
147:13
instructing 67:5
69:10

instruction
59:12
INSTRUCTI...
193:1
instrument
64:21 65:4
interactions
183:1
interest 34:7,13
56:11
internal 23:21
36:20 46:10
147:10
internally 57:12
145:24 146:21
185:2
interrupting
20:15
interview 81:8
introduce
179:17
introduced
152:12
introducing
152:23
investigation
125:12
investor 33:2
34:15
investors 39:14
invoices 20:17
20:23 22:22
23:15,17 74:6
involuntary
166:1
involve 41:22
155:3
involved 32:7
33:24 42:11
43:1 46:20
47:5 56:2
60:22 87:6,9
143:5,19 171:5
174:5 176:5
179:11,20
180:11

**involvement**
173:5 176:2,3
179:15
**involves** 43:2
**irrelevant** 41:4
41:7,8 44:9
**irrevocably**
130:23
**ISO** 16:11,24
17:11,12,15
33:12 37:17,19
37:20 44:1,19
46:9 47:6,9
64:5 146:22
179:6,7,8,21
180:18 187:2,5
**ISO's** 16:6,9,13
16:15 17:14
33:11 38:2,18
43:6 44:5 45:2
62:16 142:4
179:17,19
180:14
**issuance** 150:16
**issues** 41:20,22
46:16,17 103:4
**item** 95:10
**items** 18:12
26:16,23 75:16
90:9 118:6
**iteration** 164:10
**iterations** 74:12

**J**

**Jamie** 12:22
13:17 60:17
178:4,24
**JANE** 1:11
**January** 57:24
58:12,15 65:13
66:2 70:2
74:12 109:9,17
156:22
**Jastrzembski**
1:20 192:15
**Jenkins** 151:2

**job** 37:21 53:20
**Joe** 33:1,9 46:3
46:7 141:16
145:10 149:10
149:15
**Joe's** 180:13
**Joe@PARFun...**
149:10
**JOHN** 1:11
**JOSEPH** 1:14
3:3 5:14
194:10
**JS** 1:7
**Judge** 21:11,19
34:22 35:3,5,8
35:9,12 54:8
54:21 58:6
67:24 68:20
69:21
**Judge's** 59:12
**judgment** 155:4
155:10
**judgments**
167:8
**June** 138:9
151:3
**JUSTIN** 2:3

**K**

**Kathleen** 1:20
192:15
**keep** 20:15 87:4
128:3,8 145:14
**Ken** 145:4,11
151:2,7,9
**ken@parfund...**
151:2
**kind** 9:8 27:4
37:24 127:14
145:22
**knew** 42:15
**know** 9:9,12
10:7,11,12
23:24 24:4
29:14 33:20,21
33:23 37:4,5

37:14,22 39:13
42:18,21,23
44:15,18 46:2
46:3 56:17
72:17 73:20
82:6,12,13,24
83:19 87:8
88:17 91:13
97:11,18 104:4
114:9,19
117:24 118:9
118:13,18
119:18 143:4
143:13,14
147:4,23 150:1
150:3,4 151:21
157:6 160:1
161:16 169:13
169:19 170:21
171:1 177:13
180:16 181:1
183:15 186:17
186:22 190:6
**knowledge**
194:6
**known** 39:2
47:14
**knows** 180:15

**L**

**L** 1:4
**LaForte** 33:1,9
33:24 34:3,6,9
34:12 35:14,23
36:12,22,24
37:8,14 38:3
38:23 39:9,20
40:1,8,18 41:1
41:9 42:11
45:24 47:5
48:14 85:7
141:22 142:11
142:17,22
143:5,16 144:9
144:19 145:3
145:18 146:3,6

147:4 150:2
180:11,16
**LaForte's** 41:19
47:20 141:16
144:5,16
**landscaper** 83:7
**Landscapers**
80:6
**landscaping**
81:10,16,20
86:4,7,9,10,12
86:13 88:7
**language** 95:5
98:16 100:9
107:11 129:10
129:15,24
130:6,8,12,20
131:11,12
146:17 156:14
159:2,19
160:20 161:6
162:4,12,16,22
164:3 167:11
167:19 168:9
168:10 169:6
169:23 181:19
**large** 114:22
**largely** 47:13
168:7
**law** 34:24 158:2
158:8 160:24
169:22
**lawsuit** 9:11
**lawyer** 161:21
**laying** 189:18
**lays** 167:16
**lead** 40:16 44:2
**learn** 35:20
38:22 42:10
**lease** 49:4
177:15
**leave** 11:15
**left** 13:20 148:12
**lender** 82:21,23
**length** 23:19
**let's** 68:19 80:9

103:22 118:17
171:18 188:19
188:20
**letter** 3:10 59:7
116:9,10,12,14
116:15 137:6
140:2,13,21
**letterhead** 58:23
**letters** 68:9,14
116:3,4 137:3
137:10 150:17
**level** 72:7
176:18
**LEWIS** 1:14 3:3
5:14 194:10
**liabilities** 188:16
**Liberty** 1:17 2:4
**lie** 44:5
**lien** 155:14
**Limit** 65:9
**limited** 54:13
182:20
**limiting** 68:3,6
68:22
**line** 4:3,3,13,13
4:17,17 73:20
98:22 145:9
195:2
**lines** 149:21
**Lisa** 12:20,21
13:17 47:19
49:19 60:17
172:11,17
178:23
**Lisa's** 172:17,19
172:22
**list** 22:21 29:13
29:20,21,24
30:4,6,10,21
31:5 74:7
78:10 89:2
92:6
**listed** 88:3 91:2
96:19 139:12
**listing** 91:7
158:20

Joseph Barleta

litigation 4:1
8:19 24:3
155:2 183:16
little 26:11
29:23
LLC 1:4
LLP 1:16 2:3,8
loan 93:11,13
149:16 150:7
151:19 152:2,6
152:10,14,18
153:8
located 180:21
location 49:5
50:16 52:13
log 30:12 115:24
119:13
logistics 121:12
logs 119:17
long 18:23 39:3
39:11 48:11
52:6 57:4
71:22 100:24
121:8,14
156:10,15
167:4 180:19
longer 126:21
look 7:2 24:6
61:17 66:16,19
78:5,6 79:7
80:2,18,22
84:21 85:4,6
91:1,5 112:13
117:14,23
119:9 125:18
132:20 139:2
144:23 159:22
160:6,18 161:4
162:17 182:16
183:24 186:17
190:20,21
looked 80:14
84:24 87:20
90:20 117:21
118:1 186:6
looking 32:15

67:24 80:12
84:18 122:3
136:1 183:21
Looks 176:15
loss 21:23
lot 28:20 71:20
72:13 80:8
186:23
lower 96:22
lying 148:22

**M**

Mack 46:3,7
149:10 150:1
mailing 51:1
maintain 86:24
maker 60:1,4
making 14:23
84:17 85:14
88:11 113:21
119:7 161:8
193:7
manage 18:1
management
10:24 11:2
113:9
manager 70:17
151:9
managerial
37:24
managing 56:9
manner 146:23
147:15,17
manual 73:8
March 112:14
124:14 125:1
125:17 133:10
134:20 137:21
144:24 146:14
147:21 148:8
marked 5:21
6:13 59:4 94:6
110:17 144:1
149:3 150:21
187:18,23
Market 1:17 2:5

2:9
marketing 7:11
33:13,16 61:24
62:5 68:11
179:5,10 180:2
180:5,20 181:6
181:13 182:6
182:12,19
material 45:6,16
162:22 189:11
materials
182:12,19
math 137:21
mathematically
122:14
matrix 23:23
24:1,5 74:2
75:3 77:15
78:2 85:24
97:14,21
matter 6:11
43:23 44:5
192:9
matters 174:1
MCA 28:17 29:1
29:6,9 30:24
31:7,16,24
32:14,16 78:14
89:21 98:12
99:1,11 100:6
100:10 106:22
108:2 158:21
169:20 170:6
188:21
MCA's 32:7
McElhone 12:22
12:22 13:17
47:19 56:10
60:17 173:4,7
173:17,20
174:23 176:1
176:22 177:17
178:4,24,24
McElhone's
172:23
mean 8:9,12

30:18 49:13
53:15 60:3
77:17 84:16
86:8,11 99:3
99:12 117:21
147:2 158:23
170:23 171:2
182:3 188:13
meaning 62:16
86:22 92:23
95:21 139:9,10
means 63:16
117:24 192:21
meant 72:12
media 78:21
89:8
meet 25:8
meeting 25:5
120:13 165:7
173:13,22
174:4,11,21,24
175:4,9
meetings 24:22
25:1,11,14
186:13
members 148:3
175:11
memory 173:21
182:17
mention 107:6
mentioned 37:4
46:19 74:2,23
90:10 97:21
merchant 7:12
59:11 62:1,7
68:5,13 73:17
81:8,13 94:18
101:12 164:16
164:17 171:6
188:24
merchants
101:22 130:23
131:3 160:12
164:21
methodology
64:7

middle 98:15
mind 145:14
minimum 19:5
minute 54:21
misapprehens...
152:1
misimpression
40:17
missed 186:1,1
190:20
missing 129:11
129:14,22
134:5,6
mistake 140:10
mistaken 150:6
186:2
misunderstood
72:11
model 102:24
modification
70:11 111:14
111:19 132:23
133:1 134:1
135:6,11,13
144:21 145:19
146:7 154:5
174:23 180:11
modifications
108:20 143:9
143:20 158:17
158:19 167:10
167:12 175:16
189:9
modified 68:16
70:9 136:19
164:7 165:2,18
165:19
modify 136:8
Monday 145:12
money 43:2
92:19 93:24
99:13,23
102:12,14,15
102:17 103:15
104:2,10 105:1
108:7,14

123:22 124:1,4
125:4,17
126:16 127:24
128:20,22
129:1 132:13
138:20 139:16
141:17 146:16
152:11 153:19
**monies** 93:17
106:2 126:8
130:15 169:3,7
**month** 39:3
51:23 80:4,4
**months** 18:24
19:4,5,6 20:7
24:12 27:22
77:12 80:13
177:4
**morning** 5:24
6:1 10:8,13
**mortgage** 42:22
188:19
**moved** 50:22
53:10,14
**moving** 74:9

———————
**N**
**N** 3:1 192:1
**name** 11:10,22
14:11 38:7
46:1,7,10 49:4
114:19 193:10
**names** 12:16
28:15 161:15
**nature** 26:20
27:5 82:1 83:1
83:10 87:18,24
122:2 136:20
147:20 158:18
179:14 181:15
181:24 182:7
183:18
**Near** 12:12
**necessarily** 18:6
43:18 58:19
63:12,14,20

73:8 78:8 80:6
82:18 96:10,21
100:14 124:3
145:23 160:16
**necessity** 76:24
**need** 8:15 10:1
21:11 31:20
45:5 66:19
72:14 76:2,3
81:12 83:17,19
86:18 88:17
91:13 119:12
122:6,19
151:20,21
160:16 188:15
193:19
**needed** 8:11,13
70:20 126:8
128:20 135:10
**needs** 76:4
**negotiate** 131:16
143:2
**negotiated**
111:15 112:20
112:21 113:18
130:2 132:3
135:8 143:10
**negotiating**
113:1 140:16
141:20
**negotiation**
111:20 114:12
115:1,6 116:7
125:22 126:15
130:11 131:8
132:9 134:14
135:15,16
137:1 154:1,18
154:19
**negotiations**
119:22
**Neither** 189:14
189:17
**net** 139:24 141:7
**netted** 139:6
**never** 10:2 42:2

46:13 75:20
121:17 147:24
**new** 70:14 121:4
**NFS's** 159:19
**nods** 35:19
**non** 95:19 142:1
**non-algorithmic**
82:21,22,23
**Norm** 165:6
**normal** 134:23
**normally** 32:19
**North** 50:7,13
50:21 51:17
172:1,3 177:7
**notary** 192:16
193:19
**note** 27:17,17,20
28:21
**noted** 26:6 28:1
192:6 193:8
**notes** 24:21,23
25:23 26:1,3,9
26:13,14,21,22
27:4 113:11
192:8
**notice** 1:15 3:9
7:6 61:18 68:7
68:23 69:6
**November** 34:16
**NSF** 167:17
**NSF's** 154:5
**number** 3:8
36:17 92:24
93:16 95:24
97:18 99:7
100:11 102:6
127:7 149:13
151:6

———————
**O**
**o** 42:3 192:1
**oath** 72:24
**object** 21:7,18
21:20
**objecting** 69:22
**objection** 10:21

15:1,15 17:1
21:3,6 24:15
27:7 31:17
32:2,23 33:6
34:18,21 38:11
39:16 40:19
41:3,11,15
42:6,13 43:8
43:22 44:7
45:9 47:16
48:17 49:7
50:24 51:7
54:6 55:17
58:18 59:9,18
61:5,12 62:23
64:1 65:9 66:4
67:2 69:13,16
69:16 73:14
79:13 81:5
82:15 83:14
85:12 90:4
92:3,15 93:4
93:19 94:2,19
95:7 99:4,15
100:1,13 101:7
101:14,23
102:9,19
103:11,19
104:6,14 105:4
105:8,14,19
106:9,18
107:13 108:15
110:2 112:1
115:21 117:2
117:11 121:2
125:6 126:12
126:23 128:2
128:21 130:17
131:15 132:17
133:11 136:10
136:22 138:23
140:12 141:5
142:8,14
146:10 148:16
152:4 153:14
153:23 154:7

155:5,15,24
156:16 157:3
157:13 158:12
159:11 161:7
166:12 169:24
175:1,18
176:23 177:21
178:1 182:10
189:21
**objections** 5:10
21:10,12 69:1
69:17
**objective** 24:10
97:21
**obligates** 131:13
**obtained** 160:4
**obtaining** 23:4
**obviously** 10:14
80:22 87:3
95:12 103:5
**occasions**
106:15
**occurs** 70:12
**October** 59:8
**offer** 134:11
**offers** 181:16
**office** 48:2,5,7,9
48:11,15 49:21
50:21 51:5,10
51:12,18 52:2
52:4,6 172:2,7
172:10 177:3,9
177:17 180:22
**offices** 48:6
171:24
**Oh** 61:22 172:4
**okay** 6:12,20 7:8
8:7,12,18 10:1
13:19 14:13,16
15:7,11,19,24
16:23 17:8
18:16,20 20:1
20:24 22:8,18
23:2 24:19
28:12 30:22
36:17 39:23

Joseph Barleta

43:19,21 51:16
52:1 54:2,24
63:13,23 64:18
65:23 66:7,13
66:22 67:20
74:11 76:8,17
76:23 77:3,8
77:23 78:13,23
81:19,23 85:7
89:1,14 91:20
95:16 96:3,11
97:8,24 98:14
100:22 102:2
103:14,23
104:21 106:24
107:4,23
108:23 110:16
111:7,11
121:22 124:7
124:13,18,24
125:16,23
127:10 128:16
130:4 131:23
132:11 134:19
139:22 141:16
143:15 144:19
145:11 150:4
150:11,15
152:9 156:20
157:16 162:21
169:10,19
170:10 171:4
172:4,6 173:17
173:24 178:20
183:12 185:16
**old** 50:3 68:10
68:11 121:18
**older** 168:17
**once** 28:21
177:4
**ones** 91:2 142:7
**online** 17:24
30:8 78:21
89:7 115:24
137:17
**operates** 83:12

**operating** 48:20
51:13 53:12
**operation** 42:19
**operations**
176:18
**operator** 58:20
**opposed** 180:12
**Oral** 1:14
**orally** 123:21
**order** 31:8
114:13 122:13
126:6 135:4
143:2 182:13
182:16
**organization**
35:11 54:16
64:14 178:12
**original** 10:10
127:22,23
129:3 131:18
132:1 139:7
140:1,19
141:21 193:21
**originally** 12:17
127:17
**origination** 7:21
8:6 9:1,9,15,17
10:20 43:24
64:4 71:12,17
72:3 73:1
159:6 168:2
178:17 179:22
179:23 187:24
**outline** 183:20
**outside** 55:15
188:22 189:23
189:24
**outstanding**
22:21 89:21
**overlap** 13:22
**overlooked**
190:19
**overseeing**
176:10
**oversight** 173:1
**owed** 91:8

**owes** 145:15
146:15
**owing** 115:11
**owned** 35:24
38:23 45:13
**owner** 19:13,15
35:16 36:13
37:1,16 39:21
40:3,10 41:10
42:4 45:21
47:22,24
132:10 177:18
177:19
**owners** 45:3,4
73:22 166:9
**ownership**
18:15 19:17
34:7,13 38:1
40:17 56:11,13
**owns** 37:9 39:12
39:15 45:7
177:13

---

**P**

**P-10** 3:11 144:1
**P-11** 3:12 149:3
**P-12** 3:13
150:21
**P-13** 3:14
187:18
**P-2** 94:6,7,9
95:3 131:11
132:5,21
162:23 163:2
164:1 168:9
**P-8** 3:9 5:21
**P-9** 3:10 59:4
**PA** 2:5
**package** 90:7,11
**page** 3:4,8 4:3,3
4:13,13,17,17
7:2,6,10 98:4
98:15 100:11
107:8 112:13
129:22 134:5,9
135:24 162:23

163:2 164:1,1
164:1 167:16
168:8 188:2
195:2
**pages** 9:3,6 75:8
**paid** 60:9 93:8
99:8 120:12
122:15 126:21
130:22 137:4
141:2 169:4
179:21,23
180:3 181:13
**PAMELA** 1:5
**paper** 73:11
**Par** 1:10 46:4
141:22 142:2,2
142:4,13 145:6
145:19 151:11
**paragraph**
95:11 107:8
129:19 130:3
130:10,18
132:20
**paraphrasing**
169:2
**part** 12:9 13:13
13:22 15:13
18:13 26:11,18
28:3 31:4 65:5
66:9 73:24
75:13 76:20
77:9 80:1 84:7
85:23 90:6,10
107:16 116:6
119:1,8 126:14
129:18 131:8
131:17 133:7
133:20 134:22
158:21 160:13
164:4 166:24
171:13 178:8
186:12
**particular** 8:14
41:24 67:7
74:7 97:3
113:15 114:11

116:5 117:9
124:7 127:12
129:18 150:1
174:10 188:24
190:18
**parties** 5:8
**party** 47:6,9
60:23 152:23
**patch** 86:19
**pay** 92:20 93:24
94:23 95:23
99:13,22
102:16 106:17
106:21 108:14
111:21 114:13
122:9 123:5
127:24 133:9
135:10 139:7
140:7 141:4
151:19,20
152:2,7 153:20
164:18 177:12
188:16
**payback** 101:11
**paying** 131:18
149:17
**payment** 96:4
96:12,15 97:5
100:23 103:9
103:17,22
104:17 106:3
107:1 111:8,14
114:14 116:1
116:19 118:24
119:21 120:2,3
122:13,19
123:12,22
124:11,16
125:5,18 126:2
128:18 129:3
130:16 131:4
132:4 134:18
135:6 137:22
138:21 139:3
139:24 140:18
140:18 141:11

141:18 143:3
151:18 154:4
154:21
**payments** 92:24
95:23 104:20
116:24 119:4,6
122:4 125:24
139:13 141:8
142:19 153:12
173:9 188:20
**payoff** 108:1
116:4,9,10,12
116:14 122:18
137:2,6,10
139:4,15 140:2
140:6,13,20,24
149:16 150:16
152:10
**payroll** 55:5,9
**Pennsylvania**
1:2,18 34:17
91:24
**people** 37:20
38:23 39:12
40:16 53:16
80:11
**percent** 56:17
56:18 96:2,8
96:14,19 97:5
97:15 98:17
188:13,14
**percentage** 29:8
95:19,20 96:13
96:18,22 98:17
98:23 101:5
103:6 127:15
169:12
**perform** 56:19
57:17 83:24
90:18
**performance**
102:23 103:3
**performed** 57:5
57:19 89:10
**performing**
57:12

**performs** 61:3
87:15
**perimeters**
30:19 32:7
**period** 9:21
30:19 53:2,7
66:24 93:23
126:2,21
128:19 157:18
157:20 158:11
160:5 167:9,20
168:12
**periods** 13:11
**permitted** 54:10
**permitting**
142:11
**person** 38:8 42:3
108:18 112:24
113:6 114:20
120:18
**personal** 155:20
167:3
**personally** 38:9
46:23 155:19
156:6 171:4
**personnel** 49:15
53:10,15
**persons** 108:18
**pertain** 62:11
63:10,14,15,18
63:21,22,24
**pertained** 63:5
66:3 181:9
**pertains** 182:14
**Philadelphia**
1:18 2:5 48:16
49:22 53:11
**phone** 2:6,10
58:6 68:20
135:4 137:16
**physical** 180:24
**piece** 73:11
107:19 135:7
**pieces** 78:21
**place** 1:17 2:4
29:1,10 31:1,7

31:15 39:5
65:13 70:2
75:14 76:21
78:15 125:23
131:14 174:22
189:12
**Plaintiff's-8**
6:13
**Plaintiffs** 1:7
**planning** 95:23
**platform** 17:24
**play** 56:15
**please** 7:3 61:19
132:21 145:10
149:15 188:18
**plus** 32:5 138:12
138:12,13,13
**point** 47:4 50:8
70:7 95:3,18
116:17 118:2
130:4,10
134:13 135:14
165:16 171:15
**points** 191:2
**policies** 8:23
62:21 70:10,19
79:11 81:3
90:19 108:10
147:12 181:9
182:4
**policy** 7:23 8:2,5
8:6,15,16,18
15:12 19:7
63:5,10,16
65:12,18 67:7
70:1,14 71:7
71:13 75:13,18
76:20 110:5,7
136:18,24
147:18 188:1,9
189:15
**portal** 117:13,18
117:22 118:2
118:11,23
119:11,13,17
119:21 120:4,7

120:23 121:5
121:10,18
137:17
**position** 14:1
38:1,17 53:6
67:11
**positive** 27:18
**possible** 151:18
174:18
**potential** 70:18
**power** 163:21
**practice** 9:16,18
38:5 45:1,22
63:17 119:16
170:2
**practices** 61:10
62:11 85:16
**precertification**
182:21
**precise** 96:21
**predicated**
102:3
**prefer** 19:4
**preferably** 19:6
**preparation**
26:12 74:15
111:5 119:1
133:7 143:16
148:5 150:12
153:1 190:10
**prepare** 23:22
**prepared** 91:6
**presence** 49:13
50:8
**present** 1:22
156:23 157:4
174:23 175:4
**President**
172:21,24
176:9
**presumably**
47:14
**pretty** 16:10
79:4 186:7
**previously**
113:17

**price** 94:23
95:11 169:11
**primarily** 48:8
48:20 135:20
137:15 175:8
**primary** 95:9
**prime** 180:1,9
180:12 183:2,5
183:6,9 184:8
184:9 185:11
185:17,23
187:3
**print** 30:2,4,7
**prior** 20:6 23:15
24:12 50:3,5
57:7 94:6
109:17 110:17
164:10 166:6
**problem** 21:19
69:21
**procedure**
140:23
**procedures** 7:16
7:19 9:15
62:17,21 73:8
81:4 108:11
147:10 182:5
**proceed** 17:20
82:7 150:17
**proceeding**
79:17 164:20
166:1
**proceedings**
192:6
**process** 44:6
51:14 70:13
79:4 82:9
111:17 145:20
174:13,15
**processing** 49:3
49:6,10 52:17
53:11 57:20
64:6 109:16
178:9
**produce** 86:14
**produced** 8:19

9:11 10:4
22:23 24:2
33:18 62:15
73:23 84:14
116:5 160:11
183:16,23
184:1,4,18
186:7,8 190:6
**product** 181:18
181:20,21
182:1
**production** 4:12
10:8,13 186:3
190:13
**products** 181:16
**professional**
147:15
**profit** 21:23
**program** 99:2,7
99:12 100:6,10
107:21 129:11
159:6 162:24
**projected** 23:10
23:19
**projection** 23:22
**projections**
23:12
**promoted** 13:24
**promptly**
193:23
**proof** 19:17
**proper** 2:3 3:5
5:23 10:9,16
10:17 11:1
15:6,18 17:4
20:19 21:5,21
24:18 27:10
31:21 32:10
33:1,8 34:20
34:20,23 35:6
35:10,13 38:16
39:18 40:7,23
41:6,13,15,17
42:9,17 43:11
44:3,14 45:11
47:18 48:22

49:11 51:3,9
54:10,15,19,23
55:1,20,22
58:11,21 59:6
59:14,20 61:7
61:16 62:3
63:3 64:9
65:11 66:6
67:4,10,18
68:2 69:2,22
69:24 72:23
79:19 81:6,15
82:19 83:22
85:17 90:8
92:8,16 93:9
93:21 94:4,24
95:8,15 98:8
99:10,19 100:3
100:17 101:9
101:17 102:1
102:11 103:1
103:13,21
104:8,15 105:5
105:10,15,20
106:11,23
107:17 108:17
110:4,22,24
112:3,12 116:8
117:6,16 121:7
125:8 126:18
127:3 128:6,23
130:19 131:9
131:20 132:19
133:14 136:12
137:5 138:24
141:1,9 142:10
142:16 144:4
144:14 146:13
148:18 149:6
150:24 152:8
153:16 154:2
154:10 155:7
155:17 156:3
156:19 157:9
157:15 158:14
159:13 161:14

161:18,22
162:3,7,11,14
165:11 166:15
170:4,19,20
171:10,23
172:16 174:16
174:19 175:3
175:20 177:1
177:22 178:3
182:14,17,23
182:24 183:22
184:19 185:1,5
185:24 186:10
186:19,23
187:1,21
189:22 190:12
190:17 191:5
**proportionality**
97:22
**proposed** 160:13
162:19 171:13
**prospective**
111:18 176:19
**provide** 19:19
23:8 31:13
37:23 61:8
102:12,15
**provided** 28:11
89:20 102:2
116:18 137:2
152:16 187:13
193:13,19
**provides** 14:20
187:10
**providing** 38:18
43:2 93:14
**provision**
102:22 103:2
133:2,16
156:24 157:11
163:22 164:15
165:1,15
170:16,22
171:2
**provisions** 158:2
158:5 160:23

161:2 169:22
**public** 1:21
37:15 39:19
40:2,9 58:16
192:16 193:20
**pull** 32:20 38:14
65:7 72:1
**pulled** 66:21,24
67:1 76:18
**pulling** 30:10
32:5 76:24
**purchase** 94:22
95:11 130:22
134:12,15
135:5 169:3,11
**purchased** 102:7
131:5 169:13
**purchaser** 133:5
134:3,10
**Purchases** 136:5
**purport** 187:13
**purpose** 47:2
127:5
**purposes** 5:21
59:4 65:24
67:12 144:1
149:3 150:21
187:18
**pursuant** 1:15
182:12
**pursue** 155:1
**pursuing** 23:16
**put** 17:22
106:12 161:22

**Q**

**question** 29:15
39:17 41:12,16
59:19 61:6,13
62:24 63:2
65:10 66:1
68:21 69:18,18
83:6 110:3
144:12 155:6
172:19 174:17
183:3 184:15

**questions** 5:11
8:14 10:2 18:4
18:7,11 35:1
54:7 59:10
67:6 68:4
69:15 72:8
79:15,20 81:3
81:24 83:4,10
83:16 88:15,19
149:22 157:18
193:23
**quick** 171:18

**R**

**R** 192:1
**R&R** 187:6
**rad** 151:22
**raise** 54:7,21
**rapport** 143:2
**ratio** 85:5,10,20
**re-coop** 159:9
**read** 6:23 61:19
63:1 129:9
130:12 131:10
133:5 145:16
149:18 168:24
193:2,3 194:3
**reading** 5:8
**real** 46:1,6 51:5
**really** 79:6 82:3
85:8 91:18
121:16 180:8
**reason** 56:5
126:19 140:9
143:20 186:18
193:5,10 195:2
**reasons** 123:2
148:19
**recall** 9:7 10:15
26:4 28:12,15
36:7,8,14,19
38:9 39:1,22
39:24 40:6
57:22 65:22
66:8 74:11,14
87:23 106:4

110:13 113:2
144:15 173:15
183:7,14,23
185:15,16
186:12,21
189:11
**recalled** 26:13
**receipts** 96:9
106:17 131:3,5
169:3,13
**receivable** 22:12
22:19 23:7
132:2
**receivables**
20:11 23:3,3,5
23:6,9 24:9
26:17 27:6,14
44:23 74:4
84:5,16,19
91:3,4 95:14
95:22 97:6,16
103:5 126:14
126:16 127:8
127:16,18,20
129:4,20 130:2
130:9 131:7,17
131:22 134:16
134:20,22
135:2,5,9
156:5 170:24
188:20
**receive** 6:17
22:15 194:1
**received** 6:21
16:5 20:17
140:14,17
**receives** 131:4
**recess** 58:8
112:9 171:20
**recognize** 94:7
**reconcile** 140:23
**reconciliation**
170:15,21
171:2,5
**record** 112:7
149:7 161:22

**recourse** 129:20
130:22 168:10
**Recruiting**
33:13,16 179:4
179:10 180:2,5
180:20 181:6
181:12
**redacted** 161:8
161:13,15,23
162:2,4,13,16
**redaction** 162:8
162:10
**reduce** 126:2
142:18 151:18
173:8
**reduced** 114:14
122:13,20
123:12 154:20
**reduction**
122:24 124:2
134:17
**refer** 8:3,8,15
49:2 66:11
67:15 107:18
118:5
**reference** 31:3
112:14 115:5
173:11
**referenced**
115:1 164:7
**referencing**
120:1
**referred** 98:7
100:5
**referring** 7:20
9:10 22:19
28:6 36:4
48:23 50:12
67:21 75:3
81:17 95:24
118:21 120:1
129:10 152:6
164:17 167:22
170:17 191:3
**reflect** 25:4
96:21 113:5,11

117:8
**reflected** 99:18
102:5 137:9
**reflects** 132:1
**Refresh** 182:17
**regarding**
129:17 174:22
**regards** 120:10
123:14 133:23
153:1 165:7
176:12
**region** 91:21
**regionality**
75:22
**regular** 147:10
147:12
**regularly** 37:15
**rejected** 68:13
133:23
**related** 59:11
88:7
**relating** 73:4,7
185:11
**relation** 96:12
**relevant** 67:12
74:5 182:20
**rely** 73:12
**relying** 114:16
120:6 130:13
133:24 135:17
136:7
**remainder**
164:1
**remained** 168:6
**remedies** 154:11
154:16,22,24
155:8,12,18,22
164:4,6,13
**remember** 36:23
37:9 70:3 72:6
89:12 190:11
**remit** 131:1
**removed** 165:15
165:17
**renegotiated**
127:21

**renegotiation**
129:19
**rent** 177:12
**reorganization**
164:23
**rep** 42:4 44:1,12
44:16 85:13,15
112:23
**repaid** 100:20
116:23
**repair** 83:8
**repay** 93:16
102:7,14 169:2
**repaying** 101:12
169:7
**repayment**
115:10
**report** 22:20
30:13,14,17
32:8,18 63:24
65:7 66:23
74:22,24 75:2
75:5 76:9,15
76:18 77:1,10
78:1 88:22
89:5 91:6,9
**reporter** 5:2,20
59:3 143:24
149:2 150:20
187:17 192:16
192:23
**Reporter-Not...**
1:21
**reports** 22:12,16
62:4 66:21
73:19
**represent** 6:10
37:23 39:14
40:9 43:15
45:2 49:20
59:15 142:12
**representation**
124:14
**representations**
44:16,19 161:9
**representative**

59:16,21,24
**representatives**
43:20 113:10
146:19
**represented**
33:2 36:12
37:8 39:20
40:2 58:16
184:9
**represented0**
35:15
**representing** 2:6
2:11 36:24
37:15 39:12
43:6 50:19
162:11
**represents** 38:8
**reproduction**
192:21
**reps** 37:20 39:7
145:21 146:22
**request** 4:12
10:10 78:13
116:13 122:21
122:23 173:8
174:6,22
180:10
**requested** 10:12
78:11 91:10
111:13 137:3
**requests** 134:17
173:14
**require** 21:1,22
22:2,5,9 44:20
79:12 80:8
100:23 193:24
**required** 16:20
17:5 18:17,21
20:9 31:7
66:14,15 75:19
75:20 77:1,2,6
77:9 89:14
90:18 93:1,7
93:24 99:13,22
102:7 103:17
122:9,15

Joseph Barleta

127:24 135:9
141:3 169:2
**requirement**
19:2 166:4,5,7
168:24
**requires** 134:2
**requiring** 19:22
20:21
**rescind** 134:11
**reserve** 10:14
**reserved** 5:11
**reserves** 134:11
**resides** 48:20
**resolve** 134:16
**Resources** 33:14
33:16 179:5,11
180:3,6,21
181:6,13
**respect** 7:10
38:18 52:12
55:15 61:9
62:5,21 161:1
161:5 163:4
173:8,14
174:20 180:6
184:8,11
**respected** 62:22
**respective** 5:8
**respond** 146:2
150:5
**responded** 150:2
**responding**
151:24
**response** 68:10
146:4 149:24
153:19 173:24
184:10
**responsibilities**
12:6 53:23
54:3 55:3
60:19 172:18
172:24
**responsive**
184:2,11
**rest** 107:10
162:19

**restate** 101:15
**restructure**
107:1 129:2
132:14
**result** 154:20
**retain** 86:23
**return** 139:13
141:8,10
193:21
**returned** 104:19
**returns** 78:7
111:9 119:3
**revenue** 20:8
23:19 79:21
80:4,15,18,22
83:12,19 84:8
84:11,14,20,21
85:1
**revenues** 20:5
22:23
**review** 7:23 8:24
14:23 15:3
20:7 26:5
29:12,18,19
35:22 64:22
71:8,21 88:22
89:1 111:4
113:23 114:24
116:1 133:17
144:5 170:5
185:6,10
186:11 188:5
**reviewed** 7:16
8:2 22:14
25:22 27:22
28:3 74:19
89:4,7 123:13
174:2
**reviewing** 35:21
118:24 175:8
175:12
**revised** 156:21
166:19
**right** 7:1 8:16
10:15 19:8,14

31:11,19 40:14
43:3 45:14,17
47:15 50:14,17
50:23 62:19
65:21 66:3
70:4,5 71:11
72:9 77:10
80:18,20 83:6
83:13 84:3,4,8
84:9,19 85:5
88:16,20 89:5
89:8 93:15
98:16,22
100:18 106:4
108:2 109:6
117:10,12
118:3 121:1
126:3,19,22
131:22 132:2
134:11 136:20
137:22 138:9
138:14,21
153:22 155:23
156:6 159:2,10
159:16 160:3,7
160:20 161:6,8
162:19 175:17
175:23,24
178:24 181:21
187:10,11,14
188:10 189:16
190:7 193:3
**risk** 168:1
**ROBERT** 1:4
**role** 141:16
142:17 143:8
152:9 180:13
**roles** 55:2 60:18
**ROTHSCHILD**
2:8
**roughly** 138:12
**routinely** 58:22
**RTR** 93:1
111:22 122:9
122:15 128:10
128:12 131:18

131:21 135:10
135:11 140:1
140:19
**rules** 193:24
**run** 30:13,14,17
32:19 76:5,6,9
76:16 125:11
**running** 42:19
87:5

─────────
**S**
─────────

**s** 3:6 20:24
**S-H-E-L-P-I-N**
14:12
**sale** 135:1
**sales** 33:10,12
39:7 42:4 43:6
85:13,14
145:21
**Sanchez** 21:11
**sanction** 68:19
**satisfy** 93:1
**saw** 35:23 36:11
36:18 37:2,7
185:21
**saying** 44:4 69:3
71:6 81:23
126:15 129:22
139:14 161:10
**says** 34:24 62:14
67:20 69:6
76:2 99:11
104:1,10
132:23 151:6
153:18 182:18
**SBA** 122:17
152:10,14,17
153:8
**schedule** 50:11
91:3,5,13,16
98:9,11,11
100:5,8 102:5
129:8,16 139:3
159:15
**scope** 38:12 54:9
68:8

**sealing** 5:9
**search** 30:22
31:22 185:24
**seasonal** 80:7,10
**seasonality** 80:5
81:10
**second** 19:12
98:3 112:13
120:21
**secretary** 178:13
**section** 136:4
164:7
**secured** 152:10
181:20
**securing** 24:13
**security** 166:8
166:10,16,24
**see** 28:18,21
31:4 36:15
37:17 50:10
91:16 98:18
112:16 149:11
149:24 150:11
151:4 160:6,18
160:24 161:5
161:10 162:17
**seeing** 9:7 26:4
26:13 38:10
87:23 139:19
185:16
**seeking** 164:22
164:23
**seen** 6:14 10:3
15:14 26:8
46:12 111:1
**sees** 176:11
**seller** 130:23
131:2
**send** 16:17
**sends** 103:24
**sense** 93:7
122:14 123:7
**sent** 59:7 115:18
137:12
**sentence** 169:1
**separate** 180:23

served 13:12
service 86:20,22
  112:22 129:12
  133:21
serviced 64:5
services 1:4 56:7
  56:20 181:16
  187:9,12
servicing 55:19
  55:20 56:14
  58:20 86:7,8
  86:14
sets 132:5
setting 116:22
settlement
  184:13
Shane 2:4 21:17
shape 75:9
share 51:10
sheet 3:14 189:8
  190:3,14 193:6
  193:9,11,15,22
  195:1
sheets 22:6
Shelpin 14:9
Sheraton 34:16
shifted 121:4
shit 145:14
  146:19 147:5
  147:24
shop 83:8
short 58:8 112:9
  171:20
shorthand 64:24
show 50:12
  110:16 120:6
  161:10 187:22
showed 186:6
sign 166:8,9
  193:10,11,17
  193:18
signature 46:9
  193:21 194:13
signed 133:4,8
  134:2
significant

159:24
signing 5:8
  193:14
similar 67:13
similarly 1:7
simply 31:13
single 176:24
sisters 179:2
sit 170:11
site 73:20 75:6,7
  75:10,14,19
  76:1 78:2
  89:10
sitting 72:20
situated 1:7
six 19:6 77:12
  80:13
sizes 95:12
Snap 170:8
social 78:21 89:7
sold 134:20
sole 47:24
  134:13 173:3
solely 56:8
soliciting 7:11
  61:24 62:6
  68:12
Solutions 1:10
  6:3
somebody 37:8
  119:9
someone's
  119:14
sorry 57:14
  103:20 128:7
  133:24 134:8
sort 153:24
  158:21 183:20
sourced 108:24
space 193:13,18
speak 113:14
  121:13 143:15
  146:23 147:19
  148:6
speaking 21:10
  21:12

special 40:5
specific 7:19 8:4
  8:8,13 22:8
  25:19 26:3
  32:9,12,12
  36:3,7 37:5
  64:7 71:21
  79:7,15,20
  81:20,24 93:15
  94:22 112:24
  118:5 119:20
  119:24 123:19
  123:24 129:9
  132:4 165:7,13
  165:20 173:6
specifically 7:17
  9:6 11:2 20:6
  21:1,24 22:18
  27:19 28:4,16
  35:22 63:7,19
  70:3 80:24
  83:4 87:22
  89:12 97:12
  113:2 114:1,4
  114:20 117:20
  135:24 137:12
  143:4,8,14
  153:6 164:5
  182:15 186:13
  188:9
specifics 42:24
  44:22
specified 95:19
  96:13 98:17,21
  98:23 100:19
  100:20 102:17
  103:9 131:2
  169:11
Specify 30:19
Spectrum 49:3,5
  49:9 51:11,13
  51:14 52:17,19
  53:11,18 54:5
  55:3,14,24
  56:3,6,11,19
  57:3,4,20,23

58:2 64:6,11
  64:13,19 65:1
  108:19 109:16
  110:1 113:15
  124:9 151:15
  177:8,13,14,18
  177:19 178:5
  178:20 183:3
  189:14,17
spell 11:10,21
  14:10
split 174:11
spoke 114:8
  147:1 148:1,3
spoken 156:10
spreadsheet
  24:7,10
squat 177:11
staff 146:22
  153:5,7
stage 182:22
standard 9:16
  9:17 15:7,11
  16:8 45:22
  63:17 81:8
  85:16 107:11
  119:16 134:22
  140:23 147:17
  153:17 156:2
  166:10 170:2
  189:4
start 12:14
started 12:13
  46:20 166:23
starting 162:23
starts 145:12
statement 24:8
  33:4 37:3,12
  37:13 40:11
  51:4 113:22
  125:20 134:1
  146:14 162:9
statements
  18:22 19:3
  20:7,10,12
  21:23 26:15

27:23 73:22
  77:3,13 78:1,4
  80:3,13 89:15
states 1:1 92:6,9
stay 168:11
stayed 169:8
stenographic
  192:8
steps 8:11
stipulated 5:6
stipulations
  4:16 5:3
stop 8:7 21:11
  76:11
stopped 76:10
story 119:2
Street 1:17 2:5,9
  48:10,12 49:5
  49:13,18,21
  50:7,13,22
  51:18 52:5,7
  52:10,13 172:1
  172:3 177:7
stress 132:8
strike 13:1
  16:19 24:20
  44:17 88:9
  90:22 92:11
  94:15 97:4
  102:14 107:24
  112:6 121:23
  171:17 179:18
  185:10 190:1
struck 127:2
structure 94:21
  121:17 127:1
  133:20 167:16
  168:21 169:18
  184:24
structures 101:1
stuff 71:20
  72:13 146:24
  147:2
subject 145:9
  193:14
submit 16:9

17:16 18:18
19:3 20:9 21:2
21:23 22:3,6
22:10,15 89:15
**submitted** 18:12
19:23 89:17
**subpoena**
184:10
**subsequent**
129:16 130:1
137:2
**subsequently**
107:3 126:17
129:23
**substance**
113:11 193:4,8
**substantial**
167:14
**sufficient**
103:16 106:2
124:10,15
125:10 130:15
**sum** 113:11
**supervising** 12:8
**supervision**
192:23
**supplement**
70:14
**supply** 116:3
**SUPPORT** 4:1
**supposed** 8:20
15:13
**sure** 10:16 63:22
64:2 75:9 83:9
92:10 95:2
101:4 112:17
149:23 152:21
157:21 165:10
176:16 184:6
185:19 190:4,8
**surplus** 139:6
**Susan** 11:7,8
13:13 58:3
145:6,11 146:2
146:24 147:19
148:7,7,10

175:5,6,8,9,14
**sustain** 95:22
**sustainable**
96:17
**sworn** 5:15
**system** 30:12
113:10 121:6

————————
**T**
**t** 3:6 81:23 192:1
192:1
**tactic** 39:7
**take** 7:2 17:21
18:2,8 22:11
69:15 72:22
76:24 118:8
131:14 171:18
190:20,21
**taken** 1:15 58:9
100:11 112:10
121:8,15 154:1
171:21 176:17
192:8
**takes** 18:10
145:13
**talk** 18:16 37:21
103:22 108:12
118:17 129:6
141:19 165:8
**talked** 135:3
137:19 182:4
183:4
**talking** 37:20
64:20 65:8
67:16,18 71:23
73:9 108:5
120:9 123:8
159:4 180:14
182:5 186:5
188:7
**talks** 110:8
135:1 181:17
**tandem** 142:21
**tax** 22:3 78:7
**technically**
104:3

**teeth** 80:11
**tell** 7:14 12:16
13:9 17:8
26:10 45:3
72:21 73:10
81:19 86:5
97:14 98:6
123:16 145:12
161:7,9,12,14
172:6
**telling** 35:23
38:3,23 66:18
100:22 147:5
**tells** 125:16
**ten** 51:24 149:16
**tenant** 52:9
**term** 92:13,18
92:20 93:2,3
93:11,22 94:1
98:1 99:1,11
100:5,9 102:4
102:17 111:24
126:10 131:19
**terminated**
148:9,11
**terms** 19:2 27:5
44:5,10 61:10
79:12 81:3
86:3 93:6,12
94:22 95:3
101:18 129:3
136:2 143:3
145:19 162:24
165:20 169:11
**testified** 5:16
48:15 49:12
63:4 64:15
72:2 85:7
113:17 144:9
161:11 185:2
188:6
**testify** 7:14
71:15
**testimony** 72:24
96:3 115:17
187:24 191:1

193:13
**Texas** 79:8 92:2
160:12 171:11
**thank** 110:23
182:23 194:2
**thanks** 21:8
145:10 151:21
191:5
**thi** 28:4
**thing** 65:3 76:2
81:9,11 122:14
**things** 9:13
74:23 77:8
80:14 82:3
86:16 90:2
107:6 108:13
147:14 149:15
161:11,12
167:17 176:9
176:17
**think** 62:14 95:1
98:16 107:7
121:15 128:4
167:13
**thinking** 72:8
178:18
**third** 20:1 47:6,9
60:23 129:19
**This's** 88:21
**thought** 63:4
65:13,16 72:1
75:4 104:16
111:17 127:9
129:13 134:8
134:24
**three** 11:17 14:6
18:24 19:4,5
20:6 52:8
77:12 80:13
105:11 109:23
149:20 160:10
178:23
**time** 5:12 9:21
11:6 13:3,11
30:20 31:1
47:4 51:24

53:2,7 56:14
57:10,15 66:21
66:24 70:7,9
75:14 76:21
93:23 104:24
116:13,17
126:2,22
127:12 128:4,8
142:3 151:10
157:8,17,19
158:10,17
160:5 165:6,16
166:18,23
167:1 171:15
180:1,9,12,19
183:2,5,6,9
184:8,9 185:11
185:18,23
187:3
**times** 13:7 51:20
51:22 105:6,11
105:16 106:8
167:18
**title** 172:19
178:10
**titled** 136:4
**titles** 53:20
**today** 61:15
72:18 104:1
170:11 184:4
190:22 191:4
**today's** 143:16
**told** 148:1 153:7
173:12
**ton** 145:15
146:15
**tone** 40:5
**tooth** 83:18
**top** 49:24 132:1
139:7
**topic** 7:10,15
35:3 61:18,22
63:1 67:22
**topics** 61:17
67:16 68:1
**Tory** 11:20

13:21,23
**total** 110:13
 115:10 116:16
 122:15 139:3
**transaction** 15:5
 15:8 23:1,20
 25:20 31:13
 38:21 44:1
 63:6 67:14
 74:10 82:14
 84:1,22 85:2
 92:14,18 93:14
 95:6 100:16
 122:18 135:10
 173:4,6 179:12
 179:20 180:7
**transactions**
 28:2,7 29:6
 62:12 67:13
 94:18 95:12
 189:5
**transcript** 144:6
 192:10,20
 193:22
**transfers** 26:17
**Transparency**
 47:3
**treasurer** 60:21
**trial** 5:12
**tried** 104:23
 106:7
**true** 24:17
 184:21 194:5
**trust** 47:3
**truthful** 37:11
 37:12,13 43:16
 51:4 125:14,20
**try** 106:21
**trying** 41:9,14
 140:11
**turn** 7:9 98:3
**turns** 22:3 44:2
**two** 7:2,6 11:17
 14:1,15 48:13
 76:13 105:6
 109:23 115:23

134:9 135:24
 148:13 149:15
 149:20 162:23
 163:2 179:19
**tying** 128:3,8
**type** 18:20 19:15
 20:4,5,8,24
 23:7,12,21
 76:14 81:14,20
 83:5 87:13
 88:2,4,17 91:9
 113:10 132:16
 154:4 167:12
 169:15,22
**types** 9:13 20:12
 20:16 80:9
 108:12 164:14
 175:22 176:9
**typical** 61:10
 79:1,4,11
 88:14 101:10
 101:18,22
**typically** 77:21
 77:23 78:5,6
 78:10,13,18
 90:2,18 91:10

── **U** ──
**UCC** 155:14
 168:1
**Uh-huh** 39:10
 132:24 137:23
 138:15 149:12
**ultimately** 137:3
**unable** 104:11
 154:3
**uncouth** 146:17
**underlines**
 149:8
**Underneath**
 98:23
**understand**
 24:11 51:17
 63:9 69:2
 79:17 81:9
 87:13 88:16

104:23 128:5
 129:21 167:24
 174:13
**understanding**
 6:6,9 20:17
 41:18 80:8
 81:19 82:4
 86:5 88:10
 131:12 140:20
 164:11 168:18
 170:15 175:7
**understood** 39:6
 95:1 168:5
**underwrite** 90:1
 188:24
**underwriter**
 11:4,5,18 12:4
 12:7 18:11
**underwriters**
 15:12,20 16:2
 18:3,9 19:9
 57:7 65:1,6,17
 70:16,23 73:11
 74:8 78:18
 90:16 179:17
**underwriting**
 7:12,21 8:5,15
 8:24 9:9,16,18
 10:20 12:8
 15:4,8,12,21
 16:1 19:1,21
 20:20 22:13
 23:23,24 24:5
 44:11 56:23
 57:1,5,12,17
 57:19 61:11
 62:1,6,22
 63:18 64:10,14
 65:2,5,12
 66:12 67:19
 68:12 70:1,6,8
 70:12,17 71:5
 71:10,12,16,17
 72:4,12 73:1,5
 73:7,12,18,19
 74:1,13,22,24

75:2,5 76:3
 77:9,15,24
 78:2,19,24
 79:3,10,12
 80:2 81:1,2
 82:5,9 83:20
 83:24 84:1,4,6
 85:16,24 87:12
 87:20,23 88:5
 88:8,12,15,20
 90:3,7,10
 91:20,23 95:18
 96:8,16,18
 97:2,14,20
 150:10 175:13
 176:6,13 178:8
 188:1,8,23
 189:7 190:2,13
 190:16,23
**underwrote**
 7:18 58:2
**unique** 80:20
 81:1
**unit** 180:23
 181:2,3
**UNITED** 1:1
**unrelated** 59:11
**unsuccessfully**
 106:8
**unsure** 117:3
**updated** 71:1
**use** 16:14,15
 17:24 18:6
 30:7 45:24
 46:6,7,8,10
 65:1,4 70:23
 74:9 94:13,16
 94:17 96:20
 100:8 123:6
 134:14 135:12
 145:21 146:17
 156:11,15
 182:6 189:4
**uses** 17:16 63:17
 64:11 188:23
**usual** 5:2 81:11

85:21
**usually** 150:17
**ut** 42:3

── **V** ──
**V-I-L-L-A-R-...**
 11:23
**Valley** 34:17
**Vals** 165:6
**various** 175:15
**vary** 94:23
**vendor** 55:15
**vendors** 151:20
**venue** 158:5,9
**verbal** 25:15
 120:9 150:14
 150:17
**verbally** 17:22
 18:2,8,10
 111:15
**verification**
 73:21 117:19
 119:10
**verified** 120:24
 124:22 125:1
**verify** 18:12
 43:24 117:14
 117:17 124:19
**version** 64:24
 156:22 166:6
 168:17
**versions** 129:16
**Villarose** 11:20
 11:24
**Villarose's**
 11:21
**voluntarily**
 148:14
**voluntary** 166:1
**volunteering**
 60:12
**vs** 1:8

── **W** ──
**waived** 5:10
**waiver** 133:1

**waivers** 157:23
158:9 160:23
169:22 170:12
**walk** 15:24 30:9
70:12 176:8
**want** 21:8,14,20
21:20 30:20
32:11 40:16
51:16 54:22
67:15 68:8,18
69:15 72:16,19
73:10 76:13
80:22 82:5,12
87:3 91:16
95:2 98:14
123:5 129:21
137:20 157:5
161:12,14,18
166:22 174:14
184:17,19,20
184:20 191:4
**wanted** 32:16
98:5 184:6
188:11
**wants** 46:9
**warned** 21:16
**warnings** 21:18
**warranted**
134:16
**wasn't** 43:23
80:20 166:13
166:21 174:1
185:19 186:14
191:1
**way** 29:15 43:16
53:24 85:6
99:21 118:10
160:1 177:16
**ways** 63:13,14
**we'll** 10:13
24:19 54:20
**we're** 10:14
16:11 61:15
71:3 72:20
84:5 108:5
121:5 125:24

126:1 127:12
139:19 161:23
191:5
**we've** 29:24
156:10,17
175:16 180:18
186:13
**week** 39:2
151:19
**weekly** 101:3
103:17
**went** 25:21
115:14 119:2
128:1 186:14
**weren't** 190:17
**WHITE** 1:16
2:3
**wife** 47:13,20
**WILLIAMS**
1:16 2:3
**willing** 105:21
108:13 126:1
**window** 79:21
**wit** 184:11
**withe** 44:11
**witness** 3:2 4:2
7:4 10:15,23
15:3,16 17:3
20:16 24:17
27:9 31:19
32:4 35:1,19
38:14 40:6,21
41:4 42:8,15
43:10,23 44:9
45:10 47:17
48:19 49:9
51:1,8 55:19
58:19 61:22
64:3 66:5 67:5
69:4 73:16
79:14 81:7
82:17 83:16
85:13 90:5
92:5 93:6,20
94:3,20 95:9
99:6,16 100:2

100:14 101:15
101:24 102:10
102:20 103:12
103:20 104:7
105:9 106:10
106:19 107:14
108:16 112:2
115:22 117:3
117:12 121:3
125:7 126:13
126:24 128:3
128:22 130:18
131:16 132:18
133:12 136:11
136:23 140:13
141:6 142:15
144:13 146:11
152:5 153:15
153:24 154:8
155:16 156:1
156:17 157:7
157:14 158:13
159:12 165:10
166:13 170:1
175:2,19
176:24 178:2
191:7 193:17
193:18,19,20
194:13
**WITNESSES**
193:1
**women** 14:6
**word** 93:22
135:12
**work** 48:2,7
52:1,4,13
87:14 104:4,22
105:22 106:13
126:1,6 142:20
172:9 174:3
175:10 177:2,6
**worked** 47:7
54:4,5 141:20
**working** 16:11
53:12 60:22
62:16 108:8

180:18
**workout** 108:6
**works** 49:17
**world** 41:2
**worried** 97:1
**worthiness** 74:3
96:23
**wouldn't** 67:1
72:7 111:15
117:8 121:3
146:17 174:5
**write** 106:16
**writes** 104:9
145:3,10 146:4
149:15 151:17
**writing** 123:21
133:4 134:2
164:18 165:24
**written** 7:23 8:2
10:19 19:7,21
20:20 33:15
43:12 55:23
64:10 73:11
108:10 115:4
115:18 181:5
187:2
**wrong** 87:3
186:24
**wrote** 106:1

**X**

**X** 3:1,6

**Y**

**Yeah** 32:11
62:10 66:11
79:9 80:12
92:19 98:24
99:3 101:18
123:8 133:18
139:5 163:3
**year** 39:3 79:21
80:11 166:22
**years** 11:17 14:1
14:15 39:3
48:13 52:8

76:13 148:13
**Yellowstone**
170:7
**Yelp** 75:8
**Yep** 132:22

**Z**

**zero** 184:10

**0**

**0that** 154:5

**1**

**1** 4:18 57:24
121:24 123:12
123:17 138:2
**1.1** 163:5
**1.10** 163:18
**1.11** 163:22
**1.2** 163:7
**1.3** 163:10
**1.4** 134:10,24
135:12,17
163:12
**1.5** 163:14
**1.6** 163:16
**1.7** 163:18
**1.8** 163:18
**1.9** 163:18
**1:17** 191:8
**10:00** 1:19
**100** 56:18
141:12
**101** 4:7
**11** 1:19 138:12
192:9
**110** 4:8 97:24
99:14,16,17,23
100:4 128:13
128:17
**111** 128:1
**12** 4:5 138:4
167:16
**14,000** 110:15
131:24 137:20
139:7,20,24
140:18 141:2

Joseph Barleta

141:13
**141** 50:7
**144** 3:11
**149** 3:12
**15** 4:9 138:12
  158:15 163:1,4
  165:2 166:11
  166:14,20,21
  167:21 189:5
**150** 3:13
**16** 4:7,8
**1650** 1:17 2:5
**17** 70:2 112:15
  133:10 137:21
  138:7 144:24
  146:15 157:5
  158:15 163:1,4
  165:2 166:11
  167:21 189:5
**172** 4:9
**18** 4:6,11
**18-CV-00268**
  1:6
**18,200** 138:13
**1800** 1:16 2:4
**186** 4:14
**187** 3:14
**19102** 1:18
**19103** 2:5

**2**

**2** 4:8 164:1
**20** 139:21 177:7
**2000** 2:9
**2012** 12:15 53:4
  156:18
**2013** 9:24 10:18
  13:15
**2014** 13:24
**2015** 74:12
  156:23 157:10
  157:19 159:23
  167:5 189:8
**2016** 53:5,9
  109:21 166:22
  167:1

**2017** 13:15 57:6
  57:8,24 58:12
  58:15 65:13,20
  66:2 109:9,17
  112:6,15 121:6
  121:24 123:12
  123:17 124:8
  124:15 125:2
  133:10 134:21
  144:24 146:15
  147:21 148:8
  151:4 157:10
  157:19 160:8
  167:6 189:8
**2019** 59:8
**202** 181:2
**2020** 1:19 192:9
**205** 52:5,7,9,12
**20th** 2:9
**21** 34:16 138:9
**215-299-2842**
  2:10
**215-864-7142**
  2:6
**22,000** 137:7,13
  138:14,18
  140:8,10
**23** 4:4,6
**24** 59:8
**25** 96:2,8,14,19
  97:5,15 98:17
**2nd** 50:7

**3**

**3** 4:14 112:5
  130:3,10,18
  164:1,4
**3,200** 138:7
**3.1C** 164:17
**30** 107:3 188:12
  188:14 194:1
**309,338.25**
  115:15
**30B.6** 35:2
**30B6** 54:9,18
  61:18 68:7,11

68:19,23 69:6
**316,339.25**
  115:15
**32** 4:4
**3200** 138:13
**33** 4:5
**34** 4:6
**3500** 33:3
**39** 4:7
**3K** 151:18
**3rd** 48:9,12 49:5
  49:13,18,21
  50:13,21 51:17
  172:1,3 177:7

**4**

**4** 138:12 164:2
**4,000** 122:1
  138:2,5,9,12
  138:13
**4.1** 132:20
**4.2.1** 164:7
**4/11/17** 126:5
**41** 4:8

**5**

**5** 3:5,9 4:4,18
  151:3
**5,000** 114:14
**5,000.25** 97:4
**5,000.75** 96:6
  97:5
**50** 92:9
**54** 4:9
**547,600** 139:8
  140:19
**59** 3:10 4:10,11

**6**

**6** 4:5,9
**61** 4:4,5
**62** 4:6

**7**

**7** 4:7
**7,000** 120:2
  138:11

**7,001** 112:16
  115:9 133:10
  137:21

**8**

**85,907.95** 139:4

**9**

**9** 4:10