Joseph LaForte

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| FLEETWOOD SERVICES, | :CIVIL ACTION |
| LLC, ROBERT L. | : |
| FLEETWOOD, and | : |
| PAMELA A. FLEETWOOD, | : |
| Individually and on | : |
| behalf of all others | :NO.  18-CV-00268 |
| similarly situated, | :(JS) |
| Plaintiffs | : |
| | : |
| vs. | : |
| | : |
| COMPLETE BUSINESS | : |
| SOLUTIONS GROUP, | : |
| INC. D/B/A Par | : |
| Funding; JOHN AND | : |
| JANE DOES, | : |
| Defendant. | : |

- - -

Oral Deposition of JOSEPH

LaFORTE, taken pursuant to notice, held at

WHITE AND WILLIAMS, LLP, 1800 One Liberty

Place, 1650 Market Street, Philadelphia,

Pennsylvania 19102, on December 5, 2019,

beginning at 10:00 a.m., before Kathleen

Jastrzembski, Court Reporter-Notary Public,

there being present.

- - -

Joseph LaForte

Page 2

```
 1    APPEARANCES:

 2

 3            WHITE AND WILLIAMS, LLP
              BY:  JUSTIN PROPER, ESQUIRE
 4                SHANE HESKIN, ESQUIRE
              1800 One Liberty Place
 5            1650 Market Street
              Philadelphia, PA 19103
 6            Phone:  215-864-7142
              Representing the Defendant
 7

 8            FOX ROTHSCHILD, LLP
              BY:  BRETT BERMAN, ESQUIRE
 9            2000 Market Street
              Floor 20th Floor
10            Phone:  215-299-2842
              Bberman@foxrothschild.com
11            Representing the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Joseph LaForte

```
 1                    I N D E X
                        - - -
 2  Witness

 3       Joseph LaForte

 4  EXAMINATION BY:                    PAGE

 5       Mr. Proper                     5

 6
                    E X H I B I T S
 7                      - - -

 8  NUMBER          DESCRIPTION        PAGE

 9  P-1        Foreign Policy article   158

10  P-2        Factoring Agreement      159

11  P-3        Handwritten Notes        161

12  P-4        Fleetwood Services Matrix  173

13  P-5        Consolidation Calculator  173

14  P-6        Fast Advance Funding     182

15  P-7        Fleetwood Services Funding  190
               Payment History
16

17

18

19

20

21

22

23

24
```

Joseph LaForte

Page 4

1              LITIGATION SUPPORT INDEX

2         Direction to Witness Not to Answer

3      Page        Line        Page    Line

4      15          11          127     13

5      59          3           130     10

6      59          10          186     4

7      124         6

8

        Request for Production of Documents
9
       Page        Line        Page        Line
10
                   None
11
                     Stipulations
12
       Page    Line        Page    Line
13
       5       1
14

15

16

17

18

19

20

21

22

23

24

Joseph LaForte

Page 5

```
 1                  - - -
 2            THE COURT REPORTER: Usual
 3     stipulations?
 4            ALL COUNSEL:  Yes.
 5                  - - -
 6            (It is hereby stipulated and
 7     agreed by and between counsel for
 8     respective parties that reading, signing,
 9     sealing, certification and filing are
10     waived and that all objections, except as
11     to the form of questions, be reserved until
12     the time of trial.)
13                  - - -
14            JOSEPH LaFORTE, after having been
15     first duly sworn, was examined and
16     testified as follows:
17                  - - -
18                  EXAMINATION
19                  - - -
20     BY MR. PROPER:
21     Q.      Good morning, Mr. LaForte, how
22     are you?
23     A.      Pretty good.
24     Q.      Good.  My name is Justin Proper.
```

Joseph LaForte

Page 6

1    I'm an attorney from the Law Firm of White

2    and Williams, you're currently at our

3    offices.  I represent the plaintiffs in a

4    lawsuit that's been commenced against CBSG,

5    Complete Business Solutions Group,

6    Incorporated doing business as PAR Funding,

7    and John and Jane Does, investors of CBSG.

8             Are you aware of this lawsuit?

9    A.       Yeah.

10   Q.       Where are you currently employed?

11   A.       I work for a consulting company

12   called Recruiting and Marketing Resources.

13   Q.       How long have been you worked at

14   Recruiting and Marketing Resources?

15   A.       Seven years now.

16   Q.       Over th past seven years, have

17   you done any consulting work for companies

18   other than Recruiting and Marketing

19   Resources?

20   A.       No.

21   Q.       Have you ever been employed by a

22   company by the name of Complete Business

23   Solutions Group?

24   A.       No.

Joseph LaForte

Page 7

1  Q.        Have you ever been employed by a

2  company that does business by the name of

3  PAR Funding?

4  A.        No.

5  Q.        Have you ever done any consulting

6  work for either Complete Business Solution

7  Group or PAR Funding?

8  A.        I mean, I don't know how to

9  answer that question.

10         MR. BERMAN:  Say you don't

11  understand.

12         THE WITNESS:  I don't understand

13  the question.

14  BY MR. PROPER:

15  Q.        Well, you do consulting work for

16  a company by the name of Recruiting and

17  Marketing --

18  A.        The question is tricky because

19  Recruiting and Marketing Resources is a

20  sale on, and it could be contrude that CBSG

21  and PAR Funding work together, so I don't

22  want to answer the question wrong.  So I

23  don't understand the question.

24  Q.        That's fair.  So why don't you

Joseph LaForte

Page 8

1    tell me in more detail what Recruiting and

2    Marketing Resources does?

3    A.          Consulting for different types of

4    products and services that small businesses

5    might be able to take advantage of in the

6    market.

7    Q.          How does that company, Recruiting

8    and Marketing Resources, inner play, if at

9    all by CBSG?

10   A.          Well, it inner plays with a lot

11   of different lenders in the industry, from

12   Pay Pal to On Deck Capital to Amazon to PAR

13   Funding, to many of the companies that you

14   guys know of in the industry.  There's no

15   specific relationship in the sense that

16   it's one of our lenders that we like to use

17   to fund deals.

18   Q.          So walk me through what you do

19   for Recruiting and Marketing Resources?

20   A.          I manage a sales office that

21   takes in clients, breaks down information

22   to make sure that it's properly formatted

23   before it goes to a lender.  And after it

24   goes to a lender, I make sure that the deal

Joseph LaForte

Page 9

1    is prudently done, and I see if the client

2    would like to purchase the deal.

3    Q.        So you are looking for

4    prospective borrowers; is that fair?

5    A.        No, I don't look for the

6    prospective borrowers.

7    Q.        Who -- is Recruiting and

8    Marketing Resources a broker for lenders?

9    A.        No.

10   Q.        So what specific services does

11   Recruiting and Marketing Resources do,

12   let's say for CBSG?

13   A.        I'm a broker for different ISO's.

14   So, independent sales operators send us

15   business and we place the business.  It's

16   financial technologies.

17   Q.        So, do you work for an ISO

18   company?

19   A.        No.

20   Q.        Are you an independent sales rep?

21   A.        No.

22   Q.        So why don't you explain for the

23   record what an ISO is?

24   A.        There's a lot of different ways

Joseph LaForte

Page 10

1    to become an ISO.  You can be a syndicate,

2    you can be a broker, there's a lot of

3    different ways you can explain an ISO.  I'm

4    not an ISO, so I couldn't explain it.

5    Q.       What is your understanding as to

6    what an ISO does as it relates to your

7    consulting work with Recruiting and

8    Marketing Resources?

9    A.       Sources deals for different

10   merchants throughout the country.

11   Q.       Sources deals in what respect?

12   What's that mean, sources deals?

13   A.       Same way you source deals here,

14   right?  They source deals, you call

15   clients, you can co-call, you can use

16   different marketing techniques to get

17   business, so independent sales operators

18   source business in order to get funding.

19   Q.       Okay, so an ISO may source

20   business and bring that to Recruiting and

21   Marketing Resources, right?

22   A.       Correct.

23   Q.       So by sourcing business, is that

24   anything more than finding someone that

Joseph LaForte

Page 11

1  wants money?

2  A.        Yeah, it could be more than that,

3  yeah.  Could be some advice.  It could be

4  anything.  It's consulting.

5  Q.        Is one of the things an ISO will

6  do for Recruiting and Marketing Resources

7  is to bring someone to your business that

8  wants funding?

9  A.        Potentially.

10  Q.        Okay.  What else will an ISO do?

11  A.        I can't speak for what they do.

12  Q.        Do you work with ISOs?

13  A.        Sure.

14  Q.        So what other things do ISOs do,

15  specifically with respect to your

16  consulting work with Recruiting and

17  Marketing Resources?

18  A.        They bring us business so we can

19  find funding for them.

20  Q.        Okay.  Do all of the people that

21  are brought to you by ISOs look for some

22  form of funding, or are there other needs

23  that business have that you --

24  A.        There's a lot of different need.

Joseph LaForte

Page 12

1          MR. BERMAN: Objection.  You can

2     answer.  You can answer.

3     BY MR. PROPER:

4     Q.        Other than funding, what other

5     services does Recruiting and Marketing

6     Services provide for businesses?

7     A.        Consulting.

8     Q.        What type?

9     A.        General consulting.  Advice on

10    merchant terminals.  Could be credit.

11    Could be anything.  Very broad.

12    Q.        One of the services that

13    Recruiting and Marketing Services performs

14    though is locating lenders for your

15    clients?

16    A.        Yes.

17    Q.        So I want to sort of focus on

18    that for a moment.

19    A.        Okay.

20    Q.        Do you have written agreements,

21    and when I say you, I mean your company.

22    Do you have written agreements with any

23    specific lenders?

24    A.        Yes.

Joseph LaForte

Page 13

1   Q.        When I say your company, I just

2   want to be clear for the record, do you

3   have an ownership interest in --

4   A.        No.

5   Q.        If you could just allow me to

6   finish my question just so the court

7   reporter can take it down and we have a

8   clean record even though you may anticipate

9   what I'm going to ask.

10  A.        Okay.

11            MR. BERMAN: And the same for him

12  because you're no cutting him off at his

13  answers too, so that goes both ways.

14            MR. PROPER:  It does.  I didn't

15  realize I had done that, but I'll be

16  cognizant.

17            MR. BERMAN:  A few times.

18            MR. PROPER:  Thank you for

19  pointing that out, Brett.  I appreciate

20  that.

21            MR. BERMAN:  No problem.

22  BY MR. PROPER:

23  Q.        So with respect to your

24  relationship, or employment, or consulting

Joseph LaForte

Page 14

1   work with Recruiting and Marketing

2   Resources, you are an independent paid

3   consult, correct?

4   A.        Yes.

5   Q.        You are not employed by that

6   company?

7             MR. BERMAN: Objection.  You can

8   answer if you understand the question.

9             THE WITNESS:  I don't understand

10  the question.

11            MR. PROPER:  Okay.

12  BY MR. PROPER:

13  Q.        Does Recruiting and Marketing

14  Resources take out taxes on your behalf

15  when they pay you?

16  A.        I don't know.

17  Q.        You don't know whether or not

18  they take out taxes, or whether you have to

19  pay taxes quarterly?

20  A.        I don't know how they report, I'm

21  not too familiar with the accounting.

22  Q.        Well, when you file your

23  tax return, do you --

24  A.        My accountants do everything for

Joseph LaForte

Page 15

1    me, I don't know how to do it.

2    Q.        Do you make estimated payments?

3              MR. BERMAN: Objection.  How is

4    this relevant to class certification?

5              MR. PROPER: I'm trying to

6    understand what his relationship is with

7    Recruiting and Marketing Services, and

8    whether or not he's a paid employee or a

9    consultant.

10             MR. BERMAN: Irrelevant to class

11   certification, you don't have to answer.

12             MR. PROPER:  We'll do this all

13   day because I'm deposing this individual as

14   a fact witness.  There's overlapping issues

15   between class certifications and merits.

16   There's a specific order in the case that

17   permits us to take merits discovery

18   relevant to the specific claimants at issue

19   in this lawsuit, and counsel is directing

20   his client not to answer that question.  So

21   I'm not going to argue about it.

22             You've directed him not to

23   answer, done.  I'll move on.

24             MR. BERMAN:  No problem, and for

Joseph LaForte

Page 16

1    clarity of the record, you made a

2    misrepresentation in what you just stated.

3    The Court specifically said that no

4    class-wide merits discovery shall be

5    conducted until after the May 29, 2020

6    status conference, so your statement that

7    merits discovery is to be conducted now is

8    disingenuous and in violation of a court

9    order.

10            MR. PROPER: Can you read footnote

11   nine of that court order, Brett?

12            MR. HESKIN:  Read the whole thing

13   into the record, please.

14            MR. PROPER:  Read the footnote

15   where the judge says that it's appropriate

16   to take merits discovery relative to this

17   particular -- relative to the Fleetwoods

18   claim.

19            MR. BERMAN: I don't know what

20   footnote nine is.

21            MR. PROPER: Is there a footnote?

22            MR. BERMAN:  There is a footnote.

23            MR. PROPER:  Can you please read

24   the footnote for the record since you just

Joseph LaForte

Page 17

1    accused me of violating a court order and

2    making disingenuous statements?

3              MR. BERMAN:  You did.

4              MR. PROPER:  Okay, go ahead and

5    read it.

6              MR. BERMAN:  While the Court is

7    not ordering the parties to conduct merit

8    discovery on plaintiff's individual claims,

9    the Court strongly encourages the parties

10   the come to an agreement regarding this

11   discovery.  Discovery on plaintiffs

12   individual claims can begin at any time,

13   and there is no --

14             MR. PROPER:  Wait, what did that

15   just say?

16             MR. BERMAN:  I'm not under oath.

17   You asked me --

18             MR. PROPER:  You just accused me

19   of a violation of a Court order, and what

20   you just read said that I'm permitted to

21   take merits discovery immediately.  Did it

22   say that or did it not say that?

23             MR. BERMAN:  Listen, talk to me

24   like that again, call the Judge, this is

Joseph LaForte

Page 18

1    harassing.  Do not ever raise your voice to

2    me again.  Happy to get on the phone with

3    Judge Sanchez right now to clarify it.

4             Pick up the phone, take your

5    voice down.  I'm not here to be lectured or

6    yelled at.  I'm not being deposed.  I'm a

7    lawyer.  Call the Judge.

8             MR. PROPER: I'm not here to have

9    you tell me --

10            MR. BERMAN:  Take your voice

11   down.

12            MR. PROPER: You're yelling at me,

13   and don't try to create a misimpression on

14   the record.  You accused me of violation a

15   Court order.  You read the court order, and

16   I have not violated it.  Your objection is

17   in violation.

18            MR. BERMAN:  Call the Judge.

19            MR. PROPER:  So why don't you

20   correct the record.

21            MR. BERMAN:  Call the Judge.

22            MR. PROPER:  I don't need to call

23   the Judge yet, but I'll be calling him

24   shortly.

Joseph LaForte

Page 19

1              MR. BERMAN:  Call the Judge, and

2     don't dare raise your voice to me like this

3     again, or we will call the Judge and talk

4     about the sanctions against you.

5              MR. PROPER:  Do it.

6              MR. BERMAN:  This is harassing.

7              MR. PROPER:  Do it.

8              MR. BERMAN:  You heard my

9     objection.  The order says what it says.

10    You're in violation of the Court order if

11    you think there's merits discovery

12    occurring today.  Call the Judge.  Call the

13    Judge.

14             MR. PROPER:  Is  it your position

15    I'm not allowed to ask any questions

16    regarding the merits of Fleetwood's claim?

17             MR. BERMAN:  Ask your questions,

18    I'll object.  I am not here to answer your

19    questions.  At any time, if you don't like

20    my objection, per the Court's directive,

21    pick up the phone, call the Judge.

22             MR. PROPER:  Perfect.

23             MR. BERMAN: I'm not under oath

24    here.  I'm not being deposed here.  Stop

Joseph LaForte

Page 20

1    posing questions to me.

2            MR. PROPER:  No, you're being an

3    obstructionist.

4            MR. BERMAN:  You call the Judge

5    whenever you want.

6            MR. PROPER:  I understand that.

7    I appreciate your guidance on what my

8    rights are as an attorney.

9    BY MR. PROPER:

10   Q.        So, back to Recruiting and

11   Marketing Resources, does that company have

12   a written agreement with CBSG, or PAR

13   Funding?

14   A.        Yes.

15   Q.        Okay.  Have you read that

16   agreement?

17   A.        Yes.

18   Q.        Has that agreement been produced

19   in this lawsuit, to your knowledge?

20   A.        No.  I wouldn't know.

21   Q.        You wouldn't know, okay.

22            Can you generally tell me what

23   the terms and conditions are of that

24   agreement between those two companies as

Joseph LaForte

Page 21

1   you understand it?

2   A.          No.

3   Q.          Is there compensation that CBSG

4   pays to Recruiting and Marketing Services

5   when business is referred to CBSG?

6   A.          Yes.

7                MR. BERMAN:  Objection.  You can

8   answer.

9   BY MR. PROPER:

10  Q.          Can you tell me your

11  understanding of the nature of that

12  financial arrangement?

13  A.          Say that again, I'm sorry.

14  Q.          Can you tell me your

15  understanding of the nature of the

16  financial arrangement between CBSG and

17  Recruiting and Marketing Services?

18  A.          I don't understand your question.

19  Q.          How is CBSG -- strike that.

20               Under what circumstances does

21  CBSG pay Recruiting and Marketing Services

22  money?

23  A.          If PAR Funding, or any other

24  lender finances another company in the form

Joseph LaForte

1    of cash advance or any other product of

2    service, it would be entitled to a

3    commission.

4    Q.        Okay.  What is the formula for

5    the commission that CBSG would pay to

6    Recruiting and Marketing Services if a deal

7    is funded?

8    A.        Various.

9    Q.        Various how?

10   A.        It could vary on term.  It could

11   vary on rate.  It could vary on time of the

12   year.  It could vary on anything.

13   Q.        So under the agreement, there are

14   different parameters for how CBSG pays

15   Recruiting and Marketing Services; is that

16   fair?

17   A.        Could be.

18   Q.        Are you guessing or do you know?

19   A.        Different products require

20   different commissions.

21   Q.        Got it.  So what different

22   products does CBSG offer?

23   A.        We went over that already.  It's

24   on the top of your page right there.

Joseph LaForte

Page 23

1   Funding, consulting and credit.

2   Q.        That wasn't my question, so I

3   apologize.

4   A.        That was the first question.

5   Q.        That was what services Recruiting

6   and Marketing Services provides?

7   A.        Right.

8   Q.        I'm asking you what type of

9   financial products does CBSG offer?

10          MR. BERMAN: That wasn't your

11  question, but if that's your question, you

12  can answer.

13          THE WITNESS:  That wasn't the

14  question, but okay.  PAR Funding provides

15  many different services from cash advances,

16  all different factoring products,

17  consolidation products, lines of credit

18  products.  They're not technically lines of

19  credit.  We like to call them in-house as

20  lines of credit.  They have nothing to do

21  with other loans, and that's about it.

22  Q.        Does PAR Funding offer any form

23  of lending product?

24  A.        No.

Joseph LaForte

Page 24

1    Q.         Okay.  Have you seen the

2    different forms for cash advances verus a

3    line of credit versus a different factoring

4    product that CBSG uses?

5    A.         Yes.

6               MR. BERMAN: Objection.

7    BY MR. PROPER:

8    Q.         Are you particular with those

9    different forms?

10   A.         Sure, yeah.

11   Q.         Do you know what percentage of

12   the deals that you bring to CBSG, which I'm

13   going to use interchangeably with PAR

14   Funding, result in a merchant cash advance

15   agreement?

16   A.         Probably about 20 percent.

17   Q.         And what percentage of the deals

18   result in some type of factoring

19   arrangement?

20   A.         I consider them both

21   interchangable.

22   Q.         So what does the other 80 percent

23   consist of?

24   A.         People that don't qualify.

Joseph LaForte

Page 25

1    Q.       So I'm going to ask specifically

2    about deals that result in CBSG giving

3    money to individuals that you bring to

4    them.

5    A.       Please.

6    Q.       Okay.  What percentage of funding

7    deals that you're involved with does CBSG

8    structure as a merchant cash advance?

9    A.       20 percent.

10   Q.       And that means 80 percent of the

11   other deals that are funded are in some

12   other from of agreement.  What form of

13   agreements --

14           MR. BERMAN: Objection.

15           THE WITNESS:  There's no other

16   form of agreement.  20 percent of our

17   clients who will qualify for some type of

18   financing.

19   BY MR. PROPER:

20   Q.       Okay.

21   A.       The other 80 percent don't

22   qualify.

23   Q.       So --

24   A.       Or, let me be more specific.

Joseph LaForte

Page 26

1   Q.      Sure.

2   A.      You might apply, or maybe you get

3   funding somewhere else.  But the actual

4   closurey shows about 20 percent.  To

5   clarify.

6   Q.      I appreciate that.  We're just

7   having a disconnect.  So of the 20 percent

8   that qualify, if I'm understanding you

9   correctly, all of those individuals will

10  sign some form of merchant cash advance

11  agreement with CBSG?

12  A.      Right.

13  Q.      Got it.  Is the form of the

14  agreement the same for all of the clients

15  that are approved and actually funded by

16  CBSG?

17          MR. BERMAN: Objection.  You can

18  answer if you understand.

19          THE WITNESS:  No, because there's

20  different products, so in our businesses,

21  people have different needs.  You can't

22  have a templated product for one specific

23  client.

24  BY MR. PROPER:

Joseph LaForte

Page 27

1    Q.        Okay.

2    A.        So there might have a need for a

3    different product that doesn't fit the box

4    of a typical cash advance product, so we'd

5    have to tailor the documents in order to

6    facilitate the deal.

7    Q.        So are the agreements tailored in

8    every specific case to the needs of a

9    particular borrower?

10            MR. BERMAN:  Objection.  You can

11   answer.

12            THE WITNESS: You can't -- no.  So

13   we have different products and different

14   programs.  You can do different documents

15   and do it different legal for each client.

16   BY MR. PROPER:

17   Q.        So there is a form agreement that

18   is so sort of a template for all of the

19   deals with CBSG, right?

20   A.        Correct.

21   Q.        And under the form agreement, do

22   all the form agreements have some form of

23   the daily payment?

24   A.        No.

Joseph LaForte

Page 28

1    Q.        Do all the agreements have some

2    sort of repayment structure?

3    A.        Of course.

4    Q.        And what percentage of the

5    agreements are the borrowers required to

6    repay the money through daily ACH

7    withdraws?

8    A.        I don't have that data.

9    Q.        Okay.  In your experience, do you

10   know what percentage of the deals funded by

11   CBSG require repayment through daily

12   payments?

13   A.        I don't have that data.

14   Q.        What other repayment models have

15   you seen?  The payments will be repaid

16   under what time period?

17            MR. BERMAN: Objection.  Just for

18   clarity of the record, are you talking

19   about Texas deals?

20            MR. PROPER: I'm talking

21   generally, and we're going to get into

22   Texas.

23            MR. BERMAN: Why?  We're in a

24   class action certification discovery about

Joseph LaForte

Page 29

1    Texas deals.

2            MR. HESKIN:  He can answer.

3            MR. BERMAN: Again, I want to be

4    clear for the record what you're doing with

5    a class cert motion, so now you're talking

6    about all products, not just Texas.

7            MR. PROPER:  You can state your

8    objection.  If you don't want your client

9    to answer the question, tell him don't

10   answer.

11           MR. BERMAN:  You can answer as to

12   Texas.

13           MR. PROPER:  That wasn't my

14   question.

15           THE WITNESS:  Can you restate

16   your question, please?

17   BY MR. PROPER:

18   Q.      I want to know, in your

19   experience, what types of repayment terms

20   have you seen in deals involving CBSG,

21   other than daily payments?

22           MR. BERMAN:  Objection.  You can

23   answer.

24           THE WITNESS:  Okay, so some

Joseph LaForte

Page 30

1    clients prefer a daily payment.  You might

2    be looking at a transaction as a daily

3    payment being too aggressive.  You have

4    clients that request daily payments.  They

5    don't like the big payment coming out at

6    the end of the month, similar to a bank.

7              You might have a client that

8    would like the payments taken out two times

9    a week, which we have that product.  You

10   might have a client that likes a weekly

11   payment because he has a receivable coming

12   in and maybe he's used to -- maybe Fridays

13   are great for him because -- there's a

14   reason why.  So each of these deals, and my

15   job is to tailor the deals to make sure the

16   clients can pay.  And also to make sure the

17   clients -- so looking out for both.

18             Make sure the clients have good

19   deals.  So the payment is very important,

20   and I know where you're going with it, and

21   I agree with you.  The daily payment is

22   specifically -- it has to be a micro

23   payment, and we designed that so people can

24   not feel the payment as much; it doesn't

Joseph LaForte

Page 31

1    always work.  So it depends on how many

2    deposits you have per month, or it depends

3    on how many -- your frequency of your

4    receivables, there's a lot of variables,

5    and that's my job.

6              So at Recruiting and Marketing

7    Resources, my job is to be the bridge

8    between the lender and the client, and

9    that's why I'm here today.

10   Q.        How many deals are you personally

11   involved with where CBSG funds money to

12   your clients on a yearly basis?

13   A.        Every deal.

14   Q.        I'm sorry?

15   A.        Every deal.

16   Q.        What do you mean every deal?

17   Every one of your deals involves CBSG?

18   A.        Yes.

19   Q.        So when you said your company

20   deals with other lenders, your company may

21   deal with other lenders, but you

22   specifically may not?

23   A.        Right.

24   Q.        So you're an exclusive sales

Joseph LaForte

Page 32

1  agent for CBSG or no?

2  A.       No, I'm not a sales agent.  I'm

3  more of a consultant.  The salesmen are

4  ISO's, to your point earlier; they send the

5  deals in.  My job is to make sure that the

6  deal fits the criteria for the company, and

7  it's also a prudent deal for the customer.

8  Q.       Do you do underwriting on behalf

9  of CBSG?

10  A.       I don't.

11  Q.       Does CBSG have their own

12  underwriting department?

13  A.       Yes.

14  Q.       Do you work with someone specific

15  in the underwriting department or multiple

16  people?

17  A.       Multiple.

18  Q.       Who are some of the individuals

19  in CBSG's underwriting department that you

20  work with?

21  A.       I'm not going to name any names.

22  Q.       I'm sorry?

23  A.       I'm not going to name any names

24  today.

Joseph LaForte

Page 33

1    Q.        You're refusing to answer my

2    question?

3    A.        Yeah.

4    Q.        Okay.  You know the names.  You

5    just aren't going to tell me them?

6    A.        That's right.

7    Q.        Do you have an ownership interest

8    in CBSG?

9    A.        I don't.

10   Q.        Have you ever had an ownership

11   interest in CBSG?

12   A.        No.

13   Q.        Have you ever represented to

14   anyone in the public that you are an owner

15   of CBSG?

16   A.        No.  Not that I know of, no.

17   Q.        Have you ever represented to an

18   investor or potential investor that are you

19   are an owner of CBSG?

20   A.        No, sales director.

21   Q.        You've represented --

22   A.        In the past.

23   Q.        But not currently?

24   A.        No.

Joseph LaForte

Page 34

1   Q.        When was the last time you

2   represented to someone that you are a sales

3   director for CBSG?

4   A.        A few hours ago.

5   Q.        Who did you make that represation

6   to?

7   A.        A client.

8   Q.        But you're not a sales director

9   for CBSG?

10  A.        Yeah, I am a sales director for

11  CBSG.  I don't work there, but I am a sale

12  director.  So I handle all the sales for

13  CBSG, which makes me a sales director.  I

14  don't specifically work for the company.

15  I'm in a consulting capacity.

16  Q.        Do you have a business card that

17  says you're a sales director for CBSG?

18  A.        I don't have business cards.

19  Q.        So you don't think it's

20  misleading to tell people you're a sales

21  director for CBSG when you're not really

22  employed by the company?

23            MR. BERMAN:  Objection.  You can

24  answer if you understand the question.

Joseph LaForte

Page 35

1           THE WITNESS:  No, I don't think

2    that's inappropriate.  I think it's

3    helpful.  I think it's helpful to the

4    clients to know that we have a direct

5    relationship.  It gives them a comfort

6    level, and I think it's a good thing.  I

7    think it's a good thing that I work at

8    Recruiting and Marketing Resources because

9    it allows me the ability to customize

10   transactions, not only for CBSG PAR

11   Funding, but maybe there's a deal that

12   doesn't qualify for PAR Funding.  Should

13   the person only be a one trick pony?  They

14   should be able to go somewhere else.  If I

15   can help them, if I can lead them to go

16   somewhere else?  It's a good thing, I think

17   for the merchants.

18   Q.      Do you tell all the people that

19   you work with that you're a sales director

20   for CBSG?

21           MR. BERMAN: Objection.  If you

22   can answer the question.

23           THE WITNESS:  I don't know.

24   BY MR. PROPER:

Joseph LaForte

Page 36

1    Q.        I mean as part of --

2    A.        I don't walk around telling

3    people -- it's kind of a...

4    Q.        So as part of your regular

5    business, a small business is brought to

6    Recruiting and Market Services looking for

7    money, and as part of that conversation

8    with the business, do you typically tell

9    that business owner that you're a sales

10   director for CBSG?

11          MR. BERMAN: Multiple objections.

12   If you can answer the compound

13   hypothetical.

14          THE WITNESS:  Yeah, I'll tell

15   somebody I'm a sales director at CBSG, you

16   know.  We have an agreement with CBSG, PAR

17   Funding.  I think it's appropriate, yeah.

18   BY MR. PROPER:

19   Q.        Were you a founder of CBSG?

20   A.        I guess you can say yes.  I help

21   build some of the models, yes.  I wouldn't

22   call myself a founder, but I help build a

23   lot of the models, yes.

24   Q.        Did you invest any of your own

Joseph LaForte

Page 37

1    capital to start CBSG?

2    A.        No.

3    Q.        Have you ever represented to any

4    third party that you used our own money to

5    start CBSG?

6              MR. BERMAN:  Objection.  If you

7    can answer.

8              THE WITNESS: I can't answer.

9    BY MR. PROPER:

10   Q.        You can't answer because you

11   don't know or you --

12   A.        I've been in the business eight

13   years.  I'm not going to say that I said or

14   didn't say something over the past eight

15   years.  I don't want to lie to the Court.

16   Q.        When you say you developed some

17   of the models for CBSG, can you tell me

18   generally what you developed?

19   A.        Sure.  The exact model you have

20   in front of you for your client, Fleetwood,

21   I developed that model.  It's a

22   consolidation program which was a very

23   helpful product.  I developed that product.

24   Some of the bi-weekly products.

Joseph LaForte

Page 38

1              In my capacity as a consultant, I

2    learned pretty quickly that having one

3    product isn't a good thing, especially for

4    the merchants in small business in America,

5    so it's very order to tailor the

6    transactions in order to help them get

7    through the advances.

8    Q.        Just walk back, and I apologize.

9    When was CBSG founded, in what year?

10             MR. BERMAN: You can answer if you

11   know.

12             THE WITNESS:  I'm going to guess,

13   2012.

14   BY MR. PROPER:

15   Q.        Who were the individuals that

16   started CBSG?

17   A.        I don't know how to answer that

18   question.

19   Q.        Do you know who the owners of

20   CBSG were back in 2012?

21   A.        No.

22   Q.        Do you know who the stock holders

23   were back in 2012?

24   A.        No.

Joseph LaForte

Page 39

1   Q.        Do you know who any of the

2   principals were of that company?

3   A.        No.

4   Q.        Do you know who any of the

5   directors were of the company?

6   A.        No.

7   Q.        Who was the person at CBSG that

8   contacted you for consulting assistance

9   back in 2012?

10  A.        I don't remember.  It was too

11  long ago.

12  Q.        And I apologize if I'm

13  mispronoucing the last name, but do you

14  know a Lisa McElhone?

15  A.        Yeah, I'm married to her.

16  Q.        Thought so.  Am I producing the

17  name correctly?

18  A.        Close enough.

19  Q.        How long have you been married to

20  Ms. McElhone?

21  A.        14 years.

22  Q.        What's your current address?

23  A.        1932 Spruce Street.

24  Q.        In Philadelphia?

Joseph LaForte

Page 40

1   A.          Uh-huh.

2   Q.          Was McElhone one the founders of

3   CBSG?

4   A.          I'm not going to answer questions

5   on behalf of anybody expect for my own

6   self, that's why I'm here today.

7   Q.          Do you know whether she was and

8   you're refusing to answer, or you don't

9   know?

10          MR. BERMAN: It's what you know or

11   don't know.

12          THE WITNESS:  All right, so the

13   original founders of the company, there was

14   a lot of different products and services

15   out there for small businesses.  I started

16   the business as an independent operator, so

17   I don't want to mislead the Court.  I

18   wasn't a founder in the since because of

19   the fact I was an ISO, an independent sales

20   operator, when I first got into the

21   industry before CBSG was founded.

22   BY MR. PROPER:

23   Q.          Hold on, now I'm confused, and it

24   won't be the last time.

Joseph LaForte

Page 41

1          When you say you started the

2    business --

3    A.      In the industry, not in PAR

4    Funding.

5    Q.      So when you started in the

6    business, not started CBSG?

7    A.      Correct.

8    Q.      Got it, continue?

9    A.      So I started as an independent

10   sales operator.  So, when I say I don't

11   know, I don't remember exactly specifically

12   how it was specifically founded, I don't

13   know what that word really means.  I'm

14   pretty good on the telephones.  I started

15   as an independent sales operator for

16   another company working for somebody else,

17   and that's how I got in the industry.

18   Q.      With respect to your wife, do you

19   know whether or not she was involved in the

20   formation of CBSG?

21   A.      Yes.

22   Q.      Okay.  What was her involvement?

23          MR. BERMAN: If you can answer.

24          THE WITNESS:  I don't understand.

Joseph LaForte

Page 42

1    What you mean by formation?  How do you

2    formulate a company?  What does that mean?

3    BY MR. PROPER:

4    Q.       Well, there's papers that are

5    filed in order for --

6    A.       I don't know; her lawyers would

7    know that.  I don't know.

8    Q.       So your wife was involved with

9    dealing with the lawyers and setting up the

10   company and so on and so forth, right?

11          MR. BERMAN: Objection.  You can

12   answer.

13          THE WITNESS:  I don't know.  I

14   was a sales operator.  I don't know what

15   she did.  She ran her own business.

16   BY MR. PROPER:

17   Q.       Do you know if your wife invested

18   any of her own money in the start or

19   formation of CBSG?

20   A.       I have no idea.

21   Q.       Okay.  Is your wife currently an

22   employee of CBSG?

23   A.       Yes.

24   Q.       Has she always been an employee

Joseph LaForte

Page 43

1  of CBSG since it was founded?

2  A.       Yes.

3  Q.       Does she have a title at CBSG?

4  A.       I don't know what her title is

5  at CBSG.  We're not really big on titles

6  like you guys are here, so I don't really

7  think she has a title.

8  Q.       Do you know if she's an officer

9  or director of CBSG?

10  A.       I don't know.

11  Q.       Has she ever represented herself

12  to the public as the president of CBSG?

13  A.       I don't know what she does in

14  public.

15  Q.       Do you know who else was

16  assisting your wife back in 2012 in

17  starting CBSG?

18  A.       No.

19  Q.       Were there other people involved?

20  A.       I don't know any of these

21  questions. How my wife operated her

22  business or formulated her business.

23  Q.       What experience, if any, did your

24  wife have in financial services prior to

Joseph LaForte

Page 44

1    2012?

2    A.        My wife was a mortgage broker.

3    Q.        Who did she work for prior to

4    2012?

5    A.        I don't know the name of the

6    company.  She's a licensed mortgage broker.

7    She's a Saint Joe's graduate.  She's

8    brilliant.  If you guys are to insinuate at

9    all that she was incapable of starting this

10   business, she's a lot smarter than me.  So

11   if I were you guys, I wouldn't get her in

12   here.  Just for clarity, because we're

13   going through a lot of this for Judge --

14          MR. HESKIN:  Joe, to the extent

15   you can answer for her, we don't need to

16   depose her.

17          THE WITNESS:  I'm trying to, but

18   it's hard to answer for somebody else.

19   She's a brilliant person.  Woman-owned

20   business.  She's very smart.  I run the

21   sales side of the business, that's what I'm

22   good at.  I'm not very good at the legal.

23   I'm not very good at the accounting; I'm

24   not good at that stuff.  I'm very good at

Joseph LaForte

Page 45

1    looking at transactions.  I'm good at

2    talking to people on the phones, and that's

3    my role, hence why I own my shop,

4    Recruiting and Marketing Resources.

5    BY MR. PROPER:

6    Q.        Are you an owner of Recruiting

7    and Marketing Resources?

8    A.        No.

9    Q.        When you say you have your own

10   shop, what does that mean?

11   A.        I run the shop.  I'm the

12   director, so I'm in the office everyday,

13   you know, running the shop.

14   Q.        Who owns Recruiting and Marketing

15   Services?

16   A.        I'm not sure how it's formatted

17   right now.

18   Q.        You've worked for Recruiting and

19   Marketing Services as the director for

20   seven years, right?

21   A.        Yes.

22   Q.        You don't know any of the owners?

23   A.        No.

24   Q.        But you've never been one of the

Joseph LaForte

Page 46

1   owners?

2   A.        No.

3   Q.        And you've never had a financial

4   stake in the business, right?

5   A.        No.

6   Q.        Do you know how that business is

7   formed?  Is it a partner or corporation?

8   A.        Let me clarify.  The reason why I

9   don't know these answers, this company was

10  formatted in 2008.  I don't know who the

11  actual owner is of the company.

12  Q.        Do you report to someone?

13  A.        No.

14  Q.        Are you involved in preparing

15  financial statements for the company?

16  A.        No.

17  Q.        Do you run the office?

18  A.        Yes.

19  Q.        How many employees are there?

20  A.        About 25.

21  Q.        And you have no idea whose above

22  you at the company, right?

23            MR. BERMAN: Objection.  You can

24  answer if you understand.

Joseph LaForte

Page 47

1              THE WITNESS:  No, I don't.  I

2    don't have anybody above me.  I just don't

3    want to answer you incorrectly about the

4    formation of the company and who the owners

5    of the company are, because as I explained

6    to you, it was formatted so long ago.  I

7    don't know.

8    BY MR. PROPER:

9    Q.        Okay.  Are there any other

10   directors of the company?

11   A.        I don't know.

12   Q.        Is there anyone that is at the

13   same level that you are within the company?

14   A.        No.

15   Q.        Are you, to your knowledge, the

16   person that runs the day-to-day activities

17   of Recruiting and Marketing Services?

18   A.        Yes.

19   Q.        Does your wife have any

20   involvement in that business?

21   A.        No.

22   Q.        Now, when you said you run the

23   sales side of CBSG, what did you mean that

24   by that?

Joseph LaForte

Page 48

1   A.        CBSG doesn't have any sales

2   people.  CBSG is only a funder.

3   Q.        Are you using CBSG and PAR

4   Funding separately?

5   A.        No.  CBSG is PAR Funding.  CBSG

6   is d/b/a PAR Funding.

7   Q.        I just wanted to make sure we

8   were on the same page because I'm using

9   them interchangably.

10  Q.        No, you're right?

11  A.        You're right.  CBSG is d/b/a PAR

12  Funding.

13  Q.        So when you say that CBSG has no

14  sales force, if I'm understanding you

15  correctly, all of their sales are

16  outsourced to your -- I don't want to say

17  your company because you don't own it, but

18  are outsourced through third parties or no?

19         MR. BERMAN:  Objection.  You can

20  answer if you understand.

21         THE WITNESS:  Yes, so CBSG

22  doesn't have any sales.  It's a fintech

23  company. All it does is give out advances,

24  different types of products.  My job is to

Joseph LaForte

Page 49

1    be intermediary between the independent

2    sales operators, which there's 400 of them,

3    which is a lot of work.

4    BY MR. PROPER:

5    Q.        Sure.

6    A.        And I'm pretty good on the

7    phones, as I explained.  They gave me a job

8    in Recruiting and Marketing Resources to

9    put together deals and make sure that

10   clients are satisfied with the product

11   before it goes into PAR Funding or any

12   other lenders portal.

13   Q.        That's help.  Was Recruiting and

14   Marketing Services formed at the same time

15   CBSG was formed?

16   A.        No.  As I said, it was formed a

17   long time ago, that's why I don't have the

18   answers for you.

19   Q.        Okay, but Recruiting and

20   Marketing Resources has been around for

21   about seven years, which puts us around

22   2012, which is when CBSG was form?

23   A.        No, that's incorrect.

24   Q.        So when was Recruiting and

Joseph LaForte

Page 50

1  Marketing Services formed?

2  A.        I just said I don't remember.

3  Q.        A long time ago?

4  A.        Yeah, a long time ago.

5  Q.        You started working for

6  Recruiting and Marketing Services in 2012,

7  correct?

8  A.        About.

9  Q.        Was your consulting arrangement

10 with Recruiting and Marketing Services done

11 because of the formation of CBSG?

12 A.        No, not at all.  As a matter of

13 fact, I closed many transactions with other

14 lenders through Recruiting and Marketing

15 Resources before CBSG was even formed, so

16 my capacity at Recruiting and Marketing

17 Resources has been before CBSG was formed.

18 Q.        So prior to CBSG, you worked for

19 Recruiting and Marketing Services in a

20 consulting capacity?

21 A.        Yes.

22 Q.        And at that time, if businesses

23 came to you looking for a need, you would

24 refer them to a variety of different

Joseph LaForte

Page 51

1   lenders, right?

2   A.          Sure.

3   Q.          Who were some of the lenders you

4   worked with before CBSG?

5   A.          On Deck, Papal, Rapid.

6   Q.          Yellowstone?

7   A.          No, I never worked with

8   Yellowstone.

9   Q.          How about Richmond Capital?

10  A.          No.

11  Q.          Is it Recruiting and Marketing

12  Services?

13  A.          Recruiting and Marketing

14  Resources.

15  Q.          Recruiting and Marketing

16  Resources, I'm sorry.

17              How did it come about that you

18  began to be only refer businesses that you

19  dealt with to CBSG.

20              MR. BERMAN: Objection.

21  Mischaracterization.  You can answer.

22              MR. PROPER:  Let me take a step

23  back -- it's a pet peeve of mine when I'm

24  accused of mischaracterizing, because if I

Joseph LaForte

Page 52

1   am, I am, but I try not to.

2   BY MR. PROPER:

3   Q.       Did you testify previously that

4   all of the deals that you have are with

5   CBSG?

6   A.       No.  I said that all the deals

7   that CBSG does comes through me.

8   Q.       Got it.

9   A.       But on top to have that, I also

10  source for other companies.

11  Q.       So what percentage of your deals

12  are with CBSG versus other lenders?

13  A.       I would have to look.  I would

14  have to say 60/40.

15  Q.       60 CBSG 40 others?

16  A.       Yes.

17  Q.       Thank you, I did mischaracterize.

18  But all of the deals that CBSG funds come

19  from you?

20  A.       Yeah, so it's very -- I think

21  it's very important that that occurs.  We

22  want to make sure that -- there's an a lot

23  of unscrupulous brokers out there right

24  now, so I work in a capacity of a mediator

Joseph LaForte

Page 53

1   between the broker and the lender.

2   Q.        Uh-huh.

3   A.        The broker and the client, which

4   I think there's a lot of misrepresentation

5   in the industry, so that's my job.

6   Q.        What is -- strike that.

7            Are you familiar with a company

8   by the name of Fast Advance?

9   A.        Yes.

10  Q.        What does Fast Advance do?

11  A.        It's an independent sales

12  operator.

13  Q.        Okay.  How about Broadway

14  Advance?

15  A.        They're an independent sales

16  operator.  I think they're also a funder.

17  Q.        And are those two companies two

18  of the ISO's that will bring deals to you

19  that may result in CBSG Funding money to

20  businesses?

21  A.        Sure, could.

22  Q.        And does CBSG pay Fast Advance as

23  well as Recruiting and Marketing Resources

24  when a deal is funded?

Joseph LaForte

Page 54

1    A.        Yes.

2    Q.        Does CBSG have written contracts

3    with different independent sales

4    organizations?

5    A.        I believe so.

6    Q.        Okay, and as the person that runs

7    the sales side of CBSG, are you familiar

8    with CBSG's annual funding?

9    A.        No.

10   Q.        Do you know how much money CBSG

11   has funded this year, for instance?

12   A.        No.

13   Q.        Do you know how many accounts

14   receivable CBSG has outstanding currently,

15   ballpark?

16   A.        No.

17   Q.        Do you have access to any

18   internal financial documents for CBSG?

19   A.        What's that mean?

20   Q.        Are you able to review, for

21   instance, CBSG's profit and loss statements

22   to the extent they have them?

23   A.        No.  My wife reviews them.  I

24   don't know.

Joseph LaForte

Page 55

1    Q.        Have you ever reviewed a profit

2    and loss statement for CBSG?

3    A.        I don't think so.

4    Q.        Do you know if CBSG has a general

5    ledger?

6    A.        What's that?

7    Q.        If you don't know, that's fine.

8    A.        What is a general ledger?

9    Q.        It's an accounting tool that many

10   businesses use.

11   A.        I don't know. They have

12   professional accountants up there.  They

13   have CPA's.  They have controllers.  It's

14   in a separate facility; I don't have any

15   access to that.

16   Q.        Who are CBSG's accountants, do

17   you know?

18            MR. BERMAN: If you know.

19            THE WITNESS:  I don't know the

20   last names.  I just know them by first name

21   when they pay us if there's a discrepency

22   in a file.

23   BY MR. PROPER:

24   Q.        Do you work in the same office as

Joseph LaForte

Page 56

1    CBSG employees?

2    A.        No.

3    Q.        Where is your business,

4    Recruiting and Marketing Resources,

5    located?

6    A.        It's a separate facility in Old

7    City.

8    Q.        So what is the business address

9    for Recruiting and Marketing Resources?

10   A.        22 North 3rd.

11   Q.        What is the business address for

12   CBSG?

13   A.        CBSG is located in Florida.

14   Q.        Does CBSG have an office in

15   Philadelphia?

16   A.        No.

17   Q.        Have you ever represented to any

18   investor or potential investor that CBSG

19   has an office at 22 North 3rd Street in

20   Philadelphia?

21            MR. BERMAN: Objection.  You can

22   answer.

23            THE WITNESS:  CBSG doesn't have

24   an office at 22 North 3rd Street.

Page 57

1  BY MR. PROPER:

2  Q.        I'm asking you whether you

3  personally have ever represented --

4  A.        I don't remember representing

5  that.

6  Q.        Again, I hear your answer, I just

7  need to finish my question.

8  A.        Okay.

9  Q.        Have you, to your knowledge, ever

10 represented to any third party that CBSG

11 has an office at 22 North 3rd Street in

12 Philadelphia?

13 A.        I don't remember.  Don't know.

14 Q.        Have you ever met with CBSG

15 investors at 22 North 3rd Street?

16 A.        Yes.

17 Q.        How often do you meet with

18 investors for CBSG?

19 A.        I don't really meet with

20 investors except to talk about different

21 products and services that they're rolling

22 out.

23 Q.        Do you do any -- do you do any

24 type of presentations or promotions to try

Joseph LaForte

Page 58

1    to bring investors into CBSG?

2    A.        No, they have a separate division

3    that does that.

4    Q.        Okay.

5    A.        Once in a while they're talk

6    about different products that CBSG is

7    rolling out, and I'll do that for them.

8    Q.        Talk about different products

9    where, like in what format?

10   A.        Different products, a bi-weekly

11   program, different types of programs so I

12   can explain different programs to people.

13   Q.        Are these just people that may

14   stop by the office, or is this a more

15   formal event?  I'm trying to understand

16   like what the circumstances might be?

17   A.        Stop by the office, could be

18   anything.

19   Q.        Yeah.  I don't know what the

20   could be anything is, so I'm just wondering

21   if you can give me some examples of the

22   type of interactions you --

23   A.        The same way I'm interacting with

24   you right now.

Joseph LaForte

Page 59

1   Q.        Have you ever given a formal

2   presentation to potential investors?

3           MR. BERMAN: Objection.  I'm going

4   instruct him not to answer.

5           MR. PROPER: Okay.

6   BY MR. PROPER:

7   Q.        Have you ever represented to an

8   investor or potential investor that CBSG is

9   a lender?

10          MR. BERMAN:  Objection.  I'm

11  going to instruct him not to answer.

12          MR. HESKIN: What's the basis of

13  that?

14          MR. BERMAN: The same basis in our

15  objection to the class based

16  interrogatories.  This is a merits based

17  discovery, and this would be something you

18  should raise with the Court if you're

19  seeing investor based discovery.

20          MR. HESKIN: You mean the ones

21  that are --

22          MR. BERMAN:  I said call the

23  Court.

24          MR. HESKIN:  Got it.

Joseph LaForte

Page 60

1          MR. BERMAN:  That's something

2    we've objected to. You have not done

3    anything about our objection.  We're going

4    to stand by those objections.

5          THE WITNESS:  I would like to put

6    something on the record.

7          MR. HESKIN:  Sure.

8          THE WITNESS:  PAR Funding is a

9    Florida Company.  You're thinking of, and

10   when you're misleading to is, 20 North 3rd

11   Street is a processing office.  It's called

12   Full Spectrum.  You guys have the wrong

13   address.  It's a Florida office.

14          There's a processing entity that

15   processes all the files.  We're an fintech

16   company.  CBSG is only a lender.  In it's

17   capacity, only lends capital.  We have from

18   Recruiting and Marketing Resources that

19   sources deal, and Full Spectrum is the

20   actual processing and underwriting arm that

21   handles all of the business for PAR

22   Funding.

23   BY MR. PROPER:

24   Q.        So the business that's located at

Joseph LaForte

Page 61

1    20 North 3rd Street is called what?

2    A.        Full Spectrum.

3    Q.        Have you been to Full Spectrum's

4    office?

5    A.        Of course.

6    Q.        And Full Spectrum's office on 20

7    North 3rd where your marketing company is

8    on 22 North 3rd?

9    A.        Right.

10   Q.        Got it.  How many employees work

11   at Full Spectrum?

12   A.        I don't know.

13   Q.        Ball park?

14   A.        Ball park?

15   Q.        Yeah.

16   A.        50.

17   Q.        And are the individuals that work

18   at 20 North 3rd Steet employees of CBSG or

19   no?

20   A.        No.

21   Q.        Do you know if CBSG or PAR

22   Funding represents to the public that they

23   have an office at 141 North 2nd Street in

24   Philadelphia?

Joseph LaForte

Page 62

1    A.          Yeah, they did in 2017, Shane.

2    Q.          When did that office close?

3    A.          2018.

4    Q.          How long did CBSG have a presence

5    at that location?

6    A.          16, 18 years.

7    Q.          Why was -- this is if you know,

8    why was CBSG incorporated in Floria?

9    A.          I don't know.

10   Q.          How often is your wife in

11   Florida?

12   A.          A lot.  Too much.

13   Q.          What's the Florida address?

14   A.          I don't have that.

15   Q.          Have you ever been to the Florida

16   office?

17   A.          Sure.

18   Q.          How often do you go down to the

19   Florida office?

20   A.          Not that much.

21   Q.          What's -- just so I know what

22   that not that much means to you?

23   A.          Well, when she goes there, she

24   sends me for coffee.  I go get coffee, I

Joseph LaForte

Page 63

1    come back.  She has a lot of work to do

2    down there.  I don't really go that much.

3    Q.        When you're down at the Florida

4    office, do you do work down there?

5    A.        No.

6    Q.        So you don't --

7    A.        I work off my phone.

8    Q.        So when you're down in Florida

9    with your wife, you don't go to CBSG's

10   office and work at --

11   A.        No.

12   Q.        -- like an office or a cubical

13   down there?

14   A.        Never.

15   Q.        Who is CBSG's CFO?

16   A.        I'm not sure who it is.  I am not

17   sure who is in that capacity right now.

18   Q.        Who is the last CFO that you do

19   know worked in that capacity for CBSG?

20   A.        I couldn't say who the last one

21   was.

22   Q.        Do you know who Jo Cole is?

23   A.        Yeah, sure.

24   Q.        Is Jo Cole the current CFO?

Joseph LaForte

Page 64

1    A.        I wouldn't know.

2    Q.        What is your understanding as to

3    what Mr. Cole does for CBSG?

4    A.        I wouldn't know.  I work for

5    Recruiting and Marketing Resources.  They

6    keep me in another business.  Their

7    operations have nothing to do with me.

8    Q.        Do you know a Bill Bromley?

9    A.        Yes.

10   Q.        Does Mr. Bromley work for CBSG?

11   A.        No.

12   Q.        Does Mr. Bromley do any type of

13   consulting work for CBSG?

14   A.        I wouldn't know.

15   Q.        Do you know a company by the name

16   of Pro Source 2000?

17   A.        No.  Pro Source 200 I never heard

18   of.

19   Q.        I may have the wrong name.  Do

20   you know the name of Mr. Bromely's

21   business?

22   A.        No.

23   Q.        So just to be clear, it's your

24   testimony, to the best of your knowledge,

Joseph LaForte

Page 65

1    that let's say as of October 24, 2019, CBSG

2    did not have an office at 20 North 3rd

3    Street in Philadelphia?

4    A.        Say that again, I'm sorry.

5    Q.        Let me ask it differently.  To

6    your understanding, in what year did CBSG

7    close its 20 North 3rd Street office?

8              MR. BERMAN: Objection.

9    Mischaracterization.

10   BY MR. PROPER:

11   Q.        Did they close that office or no?

12             MR. BERMAN:  Mischaracterization.

13   BY MR. PROPER:

14   Q.        Did CBSG --

15   A.        What address?  I'm confused.

16   Q.        I confuse people a lot, so this

17   is normal for me.  So I'll try to work

18   through it.  At some point in time, did

19   CBSG have an office at 20 North 3rd Street?

20   A.        I wouldn't know that. I'm at 22

21   North 3rd.  Remember I told you that?

22   Q.        Yeah, yeah, yeah.

23   A.        I work for Recruiting and

24   Marketing Resources.  I don't know the

Joseph LaForte

Page 66

1  answer to that.

2  Q.        A some point in time did CBSG

3  ever have an office --

4  A.        I'm trying to establish the fact

5  that my wife has more to do with CBSG than

6  me, and I don't know the answers to those

7  questions.

8  Q.        Okay, so if I misheard you, I

9  apologize.  I thought you testified that at

10  some point CBSG, and I think I asked a

11  question, you know, isn't it true that CBSG

12  had an office 20 North 3rd Street, and you

13  said, "yes, in 2017 they did, Shane."

14  A.        No, I did not.

15  Q.        You didn't say that?

16  A.        No.  I said 141 North 3rd Street.

17  Q.        141, I'm sorry.

18  A.        So you guys have the wrong

19  address.  141 North 2nd, CBSG did have an

20  office.

21  Q.        Does CBSG, to your knowledge,

22  currently have any office in Philadelphia,

23  at any location?

24  A.        I don't know.

Joseph LaForte

Page 67

1   Q.        When is the last time you've been

2   to an office in Philadelphia that you

3   believe to have been rented or owned by

4   CBSG?

5           MR. BERMAN: Objection.  You can

6   answer.

7           THE WITNESS:  I don't know.

8   BY MR. PROPER:

9   Q.        Would the last time have been the

10  141 North 2nd Street office, or you don't

11  know?

12  A.        I don't know, and I don't want to

13  answer the question incorrectly on the

14  record.

15  Q.        Have you ever been to an office

16  located at 20 North 3rd Street?

17  A.        Yes.  We just established that's

18  Full Spectrum.

19  Q.        Oh, that's Full Spectrum.  Do you

20  know whether or not CBSG represents to the

21  public that the 20 North 3rd Street address

22  is actually their business office?

23  A.        I wouldn't know that.

24  Q.        Okay, and you've never been an

Joseph LaForte

Page 68

1   officer, director, or owner of CBSG,

2   correct?

3           MR. BERMAN: Objection.  Compound.

4   BY MR. PROPER:

5   Q.      I'll break it up.

6           Have you ever been an officer of

7   CBSG?

8   A.      No.

9   Q.      Ever been a director of CBSG?

10  A.      No.

11  Q.      Ever been an employee of CBSG?

12  A.      No.

13  Q.      Ever been an owner of CBSG?

14  A.      No.

15  Q.      Have you ever received any form

16  of profits that were generated by CBSG?

17  A.      No.

18  Q.      Have you ever hired or fired any

19  employees of CBSG?

20  A.      No.

21  Q.      Does CBSG do underwriting for any

22  companies other than itself, to your

23  knowledge?

24          MR. BERMAN: Objection.  You can

Joseph LaForte

Page 69

1   answer if you understand.

2           THE WITNESS:   CBSG doesn't

3   underwrite files.

4   BY MR. PROPER:

5   Q.        CBSG does not underwrite?

6   A.        No.

7   Q.        Who does the underwriting for

8   CBSG?

9   A.        Full Spectrum.

10  Q.        And I ask questions before about

11  the underwriters at CBSG, which you

12  declined to answer, so I just want to

13  clarify this to see if your response is the

14  same.

15          Are you willing to share with me

16  who the underwriters are at Full Spectrum

17  that underwrite deals for CBSG?

18  A.        No.

19  Q.        Are you familiar with how Full

20  Spectrum underwrites potential deals that

21  you bring to CBSG?

22  A.        I'm familiar with every lender on

23  the street how they underwrite deals.

24  Q.        Can you walk me through your

Joseph LaForte

Page 70

1   understanding of Full Spectrum's

2   underwriting process for deals and

3   potential deals that you bring to CBSG?

4            MR. BERMAN: Objection.  For

5   Texas?

6            MR. PROPER:  Sure.

7            MR. BERMAN:  If you know.

8            THE WITNESS:  Do you want to go

9   over the entire underwriting guidelines?

10           MR. PROPER:  Yeah.

11           THE WITNESS:  Ask me some

12  questions.

13  BY MR. PROPER:

14  Q.       Are there written underwriting

15  guidelines?

16  A.       I wouldn't know that if they

17  write them down.

18  Q.       Have you ever reviewed written

19  underwriting guidelines that were prepared

20  by Full Spectrum?

21  A.       No.

22  Q.       Do you exchange emails with

23  anyone at Full Spectrum about how they

24  underwrite deals for CBSG?

Joseph LaForte

Page 71

1           MR. BERMAN:  Objection.  You can

2     answer if you understand the question.

3           THE WITNESS:  I don't understand

4     the question.

5     BY MR. PROPER:

6     Q.      Do you know what an email is?

7     And I don't mean to be...

8     A.      Yeah, I do.

9     Q.      Do you use email in your daily

10    business activities?

11    A.      Yes, I do.

12    Q.      Do you ever email with

13    individuals at Full Spectrum?

14    A.      You didn't ask me that.

15    Q.      I'm not saying I did.

16          MR. BERMAN: He's noting my

17    objeciton, which is now why he's going

18    through it slowly.

19          THE WITNESS:  Yes, I know what

20    emails are.

21          MR. PROPER:  I totally expected

22    that you know.

23    BY MR. PROPER:

24    Q.      Have you ever emailed with anyone

Joseph LaForte

Page 72

1   at Full Spectrum?

2   A.        Sure.

3   Q.        Have you ever emailed with anyone

4   at CBSG?

5   A.        I don't know.  Well, my wife,

6   she's at CBSG, so yeah.

7   Q.        Do you email with anyone else

8   other than your wife at CBSG?

9   A.        I don't know.

10  Q.        Do you email with Jo Cole at all?

11  A.        Sometimes.

12  Q.        Ever email with Bill Bromley?

13  A.        I email with Shane.  I can email

14  anybody.

15  Q.        I'm just asking.

16  A.        Are you asking me about thousands

17  of emails?  I don't want to answer the

18  question incorrectly.

19  Q.        Do you save your emails?

20  A.        No.

21  Q.        What's your policy in terms of

22  deleting emails?

23  A.        I don't have a personal policy.

24  Q.        I just wonder, do you clean out

Joseph LaForte

Page 73

1   your emails?

2   A.        I don't save them.  I don't know

3   how to save them.

4   Q.        Yeah, yeah, yeah.  Are you a guy

5   that's got like 10,000 in his box, or are

6   you going periodically and cleaning it up?

7   A.        What do you mean kind of guy?

8   Q.        I'm a guy, and I don't delete my

9   emails.  So I'm wondering if you're a guy

10  that deletes his emails.

11  A.        I don't know if I would classify

12  myself a guy who deletes emails.  I don't

13  know.

14  Q.        As a personal practice and

15  maintaining your email box, do you ever go

16  back --

17  A.        I delete them every night.

18  Q.        You delete them every night?

19  A.        Yeah.

20  Q.        Delete every email?

21  A.        Every one.

22  Q.        Okay.  So the instances that you

23  may have emailed with Mr. Heskin in the

24  past, you wouldn't have any of those emails

Joseph LaForte

Page 74

1  currently?

2  A.        I guess not.

3  Q.        Well, you couldn't possibly if

4  you delete them every night?

5  A.        I guess not.

6  Q.        What is your email address?

7  A.        Joemac888@aol.com.

8  Q.        What's the significance of Joe

9  Mac?

10  A.        I like the name.

11  Q.        Okay.  Do you use the name Joe

12  Mac in any of your business activities?

13  A.        Sure.

14  Q.        Okay.  When did you start using

15  Joe Mac?

16  A.        2002.

17  Q.        What was the reason for using

18  Mac?

19  A.        I like it.

20  Q.        Any other reason?

21  A.        Nope.

22  Q.        When do you use Mac versus

23  LaForet?

24  A.        Any articles that I write, or any

Page 75

1   publications I write on subjects to do with

2   the business, I use my real name because I

3   think it's important.  When I'm on the

4   phone with merchants, I like to use Joe

5   Mac, it's easier.  It's easier for them to

6   understand, and I also don't want them

7   calling my phone day and night.

8   Q.       Okay, but you haven't legally

9   changed your name, right?

10  A.       No.

11  Q.       Back to underwriting.  So -- if

12  you need a break at any time, it's not a

13  marathon, we're going to be here a little

14  bit.  Any time you need a break...

15  A.       I'm good.

16  Q.       So you're not aware of any

17  written underwriting guidelines for CBSG?

18  A.       No.

19  Q.       But you said you do know how how

20  Full Spectrums underwrites deals for CBSG?

21  A.       Yes, I do.  I know what's

22  important in a file.

23  Q.       Okay.

24  A.       So mitigating, qualifying

Joseph LaForte

Page 76

1   factors.

2   Q.       Okay.

3   A.       Similar to your client that we're

4   talking about her today.  We can go over

5   that if you want.

6   Q.       Were you involved in the

7   underwriting process for my client's

8   funding for CBSG?

9   A.       Absolutely.

10  Q.       And he's a Texas business, right?

11  A.       Yes.

12  Q.       And you work with other Texas

13  businesses, right?

14  A.       Sometimes, yeah.

15  Q.       Do you know what percentage of

16  your business clients that you refer to

17  CBSG are from the State of Texas?

18  A.       I wouldn't know.

19  Q.       Do you keep any records where you

20  would be able to ascertain what percentage

21  of the deals or the number of deals

22  involved a Texas business?

23           MR. BERMAN:  Objection.

24           THE WITNESS:  No.

Joseph LaForte

Page 77

1    BY MR. PROPER:

2    Q.        If you wanted to go back and do a

3    search to determine how many deals CBSG

4    funded with a Texas business, what would

5    you do?

6    A.        I don't work at CBSG, so I

7    couldn't do that.

8    Q.        But you're their sales arm.

9    A.        Correct.

10   Q.        So you have all their sales

11   documents, right?

12   A.        But I might send the deal

13   somewhere else.  How what CBSG does and

14   doesn't do, I wouldn't have access to that

15   data.  So I'm the sales arm, maybe I did a

16   Texas deal with On Deck Capital.  Maybe I

17   gave it to PayPal, or somebody else.

18   Q.        Yeah.  All what coulda shoulda --

19   A.        Right, so I don't want to testify

20   right now to something I don't know the

21   answer to.

22   Q.        Yeah, I'm asking you a different

23   question.

24   A.        Got it.

Joseph LaForte

Page 78

1   Q.        I want to know what you would

2   need to do to go back to your office and

3   figure out how many deals CBSG funded with

4   the Texas business?

5             MR. BERMAN: I think he answered

6   that.  Do you want him to answer again?

7             MR. PROPER:  Yeah, I missed the

8   answerr.

9             MR. BERMAN:  I don't know.

10            THE WITNESS:  I don't know.

11  BY MR. PROPER:

12  Q.        You don't know how you would do

13  it?

14  A.        No.  I'm not good on the

15  computer.  I mean I sell the deals.  I

16  don't know.

17  Q.        Do you have any type of data base

18  at Recruiting and Marketing Resources where

19  you can track the individual deals you have

20  with CBSG?

21            MR. BERMAN:  Objection.  You can

22  answer if you understand the compound.

23            THE WITNESS:  Do I have a

24  tracker?  No.

Joseph LaForte

Page 79

1    BY MR. PROPER:

2    Q.        When you refer a business to

3    CBSG, and CBSG funds the business, are you

4    with me so far?

5    A.        Sure.

6    Q.        Recruiting and Marketing

7    Resources gets paid by CBSG?

8    A.        Sometimes.

9    Q.        So there's times where you'll do

10   a deal for CBSG and not get paid?

11   A.        Correct.

12   Q.        When do you get paid and when

13   don't you?

14   A.        It varies.  It depends on the

15   client.  It depends how much we have to pay

16   the independent sales operator.  It depends

17   on a lot.

18   Q.        Do you keep records of each deal

19   that you bring to CBSG?

20   A.        No.

21   Q.        When you do have a deal with

22   CBSG, are documents generated by your

23   company?

24   A.        No.

Joseph LaForte

Page 80

1    Q.        Everything you do is oral?

2    A.        Yeah.

3    Q.        You don't submit any type of

4    application or anything to CBSG?

5    A.        Sure.  I submit the application,

6    but I don't produce the documents.  You

7    asked me about documents, about contracts

8    specifically, right?

9    Q.        No.  I'm asking --

10   A.        I don't receive any of the

11   contracts from any of the lenders.  All I

12   do is send over the application.  It gets

13   approved and I deal with the customer.

14   Q.        Who prepares the application with

15   the business?

16   A.        Could be any sales rep.

17   Q.        But it's not you?

18   A.        It could be me.

19   Q.        Okay.  Do you know who prepared

20   the application with my client?

21   A.        It was an outside broker.  I

22   don't know -- I don't remember his name.

23   Q.        So in that instance when an

24   outside broker works with my client on an

Joseph LaForte

Page 81

1    application, it would get sent to you, and

2    you would in turn forward it to who?

3    A.        In this case, CBSG.

4    Q.        Would you send it to CBSG or

5    would you send it to Full Spectrum or would

6    you send it to them both?

7    A.        Well, CBSG funded the deal,

8    right?  So that was 2017, the company was

9    much different then, so you're asking me a

10   specific question about your client, now

11   I'm going back to 2017.

12   Q.        Okay.

13   A.        A little different.

14   Q.        Excellent.  So when did Full

15   Spectrum start underwriting deals for CBSG?

16   A.        I don't have the date.

17   Q.        Was Full Spectrum underwriting

18   deals for CBSG in 2017?

19   A.        No.  Well, can you strike that,

20   please?  I'm not positive.  I don't

21   remember the exact date that Full Spectrum

22   was incorporated.

23   Q.        So who was doing the underwriting

24   for CBSG before Full Spectrum?

Joseph LaForte

Page 82

1   A.          It was their own underwriters.

2   Q.          It was their own underwriting

3   department?

4   A.          Yeah.

5   Q.          So, you don't know sitting here

6   today whether or not my clients deal was

7   underwritten internally by employees of

8   CBSG, or whether it was outsourced to Full

9   Spectrum, correct?

10  A.          That's correct.

11  Q.          Okay.  Do you know why CBSG

12  started using Full Spectrum?

13  A.          No.

14  Q.          Does CBSG have an ownership

15  interest in Full Spectrum?

16  A.          I don't believe so.

17  Q.          Do you know if your wife has an

18  ownership interest in Full Spectrum?

19  A.          I don't know.

20  Q.          I'm sorry?

21  A.          I don't know.

22  Q.          Was Full Spectrum in existence

23  before it started underwriting deals for

24  CBSG?

Joseph LaForte

Page 83

1    A.        I don't know that.

2    Q.        Was the manner in which CBSG

3    underwrote files different than how Full

4    Spectrum is underwriting files for CBSG?

5    A.        I don't know.

6    Q.        You worked with underwriters at

7    CBSG, right?

8    A.        Uh-huh.

9    Q.        Yes?

10            MR. BERMAN: Verbal, yes, no.  He

11   asked you did you work with underwriters at

12   CBSG.  You have to answer verbally.

13            MR. PROPER:  You just have to

14   answer verbally.

15            THE WITNESS:  Oh, yes.

16   BY MR. PROPER:

17   Q.        And you work with underwriters at

18   Full Spectrum?

19   A.        Right.

20   Q.        So explain to me how, if at all,

21   the underwriting process, as you understand

22   it, differs between those two?

23   A.        There's a time lapse, so you're

24   bringing me back.  So CBSG had their own

Joseph LaForte

Page 84

1    underwriters back when, I don't know when.

2    Q.        I know, I'm bringing you back.

3    A.        Now it's Full Spectrum, so now

4    we're here.  So it's two different things.

5    Your file that we're talking about right

6    now is 2017, so we're mincing words a

7    little bit.

8    Q.        I'm not trying to.

9    A.        I know, but we are.

10            MR. BERMAN:  So just tell him

11   your recollection if you have one.

12            THE WITNESS:  I don't know when

13   any of these corporations were formatted.

14   I don't know.  You're asking me corporate,

15   internal information.  I don't know.

16   BY MR. PROPER:

17   Q.        I didn't think I asked --

18   A.        All I can do is talk to you about

19   the file, which we should prior get to.

20            MR. BERMAN:  Hour and fifteen

21   minutes in, we haven't asked a question

22   about Fleetwood.

23            MR. PROPER: No, we haven't.  It's

24   a good point.

Joseph LaForte

Page 85

1          MR. BERMAN:  It's a great point.

2          MR. PROPER:  I may go much longer

3    before I get there, but I appreciate that.

4    I have seven hours, so I'll use it.  And if

5    I'm doing a bad job not asking about

6    Fleetwood, you should be happy.

7    BY MR. PROPER:

8    Q.        So, let me go back because we had

9    a disconnect.  I want to know if you

10   remember how CBSG underwrote deals?

11   A.        I don't recall.  Everything

12   changes by the minute.  It's a very fast

13   business.  Things change.  I don't remember

14   how deals were underwritten.  I can tell

15   you about that file if you wan to talk

16   about that file.  I have a good

17   recollection of that one.

18   Q.        Why do you have a good

19   recollection of Fleetwood?

20   A.        Because I took a look at it

21   before I came here.

22   Q.        Got it.  From looking at the

23   file, were you able to ascertain whether

24   CBSG did the underwriting or Full Spectrum

Joseph LaForte

Page 86

1  did the underwriting?

2  A.         No, I don't have those documents,

3  but I know the transaction.  And I talked

4  to your client.

5  Q.         So you are not able to answer

6  today how, if at all, the underwriting

7  process at CBSG is different than the

8  underwriting process at Full Spectrum?

9  A.         I don't know.

10  Q.         Got it.  Are there common things

11  that CBSG did when underwriting files that

12  Full Spectrum also does?

13         MR. BERMAN: Objection.  You can

14  answer if you understand.

15         THE WITNESS:  There's common

16  things that everybody does in the industry.

17  So there's some common things in the

18  underwriting process, for example, pulling

19  somebody's credit.

20  BY MR. PROPER:

21  Q.         Let's start there, so I want to

22  talk about some of the common things that

23  CBSG has always done whether they're

24  underwriting files or Full Spectrum is

Joseph LaForte

Page 87

1   underwriting files?

2   A.        Or anyone, any company.

3   Q.        I just care about any company.  I

4   just care about CBSG or Full Spectrum.

5   A.        But we're establishing the fact

6   that there are some standards in the

7   industry where we have to pull all credits,

8   being that I'm from Recruiting and

9   Marketing Resources, that's my job, to

10  outsource deals.

11  Q.        So let's talk about those

12  standards.  One of the standards is pulling

13  a credit report?

14  A.        Sure.

15  Q.        Is there a particular credit

16  agency that you work with?

17  A.        Experian.

18  Q.        Do you pull the credit report or

19  does the underwriter pull it?

20  A.        I don't pull any of this.  I just

21  know the process.

22  Q.        Got it.  So one of the things is

23  you pull an Experian credit report.  Do you

24  understand the purpose of why the credit

Joseph LaForte

Page 88

1    report is important for an MCA transaction?

2            MR. BERMAN:  Objection.

3    Foundation.

4            MR. PROPER:  You can answer.  He

5    objected to the form of the question, which

6    is fine.

7            MR. BERMAN:  I didn't, but you

8    can answer.

9            MR. PROPER:  Well, that's what

10   you should be objecting to.  We have normal

11   stips.

12           MR. BERMAN:  Should I really?

13           MR. PROPER:  Yeah, because the

14   only objection should be privilege or form,

15   yes.

16           MR. BERMAN:  We don't agree on

17   that because there's a Court order here,

18   but that's okay.

19           MR. PROPER:  Or scope.  Go ahead.

20           MR. BERMAN: I don't need a lesson

21   on being a lawyer.  You can answer if you

22   understand the question.

23           THE WITNESS:  So their credit is

24   important.  To establish debt to income

Joseph LaForte

Page 89

1    rations and affordability for the clients,

2    and I think that's what a lot of cash

3    advance companies nowadays are failing.

4    Getting a good idea of the debt that the

5    owners of the business have is very

6    important.  That's on one side of the

7    business, and I would imagine from the

8    lenders side of the business it's important

9    to establish whether they've defaulted on

10   anyone in the past, if they have an tax

11   liens, so on and so forth that might hinder

12   their ability to get paid?

13   BY MR. PROPER:

14   Q.        So one of the important in an MCA

15   transaction is the debt to income ratio of

16   the borrower?

17   A.        I think so.

18   Q.        And in your experience, that's

19   always been something that's important to

20   how CBSG underwrites an and approves deals,

21   right?

22   A.        I think it's vital.

23   Q.        I understand, and again, I just

24   want to be clear.  I understand you think

Joseph LaForte

Page 90

1    it's vital.  In your experience, does CBSG

2    also deem that vital?

3    A.        I think that CBSG's underwriting

4    guidelines are the best in the industry.

5    Q.        And when you say CBSG's

6    underwriting guidelines, what are you

7    thinking of?

8    A.        I'm thinking of what you just

9    said, debt to income ratios.

10   Q.        By a guideline, how do you know

11   what CBSG's underwriting guidelines are?

12   A.        I know every lenders underwriting

13   guidelines.  It's my job.

14   Q.        How are those underwriting

15   guidelines communicated to you?

16   A.        There's a master list that people

17   send out, and you just get to know them.

18   It's familiarity of what people accept and

19   not accept as far as files go.  There's no

20   -- there's a box, and you try to stay in

21   that box.  Some lenders get a little too

22   aggressive in my opinion, some good, some

23   bad.

24   Q.        So CBSG has some type of written

Joseph LaForte

Page 91

1   documents that you've seen that lays out

2   core underwriting guidelines, right?

3           MR. BERMAN:  Objection.

4   Mischaracterization.

5           MR. PROPER:  Is that no?  I

6   thought you said there was a master list.

7           THE WITNESS:  I'm going this for

8   eight years.  I mean the guidelines will

9   change according to a lot of different

10  thing, so they don't specifically have to

11  lay them out, but it's obviously -- for

12  example, seasonality, you're not going to

13  fund a landscaping company in Philadelphia

14  in the middle of summer, right?  So there's

15  certain things that they'll move in and out

16  of as far as industry goes.  As far as

17  seasonality.  As far as graphic, so there

18  piece's a lot of different things that

19  companies will look at before they make a

20  credit decision.

21  BY MR. PROPER:

22  Q.        Understood.  With respect to CBSG

23  specifically, have you seen anything in

24  writing which would lay out any of the

Joseph LaForte

Page 92

1    underwriting guidelines that CBSG --

2    A.          No.  I don't need to see them, I

3    know what they are.

4    Q.          Okay, so who told you what they

5    were?

6    A.          Over the years I've memorized

7    them.  I figured out the products and

8    services that they have to offer, and we

9    try to facilitate those transactions.

10   Q.          Memorize them from a conversation

11   or a document, or both?

12   A.          Just conversations, just talking.

13   Q.          Okay, so who was the one that was

14   educating you about CBSG's underwriting?

15   A.          It's been eight years.  I don't

16   remember.

17   Q.          Can't think of one person that

18   told you what the guidelines were?

19   A.          Not really.

20   Q.          So other than the credit report,

21   what are some of the other standards or

22   common things that all lenders do including

23   CBSG?

24   A.          A financial analysis.

Joseph LaForte

Page 93

1    Q.        What does that mean?

2    A.        A financial analysis of what the

3    bank statements look like, and if the deal

4    is prudent, if it's a transaction that

5    makes sense, what we do is there's

6    standards in the file that I think there

7    has to be benefit to the borrower.  If

8    there's no benefit to the borrower, the

9    transaction shouldn't be done, I'm a firm

10   believer in that.  So I think that's the

11   main standard, should be benefit to the

12   customer.

13            If you can't establish benefit to

14   the customer, and they can't prove it out,

15   then you shouldn't do the deal.

16   Q.        Does CBSG require that the

17   underwriters review a certain number of

18   bank statements?

19   A.        I don't know.

20   Q.        Do you know if there's any

21   requirement that CBSG go back six months or

22   a year or two years?

23   A.        It depends, again.  Like this

24   time of year I think seasonality is

Joseph LaForte

Page 94

1    important, so you want to make sure that

2    the clients are -- the merchants, if you

3    would, are doing good deals, so you might

4    want to get the pay back months in that

5    respect.  So you want to get the three

6    months past, and then three months forward

7    just to make sure that seasonality doesn't

8    come into effect because the winter could

9    be challenging for some businesses.

10   BY MR. PROPER:

11   Q.        I get three months pasts.  In

12   terms of underwriting, how do you get the

13   three months forward?

14   A.        From the year before.  It's

15   called a look back, so you might go back to

16   '18 and see how the business behaved in

17   order to get a better feel for the merchant

18   and see if he's making an intelligent

19   decision.

20   Q.        So CBSG likes to do a year over

21   year analysis?

22   A.        Not all the time, I can't vouge

23   for every file, but I think it's important

24   in some cases that's it's done.

Joseph LaForte

1    Q.        Does CBSG have a standard in

2    terms of how far back they want to look?

3    A.        Three months.

4    Q.        How about Dunn and Bradstreet

5    reports, is that standard to pull?

6    A.        Different companies use different

7    products.  I think it's important to look

8    at a business report to see if there's any

9    UCC's filed to who's out there.  As far as

10   taxes, there are some nice business reports

11   I see different companies using.

12   Q.        I asked about Dunn and Brastreete

13   because that was pulled in my clients deal,

14   right?

15   A.        All right.

16   Q.        Are you aware of that or no?

17   A.        No.

18   Q.        All right.  Is it standard to

19   have some type of business report pulled

20   for deals with CBSG?

21   A.        I would hope so, yes.

22   Q.        Okay.  In your experience with

23   CBSG, is it common for them or an outside

24   underwriter to pull some type of business

Joseph LaForte

Page 96

1    report?

2    A.        Sure.

3    Q.        And one of the things that is

4    important to look for in a business report

5    are UCC filings you mentioned?

6    A.        I think it's important just to

7    make sure that may didn't default on

8    anyone, to protect the the cash advance

9    company.  And it's also important to

10   question some of the merchants that could

11   be unscrupulous or maybe make a mistake on

12   taking too much funding, which happens a

13   lot.

14             I think there's a lot of issues

15   in the industry with that, and I think it's

16   important.

17   Q.        What else is common or standard

18   in CBSG's underwriting process?

19   A.        I think the credit report is very

20   important.  The matrix is very important.

21   Analyzing the bank statements is very

22   important to make sure that there's

23   frequency of deposits depending on the

24   product you're going to bring the merchant.

Joseph LaForte

Page 97

1   If a merchant has two or three or four

2   deposits a month, you definitely don't want

3   to give them a daily payment because it

4   would be too aggressive on them, so some of

5   those things need to be looked at.

6           Outstanding cash advances is

7   really important to make sure they don't

8   over leverage themselves, and if they do,

9   if you want to help save the business, it's

10  very important to get them into those

11  products and services to help them.

12  Q.      Is it common in deals funded by

13  CBSG that CBSG have the business execute

14  some type of security agreement?

15  A.      They have an agreement, a

16  standard agreement, yeah.

17  Q.      And part of that standard

18  agreement requires the owner to sign some

19  type of personal guarantee, right?

20  A.      I'm not sure about the documents

21  right now.

22  Q.      How about the documents back in

23  2017, was it standard for business owners

24  to sign a personal guarantee?

Joseph LaForte

Page 98

1    A.         Yes, it was.  A lot of the

2    guidelines changed, and I think it's a good

3    thing.  So, specifically in New York there

4    was a lot of problems with COJ's, and I

5    think it's a good thing they did a way with

6    them.  Some companies are probably getting

7    a little too aggressive, maybe, and they

8    did away with those COJ's.  So now there

9    are no COJ's.

10   Q.         That's one of the changes was

11   getting rid of COJ's?

12   A.         Yeah.

13   Q.         Do you know if deals, if any

14   deals have other forms of executing in the

15   event of a default, like a writ of

16   attorney.  Do you know about that?

17             MR. BERMAN: Objection.  You can

18   answer if you know.

19             THE WITNESS:  I don't know.

20   BY MR. PROPER:

21   Q.         Other -- you said there's a

22   standard form that CBSG uses, correct, for

23   MCA agreements?

24             MR. BERMAN:  Objection.  I don't

Joseph LaForte

Page 99

1  think he did.

2  BY MR. PROPER:

3  Q.        Is there a standard form that

4  CBSG uses for merchant cash advances?

5  A.        I don't know.  What did you mean

6  by a standard form?  What does that mean?

7  Is there a contract?

8  Q.        Yeah, is there a standard

9  contract that's used?

10  A.        Yes.

11  Q.        And since 2012, has the form of

12  that contract been roughly the same in

13  terms of what the terms and conditions are?

14  A.        Roughly, not the same.  All

15  companies have changed their contracts for

16  different types of reviews.  As far as CBSG

17  goes, I can tell you one thing about it,

18  which I hear my wife talking about it.

19  There's constantly being reviewed because

20  of pubic audits, so they're constantly

21  looking and reviewing the contracts making

22  sure they're in compliance.

23  Q.        Do you know if the advances from

24  CBSG are regulated by any governmental

Joseph LaForte

Page 100

1   entity?

2           MR. BERMAN: Objection.  You can

3   answer.

4           THE WITNESS:  They are not.

5   BY MR. PROPER:

6   Q.      You mentioned audit.  Do you know

7   if CBSG uses any independent third party

8   auditors?

9   A.      I don't know who they are.

10  Q.      Do you know if they use any?

11  A.      I'm sure they do.

12  Q.      But you've never read a third

13  party auditing report?

14  A.      No.

15          MR. BERMAN: Can we take a break

16  for the bathroom?

17          MR. PROPER:  Sure.

18               - - -

19          (Whereupon a short recess was

20  taken.)

21               - - -

22  BY MR. PROPER:

23  Q.      I saw some document with a Form D

24  that was filed with the Securities and

Joseph LaForte

Page 101

1    Exchange Commission by CBSG.  Have you ever

2    seen any type of SEC filing by CBSG?

3    A.         That's legal.  No.

4    Q.         So you weren't involved in that

5    process, right?

6    A.         No.

7    Q.         And there's a list of a bunch of

8    different people that are called promoters.

9    Do you know what those people do?

10   A.         No.

11   Q.         And then there's a list of a

12   bunch of different people that get

13   compensation from CBSG, and there's a bunch

14   of different ones.  Did you ever deal with

15   an Alvin Holdings?

16   A.         No.

17   Q.         What about a Lindsay Blake,

18   Incorporated in Springfield?

19   A.         No.

20   Q.         A company, a Better Financial

21   Plan in King of Prussia?

22   A.         No.

23   Q.         What about AG Morgan Tax and

24   Accounting?

Joseph LaForte

Page 102

1   A.        No.

2   Q.        So you're not involved with any

3   of those individuals that might be trying

4   to solicit investors for CBSG?

5   A.        No, I don't run the sales.

6   Q.        Okay.  When's the last time you

7   saw Mr. Cole?

8   A.        A couple weeks ago.

9   Q.        What was the occasion that you

10  saw him?

11  A.        Coffee shop.

12  Q.        How about Mr. Bromley, when was

13  the last time you've seen him?

14  A.        I don't know.  I couldn't recall.

15  Q.        More than a month?

16  A.        Probably.

17  Q.        Back to sort of the form of the

18  agreement.  Is it a standard form that

19  there's a daily specified amount?  Is that

20  standard or does it vary on the repayment?

21  A.        It varies.  There's no standard

22  in what we do.  Every deal is tailored

23  specifically for the client.  Meaning that

24  different clients, you can't tailor the

Joseph LaForte

Page 103

1    deal the same.  It has to be different

2    because clients have different needs, and

3    also clients have different types of

4    businesses.

5    Q.         Is there a standard or common

6    repayment term?

7    A.         No.

8    Q.         Do all of these deals have a

9    fixed repayment term of some kind?  Whether

10   it's three months, six months?  Is there a

11   fixed repayment term?

12   A.         So, you're question is -- let's

13   try to understand what you're asking me.

14   We purchase receivables.  There's a fixed

15   return, which varies.  It could be

16   different for every client.  So these are

17   not amortized obligations, so they're not

18   loans.  So there is a fixed payback, but

19   they do differ.

20   Q.         Yeah, I'm just asking, is there a

21   fixed repayment period?

22   A.         Period, yes.

23   Q.         What is the average length that a

24   business has to repay the advance, in your

Joseph LaForte

Page 104

1   experience?

2   A.        Depends on the company and

3   depends on the product.  It depends on the

4   needs.  It can go 22 business days, I've

5   done deals where clients could, you know, a

6   client would like to factor a receivable

7   for an opportunity, or it could go up to

8   300 days.  So it varies upon the need of

9   the client.

10  Q.        But every deal has some type of

11  fixed period of time that the money has to

12  be paid back, right?

13  A.        Which is essential to our

14  product, yes.

15  Q.        Got it.  Do all of the contracts

16  with CBSG have some type of default

17  provision?

18  A.        What does that mean?  I don't

19  understand the question.

20  Q.        Do you know what a default is?

21  A.        Yes.  I don't know what the

22  provision part is though.

23  Q.        Let's just talk about a default.

24  Are there guidelines that you're aware of

Joseph LaForte

Page 105

1    that CBSG has to determine when a business

2    is in default under an MCA agreement?

3    A.        No.

4    Q.        Do you know how CBSG determines

5    when a business is in default?

6    A.        That's in the collections

7    department, I don't know.

8    Q.        Do you have anything to do with

9    the collections department?

10   A.        So, I do, in the sense that I'll

11   try to help my clients get through some

12   tough times, so I will work with

13   collections to, more or less be a liaison

14   between the two before -- especially even

15   in the case with your client.  I think I

16   was involved with the collections there as

17   far as helping them get through.

18             So, yeah, I will contact --

19   they'll contact me and I'll contact the

20   client and see if I can help them and see

21   what CBSG, or any other lender will do to

22   help them in the time of need.

23   Q.        Does CBSG keep statistics on

24   default rates?

Joseph LaForte

Page 106

1    A.        I don't know.

2    Q.        Do you have any idea what CBSG's

3    current default rate is?

4    A.        I wouldn't know.

5    Q.        Do you know what CBSG's default

6    rate was in 2018?

7    A.        No.

8    Q.        What about 2017?

9    A.        No.

10   Q.        You have no concept as to --

11   A.        I can only talk -- I mean I know

12   the files that came through Recruiting and

13   Marketing Resources.  I can tell you that I

14   probably had two percent top default rate.

15   Two percent of my merchants probably did

16   bad.

17   Q.        And how do you determine what a

18   default is to come up with the two percent?

19   A.        I get a report.  They'll write me

20   and say your client defaulted.

21   Q.        And what is the form of that

22   report?

23   A.        It's not a form.  I have to pay

24   back the commissions.  If I received any

Joseph LaForte

Page 107

1   commissions and the client defaulted, I

2   would have to pay that back.  In our

3   industry that's called a claw back, so I

4   would know about that because they took my

5   commissions back.

6   Q.       Got it. So in your experience, in

7   about two percent of your deals do you have

8   to pay back your commission?

9   A.       Probably, yeah.

10  Q.       Is there a time period where the

11  claw back is no longer is applicable?  In

12  other words, like if six months pass, is

13  there a period where they can't claw back

14  any more?

15  A.       Yeah.  Different companies have

16  different claw backs.

17  Q.       What is CBSG's policy?

18  A.       Well, I give all my commissions

19  back if they don't pay.

20  Q.       Okay.  In your experience, does

21  CBSG deem it to be a default whenever a

22  business is unable to make a payment?

23  A.       No, I don't think that's a

24  default.

Joseph LaForte

Page 108

1    Q.        What is a default?

2    A.        I think if you're looking from a

3    collection stand point, which I guess is

4    what you're asking me, there is, I would

5    imagine, paid as agreed, right?  So  if

6    somebody paid as agreed through the entire

7    contract, no missed payments, no returns,

8    that would be one way to look at it.  A

9    default could constitute a stop payment.

10   Q.        What if you have four NCF's?  Do

11   you know what an NCF is?

12   A.        I don't know.

13   Q.        I'm sorry, NSF.  I heard of that,

14   yeah.

15   A.        Non sufficient funds, yeah.  I

16   wouldn't say that would constitute a

17   default, no.  I don't think any cash

18   advance company would constitute that as a

19   default.

20   Q.        Do you know whether there's an

21   addendum to my client's agreement which

22   states that four NSF's as a default?

23   A.        I don't know.

24   Q.        You don't now?

Joseph LaForte

Page 109

1    A.        2017, I don't remember.

2    Q.        Do you know whether it was common

3    in 2017 for CBSG to have in its agreements

4    that were four NSFs is a default?

5    A.        I don't know.

6    Q.        Do you know if CBSG's agreements

7    currently have a provision which states

8    four NFSs is a default?

9    A.        I don't know.

10   Q.        Do you know if there's any

11   provision in CBSG's form agreements back in

12   2017 that filing for bankruptcy or

13   declaring bankruptcy is an event of

14   default?

15            MR. BERMAN: Objection.

16            MR. PROPER:  Do you know?

17            MR. BERMAN:  You can answer if

18   you know.

19            THE WITNESS:  I don't know.

20            MR. BERMAN: I raised the

21   mischaracterization issue again for him.

22   BY MR. PROPER:

23   Q.        Is filing for bankruptcy an event

24   of default under CBSG's contracts?

Joseph LaForte

Page 110

1    A.         I don't know.

2    Q.         Have you ever read article 3.1 of

3    CBSG's contracts, which is titled Events of

4    Defaults and Remedies?

5              MR. BERMAN: Are you referring to

6    a specific contract or generally?

7              THE WITNESS:  That's a 2017

8    contract; I couldn't possibly remember.

9    BY MR. PROPER:

10   Q.         Are you aware that in my clients

11   contract, there's a provision in article 3

12   that's titled Events of Defaults and

13   Remedies, are you aware of that?

14   A.         I believe you if it says it

15   there.  I don't know if I'm aware of it.

16   Q.         Is one of the documents that you

17   reviewed in preparation for today's

18   deposition the contract with my client and

19   CBSG?

20   A.         No.

21   Q.         Do you know if it's an event of

22   default under the agreement with my client

23   and CBSG that merchant shall admit in

24   writing its inability to pay its debts or

Joseph LaForte

Page 111

1   shall make a general assignment for the

2   benefit of creditors or any proceedings

3   shall be instituted by or against merchants

4   seeking to adjudicate it a bankrupt or

5   insolvent, or seeking reorganization,

6   arrangement adjustment, or composition of

7   it or its debts?

8   A.          I'm not a lawyer.  I don't know

9   even what that means.  Respectfully, you

10  guys, I don't know -- I'm not trying to be

11  aloof.  I don't understand any of this.

12  I'm not a lawyer.  I'm a salesman for

13  Recruiting and Marketing Resources, and

14  what CBSG wrote in their contract, I don't

15  know.  Especially back in 2017.

16  Q.          In your experience in 2017, did

17  CBSG treat the filing of bankruptcy to be

18  an event of default?

19  A.          I don't know.

20  Q.          Have you ever been involved with

21  a situation where one of your clients has

22  filed for bankruptcy?

23  A.          Sure.

24  Q.          Has one of those clients --

Joseph LaForte

Page 112

1    strike that.  Has there be been an instance

2    where wasn't of the clients that have filed

3    for bankruptcy had an outstanding

4    obligation to CBSG?

5    A.        Probably.

6    Q.        And in those instances that

7    you're thinking of, did CBSG pursue

8    collections or attempt to get its money

9    back from the borrower?

10   A.        I don't know the exact

11   underwriting -- the exact collections

12   standards for CBSG, but if I were to guess,

13   I don't think you're allowed to collect

14   when someone is in bankruptcy.  After

15   they're in bankruptcy they put a stay, and

16   you're not allowed to contact the merchant.

17   Usually it's done through a trustee, if you

18   guys are familiar with that process.

19   Q.        Do you know if CBSG files claims

20   as part of its common practice when a

21   borrower files bankruptcy?

22            MR. BERMAN:  Objection.  You can

23   answer.

24            MR. PROPER:  Do you know?

Joseph LaForte

Page 113

1          THE WITNESS: I don't know.

2   BY MR. PROPER:

3   Q.      Do you know whether CBSG secures

4   any of its MCA agreements with mortgages?

5   A.      Yes.

6   Q.      Have you had --

7   A.      On occasion.  Because, again,

8   it's very important for me to say this,

9   there's many different products and

10  services, so we have collateralized

11  products.  We have all different products

12  and services that we offer our clients.

13  Q.      Do you file UCC liens -- strike

14  that.  Does CBSG file UCC liens as part of

15  its common business practice?

16          MR. BERMAN: Objection you can

17  answer.

18          THE WITNESS:  I don't know.

19  BY MR. PROPER:

20  Q.      What other type of security does

21  CBSG routinely seek from businesses that it

22  funds?

23          MR. BERMAN: Objection.  You can

24  answer.

Joseph LaForte

Page 114

1              THE WITNESS:  Real estate, only.

2    BY MR. PROPER:

3    Q.         What other forms of real estate

4    other than mortgages?

5    A.         Is there another form of real

6    estate besides a mortgage.

7    Q.         So when CBSG is not seeking

8    security from a mortgage, what other types

9    of security is CBSG requiring from the

10   borrower?

11   A.         On a collateral deal, or are you

12   going back to MCA.

13   Q.         MCA?

14   A.         The security is the receivables,

15   we're purchasing receivables.

16   Q.         Is the failure of a business to

17   pay back the specified amount, whatever the

18   repayment period is, whether it's a day, a

19   week or a month.  Is the failure to pay

20   back to that money a default?

21              MR. BERMAN:  Objection.  You can

22   answer.

23              THE WITNESS:  Is the failure to

24   pay back money to a company that you took

Joseph LaForte

Page 115

1   and didn't pay it back?  I would say that's

2   a default, yes.

3   BY MR. PROPER:

4   Q.        Is that a default as you

5   understand CBSG's MCA agreements?  When a

6   business --

7   A.        I think it's any business.  It's

8   similar to my car.  If I don't pay for my

9   car, they're going to impound it.  It's the

10  same type of thing, so yes, I would say it

11  constitutes a default.

12  Q.        Are aware of any instance where

13  CBSG has not received the money specified

14  under an MCA agreement where CBSG has not

15  treated that to be a default?

16            MR. BERMAN: Objection.

17            THE WITNESS:  I don't understand

18  the question.

19  BY MR. PROPER:

20  Q.        Yeah.  So has there been an

21  instance, in your experience, where a

22  business didn't pay CBSG the money

23  specified in the agreement, and CBSG said,

24  no that's not a default, don't worry about

Joseph LaForte

Page 116

1   it?

2   A.        I wouldn't know.

3   Q.        Can you think of an instance

4   where that's happened?

5   A.        No.

6   Q.        Do you know if CBSG has ever

7   commenced a lawsuit personally against the

8   owner of a business when a business has

9   filed bankruptcy?

10  A.        I don't know.  I'm not in legal.

11  They have attorneys that handle that, I

12  guess.

13  Q.        What's the difference between a

14  collateral deal and an MCA?

15  A.        The collateral is -- when a

16  person purchases collateral, they're

17  looking to potentially get a longer term on

18  the deal as opposed to a specific MCA which

19  might be a little bit shorter that they

20  qualify for, so they'll pledge their

21  commercial asset in order to get a longer

22  term deal.

23  Q.        When is a collateral -- strike

24  that.

Joseph LaForte

Page 117

1              When is collateral required when

2    the term is longer than what?

3    A.        There's no collateral required

4    ever, they volunteer the collateral.

5    Q.        So as part of CBSG's underwriting

6    guidelines, if you want money to be paid

7    back in, say over a year, would collateral

8    would be required?

9    A.        Could be, depends on the

10   underwriter, yes.  Let me clarify that.

11   There's no requirement for collateral.  You

12   said the word, "requirement" at the end.  I

13   didn't hear you.  I'm sorry.  There's no

14   requirement for collateral.

15   Q.        Is a collateral deal still an MCA

16   agreement?

17   A.        Yes.

18   Q.        Are all of CBSG deals papered in

19   the form of an MCA agreement?

20   A.        Yes.

21   Q.        So some may have collateral, some

22   may have different repayment terms, but all

23   of the agreements are structured as an MCA,

24   right?

Joseph LaForte

Page 118

1            MR. BERMAN: Objection.  You can

2     answer.

3            THE WITNESS:  So, we are an MCA

4     company.  We purchase receivables.  The

5     contracts differ for the different products

6     that we have.  Every lender has different

7     products, so the contracts differ.  You're

8     going to have different addendums in there.

9     You're going to have all kinds of different

10    things in the contracts according to what

11    the program is that the person qualifies

12    for.

13    BY MR. PROPER:

14    Q.      But they're call structured as a

15    sale of receivables?

16    A.      Yes.  No, purchase of receivables

17    of what their client is selling, we're

18    purchasing.  Right.

19    Q.      Is CBSG purchasing a set of

20    existing receivables, or is it just

21    purchasing an interest in the future

22    revenue stream of the business?

23            MR. BERMAN: Objection.

24            THE WITNESS:  Future revenue

Joseph LaForte

Page 119

1    stream.

2    BY MR. PROPER:

3    Q.        So, has there ever been an

4    instance in your experience dealing with

5    CBSG where CBSG underwrites the

6    collectability of a specific outstanding

7    receivable?

8    A.        Yeah, I think that it's important

9    to understand the business and know what

10   kind of receivables they have in order to

11   make good lending decisions, yeah.

12   Q.        What does CBSG do, either

13   directly when they were underwriting deals

14   themselves, or through Full Spectrum to

15   underwrite the credit worthiness of the

16   debtor, the person that owes money to the

17   business?

18            MR. BERMAN: Objection.  You can

19   answer.

20            THE WITNESS:  There is no contact

21   with the debtors.

22   BY MR. PROPER:

23   Q.        Okay.

24   A.        Which makes the product unique.

Joseph LaForte

Page 120

```
1    Most factor agreements, and why people love

2    our product is it's not as cumbersome,

3    number one, and number two, most factors

4    will contact the creditor to let them know

5    that they're owed they money.  A lot of

6    people don't like their clients to be

7    contacted, that's why people choose to sell

8    their future receivables as opposed to a

9    specific receivable in a traditional

10   factor.

11   Q.        Does CBSG use different forms,

12   depending upon the state, or only different

13   forms depending upon the product?

14   A.        I don't know.

15   Q.        Do you know if there's a unique

16   MCA form contract for deals involving Texas

17   businesses?

18   A.        No.

19   Q.        How many Texas businesses have

20   you dealt with in the last six months?

21   A.        I think you asked me that

22   earlier.  I don't know.

23   Q.        I asked you more generally, but

24   I'm asking as specific time frame.
```

Joseph LaForte

Page 121

1    A.       I don't know.

2    Q.       How about in the last 30 days?

3    A.       I call 500 people a day.  I don't

4    know who is from Texas.

5    Q.       Well, in order to fund the deal,

6    one of the things you have to ascertain on

7    behalf of CBSG is where the business is

8    located, right?

9    A.       Uh-huh.

10           MR. BERMAN:  Objection.

11   BY MR. PROPER:

12   Q.       Yes?

13   A.       Yes.

14   Q.       In fact, that's one of the

15   questions on the credit application, isn't

16   it?

17   A.       Right.

18   Q.       Is that something you take note

19   of, where the business is located

20   A.       Not really.  I don't underwrite

21   any of the files.

22   Q.       Do you know if CBSG has records

23   on the location of its individual

24   borrowers?

Joseph LaForte

Page 122

1   A.          No I do not.  I would imagine,

2   yes.  As you said, it's in their

3   application, right?

4   Q.          Do you have copies of the

5   applications as part of your business

6   files?

7   A.          Sure.

8   Q.          So you could go back and look at

9   individual applications that resulted in

10  funding by CBSG to determine which of those

11  individuals, since 2015, were located in

12  Texas, right?

13  A.          Yes.

14  Q.          So I was asking before, which is

15  what I was just trying to get at, is there

16  a way that you could ascertain how many

17  deals funded by CBSG involved a Texas

18  business, and one of the ways you could do

19  it is manually looking at the different

20  applications, right?

21  A.          Yeah, and let me clarify

22  something from earlier too because I think

23  we're were tripping on our words here.  I'm

24  not a technology person.  I don't delete my

Joseph LaForte

Page 123

1    emails on purpose.  We have all my emails

2    on a server.  I just have a phone.  I don't

3    specifically go around deleting emails if

4    that's what you're leading to.

5    Q.        I wasn't leading to anything; I

6    just asked questions.  Your answers are

7    your answers.

8    A.        Thank you.

9    Q.        So just to circle back to that.

10   Are your business emails deleted on an

11   daily basis or no?

12   A.        I don't know.

13   Q.        The emails that you testified to

14   previously as deleting each day are emails

15   on your phone?

16   A.        Yeah.  In other words, I think I

17   delete them on my phone, but they're

18   obviously stayed saved on our server,

19   right?

20   Q.        Well, I don't know how your

21   business works.  Do you have a corporate

22   email that you can access through your

23   phone?

24   A.        Yes, it's saved on the server, so

Joseph LaForte

Page 124

1   I erase it on my phone.  I'm sure it's

2   saved on the server.

3   Q.      You're sure it's saved on your

4   server because your attorney told you it

5   was or you know that?

6           MR. BERMAN: Objection.  You don't

7   have to answer anything I told you.

8           MR. PROPER: Well, when you

9   whisper in his ear.

10          MR. BERMAN:  I didn't whisper

11  anything in his ear, let's not make

12  misrepresentations on the record.  You're

13  instructed not to talk about anything I

14  told you.  If you know, you can answer the

15  question.

16  BY MR. PROPER:

17  Q.      Did you have a conversation with

18  your attorney in the hall about you

19  deleting your emails?

20          MR. BERMAN: You have absolutely

21  no answer to that question.

22          THE WITNESS:  Of course.

23          MR. PROPER:  I just want to state

24  on the record in the Third Circuit, if you

Joseph LaForte

Page 125

1    have a conversation with your client about

2    specific things that happened during a

3    deposition, then that is a hundred percent

4    discoverable.

5            So if counsel is directing his

6    client not to even answer the question

7    whether the conversation took place, then

8    note my objection.

9            THE WITNESS:  I never had a

10   conversation about anything that we spoke

11   about.  You can put that on the record.

12   BY MR. PROPER:

13   Q.        Have you searched for emails that

14   relate to any of the issues in this

15   lawsuit?

16   A.        No.

17   Q.        Have you been instructed by

18   anyone that you should be preserving emails

19   that relate to this lawsuit?

20           MR. BERMAN: Objection to the

21   extent it calls for attorney/client, don't

22   provide any information that the attorneys

23   gave you. Otherwise you can answer.

24   BY MR. PROPER:

Joseph LaForte

Page 126

1    Q.        Have you received a litigation

2    hold letter?

3              MR. BERMAN:  Again, same

4    instruction.

5              MR. PROPER:  Just for the record,

6    it is absolutely not privileged whether or

7    not a witness received a litigation hold,

8    or was instructed whether or not to

9    preserve documents.  It is not protected by

10   the attorney/client privilege.  So note my

11   objection to that.

12             MR. BERMAN:  Except for the fact

13   that he testified that all of his emails

14   are maintained.  So you can answer.

15             MR. HESKIN: You mean after he

16   said he deleted them all?

17             MR. BERMAN:  It's his testimony.

18             THE WITNESS:  I made a mistake.

19   On my phone, I said I deleted them.  And

20   you came back to me, and said, "do you have

21   the files"?  Of course, I have a server,

22   but I didn't want to misrepresent myself.

23   BY MR. PROPER:

24   Q.        Have you ever represented to a

Joseph LaForte

Page 127

1   potential investor of CBSG, that CBSG loans

2   money to borrowers?

3   A.       Can you repeat the question?

4   Q.       Have you ever represented to an

5   investor, or potential investor of CBSG

6   that CBSG loans money to borrowers?

7            MR. BERMAN:  Objection.

8            THE WITNESS:  No.  I don't know.

9   BY MR. PROPER:

10  Q.       Have you ever represented to an

11  investor or potential investor that CBSG

12  has a standard interest rate for its loans?

13           MR. BERMAN: Objection.  You're

14  instructed not to answer any investor

15  communications.  As I welcomed you before,

16  please call the Court.

17  BY MR. PROPER:

18  Q.       Have you ever represented to any

19  third party that CBSG has a standard

20  interest rate of 35 percent on its loans?

21           MR. BERMAN:  Objection.  You can

22  answer.

23           THE WITNESS:  No.

24  BY MR. PROPER:

Joseph LaForte

Page 128

1   Q.        Does CBSG have --

2   A.        What loans?  First of all, I'm

3   confused.

4   Q.        Do you know what an interest rate

5   is?

6   A.        Sure.

7   Q.        Have you ever represented to

8   anyone that the standard rate on CBSG

9   advance is 35 percent?

10  A.        CBSG doesn't charge an interest

11  rate.

12  Q.        So the answer to my question is,

13  you would have never told any third party

14  that CBSG's average rate is 35 percent?

15  A.        We don't charge an interest rate,

16  so of course not.

17  Q.        Got it.  Have you ever

18  represented to any third party that CBSG

19  has an average factor rate?

20  A.        I don't know.

21  Q.        Do you know what CBSG's average

22  factor rate is?

23  A.        No.

24  Q.        Are you familiar with CBSG's

Joseph LaForte

Page 129

1    website?

2    A.        Yeah.

3    Q.        Does CBSG currently have a

4    website?

5    A.        I believe so.

6    Q.        Not PAR Funding.  Do you know if

7    there's a website specifically for CBSG?

8    A.        I don't know.

9    Q.        Do you know whether CBSG has ever

10   had a website?

11   A.        I'm not sure.

12   Q.        Do you know whether CBSG has ever

13   used an application that was titled, A Loan

14   Application?

15   A.        I don't know.

16   Q.        Has CBSG ever issued a loan

17   product?

18   A.        No.

19   Q.        Do you know if CBSG has ever

20   represented on its website that its MCA

21   products are loans?

22   A.        I don't know.

23   Q.        Has the structure of CBSG's

24   products from 2012 to present always been

Joseph LaForte

Page 130

1    in the form of an MCA transaction of some

2    kind?

3    A.        I believe so.

4    Q.        Do you have email communications

5    with investors?

6    A.        No.

7    Q.        Do you have email communications

8    with anyone that is trying to solicit

9    investors for CBSG?

10            MR. BERMAN:  Objection.  You

11   don't need to answer questions with respect

12   to investors.  I welcome you to call the

13   Court.

14   BY MR. PROPER:

15   Q.        Do you text with any investors or

16   potential investors of CBSG?

17            MR. BERMAN:  Same objection.  You

18   can call the Court at any time.

19            MR. PROPER:  I'm close.

20            MR. BERMAN: Okay, call.  The

21   Judge instructed us to do that.  We have

22   asserted objections on the record with

23   respect to investor communications for

24   class certification purposes.  I welcome

Joseph LaForte

Page 131

1   you to call the Court.  We're here now for

2   a deposition.  The Judge instructed you to

3   do so if there's a dispute.

4            MR. PROPER: Yeah, I remember the

5   email.

6            MR. BERMAN: So let's call the

7   Court.  You know my position.

8            MR. HESKIN: We'll get there.

9            MR. BERMAN: Whenever you want.

10           MR. PROPER: I'm just as anxious

11  as you are, but I'm just showing a little

12  bit of patience.  Trying to move things

13  along.  Seeing what we can accomplish

14  without disagreeing.

15  Q.       I need to ask you this, and it's

16  not to embarrass you in any way.  Have you

17  ever been convicted of a crime that

18  involves --

19  A.       Yes.

20  Q.       Let me just ask the full

21  question.

22  A.       I answered already.  That's it.

23           MR. BERMAN: Let him ask the

24  question one time.

Joseph LaForte

Page 132

1   BY MR. PROPER:

2   Q.        I just need to ask the question

3   for the record.  Have you ever been

4   convicted of a crime that involves

5   dishonesty?

6   A.        Never.

7   Q.        Okay.  Have you ever been

8   convicted of a crime that involves fraud?

9   A.        Never.

10  Q.        Was the conviction for the real

11  estate incident in New York, did that

12  involve any type of fraud?

13  A.        There was never a real estate

14  company, no.

15  Q.        What were you convicted of?

16          MR. BERMAN: Just answer that one

17  question.  Well -- strike that.  You have

18  his public record.  Do you want to ask him

19  if he was convicted of that crime?

20          MR. PROPER:  I just want to know

21  from the witness, so I know if it involves

22  a crime of dishonesty, which would be

23  relevant.

24          MR. BERMAN:  And he said no.

Joseph LaForte

Page 133

1          MR. PROPER:  And now I'm

2    exploring to find out what he was convicted

3    of so I can determine.

4          MR. BERMAN:  You know.

5          MR. PROPER: I'm entitled to ask

6    the witness what he was convicted of so I

7    can determine whether it's relevant to his

8    testimony as a fact witness.  If it

9    involves a crime of dishonesty, which he

10   doesn't know what the rules of evidence

11   are, but you know know what the rules of

12   evidence are.  And I know what the rules of

13   evidence are.  So I need to ascertain from

14   the witness what exactly he was convicted

15   of and when.

16          THE WITNESS:  I was convicted in

17   2007 for a money laundering case, and I did

18   my time.

19   BY MR. PROPER:

20   Q.       What state was that?

21   A.       I came out, and work here now.

22   And life is good, and I want to put that on

23   the record too.  New York.

24   Q.       Got it.  Thank you.  That's all.

Joseph LaForte

Page 134

1           Does your brother, James, have

2    any dealings with CBSG?

3    A.           I won't talk about my brother.

4           MR. HESKIN: Are you instructing

5    him not to answer,

6           MR. BERMAN:  I think he answered.

7    BY MR. PROPER:

8    Q.           So no questions of any kind.  If

9    I asked 50 questions about your brother and

10   his relationship to this case, your answer

11   for all of them, is you're not going to

12   answer?

13   A.           The answer is he has nothing to

14   do with the business, so there is no

15   answer.

16   Q.           Has he ever had anything to do

17   with CBSG?

18   A.           No.

19   Q.           Has he ever attempted to collect

20   monies on behalf of CBSG?

21   A.           I don't know.

22   Q.           Has your brother ever done any

23   work for your marketing company?

24           MR. BERMAN:  Objection.

Joseph LaForte

Page 135

1   Mischaracterization.

2           THE WITNESS:  I don't know my

3   brother's business.

4   BY MR. PROPER:

5   Q.        So if you don't -- I just need to

6   ask the questions.  Has James LaForte ever

7   done any work on behalf of Recruiting and

8   Marketing Resources?

9   A.        I don't know.

10  Q.        If he had, would you know?

11  A.        I don't know.

12  Q.        And you don't know whether James

13  LaForte has done any work, consulting or

14  otherwise, for CBSG?

15  A.        No.

16  Q.        He hasn't or you don't know?

17  A.        I don't know.

18  Q.        How about Mr. Geo, do you know

19  who he is?

20  A.        Yeah, I do.

21  Q.        Who is that gentleman?

22  A.        He was a mediator for the company

23  for a while.

24  Q.        What's his full name, if you

Joseph LaForte

Page 136

1    know?

2    A.        I don't know.

3    Q.        When was the first time you met

4    him?

5    A.        I don't remember.

6    Q.        Do you know anything about his

7    background?

8    A.        Not really.

9    Q.        What did he do on behalf of CBSG?

10   A.        He would -- what we tried to do

11   is, we tried to go out and settle disputes

12   with clients, and I thought it was a great

13   program.  He would go and meet clients to

14   see if he could mediate prior to someone

15   catching a judgment or a default.

16   Q.        Were you the one that contacted

17   Mr. Geo to go visit with people that were

18   in default?

19   A.        So if I had a default, I would

20   contact sometimes to go meet with clients

21   that wanted to meet with us.  I thought it

22   was a great program, and it worked out

23   pretty well.

24   Q.        How long did the program go on

Joseph LaForte

Page 137

1   for?

2   A.          I can't say exact, probably a

3   year and a half.

4   Q.          Do you know how many visits Mr.

5   Geo made to CBSG customers during this 12

6   to 18 month period?

7   A.          I couldn't say how many.

8   Q.          Who was the one that would

9   contact Mr. Geo for him to get involved

10  under this dispute settlement program?

11  A.          I don't understand the question.

12  Q.          Yeah, so if Mr. Geo was going to

13  make a visit to a business, would you

14  contact him or would someone else contact

15  him from CBSG?

16  A.          Someone from CBSG would contact

17  him.

18  Q.          Do you know if he had a written

19  agreement with CBSG?

20  A.          No.

21  Q.          Do you know how he was

22  compensated?

23  A.          No.

24  Q.          You don't know if he was paid

Joseph LaForte

Page 138

1    based on whether he was successful in

2    getting money from the businesses?

3    A.        No.

4    Q.        Do you know if Mr. Geo ever made

5    threats to businesses in order to secure

6    payments?

7    A.        I don't think he made any threats

8    to any business.

9    Q.        Did any customers ever complain

10   to you personally that Mr. Geo made threats

11   to them?

12   A.        Of course.

13   Q.        Do you recall on how many

14   instances a business owner contacted you

15   directly and complained that Mr. Geo had

16   expressly or implicitly threatened them?

17   A.        So the clients, for the most

18   part, the program worked very well.  I

19   would say 95 percent of the time, the

20   clients enjoyed the fact that they were

21   able to sit down and mediate with somebody

22   in person as opposed to being on the

23   phones.  Like any other product, you know,

24   five percent of them probably didn't like

Joseph LaForte

Page 139

1    the fact that somebody showed up to their

2    office space, but, you know, in general I

3    think the program worked out very well.

4    Q.        Why did the program end, if it

5    did?

6    A.        Bloomberg article.

7    Q.        Why did the Bloomberg article

8    result in that program ending?

9    A.        In hindsight I could see the

10   optics on that would look bad, and I know

11   where you guys are going with this, but it

12   was a great program.  Most of the clients

13   enjoyed the fact that we went to meet them

14   in person and didn't have a default, we

15   saved a lot of businesses like that.

16            So I say if you saw 500 clients,

17   I would say 450 of those clients had their

18   businesses saved because of the visit as

19   opposed to getting a judgment or lien on

20   them, or potentially losing their business.

21   Q.        Are you personally involved at

22   all with contacting business owners in

23   default and trying to come up with like a

24   payment arrangement?

Joseph LaForte

Page 140

1    A.        Sometimes. If they're my client,

2    yes.

3    Q.        Aren't all of CBSG deals your

4    clients?

5    A.        So, yes and no.  Because I handle

6    the ISOs, and I'm a mediators.  Sometimes

7    the ISOs handle it them themselves, it

8    depends.

9    Q.        So you mean sometimes the ISOs

10   will deal directly with CBSG without your

11   involvement?

12   A.        Correct, or they can go directly

13   to the merchant and try to work out an

14   agreement with the merchant themselves.

15   Q.        So just so we're clear because I

16   heard you differently before, which is

17   fine.  Are you involved --

18   A.        You're talking about collections

19   now, right?  We're on another subject now.

20   Q.        Not collections.  I want to know

21   if all of the funding deals from CBSG

22   derive from your involvement?

23   A.        Okay.  Respectfully, you're going

24   to another segment of the business.  We're

Joseph LaForte

Page 141

1    on collections now.  You're bringing up Mr.

2    Geo.  You're on collections.  You're

3    confusing me because you're going to back

4    to underwriting and processing now, that's

5    different.  On the collection side, it is

6    an effort by the ISO because they got paid

7    a commission, right, so they don't want to

8    have a claw back.  And they also -- we, we

9    want to make a negotiation with our client

10   to make sure we get paid.

11   Q.          That I understand completely.  I

12   just want to understand, and I am going

13   back.  Are you all the deals that CBSG

14   funds deals that you're involved with at

15   the start?

16   A.          I wouldn't say all; I would say

17   majority.

18   Q.          And if one of the deals that you

19   had brought to CBSG goes in default because

20   the borrower doesn't make a payment, there

21   have been occasions where you would make a

22   phone call, right?

23   A.          Sure.

24   Q.          One of those phone calls was to

Joseph LaForte

Page 142

1    Robert Fleetwood, correct?

2    A.        Sure.

3    Q.        Do you recall the sum and

4    substance of what you and Mr. Fleetwood

5    talked about?

6    A.        No.

7    Q.        Did you make any threats to Mr.

8    Fleetwood?

9    A.        Absolutely not.

10   Q.        Did you suggest that you would

11   ruin his business if he didn't become

12   current?

13   A.        Absolutely not.

14   Q.        That's not something you would

15   do?

16   A.        No.

17   Q.        Is it a common practice for deals

18   you're involved with to contact borrowers

19   in default to come up with a payment

20   arrangement?

21   A.        Sure.

22   Q.        And when you come up with a

23   payment arrangement, does CBSG charge a

24   finance or some restructuring fee?

Joseph LaForte

Page 143

1    A.         I don't know.  It depends.  If a

2    client is going to initiate another

3    transaction, yes.

4    Q.         In my client's case, was there an

5    instance where you negotiated a smaller

6    daily payment to try to help him out?

7    A.         Yes.

8    Q.         Okay, and when that happened, was

9    a finance fee charged?

10   A.         I don't believe so.

11   Q.         And you said there were times

12   where a finance fee would be charged, and

13   that was if another deal was going to be

14   made?

15   A.         Yeah, if there was a refinance,

16   is that what you're talking about?

17   Q.         No.  I'm talking about if there's

18   a workout, I'll use that terminology, that

19   a borrower hasn't paid you.  The borrower

20   is in default; you're trying to work out a

21   payment arrangement.

22   A.         Right.

23   Q.         Under that situation, are there

24   any additional fees that are imposed when

Joseph LaForte

Page 144

1   you're restructuring the payment?

2   A.       I don't believe so.  I'm not

3   sure.  Different lending companies handle

4   it differently.  I'm not positive.

5   Q.       Okay, so you're not sure one way

6   or the other what CBSG does; is that fair?

7   A.       In a default situation?

8   Q.       Yeah, when there's a restructured

9   payment, you're not sure specifically

10  whether CBSG charges a finance fee or not?

11  A.       No, I'm not sure.

12  Q.       If CBSG reduces a client's

13  payment, was that borrower in default prior

14  to the new payment term?

15          MR. BERMAN: Objection.

16          THE WITNESS:  It depends.

17  BY MR. PROPER:

18  Q.       Depends on what?

19  A.       What client?  Who are we talking

20  about?

21  Q.       I'm just talking generally.

22  Isn't it a fair statement that the only

23  time you would work out a payment

24  arrangement is when a borrower was in

Joseph LaForte

Page 145

1   default?

2   A.        Of course.

3   Q.        Isn't it also true that when CBSG

4   funds money, it expects to be repaid?

5   A.        Yes.

6   Q.        Isn't it true that when CBSG

7   funds money, that it expects to be repaid

8   whether the business is doing well or the

9   business is doing poorly?

10  A.        No.  I think that CBSG does a

11  good job working out payments with people

12  in general, I guess.

13  Q.        When CBSG advances funds to a

14  business, it expects, no matter what

15  happens, that you're going to pay them

16  back, and if you don't pay them back, CBSG

17  is going to pursue any legal rights it has,

18  right?

19  A.        Sure.  Same way you guys probably

20  would with your clients.

21  Q.        Can you think of any circumstance

22  where CBSG would say, "don't worry about

23  it, you don't have to pay us back"?

24  A.        You asked me that earlier, I

Joseph LaForte

Page 146

1    don't know what that means.

2    Q.        Okay.  It's hard, and I

3    understand your counsel's point.  I'm

4    limiting my questions to Texas, which I

5    would like to do at this point, but you're

6    telling me you don't know how many CBSG

7    customers from January 2015 to present were

8    Texas residents, right?

9    A.        Correct.

10   Q.        And you haven't done anything

11   prior to this deposition to ascertain that

12   number, right?

13   A.        No.

14   Q.        You don't know whether it's 10,

15   20, 50, 100, 1,000 or more?

16   A.        I don't know.

17   Q.        Do you have any concept whether

18   Texas is a high volume state for CBSG?

19   A.        I don't know about CBSG.  Just in

20   the industry itself I could speak on

21   because I do a lot of different deals with

22   a lot of different lenders.

23   Q.        Yeah.

24   A.        There's some parts of Texas that

Joseph LaForte

Page 147

1   are good, that are busy, yeah.

2   Q.        What parts of Texas are busy,

3   generally?

4   A.        Dallas is a big city, so there's

5   a lot of business in Dallas.  But I

6   wouldn't say Texas specifically is a big

7   state.

8   Q.        Do you have specific ISO's you

9   deal with in Texas?

10  A.        No.

11  Q.        Does CBSG have ISO's for every

12  state?

13  A.        No, the ISO is -- you mean the

14  independent offices, where are they

15  located?

16  Q.        Yeah.

17  A.        I don't know.

18  Q.        So maybe it's not necessary to be

19  in a particular state.  Do you have a

20  specific ISO, maybe you deal with in

21  Pennsylvania, and may bring clients from

22  states outside of Pennsylvania, right?

23  A.        Sure.  You don't have to be in

24  the state to transact business.

Joseph LaForte

Page 148

1  Q.        And going back to the form of the

2  contract back in 2012, were you involved at

3  all in preparing their original MCA formed

4  contract?

5  A.        No, I'm not a lawyer.

6  Q.        Do you know how CBSG came up with

7  the initial form?

8  A.        No.

9  Q.        Do you know whether they used

10 some other MCA company's contract as a

11 template for their agreements?

12 A.        No.

13 Q.        You said you were involved at the

14 start back in 2012 with sort of structuring

15 the types of products that would be

16 offered?

17 A.        Yeah, I'm into products, yes.

18 Q.        So what was your experience with

19 the MCA industry prior to 2012?

20 A.        Experience?

21 Q.        Yeah, did you deal with MCA

22 companies as an ISO?

23 A.        Yes.

24 Q.        And you may have already

Joseph LaForte

Page 149

1   answered --

2   A.          I already answered.

3   Q.          What type of involvement would

4   you have with the MCA companies?

5   A.          Just in a sales capacity.

6   Q.          I'm sorry, how many years were

7   you doing that for?

8   A.          Probably started in 2011.

9   Q.          Did you ever work with a

10  gentleman by the name of John Brawn?

11  A.          No.

12  Q.          Do you know who he is?

13  A.          I've read about him.

14  Q.          Why did you decide to have your

15  wife structure her business as an MCA

16  company?

17          MR. BERMAN:  Objection.

18          THE WITNESS:  For you to say I

19  told my wife to do anything?  If you knew

20  her, you'd take that.  She does her own

21  thing.  She's a lot smarter than me.  Since

22  you already exposed me, when I was in jail

23  my wife had to fend for herself because

24  she's very intelligent, very smart, and she

Joseph LaForte

Page 150

1    formatted this whole business.  I'm lucky

2    to be involved in a sales capacity so I

3    could have a job.  As a convicted felon,

4    I'm lucky to have a position.

5              So my role in the company is on a

6    sales level only.  I do not get involved

7    with CBSG business, and I made that deal

8    with my wife as soon as I came home.  So,

9    that's how it operates and, you know, she's

10   very capable.  So for you to say, it would

11   be insulting to her, that I helped her

12   somehow formulate this great business she

13   has.

14   BY MR. PROPER:

15   Q.        I was only suggesting that

16   because you had involvement with MCA

17   companies, so let me start back.  Did your

18   wife have some involvement with MCA

19   companies prior to 2012?

20   A.        No, but she has a lot of loan

21   experience.  She was a mortgage broker, as

22   I stated.

23   Q.        Yeah, so do you know how your

24   wife first became aware that there was this

Joseph LaForte

Page 151

1   concept of an MCA?

2   A.        No.

3   Q.        But the idea did not come from

4   you?

5   A.        No, I was in jail.  My wife

6   started it herself.

7   Q.        Do you know why your wife decided

8   to structure her business as an MCA company

9   versus just an alternative lender?

10  A.        MCA is an alternative lender.

11  Q.        Do you know why she structured

12  her agreement as to purchase of future

13  receivables as opposed to just a loan?

14  A.        No.  If I had to make a guess, I

15  think it's a better product than a loan.

16  Everybody seems to think that a loan

17  product is positive thing.  I don't see it

18  that way.  I think you can do a lot more

19  for merchants by having a merchant cash

20  advance agreement.  You could be more

21  nimble, and you could structure deals

22  without having an amortization period to

23  help clients grow their businesses.  And I

24  think that's the reason why she has a two

Joseph LaForte

Page 152

1   percent default rate.

2          Her two percent default rate is

3   really a tribute to her and putting

4   together the underwriting guidelines, and I

5   think it's a good thing.

6   Q.        Do you know if CBSG ever makes

7   payments on behalf of borrowers who were in

8   default to make it look like the borrower

9   is not in default?

10  A.        Can you repeat that please?

11  Q.        Do you know if CBSG ever makes a

12  payment to itself when a borrower is in

13  default to make it look like the borrower

14  is not in default?

15  A.        No.

16  Q.        Do you know if CBSG is

17  artificially misrepresenting its default

18  rate to investors?

19  A.        No.

20  Q.        Do you know what --

21  A.        Do you guys know what default is,

22  by the way?

23          MR. HESKIN: I think we already

24  discussed...

Joseph LaForte

Page 153

1            MR. PROPER:  Your counsel is

2    welcome to ask you that later.

3            MR. BERMAN:  Yeah.  Just...

4    BY MR. PROPER:

5    Q.        Do you know where CBSG gets its

6    money to advance funds to borrowers?  Does

7    it have a line of credit?  Does it do all

8    types of debt financing through

9    investments?  How does that work?

10   A.        I think they have their own

11   investment portfolio of people they work

12   with, yeah.

13   Q.        Do you know if CBSG has a line of

14   credit with any lending facility?

15   A.        I don't know.

16   Q.        Do you know how the investment

17   funds are set up?

18   A.        Private placement memorandums.

19   Q.        Have you ever read a private

20   placement memorandum?

21   A.        No.

22   Q.        Do you know whether the private

23   placement memorandum makes any

24   representations to potential investors that

Joseph LaForte

Page 154

1    CBSG loans money to borrowers?

2    A.        No.  I didn't read it.

3    Q.        Okay.  How do you know there's a

4    private placement memorandum?

5    A.        Because we -- I saw it in the

6    paper.  You saw the fine they had to pay,

7    so they had to set up private placement

8    memorandums, as you guys have in your

9    documents, which I'm sure you'll get to

10   next,

11   Q.        I'm not going to get into that.

12   A.        Okay.

13   Q.        But I know what you're talking

14   about, so thanks.

15             What can you tell me about Mr.

16   Fleetwood's business.

17   A.        Can I have my folder?

18   Q.        What did you bring with you

19   today?

20   A.        Probably the same ones you have.

21             MR. BERMAN:  The only thing I'm

22   going to pull out of here is, I think you

23   may have an email from me.  Do you, Joe?

24             THE WITNESS:  No.

Joseph LaForte

Page 155

1           MR. BERMAN:  You don't?  It's

2    just documents?  Just making sure before

3    you start looking through that.

4           THE WITNESS:  They can look

5    through my documents?

6           MR. BERMAN:  They can.  If you

7    start referring to things here, they can

8    look at them.

9           THE WITNESS:  It's the same

10   things he has.

11          MR. BERMAN:  Again, I just want

12   to make sure you don't have an email from

13   me.

14          THE WITNESS:  No.

15          MR. PROPER:  So you have a folder

16   of documents in front of you, correct.

17          MR. BERMAN: They can look once

18   you start talking about them.  I'm just

19   telling you, which is fine.

20          MR. PROPER:  Well, I'm entitled

21   to see your notes and other things.

22          MR. BERMAN:  No, you're not.

23          MR. PROPER:  I absolutely can.

24          THE WITNESS:  I just have a legal

Joseph LaForte

Page 156

1    pad with some notes here. You can look at

2    them if you want.

3    BY MR. PROPER:

4    Q.        I don't mean to smile being

5    sarcastic, but I've done this a long time

6    and there's a first that happens all the

7    time.

8             Are you telling me you had a

9    folder of documents, but I can't see the

10   folder of documents that were in front of

11   you?

12   A.        It's the same folder you have.

13   Q.        How do you know what I have?

14   A.        Why do you need to see my

15   documents?

16   Q.        Because I'm in the middle of a

17   lawsuit and you brought documents here that

18   you thought were relevant --

19   A.        The same ones you have right

20   there.

21   Q.        How do you know they're the same

22   ones I have?  You haven't seen my

23   documents.

24   A.        I just saw them.

Joseph LaForte

Page 157

1    Q.        You saw all my documents?

2    A.        Yeah.  I see them sitting right

3    there.  You have your factoring agreement.

4    I thought we were going to go over the

5    file.

6    Q.        What documents did you bring?

7    A.        The same ones you have.

8    Q.        Which are what?

9    A.        The factoring agreement that's in

10   front of you.

11   Q.        You have like a hundred plus

12   pages of documents?

13   A.        That's your opinion.  I didn't

14   see a hundred pages?

15   Q.        How thick was the manilla folder

16   you had over there?  Two inches?  Three?

17   A.        Okay.

18   Q.        But you got more than a page?

19   A.        It's the same as yours, right

20   there.

21            MR. PROPER:  Can we take a break?

22            THE WITNESS:  I'll bet you.

23            MR. HESKIN: Do we need to call

24   the court on this?

Joseph LaForte

Page 158

1              MR. PROPER:  Let's take a break.

2                    - - -

3              (Whereupon a short recess was

4    taken.)

5                    - - -

6              (Whereupon the court reporter

7    marked P-1 for purposes of identification.)

8                    - - -

9    BY MR. PROPER:

10   Q.        Taking a look at what's been

11   marked as P-1, and I just want to know if

12   you've ever seen that before?

13   A.        Sure.  I wrote it.

14   Q.        There's a picture of an

15   individual depicted upon the bottom of P-1.

16   Who is the individual with the beard?

17   A.        I have no idea.

18   Q.        Do you know why the article you

19   wrote indicates that someone who is not you

20   as being Joseph LaForte?

21   A.        No, I have no idea.

22   Q.        So you've never seen that

23   individual before?

24   A.        No.

Joseph LaForte

Page 159

1                  - - -

2              (Whereupon the court reporter

3      marked P-2 for purposes of identification.)

4                  - - -

5      BY MR. PROPER:

6      Q.         I'll show you what's marked as

7      P-2, which is a document titled Factoring

8      Agreement between CBSG and Fleetwood

9      Services, LLC.  Do you see that?

10     A.         Yes.

11     Q.         Have you seen this document

12     before?

13     A.         Yes.

14     Q.         Is this one of the documents that

15     you brought with you today?

16     A.         Yes.

17     Q.         Okay.  What other documents did

18     you bring with you today?

19     A.         Just background on the file.

20     Information on the client that might be

21     good to answer questions you guys might

22     have.

23     Q.         When did you print the documents

24     in your folder?

Joseph LaForte

Page 160

1    A.        A couple days ago.

2    Q.        And did you print those documents

3    to refresh your memory at all about the

4    events that took place between CBSG and

5    Fleetwood?

6              MR. BERMAN: You can answer it.

7              THE WITNESS:  Yeah.

8    BY MR. PROPER:

9    Q.        And you have some notes in front

10   of you too.  Are those notes, or were those

11   notes taken based upon your review of the

12   documents in preparation for the

13   deposition?

14   A.        Yes.

15   Q.        We ask for the production of the

16   file that Mr. LaForte has?

17             MR. BERMAN:  You can see what he

18   has.  I changed my mind.  You can look.

19             MR. PROPER:  Okay.

20             MR. BERMAN:  There's nothing

21   there.  It's call documents produced in

22   this case, or documents relevant.  We can

23   pick our battles on other fights.

24             MR. PROPER:  Can we mark this as

Joseph LaForte

Page 161

1    P-3?

2                  - - -

3              (Whereupon the court reporter

4    marked P-3 for purposes of identification.)

5                  - - -

6    BY MR. PROPER:

7    Q.       I'm just look at your note, Mr.

8    LaForte, and there's a reference on the

9    bottom of the first page.  "Get the

10   business debt free"?

11   A.       Yep.

12   Q.       What is that?

13   A.       I like to get all the customers I

14   work with in consolidation programs to get

15   debt free.

16   Q.       You wanted Mr. --

17   A.       I would like Mr. Fleetwood to get

18   debt free because he had multiple advances,

19   and I would like to see him get debt free.

20   That was my notes at the time, and I wanted

21   to make sure I could help the client.

22   Q.       Were these your notes taken back

23   in 2017 or taken recently?

24   A.       I don't remember.  I don't

Joseph LaForte

Page 162

1   remember when I took them.

2   Q.        Do you know if you took them two

3   days ago?

4   A.        I don't remember.

5   Q.        And what is your notes on page

6   two in reference to?

7   A.        The client was paying $6,600 --

8   $6,667.00 a day in cash advances before I

9   got the file.  When I spoke to the client,

10  they're in the golf course maintenance

11  business.  The golf course maintenance

12  business historically gets slower during

13  the winter times.  She couldn't afford all

14  the cash advances she had, which are on

15  page one, if I could take a look?

16  Q.        Sure.

17  A.        Which consisted of five cash

18  advances.  So, my job was to help the

19  client get through -- not only get through

20  the winter, but also lower their daily

21  payments.  So the main concern, as I stated

22  earlier in my testimony, is benefit to the

23  customer.  The customer, the only way that

24  the customer could have survived is if I

Joseph LaForte

Page 163

1    lowered the daily payment number one, and

2    two, injected additional capital into the

3    business.

4               So it's a twofold thing with this

5    client.  Number one, the additional

6    capital, the $100,000 that they received

7    helped them get through the winter, and

8    also they had a project that they were

9    going to make a decent amount of money on

10   that we gave them.  Number two, lower the

11   daily payments.  If I had gave them another

12   position like the rest of the deals as you

13   see on P-3, you would have had a sixth

14   position, and the client would have been

15   bankrupt.

16              So, in this case, I'm very

17   comfortable -- I was very comfortable with

18   this deal because I lowered their payment

19   by $6667.00.  On top of that, the

20   additional $100,000 that they received,

21   there was no daily payment on it.  There

22   was no stack.  So, they actually received a

23   $100,000 in financing for free, which was a

24   total savings on the file of about $48,860

Joseph LaForte

Page 164

1    a month.

2    Q.        So how much did CBSG advance to

3    Fleetwood?

4    A.        CBSG advanced to Fleetwood, on

5    P-2, $370,000.00.

6    Q.        And Fleetwood was required to pay

7    back how much?

8    A.        Fleetwood was required to pay

9    back $547,600.00.

10            That's you, Pal.  I just wanted

11   to make sure that my lawyer had that.

12   BY MR. PROPER:

13   Q.        And over what period of time did

14   Fleetwood have to repay that?

15            THE WITNESS: Did you want to make

16   a pee mark on that one, Bud?

17            What's that, Pal?

18   BY MR. PROPER:

19   Q.        Over what period of time?

20   A.        It's 110 days.

21   Q.        So what would the factor rate be

22   on that, do you know?

23   A.        Factor rate is about a 145.

24   Q.        And was that a common factor rate

Joseph LaForte

Page 165

1   at the time for CBSG?

2   A.        Sure.  It's a factor rate in the

3   industry.  The factor rates initiated in

4   her other advances.  Yellowstone's factor

5   rate was a 149.  Richmond's factor rate was

6   a 149.  Snaps was a 148.  NXGEN was a 149.

7   And Pearl was a 149.

8   Q.        Yeah, I --

9   A.        I think more importantly than

10  anything else is the term.  The reason why

11  this customer fell into hard times before

12  we got to the files is because the customer

13  had $6,600 a day in daily payments on terms

14  of less than 50 days.

15            PAR Funding came in and saved

16  this company from bankruptcy.

17  Q.        By lengthening the term?

18  A.        But not lengthening the term,

19  gave them $100,000 in fresh capital without

20  charging them a daily payment.  There's no

21  daily increase.  The actual net savings to

22  this client is $4,300 a day.  That's almost

23  $90,000 a month.  This customer would have

24  been out of business if it wasn't for PAR

Joseph LaForte

Page 166

1   Funding.

2   Q.       So, with respect to the factor

3   rate, in your experience working with CBSG,

4   a factor rate around 1.4 is fairly

5   standard?

6   A.       I won't say that.  I think it's

7   standard for this file.

8   Q.       What is the standard factor rate

9   of CBSG deals?

10  A.       Your client took these other

11  advances to this same factor rate.  As a

12  matter of fact, they were higher.

13  Q.       Yeah.

14  A.       There's not a standard.  I'm not

15  going to tell you a standard, I'm talking

16  about this file.

17  Q.       I'm not asking about anyone other

18  than CBSG.

19  A.       I can't answer you because all

20  the factor rates are different.

21  Q.       I'm asking you whether or not

22  there's a standard range of factor rates

23  that CBSG has used between 2015 and

24  present?

Joseph LaForte

Page 167

1   A.          No.  It could be a 1.01, could be

2   a 1.49. There's no standards.

3   Q.          Do you know whether or not CBSG

4   has ever represented on its website

5   anything about a standard factor rate?

6   A.          I don't know.

7   Q.          There's also a reference on P-2

8   about a 25 percent specified percentage of

9   receivables that are purportedly being

10  purchased.  Do you see that?

11  A.          Yes.

12  Q.          So can you walk me through what

13  CBSG did, if you know, in determining that

14  the daily payment that Fleetwood was

15  required to pay represented 25 percent of

16  Fleetwood's daily receivables?

17  A.          Sure.  The income received by

18  Fleetwood is approximately a million a

19  month when we underwrote the files.  25

20  percent of that is $250,000 a month.  My

21  payment was $5,000 a day.  5,000 times 22

22  days is less than 25 percent.  So, actually

23  the stated percentage holdback is a lot

24  higher than it actually was.  We put it on

Joseph LaForte

Page 168

1    there to be careful, and it's actually

2    less.  So the stated holdback on this file

3    is probably about ten percent.

4    Q.        So you weren't actually buying 25

5    percent of the receivables -- you were

6    buying 25 percent, but it was conservative?

7    A.        No.  We try to figure out, to do

8    a prudent deal, that 25 percent of the

9    person's income should go towards cash

10   advances.  Anything 30 or less is a good

11   debt to income ratio.  Similar to a bank,

12   which would be 30, 35 percent.  So how

13   you're looking at it is wrong.  It's

14   percentage of the income that that person

15   could afford.  The stress test on these

16   customers has to be -- this is where the

17   problems come in the industry.

18             If you look, your client was

19   paying $6,667 a day, and on top of that,

20   it's a golf course company.  They needed

21   100,000.  So I had two choices.  We could

22   have been like the rest of these guys, gave

23   them 100,000 at the same rate, and the

24   payment would have been $2600 more a day,

Joseph LaForte

Page 169

1    or we can come up with a creative program,

2    which we did, to lower the payment.  So we

3    saved this client.  The client was paying

4    $6000 a day, we brought the payment down to

5    $5000 a day, without charging them for the

6    100,000.

7    Q.        So you consolidated all my

8    clients debt?

9    A.        Exactly.

10   Q.        And they became debt free, and I

11   bet they're still open?

12   Q.        Well, they weren't really debt

13   free; they owed your company $547,000?

14   A.        We paid all these advances back

15   for them.  They became debt free.  If you

16   complete my program correctly, and if you

17   can look at your consolidation calculator

18   on here, that sheet.  If you complete the

19   program, you're not going to have any debt.

20          MR. BERMAN:  What sheet are you

21   referring to?  Is this something over there

22   in your files?

23          THE WITNESS:  Yeah, I have it.

24   BY MR. BERMAN:

Joseph LaForte

Page 170

1    Q.        I just want to explore this

2    concept that when CBSG entered into a

3    relationship with my client, my client no

4    longer had debt?

5    A.        No, I didn't say that.  I said

6    when they finished the program, they

7    shouldn't have had debt, that's correct.

8    Q.        All right.  Because all of the

9    debt would have been repaid to you?

10   A.        I paid off all the debt.  I paid

11   off all her advances for her.

12   Q.        And then when my client was done

13   with you, all the debt that my client owed

14   to you would have been paid?

15   A.        Of course.

16   Q.        That I understand.

17   A.        Okay.  So we paid off the

18   client's debt.  Your client was out of

19   business.  If I didn't give your client

20   that 100,000 and lower their payment from

21   56 percent of their income down to 21

22   percent of their income, your client would

23   have been out of business.

24   Q.        How much did my client owe to the

Joseph LaForte

Page 171

1    other lenders before CBSG consolidated the

2    loans?

3    A.        $370,000.

4    Q.        Okay, so when you say that you

5    gave my client $100,000 of free money, it

6    wasn't really free, right?

7    A.        It was free.

8    Q.        Well, my client owed $370,000

9    before you.  And he owed $570,000 after

10   you, that's not really flee?

11   A.        It is free.

12   Q.        How?

13   A.        It's free because your client, we

14   didn't increase their daily payment.

15   There's a factor you put on, of course, the

16   factor that was put on the market.

17   Q.        Yeah.

18   A.        But the payments were less.  This

19   customer is in survival mode.  Your client

20   went from $900,000 in deposits to $250,000

21   in deposits when I saved them on Christmas,

22   by the way, and your client cried to me at

23   Christmas and I wanted to help.  We did a

24   great deal and great service to your

Joseph LaForte

Page 172

1    client.

2    Q.        Mr. LaForte, so as part of the

3    transaction with my client, did CBSG pay

4    off the monies that my client owed to the

5    other lenders?

6    A.        Yes.

7    Q.        Okay, so where he was paying

8    Yellowstone and others before, you paid off

9    all of those and then now instead of my

10   client owing $370,000, he gets $100,000 of

11   fresh money.  There's a factor rate on that

12   fresh money, and my client now has to pay

13   $570,000 over a longer term, which then

14   lowers the daily payment?

15            MR. BERMAN:  Objection.

16            THE WITNESS:  Yes.

17   BY MR. PROPER:

18   Q.        I'm trying to understand the

19   structure to boil it down.

20   A.        Can I see the consolidation

21   calculator?

22            MR. BERMAN:  Let's mark these.

23               - - -

24            (Whereupon the court reporter

Joseph LaForte

Page 173

1    marked P-4 and P-5 for purposes of

2    identification.)

3                    - - -

4    BY MR. PROPER:

5    Q.          Let's start with P-4, which is

6    one of the documents that you brought with

7    today, correct?

8    A.          Yes.

9    Q.          What is P-4?

10   A.          It's a financial analysis of your

11   client.

12   Q.          Generated by whom?

13   A.          CBSG.

14   Q.          What is some of the information

15   that's on that financial analysis?

16   A.          In September the gross deposits

17   for the client were 997,000.  Golf

18   business, Texas.  Obviously it's a good

19   time of year for golf and in Texas the

20   weather is pretty good.

21              October the deposits went down

22   from $997,000 down to $769,000, so she's

23   trending down almost down about 20 percent.

24              November, $396,000 in deposits,

Joseph LaForte

Page 174

1    it's getting worse for your client.

2              December, $261,785 in deposits

3    for the month.  Now your client is

4    completely upside down because at 261, it's

5    going to be very tough for the client to

6    get through the next phase of the business,

7    which usually, from my understand from what

8    your client had mentioned to me, they had a

9    golf course project coming up in February.

10   So my job was to get her to February.  So

11   from December -- from January 4 to

12   February, my job was to get your client

13   into a situation where A, I could finance

14   their new project and B, I can lower their

15   payments so they can keep their doors open.

16   Q.       And what is exhibit-5?

17   A.       So we decided that, because these

18   aren't amortized obligations, I don't

19   necessarily want to pay off the cash

20   advances directly.  I let the client pay

21   them off, and there's a couple reasons for

22   that.

23              Number one, the cash advances

24   will get really aggressive back at our

Joseph LaForte

Page 175

1    clients if they find out once they're free

2    and clear of the debt, so what we do is, we

3    give them the money on a weekly basis.  We

4    let the clients pay them off.

5            So on the first transaction, we

6    funded the client $113,000.  $100,000 to

7    grow their business, and $33,000 to pay off

8    their cash advances.

9    Q.        So the cash advance companies are

10   not paid back in one consolidation?  It's

11   not like when you advance funds to my

12   client, you're simultaneously paying off

13   the other lenders you're not doing that,

14   right?

15   A.        No.

16   Q.        You're actually giving money to

17   my clients, some of which is new capital.

18   Some of which is money that was intended to

19   pay off the lenders that he had a

20   relationship with before you?

21   A.        Correct.

22   Q.        That I understand.  And you were

23   aware that my client had these other

24   arrangements with these other lenders

Joseph LaForte

Page 176

1    before the consolidation, right?

2    A.       What other arrangements?

3    Q.       You knew that my client had

4    existing agreements with other lenders at

5    the time he came to you, right?

6    A.       Of course.

7    Q.       Because I think on P-3, your

8    notes, you've got some other companies

9    written down and amounts next to it. For

10   instance, it looks like you got Yellow,

11   which I assume you mean Yellowstone?

12   A.       Uh-huh.

13   Q.       $70,000?

14   A.       Yes.

15   Q.       And then who is the second

16   company?

17   A.       Richmond.

18   Q.       $80,000?

19   A.       Uh-huh.

20   Q.       And then you got Snap at $40,000.

21   A.       Uh-huh.

22   Q.       Then who's next?

23   A.       NXGEN.

24   Q.       At $30,000.  Then you got Pearl

Joseph LaForte

Page 177

1   at $50,000, right?

2   A.        Correct.

3   Q.        Okay, so do you know whether all

4   these other companies on P-3 purported to

5   purchase a percentage of my clients future

6   receivables?

7   A.        I don't understand the question.

8   Q.        Did you ask my client to provide

9   copies of his agreement with Yellowstone,

10  Richmond, Snap, NYGEN and Pearl?

11  A.        It's in the exhibits your client

12  wrote out a sheet, if you can take a look

13  in your file.

14  Q.        Yeah.  Did you understand that

15  those agreements were structured as loans,

16  or whether the document was structured

17  similar to an MCA agreement?

18            MR. BERMAN: Objection.  You can

19  answer.

20            THE WITNESS:  They're MCA

21  agreements.

22  BY MR. PROPER:

23  Q.        So in each of those MCA

24  agreements with Yellowstone, Richmond,

Joseph LaForte

Page 178

1    Snap, NYGEN and Pearl, my client purported

2    to sell some percentage of his future

3    receivables, correct?

4    A.        Correct.

5    Q.        So if you were to add up all the

6    percentage of future receivables that my

7    client purported to have sold, adding you

8    to that list, do you know if that number is

9    more or less than an hundred percent?

10          MR. BERMAN:  Objection. You can

11   answer.

12          THE WITNESS:  It's a lot less.

13   BY MR. PROPER:

14   Q.        Okay, so what percentage of

15   future receivables did my client purport to

16   see you?

17   A.        It's in contract.

18   Q.        To Yellowstone, how much?

19   A.        $70,000.

20   Q.        What percentage of his

21   receivables is on the contract between my

22   client and Yellowstone?

23   A.        Well, $604,000, so if you take

24   $70,000 and divide it into 604 average,

Joseph LaForte

Page 179

1    that's the percentage.

2    Q.          Do you know what the actual

3    contract says?

4    A.          How can I know what's going to

5    happen in the future?  I don't know what

6    can happen in the future.

7    Q.          I'm just asking you whether or

8    not you've seen the contract between

9    Yellowstone and my client?

10   A.          I don't remember.  It was a very

11   long time ago.

12   Q.          Okay.  Do you recall having seen

13   any of the contracts between the six

14   companies or five companies you have

15   written down?

16   A.          I'm sure we have them, but I

17   haven't seen them in a while.

18   Q.          Do you know, looking at the

19   contracts, not the amount of money that was

20   outstanding, that based upon the contracts

21   how much of my clients receivables he

22   purportedly agreed to sell to those five

23   businesses?

24   A.          Again, I'll repeat myself.  It

Joseph LaForte

Page 180

1    says your client was averaging $604,000.

2    He had already sold off about $340,000 of

3    his receivables, but had had lower balances

4    which was probably 240, about 30 percent

5    probably before I got involved, yeah.

6    Q.        You're saying the total before

7    you got involved, he had already sold to

8    those five businesses 30 percent?

9    A.        Probably.

10   Q.        But you don't know what the

11   contracts say my client had sold, right, at

12   least you don't recall?

13   A.        What the contract said?

14   Q.        Yeah.  Do you recall specifically

15   what Yellowstone claims to have purchased

16   from my client in terms of a percentage of

17   receivables, do you recall that?

18   A.        No, I don't recall that, but they

19   do purchase receivables.

20   Q.        Do you recall from a contract,

21   how much Richmond purported to have

22   purchased from my client?

23   A.        No.

24   Q.        Do you recall from a contract,

Joseph LaForte

Page 181

1   how much NYGEN, Pearl, or Snap purported to

2   purchase from my client in terms of his

3   receivables?

4   A.        You're being misleading.

5   Q.        How?

6   A.        I'll tell you why.  Because the

7   contracts say the amount that you can't

8   sell more than on the faceplate of the

9   contract, so you're being misleading.

10  There's no separate sale.  It's only the

11  faceplate of the contract.  Your client

12  wrote down exactly what they have, and I

13  have the contracts.

14          MR. BERMAN:  Are you referring to

15  a document you brought, so there's no lack

16  of clarity?  Like some document you have.

17          THE WITNESS:  Yeah, the client

18  wrote it, or it would be fraud if it they

19  wrote down something that was incorrect.

20  BY MR. PROPER:

21  Q.        So where is the document that my

22  client --

23          MR. BERMAN: You brought a file,

24  just direct him.

Joseph LaForte

Page 182

1            THE WITNESS:  I'll show you the

2    document that you're the document that your

3    client signed or filled out in order to

4    request services.

5                    - - -

6            (Whereupon the court reporter

7    marked P-6 for purposes of identification.)

8                    - - -

9    BY MR. PROPER:

10   Q.        So here is P-6, and my client has

11   the outstanding balances and the daily

12   payments to the five companies that we've

13   spoken about, right?

14   A.        Yes.

15   Q.        So where does my client represent

16   on that document the percentage of

17   receivables that he purported to have sold

18   and these companies purported to have

19   purchased?

20   A.        Right there in the balance.

21   Q.        That's the outstanding balance.

22   So how much --

23   A.        He only owes the balances.  When

24   you receive sell the receivable, as you

Joseph LaForte

Page 183

1   make your payments, it becomes less, so

2   this is all he owes.  There's no other

3   purported, unless there's a document I

4   don't know about.  There's no other

5   purported receivable that he could sell.

6   Q.      What was the original amount for

7   each of those transactions?

8   A.      I could -- I would to look in the

9   file, look into the actual contracts.  My

10  guess would be -- I'll give you the exact

11  numbers if you'd like.

12  Q.      So you're going to multiply --

13  A.      Do you want the exact numbers?

14  I'll do it.

15  Q.      I can do the math.  I just want

16  to make sure we're on the same page.

17  You're multiplying the daily payment by the

18  term, right?  And then come out with the

19  amount that was required to be repaid?

20  A.      Uh-huh.

21  Q.      Got it.  I can do the math.

22          That's how you would determine

23  the rate, too, right?

24  A.      The cash advance companies, and

Joseph LaForte

Page 184

1    this is one of the things that I discussed

2    with Mr. Fleetwood.  The cash advance

3    companies, these aren't goods companies, in

4    my opinion.  They escalated the payments

5    ,So if you look, these terms that she put

6    in here are not the same as the payments

7    that are coming out.  So if you look, 12

8    months at $1370 a day on $40,000 doesn't

9    match, so the information was incorrect.

10   So the terms on this are wrong.  Your

11   client filled this out incorrectly.

12   Q.       Well, this is just the

13   outstanding balances, meaning he had

14   already paid down some of the amount that

15   was owed, right?

16   A.       He didn't, no.  The contracts

17   were different.  No.

18   Q.       All right.  So, if you were to

19   try to calculate what the rate is that was

20   charged to my client, how would you go

21   about doing that from this information?

22   A.       I would say the rates were around

23   the 145 to 147.

24   Q.       How do you calculate that?

Joseph LaForte

Page 185

1    A.          Just knowing the companies that

2    are on this list you can figure it out.

3    Q.          Is there a way you can do the

4    math with the information?

5    A.          You would have to pull the

6    contract.  Do you have the contracts?  I

7    can figure it out for you.  It's your

8    clients.  I'm sure you have them.

9    Q.          I'm just asking, how would you

10   calculate a factor rate?

11   A.          You can calculate a factor rate

12   taking the amount that you're going to fund

13   the company, multiply by the factor rate,

14   it gives you the right to return, the RTR

15   on the file.

16   Q.          How do you back into -- how do

17   you solve for the factor rate?  Do you have

18   the information what the daily payment, and

19   the term, and the balance in order to

20   calculate a factor rate from that

21   information?

22   A.          Sure, we can figure it out.

23   Q.          How would you calculate it?

24   A.          Take the original advance, times

Joseph LaForte

Page 186

1    the payment, figure out what the RTR is.

2    Q.        Got it.  Does CBSG guarantee a

3    certain rate of return to its investors?

4              MR. BERMAN:  Objection.  You

5    don't have to answer about investors.

6              THE WITNESS:  Do you think this

7    was a good deal for your client?  I know

8    you're asking the questions, but don't you

9    think we did a nice job for this client?

10   What's your opinion on that guys?

11             MR. PROPER:  One, I'm not going

12   to answer questions, and you wouldn't like

13   my answer.  So it's not productive.

14             THE WITNESS:  Save $4,000 a day

15   and give you $100,000 to keep your doors

16   open, and that's not a good deal?

17   BY MR. PROPER:

18   Q.        Do you know what the usuary

19   statute is in the State of Texas?

20   A.        This is a cash advance.  This is

21   a purchase of future receivables, we're not

22   a loan.

23   Q.        I'm just asking a question.  Do

24   you know what the usuary laws are in the

Joseph LaForte

Page 187

1    State of Texas?

2    A.        No.

3    Q.        Do you know what Texas says the

4    maximum rate of legal interest is that can

5    be charged through a Texas business?

6    A.        I don't do loans.

7    Q.        Okay.  Have you ever done any

8    research to determine what the usury laws

9    are in any particular state?

10   A.        I wouldn't need to look at any

11   research, it's a purchase of receivables,

12   it's a factoring agreement.

13   Q.        Is one of the reasons that the

14   company is structured as an MCA company is

15   to avoid the usury laws?

16   A.        No.

17   Q.        That has nothing to do with why

18   you're structuring these on paper as a

19   purchase of receivables and not a loan?

20   A.        We have a 98 percent rate of

21   clients that are satisfied.  They like to

22   speed, loans are too slow.  They're too

23   nimble and too expensive, so if you really

24   breakdown, if you guys want to get into it,

Joseph LaForte

Page 188

1    we can have a big debate on the SBA.

2    That's a much more expensive and cumbersome

3    product, clients don't want it.  You guys

4    don't have your finger on the poll, so it's

5    gone.  These people have opportunity and

6    they need capital.  Are there bad

7    companies?  Yeah, but there's bad in

8    everything.  Our company, PAR Funding, does

9    a great job in lowering people's payments

10   and shows a lot of benefit to all of our

11   customers.

12   Q.       The $300,000 and some thousand

13   that you provided to my client, what was

14   the source of those funds?

15   A.       I don't know.

16   Q.       Do you know which investors

17   provided the money for that?

18            MR. BERMAN: Objection.

19   BY MR. PROPER:

20   Q.       Do you know if it came from

21   Reticular Fund?

22   A.       I don't know.

23   Q.       Do you know whether the fund

24   that's used is common to fund all MCA

Joseph LaForte

Page 189

1    transactions?

2    A.        I have no idea.

3    Q.        Who at CBSG would know what the

4    source of funds are for a particular MCA

5    transaction?

6    A.        I don't know.

7    Q.        Would Mr. Cole know?

8    A.        I don't know.  I mean you guys

9    know these aren't syndicated transactions,

10   right.

11   Q.        You mean securitized?

12   A.        No.  Syndicated.

13   Q.        Syndicated in what respect?

14   A.        It's not a per transaction where

15   any company that would take one specific

16   transaction and try to get an investor to

17   invest in one transaction.

18   Q.        I understand that.

19   A.        You asked me that question.

20   Q.        Let me ask you this question, do

21   you know whether or not an investor that

22   invests in CBSG, let's say $250,000, where

23   that money will be earmarked for a specific

24   set of transactions?

Joseph LaForte

Page 190

1   A.         No, wouldn't be earmarked for any

2   specific transaction.  I would imagine.

3   Q.         Do you know that specifically?

4   A.         No, but I would imagine that to

5   be an absurd assumption.

6   Q.         So you don't know if there's a

7   note between CBSG and an investor which

8   says, I'm going to provide you with a

9   certain rate of return over a period of

10  time, and then within that agreement

11  there's specific agreements that are

12  referenced?

13          MR. BERMAN:  Objection.

14          THE WITNESS:  I don't know.

15  BY MR. PROPER:

16  Q.         Here's P-7.  Do you know what

17  this document is, which titled Fleetwood

18  Services Funding Payment History?  Have you

19  seen this document before?

20  A.         No.

21  Q.         So on page two of this document

22  there's a reference, or two references to

23  finance fees.  What were those charges for,

24  exactly?

Joseph LaForte

Page 191

1    A.        Your client -- it looks like your

2    client kept our capital -- let's see, they

3    modified their payments, so we charge a

4    finance fee, a small fee if they modify

5    their payments.  In this case she lowered

6    her payment from $5,000 to $3,250, and we

7    charged $7,000 to cover our cost to

8    capital.

9    Q.        Does that require a new agreement

10   when the daily payment is modified or

11   reduced?

12   A.        I don't know about the legal; I'm

13   not sure.

14   Q.        Okay.  You don't know whether

15   CBSG requires a borrower to execute a new

16   agreement when there's a reduction?

17   A.        I'm not sure, you have to ask

18   legal.

19   Q.        Who is the in-house counsel at

20   CBSG?

21   A.        I don't know.

22   Q.        Do you know who Mr. Hartley is?

23   A.        Yes.

24   Q.        Is he presently in-house counsel

Joseph LaForte

Page 192

1    for CBSG?

2    A.        I don't think so.

3    Q.        Has he ever been in-house

4    counsel?

5    A.        I don't know.  I'm he's a lawyer.

6    Q.        Okay.  When you say there's a

7    small fee charged if an agreement is

8    modified, was that CBSG's practice whenever

9    there was a workout?

10   A.        Yeah, if a client is going to

11   keep the capital longer, they should pay a

12   fee.

13   Q.        Got it.

14   A.        And sometimes it's appropriate

15   for us to charge a fee, the clients agree,

16   which they usually do sign a new agreement.

17   Like I said if you're keeping the capital

18   longer, they should charge a fee.

19   Q.        Is there anything in the

20   agreement, exhibit P-2, which permits CBSG

21   to charge a finance fee if --

22   A.        I didn't read that.  I don't

23   know.

24   Q.        Do you recall have you ever read

Joseph LaForte

Page 193

1    the agreement between my client and

2    Fleetwood?

3    A.       Did I read that agreement?

4    Q.       Yeah.

5    A.       No.

6    Q.       When's the last time that you've

7    referred to CBSG's standard contract with

8    its borrowers for any purpose?

9            MR. BERMAN: Objection.

10   BY MR. PROPER:

11   Q.       You can answer.

12   A.       Can you ask me again?

13            - - -

14            (Whereupon the court reporter

15   read back the requested portion of

16   testimony.)

17            - - -

18            THE WITNESS:  I don't know.

19   BY MR. PROPER:

20   Q.       Is there ever a purpose that you

21   would look at CBSG's contract?

22   A.       No.

23   Q.       Okay.  I saw an article written

24   about one of the individuals that were

Joseph LaForte

Page 194

1   involved in that securities fine thing by

2   the name of Dean Vagnose.  Do you have any

3   interaction with him?

4   A.        Not really.

5   Q.        Are there any occasions that y0ou

6   would interact with Mr. Vagnose?

7   A.        No.

8   Q.        This is more for my own personal

9   knowledge, but I saw in some reference that

10  you may have called for the Mariners?

11  A.        I did.

12  Q.        What years were you involved?

13  A.        1992.

14  Q.        Were you involved with their

15  minor league organization too?

16  A.        Yes.

17  Q.        Where are they based out of?

18  A.        Fiora, Arizona.  I played

19  baseball at Rollins College before that.

20  Q.        That's what I was going to ask.

21  A.        And then just a little too small.

22  Q.        Mr. LaForte, in the transactions

23  between CBSG and the customers you deal

24  with, do the customers typically have

Joseph LaForte

Page 195

1    attorneys involved?

2    A.        No.

3    Q.        Can you recall any instance, say

4    in the last year, when the customer was

5    represented by counsel?

6    A.        In the initial portion of the

7    transaction?

8    Q.        Yeah.

9    A.        No.  What I'll do is, I'll speak

10   to the CFO's of the company to make sure

11   they understand the documents.

12   Q.        Okay.  Is there negotiation back

13   and forth about the terms of the agreement,

14   or to do the customers just sign them?

15   A.        No, there's a lot of negotiation.

16   I think it's important to put a good deal

17   together for the client.  Sometimes they

18   have their own opinion about a file.  We

19   can structure it differently for everybody

20   so it depends.

21   Q.        When is the last time you recall

22   that the remedies or default provision in

23   CBSG's contract was negotiated or changed

24   in any way?

Joseph LaForte

Page 196

1             MR. BERMAN:  Objection.

2             THE WITNESS: I don't know.

3    BY MR. PROPER:

4    Q.        Do you know if that's ever

5    happened?

6    A.        I'm not in legal.  I don't know.

7    Q.        I'm just asking, in your

8    experience, do you recall any instance

9    where one of the form provisions in CBSG's

10   contract was negotiated and changed for a

11   particular business?

12   A.        No, I don't know.

13   Q.        Okay.  Are you the one that is

14   interacting with the customer and ensuring

15   that the customer signs all the documents

16   that  are required or does someone else do

17   that?

18   A.        No, CBSG does that.

19   Q.        Is there a closer at CBSG?

20   A.        A closer?

21   Q.        Yeah, or a processor or someone

22   that handles the paperwork with the

23   customer?

24   A.        No, Full Spectrum handles the

Joseph LaForte

Page 197

1   paperwork, but CBSG ultimately gets the end

2   docs.

3   Q.        But CBSG did that process itself

4   before Full Spectrum got involved, right?

5   A.        I don't know what you mean?

6   When?  You said before, it's vague.

7   Q.        Well, I thought before Full

8   Specturm, CBSG did their own underwriting.

9   Did they do their own processing as well?

10  A.        Well, they'd have to, right?

11  Q.        That's why I was asking. I was

12  wondering if you knew who at CBSG was

13  fulfilling that function?

14  A.        I don't know.

15  Q.        Okay.  Do you know how many

16  iterations or versions of the MCA agreement

17  were used for Texas customers since January

18  2015?

19  A.        What's an iteration?

20  Q.        Versions.

21  A.        No.

22  Q.        Do you know if there was more

23  than one version that's been used for Texas

24  business since January of 2015?

Joseph LaForte

Page 198

1   A.          No.

2   Q.          Do you know if there's any

3   material differences in the MCA agreements

4   between different Texas businesses and

5   CBSG?

6   A.          No.

7   Q.          You may have touched on this, but

8   just to elaborate, do you know what the

9   formula that was used for determining the

10  fair market value of the receivables for my

11  client?

12  A.          Yeah, it's right here, P-4.

13  Q.          So the formula is what?

14  A.          You don't want to be over 30

15  percent in debt to income ratios.

16  Q.          Is that a standard for all

17  transactions with businesses with CBSG,

18  whether it's a Texas business or otherwise?

19  A.          No, no standard formula with

20  anything.  You have to work with the

21  customers, specifically your client if you

22  want to talk about this client.  The tricky

23  part of it was, she couldn't afford all the

24  dailies.  She only did five deposits a

Joseph LaForte

Page 199

1    month coming into December.  The client

2    started to struggle.  The bigger issue is,

3    they needed $100,000, and their cash flow

4    was getting eaten up.  So I provided the

5    $100,000 in financing to them and lowered

6    their payment.

7    Q.        Is the manner in which CBSG

8    marketed itself to my client the same for

9    everyone in terms of --

10   A.        We didn't market your client, we

11   came from an ISO.

12   Q.        That's what I mean.  One of the

13   ways that CBSG relies upon new business is

14   its ISO's, right?

15   A.        Yes.

16   Q.        Do you know what percentage of

17   CBSG's business comes from ISO's?

18   A.        No.

19   Q.        Do you know if the manner in

20   which ISOs solicit businesses in Texas is

21   standard for how my client was solicited?

22   A.        I don't know.  I can't annswer

23   how an ISO would solicit this particular

24   customer in 2017.

Joseph LaForte

Page 200

1    Q.       Okay.

2             - - -

3             (Whereupon a short recess was

4    taken.)

5             - - -

6             MR. PROPER:  So, I want to thank

7    Mr. LaForte for his time.  I have no

8    further questions of him.  In light of his

9    testimony that he's really not involved

10   with investors, I did not want to bother

11   Judge Sanchez with the issue of whether

12   we're entitled to discovery regarding CBSG

13   investors.  We will make a motion to compel

14   and the Court can deal with that so we have

15   appropriate guidance in future depositions

16   with appropriate witnesses.

17            MR. BERMAN: And just for clarity,

18   we're not keeping Mr. LaForte's deposition

19   open, it's closed.  If they want an

20   opportunity to ask him any of those

21   questions, they have the opportunity, per

22   the Court's direction, from his clerk to

23   call now.

24            MR. PROPER:  That's true.  Just

Joseph LaForte

Page 201

1   based upon Mr. LaForte's testimony, he does

2   not appear to be the right witness.

3           MR. HESKIN: Assuming we can take

4   his testimony on --

5           MR. BERMAN: We don't agree or

6   disagree.  For this purpose, we'll just

7   fight about that another day.

8           MR. HESKIN:  Sure.  He said he

9   doesn't know anything about it.

10           So there's no reason to call the

11  Judge.

12           MR. BERMAN: Okay.  Got it.

13           - -

14           (Whereupon the witness was

15  excused and the deposition ended at 3:46.)

16

17

18

19

20

21

22

23

24

Joseph LaForte

Page 202

1                   C E R T I F I C A T I O N

2

3

4

5           I hereby certify that the

6    proceedings and evidence noted are

7    contained fully and accurately in the

8    stenographic notes taken by me upon the

9    foregoing matter on December 5, 2019, and

10   that this is a correct transcript of the

11   same.

12

13

14

15           Kathleen Jastrzembski
             Court Reporter and
16           Notary Public

17

18

19           (The foregoing certification of

20   this transcript does not apply to any

21   reproduction of the same by any means,

22   unless under the direct control and/or

23   supervision of the certifying reporter.)

24

Joseph LaForte

Page 203

```
1              INSTRUCTIONS TO WITNESSES

2          Read your deposition over carefully.

3   It is your right to read your deposition

4   and make changes in form or substance.  You

5   should assign a reason in the appropriate

6   column on the errata sheet for any change

7   made.  After making any change in form or

8   substance which has been noted on the

9   following errata sheet along with the

10  reason for any change, sign your name on

11  the errata sheet and date it.  Then sign

12  your deposition at the end of your

13  testimony in the space provided.  You are

14  signing it subject to the changes you have

15  made in the errata sheet, which will be

16  attached to the deposition before filing.

17  You must sign it in front of a witness.

18  Have the witness sign in the space

19  provided.  The witness need not be a notary

20  public.  Any competent adult may witness

21  your signature. Return the original errata

22  sheet & transcript to deposing attorney,

23  (attorney asking questions) promptly!

24              Court rules require filing within
```

Joseph LaForte

Page 204

1   30 days after you receive the deposition.

2   Thank you.

3           I have read the foregoing

4   deposition and the answers given by me are

5   true and correct, to the best of my

6   knowledge and belief.

7

8

9

10          _____

11                  JOSEPH LaFORTE

12

13  _____

    WITNESS TO SIGNATURE

14  _____

15  ADDRESS

16

17

18                  My Commission Expires

19                  .....................

20

21

22

23

24

Joseph LaForte

Page 205

1                         ERRATA SHEET

2      PAGE LINE #    CHANGE       REASON THEREFORE

3      _____

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

**A**

**a.m** 1:19
**ability** 35:9
  89:12
**able** 8:5 35:14
  54:20 76:20
  85:23 86:5
  138:21
**absolutely** 76:9
  124:20 126:6
  142:9,13
  155:23
**absurd** 190:5
**accept** 90:18,19
**access** 54:17
  55:15 77:14
  123:22
**accomplish**
  131:13
**accountants**
  14:24 55:12,16
**accounting**
  14:21 44:23
  55:9 101:24
**accounts** 54:13
**accurately** 202:7
**accused** 17:1,18
  18:14 51:24
**ACH** 28:6
**action** 1:4 28:24
**activities** 47:16
  71:10 74:12
**actual** 26:3
  46:11 60:20
  165:21 179:2
  183:9
**add** 178:5
**addendum**
  108:21
**addendums**
  118:8
**adding** 178:7
**additional**
  143:24 163:2,5
  163:20
**address** 39:22

56:8,11 60:13
62:13 65:15
66:19 67:21
74:6 204:15
**adjudicate**
  111:4
**adjustment**
  111:6
**admit** 110:23
**adult** 203:20
**advance** 3:14
  22:1 24:14
  25:8 26:10
  27:4 53:8,10
  53:14,22 89:3
  96:8 103:24
  108:18 128:9
  151:20 153:6
  164:2 175:9,11
  183:24 184:2
  185:24 186:20
**advanced** 164:4
**advances** 23:15
  24:2 38:7
  48:23 97:6
  99:4,23 145:13
  161:18 162:8
  162:14,18
  165:4 166:11
  168:10 169:14
  170:11 174:20
  174:23 175:8
**advantage** 8:5
**advice** 11:3 12:9
**afford** 162:13
  168:15 198:23
**affordability**
  89:1
**AG** 101:23
**agency** 87:16
**agent** 32:1,2
**aggressive** 30:3
  90:22 97:4
  98:7 174:24
**ago** 34:4 39:11
  47:6 49:17

50:3,4 102:8
160:1 162:3
179:11
**agree** 30:21
  88:16 192:15
  201:5
**agreed** 5:7 108:5
  108:6 179:22
**agreement** 3:10
  17:10 20:12,16
  20:18,24 22:13
  24:15 25:12,16
  26:11,14 27:17
  27:21 36:16
  97:14,15,16,18
  102:18 105:2
  108:21 110:22
  115:14,23
  117:16,19
  137:19 140:14
  151:12,20
  157:3,9 159:8
  177:9,17
  187:12 190:10
  191:9,16 192:7
  192:16,20
  193:1,3 195:13
  197:16
**agreements**
  12:20,22 25:13
  27:7,22 28:1,5
  98:23 109:3,6
  109:11 113:4
  115:5 117:23
  120:1 148:11
  176:4 177:15
  177:21,24
  190:11 198:3
**ahead** 17:4
  88:19
**allow** 13:5
**allowed** 19:15
  112:13,16
**allows** 35:9
**aloof** 111:11
**alternative**

151:9,10
**Alvin** 101:15
**Amazon** 8:12
**America** 38:4
**amortization**
  151:22
**amortized**
  103:17 174:18
**amount** 102:19
  114:17 163:9
  179:19 181:7
  183:6,19
  184:14 185:12
**amounts** 176:9
**analysis** 92:24
  93:2 94:21
  173:10,15
**Analyzing** 96:21
**and/or** 202:22
**annual** 54:8
**ansnwer** 199:22
**answer** 4:2 7:9
  7:22 12:2,2
  14:8 15:11,20
  15:23 19:18
  21:8 23:12
  26:18 27:11
  29:2,9,10,11
  29:23 33:1
  34:24 35:22
  36:12 37:7,8
  37:10 38:10,17
  40:4,8 41:23
  42:12 44:15,18
  46:24 47:3
  48:20 51:21
  56:22 57:6
  59:4,11 66:1
  67:6,13 69:1
  69:12 71:2
  72:17 77:21
  78:6,22 83:12
  83:14 86:5,14
  88:4,8,21
  98:18 100:3
  109:17 112:23

113:17,24
114:22 118:2
119:19 124:7
124:14,21
125:6,23
126:14 127:14
127:22 128:12
130:11 132:16
134:5,10,12,13
134:15 159:21
160:6 166:19
177:19 178:11
186:5,12,13
193:11
**answered** 78:5
  131:22 134:6
  149:1,2
**answerr** 78:8
**answers** 13:13
  46:9 49:18
  66:6 123:6,7
  204:4
**anticipate** 13:8
**anxious** 131:10
**anybody** 40:5
  47:2 72:14
**apologize** 23:3
  38:8 39:12
  66:9
**appear** 201:2
**APPEARAN...**
  2:1
**applicable**
  107:11
**application** 80:4
  80:5,12,14,20
  81:1 121:15
  122:3 129:13
  129:14
**applications**
  122:5,9,20
**apply** 26:2
  202:20
**appreciate**
  13:19 20:7
  26:6 85:3

Joseph LaForte

**appropriate**
   16:15 36:17
   192:14 200:15
   200:16 203:5
**approved** 26:15
   80:13
**approves** 89:20
**approximately**
   167:18
**argue** 15:21
**Arizona** 194:18
**arm** 60:20 77:8
   77:15
**arrangement**
   21:12,16 24:19
   50:9 111:6
   139:24 142:20
   142:23 143:21
   144:24
**arrangements**
   175:24 176:2
**article** 3:9 110:2
   110:11 139:6,7
   158:18 193:23
**articles** 74:24
**artificially**
   152:17
**ascertain** 76:20
   85:23 121:6
   122:16 133:13
   146:11
**asked** 17:17
   66:10 80:7
   83:11 84:17,21
   95:12 120:21
   120:23 123:6
   134:9 145:24
   189:19
**asking** 23:8 57:2
   72:15,16 77:22
   80:9 81:9
   84:14 85:5
   103:13,20
   108:4 120:24
   122:14 166:17
   166:21 179:7

185:9 186:8,23
   196:7 197:11
   203:23
**asserted** 130:22
**asset** 116:21
**assign** 203:5
**assignment**
   111:1
**assistance** 39:8
**assisting** 43:16
**assume** 176:11
**Assuming** 201:3
**assumption**
   190:5
**attached** 203:16
**attempt** 112:8
**attempted**
   134:19
**attorney** 6:1
   20:8 98:16
   124:4,18
   203:22,23
**attorney/client**
   125:21 126:10
**attorneys**
   116:11 125:22
   195:1
**audit** 100:6
**auditing** 100:13
**auditors** 100:8
**audits** 99:20
**average** 103:23
   128:14,19,21
   178:24
**averaging** 180:1
**avoid** 187:15
**aware** 6:8 75:16
   95:16 104:24
   110:10,13,15
   115:12 150:24
   175:23

———————
        **B**
**B** 3:6 174:14
**back** 20:10 38:8
   38:20,23 39:9

43:16 51:23
   63:1 73:16
   75:11 77:2
   78:2 81:11
   83:24 84:1,2
   85:8 93:21
   94:4,15,15
   95:2 97:22
   102:17 104:12
   106:24 107:2,3
   107:5,8,11,13
   107:19 109:11
   111:15 112:9
   114:12,17,20
   114:24 115:1
   117:7 122:8
   123:9 126:20
   141:3,8,13
   145:16,16,23
   148:1,2,14
   150:17 161:22
   164:7,9 169:14
   174:24 175:10
   185:16 193:15
   195:12
**background**
   136:7 159:19
**backs** 107:16
**bad** 85:5 90:23
   106:16 139:10
   188:6,7
**balance** 182:20
   182:21 185:19
**balances** 180:3
   182:11,23
   184:13
**Ball** 61:13,14
**ballpark** 54:15
**bank** 30:6 93:3
   93:18 96:21
   168:11
**bankrupt** 111:4
   163:15
**bankruptcy**
   109:12,13,23
   111:17,22

112:3,14,15,21
   116:9 165:16
**base** 78:17
**baseball** 194:19
**based** 59:15,16
   59:19 138:1
   160:11 179:20
   194:17 201:1
**basis** 31:12
   59:12,14
   123:11 175:3
**bathroom**
   100:16
**battles** 160:23
**Bberman@fo...**
   2:10
**beard** 158:16
**began** 51:18
**beginning** 1:19
**behalf** 1:6 14:14
   32:8 40:5
   121:7 134:20
   135:7 136:9
   152:7
**behaved** 94:16
**belief** 204:6
**believe** 54:5
   67:3 82:16
   110:14 129:5
   130:3 143:10
   144:2
**believer** 93:10
**benefit** 93:7,8,11
   93:13 111:2
   162:22 188:10
**BERMAN** 2:8
   7:10 12:1
   13:11,17,21
   14:7 15:3,10
   15:24 16:19,22
   17:3,6,16,23
   18:10,18,21
   19:1,6,8,17,23
   20:4 21:7
   23:10 24:6
   25:14 26:17

27:10 28:17,23
   29:3,11,22
   34:23 35:21
   36:11 37:6
   38:10 40:10
   41:23 42:11
   46:23 48:19
   51:20 55:18
   56:21 59:3,10
   59:14,22 60:1
   65:8,12 67:5
   68:3,24 70:4,7
   71:1,16 76:23
   78:5,9,21
   83:10 84:10,20
   85:1 86:13
   88:2,7,12,16
   88:20 91:3
   98:17,24 100:2
   100:15 109:15
   109:17,20
   110:5 112:22
   113:16,23
   114:21 115:16
   118:1,23
   119:18 121:10
   124:6,10,20
   125:20 126:3
   126:12,17
   127:7,13,21
   130:10,17,20
   131:6,9,23
   132:16,24
   133:4 134:6,24
   144:15 149:17
   153:3 154:21
   155:1,6,11,17
   155:22 160:6
   160:17,20
   169:20,24
   172:15,22
   177:18 178:10
   181:14,23
   186:4 188:18
   190:13 193:9
   196:1 200:17

Joseph LaForte

201:5,12
**best** 64:24 90:4
204:5
**bet** 157:22
169:11
**better** 94:17
101:20 151:15
**bi-weekly** 37:24
58:10
**big** 30:5 43:5
147:4,6 188:1
**bigger** 199:2
**Bill** 64:8 72:12
**bit** 75:14 84:7
116:19 131:12
**Blake** 101:17
**Bloomberg**
139:6,7
**boil** 172:19
**borrower** 27:9
89:16 93:7,8
112:9,21
114:10 141:20
143:19,19
144:13,24
152:8,12,13
191:15
**borrowers** 9:4,6
28:5 121:24
127:2,6 142:18
152:7 153:6
154:1 193:8
**bother** 200:10
**bottom** 158:15
161:9
**box** 27:3 73:5,15
90:20,21
**Bradstreet** 95:4
**Brastreete** 95:12
**Brawn** 149:10
**break** 68:5
75:12,14
100:15 157:21
158:1
**breakdown**
187:24

**breaks** 8:21
**Brett** 2:8 13:19
16:11
**bridge** 31:7
**brilliant** 44:8,19
**bring** 10:20 11:7
11:18 24:12
25:3 53:18
58:1 69:21
70:3 79:19
96:24 147:21
154:18 157:6
159:18
**bringing** 83:24
84:2 141:1
**broad** 12:11
**Broadway** 53:13
**broker** 9:8,13
10:2 44:2,6
53:1,3 80:21
80:24 150:21
**brokers** 52:23
**Bromely's** 64:20
**Bromley** 64:8,10
64:12 72:12
102:12
**brother** 134:1,3
134:9,22
**brother's** 135:3
**brought** 11:21
36:5 141:19
156:17 159:15
169:4 173:6
181:15,23
**Bud** 164:16
**build** 36:21,22
**bunch** 101:7,12
101:13
**business** 1:9 6:5
6:6,22 7:2,6
9:15,15 10:17
10:18,20,23
11:7,18,23
21:5 34:16,18
36:5,5,8,9
37:12 38:4

40:16 41:2,6
42:15 43:22,22
44:10,20,21
46:4,6 47:20
56:3,8,11
60:21,24 64:6
64:21 67:22
71:10 74:12
75:2 76:10,16
76:22 77:4
78:4 79:2,3
80:15 85:13
89:5,7,8 94:16
95:8,10,19,24
96:4 97:9,13
97:23 103:24
104:4 105:1,5
107:22 113:15
114:16 115:6,7
115:22 116:8,8
118:22 119:9
119:17 121:7
121:19 122:5
122:18 123:10
123:21 134:14
135:3 137:13
138:8,14
139:20,22
140:24 142:11
145:8,9,14
147:5,24
149:15 150:1,7
150:12 151:8
154:16 161:10
162:11,12
163:3 165:24
170:19,23
173:18 174:6
175:7 187:5
196:11 197:24
198:18 199:13
199:17
**businesses** 8:4
12:6 26:20
40:15 50:22
51:18 53:20

55:10 76:13
94:9 103:4
113:21 120:17
120:19 138:2,5
139:15,18
151:23 179:23
180:8 198:4,17
199:20
**busy** 147:1,2
**buying** 168:4,6

---

## C

**C** 202:1,1
**calculate** 184:19
184:24 185:10
185:11,20,23
**calculator** 3:13
169:17 172:21
**call** 10:14 17:24
18:7,18,21,22
19:1,3,12,12
19:21 20:4
23:19 36:22
59:22 118:14
121:3 127:16
130:12,18,20
131:1,6 141:22
157:23 160:21
200:23 201:10
**called** 6:12
60:11 61:1
94:15 101:8
107:3 194:10
**calling** 18:23
75:7
**calls** 125:21
141:24
**capable** 150:10
**capacity** 34:15
38:1 50:16,20
52:24 60:17
63:17,19 149:5
150:2
**capital** 8:12 37:1
51:9 60:17
77:16 163:2,6

165:19 175:17
188:6 191:2,8
192:11,17
**car** 115:8,9
**card** 34:16
**cards** 34:18
**care** 87:3,4
**careful** 168:1
**carefully** 203:2
**case** 15:16 27:8
81:3 105:15
133:17 134:10
143:4 160:22
163:16 191:5
**cases** 94:24
**cash** 22:1 23:15
24:2,14 25:8
26:10 27:4
89:2 96:8 97:6
99:4 108:17
151:19 162:8
162:14,17
168:9 174:19
174:23 175:8,9
183:24 184:2
186:20 199:3
**catching** 136:15
**CBSG** 6:4,7
7:20 8:9 9:12
20:12 21:3,5
21:16,19,21
22:5,14,22
23:9 24:4,12
25:2,7 26:11
26:16 27:19
28:11 29:20
31:11,17 32:1
32:9,11 33:8
33:11,15,19
34:3,9,11,13
34:17,21 35:10
35:20 36:10,15
36:16,19 37:1
37:5,17 38:9
38:16,20 39:7
40:3,21 41:6

Joseph LaForte

41:20 42:19,22
43:1,3,5,9,12
43:17 47:23
48:1,2,3,5,5,11
48:13,21 49:15
49:22 50:11,15
50:17,18 51:4
51:19 52:5,7
52:12,15,18
53:19,22 54:2
54:7,10,14,18
55:2,4 56:1,12
56:13,14,18,23
57:10,14,18
58:1,6 59:8
60:16 61:18,21
62:4,8 63:19
64:3,10,13
65:1,6,14,19
66:2,5,10,11
66:19,21 67:4
67:20 68:1,7,9
68:11,13,16,19
68:21 69:2,5,8
69:11,17,21
70:3,24 72:4,6
72:8 75:17,20
76:8,17 77:3,6
77:13 78:3,20
79:3,3,7,10,19
79:22 80:4
81:3,4,7,15,18
81:24 82:8,11
82:14,24 83:2
83:4,7,12,24
85:10,24 86:7
86:11,23 87:4
89:20 90:1,24
91:22 92:1,23
93:16,21 94:20
95:1,20,23
97:13,13 98:22
99:4,16,24
100:7 101:1,2
101:13 102:4
104:16 105:1,4

105:21,23
107:21 109:3
110:19,23
111:14,17
112:4,7,12,19
113:3,14,21
114:7,9 115:13
115:14,22,23
116:6 117:18
118:19 119:5,5
119:12 120:11
121:7,22
122:10,17
127:1,1,5,6,11
127:19 128:1,8
128:10,18
129:3,7,9,12
129:16,19
130:9,16 134:2
134:17,20
135:14 136:9
137:5,15,16,19
140:3,10,21
141:13,19
142:23 144:6
144:10,12
145:3,6,10,13
145:16,22
146:6,18,19
147:11 148:6
150:7 152:6,11
152:16 153:5
153:13 154:1
159:8 160:4
164:2,4 165:1
166:3,9,18,23
167:3,13 170:2
171:1 172:3
173:13 186:2
189:3,22 190:7
191:15,20
192:1,20
194:23 196:18
196:19 197:1,3
197:8,12 198:5
198:17 199:7

199:13 200:12
**CBSG's** 32:19
54:8,21 55:16
63:9,15 90:3,5
90:11 92:14
96:18 106:2,5
107:17 109:6
109:11,24
110:3 115:5
117:5 128:14
128:21,24
129:23 192:8
193:7,21
195:23 196:9
199:17
**cert** 29:5
**certain** 91:15
93:17 186:3
190:9
**certification** 5:9
15:4,11 28:24
130:24 202:19
**certifications**
15:15
**certify** 202:5
**certifying**
202:23
**CFO** 63:15,18
63:24
**CFO's** 195:10
**challenging** 94:9
**change** 85:13
91:9 203:6,7
203:10 205:2
**changed** 75:9
98:2 99:15
160:18 195:23
196:10
**changes** 85:12
98:10 203:4,14
**charge** 128:10
128:15 142:23
191:3 192:15
192:18,21
**charged** 143:9
143:12 184:20

187:5 191:7
192:7
**charges** 144:10
190:23
**charging** 165:20
169:5
**choices** 168:21
**choose** 120:7
**Christmas**
171:21,23
**circle** 123:9
**Circuit** 124:24
**circumstance**
145:21
**circumstances**
21:20 58:16
**city** 56:7 147:4
**CIVIL** 1:4
**claim** 16:18
19:16
**claimants** 15:18
**claims** 17:8,12
112:19 180:15
**clarify** 18:3 26:5
46:8 69:13
117:10 122:21
**clarity** 16:1
28:18 44:12
181:16 200:17
**class** 15:4,10,15
28:24 29:5
59:15 130:24
**class-wide** 16:4
**classify** 73:11
**claw** 107:3,11,13
107:16 141:8
**clean** 13:8 72:24
**cleaning** 73:6
**clear** 13:2 29:4
64:23 89:24
140:15 175:2
**clerk** 200:22
**client** 9:1 15:20
26:23 27:15
29:8 30:7,10
31:8 34:7

37:20 53:3
76:3 79:15
80:20,24 81:10
86:4 102:23
103:16 104:6,9
105:15,20
106:20 107:1
110:18,22
118:17 125:1,6
140:1 141:9
143:2 144:19
159:20 161:21
162:7,9,19
163:5,14
165:22 166:10
168:18 169:3,3
170:3,3,12,13
170:18,19,22
170:24 171:5,8
171:13,19,22
172:1,3,4,10
172:12 173:11
173:17 174:1,3
174:5,8,12,20
175:6,12,23
176:3 177:8,11
178:1,7,15,22
179:9 180:1,11
180:16,22
181:2,11,17,22
182:3,10,15
184:11,20
186:7,9 188:13
191:1,2 192:10
193:1 195:17
198:11,21,22
199:1,8,10,21
**client's** 76:7
108:21 143:4
144:12 170:18
**clients** 8:21
10:15 12:15
25:17 26:14
30:1,4,16,17
30:18 31:12
35:4 49:10

76:16 82:6
89:1 94:2
95:13 102:24
103:2,3 104:5
105:11 110:10
111:21,24
112:2 113:12
120:6 136:12
136:13,20
138:17,20
139:12,16,17
140:4 145:20
147:21 151:23
169:8 175:1,4
175:17 177:5
179:21 185:8
187:21 188:3
192:15
**close** 39:18 62:2
65:7,11 130:19
**closed** 50:13
200:19
**closer** 196:19,20
**closurey** 26:4
**co-call** 10:15
**coffee** 62:24,24
102:11
**cognizant** 13:16
**COJ's** 98:4,8,9
98:11
**Cole** 63:22,24
64:3 72:10
102:7 189:7
**collateral**
114:11 116:14
116:15,16,23
117:1,3,4,7,11
117:14,15,21
**collateralized**
113:10
**collect** 112:13
134:19
**collectability**
119:6
**collection** 108:3
141:5

**collections** 105:6
105:9,13,16
112:8,11
140:18,20
141:1,2
**College** 194:19
**column** 203:6
**come** 17:10
51:17 52:18
63:1 94:8
106:18 139:23
142:19,22
151:3 168:17
169:1 183:18
**comes** 52:7
199:17
**comfort** 35:5
**comfortable**
163:17,17
**coming** 30:5,11
174:9 184:7
199:1
**commenced** 6:4
116:7
**commercial**
116:21
**commission**
22:3,5 101:1
107:8 141:7
204:17
**commissions**
22:20 106:24
107:1,5,18
**common** 86:10
86:15,17,22
92:22 95:23
96:17 97:12
103:5 109:2
112:20 113:15
142:17 164:24
188:24
**communicated**
90:15
**communicatio...**
127:15 130:4,7
130:23

**companies** 6:17
8:13 20:24
52:10 53:17
68:22 89:3
91:19 95:6,11
98:6 99:15
107:15 144:3
148:22 149:4
150:17,19
175:9 176:8
177:4 179:14
179:14 182:12
182:18 183:24
184:3,3 185:1
188:7
**company** 6:11
6:22 7:2,16 8:7
9:18 12:21
13:1 14:6
20:11 21:24
31:19,20 32:6
34:14,22 39:2
39:5 40:13
41:16 42:2,10
44:6 46:9,11
46:15,22 47:4
47:5,10,13
48:17,23 53:7
60:9,16 61:7
64:15 79:23
81:8 87:2,3
91:13 96:9
101:20 104:2
108:18 114:24
118:4 132:14
134:23 135:22
149:16 150:5
151:8 165:16
168:20 169:13
176:16 185:13
187:14,14
188:8 189:15
195:10
**company's**
148:10
**compel** 200:13

**compensated**
137:22
**compensation**
21:3 101:13
**competent**
203:20
**complain** 138:9
**complained**
138:15
**complete** 1:9 6:5
6:22 7:6
169:16,18
**completely**
141:11 174:4
**compliance**
99:22
**composition**
111:6
**compound**
36:12 68:3
78:22
**computer** 78:15
**concept** 106:10
146:17 151:1
170:2
**concern** 162:21
**conditions** 20:23
99:13
**conduct** 17:7
**conducted** 16:5
16:7
**conference** 16:6
**confuse** 65:16
**confused** 40:23
65:15 128:3
**confusing** 141:3
**conservative**
168:6
**consider** 24:20
**consist** 24:23
**consisted** 162:17
**consolidated**
169:7 171:1
**consolidation**
3:13 23:17
37:22 161:14

169:17 172:20
175:10 176:1
**constantly** 99:19
99:20
**constitute** 108:9
108:16,18
**constitutes**
115:11
**consult** 14:3
**consultant** 15:9
32:3 38:1
**consulting** 6:11
6:17 7:5,15 8:3
10:7 11:4,16
12:7,9 13:24
23:1 34:15
39:8 50:9,20
64:13 135:13
**contact** 105:18
105:19,19
112:16 119:20
120:4 136:20
137:9,14,14,16
142:18
**contacted** 39:8
120:7 136:16
138:14
**contacting**
139:22
**contained** 202:7
**continue** 41:8
**contract** 99:7,9
99:12 108:7
110:6,8,11,18
111:14 120:16
148:2,4,10
178:17,21
179:3,8 180:13
180:20,24
181:9,11 185:6
193:7,21
195:23 196:10
**contracts** 54:2
80:7,11 99:15
99:21 104:15
109:24 110:3

Joseph LaForte

118:5,7,10
179:13,19,20
180:11 181:7
181:13 183:9
184:16 185:6
**control** 202:22
**controllers**
55:13
**contrude** 7:20
**conversation**
36:7 92:10
124:17 125:1,7
125:10
**conversations**
92:12
**convicted**
131:17 132:4,8
132:15,19
133:2,6,14,16
150:3
**conviction**
132:10
**copies** 122:4
177:9
**core** 91:2
**corporate** 84:14
123:21
**corporation**
46:7
**corporations**
84:13
**correct** 10:22
14:3 18:20
27:20 41:7
50:7 68:2 77:9
79:11 82:9,10
98:22 140:12
142:1 146:9
155:16 170:7
173:7 175:21
177:2 178:3,4
202:10 204:5
**correctly** 26:9
39:17 48:15
169:16
**cost** 191:7

**coulda** 77:18
**counsel** 5:4,7
15:19 125:5
153:1 191:19
191:24 192:4
195:5
**counsel's** 146:3
**country** 10:10
**couple** 102:8
160:1 174:21
**course** 28:3 61:5
124:22 126:21
128:16 138:12
145:2 162:10
162:11 168:20
170:15 171:15
174:9 176:6
**court** 1:1,20 5:2
13:6 16:3,8,11
17:1,6,9,19
18:15,15 19:10
37:15 40:17
59:18,23 88:17
127:16 130:13
130:18 131:1,7
157:24 158:6
159:2 161:3
172:24 182:6
193:14 200:14
202:16 203:24
**Court's** 19:20
200:22
**cover** 191:7
**CPA's** 55:13
**create** 18:13
**creative** 169:1
**credit** 12:10
23:1,17,19,20
24:3 86:19
87:13,15,18,23
87:24 88:23
91:20 92:20
96:19 119:15
121:15 153:7
153:14
**creditor** 120:4

**creditors** 111:2
**credits** 87:7
**cried** 171:22
**crime** 131:17
132:4,8,19,22
133:9
**criteria** 32:6
**cubical** 63:12
**cumbersome**
120:2 188:2
**current** 39:22
63:24 106:3
142:12
**currently** 6:2,10
33:23 42:21
54:14 66:22
74:1 109:7
129:3
**customer** 32:7
80:13 93:12,14
162:23,23,24
165:11,12,23
171:19 195:4
196:14,15,23
199:24
**customers** 137:5
138:9 146:7
161:13 168:16
188:11 194:23
194:24 195:14
197:17 198:21
**customize** 35:9
**cutting** 13:12

---

### D

**D** 3:1 100:23
**d/b/a** 1:10 48:6
48:11
**dailies** 198:24
**daily** 27:23 28:6
28:11 29:21
30:1,2,4,21
71:9 97:3
102:19 123:11
143:6 162:20
163:1,11,21

165:13,20,21
167:14,16
171:14 172:14
182:11 183:17
185:18 191:10
**Dallas** 147:4,5
**dare** 19:2
**data** 28:8,13
77:15 78:17
**date** 81:16,21
203:11
**day** 15:13 75:7
114:18 121:3
123:14 162:8
165:13,22
167:21 168:19
168:24 169:4,5
184:8 186:14
201:7
**day-to-day**
47:16
**days** 104:4,8
121:2 160:1
162:3 164:20
165:14 167:22
204:1
**deal** 8:24 9:2
22:6 27:6
31:13,15,16,21
32:6,7 35:11
53:24 60:19
77:12,16 79:10
79:18,21 80:13
81:7 82:6 93:3
93:15 95:13
101:14 102:22
103:1 104:10
114:11 116:14
116:18,22
117:15 121:5
140:10 143:13
147:9,20
148:21 150:7
163:18 168:8
171:24 186:7
186:16 194:23

195:16 200:14
**dealing** 42:9
119:4
**dealings** 134:2
**deals** 8:17 10:9
10:11,12,13,14
24:12,17 25:2
25:7,11 27:19
28:10,19 29:1
29:20 30:14,15
30:19 31:10,17
31:20 32:5
49:9 52:4,6,11
52:18 53:18
69:17,20,23
70:2,3,24
75:20 76:21,21
77:3 78:3,15
78:19 81:15,18
82:23 85:10,14
87:10 89:20
94:3 95:20
97:12 98:13,14
103:8 104:5
107:7 117:18
119:13 120:16
122:17 140:3
140:21 141:13
141:14,18
142:17 146:21
151:21 163:12
166:9
**dealt** 51:19
120:20
**Dean** 194:2
**debate** 188:1
**debt** 88:24 89:4
89:15 90:9
153:8 161:10
161:15,18,19
168:11 169:8
169:10,12,15
169:19 170:4,7
170:9,10,13,18
175:2 198:15
**debtor** 119:16

**debtors** 119:21
**debts** 110:24
  111:7
**December** 1:18
  174:2,11 199:1
**decent** 163:9
**decide** 149:14
**decided** 151:7
  174:17
**decision** 91:20
  94:19
**decisions** 119:11
**Deck** 8:12 51:5
  77:16
**declaring**
  109:13
**declined** 69:12
**deem** 90:2
  107:21
**default** 96:7
  98:15 104:16
  104:20,23
  105:2,5,24
  106:3,5,14,18
  107:21,24
  108:1,9,17,19
  108:22 109:4,8
  109:14,24
  110:22 111:18
  114:20 115:2,4
  115:11,15,24
  136:15,18,19
  139:14,23
  141:19 142:19
  143:20 144:7
  144:13 145:1
  152:1,2,8,9,13
  152:14,17,21
  195:22
**defaulted** 89:9
  106:20 107:1
**Defaults** 110:4
  110:12
**Defendant** 1:12
  2:6,11
**definitely** 97:2

**delete** 73:8,17
  73:18,20 74:4
  122:24 123:17
**deleted** 123:10
  126:16,19
**deletes** 73:10,12
**deleting** 72:22
  123:3,14
  124:19
**department**
  32:12,15,19
  82:3 105:7,9
**depending**
  96:23 120:12
  120:13
**depends** 31:1,2
  79:14,15,16
  93:23 104:2,3
  104:3 117:9
  140:8 143:1
  144:16,18
  195:20
**depicted** 158:15
**depose** 44:16
**deposed** 18:6
  19:24
**deposing** 15:13
  203:22
**deposition** 1:14
  110:18 125:3
  131:2 146:11
  160:13 200:18
  201:15 203:2,3
  203:12,16
  204:1,4
**depositions**
  200:15
**deposits** 31:2
  96:23 97:2
  171:20,21
  173:16,21,24
  174:2 198:24
**derive** 140:22
**DESCRIPTI...**
  3:8
**designed** 30:23

**detail** 8:1
**determine** 77:3
  105:1 106:17
  122:10 133:3,7
  183:22 187:8
**determines**
  105:4
**determining**
  167:13 198:9
**developed** 37:16
  37:18,21,23
**differ** 103:19
  118:5,7
**difference**
  116:13
**differences**
  198:3
**different** 8:3,11
  9:13,24 10:3,9
  10:16 11:24
  22:14,19,20,21
  23:15,16 24:2
  24:3,9 26:20
  26:21 27:3,13
  27:13,14,15
  40:14 48:24
  50:24 54:3
  57:20 58:6,8
  58:10,11,12
  77:22 81:9,13
  83:3 84:4 86:7
  91:9,18 95:6,6
  95:11 99:16
  101:8,12,14
  102:24 103:1,2
  103:3,16
  107:15,16
  113:9,11
  117:22 118:5,6
  118:8,9 120:11
  120:12 122:19
  141:5 144:3
  146:21,22
  166:20 184:17
  198:4
**differently** 65:5

  140:16 144:4
  195:19
**differs** 83:22
**direct** 35:4
  181:24 202:22
**directed** 15:22
**directing** 15:19
  125:5
**direction** 4:2
  200:22
**directive** 19:20
**directly** 119:13
  138:15 140:10
  140:12 174:20
**director** 33:20
  34:3,8,10,12
  34:13,17,21
  35:19 36:10,15
  43:9 45:12,19
  68:1,9
**directors** 39:5
  47:10
**disagree** 201:6
**disagreeing**
  131:14
**disconnect** 26:7
  85:9
**discoverable**
  125:4
**discovery** 15:17
  16:4,7,16 17:8
  17:11,11,21
  19:11 28:24
  59:17,19
  200:12
**discrepency**
  55:21
**discussed**
  152:24 184:1
**dishonesty**
  132:5,22 133:9
**disingenuous**
  16:8 17:2
**dispute** 131:3
  137:10
**disputes** 136:11

**DISTRICT** 1:1
  1:2
**divide** 178:24
**division** 58:2
**docs** 197:2
**document** 92:11
  100:23 159:7
  159:11 177:16
  181:15,16,21
  182:2,2,16
  183:3 190:17
  190:19,21
**documents** 4:8
  27:5,14 54:18
  77:11 79:22
  80:6,7 86:2
  91:1 97:20,22
  110:16 126:9
  154:9 155:2,5
  155:16 156:9
  156:10,15,17
  156:23 157:1,6
  157:12 159:14
  159:17,23
  160:2,12,21,22
  173:6 195:11
  196:15
**doing** 6:6 29:4
  81:23 85:5
  94:3 145:8,9
  149:7 175:13
  184:21
**doors** 174:15
  186:15
**duly** 5:15
**Dunn** 95:4,12

**E**

**E** 3:1,6 202:1
**ear** 124:9,11
**earlier** 32:4
  120:22 122:22
  145:24 162:22
**earmarked**
  189:23 190:1
**easier** 75:5,5

EASTERN 1:2
eaten 199:4
educating 92:14
effect 94:8
effort 141:6
eight 37:12,14
   91:8 92:15
either 7:6
   119:12
elaborate 198:8
email 71:6,9,12
   72:7,10,12,13
   72:13 73:15,20
   74:6 123:22
   130:4,7 131:5
   154:23 155:12
emailed 71:24
   72:3 73:23
emails 70:22
   71:20 72:17,19
   72:22 73:1,9
   73:10,12,24
   123:1,1,3,10
   123:13,14
   124:19 125:13
   125:18 126:13
embarrass
   131:16
employed 6:10
   6:21 7:1 14:5
   34:22
employee 15:8
   42:22,24 68:11
employees 46:19
   56:1 61:10,18
   68:19 82:7
employment
   13:24
encourages 17:9
ended 201:15
enjoyed 138:20
   139:13
ensuring 196:14
entered 170:2
entire 70:9
   108:6

entitled 22:2
   133:5 155:20
   200:12
entity 60:14
   100:1
erase 124:1
errata 203:6,9
   203:11,15,21
   205:1
escalated 184:4
especially 38:3
   105:14 111:15
ESQUIRE 2:3,4
   2:8
essential 104:13
establish 66:4
   88:24 89:9
   93:13
established
   67:17
establishing
   87:5
estate 114:1,3,6
   132:11,13
estimated 15:2
event 58:15
   98:15 109:13
   109:23 110:21
   111:18
events 110:3,12
   160:4
everybody 86:16
   151:16 195:19
everyday 45:12
evidence 133:10
   133:12,13
   202:6
exact 37:19
   81:21 112:10
   112:11 137:2
   183:10,13
exactly 41:11
   133:14 169:9
   181:12 190:24
EXAMINATI...
   3:4 5:18

examined 5:15
example 86:18
   91:12
examples 58:21
Excellent 81:14
exchange 70:22
   101:1
exclusive 31:24
excused 201:15
execute 97:13
   191:15
executing 98:14
exhibit 192:20
exhibit-5 174:16
exhibits 177:11
existence 82:22
existing 118:20
   176:4
expect 40:5
expected 71:21
expects 145:4,7
   145:14
expensive
   187:23 188:2
Experian 87:17
   87:23
experience 28:9
   29:19 43:23
   89:18 90:1
   95:22 104:1
   107:6,20
   111:16 115:21
   119:4 148:18
   148:20 150:21
   166:3 196:8
Expires 204:17
explain 9:22
   10:3,4 58:12
   83:20
explained 47:5
   49:7
explore 170:1
exploring 133:2
exposed 149:22
expressly 138:16
extent 44:14

54:22 125:21

——————
F
——————

F 202:1
faceplate 181:8
   181:11
facilitate 27:6
   92:9
facility 55:14
   56:6 153:14
fact 15:14 40:19
   50:13 66:4
   87:5 121:14
   126:12 133:8
   138:20 139:1
   139:13 166:12
factor 104:6
   120:1,10
   128:19,22
   164:21,23,24
   165:2,3,4,5
   166:2,4,8,11
   166:20,22
   167:5 171:15
   171:16 172:11
   185:10,11,13
   185:17,20
factoring 3:10
   23:16 24:3,18
   157:3,9 159:7
   187:12
factors 76:1
   120:3
failing 89:3
failure 114:16
   114:19,23
fair 7:24 9:4
   22:16 144:6,22
   198:10
fairly 166:4
familiar 14:21
   53:7 54:7
   69:19,22
   112:18 128:24
familiarity
   90:18

far 79:4 90:19
   91:16,16,17
   95:2,9 99:16
   105:17
fast 3:14 53:8,10
   53:22 85:12
February 174:9
   174:10,12
fee 142:24 143:9
   143:12 144:10
   191:4,4 192:7
   192:12,15,18
   192:21
feel 30:24 94:17
fees 143:24
   190:23
fell 165:11
felon 150:3
fend 149:23
fifteen 84:20
fight 201:7
fights 160:23
figure 78:3
   168:7 185:2,7
   185:22 186:1
figured 92:7
file 14:22 55:22
   75:22 84:5,19
   85:15,16,23
   93:6 94:23
   113:13,14
   157:5 159:19
   160:16 162:9
   163:24 166:7
   166:16 168:2
   177:13 181:23
   183:9 185:15
   195:18
filed 42:5 95:9
   100:24 111:22
   112:2 116:9
files 60:15 69:3
   83:3,4 86:11
   86:24 87:1
   90:19 106:12
   112:19,21

Joseph LaForte

121:21 122:6
126:21 165:12
167:19 169:22
**filing** 5:9 101:2
109:12,23
111:17 203:16
203:24
**filings** 96:5
**filled** 182:3
184:11
**finance** 142:24
143:9,12
144:10 174:13
190:23 191:4
192:21
**finances** 21:24
**financial** 9:16
21:12,16 23:9
43:24 46:3,15
54:18 92:24
93:2 101:20
173:10,15
**financing** 25:18
153:8 163:23
199:5
**find** 11:19 133:2
175:1
**finding** 10:24
**fine** 55:7 88:6
140:17 154:6
155:19 194:1
**finger** 188:4
**finish** 13:6 57:7
**finished** 170:6
**fintech** 48:22
60:15
**Fiora** 194:18
**fired** 68:18
**firm** 6:1 93:9
**first** 5:15 23:4
40:20 55:20
128:2 136:3
150:24 156:6
161:9 175:5
**fit** 27:3
**fits** 32:6

**five** 138:24
162:17 179:14
179:22 180:8
182:12 198:24
**fixed** 103:9,11
103:14,18,21
104:11
**flee** 171:10
**Fleetwood** 1:4,5
1:5 3:12,15
37:20 84:22
85:6,19 142:1
142:4,8 159:8
160:5 161:17
164:3,4,6,8,14
167:14,18
184:2 190:17
193:2
**Fleetwood's**
19:16 154:16
167:16
**Fleetwoods**
16:17
**Floor** 2:9,9
**Floria** 62:8
**Florida** 56:13
60:9,13 62:11
62:13,15,19
63:3,8
**flow** 199:3
**focus** 12:17
**folder** 154:17
155:15 156:9
156:10,12
157:15 159:24
**following** 203:9
**follows** 5:16
**footnote** 16:10
16:14,20,21,22
16:24
**force** 48:14
**foregoing** 202:9
202:19 204:3
**Foreign** 3:9
**form** 5:11 11:22
21:24 23:22

25:12,16 26:10
26:13 27:17,21
27:22,22 49:22
68:15 88:5,14
98:22 99:3,6
99:11 100:23
102:17,18
106:21,23
109:11 114:5
117:19 120:16
130:1 148:1,7
196:9 203:4,7
**formal** 58:15
59:1
**format** 58:9
**formation** 41:20
42:1,19 47:4
50:11
**formatted** 8:22
45:16 46:10
47:6 84:13
150:1
**formed** 46:7
49:14,15,16
50:1,15,17
148:3
**forms** 24:2,9
98:14 114:3
120:11,13
**formula** 22:4
198:9,13,19
**formulate** 42:2
150:12
**formulated**
43:22
**forth** 42:10
89:11 195:13
**forward** 81:2
94:6,13
**Foundation** 88:3
**founded** 38:9
40:21 41:12
43:1
**founder** 36:19
36:22 40:18
**founders** 40:2

40:13
**four** 97:1 108:10
108:22 109:4,8
**FOX** 2:8
**frame** 120:24
**fraud** 132:8,12
181:18
**free** 161:10,15
161:18,19
163:23 169:10
169:13,15
171:5,6,7,11
171:13 175:1
**frequency** 31:3
96:23
**fresh** 165:19
172:11,12
**Fridays** 30:12
**front** 37:20
155:16 156:10
157:10 160:9
203:17
**fulfilling** 197:13
**full** 60:12,19
61:2,3,6,11
67:18,19 69:9
69:16,19 70:1
70:20,23 71:13
72:1 75:20
81:5,14,17,21
81:24 82:8,12
82:15,18,22
83:3,18 84:3
85:24 86:8,12
86:24 87:4
119:14 131:20
135:24 196:24
197:4,7
**fully** 202:7
**function** 197:13
**fund** 8:17 91:13
121:5 185:12
188:21,23,24
**funded** 22:7
25:11 26:15
28:10 53:24

54:11 77:4
78:3 81:7
97:12 122:17
175:6
**funder** 48:2
53:16
**funding** 1:11
3:14,15 6:6 7:3
7:7,21 8:13
10:18 11:8,19
11:22 12:4
20:13 21:23
23:1,14,22
24:14 25:6
26:3 35:11,12
36:17 41:4
48:4,5,6,12
49:11 53:19
54:8 60:8,22
61:22 76:8
96:12 122:10
129:6 140:21
165:15 166:1
188:8 190:18
**funds** 31:11
52:18 79:3
108:15 113:22
141:14 145:4,7
145:13 153:6
153:17 175:11
188:14 189:4
**further** 200:8
**future** 118:21,24
120:8 151:12
177:5 178:2,6
178:15 179:5,6
186:21 200:15

---
**G**
---

**general** 12:9
55:4,8 111:1
139:2 145:12
**generally** 20:22
28:21 37:18
110:6 120:23
144:21 147:3

Joseph LaForte

**generated** 68:16
79:22 173:12
**gentleman**
135:21 149:10
**Geo** 135:18
136:17 137:5,9
137:12 138:4
138:10,15
141:2
**getting** 89:4
98:6,11 138:2
139:19 174:1
199:4
**give** 48:23 58:21
97:3 107:18
170:19 175:3
183:10 186:15
**given** 59:1 204:4
**gives** 35:5
185:14
**giving** 25:2
175:16
**go** 17:4 35:14,15
62:18,24 63:2
63:9 70:8
73:15 76:4
77:2 78:2 85:2
85:8 88:19
90:19 93:21
94:15 104:4,7
122:8 123:3
136:11,13,17
136:20,24
140:12 157:4
168:9 184:20
**goes** 8:23,24
13:13 49:11
62:23 91:16
99:17 141:19
**going** 13:9 15:21
24:13 25:1
28:21 30:20
32:21,23 33:5
37:13 38:12
40:4 44:13
59:3,11 60:3

71:17 73:6
75:13 81:11
91:7,12 96:24
114:12 115:9
118:8,9 134:11
137:12 139:11
140:23 141:3
141:12 143:2
143:13 145:15
145:17 148:1
154:11,22
157:4 163:9
166:15 169:19
174:5 179:4
183:12 185:12
186:11 190:8
192:10 194:20
**golf** 162:10,11
168:20 173:17
173:19 174:9
**good** 5:21,23,24
30:18 35:6,7
35:16 38:3
41:14 44:22,22
44:23,24,24
45:1 49:6
75:15 78:14
84:24 85:16,18
89:4 90:22
94:3 98:2,5
119:11 133:22
145:11 147:1
152:5 159:21
168:10 173:18
173:20 186:7
186:16 195:16
**goods** 184:3
**governmental**
99:24
**graduate** 44:7
**graphic** 91:17
**great** 30:13 85:1
136:12,22
139:12 150:12
171:24,24
188:9

**gross** 173:16
**Group** 1:10 6:5
6:23 7:7
**grow** 151:23
175:7
**guarantee** 97:19
97:24 186:2
**guess** 36:20
38:12 74:2,5
108:3 112:12
116:12 145:12
151:14 183:10
**guessing** 22:18
**guidance** 20:7
200:15
**guideline** 90:10
**guidelines** 70:9
70:15,19 75:17
90:4,6,11,13
90:15 91:2,8
92:1,18 98:2
104:24 117:6
152:4
**guy** 73:4,7,8,9
73:12
**guys** 8:14 43:6
44:8,11 60:12
66:18 111:10
112:18 139:11
145:19 152:21
154:8 159:21
168:22 186:10
187:24 188:3
189:8

_____

**H**

**H** 3:6
**half** 137:3
**hall** 124:18
**handle** 34:12
116:11 140:5,7
144:3
**handles** 60:21
196:22,24
**Handwritten**
3:11

**happen** 179:5,6
**happened** 116:4
125:2 143:8
196:5
**happens** 96:12
145:15 156:6
**happy** 18:2 85:6
**harassing** 18:1
19:6
**hard** 44:18
146:2 165:11
**Hartley** 191:22
**hear** 57:6 99:18
117:13
**heard** 19:8
64:17 108:13
140:16
**held** 1:15
**help** 35:15 36:20
36:22 38:6
49:13 97:9,11
105:11,20,22
143:6 151:23
161:21 162:18
171:23
**helped** 150:11
163:7
**helpful** 35:3,3
37:23
**helping** 105:17
**Heskin** 2:4
16:12 29:2
44:14 59:12,20
59:24 60:7
73:23 126:15
131:8 134:4
152:23 157:23
201:3,8
**high** 146:18
**higher** 166:12
167:24
**hinder** 89:11
**hindsight** 139:9
**hired** 68:18
**historically**
162:12

**History** 3:15
190:18
**hold** 40:23 126:2
126:7
**holdback**
167:23 168:2
**holders** 38:22
**Holdings** 101:15
**home** 150:8
**hope** 95:21
**Hour** 84:20
**hours** 34:4 85:4
hundred 125:3
157:11,14
178:9
**hypothetical**
36:13

_____

**I**

**idea** 42:20 46:21
89:4 106:2
151:3 158:17
158:21 189:2
**identification**
158:7 159:3
161:4 173:2
182:7
**imagine** 89:7
108:5 122:1
190:2,4
**immediately**
17:21
**implicitly**
138:16
**important** 30:19
52:21 75:3,22
88:1,24 89:6,8
89:14,19 94:1
94:23 95:7
96:4,6,9,16,20
96:20,22 97:7
97:10 113:8
119:8 195:16
**importantly**
165:9
**imposed** 143:24

impound 115:9
in-house 23:19
   191:19,24
   192:3
inability 110:24
inappropriate
   35:2
incapable 44:9
inches 157:16
incident 132:11
including 92:22
income 88:24
   89:15 90:9
   167:17 168:9
   168:11,14
   170:21,22
   198:15
incorporated
   6:6 62:8 81:22
   101:18
incorrect 49:23
   181:19 184:9
incorrectly 47:3
   67:13 72:18
   184:11
increase 165:21
   171:14
independent
   9:14,20 10:17
   14:2 40:16,19
   41:9,15 49:1
   53:11,15 54:3
   79:16 100:7
   147:14
INDEX 4:1
indicates 158:19
individual 15:13
   17:8,12 78:19
   121:23 122:9
   158:15,16,23
Individually 1:6
individuals 25:3
   26:9 32:18
   38:15 61:17
   71:13 102:3
   122:11 193:24

industry 8:11,14
   40:21 41:3,17
   53:5 86:15
   87:7 90:4
   91:16 96:15
   107:3 146:20
   148:19 165:3
   168:17
information
   8:21 84:15
   125:22 159:20
   173:14 184:9
   184:21 185:4
   185:18,21
initial 148:7
   195:6
initiate 143:2
initiated 165:3
injected 163:2
inner 8:8,10
insinuate 44:8
insolvent 111:5
instance 54:11
   54:21 80:23
   112:1 115:12
   115:21 116:3
   119:4 143:5
   176:10 195:3
   196:8
instances 73:22
   112:6 138:14
instituted 111:3
instruct 59:4,11
instructed
   124:13 125:17
   126:8 127:14
   130:21 131:2
instructing
   134:4
instruction
   126:4
INSTRUCTI...
   203:1
insulting 150:11
intelligent 94:18
   149:24

intended 175:18
interact 194:6
interacting
   58:23 196:14
interaction
   194:3
interactions
   58:22
interchangable
   24:21
interchangably
   48:9
interchangeably
   24:13
interest 13:3
   33:7,11 82:15
   82:18 118:21
   127:12,20
   128:4,10,15
   187:4
intermediary
   49:1
internal 54:18
   84:15
internally 82:7
interrogatories
   59:16
invest 36:24
   189:17
invested 42:17
investment
   153:11,16
investments
   153:9
investor 33:18
   33:18 56:18,18
   59:8,8,19
   127:1,5,5,11
   127:11,14
   130:23 189:16
   189:21 190:7
investors 6:7
   57:15,18,20
   58:1 59:2
   102:4 130:5,9
   130:12,15,16

152:18 153:24
   186:3,5 188:16
   200:10,13
invests 189:22
involve 132:12
involved 25:7
   31:11 41:19
   42:8 43:19
   46:14 76:6,22
   101:4 102:2
   105:16 111:20
   122:17 137:9
   139:21 140:17
   141:14 142:18
   148:2,13 150:2
   150:6 180:5,7
   194:1,2,14
   195:1 197:4
   200:9
involvement
   41:22 47:20
   140:11,22
   149:3 150:16
   150:18
involves 31:17
   131:18 132:4,8
   132:21 133:9
involving 29:20
   120:16
Irrelevant 15:10
ISO 9:17,23
   10:1,3,4,6,19
   11:5,10 40:19
   141:6 147:13
   147:20 148:22
   199:11,23
ISO's 9:13 32:4
   53:18 147:8,11
   199:14,17
ISOs 11:12,14
   11:21 140:6,7
   140:9 199:20
issue 15:18
   109:21 199:2
   200:11
issued 129:16

issues 15:14
   96:14 125:14
iteration 197:19
iterations
   197:16

J

jail 149:22 151:5
James 134:1
   135:6,12
Jane 1:11 6:7
January 146:7
   174:11 197:17
   197:24
Jastrzembski
   1:20 202:15
Jo 63:22,24
   72:10
job 30:15 31:5,7
   32:5 48:24
   49:7 53:5 85:5
   87:9 90:13
   145:11 150:3
   162:18 174:10
   174:12 186:9
   188:9
Joe 44:14 74:8
   74:11,15 75:4
   154:23
Joe's 44:7
Joemac888@a...
   74:7
John 1:11 6:7
   149:10
Joseph 1:14 3:3
   5:14 158:20
   204:10
JS 1:7
judge 16:15
   17:24 18:3,7
   18:18,21,23
   19:1,3,12,13
   19:21 20:4
   44:13 130:21
   131:2 200:11
   201:11

Joseph LaForte

**judgment**
136:15 139:19
**Justin** 2:3 5:24

### K

**Kathleen** 1:19
202:15
**keep** 64:6 76:19
79:18 105:23
174:15 186:15
192:11
**keeping** 192:17
200:18
**kept** 191:2
**kind** 36:3 73:7
103:9 119:10
130:2 134:8
**kinds** 118:9
**King** 101:21
**knew** 149:19
176:3 197:12
**know** 7:8 8:14
14:16,17,20
15:1 16:19
20:20,21 22:18
24:11 28:10
29:18 30:20
33:4,16 35:4
35:23 36:16
37:11 38:11,17
38:19,22 39:1
39:4,14 40:7,9
40:10,11 41:11
41:13,19 42:6
42:7,7,13,14
42:17 43:4,8
43:10,13,15,20
44:5 45:13,22
46:6,9,10 47:7
47:11 54:10,13
54:24 55:4,7
55:11,17,18,19
55:20 57:13
58:19 61:12,21
62:7,9,21
63:19,22 64:1

64:4,8,14,15
64:20 65:20,24
66:6,11,24
67:7,11,12,20
67:23 70:7,16
71:6,19,22
72:5,9 73:2,11
73:13 75:19,21
76:15,18 77:20
78:1,9,10,12
78:16 80:19,22
82:5,11,17,19
82:21 83:1,5
84:1,2,9,12,14
84:15 85:9
86:3,9 87:21
90:10,12,17
92:3 93:19,20
98:13,16,18,19
99:5,23 100:6
100:9,10 101:9
102:14 104:5
104:20,21
105:4,7 106:1
106:4,5,11
107:4 108:11
108:12,20,23
109:2,5,6,9,10
109:16,18,19
110:1,15,21
111:8,10,15,19
112:10,19,24
113:1,3,18
116:2,6,10
119:9 120:4,14
120:15,22
121:1,4,22
123:12,20
124:5,14 127:8
128:4,20,21
129:6,8,9,12
129:15,19,22
131:7 132:20
132:21 133:4
133:10,11,11
133:12 134:21

135:2,9,10,11
135:12,16,17
135:18 136:1,2
136:6 137:4,18
137:21,24
138:4,23 139:2
139:10 140:20
143:1 146:1,6
146:14,16,19
147:17 148:6,9
149:12 150:9
150:23 151:7
151:11 152:6
152:11,16,20
152:21 153:5
153:13,15,16
153:22 154:3
154:13 156:13
156:21 158:11
158:18 162:2
164:22 167:3,6
167:13 177:3
178:8 179:2,4
179:5,18
180:10 183:4
186:7,18,24
187:3 188:15
188:16,20,22
188:23 189:3,6
189:7,8,9,21
190:3,6,14,16
191:12,14,21
191:22 192:5
192:23 193:18
196:2,4,6,12
197:5,14,15,22
198:2,8 199:16
199:19,22
201:9
**knowing** 185:1
**knowledge**
20:19 47:15
57:9 64:24
66:21 68:23
194:9 204:6

### L

**L** 1:4
**lack** 181:15
**LaForet** 74:23
**LaFORTE** 1:15
3:3 5:14,21
135:6,13
158:20 160:16
161:8 172:2
194:22 200:7
204:10
**LaForte's**
200:18 201:1
**landscaping**
91:13
**lapse** 83:23
**laundering**
133:17
**Law** 6:1
**laws** 186:24
187:8,15
**lawsuit** 6:4,8
15:19 20:19
116:7 125:15
125:19 156:17
**lawyer** 18:7
88:21 111:8,12
148:5 164:11
192:5
**lawyers** 42:6,9
**lay** 91:11,24
**lays** 91:1
**lead** 35:15
**leading** 123:4,5
**league** 194:15
**learned** 38:2
**lectured** 18:5
**ledger** 55:5,8
**legal** 27:15
44:22 101:3
116:10 145:17
155:24 187:4
191:12,18
196:6
**legally** 75:8
**lender** 8:23,24

21:24 31:8
53:1 59:9
60:16 69:22
105:21 118:6
151:9,10
**lenders** 8:11,16
9:8 12:14,23
31:20,21 49:12
50:14 51:1,3
52:12 80:11
89:8 90:12,21
92:22 146:22
171:1 172:5
175:13,19,24
176:4
**lending** 23:23
119:11 144:3
153:14
**lends** 60:17
**length** 103:23
**lengthening**
165:17,18
**lesson** 88:20
**let's** 9:12 65:1
86:21 87:11
103:12 104:23
124:11 131:6
158:1 172:22
173:5 189:22
191:2
**letter** 126:2
**level** 35:6 47:13
150:6
**leverage** 97:8
**liaison** 105:13
**Liberty** 1:16 2:4
**licensed** 44:6
**lie** 37:15
**lien** 139:19
**liens** 89:11
113:13,14
**life** 133:22
**light** 200:8
**likes** 30:10
94:20
**limiting** 146:4

Joseph LaForte

Lindsay 101:17
line 4:3,3,9,9,12
  4:12 24:3
  153:7,13 205:2
lines 23:17,18,20
Lisa 39:14
list 90:16 91:6
  101:7,11 178:8
  185:2
Listen 17:23
litigation 4:1
  126:1,7
little 75:13
  81:13 84:7
  90:21 98:7
  116:19 131:11
  194:21
LLC 1:4 159:9
LLP 1:16 2:3,8
loan 129:13,16
  150:20 151:13
  151:15,16
  186:22 187:19
loans 23:21
  103:18 127:1,6
  127:12,20
  128:2 129:21
  154:1 171:2
  177:15 187:6
  187:22
located 56:5,13
  60:24 67:16
  121:8,19
  122:11 147:15
locating 12:14
location 62:5
  66:23 121:23
long 6:13 39:11
  39:19 47:6
  49:17 50:3,4
  62:4 136:24
  156:5 179:11
longer 85:2
  107:11 116:17
  116:21 117:2
  170:4 172:13

192:11,18
look 9:5 11:21
  52:13 85:20
  91:19 93:3
  94:15 95:2,7
  96:4 108:8
  122:8 139:10
  152:8,13 155:4
  155:8,17 156:1
  158:10 160:18
  161:7 162:15
  168:18 169:17
  177:12 183:8,9
  184:5,7 187:10
  193:21
looked 97:5
looking 9:3 30:2
  30:17 36:6
  45:1 50:23
  85:22 99:21
  108:2 116:17
  122:19 155:3
  168:13 179:18
looks 176:10
  191:1
losing 139:20
loss 54:21 55:2
lot 8:10 9:24
  10:2 11:24
  31:4 36:23
  40:14 44:10,13
  49:3 52:22
  53:4 62:12
  63:1 65:16
  79:17 89:2
  91:9,18 96:13
  96:14 98:1,4
  120:5 139:15
  146:21,22
  147:5 149:21
  150:20 151:18
  167:23 178:12
  188:10 195:15
love 120:1
lower 162:20
  163:10 169:2

170:20 174:14
  180:3
lowered 163:1
  163:18 191:5
  199:5
lowering 188:9
lowers 172:14
lucky 150:1,4

_____

**M**

Mac 74:9,12,15
  74:18,22 75:5
main 93:11
  162:21
maintained
  126:14
maintaining
  73:15
maintenance
  162:10,11
majority 141:17
making 17:2
  94:18 99:21
  155:2 203:7
manage 8:20
manilla 157:15
manner 83:2
  199:7,19
manually
  122:19
marathon 75:13
Mariners
  194:10
mark 160:24
  164:16 172:22
marked 158:7
  158:11 159:3,6
  161:4 173:1
  182:7
market 1:17 2:5
  2:9 8:6 36:6
  171:16 198:10
  199:10
marketed 199:8
marketing 6:12
  6:14,18 7:17

7:19 8:2,8,19
  9:8,11 10:8,16
  10:21 11:6,17
  12:5,13 14:1
  14:13 15:7
  20:11 21:4,17
  21:21 22:6,15
  23:6 31:6 35:8
  45:4,7,14,19
  47:17 49:8,14
  49:20 50:1,6
  50:10,14,16,19
  51:11,13,15
  53:23 56:4,9
  60:18 61:7
  64:5 65:24
  78:18 79:6
  87:9 106:13
  111:13 134:23
  135:8
married 39:15
  39:19
master 90:16
  91:6
match 184:9
material 198:3
math 183:15,21
  185:4
matrix 3:12
  96:20
matter 50:12
  145:14 166:12
  202:9
maximum 187:4
MCA 88:1 89:14
  98:23 105:2
  113:4 114:12
  114:13 115:5
  115:14 116:14
  116:18 117:15
  117:19,23
  118:3 120:16
  129:20 130:1
  148:3,10,19,21
  149:4,15
  150:16,18

151:1,8,10
  177:17,20,23
  187:14 188:24
  189:4 197:16
  198:3
McElhone 39:14
  39:20 40:2
mean 7:8 10:12
  12:21 31:16
  36:1 42:1,2
  45:10 47:23
  54:19 59:20
  71:7 73:7
  78:15 91:8
  93:1 99:5,6
  104:18 106:11
  126:15 140:9
  147:13 156:4
  176:11 189:8
  189:11 197:5
  199:12
meaning 102:23
  184:13
means 25:10
  41:13 62:22
  111:9 146:1
  202:21
mediate 136:14
  138:21
mediator 52:24
  135:22
mediators 140:6
meet 57:17,19
  136:13,20,21
  139:13
memorandum
  153:20,23
  154:4
memorandums
  153:18 154:8
Memorize 92:10
memorized 92:6
memory 160:3
mentioned 96:5
  100:6 174:8
merchant 12:10

24:14 25:8
26:10 94:17
96:24 97:1
99:4 110:23
112:16 140:13
140:14 151:19
**merchants**
10:10 35:17
38:4 75:4 94:2
96:10 106:15
111:3 151:19
**merit** 17:7
**merits** 15:15,17
16:4,7,16
17:21 19:11,16
59:16
**met** 57:14 136:3
**micro** 30:22
**middle** 91:14
156:16
**million** 167:18
**mincing** 84:6
**mind** 160:18
**mine** 51:23
**minor** 194:15
**minute** 85:12
**minutes** 84:21
**mischaracteri...**
51:21 65:9,12
91:4 109:21
135:1
**mischaracterize**
52:17
**mischaracteri...**
51:24
**misheard** 66:8
**misimpression**
18:13
**mislead** 40:17
**misleading**
34:20 60:10
181:4,9
**mispronoucing**
39:13
**misrepresent**
126:22

**misrepresenta...**
16:2 53:4
**misrepresenta...**
124:12
**misrepresenting**
152:17
**missed** 78:7
108:7
**mistake** 96:11
126:18
**mitigating** 75:24
**mode** 171:19
**model** 37:19,21
**models** 28:14
36:21,23 37:17
**modified** 191:3
191:10 192:8
**modify** 191:4
**moment** 12:18
**money** 11:1
21:22 25:3
28:6 31:11
36:7 37:4
42:18 53:19
54:10 104:11
112:8 114:20
114:24 115:13
115:22 117:6
119:16 120:5
127:2,6 133:17
138:2 145:4,7
153:6 154:1
163:9 171:5
172:11,12
175:3,16,18
179:19 188:17
189:23
**monies** 134:20
172:4
**month** 30:6 31:2
97:2 102:15
114:19 137:6
164:1 165:23
167:19,20
174:3 199:1
**months** 93:21

94:4,6,6,11,13
95:3 103:10,10
107:12 120:20
184:8
**Morgan** 101:23
**morning** 5:21
**mortgage** 44:2,6
114:6,8 150:21
**mortgages** 113:4
114:4
**motion** 29:5
200:13
**move** 15:23
91:15 131:12
**multiple** 32:15
32:17 36:11
161:18
**multiply** 183:12
185:13
**multiplying**
183:17

_____

## N

**N** 3:1 202:1
**name** 5:24 6:22
7:2,16 32:21
32:23 39:13,17
44:5 53:8
55:20 64:15,19
64:20 74:10,11
75:2,9 80:22
135:24 149:10
194:2 203:10
**names** 32:21,23
33:4 55:20
**nature** 21:11,15
**NCF** 108:11
**NCF's** 108:10
**necessarily**
174:19
**necessary**
147:18
**need** 11:24
18:22 27:2
44:15 50:23
57:7 75:12,14

78:2 88:20
92:2 97:5
104:8 105:22
130:11 131:15
132:2 133:13
135:5 156:14
157:23 187:10
188:6 203:19
**needed** 168:20
199:3
**needs** 11:22
26:21 27:8
103:2 104:4
**negotiated** 143:5
195:23 196:10
**negotiation**
141:9 195:12
195:15
**net** 165:21
**never** 45:24 46:3
51:7 63:14
64:17 67:24
100:12 125:9
128:13 132:6,9
132:13 158:22
**new** 98:3 132:11
133:23 144:14
174:14 175:17
191:9,15
192:16 199:13
**NFSs** 109:8
**nice** 95:10 186:9
**night** 73:17,18
74:4 75:7
**nimble** 151:21
187:23
**nine** 16:11,20
**Non** 108:15
**Nope** 74:21
**normal** 65:17
88:10
**North** 56:10,19
56:24 57:11,15
60:10 61:1,7,8
61:18,23 65:2
65:7,19,21

66:12,16,19
67:10,16,21
**notary** 202:16
203:19
**note** 121:18
125:8 126:10
161:7 190:7
**noted** 202:6
203:8
**notes** 3:11
155:21 156:1
160:9,10,11
161:20,22
162:5 176:8
202:8
**notice** 1:15
**noting** 71:16
**November**
173:24 202:9
**nowadays** 89:3
**NSF** 108:13
**NSF's** 108:22
**NSFs** 109:4
**number** 3:8
76:21 93:17
120:3,3 146:12
163:1,5,10
174:23 178:8
**numbers** 183:11
183:13
**NXGEN** 165:6
176:23
**NYGEN** 177:10
178:1 181:1

_____

## O

**O** 202:1
**oath** 17:16 19:23
**objeciton** 71:17
**object** 19:18
**objected** 60:2
88:5
**objecting** 88:10
**objection** 12:1
14:7 15:3
18:16 19:9,20

Joseph LaForte

21:7 24:6
25:14 26:17
27:10 28:17
29:8,22 34:23
35:21 37:6
42:11 46:23
48:19 51:20
56:21 59:3,10
59:15 60:3
65:8 67:5 68:3
68:24 70:4
71:1 76:23
78:21 86:13
88:2,14 91:3
98:17,24 100:2
109:15 112:22
113:16,23
114:21 115:16
118:1,23
119:18 121:10
124:6 125:8,20
126:11 127:7
127:13,21
130:10,17
134:24 144:15
149:17 172:15
177:18 178:10
186:4 188:18
190:13 193:9
196:1
**objections** 5:10
36:11 60:4
130:22
**obligation** 112:4
**obligations**
103:17 174:18
**obstructionist**
20:3
**obviously** 91:11
123:18 173:18
**occasion** 102:9
113:7
**occasions**
141:21 194:5
**occurring** 19:12
**occurs** 52:21

**October** 65:1
173:21
**offer** 22:22 23:9
23:22 92:8
113:12
**offered** 148:16
**office** 8:20 45:12
46:17 55:24
56:14,19,24
57:11 58:14,17
60:11,13 61:4
61:6,23 62:2
62:16,19 63:4
63:10,12 65:2
65:7,11,19
66:3,12,20,22
67:2,10,15,22
78:2 139:2
**officer** 43:8 68:1
68:6
**offices** 6:3
147:14
**Oh** 67:19 83:15
**okay** 10:19
11:10,20 12:19
13:10 14:11
17:4 20:15,21
22:4 23:14
24:1 25:6,20
27:1 28:9
29:24 33:4
41:22 42:21
47:9 49:19
53:13 54:6
57:8 58:4 59:5
66:8 67:24
73:22 74:11,14
75:8,23 76:2
80:19 81:12
82:11 88:18
92:4,13 95:22
102:6 107:20
119:23 130:20
132:7 140:23
143:8 144:5
146:2 154:3,12

157:17 159:17
160:19 170:17
171:4 172:7
177:3 178:14
179:12 187:7
191:14 192:6
193:23 195:12
196:13 197:15
200:1 201:12
**Old** 56:6
**once** 58:5
155:17 175:1
**ones** 59:20
101:14 154:20
156:19,22
157:7
**open** 169:11
174:15 186:16
200:19
**operated** 43:21
**operates** 150:9
**operations** 64:7
**operator** 40:16
40:20 41:10,15
42:14 53:12,16
79:16
**operators** 9:14
10:17 49:2
**opinion** 90:22
157:13 184:4
186:10 195:18
**opportunity**
104:7 188:5
200:20,21
**opposed** 116:18
120:8 138:22
139:19 151:13
**optics** 139:10
**oral** 1:14 80:1
**order** 10:18
15:16 16:9,11
17:1,19 18:15
18:15 19:9,10
27:5 38:5,6
42:5 88:17
94:17 116:21

119:10 121:5
138:5 182:3
185:19
**ordering** 17:7
**organization**
194:15
**organizations**
54:4
**original** 40:13
148:3 183:6
185:24 203:21
**outside** 80:21,24
95:23 147:22
**outsource** 87:10
**outsourced**
48:16,18 82:8
**outstanding**
54:14 97:6
112:3 119:6
179:20 182:11
182:21 184:13
**overlapping**
15:14
**owe** 170:24
**owed** 120:5
169:13 170:13
171:8,9 172:4
184:15
**owes** 119:16
182:23 183:2
**owing** 172:10
**owned** 67:3
**owner** 33:14,19
36:9 45:6
46:11 68:1,13
97:18 116:8
138:14
**owners** 38:19
45:22 46:1
47:4 89:5
97:23 139:22
**ownership** 13:3
33:7,10 82:14
82:18
**owns** 45:14

| | P |
| **P-1** 3:9 158:7,11 | |
158:15
**P-2** 3:10 159:3,7
164:5 167:7
192:20
**P-3** 3:11 161:1,4
163:13 176:7
177:4
**P-4** 3:12 173:1,5
173:9 198:12
**P-5** 3:13 173:1
**P-6** 3:14 182:7
182:10
**P-7** 3:15 190:16
**PA** 2:5
**pad** 156:1
**page** 3:4,8 4:3,3
4:9,9,12,12
22:24 48:8
157:18 161:9
162:5,15
183:16 190:21
205:2
**pages** 157:12,14
**paid** 14:2 15:8
79:7,10,12
89:12 104:12
108:5,6 117:6
137:24 141:6
141:10 143:19
169:14 170:10
170:10,14,17
172:8 175:10
184:14
**Pal** 8:12 164:10
164:17
**PAMELA** 1:5
**Papal** 51:5
**paper** 154:6
187:18
**papered** 117:18
**papers** 42:4
**paperwork**
196:22 197:1
**Par** 1:10 6:6 7:3

Joseph LaForte

7:7,21 8:12
20:12 21:23
23:14,22 24:13
35:10,12 36:16
41:3 48:3,5,6
48:11 49:11
60:8,21 61:21
129:6 165:15
165:24 188:8
**parameters**
22:14
**park** 61:13,14
**part** 36:1,4,7
97:17 104:22
112:20 113:14
117:5 122:5
138:18 172:2
198:23
**particular** 16:17
24:8 27:9
87:15 147:19
187:9 189:4
196:11 199:23
**parties** 5:8 17:7
17:9 48:18
**partner** 46:7
**parts** 146:24
147:2
**party** 37:4 57:10
100:7,13
127:19 128:13
128:18
**pass** 107:12
**pasts** 94:11
**patience** 131:12
**pay** 8:12 14:15
14:19 21:21
22:5 30:16
53:22 55:21
79:15 94:4
106:23 107:2,8
107:19 110:24
114:17,19,24
115:1,8,22
145:15,16,23
154:6 164:6,8

167:15 172:3
172:12 174:19
174:20 175:4,7
175:19 192:11
**payback** 103:18
**paying** 162:7
168:19 169:3
172:7 175:12
**payment** 3:15
27:23 30:1,3,5
30:11,19,21,23
30:24 97:3
107:22 108:9
139:24 141:20
142:19,23
143:6,21 144:1
144:9,13,14,23
152:12 163:1
163:18,21
165:20 167:14
167:21 168:24
169:2,4 170:20
171:14 172:14
183:17 185:18
186:1 190:18
191:6,10 199:6
**payments** 15:2
28:12,15 29:21
30:4,8 108:7
138:6 145:11
152:7 162:21
163:11 165:13
171:18 174:15
182:12 183:1
184:4,6 188:9
191:3,5
**PayPal** 77:17
**pays** 21:4 22:14
**Pearl** 165:7
176:24 177:10
178:1 181:1
**pee** 164:16
**peeve** 51:23
**Pennsylvania**
1:2,18 147:21
147:22

**people** 11:20
24:24 26:21
30:23 32:16
34:20 35:18
36:3 43:19
45:2 48:2
58:12,13 65:16
90:16,18 101:8
101:9,12 120:1
120:6,7 121:3
136:17 145:11
153:11 188:5
**people's** 188:9
**percent** 24:16
24:22 25:9,10
25:16,21 26:4
26:7 106:14,15
106:18 107:7
125:3 127:20
128:9,14
138:19,24
152:1,2 167:8
167:15,20,22
168:3,5,6,8,12
170:21,22
173:23 178:9
180:4,8 187:20
198:15
**percentage**
24:11,17 25:6
28:4,10 52:11
76:15,20 167:8
167:23 168:14
177:5 178:2,6
178:14,20
179:1 180:16
182:16 199:16
**Perfect** 19:22
**performs** 12:13
**period** 28:16
103:21,22
104:11 107:10
107:13 114:18
137:6 151:22
164:13,19
190:9

**periodically**
73:6
**permits** 15:17
192:20
**permitted** 17:20
**person** 35:13
39:7 44:19
47:16 54:6
92:17 116:16
118:11 119:16
122:24 138:22
139:14 168:14
**person's** 168:9
**personal** 72:23
73:14 97:19,24
194:8
**personally** 31:10
57:3 116:7
138:10 139:21
**pet** 51:23
**phase** 174:6
**Philadelphia**
1:17 2:5 39:24
56:15,20 57:12
61:24 65:3
66:22 67:2
91:13
**phone** 2:6,10
18:2,4 19:21
63:7 75:4,7
123:2,15,17,23
124:1 126:19
141:22,24
**phones** 45:2
49:7 138:23
**pick** 18:4 19:21
160:23
**picture** 158:14
**piece's** 91:18
**place** 1:17 2:4
9:15 125:7
160:4
**placement**
153:18,20,23
154:4,7
**plaintiff's** 17:8

**plaintiffs** 1:7 6:3
17:11
**Plan** 101:21
**play** 8:8
**played** 194:18
**plays** 8:10
**please** 16:13,23
25:5 29:16
81:20 127:16
152:10
**pledge** 116:20
**plus** 157:11
**point** 32:4 65:18
66:2,10 84:24
85:1 108:3
146:3,5
**pointing** 13:19
**policy** 3:9 72:21
72:23 107:17
**poll** 188:4
**pony** 35:13
**poorly** 145:9
**portal** 49:12
**portfolio** 153:11
**portion** 193:15
195:6
**posing** 20:1
**position** 19:14
131:7 150:4
163:12,14
**positive** 81:20
144:4 151:17
**possibly** 74:3
110:8
**potential** 33:18
56:18 59:2,8
69:20 70:3
127:1,5,11
130:16 153:24
**potentially** 11:9
116:17 139:20
**practice** 73:14
112:20 113:15
142:17 192:8
**prefer** 30:1
**preparation**

Joseph LaForte

110:17 160:12
**prepared** 70:19
80:19
**prepares** 80:14
**preparing** 46:14
148:3
**presence** 62:4
**present** 1:21
129:24 146:7
166:24
**presentation**
59:2
**presentations**
57:24
**presently** 191:24
**preserve** 126:9
**preserving**
125:18
**president** 43:12
**pretty** 5:23 38:2
41:14 49:6
136:23 173:20
**previously** 52:3
123:14
**principals** 39:2
**print** 159:23
160:2
**prior** 43:24 44:3
50:18 84:19
136:14 144:13
146:11 148:19
150:19
**private** 153:18
153:19,22
154:4,7
**privilege** 88:14
126:10
**privileged** 126:6
**Pro** 64:16,17
**probably** 24:16
98:6 102:16
106:14,15
107:9 112:5
137:2 138:24
145:19 149:8
154:20 168:3

180:4,5,9
**problem** 13:21
15:24
**problems** 98:4
168:17
**proceedings**
111:2 202:6
**process** 70:2
76:7 83:21
86:7,8,18
87:21 96:18
101:5 112:18
197:3
**processes** 60:15
**processing**
60:11,14,20
141:4 197:9
**processor**
196:21
**produce** 80:6
**produced** 20:18
160:21
**producing** 39:16
**product** 22:1
23:23 24:4
26:22 27:3,4
30:9 37:23,23
38:3 49:10
96:24 104:3,14
119:24 120:2
120:13 129:17
138:23 151:15
151:17 188:3
**production** 4:8
160:15
**productive**
186:13
**products** 8:4
22:19,22 23:9
23:16,17,18
26:20 27:13
29:6 37:24
40:14 48:24
57:21 58:6,8
58:10 92:7
95:7 97:11

113:9,11,11
118:5,7 129:21
129:24 148:15
148:17
**professional**
55:12
**profit** 54:21
55:1
**profits** 68:16
**program** 37:22
58:11 118:11
136:13,22,24
137:10 138:18
139:3,4,8,12
169:1,16,19
170:6
**programs** 27:14
58:11,12
161:14
**project** 163:8
174:9,14
**promoters** 101:8
**promotions**
57:24
**promptly**
203:23
**Proper** 2:3 3:5
5:20,24 7:14
12:3 13:14,18
13:22 14:11,12
15:5,12 16:10
16:14,21,23
17:4,14,18
18:8,12,19,22
19:5,7,14,22
20:2,6,9 21:9
24:7 25:19
26:24 27:16
28:20 29:7,13
29:17 35:24
36:18 37:9
38:14 40:22
42:3,16 45:5
47:8 49:4
51:22 52:2
55:23 57:1

59:5,6 60:23
65:10,13 67:8
68:4 69:4 70:6
70:10,13 71:5
71:21,23 77:1
78:7,11 79:1
83:13,16 84:16
84:23 85:2,7
86:20 88:4,9
88:13,19 89:13
91:5,21 94:10
98:20 99:2
100:5,17,22
109:16,22
110:9 112:24
113:2,19 114:2
115:3,19
118:13 119:2
119:22 121:11
124:8,16,23
125:12,24
126:5,23 127:9
127:17,24
130:14,19
131:4,10 132:1
132:20 133:1,5
133:19 134:7
135:4 144:17
150:14 153:1,4
155:15,20,23
156:3 157:21
158:1,9 159:5
160:8,19,24
161:6 164:12
164:18 172:17
173:4 177:22
178:13 181:20
182:9 186:11
186:17 188:19
190:15 193:10
193:19 196:3
200:6,24
**properly** 8:22
**prospective** 9:4
9:6
**protect** 96:8

**protected** 126:9
**prove** 93:14
**provide** 12:6
125:22 177:8
190:8
**provided** 188:13
188:17 199:4
203:13,19
**provides** 23:6,14
**provision**
104:17,22
109:7,11
110:11 195:22
**provisions** 196:9
**prudent** 32:7
93:4 168:8
**prudently** 9:1
**Prussia** 101:21
**pubic** 99:20
**public** 1:20
33:14 43:12,14
61:22 67:21
132:18 202:16
203:20
**publications**
75:1
**pull** 87:7,18,19
87:20,23 95:5
95:24 154:22
185:5
**pulled** 95:13,19
**pulling** 86:18
87:12
**purchase** 9:2
103:14 118:4
118:16 151:12
177:5 180:19
181:2 186:21
187:11,19
**purchased**
167:10 180:15
180:22 182:19
**purchases**
116:16
**purchasing**
114:15 118:18

**purport** 178:15
**purported** 177:4
  178:1,7 180:21
  181:1 182:17
  182:18 183:3,5
**purportedly**
  167:9 179:22
**purpose** 87:24
  123:1 193:8,20
  201:6
**purposes** 130:24
  158:7 159:3
  161:4 173:1
  182:7
**pursuant** 1:15
**pursue** 112:7
  145:17
**put** 49:9 60:5
  112:15 125:11
  133:22 167:24
  171:15,16
  184:5 195:16
**puts** 49:21
**putting** 152:3

**Q**

**qualifies** 118:11
**qualify** 24:24
  25:17,22 26:8
  35:12 116:20
**qualifying** 75:24
**quarterly** 14:19
**question** 7:9,13
  7:18,22,23
  13:6 14:8,10
  15:20 21:18
  23:2,4,11,11
  23:14 29:9,14
  29:16 33:2
  34:24 35:22
  38:18 57:7
  66:11 67:13
  71:2,4 72:18
  77:23 81:10
  84:21 88:5,22
  96:10 103:12

104:19 115:18
124:15,21
125:6 127:3
128:12 131:21
131:24 132:2
132:17 137:11
177:7 186:23
189:19,20
**questions** 5:11
  19:15,17,19
  20:1 40:4
  43:21 66:7
  69:10 70:12
  121:15 123:6
  130:11 134:8,9
  135:6 146:4
  159:21 186:8
  186:12 200:8
  200:21 203:23
**quickly** 38:2

**R**

**R** 202:1
**raise** 18:1 19:2
  59:18
**raised** 109:20
**ran** 42:15
**range** 166:22
**Rapid** 51:5
**rate** 22:11 106:3
  106:6,14
  127:12,20
  128:4,8,11,14
  128:15,19,22
  152:1,2,18
  164:21,23,24
  165:2,5,5
  166:3,4,8,11
  167:5 168:23
  172:11 183:23
  184:19 185:10
  185:11,13,17
  185:20 186:3
  187:4,20 190:9
**rates** 105:24
  165:3 166:20

166:22 184:22
**ratio** 89:15
  168:11
**rations** 89:1
**ratios** 90:9
  198:15
**read** 16:10,12,14
  16:23 17:5,20
  18:15 20:15
  100:12 110:2
  149:13 153:19
  154:2 192:22
  192:24 193:3
  193:15 203:2,3
  204:3
**reading** 5:8
**real** 75:2 114:1,3
  114:5 132:10
  132:13
**realize** 13:15
**really** 34:21
  41:13 43:5,6
  57:19 63:2
  88:12 92:19
  97:7 121:20
  136:8 152:3
  169:12 171:6
  171:10 174:24
  187:23 194:4
  200:9
**reason** 30:14
  46:8 74:17,20
  151:24 165:10
  201:10 203:5
  203:10 205:2
**reasons** 174:21
  187:13
**recall** 85:11
  102:14 138:13
  142:3 179:12
  180:12,14,17
  180:18,20,24
  192:24 195:3
  195:21 196:8
**receivable** 30:11
  54:14 104:6

119:7 120:9
182:24 183:5
**receivables** 31:4
  103:14 114:14
  114:15 118:4
  118:15,16,20
  119:10 120:8
  151:13 167:9
  167:16 168:5
  177:6 178:3,6
  178:15,21
  179:21 180:3
  180:17,19
  181:3 182:17
  186:21 187:11
  187:19 198:10
**receive** 80:10
  182:24 204:1
**received** 68:15
  106:24 115:13
  126:1,7 163:6
  163:20,22
  167:17
**recess** 100:19
  158:3 200:3
**recollection**
  84:11 85:17,19
**record** 9:23 13:2
  13:8 16:1,13
  16:24 18:14,20
  28:18 29:4
  60:6 67:14
  124:12,24
  125:11 126:5
  130:22 132:3
  132:18 133:23
**records** 76:19
  79:18 121:22
**Recruiting** 6:12
  6:14,18 7:16
  7:19 8:1,7,19
  9:7,11 10:7,20
  11:6,16 12:5
  12:13 14:1,13
  15:7 20:10
  21:4,17,21

22:6,15 23:5
31:6 35:8 36:6
45:4,6,14,18
47:17 49:8,13
49:19,24 50:6
50:10,14,16,19
51:11,13,15
53:23 56:4,9
60:18 64:5
65:23 78:18
79:6 87:8
106:12 111:13
135:7
**reduced** 191:11
**reduces** 144:12
**reduction**
  191:16
**refer** 50:24
  51:18 76:16
  79:2
**reference** 161:8
  162:6 167:7
  190:22 194:9
**referenced**
  190:12
**references**
  190:22
**referred** 21:5
  193:7
**referring** 110:5
  155:7 169:21
  181:14
**refinance**
  143:15
**refresh** 160:3
**refusing** 33:1
  40:8
**regarding** 17:10
  19:16 200:12
**regular** 36:4
**regulated** 99:24
**relate** 125:14,19
**relates** 10:6
**relationship**
  8:15 13:24
  15:6 35:5

134:10 170:3
175:20
**relative** 16:16
16:17
**relevant** 15:4,18
132:23 133:7
156:18 160:22
**relies** 199:13
**remedies** 110:4
110:13 195:22
**remember** 39:10
41:11 50:2
57:4,13 65:21
80:22 81:21
85:10,13 92:16
109:1 110:8
131:4 136:5
161:24 162:1,4
179:10
**rented** 67:3
**reorganization**
111:5
**rep** 9:20 80:16
**repaid** 28:15
145:4,7 170:9
183:19
**repay** 28:6
103:24 164:14
**repayment** 28:2
28:11,14 29:19
102:20 103:6,9
103:11,21
114:18 117:22
**repeat** 127:3
152:10 179:24
**report** 14:20
46:12 87:13,18
87:23 88:1
92:20 95:8,19
96:1,4,19
100:13 106:19
106:22
**reporter** 5:2
13:7 158:6
159:2 161:3
172:24 182:6

193:14 202:16
202:23
**Reporter-Not...**
1:20
**reports** 95:5,10
**represation** 34:5
**represent** 6:3
182:15
**representations**
153:24
**represented**
33:13,17,21
34:2 37:3
43:11 56:17
57:3,10 59:7
126:24 127:4
127:10,18
128:7,18
129:20 167:4
167:15 195:5
**representing** 2:6
2:11 57:4
**represents** 61:22
67:20
**reproduction**
202:21
**request** 4:8 30:4
182:4
**requested**
193:15
**require** 22:19
28:11 93:16
191:9 203:24
**required** 28:5
117:1,3,8
164:6,8 167:15
183:19 196:16
**requirement**
93:21 117:11
117:12,14
**requires** 97:18
191:15
**requiring** 114:9
**research** 187:8
187:11
**reserved** 5:11

**residents** 146:8
**Resources** 6:12
6:14,19 7:19
8:2,8,19 9:8,11
10:8,21 11:6
11:17 14:2,14
20:11 31:7
35:8 45:4,7
49:8,20 50:15
50:17 51:14,16
53:23 56:4,9
60:18 64:5
65:24 78:18
79:7 87:9
106:13 111:13
135:8
**respect** 10:11
11:15 13:23
41:18 91:22
94:5 130:11,23
166:2 189:13
**Respectfully**
111:9 140:23
**respective** 5:8
**response** 69:13
**rest** 163:12
168:22
**restate** 29:15
**restructured**
144:8
**restructuring**
142:24 144:1
**result** 24:14,18
25:2 53:19
139:8
**resulted** 122:9
**Reticular**
188:21
**return** 14:23
103:15 185:14
186:3 190:9
203:21
**returns** 108:7
**revenue** 118:22
118:24
**review** 54:20

93:17 160:11
**reviewed** 55:1
70:18 99:19
110:17
**reviewing** 99:21
**reviews** 54:23
99:16
**Richmond** 51:9
176:17 177:10
177:24 180:21
**Richmond's**
165:5
**rid** 98:11
**right** 10:14,21
18:3 22:24
23:7 26:12
27:19 31:23
33:6 40:12
42:10 45:17,20
46:4,22 48:10
48:11 51:1
52:23 58:24
61:9 63:17
75:9 76:10,13
77:11,19,20
80:8 81:8 83:7
83:19 84:5
89:21 91:2,14
95:14,15,18
97:19,21 101:5
104:12 108:5
117:24 118:18
121:8,17 122:3
122:12,20
123:19 140:19
141:7,22
143:22 145:18
146:8,12
147:22 156:19
157:2,19 170:8
171:6 175:14
176:1,5 177:1
180:11 182:13
182:20 183:18
183:23 184:15
184:18 185:14

189:10 197:4
197:10 198:12
199:14 201:2
203:3
**rights** 20:8
145:17
**Robert** 1:4
142:1
**role** 45:3 150:5
**rolling** 57:21
58:7
**Rollins** 194:19
**ROTHSCHILD**
2:8
**roughly** 99:12
99:14
**routinely** 113:21
**RTR** 185:14
186:1
**ruin** 142:11
**rules** 133:10,11
133:12 203:24
**run** 44:20 45:11
46:17 47:22
102:5
**running** 45:13
**runs** 47:16 54:6

---
**S**
---
**S** 3:6
**Saint** 44:7
**sale** 7:20 34:11
118:15 181:10
**sales** 8:20 9:14
9:20 10:17
31:24 32:2
33:20 34:2,8
34:10,12,13,17
34:20 35:19
36:9,15 40:19
41:10,15 42:14
44:21 47:23
48:1,14,15,22
49:2 53:11,15
54:3,7 77:8,10
77:15 79:16

80:16 102:5
149:5 150:2,6
**salesman** 111:12
**salesmen** 32:3
**Sanchez** 18:3
200:11
**sanctions** 19:4
**sarcastic** 156:5
**satisfied** 49:10
187:21
**save** 72:19 73:2
73:3 97:9
186:14
**saved** 123:18,24
124:2,3 139:15
139:18 165:15
169:3 171:21
**savings** 163:24
165:21
**saw** 100:23
102:7,10
139:16 154:5,6
156:24 157:1
193:23 194:9
**saying** 71:15
180:6
**says** 16:15 19:9
19:9 34:17
110:14 179:3
180:1 187:3
190:8
**SBA** 188:1
**scope** 88:19
**sealing** 5:9
**search** 77:3
**searched** 125:13
**seasonality**
91:12,17 93:24
94:7
**SEC** 101:2
**second** 176:15
**secure** 138:5
**secures** 113:3
**securities**
100:24 194:1
**securitized**

189:11
**security** 97:14
113:20 114:8,9
114:14
**see** 9:1 69:13
92:2 94:16,18
95:8,11 105:20
105:20 136:14
139:9 151:17
155:21 156:9
156:14 157:2
157:14 159:9
160:17 161:19
163:13 167:10
172:20 178:16
191:2
**seeing** 59:19
131:13
**seek** 113:21
**seeking** 111:4,5
114:7
**seen** 24:1 28:15
29:20 91:1,23
101:2 102:13
156:22 158:12
158:22 159:11
179:8,12,17
190:19
**segment** 140:24
**self** 40:6
**sell** 78:15 120:7
178:2 179:22
181:8 182:24
183:5
**selling** 118:17
**send** 9:14 32:4
77:12 80:12
81:4,5,6 90:17
**sends** 62:24
**sense** 8:15 93:5
105:10
**sent** 81:1
**separate** 55:14
56:6 58:2
181:10
**separately** 48:4

**September**
173:16
**server** 123:2,18
123:24 124:2,4
126:21
**service** 22:2
171:24
**services** 1:4 3:12
3:15 8:4 9:10
12:5,6,12,13
15:7 21:4,17
21:21 22:6,15
23:5,6,15 36:6
40:14 43:24
45:15,19 47:17
49:14 50:1,6
50:10,19 51:12
57:21 92:8
97:11 113:10
113:12 159:9
182:4 190:18
**set** 118:19
153:17 154:7
189:24
**setting** 42:9
**settle** 136:11
**settlement**
137:10
**seven** 6:15,16
45:20 49:21
85:4
**Shane** 2:4 62:1
66:13 72:13
**share** 69:15
**sheet** 169:18,20
177:12 203:6,9
203:11,15,22
205:1
**shop** 45:3,10,11
45:13 102:11
**short** 100:19
158:3 200:3
**shorter** 116:19
**shortly** 18:24
**shoulda** 77:18
**show** 159:6

182:1
**showed** 139:1
**showing** 131:11
**shows** 26:4
188:10
**side** 44:21 47:23
54:7 89:6,8
141:5
**sign** 26:10 97:18
97:24 192:16
195:14 203:10
203:11,17,18
**signature**
203:21 204:13
**signed** 182:3
**significance**
74:8
**signing** 5:8
203:14
**signs** 196:15
**similar** 30:6
76:3 115:8
168:11 177:17
**similarly** 1:7
**simultaneously**
175:12
**sit** 138:21
**sitting** 82:5
157:2
**situated** 1:7
**situation** 111:21
143:23 144:7
174:13
**six** 93:21 103:10
107:12 120:20
179:13
**sixth** 163:13
**slow** 187:22
**slower** 162:12
**slowly** 71:18
**small** 8:4 36:5
38:4 40:15
191:4 192:7
194:21
**smaller** 143:5
**smart** 44:20

149:24
**smarter** 44:10
149:21
**smile** 156:4
**Snap** 176:20
177:10 178:1
181:1
**Snaps** 165:6
**sold** 178:7 180:2
180:7,11
182:17
**solicit** 102:4
130:8 199:20
199:23
**solicited** 199:21
**Solution** 7:6
**Solutions** 1:10
6:5,23
**solve** 185:17
**somebody** 36:15
41:16 44:18
77:17 108:6
138:21 139:1
**somebody's**
86:19
**soon** 150:8
**sorry** 21:13
31:14 32:22
51:16 65:4
66:17 82:20
108:13 117:13
149:6
**sort** 12:17 27:18
28:2 102:17
148:14
**source** 10:13,14
10:18,19 52:10
64:16,17
188:14 189:4
**sources** 10:9,11
10:12 60:19
**sourcing** 10:23
**space** 139:2
203:13,18
**speak** 11:11
146:20 195:9

**specific** 8:15
  9:10 12:23
  15:16,18 25:24
  26:22 27:8
  32:14 81:10
  110:6 116:18
  119:6 120:9,24
  125:2 147:8,20
  189:15,23
  190:2,11
**specifically**
  11:15 16:3
  25:1 30:22
  31:22 34:14
  41:11,12 80:8
  91:10,23 98:3
  102:23 123:3
  129:7 144:9
  147:6 180:14
  190:3 198:21
**specified** 102:19
  114:17 115:13
  115:23 167:8
**Spectrum** 60:12
  60:19 61:2,11
  67:18,19 69:9
  69:16,20 70:20
  70:23 71:13
  72:1 81:5,15
  81:17,21,24
  82:9,12,15,18
  82:22 83:4,18
  84:3 85:24
  86:8,12,24
  87:4 119:14
  196:24 197:4
**Spectrum's** 61:3
  61:6 70:1
**Spectrums**
  75:20
**Specturm** 197:8
**speed** 187:22
**spoke** 125:10
  162:9
**spoken** 182:13
**Springfield**

101:18
**Spruce** 39:23
**stack** 163:22
**stake** 46:4
**stand** 60:4 108:3
**standard** 93:11
  95:1,5,18
  96:17 97:16,17
  97:23 98:22
  99:3,6,8
  102:18,20,21
  103:5 127:12
  127:19 128:8
  166:5,7,8,14
  166:15,22
  167:5 193:7
  198:16,19
  199:21
**standards** 87:6
  87:12,12 92:21
  93:6 112:12
  167:2
**start** 37:1,5
  42:18 74:14
  81:15 86:21
  141:15 148:14
  150:17 155:3,7
  155:18 173:5
**started** 38:16
  40:15 41:1,5,6
  41:9,14 50:5
  82:12,23 149:8
  151:6 199:2
**starting** 43:17
  44:9
**state** 29:7 76:17
  120:12 124:23
  133:20 146:18
  147:7,12,19,24
  186:19 187:1,9
**stated** 16:2
  150:22 162:21
  167:23 168:2
**statement** 16:6
  55:2 144:22
**statements** 17:2

46:15 54:21
  93:3,18 96:21
**states** 1:1 108:22
  109:7 147:22
**statistics** 105:23
**status** 16:6
**statute** 186:19
**stay** 90:20
  112:15
**stayed** 123:18
**Steet** 61:18
**stenographic**
  202:8
**step** 51:22
**stips** 88:11
**stipulated** 5:6
**stipulations**
  4:11 5:3
**stock** 38:22
**stop** 19:24 58:14
  58:17 108:9
**stream** 118:22
  119:1
**street** 1:17 2:5,9
  39:23 56:19,24
  57:11,15 60:11
  61:1,23 65:3,7
  65:19 66:12,16
  67:10,16,21
  69:23
**stress** 168:15
**strike** 21:19
  53:6 81:19
  112:1 113:13
  116:23 132:17
**strongly** 17:9
**structure** 25:8
  28:2 129:23
  149:15 151:8
  151:21 172:19
  195:19
**structured**
  117:23 118:14
  151:11 177:15
  177:16 187:14
**structuring**

148:14 187:18
**struggle** 199:2
**stuff** 44:24
**subject** 140:19
  203:14
**subjects** 75:1
**submit** 80:3,5
**substance** 142:4
  203:4,8
**successful** 138:1
**sufficient**
  108:15
**suggest** 142:10
**suggesting**
  150:15
**sum** 142:3
**summer** 91:14
**supervision**
  202:23
**SUPPORT** 4:1
**sure** 8:22,24
  11:13 24:10
  26:1 30:15,16
  30:18 32:5
  37:19 45:16
  48:7 49:5,9
  51:2 52:22
  53:21 60:7
  62:17 63:16,17
  63:23 70:6
  72:2 74:13
  79:5 80:5
  87:14 94:1,7
  96:2,7,22 97:7
  97:20 99:22
  100:11,17
  111:23 122:7
  124:1,3 128:6
  129:11 141:10
  141:23 142:2
  142:21 144:3,5
  144:9,11
  145:19 147:23
  154:9 155:2,12
  158:13 161:21
  162:16 164:11

165:2 167:17
  179:16 183:16
  185:8,22
  191:13,17
  195:10 201:8
**survival** 171:19
**survived** 162:24
**sworn** 5:15
**syndicate** 10:1
**syndicated**
  189:9,12,13

**T**

**T** 3:6 202:1,1
**tailor** 27:5 30:15
  38:5 102:24
**tailored** 27:7
  102:22
**take** 8:5 13:7
  14:14,18 15:17
  16:16 17:21
  18:4,10 51:22
  100:15 121:18
  149:20 157:21
  158:1 162:15
  177:12 178:23
  185:24 189:15
  201:3
**taken** 1:15 30:8
  100:20 158:4
  160:11 161:22
  161:23 200:4
  202:8
**takes** 8:21
**talk** 17:23 19:3
  57:20 58:5,8
  84:18 85:15
  86:22 87:11
  104:23 106:11
  124:13 134:3
  198:22
**talked** 86:3
  142:5
**talking** 28:18,20
  29:5 45:2 76:4
  84:5 92:12

99:18 140:18
143:16,17
144:19,21
154:13 155:18
166:15
tax 14:23 89:10
101:23
taxes 14:14,18
14:19 95:10
technically
23:18
techniques
10:16
technologies
9:16
technology
122:24
telephones
41:14
tell 8:1 18:9
20:22 21:10,14
29:9 33:5
34:20 35:18
36:8,14 37:17
84:10 85:14
99:17 106:13
154:15 166:15
181:6
telling 36:2
146:6 155:19
156:8
template 27:18
148:11
templated 26:22
ten 168:3
term 22:10
103:6,9,11
116:17,22
117:2 144:14
165:10,17,18
172:13 183:18
185:19
terminals 12:10
terminology
143:18
terms 20:23

29:19 72:21
94:12 95:2
99:13,13
117:22 165:13
180:16 181:2
184:5,10
195:13 199:9
test 168:15
testified 5:16
66:9 123:13
126:13
testify 52:3
77:19
testimony 64:24
126:17 133:8
162:22 193:16
200:9 201:1,4
203:13
Texas 28:19,22
29:1,6,12 70:5
76:10,12,17,22
77:4,16 78:4
120:16,19
121:4 122:12
122:17 146:4,8
146:18,24
147:2,6,9
173:18,19
186:19 187:1,3
187:5 197:17
197:23 198:4
198:18 199:20
text 130:15
th 6:16
thank 13:18
52:17 123:8
133:24 200:6
204:2
thanks 154:14
they'd 197:10
thick 157:15
thing 16:12 35:6
35:7,16 38:3
91:10 98:3,5
99:17 115:10
149:21 151:17

152:5 154:21
163:4 194:1
things 11:5,14
84:4 85:13
86:10,16,17,22
87:22 91:15,18
92:22 96:3
97:5 118:10
121:6 125:2
131:12 155:7
155:10,21
184:1
think 19:11
34:19 35:1,2,3
35:6,7,16
36:17 43:7
52:20 53:4,16
55:3 66:10
75:3 78:5
84:17 89:2,17
92:17 93:6,10
93:24 94:23
95:7 96:6,14
96:15,19 98:2
98:5 99:1
105:15 107:23
108:2,17
112:13 115:7
116:3 119:8
120:21 122:22
123:16 134:6
138:7 139:3
145:10,21
151:15,16,18
151:24 152:5
152:23 153:10
154:22 165:9
166:6 176:7
186:6,9 192:2
195:16
thinking 60:9
90:7,8 112:7
third 37:4 48:18
57:10 100:7,12
124:24 127:19

128:13,18
thought 39:16
66:9 91:6
136:12,21
156:18 157:4
197:7
thousand
188:12
thousands 72:16
threatened
138:16
threats 138:5,7
138:10 142:7
three 94:5,6,11
94:13 95:3
97:1 103:10
157:16
time 5:12 17:12
19:19 22:11
28:16 34:1
40:24 49:14,17
50:3,4,22
65:18 66:2
67:1,9 75:12
75:14 83:23
93:24 94:22
102:6,13
104:11 105:22
107:10 120:24
130:18 131:24
133:18 136:3
138:19 144:23
156:5,7 161:20
164:13,19
165:1 173:19
176:5 179:11
190:10 193:6
195:21 200:7
times 13:17 30:8
79:9 105:12
143:11 162:13
165:11 167:21
185:24
title 43:3,4,7
titled 110:3,12
129:13 159:7

190:17
titles 43:5
today 19:12 31:9
32:24 40:6
76:4 82:6 86:6
154:19 159:15
159:18 173:7
today's 110:17
told 65:21 92:4
92:18 124:4,7
124:14 128:13
149:19
tool 55:9
top 22:24 52:9
106:14 163:19
168:19
total 163:24
180:6
totally 71:21
touched 198:7
tough 105:12
174:5
track 78:19
tracker 78:24
traditional
120:9
transact 147:24
transaction 30:2
86:3 88:1
89:15 93:4,9
130:1 143:3
172:3 175:5
189:5,14,16,17
190:2 195:7
transactions
35:10 38:6
45:1 50:13
92:9 183:7
189:1,9,24
194:22 198:17
transcript
202:10,20
203:22
treat 111:17
treated 115:15
trending 173:23

Joseph LaForte

trial 5:12
tribute 152:3
trick 35:13
tricky 7:18
  198:22
tried 136:10,11
tripping 122:23
true 66:11 145:3
  145:6 200:24
  204:5
trustee 112:17
try 18:13 52:1
  57:24 65:17
  90:20 92:9
  103:13 105:11
  140:13 143:6
  168:7 184:19
  189:16
trying 15:5
  44:17 58:15
  66:4 84:8
  102:3 111:10
  122:15 130:8
  131:12 139:23
  143:20 172:18
turn 81:2
two 20:24 30:8
  53:17,17 83:22
  84:4 93:22
  97:1 105:14
  106:14,15,18
  107:7 120:3
  151:24 152:2
  157:16 162:2,6
  163:2,10
  168:21 190:21
  190:22
twofold 163:4
type 12:8 23:8
  24:18 25:17
  57:24 58:22
  64:12 78:17
  80:3 90:24
  95:19,24 97:14
  97:19 101:2
  104:10,16

113:20 115:10
132:12 149:3
types 8:3 29:19
  48:24 58:11
  99:16 103:3
  114:8 148:15
  153:8
typical 27:4
typically 36:8
  194:24

___

**U**

UCC 96:5
  113:13,14
UCC's 95:9
Uh-huh 40:1
  53:2 83:8
  121:9 176:12
  176:19,21
  183:20
ultimately 197:1
unable 107:22
understand 7:11
  7:12,23 14:8,9
  15:6 20:6 21:1
  21:18 26:18
  34:24 41:24
  46:24 48:20
  58:15 69:1
  71:2,3 75:6
  78:22 83:21
  86:14 87:24
  88:22 89:23,24
  103:13 104:19
  111:11 115:5
  115:17 119:9
  137:11 141:11
  141:12 146:3
  170:16 172:18
  174:7 175:22
  177:7,14
  189:18 195:11
understanding
  10:5 21:11,15
  26:8 48:14
  64:2 65:6 70:1

**Understood**
  91:22
underwrite 69:3
  69:5,17,23
  70:24 119:15
  121:20
underwriter
  87:19 95:24
  117:10
underwriters
  69:11,16 82:1
  83:6,11,17
  84:1 93:17
underwrites
  69:20 75:20
  89:20 119:5
underwriting
  32:8,12,15,19
  60:20 68:21
  69:7 70:2,9,14
  70:19 75:11,17
  76:7 81:15,17
  81:23 82:2,23
  83:4,21 85:24
  86:1,6,8,11,18
  86:24 87:1
  90:3,6,11,12
  90:14 91:2
  92:1,14 94:12
  96:18 112:11
  117:5 119:13
  141:4 152:4
  197:8
underwritten
  82:7 85:14
underwrote
  83:3 85:10
  167:19
unique 119:24
  120:15
UNITED 1:1
unscrupulous
  52:23 96:11
upside 174:4
use 8:16 10:15
  24:13 55:10

71:9 74:11,22
75:2,4 85:4
95:6 100:10
120:11 143:18
uses 24:4 98:22
  99:4 100:7
Usual 5:2
usually 112:17
  174:7 192:16
usuary 186:18
  186:24 187:8
  187:15

___

**V**

Vagnose 194:2,6
vague 197:6
value 198:10
variables 31:4
varies 79:14
  102:21 103:15
  104:8
variety 50:24
Various 22:8,9
vary 22:10,11,11
  22:12 102:20
Verbal 83:10
verbally 83:12
  83:14
version 197:23
versions 197:16
  197:20
versus 24:3
  52:12 74:22
  151:9
verus 24:2
violated 18:16
violating 17:1
violation 16:8
  17:19 18:14,17
  19:10
visit 136:17
  137:13 139:18
visits 137:4
vital 89:22 90:1
  90:2
voice 18:1,5,10

19:2
volume 146:18
volunteer 117:4
vouge 94:22
vs 1:8

___

**W**

Wait 17:14
waived 5:10
walk 8:18 36:2
  38:8 69:24
  167:12
wan 85:15
want 7:22 12:17
  13:2 20:5 29:3
  29:8,18 37:15
  40:17 47:3
  48:16 52:22
  67:12 69:12
  70:8 72:17
  75:6 76:5
  77:19 78:1,6
  85:9 86:21
  89:24 94:1,4,5
  95:2 97:2,9
  117:6 124:23
  126:22 131:9
  132:18,20
  133:22 140:20
  141:7,9,12
  155:11 156:2
  158:11 164:15
  170:1 174:19
  183:13,15
  187:24 188:3
  198:14,22
  200:6,10,19
wanted 48:7
  77:2 136:21
  161:16,20
  164:10 171:23
wants 11:1,8
wasn't 23:2,10
  23:13 29:13
  40:18 112:2
  123:5 165:24

171:6
**way** 10:13 58:23
98:5 108:8
122:16 131:16
144:5 145:19
151:18 152:22
162:23 171:22
185:3 195:24
**ways** 9:24 10:3
13:13 122:18
199:13
**we'll** 15:12
131:8 201:6
**we're** 26:6 28:21
28:23 43:5
44:12 60:3,15
75:13 76:3
84:4,5,6 87:5
114:15 118:17
122:23 131:1
140:15,19,24
183:16 186:21
200:12,18
**we've** 60:2
182:12
**weather** 173:20
**website** 129:1,4
129:7,10,20
167:4
**week** 30:9
114:19
**weekly** 30:10
175:3
**weeks** 102:8
**welcome** 130:12
130:24 153:2
**welcomed**
127:15
**went** 22:23
139:13 171:20
173:21
**weren't** 101:4
168:4 169:12
**When's** 102:6
193:6
**whisper** 124:9

124:10
**White** 1:16 2:3
6:1
**wife** 41:18 42:8
42:17,21 43:16
43:21,24 44:2
47:19 54:23
62:10 63:9
66:5 72:5,8
82:17 99:18
149:15,19,23
150:8,18,24
151:5,7
**Williams** 1:16
2:3 6:2
**willing** 69:15
**winter** 94:8
162:13,20
163:7
**withdraws** 28:7
**witness** 3:2 4:2
7:12 14:9
15:14 23:13
25:15 26:19
27:12 29:15,24
35:1,23 36:14
37:8 38:12
40:12 41:24
42:13 44:17
47:1 48:21
55:19 56:23
60:5,8 67:7
69:2 70:8,11
71:3,19 76:24
78:10,23 83:15
84:12 86:15
88:23 91:7
98:19 100:4
109:19 110:7
113:1,18 114:1
114:23 115:17
118:3,24
119:20 124:22
125:9 126:7,18
127:8,23
132:21 133:6,8

133:14,16
135:2 144:16
149:18 154:24
155:4,9,14,24
157:22 160:7
164:15 169:23
172:16 177:20
178:12 181:17
182:1 186:6,14
190:14 193:18
196:2 201:2,14
203:17,18,19
203:20 204:13
**witnesses** 200:16
203:1
**Woman-owned**
44:19
**wonder** 72:24
**wondering**
58:20 73:9
197:12
**word** 41:13
117:12
**words** 84:6
107:12 122:23
123:16
**work** 6:11,17
7:6,15,21 9:17
10:7 11:12,16
14:1 31:1
32:14,20 34:11
34:14 35:7,19
44:3 49:3
52:24 55:24
61:10,17 63:1
63:4,7,10 64:4
64:10,13 65:17
65:23 76:12
77:6 83:11,17
87:16 105:12
133:21 134:23
135:7,13
140:13 143:20
144:23 149:9
153:9,11
161:14 198:20

**worked** 6:13
45:18 50:18
51:4,7 63:19
83:6 136:22
138:18 139:3
**working** 41:16
50:5 145:11
166:3
**workout** 143:18
192:9
**works** 80:24
123:21
**worry** 115:24
145:22
**worse** 174:1
**worthiness**
119:15
**wouldn't** 20:20
20:21 36:21
44:11 64:1,4
64:14 65:20
67:23 70:16
73:24 76:18
77:14 106:4
108:16 116:2
141:16 147:6
186:12 187:10
190:1
**writ** 98:15
**write** 70:17
74:24 75:1
106:19
**writing** 91:24
110:24
**written** 12:20,22
20:12 54:2
70:14,18 75:17
90:24 137:18
176:9 179:15
193:23
**wrong** 7:22
60:12 64:19
66:18 168:13
184:10
**wrote** 111:14
158:13,19

177:12 181:12
181:18,19

**X**
**X** 3:1,6

**Y**
**y0ou** 194:5
**yeah** 6:9 11:2,3
24:10 33:3
34:10 36:14,17
39:15 50:4
52:20 58:19
61:15 62:1
63:23 65:22,22
65:22 70:10
71:8 72:6 73:4
73:4,19
76:14 77:18,22
78:7 80:2 82:4
88:13 97:16
98:12 99:8
103:20 105:18
107:9,15
108:14,15
115:20 119:8
119:11 122:21
123:16 129:2
131:4 135:20
137:12 143:15
144:8 146:23
147:1,16
148:17,21
150:23 153:3
153:12 157:2
160:7 165:8
166:13 169:23
171:17 177:14
180:5,14
181:17 188:7
192:10 193:4
195:8 196:21
198:12
**year** 22:12 38:9
54:11 65:6
93:22,24 94:14

Joseph LaForte

94:20,21 117:7
137:3 173:19
195:4
**yearly** 31:12
**years** 6:15,16
37:13,15 39:21
45:20 49:21
62:6 91:8 92:6
92:15 93:22
149:6 194:12
**yelled** 18:6
**yelling** 18:12
**Yellow** 176:10
**Yellowstone**
51:6,8 172:8
176:11 177:9
177:24 178:18
178:22 179:9
180:15
**Yellowstone's**
165:4
**Yep** 161:11
**York** 98:3
132:11 133:23

**Z**

**0**

**1**

**1** 4:13
**1,000** 146:15
**1.01** 167:1
**1.4** 166:4
**1.49** 167:2
**10** 4:5,6 146:14
**10,000** 73:5
**10:00** 1:19
**100** 146:15
**100,000** 163:6
163:20,23
165:19 168:21
168:23 169:6
170:20 171:5
172:10 175:6
186:15 199:3,5
**11** 4:4

**110** 164:20
**113,000** 175:6
**12** 137:5 184:7
**124** 4:7
**127** 4:4
**13** 4:4
**130** 4:5
**1370** 184:8
**14** 39:21
**141** 61:23 66:16
66:17,19 67:10
**145** 164:23
184:23
**147** 184:23
**148** 165:6
**149** 165:5,6,6,7
**15** 4:4
**158** 3:9
**159** 3:10
**16** 62:6
**161** 3:11
**1650** 1:17 2:5
**173** 3:12,13
**18** 62:6 94:16
137:6
**18-CV-00268**
1:6
**1800** 1:16 2:4
**182** 3:14
**186** 4:6
**190** 3:15
**19102** 1:18
**19103** 2:5
**1932** 39:23
**1992** 194:13

**2**

**20** 24:16 25:9,16
26:4,7 60:10
61:1,6,18 65:2
65:7,19 66:12
67:16,21
146:15 173:23
**200** 64:17
**2000** 2:9 64:16
**2002** 74:16

**2007** 133:17
**2008** 46:10
**2011** 149:8
**2012** 38:13,20
38:23 39:9
43:16 44:1,4
49:22 50:6
99:11 129:24
148:2,14,19
150:19
**2015** 122:11
146:7 166:23
197:18,24
**2017** 62:1 66:13
81:8,11,18
84:6 97:23
106:8 109:1,3
109:12 110:7
111:15,16
161:23 199:24
**2018** 62:3 106:6
**2019** 1:18 65:1
202:9
**2020** 16:5
**20th** 2:9
**21** 170:21
**215-299-2842**
2:10
**215-864-7142**
2:6
**22** 56:10,19,24
57:11,15 61:8
65:20 104:4
167:21
**24** 65:1
**240** 180:4
**25** 46:20 167:8
167:15,19,22
168:4,6,8
**250,000** 167:20
171:20 189:22
**2600** 168:24
**261** 174:4
**261,785** 174:2
**29** 16:5
**2nd** 61:23 66:19

67:10

**3**

**3** 4:5 110:11
**3,250** 191:6
**3.1** 110:2
**3:46** 201:15
**30** 121:2 168:10
168:12 180:4,8
198:14 204:1
**30,000** 176:24
**300** 104:8
**300,000** 188:12
**33,000** 175:7
**340,000** 180:2
**35** 127:20 128:9
128:14 168:12
**370,000** 171:3,8
172:10
**370,000.00**
164:5
**396,000** 173:24
**3rd** 56:10,19,24
57:11,15 60:10
61:1,7,8,18
65:2,7,19,21
66:12,16 67:16
67:21

**4**

**4** 4:6 174:11
**4,000** 186:14
**4,300** 165:22
**40** 52:15
**40,000** 176:20
184:8
**400** 49:2
**450** 139:17
**48,860** 163:24

**5**

**5** 1:18 3:5 4:13
202:9
**5,000** 167:21,21
191:6
**50** 61:16 134:9
146:15 165:14

**50,000** 177:1
**500** 121:3
139:16
**5000** 169:5
**547,000** 169:13
**547,600.00**
164:9
**56** 170:21
**570,000** 171:9
172:13
**59** 4:5,6

**6**

**6** 4:7
**6,600** 162:7
165:13
**6,667** 168:19
**6,667.00** 162:8
**60** 52:15
**60/40** 52:14
**6000** 169:4
**604** 178:24
**604,000** 178:23
180:1
**6667.00** 163:19

**7**

**7,000** 191:7
**70,000** 176:13
178:19,24
**769,000** 173:22

**8**

**80** 24:22 25:10
25:21
**80,000** 176:18

**9**

**90,000** 165:23
**900,000** 171:20
**95** 138:19
**98** 187:20
**997,000** 173:17
173:22