## <u>DECLARATION OF KARA DIPIETRO</u>

Pursuant to 28 U.S.C. Section 1746, the undersigned states as follows:

1.      My name is Kara DiPietro.  I am over twenty-one years of age and have personal knowledge of the matters set forth herein.  I am the President and Chief Executive Officer of HMC, Inc. (HMC), a company that is in the business of building commercial cafeterias.  I reside in Maryland where my business is also located.

2.      Beginning in approximately February 2018, HMC entered into a series of merchant cash advance agreements with Joseph LaForte ("LaForte") and Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG").  A broker by the name of Alan contacted me and referred me to CBSG to consolidate my business loans.

3.      Soon thereafter, I spoke directly with LaForte.  He introduced himself as "Joe Mack" or "Joe Macki" and told me he was in charge of CBSG.  During our initial conversation, LaForte confirmed to me that he was the boss at CBSG as well as Par Funding ("Par") entities he controlled.  As detailed in the exhibits described below, LaForte would sent me emails from "Joe Mack" with the email address joe@parfunding.

4.      LaForte explained that CBSG/Par Funding would loan money to HMC in exchange for daily payments. The loan agreements stated that payments are based on a specified 10% of HMC's accounts receivables.

5.      Based on the loan terms that LaForte proposed, I agreed to consolidate HMC's loans with CBSG on or about February 26, 2018. After that, and through February 24, 2019 HMC and CBSG entered into many more separate loan agreements that I secured through personal guarantees.

6.     During this same time period, LaForte also told me that CBSG offered investments to individuals who wished to invest in CBSG's merchant loan business, the very same business that had consolidated HMC's loans.

7.     In approximately April 2018, Perry Abbonizio ("Abbonizio"), who told me that he is the lead sales person for CBSG, contacted me to follow up on my interest in CBSG's investment opportunity.  Attached hereto as Exhibit "A" is a true and correct copy of emails to me and my father, Gerry Dzurek, ranging from April-July 2018 discussing the CBSG investment opportunity.

8.     Abbonizio told me that CBSG only accepted investments through its investment funds and that he would arrange for an in-person meeting with David Alperstein of Alperstein & Associates in Philadelphia to discuss the CBSG investment.

9.     On or about June 5, 2018, I met with Alperstein and Abbonizio at Par's offices in Philadelphia. Alperstein told me that he served as the manager of a Par investment fund that handled investments in CBSG's loan business.

10.     LaForte joined us about halfway through the meeting. With LaForte present at the meeting, Alperstein told me that CBSG would use my investment funds to make merchant loans similar to the loans I had obtained for HMC through CBSG.

11.     During the meeting, Alperstein said Par would pay me monthly interest with a return of principal in one year. The percentage of interest Par paid investors depended on the amount invested, so that the more I invested, the higher my return.

12.     Alperstein told me that Par required a minimum investment amount of $50,000. Alperstein also told me that if I invested $200,000, Par promised to pay me a 12% return paid monthly for 12-months.

13.     During the meeting, LaForte told me CBSG had a loan default rate of less than 1% so there was virtually no risk to my investment funds given the low default rate.

14.     LaForte also told me that my investment was secured by insurance, and that there was no risk to my principal.  He told me that if a merchant defaulted on his loan, then CBSG had the insurance to back up investor funds, thus reassuring me that my investment was safe and secure.

15.     After the meeting, Alperstein emailed me documents concerning the Par investment that included a Subscription Agreement with MCA Capital Fund I, LLC (MCA), an Investor Questionnaire, and Promissory Note.

16.     In mid-June 2018, based on what LaForte and Alperstein told me about the investment opportunity, as well as LaForte's reassurances to me that CBSG had a less than 1% default rate, and that my funds were secured by insurance, I decided to invest. Attached hereto as Composite Exhibit "B" are true and correct copies of my signed investment documents.

17.     Neither LaForte, nor Alperstein, Abbonizio, or anyone associated with the investment opportunity ever disclosed any risks associated with an investment with Par or MCA, such as that I could lose all my investment funds.  If I had known that CBSG had a higher default rate than what LaForte told me, or that my investment funds were not backed by insurance, I never would have invested.

18.     In October 2018, I contacted LaForte to inquire whether he had any investment opportunities for my father if he were to invest $14 million with CBSG and Par.  Attached hereto as Exhibit "C" is a true and correct copy of that my email exchange with LaForte.

19.     I had no expertise with investments of this type. I was looking for a safe and secure investment with no risk to my principal.

20.     If LaForte, Abbonizio, Alperstein, or anyone with CBSG, Par, MCA or any entity related to the investment opportunity had told me that I could lose my principal, I never would have invested.

21.     No one told me that my principal would be used for anything other than to fund loans to merchants.  Had I known that my money would be used for any other purpose, I would never have invested.

22.     By May 2019, CBSG had debited far more per day than it was entitled to under the loans with CBSG.  Around the same time period, my investment term was approaching maturity.  I repeatedly complained and asked for an accounting from CBSG.

23.     On May 3, 2019, LaForte demanded I travel to Philadelphia to meet with him and CBSG's CFO to discuss my outstanding balances. That meeting occurred on May 6, 2019. At that meeting LaForte presented me with a new loan that he demanded I sign. After the meeting, LaForte followed me to my car and threatened to blow up my home if I did not sign the new loan with CBSG and pay what he said I "owed" them.  LaForte also made similar physical threats to HMC's attorney, telling him that he did not want anybody to get "hurt."  On Friday, May 10, 2019, LaForte sent me a text message saying "Get your fat ass up and call me," followed by "That was my last call. Now action."  A true and correct copy of this text message I received from LaForte is attached as Exhibit D.

24.    On July 26, 2019, I filed a lawsuit against CBSG and others alleging violations of the federal Wire Fraud and RICO statutes.  That lawsuit is still ongoing.

I declare under penalty of perjury that the foregoing is true, correct, and made in good faith.

Executed on this 14 day of July 2020 in Baltimore, Maryland.

KARA DIPIETRO

The following emails chain is illustrating how the MCA I fund manager, David Alperstien, and Perry Abbonizio the Lead Sales/Relationship guy along with LaForte solicited my participation and my father Gerry Dzurek's participation with their MCA I fund.

---

**From:** david@mcacapfund.com <david@mcacapfund.com>
**Sent:** Monday, April 9, 2018 3:04:20 PM
**To:** Kara DiPietro
**Cc:** Perry Abbonizio
**Subject:** MCA Capital Fund I, LLC

Dear Kara,

First and foremost, it is a pleasure to meet you. Perry indicated that you inquired about an investment in Complete Business Solutions Group/Par Funding (CBSG).  Previously, those willing to place money with CBSG did so directly. However, as Perry discussed, in January of this year the investment structure has changed to a fund based platform. As an attorney retained by merchant cash advance companies, I understood the means of setting up the proper investment product in this space with the use of a Private Placement Memorandum pursuant to SEC Regulation D.

Attached you will find a detailed summary of terms and most importantly, the schedule of investment. The offering is a debt instrument that pays a fixed monthly distribution based on a one-year Promissory Note. The investment itself will be placed with CBSG who will then execute a Promissory Note and a Security Agreement with MCA Capital Fund I, LLC. This is important because the fund will then be secured against their entire portfolio. I know this was a concern for you.

Of course, we can discuss in greater detail after you have some time to review the attached materials. Thank you again for your interest and look forward to speaking with you in the near future!

Very truly yours,
David R. Alperstein, Esquire
MCA Capital Fund I, LLC
1080 N. Delaware Avenue
Suite 505
Philadelphia, PA 19125
(215) 710-0690 Phone
(215) 710-0689 Fax

**From:** Kara DiPietro [mailto:k.dipietro@hmcincorporated.com]
**Sent:** Monday, April 09, 2018 3:13 PM
**To:** david@mcacapfund.com
**Cc:** Perry Abbonizio; Gerry Dzurek
**Subject:** Re: MCA Capital Fund I, LLC

Thank you David for the the timely delivery of the information.

Perry, we appreciated your time on the phone today.

We will review the information and be back in touch soon with questions or next steps.

Best,
Kara

**From:** david@mcacapfund.com <david@mcacapfund.com>
**Sent:** Tuesday, April 10, 2018 3:45:28 PM
**To:** Kara DiPietro
**Cc:** 'Perry Abbonizio'; Gerry Dzurek
**Subject:** RE: MCA Capital Fund I, LLC

Kara,

Sounds good!

There is one thing I forgot to mention in my initial email. The fund has the ability to accept monies from retirement funds (IRA).

If this is something of interest, I can recommend some custodians we work with that will facilitate the transfer.

Thanks again and look forward to speaking with you soon.

David R. Alperstein, Esquire
MCA Capital Fund I, LLC
1080 N. Delaware Avenue
Suite 505
Philadelphia, PA 19125
(215) 710-0690 Phone
(215) 710-0689 Fax

**From:** Kara DiPietro <k.dipietro@hmcincorporated.com>
**Sent:** Tuesday, April 10, 2018 3:50 PM
**To:** david@mcacapfund.com
**Cc:** 'Perry Abbonizio' <perry@parfunding.com>; Gerry Dzurek <g.dzurek@hmcincorporated.com>
**Subject:** Re: MCA Capital Fund I, LLC

David,

Thank you for mentioning. I arrived in Baltimore at 4:30am - I'll be back in the office tomorrow and will be in touch.

Thanks again,
Kara

**From:** david@mcacapfund.com <david@mcacapfund.com>
**Sent:** Thursday, April 26, 2018 9:27 AM
**To:** Kara DiPietro <k.dipietro@hmcincorporated.com>
**Cc:** 'Perry Abbonizio' <perry@parfunding.com>; Gerry Dzurek <g.dzurek@hmcincorporated.com>
**Subject:** RE: MCA Capital Fund I, LLC

Hello Kara,

Hope all  is well.

Just a follow up to our previous discussions. If you should have any additional questions, let me know of course.

Look forward to speaking with you.
Thanks.

David R. Alperstein, Esquire
MCA Capital Fund I, LLC
1080 N. Delaware Avenue
Suite 505
Philadelphia, PA 19125
(215) 710-0690 Phone
(215) 710-0689 Fax

**From:** Gerry Dzurek <g.dzurek@hmcincorporated.com>
**Sent:** Thursday, April 26, 2018 3:32 PM
**To:** david@mcacapfund.com; Kara DiPietro <k.dipietro@hmcincorporated.com>
**Cc:** 'Perry Abbonizio' <perry@parfunding.com>
**Subject:** RE: MCA Capital Fund I, LLC

David,
We will hopefully be in touch soon.  Thanks for the follow up.


Sincerely,

Gerry Dzurek

**From:** david@mcacapfund.com [mailto:david@mcacapfund.com]
**Sent:** Thursday, May 10, 2018 4:13 PM
**To:** Gerry Dzurek <g.dzurek@hmcincorporated.com>; Kara DiPietro <k.dipietro@hmcincorporated.com>
**Cc:** 'Perry Abbonizio' <perry@parfunding.com>
**Subject:** RE: MCA Capital Fund I, LLC

Gerry/Kara,

Just a friendly hello and checking in to see if you might have any questions.

If I can assist in any way let me know of course.

Hope all is well!


David R. Alperstein, Esquire
MCA Capital Fund I, LLC
1080 N. Delaware Avenue
Suite 505
Philadelphia, PA 19125
(215) 710-0690 Phone
(215) 710-0689 Fax

**From:** Kara DiPietro
**Sent:** Thursday, May 10, 2018 4:17 PM
**To:** david@mcacapfund.com
**Cc:** Gerry Dzurek <g.dzurek@hmcincorporated.com>; Perry Abbonizio <perry@parfunding.com>
**Subject:** Re: MCA Capital Fund I, LLC

Thank you for reaching out David. It's been a really busy couple of months, our year end, planning for rest of year. We will schedule a call in a month or so - feel free to reach out again.

Kara

**From:** Kara DiPietro
**Sent:** Sunday, July 01, 2018 8:36 PM
**To:** Joe Mack <joe@parfunding.com>; perry@parfunding.com; david@mcacapfund.com
**Subject:** us07-01-2018 Meeting Requestus

Joe, Perry, David -

When I visited your offices and proposed the idea to turn invoices in a way that would maximize my cash flow and widen your margin (because of the quick pay down term), and that I wanted to invest in CBSG, you asked me why I wanted to do that. I told you that your program saved me, my business and because they go hand in hand you saved my life.

Since our paths crossed I've been outlining my experience and the possibilities and I think with your industry knowledge and bank roll we could bring something amazing to small businesses from sea to shining sea.

I did not mention by name the company I'm ready to go after but I bet you could guess in three tries.

Perry, I sent you an email and then had the opportunity to speak with David for a few minutes and gave him the short version of what I'm thinking.

I'm looping in the SBA now as well as my legal counsel who are the perfect fit for taking these jokers out. When can we meet again?

Kara

Sent from my iPhone

**Appendix A: Subscription Agreement**

# MCA CAPITAL FUND I, LLC
*A New Jersey Limited Liability Company*

## $50,000,000 AGGREGATE AMOUNT 8%-15% PROMISSORY NOTES

## 1000 UNITS OFFERED
*$50,000 - $100,000 principal amount one-year 8% promissory note*
*$100,000 up to $200,000 principal amount one-year 10% promissory note*
*$200,000 up to $400,000 principal amount one-year 12% promissory note*
*$400,000 up to $600,000 principal amount one-year 14% promissory note*
*Above $600,000 principal amount one-year 15% promissory note*

**Offering Price: $50,000 Per Unit          Minimum Subscription: One Unit**

### SUBSCRIPTION AGREEMENT

MCA Capital Fund I, LLC
1080 N. Delaware Avenue, Suite 505
Philadelphia, Pennsylvania 19125

Dear Prospective Investor:

This Subscription Agreement ("Agreement") has been executed by the undersigned in connection with the exempt general solicitation offer and sale to a select group of investors of up to 1000 units (the "Units") of the securities of MCA Capital Fund I, LLC (the "Company") at an offering price of $50,000 per Unit for an aggregate offering price of $50,000,000 (the "Offering"). Each Unit will consist of one $50,000 principal amount 12-month 8%-15% promissory note. Each promissory note is an unsecured debt security with a principal amount face value of $50,000 that matures in 12 months with a 8%-15% annualized interest rate (the "Notes"), as more fully described in the Company's confidential offering memorandum dated February 1, 2018. The minimum subscription by an investor is one Unit ($50,000 minimum investment). The Company reserves the right in its sole discretion to sell fractionalized Units, and may also accept investments of less than one Unit.

All of the Units will be sold on a "best-efforts" basis which means that net Offering proceeds will be available to the Company upon receipt, acceptance and clearance thereof and that no minimum amount of Unit sales will be required in order to complete and close this Offering. There can be no assurance that all of the Units offered will be subscribed for.

The Units and underlying Interests may also be referred to herein as "securities."

The undersigned hereby makes the following representations, warranties and agreements:

1.     **Information.** The undersigned has received and carefully reviewed the Company's confidential offering memorandum dated February 1, 2018 (the "Memorandum") accompanying this Agreement. The representations and warranties herein contained shall survive the execution and delivery of this Agreement and the sale of the Units hereunder.

**2.      Agreement to Subscribe.** The undersigned hereby subscribes for _____4_____ Units at a price of $50,000 per Unit, payment for which in the total amount of $ 200,000,000 is made herewith. Payment for such subscription is being made by wire transfer or by check, bank draft, or money order.

The Company may accept or reject any subscription in whole or in part or otherwise alter the terms under which subscriptions may be accepted. The Company, its officers, directors, advisors, employees, current interest holders, and its and their affiliates may purchase the Units on the same basis as other subscribers.

The undersigned understands that except as provided under state securities laws, this subscription is irrevocable and that the execution and delivery of this Agreement will not constitute an agreement between the undersigned and the Company until this Agreement has been accepted by the Company.

**3.      Access to Information.** The undersigned acknowledges that the undersigned is subscribing for the Units after what the undersigned deems to be adequate investigation of the business and prospects of the Company by the undersigned, or the purchaser representative(s) appointed by the undersigned. The undersigned and the undersigned's purchaser representative(s), if any, have been furnished with the Memorandum and any other materials relating to the business and operation of the Company which have been requested by them and have been given an opportunity to make any further inquiries desired of the management and any other personnel of the Company. The undersigned and the undersigned's purchaser representative(s), if any, have received complete and satisfactory answers to any such inquiries.

**4.      Certain Representations.** The undersigned represents and warrants that the information submitted herewith to the Company by or on behalf of the undersigned is true and correct as of the date hereof. The undersigned further represents and warrants that:

(a)   If the undersigned is a corporation, it is duly organized, validly existing and in good standing under the laws of the state and country of its incorporation; that the corporation has the corporate power to carry on its business and to make the investment contemplated herein and that this investment is for a proper corporate purpose; that this subscription has been duly and validly authorized, executed and delivered and when accepted by the Company will constitute the valid, binding, and enforceable agreement of the undersigned; that the corporation has sufficient liquid assets to pay the full acquisition costs in connection with the Units it proposes to acquire; and that the corporation has sufficient assets such that it can afford a total loss of its investment in the Units.

(b)   If the undersigned is a partnership or association, that each individual partner or member of the partnership or association can bear the economic risks of his, her, or its pro rata share of this investment and can afford a total loss of his, her, or its investment; and that each individual partner or member has sufficient liquid assets to pay his, her, or its portion of the full acquisition costs in connection with the Units the partnership or association has agreed to acquire, has adequate means of providing for his, her, or its current needs and possible personal contingencies, and has no present need for liquidity of his, her, or its investment.

(c)   The undersigned has been advised that neither the Units nor the underlying securities are being registered under the Securities Act of 1933, as amended (the "Act"), on the basis of an applicable statutory exemption, which may include, without limitation or exclusion, Rule 506(b) of Regulation D, as may be amended from time to time, and on the representations made by the undersigned herein. The undersigned understands that no federal agency has passed on or made any recommendation or endorsement of the Units and that the Company is relying on the truth and accuracy of the representations, declarations and warranties herein made by the undersigned in offering the Units for sale to the undersigned without having first registered the same under the Act.

Appendix A – Page 2

(d) The undersigned is acquiring the Units for investment for the undersigned's own account and not with a view to their resale or distribution and does not intend to divide his, her, or its participation with others or to resell or otherwise dispose of all or any part of the Units unless and until they are subsequently registered under the Act, or an exemption from such registration is available.

(e) The undersigned has an existing relationship with the Company or its principals, executive officers, or directors evincing trust between the parties (namely close business association, close friendship, or close family ties), and is acquiring the securities as ultimate purchaser and not as underwriter or conduit to other beneficial owners or subsequent purchasers.

(f) The undersigned alone, or together with the undersigned's purchaser representative, has the ability to evaluate the merits and risks of an investment in the Company based upon his, her, its, or their knowledge and experience in financial and business matters.

(g) The undersigned understands that, in the view of the Securities and Exchange Commission (the "Commission"), the applicable statutory exemption(s) referred to above would not be available if, notwithstanding the undersigned's representations, the undersigned had in mind merely acquiring the Units for immediate resale or distribution upon a market developing therefore.

(h) The undersigned further understands that in the event Rule 144 of the Act ("Rule 144") hereafter becomes applicable to the Units, any routine sale of the Units made thereunder can be made only in limited amounts in accordance with the terms and conditions of this subscription agreement and of Rule 144 and that in the event Rule 144 is not applicable, compliance with a disclosure exemption will be required before the undersigned can transfer part or all of the Units. However, the Company shall supply the undersigned with any information necessary to enable the undersigned to make routine sales of the Units under Rule 144, if applicable, and if there shall, at such time, be a market therefore, of which there is no assurance.

(i) The undersigned accepts the condition that, before any transfer of any of the Units can be made by the undersigned, written approval must first be obtained from the Company's counsel. The basis of such approval, which shall not be unreasonably withheld, shall be in compliance with the requirements of the federal and state statutes regulating securities. The undersigned understands that a legend to this effect may be placed on the underlying securities, and that stop transfer instructions will be issued by the Company, to its transfer agent, if any.

(j) The undersigned understands and agrees that if the undersigned's subscription is accepted, the undersigned may be required to execute other documents to effectuate or evidence his, her, or its purchase of the Units.

(k) No one acting on behalf of the Company has made any representation, warranty, or agreement to or with the undersigned with respect to purchase of the Units, except as described herein and in the Memorandum accompanying this Agreement.

(l) The undersigned affirms that the information and representations contained herein, particularly those representations relating to the undersigned's general ability to bear the risks of the investment being made hereby and the undersigned's suitability as an investor are true and correct.

(m) The undersigned's investment in the Company has not been solicited by means of public solicitation or advertisement and all of the information and representations contained herein, particularly those representations relating to the undersigned's general ability to bear the risks of the investment being made hereby and the undersigned's suitability as an investor are true and correct.

(n) The undersigned is aware that the Units are a speculative investment involving a very high degree of risk and that there is no guarantee that the undersigned will realize any gain from the undersigned's investment. The undersigned is able (i) to bear the economic risk of this investment, (ii) to hold the Units indefinitely, and (iii) presently able to afford a complete loss of this investment.

(o) The undersigned has adequate other means of providing for the undersigned's current needs and personal contingencies and therefore has no need for liquidity in this investment. The undersigned's overall commitment to investments, which are not readily marketable, is not disproportionate to the undersigned's net worth and the undersigned's investment in the Units will not cause such overall commitment to become excessive.

(p) The undersigned represents that the funds provided for this investment are either separate property of the undersigned, community property over which the undersigned has the right of control or are otherwise funds as to which the undersigned has the right of management.

(q) The undersigned understands the meaning and legal consequences of the representations and warranties made herein, all of which are true and correct as of the date hereof and will be true and correct as of the date of the undersigned's acquisition of the Units subscribed for herein. Each such representation and warranty shall survive such purchase.

(r) The undersigned will indemnify and hold harmless the Company, its agents, counsel, successors, and assigns, and each of their affiliated persons, from any and all damages, losses, costs and expenses (including reasonable attorney's fees) which they, or any of them, may incur by reason of the undersigned's failure, or alleged failure, to fulfill any of the terms and conditions of this subscription or by reason of the undersigned's breach of any of his, her, or its representations and warranties contained herein.

(s) The undersigned is a bona fide resident of the state set forth on the signature page hereof, maintains his, her, or its principal residence there and is at least 21 years of age.

(t) The undersigned has relied on his, her, or its own legal counsel to the extent the undersigned has deemed necessary as to all legal matters and questions presented with reference to the offering and sale of the Units subscribed for herein.

(u) The undersigned hereby agrees that this subscription is irrevocable and that the representations and warranties set forth in this Agreement shall survive the acceptance hereof by the Company.

(v) The undersigned hereby agrees and acknowledges that the agreements and representations herein set forth shall become effective and binding upon the undersigned and the undersigned's heirs, legal representatives, successors, and assigns upon the Company's acceptance hereof.

## 5. General.

(a) All notices or other communications given or made hereunder shall be in writing and shall be delivered, or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at the undersigned's address set forth below and to the Company at the address set forth above.

(b) Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the internal laws of the State of Pennsylvania, without giving effect to conflicts of law.

(c) This Agreement constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties. The undersigned agrees not to transfer or assign this Agreement, or any of his, her, or its interest herein, without the express written consent of the Company.

(d) The undersigned agrees that counsel to the Company shall not be liable for taking any action pursuant to this Agreement in the absence of willful misconduct, misfeasance, malfeasance, or fraud.

Appendix A – Page 4

(e) The undersigned has enclosed with this Agreement appropriate evidence of the authority of the individual executing this Agreement to act on its behalf (i.e. if a trust, a copy of the trust agreement; if a corporation, a certified corporate resolution authorizing the signature and a copy of the articles of incorporation; or if a partnership, a copy of the partnership agreement).

Subscriber Information for Issuance of Certificates for the Units as Follows:

(Entity Name)

Kara A. DiPietro

(Name)

(Title)

<div style="background:black"> </div>

(Street and No.)

Towson MD 21204

(City, State and Zip Code)

4481

(Social Security No. or Federal Employer ID No.)

77

(Date of Birth)

k.dipietro@hmcincorporated.com

(Email Address)

(Phone Number)

Very truly yours,

By: Kara Dipietro     Digitally signed by Kara Dipietro
Date: 2018.06.14 15:07:10 -04'00'

(Signature of Subscriber)

Dated: June 14 _____, 2018

Company Acceptance of Subscription Upon Execution Below:

MCA Capital Fund I, LLC

By: _____

David R. Alperstein, President

Dated: 6/15 _____ 2018

**Appendix C: Form of Promissory Note**

THIS NOTE HAS BEEN MADE FOR INVESTMENT PURPOSES ONLY AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH THE DISTRIBUTION THEREOF AND HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THIS NOTE MAY NOT BE SOLD, TRANSFERRED, OR ASSIGNED ("TRANSFER") UNLESS IT IS SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE AND THE MAKER CONSENTS IN WRITING TO SUCH TRANSFER.

# MCA CAPITAL FUND I, LLC
*A New Jersey Limited Liability Company*

## $50,000,000 AGGREGATE AMOUNT 8%-15% PROMISSORY NOTES

### 1000 UNITS OFFERED
*$50,000 - $100,000 principal amount one-year 8% promissory note*
*$100,000 up to $200,000 principal amount one-year 10% promissory note*
*$200,000 up to $400,000 principal amount one-year 12% promissory note*
*$400,000 up to $600,000 principal amount one-year 14% promissory note*
*Above $600,000 principal amount one-year 15% promissory note*

### Offering Price: $50,000 Per Unit          Minimum Subscription: One Unit

Certificate No.: MCAP-2

Principal Amount: $200,000

Holder: Kara A. DiPietro

Date: June 14, 2018

Issuance Date: 6/15/18

Maturity Date: 6/15/19

Interest Rate: 12%

*APPENDIX C – Page   1*

MCA Capital Fund I, LLC, a New Jersey limited liability company, with a business address at 1080 N. Delaware Avenue, Suite 505, Philadelphia, Pennsylvania 19125, is offering up to 1000 units comprised of one $50,000 principal amount 12-month 8% - 15% promissory note per unit (the "Units") for an aggregate offering price of $50,000,000 (the "Offering"). Each promissory note is a debt security consisting of a $50,000 principal amount 12-month 8% - 15% note (depending on the number of Units purchased) (the "Notes"). The minimum subscription by an investor is one Unit ($50,000 minimum investment).

MCA Capital Fund I, LLC (the "Maker"), for value received, promises to pay to the individual and/or legal entity designated in this Note as the "Holder," the principal sum of  two hundred thousand  ($ 200,000 ) Dollars. The Notes will have an annual rate of return of  12  % percent, simple interest, over the term thereof, with a maturity date of 12 months from date of issuance this Note, unless extend at the election of the Holder as provided herein (the "Maturity Date"). The Holder will be entitled to receive interest accrued at an annual rate of  12  % of the principal amount of the Notes held, to be paid out whenever funds are legally available and when and as declared by the Maker's officer(s) and/or manager(s). The Maker may pay interest in cash or capitalize interest to principal, on a monthly basis. The Notes being offered by the Company are not secured. Interest shall accrue annually and be based on the commencement date of the Note. The entire principal shall be due and payable to the Holder no later than the Maturity Date. The Maker may at any time or from time to time make a voluntary prepayment, whether in full or in part, of this Note, without premium or penalty.

Interest on Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months. Interest will begin to accrue on the first (1st) day or fifteenth (15th) day of each month depending upon the date on which payment for the Note was received by the Company. If the Company receives payment on the first (1st) through the fourteenth (14th) day of the month, interest will begin to accrue on the Fifteenth (15th) day of the month and payments of interest only will be due and payable on the eighteenth (18th) day of the following month and each month thereafter until maturity. If the company receives payment on the Fifteenth (15th) day of the month through the last day of the month, interest will begin to accrue on the first (1st) day of the month and payment of interest only will be due and payable on the fourth (4th) day of the following month and each month thereafter until maturity.

The Company may at any time or from time to time make a voluntary prepayment, plus any accrued interest at a prorated rate, whether in full or in part, of the Notes, without premium or penalty. No interest shall accrue past the date of a pre-payment in full of any such Note.

**1.    NOTES**

The Notes represented by this document are in the principal amount set forth above, and are offered for sale by the Maker, pursuant to the terms, conditions and information contained in that certain "Confidential Offering Memorandum" dated February 1, 2018. The Notes shall be senior debt of the Maker.

**2.    EVENTS OF DEFAULT**

A default shall be defined as one or more of the following events ("Event of Default") occurring and continuing:

(a)    The Maker shall fail to pay any interest and/or principal payments on the Notes when due and declared payable by the Maker for a period of thirty (30) days after notice of such default has been sent by the Holder to the Maker.

(b)    The Maker shall dissolve or terminate the existence of the Maker.

(c)    The Maker shall file a petition in bankruptcy, make an assignment for the benefit of its creditors, or consent to or acquiesce in the appointment of a receiver for all or substantially all of its property, or a petition for the appointment of a receiver shall be filed against the Maker and remain unstayed for at least ninety (90) days.

Upon the occurrence of an Event of Default, the Holder of the Notes may, by written notice to the Maker, declare the unpaid principal amount and all accrued and unpaid interest of the Notes immediately due and payable.

**3.    NO SECURITY FOR PAYMENT OF THE NOTES**

The Notes offered by the Maker are unsecured.

**4.    STATUS OF HOLDER**

The Maker may treat the Holder of the Notes as the absolute owner of the Notes for the purpose of making payments of principal or interest and for all other purposes, and shall not be affected by any notice to the contrary, unless the Maker so consents in writing.

**5.    LIQUIDATION**

Upon liquidation, an investor will have the right to receive repayment of all unpaid principal and interest due on the Notes. A sale, merger, reorganization or similar transaction will be treated as a liquidation event.

**6.    NO REDEMPTION**

The Holder has no right to redeem the Notes.

7. **SECURITIES ACT RESTRICTIONS**

This Note has not been registered for sale under the Act. This Note may not be sold, offered for sale, pledged, assigned or otherwise disposed of, unless certain conditions are satisfied, as more fully set forth in the Subscription Agreement.

8. **TERM**

The Notes will mature 12 months from the date set forth on this certificate.

9. **ATTORNEYS' FEES**

The prevailing party in an action to enforce this Note shall be entitled to reasonable attorneys' fees, costs and collection expense.

10. **MISCELLANEOUS.**

(a)   Successors and Assigns. The Holder may not assign, transfer or sell this Note to any party without the express written consent of the Maker. This Note shall be binding upon and shall inure to the benefit of the parties, their successors and, subject to the above limitation, their assigns, and shall not be enforceable by any third party.

(b)   Entire Agreement. Subject to and in addition to all terms, conditions, representations and warranties in the Subscription Agreement executed by the Holder, this Note contains all oral and written agreements, representations and arrangements between the parties with respect to its subject matter, and no representations or warranties are made or implied, except as specifically set forth herein. No modification, waiver or amendment of any of the provisions of this Note shall be effective unless in writing and signed by both parties to this Note.

(c)   Notices. All notices in connection with this Note shall be in writing and personally delivered or delivered via overnight mail, with written receipt therefor, or sent by certified mail, return receipt requested, to each of the parties hereto at their addresses set forth below (or such other address as may hereafter be designated by either party in writing in accordance with this Section 10). Such notice shall be effective upon personal or overnight delivery or five (5) days after mailing by certified mail.

(d)   Section Headings. The headings of the various sections of the Note have been inserted as a matter of convenience for reference only and shall be of no legal effect.

(e)   Severability. If any provision or portion of this Note or the application thereof to any person or party or circumstances shall be invalid or unenforceable under applicable law, such event shall not affect, impair, or render invalid or unenforceable the remainder of this Note.

(f)   Applicable Law. This Note shall be deemed to have been made in the State of New Jersey, and any and all performance hereunder, or breach thereof, shall be interpreted and

*APPENDIX C – Page   4*

construed pursuant to the laws of the State of Jersey without regard to conflict of laws rules applied in the State of New Jersey. The parties hereto hereby consent to personal jurisdiction and venue exclusively in the State of Pennsylvania with respect to any action or proceeding brought with respect to this Note.

**MAKER**:

MCA Capital Fund I, LLC

By:

David R. Alperstein, President

Date: 6/15/18

**HOLDER**:

Print Name: Kara A. DiPietro

Date: June 14, 2018

*APPENDIX C -- Page   5*

<u>**Appendix D: Notice of Acceptance**</u>

# MCA National Fund, LLC

*A New Jersey Limited Liability Company*

## $50,000,000 AGGREGATE AMOUNT 8.5% PROMISSORY NOTES

## 1000 UNITS OFFERED

**Offering Price: $50,000 Per Unit**          **Minimum Subscription: One Unit**

## <u>NOTICE OF ACCEPTANCE</u>

**Investor**: Kara DiPietro

**Number of Units**: 4

**Date of Acceptance**: 6/15/18

The subscription by the above referenced investor for the above referenced number of Units being offered by the Company in accordance with the terms and conditions provided by the offering documents furnished to the investor is hereby accepted as of the date set forth above.

MCA National Fund, LLC

By:

David R. Alperstein, President

**From:** Kara DiPietro
**Sent:** Friday, October 19, 2018 9:21 PM
**To:** Joe Mack <joe@parfunding.com>
**Subject:** 10-19-2018 RFI $14,000,000

Hey! My dad just called and asked if I'd help him secure a facility where he could put $14,000,000 for 12-24 months - and if that short term investment would work what would be the return?

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**From:** Joe Mack [mailto:joe@parfunding.com]
**Sent:** Friday, October 19, 2018 10:15 PM
**To:** Kara DiPietro <k.dipietro@hmcincorporated.com>
**Subject:** Re: 10-19-2018 RFI $14,000,000

I can get him 12 percent for 24 months. Interest payable monthly 140k a month. Balloon at the 24th month.  Just got audited financials done. We have 270 million in advances working w Par and I have several other funds. But I would recommend he come to Par. I have 80 million in the company myself. So his money would be side by side w mine. I can send Perry out to see him to go over details if he would like that

Sent from my iPhone

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**From:** Kara DiPietro
**Sent:** Friday, October 19, 2018 10:20 PM
**To:** Joe Mack <joe@parfunding.com>
**Subject:** Re: 10-19-2018 RFI $14,000,000

Awesome. Is it ok if I forward your response to him? I can copy you and Perry - then you guys can coordinate?

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**From:** Joe Mack [mailto:joe@parfunding.com]
**Sent:** Friday, October 19, 2018 11:04 PM
**To:** Kara DiPietro <k.dipietro@hmcincorporated.com>
**Subject:** Re: 10-19-2018 RFI $14,000,000

Of course

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**From:** Kara DiPietro
**Sent:** Friday, October 19, 2018 11:13 PM
**To:** Gerry Dzurek <g.dzurek@hmcincorporated.com>
**Cc:** Joe Mack <joe@parfunding.com>; Perry Abbonizio <perry@parfunding.com>
**Subject:** Fwd: 10-19-2018 RFI $14,000,000

Dad - See below. I believe you said that you needed confirmation by Monday/Tuesday. I'll give you a call tomorrow and will assist coordinating next steps.


Kara

**From:** Kara DiPietro
**Sent:** Saturday, October 20, 2018 7:56 PM
**To:** Joe Mack <joe@parfunding.com>
**Subject:** Re: 10-19-2018 RFI $14,000,000

George Chanos is one of my Dad's friends. George and my father are partnering on a couple of interesting ventures. They are both in Vegas now - one of the items on their agenda is the 14mm we discussed. I will be in touch with next steps regarding that - but thought you may be interested in this short lecture George gave in Deleware a few weeks back. My dad and I were in the audience.

https://m.youtube.com/watch?feature=youtu.be&v=T_6-Ys8t0Mk#menu

**From:** Joe Mack [mailto:joe@parfunding.com]
**Sent:** Sunday, October 21, 2018 12:35 AM
**To:** Kara DiPietro <k.dipietro@hmcincorporated.com>
**Subject:** Re: 10-19-2018 RFI $14,000,000

He is amazing. Thanks for sharing that. I believe he is correct on the AI. I have been using it for 6 months and increased revenue by 30 percent. It is good and bad. I think he is spot on. Let me know what I can do for your Dad. Be happy to work with you all.

Sent from my iPhone

| Delivered Date | Type | Sender Name | Text | Attachment | Attachment type | KARA DIPIETRO, HMC INCORPORATED, TEXT MESSAGE COMMUNICATIONS JOE LAFORTE AND KARA DIPIETRO 5/2019 |
|---|---|---|---|---|---|---|
| | Incoming | Joe Laforte | U need to call me. | | | |
| 5/10/2019 9:29 | Outgoing | | i will | | | |
| 5/10/2019 9:30 | Outgoing | | i am at an event right now | | | |
| | Incoming | Joe Laforte | I had enough of this non sense w you not keeping your word. We sat down and concurred on the figures. Now you are welching | | | |
| 5/10/2019 9:33 | Outgoing | | no that is not what I said. I told Joe Cole to get the contracts | | | |
| | Incoming | Joe Laforte | Fuck this. I am filing today | | | |
| 5/10/2019 9:34 | Outgoing | | good luck with that | | | |
| | Incoming | Joe Laforte | We will see. I am not Yellowstone. | | | |
| | Incoming | Joe Laforte | Get your fat ass up and call me | | | |
| | Incoming | Joe Laforte | That was my last call. Now action | | | |
| 5/10/2019 10:20 | Outgoing | | I told you I am at an event | | | |
| | Incoming | Joe Laforte | You are in default with our company.  You are returning payments in our account. | | | |
| | Incoming | Joe Laforte | No respect for me. I gave you millions of dollars to help your business. Bailed you out of jams so many times. Now I am being ignored. Shameful | | | |
| 5/10/2019 13:23 | Outgoing | | You wouldn't listen to me, and you tried to make me pay for your company's mistake. I would never screw someone who treated me with respect. | | | |
| | Incoming | Joe Laforte | Ok. So u think I screwed you??? Are u seriously nuts. I am out millions. I trusted u with my family's money. I never screwed anyone. Especially you.  Now I am going to have to come after you for the money | | | |
| 5/10/2019 13:27 | Outgoing | | i know i saw jamies name | | | |
| 5/10/2019 13:27 | Outgoing | | no i am not going to screw | | | |
| | Incoming | Joe Laforte | You keep clicking me and my AR team is contacting your clients as we speak. Judgments being drawn up.  This is avoidable.  You agree to the number. Pay me back | | | |
| | Incoming | Joe Laforte | Pick up the phone | | | |
| 5/10/2019 13:27 | Outgoing | | you i will pay you what i owe | | | |
| | Incoming | Joe Laforte | It is me. You know my number. | | | |
| 5/10/2019 13:28 | Outgoing | | not now i gotta go - email will come to you later to work it out | | | |

| Delivered Date | Type | Sender Name | Text | Attachment | Attachment type |
|---|---|---|---|---|---|
| 5/10/2019 13:29 | Outgoing | | oh they are contacting my clients ok. tell them I said hi. | | |
| | Incoming | Joe Laforte | Pick up coward | | |
| 5/10/2019 13:29 | Outgoing | | i am not picking up the phone | | |
| 5/10/2019 13:30 | Outgoing | | you are disrespectful and rude. | | |
| | Incoming | Joe Laforte | I are bouncing the payments. Your disrespecting our agreement | | |
| 5/10/2019 13:31 | Outgoing | | you should have talked to me about the issue - you know what happened i know what happened. joe cole knows what happed. | | |
| 5/10/2019 13:33 | Outgoing | | lol i trued to tell you to read the agreements because they weren't good for you but...<br>Bye | | |
| | Incoming | Joe Laforte | We are done. Thatâ€™s it.  No honor.  Filing on u now. | | |
| | Incoming | Joe Laforte | This is fraud on your part.  Straight up robbery. Your disgusting | | |
| 5/10/2019 13:34 | Outgoing | | wtvr my father just told you youll get an email later | | |
| | Incoming | Joe Laforte | Donâ€™t bother | | |
| 5/10/2019 13:35 | Outgoing | | ok | | |
| 5/10/2019 13:35 | Outgoing | | good | | |
| | Incoming | Joe Laforte | Check your e mail. You will find that more interesting | | |
| | Incoming | Joe Laforte | Never though u would screw me for money. Wtf Kara.  How can u turn on friends. And if we were never friends, how can u take money like this from people and not want to pay it back. | | |
| 5/12/2019 13:43 | Outgoing | | Don't give me that bullshit. You know goddamn well what you did. I spent 75 hours over the last two weeks showing the breach of contract and offering solutions. You are not my friend. A friend would not have done that to me. And I don't take well to such disrespectful treatment and name calling. You need to get control of your company. Or whoever's company it really is. | | |
| | Incoming | Joe Laforte | Kara. Stop. We breached nothing. We gave u solid deals. If u canâ€™t pay I will work with you. You are making yourself look like a beat artist. I know your not | | |
| | Incoming | Joe Laforte | Kara. Letâ€™s get this straightened out. I want to help you. Like I always have. But if we canâ€™t work through the issue I will have to file judgment and call in your receivables. The owner of a new lending company kinetic capital canâ€™t be in default either the very product u sell??  That would be insane | | |