UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 20-cv-81205-RAR

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d/b/a PAR FUNDING, et al,

    Defendants.

**DEFENDANTS' JOINT MEMORANDUM TO THE COURT REGARDING THE SCOPE OF THE RECEIVER'S ACTIVITIES PURSUANT TO THE CURRENT TRO**

Defendants Complete Business Solutions Group, Inc. d/b/a Par Funding, Full Spectrum Processing, Inc., Lisa McElhone, Joseph Cole Barleta and Joseph W. LaForte, and Relief Defendant L.M.E 2017 Family Trust, respectfully submit this Joint Memorandum in advance of the August 4, 2020, 3:30 pm conference on the scope of the Receiver's activities under the TRO.[1]

**Procedural History**

On July 24, 2020, the SEC sought an *ex parte* Order appointing a Receiver claiming that, "for the protection of the investors," the Receiver needed to be vested with "full and exclusive power, duty, and authority to: administer and manage their business affairs, funds, assets, causes of action and any other property of the Companies; marshal and safeguard all of the assets of the

---

[1] The Court permitted each party to file a 10-page Memorandum. Rather than burden the Court with multiple filings, we have filed herein a single joint Memorandum of 15 pages.

Companies…" SEC's Motion for the Appointment of a Receiver dated July 24, 2020 (Dkt. No. 4). The Commission proposed an extraordinarily broad order (*see* sealed ECF 4-2), which sought to provide the receiver with all of the "powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, and general and limited partners of the entity Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1962 and Fed.R.Civ.P. 66." *Id.* at ¶1. The SEC's proposed order would have led to the immediate dismissal of the "trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys and other agents of the Receivership Entities." *Id.* at ¶2. And it would have empowered the receiver to transfer all bank accounts to the receiver's control and, remarkably, to "transfer, compromise, or otherwise dispose of any Receivership Property," ***without further Order of this Court***. *Id.* at ¶¶ 30-34. (Emphasis added).

Defendants did not object to Mr. Stumphauzer to be a neutral party in this case. However, Defendants strenuously objected to the imposition of a receiver that would liquidate and destroy these legitimate businesses and cause unnecessary harm to the very investors that the Commission is charged with protecting. *See* Defendants' July 28 Response, ECF 43, at pages 3-6, citing law limiting the scope of a Receivership Order to prevent the unnecessary liquidation of legitimate businesses. *See also Tucker v Baker*, 214 F.2d 627, 631 (5th Cir. 1954) ("[a] receivership is only a means to reach some legitimate end sought through the exercise of the power of the court of equity; it is not an end in itself."); *In re Wiand*, Case No. 8:10-CV-71-T-17MAP, et al, 2011 WL

4530203 at *7 (M.D. Fl. Sept. 29, 2011)(Receivership proceeding arising out of SEC enforcement action, citing *Tucker*)

On July 27, 2020, the Court entered an Order appointing a Receiver. The Court specifically did <u>not</u> confer the overbroad and sweeping powers sought by the Commission. Instead, the Court provided the Receiver with measured powers to monitor the affairs of these legitimate businesses, <u>without</u> empowering him to immediately displace management and, effectively, liquidate the company. *Id.* at p. 3-4. However, since that Order and as described below, the SEC is effectively causing the demise of an otherwise thriving business, violating its fundamental obligation to "First, do no harm." *See* Comments on Proposed Rule (SEC Release No. IA-1812; File No. S7-19-99, Oct. 28, 1999), 1999 WL 33949884. Without a significant and immediate course correction by this Court, the SEC – not the Defendants – will cause enormous losses to large and small investors as well as hundreds of small businesses across the country.

**POINT ONE**

**Since its Founding, CBSG has Consistently Utilized
Excellent Counsel to Identify and Address Compliance Issues**

We respectfully suggest that this Court may find relevant that CBSG has always strived for compliance and utilized excellent counsel. In 2014, the law firm Offit Kurman produced CBSG initial promissory note/security agreement (hereinafter "Note" or "Notes") for use in raising capital through third party creditors in the form of debt. The instrument typically provided for monthly interest and principal payments over 12 to 24 months. The notes ranged between $50K - $500K in principal, with some creditors purchasing multiple concurrent notes. Importantly, Offit Kurman issued an opinion letter, dated April 25, 2014, on the legality of the funding business under Pennsylvania law and the purchase and sale of future receivables agreement.

In July 2016, an expert business and securities lawyer at DLA Piper reviewed and edited the Notes. DLA Piper added the language that, "This note has not been registered under the securities act of 1933..." making clear to creditors that the notes were debt instruments and not securities. Impressively, interest rates paid to investors averaged 25% annually.

In December 2017, CBSG retained noted securities regulation expert, Philip Rutledge. Mr. Rutledge has a national reputation in securities regulation and was instrumental in shaping various provisions of significant US financial services legislation, including the Securities Markets Improvement Act of 1996, the *Gramm-Leach-Bliley Financial Modernization Act of 1999*, the *Sarbanes-Oxley Act of 2002*, and the *Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010*. While in government, Mr. Rutledge served as an expert witness on behalf of the Pennsylvania Office of the Attorney General in civil securities litigation and has testified as a securities expert before the United States Senate Permanent Subcommittee on Investigations. Mr. Rutledge was empowered to make any changes in CBSG's business structure in order to address any regulatory concerns. For example, to improve CBSG's compliance, Mr. Rutledge introduced a note purchase agreement and began changing the business structure so that CBSG would not be involved with soliciting and raising capital from creditors. He also registered CBSG in Pennsylvania under SEC 503b for its non-principal debt instruments. In January 2019, CBSG counsel reviewed and filed all state registrations needed for CBSG's current creditors. [2]

---

[2] Throughout the course of CBSG's ongoing business operations, CBSG retained and worked with nationally known accounting firms such as Clifton Larson Allen, Friedman LLP and Rod Erml Associates to undertake comprehensive reviews and audits of the financial aspects and structure of CBSG's business.  In doing so, these respected accounting firms undertook detailed review and analysis of the financials, client receivables and structure of investor notes.  This additional detail

4

In February 2020, CBSG engaged Fox Rothschild LLP to take over the function of serving as primary counsel to assist the company in dealing with litigation concerning defaults by merchants, which included handling existing and new litigation in Philadelphia (as all of the CBSG agreements have Philadelphia venue provisions). Fox Rothschild also was engaged to defend against litigation (albeit meritless) brought by a select group of merchants that instituted litigation by and through one Philadelphia law firm that engaged in a pattern of abusive and aggressive litigation surrounding the merchant defaults.

In early March, Haynes Boone, and key lawyers from that firm with substantial SEC and regulatory experience, were engaged to review and defend against issues raised by the Texas Securities Commission.

In March 2020, at the outset of the COVID-19 pandemic, as experienced by nearly every business in America at the time, issues arose with increased merchant defaults caused by government shut-down orders. As a result of these issues, CBSG sought to engage in a note restructure to address the business-related issues caused by COVID – with the purpose of protecting the investors and the businesses. In doing so, CBSG retained Phil Ruttledge to again review the notes outstanding with investors and to create a comprehensive Exchange Offer that sought to recapitalize the existing debt. In doing so, a formal Exchange Offer was created and sent to all existing investors. (An example of the Exchange offer is annexed hereto as Exhibit 1) This Offer included the issuance of new notes (but did not include any new debt raises as no new debt

---

will be provided to the Court as part of the comprehensive brief to be submitted in the coming days.

capital had brought into the business since late January or early February). As part of the Exchange Offer, CBSG provided substantial and significant disclosures regarding the various regulatory actions that had occurred in Pennsylvania, New Jersey and Texas, along with significant disclosures concerning litigation, UCC liens, potential new note offerings, risks associated with the MCA business and other key points. Moreover, as part of the Exchange Offer, Phil Ruttledge filed public disclosure documents with the SEC and various state law blue sky filings.

On the afternoon of July 28, the SEC advised that Mr. Stumphauzer would cause the immediate dismissal of all the employees of the businesses and that no employees of the business would be permitted to enter the premises – leading to over 100 employees being barred from the business premises for the last week despite the fact that thousands of merchants around the country rely on ongoing communication with CBSG to ensure the ongoing viability of their business operations. The SEC further advised that Fox Rothschild would be terminated from representing Defendants' businesses in ongoing litigation and collection work which, in fact, is a part of the process of providing funds for the repayment of the investors. In that regard, the SEC filed another "Urgent" motion regarding the collection litigation and settlements that are a normal aspect of this business. The SEC directed the Receiver to change the locks on the businesses and bar employees from working, along with barring any employees from having any access to CBSG systems, when it is clear that the Receiver has no idea (and could have no idea) how to manage this complex operation. On behalf of CBSG, Fox Rothschild has been attempting to provide information and access to key employees to implore the receiver to take immediate action to begin doing daily ACH draws (which brings in nearly $2 million per day), allow employees access to systems to work with merchants and to continue servicing existing contractual terms on merchant deals and

6

to work to keep the nearly $500,000,000 of outstanding merchant agreements performing so that the debt to investors can be repaid. To date, not a dollar has been taken in by the Receiver to pay investors, and they have not been paid. The Receiver's and SEC's actions are ruining a business with excellent fundamentals and a strong financial base and essentially putting it into an ineffective liquidation causing huge financial losses. In taking this course of action against a fully operational business, the key fact that has been lost by the SEC, is that their actions are going to unilaterally lead to massive investor defaults.  That cannot be the outcome that this Court sought when it appointed a limited receiver based on the *ex-parte* submissions of the SEC.

## POINT TWO

### The Business of CBSG is Strong and Supported by Large, Sophisticated Investors

Begun in 2012, the business of CBSG and its related business has grown into 150 employees and attracts large, sophisticated investors. CBSG employs 15 accountants, outside auditors and excellent counsel to guide its affairs and ensure compliance. The business model is easy enough to describe, but its operations are extremely complex and require teams of people expert in the particular financial calculations at the heart of the business. In essence, CBSG has two related businesses. On one side is its merchant funding business. CBSG funds merchants and receives a portion of the merchants' receivables. Picking the right merchants by analyzing the creditworthiness and history of the merchant, and gauging the proper terms of the funding, are crucial to the success of this business.  Contrary to the suggestion in the SEC's Complaint, this is a perfectly lawful practice as courts have found throughout the country.

An important part of the business is collections. Merchants sometimes do not pay or get into arrears. Lawyers bring actions or reach settlements. There are currently about 1,000 such

collection actions across the country, being handled by Fox Rothschild and other excellent counsel around the country. This is typical for the business.

On the other side of the business is the receipt of investor funds which are used to make the merchant advances. Investors receive Notes reflecting their investment and which provide for a rate of interest on the principle. Although the SEC has attached to its Complaint previously utilized Notes – all drafted by esteemed counsel such as DLA Piper – the Exchange Offer used since March 2020 by a vast majority of the investors are excellent with fulsome disclosures that were understood and agreed to by the existing note holders.

Since CBSG began receiving investor funds in 2012, it has never missed a payment to an investor, but for the short Covid-19-related moratorium in April 2020. And, it has paid interest averaging 15-20% per annum to investors. Because of this, and because of the extraordinarily sophisticated financial models and calculations used to run the business, it has attracted large, sophisticated investors. For example, two brothers conducted a thorough due diligence and invested $40 million. Similarly, another very sophisticated investor conducted a comprehensive due diligence and invested $60 million. And an attorney for a fund invested approximately $10 million into CBSG. In filings we will make this Friday, or whenever our principle opposition filings are due, this Court will see that these investors beseech this Court to permit CBSG to continue in business and squarely refute claims made by the SEC in this action. As one investor writes:

> The Commission has not spoken to me, or anyone at my fund, regarding their current actions, despite their claims of trying to protect us. I am entirely against liquidation or closure of Par as it will not only hurt myself, but also hundreds of investors. In fact, if liquidation were to occur, it is highly likely that many of my investors who are senior citizens would lose much of their life savings and homes.

And that is just one investor fund. The SEC's slow liquidation here will unquestionably wreak financial devastation upon countless innocent investors - in the midst of a pandemic.

## POINT THREE

**Since its Founding in 2012, and Until the SEC Action and the Involvement of the Receiver, Investors have Made Very Healthy Interest and there Are No Investor Losses. In Just Seven Days, However, the SEC and the Receiver Have Converted their Restraint of this Company into a Slow and Ineffective Liquidation which will <u>Cause Investors and Merchants to Lose Their Money</u>**

Since its founding in 2012, and until the SEC's action here and the involvement of the Receiver, CBSG has never missed a payment to investors a pre-Covid-19 and investors have made very healthy interest. Pre and Post-Covid 19, there is zero default on principal payments to an investor. Pre and Post-Covid 19, there is zero default on interest to an investor, although Notes were renegotiated in March 2020 to a lower interest rate due to Covid-19's effect on the economy (after years of 15-20% returns). CBSG has never missed a redemption to an investor.

And the merchant default rates are excellent. Put simply, the merchant cash over cash default exposure is 1.2%. That means that of all merchants receiving $100 in cash from CBSG, only $1.20 (1.2%) is defaulted on. Outside audits to GAAP were performed by Clifton Larson Allen, Friedman LLP and others in 2017, 2018 and 2019 and the most recent audit finished just days ago in July 2020.

Current financials are strong and can survive Covid – until the SEC started its liquidation. At the close of the business day on Tuesday, July 28, 2020, the balance sheet for CBSG - prior to the Receiver taking over - reflected the following:

1.      Bank balance – cash on hand was $18 million.

2. Fixed receivables from the merchants for whom CBSG enters into factoring agreements was $413 million.

The company's monthly cash flow from client deposits is approximately $30 million. From this amount, the company sustains its monthly operating costs of $5 million which includes salaries, office rent and other monthly business expenses. Two million is earmarked for interest paid to creditors. With the balance of retained earnings of approximately $25 million, the company funds new factoring agreements after a thorough review of the merchant's businesses. Many of the businesses which enter into factoring agreements with the company include seasonal businesses such as landscaping and certain retail businesses which add new employees during summer or winter months. The company uses best business practices and has a full-time compliance officer on staff. In order to sustain this business, it is imperative that daily active management of its portfolio is maintained to ensure that client payments are consistently received via ACH payments.

The strength of the company portfolio and its growth over the last year is detailed on the Financial Summary attached. The Net Equity line under liabilities shows strong, consistent growth with use of retained earnings. The company went from approximately $85M at the beginning of 2019 to $104M in retained earnings before the Covid-19 crisis reduced a significant amount of the account receivable portfolio due to bad debt. Even then, however, through prudent management, CBSG was able to rebuild its portfolio to a secure a profitable position even after the height of the Covid-19 pandemic. As of July 2020, CBSG was communicating frequently with merchants to renegotiate terms due to Covid-19 interruption of their businesses and income.

In February 2020, CBSG made a decision not to raise any new capital since they anticipated Covid-19 related business closures. CBSG has renegotiated with its creditors as well since the Covid crisis. Prior to the pandemic, creditors were receiving interest rates of approximately 15%. Since Covid-19, rates were reduced to 5% across the board to account for reduced receipt of merchant payments. Indeed, CBSG paid $18M in interest, including through the Covid moratorium from March through May 2020 and, but for the SEC's action, expects to pay approximately $46M in total interest for the year under the restructured notes. Through careful, diligent management, CBSG was able to regrow its equity position during the past two months.

However, once the Receiver, at the direction of the SEC, took over and locked out the employees, the day to day management of the business could not be maintained. Although, through careful stewardship, CBSG was able to navigate the storm of Covid-19, the SEC's actions with the Receiver are cratering the business. <u>To make it absolutely crystal clear, the financial data shows that, for one week that the Receiver has been in place, July 29, 2020 through August 4, 2020, the total loss in ACH payments is approximately $6,592,991.59.</u>

Similarly, Full Spectrum Processing ("FSP") employed approximately 80 people in its two offices in Philadelphia. Since the Covid-19 crises, and just before the Receiver, it employed approximately 60 people and hoped to rehire 10-15 more. FSP provides all of the processing services for CBSG's portfolio. These services include day to day processing of ACH payments, technology services including computer services, collections work and other office services. In addition to CBSG, FSP provides these services for other clients as well, including a solar panel construction company, a physical therapy business, a property management company and other businesses. Acting at the behest of the SEC, the Receiver expelled the employees and closed these

offices and froze the related merchant client bank accounts. These actions have caused these businesses to suffer significant losses. The SEC's actions will close these businesses and their employees will join the ranks of the millions of unemployed. The SEC's actions have also done severe harm to the CBSG's banking and processing relationships. It is time-consuming to organize the merchant cash advance structure pursuant to industry standards. Even if the company's employees return immediately, the general chaos caused by the SEC's actions will take the company time to recover.

As we show next, the SEC's plan, to install a new company (DSI) to start anew on extraordinarily detailed work in which CBSG's employees are expert, is a complete waste of time and money and totally unworkable. It is also totally unnecessary. It will, however, without doubt, result in the demise of CBSG and the loss of over 100 jobs in Pennsylvania, not to mention severe injury to investors and merchants who have long relied on CBSG's operations.

**This case is Not 1 Global. The SEC's Plan to Install A New Company to take over CBSG's operations is Totally Unnecessary, Unworkable and will Result in the Demise of CBSG**

The SEC may cite to *1 Global Capital, LLC*, 18-19121-RBR. This is a markedly different case. In *1 Global Capital*, the owners of the business filed a voluntary petition for Chapter 11 reorganization in U.S. Bankruptcy Court <u>before</u> the SEC filed its enforcement action. The Debtor remained in lawful possession of its business, and a senior management overseer was appointed <u>with the consent of the Debtor</u>. Only later did the SEC file its securities action, and the Receiver appointed in that case, Jon Sale, Esq., was appointed as an overseer to management. *See* First Amended Disclosure Statement in Support of Liquidation Plan, describing the history of that litigation in Bankruptcy Court and District Court. 18-19121-RBR, ECF 806. In one year, the company appointed in *1 Global*, (the very same professionals that the SEC and

12

Receiver propose to use in this case), billed $3,339,000 for their "liquidation" plan. (*See* 1 Global, "Plan of Liquidation," annexed hereto as Exhibit 2)

Here, this Court has before it a fully operational, ongoing, 100-plus employee business that is relied upon by investors who have millions of dollars at stake and hundreds of merchants who rely on their relationship with CBSG – a company which has very significant longstanding outside legal and accounting resources. The SEC's erroneous plans will cause millions in losses.

## **Conclusion**

Despite this Court's clear direction to the Receiver ("to take…action as necessary and appropriate for the preservation of the [entities] property interests," and "to prevent the dissipation...of such property interests," and not "interfere or hinder" with "efforts to preserve" the entities property interests), the SEC's direction of the Receiver is, right now, each and every day, destroying this business and with it, hundreds of millions of dollars in value. This gross harm, to a business that just days ago was profitable and paying regularly on every Note, is not being caused by the Defendants – it is unquestionably being caused by the actions of the SEC. The SEC - not the Defendants - are creating hundreds of millions of dollars in potential liability and losses to large and small investors. [3]

---

[3] Defendants have no objection to the Receiver performing monitoring functions to insure and verify the lawful, proper and compliant operations of CBSG. They will find a house in solid order.

Respectfully submitted,

Law Offices of Alan S. Futerfas
*Attorneys for Lisa McElhone*
565 Fifth Avenue, 7th Floor
New York, New York 10017
(212) 684-8400
asfuterfas@futerfaslaw.com
*pro hac vice*

By: /s/*Alan S. Futerfas*
    Alan S. Futerfas

**GRAYROBINSON, P.A.**
*Attorneys for L.M.E. 2017 Family Trust*
333 S.E. 2d Avenue, Suite 3200
Miami, Florida 33131
Telephone #: (305) 416-6880
Facsimile #: (305) 416-6887
Joel.hirschhorn@gray-robinson.com
joel.hirschhorn@gray-robinson.com

By: s/Joel Hirschhorn
JOEL HIRSCHHORN
Florida Bar #104573

**FOX ROTHSCHILD LLP**
*Attorneys for Complete Business Solutions Group, Inc. d/b/a Par Funding, Full Spectrum Processing, Inc., Lisa Mcelhone, Joseph Cole Barleta and Joseph W. LaForte and Relief Defendant, L.M.E 2017 Family Trust*
One Biscayne Tower, Suite 2750
2 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 442-6547

By: /s/*Joseph DeMaria*
  **Joseph A. DeMaria, B.C.S.**
  Florida Bar No. 764711
  Email: JDeMaria@FoxRothschild.com
  **Robert F. Elgidely**
  Florida Bar No. 111856
  Email: RElgidely@FoxRothschild.com

**Brett Berman**
2000 Market Street, 20th Floor
Philadelphia, PA 19103,
Tel: (215) 299-2000
Email: bberman@foxrothschild.com

**Alex L. Braunstein**
Florida Bar No. 098289
777 S. Flagler Drive
Suite 1700 West Tower
West Palm Beach, FL 33401
Telephone: (561) 804-4497
Email: ABraunstein@foxrothschild.com
Email: mmiller-hayle@foxrothschild.com

Bettina Schein, Esq.
*Attorney for Joseph Cole Barleta*
*Pro hac vice admission pending*
565 Fifth Avenue, 7th Floor
New York, New York 10017
(212) 880-9417
bschein@bettinascheinlaw.com

s/ James R. Frocarro, Jr.
JAMES R. FROCCARO JR.
20 Vanderventer Ave., Suite 103W
Port Washington, New York 11050
516-944-5062-(office)
516-944-5066-(fax)
516-965-9180-(mobile)
jrfesq61@aol.com-(email)

15

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on August 4, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

s/Joel Hirschhorn
JOEL HIRSCHHORN
