**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 20-cv-81205-RAR**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**COMPLETE BUSINESS SOLUTIONS GROUP,**
   **INC. d/b/a/ PAR FUNDING,**
**FULL SPECTRUM PROCESSING, INC.,**
**ABETTERFINANCIALPLAN.COM LLC**
   **d/b/a/ A BETTER FINANCIAL PLAN,**
**ABFP MANAGEMENT COMPANY, LLC,**
   **f/k/a/ PILLAR LIFE SETTLEMENT**
   **MANAGEMENT COMPANY, LLC,**
**ABFP INCOME FUND, LLC,**
**ABFP INCOME FUND 2, L.P.,**
**UNITED FIDELIS GROUP CORP.,**
**FIDELIS FINANCIAL PLANNING LLC,**
**RETIREMENT EVOLUTION GROUP, LLC,**
**RETIREMENT EVOLUTION INCOME**
**FUND, LLC, f/k/a RE INCOME FUND, LLC,**
**RE INCOME FUND 2, LLC,**
**LISA MCELHONE,**
**JOSEPH COLE BARLETA, a/k/a/ JOE COLE,**
**JOSEPH W. LAFORTE, a/k/a JOE MACK,**
   **a/k/a/ JOE MACKI, a/k/a JOE MCELHONE,**
**PERRY S. ABBONIZIO,**
**DEAN J. VAGNOZZI,**
**MICHAEL C. FURMAN,**
**and JOHN GISSAS,**

**Defendants, and**

**THE LME 2017 FAMILY TRUST, a/k/a**
**LME 2017 FAMILY TRUST,**

**Relief Defendant.**

_____/

**<u>AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>[1]**

---

[1] The Amended Complaint corrects a scriveners error, to include "The" in the Relief Defendant's name and identifies the Trustees of the Relief Defendant.

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I. __INTRODUCTION__

1.      This case concerns a web of unregistered, fraudulent securities offerings that have raised nearly half a billion dollars from an estimated 1,200 investors nationwide. At the center of this web are Lisa McElhone and her husband, convicted felon Joseph W. LaForte, a/k/a Joe Mack, a/k/a Joe Macki, a/k/a Joe McElhone. The McElhone-LaForte duo is in the business of making opportunistic loans – some of which charge more than 400% interest – to small businesses across America. They offer the loans through a company they control, Complete Business Solutions Group, Inc. d/b/a Par Funding ("Par Funding").

2.      To fuel the Par Funding loans and enrich themselves, the Defendants operate a scheme wherein they raise investor money through unregistered securities offerings.  From August 2012 until approximately December 2017, Par Funding primarily issued promissory notes and offered them to the investing public directly and through a network of sales agents.

3.      This changed in early January 2018, when Par Funding learned it was under investigation by the Pennsylvania Department of Banking and Securities for violating state securities laws through its use of unregistered agents. In September 2018, Par Funding told the Pennsylvania Securities Regulators it had terminated its agreements with the unregistered sales agents. This was only half of the story.

4.      In truth and unbeknownst to the Pennsylvania Securities Regulators, after learning of the investigation Par Funding implemented a new way to fuel its loans – namely, through so-called "Agent Funds" created for the purpose of issuing their own promissory notes, selling the notes to the investing public through unregistered securities offerings, and funneling investor funds to Par Funding. Par Funding compensates the Agent Funds by issuing Par Funding promissory notes to the Agent Funds offering higher rates of return than what the Agent Funds are obligated

to pay investors under the Agent Funds' notes. Par Funding has more than 40 Agent Funds operating today.

5.　　McElhone and Laforte orchestrate the scheme through Par Funding and McElhone's company, Full Spectrum Processing, Inc., whose employees and officers operate Par Funding. LaForte, Full Spectrum CFO Joseph Cole Barleta, a/k/a Joe Cole, and Par Funding investment director and partial owner Perry S. Abbonizio solicit investors to invest in the securities.

6.　　Dean J. Vagnozzi, through his company ABetterFinancialPlan.com d/b/a A Better Financial Plan, recruits individuals to create the Agent Funds, offering them the opportunity to open a turnkey Agent Fund that issues and sells securities, complete with training, marketing materials, and an "Agent Guide," as well as a Private Placement Memorandum, corporate registration, and offering materials provided by Vagnozzi's attorney. Vagnozzi manages the Agent Funds through his company ABFP Management Company, LLC, and Abbonizio oversees and coordinates the Agent Funds.

7.　　Vagnozzi, Michael C. Furman, and John Gissas each operate Agent Funds that raise money for Par Funding through unregistered securities offerings. Vagnozzi operates ABFP Income Fund, LLC and ABFP Income Fund 2, L.P., which issue, offer, and sell promissory notes and limited partnership interests to investors. Furman, through his company United Fidelis Group Corp., operates and manages Fidelis Financial Planning LLC, which issues, offers, and sells promissory notes to investors; and Gissas, through his company Retirement Evolution Group, LLC, operates Retirement Evolution Income Fund LLC and RE Income Fund 2, LLC, both of which issue, offer and sell promissory notes to investors.

8.　　The fraudulent scheme operates behind multiple veils of secrecy built of the Defendants' lies to conceal: (1) the true nature of Par Funding's loan practices; (2) Par Funding's

3

true track record of issuing loans and the default rates of the loans; (3) the safety of investing in Par Funding's loans; (4) LaForte's criminal record, identity, and control of Par Funding; (5) three Cease-and-Desist Orders state securities regulators have entered against Par Funding for violating state securities laws; (6) the true result of the New Jersey Division of Securities' investigation of Par Funding; (7) the fact that contrary to Par Funding's representations to the Commission in its filings, it diverts investor funds to McElhone and Cole, Par Funding's CFO, and also funnels money to The LME 2017 Family Trust, which is McElhone's family trust; (8) the fact that contrary to his representations to investors, LaForte has never invested in Par Funding; (9) a Cease-and-Desist Order and sanctions issued against Vagnozzi for violating state securities laws in connection with the Par Funding offering; (10) a Cease-and-Desist Order and sanctions issued against ABFP for violating state securities laws in connection with the Par Funding offering; and (11) a Cease-and-Desist Order and sanctions issued against Abbonizio for violating state securities laws in connection with the Par Funding offering.

9. These lies, and the scheme the Defendants employ to perpetuate them in the unregistered securities offerings, form the basis of this action. Each Defendant plays a critical and substantial role in the fraudulent scheme to misrepresent and conceal the truth. Each individual Defendant solicits investors to purchase securities – either through an Agent Fund or directly from Par Funding – by scheming and lying. And it continues to this day.

10. Based on the ongoing nature of the Defendants' violations and the scienter the Defendants have demonstrated through their willful and wanton disregard for the federal securities laws, the Defendants have shown they will continue to violate the law unless the Court grants the emergency relief the Commission seeks: (1) a Temporary Restraining Order against all Defendants; (2) an Order to Show Cause Why a Preliminary Injunction Should Not be Granted; (3) an Asset Freeze Order; (4) an Order Requiring Sworn Accountings; (5) an Order Prohibiting the Destruction of

Documents; and (6) an Order Expediting Discovery.  Simultaneously, the Commission is filing a separate motion seeking the appointment of a Receiver to further protect investors.

## II.  DEFENDANTS AND RELIEF DEFENDANT

### A.  Defendants

#### 1. *The Par Funding Entities and Employees*

##### a.  *Complete Business Solutions Group, Inc. d/b/a Par Funding*

11.    Par Funding is a Delaware company Lisa McElhone and her husband, Joseph LaForte, started in 2011, which had its main office in Philadelphia until 2017 and currently has its sole office in Palm Beach Gardens, Florida. From no later than August 27, 2013 through present, Complete Business Solutions Group has done business using the fictitious name Par Funding. Par Funding provides short-term loans to small businesses and claims to have funded more than $600 million in loans. Lisa McElhone is Par Funding's President, CEO, and sole employee. McElhone has ultimate decision-making authority for Par Funding.  The LME 2017 Family Trust is Par Funding's sole owner, and Lisa McElhone and Joseph LaForte are the trustees of this Trust.

12.    In 2018, the Commonwealth of Pennsylvania, acting through the Department of Banking and Securities, Bureau of Securities Compliance and Examinations ("Bureau"), conducted an investigation of certain securities-related activities of Par Funding. Based on the results of its investigation, the Bureau concluded that Par Funding violated the Pennsylvania Securities Act of 1972, 70 P .S. § 1-301 ("Pennsylvania Securities Act"). On November 28, 2018, Par Funding consented to entry of an Order by the Pennsylvania Department of Banking and Securities imposing a $499,000 administrative assessment for violations of the Pennsylvania Securities Act through the use of an unregistered agent to offer and sell Par Funding promissory notes in Pennsylvania. *Pennsylvania Dep't of Banking and Securities v. Complete Business Solutions Group, Inc. d/b/a Par Funding* (18-0098-SEC-CAO).

13.     On December 27, 2018, the New Jersey Bureau of Securities issued a Cease and Desist Order against Par Funding, based on Par Funding's sale of unregistered securities in New Jersey and use of unregistered agents, in violation of the New Jersey securities laws. *In re the Matter of Complete Business Solutions Group, Inc. and Complete Business Solutions Group, Inc. d/b/a Par Funding.*

14.     In February 2020, the Texas State Securities Board issued an Emergency Cease and Desist Order against Par Funding and others, alleging fraud and registration violations, and that matter is in active litigation. *In the Matter of Senior Asset Protection, Inc. dba Encore Financial Solutions, Merchant Growth & Income Funding, LLC, ABetterFinancialPlan.com, LLC aka ABetterFinancialPlan, Complete Business Solutions Group, Inc. dba Par Funding, Gary Neal Beasley and Perry Abbonizio* (ENF-CDO-20-1798). The Texas action alleges that all of the respondents engaged in fraud based on their failure to disclose to investors the Pennsylvania and New Jersey Orders against Par Funding and court actions filed against Par Funding based on its lending practices.

### b.  Full Spectrum Processing, Inc.

15.     Full Spectrum is a Pennsylvania company created in 2016 and its primary place of business is in Philadelphia, Pennsylvania. Lisa McElhone is the sole owner of Full Spectrum. Since 2017, McElhone has used Full Spectrum to operate Par Funding, which has no employee other than McElhone.

### c.  Lisa McElhone

16.     McElhone is a Florida resident. She created Par Funding, is its Chief Executive Officer and sole employee, and is also the sole owner of Full Spectrum. McElhone is and always has been a signatory on all Par Funding bank accounts. On August 1, 2012, the Director for the Department of Consumer and Business Services for the State of Oregon issued a Cease and Desist

Order against McElhone for providing debt management services without registering as a debt management services provider, in violation of the Oregon Mortgage Lender Law and Oregon statutes. McElhone consented to a permanent Cease-and-Desist Order on October 13, 2013. Between July 2015 and October 2019, McElhone received approximately $11.3 million from Par Funding via checks and wire transfers.

### d. Joseph W. LaForte, a/k/a Joe Mack, a/k/a Joe Macki, a/k/a Joe McElhone

17.     LaForte is a resident of Philadelphia, Pennsylvania and the spouse of Lisa McElhone, with whom he founded Par Funding. LaForte uses the aliases Joe Mack, Joe Macki, and Joe McElhone. LaForte claims to be the owner of Par Funding and runs the day-to-day operations. LaForte acts as the *de facto* CEO of Par Funding and Full Spectrum, and Abbonizio introduces him to investors as Par Funding's president. He also serves as Par Funding's Director of Sales through his employment with Recruiting and Marketing Resources.  He conducts his work for Par Funding primarily within the Full Spectrum office space in Philadelphia. From 1995 until 2000, LaForte worked for various securities broker-dealers. He obtained Series 7 and Series 63 securities licenses in 1996 and a Series 24 securities license in 1997; however, these licenses have expired.

18.     On October 4, 2006, LaForte was convicted of state charges in New York for grand larceny and money laundering, and on November 8, 2007 he was sentenced to three to ten years in prison and to pay restitution in the amount of $14.1 million. In 2009, LaForte pled guilty to federal criminal charges in the District of New Jersey for conspiracy to operate an illegal gambling business. He was released from jail in February 2011 and founded Par Funding with his wife, McElhone, shortly thereafter while on supervised release.

### e.  Joseph Cole Barleta, a/k/a Joseph Cole a/k/a Joe Cole

19.     Cole is a resident of Philadelphia, Pennsylvania.  He was employed by Par Funding as its CFO until 2017, when all of Par Funding employees were converted to Full Spectrum employees. Since 2017, he has been employed by Full Spectrum as Full Spectrum's CFO, and through his employment at Full Spectrum has functioned as the CFO of Par Funding from 2017 through present. From July 2019 until October, Cole received about $1.8 million from Par Funding, which included investor funds, through payments to his company ALB Management Inc. Between July 2016 and November 2019, Par Funding transferred about $14.4 million, which included investor funds, to Beta Abigail and New Field Ventures, LLC, companies in which Cole has an ownership or other beneficial interest.

### f.  Perry S. Abbonizio

20.     Abbonizio claims to be an owner and managing partner of Par Funding and he is responsible for bringing investment capital into Par Funding.  He recruits and trains Par Funding's Agent Fund managers, provides information to potential investors about Par Funding, oversees the Agent Funds, and solicits investors. From February 2017 until November 2019, Par Funding has paid about $9.5 million, including investor funds, to Abbonizio's company with Cole, New Field Ventures. Abbonizio held Series 7, 63 and 65 securities licenses that have expired. From 1996 until 2015, Abbonizio was associated with various securities broker-dealers.

21.     In 2015, the Financial Industry Regulatory Authority ("FINRA") sanctioned Abbonizio by consent in a regulatory action resulting in a four-month license suspension and $10,000 fine based on allegations that Abbonizio, without providing notice to his FINRA member firm, solicited his firm clients to purchase $625,000 in outside private placements and received compensation without firm knowledge/permission. In February 2020, the Texas Securities Board

issued an Emergency Cease-And-Desist Order against Abbonizio for fraud violations in connection with the offer and sale of Par Funding promissory notes.

### 2. *The "A Better Financial Plan" Companies and Owner*

#### a. *Dean J. Vagnozzi*

22.     Vagnozzi lives in Pennsylvania and is the sole owner of ABFP and ABFP Management.  He held Series 6 and 63 securities licenses, which have expired, and was associated with a FINRA-registered securities broker-dealer from February 2008 until February 2009. In addition to operating the ABFP entities and funds, Vagnozzi solicited investors to invest in Par Funding promissory notes pursuant to a so-called "finders agreement" from about August 2016 until December 2017. Since January 2018, he also recruited individuals to start investment firms for the purpose of raising money for Par Funding, and has individuals nationwide operating these investment firms which he manages through ABFP Management.

23.     On May 30, 2019, Vagnozzi, doing business as ABFP, entered into a settlement with the Pennsylvania Department of Banking and Securities in connection with the sale of promissory notes Par Funding offered and sold. In connection with that case, Vagnozzi agreed to pay a penalty of $490,000 for violations of the Pennsylvania Securities Act. On July 14, 2020, the Commission instituted settled administrative proceedings against Vagnozzi for his offering and selling unregistered securities in violation of Section 5 of the Securities Act and acting as an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act, in connection with the sale of securities unrelated to the instant case.

#### a. *ABFP Management Company, LLC*

24.     ABFP Management is a Delaware limited liability company located in Collegeville, Pennsylvania. It is wholly owned by Dean Vagnozzi. It is engaged in the business of, among things, providing management services related to organizing and operating companies formed for

the purpose of raising funds from investors and using the investor funds to invest in alternative investments. ABFP Management provides these and other management services for the Par Funding Agent Funds in exchange for a portion of the investment returns.

### a. ABetterFinancialPlan.Com d/b/a A Better Financial Plan

25.    ABFP is a Pennsylvania limited liability company Dean Vagnozzi formed on November 12, 2010. It is located in King of Prussia, Pennsylvania. Vagnozzi owns and manages ABFP, and he claims it is his corporate alter ego. ABFP is an investment firm that offers alternative investments involving assets unrelated to the stock market. ABFP has been soliciting investors for Par Funding since no later than April 4, 2017.

26.    In February 2020, the Texas Securities Board issued an Emergency Cease-And-Desist Order against ABFP for fraud violations in connection with the offer and sale of Par Funding promissory notes.  On July 14, 2020, the Commission instituted settled administrative proceedings against ABFP for its violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act in connection with the sale of securities unrelated to the instant case.

### a. ABFP Income Fund, LLC

27.    ABFP Income Fund is a Delaware limited liability company created by Vagnozzi on January 12, 2018, with a principal place of business in King of Prussia, Pennsylvania. Beginning no later than February 2, 2019, Vagnozzi, through ABFP Income Fund, raised at least $22 million for Par Funding through the offer and sale of promissory notes to at least 99 investors.

### a. ABFP Income Fund 2, L.P.

28.    ABFP Income Fund 2 is a Delaware limited partnership formed in 2018 with its principal place of business in King of Prussia, Pennsylvania. Vagnozzi, through ABFP Management, formed ABFP Income Fund 2 for the purpose of raising investor money to pool and invest in the promissory notes of merchant cash advance companies, and specifically Par Funding.

ABFP Management is the General Partner of ABFP Income Fund 2. Beginning no later than August 8, 2018, Vagnozzi, through ABFP Income Fund 2, has raised at least $6 million for Par Funding, through the offer and sale of limited partnership interests in ABFP Income Fund 2 to at least 49 investors.

### 3. *The Florida Investment Firms, Agent Funds, and Owners*

#### a. *Michael C. Furman*

29.    Furman is a resident of West Palm Beach, Florida. He is the President of Fidelis Planning, which he manages through his company United Fidelis Group. He is a certified public accountant licensed in Pennsylvania.

#### b. *United Fidelis Group Corp.*

30.    United Fidelis Group is a Florida corporation Furman incorporated in May 2014 and its principal address is in West Palm Beach, Florida.  Furman owns and operates United Fidelis Group.

#### c. *Fidelis Financial Planning LLC*

31.    Fidelis Planning is a Delaware limited liability company formed in April 2018 and its principal address is in West Palm Beach, Florida. Michael Furman is the President of Fidelis Planning and United Fidelis Group is the sole manager of Fidelis Planning. ABFP Management provides management services to Fidelis.  Fidelis is a pooled financial fund created for the purpose of raising investor funds for Par Funding. Since no later than August 9, 2018, Furman, through Fidelis Planning, has raised more than $5.8 million from investors for Par Funding through the offer and sale of promissory notes.

#### d. *John Gissas*

32.    Gissas resides in Wildwood, Florida. Gissas is the President of Retirement Evolution.

### e.  Retirement Evolution Group, LLC

33.     Retirement Evolution is a Florida limited liability company formed by John Gissas in April 2018, with its principal address in Wildwood, Florida.

### f.  Retirement Evolution Income Fund, LLC,
### f/k/a RE Income Fund LLC ("RE Income Fund")

34.     RE Income Fund is a Delaware limited liability company formed in 2018 with its principal address in Wildwood, Florida. Since as early as May 2018, Gissas, through RE Income Fund, has raised more than $5.4 million from at least 62 investors for Par Funding through the offer and sale of promissory notes.

### g.  RE Income Fund 2, LLC

35.     RE Income Fund 2 is a Delaware Limited Liability Company formed in 2019. Its principal address is in Wildwood, Florida. Gissas is its President and sole manager. RE Fund 2 is a pooled investment fund created for the purpose of raising funds for Par Funding. Since no later than August 1, 2019, Gissas, through RE Fund 2, has raised at least $150,000 from investors for Par Funding through the offer and sale of promissory notes.

## B.  <u>Relief Defendant</u>

36.     **The LME 2017 Family Trust, a/k/a LME 2017 Family Trust** (the "LME Trust") owns Par Funding and McElhone is the Grantor of the Trust. According to the Certification of Trust, McElhone and LaForte are the Trustees of the LME Trust.  Between July 2018 and September 2018, Par Funding transferred at least $14.3 million, which included investor funds, to the LME Trust for no legitimate purpose.

## III.  <u>JURISDICTION AND VENUE</u>

37.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and

Section 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa. This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida. Par Funding's sole office is located in the Southern District of Florida and it is registered to do business in Florida as a foreign corporation with McElhone as the registered agent. Lisa McElhone, the CEO of Par Funding and sole owner of Full Spectrum, resides in the Southern District of Florida and works in the Par Funding office located in the Southern District of Florida. Par Funding has also sold its promissory notes to investors located in the Southern District of Florida. Abbonizio has solicited investors and participated in solicitation events and meetings in the Southern District of Florida on behalf of Par Funding and as a Full Spectrum employee. Cole is the CFO of Par Funding, which has its sole office in the Southern District of Florida. LaForte and McElhone control Par Funding and Full Spectrum, which operates Par Funding, and LaForte has participated in meetings and events in the Southern District of Florida to solicit investors for the Par Funding offerings.

38.     Vagnozzi has solicited investors in the Southern District of Florida, both directly and through his ABFP companies and investment funds. Furman resides in the Southern District of Florida and United Fidelis and Fidelis Planning are located in the Southern District of Florida. Investors residing in the Southern District of Florida have invested in Gissas' Retirement Evolution funds.

39.     In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.  THE FRAUDULENT PAR FUNDING SECURITIES OFFERING SCHEME

### A.  Par Funding

40.     McElhone and her husband LaForte founded Par Funding in 2011 shortly after LaForte was released from prison, and they control Par Funding together.

41.     Since no later than August 1, 2012, Par Funding has been in the business of funding short-term loans to small-sized businesses, which Par Funding refers to as "merchant cash advances." (the "Loans" or "MCAs").

42.     McElhone is Par Funding's sole employee. Since 2017, Par Funding has been operated by McElhone's company Full Spectrum. McElhone is the President of Par Funding, the signatory on the Par Funding bank accounts, and according to Par Funding's most recent corporate designate deposition under Federal Rule of Civil Procedure 30(b)(6), has ultimate authority over Par Funding.

43.     LaForte acts as the *de facto* CEO of Par Funding.  He runs the day-to-day operations of Par Funding and Full Spectrum, has hiring and firing authority, supervises the Full Spectrum employees including the underwriting employees, and together with another individual decides which Loans Par Funding will approve and fund.  He also signs contracts on behalf of Par Funding and renegotiates Loan terms with small businesses.

44.     Par Funding has purportedly funded more than $600 million in Loans.

45.     Some of Par Funding's Loans carry interest rates of more than 400%.

46.     According to a recent expert witness analysis of a sample of the Loans, more than half of the Loans charge in excess of 95% interest.

47.     Since 2013, Par Funding has filed more than 2,000 lawsuits seeking more than $300 million in missed payments against small businesses Par Funding alleges defaulted on the Loans.

48.     To fund the Loans Par Funding raises investor money through the offer and sale of securities in the form of promissory notes.

**B.  Phase 1 of The Offering: Par Funding Issues Promissory Notes Directly To Investors**

49.     From no later than August 2012 until December 2017, Par Funding sold promissory notes only directly to investors.

50.     Par Funding issued promissory notes providing for a 12-month duration and stating the investor would receive annual interest rates ranging from 12% to 44%.

51.     Investors signed a "Non-Negotiable Term Promissory Note" and an accompanying "Security Agreement" (collectively the "Par Funding Notes").

52.     McElhone and Cole signed the Par Funding Notes on behalf of Par Funding.

53.     The Par Funding Notes generally provide that the interest is paid over twelve months, and then the investor's principal investment is returned in full to the investor.

54.     The Security Agreement states that Par Funding grants a security interest to the investor in substantially all of Par Funding's assets, including its accounts receivable.

55.     To locate and solicit investors, Par Funding contracted with sales agents through "Finders Agreements" Cole signed on behalf of Par Funding. The Finders Agreements provide that once Par Funding receives investor funds, it will pay the agent a one-time distribution.

56.     Beginning no later than Fall 2016 until December 2017, Vagnozzi was one such agent for Par Funding.

57.     Vagnozzi and his company ABFP raised about $20 million for Par Funding in exchange for a commission equal to 6 or 7 percent of each investment he solicited.

58.     Defendant Furman also solicited investors to purchase Par Funding Notes. For example, in November 2017 Furman met with potential investors at his firm, United Fidelis, in West Palm Beach, Florida, and recommended the Par Funding investment.

59.     Furman told the potential investors that Par Funding made loans to small businesses and charged 36% interest on the loans. Furman distributed Par Funding marketing materials, including a brochure, and touted Par Funding's management expertise and its thorough due diligence in selecting borrowers.  Furman also emphasized to the investors that their money would be safe and secure because the default rates on the Loans were 1% or less.

60.     Furman told the potential investors that the percentage of interest Par Funding would pay on its Notes would depend on the amount invested. He told them the higher the investment amount, the higher the interest rate and thus the return. He explained to the potential investors that if they invested $300,000-$400,000, Par Funding promised to pay the investors an annual return of 12.5% in monthly installments over one year. Furman provided the potential investors with offering materials, including the Par Funding Note.

61.     By December 2017, Par Funding had raised at least $90 million from investors through the offer and sale of Promissory Notes. The investors purchased the Par Funding notes by sending funds directly to Par Funding or through self-directed IRA accounts.

**C.  Par Funding Learns It Is Under Investigation For State Securities Law Violations And Begins Efforts To Restructure Its Offering To Conceal Adverse Information**

62.     Things changed in January 2018. On January 4, 2018, the Pennsylvania Securities Regulators issued a subpoena to Par Funding in connection with its investigation of Par Funding's use of unregistered Agents. In September 2018, Par Funding, through its counsel, assured the Pennsylvania Securities Regulators that it was no longer using Agents to find investors.

63.     In truth, when Par Funding made this representation it had already restructured its offering by converting its Agents to Agent Fund managers the Agents created under the guidance and supervision of Vagnozzi and Abbonizio.

64.     Vagnozzi had previously proposed this structure to Cole and Abbonizio in 2017, but Par Funding did not put this structure into place until January 2018, after it received the Pennsylvania Securities Regulators' subpoena and it continues to this day.

65.     Under this new structure, Par Funding uses Agent Funds to offer and sell promissory notes the Agent Funds issue to investors.  The Agent Funds then funnel investor money to Par Funding, which then issues Par Funding Notes to its Agent Funds.

66.     Below is an illustration Abbonizio and his attorney showed existing investors in April 2020, explaining how the fund structure works with respect to the ABFP Income Fund:



67.     The Agent Fund PPMs distributed to potential investors state that the Agent Fund is raising money to invest in "an MCA company," but do not disclose that this is Par Funding.

68.     Nor do the Agent Fund PPMs disclose Par Funding's regulatory history, that Par Funding is managed by a convicted felon, that Pennsylvania and New Jersey Securities Regulators filed actions against Par Funding and there are Cease and Desist Orders against Par Funding in those states, or any other adverse information about Par Funding.

69.     While the Agent Funds offer investors promissory notes in the Agent Funds, investors are told that profits will be generated by Par Funding's Loan business in which the Agent Funds invest.

### D. Phase 2 of the Offering: Par Funding Uses Agent Investment Funds To Raise Investor Money And Issues Its Notes To The Agent Investment Funds

70.     From January 2018 through present, Par Funding has raised investor money primarily through Agent Funds, and occasionally by selling its own Promissory Notes to investors.

### 1. Vagnozzi and Par Funding's Roles In Creating, Managing, and Promoting The Agent Funds' Securities Offerings

71.     Vagnozzi is instrumental in recruiting people to start Agent Funds to provide funding to Par Funding.

72.     As recently as April 2020, Vagnozzi hosted a Zoom call geared toward recruiting people to start Agent Funds to raise money for Par Funding. Vagnozzi led the call in which he explained that he wanted to teach people how to be "finders" and not unregistered broker-dealers so that they would not get into "any trouble." He goes on to talk about Par Funding, describing it as one of the best MCA lenders you can find, touts the 1% default rate, and says you can get commissions and "you will make money."

73.     Once Vagnozzi successfully recruits Agents, he and Abbonizio train them how to raise money through securities offerings that will ultimately fuel Par Funding.

74.     Vagnozzi teaches Agents how to open their own turnkey investment funds. He provides them with an "Agent Guide" that instructs them how to create an Agent Fund, telling Agents they merely need to choose a name for an Agent Fund and send that name together with $5,000 to Vagnozzi's attorney, who will then set up a fund, get the corporate paperwork filed, draft a PPM for the fund, and get a tax identification number.

75.     The Agent Guide tells the Agents which banks to use to set up bank accounts and directs them to add an ABFP employee as an authorized signer on the account. According to the Agent Guide, ABFP Management then pays the investment expenses and payouts to the Agent

Funds' investors. In the Agent Guide, Vagnozzi tells the Agents that ABFP Management will handle these tasks so the Agents can "focus on selling."

76.     Par Funding, through Abbonizio and Vagnozzi, also train the Agents at Full Spectrum's office and Par Funding provides the Agents with marketing materials to solicit investors.

77.     Vagnozzi and Abbonizio oversee the Agent Funds and Vagnozzi manages them through his company ABFP Management in exchange for 25% of the Agent Funds' profits.

78.     According to Abbonizio and LaForte, there are more than 40 Agent Funds raising investor money for Par Funding.

79.     Par Funding, through LaForte, Cole, and Abbonizio, helps solicit investors to invest in the Agent Funds by speaking at events the Agent Funds organize to raise money from potential investors.

80.     Abbonizio also helps the Agent Funds solicit investors through telephone calls, and Abbonizio, Cole, and LaForte assist by soliciting investors during meetings the Agent Funds arrange at Par Funding's office.

81.     The Agent Funds and ABFP Management make their profits based on the rates of return promised in the Par Funding Notes and the Investment Funds' notes with the investors.

82.     Each Agent Fund sends Par Funding investor funds raised through the Agent Funds' securities offerings. This occurs by the Agent Funds either wiring investor funds to Par Funding or directing the investor to open a self-directed IRA account that invests in Par Funding.

83.     Upon receipt of the investor funds, Par Funding issues a Par Funding Note to the Agent Fund with a higher promised rate of interest than the Agent Fund promises to its investors in its own promissory notes.

84.     Par Funding pays an Agent Fund its monthly returns and the Agent Fund in turn pays its investors.

85.     The remainder (or the spread) is for the Agent Fund, and it is obligated under an agreement it signs with ABPF Management to pay ABFP Management 25% from this remaining amount.

**2. Vagnozzi Offers and Sells Notes Through His Own Agent Funds**

86.     In addition to managing Agent Funds, Vagnozzi offers and sells promissory notes through his own Agent Funds, ABFP Income Fund and ABFP Income Fund 2 (collectively, the "ABFP Funds").

87.     The ABFP Funds each filed a Form D with the Commission giving notice of an exempt securities offering of either debt or equity securities in reliance on Rule 506(b) of the Securities Act, 17 C.F.R. § 230.506(b).

88.     The ABFP Funds' PPMs reflect that the ABFP Funds either enter into promissory notes with investors, promising annual returns as high as 15%, with monthly interest payments and full return of principal at the end of the typical 12-month term or sell investors interests in a limited partnership for $5,000 per single interest.

89.     The ABFP Income Fund PPM states that investor funds will be used to invest in promissory notes with MCA companies.

90.     The ABFP Income Fund 2 PPM states that investor money will be used 80% toward MCA promissory notes and 20% toward investment in one NYSE-traded equity.

91.     Investors either contribute directly to the ABFP Income Funds or through a self-directed IRA account at a Pennsylvania-based IRA administrator.

92.     Vagnozzi directs investors to open an account at the IRA administrator company, and investors contribute funds and receive their investment funds through this account.

93.     Vagnozzi and ABFP advertise the investment through radio, television commercials, the Internet, and ABFP's Facebook page.

94.     Vagnozzi and ABFP also solicit investors through one-on-one presentations at the ABFP office and dinner seminars.

95.     For example, on November 21, 2019, Vagnozzi and ABFP hosted more than 300 investors and prospective investors for a dinner where they were solicited to invest in Par Funding through Vagnozzi's funds.

96.     Attendees were given a one-page flyer describing four investment opportunities, one of which was MCAs. The flyer described the MCA investment opportunity as having a 2% default rate and offering between 10-14% returns with principal returned in 1, 2, or 3 years.

97.     Vagnozzi spoke first at the November 2019 event and touted Par Funding's financial success.  He explained that Par Funding was buying a bank and was looking for investors to help – not because Par Funding couldn't write a check to buy the bank itself, but because bank regulations only let Par Funding be a 5% owner.

98.     Vagnozzi told the attendees that "[w]e have stock market alternative investments that are secure…" and that an investment in Par Funding does not have "too much risk" and the investment is "knocking it out of the park."

99.     Vagnozzi then introduced Abbonizio, who told the audience that Par Funding has a default rate of 1%, compared to an industry average default rate of 18.5%.

100.    Abbonizio also told the audience to focus on the default rate because that is the most important part of the investment.

101.    Abbonizio then introduced LaForte, to whom he referred as the President.

102.    LaForte told the audience that Par Funding is probably the most profitable cash advance company in the United States and maybe in the world.

103.    LaForte also told the audience that he started the company about eight years ago with $500,000 of his own capital.

104.    LaForte then introduced Cole, who touted the financial health of Par Funding.

105.    During the November 21, 2019 solicitation dinner event, Vagnozzi told potential investors that he has taken more than 500 investors into an investment with Par Funding.

106.    By March 2020 Vagnozzi was claiming 600 investors had invested in Par Funding through him.

107.    Through securities offerings, ABFP Income Fund has raised at least $$22,309,000 from investors since February 19, 2018, and ABFP Income Fund 2 has raised at least $$6,322,500 from investors since August 8, 2018.

### 3. Furman Offers and Sells Notes Through His Own Agent Fund: Fidelis Planning

108.    Since no later than August 2018, Furman, through his companies Fidelis Planning and United Fidelis, has raised at least $5.8 million for Par Funding through investments in Furman's Agent Fund, Fidelis Planning.

109.    Fidelis Planning enters into promissory notes with investors, promising annual returns as high as 15%, with monthly interest payments and full return of principal at the end of the typical 12-month term.

110.    The Fidelis Planning PPM tells investors that Fidelis will invest their funds with a MCA business.

111.    Furman and United Fidelis advertise the Fidelis Planning investment through newspaper advertisements.

112.    Furman solicits investors via telephone and puts potential investors in contact with Abbonizio, Cole, and LaForte, who continue the solicitation efforts.  He also invites potential

investors to the solicitation dinners Vagnozzi and ABFP host, where Abbonizio and Vagnozzi help Furman solicit investors.

113. After raising investor funds, Furman wires the money to Par Funding and receives a Par Funding Note issued to Fidelis Planning.

114. According to its May 2019 filing with the Commission, Furman and Fidelis Planning raised $5,838,000 for Par Funding from August 2018 through May 2019. According to bank records, it appears that Furman and Fidelis Planning raised more than $11 million as of December 2019.

### 4. Gissas Offers and Sells Notes Through His Own Agent Funds: RE Income Fund and RE Income Fund 2

115. Since no later than Summer 2018, Gissas and his company Retirement Evolution have raised money for Par Funding through the offer and sale of investments in Gissas' Agent Funds, RE Fund and RE Fund 2.

116. Gissas appears to primarily target investors in The Villages retirement community near Wildwood, Florida.

117. The RE Funds issue, offer, and sell promissory notes to investors.

118. Gissas and Retirement Evolution advertise the securities offerings on the RE Fund website, where they provide the RE Fund PPM.

119. Gissas and Retirement Evolution also use newspaper advertisements, largely in The Villages, to invite the public to lunches and dinners where Gissas, sometimes with the assistance of Abbonizio, solicits the audience to invest in the RE Funds, which will invest in Par Funding Notes.

120. For example, in August 2019 Gissas and Retirement Evolution hosted a dinner for 12 potential investors in Wildwood, Florida. Gissas gave the investors an RE Fund 2 PPM and

promissory note to review, and told the investors the investment offered an 8% to 12% return through an investment in an MCA business in Philadelphia.

121.    Abbonizio then spoke to the investors, identified himself as the 25% owner of Par Funding, and then touted Par Funding's low default rate and that the MCA loans are insured.

122.    At least one attendee at this event subsequently invested in Par Funding through the RE Fund 2 promissory note.

123.    Through the unregistered offerings, Gissas, Retirement Evolution, and the RE Funds raised at least $5.5 million for Par Funding.

### E.   Phase 3 of the Offering: Par Funding, Vagnozzi, and Furman Offer "Exchange Notes"

124.    On March 12, 2020, Vagnozzi forwarded investors a message he received from Cole of that same date. According to Cole's message, the purpose of Cole writing Vagnozzi was to "update our partners."

125.    In the message, Cole states Par Funding believes the Coronavirus will have "no long term effects to [Par Funding's] projected growth and revenue." Cole further states in this same message that "There has been no noticeable effect to our client payments or default rates. We had our largest funding month by deal count in February and have confidence in being able to maintain consistent funding volume in the coming months."

126.    A mere two weeks later, Vagnozzi and Furman forwarded investors a dramatically different message purporting to be from Par Funding that states "Over the past several months, Par Funding, like many other companies across the globe, has been severely impacted by the Coronavirus pandemic." Par Funding goes on to say it has "been forced to close our physical offices" and that "virtually all of [Par Funding's Loan borrowers] have called seeking a moratorium on payments and other restructured payment terms."

127.     Purportedly as the result of the Covid-19 Pandemic, investors did not receive their monthly investment returns in April and May 2020.

128.     On March 16, 2020, ABFP emailed investors reassuring them that their investments in Par Funding were safe.  ABFP told investors "The management team at CBSG/Par is extremely confident that their financial position and funding strategies will enable them to weather this storm. They want you to remain confident that your investment with them is solid."

129.     Vagnozzi goes on to reassure investors "the employees at Par are some of the hardest working people I have ever met," and reminds investors that "not one payment has ever been late."

130.     On March 26, 2020 ABFP, through Vagnozzi, emailed investors a message from Par Funding concerning the purported financial impact the COVID-19 pandemic had on Par Funding's revenues, together with a message from Vagnozzi stating that "Par Funding has defaulted on a note with the fund that you each invested in, and they will continue to default for the next few months."

131.     In this same email message Vagnozzi goes on to discourage investors from filing a lawsuit against Par Funding and tells investors his attorney is working to restructure the investments so payments to investors can resume.

132.     In April 2020, Furman emailed investors an email message he claimed was from Par Funding indicating that if investors do not accept an offering to replace their current promissory notes with "Exchange Notes" offering significantly less interest and over a longer period of time, then Par Funding would file for bankruptcy.

133.     In April 2020, Vagnozzi and Furman emailed investors a video created on about April 18, 2020, in which Vagnozzi and his attorney – the same attorney who created the turnkey Agent Funds – tell investors that the attorney reviewed Par Funding's financials and Par Funding

is insolvent. Vagnozzi reassures investors he believes Par Funding will rebound, and then Vagnozzi and the attorney recommend that investors not to file lawsuits against Par Funding for defaulting on the promissory notes but to instead accept Exchange Notes through which the investors would receive lower investment returns than they were promised in the promissory notes they had purchased from ABFP and the Agent Funds.

134.    In this same video message to investors, Vagnozzi's attorney also tells investors that because Par Funding has not paid investors their returns in March, he obtained a UCC lien report against Par Funding and was "first in line" to collect for the investors. Public records do not reflect any such lien against Par Funding, but do reflect a number of other liens against Par Funding that would preclude Vagnozzi's attorney's purported lien from being first in line.

135.    On April 26, 2020, Vagnozzi, through ABFP, emailed investors a video of Vagnozzi and his attorney discussing the Exchange Offering, in which the attorney recommends that investors accept the Exchange Offering and walks the investors through the offering documents, page by page, reminding investors to review the disclosures and risks in the Exchange Offering materials.

136.    The Exchange Offering materials and PPM include a risk section that discloses to investors the risks associated with the Exchange Offering. In it, ABFP tells investors "The nature of the Company's business subjects the Company to litigation. The Company is in the business of providing MCAs to small and mid-size businesses. In connection with its collection efforts against MCA customers and in other similar contexts involving its MCA customers, the Company has been subject to a substantial number of lawsuits."

137.    While ABFP disclosed lawsuits small businesses might file, there is no disclosure of the Texas Securities Regulators' action against ABFP, Par Funding, and Abbonizio that was filed just months prior to the Exchange Offering, of the Emergency Cease-and-Desist Order filed

entered against ABFP, Par Funding, and Abbonizio in Texas, or that the Texas securities enforcement action is ongoing.

138.    Nor was there any disclosure that the Texas Securities Regulators had entered an emergency Cease-and-Desist Order finding that ABFP, Par Funding, and Abbonizio made material misrepresentations and omissions to investors in connection with the Par Funding and Agent Fund offering about the Par Funding offering, Par Fundnig's regulatory history, and Par Funding's management, and that this litigation was continuing at the time of the Exchange Offering.

139.    Based on representations by Par Funding and Vagnozzi's attorney that Par Funding would otherwise default on payments altogether or enter bankruptcy, and based on Vagnozzi's attorney's recommendation, as a lawyer, that they accept the offering, investors opted for the Exchange Offering and entered into new promissory notes.

140.    Based on the representations made to them, investors felt they had no choice but to agree to the Exchange Offering and to replace their existing notes in the ABFP Funds and Fidelis Planning Fund with new notes that offered less interest and thus a lower rate of return.

141.    All or nearly all of the investors accepted an Exchange Note that replaced the ABFP Funds and Fidelis Planning promissory notes they had previously purchased.

**F.   The Securities Offerings Are Ongoing and Defendants Are Planning To Expand**

142.    The Defendants are continuing to offer securities to investors through the Agent Funds and Par Funding.

143.    For example, Furman is currently soliciting investors to purchase Par Funding Notes. Unbeknownst to Furman, the individuals are posing as investors.[1]

---

[1] All undercover activity and recordings referenced or described in the Complaint were done strictly at the direction and behest of law enforcement agencies and not the Commission.

144.     Furman coordinated a meeting between these two individuals posing as investors, and LaForte. The meeting occurred in the Southern District of Florida in late June 2020 to solicit the individuals to invest.

145.     While Par Funding has continued offering its notes directly to investors on occasion since its January 2018 restructuring, Par Funding is now seeking significantly higher investments amounts, most recently $10 million from the undercover individuals.

146.     During the meeting, LaForte touted Par Funding as a "leader in the industry" and contrary to the representations made to current investors to force them to take the Exchange Notes in April 2020, represented that "here we are today post-COVID pretty healthy." He explained that the underwriting performed on the Loans helped ensure the success of Par Funding, stating "It all goes back to the underwriter."

147.     In soliciting the undercover individuals, LaForte represented that Par Funding paid investors $28 million in 2018 and $56 million in 2019 – "which is a lot lower proportion that what we paid ourselves. It's about half."

148.     On July 7, 2020, Cole emailed these two individuals draft Par Funding Exchange Notes and offering materials through which they could invest in Par Funding.

149.     In July 2020, Abbonizio, LaForte, and Cole met with these same undercover individuals at Full Spectrum's office in Philadelphia to pitch them further on the Exchange Note investment.

150.     Additionally, Gissas and Retirement Evolution appear to continue to actively solicit investors, with Retirement Evolution putting a general advertisement/invitation in The Village's local newspaper as recently as July 2020, for a luncheon seminar about alternative investments with annual returns of 8% and 10% paid monthly, scheduled for the week of July 13, 2020.

151.     As for Vagnozzi, three days after the Commission entered a July 14, 2020 Consent Order against him and ABFP for engaging in unregistered securities offerings and acting as an unregistered broker-dealer in connection with five offerings not at issue in this case, Vagnozzi, emailed investors about the Order and announced that he is expanding his business:

a.   "My staff and I feel that the results of this [SEC] investigation are the absolute best reason someone should invest with us…."

b.   "[The SEC] [a]lso determined that all investments offered by ABFP were carried out in a manner consistent with the information provided to investors."

c.   "Three years of investigation, $300k spent on my end, and all they can say is they don't like my advertising methods and the fact that I served steak dinners in 2013 as a way for people to hear about our investments."

152.     The Order makes no such findings. Vagnozzi mischaracterizes the Order to investors as a selling point for investing with him and ABFP, and in the same email message announces that he is forming a non-public company that he will soon advertise.

153.     Vagnozzi and ABFP also issued a press release about the Order, claiming that "the findings of these proceedings have also paved the way for the company to restructure as a public company, which will alleviate advertising restrictions in the future."

### G.  Material Misrepresentations and Omissions in Connection with The Par Funding, ABFP, United Fidelis, and Retirement Evolution Offerings

#### 1.  False Claims about Par Funding's Rigorous Underwriting Process

154.     Because investor returns are purportedly generated by the interest small businesses pay on the Loans Par Funding makes, the success and profitability of the investment turns on Par Funding lending money to small businesses who pay back Loans with interest and do not default on the Loans.

155.    As Abbonizio explained to one potential investor, this is the most important consideration when deciding whether to invest in the Agent Funds.

156.    On January 7, 2020, Abbonizio met with an investor to pitch her on the Par Funding investment. The investor was undercover and the meeting was recorded. Abbonizio described the underwriting group as "the key to our whole investment thesis," and went on to explain that the investment in Par Funding is "only compelling if you have confidence that whatever you give, $50,000 or $5 million, that we are going to do an exemplary job of putting your hard earned money in the hands of suitable companies that can meet their daily obligation to pay us back."

157.    To drive this selling point home, Abbonizio explained: "If you leave here and remember nothing else. Why would I entrust the money? Because they have an exemplary track record of underwriting, utilizing three components, taking three days and be [sic] more vigilant. That's the crux of it."

158.    In a Par Funding brochure that Furman, Abbonizio, and Vagnozzi distribute to potential investors, Par Funding details its supposedly rigorous underwriting process to approve merchant loans, calling it "Exceptional Underwriting Rigor."

159.    Par Funding claims that the underwriting process takes 48 to 72 hours and includes, among other things, an on-site inspection of each merchant before approving any Loan.

160.    According to the marketing materials, "There is no substitute for personal on-site merchant inspections," and "Visual confirmation of a business' viability yields the highest levels of confidence in the future viability of merchant partners."

161.    Par Funding emphasizes that the on-site inspection "…has been proven to enhance the low default Par Funding experience[s]."

162.    Abbonizio also touts Par Funding's underwriting process to potential investors, both during one-on-one meetings with potential investors and during solicitation events.

163.    For example, at the November 2019 solicitation dinner Vagnozzi and ABFP hosted, Abbonizio told potential investors that Par Funding has "rigorous standards" and "the best underwriting in the industry."

164.    In August 2019, Abbonizio told other potential investors during another solicitation event that Par Funding does an on-site inspection of small businesses 100% of the time before approving any Loan.

165.    The representations about Par Funding's underwriting process are false.

166.    In truth, the underwriting was not stringent.

167.    Contrary to the Defendants' representations, Par Funding did not always conduct on-site inspections of small businesses prior to funding Loans, and it would approve Loans in less than 48 hours.

168.    For example, in October 2019, Par Funding approved and funded a Loan of $792,000 to a small business in Ohio (the "Ohio Small Business"). Par Funding did not conduct an on-site inspection prior to approving the Loan and did not request information about debt schedules, profit margins, or expenses.

169.    Similarly, in August 2019, Par Funding approved and funded a Loan to a small business in Houston (the "Houston Small Business") without conducting an on-site inspection and requesting materials showing accounts receivables, expenses, profit margins, or debt schedules.

170.    Likewise, in April 2019, Par Funding approved and funded a Loan of $33,750 to a small business in League City, Texas (the "League City, Texas Small Business."). Par Funding did not conduct an on-site inspection prior to approving and funding the Loan.

171.    Between October 2018 and December 2018, Par Funding funded four Loans to a small business in California (the "California Small Business"), totaling $3.5 million. For each of these four Loans, Par Funding failed to perform an on-site inspection of the California Small

Business, and in each instance the Loan was underwritten by Par Funding in less than 48 hours from the time the California Small Business owner applied for the Loan. Despite funding $3.5 million in Loans to the California Small Business over the course of just three months, Par Funding never requested information showing the California Small Business' profit margins or expenses during the underwriting process or at any other time prior to approving the Loan.

172.    The lack of an on-site inspection is not a new development for Par Funding, but instead goes back to at least as early as 2016. For example, in April 2016, Par Funding issued a Loan of $40,000 to a pharmacy in Tennessee with the initial N.R. (the "Tennessee Small Business").

173.    Par Funding did not conduct an on-site inspection prior to approving the Loan to the Tennessee Small Business. Par Funding completed the underwriting process within 48 hours of the Tennessee Small Business applying for the Loan. Par Funding did not request information showing profit margins, debt schedules, expenses, or accounts receivable. Nor did Par Funding even conduct an interview before approving the Loan.

174.    For some small businesses, the only on-site visit that ever occurs is to threaten a merchant with physical violence.

175.    For example, in June 2016 Par Funding loaned $100,000 to a merchant pharmacy in Knoxville, Tennessee. Par Funding completed the underwriting process in less than 48 hours, failed to offer the merchant insurance of any kind, and did not seek the merchant's debt schedule, profit margins, or any information about the merchant's accounts receivables prior to funding the Loan. Nor did Par Funding conduct an on-site inspection. As the Tennessee merchant has explained under oath, "The only time CBSG visited the Company or sent someone to visit me was when it threatened me with physical violence after I missed payments."

176.     For other small businesses, Par Funding simply asks the small business to email them a photo of their office rather than perform the on-site inspection promised to investors.

177.     For example, a law firm in Washington, D.C. (the "Small D.C. Business") borrowed $38,670.75 from Par Funding in November 2017 and the only "inspection" of the merchant's business was a photo of the office Par Funding asked the merchant to email them.

178.     When Par Funding does conduct an on-site inspection, it is sometimes done after Par Funding has already approved and funded the Loan.

179.     For example, Par Funding approved a $370,000 Loan to a Sports Field Grading and Maintenance company in Dallas, Texas and funded the Loan on January 4, 2017. The on-site inspection occurred on January 5, 2017, after the Loan had been approved and funded in its entirety.

180.     Thus, Par Funding does not always conduct an on-site inspection prior to approving a Loan and sometimes completes the entire underwriting process in less than 48 hours.  These facts do not stop Par Funding from making representations to the contrary to investors.

181.     For example, in January 2020, Abbonizio told an undercover individual posing as an investor that Par Funding requires three days to complete an underwriting process on a Loan application because Par Funding conducts what he referred to as "the coup de grace" – a personal onsite inspection. He told her that because of this vigilant process, he felt confident telling her to invest her money in Par Funding.

182.     However, that same month, Par Funding made a $150,000 Loan to a Boston Small Business with the initial TMA, without conducting an on-site inspection and in fact completed the underwriting process in less than 48 hours.  Instead of conducting "the coup de grace," Par Funding merely asked the Boston Small Business owner to email photos of her office.

183.    Additionally, as set forth above, contrary to the rigorous underwriting process Par Funding touts to investors, Par Funding approves and funds Loans to small businesses without obtaining information about the merchant's profit margins, expenses, or debts.

184.    Even Par Funding's representation to potential investors that it assigns a liaison to each merchant to cultivate the relationship is misleading, as Par Funding does not always assign a liaison to small businesses or have a liaison who communicates with the small businesses. For example, Par Funding did not assign a liaison to the Ohio Small Business, the League City Small Business, the Texas Small Business, or the California Small Business.

### 2. False and Misleading Claims about Par Funding's Loan Default Rate

185.    LaForte, Abbonizio and Vagnozzi make false claims to prospective investors that Par Funding has a 1% loan default rate.

186.    For example, in Summer 2018, LaForte met with at least one investor in Maryland and pitched the Par Funding investment to her, telling her that Par Funding's loan default rate was only 1%.

187.    On January 7, 2020, Abbonizio told an undercover individual posing as a potential investor that Par Funding issues bad loans 1 percent of the time. He explained that the defaults are "one percent of $500 million."

188.    Similarly, at a dinner for investors and potential investors on November 21, 2019, Abbonizio presented the investment.  He told more 300 investors at this event that the 10% to 14% investment returns were "enticing," but it is only enticing if Par Funding does a good job at loaning money to borrowers.

189.    At this same dinner, Abbonizio emphasized that Par Funding has "the best underwriting in the industry" and has "rigorous operational standards, almost seven years in the making." Because of this, Abbonizio explained, they have a default rate that is "less than 1

percent." He also explained to the investors why this is so important – because if enough of the borrowers miss their payments to Par Funding, that "could impede Par Funding's ability to pay Vagnozzi's fund to ultimately pay you."

190.    At this same dinner, ABFP and Vagnozzi also touted Par Funding's low default rate, giving potential investors a flyer describing the Par Funding investment opportunity as having a 2% default rate.

191.    Likewise, on the United Fidelis website, Furman and United Fidelis tout a 1.2% default rate for the "MCA investment" they offer.

192.    These representations are false and misleading.

193.    In reality, Par Funding has filed more than 2,000 collections lawsuits against small borrowers for defaulting on the Loans Par Funding made to them.

194.    Par Funding claims to have funded $600 million in Loans. These lawsuits allege that the Loans are in default and seek to recover more than $300 million that the small businesses have allegedly failed to repay Par Funding. An analysis of these lawsuits reveals that Par Funding's loan default rate is as high as 10%.

195.    In Fall 2017, Furman gave a Florida investor a Par Funding brochure claiming that Par Funding had provided "more than $220 million in business funding" since its inception in 2012.

196.    However, by August 2017, Par Funding had filed more than 240 lawsuits against small businesses for defaulting on their Loans, seeking more than $20 million in missed Loan payments.

197.    Likewise, on August 15 2019, Abbonizio touted Par Funding's 1% default rate to potential investors at a Retirement Evolution solicitation dinner. However, by August 2019, Par

Funding had filed more than 800 lawsuits against small businesses for defaulted Loans, seeking more than $100 million in missed Loan payments.

198.     Similarly, when Abbonizio and Vagnozzi touted Par Funding's low default rates to potential investors during the ABFP solicitation dinner on November 21, 2019, Par Funding had filed more than 1,000 lawsuits, in Philadelphia alone, against small businesses for defaulted Loans, seeking more than $145 million in missed Loan payments.

199.     LaForte and Cole, Par Funding's CFO, were present when these representations were made to potential investors on November 21, 2019, and did not correct these false and misleading statements.

200.     When Abbonizio touted Par Funding's low default rates to an Undercover posing as a potential investor in January 2020, Par Funding had filed more than 1,200 lawsuits seeking more than $150 million in missed payments on defaulted Loans.

201.     Most recently, in July 2020, LaForte and Abbonizio touted the 1% default rate on the Loans in a solicitation meeting with undercover individuals posing as potential investors. When they made this representation, Par Funding had filed at least 2,000 lawsuits seeking about $300 million in missed payments from small business owners on Loans Par Funding alleges are in default.

202.     Additionally, Par Funding calculates the default rate differently in its representations to investors by not including in the rate any Loan where the borrower is making even a partial payment or is speaking with Par Funding about the Loan.

203.     For example, on July 10, 2020, Par Funding told a Texas small business owner with the initial MF that it would take his Par Funding Loan out of default status if the small business owner made a mere $500 payment on his $1.2 million Loan balance.

### 3. False Claims that Par Funding Offers Insurance on Its Loans

204.    In the brochure Par Funding distributes to potential investors through the Agent Funds, Par Funding claims to offer insurance on all of its products up to $150,000. Par Funding further claims that "[t]he insurance protects Par Funding in case of a default or non-payment."

205.    On June 5, 2018, LaForte also told a potential investor in Maryland that if a merchant defaulted on his loan, Par Funding had insurance to back up investor funds, thus reassuring the investor that her investment was safe and secure.

206.    At an event in Florida to solicit investors in RE Income Fund 2 in August 2019, Abbonizio told potential investors that Par Funding's merchant loans were insured.

207.    These claims are false.  Par Funding did not offer small businesses insurance on the Loans, and thus investor funds were not protected by insurance.

208.    For example, during the more than two-year period spanning November 2015 through January 2018, Par Funding approved and funded 15 Loans to a small business located in Los Angeles, California (the "L.A. Small Business"). The Loans totaled $6,126,054.13.

209.    At no time, on any of the 15 Loans approved over the course of these two years did Par Funding offer the L.A. Small Business insurance of any kind.

210.    On each of the 15 occasions when Par Funding approved and funded a Loan to the L.A. Small Business, Par Funding completed the underwriting in less than 48 hours, never offered the L.A. Small Business insurance of any kind, never conducted an in-person interview before giving the L.A. Small Business the Loans, never requested information about the L.A. Small Business's expenses, and never requested information about the L.A. Business's profit margins.

211.    Par Funding's Loans to the League City, Texas Small Business, Tennessee Small Business, Ohio Small Business, Boston Small Business, Arizona Small Business, Houston Small

Business, D.C. Small Business, New Jersey Small Business, and Dallas Small Business span the period from April 2016 through January 2020.

212.    Par Funding did not offer insurance to a single one of these small businesses to whom it issued Loans.

### 4. Misrepresentations and Omissions about LaForte's Background

213.    LaForte touts his financial and business acumen and his success through Par Funding, but fails to disclose his criminal history. Similarly, the Par Funding website includes numerous articles featuring LaForte and his claimed business success, and directs readers to LaForte's "Forbes Council" profile, in which he describes himself as "…one of the small business industry's most distinguished and accomplished leaders."  LaForte also holds himself out in videos he posts online as a "financial expert" for Par Funding.

214.    In truth, LaForte is a twice-convicted felon and prior to founding Par Funding with McElhone, was imprisoned and ordered to pay $14.1 million in restitution for grand larceny and money laundering. To conceal these facts, LaForte uses two aliases – Joe Mack and Joe Macki because, as LaForte admitted to at least one individual, if people "google" his real name they will see his negative history. Par Funding and Cole actively assist LaForte in concealing his true identity, and thus his criminal background, by providing LaForte with a Par Funding email address bearing the name of his alias, joemack@parfunding.com, and a Par Funding business card for his alias Joe Macki.

215.    Additionally, Cole has solicited investors by touting the experience of Par Funding's management team while failing to disclose LaForte's criminal history, despite knowing LaForte has been convicted of crimes involving dishonesty. For example, in Fall 2017, Cole solicited a potential investor with initial E.H. who resides in Massachusetts to invest in Par Funding, promising up to 15% monthly interest payments.  Cole told the investor that Par Funding

was successful and touted Par Funding's experienced management team. Cole did not disclose that the management team was led by a convicted felon.

216.    Similarly, during an August 2019 solicitation event in Wildwood, Florida, Abbonizio solicited investors to invest in Par Funding through RE Income 2 by touting the "great team" at Par Funding. He failed to disclose that the leader of the team is a convicted felon.

217.    Abbonizio also conceals LaForte's identity from investors. For example, when an undercover individual posing as an investor asked Abbonizio who the founders of Par Funding are, Abbonizio responded: "There's basically five of us. There's myself, Joe Cole, who is the CFO, Joe McElhone, and Lisa McElhone… and Lisa is the President of the company."  He then went on to identify the fifth founder – "a family out of Manhattan. They have $48 million with us." Joe McElhone is yet another alias for Joseph LaForte used to conceal his identify from investors.

218.    In its 2019 and 2020 Form D Filings with the Commission, Par Funding failed to identify LaForte in Item 3 of the form requiring the disclosure of "Related Persons." The instructions accompanying Form D direct filers to provide the following information under "Related Persons":

> Enter the full name and address of each person having the specified relationships with any issuer and identify each relationship:
> • Each executive officer and director of the issuer and person performing similar functions (title alone is not determinative) for the issuer, such as the general and managing partners of partnerships and managing members of limited liability companies; and
> • Each person who has functioned directly or indirectly as a promoter of the issuer within the past five years of the later of the first sale of securities or the date upon which the Form D filing was required to be made.
>  If necessary to prevent the information supplied from being misleading, also provide a clarification in the space provided.

219.    As set forth above, LaForte is identified as the President of Par Funding, runs the day-to-day operations, and he functions as an executive officer of Par Funding. Nonetheless, Par Funding does not disclose LaForte's involvement in its Commission filings.

### 5.  Misrepresentations and Omissions about Par Funding's Regulatory History

220.    LaForte touts to prospective investors Par Funding's success. For example, in November 2019 LaForte told potential investors that Par Funding is probably the most profitable cash advance company in the United States and maybe in the world.

221.    Abbonizio also solicits investors by touting Par Funding's success and its track record as a leader in the merchant cash industry.

222.    Similarly, Vagnozzi touts Par Funding's purported success. For example, in a 6-minute video, Vagnozzi tells potential investors he would like to introduce them to "one of the best merchant cash advance lenders that you can find" and characterizes it as "highly profitable."

223.    The video is widely distributed; it is posted on the Vimeo pages of ABFP and Vagnozzi, was posted on the ABFP Income Fund website until at least April 17, 2020, emailed to potential investors, and shown during sales pitches.

224.    On the ABFP Facebook page, Vagnozzi characterizes "our MCA Fund" as [sic] "Best investment you can find."

225.    In early 2020, Vagnozzi described the investment in Par Funding to an undercover posing as a potential investor as "like the crack-cocaine" of investments ABFP offers, adding "[a] check every month."

226.    As for Gissas, he advertises the Retirement Evolution as an investment in "a top company in the merchant cash sector." Neither in the advertisements nor in the solicitation events he leads does Gissas disclose Par Funding's regulatory history.

227.    Par Funding, LaForte, Abbonizio, Vagnozzi, and Gissas tout Par Funding while failing to disclose that Par Funding has twice been sanctioned for violating state securities laws.

228.     In November 2018, the Pennsylvania Securities Regulators filed a Consent Agreement and Order against Par Funding for violating the Pennsylvania Securities Act prohibiting the use of unregistered sales agents in the offer and sale of securities, and fined Par Funding $499,000 (the "Pennsylvania Order").

229.     In December 2018, the New Jersey Bureau of Securities issued a Cease-and-Desist Order against Par Funding based on its offer and sale of unregistered securities (the "New Jersey Order"). Both of these Orders were in effect when the Defendants touted Par Funding as an investment opportunity to potential investors, and both Orders remain in effect.

230.     However, the Defendants have failed to disclose these Orders while touting Par Funding.

231.     In February 2020, the Texas State Securities Board issued an Emergency Cease-and-Desist Order against Par Funding and others, alleging fraud and registration violations in connection with its securities offering through an Agent Fund in Texas (the "Texas Order").

232.     Undeterred, Par Funding has continued soliciting investors and continued touting the success of Par Funding without disclosing the Texas Order to potential investors.

### 6. Misrepresentations about the New Jersey Order

233.     Furman has misrepresented the New Jersey Order to at least one potential investor while soliciting her for the Par Funding investment through Fidelis. For example, on June 16, 2019, Furman told an undercover individual posing as an investor that the state of New Jersey had "retracted" its action against Par Funding and had said Par Funding was "good" and did not need to pay a fine or have any penalties.

234.     This is false. New Jersey did not retract its Order.

### 7. False Statements In Par Funding's Commission Filings
### About McElhone and Cole's Receipt of Funds

235.     Par Funding has filed two false filings with the Commission concerning its Par Funding Note offering and how investor funds would be used.  On February 12, 2019, Par Funding filed a Notice of Exempt Offering of Securities on Form D with the Commission, stating that it was a new notice for an offering of debt securities in reliance on the exemption under Rule 506(b) and that the first sale was on August 1, 2012. The filing discloses approximately $3.6 million Par Funding has paid in finders' fees and a total amount sold of approximately $227 million to 488 investors. In the Use of Proceeds section, the filing states that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or others listed in the filing's section for related persons, in which McElhone and Cole are listed as executive officers and directors.

236.     On April 28, 2020, Par Funding filed an amended Form D with the Commission with respect to the offering that began August 1, 2012, disclosing the total amount sold to the 488 investors was higher than it initially reported in 2019 - $378 million.

237.     This filing states that Par Funding has paid no finders' fees and commissions, and again states that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or others listed in the filing's related persons section, which again includes McElhone and Cole.

238.     Cole signed the Amended Form D on behalf of Par Funding.

239.     The representations in both filings that Cole and McElhone would not receive any of the gross proceeds of the securities offering are false.

240.     McElhone received at least $11.3 million from the offering between July 2015 and October 2019.  As for Cole, Par Funding transferred funds, which included investor funds, to

companies in which Cole has an ownership interest or otherwise receives financial benefits: $1.8 million to ALB Management between July 2019 and October 2019; about $4.9 million to Beta Abigail between July 2016 and April 2019; and about $9.5 million to New Field Ventures, LLC between February 2017 and November 2019.

241.    In a recent recorded conversation with an FBI confidential source, Cole admitted that Par Funding pays him through his consulting firms and that the amounts are reflected in the "consulting" line on the Par Funding financial statements.

242.    The Par Funding financial statements reflect the amount of the consulting payments and notes that New Field Ventures is owned by Cole and Abbonizio. Cole is also an owner of Beta Abigail, which also receives purported consulting funds from Par Funding, and he admitted to the undercover human source that ALB Management is a company through which he receives payments from Par Funding.

243.    The representation in Par Funding's 2020 Form D filing that Par Funding did not pay commissions is similarly false. Par Funding had paid so-called finders' fees of at least $3.6 million plus an addition $1 million in payments labeled as "commissions" from July 2015 to February 2020.

### 8. False Claims about LaForte's Personal Investment in Par Funding

244.    LaForte falsely told prospective investors that he personally invested in Par Funding.  For example, at the November 2019 solicitation dinner for ABFP, LaForte told the crowd that he had invested $500,000 of his own money in Par Funding to get the company started. LaForte also claimed in an email to an existing investor inquiring about someone else potentially investing, "I have 80 million in the company myself. So his money would be side by side w [sic] mine."

245.     LaForte's claims are false. Not only did LaForte not invest his own money to start Par Funding, but he has in fact never invested in Par Funding.

**9. Misrepresentations and Omissions about Vagnozzi's Regulatory History**

246.     While soliciting investors for the Par Funding investment through ABFP, Vagnozzi touts his financial and business acumen and his success through ABFP, but fails to disclose his regulatory history.

247.     For example, at the November 2019 solicitation dinner, Vagnozzi touts his "proven track record," how investors have never missed a payment, and how well ABPF does for its investors.

248.     At this same dinner, Vagnozzi told the audience of investors: "What I'm doing is legal, but most financial advisors don't have a set of you-know-what's to drop that license so they can do what I'm doing."

249.     In truth, just months before making this representation to potential investors, the Pennsylvania Securities Regulators sanctioned Vagnozzi for violating state securities laws.

250.     Vagnozzi has testified under oath that ABFP is his alter ego. While playing up his supposed investment success, including success through the Par Funding investment, Vagnozzi fails to disclose to investors the fact that he settled a regulatory action with the state of Pennsylvania in May 2019 ordering him to pay a $490,000 fine based on his sales of the Par Funding investment in violation of state law.

251.     Understanding that investors would want to know of unlawful activity when deciding with whom to invest, Vagnozzi publishes an article on the ABFP website addressing the issue head-on. And lying about it.

252.     Specifically, on the ABFP website, Vagnozzi has an article published entitled "What's the Catch? By Dean Vagnozzi." In it, he tells potential investors:

I know that potential clients will inevitably wonder, "what's the catch?"

Is Dean Vagnozzi a scam artist? Is A Better Financial Plan 1346 a fraud? Of course they would be skeptical! And so would I!

So let me save you a lot of time. There is no catch.

So stop looking for one. Stop googling, stop searching to see if Dean Vagnozzi is a scam, stop looking on the Better Business Bureau's website to see if A Better Financial Plan 1346 is a fraud. I have never had a criminal record in my life and I am very confident that there never will be.

In fact, to the best of my knowledge, *the only law that I think I ever broke* was a speeding ticket that I received on the New Jersey Turnpike back when I was in my early 20's. That is about the only misdemeanor that I have ever been a part of. (Jeez, I sound like a lot of fun, don't I?)

253.    In truth, in 2019 Vagnozzi was sanctioned by the Pennsylvania Securities Regulators for violating the federal securities laws; and in February 2020 the Texas Securities Regulators filed a claim against ABFP for fraud in connection with the Par Funding offering, which remains pending.

254.    Even after the Commission filed a Consent Order against Vagnozzi for his violation of the federal securities laws on July 14, 2020, Vagnozzi continues to publish the "What's the Catch?" article, "What's the Catch?" on the ABFP website.

255.    None of Vagnozzi's regulatory history is disclosed to investors. Instead, Vagnozzi tells potential investors a traffic law is the only law he has ever violated.

256.    As recently as July 23, 2020, the ABFP website homepage includes a photo of Vagnozzi standing with individuals with the caption "A Team You Can Trust." This caption is a

hyperlink that takes the reader to a page that reads "About Dean Vagnozzi." This page includes details about Vagnozzi's successes and career path.

257.    There is no mention of his regulatory history or the sanctions levied against him for violating securities laws in connection with the offer and sale of Par Funding securities.

### 10. Misrepresentations and Omissions about ABFP's Regulatory History

258.    ABFP's website homepage, www.abetterfinancialplan.com, features a video in which Vagnozzi tells potential investors that none of his clients have ever lost money and that ABFP works with one of the top law firms in Philadelphia.

259.    The webpage also includes a video that purports to tell the story of ABFP, and testimonials ABFP reprints and posts on the website to show glowing reviews about the company such as "Dean and his company are standup people."

260.    ABFP fails to disclose that ABFP is subject to a February 2020 Cease-and-Desist Order issued by Texas Securities Regulators.

261.    In the Exchange Offering materials provided to investors, ABFP disclosed as an investment risk the existence of lawsuits filed by small businesses based on Loan disputes. However, there is no disclosure of the existence of the case against ABFP, Par Funding, and Abbonizio in Texas. Nor is there is any disclosure of the Emergency Cease-and-Desist Order the Texas Regulators entered months before the Exchange Offering based on findings that ABFP, Par Funding, and Abbonizio made fraudulent and material misrepresentations and omissions to investors in connection with the Par Funding and Agent Fund offering, or that the fact that the action filed by the Texas Regulators was – and is – ongoing.

### 11. Misrepresentations and Omissions about Abbonizio's Regulatory History

262.    Similarly, when ABFP offered the Exchange Offering, the Texas Securities Regulators had issued the Emergency Cease-and-Desist Order against Par Funding based on his

fraudulent misrepresentations and omissions in connection with Par Funding and the Agent Fund offering.

263.    ABFP, through Vagnozzi, was aware of that Order, as ABFP is also a party to the Texas Action.  When offering the Exchange Notes, ABFP and Vagnozzi reassured investors about Par Funding's ability to rebound and recommence payments if investors accepted the Exchange Notes and touted the hardworking employees at Par Funding.

264.    Par Funding's website continued advertising its purported "strong, dedicated team," which continues to this day.

265.    At the time of Exchange Note offering, Abbonizio was a partial owner and manager of Par Funding who had solicited investors to make their initial investments in Par Funding through the Agent Funds, and Abbonizio continues his role at Par Funding today.

266.    However, at no time did ABFP, Vagnozzi, or Par Funding disclose to investors that just before the offering began, the Texas Securities Regulators issued an Emergency Cease-and-Desist Order against Abbonizio for, among other things, engaging in fraud in connection with the Par Funding offerings and Agent Fund solicitations.

267.    Likewise, in soliciting undercover individuals to invest in Par Funding in June and July 2020, no one at Par Funding disclosed the Texas Cease-and-Desist Order issued against Abbonizio.

## **COUNT I**

### **Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act**

**Against Par Funding, Full Spectrum, ABFP, ABFP Management,
ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning,
McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman**

268.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

269.    Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

270.    By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)].

## **COUNT II**

### **Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act**

**Against Par Funding, Full Spectrum, ABFP, ABFP Management,
ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning,
McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman**

271.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

272.    Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017

through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, has knowingly or recklessly made untrue statements of material facts or omitted to state material facts in order to make the statements made, in the light of the circumstances in which they were made, not misleading.

273.     By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

## COUNT III

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

### Against Against Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman

274.     The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

275.     Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts,

practices, and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

276.     By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)].

## COUNT IV

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(1) of the Securities Act

### Against Par Funding, Full Spectrum, ABFP, ABFP Management,
### ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning,
### McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman

277.     The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

278.     Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have knowingly or recklessly employed devices, schemes or artifices to defraud.

279.     By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(2) of the Securities Act

#### Against all Defendants

280.     The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

281.     Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, Gissas, Retirement Evolution, and RE Fund, beginning no later than May 2018 through present, and RE Fund 2, beginning no later than August 2019 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

282.     By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT VI

**Fraud in the Offer or Sale of Securities in
Violation of Section 17(a)(3) of the Securities Act**

**Against All Defendants**

283.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

284.    Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, Gissas, Retirement Evolution, and RE Fund, beginning no later than May 2018 through present, and RE Fund 2, beginning no later than August 2019 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

285.    By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless and restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT VII

### Sale of Unregistered Securities in Violation of
### Sections 5(a) and 5(c) of the Securities Act

### Against All Defendants

286.     The Commission repeats and realleges paragraphs 1 through 267 of this Complaint as if fully set forth herein.

287.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued and the transactions conducted by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

288.     Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, Gissas, Retirement Evolution, and RE Fund, beginning no later than May 2018 through present, and RE Fund 2, beginning no later than August 2019 through present, directly or indirectly:

(a)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise;

(b)     carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

289.    By reason of the foregoing, the Defendants violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT VIII

### Control Person Liability Under
### Section 20(a) of the Exchange Act

### Against McElhone and LaForte

290.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint as if fully set forth herein.

291.    From no later than July 2015 through present, McElhone and LaForte have been, directly or indirectly, control persons of Par Funding and Full Spectrum for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

292.    From no later than July 2015 through present, Par Funding and Full Spectrum violated Section 10(b) and Rule 10b-5 of the Exchange Act.

293.    As control persons of Par Funding and Full Spectrum, McElhone and LaForte are jointly and severally liable with and to the same extent as Par Funding and Full Spectrum for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

294.     By reason of the foregoing, McElhone and LaForte directly and indirectly have violated, and unless restrained and enjoined, are reasonably likely to continue to violate Section 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and §78t(a), and 17 C.F.R. § 240.10b-5.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find that Defendants committed the violations alleged and:

## I.

## Temporary Restraining Order And Preliminary Injunction

Issue a Temporary Restraining Order and Preliminary Injunction, restraining and enjoining: All Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a)(2) and (3), and Sections 5(a) and (c) of the Securities Act; Defendants Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act; and McElhone and LaForte, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 20(a) of the Exchange Act.

## II.

## Permanent Injunction

Issue a Permanent Injunction, restraining and enjoining: All Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them,

and each of them, from violating Sections 17(a)(2) and (3), and Sections 5(a) and (c) of the Securities Act; Defendants Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.

### III.

### <u>Asset Freeze and Sworn Accountings</u>

Issue an Order freezing the assets of Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, Retirement Evolution Group, RE Fund, RE Fund 2, McElhone, LaForte, Cole and Relief Defendant LME Trust, and requiring the Defendants and Relief Defendant to file sworn accountings with this Court.

### IV.

### <u>Records Preservation</u>

Issue an Order requiring all Defendants and the Relief Defendant to preserve any records related to the subject matter of this lawsuit that are in their custody or possession or subject to their control.

### V.

### <u>Disgorgement</u>

Issue an Order directing all Defendants and the Relief Defendant to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## VI.

### <u>Penalties</u>

Issue an Order directing all Par Funding, Full Spectrum, ABFP, ABFP Management, United Fidelis, Retirement Evolution, McElhone, LaForte, Cole, Abbonizio, Vagnozzi, Furman, and Gissas to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## VII.

### <u>Appointment of a Receiver</u>

Appoint a receiver over Defendants Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, Retirement Evolution, RE Fund and RE Fund 2.

## VIII.

### <u>Further Relief</u>

Grant such other and further relief as may be necessary and appropriate.

## IX.

### <u>Retention of Jurisdiction</u>

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## DEMAND FOR JURY TRIAL

The Commission hereby demands a jury trial in this case.

August 10, 2020                          Respectfully submitted,

                                By:      s/Amie Riggle Berlin
                                         Amie Riggle Berlin
                                         Senior Trial Counsel
                                         Florida Bar No. 630020
                                         Direct Dial: (305) 982-6322
                                         Direct email: berlina@sec.gov

                                         Attorney for Plaintiff
                                         **SECURITIES AND EXCHANGE**
                                         **COMMISSION**
                                         801 Brickell Avenue, Suite 1950
                                         Miami, Florida  33131
                                         Telephone: (305) 982-6300
                                         Facsimile:   (305) 536-4154

Of counsel:
Linda Schmidt, Senior Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, Florida 33131

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 10th day of August 2020 via email and cm-ecf on all defense counsel in this case.

                          s/ Amie Riggle Berlin
                          Amie Riggle Berlin