# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-CIV-81205-RAR

**SECURITIES AND EXCHANGE
COMMISSION,**

      Plaintiff,

v.

**COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d/b/a PAR FUNDING**, *et al.,*

      Defendants.

_____/

## <u>ORDER DENYING MOTION TO DISMISS</u>

This case is an enforcement action brought by the Securities and Exchange Commission ("SEC") alleging that Defendants issued, marketed, and sold unregistered, fraudulent securities to fund short-term loans to small businesses—known as "merchant cash advances." Before the Court is a Motion to Dismiss the Amended Complaint [ECF No. 363] ("Motion") filed by Defendants Complete Business Solutions Group, Inc. d/b/a Par Funding, Lisa McElhone, Joseph W. LaForte, Joseph Cole Barleta, Perry S. Abbonizio, Dean J. Vagnozzi, Michael C. Furman (collectively, "Defendants") and Relief Defendant The LME 2017 Family Trust. Having reviewed the Motion, the SEC's Response [ECF No. 416], Defendants' Reply [ECF No. 455], the record, applicable law, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that the Motion [ECF No. 363] is **DENIED** for the reasons discussed herein.

## BACKGROUND

### I.  Factual Background

The Court begins by setting forth the facts as described in the SEC's Amended Complaint, many of which Defendants vehemently dispute.  Par Funding—a company founded in 2011 by husband-wife duo McElhone and LaForte—was engaged in the business of making "opportunistic loans" to small businesses across the country.  *See* Am. Compl. ¶ 1.  From approximately August 2012 through mid-2020, to fuel these merchant cash advances (MCAs), Defendants raised nearly half a billion dollars through unregistered securities sold to over a thousand investors nationwide. *Id*.  The SEC describes the alleged scheme as consisting of two primary phases.  During the first phase, from August 2012 until around December 2017, Par Funding primarily issued promissory notes and offered them to the investing public directly and through a network of sales agents ("Phase I").  *Id*. ¶ 2.

Then, in early January 2018—after learning it was under investigation by the Pennsylvania Department of Banking and Securities for violating state securities laws through the use of unregistered agents—Par Funding implemented a new way to raise funds for the MCAs ("Phase II").  *Id.* ¶¶ 3-4.  Par Funding began relying on "Agent Funds" that were "created for the purpose of issuing their own promissory notes, selling the notes to the investing public through unregistered security offerings, and funneling investor funds to Par Funding."  *Id.* ¶ 4.  Par Funding would compensate the Agent Funds by offering them promissory notes that had higher rates of return than the notes the Agent Funds sold to investors.  *Id.* ¶ 4.

The Amended Complaint states that McElhone and LaForte "orchestrate[d] the scheme" through Par Funding and McElhone's company, Full Spectrum Processing, Inc., whose employees operated Par Funding.  LaForte, Cole (Full Spectrum's CFO), and Abbonizio (Par Funding's

investment director and partial owner) solicited investors to invest in the securities.  Am. Compl. ¶ 5.  Vagnozzi, through his company ABetterFinancialPlan.com d/b/a A Better Financial Plan ("ABFP"), recruited individuals to create the Agent Funds and provided them training and other materials to assist them with the creation and operation of the funds.  *Id.* ¶ 6.  Vagnozzi, Furman, and Gissas each operated Agent Funds that raised money for Par Funding through unregistered securities offerings.  *Id.* ¶ 7.

The SEC avers that in addition to violating the federal securities laws by selling unregistered securities, Defendants also made false or misleading statements and omissions concerning the Par Funding offering in violation of the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  *Id.* at 29-50.  The misrepresentations alleged by the SEC can be grouped into seven categories:

***First***, the Amended Complaint alleges that Defendants made misrepresentations regarding Par Funding's underwriting process.  It describes a recorded conversation between Abbonizio and an individual posing undercover as an investor where Abbonizio touted Par Funding's underwriting practices. Am. Compl. ¶¶ 156-57.  It is also cites a brochure that Furman, Abbonizio, and Vagnozzi distributed to investors emphasizing Par Funding's "Exceptional Underwriting Rigor"; marketing materials where Par Funding claimed that it conducted on-site merchant inspections prior to loan approval; and a solicitation event where Abbonizio told investors that Par Funding does on-site inspections 100% of the time before approving any loan.  *Id.* ¶¶ 158-164. The SEC alleges that contrary to these representations, Par Funding did not always conduct on-site inspections before approving an MCA.  *Id.* ¶¶ 167-82.  It also contends that Par Funding funded loans "without obtaining information about the merchant's profit margins, expenses, or debts," *id.*

¶ 183, and did not "always assign a liaison to small businesses or have a liaison who communicates with the small businesses" as it claimed. *Id.* ¶ 184.

***Second***, the Amended Complaint alleges that Defendants made misrepresentations regarding Par Funding's loan default rate. LaForte, Abbonizio, and Vagnozzi represented to prospective investors that Par Funding's loan default rate was around 1%, *id.* ¶¶ 185-190, when in reality, "Par Funding has filed more than 2,000 collections lawsuits against small borrowers for defaulting on the [l]oans Par Funding made to them." *Id.* ¶ 193. The Amended Complaint asserts that Par Funding claims to have funded more than $600 million in loans and the lawsuits seek to recover over $300 million that the small businesses have allegedly failed to repay. *Id.* ¶ 194. According to the SEC, "[a]n analysis of these lawsuits reveals that Par Funding's loan default rate is as high as 10%." *Id.* The SEC also alleges that Par Funding excluded from its default rate "any [l]oan where the borrower is making even a partial payment or is speaking with Par Funding about the loan." *Id.* ¶ 202.

***Third***, the Amended Complaint alleges that Defendants made misrepresentations regarding insurance offered on the MCAs. The brochure that Par Funding distributed to potential investors allegedly misrepresented that Par Funding offered insurance on all its products up to $150,000. Am. Compl. ¶ 204. LaForte and Abbonizio also told investors that Par Funding had insurance to back up investor funds. *Id.* ¶¶ 205-06. In reality, "Par Funding did not offer small businesses insurance on the [l]oans, and thus investor funds were not protected by insurance." *Id.* ¶ 207.

***Fourth***, the Amended Complaint alleges that Defendants made misrepresentations and omissions about LaForte's background to investors. LaForte, Cole, Abbonizio, and Par Funding touted LaForte's financial and business acumen and success without disclosing that he is a twice-convicted felon who was formerly imprisoned and ordered to pay $14.1 million in restitution for

grand larceny and money laundering. *Id.* ¶¶ 213-217. Further, Par Funding did not disclose LaForte as a "Related Person" in its Form D filing with the SEC even though LaForte ran the day-to-day operations of Par Funding and functioned as one of its executives. *Id.* ¶¶ 218-219.

*Fifth*, the Amended Complaint alleges that Defendants made misrepresentations to investors regarding Defendants' regulatory history. In November 2018, Pennsylvania securities regulators filed a Consent Agreement and Order against Par Funding for violating the Pennsylvania Securities Act's prohibition on the use of unregistered agents in the offer and sale of securities and fined Par Funding $499,000 ("Pennsylvania Order"). Am. Compl. ¶ 228. Then, in December 2018, the New Jersey Bureau of Securities issued a Cease-and-Desist Order against Par Funding based on its offer and sale of unregistered securities ("New Jersey Order"). *Id.* ¶ 229. Additionally, in February 2020, the Texas State Securities Board issued an Emergency Cease-and-Desist Order against Par Funding and others, alleging fraud and registration violations in connection with its securities offerings through an Agent Fund in Texas ("Texas Order"). *Id.* ¶ 231. The SEC alleges that Par Funding, LaForte, Abbonizio, and Vagnozzi promoted Par Funding's success while failing to disclose to investors that Par Funding had been sanctioned several times for violating state securities laws. *Id.* ¶¶ 220-227.

The SEC alleges that Vagnozzi similarly touted his financial and business acumen and success to investors but failed to disclose his regulatory history. Am. Compl. ¶¶ 246-57. Vagnozzi told an audience of investors at a dinner: "What I'm doing is legal, but most financial advisors don't have a set of you-know-what's to drop that license so they can do what I'm doing." *Id.* ¶ 248. However, just months before, Pennsylvania securities regulators had sanctioned Vagnozzi for state securities law violations. *Id.* ¶ 249. Even after Vagnozzi was sanctioned by state securities regulators and the SEC filed a Consent Order against him, the ABFP website featured

an article he wrote titled "What's the Catch?", which recognized that investors may be wondering "Is Dean Vagnozzi a scam artist?  Is A Better Financial Plan 1346 a fraud?"  Vagnozzi attempted to dispel those concerns in the article, stating "[t]here is no catch" and "the only law I think I ever broke was a speeding ticket that I received on the New Jersey Turnpike . . . ."  *Id.* ¶ 252.  ABFP's website featured videos telling investors that none of Vagnozzi's clients had ever lost money, that ABFP worked with one of the top law firms in Philadelphia, and that "Dean and his company are standup people," while failing to disclose the existence of a securities enforcement action against ABFP, Par Funding, and Abbonizio in Texas.  *Id.* ¶¶ 258-261.

Furthermore, Furman allegedly made misrepresentations about the New Jersey Order to at least one potential investor—who was an undercover individual—falsely claiming that New Jersey had "retracted" its action against Par Funding and that Par Funding was "good" and did not face fines or penalties.  *Id.* ¶¶ 233-34.

*Sixth*, the Amended Complaint alleges that Par Funding made false statements in its Form D filings with the SEC about McElhone and Cole's receipt of funds and Par Funding's payment of finders' fees and commissions. Am. Compl. ¶¶ 235-243.  Par Funding filed a Notice of Exempt Offering of Securities on Form D with the SEC on February 19, 2019 and an amended Form D on April 28, 2020.  *Id.* ¶¶ 235-36.  These filings stated that none of the gross proceeds of the offering had been or were proposed to be used for payments to executive officers or others listed on the form as Related Persons.  *Id.* ¶¶ 235-37.  The amended Form D, signed by Cole, also stated that Par Funding had paid no finders' fees and commissions.  *Id.* ¶ 237.  Contrary to the statements made on the Form D filings, both McElhone and Cole received money from the offering, *id.* ¶ 240-42, and Par Funding paid finders' fees of at least $3.6 million, as well as $1 million in commissions.  *Id.* ¶ 243.

*Seventh*, the Amended Complaint alleges that LaForte falsely told prospective investors that he had personally invested large sums of money in Par Funding. *Id.* ¶¶ 244-45.

## II.   Procedural Background

The SEC filed this action on July 24, 2020, seeking—among other things—a temporary restraining order and preliminary injunction, an asset freeze, appointment of a receiver, a permanent injunction, disgorgement, and penalties. *See* Compl. [ECF No. 1].  The Court entered an order appointing a receiver over certain Defendant entities, as well as several subsequent orders expanding the scope of the receivership [ECF Nos. 141, 238, 436, 484, 517].  The Court also granted the SEC's request for a temporary restraining order and asset freeze [ECF No. 42] and held a two-day preliminary injunction hearing [ECF Nos. 170, 192].  Following the hearing, each Defendant consented to a preliminary injunction [ECF Nos. 173, 176, 187, 200, 201, 221, 255, 336].  On October 27, 2020, the Court stayed this case as to Defendant Gissas, who reached a tentative settlement with the SEC [ECF No. 349].  On November 2, 2020, Defendants filed the instant Motion to Dismiss, seeking dismissal of the Amended Complaint that the SEC filed on August 10, 2020.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'"  *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quotation omitted); *Iqbal*, 556 U.S. at 678.

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *S.E.C. v. City of Miami, Fla.*, 988 F. Supp. 2d 1343, 1353 (S.D. Fla. 2013). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Eleventh Circuit has explained that:

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Under Rule 9(b), it is "sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## ANALYSIS

The SEC's Amended Complaint alleges that Defendants engaged in fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) thereunder (Counts I-III) and Section 17(a)(1)-(3) of the Securities Act (Counts IV-VI). It also alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act by selling unregistered securities (Count VII). Lastly, the SEC asserts Control Liability Under Section 20(a) of the Exchange Act against McElhone and LaForte (Count VIII).

In their Motion, Defendants raise several arguments in favor of dismissal. First, Defendants argue that the SEC does not have enforcement authority over the Phase I Par Funding promissory notes because they are not securities. *See* Mot. at 4. Second, Defendants maintain the SEC has failed to establish that Defendants violated the antifraud provisions of the federal securities laws—Section 10(b), Rule 10b-5(a)-(c), and Section 17(a)(1)-(3)—because the SEC insufficiently alleges that Defendants possessed the requisite state of mind and fails to plead claims with particularity as required by Rule 9(b). *Id.* Third, Defendants argue that the SEC's Amended Complaint constitutes a shotgun pleading. *Id.* Fourth, Defendants contend that the Amended Complaint improperly joins The LME Trust as a relief defendant without sufficiently alleging facts to show that The LME Trust is a recipient of ill-gotten funds. *Id.* And fifth, Defendants claim that the Amended Complaint requests relief well outside the statute of limitations. *Id.* The Court will address each of these arguments in turn.

## I.   Are the Phase I Promissory Notes Securities?

### a.   *Test for determining whether promissory notes are securities*

To reach the issue of an alleged violation of the Securities Acts, the transaction at hand must involve a "security" as defined in the Acts. *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007) (quoting *Home Guaranty Ins. Corp. v. Third Fin. Servs., Inc.*, 667 F. Supp. 577, 579 (M.D. Tenn. 1987)). Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act broadly define a "security" to include "any note." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).[1] However, the Supreme Court has explained that the phrase "any note" as it appears in the Securities Acts "should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the

---

[1] The Exchange Act exempts those notes with terms "not exceeding nine months." 15 U.S.C. § 78c(a)(10).

Securities Acts." *Reves v. Ernst & Young*, 494 U.S. 56, 62-63 (1990).  Congress's purpose in enacting the federal securities laws was to "regulate *investments*, in whatever form they are made and by whatever name they are called." *Id.* at 61 (emphasis in original).

Accordingly, in *Reves*, the Supreme Court articulated a test—the "family resemblance" test—to enable courts to distinguish between "notes issued in an investment context (which are 'securities') from notes issued in a commercial or consumer context (which are not)." *Id.* at 63. The family resemblance test begins with a presumption that *any* note of more than nine months is a security.  *Id.*  That presumption is rebuttable only by a showing that the note is on a list of judicially excepted instruments or bears a "strong resemblance" to an item on that list.  *Id.* at 67. The categories of non-security instruments enumerated by the Second Circuit and adopted by the Supreme Court in *Reves* include:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] . . . notes evidencing loans by commercial banks for current operations.

*Id.* at 65 (quoting *Exch. Nat. Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)).

The Supreme Court listed four factors that courts should apply to determine whether an instrument bears a "strong resemblance" to the items on the list: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]"; (2) "the 'plan of distribution' of the instrument," with an eye on "whether it is an instrument in which there is common trading for speculation or investment"; (3) "the reasonable expectations of the investing public"; and (4)

"whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 66-67 (internal quotations omitted).  If an instrument is not sufficiently similar to one of the enumerated items, "the decision whether another category should be added is to be made by examining the same factors." *Id.* at 67.  Notably, *Reves* emphasizes that the test is designed to focus on the "economic realities" of the transaction and not elevate form over substance. *Id.* at 61-62.  Because the factors are considered as a whole, failure to satisfy one of the factors is not dispositive. *S.E.C. v. Thompson*, 732 F.3d 1151, 1160 (10th Cir. 2013).

### b.  *Defendants' argument as to why Phase I promissory notes are not securities*

As mentioned above, Defendants argue that the Court should dismiss the SEC's claims regarding any conduct stemming from the alleged offer or sale of promissory notes during Phase I because the notes issued by Par Funding during that time were not securities. *See* Mot. at 8-10. Defendants contend that the Phase I promissory notes fall under two of the judicially exempt categories: (1) short term notes secured by a lien on a small business or some of its assets; and (2) short-term notes secured by an assignment of accounts receivable. *Id.* at 8-9.  Defendants point to the 12-month duration of the promissory notes and the Security Agreement that accompanied them, which states that Par Funding "grant[s] a security interest to the investor in substantially all of [Par Funding's] assets, including, without limitation, its inventory, accounts receivable and general intangibles, to Secured Party . . . ." *Id.*; Security Agreement [ECF Nos. 28-14 and 28-15]. The Security Agreement also defines "Collateral" as:

> [A]ll tangible and intangible personal property of Debtor [Par Funding], wherever located and whether now owned or hereafter acquired, including but not limited to all accounts, contract rights, general intangibles, chattel paper, machinery equipment, goods, inventory, fixtures, investment property, letter of credit rights, supporting obligations, books and records, deposit accounts, bank

> accounts, documents and instruments together with all proceeds thereof.

Security Agreement [ECF No. 28-14] at 2. Defendants maintain that because the Phase I promissory notes fall under the judicially exempt categories, the Court need not apply the family resemblance factors.

### c. Discussion

Guided by the principles articulated in *Reves*, the Court finds that Defendants have not rebutted the presumption that the Phase I promissory notes are securities. The Phase I promissory notes do not obviously fit into the judicially exempt categories enumerated in *Reves* such that application of the family resemblance factors is rendered superfluous—and the family resemblance factors support a finding that the Phase I promissory notes *are* securities.

As an initial matter, the Court notes that the judicially exempt instruments are on that list precisely because they possess characteristics that the family resemblance factors are designed to identify. *See Reves*, 494 U.S. at 65-66 (explaining that the family resemblance factors reflect "what it is about *those* [judicially exempt] instruments that makes *them* non-'securities.'") (emphasis in original). Thus, finding that an instrument is a non-security simply because it superficially resembles one of the enumerated exceptions—even where the family resemblance factors point the other way—flouts *Reves*'s directive that courts must focus on the "economic realities" of the transaction. *See S.E.C. v. Wallenbrock*, 313 F.3d 532, 538 (9th Cir. 2002) ("It is not the moniker or label that is dispositive, but the economic characteristics of the notes.").

For example, in *S.E.C. v. J.T. Wallenbrock & Assocs.*, the defendant sold unregistered securities in the form of three-month promissory notes, promising a 20% return with little or no risk, where the notes were purportedly secured by latex glove manufacturers' accounts receivable purchased by the defendant through an offshore trust. No. 02-00808, 2002 WL 35649374, at *1

(C.D. Cal. Apr. 3, 2002).   The court found that the promissory notes did not fall within the judicially crafted exemption for short-term notes secured by accounts receivable.  *Id.* at *2.   It explained that "the typical short-term note secured by an assignment of accounts receivable is issued directly by a manufacturer to the lender; in exchange for funds to cover a cash-flow shortfall, the manufacturer assigns a particular receivable to the lender."  *Id.*  In contrast, the notes in *Wallenbrock* were issued to finance the defendant's purported business of receivables factoring—there was no contact between the investors and the manufacturers, the notes did not indicate who the manufacturers were, and the notes were not exchanged for interest in particular receivables.  *Id.*  The court therefore concluded that the notes bore only a "surface resemblance" to the exemption and, after applying the family resemblance factors, concluded that the notes were securities.  *Id.* at *3-4.

Similarly, in *S.E.C. v. 1 Global Capital, LLC*, the court held that promissory notes issued to fund the defendant's MCA loans did not fall under the judicially crafted exemption for short-term loans secured by accounts receivable or a lien on a small business or some of its assets.  No. 18-61991, 2019 WL 1670799, at *5 (S.D. Fla. Feb. 8, 2019).   The court reasoned that these exemptions did not clearly extend to the situation at hand where the notes were secured by "*many* liens on *many* businesses or secured by *multiple* assignments of accounts receivable," and "each noteholder obtained a small, fractionalized interest in up to hundreds of MCAs."  *Id.*[2]

---

[2] Although it dealt with a different type of instrument, the Fourth Circuit's holding in *Zolfaghari v. Sheikholeslami*, 943 F.2d 451 (4th Cir. 1991), also highlights the importance of looking beyond the labels associated with the notes.  There, the district court had dismissed the plaintiffs' securities claims, finding that the notes at issue were not securities.  *Id.* at 454.  The Fourth Circuit noted that it was "understandable" that the district court reached this conclusion because plaintiffs indicated they were buying "notes secured by first mortgages"—and a note secured by a mortgage is typically not a security.  *Id.*  However, the Fourth Circuit nevertheless reversed, distinguishing between notes secured by a single mortgage, which are not securities, and interests in an amalgamated pool of mortgage notes, which *are* securities "because any profits realized are derived from the managerial efforts of those who run the pool and make such decisions

As in *Wallenbrock* and *1 Global Capital*, the Phase I promissory notes at issue here are not clearly encompassed by the judicially crafted exemptions for short-term notes secured by accounts receivable or by a lien on assets of a small business as those exemptions are commonly understood. The investors' funds were used by Par Funding to fund thousands of loans to small businesses so that each investor noteholder obtained "a small, fractionalized interest" in the loans. The SEC does not allege that the notes were exchanged for interest in particular receivables or assets. Nor is there any indication that the notes even identified the small business borrowers or that the noteholders had any contact with them or the ability to assess the soundness of their businesses as in the traditional context of a loan secured by the assets of a small business. Rather, the noteholders relied on Par Funding's entrepreneurial efforts managing the portfolio of MCA loans and ensuring the noteholders would receive their return on investment.

Thus, although there may be circumstances where application of the family resemblance factors is superfluous because it is readily apparent—based on economic characteristics—that an instrument falls under one of the judicial exemptions, such circumstances are not present in this case. *See Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 585 (6th Cir. 2000) ("Although the promissory notes received by [Plaintiff] bear similarities to at least two of the enumerated categories of notes which are not securities . . . we decline to struggle to fit an atypical peg into a standardized hole when the Supreme Court has provided, in its four-factor test, a tool for custom fitting."); *Wallenbrock*, 2002 WL 35649374, at *3 ("The crucial inquiry . . . is the family resemblance factors, not whether the face of the note appears to fall within one of the exception categories.").

---

as determining which mortgages shall be in the pool, how the individual notes will be serviced and managed, and other fund decisions." *Id.* at 455.

The Court therefore proceeds to examine the family resemblance factors discussed in *Reves* to discern whether the Phase I promissory notes are securities under the Securities Acts. First, the Court looks at the motivations that would prompt a reasonable seller and buyer to enter into the transaction. The Supreme Court has explained that "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66. In contrast, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose . . . the note is less sensibly described as a 'security.'" *Id*.

The first factor comfortably supports a finding that the Phase I promissory notes are securities. The investors' primary motivation was likely the 12% to 44% rate of return that Par Funding offered. *See* Am. Compl. ¶ 50. There is no indication that the investor noteholders received any other benefits from the transaction. The SEC alleges that Par Funding sold the notes to fuel its merchant cash advance loan business and enrich itself and its principals. *See id.* ¶¶ 1, 2, 48-50. Thus, from both sides, "the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction." *Reves*, 494 U.S. at 68.

Second, the Court examines if there was "common trading for speculation or investment" on the notes. The offer and sale of the note to a "broad segment of the public" is sufficient to establish this element. *Id.*; *see also S.E.C. v. Levin*, No. 12-21917, 2014 WL 11878357, at *10 (S.D. Fla. Oct. 6, 2014) ("The notes here were sold to at least 83 different investors in at least 6 different states . . . That the notes were sold to a number of investors in different states indicates

that the notes are securities."); *Wright v. Downs*, 972 F.2d 350, 1992 WL 168104, at *3 (6th Cir. July 17, 1992) (finding that notes sold to 200 investors constituted a broad segment of the public). The Amended Complaint does not specify exactly how many investors purchased the Phase I promissory notes, but it alleges that by the end of Phase I in December 2017, Par Funding had raised at least $90 million from investors through the offer and sale of promissory notes. *See* Am. Compl. ¶ 61. It also alleges that Par Funding contracted with sales agents through "Finders Agreements" to locate and solicit investors. *Id.* ¶ 55. And by February 2019, Par Funding had raised no less than $227 million from 488 investors in at least a dozen states. *Id.* at ¶ 235. Thus, this factor weighs in favor of finding that the Phase I promissory notes are securities.

Third, the Court analyzes the reasonable expectation of the investing public to see if the public views the notes as securities. Instruments are considered securities "on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Reves*, 494 U.S. at 66. Further, where the notes are characterized by the originator as "investments" and there are no "countervailing factors" that would lead a reasonable person to question this characterization, "it would be reasonable for a prospective purchaser to take the [originator] at its word." *Id.* at 69; *see also S.E.C. v. Lottonet Operating Corp.*, No. 17-21033, 2017 WL 6949289, at *10 (S.D. Fla. Mar. 31, 2017), report and recommendation adopted, No. 17-21033, 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017) (indicating that the issuer's "characterization of these investments as subject to the federal securities laws is sufficient to characterize them as securities where . . . there are 'no countervailing factors that would lead a reasonable person to question this characterization.'") (quotation omitted).

Here, the third factor supports a finding that the Phase I promissory notes are securities. Par Funding characterized the notes as securities by filing a Notice of Exempt Offering of Securities on Form D with the SEC. *See* Am. Compl. ¶¶ 235-36. Defendants contend that Par Funding's Form D is not relevant to whether the Phase I promissory notes are securities because Par Funding filed the Form D in February 2019—after Phase I. *See* Reply at 2. However, the Form D indicated that the first sale of the notes was on August 1, 2012, which is when Phase I started. *See* Am. Compl. ¶¶ 235-36. Additionally, the Court agrees with the SEC that investors sending money to Par Funding to fund its MCA business in exchange for a high single- or low double-digit rate of return would reasonably expect that they were making an investment. *Id.* ¶¶ 58-60; *S.E.C. v. Davis*, No. 18-10481, 2019 WL 6841986, at *4 (C.D. Cal. Oct. 15, 2019) (finding that a reasonable investor would consider twelve-to-eighteen-month promissory notes bearing 5%-8% interest an investment); *Wallenbrock*, 313 F.3d at 539 ("A reasonable investor sending funds to [Defendant] for a guaranteed return of 20% and an automatic rollover every three months would expect that the funds were an investment, not a short-term loan.").[3]

The final factor requires the Court to assess whether there are adequate risk-reducing factors such as an alternate regulatory scheme that would "significantly reduce[ ] the risk of the instrument" to the lender, "thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67 (citations omitted). On the one hand, the Amended Complaint alleges that the investor funds were not protected by insurance, *see* Am. Compl. ¶ 207, and Defendants have not identified an alternative regulatory scheme to protect investors' interests. Even though

---

[3] In its Response, the SEC cites to several documents introduced at the preliminary injunction hearing to show that Defendants characterized the Par Funding notes as "investments" during Phase I when soliciting investors. However, "[i]n passing on a motion to dismiss because the complaint fails to state a cause of action, the facts set forth in the complaint are assumed to be true and affidavits and other evidence produced on application for a preliminary injunction may not be considered." *Fla. Fam. Pol'y Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009) (quoting *Land v. Dollar*, 330 U.S. 731 (1947)).

Pennsylvania, Texas, and New Jersey state regulators brought actions against Defendants, the Amended Complaint alleges that the Par Funding notes were offered "nationwide," Am. Compl. ¶ 1, and *Reves* was particularly focused on whether the notes would escape "*federal* regulation" if the Securities Act were not to apply.  494 U.S. at 69 (emphasis added).  However, on the other hand, the Security Agreement that accompanied the notes indicates that the funds received from investors were collateralized, which helps mitigate the risk.  *See Bass*, 210 F.3d at 585 ("In application, [the fourth *Reves*] factor comprises, in addition to comprehensive regulatory schemes, the presence or absence of risk-reducing factors such as collateral or insurance.").  The Court therefore treats this factor as neutral in its analysis of whether the notes are securities.  *See Aubrey v. Barlin*, 159 F. Supp. 3d 752, 757 (W.D. Tex. 2016) (finding that risk-reducing factors were neutral in the determination of whether notes were securities where there was collateral but no evidence of insurance or an alternative regulatory scheme).

The Court notes that Defendants only cursorily challenge the *Reves* factors in their briefing. They instead rely heavily on one case that the Court finds distinguishable.  Defendants argue that the Phase I notes are comparable to the short-term notes in *Asset Prot. Plans, Inc. v. Oppenheimer & Co.*, No. 11-00440, 2011 WL 2533839 (M.D. Fla. June 27, 2011) ("*APP*"), which provided money to NFL prospects to cover training, relocation, and other living expenses until the prospects began to receive income as professional athletes.  The *APP* court concluded that the notes were similar to notes delivered in consumer financing, as well as short-term notes secured by a lien on a small business or some of its assets because the notes were secured by the guarantee and assets of the prospects' sports agency.  *Id.* at *3.  The court also found that the two largest notes were akin to a "short-term note secured by an assignment of accounts receivable" because they were secured by both a prospect's anticipated income and the sports agency's future accounts.  *Id.*

The Court disagrees that the Phase I promissory notes are comparable to the notes at issue in *APP*.  The notes there were intended to cover the players' expenses until they began receiving income as professional athletes, which is significantly different than the use of investor funds for an enterprise like Par Funding's MCA business.  *See Reves*, 494 U.S. at 66 (indicating that a note to obtain funds to correct for cash-flow difficulties or for a consumer purpose is less likely to be a security, whereas a note to raise capital for business enterprise is likely to be a security).  Further, the *APP* court concluded that each note was a heavily negotiated loan, and the notes were not offered to the general public.  *APP*, 2011 WL 2533839, at *4.  The court found that with a heavily negotiated loan between two parties, "a main concern of the Securities Acts—that the issuer 'has superior access to and control of information' while the investor must rely 'solely on semi-anonymous and secondhand market information'—is not present." *Id.*  In contrast, the Par Funding notes were offered to a broad segment of the public, and Par Funding had superior access to and control of information regarding the businesses that would be receiving the MCA loans.  The Phase I promissory notes are therefore materially distinguishable from the notes at issue in *APP*.

For the foregoing reasons, and primarily based on the first, second, and third *Reves* factors, the Court concludes that Defendants have not overcome the presumption that the promissory notes are securities.

## II. Has the SEC sufficiently alleged violations of the antifraud provisions of the Securities Acts?

The Court now turns to whether the SEC has sufficiently alleged violations of the Securities Acts' antifraud provisions.  The SEC alleges that Defendants' actions violated Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act.  These statutes are very similar.  The main difference is "that § 10(b) and Rule 10b-5 apply to acts committed in connection with *a purchase or sale* of securities while § 17(a) applies to acts committed in connection with

*an offer or sale* of securities." *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995) (emphasis in original); *see also S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795 (11th Cir. 2015) ("Though Rule 10b-5 regulates a different activity, i.e., the "purchase or sale" of securities rather than their "offer or sale," it borrows much, though not all, of its language from § 17(a).").

Rule 10b-5 and Section 17(a) both include three subsections.  Rule 10b-5(a) makes it unlawful to "employ any device, scheme, or artifice to defraud"; subsection (b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading"; and subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5(a)-(c).

Similarly, Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud"; § 17(a)(2) makes it unlawful "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading"; and § 17(a)(3) makes it unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a).

In some cases, the Eleventh Circuit has indicated that violations of Section 10(b), Rule 10b-5, and Section 17(a) require a showing of "material misrepresentations or materially misleading omissions."  *See S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007); *S.E.C. v. Radius Cap. Corp.*, 653 F. App'x 744, 749 (11th Cir. 2016).  However, the Eleventh Circuit has also clarified that a defendant may be liable under both Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) without making a material misrepresentation.  *See Big Apple Consulting*, 783 F.3d at 796 (indicating that subsections (1) and (3) in § 17(a) and subsections (a) and (c) in

Rule 10b–5 "prohibit schemes to defraud and fraudulent courses of business" and "do not use the word 'make' or even address misstatements"); *S.E.C. v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("The operative language of section 17(a) does not require a defendant to "make" a statement in order to be liable . . . Likewise, subsections (a) and (c) of Rule 10b–5 'are not so restricted' as subsection (b), because they are not limited to 'the making of an untrue statement of a material fact.'"); *see also S.E.C. v. Strebinger*, 114 F. Supp. 3d 1321, 1331 (N.D. Ga. 2015) ("[S]ubsection (a) and (c) of Rule 10b-5, unlike subsection (b), do not require an individual 'make' a false statement to establish liability."); *S.E.C. v. Contrarian Press, LLC*, No. 16-06964, 2019 WL 1172268, at *4 (S.D.N.Y. Mar. 13, 2019) ("While Rule 10b-5(b) targets misleading disclosures, Rules 10b-5(a) and (c) target deceptive conduct.").

Accordingly, to allege claims under Section 17(a)(1)-(3), Section 10(b), and Rule 10b-5(a)-(c), the SEC must show: (1) a device, scheme, artifice to defraud; a material misrepresentation or omission; *or* an act, practice, or course of business which would operate as a fraud or deceit; (2) in the offer of or in connection with the purchase or sale of a security; and (3) in interstate commerce. *See S.E.C. v. Quiros*, No. 16-21301, 2016 WL 11578637, at *12 (S.D. Fla. Nov. 21, 2016). For claims under Section 17(a)(1) and Rule 10b-5, the SEC must also allege facts supporting scienter. *Merch. Cap.*, 483 F.3d at 766. The SEC need only demonstrate negligence for claims under Sections 17(a)(2) and (3). *Id.* There is "considerable overlap among the subsections of the Rule and related provisions of the securities laws"—*i.e.*, they prohibit some of the same conduct. *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1102 (2019). However, Rule 10b-5(b) and § 17 (a)(2) specifically require misrepresentation. And Rule 10b-5(b)—but not § 17(a)(2)—requires that the defendant be the "maker" of the misrepresentation or omission, meaning the defendant has "ultimate authority over the statement, including its content and whether and how

to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *Big Apple Consulting*, 783 F.3d at 797 (holding that Section 17(a)(2) cannot be read to include the "maker" restriction present in Rule 10b–5(b)).

The Court will first address whether the SEC has sufficiently alleged material misrepresentations or omissions in violation of Rule 10b-5(b) and § 17(a)(2).  The Court will then analyze whether the SEC has adequately pleaded violations of Rule 10b-5(a) and (c) and §§ 17(a)(1) and (a)(3).

### a. Whether the SEC has sufficiently alleged violations of Rule 10b-5(b) and Section 17(a)(2)

As noted above, to establish a violation of Rule 10b-5(b), the SEC must prove that the defendant made a material misrepresentation or materially misleading omission in connection with the sale or purchase of securities with scienter.  Section 17(a)(2) requires a showing of a material misrepresentation or materially misleading omission in connection with an offer or sale of securities made with negligence.  Because the Court has already determined that the SEC has adequately alleged the promissory notes are securities—and Defendants do not otherwise challenge the "in connection with the purchase or sale of" and "in the offer or sale of" elements— the Court will focus its analysis on: (i) whether the SEC has sufficiently pleaded material misrepresentations or omissions made with scienter and negligence; and (ii) whether the SEC's allegations concerning the circumstances constituting fraud satisfy the heightened pleading requirements of Rule 9(b).

In the securities fraud context, the test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Merch. Cap.*, 483 F.3d at 766 (quoting *S.E.C. v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982)).  In other words, a statement or omission is material where "there is a substantial likelihood

that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix of information available.'" *S.E.C. v. Monterosso*, 768 F. Supp. 2d 1244, 1263 (S.D. Fla. 2011), aff'd, 756 F.3d 1326 (11th Cir. 2014) (quoting *S.E.C. v. DCI Telecommunications, Inc.*, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000)).  Materiality is a mixed question of law and fact—and a complaint should not be dismissed on materiality grounds unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004) (internal quotations and citation omitted). Scienter can be established by a showing of knowing misconduct or severe recklessness. *Monterosso*, 756 F.3d at 1335.  To show severe recklessness, the SEC must demonstrate "that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quoting *Carriba Air*, 681 F.2d at 1324).  Circumstantial evidence may be used to support a strong inference of scienter.  *City of Miami*, 988 F. Supp. 2d at 1360.

The SEC need only plead scienter generally.  *S.E.C. v. Levin*, No. 12-21917, 2013 WL 5588224, at *13 (S.D. Fla. Oct. 10, 2013).  However, it must still "allege plausible facts or suggest reasonable inferences that, if taken as true, would support a finding of scienter."  *S.E.C. v. Mannion*, 789 F. Supp. 2d 1321, 1342 (N.D. Ga. 2011); *see also S.E.C. v. Ustian*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017) ("In SEC enforcement actions, Rule 9(b) allows mental states to be alleged generally, yet there must still be some basis for believing the plaintiff could prove

scienter.") (quotation omitted).  The Court determines scienter by examining all allegations in the aggregate rather than sole allegations in isolation.  *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016-17 (11th Cir. 2004).  Typically, scienter is an issue left to the trier of fact.  *Monterosso*, 756 F.3d at 1335.[4]

To establish negligence for purposes of Sections 17(a)(2)-(3), the SEC must show a failure to exercise a standard of reasonable care.  *City of Miami*, 988 F. Supp. 2d at 1362; *see also S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir. 1997) (describing negligence in securities context as the failure to exercise reasonable care or competence).  Factual allegations supporting an inference of scienter will also satisfy the lower standard of negligence required for claims under Sections 17(a)(2) and (3) of the Securities Act.  *S.E.C. v. Coplan*, No. 13-62127, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014).

For the reasons discussed below, the Court finds that the SEC has established the elements of Rule 10b-5(b) for each Defendant.  The Court therefore finds it unnecessary to separately analyze Section 17(a)(2) and concludes that its elements are also satisfied.  For McElhone and

---

[4] Defendants contend that the SEC must meet the benchmark announced by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), under which a complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  The Court acknowledges that district courts have taken differing positions as to whether this standard from *Tellabs* applies to SEC enforcement actions.  Compare *S.E.C. v. Betta*, No. 09-80803, 2011 WL 4369012, at *9 (S.D. Fla. Sept. 19, 2011) (indicating that based on *Tellabs*, courts are required to take into account "plausible opposing inferences" when assessing whether scienter was adequately pleaded) with *Mannion*, 789 F. Supp. 2d at 1334 (finding that the standard announced in *Tellabs* is limited to private actions and has no application to SEC enforcement actions).  Having reviewed *Tellabs*, the Court is persuaded by cases that have declined to extend the standard to SEC enforcement actions.  *See, e.g., S.E.C. v. Pentagon Cap. Mgmt. PLC*, 612 F. Supp. 2d 241, 263-64 (S.D.N.Y. 2009); *Rains v. Zale Corp.*, No. 09-2133, 2011 WL 3331213, at *5 (N.D. Tex. Aug. 1, 2011).  In any event, the Court believes that the inferences of scienter it draws from the SEC's allegations in this case are at least as compelling as opposing inferences that one could draw from the facts alleged.

LaForte, the Court also finds that the SEC has sufficiently pleaded controlling person liability under Section 20(a).

### i.   *LaForte*

The SEC alleges at least three material misrepresentations by LaForte that satisfy the elements of Rule 10b-5(b) and Section 17(a)(2) and are pleaded with particularity as required by Rule 9(b).  First, the SEC alleges that on November 21, 2019, LaForte falsely told an audience of more than 300 investors and potential investors that he had invested his own money in Par Funding. *See* Am. Compl. ¶¶ 103, 244-245.  This allegation sets forth the who, what, when, where, and how of the allegedly false statement and therefore satisfies Rule 9(b).  The SEC has also established materiality for this misrepresentation—in deciding whether to invest in Par Funding, a reasonable person could attach importance to whether LaForte, who ran the day-to-day operations of Par Funding, would be willing to risk his own money by investing in the company.  Finally, taking as true the SEC's allegation that LaForte never actually invested his money in Par Funding, the Amended Complaint sufficiently alleges that LaForte acted with knowledge or at minimum severe recklessness when he led investors to believe otherwise.

Second, the SEC alleges that LaForte touted his business success, financial expertise, and leadership without disclosing that he was previously convicted and served time in prison for grand larceny and money laundering.  *Id.* ¶¶ 213-14.  For example, the Amended Complaint alleges that "the Par Funding website includes numerous articles featuring LaForte and his claimed business success, and directs readers to LaForte's 'Forbes Council' profile, in which he describes himself as '…one of the small business industry's most distinguished and accomplished leaders.'"  *Id.* ¶ 213.  The Amended Complaint also states that "LaForte … holds himself out in videos he posts online as a 'financial expert' for Par Funding."  *Id.*  The SEC alleges that to conceal his criminal

history, LaForte "uses two aliases—Joe Mack and Joe Macki—because, as LaForte admitted to at least one individual, if people 'google' his real name they will see his negative history." *Id.* ¶ 214. These factual allegations are sufficient to satisfy Rule 9(b)'s particularity requirement.

Reasonable minds could conclude that LaForte's criminal history was material to investors. *See, e.g., S.E.C. v. Prater*, 289 F. Supp. 2d 39, 52-53 (D. Conn. 2003) ("The failure to disclose anywhere on the websites or in other materials any information about [Defendant's] extensive criminal history, including convictions for fraud, would certainly constitute a material omission which a reasonable investor might view as important in deciding whether to trust their money with [Defendant] or his company."); *S.E.C. v. Cap. Cove Bancorp LLC*, No. 15-00980, 2015 WL 9704076, at *6 (C.D. Cal. Sept. 1, 2015) (finding that in using an alias, defendant "omitted and never disclosed [his] criminal history when soliciting investments" and that this omission was material); *United States v. Hatfield*, 724 F. Supp. 2d 321, 328 (E.D.N.Y. 2010) ("It is well-settled that information impugning management's integrity is material to shareholders."). And the SEC's allegations that LaForte used aliases with investors because he knew a Google search of his name would reveal his "negative history" supports an inference of scienter. Am. Compl. ¶ 214.

In their Reply, Defendants argue that LaForte's alleged omissions regarding his criminal history cannot form the basis for securities fraud violations because the SEC's own regulations—specifically Regulation S-K—only require disclosure of a conviction by a control person when it is within five years and material to an investment decision. *See* Reply at 9-10 (citing 17 C.F.R. § 229.401(g)). However, "the fact that Regulation S–K does not require disclosure of particular information does not answer whether the information is material to investors under the securities laws." *S.E.C. v. Brown*, 740 F. Supp. 2d 148, 159 (D.D.C. 2010).[5] And because the SEC has

---

[5] Furthermore, the SEC alleges that Defendants' fraudulent scheme began in 2012, and LaForte's latest conviction occurred in 2009. Am. Compl. ¶¶ 2, 18. It is therefore not apparent from the face of the

alleged that LaForte used aliases with investors, Defendants' argument that LaForte's criminal history was publicly available is similarly unavailing at this stage of the proceedings.

Third, the SEC alleges that LaForte told investors that the default rate on Par Funding's loans was 1% when in reality, Par Funding had filed at least 2,000 lawsuits seeking about $300 million in missed payments from borrowers—which the SEC alleges reflect a default rate closer to 10%. Am. Compl. ¶¶ 185-203. The SEC also asserts that LaForte misrepresented to investors that their funds were protected by insurance. *Id.* ¶¶ 204-212. And the SEC provides specific dates when LaForte made these misrepresentations to investors. *Id.* ¶¶ 186, 199, 201, 205. These allegations are sufficient to satisfy Rule 9(b).

Given that borrowers defaulting on the MCA loans affects Par Funding's ability to repay investors, a reasonable investor would likely attach importance to the default rate being ten times higher than what was represented to investors. The Court also has no trouble concluding that a reasonable person would attach importance to a representation concerning whether an investment is protected by insurance. The Court therefore finds that materiality is adequately pleaded for these misrepresentations. Considering that the SEC (unlike private litigants) is only required to plead scienter generally, the SEC's allegations that LaForte approved and signed the loans and was responsible for Par Funding's day-to-day operations raises an inference that he knew or was severely reckless in not knowing that the loans did not include an insurance component and that the loans he was approving had resulted in thousands of lawsuits for defaulted loan payments. *Id.* ¶ 43.

---

Amended Complaint that the alleged misrepresentations about LaForte's criminal history occurred entirely outside the five-year window referenced by Defendants.

Defendants argue that the SEC's allegations that Par Funding's loan default rate was calculated differently than the SEC's preferred method does not prove falsity or scienter. *See* Mot. at 14. They also contend that the SEC's allegation that "Par Funding did not offer small businesses insurance on the [l]oans" does not mean investor funds were not protected by insurance. *Id.* at 15. However, the Court is required to accept the SEC's well-pleaded allegations as true at this stage. Whether Par Funding did indeed protect investor funds with insurance or accurately represent its loan default rate are factual issues that cannot be resolved on a motion to dismiss.

### ii.   Cole

The SEC alleges that Cole signed[6] an April 2020 Form D for Par Funding that was filed with the SEC, and that the form failed to identify LaForte in the "Related Persons" section, which requires identification of "[e]ach executive officer or director of the issuer and person performing similar functions (title alone is not determinative) for the issuer . . ." and "[e]ach person who has functioned directly or indirectly as a promoter of the issuer . . . ." *Id.* ¶¶ 218-19, 238. The Form D also falsely stated that Par Funding: (1) did not pay McElhone or Cole any of the gross proceeds from the securities offering, and (2) did not pay any commissions. *Id.* ¶¶ 237-43. These allegations are sufficient to satisfy Rule 9(b).

The SEC's allegations regarding Cole's misrepresentations also satisfy materiality. As discussed above, when making an investment decision, a reasonable investor could attach importance to LaForte's criminal history and the fact that he was running the day-to-day operations of Par Funding. Furthermore, courts have held that "[m]isrepresentations regarding the use of investors' funds are material." *Lottonet*, 2017 WL 6949289, at *13 (collecting cases).

---

[6] "[C]ourts have consistently held that the signer of a corporate filing is its "maker." *Brown*, 878 F. Supp. 2d at 116.

The Court also finds that the SEC's allegations are sufficient to support an inference of scienter. The SEC alleges that Cole knew LaForte had been convicted of crimes involving dishonesty and actively helped conceal LaForte's identity from investors. *See* Am. Compl. ¶ 215. The SEC also alleges that Cole attended sales events with LaForte where LaForte was introduced to investors as the President of Par Funding, yet Cole still did not list LaForte on the Form D submitted to the SEC. *Id.* ¶¶ 101, 104. Finally, the SEC alleges that Cole received proceeds from the securities offering but nevertheless signed a Form D representing that he did not. *Id.* ¶ 240. These allegations are enough to support an inference of scienter at the pleadings stage.

### iii.    *Abbonizio*

The SEC alleges that Abbonizio misrepresented Par Funding's loan default rate to investors and falsely told investors that the MCA loans were insured and that Par Funding always performed on-site inspections before approving a loan. The Amended Complaint describes a November 2019 event where Abbonizio told an audience of investors that Par Funding had a default rate of 1%, compared to an industry average default rate of 18.5%. Am. Compl. ¶ 99. He advised the audience to focus on the default rate because that is the most important part of the investment. *Id.* ¶ 100. On January 7, 2020, Abbonizio told an undercover individual posing as a potential investor that Par Funding issues bad loans 1% of the time. *Id.* ¶ 187. He explained that the defaults are "one percent of $500 million." *Id.* The SEC alleges that contrary to these assertions, Par Funding had filed at least 2,000 lawsuits seeking about $300 million in missed payments from borrowers. *Id.* ¶ 47.

The SEC also alleges that Abbonizio touted Par Funding's underwriting, describing the underwriting group to an undercover individual posing as an investor as "the key to our whole investment thesis," and explaining that the investment in Par Funding is "only compelling if

you have confidence that whatever you give, $50,000 or $5 million, that we are going to do an exemplary job of putting your hard earned money in the hands of suitable companies that can meet their daily obligation to pay us back." *Id.* ¶ 156. The SEC further asserts that in August 2019, Abbonizio falsely told potential investors during a solicitation event that Par Funding does an on-site inspection of small businesses 100% of the time before approving any loan. *Id.* ¶¶ 163-64. With respect to insurance, the SEC alleges that at an event in Florida to solicit investors in August 2019, Abbonizio told potential investors that Par Funding's merchant loans were insured. *Id.* ¶ 206. These allegations sufficiently set forth the who, what, when, where, and how of the allegedly false statements and therefore satisfy Rule 9(b).

As noted previously, given that Par Funding's ability to pay investors is impacted by whether small business borrowers make payments on the MCAs, a reasonable person deciding whether to invest in Par Funding would certainly attach importance to the default rate, whether there was insurance on the loans, and Par Funding's underwriting rigor. The Court therefore finds that the SEC has sufficiently alleged that Abbonizio's misrepresentations or omissions were material.

The SEC's allegations also support a reasonable inference that Abbonizio acted with scienter. The Amended Complaint avers that Abbonizio was an owner and manager of Par Funding—and that Par Funding's business centered on making merchant cash advances. Am. Compl. ¶¶ 11, 20, 41. The SEC alleges that Abbonizio was responsible for soliciting investors and providing information to potential investors about Par Funding. *Id.* ¶ 20. It also alleges that Abbonizio repeatedly made assertions to investors about how critical the MCA default rate and underwriting were to Par Funding's business, suggesting that he was informed regarding these matters. *Id.* ¶¶ 100, 154-58, 181, 189; *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314,

325 (S.D.N.Y. 2001) ("[C]ourts . . . have held that on a motion to dismiss, making all reasonable assumptions in favor of the plaintiff includes assuming that principal managers of a corporation are aware of matters central to that business's operation.").[7]  Coupled with the SEC's general assertion that Abbonizio acted with scienter, these allegations support a reasonable inference that Abbonizio was at least reckless in misrepresenting the loan default rate, existence of insurance on the MCAs, and underwriting process to investors.  *See S.E.C. v. Landberg*, 836 F. Supp. 2d 148, 155 (S.D.N.Y. 2011) ("[A]llegations of recklessness have been found to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.") (quotation omitted).

### iv.    *Vagnozzi*

The SEC alleges misrepresentations or omissions by Vagnozzi with sufficient particularity to satisfy Rule 9(b).  The SEC alleges that at a November 2019 solicitation dinner, Vagnozzi touted his "proven track record" and told the audience of investors: "What I'm doing is legal, but most financial advisors don't have a set of you-know-what's to drop the license so they can do what I'm doing."  Am. Compl. ¶¶ 247-48.  Just months before making this representation, however, Vagnozzi had allegedly been sanctioned by Pennsylvania state regulators for securities laws violations.  *Id.* ¶ 249.  The SEC also alleges that Vagnozzi had his "What's the Catch?" article

---

[7]  In the context of securities fraud actions brought by private litigants, many courts have held that scienter cannot be inferred merely from a defendant's position within the company.  *See, e.g., Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1360 (S.D. Fla. 2015); *In re Pegasus Wireless Corp. Sec. Litig.*, No. 07-81113, 2009 WL 3055205, at *6 (S.D. Fla. Sept. 21, 2009).  The Court finds it unnecessary to analyze whether this is also the case in SEC enforcement actions—which are not subject to the Private Securities Litigation Reform Act's heightened pleading standard for scienter—because the Court is not concluding that the SEC sufficiently alleged scienter based merely on Abbonizio's position in the company.  Rather, the Court is persuaded that Abbonizio's repeated representations to investors regarding the centrality of the default rate and underwriting—coupled with his responsibility for conveying information about Par Funding to investors—are sufficient to support an inference that he was at least severely reckless in not knowing his statements were false.

published on the ABFP website, in which he asserts that a traffic law is the only law he has ever violated and encourages investors to "[s]top googling, stop searching to see if Dean Vagnozzi is a scam . . ." *Id.* ¶ 252. The SEC asserts that this article was on the ABFP website after Vagnozzi had been sanctioned by Pennsylvania regulators for securities laws violations, Texas regulators had filed a claim against ABFP (Vagnozzi's alleged alter ego) for fraud in connection with the Par Funding offering, and the SEC had filed a consent order against Vagnozzi for violations of federal securities laws. *Id.* ¶¶ 253-54.

The Court further finds that a reasonable investor could attach importance to Vagnozzi's violations of state and federal securities laws when making the decision of whether to invest in Par Funding through Vagnozzi's company. *See Merch. Cap.*, 483 F.3d at 771-72 ("The existence of a state cease and desist order against identical instruments is clearly relevant to a reasonable investor, who is naturally interested in whether management is following the law in marketing the securities.").

Finally, the Court finds that in addition to its general allegations that Vagnozzi acted with knowledge or recklessly, the SEC pleads sufficient facts to support an inference of scienter. The regulatory actions that Vagnozzi allegedly failed to disclose were about him and ABFP, the company he owned, so it is fairly obvious that Vagnozzi knew about them.

### v.    *Furman*

The Amended Complaint asserts that Furman misrepresented the New Jersey Order to at least one potential investor while soliciting her for the Par Funding investment through Fidelis. *See* Am. Compl. ¶ 233. Specifically, the SEC alleges that on June 16, 2019, Furman told an undercover individual posing as an investor that the state of New Jersey had "retracted" its action against Par Funding and had said Par Funding was "good" and did not need to pay a fine or have

any penalties. *Id.* The SEC alleges that this representation was false. *Id.* ¶ 234. These allegations are sufficient to satisfy Rule 9(b)'s particularity standard.

As noted previously, a reasonable investor could find Defendants' violations of state or federal securities laws material. The Court further finds that the SEC has sufficiently pleaded scienter for Furman. The SEC generally alleges that Furman acted knowingly or recklessly—and Furman's statement that the New Jersey Order was retracted when it remains in effect represents "an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Monterosso*, 756 F.3d at 1335 (quotation and citation omitted); *see also S.E.C. v. ICN Pharms., Inc.*, 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000) (indicating that "when a complaint alleges with particularity the circumstances constituting fraud, as required by Rule 9(b), then generally it will also have set forth facts from which an inference of scienter could be drawn") (internal quotations and alterations omitted).

### vi. *Par Funding*

Section 10(b) and Rule 10b-5 can be violated by any "person," natural or legal, including corporations. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F. 3d 471, 475 (9th Cir. 2015). Because the Exchange Act and related regulations "do not contain any explicit instructions on when an employee's acts and intent are to be imputed as those of the company, courts have looked to agency principles for guidance." *Id.*; *see also APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328, 1353 (N.D. Ga. 2004) ("[T]he principles of agency may be used to impute the actions of corporate officers and directors to the corporation itself . . . in essence, making the corporation liable under § 10(b) and Rule 10b-5."); *S.E.C. v. Tome*, 638 F. Supp. 596, 623 (S.D.N.Y. 1986) (indicating that a corporation can only act through its agents and is therefore liable as a principal "for the actions

of its responsible officers and authorized agents."); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 201 (1994) ("many courts . . . have imposed liability in § 10(b) actions based upon respondeat superior and other common-law agency principles."). Indeed, the Eleventh Circuit has stated that because a corporation has no state of mind of its own, the scienter of its agents must be imputed to it. *Mizzaro*, 544 F.3d at 1254; *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003).

As discussed above, the SEC has sufficiently alleged material misrepresentations or omissions—made with scienter—by LaForte, Cole, and Abbonizio. The Amended Complaint asserts that LaForte, Cole, and Abbonizio are owners, officers, and/or directors of Par Funding. *See* Am. Compl. ¶¶ 5, 17, 19, 20, 37, 121. It also pleads sufficient facts to support the inference that they made the alleged misrepresentations while transacting corporate business for Par Funding—for example, LaForte and Abbonizio's alleged misrepresentations occurred in the context of soliciting investors for Par Funding, and Cole allegedly made misrepresentations in Par Funding's Form D filing with the SEC. Par Funding "may be held liable co-extensively with the officer or employee actually responsible for the fraudulent conduct engaged in while in the course of employment and while transacting corporate business," *APA Excelsior*, 329 F. Supp. 2d at 1353-54. Furthermore, Par Funding is considered a "maker" of the false statements contained in the Form D filings. *See Lottonet*, 2017 WL 6949289, at *12 (finding that company and signatory were both makers of the false statements and omissions contained in the company's Private Placement Memorandum and Form D filings); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 240 (S.D.N.Y. 2018) (holding that corporation and executive who signed the corporation's Form 10-Qs submitted to the SEC were both responsible for the statements contained therein).

Additionally, the SEC alleges that Par Funding distributed a marketing brochure to potential investors that falsely claimed Par Funding's underwriting process takes 48 to 72 hours and includes, among other things, an on-site inspection before approving any loan. *See* Am. Compl. ¶¶ 159-161, 165-180. The SEC also alleges that the brochure falsely claims to offer insurance on all its products up to $150,000. *Id.* ¶¶ 204, 207. The Court disagrees with Defendants' contention that the SEC cannot rely on the brochure for its Rule 10b-5(b) claims because "the Complaint does not identify the maker of the alleged statement," as required by *Janus*. The Amended Complaint indicates that Par Funding distributes the brochure to investors through Abbonizio, a part owner and director of Par Funding, as well as through Agent Funds. *Id.* ¶¶ 158, 204. The SEC has therefore alleged that Par Funding is "the entity with authority over the content of the statement and whether and how to communicate it." *Janus*, 564 U.S. at 144.

The Court is also satisfied that the SEC has sufficiently alleged materiality and scienter for the misrepresentations in the brochure. As an initial matter, the foregoing analysis regarding the materiality of misrepresentations as to insurance and underwriting in connection with the claims against the individual defendants is equally applicable here. To plead corporate scienter in the context of securities actions brought by private litigants—which have a heightened pleading standard that the SEC is not required to meet here—the plaintiff need only allege facts that engender a strong inference "that *somebody* responsible for the allegedly misleading statements must have known about the fraud." *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, No. 17-00241, 2018 WL 1558577, at *23 (N.D. Ga. Mar. 29, 2018), order clarified, No. 17-00241, 2018 WL 1702675 (N.D. Ga. Apr. 6, 2018) (emphasis added). The person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at

issue. *See Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012); *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 883 (W.D. Tex. 2014).

Here, as noted previously, the SEC has sufficiently alleged that LaForte and Abbonizio acted with scienter when they made misleading statements regarding Par Funding's underwriting rigor and insurance. The SEC also alleges that LaForte controlled the day-to-day operations of Par Funding, that Abbonizio distributed the brochure to investors, and that Abbonizio oversees the Agent Funds that also distributed the brochure to investors. *See* Am. Compl. ¶¶ 6, 17, 20, 158. These allegations are sufficient to impute scienter to Par Funding. *See In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("[C]ourts have readily attributed the scienter of management-level employees to corporate defendants."). Thus, dismissal of the SEC's Rule 10b-5(b) and Section17(a)(2) claims against Par Funding is unwarranted.

### vii.    McElhone

Because the SEC does not specifically allege that McElhone personally uttered any of the misrepresentations referenced in the Amended Complaint, the Court must determine whether the SEC's allegations are sufficient to hold McElhone primarily liable under Rule 10b-5(b) for Par Funding's misrepresentations. In other words, the Court must examine whether the SEC has sufficiently alleged that McElhone was the "maker" of those misrepresentations as contemplated by the Supreme Court in *Janus*.

In *Janus*, the Supreme Court held that a mutual fund investment adviser could not be held liable in a private action under Rule 10b-5 for false statements included in its client mutual funds' prospectuses. 564 U.S. at 131. The Supreme Court explained that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a

> statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by— and only by—the party to whom it is attributed.  This rule might best be exemplified by the relationship between a speechwriter and a speaker.  Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142-43.  Courts applying *Janus* have emphasized that "*Janus* did not alter the well-established rule that a corporation can act only through its employees and agents." *S.E.C. v. Brown*, 878 F. Supp. 2d 109, 116 (D.D.C. 2012); *see also S.E.C. v. Pocklington*, No. 18-00701, 2018 WL 6843663, at *14 (C.D. Cal. Sept. 10, 2018) ("Importantly, *Janus* does not stand for the proposition that officers cannot be liable for false and misleading statements in their own company's financial statements.").  A corporate officer's position alone is insufficient to render the officer a "maker" of the statement without "additional allegations as to the officer's ability to control the contents of the statement at issue." *Mandalevy v. Bofi Holding, Inc.*, No. 17-00667, 2021 WL 794275, at *6 (S.D. Cal. Mar. 2, 2021).  However, a plaintiff is not required to "plead that the defendant directly issued the allegedly misleading statement." *Id.*  Rather, the plaintiff must plead sufficient facts to support an inference that the defendant had the power and authority to control the content and issuance of the statement. *Id*.

Although it is a close call, the Court finds that at this stage, the SEC has adequately pleaded that McElhone had power and authority to control the content of the alleged misrepresentations in Par Funding's brochure and Form D filings with the SEC.  This case does not present a situation where, for example, the plaintiff is alleging that a CEO of a large company was the "maker" of statements by other employees acting within the scope of their employment simply by virtue of his or her position.  The SEC alleges that McElhone is Par Funding's President, CEO, and sole

formal employee, and that she has ultimate decision-making authority for Par Funding.  Am. Compl. ¶¶ 11, 16, 37, 42.  It also alleges that McElhone and LaForte control Par Funding together. *Id.* ¶ 40.  Moreover, "the question whether a defendant in fact exercised the requisite control over the content of the statement is 'an inherently fact-bound inquiry.'" *S.E.C. v. Kameli*, No. 17-4686, 2020 WL 2542154, at *13 (N.D. Ill. May 19, 2020) (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015)); *see also S.E.C. v. Geswein*, 2 F. Supp. 3d 1074, 1083 (N.D. Ohio 2014) (indicating that whether defendants were the "makers" of the alleged misrepresentations required fact-intensive discovery).  Additionally, the facts alleged in the Amended Complaint support an inference that McElhone—as CEO and as the person who controlled Par Funding—was at a minimum reckless in not knowing that representations made in the Par Funding brochure and filings with the SEC were false.  At this stage, the SEC has pleaded sufficient facts to state a claim for primary liability under Rule 10b-5(b) based on McElhone's near exclusive decision-making authority over Par Funding.

The SEC has also adequately pleaded that McElhone is liable as a "controlling person" under Section 20(a) of the Exchange Act.  Section 20(a) "imposes joint and several liability on '[e]very person who, directly or indirectly, controls any person liable' for violation of the securities laws." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1276 (11th Cir. 2016) (quoting 15 U.S.C. § 78t(a)).  It is a type of secondary liability and "cannot exist in the absence of a primary violation." *Id.* (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004)).  A defendant is liable as a controlling person under Section 20(a) if he or she "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Grp., Inc.*, 84

F.3d 393, 396 (11th Cir. 1996) (quotation and alteration omitted).  A controlling person is derivatively liable under Section 20(a) if the controlling person "acted recklessly in failing to do what he could have done to prevent the violation."  *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 722 (11th Cir. 2008) (quotation omitted).

As set forth above, the SEC sufficiently alleges primary violations by Par Funding.  It also alleges that McElhone and LaForte exercised control over Par Funding—and that McElhone is the President of Par Funding, the signatory on Par Funding's bank accounts, and according to Par Funding's most recent corporate deposition under Federal Rule of Civil Procedure 30(b)(6), has ultimate authority over Par Funding.  *See* Am. Compl. ¶ 40, 42.  Furthermore, the Amended Complaint alleges that McElhone acted recklessly.  *Id.* ¶¶ 269, 272, 275.  Thus, the Court finds that the SEC has adequately pleaded control person liability under Section 20(a).[8]

### b.  *Whether the SEC has sufficiently alleged violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3)*

To state a claim under Rule 10b-5(a) and (c) and Section 17(a)(1), the SEC must show that (1) the defendant committed a deceptive or manipulative act (2) in furtherance of the alleged scheme to defraud (3) with scienter.  *S.E.C. v. Glob. Dev. & Env't Res., Inc.*, No. 08-00993, 2008 WL 11338454, at *3 (M.D. Fla. Nov. 26, 2008); *Quiros*, 2016 WL 11578637, at *12.  Section 17(a)(3) requires only a showing of negligence.  *Id.*

Prior to the Supreme Court's holding in *Lorenzo*, many courts had adopted the position that Rule 10b-5(a) and (c) require deceptive acts distinct from the alleged misrepresentation

---

[8]  In their Reply, Defendants contend that "it is well established" that a plaintiff must allege a controlling person's "culpable participation" in the fraud to plead controlling person liability under Section 20(a). Reply at 13.  However, the Eleventh Circuit and courts in this district have declined to adopt the culpable participation test for Section 20(a).  *See Durgin v. Mon*, 659 F. Supp. 2d 1240, 1257, n.6 (S.D. Fla. 2009), aff'd, 415 F. App'x 161 (11th Cir. 2011) (citing *Laperriere*, 526 F.3d 715; *Brown*, 84 F.3d 393).  The Court therefore declines to apply that standard in evaluating the SEC's Section 20(a) claim.

forming the basis of a Rule 10b-5(b) claim, but courts have indicated that this position in no longer tenable in light of *Lorenzo*.  *See S.E.C. v. Winemaster*, No. 19-04843, 2021 WL 1172773, at *23 (N.D. Ill. Mar. 29, 2021); *see also In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-06509, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020) ("[U]nder *Lorenzo*, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself.").

In *Lorenzo*, the Supreme Court held that Rule 10b-5(a) and (c) "capture a wide range of conduct," including "the dissemination of false or misleading statements with intent to defraud . . . even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Lorenzo*, 139 S. Ct. at 1100-01.  The Supreme Court explained that there is "considerable overlap among the subsections" of Rule 10b-5 as "each succeeding prohibition was . . . meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections."  *Id.* at 1102.  Thus, the Court emphasized that there is no basis to find that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct."  *Id.*

Guided by these principles, the Court concludes that the SEC has adequately pleaded violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) for all Defendants.  As set forth in connection with the SEC's Rule 10b-5(b) and Section 17(a)(2) claims, the SEC has sufficiently alleged that Defendants each made material misrepresentations and/or omissions with scienter in the offer and sale of the Par Funding promissory notes.  The Amended Complaint also alleges that these Defendants did so in furtherance of a scheme designed to conceal—among other things— the true nature of Par Funding's loan practices, the safety of investing in Par Funding, Par Funding's regulatory history, and the fact that proceeds from the security offering were "funneled"

to McElhone, Cole, and The LME Trust, which is McElhone's family trust.  *See* Am. Compl. ¶ 8. The SEC alleges that McElhone and LaForte orchestrated the scheme.  *Id.* ¶ 5.

The SEC further alleges that after Par Funding was sanctioned by state securities regulators for the use of unregistered sales agents, Defendants engaged in a coordinated effort to set up the Agent Fund model to allow Par Funding to continue offering fraudulent, unregistered securities without disclosing Par Funding's regulatory history to investors. *Id.* ¶¶ 4-7.  Without commenting on the merits of the SEC's allegations, the Court finds that they are sufficient to withstand Defendants' Motion to dismiss the Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) claims.

## III.   Is the Amended Complaint a shotgun pleading?

Defendants contend that the SEC's Amended Complaint constitutes an impermissible shotgun pleading because "the antifraud provisions contained in Counts I-VII do not state with particularity which specific allegations apply to which specific count" and instead state that the SEC "repeats and realleges paragraphs 1 through 267 of this Complaint." Mot. at 26 (citing Am. Compl. ¶¶ 268, 271, 274, 277, 280, 281, 286).  Defendants rely on *Wagner v. First Horizon Pharmaceutical Corp.*, where the Eleventh Circuit found that the elements of the securities fraud claims in plaintiff's complaint were insufficiently linked to the large fact section that preceded the counts.  464 F.3d 1273, 1279 (11th Cir. 2006).  The Eleventh Circuit noted that the complaint was "the proverbial shotgun pleading," which are "those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense."  *Id.*

Importantly, however, the Eleventh Circuit has explained that "[t]he essence of a shotgun pleading is 'that it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'"  *Vujin v. Galbut*, 836 F. App'x 809, 814 (11th Cir. 2020) (quoting *Anderson v. District Bd. of Trustees of Cent. Florida Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir.

1996)).  The Eleventh Circuit has identified four types of pleadings that produce this problem: (1) "complaints that contain multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) "complaints that are replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action";  (3)  "complaints that do not separate each cause of action or claim for relief into separate counts"; and (4) "complaints that assert multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  *Id.* at 815 (quoting *Weiland v. Palm Beach Cty. Sherriff's Off.*, 792 F.3d 1313, 1321-23 (11th Cir. 2015)) (internal quotations omitted).

Here, the Court is not convinced that the Amended Complaint is a shotgun pleading.  Each count does not incorporate every preceding allegation, including the allegations from preceding counts.   Rather, each count incorporates only the general factual allegations contained in paragraphs 1-267 of the Amended Complaint, which "support each claim for relief and identify the relevant events, misrepresentations, and omissions advanced by the SEC."  *City of Miami*, 988 F. Supp. at 1354 (denying motion to dismiss SEC complaint that incorporated the factual allegations in paragraphs 1 through 115 into each count as shotgun pleading); *see also S.E.C. v. Spartan Sec. Grp., LTD*, No. 19-00448, 2019 WL 2372277, at *3 (M.D. Fla. June 5, 2019) (denying motion to dismiss SEC complaint as shotgun pleading because "[w]hile each count incorporates by reference all the factual allegations, each count does not incorporate the prior count.");  *Strebinger*, 114 F. Supp. 3d at 1327, n.4 ("[A]ll of the SEC's claims are based on one continuous act of fraud and, therefore, it is appropriate for the SEC to incorporate all of its factual allegations into each count.").

Further, it is certainly not "virtually impossible" to know which factual allegations are intended to support which claims for relief.  *See S.E.C. v. PV Enterprises, Inc.*, No. 16-20542, 2016 WL 8808697, at *3 (S.D. Fla. June 28, 2016).  The factual allegations against each Defendant are clear—the SEC separately describes each alleged misrepresentation that forms the basis for its claims under the antifraud provisions and indicates exactly which Defendants made each misrepresentation.  And the Amended Complaint identifies claims with sufficient clarity for Defendants to frame a responsive pleading.  Therefore, dismissal of the Amended Complaint on the grounds that it is a shotgun pleading is unwarranted.

## IV. Does the SEC plead sufficient facts to establish that The LME Trust is a proper relief defendant?

A federal court may add a person who is not accused of wrongdoing in a securities enforcement action as a relief defendant when that person (1) has received ill-gotten funds and (2) does not have a legitimate claim to those funds.  *S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007).  The person or entity is known as a "relief defendant" or a "nominal defendant"—someone who is not accused of violating the securities laws but who is nevertheless in possession of funds that the violator passed along to him or her.  *S.E.C. v. Merrill*, No. 18-2844, 2021 WL 1117280, at *4 (D. Md. Mar. 23, 2021).  In the securities context, to have no legitimate claim to the ill-gotten funds means that an individual gave no consideration for the funds and thus received them as a gift.  *S.E.C. v. Nat. Diamonds Inv. Co.*, No. 19-80633, 2019 WL 2583863, at *7 (S.D. Fla. June 11, 2019).  "Alleging that the proposed relief defendant has 'no legitimate claim' to the ill-gotten funds is sufficient to satisfy the second pleading requirement at the motion to dismiss stage of the proceeding." *Fed. Trade Comm'n v. IAB Mktg. Assocs., LP*, No. 12-61830, 2013 WL 11331001, at *1 (S.D. Fla. Aug. 20, 2013) (citations omitted).

Here, the Amended Complaint states that The LME Trust owns Par Funding; that McElhone is the Grantor of the Trust; and that McElhone and LaForte are the Trustees of The LME Trust. *See* Am. Compl. ¶ 36. The SEC also alleges that "[b]etween July 2018 and September 2018, Par Funding transferred at least $14.3 million, which included investor funds, to The LME Trust for no legitimate purpose." *Id.* These allegations are sufficient at the pleading stage to establish that The LME Trust is a proper Relief Defendant in this case. *See F.T.C. v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 281 (D. Conn. 2013) (denying relief defendant's motion to dismiss where plaintiff alleged that the relief defendant "received or otherwise benefitted from" proceeds of the unlawful practice and the relief defendant had "no legitimate claim" to those funds); *United States Commodity Futures Trading Comm'n v. Gresham*, No. 09-00075, 2010 WL 11506864, at *3 (N.D. Ga. Apr. 28, 2010) (denying relief defendant's motion to dismiss where plaintiff alleged that relief defendant received over $400,000 from Ponzi scheme and did not provide any services in exchange for the funds, or in the alternative, the services he provided did not warrant the substantial payments received).

Defendants maintain that the SEC has pleaded insufficient facts to establish that The LME Trust is a proper Relief Defendant in this case. *See* Mot. at 28. They argue that because Par Funding's funneling of investor funds to The LME Trust is part of the alleged fraud, the SEC's allegations regarding this conduct in the context of the nonfraud Relief Defendant must still be pleaded with particularity under Rule 9(b). *Id.* at 28-29. They also insist that the SEC is required to provide factual support for its allegation that investor funds were diverted into the Trust, particularly because a reasonable inference can be drawn from the Amended Complaint that the transfers were made from Par Funding revenues and not gross proceeds from the offering. *Id.* at 29-30.

As an initial matter, it is not clear that Rule 9(b)'s heightened pleading standard applies to the SEC's allegations that The LME Trust is a relief defendant.  *See, e.g., Merrill*, 2021 WL 1117280, at *5 ("[T]he SEC need not satisfy the heightened pleading standard of Federal Rule 9(b) for claims sounding in fraud to adequately allege a claim against [the Movant] as a Relief Defendant.").  However, the Court need not resolve this question because even assuming Rule 9(b)'s heightened pleading standard applies, the Court finds that the SEC has satisfied it.  The SEC provides the specific amounts of funds that Par Funding allegedly transferred to The LME Trust ($14.3 million) and the time period when the transfers occurred (between July and September 2018).  Defendants' contention that the SEC's allegations are insufficient because one can draw a reasonable inference that the transfers consisted of proceeds from Par Funding's merchant cash advances is unavailing.  The Court must draw reasonable inferences in the SEC's favor on a motion to dismiss—and must take its allegation that the transfers included investor funds as true at this stage.  *See S.E.C. v. Aragon Cap. Advisors, LLC*, No. 07-00919, 2011 WL 3278907, at *19 (S.D.N.Y. July 26, 2011).

Defendants rely heavily on *S.E.C. v. Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d 1291 (M.D. Fla. 2009), where the Court concluded that the SEC had failed to establish that the relief defendants, referred to collectively as Sun Capital, lacked an ownership interest or legitimate claim in the funds they received.  In that case, the SEC alleged that Defendants made misrepresentations to investors when soliciting investor funds to fuel their business, which included making loans to Sun Capital.  *See S.E.C. v. Founding Partners Cap. Mgmt.*, No. 09-00229, 2009 WL 10669238, at *2 (M.D. Fla. May 7, 2009).  Defendants made loans to Sun Capital pursuant to written loan agreements, which allowed Sun Capital to use the loan proceeds to purchase healthcare and commercial receivables.  *Founding Partners*, 639 F. Supp. 2d at 1292.  In finding that Sun Capital

was not a proper relief defendant, the Court reasoned that Sun Capital "received the loan proceeds pursuant to written loan agreements . . . , which gives Sun Capital certain rights and obligations with regard to the loan proceeds." *Id.* at 1294. It further noted that there had been "a debtor-creditor relationship between Sun Capital and [Defendant] based on written agreements" for years and that "Sun Capital is a far cry from the 'paradigmatic' nominal defendant: a trustee, agent or depository." *Id.*

The facts in this case are significantly different. The SEC alleges that The LME Trust is McElhone's family trust and that McElhone and LaForte are its trustees. In contrast to the debtor-creditor relationship described in *Founding Partners*, or cases where the relief defendant performed services in exchange for compensation, "[a] claim of ownership is not legitimate where the relief defendant holds the funds in trust for the primary violator, the ownership claim is a sham, the relief defendant acted as a mere conduit of proceeds from the underlying statutory violation, or some similar specious claim to ownership." *S.E.C. v. World Cap. Mkt., Inc.*, No. 14-02334, 2014 WL 12561076, at *2 (C.D. Cal. July 10, 2014).

## V. Are the SEC's claims time-barred under 28 U.S.C. section 2462?

Defendants argue that many of the SEC's claims are time-barred because they are based on conduct that occurred outside the five-year statute of limitations period set forth in 28 U.S.C. section 2462. *See* Mot. at 30. Specifically, Defendants contend that any non-equitable remedies, including penalties and disgorgement, requested by the SEC for conduct arising prior to July 24, 2015 (five years prior to the date of the Complaint) must be dismissed. *Id.* The SEC does not dispute that the Court may only penalize violations that occurred within five years of the filing of the Complaint and award disgorgement for ill-gotten gains received during that period. Resp. at 39. However, it disputes Defendants' attempt to link the statute of limitations to "conduct,"

asserting that section 2462 is tied to the accrual of a "claim," and the Court may therefore impose a penalty for any violation where at least one of the elements occurs within the limitations period. *Id.* at 39-40.  The SEC also points out that each count in its Amended Complaint identifies the time period from July 2015 onward—*i.e.*, within the statute of limitations—and thus there is nothing for the Court to dismiss.  *Id.* at 40.

The Court does not see any reason to dismiss counts in the Amended Complaint based on section 2462.  If the SEC's claims included violations occurring outside the five-year limitations period, it would be appropriate for the Court to partially dismiss the claims to the extent they seek time-barred relief.  *See S.E.C.  v. Cohen*, 332 F. Supp. 3d 575, 587-88 (E.D.N.Y. 2018).  However, each count in the Amended Complaint is limited to the five-year period within the statute of limitations.  *See* Am. Compl. ¶¶ 272, 275, 278, 281, 284, 288, and 291.  And the parties agree that the SEC may only penalize violations occurring within the five-year limitations period.  *See S.E.C. v. Graham*, 823 F.3d 1357, 1364 (11th Cir. 2016).  Accordingly, dismissal of any counts on statute of limitations grounds is unwarranted.

## **CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss [ECF No. 363] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 11th day of May, 2021.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**