UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF
FLORIDA

Case No. 20-CIV-81205-RAR

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS GROUP,
INC. d/b/a PAR FUNDING, *et al.*,

        Defendants.
_____/

**DEFENDANT JOSEPH W. LAFORTE'S OBJECTION TO RECEIVER RYAN K. STUMPHAUZER'S SIXTH APPLICATION FOR ALLOWANCE AND PAYMENT OF PROFESSIONALS' FEES AND REIMBURSEMENT OF EXPENSES FOR OCTOBER 1, 2021-DECEMBER 31, 2021 (DE# 1153)
AND RESPONSE TO QUARTERLY STATUS REPORT (DE# 1140)**

    Defendant, Joseph W. LaForte, respectfully submits this memorandum in support of his objections to the Receiver's Sixth Application for Allowance and Payment of Professionals' Fees and Reimbursement of Expenses for October 1, 2021 – December 31, 2021. (DE# 1153), and Response to Quarterly Status Report (DE# 1140). As discussed below, the billing statements request reimbursement for expenses that are a blatant waste of the receivership estate's assets. The Quarterly Status Report, filed on January 31, 2022, shows just how inefficient of a job the Receiver is doing on his own. For this lackluster performance, the Receiver is requesting that this Court award $1,528,064.31 in fees and costs for the fourth quarter of 2021.

    **The Applicable Law**

    There is no dispute that a District Court's power over a receiver is a matter for the District Court's discretion. Indeed, a receiver "is a creature of equity" whose powers "are limited by the district judge's concept of equity." *In re Wiand*, No. 8:10-cv-71-T-17MAP, et al., 2012 U.S. Dist. LEXIS 22667, 2012 WL

1

611896, at *5 (M.D. Fla. Jan. 4, 2012).  A receiver "receives h[er] power and authority directly from the court and therefore is subject to the court's directions and orders in the discharge of h[er] official duties." *SEC v. Elfindepan, S.A.*, 169 F. Supp. 2d 420, 424 (M.D.N.C. 2001).  It is particularly relevant to the instant motion that once appointed, a receiver is a "neutral officer of the Court." *Sterling v. Stewart,* 158 F.3d 1199, 1201 n.2 (11th Cir 1998). Put another way, the receiver must be impartial between parties, although that impartiality "does not extend to h[er] relationship with the receivership estate" as receivers owe a "'fiduciary duty to the owners of the property under h[er] care' and thus must 'protect and preserve' the receivership's assets 'for the benefit of the persons ultimately entitled to it.'" *SEC v. Schooler,* No. 3:12-cv-2164-GPC-JMA, 2015 U.S. Dist. LEXIS 46870, 2015 WL 1510949, at *3 (S.D. Cal. March 4, 2015) (quoting *Sovereign Bank v. Schwab*, 414 F.3d 450, 454 (3d Cir. 2005). As neutral officers of the court, however, receivers must avoid the appearance of impropriety or partiality in their actions. *Schooler,* 2015 U.S. Dist. LEXIS 46870, 2015 WL 1510949, at *3.  See also *FTC v. On Point Global LLC*, 2020 U.S. Dist. LEXIS 180255, at *11 (S.D. Florida September 30, 2020).

Here, the Receiver's billing records show that some of his conduct is wasteful of the estate's assets.

### **The Receiver is Wasting Receivership Assets**

The Receiver's billing records show that the Receiver is continuing to saddle the Receivership Estate account with huge fees while collecting a minimal amount. Since the inception of the receivership, he has collected an abysmal $32 million for CBSG over 18 months. To put this into context, in July of 2020, in the height of the COVID-19 Pandemic, when businesses had huge cash flow problems, the CBSG collected over $30 million in a single month. After 18 months of using attorneys skilled in white collar investigations, and focusing primarily on investigating and going after LaForte rather than collections, the Receiver has now hired a professional collections firm, Altus Receivables Management, Inc. ("Altus"), a national collection company that the Receiver recently engaged on a contingency fee recovery basis. (DE# 1140 at 5). However, in doing so, the Receiver has failed to comply with the

2

Amended Receivership Order, which allows the Receiver "to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order." (DE# 141 at ¶57). However, the same paragraph also states that "The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement." *Id.* This follows the Receiver's pattern of lack of transparency.

For example, the Receiver states "[t]o date, the Receiver has resolved, either through full payoffs of the amount owed or settlements, the account balances of 15 counterparties to agreements with Eagle Six Consultants, Inc. ("ESC") and Heritage Business Consulting, Inc. ("HBC")". (DE# 1140 at 5). Consistent with his pattern of refusing to disclose potential settlements or parties against whom he seeks to lift the litigation injunction in order to have a meaningful meet and confer, the Receiver is being completely opaque about the settlement terms merchants are receiving. Why? The Court, investors, and the defendants are entitled to that information and there is no good reason why it is not being provided.

To support his billing, the Receiver shows the large amount of cash and assets in the Receivership Estate in his Quarterly Status Reports. However, these reports show cash and assets that belong to defendants which were hidden in plain sight and already frozen by the Court. The Receiver was given these assets by simply filing successive motions to expand, but yet he touts his worth by counting these "frozen" assets that he simply takes from the Defendant's accounts and moves into his accounts. This is not progress or successful collections and is orders of magnitude less successful than Par Funding was prior to the Receivership. The Receiver was originally appointed to manage Par Fundings portfolio. Since that time, he has only managed to collect $32 million from a portfolio with a value of $420 million with over 2,500 merchants.

The Receiver is a high stakes white collar lawyer, not a collections lawyer, not a businessperson. He fails to understand, or chooses not to because he is making tens of millions of dollars, that he is a liability to Par's portfolio. He took over 18 months to outsourced collections to Altus on a contingency

3

basis after collecting one month's worth of receivables in 18 months as the Receiver. The Receiver has clearly thrown his hands up on collection efforts, he should not be rewarded handsomely for doing so. Clearly it is not good business to have DSI charging $1 million a quarter to conduct collections and then outsource collections on a contingency basis to yet another company. While Mr. LaForte is heartened that the Receiver has finally hired a professional collections operation—albeit without seeking permission from the Court—it is clear that the Receiver and DSI have been so ineffective at collections that the fees they have been paid, including a raise for DSI has only hurt the Receivership Estate. Further, the lack of transparency as to the marching orders and percentage of contingency to be paid to Altus is concerning.

**Receiver Failures- Property Portfolio**

The Receiver's failure extends beyond the poor collections to the property portfolio which is the easiest and most clear and clean-cut entities to manage.  Early in this action, the Court had reservations about the Receiver acting as a "property manager," rightfully so.  Prior to the expanded receivership in December 2020 defendants collected **$230,392.68** in rent per month. Now looking at the receiver's quarterly status report he is only collecting **$159,806.59** in rent per month, which is 30% less than the defendants collected.

The Receiver told the court that him taking over the rental properties would be "plug and play" and that his counsel "knew" the property manager/property management company personally so it would be a simple transition (should we include Dec 2020 transcripts?)  This was not exactly accurate and the proof is in the numbers.  The truth is that the Receiver immediately fired 5 of the LM Property Management employees who maintained the value of the portfolio through maintenance, cleaning, upkeep, and thorough turnover methods.  The termination of this key component of the business is the causation of significant lost profits, apparent vacancies, and potential devaluation of the portfolio. The Defendants were able to collect $70,586.09 more (30% more) per month than the Receiver even through the pandemic.  The loss of revenue in one of the most conservative businesses on the planet (rental

4

payments) extends to Par Funding's portfolio which has been downright abysmal.

The Receiver and his Retained Personnel are charging millions of dollars to the estate yet are collecting significantly less rent from Class A buildings. "The building portfolio is a bright spot in the receivership" If it is such a bright spot why is he failing the estate? The proof of his failures overall lies in the performance of the property management. If the Receiver is unable to simply collect rents, how could he ever be expected to effectively collect the hundreds of millions of dollars owed by merchants, which is of course more complex than a tenant paying for his apartment once a month? The firing and removal of the defendant's property management company and the unjust expansion of the Receivership which was built on falsities told by Bradley Sharp through his Non-GAAP, Non-CPA, report is the causation of the losses to the property portfolio and other assets which were much better off prior to the Receivership.

The numbers do not lie. Installing the Receiver over Par Funding and the Defendants' assets has been a disaster. The assets could have been held for potential disgorgement by lis pendens and a monitor. Instead, the Receiver has been in liquidation mode of Par's valuable profitable portfolio (as the defense warned would happen) from day 1, while making it appear that he is working for the Receivership Estate. The collateral damage done by expanding the Receivership over the defendants' assets have proved to be a failure.

### Billing

Additionally, the Receiver's billing is also concerning. The Receiver has had at least one of his attorneys at every single deposition even depositions that do not support the Receiver's mission of marshalling assets for the Receivership Estate. For example, the Receiver had an attorney appear at the SEC's 30(b)(6) depositions. Why the Receiver needed to bill to hear the SEC object and refuse to answer questions is a mystery. Furthermore, the Receiver bills for things that do not add value to the case, and not only bills, but double and triple bills for reviewing documents that do not support his mission. For

5

example:

On October 3, 2021, two attorneys from the Stumphauzer firm billed to review SEC's response to motion to dismiss and motion for sanctions in connection with 30(b)(6) deposition of SEC, one attorney billing a .2 for it and one billing .5 for the same task. (DE#1153-8 at 6-7). On top of that Mr. Alfano from the Pietragallo firm billed .7 for review of the same response. (DE#1153-9 at 8). The Receiver had no interest in this motion and these billings added no value to the case since the Receiver is a neutral party in this action. On October 4th and 5th, attorneys from both the Stumphauzer firm and the Pietragallo firm billed to review the Defendants' Daubert motion to exclude the SEC's proposed expert witness. Again, there is no reason why any attorney, let alone multiple attorneys for the Receiver needed to review this substantive motion and these billings added no value to the case. These examples, among others, of the Receiver and his counsel billing and multiple billing the Receivership Estate with no value added to the case should not be billed to the Receivership Estate.

In addition to the double billing, the Receiver and his attorneys are not maximizing efficiency and loading up on partner time rather than using associates for relatively simple tasks. In the Fee Application the Receiver states:

> The Pietragallo firm — with its sixty (60) attorneys, including nineteen (19) professionals in the Philadelphia office, as well as approximately ten (10) paralegals, a forensic accountant and two Certified Fraud Examiners — is uniquely suited to serve as counsel to the Receiver because, in addition to defending high-profile government investigations and litigating complex commercial disputes in federal and state courts . . .

DE# 1153 at 13. While the Fee Application highlight's the Pietragallo firm giving discounted hourly rates (DE#1153 at 14), it fails to mention that 8 of 10 attorneys from the Pietragallo firm who billed on this matter during the relevant time period were partners. (DE#1153-4 at 2). Furthermore, of the two associates who billed on the file, one of them only billed three tenths (.3) of an hour. *Id.* Clearly the Pietragallo firm is not reasonably allocating work to associates to preserve assets for the Receivership Estate. While the Pietragallo firm certainly has the credentials for a case of this magnitude, lawyers of this

caliber do not need to be billing for collections or to be managing rental properties. Simply put, the Receiver should have moved the Court to retain a contingency collections firm a year and a half ago, rather than bilk the Receivership Estate for all he could before he threw his hands up to hire a collections firm on a contingency basis.

## Conclusion

It is inconceivable that this type of profligate spending is consistent with the Receiver's fiduciary obligation to "protect and preserve" the estate's assets. For all of these reasons, the Defendants object to the bill as proposed.

Dated: March 1, 2022

        **KOPELOWITZ OSTROW**
        **FERGUSON WEISELBERG GILBERT**
        One W. Las Olas Blvd., Suite 500
        Fort Lauderdale, Florida 33301
        *Attorneys for Joseph W. LaForte*

        By: */s/ Joshua R. Levine*
            DAVID L. FERGUSON
            Florida Bar Number: 0981737
            Ferguson@kolawyers.com
            JOSHUA R. LEVINE
            Florida Bar Number: 91807
            Levine@kolawyers.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 1, 2022, I electronically filed the forgoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmissions of Notices of Electronic Filing generated by CM/ECF.

        By: */s/ Joshua R. Levine*
            JOSHUA R. LEVINE