**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 20-CV-81205-RAR**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff, v.**

**COMPLETE BUSINESS SOLUTIONS GROUP,**
**INC. d/b/a/ PAR FUNDING, et al.,**

**Defendants.**

_____/

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S AMENDED[1] OMNIBUS**
**MOTION FOR FINAL JUDGMENTS AGAINST DEFENDANTS MICHAEL FURMAN,**
**JOSEPH COLE BARLETA, JOSEPH LAFORTE, AND LISA MCELHONE**

## I. INTRODUCTION

Plaintiff Securities and Exchange Commission respectfully moves the Court to enter Final Judgments against Defendants Michael Furman, Joseph Cole Barleta ("Cole"), Joseph LaForte, and Lisa McElhone (collectively, the "Defendants"), ordering:

- LaForte and McElhone, who previously consented to permanent injunctions, to be held joint and severally liable to pay disgorgement of $226,471,877 and prejudgment interest thereon in the amount of $10,952,117.55, and ordering them each to pay a civil penalty of $50,000,000;

- Cole, who previously consented to a permanent injunction, to pay disgorgement of $13,247,011, prejudgment interest of $640,621.80, and a civil penalty of $5,000,000; and

- Furman, whom a jury found liable on all counts alleged against him, to pay disgorgement of $1,834,000, prejudgment interest of $88,691.74, and a civil penalty of $1,834,000, and imposing a permanent injunction against him for violations of Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934 ("Exchange Act").

---

[1] This amended motion replaces the phrase "Ponzi scheme," which is used as shorthand to refer to paying investors purported investment proceeds that include earlier investor funds, with language describing those facts. The Exhibit cites are the same, and therefore we do not refile the Exhibits since they appear on the docket.

The SEC seeks Final Judgments ordering that the Defendants pay the monetary relief to the Receivership in this case. These funds are for eventual distribution by the Receiver to investors. Any issues regarding whether funds or assets the Receiver has collected can be used to *satisfy* any Final Judgment the Court enters are not presently before the Court. If the Court enters the proposed Final Judgments against the Defendants, then those issues would become ripe for consideration as a collections and/or satisfaction matter, which will also ensure that no duplicative collections efforts occur concerning the balances owed by each Defendant under the Final Judgments imposed against them. At this time, however, the only issue before the Court is the amount of monetary relief that should be entered in the Final Judgments against each remaining Defendant.

## II.  RELEVANT PROCEDURAL HISTORY

On July 24, 2020, the SEC filed a Complaint against the Defendants alleging violations of Sections 5(a) and (c) and 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act against each of them, as well as violations of Section 20(a) of the Exchange Act against McElhone and LaForte [ECF No. 1]. On August 10, 2020, the SEC filed an Amended Complaint alleging these same violations against the Defendants [ECF No. 119].

On July 28, 2020 , the Court granted the SEC's Motion for Temporary Restraining Order and other relief against each of the Defendants [ECF No. 42]. The Court also ordered each Defendant to file a sworn accounting of all funds received in connection with Par Funding and the use of such funds. *Id.* Following a two-day evidentiary hearing in August 2020, McElhone, Cole, LaForte, and Furman consented to Preliminary Injunctions, and McElhone and LaForte consented to the entry of Asset Freezes in the amount of $458 million against them [ECF Nos. 230, 202, 337 and 182, Orders of Preliminary Injunctions]. The Defendants moved to dismiss this case numerous times, arguing that the Complaint failed to allege claims against them and that the SEC staff had engaged in misconduct. The Court denied each of these motions [ECF Nos. 363, 583, 663, 739, 746, 776, 847].

On the eve of trial Defendants McElhone, LaForte, and Cole consented to bifurcated judgments against them, which the Court entered on November 24, 2021 and November 28, 2021 [ECF Nos. 1008, 1010 and 1018 ("Judgments")]. The Judgments impose permanent injunctions against McElhone, LaForte, and Cole, prohibiting future violations of the federal securities laws, and order that the allegations in the Amended Complaint will be deemed as true for purposes of

the Court determining the disgorgement, prejudgment interest, and civil money penalties imposed against McElhone, LaForte, and Cole [ECF Nos. 1008, 1010 and 1018].

Commencing December 6, 2021, the Court conducted a jury trial against Defendant Furman. On December 15, 2021, the jury returned a verdict finding Furman liable for every claim alleged against him in the Amended Complaint [ECF No.1101].  On January 12, 2022, Furman filed a Motion for Retrial [ECF No. 1129], which remains pending.

### III. THE COURT SHOULD IMPOSE THE REQUESTED FINAL JUDGMENTS AGAINST MCELHONE, LAFORTE, AND COLE

#### A.  Facts Deemed As True For Purposes Of This Motion

As set forth in the Judgments to which McElhone, LaForte, and Cole consented, the following allegations of the Amended Complaint are deemed as true, and the Defendants cannot contest them, for purposes of this Motion [ECF Nos. 1008, 1010 and 1018].

#### 1.  McElhone, LaForte, and Cole's Backgrounds, Positions, and Roles at Par Funding

This case concerns a web of unregistered, fraudulent securities offerings that raised nearly half a billion dollars from an estimated 1,200 investors nationwide [ECF No. 119 at ¶ 1]. At the center of this web were McElhone and her husband, convicted felon LaForte. *Id.* at ¶ 1. McElhone and her husband LaForte founded Complete Business Solutions Group, Inc., d/b/a Par Funding ("Par Funding"), shortly after LaForte was released from prison, and they controlled Par Funding together. *Id.* at ¶ 40. From no later than August 1, 2012 until the SEC filed this case in July 2020, Par Funding was in the business of funding short-term loans to small-sized businesses, which Par Funding refers to as "merchant cash advances" (the "Loans" or "MCAs"). *Id.* at ¶ 41.

**McElhone** was Par Funding's President, CEO, and sole employee, and McElhone had ultimate decision-making authority for Par Funding. *Id.* at ¶¶ 11, 16.  McElhone was at all times a signatory on all of the Par Funding bank accounts. *Id.* at ¶ 16. McElhone is also the Grantor of The LME 2017 Family Trust, which was Par Funding's sole owner, and McElhone and LaForte are the trustees of this Trust. *Id.* at ¶¶ 11, 36.  McElhone was also the sole owner of Full Spectrum Processing, Inc., an entity used by McElhone to operate Par Funding. *Id.* at ¶¶ 15-16. On August 1, 2012, the Director for the Department of Consumer and Business Services for the State of Oregon issued a Cease and Desist Order against McElhone for providing debt management services without registering as a debt management services provider, in violation of the Oregon

Mortgage Lender Law and Oregon statutes; McElhone consented to a permanent Cease-and-Desist Order on October 13, 2013. *Id.* at ¶ 16.

**LaForte** founded Par Funding with his wife, McElhone. *Id.* at ¶ 17. LaForte used the aliases Joe Mack, Joe Macki, and Joe McElhone. *Id.* LaForte claimed to be the owner of Par Funding and ran the day-to-day operations. LaForte acted as the *de facto* CEO of Par Funding and Full Spectrum, and was introduced to investors as Par Funding's president. *Id.* In addition to running the day-to-day operations of Par Funding and Full Spectrum, LaForte had hiring and firing authority, supervised the Full Spectrum employees including the underwriting employees, and together with another individual decided which Loans Par Funding would approve and fund. *Id.* at ¶ 43. He also signed contracts on behalf of Par Funding and renegotiated Loan terms with small business borrowers. *Id.* at ¶ 43. In addition, LaForte served as Par Funding's Director of Sales. *Id.* LaForte has a history of working in the securities industry – to wit, from 1995 until 2000 LaForte worked for various securities broker-dealers, in 1996 he obtained Series 7 and Series 63 securities licenses, and in 1997 he obtained a Series 24 securities license; however, these licenses have expired. *Id.*

Additionally, LaForte has a criminal history. On October 4, 2006, LaForte was convicted of state charges in New York for grand larceny and money laundering, and on November 8, 2007 he was sentenced to three to ten years in prison and to pay restitution in the amount of $14.1 million. *Id.* at ¶ 18. In 2009, LaForte pled guilty to federal criminal charges in the District of New Jersey for conspiracy to operate an illegal gambling business. *Id.* He was released from jail in February 2011 and founded Par Funding with his wife, McElhone, shortly thereafter while on supervised release. *Id.*

**Cole** acted as Par Funding's CFO. He was employed by Par Funding as its CFO until 2017, when all of Par Funding employees were converted to Full Spectrum employees. *Id.* at ¶ 19. From 2017 until the SEC filed its Complaint in July 2020, Cole was employed by Full Spectrum as Full Spectrum's CFO, and through his employment at Full Spectrum he functioned as the CFO of Par Funding. *Id.* From July 2019 until October, Cole received about $1.8 million from Par Funding, which included investor funds, through payments to his company ALB Management Inc. *Id.* Between July 2016 and November 2019, Par Funding transferred about $14.4 million, which included investor funds, to Beta Abigail and New Field Ventures, LLC, companies in which Cole had an ownership or other beneficial interest. *Id.*

## 2. Other Defendants Discussed In This Motion

**Perry Abbonizio** claimed to be an owner and managing partner of Par Funding and he was responsible for bringing investment capital into Par Funding. *Id.* at ¶ 20.  He recruited and trained Par Funding's Agent Fund managers, provided information to potential investors about Par Funding, oversaw the Agent Funds, and solicited investors. *Id.* In 2015, the Financial Industry Regulatory Authority ("FINRA") sanctioned Abbonizio by consent in a regulatory action resulting in a four-month license suspension and $10,000 fine based on allegations that Abbonizio, without providing notice to his FINRA member firm, solicited his firm clients to purchase $625,000 in outside private placements and received compensation without firm knowledge/permission. *Id.* at ¶ 21.  In February 2020, the Texas Securities Board issued an Emergency Cease-And-Desist Order against Abbonizio for fraud violations in connection with the offer and sale of Par Funding promissory notes. *Id.*

**Dean Vagnozzi** was the sole owner of  ABetterFinancialPlan.Com d/b/a A Better Financial Plan ("ABFP") and ABFP Management Company, LLC. *Id.* at ¶ 22.  Vagnozzi solicited investors to invest in Par Funding promissory notes pursuant to a so-called "finders agreement" from about August 2016 until December 2017. *Id.*  From January 2018 until the SEC filed its Complaint in July 2020, Vagnozzi also recruited individuals to start investment firms for the purpose of raising money for Par Funding. *Id.* On May 30, 2019, Vagnozzi, doing business as ABFP, entered into a settlement with the Pennsylvania Department of Banking and Securities in connection with the sale of promissory notes Par Funding offered and sold. *Id.* at ¶ 23.  In connection with that case, Vagnozzi agreed to pay a penalty of $490,000 for violations of the Pennsylvania Securities Act. *Id.*  On July 14, 2020, the SEC instituted settled administrative proceedings against Vagnozzi for his offering and selling unregistered securities in violation of Section 5 of the Securities Act and acting as an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act, in connection with the sale of securities unrelated to the instant case. *Id.*  In February 2020, the Texas Securities Board issued an Emergency Cease-And- Desist Order against ABFP, which had been soliciting investors for Par Funding since 2017, for fraud violations in connection with the offer and sale of Par Funding promissory notes.  *Id.* at ¶¶ 25-26.

## 3.  Par Funding's Regulatory History

**The Pennsylvania Action.**  In 2018, the Commonwealth of Pennsylvania, acting through the Department of Banking and Securities, Bureau of Securities Compliance and Examinations

("Bureau"), conducted an investigation of certain securities-related activities of Par Funding. *Id.* at ¶ 12.  Based on the results of its investigation, the Bureau concluded that Par Funding violated the Pennsylvania Securities Act of 1972, 70 P .S. § 1-301 ("Pennsylvania Securities Act"). *Id.*  On November 28, 2018, Par Funding consented to entry of an Order by the Pennsylvania Department of Banking and Securities imposing a $499,000 administrative assessment for violations of the Pennsylvania Securities Act through the use of an unregistered agent to offer and sell Par Funding promissory notes in Pennsylvania. *Pennsylvania Dep't of Banking and Securities v. Complete Business Solutions Group, Inc. d/b/a Par Funding* (18-0098-SEC-CAO). [ECF No. 119 at ¶ 12].

The New Jersey Action.  On December 27, 2018, the New Jersey Bureau of Securities issued a Cease and Desist Order against Par Funding, based on Par Funding's sale of unregistered securities in New Jersey and use of unregistered agents, in violation of the New Jersey securities laws. *In re the Matter of Complete Business Solutions Group, Inc. and Complete Business Solutions Group, Inc. d/b/a Par Funding.* [ECF No. 119 at ¶ 13].

The Texas Action.   In February 2020, the Texas State Securities Board issued an Emergency Cease and Desist Order against Par Funding and others, alleging fraud and registration violations, and that matter is in active litigation. *In the Matter of Senior Asset Protection, Inc. dba Encore Financial Solutions, Merchant Growth & Income Funding, LLC, ABetterFinancialPlan.com, LLC aka ABetterFinancialPlan, Complete Business Solutions Group, Inc. dba Par Funding, Gary Neal Beasley and Perry Abbonizio* (ENF-CDO-20-1798). [ECF No. 119 at ¶ 14].  The Texas action alleges that Par Funding, Abbonizio, and Vagnozzi's company ABFP engaged in fraud based on their failure to disclose to investors the Pennsylvania and New Jersey Orders against Par Funding and court actions filed against Par Funding based on its lending practices. *Id.*

### 4. The Fraudulent Securities Offering Scheme

Par Funding claimed to have funded more than $600 million in Loans, some of which charged interest rates of more than 400%. *Id.* at ¶¶ 11, 194.  To fund these Loans, the Defendants raised investor money through the offer and sale of securities in the form of promissory notes. *Id.* at ¶ 48. No registration statement was filed or in effect with the SEC pursuant to the Securities Act with respect to the securities issued and the transactions conducted by the Defendants as described in the Amended Complaint and no exemption from registration existed with respect to these securities and transactions. *Id.* at ¶ 287.

### a.  *August 2012 until December 2017*

From August 2012 until approximately December 2017, Par Funding primarily issued promissory notes and offered them to the investing public directly and through a network of sales agents. *Id.* at ¶¶ 2, 49-50.  Par Funding sold promissory notes directly to investors, providing for a 12-month duration and stating the investor would receive annual interest rates ranging from 12% to 44%. *Id.* at ¶¶ 49-50.  Investors signed a "Non-Negotiable Term Promissory Note" and an accompanying "Security Agreement" (collectively the "Par Funding Notes"), which McElhone and Cole signed on behalf of Par Funding. *Id.* at ¶¶ 51-52.  The Par Funding Notes provided that the interest would be paid over twelve months, at which time the investor would receive a return in full of the investor's principal investment; and the Security Agreement stated that Par Funding granted a security interest to the investor in substantially all of Par Funding's assets, including its accounts receivable. *Id.* at ¶¶ 53-54.

To locate and solicit investors, Par Funding contracted with sales agents through "Finders Agreements" that Cole signed on behalf of Par Funding. *Id.* at ¶ 55.  The Finders Agreements provided that once Par Funding received investor funds, it would pay the agent a one-time distribution. *Id.* at ¶ 56.  For example, beginning no later than Fall 2016 until December 2017, Dean Vagnozzi, who was one such agent for Par Funding, raised about $20 million for Par Funding in exchange for a commission equal to 6 or 7 percent of each investment he solicited. *Id.* at ¶¶ 56-57. By December 2017, Par Funding had raised at least $90 million from investors through the offer and sale of Promissory Notes. *Id.* at ¶ 61.  The investors purchased the Par Funding notes by sending funds directly to Par Funding or through self-directed IRA accounts. *Id.*

### b.  *January 2018: Discovery of Pennsylvania Securities Regulator's Investigation*

In early January 2018, Par Funding learned it was under investigation by the Pennsylvania Department of Banking and Securities for violating state securities laws through its use of unregistered agents. *Id.* at ¶¶ 3, 62.  In September 2018, Par Funding assured the Pennsylvania Securities Regulators it had terminated its agreements with the unregistered sales agents and was no longer using agents to find investors. *Id.*  However, this was only half of the story. *Id.* at ¶ 3.  In truth and unbeknownst to the Pennsylvania Securities Regulators, after learning of the investigation Par Funding had already implemented a new way to fuel its loans – namely, through so-called "Agent Funds" created for the purpose of issuing their own promissory notes, selling the notes to the investing public through unregistered securities offerings, and funneling investor funds

to Par Funding. *Id.* at ¶¶ 4, 63, 65.  Vagnozzi had previously proposed this structure to Cole in 2017, but Par Funding did not put this structure into place until January 2018, after it received the Pennsylvania Securities Regulators' subpoena. *Id.* at ¶ 64.  Par Funding continued raising money for its unregistered offering until the SEC filed its Complaint in July 2020. *Id.*

### c. From August 2018 Until The SEC Filed Its Complaint In July 2020

Par Funding used Agent Funds to offer and sell promissory notes the Agent Funds issued to investors; the Agent Funds funneled the investor money to Par Funding, which then issued Par Funding Notes to its Agent Funds. *Id.* at ¶ 65.  Below is an illustration shown to investors in April 2020, explaining how the fund structure worked with respect to the ABFP Income Fund, which was one of the Agent Funds:



*Id.* at ¶ 66.

The Agent Fund PPMs distributed to potential investors stated that the Agent Fund was raising money to invest in "an MCA company," but did not disclose that this was Par Funding. *Id.* at ¶ 67. Nor did the Agent Fund PPMs disclose Par Funding's regulatory history, that Par Funding was managed by a convicted felon, that Pennsylvania and New Jersey Securities Regulators filed actions against Par Funding and there were Cease and Desist Orders against Par Funding in those states, or any other adverse information about Par Funding. *Id.* at ¶ 68.  While the Agent Funds offered investors promissory notes in the Agent Funds, investors were told that profits would be generated by Par Funding's Loan business in which the Agent Funds invested. *Id.* at ¶ 69.

From January 2018 through July 2020 when the SEC filed its Complaint, Par Funding had raised investor money primarily through Agent Funds, and occasionally by selling its own Promissory Notes to investors. *Id.* at ¶ 70.  Par Funding, through Abbonizio and Vagnozzi, trained the Agents at Full Spectrum's office and Par Funding provided the Agents with marketing materials to solicit investors. *Id.* at ¶ 76. Abbonizio, together with Vagnozzi, oversaw the Agent Funds. *Id.* at ¶ 77.  According to Abbonizio and LaForte, there were more than 40 Agent Funds raising investor money for Par Funding. *Id.* at ¶ 78.

Par Funding, through LaForte, Cole, and Abbonizio, helped solicit investors to invest in the Agent Funds by speaking at events the Agent Funds organized to raise money from potential investors. *Id.* at ¶ 79 (*see also* ¶¶ 119-122 concerning Abboniaio).  For example, on November 21, 2019, Vagnozzi and ABFP hosted more than 300 investors and prospective investors for a dinner where they were solicited to invest in Par Funding through Vagnozzi's Agent Funds. *Id.* at ¶ 95. Attendees were given a one-page flyer describing four investment opportunities, one of which was MCAs. The flyer described the MCA investment opportunity as having a 2% default rate and offering between 10-14% returns with principal returned in 1, 2, or 3 years. *Id.* at ¶ 96.  Abbonizio told the audience that Par Funding has a default rate of 1%, compared to an industry average default rate of 18.5%. *Id.* at ¶ 99.  Abbonizio also told the audience to focus on the default rate because that is the most important part of the investment. *Id.* at ¶ 100.  Abbonizio then introduced LaForte, to whom he referred as the President. *Id.* at ¶ 101.  LaForte told the audience that Par Funding is probably the most profitable cash advance company in the United States and maybe in the world. *Id.* at ¶ 102.  LaForte also told the audience that he started the company about eight years earlier with $500,000 of his own capital. *Id.* at ¶ 103. LaForte then introduced Cole, who touted the financial health of Par Funding. *Id.* at ¶ 104.

Abbonizio also helped the Agent Funds solicit investors through telephone calls, and Abbonizio, Cole, and LaForte assisted by soliciting investors during meetings the Agent Funds arranged at Par Funding's office. *Id.* at ¶ 80.  For example, Defendant Furman put potential investors in contact with Abbonizio, Cole, and LaForte, who continued Furman's solicitation efforts. *Id.* at ¶ 112.

Par Funding compensated the Agent Funds by issuing Par Funding promissory notes to the Agent Funds offering higher rates of return than what the Agent Funds are obligated. *Id.* at ¶ 4. Specifically, the Agent Funds made their profits based on the rates of return promised in the Par Funding Notes and the Investment Funds' notes with the investors. *Id.* at ¶ 81.  Each Agent Fund sent Par Funding investor funds raised through the Agent Funds' securities offerings. *Id.* at ¶ 82. This occurred by the Agent Funds either wiring investor funds to Par Funding or directing the investor to open a self-directed IRA account that invests in Par Funding. *Id.*  Upon receipt of the investor funds, Par Funding issued a Par Funding Note to the Agent Fund with a higher promised rate of interest than the Agent Fund promises to its investors in its own promissory notes. *Id.* at ¶ 83.  Par Funding paid an Agent Fund its monthly returns and the Agent Fund in turn pays its

investors. *Id.* at ¶ 84.  The remainder (or the spread) was for the Agent Fund, and it is obligated under an agreement it signs with ABPF Management to pay ABFP Management 25% from this remaining amount. *Id.* at ¶ 85.

### d.  *April 2020: The Exchange Note Offering*

On March 12, 2020, Vagnozzi forwarded investors a message he received from Cole of that same date. According to Cole's message, the purpose of Cole writing Vagnozzi was to "update our partners." *Id.* at ¶ 124.  In the message, Cole stated Par Funding believed the Coronavirus will have "no long term effects to [Par Funding's] projected growth and revenue." Cole further stated in this same message that "There has been no noticeable effect to our client payments or default rates. We had our largest funding month by deal count in February and have confidence in being able to maintain consistent funding volume in the coming months." *Id.* at ¶ 125.  A mere two weeks later, Vagnozzi and Furman forwarded investors a dramatically different message purporting to be from Par Funding that stated "Over the past several months, Par Funding, like many other companies across the globe, has been severely impacted by the Coronavirus pandemic." *Id.* at ¶ 126.  Par Funding went on to say it has "been forced to close our physical offices" and that "virtually all of [Par Funding's Loan borrowers] have called seeking a moratorium on payments and other restructured payment terms." *Id.*  Purportedly as the result of the Covid-19 Pandemic, investors did not receive their monthly investment returns in April and May 2020. *Id.* at ¶ 127.

On March 26, 2020, Vagnozzi/ABFP emailed investors a message from Par Funding concerning the purported financial impact the COVID-19 pandemic had on Par Funding's revenues, together with a message from Vagnozzi stating that "Par Funding has defaulted on a note with the fund that you each invested in, and they will continue to default for the next few months." *Id.* at ¶ 130.  In April 2020, Furman emailed investors an email message he claimed was from Par Funding indicating that if investors do not accept an offering to replace their current promissory notes with "Exchange Notes" offering significantly less interest and over a longer period of time, then Par Funding would file for bankruptcy. *Id.* at ¶ 132.  Based on representations by Par Funding and Vagnozzi's attorney that Par Funding would otherwise default on payments altogether or enter bankruptcy, and based on Vagnozzi's attorney's recommendation, as a lawyer, that they accept the offering, investors opted for the Exchange Offering and entered into new promissory notes. *Id.* at ¶ 139.  Based on the representations made to them, investors felt they had no choice but to agree to the Exchange Offering and to replace their existing notes in the ABFP Funds and Fidelis

Planning Fund with new notes that offered less interest and thus a lower rate of return. *Id.* at ¶ 140. All or nearly all of the investors accepted an Exchange Note. *Id.* at ¶ 141.

### e. *As of the Filing of the Complaint, In July 2020, The Fraud Was Ongoing and Expanding*

When the SEC filed the Complaint in July 2020, the Defendants were continuing to offer securities to investors through the Agent Funds <u>and</u> Par Funding. *Id.* at ¶ 142.  While Par Funding had continued offering its notes directly to investors on occasion since its January 2018 restructuring, in June and July 2020 Par Funding was seeking significantly higher investments amounts, including $10 million from individuals posing as investors. *Id.* at ¶ 145. Specifically, Furman had coordinated a meeting between LaForte and two individuals posing as investors, and the meeting occurred in the Southern District of Florida in late June 2020 to solicit the individuals to invest. *Id.* at ¶¶ 144.  During the meeting, LaForte touted Par Funding as a "leader in the industry" and contrary to the representations made to existing investors to force them to take the Exchange Notes in April 2020, LaForte represented to these undercover individuals posing as investors that "here we are today post-COVID pretty healthy." *Id.* at ¶ 146.  LaForte explained that the underwriting performed on the Loans helped ensure the success of Par Funding, stating "It all goes back to the underwriter." *Id.*   In soliciting the undercover individuals, LaForte also represented that Par Funding paid investors $28 million in 2018 and $56 million in 2019 – "which is a lot lower proportion that what we paid ourselves. It's about half." *Id.* at ¶ 147.

On July 7, 2020, Cole emailed these two individuals posing as investors draft Par Funding Exchange Notes and offering materials through which they could invest in Par Funding. *Id.* at ¶ 148.  In July 2020, Abbonizio, LaForte, and Cole also met with these same undercover individuals at Full Spectrum's office in Philadelphia to pitch them further on the Exchange Note investment. *Id.* at ¶ 149.

### 5.  Material Misrepresentations and Omissions

The fraudulent scheme operated behind multiple veils of secrecy built of the Defendants' lies to conceal: (1) the true nature of Par Funding's loan practices; (2) Par Funding's true track record of issuing loans and the default rates of the loans; (3) the safety of investing in Par Funding's loans; (4) LaForte's criminal record, identity, and control of Par Funding; (5) three Cease-and-Desist Orders state securities regulators have entered against Par Funding for violating state securities laws; (6) the true result of the New Jersey Division of Securities' investigation of Par Funding; (7) the fact that contrary to Par Funding's representations to the SEC in its filings, it

diverts investor funds to McElhone and Cole, Par Funding's CFO, and also funnels money to The LME 2017 Family Trust, which is McElhone's family trust; (8) the fact that contrary to his representations to investors, LaForte has never invested in Par Funding; (9) a Cease-and- Desist Order and sanctions issued against Vagnozzi for violating state securities laws in connection with the Par Funding offering; (10) a Cease-and-Desist Order and sanctions issued against ABFP for violating state securities laws in connection with the Par Funding offering; and (11) a Cease- and-Desist Order and sanctions issued against Abbonizio for violating state securities laws in connection with the Par Funding offering. *Id.* at ¶ 8.

These lies, and the scheme the Defendants employed to perpetuate them in the unregistered securities offerings, formed the basis of this action. *Id.* at ¶ 9.  Each Defendant played a critical and substantial role in the fraudulent scheme to misrepresent and conceal the truth. *Id.*  Each individual Defendant solicited investors to purchase securities – either through an Agent Fund or directly from Par Funding – by scheming and lying - and it continued until the day the SEC filed is Complaint in July 2020. *Id.*

### a. False Claims about Par Funding's Rigorous Underwriting Process

Because investor returns were purportedly generated by the interest small businesses pay on the Loans Par Funding makes, the success and profitability of the investment turned on Par Funding lending money to small businesses who paid back Loans with interest and did not default on the Loans. *Id.* at ¶ 154. As Abbonizio explained to one potential investor, this is the most important consideration when deciding whether to invest in the Agent Funds. *Id.* at ¶ 155.

In a Par Funding brochure Abbonizio and Agent Fund managers distributed to potential investors, Par Funding detailed its supposedly rigorous underwriting process to approve merchant loans, calling it "Exceptional Underwriting Rigor." *Id.* at ¶ 158.  Par Funding claimed that the underwriting process took 48 to 72 hours and included, among other things, an on-site inspection of each merchant before approving any Loan. *Id.* at ¶ 159.  According to the marketing materials, "There is no substitute for personal on-site merchant inspections," and "Visual confirmation of a business' viability yields the highest levels of confidence in the future viability of merchant partners." *Id.* at ¶ 160.  Par Funding emphasized that the on-site inspection "…has been proven to enhance the low default Par Funding experience[s]." *Id.* at ¶ 161.  Abbonizio also touted Par Funding's underwriting process to potential investors, both during one-on-one meetings with potential investors and during solicitation events. *Id.* at ¶ 162.  For example, at the November 2019

solicitation dinner at which LaForte, Cole, and Abbonizio presented, Abbonizio told potential investors that Par Funding has "rigorous standards" and "the best underwriting in the industry." *Id.* at ¶¶ 163 & 95, 101-104.

The representations about Par Funding's underwriting process were false. *Id.* at ¶ 165. In truth, the underwriting was not stringent. *Id.* at ¶ 166. Contrary to the Defendants' representations, Par Funding did not always conduct on-site inspections of small businesses prior to funding Loans, and it would approve Loans in less than 48 hours. *Id.* at ¶ 167. For some small businesses, the only on-site visit that ever occurred was to threaten a merchant with physical violence. *Id.* at ¶ 174. For other small businesses, Par Funding simply asked the small business to email them a photo of their office rather than perform the on-site inspection promised to investors. *Id.* at ¶ 176. When Par Funding did conduct an on-site inspection, it was sometimes done after Par Funding had already approved and funded the Loan. *Id.* at ¶ 178. Thus, Par Funding did not always conduct an on-site inspection prior to approving a Loan and sometimes completes the entire underwriting process in less than 48 hours, but this did not stop Par Funding from making representations to the contrary to investors. *Id.* at ¶ 180.

### b. False and Misleading Claims about Par Funding's Loan Default Rate

LaForte made false claims to prospective investors that Par Funding had a 1% loan default rate. *Id.* at ¶ 185. For example, in Summer 2018, LaForte met with at least one investor in Maryland and pitched the Par Funding investment to her, telling her that Par Funding's loan default rate was only 1%. *Id.* at ¶ 186. The default rate was important. At a dinner for investors and potential investors on November 21, 2019 where LaForte, Cole, and Abbonizio presented the Par Funding offering, Abbonizio told more 300 investors at this event that the 10% to 14% investment returns were "enticing," but it is only enticing if Par Funding does a good job at loaning money to borrowers. *Id.* at ¶ 188. At this same dinner, Abbonizio emphasized that Par Funding has "the best underwriting in the industry" and has "rigorous operational standards, almost seven years in the making." *Id.* at ¶ 189. Because of this, Abbonizio explained, they have a default rate that is "less than 1 percent." *Id.* He also explained to the investors why this is so important – because if enough of the borrowers miss their payments to Par Funding, that "could impede Par Funding's ability to pay Vagnozzi's fund to ultimately pay you." *Id.*

These representations were false and misleading. *Id.* at ¶ 192. In reality, Par Funding had filed more than 2,000 collections lawsuits against small borrowers for defaulting on the Loans

Par Funding made to them. *Id.* at ¶ 193.  Par Funding claimed to have funded $600 million in Loans. *Id.* at ¶ 194.  These lawsuits allege that the Loans are in default and seek to recover more than $300 million that the small businesses have allegedly failed to repay Par Funding. *Id.*  An analysis of these lawsuits reveals that Par Funding's loan default rate is as high as 10%. *Id.*

In Fall 2017, Furman gave a Florida investor a Par Funding brochure claiming that Par Funding had provided "more than $220 million in business funding" since its inception in 2012. *Id.* at ¶ 195.  However, by August 2017, Par Funding had filed more than 240 lawsuits against small businesses for defaulting on their Loans, seeking more than $20 million in missed Loan payments. *Id.* at ¶ 196.  Likewise, on August 15 2019, Abbonizio touted Par Funding's 1% default rate to potential investors at a solicitation dinner. *Id.* at ¶ 197.  However, by August 2019, Par Funding had filed more than 800 lawsuits against small businesses for defaulted Loans, seeking more than $100 million in missed Loan payments. *Id.*

Similarly, when Abbonizio touted Par Funding's low default rates to potential investors during the solicitation dinner on November 21, 2019, Par Funding had filed more than 1,000 lawsuits, in Philadelphia alone, against small businesses for defaulted Loans, seeking more than $145 million in missed Loan payments. *Id.* at ¶ 198.  LaForte and Cole, Par Funding's CFO, were present when these representations were made to potential investors on November 21, 2019, and did not correct these false and misleading statements. *Id.* at ¶ 199.  When Abbonizio touted Par Funding's low default rates to an Undercover posing as a potential investor in January 2020, Par Funding had filed more than 1,200 lawsuits seeking more than $150 million in missed payments on defaulted Loans. *Id.* at ¶ 200.

In July 2020, LaForte and Abbonizio touted the 1% default rate on the Loans in a solicitation meeting with undercover individuals posing as potential investors. *Id.* at ¶ 201.  When they made this representation, Par Funding had filed at least 2,000 lawsuits seeking about $300 million in missed payments from small business owners on Loans Par Funding alleges are in default. *Id.*

Additionally, Par Funding calculates the default rate differently in its representations to investors by not including in the rate any Loan where the borrower is making even a partial payment or is speaking with Par Funding about the Loan. *Id.* at ¶ 202.  For example, on July 10, 2020, Par Funding told a Texas small business owner with the initial MF that it would take his

Par Funding Loan out of default status if the small business owner made a mere $500 payment on his $1.2 million Loan balance. *Id.* at ¶ 203.

### c. False Claims that Par Funding Offers Insurance on Its Loans

In the brochure Par Funding distributes to potential investors through the Agent Funds, Par Funding claims to offer insurance on all of its products up to $150,000. Par Funding further claims that "[t]he insurance protects Par Funding in case of a default or non-payment." *Id.* at ¶ 204. On June 5, 2018, LaForte also told a potential investor in Maryland that if a merchant defaulted on his loan, Par Funding had insurance to back up investor funds, thus reassuring the investor that her investment was safe and secure. *Id.* at ¶ 205.

These claims were false. *Id.* at ¶ 207. Par Funding did not offer small businesses insurance on the Loans, and thus investor funds were not protected by insurance. *Id.* For example, during the more than two-year period spanning November 2015 through January 2018, Par Funding approved and funded 15 Loans to a small business located in Los Angeles, California (the "L.A. Small Business"). *Id.* at ¶ 208. The Loans totaled $6,126,054.13. *Id.* At no time, on any of the 15 Loans approved over the course of these two years did Par Funding offer the L.A. Small Business insurance of any kind. *Id.* at ¶ 209.

Similarly, Par Funding's Loans to the League City, Texas Small Business, Tennessee Small Business, Ohio Small Business, Boston Small Business, Arizona Small Business, Houston Small Business, D.C. Small Business, New Jersey Small Business, and Dallas Small Business span the period from April 2016 through January 2020. *Id.* at ¶ 211. Par Funding did not offer insurance to a single one of these small businesses to whom it issued Loans. *Id.* at ¶ 212.

### d. Misrepresentations and Omissions about LaForte's Background

LaForte touts his financial and business acumen and his success through Par Funding, but fails to disclose his criminal history. *Id.* at ¶ 213. Similarly, the Par Funding website includes numerous articles featuring LaForte and his claimed business success, and directs readers to LaForte's "Forbes Council" profile, in which he describes himself as "…one of the small business industry's most distinguished and accomplished leaders." *Id.* LaForte also holds himself out in videos he posts online as a "financial expert" for Par Funding. *Id.*

In truth, LaForte is a twice-convicted felon and prior to founding Par Funding with McElhone, was imprisoned and ordered to pay $14.1 million in restitution for grand larceny and money laundering. *Id.* at ¶ 214. To conceal these facts, LaForte uses two aliases – Joe Mack and

Joe Macki because, as LaForte admitted to at least one individual, if people "google" his real name they will see his negative history. *Id.* Par Funding and Cole actively assist LaForte in concealing his true identity, and thus his criminal background, by providing LaForte with a Par Funding email address bearing the name of his alias, joemack@parfunding.com, and a Par Funding business card for his alias Joe Macki. *Id.*

Additionally, Cole has solicited investors by touting the experience of Par Funding's management team while failing to disclose LaForte's criminal history, despite knowing LaForte has been convicted of crimes involving dishonesty. *Id.* at ¶ 215. For example, in Fall 2017, Cole solicited a potential investor with initials E.H. who resides in Massachusetts to invest in Par Funding, promising up to 15% monthly interest payments. Cole told the investor that Par Funding was successful and touted Par Funding's experienced management team. *Id.* Cole did not disclose that the management team was led by a convicted felon. *Id.*

In its 2019 and 2020 Form D Filings with the SEC, Par Funding failed to identify LaForte in Item 3 of the form requiring the disclosure of "Related Persons." *Id.* at ¶ 218. The instructions accompanying Form D direct filers to provide the following information under "Related Persons":

Enter the full name and address of each person having the specified relationships with any issuer and identify each relationship:

•   Each executive officer and director of the issuer and person performing similar functions (title alone is not determinative) for the issuer, such as the general and managing partners of partnerships and managing members of limited liability companies; and

•   Each person who has functioned directly or indirectly as a promoter of the issuer within the past five years of the later of the first sale of securities or the date upon which the Form D filing was required to be made.

•   If necessary to prevent the information supplied from being misleading, also provide a clarification in the space provided.

*Id.*

LaForte was identified as the President of Par Funding, ran the day-to-day operations, and he functioned as an executive officer of Par Funding. *Id.* at ¶ 219. Nonetheless, Par Funding did not disclose LaForte's involvement in its Commission filings. *Id.*

### e. Misrepresentations and Omissions about Par Funding's Regulatory History

LaForte touts to prospective investors Par Funding's success. *Id.* at ¶ 220.  For example, in November 2019 LaForte told potential investors that Par Funding is probably the most profitable cash advance company in the United States and maybe in the world. *Id.*  Abbonizio also solicited investors by touting Par Funding's success and its track record as a leader in the merchant cash industry. *Id.* at ¶ 221.  Par Funding, LaForte, and Abbonizio touted Par Funding while failing to disclose that Par Funding has twice been sanctioned for violating state securities laws. *Id.* at ¶ 227.

### 6. McElhone, LaForte, and Cole Violated the Federal Securities Laws

In November 2018, the Pennsylvania Securities Regulators filed a Consent Agreement and Order against Par Funding for violating the Pennsylvania Securities Act prohibiting the use of unregistered sales agents in the offer and sale of securities, and fined Par Funding $499,000. *Id.* at ¶ 228.  In December 2018, the New Jersey Bureau of Securities issued a Cease-and-Desist Order against Par Funding based on its offer and sale of unregistered securities. *Id.* at ¶ 229.  Both of these Orders were in effect when the Defendants touted Par Funding as an investment opportunity to potential investors, and both Orders remain in effect. *Id.*  However, the Defendants failed to disclose these Orders while touting Par Funding. *Id.* at ¶ 230.

In February 2020, the Texas State Securities Board issued an Emergency Cease- and-Desist Order against Par Funding and others, alleging fraud and registration violations in connection with its securities offering through an Agent Fund in Texas. *Id.* at ¶ 231.  Undeterred, Par Funding continued soliciting investors and continued touting the success of Par Funding without disclosing the Texas Order to potential investors. *Id.* at ¶ 232.

### f. False Statements In Par Funding's Commission Filings About McElhone and Cole's Receipt of Funds

Par Funding has filed two false filings with the SEC concerning its Par Funding Note offering and how investor funds would be used. *Id.* at ¶ 235.  On February 12, 2019, Par Funding filed a Notice of Exempt Offering of Securities on Form D with the SEC, stating that it was a new notice for an offering of debt securities in reliance on the exemption under Rule 506(b) and that the first sale was on August 1, 2012. *Id.*  The filing disclosed approximately $3.6 million Par Funding has paid in finders' fees and a total amount sold of approximately $227 million to 488 investors. *Id.*  In the Use of Proceeds section, the filing states that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or others listed

in the filing's section for related persons, in which McElhone and Cole are listed as executive officers and directors. *Id.*

On April 28, 2020, Par Funding filed an amended Form D with the SEC with respect to the offering that began August 1, 2012, disclosing the total amount sold to the 488 investors was higher than it initially reported in 2019 - $378 million. *Id.* at ¶ 236.  This filing stated that Par Funding had paid no finders' fees and commissions, and again stated that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or others listed in the filing's related persons section, which again includes McElhone and Cole. *Id.* at ¶ 237.  Cole signed the Amended Form D on behalf of Par Funding. *Id.* at ¶ 238.

The representations in both filings that Cole and McElhone would not receive any of the gross proceeds of the securities offering are false. *Id.* at ¶ 239.  McElhone received at least $11.3 million from the offering between July 2015 and October 2019. *Id.* at ¶ 240.  As for Cole, Par Funding transferred funds, which included investor funds, to companies in which Cole had an ownership interest or otherwise received financial benefits: $1.8 million to ALB Management between July 2019 and October 2019; about $4.9 million to Beta Abigail between July 2016 and April 2019; and about $9.5 million to New Field Ventures, LLC between February 2017 and November 2019. *Id.*  In a recorded conversation with an FBI confidential source, Cole admitted that Par Funding paid him through his consulting firms and that the amounts are reflected in the "consulting" line on the Par Funding financial statements. *Id.* at ¶ 241.

The Par Funding financial statements reflected the amount of the consulting payments and noted that New Field Ventures was owned by Cole and Abbonizio. *Id.* at ¶ 242.  Cole ws also an owner of Beta Abigail, which also received purported consulting funds from Par Funding, and he admitted to the undercover human source that ALB Management is a company through which he received payments from Par Funding. *Id.*

The representation in Par Funding's 2020 Form D filing that Par Funding did not pay commissions is similarly false. *Id.* at ¶ 243.  Par Funding had paid so-called finders' fees of at least $3.6 million plus an addition $1 million in payments labeled as "commissions" from July 2015 to February 2020. *Id.*

### g. False Claims about LaForte's Personal Investment in Par Funding

LaForte falsely told prospective investors that he personally invested in Par Funding. *Id.* at ¶ 244.  For example, at the November 2019 solicitation dinner, LaForte told the crowd of about

300 potential investors that he had invested $500,000 of his own money in Par Funding to get the company started. *Id.* at ¶¶ 95 & 244.  LaForte also claimed in an email to an existing investor inquiring about someone else potentially investing, "I have 80 million in the company myself. So his money would be side by side w [sic] mine." *Id.* at ¶ 244.  LaForte's claims were false. *Id.* at ¶ 245.  Not only did LaForte not invest his own money to start Par Funding, but he had in fact never invested in Par Funding. *Id.*

### h. Misrepresentations and Omissions about Abbonizio's Regulatory History

Par Funding's website continued advertising its purported "strong, dedicated team," which continued until the SEC filed its Complaint in July 2020. *Id.* at ¶ 264. At the time of Exchange Note offering, Abbonizio was a partial owner and manager of Par Funding who had solicited investors to make their initial investments in Par Funding through the Agent Funds, and Abbonizio continued his role at Par Funding as of the day the SEC filed its Complaint in July 2020. *Id.* at ¶ 265. However, at no time did Par Funding disclose to investors that just before the offering began, the Texas Securities Regulators issued an Emergency Cease-and-Desist Order against Abbonizio for, among other things, engaging in fraud in connection with the Par Funding offerings and Agent Fund solicitations. *Id.* at ¶ 266.  Likewise, in soliciting undercover individuals to invest in Par Funding in June and July 2020, no one at Par Funding disclosed the Texas Cease-and-Desist Order issued against Abbonizio. *Id.* at ¶ 267.

Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present [July 2020], by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, has knowingly or recklessly made untrue statements of material facts or omitted to state material facts in order to make the statements made, in the light of the circumstances in which they were made, not misleading. By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]. *Id.* at ¶¶ 272-73.

Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present [July 2020], directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices, and courses of business which

have operated, are now operating, and will operate as a fraud upon the purchasers of such securities. By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)]. *Id.* at ¶¶ 275-76.

Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present [July 2020], directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have knowingly or recklessly employed devices, schemes or artifices to defraud. 279. By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]. *Id.* at ¶¶ 278-79.

Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present [July 2020], directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]. *Id.* at ¶¶ 281-82.

Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present [July 2020], directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers. By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless and restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]. *Id.* at ¶¶ 284-85.

No registration statement was filed or in effect with the SEC pursuant to the Securities Act with respect to the securities issued and the transactions conducted by the Defendants as described

in this Complaint and no exemption from registration existed with respect to these securities and transactions. *Id.* at ¶ 287. Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present [July 2020], directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise; (b) carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the SEC as to such securities. *Id.* at ¶ 288. By reason of the foregoing, the Defendants violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c). *Id.* at ¶ 289.

From no later than July 2015 through present [July 2020], McElhone and LaForte have been, directly or indirectly, control persons of Par Funding and Full Spectrum for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). *Id.* at ¶ 291. From no later than July 2015 through present, Par Funding and Full Spectrum violated Section 10(b) and Rule 10b-5 of the Exchange Act. *Id.* at ¶ 292. As control persons of Par Funding and Full Spectrum, McElhone and LaForte are jointly and severally liable with and to the same extent as Par Funding and Full Spectrum for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act. *Id.* at ¶ 293. By reason of the foregoing, McElhone and LaForte directly and indirectly have violated, and unless restrained and enjoined, are reasonably likely to continue to violate Section 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and §78t(a), and 17 C.F.R. § 240.10b-5. *Id.* at ¶ 294.

**B.  Additional Facts and Evidence of LaForte, McElhone, and Cole's Misconduct**

1.     **McElhone** authorized and directed the offerings, and approved the marketing materials used in the offerings for distribution to investors. [ECF No. 20-2 (TRO Exhibit 3), at 224:17-225:16]. McElhone was the boss at Par Funding. [ECF No. 816-3, Deposition of Jamie McElhone, at 17:11-20, 18:9-11, 20:13-16; ECF No. 816-6, Par Funding Organizational Chart]. McElhone was at the Par Funding office every day, she hired employees, executed contracts on behalf of Par Funding, and she was in charge of everyone at Par Funding. [ECF No. 816-3, Jamie McElhone

Deposition, at 26:16-28:19; ECF No. 816-5, Abbonizio Contract (authenticated by ECF No. 816-11, Declaration of Receiver's Counsel)].   McElhone hired Abbonizio to help Par Funding solicit investors and McElhone executed a consulting agreement with Abbonizio; Abbonizio's title was "Principal" of Par Funding, and Par Funding authorized him to use that title in his communications until the Receiver was appointed in July 2020.  Under the consulting agreement McElhone entered into with Abbonizio, Abbonizio's job was identifying potential investors for Par Funding. [ECF No. 816-5, MSJ Exhibit D]. McElhone also directly solicited investors [Exhibit 4, ECF No. 1213-4, at transcript pages 28-44].

     2.    **LaForte** reviewed and participated in the drafting of marketing materials and the funding analysis and brochure distributed to potential investors in the Par Funding offerings. [ECF Nos. 816-9, 41-10, 31-9 (MSJ Ex H and TRO Exhibits 25 and 119)].  LaForte also participated in at least one conference call with Agent Fund managers to encourage them to sell the investments: during the call, LaForte participated using his alias Joe Mack, told the Agent Fund managers about his efforts to minimize risk to pay investors, told the Agent Fund managers what he would tell investors in order to get them to invest; referred to Par Funding as his company; and told the Agent Fund managers, "I have a finance background. I worked on Wall Street." [ECF No. 816-10 and 816-6 (MSJ Exhibit I and Exhibit E thereto, Transcript of December 2018 Conference call), at 3-5; 11-12; 16; 26-27; 31-33].  LaForte did not disclose his criminal background. *Id.*

     3.    The Par Funding website included numerous articles featuring LaForte and his claimed business success, and directed readers to LaForte's "Forbes Council" profile, in which he described himself as "…one of the small business industry's most distinguished and accomplished leaders." LaForte also held himself out on his Linked In page as "one of the small business finance industry's most distinguished and accomplished leaders" and claimed that he "maintains a stellar reputation amongst industry professionals, clients, and company employees." [ECF No. 28-6, TRO Exhibit 81].

     4.    **Cole** solicited at least one investor by touting the experience of Par Funding's management team while failing to disclose LaForte's criminal history [ECF No. 29-5, TRO Exhibit Exhibit 96, at ¶¶ 3-6 & 10], despite knowing "from the first day" that LaForte has been convicted of crimes involving dishonesty [ECF No. 20-3, TRO Exhibit 4, Cole Deposition, at 41:18-43:18].

     5.    Cole lied to Par Funding's attorney to conceal LaForte's involvement. Par Funding's then-attorney did not list LaForte as a "related person" on the Par Funding filings with the SEC or

in offering documents because Cole told the attorney that LaForte had no role in Par Funding. [ECF No. 896-13, Phil Rutledge Deposition, at pdf pg. 241, lines 14-16 ("So I called Mr. Cole, and I said what's Mr. LaForte's involvement with CBSG? Joe Cole said, oh, he's not involved."); pdf pg. 242, lines 7-21 (counsel would have disclosed LaForte had he known his involvement)].

6.     The Defendants operated Par Funding as a fraudulent scheme (Counts I-VI), and also used investor money to pay purported investment returns to individual and Agent Fund investors. *SEC v. Quiros*, Case No. 2016-cv-21301, 2016 WL 11578637 at *13 (S.D. Fla. Nov. 21, 2016) ("The likelihood that [the defendant] conducted some legitimate business operations does not counteract the existence of a Ponzi scheme[2] because the distributions made to investors were nevertheless funded by other investors' money.  In addition, commingling funds 'is a common characteristic of a Ponzi scheme.' ") (internal citations omitted).

   a.   Par Funding commingled investor funds and MCA loan borrower funds. [ECF No. 774-1 at page 61, paragraph 129].

   b.   Par Funding raised at least $550,325,596 from investors in investor principal, and returned $300,108,117 to investors and Agent Funds [Exhibit 19, Declaration of Receiver].

   c.   However, from inception through 2019, Par Funding did not generate enough money from its MCA Loan business to pay investors this more than $300 million in purported investment returns.

      a.   Par Funding generated only $6.6 million from MCA Activity. [ECF No. 426-1 at pdf pg 3, ¶ 6].  This is equal to about 2 percent of the amount Par Funding paid investors (6.6/300,108,117).  *See also* Exhibit 4 (ECF No. 1213-4), Cole Deposition, at 97:18-25 (admitting that Par Funding broke even; specifically, that Par Funding's MCA Loan business only received back from borrowers about the same amount Par Funding loaned out to borrowers].

      b.   From inception through 2019, Par Funding incurred a cash loss from operations of $136.2 million. [ECF No. 426-1 at pdf pg 3, ¶ 8].

---

[2] This reference to the phrase "Ponzi scheme" is in a quote from a case is therefore not edited.

      d.   Accordingly, the payments Par Funding made to investors included investor funds. [ECF No. 426-1 at pdf pg 3 at ¶ 7 and pdf pg. 10].

7.     From inception through 2019, Par Funding paid more than $144 million of commingled investor funds to or for the benefit of LaForte, McElhone, Cole and Abbonizio. [ECF No. 426-1 at pdf pg 3, ¶ 7]. By way of just a few examples, the Complaint allegation deemed as true is that McElhone transferred more than $10 million in cash for her benefit.  Also, the Receiver has reported that Par Funding paid at least $37.8 million to McElhone's company Heritage Business Consulting, at least $24.4 million to McElhone;s company Eagle Six Consultants, and about $40 million to the LME Trust for which McElhone and LaForte were trustees and beneficiaries, as well as more than $20 million to LaForte's business [ECF No. 426-1 at pdf pp 5 & 9; ECF No. 482 at pdf pg 7, ¶ 1].  As set forth in the successful litigation by the Receiver to expand the receivership, McElhone and LaForte also transferred Par Funding money for the purpose of acquiring dozens of real estate properties for McElhone and LaForte's benefit. [*See, e.g.,* ECF. No. 482, summary beginning on page 13].

### C.  The Court Should Draw An Adverse Inference Against LaForte and McElhone And Preclude Them From Introducing All Previously Withheld Evidence

#### 1.  *LaForte and McElhone's Assertion of the Fifth Amendment*

Throughout the entirety of this case, LaForte and McElhone asserted their Fifth Amendment privilege against self-incrimination in response to every discovery request and question asked of them.  The Court ordered McElhone and LaForte to file sworn accountings of the money they received in connection with Par Funding [ECF No. 42].  LaForte and McElhone refused to provide the sworn accountings this Court ordered and continued to refuse to provide any information whatsoever throughout discovery.

#### 2.  *Precluding Defendants from Introducing Withheld Evidence Is Warranted*

The Court should preclude Defendants from introducing withheld evidence in response to this Motion.  It is well-settled that "[t]he Fifth Amendment cannot be invoked to oppose discovery and then tossed aside to support a party's assertions." *Sec. & Exch. Comm'n v. Zimmerman*, 854 F. Supp. 896, 899 (N.D. Ga. 1993) (ruling that the defendant could not introduce any evidence previously withheld on Fifth Amendment grounds) (citations omitted).  Because LaForte and McElhone refused to produce sworn accountings, the Court should preclude them from now presenting evidence of the amounts they received in connection with Par Funding. *See also Glock,*

*Inc. v. Glob. Guns & Hunting, Inc.,* No. 1:12-CV-136-MHS, 2015 U.S. Dist. LEXIS 195062 (N.D. Ga. Mar. 30, 2015). They also refused to respond to discovery requests concerning their reliance on advice of counsel defense, or to even identify which lawyer they purportedly sought advice from, and should be precluded from introducing that now. *See, e.g.,* [ECF No. 916-2, ECF No. 1213-13 Interrogatories 1-4; ECF No. 1213-15 Interrogatories 1-4]. As the Court in *SEC v. Benson* held in ruling that a defendant could not use the Fifth Amendment to refuse discovery and then present that concealed evidence in support of the defendant's motion:

> [I]n a civil case, he cannot have it both ways. By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up the right to prove them. By his initial obstruction of discovery and his subsequent assertion of the privilege, defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials. There is no reason why judgment should not be granted on this record.

657 F. Supp. 1122, 1129 (S.D. N.Y. 1987) ("By hiding behind the protection of the Fifth Amendment as to his contentions, [defendant] gives up the right to prove them."). *Accord Traficant v. Comm'r of Internal Revenue Serv.*, 884 F.2d 258, 265 (6th Cir. 1989) (limits on introducing evidence on matter as to which defendant had invoked privilege against self-incrimination were "properly within the scope of cases holding that a party to civil litigation or other non-criminal proceedings may encounter costs imposed in exchange for the assertion of the Fifth Amendment privilege as long as they are not so high as to force abandonment of the privilege"); *SEC v. Global Express Capital Real Estate Inv. Fund I, LLC*, No. 2:03-cv-01514-KJD-LRL, 2006 WL 7347289, at *14 (D. Nev. Mar. 28, 2006), *aff'd in part, rev'd in part, and remanded on other grounds*, 289 Fed.Appx. 183 (9th Cir. 2008) ("[U]se of the privilege as a 'shield' against discovery precludes the use of undiscoverable information as a 'sword' in response to summary judgment or at trial to assert any defenses."); *Pack v. Byer*, 157 F.R.D. 219, 224 (D. N.J. 1993) ("[P]arties which assert the Fifth Amendment privilege are precluded from later waiving the privilege and utilizing the evidence."); *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545, 550 (S.D. N.Y. 1985) ("In light of the defendant's invocation of his fifth amendment rights regarding the basis of his defenses and denials, a total preclusion order is appropriate.").

### 3. The Court Draw An Adverse Inference Against Laforte and McElhone

LaForte and McElhone asserted the Fifth Amendment in response to every discovery request as well as every question asked at their depositions [Exhibits 13-16 and 18 (filed as ECF 1213-13 – 1213-16 and 1213-18); ECF No. 937-4]. The Court should draw the inference that had

LaForte and McElhone testified, their testimony would have been adverse to their positions. The Constitution does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Accordingly, courts routinely draw adverse interests against parties who do not testify. *United States v. A Single Family Residence*, 803 F.2d 625, 629 n.4 (11th Cir. 1986) (trial court properly drew adverse interest from corporate representative's refusal to testify that testimony would not have been favorable to corporation's position); *FDIC v. Elio*, 39 F.3d 1239 (1st Cir. 1994) (District Court entitled to draw negative inference against defendant who was recipient of fraudulent transfer); *SEC v. Cherif*, 933 F.2d 403, 412 (7th Cir. 1991) (affirming preliminary injunction where court took adverse inference from assertion of Fifth Amendment).

Courts regularly draw adverse inferences from a defendant's invocation of the Fifth Amendment privilege in Commission enforcement actions. *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 525 (D.N.J. 1999); *SEC v. Scott*, 565 F. Supp. 1513, 1533 (S.D.N.Y. 1983), *aff'd sub nom. SEC v. Cayman Islands Reinsurance Corp.*, 734 F.2d 118 (2d Cir. 1984); *SEC v. Musella*, 578 F. Supp. 425, 429 (S.D.N.Y. 1984); *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987); *SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 856-60 (S.D.N.Y. 1997), *aff'd SEC v. Softpoint,* 159 F.3d 1348, 1998 WL 537522, at *1 (2d Cir. June 29, 1998); *SEC v. Invest Better 2001*, 2005 WL 2385452, at *2-3 (S.D.N.Y. May 4, 2005); *SEC v. Pittsford Capital Income Partners, LLC,* 2007 WL 2455124, at *14-15 (W.D.N.Y. Aug. 23, 2007); *SEC v. Cassano*, 2000 WL 1512617 at *2 n.1 (S.D.N.Y. Oct. 11, 2000); *SEC v. Herman,* 2004 WL 964104, at *7 (S.D.N.Y. May 5, 2004); *SEC v. DiBella,* 2007 WL 1395105, at *1-4 (D. Conn. May 8, 2007); *SEC v. PacketPort.Com, Inc.,* 2006 WL 2349452 at *6 (D. Conn. July 28, 2006). Because LaForte and McElhone previously refused to testify, they should not now be allowed to offer their own testimony opposing this motion. *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545 (S.D.N.Y. 1987) (assertion of Fifth Amendment precluded party from presenting evidence on any matter relating to the facts on which it asserted Fifth Amendment rights).

As to McElhone, she asserted the Fifth Amendment in response to the following Requests for Admissions [ECF No. 914-1] and the Court should take an adverse inference against McElhone that had she answered these Requests for Admissions the answers would have been against her position in this case – *i.e.*, she would have admitted them. Supporting evidence in the record is cited below as well.

From no later than May 2015 until at least February 2020, McElhone authorized Par Funding to offer promissory notes to the general public. (RFA 3, 914-2).  *See* TRO Exhibit 3 at 224:17-225:16 (McElhone had ultimate decision-making authority);  ECF No. 816-3, Deposition of Jamie McElhone, at 17:11-20, 18:9-11, 20:13-16 (McElhone was the boss at Par Funding who ran everything); ECF No. 816-6, Par Funding Organizational Chart (showing McElhone's position); TRO Exhibit 89 (McElhone signed investors' promissory notes on behalf of Par Funding).

From no later than May 2015 until at least February 2020, McElhone authorized Par Funding to sell promissory notes to the general public. (RFA 4, 914-2). *See cites for RFA 3 above.*

McElhone made the decision on behalf of Par Funding to conceal Par Funding's regulatory history from potential purchasers of Par Funding's promissory notes. (RFA 5, 914-2). *See cites for RFA 3 above.*

McElhone approved for distribution to potential purchasers of Par Funding promissory notes the brochure attached as Exhibit A. (RFA 7, 914-2). *See cites for RFA 3 above.*

McElhone approved Par Funding's February 2019 filing with the Securities and Exchange Commission in the form attached as Exhibit B. (RFA 9, 914-2). *See cites for RFA 3 above.*

McElhone approved Par Funding's April 2020 filing with the Securities and Exchange Commission in the form attached as Exhibit C. (RFA 10, 914-2). *See cites for RFA 3 above.*

From no later than July 2015 until at least February 2020, McElhone authorized Par Funding to fund merchant cash advances without conducting on-site inspections. (RFA 11, 914-2). *See cites for RFA 3 above.*

### C.  The Court Should Preclude Cole From Introducing Evidence About His Receipt and Use of Funds

Cole consented to the entry of the Judgment this Court entered against him and to all allegations in the Complaint being deemed as true for purposes of this Motion.  The Complaint alleges Cole received more than $14 million, and this fact must be deemed as true and cannot be contested by Cole pursuant to the Judgment entered against him.  Further, Cole refused to provide a sworn accounting despite the Court's order directing him to do so.  The SEC also propounded discovery concerning how much money Cole received in connection with Par Funding, and Cole produced no evidence. In response to the SEC's request for Cole's bank account records and documents reflecting Cole's compensation and other amounts received from Par Funding, Cole

answered that the "documents [ ] have already been seized either by the Plaintiff or by the Receiver." [Exhibit 17, Cole Response to RFP, at Nos. 12, 13, & 17].

Accordingly, the Court should preclude Cole from introducing the evidence he withheld when he refused to a file a sworn accounting, as well as relying on any documents responsive to the SEC's discovery requests that Cole failed to produce to the SEC. The SEC relied on Cole's statements that he had nothing to produce that the SEC had not already received, and the Cole cannot now come forward with any additional evidence he withheld.

### D.  The Court Should Order Disgorgement and Prejudgment Interest Against LaForte, McElhone, and Cole In the Amounts The SEC Seeks

Any federal court may order disgorgement in any action or proceeding brought by the SEC under any provision of the securities laws. Sections 21(d)(5) and 21(d)(7) of the Exchange Act, and the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), effective January 1, 2021.  Under Sections 21(d)(5) and 21(d)(7) of the Exchange Act, federal district courts have authority to order disgorgement in Commission enforcement actions. Disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. First Jersey Sec., Inc*., 101 F.3d 1450, 1474-75 (2d Cir. 1996).  *See also SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) ("The amount of disgorgement need not be an exact calculation of the defendant's profits, but only 'a reasonable approximation of the profits causally connected to the violation'" (quoting *SEC v. Patel,* 61 F.3d 137, 139 (2d Cir. 1995); *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013).

In addition, courts have discretion to add prejudgment interest to a defendant's disgorgement amount to prevent the defendant from benefitting from the use of his/her ill-gotten gains interest free. *First Jersey*, 101 F.3d at 1475; *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978*)*.  "[I]n order to be entitled to disgorgement, the SEC needs to produce only a reasonable approximation of the defendant's ill-gotten gains." *SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014) (quoting *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005)).  *See also CFTC v. Tayeh*, 2021 WL 794542 at *1 (11th Cir. March 2, 2021) (unpublished) (citing disgorgement standards post-*Liu*).  Courts have authority to award disgorgement in an amount equal to net profits regardless of whether the defendant subsequently spent the funds.  *SEC v. Faulkner*, 2021 WL 75551, at *6 (SEC need not "trace a defendant's ill-gotten profits to an identified res currently in the defendant's possession in order to obtain disgorgement"); *SEC v.*

*Owings Group*, 2021 WL 1909606, at *5 (SEC need not trace the specific funds).  Moreover, the SEC's disgorgement claims are not limited to what the harmed investors could recover.  *See, e.g., SEC v. Laura*, No. 18-CV-5075 (NGG) (VMS), 2020 WL 8772252, at *4 (E.D.N.Y. Dec. 30, 2020) (rejecting argument that, under *Liu*¸ the SEC's power to seek disgorgement is exactly coterminous with an individual injured investor's claim).

Upon the SEC's production of a reasonable approximation, "the burden shifts to the defendant 'to demonstrate the SEC's estimate is not reasonable.'"  *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017) (quoting *Monterosso*, 756 F.3d at 1337).  If the SEC's "measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).  *See also SEC v. Warren*, 534 F.3d 1368, 1370 & n.2 (11th Cir. 2008) (noting that "[a] contrary rule would allow con artists to escape disgorgement liability by spending their ill-gotten gains—an absurd result") (cited with approval by the Supreme Court in *Liu* on other grounds, 140 S. Ct. at 1950).  No deduction is appropriate for claimed expenses where the "manner in which the books… were kept renders such an account impossible"; "[u]nder the circumstances, every doubt and difficulty should be resolved against them." *See Rubber Co. v. Goodyear*, 76 U.S. 788, 803-4 (1870).  A defendant's financial situation, or any financial hardship disgorgement would impose, are not factors to be considered in determining disgorgement. *Id.*

The SEC seeks disgorgement from the Defendants, with disgorgement proceeds ultimately being distributed to the victim investors by the Court-appointed Receiver in this case. The disgorgement requests at issue in this Motion are also consistent with both the new provision for disgorgement in Exchange Act 21(d)(7), 15 U.S.C. § 78u(d)(7), and *Liu*'s holding that disgorgement should be distributed to harmed investors where feasible, 140 S. Ct. at 1948-49. After *Liu*, Congress amended Exchange Act Section 21(d) on January 1, 2021 to add new Section 21(d)(7), which expressly authorizes courts to award disgorgement in Commission actions.  *See* National Defense Authorization Act ("NDAA") for Fiscal Year 2021, Pub. L. No. 116-283. Section 21(d)(7) provides courts with greater flexibility to determine where collected disgorged funds may be distributed because that provision omits the phrase "for the benefit of investors," which is present in Section 21(d)(5), and which the *Liu* Court construed as a "limitation[]" or "restrict[ion]" on a court's equitable authority to disburse collected disgorgement amounts. *Liu*, 140 S. Ct. at 1948-49.  The disgorgement awards sought herein satisfy both this provision and

the heightened standard in *Liu* because if the SEC is able to collect the requested disgorgement from the Defendants a distribution to harmed investors is feasible. The Court has appointed a Receiver in this case, and the Receiver knows who the investors are and the amount each invested, has contact information for investors, and intends to seek a distribution to investors at the conclusion of the Receivership. Accordingly, the disgorgement requested is not only consistent with *Liu* but also meets the more flexible standard for distribution under the NDAA.

### 1. The Court Should Order McElhone and LaForte to Disgorge $226,471,877 With Prejudgment Interest In The Amount of $10,952,117.55

The Court should order McElhone and LaForte jointly and severally liable for disgorgement of $226,471,877, representing the amount Par Funding raised from investors ($550,325,596) minus the amounts Par Funding paid in principal or interest payments to investors and Agent Funds ($300,108,117)[3] [Exhibit 19 hereto], and the amounts Par Funding paid to Cole ($13,247,011) and Abbonizio ($10,498,581).[4] Prejudgment interest on this disgorgement figure, using the rate of interest and time period to which LaForte and McElhone previously consented, is $10,952,117.55, for a total of $237,423,994.55 in disgorgement with prejudgment interest.

#### a. Holding LaForte and McElhone Joint and Severally Liable is Warranted

Joint and several liability is appropriate for LaForte and McElhone, who, as set forth in the Complaint allegations deemed as true for purposes of this Motion, are married and thus share assets, and acted as partners to engage in wrongdoing by orchestrating the unregistered offering scheme through the companies they controlled. [ECF No 119]. *Liu v. SEC*, 140 S. Ct. 1936, 1949 (2020) (Joint-and-several liability can be imposed "for partners engaged in concerted wrongdoing."). *Liu*, 140 S. Ct. at 1949. As set forth in the Complaint allegations deemed as true for purposes of this Motion, LaForte and McElhone orchestrated the unregistered fraudulent scheme and controlled Par Funding and Full Spectrum together. Joint and several liability of

---

[3] This figure includes all Agent Funds, including but not limited to Defendants Dean Vagnozzi, John Gissas, and Michael Furman. Thus, the disgorgement amount of Vagnozzi, Gissas, and Furman is not included in the amount sought against LaForte and McElhone.

[4] The amount Par Funding paid Abbonizio is not included in the disgorgement figure for LaForte and McElhone because the Court has entered a Final Judgment, by consent, for Abbonizio to pay that amount. Similarly, the disgorgement amount for LaForte and McElhone does not include the amount of disgorgement the SEC is asking the Court to order Cole to pay. The reason these amounts are deducted against

LaForte and McElhone is also appropriate where, as here, they are married and both participated in the violations. *Id.* (noting that the defendants who were married may be jointly and severally liable where they both participated in the violations).

### b.  *Disgorgement In An Amount Equal to Par Funding's Ill-Gotten Gains is Warranted*

Seeking disgorgement from McElhone and LaForte in an amount equal to Par Funding's ill-gotten gains is appropriate for at least three reasons.  First, the Complaint allegations, deemed as true for this Motion, are that McElhone and LaForte, among other things violated Section 20(a) of the Exchange Act by controlling Par Funding and the unregistered fraudulent offerings at issue. [ECF No. 119]. Section 20(a) of the Exchange Act provides that "any person who, directly or indirectly, controls any person . . . shall . . . be liable jointly and severally with and to the same extent as such controlled person."  Thus, the Court should set LaForte and McElhone's disgorgement equal to the ill-gotten gains of Par Funding, the entity they controlled.

Second, setting disgorgement equal to the amount of Par Funding's ill-gotten gains is also warranted because McElhone and LaForte's conduct makes it impossible for the SEC to determine the amounts they received personally.  McElhone and LaForte asserted their Fifth Amendment rights and did not produce or file the sworn accountings this Court ordered them to file or respond to any discovery whatsoever concerning funds they received (or any other matter whatsoever). Additionally, their conduct during the offering fraud makes it impossible to determine the full amount they received personally. The Supreme Court has endorsed the ancient equitable principle that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).  Here, McElhone and LaForte operated Par Funding by commingling investor funds with MCA Loan funds, McElhone was the signatory on the Par Funding bank accounts and money was transferred by these accounts through numerous entities, some of which were owned or controlled by McElhone and LaForte, and steps were taken to conceal the payments they received in connection with Par Funding.  For example, LaForte received untold amounts of cash from merchant borrowers who were repaying the investor funds they had been loaned by Par Funding; McElhone transferred funds from Par Funding to various entities she controlled (the identities of all such entities remain unknown due to her failure to respond to discovery) [ECF No 426-1 and McElhone discovery filed herewith]; investor funds were used for the acquisition of personal luxury items and properties for McElhone and LaForte that the Receiver continues to investigate and the full extent of which is unknown [*See* Receiver's

motions to expand the receivership and Orders granting same], and McElhone and LaForte received assets through at least one fake MCA loan agreement that purported to be for an MCA loan but which was in reality merely a vehicle through which McElhone and LaForte received expensive watches [ECF No. 634].

Because of the commingled accounts, the thousands of payees on the Par Funding accounts, McElhone and LaForte's refusal to respond to discovery or provide an accounting of funds they received, and the fact that McElhone and LaForte received funds and assets from Par funding through concealed means (the full extent of which remains unknown due to their refusal to provide discovery and sworn accountings), McElhone and LaForte's total personal gains cannot be determined. At a minimum, they received, directly or indirectly through entities they own or assets acquired for their personal benefit, more than $100 million from Par Funding that the SEC and Receiver have been able to identify. However, the full extent of their gains remains unknown for the reasons set forth above.

Third, McElhone and LaForte's roles in the offering fraud as alleged in the Complaint and stated herein, together with the facts that:they touted the success and low default rate of Par Funding loans (alleged in the Complaint) while Par Funding was operating at a deficit or barely breaking even, the cash flow from Par Funding's Merchant Advances was not sufficient to pay the promised investor returns and operational expenses, Par Fundingpaid individual and Agent Funds their purported investment returns using commingled money that included investor funds, and these Defendants themselves received commingled investor funds alsowarrants the disgorgement figure the SEC seeks.[5] Contrary to the profitable and successful business the defendants touted to investors, Par Funding operated in most years at a deficit, and from 2011 through 2020 Par Funding only netted a total of about $7 million on the more than $1 billion Par Funding advanced to merchants through its MCA loan business. While Par Funding only netted $6 million from sources other than investor funds, Par Funding distributed more than 40 times that amount - about $300

---

[5] These facts are set forth above in the Motion and are, as set forth above, supported by ECF No. 426-1; Exhibit 4 at 97:18-25 (admitting that Par Funding broke even; specifically, that Par Funding's MCA Loan business only received back from borrowers about the same amount Par Funding loaned out to borrowers); ECF No. 774-1 (SEC Expert witness report that "The cash flow from Par Funding's Merchant Advances was not sufficient to pay the promised investor returns and operational expense," returns could not have been paid without investor funds, and investor funds were commingled); ECF No. 482.

million - to investors as their purported investment returns and return of principle.  In basic terms, Par Funding could not have made these payments to investors without the inflow of new investor funds.  McElhone was the signatory on the bank accounts, and she and LaForte controlled Par Funding together.  Par Funding was in the business of loaning small businesses investor money that was raised in the Defendants' fraudulent scheme,[6] and thus the business resulted from wrongful activity.  It is well-established that under these circumstances, business expenditures are not deducted from the disgorgement figure. *See Liu*, 140 S. Ct. at 1945 (referencing Supreme Court precedent that "carved out an exception [for deductions from disgorgement] when the entire profit of a business or undertaking results from the wrongful activity.") (internal quotation marks omitted).  Further, because of the nature of the business, commingled accounts, and the fraudulent scheme, it is not possible to determine the amount Par Funding that has "value independent of fueling a fraudulent scheme." *Id.* at 140 S. Ct. at 1950.

### c. The Court Should Order $10,952,117.55 in Prejudgment Interest Against McElhone and LaForte

LaForte and McElhone consented to prejudgment interest, and the Judgments entered against each of them provide that "[p]rejudgment interest on disgorgement shall be calculated from August 1, 2020, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." [ECF Nos. 1002-2 & 1004-1 at p.5].  Using that rate and the time period commencing August 1, 2020, prejudgment interest on the $226,471,877 disgorgement figure is $10,952,117.55. [Exhibit 3, Prejudgment Interest Calculation].  Accordingly, the Court should order prejudgment interest of $10,952,117.55, calculated from the date of the complaint filing through April 12, 2022, for a total of $237,423,994.55 in disgorgement with prejudgment interest.

### 2. The Court Should Order Cole to Pay $13,247,011 in Disgorgement Together With $640,621.80 in Prejudgment Interest

#### a. Disgorgement In The Amount Cole Received From Par Funding Is Warranted

As set forth in the Complaint allegations deemed as true for purposes of this Motion, Cole received more than $14 million from Par Funding directly and through entities he controlled.  Cole cannot contest this fact and therefore the Court can enter disgorgement for the more than $14

---

[6] The Complaint includes two counts against the Defendants for engaging in a fraudulent scheme in violation of the federal securities laws.

million alleged in the Complaint. However, the SEC is seeking a lesser amount, $13,247,011, from Cole as disgorgement to reflect the funds we have identified as his ill-gotten gains.

Cole failed to produce the sworn accounting the Court ordered. During discovery, Cole responded to discovery requests seeking evidence and information about funds he received form Par Funding by stating that the SEC and Receiver already had all responsive documents. Accordingly, like McElhone and LaForte, Cole cannot now come forward with evidence that was not produced to the SEC.

Based on the records available to the SEC and Receiver, Par Funding distributed $13,247,011 to Cole and his entities. Cole acted as the CFO of Par Funding, which operated as a fraudulent scheme (*see* the Complaint counts against Cole), and Cole touted that Par Funding was successful with a low default rate while Par Funding was operating at a deficit or barely breaking even, the cash flow from Par Funding's Merchant Advances was not sufficient to pay the promised investor returns and operational expenses, and Par Funding paid individual and Agent Funds their purported investment returns using commingled money that included investor funds. [7] Coleproduced no documents in this case supporting business expenditures or anything else for that matter.  There was no Rule 26 production, no sworn accounting despite a Court order requiring it, and he produced no records in response to discovery on grounds the SEC and Receiver already had all documents.  Even if, for sake of argument, Par Funding did not operate as a fraudulent scheme,[8] it is not possible to identify any business expenses Cole made, let alone any business expenditures that were not in furtherance of the unregistered offering fraud and fraudulent scheme. Accordingly, the Court should order Cole to disgorge the amount he received from unregistered offering fraud – namely, $13,247,011. [Exhibit 1, Prejudgment Interest Calculation].

### b. The Court Should Order $640,621.80 in Prejudgment Interest Against Cole

Cole consented to prejudgment interest, and the Judgment entered against him provides that "[p]rejudgment interest on disgorgement shall be calculated from August 1, 2020, based on

---

[7] These facts are set forth above in the Motion and are, as set forth above, supported by ECF No. 426-1; Exhibit 4 at 97:18-25 (admitting that Par Funding broke even; specifically, that Par Funding's MCA Loan business only received back from borrowers about the same amount Par Funding loaned out to borrowers); ECF No. 774-1 (SEC Expert witness report that "The cash flow from Par Funding's Merchant Advances was not sufficient to pay the promised investor returns and operational expense," returns could not have been paid without investor funds, and investor funds were commingled); ECF No. 482.

[8] There are two fraudulent scheme counts alleged against Cole.

the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." [ECF No. 1016-1 at p.5].  Using that rate and the time period commencing August 1, 2020, prejudgment interest on the $13,247,011 disgorgement figure is $640,621.80. [Exhibit 1 hereto].  Accordingly, the Court should order prejudgment interest of $640,621.80, calculated from the date of the complaint filing through April 12, 2022, for a total of $13,887,632.80 in disgorgement with prejudgment interest.

### E.  The Court Should Impose Penalties Against LaForte, McEhone, and Cole in the Amounts The SEC Seeks

#### 1.  Civil Penalty Standards

Civil penalties are intended to punish the individual wrongdoer and to deter him/her/they and others from future securities law violations. *Monterosso*, 756 F.3d at 1338.  Courts have looked to the following factors when imposing penalties under the civil penalty provisions of the securities laws:

> (1) the egregiousness of the violations at issue, (2) the defendant's scienter, (3) the repeated nature of the violations, (4) a defendant's failure to admit to their wrongdoing; (5) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (6) a defendant's lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to the defendant's demonstrated current and future financial condition.

*Huff,* 758 F. Supp. 2d at 1364.

These are the same factors the Court found in granting the SEC's *Ex Parte* Emergency Motion for Temporary Restraining Orders in July 2020, to determine that there was a reasonable likelihood of future violations by all Defendants. [ECF No. 14 at pdf p.72; ECF No. 40].  Since then, there is only more evidence of wrongdoing.

Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act authorize three tiers of civil monetary penalties against violators. *SEC v. BIH Corp.*, No. 10-cv-577, 2014 WL 7057748 at *2 (M.D. Fla. Dec. 12, 2014); 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d).  First-tier penalties apply to any violation of the Securities or Exchange Act.  *Id*.  Second-tier penalties apply to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  *Id*.  Finally, third-tier penalties apply to any violation satisfying the second-tier criteria that also "resulted in substantial losses or created a significant risk of substantial losses to other persons."  *Id*.

As discussed in more detail below, third-tier penalties are appropriate against McElhone, LaForte, and Cole.  Their conduct involved fraud, deceit, and deliberate disregard of the securities laws, and resulted in more than $200 million in losses to investors.

### 2.  The Court Should Impose A $50 Million Penalty Against Each of  McElhone and LaForte

The Court should impose third tier penalties in the amount of $50 million against each of McElhone and LaForte.  A third tier penalty for the time period at issue is about $190,000 – multiplied per each time the defendant violated the federal securities laws – or the penalty can be equal to the gross pecuniary gain to the individual defendant as a result of the violation.[9] McElhone and LaForte's conduct supports third-tier penalties because the violations alleged in the Complaint involve fraud and there are substantial losses to investors, as the Receiver has reported, or risk of losses. They engaged in hundreds of separate violations in connection with their investor solicitations, and they orchestrated this multi-year massive fraud, operated Par Funding with Cole in a fraudulent scheme, , controlled Par Funding and its unregistered and fraudulent offerings, and profited handsomely to the tune of at least $100 million.

### a.  McElhone and LaForte's Conduct Was Egregious

As set forth in the Complaint allegations deemed as true for purposes of this Motion, McElhone and LaForte operated a multi-year unregistered securities offering fraud that raised about half a billion dollars from investors. They designed and orchestrated the offering through Agent Funds in order to circumvent securities registration laws, and they raised investor funds by lying to and deceiving investors.  McElhone authorized the false marketing materials for distribution to investors and was in control of the bank accounts that were used to raise investor funds and then siphon the investor funds to herself, to Agent Funds for payment of commissions to solicit investors for Par Funding, and to make the payments to investors of their purported investment returns that included investor funds.  Par Funding executed numerous securities in the form of promissory notes during the course of the fraudulent scheme, some of which McElhone signed.  LaForte utilized a trail of aliases to conceal his identity as a convicted felon from investors, solicited at least 300 investors (at one event alone), made a series of misrepresentations and

---

[9]  The figures are taken from the Federal Civil Penalties Inflation Adjustment Act of 1990, which adjusted the potential penalty amounts to account for inflation based on violation dates.  17 C.F.R. §§201.1001-1005.  *See also* Commission Release Nos. 33-10604, 34-85118.

omissions directly to at least 300 investors, and helped draft the false offering documents. As the Court found when granting the SEC's TRO in July 2020, their conduct was egregious, and the evidence since then has only strengthened that finding.

For example, as alleged in the Complaint, McElhone and LaForte operated Par Funding through a fraudulent scheme and engaged in a course of business to defraud investors. They also transferred at least $100 million to themselves, companies McElhone owned, to purchase assets for themselves, or otherwise for their personal benefit. McElhone approved the Par Funding filings with the SEC that included misrepresentations and omissions about McElhone and Cole's receipt of proceeds as well as LaForte's role in Par Funding. LaForte helped draft the marketing materials and McElhone approved them for distribution to investors. McElhone also hired Abbonizio to lure investors to Par Funding through the unregistered offering, and she was the "boss" of the entire operation. And despite telling investors their funds would be used for the Par Funding MCA loan business, McElhone and LaForte utilized investor funds to purchase properties for their own benefit. As set forth in the Receiver's filings about this issue, when McElhone and LaForte were caught, they lied to the Court about it. Specifically, while an asset freeze was in effect against them, they advised the Court that they were maintaining the status quo with the respect to the properties purchased with investor funds – when in truth, they had transferred at least one property to a third party while that asset freeze was in effect.[10] As set forth in the Complaint allegations, their offering also included marketing to investors that they could invest their IRA retirement funds, thus targeting retirees and/or retirement money. McElhone and LaForte's half-billion dollar offering fraud, unregistered and designed to avoid detection by state regulators, was egregious.

### b. McElhone and LaForte's Scienter

The Complaint alleges that McElhone and LaForte acted with scienter, by knowing or being reckless in not knowing, in connection with every scienter-based fraud claim against them. These allegations are deemed as true for purposes of this Motion, and therefore scienter cannot be litigated on this Motion. Further, as the Court previously found when granting the SEC's TRO Motion, McElhone and LaForte acted with scienter. As the Court found when denying the Defendants' Motion to Dismiss, the Complaint allegations – deemed as true for purposes of this Motion – demonstrate scienter. [ECF No. 583. Courts have defined scienter as a state of mind

---

[10] As a result of this transfer, the Receiver is now litigating a federal case concerning this property and the fraudulent transfer.

embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  Scienter can be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982). The Commission may establish scienter for violations of Sections 17(a) and 10(b) by showing defendants made representations to investors "without basis and in reckless disregard for their truth or falsity." *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 10 (D.D.C. 1998).

As the Court found when denying the Defendants' Motion to Dismiss, the Complaint allegations LaForte and McElhone support a finding that they acted knowingly, or at a minimum recklessly, while making misrepresentations and omissions to investors. LaForte knew or was reckless in not knowing that statements made regarding the underwriting process, insurance offering to all small businesses, and onsite inspections were false.  LaForte oversaw the day-to-day operations of the underwriting department at Par Funding and decided which Loans to fund. Accordingly, he knew or was reckless in not knowing that statements that Par Funding conducted rigorous underwriting and conducted an on-site inspection of the small businesses were false. Similarly, as CEO with control over the Company, McElhone knew or was reckless in not knowing that these representations in the Par Funding brochure were false, and yet she authorized the distribution of the brochure. McElhone authorized the filing of Par Funding's filings with the SEC, falsely reporting that she and Cole would not receive any of the gross proceeds of the offering and that there were no finders' fees.  McElhone, as CEO and as a control person, knew or was reckless in not knowing that McElhone, her companies, and Cole's companies received millions of dollar from Par Funding and that Par Funding had paid so-called finders' fees of at least $3.6 million plus an addition $1 million in payments labeled as "commissions" from July 2015 to February 2020.

### c. The Violations Repeated, and McElhone and LaForte Have Failed to Admit Wrongdoing and Have Not Cooperated

As set forth in the Complaint allegations, the violations occurred for at least 5 years, and involved the solicitation of hundreds of investors through deceit.  McElhone and LaForte have failed to admit any wrongdoing and they have not cooperated. In fact, despite the Court's amended Order appointing the Receiver directing and requiring cooperation with the Receiver, McElhone and LaForte have litigated against the Receiver from the outset of this case, complicated collections efforts by the Receiver, and utterly failed to cooperate. McElhone and LaForte's extensive litigation against every effort by the Receiver to collect and harness funds and assets for

distribution to investors has resulted in extensive costs to the Receivership and thus investors. There has been no cooperation whatsoever with the SEC or the Receiver.

### d. *McElhone and LaForte's Conduct Resulted in Substantial Losses or Risk of Losses*

As set forth in the Complaint, McElhone and LaForte's unregistered and fraudulent offering resulted in the substantial risk of investor losses. Their offering raised more than half a billion dollars from investors, and hundreds of millions of dollars of investor funds remain unpaid. [Exhibit 19].

### e. *There Is No Evidence Supporting a Reduction in Penalty Due to Financial Condition*

There is no evidence in this case of McElhone and LaForte's financial condition that would warrant a reduction in penalty. They produced no sworn accounting despite the Court's Order, and refuse to participate in discovery. As a result, their current financial conditions are unknown and they cannot now present previously withheld evidence.

Imposing penalties of $50 million each against McElhone and LaForte is appropriate in this case. The total against them is $100 million, which is less than the amount of their minimum pecuniary gain – and to be clear, the SEC can only address their minimum gain because these Defendants refused to participate in discovery and therefore the full scope of their gains in unknown. $50 million is also less than the statutory penalty multiplied by the number of violations, since hundreds of investors participated in the unregistered offering fraud McElhone and LaForte orchestrated – making the penalty for the Section 5 violations based on multiplying the violation by the penalty amount in excess of $50 million – for that Count alone. Consider for example the Complaint allegations that at just one event alone, LaForte made misrepresentations to at least 300 investors, hundreds of investors invested in the offering, the brochure and marketing materials were distributed to investors nationwide, and the Par Funding website (offering the investment to a massive audience of potential investors worldwide) included numerous misrepresentations and omissions – namely, about insurance, onsite inspections, LaForte's involvement at Par Funding, the MCA loan default rates, the use of investor proceeds, the success of Par Funding, Par Funding's regulatory history, and the due diligence conducted by Par Funding prior to issuing MCA loans. The penalties are also consistent with a $100 million penalty imposed against the individual defendant, Robert Shapiro, in *SEC v. Woodbridge*, 17-cv-24624 (S.D.Fla.), where Shapiro operated a $1.2 billion fraudulent scheme. Given the scope of the fraud, the duration, scienter,

egregiousness of the violations, and the massive investor losses, $50 million penalties are more than justified in this case.

### 2. The Court Should Impose A $5 Million Penalty Against Cole

A $5 million penalty against Cole is within the range of a third-tier penalty because Cole's pecuniary gain of $14 million far exceeds this amount.

#### a. Cole's Violations Were Egregious

As the Court found in granting the SEC's TRO Motion, Cole's violations as set forth in the Complaint were egregious.  He solicited investors, executed the promissory notes that made the unregistered offering happen, executed the false Par Funding filings with the SEC that concealed his ill-gotten gains and LaForte's role in the complaint, solicited investors, ran the day-to-day operations of Par Funding with LaForte, and as the CFO he knew Par Funding's true financial status but prepared the marketing material that falsely touted a 1% MCA loan default rate.

A $5 million penalty, less than that of McElhone and LaForte but greater than that of Abbonizio and Vagnozzi, is appropriate.  Cole played a significant role in the fraud, albeit a lesser role than LaForte and McElhone. Seeking a higher penalty against Cole than the $400,000 penalties the Court imposed against Vagnozzi and Abbonizio, by their consent, is appropriate because Cole had a more significant and central role in the fraudulent scheme,  and Vagnozzi and Abbonizio offered complete settlements and had less ill-gotten gains than Cole.  Cole's conduct was also more egregious because he prepared the false document distributed to investors claiming that Par Funding's default rate was only 1% when in fact it was at least 10 times that amount and he ran Par Funding's day-to-day operations with LaForte and executed the promissory notes at issue in this case. Further, as CFO Cole knew Par Funding'ss true financial status and yet created the false marketing materials touting Par Funding's success for Abbonizio, Vagnozzi, and others to distribute to potential investors.

#### b. Cole's Scienter

As with McElhone and LaForte, the Complaint explicitly alleges that Cole acted at least severely recklessly, and thus with scienter, as to each of the scienter-based fraud claims against him.  These allegations are deemed admitted for purposes of this Motion, and Cole is precluded by the Judgment to which he consented from arguing otherwise. As the Court found in denying the Defendants' Motion to Dismiss, the Complaint allegations support a scienter finding.  As set forth above, Cole was the CFO and he knew or was reckless in not knowing Par Funding's true

financial status. Nonetheless, he prepared the marketing material that touted the 1% default rate on the Par Funding MCA loans.  During the trial against Furman, Cole admitted under cross examination that the default rate did not reflect the MCA loans at issue in the thousands of lawsuits Par Funding had filed against MCA borrowers for defaulting on their MCA loans. [Exhibit _ (ECF No. 1213-9) at 147:2-151:20].  As alleged in the Complaint, Cole signed the false SEC filing, falsely reporting to the SEC that he and McElhone had not received any proceeds from the offering while concealing the fact that LaForte, a convicted felon, was at the helm of Par Funding. As set forth in the Court's Order denying the Motion to Dismiss and in the SEC's TRO Motion – both of which were based on the Complaint allegations deemed as true for purposes of this Motion, Cole acted with a high level of scienter.

### c.  Cole's Conduct Was Repeated For Years, He Has Not Admitted Wrongdoing, And He Has Not Cooperated

Cole engaged in the securities violations for years. He prepared new false marketing materials touting the 1% default rate every month for years. He ran the day-to-day operations at Par Funding for years. He executed promissory notes for the unregistered offering for years. He solicited at least 300 investors. His conduct was not isolated, but was recurring. Cole has not admitted to any wrongdoing and he has not cooperated. Instead of cooperating, he engaged in the same pattern of litigation against the Receiver to hamper collections efforts despite the Court's amended Order requiring him to cooperate.

### d.  Cole's Conduct Created Substantial Losses or the Risk Thereof

Cole's conduct in the unregistered offerings and the fraudulent scheme in which he engaged with his co-Defendants resulted in at least $200 million of investor losses. [Exhibit 19]. Meanwhile, as alleged in the Complaint, Cole profited to the tune of at least $14 million.

### e.  There Is No Basis for Reducing Cole's Penalty Based on His Financial Condition

During discovery, Cole did not produce any documents and instead responded that the SEC had all responsive documents to requests relating to his funds.  Cole did not provide a sworn accounting despite the Court ordering him to do so.  The SEC therefore has no evidence of Cole's current financial status, and he cannot now present evidence – if any – that he previously withheld when he failed to file a sworn accounting or produce documents.

### F.  The Court Should Order Disgorgement and Prejudgment Interest Against Furman in the Amounts The SEC Seeks

#### 1.  The Court Should Order Furman to Disgorge $1,834,000

The Court should order Furman to disgorge $1,834,000, an amount equal to his ill-gotten gains.  Furman raised about $12.1 million from investors, which Furman funneled through his Agent Fund to Par Funding in exchange for promissory notes. [Exhibit 5, Trial Testimony of Brad Sharp (ECF No. 1213-5) at 63:19-64:1].  Par Funding paid Furman's Agent Fund about $6,4 million under the notes. *Id.* at 64:2-4.  Of this amount, Furman disbursed $4,643,000 to investors as their purported investment returns and to Vagnozzi for administrative services, and retained $1,834,000. [ECF No. 1121-26 (Trial Exhibit Admitted as P-205)].  Accordingly, disgorgement of $1,834,000 is appropriate.  Furman did not file the sworn accounting the Court ordered [ECF No. 1213-12], and the Court should not permit him to introduce any such evidence now, nearly two years after it was due. In response to an interrogatory asking Furman to identify how much money he received, he answered under oath that he did not know. [ECF No. 1213-11 at page 28, Interrogatory 9].  The Court should not permit Furman to come before this Court now with evidence he previously withheld, and should preclude Furman from introducing any evidence concerning his ill-gotten gains because he refused to provide this information when asked during discovery and ordered by the Court to produce a sworn accounting identifying it.

#### 2.  The Court Should Order Furman to Pay Prejudgment Interest of $88,691.74

As set forth above, prejudgment interest is based on the IRS interest rate for unpaid taxes. Applying this rate to Furman's disgorgement figure, prejudgment interest is $88,691.74. [Exhibit 2, Prejudgment Interest Calculation for Furman].

Accordingly, the Court should order Furman to pay $1,834,000, with prejudgment interest of $88,691.74, for a total of $1,922,691.74 in disgorgement and prejudgment interest.

### G.  The Court Should Order Furman to Pay a Penalty of $1,834,000

Furman's conduct warrants a third tier penalty equal to his pecuniary gains of $1,834,000.

#### a.  Furman's Violations Were Egregious

As demonstrated during the trial, Furman's violations were egregious. He targeted elderly investors and marketed investing retirement funds, and he told a series of misrepresentations and omissions to these elderly investors in order to make it happen. ECF No. 1213-8 at 99:5-100:9; ECF No. 1213-5 at 133-146; ECF No. 1213-6 at 103-220; ECF No. 1213-7 at 98-136.  He falsely

and without any basis for doing so told an individual posing as an undercover investor that the New Jersey regulatory action against Par Funding had been rescinded, and that the New Jersey regulators had determined that Par Funding's offering was "good." At trial, the SEC presented the recording of that solicitation together with the testimony of the regulator that Furman's representation was false. The SEC also presented evidence that Furman also held numerous events for potential investors where he made the material misrepresentations and omissions at issue, including Par Funding's management while omitting LaForte's role and background as a convicted felon. During the trial, several elderly investors testified about the lies Furman told them and the omissions Furman made. ECF No. 1213-5 at 133-146; ECF No. 1213-6 at 103-220; ECF No. 1213-7 at 98-136.

The jury found Furman liable for engaging in securities fraud six different ways, under Sections 17(a)(1), (2), and (3) of the Securities Act, and under Rules 10b-5(a), (b), and (c) of the Exchange Act. The jury also found Furman liable for engaging in an unregistered offering under Sections 5(a) and (c) of the Securities Act.

### b. Furman Acted with Scienter and Repeated his Violations for Years

The jury found Furman liable for four securities violations that required a scienter finding. Thus, the jury found that Furman acted with scienter in engaging in the violations. The jury also found that Furman engaged in securities fraud and an unregistered offering, and the evidence presented showing investors' investments showed clearly that Furman's conduct was not isolated in nature, *see, e.g.,* Trial Exhibit 205 (ECF No. 1121-26).

### c. Furman Failed to Admit Wrongdoing

Furman failed to admit wrongdoing and instead presented a defense in this case that the SEC was to blame for his violations. His argument at trial was that he had played by the rules but the SEC had "changed the game." In truth, the rules and laws at issue in this case have been in effect since 1933 and 1934, and Furman is a licensed securities professional who knew or should have known that. During his testimony, Furman cast blame on everyone but himself, evading direct answers about even the most basic of facts. At one point, he even attempted to blame his investors. Furman did not admit to any wrongdoing in this case.

Furman not only failed to accept any accountability for his violations, but also his trial testimony was impeached not only by documentary evidence, but also by audio recordings of

Furman pitching potential investors and testimony from an FBI agent to whom Furman made contradictory statements during a 2020 interview.

### d. Furman's Conduct Created Substantial Losses or the Risk of Substantial Losses

During the first day of trial, Brad Sharp testified that Furman's investors had not yet received their principal or investment returns and that Par Funding still owed Furman's agent fund money on the unregistered offering. [Exhibit 5 (ECF No. 1213-5) at 64:12-17].

### e. Furman Did Not Cooperate With Authorities and There is No Evidence that Furman's Financial Condition Warrants A Lesser Penalty

Furman has not cooperated.  Furman refused to file a sworn accounting despite the Court's Order, citing the Fifth Amendment as the basis for his refusal.  Even after subsequently testifying during his deposition in this case, Furman did not file or otherwise produce a sworn accounting or any documents requested in discovery.  Accordingly, there is no evidence of his financial condition and he cannot now come forward with previously withheld evidence.

Accordingly, the requested penalty is appropriate as is a third-tier penalty.

### H. The Court Should Impose a Permanent Injunction Against Furman

Furman is currently subject to a preliminary injunction. The Court should impose a permanent injunction against him. The jury found Furman liable for 7 violations of the federal securities laws, and the factors for consideration in imposing a permanent injunction are the same as those for imposing a penalty.

In assessing whether there is a reasonable likelihood of future violations warranting a permanent injunction, courts look to the following factors: (1) the egregiousness of defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of a defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of the conduct: and (6) likelihood of opportunities for future violations. *Unique*, 119 F. Supp. 2d at 1340. The first five factors are addressed above.  As for the final factor, past illegal conduct is highly suggestive of the likelihood of future violations. *CFTC v. Matrix Trading Group*, 2002 WL 31936799 at *12 (S.D. Fla. Oct. 3, 2002).

Here, past illegal conduct has been found by a jury.  Furman's conduct was egregious, recurrent over the course of years, and involved a high level of scienter.  Furman has made no assurances against future violations.  Nor has he recognized the wrongful nature of his conduct. He has been in the securities industry for years and makes a living selling investments to investors.

That is his career.  Under these circumstances, a permanent injunction is necessary to deter his future violations.

WHEREFORE, the SEC respectfully requests Final Judgments against McElhone, LaForte, Cole, and Furman, as set forth herein.

May 20, 2022

Respectfully submitted,

<u>s/Amie Riggle Berlin</u>
Amie Riggle Berlin, Esq.
Senior Trial Counsel
Fla. Bar No. 630020
Telephone: (305) 982-6322
Facsimile: (305) 536-4154
E-mail: berlina@sec.gov

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300