**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 20-CV-81205-RAR**

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d/b/a PAR FUNDING, et al.,

        Defendants.

_____/

**RECEIVER'S MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS**
**JOSEPH LAFORTE AND LISA MCELHONE SHOULD NOT BE HELD IN CONTEMPT**
**AND TO LIFT LITIGATION INJUNCTION AGAINST SPECIFIED THIRD PARTIES**

        Ryan K. Stumphauzer, Esq., Court-Appointed Receiver ("Receiver") of the Receivership

Entities, by and through his undersigned counsel, hereby seeks an Order to Show Cause Why

Defendants Joseph LaForte ("LaForte") and Lisa McElhone ("McElhone") should not be held in

contempt of court for diverting funds due and owing to the Receivership Estate[1] using, among

other means, shell corporations, nominee corporate officers, "check cashers," and structured

financial transactions.  If the Court issues a contempt order against LaForte and McElhone, the

Receiver will seek compensatory damages for funds diverted from CBSG and CFS, attorneys' fees

and costs associated with this motion and related recovery lawsuits, as well as a coercive daily fine

until LaForte and McElhone comply with the Court's contempt order.

---

[1]  The Court signed the Order Appointing Receiver on July 27, 2020 [ECF No. 36, "Order
Appointing Receiver"], and it became effective on July 28, 2020, when the Court issued its Order
Granting Emergency *Ex Parte* Motion for Temporary Restraining Order and Other Relief [ECF
No. 42, "TRO Order").  Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG" or
"Par Funding") became a receivership entity at that time.  For purposes of this motion, it is
important to note that Contract Financing Solutions, Inc. ("CFS") was not added to the
Receivership until May 5, 2021 [ECF No. 579].

The Receiver also seeks an order authorizing him to initiate litigation against various individuals and entities that assisted LaForte and McElhone in executing the diversion scheme, or that received proceeds from the diversion scheme, including James LaForte, Jr. (a/k/a "Jimmy LaForte," a/k/a "Jimmy McElhone," a/k/a "Jimmy Schillaci"), Tina LaForte, Sage Choi LaForte, Jamie McElhone, Francis L. Scarpati (a/k/a "Frank Scarpati"), Peter Padovano, Vincent Bardong, Marc Roddini, Justin Scavetti, John R. Mulvihill, III, Alan Redmond, Platinum Rapid Funding Group, Ltd., Financial Mutual, Inc., Total Business Strategies, LLC, Straight Line Source, Inc., BG Sky Trade LLC, Bene Market LLC, Mac Mrktng, LLC (a/k/a Mac Marketing), F and N Consulting, Inc., and Bushwick Beer Garden LLC (a/k/a Bushwick BG LLC).

## I.     Individuals and Business Entities Involved in the Merchant Collection Diversion Scheme

a.  CFS was a merchant cash advance business that operated from the same business addresses as Par Funding, hosted data on Par Funding's G-Suite, and acted as a syndicate for Par Funding.  In other words, Par Funding sold, transferred, or otherwise shared a percentage of its merchant cash advance agreements with CFS. Defendant Joseph Cole often signed merchant cash advance agreements on behalf of CFS, while Defendant Lisa McElhone would countersign on behalf of Par Funding.  As of December 31, 2019, the total amount of funds transferred from Par Funding to CFS was $13,143,014.68, and the total amount CFS repaid to Par Funding was $9,657,088.81.  According to her own personal financial statement, Lisa McElhone, through her trust, The LME 2017 Family Trust, owns CFS.  [ECF No. 560, Ex. 2]. The Receiver explained the *alter ego* relationship between CFS and Par Funding, and attached evidentiary proof of that relationship, in a previous

Motion to Expand [*See* ECF No. 560], which was granted on May 5, 2021 [*See* ECF No. 579].

b.  Platinum Rapid Funding Group, Ltd. ("Platinum Rapid") is a New York business entity purporting to operate as a merchant cash advance company.  After this receivership was established, Platinum Rapid collected at least $1.15 million from at least 86 of CFS' merchants, and transferred approximately $1.8 million to Financial Mutual, Inc., discussed *infra*, between August 2020 and August 2021.

c.  Straight Line Source, Inc. ("Straight Line Source") is a New York business entity that purports to be a premier provider of financial products for small businesses that are unable to receive working capital through conventional lending institutions to finance the continued growth of their business.  Straight Line Source transferred approximately $77,000 to Financial Mutual between February 2021 and January 2022.

d.  Vincent Bardong purports to be the President of Platinum Rapid. [*See* Exh. 2, Bardong LinkedIn Page Excerpt] and, in multiple lawsuits, has been identified as the President of Straight Line Source.  *See, e.g., Brandon Callier v. Straight Line Source, Inc.*, Case No. 20-cv-0282, United States District Court for the Western District of Texas.  Mr. Bardong also pledged his residence in Lackawaxen Township, Pennsylvania to secure Defendant Joseph LaForte's release on bond on federal firearm charges in the matter styed *United States v. Joseph LaForte*, Case No. 20-231-CR, United States District Court for the Eastern District of Pennsylvania.  [See Exh. 1, Court Order].

e. Financial Mutual, Inc. ("Financial Mutual") is a Wyoming corporation that was formed on March 15, 2019, and its registered address is 1712 Pioneer Ave, Cheyenne, WY 82001. That street address is also used by Capital Administrations LLC, the company that incorporated Financial Mutual.

f. Total Business Strategies, LLC was a Wyoming corporation that was formed in May 2008 and dissolved in July 2021. Its registered address was 1712 Pioneer Ave, Cheyenne, WY, 82001. That street address is also used by Wyoming Corporate Services, Inc., the company that incorporated Total Business Strategies, LLC.[2] Wyoming Corporate Services, Inc. utilizes the same email address as Capital Administrations, LLC, the company that incorporated Financial Mutual.

g. Francis Scarpati was the President of Financial Mutual and an authorized signor on Financial Mutual's Bank of America account. Scarpati is an associate of Joseph LaForte, and previously served as the Director of Credit at Fast Advance Funding,

---

[2] Wyoming Corporate Services, Inc. has garnered significant media attention, as has the two-story building where it and Capital Administrations LLC are co-located, 1712 Pioneer Avenue, Cheyenne, Wyoming. Indeed, some news articles have coined Cheyenne, Wyoming "as the Little Cayman Island of the Great Plains" because it is a hub for so-called "shelf" companies. As described in a Reuters article, shelf companies are established years prior, "then left 'on the shelf' to season for years," and then "sold later to owners" who want a company with "years of regulatory filings behind it, lending a greater feeling of solidity." *See Shell Games, a Reuters Investigation, Special Report, a Little House of Secrets on the Great Plains, available at* https://www.reuters.com/article/oukwd-uk-usa-shell-companies-idAFTRE75R22L20110628 (last visited July 28, 2022). Extensive text and email correspondence between Defendant LaForte, an accountant, and other individuals demonstrate that LaForte often used Wyoming to register businesses he controlled, either directly or indirectly. Other companies registered in Wyoming include Eagle Six Consultants, Inc., Kingdom Logistics, LLC, Kingdom Energy Group, LLC, United Communications, LLC, and Millennium Holding Limited LLC.

an affiliate of CBSG and now a receivership entity, and the Director of Underwriting at Fairmount Funding, also an affiliate of Par Funding.[3]

h. Peter Padovano was also an authorized signor for the Financial Mutual bank account at Bank of America. Like Mr. Bardong, Peter Padovano pledged his residence in Staten Island, New York to secure Joseph LaForte's release on bond on federal firearm charges in the matter styed *United States v. Joseph LaForte*, Case No. 20-231-CR, United States District Court for the Eastern District of Pennsylvania. [*See* Exh. 1, Court Order].

i. National Brokers of America, ***Inc.*** ("National Brokers, Inc.") is an Ohio business entity with a principal place of business of 354 Penn Street, Reading, PA, 19602. National Brokers, Inc. purportedly operated a private health insurance center that solicited individuals through direct marketing. On or about September 3, 2019, National Brokers, ***Inc.*** filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania at Case No. 19-15488-pmm. In its bankruptcy filings, National Brokers, ***Inc.*** did not list Par Funding or its affiliates as known or suspected creditors.

j. National Brokers of America, ***LLC*** ("National Brokers, LLC") lacks a known corporate registration, but used the same federal employer identification as National Brokers, ***Inc***. National Brokers, ***LLC*** entered into more than sixty (60) merchant cash advance agreements with Par Funding and accumulated a balance of $35,293,618, making it the second largest "exception portfolio" merchant.

---

[3] In an email dated August 14, 2018, Joe Cole provided Joseph LaForte and Jimmy LaForte with a "New Company Projection" for Fairmount, indicating that this new affiliated MCA company would be deploying "$80M in new capital."

k.  Bene Market, LLC ("Bene Market") is a Delaware business entity organized on
May 25, 2016, that registered to do business in Pennsylvania on August 16, 2019.
Bene Market purportedly operated a private health insurance enrollment center that
solicited individuals through direct marketing.  Bene Market used the same physical
address as National Brokers, *LLC*, and used the same federal employer
identification number as National Brokers, *Inc*.  The U.S. Department of Labor
filed a lawsuit against Bene Market, LLC, National Brokers of America, Inc., Alan
Redmond, and others on August 31, 2020. In that lawsuit, the DOL alleged:

> Defendant National Brokers was engaged in health
> insurance sales . . . until it ceased operations in 2018. At the
> time Defendant National Brokers ceased operations,
> Defendant Bene Market assumed control over all of the
> employees and business operations of Defendant National
> Brokers . . . Defendant Bene Market is a successor in interest
> to Defendant National Brokers, and is liable for the conduct
> of National Brokers both directly as part of a single
> enterprise and as a successor in interest.

See *Dep't of Labor v. Bene Market LLC, et al.*, United States District Court for the
Eastern District of Pennsylvania Case No. 20-cv-04265, ECF No. 1, ¶8. The alter-
ego relationship between National Brokers, *Inc.*; National Brokers, *LLC*; and Bene
Market was previously described in the Receiver's Motion to Lift the Litigation
Injunction to Allow Commencement of Proceedings Against National Brokers of
America, Inc.; National Brokers of America, LLC; Bene Market, LLC and Alan
Redmond.  [ECF No. 584].  Bene Market was also a party to several merchant cash
advance agreements with CBSG, including being designated as a "D/B/A" on
agreements executed by National Brokers, LLC.

l.  Alan Redmond ("Redmond") is an adult individual with a principal business address of 4 S. 4th Street, Reading, PA 19605, and holds himself out as the President, Chief Executive Office and/or owner of National Brokers, Inc. and/or its alter ago, National Brokers, LLC, and of its successor in interest, Bene Market.

m.  Mac Mrktng, LLC (a/k/a Mac Marketing) is a Delaware limited liability company. Jamie McElhone, the sister of Defendant Lisa McElhone and sister-in-law of Defendant Joseph LaForte, was the sole member of Mac Mrktng, and purportedly used the company for marketing and consulting services.

n.  F and N Consulting, Inc. is a New York business entity purportedly doing business at 79 Glenwood Avenue, Staten Island, New York, a property address that is associated with Frank Scarpati.  As explained above, Scarpati is also the President of Financial Mutual and was formerly associated with Fast Advance Funding and Fairmount Funding.

o.  BG Sky Trade, LLC is a Florida entity purportedly doing business at 330 SW 2nd Avenue, Suite 213, Fort Lauderdale Florida, 33312.

p.  John R. Mulvihill, III was the sole manager identified in the Articles of Organization for BG Sky Trade, LLC, and formerly worked for CBSG under Jimmy LaForte.

q.  Bushwick Beer Garden LLC a/k/a Bushwick BG LLC ("Bushwick") is a New York business entity formed in January 2020 that maintained bank accounts at BCB Community Bank.[4]   Vincent Minsquero wrote an undated letter to BCB

---

[4] Bushwick BG LLC filed its Articles of Organization on January 10, 2020, and Bushwick Beer Garden LLC filed its Articles of Organization on January 13, 2020.  Although they are registered as different legal entities, these two related companies used each other's names interchangeably in

Community Bank to remove his name from the bank accounts of Bushwick BG LLC and to give sole signature authority to "James LaForte." [*See* Ex. 3]. Sage LaForte, a relative of defendant LaForte and James LaForte, Jr., also sent an email to BCB Community Bank, attaching a copy of James LaForte, Jr.'s driver's license on May 3, 2021, so that James LaForte, Jr. could assume control of the Bushwick bank account. [*See* Ex. 4]. Bushwick received $715,838 of funds from Financial Mutual. The Receiver has confessed judgment in the amount of $135,308.63 against Bushwick Beer Garden LLC due to its default on a promissory note with Receivership Entity Eagle Six Consultants, Inc. *Stumphauzer v. Bushwick Beer Garden LLC*, No. 210902523 (CCP Phila.).

r.   Vincent Minsquero was the principal and sole member of both Bushwick entities. Like Bardong and Padovano, Minsquero also posted his personal residence on Staten Island to secure Joseph LaForte's release on bond on federal firearm charges in the matter styed *United States v. Joseph LaForte*, Case No. 20-231-CR, United States District Court for the Eastern District of Pennsylvania. [See Exh. 1, Court Order]. Minsquero also received a check for more than $25,000 from Financial Mutual and withdrew $49,800 of cash from Bushwick.

s.   James LaForte, Jr. is the brother of Defendant Joseph LaForte. James LaForte, Jr., together with his brother, Defendant Joseph LaForte, was previously convicted in the State of New York of multiple counts of grand larceny, money laundering and conspiracy in connection with a $14 million real estate scheme. James LaForte, Jr.

---

various business transactions, and each received funds from Financial Mutual as part of the diversion scheme described in this motion.

was also previously convicted in the U.S. District Court for the District of New Jersey for conspiracies to commit loansharking, extortion, and arson.

t.   Tina LaForte and Sage Choi LaForte (a/k/a Sage Boyle Choi), on knowledge and belief, are both relatives of Joseph LaForte and James LaForte, Jr.

u.   Marc Roddini is a resident of Staten Island, New York, and a personal associate of Joseph LaForte.  In addition, he previously brokered MCA deals on behalf of and received commission payments from Recruiting and Marketing Resources Inc., an affiliate of Par Funding and currently included as one of the Receivership Entities. Roddini cashed checks drawn on the account of Financial Mutual.

v.   Justin Scavetti is a resident of Staten Island, New York, and cashed multiple checks drawn on the account of Financial Mutual.  Justin Scavetti also co-signed two notes with Joseph Scavetti,[5] the President of Ticket Guru,[6] evidencing loans from Eagle Six Consultants, Inc. [See Ex. 5].  Those loans were secured by Ticket Guru's assets and a residential property that was jointly owned by Justin Scavetti and Joseph Scavetti. [See Ex. 6].

---

[5] Joseph Scavetti and Anthony Zingarelli, often described as the right hand of Defendant Joseph LaForte, were charged together in Case No. 08-CR-00916(s)(4) in the Eastern District of New York for conspiracy to import marijuana, conspiracy to distribute marijuana, and money laundering, and both eventually pled guilty to conspiracy to distribute.  Joseph Scavetti was also convicted is Case No. 97-CR-00279-ER for conspiracy to distribute methamphetamine and distribution of methamphetamine.

[6] In an October 2017, Anthony Zingarelli wrote an email to a website/design consultant for the purpose of setting up a website and email addresses for Ticket Guru, a purported merchant that owes $254,471 to CBSG and $2,899.501 to Eagle Six Consultants, Inc.  In that email, Zingarelli explained "we opened a new company called Ticket Guru," and that "Joe would like this to happen right away[.].  I copied our new business partner Joe Scavetti on the email."

II.     <u>THE SCHEME TO DIVERT RECEIVERSHIP ASSETS</u>

For the last 22 months, the Collections Department at Par Funding has worked diligently to collect outstanding merchant balances, despite pre-Receivership business conditions and the inevitable merchant intransigence that arose following the appointment of a Receiver.  Similarly, the Receiver and his counsel, together with various consultants and private investigators working on their behalf, have conducted witness interviews, subpoenaed dozens of bank accounts, analyzed text messages and email correspondence, and conducted research using public sources and subscription databases to locate, collect, and recoup assets of the Receivership Entities.  All the while, the Defendants loudly and persistently criticized the Receiver for his purported inability to collect on merchant accounts with due speed or diligence.

Ironically, the Receiver has uncovered substantial evidence that Defendants LaForte and McElhone orchestrated a complex scheme to interfere with the Receiver's collection efforts, to divert merchant collections from CBSG and CFS to other entities LaForte and McElhone controlled, to launder the diverted funds through shell and nominee corporations, and to use the laundered funds for their personal use and benefit, including the payment of their legal and expert witness fees in this case.  The diversion scheme had multiple aspects and variations, but common patterns have emerged.  In one variant of the scheme, unknown individuals contacted dozens of CFS' merchants via telephone and email to explain that their merchant balances had been assigned to Platinum Rapid for collection.  [Ex. 7].  In some instances, an individual purporting to be "T. Lane" or "Terry Lane" (who is believed to be a former Par Funding employee) would legitimize the demand by sending a formal letter on Platinum Rapid's letterhead.  [*Id.*]  They did so without the Receiver's knowledge or permission.  Between July 2020 and July 2021, Platinum Rapid

collected at least $1.15 million from at least 86 of CFS' merchants.[7]   Although some of these collections occurred before CFS was added to the receivership, the Receiver has already established that CFS was an *alter ego* of CBSG, and internal accounting records reflect that CBSG funded many of its MCAs.

In a second variant of the scheme, CFS' merchants submitted payments using wire instructions provided by a person purporting to act on behalf of Platinum Rapid, without realizing the wire instructions were for *Financial Mutual's* account at Bank of America, and not an account of *Platinum Rapid* or *CFS*.  [Ex. 8].  Financial Mutual is not one of the Receivership Entities, nor does the Receiver have access to, or control of, Financial Mutual's bank accounts.  To the contrary, only Francis Scarpati and Peter Padovano, both of whom are Joseph LaForte's personal contacts, had access to that account [See Ex. 9], until they emptied and closed it on March 29, 2022 (approximately four weeks after the Receiver served a subpoena requesting information relating to deposits into Financial Mutual's bank account) [Ex. 10].

After receiving the diverted merchant collections, Financial Mutual, in turn, made substantial payments totaling approximately $3 million to lawyers and accountants that were retained by Joseph LaForte, Lisa McElhone, The LME 2017 Family Trust, and Joseph Cole Barleta to represent them in this litigation.[8]  Financial Mutual also made payments on James LaForte, Jr.'s

---

[7] Several of the financial figures in this motion are subject to change (*i.e.*, to show that additional amounts were diverted from the Receivership Estate), as the Receiver has issued multiple subpoenas to obtain bank account records for parties and individuals believed to be involved in the scheme, including some of the entities named herein.  In the event the Receiver identifies additional amounts that were diverted from the Receivership Estate through this scheme, the Receiver will file a supplement to this motion or a new motion addressing the additional conduct.

[8] The Receiver is not suggesting that any of the attorneys or accountants for LaForte or McElhone necessarily knew or should have known the source of the funds, or that they knew or should have known of the underlying diversion scheme.  To the contrary, it appears the LaForte and McElhone laundered the money through nominee companies, or by having checks cashed by relatives and

credit card, wrote checks to Jamie McElhone's company, Mac Mrktng, and wrote checks to Dayne Property Management Group Inc. (a company that received merchant cash advances from Par Funding, and that Lisa McElhone used to pay property taxes for the residence she owns in Jupiter, Florida, after that property was included within the Receivership Estate).   Finally, Financial Mutual issued countless checks to, or sent wires for the benefit of, James LaForte, Jr., Sage LaForte, Tina LaForte, Justin Scavetti, Peter Padovano, Marc Roddini, and Frank Scarpatti.   Most of these checks were subsequently cashed at various Bank of America branches or check cashing stores, thereby making the proceeds virtually impossible to trace.   [*See* Comp. Exhibit 11].   The checks issued by Financial Mutual typically did not bear an invoice number, purchase order number, product or service description, or any other notation that would be indicative of a legitimate business transaction; instead, the "description" field of the check was often left blank or contained a dubious description such as "baseball cards."

In a third variation of the scheme, Par Funding's "exception portfolio" merchants, including B&T Supplies, Inc.; Lifeguard Office Supplies, Inc.; and Bene Market (the successor in interest of National Brokers of America, **Inc.** *and* **LLC**) made payments directly to Financial Mutual.   In other instances, the "exception portfolio" merchants made payments to BG Sky Trade, which, in turn, made payments to Financial Mutual, the Defendants' attorneys, Straight Line Source, F and N Consulting, Total Business Solutions, and LaForte family members (Sage LaForte, Tina LaForte, and others).   John Mulvihill, who owned BG Sky Trade and controlled its bank account, executed these transactions at the behest and instruction of James LaForte, Jr.   The

---

friends that were loyal to LaForte and McElhone.   The precise purpose of these machinations, it appears, was to conceal their actions from the Court, the Receiver, and possibly even the Defendants' own attorneys and the forensic accounting firms working for them on this case.

charts below summarize payments that were diverted from CBSG's "exception portfolio" merchants to Financial Mutual and BG Sky Trade:

| Payments from B&T Supplies and Lifeguard Office Supplies Diverted from CBSG to BG Sky Trade | |
|---|---|
| Date | Amount |
| 8/3/2020 | $50,000 |
| 8/4/2020 | 150,000 |
| 8/5/2020 | 100,000 |
| 8/6/2020 | 50,000 |
| 8/7/2020 | 150,000 |
| | $500,000 |

| Payments from Bene Market, the Successor in Interest of National Brokers of America, Diverted from CBSG to BG Sky Trade | |
|---|---|
| Date | Amount |
| 8/11/2020 | $100,000 |
| 8/18/2020 | 100,000 |
| 8/25/2020 | 50,000 |
| 8/31/2020 | 50,000 |
| 9/4/2020 | 50,000 |
| 9/11/2020 | 50,000 |
| 9/22/2020 | 50,000 |
| 10/8/2020 | 100,000 |
| 10/19/2020 | 50,000 |
| 10/27/2020 | 85,000 |
| 10/29/2020 | 50,000 |
| 11/5/2020 | 25,000 |
| 11/10/2020 | 50,000 |
| 11/17/2020 | 25,000 |
| 12/7/2020 | 50,000 |
| 12/14/2020 | 50,000 |
| 12/24/2020 | 50,000 |
| 1/4/2021 | 50,000 |
| 1/11/2021 | 50,000 |
| | $1,085,000 |

| Payments from Bene Market, the Successor in Interest of National Brokers of America, Diverted from CBSG to Financial Mutual | |
| --- | --- |
| **Date** | **Amount** |
| 1/15/2021 | $100,000 |
| 1/22/2021 | 59,000 |
| 1/22/2021 | 41,000 |
| 2/1/2021 | 51,000 |
| 2/3/2021 | 49,000 |
| 2/5/2021 | 100,000 |
| 2/16/2021 | 75,000 |
| 2/17/2021 | 75,000 |
| 2/18/2021 | 100,000 |
| 2/26/2021 | 100,000 |
| 3/8/2021 | 50,000 |
| 3/19/2021 | 100,000 |
| 3/25/2021 | 50,000 |
| 3/29/2021 | 50,000 |
| 3/30/2021 | 50,000 |
| 4/5/2021 | 50,000 |
| 5/3/2021 | 200,500 |
| 5/3/2021 | 149,500 |
| 5/18/2021 | 50,000 |
| | **$1,500,000** |

Unlike the CFS merchants described in the preceding paragraph, there is no evidence that Par Funding's "exception portfolio" merchants were deceived by unknown individuals or had been told their accounts were "assigned" to Platinum Rapid. To the contrary, the founder and owner of B&T Supplies and Lifeguard Office Supplies, Tzvi Odzer, provided the Receiver with an expert report in November 2021 for the precise purpose of documenting "side payments" to the LaForte brothers, often in cash, and it explicitly referenced payments to "BG Sky." [See Composite Ex. 12]. This complex web of rerouted payments through nominee-controlled or shell corporations was, by careful and deliberate design, intended to obfuscate the money trail. Consequently, it took the Receiver months to subpoena merchants, subpoena and analyze bank account records, interview witnesses, and research the myriad shell companies and their nominee owners.

14

On June 7, 2021, the Receiver's counsel posed a direct question to the Defendants regarding the diversion of funds from CFS' merchants to Platinum Rapid.  The Defendants' counsel denied any knowledge of the scheme, stating that "our clients do not know the reason the merchants paid Platinum and not CFS." [*See* Composite Ex. 13]. It was only after the Receiver's lengthy and involved investigation that he was able to confirm this was not a truthful response from LaForte and McElhone.

Likewise, Mr. Redmond, who has been engaged in ongoing communications and negotiations with the Receiver's consulting firm, never mentioned that his alter-ego company, Bene Market, was making massive payments to Financial Mutual or BG Sky Trade, all the while proclaiming that he and his companies were insolvent and therefore unable to repay the $35 million owed to the Receivership Estate and, by extension, the victim-investors in this matter.

And Defendant LaForte, during the midst of this diversion scheme, represented to the Court on May 7, 2021:

> The Principal of B&T executed a surety that secures all of the corporate assets of his corporate and personal assets and permits confessions of judgment against B&T and Mr. Odzer individually. *See* Surety Agreement, attached as Exhibit B. *Despite this, the Receiver has failed to exercise the surety and allowed B&T to simply fail to make payments to the Receivership Estate. In doing so, the Receiver has failed in his core function of collecting Par Funding's receivables for the benefits of the investors. Moreover, the lack of collection has apparently allowed B&T to use the money it should have been paying to the Receivership Estate to instead acquire companies. See* Apr 14, 2021 press release re B&T's acquisition of 85-year old New York City uniform company, OK Uniform. Moreover, in November of 2019, B&T entered into a partnership with the National Hockey League's Las Vegas Golden Knights and purchased the naming rights to the Las Vegas Golden Knights' community arena in Henderson, Nevada. *See* November 20, 4, 2019 press release announcing partnership.
>
> If certainly does appear that B&T is collectible. However, after nine months, the Receiver and his highly paid investigative team, is still

> investigating the value of the security interest and has made no
> apparent effort to collect from B&T.

[ECF No. 581, Joseph LaForte's Response to the Receiver's Quarterly Status Report Dated May 3, 2021, and Exhibit 1 thereto, at pp. 9-10] (emphasis added). LaForte's Response did not, however, explain that he and McElhone had diverted $500,000 of collections from B&T Supply and Lifeguard Office Supplies, and nearly $2.6 million from Bene Market, the successor in interest of National Brokers of America. Nor did the Defendants mention that they were using these diverted funds to pay at least $3 million of fees to their lawyers and accountants in this case, and to pay approximately $1.9 million to family members and other nominee "check-cashers," including James LaForte, Jr., Tina LaForte, Sage LaForte, Tina LaForte, Mac Mrktng (Jamie McElhone's company), Frank Scarpati, Peter Padovano, Marc Roddini and Justin Scavetti.

### III. THE COURT HAS THE LEGAL AUTHORITY AND A SOUND FACTUAL BASIS TO ISSUE AN ORDER TO SHOW CAUSE WHY JOSEPH LAFORTE AND LISA MCELHONE SHOULD NOT BE HELD IN CIVIL CONTEMPT

#### a. Legal Standards for Civil Contempt

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990). A party may initiate contempt proceedings by filing a motion requesting the court to issue an order to show cause why a party should not be held in civil contempt. *Newman v. State of Alabama*, 683 F.2d 1312, 1318 (11th Cir. 1982). "If the court finds that the conduct *as alleged* would violate the prior order, it enters an order requiring the defendant to show cause why [the party] should not be held in contempt and conducts a hearing on the matter." *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990) (emphasis added); *Wyatt ex rel. Rawlings v. Rogers*, 92 F.3d 1074, 1078 (11th Cir.1996) (stating that the moving party need only *allege* facts, which if true, would support a contempt finding).

In a civil contempt proceeding, the petitioning party bears the burden of establishing by clear and convincing evidence (1) that the allegedly violated order was lawful and unambiguous; (2) the contempt defendants had notice of the order; and (3) the contempt defendants violated the order. *F.T.C. v. Levin*, 618 F.3d 1221, 1232, 1235 (11th Cir. 2010). "The focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).

After the moving party makes this prima facie showing, "the burden of production shifts to the alleged contemnor to show a 'present inability to comply that goes beyond a mere assertion of inability.'" *PlayNation Play Systems, Inc. v. Velex Corporation*, 939 F.3d 1205, 1212 (11th Cir. 2019) (*citing Khimani*, 892 F.2d at 1516). The moving party bears the ultimate burden of demonstrating that the contempt defendants had the ability to comply with the order. *Levin*, 618 F.3d at 1332.

District courts have broad discretion in fashioning civil contempt sanctions. *Khimani*, 892 F.2d at 1519 (citation omitted). If the court determines that a party is in contempt, the court has the option to impose sanctions for contumacious conduct, including the imposition of a "coercive daily fine, a compensatory fine, attorney's fees and expenses to the Receiver, and coercive incarceration." *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991).

**b.  <u>An Order to Show Cause is Warranted Based on the Facts Presented</u>**

There is sufficient evidence, as documented in this motion and the exhibits hereto, that the conduct, as alleged, constitutes a violation of the Order and the Amended Order.  For the reasons

set forth below, the Court should enter an order for Defendants Joseph LaForte and Lisa McElhone to show cause why they should not be held in contempt.

### c.  **The Court's Orders are Valid and Lawfully Issued.**

First, there can be no dispute that the Order and the Amended Order are valid and lawfully issued.  *See* Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a) (providing jurisdiction over suits in equity); Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (same); 28 U.S.C. § 3103 (setting forth the power of the Court to appoint a receiver in equity).  The "appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief," and "the appointment of a temporary receiver is often a necessary ancillary form of relief in a SEC civil enforcement action for injunctive relief." *SEC v. First Financial Grp. of Texas*, 645 F.2d 429, 438 (5th Cir. 1981).

### IV.  **Two Things Are Emphatically Clear: (1) The Court's Receivership Orders (including the Asset Freeze), and (2) the Defendants' Egregious and Numerous Violations of Them.**

### a.  **The Court's Receivership Orders**

On July 27, 2020, this Court appointed the Receiver and vested him with "full and exclusive power, duty, and authority" to "take custody, control, and possession" of all Receivership property; to "administer and manage" such property, including through the use of third-party vendors; and to "marshal and safeguard all of the assets of the Receivership Entities." (ECF No. 36, the "Order") at 1-2 (emphasis added).  Thereafter, on August 13, 2020, the Court entered an Amended Order Appointing Receiver with broad "asset freeze" language, as follows:

> all persons and entities with direct or indirect control over any Receivership Assets and/or any Recoverable Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Receivership Assets

and/or Recoverable Assets that are on deposit with financial institutions such as banks, brokerage firms and mutual funds.

(ECF No. 141, the "Amended Order", ¶ 3). The Court further advised that anyone with notice of the Amended Order was "restrained and enjoined from directly or indirectly taking any action, or causing any action to be taken . . . which would . . . . [i]nterfere with the Receiver's efforts to take control, possession, or management of any Receivership Property," "hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties," or "[d]issipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property." *Id*. at ¶29(a) to 29(c).

The Amended Order stated further that "the Receivership Entities and all persons receiving notice of this Order," including Defendants LaForte and McElhone, shall not "hinder or interfere with the Receiver's efforts to take control or possession of the Receivership Entities' property interests identified above, or hinder his efforts to preserve them." Amended Order ¶ 9. The term "interference" includes as a meaning "[a]n obstruction or hindrance." *Interference*, Black's Law Dictionary (11th ed. 2019). "Hinder" means "to slow or make difficult; to hamper; to hold back; to impede, delay or prevent." *Id*. No further language prohibiting access to the Receiver's property was necessary to achieve this purpose.

The Court explained it was "tak[ing] *exclusive jurisdiction and possession* of the assets, of whatever kind and wherever situated, of" the Receivership Entities. *Id*. ¶ 1 (emphasis added). The Court further explained that "the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Defendants ('Receivership Assets') and those assets of the Relief Defendant that: (*a*) *are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the*

*Defendants; and/or (c) may otherwise be includable as assets of the estates of the Defendants*

*(collectively, 'Recoverable Assets').*" *Id.* at p. 1 (emphasis added).  The Court therefore issued an

asset freeze over the Receivership Assets and Recoverable Assets, and directed the Receiver to

"take custody, control and possession of all Receivership Property . . .  to sue for and collect,

recover, receive and take into possession from third parties all Receivership Property and records

relevant thereto."  Id. at ¶ 7(b).  The Court reinforced that anyone with notice of the Amended

Order:

> was restrained and enjoined from directly or indirectly taking any action or causing
> any action to be taken, without the express written agreement of the Receiver,
> which would:
> A.   Interfere with the Receiver's efforts to take control, possession, or
>      management of any Receivership Property . . .
> B.   Dissipate or otherwise diminish the value of any Receivership
>      Property; such prohibited actions include but are not limited to,
>      releasing claims or disposing, *transferring*, exchanging, *assigning*
>      or in any way conveying any Receivership Property . . .
> C.   Interfere with or harass the Receiver, or interfere in any manner
>      with the exclusive jurisdiction of this Court over the Receivership
>      Estates . . .

[ECF No. 141, ¶¶ 29A to 29C (emphasis added)].

As set forth in detail below, the Defendants have violated the Court's orders hundreds of

times, if not more, over the course of this receivership.  Consequently, the Receiver is now

compelled, pursuant to the Amended Order, to "promptly notify the Court and SEC counsel of

any failure or apparent failure of any person or entity to comply in any way with the terms of this

Order."  *Id*. at ¶ 31.

Defendants LaForte and McElhone will most certainly argue that they collected CFS'

merchant balances *before* that entity was added to the Receivership Estate, but this argument

should not give the Court any pause.  First and most obviously, CBSG money was used to fund

CFS' merchant cash advances, and the Defendants were well-aware of this fact, as evidenced in

their own accounting records, which reflect a massive balance due from CFS to CBSG. As a result, any funds received from CFS merchants through this diversion scheme should have been paid back to CBSG. Second, once the Amended Order was entered on August 13, 2020, the accounts receivable of CFS (that Defendants LaForte and McElhone diverted) constituted either Receivership Assets or Recoverable Assets. Therefore, LaForte and McElhone violated the Amended Order by (i) diverting these funds, (ii) failing to transfer the diverted funds to the Receiver once CFS was added as a receivership entity, and (iii) failing to provide an accounting of these funds and turn over all records and documentation regarding this diversion scheme to the Receiver. Third, no matter when CFS was added to the receivership, neither LaForte nor McElhone has any possible justification for diverting funds from CBSG merchants, including B&T Supply, Lifeguard Office Supply, or National Brokers, Inc. a/k/a National Brokers, LLC a/k/a Bene Market. These merchants alone owed a total of more than $126 million to Par Funding at the time the Court appointed the Receiver. Fourth, if the Defendants believed their conduct was justifiable, it is inexplicable why they went to such great lengths to conceal it by: (i) setting up Wyoming corporations for the purpose of making it more difficult to ascertain ownership and control, despite no business ties to Wyoming; (ii) collecting CFS debt using the name and letterhead of Platinum Rapid, and the bank account of Financial Mutual, instead of simply depositing money into CFS accounts that were the subject of an asset freeze, but not yet under the Receiver's control; (iii) re-routing some of the money through BG Sky Trade or Bushwick, which had no involvement with these merchant balances; (iv) using straw "check cashers" to make the money untraceable; and (v) advising their attorneys they had no knowledge of the diversion scheme when the Receiver posed specific questions to them about CFS collections activity.

Nonetheless, if Defendants LaForte and McElhone attempt to defend their conduct despite the obvious, the Court should consider their explanations in light of: (i) their pre-Receivership efforts to collect cash from merchants, thereby keeping the money off of CBSG's books and unavailable to investors; (ii) the Defendants' previous data breach, for which they already paid some of the Receiver's fees to avoid a contempt hearing; and (iii) McElhone's transfer of property to Kingdom Logistics (which, in turn, transferred it to another entity, DEF Capital, in quick succession) after the Receivership Order and asset freeze were in place, allegedly based upon a misunderstanding of pre-Receivership contractual obligations.   If LaForte and McElhone's conduct is considered holistically, it is clear they have flouted this Court's Orders, as evidenced by their continuing efforts to "spin" the facts, all the while lining their pockets and paying their lawyers and forensic accountant to defend them in this case, through secret transactions.

### b. LaForte and McElhone Violated the Court's Unambiguous Orders by Diverting Funds that Lawfully Belonged to the Receivership Estate

Finally, there is sufficient evidence that Defendants LaForte and McElhone violated the Order and the Amended Order in at least two discrete ways, including by: (i) taking action or causing any action, without the Receiver's knowledge or permission, to interfere with the Receiver's efforts to recover assets by collecting and diverting the merchant balances of Par Funding and CFS; and (ii) dissipating and diminishing the value of the merchant portfolio of the Receivership Entities by purportedly "assigning" merchant balances to conspirators and third-parties, which, in turn, paid Defendants LaForte and McElhone, their accountants, their lawyers, and other parties LaForte and McElhone designated, including their relatives and credit card companies.

This motion, including the tables in Section II, *infra*, along with the attached exhibits, demonstrate that Defendants LaForte and McElhone:  (i) made, or caused others to make, deceptive

phone calls to CFS' merchants; (ii) sent, or caused to be sent, false and misleading letters to merchants to advise them their account balances had been assigned to Platinum Rapid; (iii) caused dozens of CFS merchants to make payments to Platinum Rapid and Financial Mutual, rather than to Receivership Entities, including Par Funding or CFS; (iv) directed exception portfolio merchants and/or their alter egos, including B&T Supply, Lifeguard Office Supplies, and Bene Market, to send payments to BG Sky Trade and Financial Mutual; (iv) executed, or caused to be executed, hundreds of financial transactions, if not more, over the course of multiple months, through multiple shell corporations controlled by loyal nominee owners, in an attempt to make the funds untraceable; and (v) used "straw" check cashers to convert the proceeds to cash.  LaForte and McElhone blatantly violated the Court's orders with each of these actions and, by doing so, ensured that funds rightfully payable to the victim-investors were instead diverted for their personal use and benefit, as illustrated in the charts below:

| Funds Distributed by Financial Mutual | |
|---|---|
| **Recipient** | **Amount** |
| Defendants' Professional Fees | $2,059,129.95 |
| Bushwick Beer Gardens / Bushwick BG | 715,838.32 |
| Justin Scavetti | 360,000.00 |
| Peter Padovano | 255,299.99 |
| F&N Consulting | 138,663.64 |
| Sage LaForte | 100,146.00 |
| Mac Mrktng | 90,576.80 |
| Dayne Property Management Group Inc. | 40,875.00 |
| Frank Scarpati Investment – Atlas Fund | 25,000.00 |
| Frank Scarpati | 20,000.00 |
| Marc Roddini | 18,150.00 |
| Tina LaForte | 8,000.00 |
| John Mulvihill | 4,100.00 |
| James LaForte | 3,500.00 |
| **Total** | **$3,839,279.70** |

23

| Funds Distributed by BG Sky Trade | |
|---|---|
| **Recipient** | **Amount** |
| Financial Mutual | $656,029.51 |
| Jade Redevelopment[9] | 680,000.00 |
| Defendants' Professional Fees | 479,195.00 |
| James LaForte, Jr. | 330,467.84 |
| F and N Consulting | 235,000.00 |
| Total Business Strategies | 85,000.00 |
| Sage Choi LaForte | 43,950.00 |
| Tina LaForte | 37,000.00 |
| John Mulvihill | 21,010.49 |
| Straight Line Source | 15,000.00 |
| Peter Padovano | 10,000.00 |
| **Total** | **$2,592,652.84** |

| Funds Distributed by Bushwick BG, LLC a/k/a Bushwick Beer Gardens | |
|---|---|
| **Recipient** | **Amount** |
| Dayne Property Management Group Inc.[10] | $1,392,400.00 |

---

[9] Jade Redevelopment LLC ("Jade Redevelopment") is a Philadelphia business entity that appears to be in the business of acquiring and leasing rental units in Philadelphia, Pennsylvania. According to recent court filings in Municipal Court in Philadelphia, Pennsylvania, Jade Redevelopment's business address is 2204 West Erie Avenue, Philadelphia, PA 19140. [Exh. 14.] Joey Rosenberg represents himself to be the Founder of Jade Redevelopment on his LinkedIn profile. [Ex. 15.] Joey Rosenberg is also the president of Rosenberg's Check Cashing, Inc., which operates a check cashing operation out of 2204 West Erie Avenue, Philadelphia, PA 19140, the same address that Jade Redevelopment uses. Justin Scavetti, who received $360,000 from Financial Mutual, cashed several of those checks at Rosenberg's Check Cashing. [Exh. 11, at pp. 2, 3, 5, 8, 11, 12.]

Bank records contained within the Receivership Entities' records reflect that James LaForte, Jr., individually and on behalf of entities he controlled, including Valleybrook Consulting LLC and Ranier and Lloyd Associates LLC, transferred at least $180,000 to Jade Redevelopment prior to the establishment of the receivership. Jade Redevelopment also received at least $680,000 from BG Sky Trade as part of this diversion scheme.

[10] Dayne Property Management Group Inc. received several merchant cash advances from Par Funding prior to the receivership. *After* the receivership, on May 9, 2022, Dayne Property Management Group paid $94,281 to Palm Beach County for the 2021 property taxes due on the $5.8 million waterfront residence of Defendant McElhone at 107 Quayside Drive in Jupiter, Florida. [Exh. 16.] That property is now part of the Receivership Estate, but Defendants LaForte and McElhone remain liable for paying the property taxes pursuant to an agreement with the

| Defendants' Professional Fees | $468,000.00 |
|---|---|
| James LaForte, Jr. | $341,807.78 |
| Justin Scavetti | $212,000.00 |
| F&N Consulting | $120,100.00 |
| Vincent Minsquero | $37,000.00 |
| Sage LaForte | $26,450.00 |
| **Total** | **$2,597,757.78** |

Notably, these tables do not reflect substantial restaurant charges, automobile expenses, rental payments in luxury New York residential buildings, cell phone and cable charges, shopping-related charges, credit card payments, among other seemingly personal expenses that Financial Mutual, BG Sky Trade, and Bushwick paid over this same period of time.

## CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court issue an Order to Show Cause to Defendants Joseph LaForte and Lisa McElhone. LaForte and McElhone, through their misconduct and deception—directed at both the Court and the Receiver—have cost the investors millions of dollars in the form of diverted collections, unnecessary attorneys' fees and costs, in addition to the Court's time and resources. *See Velex*, 939 F.3d at 1215 (upholding award of attorneys' fees to prevailing party in a contempt proceeding because "this Court has long held that no willful or intentional violation of a court order is required for attorneys' fees to be granted as a contempt sanction"); *Watkins*, 943 F.2d at 1304 (noting that the Receiver may seek "attorney's fees and expenses"); *Tom James Co. v. Morgan*, 141 F. App'x 894, 900 (11th Cir. 2005) (stating that the district court has the "inherent power" to award reimbursement for investigative expenses). Indeed, it is Defendants LaForte and McElhone—and not the victim-

---

Receiver. A LinkedIn profile for "Jimmy Schillaci," an alias James LaForte, Jr. often used, represents that he is the "Business Owner" of Dayne Property Management. [Exh. 17.]

investors—who should bear the expense of the fees and costs resulting from their numerous violations of the Court's orders.

The Receiver also requests that the Court issue an order lifting the litigation injunction to allow the Receiver to pursue claims against the following individuals and entities related to their involvement and participation in this diversion scheme: James LaForte, Jr. (a/k/a "Jimmy LaForte," a/k/a "Jimmy McElhone," a/k/a "Jimmy Schillaci"), Tina LaForte, Sage Choi LaForte, Jamie McElhone, Francis L. Scarpati (a/k/a "Frank Scarpati"), Peter Padovano, Vincent Bardong, Alan Redmond, Marc Roddini, Vincent Scavetti, John R. Mulvihill, III, Platinum Rapid Funding Group, Ltd., Financial Mutual, Inc., Straight Line Source, Inc., BG Sky Trade LLC, Bene Market LLC, Mac Mrktng, LLC, F and N Consulting, Inc., and Bushwick BG LLC a/k/a Bushwick Beer Garden LLC.

The Receiver also requests that the Court impose a coercive daily fine until Defendants LaForte and McElhone comply with the Order and the Amended Order by turning over all records and documentation regarding this diversion scheme. *Watkins*, 943 F.2d at 1304 (noting availability of imposing a coercive daily fine for contumacious conduct).

Finally, during the Receiver's meet-and-confer efforts regarding this motion, counsel for Defendants LaForte and McElhone requested that, in the event the Court issues a show cause order, McElhone and LaForte be provided 30 days to file a response. The Receiver does not oppose the Court providing Defendants LaForte and McElhone 30 days to file their response, following the issuance of a show cause order. A proposed Order granting this motion is attached as Exhibit 18.

## CERTIFICATION REGARDING PRE-FILING CONFERENCE

The undersigned counsel has conferred with counsel for Joseph LaForte and Lisa McElhone, and with the SEC, regarding the relief sought through this motion and certifies that: (1) counsel for Defendants Joseph LaForte and Lisa McElhone oppose the Receiver's request for the Court to enter a show cause order, and do not agree that they violated the Court's orders or should be held in contempt, but they do not oppose the Receiver's request to lift the litigation injunction to pursue claims against third parties related to the allegations underlying this motion; and (2) the SEC does not oppose the Receiver's requested relief.

Dated: July 29, 2022                                      Respectfully Submitted,

**STUMPHAUZER FOSLID**
**SLOMAN ROSS & KOLAYA, PLLC**
Two South Biscayne Blvd., Suite 1600
Miami, FL 33131
Telephone: (305) 614-1400
Facsimile: (305) 614-1425

By: */s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA
Florida Bar No. 056140
tkolaya@sfslaw.com

*Co-Counsel for Receiver*

**PIETRAGALLO GORDON ALFANO**
**BOSICK & RASPANTI, LLP**
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

By: */s/ Gaetan J. Alfano*
GAETAN J. ALFANO
Pennsylvania Bar No. 32971
*(Admitted Pro Hac Vice)*
GJA@Pietragallo.com

*Co-Counsel for Receiver*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 29, 2022, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA
