**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 20-CV-81205-RAR**

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff, v.**

**COMPLETE BUSINESS SOLUTIONS GROUP,**
**INC. d/b/a/ PAR FUNDING, et al.,**

      **Defendants.**
_____/

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S AMENDED OMNIBUS**
**<u>REPLY IN SUPPORT OF ITS MOTION FOR MONETARY REMEDIES</u>**

Amie Riggle Berlin
**ATTORNEY FOR PLAINTIFF SECURITIES**
**AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154
berlina@sec.gov

# I.  <u>INTRODUCTION</u>

Defendants Lisa McElhone, Joseph LaForte, and Joseph Cole Barleta ("Cole") filed a response to the Securities and Exchange Commission's Motion for Monetary Remedies ("Motion"), denying their underlying conduct and the consequences that arose from it and focusing instead on collections, distributions, and matters concerning their merchant cash advance business that are not before this Court.

There is but one issue before the Court with respect to McElhone, LaForte, and Cole: the amount of disgorgement, prejudgment interest, and civil money penalties to be awarded against each of them with the allegations of the Complaint deemed as true for purposes of the Commission's Motion.  McElhone, LaForte, and Cole's continued lack of contrition for their actions underscores the need for the Commission's requested penalty relief against each of them. Their argument that the Commission failed to present a reasonable approximation of ill-gotten gains from the unregistered and fraudulent securities offering ignores the evidence, mischaracterizes the Commission's arguments, and misconstrues the law. Contrary to the Defendants' hollow assertions, the Commission's disgorgement calculation is not based on investor losses and *does* deduct the majority of expenditures McElhone and LaForte now argue the Commission failed to deduct.  While McElhone and LaForte argue for even more deductions, they utterly fail to present evidence sufficient to meet their burden. Similarly, their arguments for a lower penalty amount not only ignore the Complaint allegations but impermissibly challenge them in violation of the Consent Judgments, rely on an incorrect understanding of the "risk of loss" analysis, and improperly request a lower penalty figure based on a survey of random case law in one Circuit together with various math formulas and percentages that have no basis in the law.

As for Michael Furman, he presents no credible evidence to meet his burden on disgorgement, his arguments are based on incorrect facts, and there is no merit to or credible evidence supporting his conclusory assertions that the Court should impose no penalty against him.

For the reasons set forth below, the Court should grant the relief the Commission seeks.

# II.  **THE COURT SHOULD ENTER RELIEF AGAINST MCELHONE AND LAFORTE IN THE AMOUNTS THE SEC SEEKS**

## A.  **The Commission Has Met Its Burden of Presenting A Reasonable Approximation of the Disgorgement Figure As To McElhone And LaForte**

Disgorgement is an equitable remedy intended to prevent unjust enrichment. *Commodity Futures Trading Comm'n v. Sidoti,* 178 F.3d 1132, 1138 (11th Cir.1999). To be entitled

to disgorgement, the Commissions needs only to produce a reasonable approximation of the defendant's ill-gotten gains. *See S.E.C. v. Calvo,* 378 F.3d 1211, 1217 (11th Cir. 2004) ("Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." (quotations marks and alterations omitted)). Once the Commission presents its estimate, the burden shifts to the defendant to demonstrate that the Commission did not show that its estimate was a **reasonable approximation**. *Id.*

The Commission provided a disgorgement calculation for McElhone and LaForte by identifying the amount raised in the unregistered and fraudulent securities offering scheme at issue in this case and then deducting from that amount the following payments and expenditures:

- Amounts paid to investors directly;

- Amounts paid to so-called "Agent Funds," including among dozens of others, co-Defendants/Agent Fund Managers Michael Furman, Dean Vagnozzi, and John Gissas;[1]

- Amounts paid to co-Defendant Perry Abbonizio for his role in the offering fraud, which amounts are already the subject of a disgorgement order against Abbonizio; and[2]

- Amounts paid to Cole in connection with the unregistered offering fraud, which amounts are the subject of the disgorgement order the Commission seeks against Cole.[3]

This is a reasonable approximation of the profits related to the violative conduct alleged in the Complaint. As set forth in the Commission's Motion, (i) it is not possible to identify additional expenses, let alone legitimate expenses, of the unregistered offering fraud because McElhone and LaForte commingled the offering-related funds with those of their merchant cash advance business; (ii) McElhone and LaForte refused to participate in discovery or to provide the Court-ordered sworn accountings and utilized a series of pass-through entities through which they transferred money to themselves;[4] and (iii) the Defendants used funds raised from investors in the unregistered offering fraud to pay other investors, and thus some expenditures in the offering are

---

[1] This includes Defendants Vagnozzi, Furman, and Gissas, among dozens of others.

[2] The Court has ordered Abbonizio to disgorge these funds

[3] The Commission seeks this amount directly from Cole as his disgorgement

[4] These transfers have been the subject of numerous motion by the Receiver, including the most recent Motion for Order to Show Cause against McElhone and LaForte for siphoning receivership funds in violation of the Court's asset freeze order and receivership order to finance their litigation team in this case.

actually not, as Defendants told investors, investment returns.

Notably, McElhone and Laforte fail to establish a single legitimate business expense that the Commission purportedly failed to deduct.  Instead, McElhone and LaForte argue that the Commission (1) unreasonably relies on the Receiver's declaration of the amounts raised from investors and the expenditures made in the unregistered offering, and (2) fails to deduct (a) legitimate business expenses of their merchant cash advance business, (b) "other avenues of recovery that will be used to make noteholders whole," and (c) "other equitable deductions which should be accepted by the Court."[5]  These arguments are meritless.

### 1. McElhone and LaForte Fail To Meet Their Burden For Demonstrating That The Commission Was Clearly Unreasonable For Relying on the Defendants' Own Quickbooks Records Rather Than an Unverified Report By Brad Sharp

McElhone and LaForte argue that the Commission's reliance on the Receiver's sworn declaration reciting amounts in the Defendants' own Quicbooks records is unreasonable because Brad Sharp filed a report reflecting numbers that are $3.8 million less than those stated in the sworn declaration. [ECF No. 1329 at pp. 14-15].  This argument fails, for several reasons.

As a starting point, it is important to understand that the Receiver's sworn declaration and Sharp's report are *based on two different things*.

As the Receiver states in the declaration, the figures provided therein are based on the *Defendants' Quickbooks and financial records*, which reflect that Par Funding raised $550,325,596 from investors and paid $300,108,117 to investors and Agent Funds. These same Quickbooks and financial records were analyzed by LaForte's expert witness and the Commission's expert witness during discovery.  The Commission's expert witness, accountant Melissa Davis, issued an expert report in August 2021 that provided the same figures and conclusions the Receiver summarizes in his declaration and states the records were reconciled [ECF No. 774-1, Davis Report, at ¶¶ 23 & 30]. The Defendants have presented no evidence or argument that these figures are an inaccurate representation of what the Defendants' own Quickbooks records reflect.

Instead, McElhone and LaForte rely solely on Sharp's unsworn analysis which states Par Funding raised less and paid out more than Par Funding's Quickbooks records show – specifically, Sharp's report states Par Funding raised $548.8 Million from investors and paid $302.4 million to

---

[5] ECF No. at pdf p 15.

3

investors and Agent Funds. Sharp's analysis has not been reviewed by any accountant or verified in any manner, the figures are not consistent with those of Davis or LaForte's expert witness Joel Glick, the figures do not reflect what is shown in the Quickbooks records, and the Defendants present no evidence whatsoever as to why Sharp's analysis is right and the figures reflected in the Quickbooks financial records (as summarized in the Receiver's declaration and Davis report) are wrong.[6]  Nor do the McElhone and LaForte present any evidence – let alone a clear showing – that the Commission was unreasonable for relying on the Receiver's summary of what the Quickbooks and financial records show and which figures the Commission's own expert witness also found. The only thing the Defendants present is a statement by one of the Receiver's lawyers during a hearing where that lawyer, who is not an accountant, stating his belief that the Sharp analysis is more thorough.  And nothing more. This is not sufficient to meet the Defendants' burden.

To prove that the Commission's calculation is not a reasonable approximation, the Defendants are required to clearly demonstrate that, and any risk of uncertainty falls on the Defendants. *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) ("Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.").  A lawyer's comment during a hearing that he believes the Sharp analysis is more thorough is not a clear demonstration that the Commission's reasonable approximation is unreasonable. *Id.  See also SEC v. The Owings Group, LLC*, 2021 WL 1909606, at *4 (D. Md. May 12, 2021) (unsworn and conclusory exhibit does not overcome the SEC's showing and "any doubts are to be resolved against the defrauding party").

The difference between the figures shown in the financial records (and stated in the Receiver's report and Davis expert witness report) and those in the Sharp analysis is about $3.8 million. There is a risk of uncertainty as to whether Sharp is right or the Defendants' financial records (summarized in the Receiver's declaration and Davis's report) are right. This risk of uncertainty must be resolved against McElhone and LaForte as a matter of law.  *Id.*  As set forth in the Motion, the Defendants commingled investor funds with merchant cash advance funds, and the bank records reflect transactions with thousands of borrowers, investors, and other unrelated entities.  Auditing Sharp's report or hiring accountants to analyze it to determine if Sharp is right

---

[6] LaForte and McElhone previously filed the expert report of David Dunkelberger [ECF No. 1298-17], which was stricken.  We note only that even if that report had not been stricken, Dunkelberger did not opine on the Sharp figures.

and the Defendants' financial records are wrong would be an inordinate expense that even the Defendants failed to undertake. Under these circumstances, the Court should order disgorgement based on the Defendants' own Quickbooks and financial records that all parties have utilized throughout this case. *Calvo*, 378 F.3d at 1218 ("[W]here a defendant's record-keeping or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense, it is well within the district court's discretion to rule that the amount of disgorgement will be the more readily measurable proceeds received from the unlawful transactions.").

Accordingly, the Defendants fail to meet their burden for clearly demonstrating that the Commission's disgorgement figure is unreasonable due to reliance on the Defendants' own financial records and Receiver's summary thereof, which figures are identical to those found by the Commission's expert witness and were not challenged in the rebuttal report issued by LaForte's expert witness Joel Glick.

### 2.   McElhone and LaForte's Argument That The Commission Failed To Deduct Disgorgement Amounts of Other Defendants Is Wrong

McElhone and LaForte argue that "the SEC contends that the Defendants are not entitled to an offset for the disgorgement sought or obtained from Furman, Gissas and Vagnozzi – which totals approximately $7,405,248." [ECF No. 1329 at pp. 14].  This is incorrect.

McElhone and LaForte's argument is that "the disgorgement awards obtained from these three Defendants [Furman, Gissas, and Vagnozzi] will be used to repay noteholders and will therefore reduce the balance of the amount raised from noteholders versus the amount repaid." [ECF No. 1329 at 14-15].  This is not the proper inquiry.  A disgorgement calculation is not based on investor losses, but on each party's ill-gotten gains.

As clearly set forth in the SEC's Motion, the Commission's disgorgement calculation for McElhone and LaForte includes a deduction of about $300 million, which includes among other things, the amount Par Funding paid to <u>all Agent Funds</u>.[7]  The Receiver's declaration cited by the Commission also explicitly states that this $300 million figure include payments to "all Agent

---

[7] Motion, ECF No. 1252 at pdf p 30 ("The Court should order McElhone and LaForte jointly and severally liable for disgorgement of $226,471,877, representing the amount Par Funding raised from investors ($550,325,596) *minus the amounts Par Funding paid in principal or interest payments to investors and Agent Funds* ($300,108,117)) (emphasis added).

Funds."[8]  As set forth in the Complaint, Gissas, Furman, and Vagnozzi are Agent Fund managers and received money from Par Funding through their Agent Funds [ECF No. 119 at ¶¶ 6-7].  The Motion explicitly states that the $300 million the Commission deducted includes all payments by Par Funding "*to **all** Agent Funds, **including but not limited to** Defendants Dean Vagnozzi, John Gissas, and Michael Furman*."[9]  Thus, the Defendants' argument that the Commission did not deduct the amounts Par Funding paid to Vagnozzi, Gissas, and Furman is simply wrong.

For this same reason, McElhone and LaForte's argument that the Commission did not deduct Par Funding's payments to A.G. Morgan fails [ECF No. 1329 at 16].  They claim that $6,950,000 should be deducted from their disgorgement figure because in a separate case recently filed against Agent Fund A.G. Morgan, the Commission alleges that Par Funding paid $6,950,000 to that Agent Fund [ECF No. 1329 at 16].  As McElhone and LaForte acknowledge in their Response and as the Complaint they cite makes clear, A.G. Morgan is an Agent Fund.  As  the Commission's Motion and Receiver's Declaration clearly state, the $300 million the Commission deducted in its disgorgement calculation includes payments from Par Funding to ***all*** Agent Funds. This includes A.G. Morgan.  Thus, the disgorgement sought against McElhone and LaForte does not include any payment by Par Funding to the Gissas, Furman, or Vagnozzi Agent Funds, the A.G. Morgan Agent Fund, or to *any* of the dozens of other Agent Funds.

Accordingly, McElhone and LaForte's second argument fails.

### 3.  McElhone and LaForte's Argument That The Commission Failed to Reasonably Approximate Disgorgement Because Investors Were Supposedly Profit Participants Fails

McElhone and LaForte next argue that the Commission's disgorgement approximation is unreasonable because it includes funds raised from investors who were also profit participants [ECF No. 1329 at 16-17].  The crux of McElhone and LaForte's argument is that the Commission's approximation is unreasonable because any investors who were also profit participants should not, according to McElhone and LaForte's view, be permitted to make claims during the claims and distribution phase of this case.[10] *Id.*  As an initial matter, McElhone and LaForte's focus on investor

---

[8] Receiver's Declaration, ECF No. 1214-1 at Exhibit 19 thereto, ¶ 7 ("[T]he company repaid to investors, including the "Agent Funds" a total of $300,108,117. These amounts include interest payments and the return of principal.") (emphasis added).

[9] ECF No. 1252 at pdf p30 n3.

[10] The investor claims process is separate.  Investors make claims, the Receiver reviews them and then files a Motion concerning those claims. If and when the investors make a claim, the Receiver

losses and claims is wrong. The issue before the Court is disgorgement, which is based not on investor losses or claims, but on the Defendants' ill-gotten gains resulting from the securities law violations at issue in this case.  In fact, disgorgement can be ordered in an amount that is different from, or even exceeds the victims' losses. *See Kansas v. Nebraska*, 574 U.S. 445, 463 (2015) (ordering disgorgement that exceeded the victim's "actual damages"); *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) ("[A] disgorgement order might be for an amount more or less than that required to make the victims whole."); *See, e.g., SEC v. Laura*, No. 18-CV-5075 (NGG) (VMS), 2020 WL 8772252, at *4 (E.D.N.Y. Dec. 30, 2020) (rejecting argument that, under *Liu¸* the Commission's power to seek disgorgement is exactly coterminous with an individual injured investor's claim; the Commission's disgorgement claims are not limited to what the harmed investors could recover).

Disgorgement is sought based on McElhone and LaForte's violations of the securities laws through a fraudulent offering scheme involving the unregistered offer and sale of Par Funding promissory notes. The investors at issue were offered and sold *promissory notes* in the unregistered offering at issue in this case.  McElhone and LaForte do not dispute and in fact *attach* these very promissory notes as exhibits to their Response. Thus, the funds raised by Par Funding through the unregistered offer and sale of these notes are directly at issue and must be included in the disgorgement calculation.

As for McElhone and LaForte's arguments about the balance of principal and interest owed to these investors, that is not the issue before the Court. The Commission's disgorgement calculation does not consider the balance owed on promissory notes.  In fact, the interest promised to investors and owed on the notes does not factor into and is not included in the Commission's calculation.  Disgorgement is not a calculation of what investors are owed or what the investors were promised in future interest payments. Disgorgement is instead, again, the Defendants' *gains*. And that is precisely what the Commission has presented to this Court.

As for the argument that these investors are wealthy and sophisticated, even if the Defendants had clearly demonstrated those facts – and they offer no evidence whatsoever – it is irrelevant to any disgorgement calculation. There is not a special deduction where Defendants get

---

will review it and it will be handled by the Court during the claims review and distribution phase of this case. Right now, we are at the remedies phase against the Defendants and the issue concerning disgorgement is the calculation of Defendants' ill-gotten gains.

to keep ill-gotten gains if their victims are wealthy and sophisticated.  And as with all of their other arguments, the Defendants cite zero legal support for this argument.

As such, McElhone and LaForte fail to meet their burden of clearly demonstrating the Commission's disgorgement figure is not a reasonable approximation because it includes money raised from investors in connection with the unregistered offer and sale of the notes at issue in this case who are sophisticated, wealthy, or had consulting/profit-sharing agreements on the side.[11]

### 4.  McElhone and LaForte Fail To Meet Their Burden With Respect to the Supposed Consulting Fee Deductions They Seek

McElhone and LaForte seek an additional $8,620,102.26 in deductions for payments they supposedly made to "consultants." [ECF No. 1329 at 18-19].  They argue that if the Commission deducted amounts of disgorgement sought against co-Defendants Abbonizio and Cole, who happened to have consulting agreements, then the Commission was required to also deduct payments to *anyone* who had a consulting agreement with Par Funding.

Contrary to McElhone and LaForte's argument, the mere existence of a consulting agreement is not the basis of any disgorgement award, deduction, or cause of action in this case. Disgorgement is calculated based on Defendants' ill-gotten gains due to their violations of the federal securities laws.  As set forth in the Complaint, Par Funding paid Abbonizio and Cole; thus Abbonizio and Cole's ill-gotten gains came from the same monies at issue in the McElhone and LaForte disgorgement amount. As set forth in the Motion, the disgorgement amounts sought against Abbonizio and Cole are deducted from the amount sought against McElhone and LaForte in order to avoid double-counting and double recovery.

Further, of the 24 people and entities McElhone and LaForte claim are consultants, 15 are in truth Agent Funds or investors.  As set forth in the Motion, Par Funding's payments to all Agent Funds and individual investors have already been deducted in the Commission's disgorgement calculation. For the remaining 9 individuals McElhone and LaForte identify as consultants, McElhone and LaForte provide no evidence of what if any services were provided, whether those services were legitimate and provided in connection with the investment, why these purported

---

[11] Not only are claims and distribution issues not before the Court, but also the Defendants have no standing and no role in that process.  The fact that McElhone and LaForte believe they are entitled to decide which victims are made whole and which of their victims are not made whole reflects their utter lack of contrition for the seven violations of the federal securities laws to which they have consented.

consultants were paid, or any evidence whatsoever demonstrating that these were legitimate business expenses. Instead, McElhone and LaForte offer nothing more than a list, financial records showing that payments were made, and argument. This is not sufficient evidence upon which the Court can reduce the disgorgement amount. *See United States Commodity Futures Trading Comm'n v. Tayeh*, 848 F. App'x 827, 830 (11th Cir. 2021) (affirming disgorgement order and imposing plaintiff's reasonable approximation of ill-gotten gains when defendant failed to provide "concrete and credible evidence" to demonstrate the business expenses were legitimate).  As for McElhone and LaForte's assertion that these consultants in fact raised money from investors to fuel the unregistered offering alleged in the Complaint, even if that is true (and no clear evidence was presented to demonstrate this), as a matter of law these are not permissible deductions. *Liu*, 140 S. Ct. at 1950 (deductions are appropriate for "legitimate expenses" that "have value independent of fueling a fraudulent scheme").

Accordingly, McElhone and LaForte fail to meet their burden of clearly demonstrating that payments to these 8 individuals and entities are legitimate business expenses let alone that they should be `deducted.[12]

### 5. McElhone and LaForte Fail To Meet Their Burden With Respect to the Supposed "Legitimate Expense" Deductions They Seek

#### a. McElhone and LaForte Misconstrue the Disgorgement Analysis

As an initial matter, McElhone and LaForte argue that "[t]he Defendants in this case ran a profitable business that generated significant returns for noteholders. In doing so, they incurred legitimate expenses that must be accounted for in any equitable disgorgement award *based on Par's revenues*." [ECF No. 1329 at p. 20 (emphasis added)].  However, the Commission is not seeking disgorgement equal to the revenues from Par Funding's merchant cash advance business. Instead, the Commission is seeking disgorgement based on the unjust enrichment related to the

---

[12] In support of their argument, McElhone and LaForte cite *Sec. & Exch. Comm'n v. Almagarby*, No. 17-62255 (S.D. Fla. ).  This is a case where the Court granted the Commission's motion for disgorgement.  While the Defendants describe the ruling as deducting fees paid to "finders," that case did not involve an offering fraud or unregistered offering where "finders" (as used in the Complaint here) solicited investors. Instead, that case involved claims against individuals for acting as unregistered dealers in connection with stock trading.  The Commission's motion sought to deduct certain expenses, including those paid to finders who located stock issuers. In the instant case, the Commission has presented a calculation consistent with the calculation we presented in *Almagarby*, where we are asking for certain expenditures in the form of payments to Agent Funds to be deducted.

alleged unregistered and fraudulent securities offering scheme through which McElhone and LaForte violated eight provisions of the federal securities laws [ECF No. 119, Counts I-VIII].

### b. McElhone and LaForte's Arguments That They Are Entitled to Deduct "Legitimate Business Expenses" Fail

#### (i) Because All of the Promissory Note Offerings Alleged in the Complaint Were Unlawful, All Profits of that Offering Are Subject to Disgorgement

The Complaint alleges that the McElhone and LaForte, directly and through their company Par Funding, violated the federal securities laws by participating in the unregistered offer and sale of promissory notes, making material misrepresentations and omissions in connection with those securities offerings, participating in a fraudulent course of business, and engaging in a fraudulent scheme in connection with that offering (Counts I-VIII). Because all of these unregistered promissory note offerings described in the Complaint were unlawful, all of the profits of those offerings are subject to disgorgement. *SEC v. Voight*, 2021 WL 5181062, at *10 (S.D. TX June 28, 2021) (finding that no legitimate expenses should be deducted from the disgorgement figure: "Because all of the promissory note offerings described in the Complaint were unlawful, all of the profits of those offerings are subject to disgorgement.") (citing *Liu*, 140 S. Ct. at 1950 (recognizing that deductions of expenses are not required "when the 'entire profit of a business or undertaking' results from the wrongdoing")); *Faulkner*, 2021 WL 75551, at *7 ("[B]ecause *all* of the securities that Hallam sold were in violation of the securities laws, the court finds that all of the compensation Hallam received for his role in the sale of these securities is subject to disgorgement."); *SEC v. Penn*, Case No. 14-CV-581 (VEC), 2021 WL 1226978, at *11 n.21 (S.D.N.Y. Mar. 31 2021) ("The analogy between this case and Liu does not fit neatly .... Because the entire relationship between Ssecurion and the Fund was fraudulent, there are no legitimate expenses at issue, even if the stolen funds were commingled with funds that were then used to pay legitimate expenses.").

*Liu* recognizes an exception to the requirement that legitimate expenses must be deducted, namely where the "entire profit of a business or undertaking" results from wrongful activity. *Liu*, 140 S. Ct. at 1945 (internal citation omitted). Although the Supreme Court does not define what constitutes an "undertaking" in this context, the unregistered offering fraud scheme alleged in the Complaint must fit into that category. *See Penn*, 2021 WL 1226978, at *11 (finding that the alleged securities scheme met the "undertaking" category identified in *Liu*). Money is fungible, so any portion of the funds obtained through the alleged scheme in this case that were subsequently spent on allegedly legitimate expenses are "merely wrongful gains under another name." *Liu*, 1140

S.Ct. at 1950.  It is undisputed that the investor funds raised through the scheme were commingled with the merchant cash advance business funds, which further warrants a finding that there were no legitimate business expenses. *Penn*, 2021 WL 1226978, at *11 (finding that there were no legitimate business expenses to deduct because the expenses were paid using commingled funds that contained the proceeds of the securities law scheme violation alleged in the Complaint).

Thus, no legitimate business expenses should be deducted in this case.

### (ii) Defendants' Use of Investor Funds to Pay Investors Their Purported Investment Returns Is A Further Reason Why Legitimate Business Expenses Are Not Deducted

The Commission has also presented a second reason why no legitimate business expenses should be deducted – namely, the Defendants paid investors using other investor funds and thus operated a second type of scheme in addition to the scheme alleged in the Complaint that is the subject of the fraudulent scheme Count therein.  In response, McElhone and LaForte argue that they did not use investor funds to pay other investors because they: (1) never missed payments to investors; (2) made "very substantial profits" from the merchant cash advance business; and (3) invested in real estate and "other valuable investments."[13] [ECF No. 1329 at 20].  McElhone and LaForte cite no case law to support their theory that these three facts – even if true – are relevant to whether investor funds were used to pay other investors their supposed investor returns or to whether they funded Par Funding's loans using proceeds from this type of scheme.  Nor can they.

> [T]he existence of an operating business does not negate [Defendant]'s fraudulent conduct. While the typical Ponzi scheme involves earlier investors receiving their returns from the funds of later investors, often with no underlying business, the facts of this case still sound in fraud. 'The likelihood that [the defendant] conducted some legitimate business operations does not counteract the existence of a Ponzi scheme because the distributions made to investors were nevertheless funded by other investors' money.' In addition, commingling funds 'is a common characteristic of a Ponzi scheme.'

---

[13] The Defendants' reference here to investing in real estate and other valuable investments is not discussed in the Response beyond this sentence, there is no evidence or discussion provided, and therefore the Commission cannot respond to this prong of their argument.  If they are arguing that they used investor funds to buy real estate and other items, the relevance of that is unclear other than an admission their representations to investors about the use of funds (loaning the money to borrowers) was false on yet another ground.  Rather than speculate, the Commission merely notes that because this is not explained or supported, replying is neither possible nor necessary.

*SEC v. Quiros*, Case No. 16-cv-21301, 2016 WL 11578637 at *13 (S.D. Fla. Nov. 21 2016) (finding a Ponzi scheme; quoting *SEC v. Helms*, Case No. 13-1036, 2015 WL 1040443, at *8 (W.D. Tex. Mar. 10, 2015)). Thus, whether the Defendants conducted some legitimate business operations through their merchant cash advance business does not counteract the fact investor funds were used to pay investors.

Additionally, McElhone and LaForte's argument that Par Funding generated "very substantial profits" ignores the sworn testimony of Par Funding's CFO Cole in this case to the contrary. Cole testified that Par Funding had three sources of revenue: (1) investor funds; (2) merchant cash advance payments from borrowers; and (3) "joint funding partners." [ECF No. 1213-4 at 201:5-202:17]. Cole testified that Par Funding's revenue from joint funding partners totaled only about $5 million. *Id.* 202:18-203:8. As for the revenue from the merchant cash advance loans, Cole testified that there was none; Par Funding only received back from borrowers an amount that was about **_equal_** to the amount Par Funding loaned out to borrowers:

```
 8      Q.   So approximately during the lifetime of
 9   Par Funding -- I'm sorry -- Complete Business
10   Solutions Group, approximately how much money did it
11   fund in the merchant cash advance agreements?
12      A.   You're talking about gross cash provided
13   to third-party merchants as part of these MCA deals?
14      Q.   Yes.
15      A.   The approximate amount is $1.3 billion
16   from the beginning of 2013 through July of 2020.
```

[Cole Testimony, ECF No. 1213-4 at 95:8-16].

```
18      Q.   So I'm asking about how much in actual
19   cash, not receivables or anticipated money that
20   might come in, but how much did the merchants
21   actually pay back to Complete Business Solutions
22   Group during that same timeframe of 2013 through
23   July 2020?
24      A.   It was close to the amount funded out.  It
25   was approximately also 1.3 billion.
```

*Id.* at 97:18-25.[14]

Thus, Par Funding's merchant cash advance loans broke even before expenses were deducted, joint funding partners generated $5 million in revenue, and the only other source of revenue was investor funds.

- This begs the question: If Par Funding's merchant cash advance business operated as a ***break-even*** (at best, since this is before Par Funding paid expenses) and the joint funding partners generated revenue of only ***$5 million***, what sources of revenue did Par Funding use to pay investors $300 million in purported investment returns?

  o As Cole testified, there was only ***one other source of revenue*** at Par Funding – ***investor money***.

As set forth in the Commission's Motion, Sharp found that Par Funding paid investors with other investor money. The Commission's expert witness, Melissa Davis, also found that Par Funding could not have paid investors without the inflow of more investor money. [ECF No. 774-1 at ¶ 85]. It is undisputed that Par Funding commingled investor funds with merchant cash advance funds; however, LaForte's expert witness Joel Glick admitted in his sworn testimony that he did not perform an analysis to determine if *commingled* investor funds were used to pay other investors their purported investment returns and in fact "specifically disregarded the commingling." [ECF No. 896-4 at 92:3-9 and 100:25-12]. Meanwhile, LaForte, the *de facto* CEO of Par Funding who ran the day-to-day operations was asked during his deposition whether the payments made to investors included investor funds; he asserted the Fifth Amendment and refused to testify. [ECF No. 961-20, LaForte Testimony, at 31:22-35:3].

For the reasons set forth in the Motion, the Court should find that Par Funding's payments to investors consisted of commingled funds that included investor money. The Defendants' arguments to the contrary are unavailing. Because investors were paid with investor money, there are no legitimate business expenses to deduct.

---

[14] When asked whether Par Funding operated at a net loss (consider that Par Funding is breaking even in its loan business), LaForte asserted the Fifth Amendment and refused to answer. [ECF No. 961-20 at 36:2-37:20]. Par Funding had its financial statements audited exactly one time – and as stated in the Motion, the audited financial statements state that Par Funding's business was operating at a net loss and the only source of revenue sufficient to pay investors was other investor funds. *See* Audited Financial Statement attached to the Declaration of James Klenk, previously filed ECF No. 177-52.

### (iii)   *Even if Deducting Legitimate Business Expenses were Appropriate in this Case – and It is Not – McElhone and LaForte Fail to Meet of Presenting Concrete and Credible Evidence That Expenses Were Legitimate*

Even if the Court decides to examine the purported legitimate business expenses argued by McElhone and LaForte, it is a short inquiry.  The Defendants bear the burden of presenting Courts have re-affirmed post-*Liu* that the SEC must put forth a reasonable approximation of defendant's ill-gotten gains and that, once the SEC has done so, the risk of uncertainty falls on the wrongdoer who created that uncertainty.  *See, e.g., SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (also confirming it is defendant's burden to identify legitimate business expenses); *SEC v. Goulding*, --- F.4th ---, 2022 WL 2527117, at *3 (7th Cir. July 7, 2022); *SEC v. Genaudio, Inc.*, 32 F.4th 902, 945 & n.22 (10th Cir. 2022); *SEC v. Premier Holding Corp.*, 2022 WL 541194, at *1 (9th Cir. Feb. 23, 2022).  The Defendants must "provide **concrete and credible evidence** to demonstrate the amount of money spent on any of the alleged business expenses or **whether any of the business expenses were legitimate**." *Tayeh*, 848 F. App'x at 830.  Deductions are only appropriate for "legitimate expenses" that "have value independent of fueling a fraudulent scheme." *Liu*, 140 S.Ct. at 1950. *See also SEC v. Smith*, 2020 WL 6712257, at *3 (C.D. Cal. Oct. 19, 2020) (reasonable approximation satisfied where, "[b]ased on the records available to the SEC, it was not able to identify any legitimate, reasonable business expenses that should be deducted").

Here, McElhone and LaForte argue that the Commission's disgorgement figure should be reduced by $56 million in supposed legitimate business expenses. In support, they offer nothing more than their own profit and loss statement for Par Funding, and the financial records showing the payments were made. The Profit and Loss statement only lists the names of the expenditures,[15] without any detail regarding what specifically payment was for and with no indication about whether the expense had value independent of fueling a fraudulent scheme or was consistent with

---

[15] Specifically, the Defendants cite "banking fees, computer and internet expenses, insurance costs, janitorial services, legal fees, other professional fees (such as accountant and tax preparation costs), payroll to non-insiders and utilities costs." And nothing more. [ECF No. 1329 at 22-23]. They seek deductions for these expenditures without making any effort to distinguish these expenditures from those that fueled the violations and do not argue or show that these expenditures are consistent with how investors were told their money would be spent. Notably, they list insurance costs, while one of the Complaint allegations is that they lied to investors about having insurance on the investments when in truth there was none, and utilities fees despite the fact that the office housed numerous businesses other than Par Funding. The Defendants make no effort to justify deductions for these expenditures, and therefore there is no basis for doing so.

how investors were told their money would be spent.

McElhone and LaForte offer no evidence whatsoever that these expenses were legitimate business expenses, that they have any connection whatsoever to the monies subject to disgorgement, that these expenses have value independent of fueling a fraudulent scheme, or that these expenses are consistent with what investors were told about how their investment funds would be spent. As such, the Court cannot reduce the disgorgement figure by the amount the Defendants seek. *F.T.C. v. Wash. Data Res., Inc.*, 704 F.3d 1323, 1325 (11th Cir. 2013) ("[D]efendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." ); *S.E.C. v. Aerokinetic Energy Corp.*, 444 F. App'x 382, 385 (11th Cir. 2011) (rejecting argument that district court should have offset defendants' ill-gotten gains by legitimate business expenses); *Tayeh*, 848 F. App'x at 830 (defendant fails to meet burden of showing legitimate business expenses for disgorgement deduction where defendant fails to provide "concrete and credible evidence" to demonstrate whether the business expenses were legitimate); *Faulkner*, 2021 WL 75551, at *7 (holding that evidence of legitimate business activities unrelated to the charged conduct did not reduce disgorgement liability); *Penn*, 2021 WL 1226978, at *11 (expenses for things beyond what investors were told their monies would be used for are not deducted); *The Owings Group,* 2021 WL 1909606, at *4 (unsworn and conclusory exhibit does not overcome the SEC's showing and "any doubts are to be resolved against the defrauding party"); *SEC v. Griffithe*, 2021 WL 6551385, at *2 (C.D. Cal. Nov. 18, 2021) (similar); *SEC v. Erwin*, 2021 WL 3773649, at *12 (D. Col. Aug. 25, 2021) (similar); *SEC v. Team Resources, Inc.*, 2022 WL 463390, at *2 (N.D. Tex. Feb. 15, 2022) (bare "criticism" of Commission's approximation, unsupported "with any documentary evidence," does not defeat the Commission's showing).

Accordingly, the Defendants fail meet their burden and there are no expenses that can deducted as "legitimate business expenses" on the record before the Court.

### 6.  McElhone and LaForte Fail To Meet Their Burden With Respect to the Supposed "FSP Legitimate Expense" Deductions They Seek

Next, McElhone and LaForte argue that the Commission's disgorgement calculation is not a reasonable approximation because it fails to deduct "legitimate" business expenses of Full Spectrum Processing, Inc.  McElhone and LaForte present nothing more than a Profit and Loss Statement that lists expenses and shows they were made, with no evidence that these are legitimate

business expenses. This argument fails for the same reason the "legitimate" business expenses argument relating to Par Funding fails, as set forth immediately above in Sections 5(b)(i)-(iii).

### 7. McElhone and LaForte's Argument for Reductions for the Amount of Taxes Paid Fails as a Matter of Law

McElhone and LaForte next argue that the Court must reduce disgorgement by the amount of taxes Par Funding paid [ECF No. 1329 at 24-25]. They cite no case law in support of this argument – because their position is contrary to the law. *SEC. v. U.S. Pension Tr. Corp.*, 444 F. App'x 435, 437 (11th Cir. 2011) (holding that no authority requires the court to deduct from the disgorgement figure the amount of ill-gotten gains paid to the government in income tax); *SEC. v. Merch. Cap., LLC*, 486 F. App'x 93, 96 (11th Cir. 2012) (rejecting argument that the district court was required to take into account the amount of income taxes paid).

Accordingly, each of McElhone and LaForte's disgorgement arguments fails.[16]

### B. McElhone and LaForte's Penalty Arguments Are Unavailing and the Court Should Enter the Penalties the Commission Seeks

McElhone and LaForte fail to present compelling evidence and arguments supporting their position that the third-tier penalties sought against them are not appropriate. The first tier applies to violations that do not include fraudulent conduct. The second tier provides a higher amount for violations involving fraud, deceit or a deliberate or reckless disregard of a regulatory requirement. 15 U.S.C. §78u(d)(3)(B)(ii). The third tier applies to violations that (a) involved fraud, deceit, or a deliberate or reckless disregard of a regulatory requirement <u>and</u> (b) directly or indirectly resulted in substantial losses or a significant risk of substantial losses to others. 15 U.S.C. § 78u(d)(3)(B)(iii). Under the federal securities statutes, the Court may impose a separate civil money penalty for *each* of a defendant's "act[s] or omission[s]" willfully violating the securities laws, counted by multiplying the statutory penalty amount by each unlawful transaction, each misrepresentation or omission, or even each time period of the violation. For example, in *SEC v. Revolutionary Concepts, Inc.*, 2022 WL 386085, at * 10-11 (11th Cir. Feb. 9, 2022) the Eleventh Circuit affirmed a penalty judgment based on multiplying the statutory penalty amount times the number of *transactions* that violated the securities laws. If applied in this case, the

---

[16] McElhone and LaForte expend significant time arguing about receivership assets and collections issues. However, as stated in the Motion and as the Court noted during a recent hearing, those issues are not at issue on the Commission's Motion. If the Court determines that the Response – which seeks a ruling on collections – should be converted to a motion and the Commission should respond, we will do so at that time.

statutory amount would be multiplied by *at least* 1,200 because the Complaint alleges that the Defendants violative conduct involved the unregistered, fraudulent offer and sale of securities to at least 1,200 investors.

1.  **The Court Should Reject McElhone and LaForte's Hollow Protestations That Their Conduct Does Not Reflect The Highest Level of Scienter**

McElhone and LaForte argue that a high penalty is not warranted because this case "is, at worst, a disclosure case." [ECF No. 1329 at 29]. – Clearly, McElhone and LaForte lack any contrition for their conduct.  McElhone and LaForte fail to address the facts and violations alleged in the Complaint, which alleges that they orchestrated a massive unregistered offering scheme through a company they control that defrauded more than 1,000 investors throughout the United States to the tune of nearly half a billion dollars, that included numerous material misrepresentations and omissions to investors and to the Commission, and that was orchestrated in order to conceal the illegal conduct from state securities regulators and to avoid compliance with the registration requirement of the federal securities laws. [ECF No. 119].  The conduct in this case with respect to the scope, wide variety of misconduct, misrepresentations and omissions, scheming to avoid registration and to conceal illegal conduct from the government, and lying to the government – all while operating a massive web of unregistered agent fund offerings – is unprecedented. Which is why the Defendants cannot cite a single analogous case in support of their argument to reduce the penalty.

Therefore, McElhone and LaForte resort only to pointing out that at least they did not improperly take investor funds during their massive fraudulent and unregistered securities scheme. [ECF No. 1329 at 30].  Even this argument – which fails to address the allegations and arguments in the Complaint and Motion – is a losing argument. The Complaint alleges that "contrary to Par Funding's representations to the Commission in its filings, it diverts investor funds to McElhone and Cole, Par Funding's CFO, and also funnels money to The LME 2017 Family Trust, which is McElhone's family trust." [ECF No. 119 at ¶ 8].  And that these transfers occurred "for no legitimate purpose." *Id.* at ¶ 36.  Which is why McElhone's Trust is a named Relief Defendant in this case.  Moreover, and because McElhone and LaForte have placed this at issue by affirmatively raising it in their Response argument, the evidence introduced through the Receiver in this case is that McElhone and LaForte diverted investor funds to purchase numerous real estate properties for themselves, as well as luxury items.  The Court has in fact expanded the Receivership to include these properties that McElhone and LaForte purchased with investor funds by causing Par Funding to transfer monies for the purchase of these properties.

Even without any misappropriation of investor funds for their own benefit, the Defendants' conduct as set forth in the Complaint reflects the highest degree of scienter. McElhone and LaForte do not address scienter within the context of the Complaint allegations, because there is no winning argument for them to make in that regard.

### 2. McElhone and LaForte's Argument That They Created a Powerful, Lawful Business Is Belied By The Evidence And Even if True – Which It is Not – Building a Successful Company Is Not A Penalty Factor

McElhone and LaForte acknowledge that the Commission's framework for determining an appropriate penalty is appropriate and agree with the factors the Court must consider. [ECF No. 1329 at 29]. However, they spend significant time arguing that they "created a powerful, lawful business" – which is not one of the seven penalty factors. *Id.* at 30-34. McElhone and LaForte make a series of arguments, each of which is addressed in turn.

McElhone and LaForte argue that the investors were sophisticated and conducted due diligence. *Id.* at 31. In support they cite a declaration from a lawyer regarding the MCA business being legal and not a usurious loan practice and declarations from two agent fund managers – one of whom is currently a Defendant in a separate Commission action based on his alleged fraud in connection with the Par Funding offering. *See  SEC v. AJ Morgan & Camarda* Complaint filed as an Exhibit to McElhone and LaForet's Response. The Complaint lays out facts alleging securities fraud and allegations that the Defendants lied to investors. The argument that some investors were sophisticated and conducted due diligence, even if true, impermissibly points the finger at the investors. As this Court has previously found, investor reliance is not an element of any securities law violation alleged in this case and is not a consideration. *See* Court Order denying Motion to Dismiss in this case. Moreover, the representation is false and belied not only by the investor declarations filed with the Commission's Motion for Temporary Restraining Order [ECF No. 14 and sworn investor declaration filed therewith stating they did not know and would not have invested had they known], but also the investor testimony this Court heard during the Furman trial.

Next, McElhone and LaForte argue for several pages that their merchant cash advance business was not illegal and that they had financial models in place that only their expert witness, Joel Glick, analyzed. [ECF No. 1329 at 31-33]. This is not relevant to the penalty assessment for the Defendants *securities law violations.*  The legality of merchant cash advances is ***not*** an issue in this case, as the Court has explained to the Defendants many times. And McElhone and LaForte's arguments are belied by the expert report of Melissa Davis and reports of Brad Sharp

which are part of the record of this case and analyze the operations of the merchant cash advance business. But again, not relevant to the penalty for *securities law violations*. They go on to argue myriad facts about the merchant cash operations and its valuations, citing no evidence, and argue that investors never missed receiving a payment. Whether or not investors missed payments is not relevant to any issue, and Defendants fail to articulate why this is relevant.

A business can pay investors and still be illegal under the securities laws, a scheme, and a fraud – which violations are what the Defendants have consented to in this case. *See also SEC v. Quiros*, Case No. 16-cv-21301, 2016 WL 11578637 at *13 (S.D. Fla. Nov. 21 2016) (finding a Ponzi scheme and noting this can occur even in companies that are functioning or have some aspect of legitimacy). The Commission is not responding to arguments about the legitimacy of merchant cash advance businesses because this is beyond the scope of this case and as the Court has explained since the preliminary injunction hearing in August 2020, whether merchant cash advance businesses are legal is not a feature of this case.

Next, McElhone and LaForte argue that Par Funding's merchant cash advance business was profitable. It is unclear why this is relevant to the penalty, and the Defendants do not articulate it. However, as set forth above in Section II.5, Cole, the Par Funding CFO and a Defendant in this case, admitted under oath in this case that Par Funding's loan business only received back from borrowers about the same amount that it loaned out to borrowers. In other words, the company broke-even, and that was before any expenses were paid. The Defendants' arguments also ignore the evidence presented during the preliminary injunction hearing in this case, and specifically the sole audited financial statements of Par Funding, which state that the Company was operating at a loss in 2017. [ECF No. 177-52, Declaration of James Klenk, and Exhibit thereto; *See also* ECF No. 774-1, Expert Report of Melissa Davis, at pdf p 27, 37 (addressing the factoring revenue the Defendants claim and showing that in fact they were reporting factoring losses].[17]

Additionally, the Defendants' arguments ignore the allegations in the Complaint that they had filed thousands of lawsuits against borrowers who had not paid on the loans, and that Par Funding was owed significant money on loans that were in default. [ECF No. 119].   These

---

[17] As far as the Defendants relying on their own financial reports, the evidence in this case also shows that Par Funding had multiple copies of the same financial statements, with different numbers in them. ECF No. 177-52.  When asked if he directed accountants to change and modify financial statements, LaForte asserted the Fifth Amendment. [ECF No 961-20 at 40:1-16].

allegations are deemed as true and the Defendants are prohibited, by the terms of their Consent Judgments, from challenging them.

### 3. McElhone and LaForte's Argument That They Hired Many Accountants And Lawyers Is Not Sufficient To Warrant A Lower Penalty And They Are Prohibited From Challenging The Complaint Allegations

Similarly misplaced is the Defendants' attempt to argue that they relied on accountants and lawyers [ECF No. 1329 at 34-35]. The Defendants are bound by the Complaint allegations, which allege that they acted with scienter – and specifically, that they acted knowingly or recklessly. [ECF No. 119 at ¶¶ 269, 272, 275, 278, 284, 291-93]. Pursuant to the Consent Judgments, the Defendants are precluded from challenging these allegations and attempting to litigate their affirmative defenses to them. But even if the Defendants could challenge these allegations – and they cannot – they cite no evidence of any accountant or lawyer who gave them advice that they could make any of the misrepresentations and omissions alleged in the Complaint, engage in the scheme and fraudulent course of business, or operate the unregistered offering of promissory notes alleged in the Complaint. They cite no evidence that they sought any advice, or received any advice, about whether they were using investor funds to pay other investors. And simply citing to the presence of many accountants and lawyers is not sufficient to demonstrate reliance on advice of counsel as a matter of law. Nor is citing deposition testimony of a Par Funding employee, James Klenk, stating simply that Klenk did not think Par Funding was a Ponzi scheme when he worked there sufficient to show reliance on any advice Klenk gave – ever, let alone during the fraud.

The legal advice the Defendants filed with their Response [ECF No 1330-24] consists of three letters regarding whether merchant cash advance businesses are legal, which letters explicitly state that the lawyers are not giving any advice about compliance with the federal securities laws:

> 7.      We express no opinion as to any matters involving any state or federal securities laws, rules or regulations, ERISA, and/or laws, rules or regulations promulgated by the Commonwealth of Pennsylvania (or other state) related to consumer loans.

*Id.* at pg 3 (attorney letter #1).

> G.      I express no opinion as to any matters involving any state or federal securities laws, rules or regulations or ERISA.

*Id.* at pg 7 (attorney letter #2)

As for the third attorney letter, it concerns only attaching liens to merchant cash advances and includes no reference to or discussion of any matter at issue in this case, let alone any securities law violation. *Id.* at pg 10.  The only other evidence presented is an email dated *March 1, 2019* from Martin Hewitt, in which Hewitt addresses the New Jersey state cease-and-desist Order and states that the issue has been resolved and Par Funding should file a Form D to have registration exemption. *Id.* at 12.  The Defendants present no evidence as to what they told that lawyer, whether they told that lawyer that they were engaged in a general solicitation (which is not subject to an exemption), whether they told that lawyer that they were using agent funds to solicit investors (not subject to an exemption), the duration of the notes (which also affects exemption), what advice if any they sought and received concerning the violations at issue in the Complaint, or any other fact necessary to establish reliance on advice of counsel.  They present an email and nothing more. Critically, the email is from March 1, 2019, well after the Defendants began using Agent Funds to circumvent the registration provisions of the federal securities laws [ECF No. 119 at ¶ 62-70] and near the end of the unregistered offering, which this Court ended in July 2020.

Nor can the Defendants claim that they relied on this counsel to create their Agent Fund scheme to avoid registration because not only does the March 2019 email not support that finding, but also the Complaint alleges that the Defendants orchestrated the Agent Fund scheme in order to circumvent the securities laws and to dupe the state securities regulators.  The Complaint also alleges they engaged in this behavior knowingly or recklessly.  Similarly, this cannot be used to argue reliance on advice of counsel regarding the misrepresentations and omissions about the New Jersey regulatory action because the Complaint alleges that these were made knowingly or recklessly by the Defendants. These allegations are deemed as true, and they cannot be challenged by the Defendants pursuant to the Consent Judgments to which the Defendants agreed.[18]  However, the Defendants impermissibly challenge the Complaint allegations throughout the Response and the Court should not consider that evidence.  If the Court were to consider this evidence, the Commission would need to file counter-evidence and the trial the Consent Judgments were designed to avoid would have to ensure regarding the reliance defenses and all other matters the Defendants raise that challenge the allegations of the Complaint.

---

[18] The vast majority of the Defendants' legal advice argument concerns the legality of a merchant cash advance business or consists of statements unsupported by evidence. The legality of the merchant cash advance business is not relevant to this case.

Additionally, because McElhone and LaForte asserted the Fifth Amendment in response to discovery after any reliance on advice of counsel claim, they should be precluded from presenting that evidence now. *See* Exhibit 13 to the Commission's Motion, ECF No 1213-13, LaForte's Answers to Interrogatories 1-4 (Asserting the Fifth Amendment and refusing to identify any lawyers and other professions upon whose advice he relied and the substance and details of any such advice); Exhibit 15 to the Commission's Motion, ECF No 1213-15, McElhone's Answers to Interrogatories 1-4 (Same). As for Cole, he refused to disclose the substance of any legal advice received sought or received from the lawyer who sent this email on grounds it was privileged [Exhibit 1, Cole Interrogatory Answers], and therefore he cannot now use that privilege as a sword and a shield to argue the facts he previously withheld on privilege grounds.

### 4. McElhone and LaForte's Argument There Was Not Substantial Loss or Risk of Loss Is Incorrect and Misconstrues the Law

McElhone and LaForte argue that there was no substantial loss or risk of loss to investors, and therefore third tier penalties are inapplicable [ECF No. 1329 at 41-42]. They argue that McElhone did not pay herself consulting fees with investor funds, McElhone's conduct is not sufficient for third tier penalties, investors were paid, and therefore there was no risk of loss. *Id.* This ignores the Complaint allegations and the law. The Complaint alleges that McElhone and LaForte orchestrated the fraudulent scheme laid out in the Complaint [ECF No. 119 at ¶ 5], controlled Par Funding and the offering, *id.* at ¶¶11-12, 15-18 (among others), are liable as the control persons for the Par Funding securities fraud (Complaint Count), diverted investor money to McEhone and lied about it to the Commission, *Id.* at ¶¶ 8, 36, 235-243], signed the promissory notes, *Id.* at ¶52, and controlled the bank accounts, *Id.* at ¶ 42. The Defendants are prohibited from challenging these allegations or the Counts to which they consented for purposes of this Motion.

This conduct, and the securities fraud and securities scheme counts to which McElhone and LaForte consented, clearly support a finding of substantial risk of loss to investors. The Defendants point to the fact that they paid investors, but this is not the determining factor. Instead, as the Eleventh Circuit has made clear, a fraudulent scheme creates a substantial risk of loss because the conduct would have been important to any reasonable investor. *See, e.g., SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) ("While there was no direct evidence of loss, as the magistrate judge found, and the district judge agreed, the fraudulent scheme created a substantial risk of loss as the revenue overstatements would have been important to any reasonable

shareholder.").  Further, the evidence reflects that Par Funding could not make investor payments without raising additional investor funds (ECF No 774-1 and Sharp report cited in Motion), and in fact Par Funding stopped making investor payments before the Commission filed this case.  As set forth in the Commission's Motion, the investors are still owed hundreds of millions of dollars in *principal* – we have not even presented the amount they would be owed if the interest they are owed under the notes was calculated. Defendants make no other arguments concerning the risk of loss.  Nor do they address any of the Complaint allegations reflecting the fraud and scheme allegations that give rise to such risk.

### 5.  McElhone and LaForte's Argument That Their Conduct Was Not Egregious Is Wrong and Ignores the Complaint Allegations

McElhone and LaForte argue that LaForte's use of an alias was not done to defraud investors [ECF No. 1329 at 42-43].  However, they are prohibited from making this argument. The Complaint alleges that LaForte used aliases in order to conceal his felony convictions from investors. [ECF No. 119 at ¶ 214]. LaForte's argument that "everyone knew" he used aliases and everyone knew his real identity not only impermissibly challenges the Complaint allegations, but also contradicts the testimony from investors in this case, including investor testimony at trial and the numerous investor declarations filed with the Temporary Restraining Order Motion. *See also* ECF No. 14 and Exhibits thereto: Exhibit 18, at ¶ 3; Exhibit 20 at 56:2-62:15; 53:16; Exhibit 19 at Exh. A thereto; Exhibit 3, at 318:6-16].  As with the Defendants' scienter, the egregiousness of the conduct is fully evidence by not only the Complaint allegations but the TRO Motion and the authenticated exhibits filed therewith [ECF Nos. 119 and 14].

McElhone and LaForte also argue that their misrepresentations and omissions, including those in the Par Funding marketing materials McElhone approved for distribution, were not egregious because Par Funding was a healthy, thriving company. This issue is addressed above, and we do not repeat it again here. However, we note in connection with the Defendants' argument about the 1% default rate [ECF No. 1329 at 43] that Cole testified during the trial against Michael Furman that the 1% default rate did not reflect the thousands of loans that were in default and for which Par Funding was suing borrowers for payment. *See infra.* Further, the Defendants' argument that the "KPI Report" (which is the report distributed to investors touting a 1% default rate) was accurate is an impermissible argument. The Complaint alleges that this report and the 1% default rate were false and misleading. [ECF No. 119 at ¶¶ 185-203].

Similarly, the Defendants impermissibly argue that the allegations that McElhone authorized the marketing materials for distribution are not true. [ECF No. 1329 at 43].   The Complaint alleges that McElhone had ultimate authority over Par Funding [ECF No. 119 at ¶ 42]. The Commission filed with its Motion evidence supporting the assertion that McElhone authorized the marketing materials.  The Defendants offer no evidence that they did not participate in the drafting of legal documents and offering materials, other than to point out that an employee at Par Funding testified she emailed them out and to argue without evidence that Par Funding used legal counsel to draft documents. [ECF No. 1329 at 43-44].  They present nothing to rebut the testimony the Commission has filed with its Motion of McElhone's sister, Jamie McElhone, that McElhone authorized the materials and the boss of everything at Par Funding.

Next, the Defendants cite their Motion to Dismiss, which the Court denied, as evidence that Par Funding was a thriving business. [ECF No. 1329 at 44].  Again, whether Par Funding was thriving is not at issue, other than with respect to the securities law violations at issue and the allegations in the Complaint, deemed as true, that Par Funding was not the low-risk, 1% default trate business Defendants claimed it was.  Regardless, the Motion to Dismiss was denied.  As set forth above, Cole admitted Par Funding was only breaking even, the Receiver has filed numerous reports reflecting that Par Funding was not a thriving business and that the majority of loans were to a small group of borrowers and were in default, the Complaint (deemed as true for purposes of this Motion) alleges that Par Funding had thousands of lawsuits pending for defaulted loans, and that the default rate was at least ten times higher than what the Defendants represented it was. [ECF Nos. 83, 119, 180, 215, 240, 305, 358, 359, 426, 482, 666, 902, 1140, 1223, 1334].

The Defendants do not address the remainder of the allegations against them, for orchestrating the scheme alleged in the Complaint or otherwise.

### 6.  McElhone and LaForte's Argument That Their Conduct Was Not Recurrent Is Wrong and Ignores the Complaint Allegations

McElhone and LaForte argue that there is no evidence their conduct was recurring or how many investors were defrauded [ECF No. 1329 at 45].  The Complaint alleges that McElhone and LaForte orchestrated the entire fraudulent scheme at issue in this case and controlled Par Funding, and McElhone, LaForte, and Cole have all consented to the following allegations being true and cannot contest them:

Par Funding, McElhone, LaForte, and Cole, *beginning no later than July 2015 and continuing through present*[19]*... knowingly or recklessly, employed devices, schemes or artifices to defraud* in connection with the purchase or sale of securities.

Par Funding, McElhone, LaForte, and Cole, *beginning no later than July 2015 and continuing through present,...* in connection with the purchase or sale of securities, have *knowingly or recklessly made untrue statements of material facts or omitted to state material facts in order to make the statements made, in the light of the circumstances in which they were made, not misleading*

Par Funding, McElhone, LaForte, and Cole, *beginning no later than July 2015 and continuing through present,...* in connection with the purchase or sale of securities, *knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.*

Par Funding, McElhone, LaForte, and Cole, *beginning no later than July 2015 and continuing through present,... knowingly or recklessly employed devices, schemes or artifices to defraud*

Par Funding, McElhone, LaForte, and Cole, *beginning no later than July 2015 and continuing through present, ...negligently obtained money or property by means of untrue statements of material facts and omissions* to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Par Funding, McElhone, LaForte, and Cole, *beginning no later than July 2015 and continuing through present,... negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud* or deceit upon the purchasers

Par Funding, McElhone, LaForte, and Cole, *beginning no later than July 2015 and continuing through present,...* [participated in an unregistered securities offering]

*From no later than July 2015 through present*, McElhone and LaForte have been, directly or indirectly, control persons of Par Funding and Full Spectrum....

*From no later than July 2015 through present*, Par Funding and Full Spectrum violated Section 10(b) and Rule 10b-5 of the Exchange Act.

*As control persons of Par Funding and Full Spectrum, McElhone and LaForte are jointly and severally liable with and to the same extent as Par Funding*[20]....

[ECF No. 119 at ¶¶ 269, 272, 275, 278, 284, 291-93 (emphasis added)].  The Defendants cannot now argue that they only violated the securities laws *sometimes* or place a burden on the

---

[19] The filing date in July 2020.

[20] In their Response, McElhone and LaForte ignore the conduct alleged against Par Funding through its employees, offering, and agents, and focus solely on themselves. However, they have consented to be held liable to same extent as Par Funding for the violations alleged against Par Funding. Since they do not address this, we note it here because the conduct of Par Funding overall must be factored into the penalty determination for McElhone and LaForte.

Commission to demonstrate each transaction. They consented to the allegations being deemed as true, and they are for purposes of this Motion.

The Complaint alleges at least 1,200 investors invested through promissory notes in an unregistered offering orchestrated by McElhone and LaForte, whereby investors invested in the offering through notes McElhone and Coles signed; that these investors were defrauded in the Defendants' fraudulent unregistered offering scheme; that the conduct against each specific Defendant at issue occurred for the course of years, and that LaForte and Cole, among many other instances of violative conduct, solicited at least 300 investors in one single event alone. *Id.* at ¶¶ 1, 52, 95-107. The fact that the Defendants argue this conduct was isolated and not recurrent, given the Complaint allegations to which they consented, is further evidence of their utter lack of contrition and acknowledgement of the serious nature of the violations alleged against them.

### 7. Defendants' Argument About Acknowledging Wrongdoing is Meritless

McElhone and LaForte argue that because they executed Consents, this demonstrates an acknowledgement of wrongdoing [ECF No. 1329 at 45]. This is wrong. In their Consents, the Defendants explicitly state that they are signing the Consents *without admitting or denying liability.* The arguments made in the Response also bely their hollow assertion that the Consents reflect an acknowledgement of wrongdoing. As set forth above, the Defendants blame the Commission in their Response, claim investors were sophisticated and did due diligence to detract from the Defendants' fraudulent misrepresentations and omission, continue to challenge the Complaint allegations throughout their Response, and even try to point the finger at attorneys and accountants despite consenting to the Complaint allegations being true that explicitly allege the Defendants acted knowingly and recklessly for some violations, and negligently for others. They continue, even now, to point the finger at everyone else and to deny the Complaint allegations even though this Motion is before the Court with the Complaint allegations being deemed as true pursuant to a Court order to which the Defendants consented in order to avoid a trial. There is no basis whatsoever for a finding that they acknowledge wrongdoing. The record in this case, including the Complaint, reflects the opposite.

### 8. McElhone and LaForte's Argument That They Cooperated is Incorrect

Incredibly, the Defendants argue that they cooperated because (1) Cole offered to assist the Receiver; and (2) this Court stated to undersigned counsel that the Defense lawyers were allowed to vigorously defend their clients [ECF No. 1329 at 46]. This is not evidence of cooperation. The

Defendants present no evidence whatsoever that Cole offered to assist the Receiver in any way, not even a declaration from Cole. Further, defending a client is not cooperation. If that were the case, then cooperation would not be a factor in *any* case where defendants have lawyers defending them. The facts set forth in the Motion and the record of this case reflect an effort by Defendants, from the beginning, to blame the Receiver and the Commission for their violations of the securities laws. They have thwarted the Receiver's efforts and the Receiver has filed several motions to that effect, which are all part of the record in this case. Most recently, the Receiver filed a Motion alleging that McElhone and Cole paid for their defense by illegally siphoning money from the Receivership in violation of the asset freeze and receivership orders, and the Court has issued an order to show cause [ECF No. 1328 and 1332].  The fact that on the record presented in this case the Defendants claim that they have cooperated in this case is frankly beyond the pale.

### 9.   McElhone and LaForte's Argument For Tier 2 Penalties is Meritless

For the reasons set forth above, Tier 2 penalties are inapplicable on the facts of this Complaint. As set forth above, there was a risk of investor losses because of the nature of the allegations and violations alleged in the Complaint.  McElhone and LaForte's only argument is a chart they made of cases in this Circuit where they cite the penalty imposed and then calculate the penalty as a percentage of the disgorgement imposed, asking this Court to do the same.  They can cite no case law where this type of calculation is used to determine a penalty.  Nor do they cite any legal support that the Commission seeks penalties based on Circuit jurisdiction, or that Circuit jurisdiction is remotely relevant.  The seven factors the Defendants acknowledge in their Response are the appropriate focus in deciding the appropriate figure, not percentages based on a lawyer's math survey and statistics research project.

As set forth in the Motion, and in this Reply, the factors for determining a penalty demonstrate that the Commission's penalty request is appropriate. While the Defendants cite cases in a chart, they cite to ***no case*** involving the type of conduct alleged here, with the wide ranging misrepresentations and omissions (from concealing regulatory history to financial success to risk to default rates to the identity of the man at the helm, to investments being insured, and more). They can point to no case involving that plus the schemes and fraudulent course of business involved in this nationwide unregistered offering fraud. They can point to no case where the Defendants lied to investors, the Commission, *and* state regulators.  They can point to no case

where the defendants also schemed to create an offering structure in order to avoid registering with the Commission.  This case has no parallel.

Nor do the Defendants adequately address and distinguish the *Shapiro* case cited by the Commission, where the conduct was similar but did not involve nearly the same scope and range of violations. The Defendants claim the case is inapposite because *Shapiro* involved a Ponzi scheme under Section 10(b) of the Securities Act. The Defendants fail to recognize that this case involves a claim – to which they consented – for that same scheme violation under the federal securities laws.[21] The scheme alleged in the two cases might be different, but they are the same violation of the federal securities laws. And again, *Shapiro* did not involve the same broad scope of violative conduct involved in this case. This case is exceptionally egregious.

### III.  THE COURT SHOULD ENTER RELIEF AGAINST COLE IN THE AMOUNTS THE SEC SEEKS

#### A.  Cole Fails To Meet His Burden Regarding the Disgorgement Figure

Cole presents two arguments for reducing his disgorgement obligation, both of which lack merit. First, Cole argues that the disgorgement figure sought against him is incorrect because it includes amounts paid to him through New Field Ventures, LLC.  According to Cole, payments to him through New Field Ventures was not alleged in the Complaint and therefore this fact is not deemed admitted. [ECF No. 1329 at 27].  This is incorrect.  The Complaint alleges:

> McElhone received at least $11.3 million from the offering between July 2015 and October 2019. ***As for Cole, Par Funding transferred funds, which included investor funds, to companies in which Cole has an ownership interest or otherwise receives financial benefits:*** $1.8 million to ALB Management between July 2019 and October 2019; about $4.9 million to Beta Abigail between July 2016 and April 2019; and ***about $9.5 million to New Field Ventures, LLC between February 2017 and November 2019.***

> Between July 2016 and November 2019, ***Par Funding transferred about $14.4 million, which included investor funds, to*** Beta Abigail and ***New Field Ventures, LLC, companies in which Cole has an ownership or other beneficial interest***

[Amended Complaint, ECF No. 119, at ¶¶ 19 & 240].

Thus, Cole's first argument fails.  Cole's arguments that he did not receive funds from Par Funding through New Field Ventures are prohibited under the Consents, which provide that Cole

---

[21] Defendants state there was a bankruptcy case filed in connection with Shapiro. The Consent was not signed by a bankruptcy trustee, and Defendants fail to demonstrate the relevance of bankruptcy.

cannot contest the facts alleged in the Complaint and that all allegations in the Complaint are deemed as true for purposes of this Motion.

Second, Cole argues that the Court must reduce his disgorgement by the amount of taxes Cole paid. [ECF No. 1329 at 28]. As set forth above in Section II.7, tax payments are not deducted from disgorgement figures. *U.S. Pension Tr. Corp.*, 444 F. App'x at 437 (holding that no authority requires the court to deduct from the disgorgement figure the amount of ill-gotten gains paid to the government in income tax); *Merch. Cap., LLC*, 486 F. App'x at 96 (rejecting argument that the district court was required to take into account the amount of income taxes paid).

Accordingly, Cole fails to meet his burden for demonstrating the Commission's disgorgement figure is not reasonable.

## B. Cole's Penalty Arguments Are Wrong

Because Cole filed his response jointly with McElhone and LaForte, many of his arguments are addressed above in Section II.B and we do not repeat them again here. However, there are a few arguments that specifically concerned only Cole, which arguments are addressed here.

Cole claims his conduct was not egregious because he did not draft the K1 report that disclosed a 1% default rate, and he did not know that the default rate was higher. This is belied by the evidence. In his deposition, Cole admitted he drafted the "KPI Report," also known as the "Funding Analysis," which is the chart distributed to investors that states the 1% default rate. *See* Motion Exhibit 4, ECF 1213-4 at 127:18-128:1, 146:17-151:21. During the Furman trial, Cole testified admitting that the percentage in that chart which is shown to investors (*i.e.,* the 1% default rate chart as alleged in the Complaint) reflects *not* the loans that are in default and are not being paid but instead reflects the subset of those loans in default that management in its discretion decides to *write off*. *See* Motion Exhibit 1213-9 at 137:20-25 (Cole prepared the KPI report distributed to investors; Def. Exh. 29); and 1213-9 at 147:2-151:20. As Cole testified, the loans in default, as reflected in the thousands of cases Par Funding filed against the borrowers who had not paid, is different from the figure in the chart shown to investors. They are, as he testified, "apples and oranges." *Id.* Cole not only knew that chart was being distributed to investors, but also as set forth in the Complaint, Cole was present when hundreds of investors were given that chart and were told that Par Funding had a 1% default rate [ECF No. 119 at ¶¶ 95-104]. Incredibly, at the time of that event in November 2019, Par Funding had filed more than 1,000 lawsuits in

Pennsylvania alone, seeking more than $147 million in missed Loan payments from small businesses. *See* TRO Exhibit 73 at ¶ 7(c).  Thus, Cole's claims about the K1 report are not true.

Cole does not address of any the other conduct alleged against him in the Complaint or the egregiousness thereof, including allegations about his signing the promissory notes that made the unregistered offering happen, soliciting investors, making misrepresentations and omissions about Par Funding's regulatory history, lying to the Commission about his receipt of investor proceeds and the involvement of LaForte in the Par Funding Form D that he signed and filed, actively assisting LaForte in concealing his true identity and thus his criminal background from investors, or making misrepresentations and omissions to investors about LaForte's criminal history.

Cole's only other argument on the penalty factors, other than those previously addressed above in Section II.B, is that his conduct was not recurring. As set forth above, Cole consented to the Complaint allegations that he engaged in the violations at issue for a number of years, and the Complaint allegations detail specific conduct within those time ranges. [ECF No. 119 at ¶¶ 269, 272, 275, 278, 284, 291-93].  The Consent Judgments preclude Cole from challenging these facts.

Cole's argument that a second tier penalty is appropriate because the violations did not involve the risk of investor loss is wrong for the same reasons set forth above with respect to LaForte and McElhone. Risk of loss analysis is based on the nature of the facts and violations alleged, and the Eleventh Circuit has been clear that the type of fraudulent scheme alleged here carries a risk of loss. *See, e.g., SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) ("While there was no direct evidence of loss, as the magistrate judge found, and the district judge agreed, the fraudulent scheme created a substantial risk of loss as the revenue overstatements would have been important to any reasonable shareholder.").  Cole offers no argument of evidence, other than his statistics project, to demonstrate that the penalty the Commission requested is not appropriate.

## IV.  THE COURT SHOULD ENTER RELIEF AGAINST FURMAN IN THE AMOUNTS THE SEC SEEKS

Furman fails to meet his burden for demonstrating the Commission's disgorgement calculation is unreasonable.  He argues that the trial testimony of Brad Sharp concerning Furman's gains, and the trial exhibits of authenticated business records reflecting those gains, are not a sufficient basis for approximating Furman's ill-gotten gains because Sharp did not independently verify the figures in the business record he authenticated [ECF No. 1296].

However, Furman presents no evidence that the business records, which were admitted, are wrong. And Furman fails to acknowledge that he failed to produce ***any* financial documents** in response to discovery requests and failed to file the **Court-ordered sworn accounting of the funds he received in connection with the violations.** As set forth above, the Eleventh Circuit in *Calvo* made clear that in calculating disgorgement the risk of uncertainty is against the Defendant – and that is particularly true where, as here, the Defendant's failure to comply with Court orders and produce records is a cause of that.

Furman presents a declaration in an effort to now – after discovery and more than two years after the Court ordered it – provide some accounting. The Court should not consider this self-serving declaration because Furman failed to produce this information when he was Court ordered to do so in July 2020. He attaches documents he failed to produce in response to discovery and as set forth at trial, claimed he could not recall passwords to access his documents on his laptop. The Court should not permit Furman to come forward now – after discovery and two years after he was ordered to provide a sworn accounting – to unveil the evidence he has been concealing. The Court should not consider any of this evidence.

Incredibly, Furman blames the Commission by claiming the Commission could have done more to get this evidence by asking Furman in his deposition. In fact, the Commission ***did*** ask Furman during his deposition. Attached as Exhibit 2 is the deposition of Michael Furman in which he testifies that he does not know how much money his Agent Fund, Fidelis, raised, the answer would depend on the definition of the word "raised," and he was not sure of the specific figure [Exhibit 2 at 49:25-51:2]. He also testified that he did not know how much investor money Fidelis sent to Par Funding for the purchase of notes other than it was "north of 1 million." *Id.* at 150:9-22. He testified he did not know how much he paid himself from Fidelis. *Id.* at 205:17-206:25.

Then again *after* his deposition occurred, the Commission sought interrogatory answers from Furman and Furman answered claiming that he did not know how much he received, directly or indirectly, in connection with the Par Funding offering because he lacked access to documents but would produce said documents if he ever obtained them. [ECF No. 1213-9 at Interrogatory 9]. He never produced them – until he filed his Response and filed them.

In his declaration, Furman asserts a list of expenses that he claims he made. Even if the Court accepts and considers this declaration, Furman makes no showing whatsoever that these expenses are "legitimate." He presents no evidence other than his own declaration stating what the

expenses were for.  Moreover, in his declaration, his descriptions clearly show these are not legitimate expenses because he is seeking to deduct the expenses for marketing the fraudulent and unregistered offering, for the legal fees to prepare the unregistered offering documents, for his own dental fees and travel, and other similar expenses that appear to be aimed at either fueling the violations or completely personal in nature.  There are other descriptions that lack any detail to guess in theory whether the expenses are legitimate, such as insurance chargebacks and payments to his administrative staff who worked at United Fidelis –a company that, as Furman testified at trial, had numerous investments it offered other than Par Funding.  Yet Furman apparently seeks to receive a reduction of his staff's entire salary without any evidence that they provided *legitimate* business services or that the salary was entirely for those *legitimate* services associated with the Fidelis offering.  Because Furman presents no clear and credible evidence about the expenses, other than that they were made, these are just theories based on Furman's brief descriptions. Furman clearly has not met his burden of presenting clear and credible evidence of *any* legitimate business expense that can be deducted.

Furman's next argument is that the Court cannot rely on certain evidence because Furman was prohibited from conducting discovery.  This is false. Furman made no attempt to obtain discovery during the discovery period, and the Magistrate denied his efforts to do so ***after*** discovery had ended – an Order Furman did not appeal.

Furman also argues that he was prevented from introducing evidence of investor losses at trial. This is irrelevant. He had the opportunity to present that evidence with his Response and failed to do so.  Furman goes on to argue at length about the risk of losses relating to Par Funding. The issue, however, is the risk of losses based on *Furman's* conduct and violations – facts Furman fails to address.  Next, Furman claims he lacks the ability to pay a penalty. However, he presents no evidence whatsoever to support that hollow assertion.  Finally, Furman argues that he was not impeached at trial. The transcript, which the Commission filed with its Motion, speaks for itself.

Furman failed to meet his burden, presents no credible evidence in support of his arguments, and his arguments should be rejected.  The Court should enter the relief the Commission seeks against him for the reasons set forth in the Motion.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the SEC's motion for remedies and enter the proposed Final Judgments against Defendants.

Respectfully submitted,

August 3, 2022

By: *s/Amie Riggle Berlin*
Amie Riggle Berlin
Senior Trial Counsel
Fla. Bar No. 630020
Telephone: (305) 982-6362
Facsimile: (305) 536-4154
E-mail:  berlina@sec.gov

**ATTORNEY FOR PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300