UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-CV-81205-RAR

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS GROUP,
INC. d/b/a PAR FUNDING, *et al.*,

        Defendants.

_____/

## LISA MCELHONE'S AND JOSEPH LAFORTE'S RESPONSE IN OPPOSITION TO THE RECEIVER'S MOTION FOR AN ORDER TO SHOW CAUSE

The Receiver's Motion for an Order to Show Cause (the "Motion") is long on theory and short on proof. The Receiver contends that Joseph LaForte and Lisa McElhone (collectively the "Defendants") orchestrated a conspiracy to divert millions of dollars in merchant collections from CBSG and CFS to persons and entities they allegedly control, who then allegedly funneled the money back to the Defendants. Although the Receiver is legally required to establish these allegations by *clear and convincing evidence*, he has not presented any affidavits, declarations or other evidence in admissible form to support his claims. Instead, the Motion is based entirely on an unsubstantiated narrative extrapolated from a handful of transactions involving third parties. None of these transactions actually show that *any* funds were diverted from the Receivership or that either of the Defendants were involved in the transactions. Indeed, although the Motion states that millions of dollars in payments were diverted from the Receivership, the only specifics the Receiver provides is a single $5,000 wire transfer from a merchant to Financial Mutual, Inc. (which is not owned or controlled by the Defendants) which is proffered without any supporting

documentation to establish its purpose. (*See* D.E. 1328-8). Of paramount importance, there is not a shred of evidence in the entire Motion to suggest that either of the Defendants knew about – let alone directed – any of the transactions at issue.

As will be shown in this response brief, the Receiver has simply not met his burden of proof and seeks to support his case by casting aspersions on the Defendants (and anyone who is associated with them). Because the Receiver lacks actual evidence, he needs the Court to assume the worst about the Defendants (and the various non-parties identified in the motion) and presume wrongdoing in transactions the Receiver has not properly investigated and does not actually understand. Although it is not the Defendants' burden to prove a negative, this response will show that the Receiver has misapprehended various payments from third-parties which it points to as evidence of wrong-doing. In particular, the evidence will show that Joseph LaForte's brother, James LaForte, used his personal income, and borrowed money from his personal and business contacts, in order to help pay for the Defendants' legal fees and otherwise assist them in paying their expenses while Defendants' assets are frozen. The Receiver asserts that Financial Mutual made approximately $3 Million in payments to professionals engaged by the Defendants[1] and concludes that these payments "must" have come from diverted funds – however, the payments Financial Mutual made to professionals actually came from a $3 Million loan it provided to James LaForte.[2] None of these funds represent diverted receivables owned by CBSG or CFS in any way. Moreover, James LaForte obtained the loan from Financial Mutual and directed several payments

---

[1] The Receiver does not present any documentation or supporting affidavits to substantiate his allegations concerning $3 million in payments. *See* DE 1328 p.11. Later in the motion, the Receiver presents a chart which states Financial Mutual paid $2,059,129.95 in professional fees – again, without any substantiation. *Id.* at 23. This discrepancy is never explained.

[2] *See* the Declaration of James LaForte (attached as Exhibit 1) and the Declaration of Francis Scarpati (attached as Exhibit 2), and the loan agreement attached to the Declarations (Exhibit A to the LaForte Declaration and Exhibit B to the Scarpati Declaration).

to the various professionals. The Receiver has been unable to adduce any evidence which suggests – let alone proves by clear and convincing evidence – that the Defendants orchestrated the diversion of Receivership assets. And without such evidence, the Receiver fails to carry his burden of proof.

It is also notable that, during the timeframe the Receiver contends the Defendants were orchestrating an elaborate conspiracy to divert money from CFS merchants, over $950,000 was sitting in two CFS bank accounts to which the Defendants had free access. (*See* CFS account statements, attached as Exhibit 3). The Defendants did not touch these funds once the Receivership was established, even though the Receivership was not expanded to cover CFS until May 5, 2021, fully ten months later. If the Defendants had wanted to "divert" money from CFS during this time, they could simply have made a withdrawal from this unfrozen account – but they did not so. Given these facts, it is fanciful for the Receiver to contend – without evidence – that the Defendants engaged in an elaborate conspiracy to divert receivables from CFS through companies they did not own or control.

For all of these reasons, and as discussed further herein, the Receiver has not – and cannot – meet his burden of proof to show a violation of the Receivership Orders. Accordingly, the Defendants cannot properly be held in contempt.

## STANDARD OF REVIEW

As the Receiver emphasizes in his Motion, the Court may enter an order to show cause when the conduct *alleged* in the motion would constitute a violation of the Court's order. (*See* DE 1328, p. 16; citing *Mercer v. Mitchell*, 908 F. 2d 763, 768 (11th Cir. 1990)). However, the movant **always** has the burden to prove a violation by **clear and convincing evidence** before an actual finding of contempt can be made. See *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th

Cir. 2002); *see also F.T.C. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010); *Major v. Orthopedic Equipment Co., Inc.*, 496 F. Supp. 604, 611 (E.D. Va. 1980) (the moving party must carry its burden to prove each violation "with **competent, credible and admissible evidence** in each instance") (emphasis supplied).

"The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Riccard*, 307 F.3d at 1296. It is not sufficient for the movant to establish the mere possibility of a violation. *Id.* at 1297 (noting that ""maybe" is not close enough when measured against the "clear and unambiguous" standard" the Court must apply); *see also United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30 (D.D.C. 2014) ("In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate *a reasonable certainty* that a violation occurred") (emphasis supplied) (citations omitted).

Assuming the movant can meet its burden to present clear and convincing evidence of a violation, "the burden then shifts to the alleged contemnor to produce evidence explaining his noncompliance at a 'show cause' hearing." *See Leshin*, 618 F.3d at 1232 (citations omitted).

## THE DEFENDANTS HAVE NOT VIOLATED THE RECEIVERSHIP ORDERS, AND THE RECEIVER FAILS TO PRODUCE ANY EVIDENCE THAT THEY DID

### I.     The Receiver Fails to Present Clear and Convincing Evidence that the Defendants Carried Out the Alleged "Diversion Scheme"

The Receiver contends that the Defendants violated the Court's Order appointing the Receiver and the Amended Order of appointment (D.E. 36 and D.E. 141, referred to collectively

as the "Receivership Orders"),[3] by perpetrating a complex scheme to divert millions of dollars in merchant collections from CBSG and CFS. However, the Receiver has not presented *any* evidence to support this theory, let alone the ***clear and convincing*** evidence needed for the Receiver to carry his burden. Undeterred by a complete absence of proof, the Receiver purports to have uncovered three "variants" of the purported "diversion scheme."

First, the Receiver contends that a person known as "Terry Lane" and other "unknown individuals" contacted unnamed CFS merchants by telephone and email to explain that their merchant balances owed to CFS had been assigned to Platinum Rapid (a company owned by Vincent Bardong, which Defendants have no ownership or control over). Although the Motion claims that this was done to "dozens of CFS merchants" and that Platinum Rapid succeeded in collecting at least $1.15 Million from at least 86 CFS merchants between July 2020 and July 2021, the only example the Receiver purports to show is a single email chain between Terry Lane and Tyson Hoff (neither of whom are known to the Defendants). This email appears to relate to funding that Alpero General Contracting and Roofing Systems LLC received from Main Line Funding[4] – ***not from CFS*** – and contains no mention of an assignment to Platinum Rapid. This unauthenticated email chain – even if accepted at face value – is evidence of nothing, since it does not show a purported assignment from CFS to Platinum Rapid or that any funds owed to CFS were

---

[3] The Receiver excerpts the provisions of the Receivership Orders in its Motion. (*See* D.E. 1328, p. 18-19). While the Receivership Orders speak for themselves, this proceeding hinges on the Receiver's erroneous allegations regarding the Defendants' conduct, and not on any nuances in the interpretation of the Receivership Orders.

[4] Exhibit 7 to the Receiver's motion includes a letter from Platinum Rapid, which may have been an attachment to the email chain at issue. The image quality on the letter is so poor it cannot be read with the naked-eye – but when the document is enlarged it clearly refers to a debt owed to Main Line Funding. Upon information and belief, Main Line Funding is the d/b/a for Financial Mutual, which is Francis Scarpati's company. The Defendants have no interest in, or control over, Financial Mutual or Main Line Funding.

diverted to the Defendants or for their benefit.[5] Furthermore, even if this email chain did show a diversion of merchant receivables from CFS to Platinum (which does not appear to be the case) there is no indication that any of this was done with the Defendants' knowledge or at their direction.[6]

For the so-called second variant, the Receiver contends that unnamed CFS merchants made wire transfers using wire instructions provided by a person purporting to represent Platinum Rapid without realizing that the payments were directed to Financial Mutual and not to Platinum Rapid or CFS. The Receiver suggests this was a widespread pattern of behavior, but – again – has only identified a single $5,000 wire transfer made by Hendrick Varona to Financial Mutual from an account belonging to Lee Roofing LLC.[7] (*See* Receiver's Exhibit 8, DE 1328-8). Again, the Receiver has not presented any evidence that the $5,000 payment was earmarked to pay for a debt owed to CFS, or that Mr. Varona was tricked into believing that this wire payment would be credited against any debt he may have owed to CFS. The Receiver also has not presented a shred of proof that the Defendants knew about this transaction – let alone that they orchestrated or

---

[5] The Receiver appears to believe that this email exchange reflects an effort to collect from a CFS merchant because "Terry Lane" used an "@contractfinancingsolution.com" email address to communicate with Mr. Hoff. However, the attachment to the email refers to funding provided by Main Line Funding, and the emails provide no indication that "Terry Lane" was attempting to collect a balance owed to CFS. To the extent Tyson Hoff and/or Alpero General Contracting and Roofing Systems LLC had MCA contracts with CFS, it is entirely possible that they obtained separate and/or additional funding agreements with Platinum Rapid and/or Main Line Funding, and that the subject emails reflect efforts to collect on those MCA contracts.

[6] The Defendants have no personal knowledge regarding the collection efforts reflected in the emails. To the extent "Terry Lane" was trying to collect a debt owed to CFS, he or she did not do so on the Defendants' behalf.

[7] Public filings identify Mr. Varona as the Manager and Registered Agent of both Lee Roofing LLC and Alpero General Contracting and Roofing Systems LLC. (*See* Exhibit 4). Notably, Alpero is the corporation discussed in connection with the Receiver's first alleged variation of the "diversion scheme." Thus, two of the three "diversion schemes" the Receiver purports to have uncovered appear to be based on efforts to collect from a single merchant – a merchant who has not provided a declaration or given testimony to support the Receiver's unsubstantiated claims.

approved it.[8]

Third, the Receiver contends that three of CBSG's "exception portfolio merchants – B&T Supplies, Inc., Lifeguard Office Supplies, Inc. and Bene Market – made payments to Financial Mutual (which is owned by Francis Scarpati) and to BG Sky Trade LLC (which is owned by John Mulvihill), and that these payments were diverted from CBSG. The Motion presents charts that purport to show $500,000 in payments from B&T Supplies and Lifeguard Office Supplies to BG Sky Trade (Tzvi Odzer's companies), $1,085,000 in payments from Bene Market (Alan Redmond's company) to BG Sky Trade, and $1,500,000 in payments from Bene Market to Financial Mutual. While the Receiver makes the bold assertion that these charts demonstrate a "complex web of rerouted payments through nominee-controlled or shell corporations" (DE 1328, p. 14), once again, absolutely no proof is provided. Indeed, the Receiver has presented no evidence that these monies were actually paid,[9] that the monies constitute payments on MCA contracts with Receivership Entities which were being diverted, or – most importantly – that either of the Defendants directed (or even knew about) these payments.

Having failed to present any proof that the monies which were allegedly paid to Financial Mutual, BG Sky Trade and Bushwick BG were diverted from the Receivership, the Receiver proceeds to speculate about payments these companies made to professionals hired by the Defendants and to other persons and entities who are not subject to the Receivership.[10] The

---

[8] The Defendants do not have any knowledge regarding this transaction. However, they believe that some merchants likely sought funding from other MCA lenders after the Receivership was established and they were no longer able to obtain funds from CBSG or CFS. It is entirely possible that this merchant received separate funding from Financial Mutual, and that this wire payment may have been a payment on cash advanced by Financial Mutual.
[9] There are no bank statements or other records attached to the Motion to evidence the payments.
[10] The Receiver cynically labels such payees "shell corporations owned by loyal nominee owners" and "straw check cashers" – but presents no evidence to support these claims.

Receiver appears to believe that the mere existence of these payments shows, *ipso facto*, that Financial Mutual, BG Sky Trade and Bushwick BG received diverted funds and then paid them out at the Defendants' direction as part of a diversion scheme. While the payments at issue obviously fail to provide such proof, the Defendants will now discuss other evidence which expressly contradicts many of the Receiver accusations.[11]

### II. The Defendants Have Marshalled Evidence to Debunk the Receiver's Unsubstantiated Allegations

While the Receiver has clearly not met its burden of proof (and the Defendants are under no obligation to prove a negative) counsel for the Defendants have investigated some of the third-party transactions at issue and have discovered facts and evidence which contradict many of the Receiver's claims. While the Defendants were not personally involved in the transactions at issue, they believe the following to be true based on what they have learned to date:

#### A. Payments for the Defendants' Professional Fees

The Receiver points to payments that Financial Mutual, BG Sky Trade and Bushwick BG made to lawyers and other professionals retained by the Defendants as evidence of wrongdoing. However, all of these payments were arranged by Joseph LaForte's brother, James LaForte, out of legitimate monies he was entitled to as part of his efforts to assist his family with their legal problems in their hour of need. (*See*, generally, James LaForte Declaration, Exhibit 1). The Receiver states that Financial Mutual paid $2,059,129.95 to Defendants' professionals and asserts (apropos of nothing) that these were diverted funds. (*See* D.E. 1328, p. 23). But James LaForte

---

[11] The fact that the Defendants do not attempt to explain *every* payment by a third-party referred to in the Motion should not be construed as an admission that any payments were illegitimate or improper. The Defendants do not bear the burden of proof and are not obliged to prove anything. In the absence of substantiation provided by the Receiver, it is simply not possible for Defendants to identify merchants who were allegedly involved in transactions which the Receiver questions, but does not identify.

and Francis Scarpati (the owner of Financial Mutual) have provided sworn Declarations attesting to the fact that Financial Mutual made payments to these professionals as part of a $3 Million loan Financial Mutual provided to James LaForte. (*See* Exhibit 1, ¶ 6-7; Exhibit 2, ¶ 6). Likewise, James LaForte has attested that he made payments to professionals out of the account of his restaurant business (Bushwick Beer Garden), and that he arranged for BG Sky Trade (where he earns commissions from his work as an account representative) to make payments to attorneys in satisfaction of certain commissions owed to him by BG Sky Trade. (*See* Exhibit 1, ¶ 8). These Declarations demonstrate that none of these payments came from diverted funds.

### B.  Payments from Tzvi Odzer and his Companies

The Receiver states that two companies owned by Tzvi Odzer – B&T Supplies and Lifeguard Office Supplies – made $500,000 in payments to BG Sky Trade. The Defendants do not have any direct knowledge regarding these payments, but James LaForte has attested that Mr. Odzer agreed to make this payment to BG Sky Trade (and other payments to Joseph LaForte's attorneys) in partial satisfaction of a $1.5 Million commission Mr. Odzer (or his companies) owed James LaForte for procuring a very large shipment of PPE during the early days of the Pandemic. (*See* Exhibit 1, ¶ 12).

### C.  Payments from Bene Market to Financial Mutual and BG Sky Trade

The subject Motion lists 19 payments totaling $1.5 Million from Bene Market to Financial Mutual that were made between January 15 and May 18, 2021, and baldly asserts that these represent diverted funds. However, Francis Scarpati attests that these were payments Financial Mutual earned for leads it provided to Bene Market, and he has provided invoices which perfectly match the payments identified by the Receiver. (*See* Exhibit 2, at ¶ 5 and Ex. A).

Likewise, the Receiver points to $1,085,000 in payments from Bene Market to BG Sky Trade that were made between August 2020 and January 2020. However, James LaForte attests that he does business with and through BG Sky Trade, that BG Sky Trade has provided leads to Bene Market on a commission basis, and that he believes the payment at issue reflect earned commissions for leads. (*See* Exhibit 1, ¶ 13). Accordingly, all of these payments appear to reflect legitimate transactions between third-parties – which have absolutely nothing to do with the Defendants, the Receivership, or diverted funds which ought to have been paid to the Receivership.

**D.**   **Funds Paid To and By Dayne Property Management**

The Receiver states that James LaForte's company, Bushwick BG, LLC, paid $1,392,400 to Dayne Property Management Group, Inc., and that Dayne paid $94,281 in property taxes on Lisa McElhone's home in Jupiter, Florida in May of 2022.  James LaForte has confirmed that he paid Dayne $1,392,412, but these payments do not constitute diverted funds – they were made for substantial renovation work Dayne performed for several restaurants in which James LaForte has an ownership interest. (*See* Exhibit 1). James LaForte has provided the invoices reflecting the work performed, the total amounts paid, as well as photographs showing a representative sampling of the work Dayne performed in order to earn these payments. (*Id*. at Ex. B and C).

James LaForte also attests that he asked Joe Talamini (who owns Dayne, and is a good friend with whom James LaForte does a significant amount of business) to pay the property taxes on the Jupiter home at a time when James LaForte was cash strapped. (*Id.* at ¶ 15). Mr. Talimini agreed to make the requested payment, and James LaForte quickly repaid Mr. Talimini as he had promised to do.[12] (*Id.*). Once again, these payments have nothing to do with CBSG and provide

---

[12] Given the friendship between James LaForte and Mr. Talimini, and their significant business ties (James' company paid Mr. Talimini's company more than $1.3 Million for services over a

no evidence of a diversion scheme – let alone one orchestrated by the Defendants

### E. Platinum Rapid and Financial Mutual Deny the Receiver's Allegations

The Receiver claims that Platinum Rapid and Financial Mutual were at the center of two of the three alleged "diversion scheme variants" identified in the Motion. Specifically, the Receiver asserts that: 1) unknown individuals contacted CFS merchants to trick them into thinking their account balances had been transferred to Platinum Rapid, and that Platinum Rapid collected at least $1.15 Million from at least 86 CFS merchants; and, 2) that a person purporting to act on behalf of Platinum Rapid tricked CFS merchants into submitting payments to Financial Mutual's bank account. (D.E. 1328, p. 10-11). The Receiver has not provided a shred of evidence to prove that *any* CFS merchants were tricked in these ways – let alone that any of this was done for the Defendants' benefit or at their direction. Furthermore, Vincent Bardong (the owner of Platinum Rapid) and Francis Scarpati (the owner of Financial Mutual) have provided sworn declarations in which they flatly deny these allegations and affirm that the Defendants *did not* have any involvement in their businesses or attempt to orchestrate their actions in any way. (*See* Declaration of Vincent Bardong, attached as Exhibit 5, and Scarpati Declaration, Exhibit 2).

The Receiver also attempts to draw an inference of wrongdoing by asserting that Francis Scarpati emptied and closed Financial Mutual's bank account with Bank of America four weeks after the Receiver issued a subpoena to obtain records from that account. The Defendants have no personal knowledge of these matters. However, Mr. Scarpati has declared under penalty of perjury that it was Bank of America that chose to close the account after it was subpoenaed. (*See* Exhibit 2, ¶ 10). Thus, the Receiver appears to have jumped to conclusions – once again – in an attempt to

---

sixteen-month period) it is not unusual that Mr. Talimini would agree to provide James LaForte with a short-term loan.

substantiate its false allegations against the Defendants.

### III. The Court Must Decline the Receiver's Invitation to Consider Hearsay and Unproven Collateral Allegations in Connection with the Present Motion

Instead of presenting actual evidence that the Defendants have violated the Receivership Order, the Receiver relies on bald rhetoric by simply proclaiming that the Defendants' "egregious and numerous violations" are "emphatically clear." (D.E. 1328, p. 18). Then – in an attempt to deflect from the obvious factual and evidentiary deficiencies in the Motion and overcome the Defendants' anticipated counter-arguments – the Receiver asks that the Court "consider [Defendants'] explanations in light of" other unproven matters which pre-date the Receivership and/or have nothing to do with the issues presented in the present Motion. *Id.* at p. 22. Although the Receiver's irrelevant allegations regarding these collateral matters are addressed briefly below, it is clear that the Receiver is simply trying to muddy-the-waters, and this Court (which sits in equity) need not and should not countenance the Receiver's improper arguments.

First, the Receiver contends that the Court should consider the Defendants' alleged "Pre-Receivership efforts to collect cash from merchants, thereby keeping the money off of the CBSG's books and unavailable to investors." *Id.* Although the Receiver does not cite any support for the contention, he appears to be referencing the self-serving and unsubstantiated hearsay statements of Tzvi Odzer (a/k/a Stephen Odzer), contained in a "report" by an accounting firm Mr. Odzer retained. (*See* D.E. 1328-12, referred to herein as the "Report"). To begin, the Report is pure hearsay and is inadmissible for any purpose in this proceeding. Second, the Report acknowledges that Mr. Odzer and his companies borrowed more than $92 Million from CBSG, and presents salacious and unsupported allegations in an effort to offset this enormous debt.[13] Indeed, the

---

[13] Although the Receiver contends that Odzer participated in the diversion of funds from the Receivership, the fact of the matter is the Receiver is in possession of a Confession of Judgment

Report admits that – even if Mr. Odzer were entitled to all of the unsubstantiated offsets he is claiming (which he absolutely is not) – he and his companies would still owe CBSG more than $8.5 Million.[14]

The self-serving and unsworn Report is almost exclusively directed to events and transactions which allegedly occurred *before* the Receivership incepted on July 27, 2020. The only transactions referenced in the Report which occurred after the Receivership are a handful of wire transfers made to persons and entities outside of the Defendants' control. While the Report contends that "LaForte" (it does not specify whether this refers to Joseph or James) directed Odzer to make these payments, this statement constitutes inadmissible hearsay, and is not supported by any actual evidence. Furthermore – and laying aside all of the evidentiary issues only for the moment – Mr. Odzer's credibility is sorely lacking. In addition to the fact that Mr. Odzer has a direct financial interest in saying anything he can to eliminate or reduce his nearly $100 Million debt, Mr. Odzer is a convicted felon having been found guilty of bank fraud and conspiracy, for which he served a prison sentence and was ordered to pay more than $16 Million in restitution.[15]

---

for Mr. Odzer's companies, and a Surety Agreement in which Mr. Odzer personally guarantees those debts. Notwithstanding, the Receiver has not filed the COJ or taken any legal action to collect the $92 Million debt from Mr. Odzer or his companies – even though they are solvent and have substantial assets. The Receiver's silence and inaction on these issues speaks volumes about the Receiver's belief in Odzer's credibility.

[14] To be absolutely clear, the debt at issue is *much* larger than $8.5 Million, and Mr. Odzer's self-serving statements about the alleged reduction of his debt should not begiven any credit at all.

[15] In January of 2021, Mr. Odzer received a presidential pardon, which was conditioned on payment of the outstanding balance of the restitution order to his victims. (*See* Pardon, attached as Exhibit 6). It is unclear whether the restitution has been made. In seeking the pardon, advocates for Mr. Odzer attempted to portray him as a philanthropist, citing his donation of PPE during the Covid crises. (*See* Statement from the Press Secretary Regarding Executive Grants of Clemency, attached as Exhibit 7). Ironically, the PPE Mr. Odzer donated was purchased with funding obtained from CBSG (which he has not repaid). Furthermore, the Odzer Report alleges that PPE Odzer procured from James LaForte with CBSG funding was "worthless" and "non-salable" and that he is therefore entitled to offset his debt to CBSG by $1.5 Million (which is the amount of James LaForte's commission on the PPE deal). Aside from the fact that Odzer's self-serving claims

It is notable that the Receiver fails to mention this in the Motion, since he took great pains to note the criminal history of each person who is allegedly associated with Joseph LaForte (no matter how attenuated). The Receiver's efforts to paint LaForte and his alleged "associates" in a bad light based on their prior records – while completely ignoring Odzer's fraud convictions and his enormous ($92 Million) financial interest in avoiding his debts to CBSG – speaks volumes.

Second, the Receiver contends that the Court should consider the Receiver's prior unproven allegations that the Defendants violated the Receivership Orders based on an alleged data breach, and a separate contempt motion relating to the transfer of property to Kingdom Logistics (which was not adjudicated on the merits in this Court, and is now the subject of a separate lawsuit brought by the Receiver in Texas). The Defendants previously settled the Receiver's "data breach" claim *without admitting any wrongdoing* in order to avoid getting bogged-down in expensive and distracting collateral proceeding. The Kingdom Logistic lawsuit is still pending, and Lisa McElhone (who is a party to that action) has denied all liability and is vigorously defending herself. The Receiver is aware that there was no adjudication of wrongdoing in either of these proceedings and that he amicably resolved the alleged "data breach" matter, but he is nevertheless attempting to use these unproven collateral allegations to cast doubt on the Defendants' credibility. But no amount of commentary about prior unrelated matters can serve as a surrogate for clear and convincing evidence in admissible form – of which the Receiver has none.

In short, salacious hearsay and unproven allegations of unrelated bad conduct are not substitutes for clear and convincing evidence of the specific alleged contempt violations at issue in this Motion. Accordingly, the Court may not properly consider the Odzer Report or the

---

are hardly credible, it bears mention that Mr. Odzer presumably did not disclose these alleged "facts" in connection with his application for a pardon.

Receiver's prior contempt allegations in connection with the present Motion.

## IV. The Receiver Presents No Evidence Whatsoever Relating to Lisa McElhone

The subject motion is premised on the Receiver's unsupported allegations that Joseph LaForte's "personal contacts" received payments from CFS merchants and funneled it back to the Defendants as part of massive diversion scheme. While these allegations are based on pure conjecture and cannot be sustained, it is important to note that the Receiver does not even insinuate that Lisa McElhone had any knowledge of or involvement in any of the transactions at issue, or of the alleged orchestration of this scheme. [16]

## V. Demand for an Evidentiary Hearing

The Court's Order to Show Cause provides that an evidentiary hearing will be held on the Receiver's Contempt Motion. (D.E. 1332, p. 3). But in an abundance of caution, the Defendants demand an evidentiary hearing to address the numerous disputed issues of fact presented in the Receiver's Motion and this Opposition.

## **CONCLUSION**

As discussed in the Court's Order to Show Cause (D.E. 1332), the Motion alleges that the Defendants violated the Receivership Order by: 1) diverting merchant collections from CBSG and CFS to other entities they controlled; 2) laundering the diverted funds through shell and nominee corporations; and 3) using the laundered funds for their personal use and fund. However, the

---

[16] Furthermore, from July 28, 2020 through the expansion of the Receivership on December 16, 2020, Ms. McElhone had access to the bank accounts of Eagle Six Consulting, Heritage Business Consulting, and the various commercial real estate properties which were rented and managed through LM Property Management (amongst other accounts). Ms. McElhone did not touch these bank accounts (which had a combined value of over $8 Million) during this timeframe. Indeed, she continued to manage and maintain the commercial properties – without compensation – while rent payments accumulated in the bank accounts, thus preserving these funds for the Receiver. Ms. McElhone's conduct during this time speaks volumes, and should be weighed against the Receiver's vague and unsubstantiated claims that she somehow participated in a diversion scheme.


Receiver has not presented *any* evidence to support these allegations – let alone the clear and convincing evidence needed for the Receiver to carry his burden. Indeed, the Motion does not present a scintilla of evidence to show that either of the Defendants was involved in *any* of the transactions at issue. Moreover, the evidence proffered by the Defendants debunks many of the Receiver's unsupported allegations. For all of these reasons, there has been no showing that the Defendants violated the Receivership Orders in any way, and the Defendants cannot be held in contempt.

Dated: August 29, 2022.

| | |
|---|---|
| **KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT** *Attorneys for Joseph W. LaForte* One W. Las Olas Blvd., Suite 500 Fort Lauderdale, Florida 33301 Tel: (954) 525-4100<br><br>By: */s/ David L. Ferguson*<br>  DAVID L. FERGUSON<br>  Florida Bar Number: 0981737<br>  Ferguson@kolawyers.com<br>  JOSHUA R. LEVINE<br>  Florida Bar Number: 91807<br>  Levine@kolawyers.com<br><br>**LAW OFFICES OF ALAN S. FUTERFAS**<br>565 Fifth Avenue, 7th Floor<br>New York, New York 10017<br>Telephone: 212-684-8400<br>asfuterfas@futerfaslaw.com<br>*Attorneys for Lisa McElhone*<br><br>By: */s/ Alan S. Futerfas*<br>  ALAN S. FUTERFAS<br>  *Admitted Pro Hac Vice* | **KAPLAN ZEENA LLP** *Attorneys for Defendant Lisa McElhone* 2 South Biscayne Boulevard, Suite 3050 Miami, Florida 33131 Telephone: (305) 530-0800 Facsimile: (305) 530-0801<br><br>By: */s/ James M. Kaplan*<br>  JAMES M. KAPLAN<br>  Florida Bar No.: 921040<br>  james.kaplan@kaplanzeena.com<br>  elizabeth.salom@kaplanzeena.com<br>  service@kaplanzeena.com<br>  NOAH E. SNYDER<br>  Florida Bar No.: 107415<br>  noah.snyder@kaplanzeena.com<br>  maria.escobales@kaplanzeena.com<br>  julie.valdes@kaplanzeena.com |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this  29th  day of August 2022, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmissions of Notices of Electronic Filing generated by CM/ECF.

By: /s/ *James M. Kaplan*  
JAMES M. KAPLAN