IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-CV-81205-RAR

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d/b/a PAR FUNDING, et al.,

        Defendants.
_____/

**RECEIVER'S REPLY TO DEFENDANTS JOSEPH LAFORTE AND LISA MCELHONE'S OPPOSITION TO MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS JOSEPH LAFORTE AND LISA MCELHONE SHOULD NOT BE HELD IN CONTEMPT**

      Ryan K. Stumphauzer, Esq., Court-Appointed Receiver ("Receiver") of the Receivership Entities, by and through his undersigned counsel, hereby files his Reply to Defendants Joseph LaForte ("LaForte") and Lisa McElhone's ("McElhone") (collectively, the "Defendants") Response [ECF No. 1385] (the "Response") in opposition to the Receiver's Motion for an Order to Show Cause Why Defendants Joseph LaForte and Lisa McElhone Should Not Be Held in Contempt [ECF No. 1328] (the "Motion") and states:

**INTRODUCTION**

      In their Response, LaForte and McElhone argue that the Receiver's Motion is nothing more than an "unsubstantiated narrative" that is not supported by any evidence "in admissible form." (Response at 1). Rather, they suggest, the Receiver has merely identified a "handful of transactions" that do not "actually show that any funds were diverted from the Receivership or that either of the Defendants were involved in the transactions." (*Id*.). In an effort to support their

position, the Defendants have submitted a declaration of LaForte's brother, James "Jimmy" LaForte ("Jimmy LaForte"), as well as declarations from two of Jimmy LaForte's close friends.

Denying that any improper diversion took place, the Defendants suggest that the millions of dollars the Receiver identified in the Motion "came from a $3 Million loan" that one of Jimmy LaForte's friends, Francis Scarpati, through his company Financial Mutual, provided to Jimmy LaForte. (*Id*. at 2). They even attach a copy of a purported loan agreement that Mr. Scarpati and Jimmy LaForte executed. Criticizing the Receiver for "not properly investigat[ing]" this matter and "not actually understand[ing]" these transactions, the Defendants emphatically proclaim that "[n]one of these funds represent diverted receivables owned by CBSG or CFS in any way." (*Id*.)

As the Receiver will demonstrate at the upcoming hearing on the Motion, however, the opposite is true. There is overwhelming evidence of this diversion scheme. Notwithstanding what is contained in his sworn declaration, Mr. Scarpati, the longtime friend of Jimmy LaForte, will testify at the hearing that funds he "loaned" for the payment of LaForte and McElhone's legal fees in this case, in fact, came from contract balances he collected from CFS merchants. Using an alias and misrepresenting to merchants that their balances had been "transferred" to another MCA company, Scarpati collected at least $950,000 in diverted CFS receivables and used those funds to pay LaForte and McElhone's professional fees. The Receiver is prepared to present this and other evidence that clearly and convincingly establishes this diversion scheme and that LaForte and McElhone violated this Court's orders.

## ARGUMENT

**A. The Defendants misunderstand the procedures governing contempt proceedings.**

In the Opposition, the Defendants criticize the Receiver for failing to support the allegations in the Motion with clear and convincing evidence. (Opposition at 5). To that end, they

suggest that there is a "complete absence of proof" in the Motion. Although "clear and convincing" is the correct standard of proof for finding a party in contempt, the time for the Receiver to provide such proof is at the evidentiary hearing on the Motion, and not in the Motion itself. The Receiver previously explained this in the Motion:

> "If the court finds that the conduct *as alleged* would violate the prior order, it enters an order requiring the defendant to show cause why [the party] should not be held in contempt and conducts a hearing on the matter." *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990) (emphasis added); *Wyatt ex rel. Rawlings v. Rogers*, 92 F.3d 1074, 1078 (11th Cir.1996) (stating that the moving party need only *allege* facts, which if true, would support a contempt finding).

(Motion at 16).

The Receiver alleged sufficient facts in the Motion to justify the Court entering a show cause order and scheduling a hearing during which the Receiver will present his evidence. Indeed, as alleged in the Motion, the Receiver identified an extensive diversion scheme, which constitutes a violation of the Court's various orders appointing the Receiver, placing the Receiver in charge of the Receivership Entities, and imposing an asset freeze over "Receivership Assets" and "Recoverable Assets." The Receiver is prepared to present admissible evidence that clearly and convincingly proves these allegations at the hearing on September 12, 2022.

The Defendants further criticize the Receiver for relying on "hearsay and unproven collateral allegations" in support of the Motion.[1] Much of what the Defendants are referring to—such as the accounting report detailing cash payments from the owner of B&T Supplies to Joseph LaForte and Jimmy LaForte, and the Receiver's prior show cause motion relating to the Defendants' data breach—were simply included in this Motion to put these additional violations

---

[1] Ironically, the only "evidence" the Defendants provide in their Opposition are three declarations, none of which the Defendants will be permitted to introduce at the evidentiary hearing to prove the truth of the statements contained therein. *See* Fed. R. Evid. 1101(b) ("These rules apply in . . . civil cases and proceedings" and "contempt proceedings.").

in context, but are not necessary to prove the diversion scheme. In any event, the Receiver will reduce his proof of this diversion scheme to admissible evidence at the upcoming hearing.[2]

## B. The Receiver provided the Defendants with extensive evidence of the scheme.

In the Motion, the Receiver identified millions of dollars of diverted payments to "nominee-controlled or shell corporations," which were then used to pay LaForte and McElhone's legal fees in this case. The Defendants state in their Opposition that "the Receiver has presented no evidence that these monies were actually paid," going so far as suggesting that "[t]here no bank records or other records attached to the Motion to evidence the payments." (Opposition at 7). What the Defendants fail to mention is that on August 19, 2022, ten (10) days before they filed their Opposition, the Receiver sent these very bank records to the Defendants.

The Receiver could have filed these bank records on the public docket, but chose not to for several reasons. First, with the docket in this case now approaching 1,400 entries, the Receiver did not see a need to flood the docket with every bank record evidencing every single payment the Receiver has identified as part of the diversion scheme. Rather, the Receiver included in his Motion summary tables of the total amounts that various entities and individuals paid or received as part of this diversion scheme, along with samples of the checks and bank statements reflecting these transactions. The Receiver will present this evidence to the Court at the contempt hearing.

Second, the bank records contain numerous references to account numbers and other financial information that the Receiver would have needed to redact prior to filing. Given the

---

[2] The Receiver does not anticipate that LaForte or McElhone will testify at the hearing. Rather, their counsel indicated that LaForte and McElhone would assert their Fifth Amendment rights in response to the Receiver's questions about the diversion scheme. As a result, counsel for the Receiver is working with counsel for LaForte and McElhone on finalizing a stipulation confirming that LaForte and McElhone would assert their Fifth Amendment rights if asked certain questions at the hearing regarding the diversion scheme, in lieu of requiring them to appear and assert their Fifth Amendment right in response to each of those questions

voluminous nature of these records, the Receiver decided it was not an appropriate use of the Receivership Estate's resources to redact all potentially sensitive information from these records.

Third, as discussed above, the time for the Receiver to *prove* his allegations is at the evidentiary hearing on September 12, 2022. On the other hand, his obligation in filing the Motion was simply to include sufficient facts that, as alleged, reflected a violation of this Court's orders. The Receiver more than satisfied this standard in providing summaries and totals of the diverted funds, and is prepared to provide the Court with detailed evidence at the upcoming evidentiary hearing to warrant a finding of contempt against LaForte and McElhone.

**C. The main witness LaForte and McElhone identify in their Opposition—Francis Scarpati—will testify at the upcoming hearing, contradict much of what was contained in his declaration that the Defendants presented to this Court, and admit to participating in the diversion scheme.**

The Receiver's Motion describes, as part of this diversion scheme, that dozens of CFS merchants were tricked into paying funds to other companies, including Platinum Rapid Funding and Financial Mutual, and that these funds were then used to pay the fees for LaForte and McElhone's lawyers and forensic accountant in this case. The Defendants scoff at these allegations, suggesting that there is not "a shred of evidence to prove that *any* CFS merchants were tricked in these ways." (Opposition at 11). The Defendants further deny that Francis Scarpati, the owner of Financial Mutual, was in the middle of executing this diversion scheme. In fact, they go so far as attaching a declaration from Mr. Scarpati, explaining that Mr. Scarpati "flatly den[ies] these allegations." (*Id.*) Rather, they suggest, the Receiver has "jumped to conclusions," and does not appreciate that Mr. Scarpati was simply paying these professional fees as a favor to his childhood friend, Jimmy LaForte, under a $3 million loan agreement.

The Receiver issued a subpoena to Mr. Scarpati commanding him to testify at the upcoming evidentiary hearing on September 12, 2022. Mr. Scarpati's counsel indicated that Mr. Scarpati

was not available to attend the hearing—either in person or over Zoom—due to other pre-planned travel arrangements. As a result, the Receiver's counsel took the videotaped deposition of Mr. Scarpati on September 7, 2022. The Receiver has ordered the transcript of this deposition on an expedited basis and will present Mr. Scarpati's deposition testimony to the Court at the hearing.

To put it mildly, Mr. Scarpati's deposition testimony is devastating to LaForte and McElhone's efforts to oppose the Motion. Mr. Scarpati admitted several critical facts during the deposition, including the following:

- Mr. Scarpati described himself as a longtime friend of Jimmy LaForte.

- Immediately before the appointment of the Receiver, Mr. Scarpati worked for CBSG and, prior to that, he worked for its affiliate Fast Advance Funding LLC.

- For the majority of the approximately four (4) years he worked for CBSG and its related entities, Mr. Scarpati worked directly under the supervision of Jimmy LaForte.

- After the appointment of the Receiver and imposition of the asset freeze, Mr. Scarpati used an alias, "Terry Lane," and sent emails from a CFS email address to CFS merchants, urging them to pay off their CFS balances to Platinum Rapid Funding.

- Mr. Scarpati estimated that approximately 75 CFS merchants agreed to make these payments, which totaled at least $900,000.00.

- Platinum Rapid Funding then wired these funds to one of Mr. Scarpati's companies, Financial Mutual.

- Scarpati, through Financial Mutual, then "loaned" these funds to Jimmy LaForte under the terms of a written loan agreement. Contrary to what he represented in his declaration, however, the loan agreement was not for a loan of $3 million. Rather, the loan amount was "open-ended" under which Mr. Scarpati, at Jimmy LaForte's

direction, would send out as much money as Jimmy LaForte requested and Mr. Scarpati could provide from his account at Financial Mutual. These payments totaled more than $3.2 million, including more than $2 million that Financial Mutual paid directly to LaForte and McElhone's lawyers and forensic accountant in this case.

- Mr. Scarpati testified that the loan agreement, which is dated as of August 1, 2020, did not include the $3 million figure when Mr. Scarpati and Jimmy LaForte allegedly executed the agreement on that date. [ECF No. 1385-2 at pp. 24-26]. Rather, Mr. Scarpati confirmed that this figure was filled in within the last 30 to 60 days (*i.e.*, after the Receiver filed the Motion).

- Despite the statement in his declaration that Mr. Scarpati had no business dealings with LaForte following the establishment of the Receivership, Mr. Scarpati confirmed the authenticity of a text message thread from October 2020, in which he asked another former Par Funding employee, John "Jack" Mulvihill, who is the owner of BG Sky Trade LLC, to send him commissions that were owed to "Jimmy and Joe." Mr. Scarpati confirmed that "Jimmy and Joe" was a reference to Jimmy LaForte and Joseph LaForte. He further testified, however, that he could not recall why he would have been requesting the payment of any commissions owed to Joseph LaForte after the establishment of the receivership.

Mr. Scarpati also testified about a number of other topics relating to the diversion scheme.

Thus, despite the Defendants' suggestion that there is not "a shred of evidence to prove that any CFS merchants were tricked in these ways," Mr. Scarpati flatly admitted that he participated in this diversion scheme, in the precise manner the Receiver described in the Motion. The Receiver will present this and other evidence to the Court at the upcoming evidentiary hearing,

conclusively establishing this diversion scheme and LaForte and McElhone's violations of this Court's orders.

## CONCLUSION

For the foregoing reasons and those further explained in the Motion, the Receiver submits that he will prove this diversion scheme with clear and convincing evidence, and requests that the Court enter an Order finding LaForte and McElhone in contempt of court and granting such other and further relief as is just and proper.

Dated: September 8, 2022

Respectfully Submitted,

**STUMPHAUZER FOSLID SLOMAN ROSS & KOLAYA, PLLC**
Two South Biscayne Blvd., Suite 1600
Miami, FL 33131
Telephone: (305) 614-1400
Facsimile: (305) 614-1425

By: */s/ Timothy A. Kolaya*
   TIMOTHY A. KOLAYA
   Florida Bar No. 056140
   tkolaya@sfslaw.com

*Co-Counsel for Receiver*

**PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP**
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

By: */s/ Gaetan J. Alfano*
   GAETAN J. ALFANO
   Pennsylvania Bar No. 32971
   *(Admitted Pro Hac Vice)*
   GJA@Pietragallo.com

*Co-Counsel for Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 8, 2022, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA
