**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-CV-81205-RAR**

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

**v.**

**COMPLETE BUSINESS SOLUTIONS GROUP,**
**INC. d/b/a PAR FUNDING, *et al.*,**

      **Defendants.**

_____/

**DEFENDANTS JOSEPH LAFORTE AND LISA MCELHONE'S MOTION
FOR RECONSIDERATION OF THE COURT'S ORDERS GRANTING THE
RECEIVER'S MOTION TO COMPEL LISA MCELHONE AND JOSEPH LAFORTE
TO PAY ALLEGED OBLIGATIONS OR VACATE AND SURRENDER THEIR
HAVERFORD HOME AND INCORPORATED MEMORANDUM OF LAW**

Defendants, Joseph LaForte and Lisa McElhone (collectively the "Defendants"), by and through their undersigned counsel, and pursuant to Federal Rules of Civil Procedure 60(b), respectfully request that the Court recede, and grant relief, from its Order Compelling Lisa McElhone and Joseph LaForte to Vacate and Surrender Haverford Home Or, In The Alternative, Pay Obligations For Single-Family Homes [ECF No. 1486] and its Order Lifting Stay Of The Court's Haverford Home Order [ECF No. 1503] (collectively the "Haverford Home Orders"), and as support therefore state as follows:

**INTRODUCTION AND PROCEDURAL HISTORY**

The Defendants seek relief from the Haverford Home Orders, which are the product of flawed legal arguments which were impermissibly presented for the first time in a reply brief, and to which the Defendants had no opportunity to respond.

By way of background, on January 10, 2023, at 6:56 p.m., the Receiver filed a motion to

compel the Defendants to vacate and surrender their personal residence located at 568 Ferndale Lane in Haverford, Pennsylvania (the "Haverford Home") or, alternatively, to pay outstanding obligations which they allegedly owed pursuant to an agreement with the Receiver to pay "rent" on the Haverford Home, as well as carrying costs for the Haverford Home and two other single-family homes – a property located in Paupack, Pennsylvania (the "Paupack Home") and another property located in Jupiter, Florida (the "Jupiter Home").[1] (*See* ECF 1484, the "Motion to Evict").  Less than six (6) hours later (at 12:31 a.m. on Jan. 11, 2023) this Court granted the Receiver's Motion to Evict without giving the Defendants an opportunity to respond to the motion. (*See* ECF 1486, the "First Haverford Home Order"). At a Status Conference later that same day, counsel for the Defendants made an *ore tenus* motion to stay the Court's order on the Motion to Evict so the issues presented could be briefed, and the Court subsequently entered an order granting the stay. (*See* ECF 1488).

On January 23, 2023, the Defendants filed their Memorandum in Opposition to the Motion to Evict, in which they demonstrated that they were not obligated to pay the sums demanded by the Receiver because the agreement on which the obligation was premised had expired by its own terms, and because it would be inequitable to force the Defendants to pay these obligations under the facts presented. (*See* ECF 1497). On January 27, 2023, the Receiver filed a Reply brief in which he argued ***for the first time*** that the expired agreement between the Receiver and the Defendants had been a lease, and that – pursuant to Pennsylvania law (which the Receiver likewise argued for the first time) – the lease had converted to a holdover tenancy with the same terms and conditions that applied prior to expiry. (*See* ECF 1501). Defendants had no opportunity to respond to this new legal theory.

---

[1] The Motion to Evict also sought authorization to market commercial properties within the Receivership Estate for sale, and that relief was granted by the Court. The Defendants are not seeking reconsideration of the portion of the Court's order that authorized the Receiver to market these properties for sale. Accordingly, those portions of the Receiver's Motion, and the Defendants' Response in Opposition, are not discussed herein.

On Jan. 31, 2023, the Court lifted the stay on the First Haverford Home Order, holding that "the Receiver has clearly explained why the lease agreement between Defendants and the Receiver has not expired, but has instead converted into a holdover tenancy." (*See* ECF 1503, the "Second Haverford Home Order"). The Court's Second Haverford Home Order authorized the Receiver to proceed with the directives set forth in the First Haverford Home Order – which provided that, if the Defendants did not pay the Receiver the "past due rent for the Haverford Home, and other residential expenses and carrying costs for all three Single-Family Homes within the Receivership Estate"[2] within 30 days of the order, they would be required to vacate and surrender the Haverford Home to the Receiver within 90 days.

The Defendants now seek reconsideration of the Haverford Home Orders, and respectfully submit that the Court's holding that: a) the Defendants entered into a lease with the Receiver; and b) the lease converted into a holdover tenancy (which was the sole basis cited for the Court's determination that the Defendants owed the Receiver the claimed sums) were based on clear substantive and procedural legal errors. Specifically, the subject agreement – consisting of an email exchange between counsel for the Receiver and the Defendants – was not a valid and binding lease (let alone one governed by the substantive law of the State of Pennsylvania) because: it was ambiguous or silent on several key terms; it pertained to three different properties (only one of which the Defendants were permitted to occupy); and the agreement had expired on February 23, 2022 by its own terms. Furthermore, the Court's holding that the "lease" converted to a holdover tenancy with a one-year term by operation of Pennsylvania law is in direct conflict with its provision that – in exchange for payment of the sums the Defendants allegedly owe pursuant to the holdover tenancy – the Defendants would be permitted to reside at the Haverford House only until such time as the

---

[2] *i.e.*, the Haverford, Paupack and Jupiter Homes.

Receiver filed a motion with the Court seeking to sell the Haverford Home or require the Defendants to vacate and surrender the premises. Put simply, the law does not support the existence of a holdover tenancy which imposes obligations on the tenants for a fixed period of time but confers only a contingent right to occupancy which can be revoked at any time.

Finally, even if the substantive legal deficiencies with the Haverford Home Orders could be overcome (they cannot), the Haverford Home Orders are the product of clear procedural error because the Receiver first asserted that the subject agreement constituted a lease, and that a holdover tenancy was created after the lease expired, in a reply brief to which the Defendants were not afforded an opportunity to respond. Because it is well-established that a reply memorandum may not raise new arguments or evidence – and the Haverford Home Orders were based exclusively on the Court's approval and adoption of arguments the Receiver raised for the first time in its reply[3] – the Court's Haverford Home Orders are marred by procedural defects as well.

For all of these reasons, and as discussed in greater detail herein, the Haverford Home Orders are procedurally defective and are based on clear mistakes of law. Accordingly, reconsideration and relief from the Haverford Home Orders is appropriate under Federal Rule of Civil Procedure 60(b)(1). In view of the importance of this motion – and the grave consequences which will be imminently visited on Defendants in the absence of immediate relief (namely; eviction from their sole residence) – Defendants respectfully request that the Court schedule oral argument in order to permit the parties to further present their respective positions and to allow the parties to respond to direct questions by the Court.

---

[3] In point of fact, the words "lease", "holdover" and "tenancy" are not found *anywhere* in the Receiver's Motion to Evict. (*See* ECF 1484).

## <u>LEGAL STANDARD</u>

Rule 60(b)(1) allows a district court to relieve a party from an order or judgment based on "mistake." *See* Fed. R. Civ. P. 60(b) (1).   "As a matter of text, structure, and history, a "mistake" under Rule 60(b)(1) includes a judge's errors of law." *Kemp v. United States*, 213 L. Ed. 2d 90, 142 S. Ct. 1856, 1858 (2022).   "[W]here a district court's mistake was clear on the record and involved a plain misconstruction of the law and the erroneous application of that law to the facts, compelling policies of basic fairness and equity reflected by 60(b) may mandate amendment to conform its judgment to the law." *Nisson v. Lundy*, 975 F.2d 802, 806 (11th Cir. 1992) (citing *Compton v. Alton Steamship Co.*, 608 F. 2d 96, 104 (11th Cir. 1979)).

## <u>MEMORANDUM OF LAW</u>

The Court's Haverford Home Orders were wrongfully decided for at least two reasons. First, the Court's holding that the Defendants were subject to a lease agreement with the Receiver – and that the lease agreement had automatically converted to a holdover tenancy upon its expiration – was based on clear mistakes as to the law and the application of the facts to the law. Second, even if the law and the facts did support a finding that a holdover tenancy was created (which is denied for the reasons discussed herein), the Receiver alleged the existence of a lease and a holdover tenancy for the first time in a Reply memorandum of law, and the Defendants were not given an opportunity to respond to these arguments. Accordingly, the Court's determination that the Defendants were subject to a holdover tenancy was also the product of clear procedural mistakes of law.

### 1.  The Court Committed Error By Holding That the Receiver Established the Existence of A Lease and a Holdover Tenancy

As first filed, the Receiver's Motion to Evict ***did not*** contend that the Receiver leased the Haverford Home to the Defendants, let alone that a holdover tenancy was created after the lease expired. All the Motion said was that the Defendants "breached an agreement they reached with the

Receiver to pay rent and all carrying costs related to the Single-Family Homes."[4] (*See* ECF 1484 at p. 2). The Receiver went on to state that – if the Defendants paid the amount they allegedly owed under the "agreement" within 30 days – he would permit them to "continue to occupy the Haverford Home until such future time that the Receiver seeks an Order authorizing the Receiver to sell the Haverford Home or requiring McElhone and LaForte to vacate and surrender the Haverford Home." (*Id*. at p. 3).  In other words, the Receiver never contended that the expired agreement was a lease governed by Pennsylvania law, and likewise did not agree to allow the Defendants to continue living in the Haverford Home for a definite period of time in exchange for payment. Instead, the Receiver merely stated he would allow the Defendants to continue living in the Haverford Home until he decided otherwise and filed a motion to sell the house or evict the Defendants. The Receiver did not attach a copy of "agreement" to his Motion, nor did he acknowledge that the agreement had expired on its own terms.

In their Response in Opposition to the Motion to Vacate, the Defendants provided the Court with a copy of the subject agreement – a February 23, 2021 email exchange between the Receiver's attorney, Gaetan Alfano, and the Defendants' former counsel, James R. Froccaro (the "Agreement") – and pointed out that the Agreement clearly stated it would only "remain in place for the lesser of one year OR a verdict or other resolution in the SEC case." (*See* ECF 1497-1, p. 3).  Accordingly, the Defendants urged the Court to find that the Agreement had expired on February 23, 2022, and that it would be inequitable to force them to pay the sums the Receiver is seeking on pain of eviction under the facts presented.

In response, the Receiver filed a Reply brief in which he argued – for the first time – that the Agreement was actually a "lease," and that the lease had converted to a holdover tenancy "subject to

---

[4] The defined term "Single-Family Homes" refers to the Haverford, Paupack and Jupiter Homes.

the same terms, conditions, and covenants as the old lease." (*See* ECF 1501, p. 7). The Receiver therefore urged the Court to find that the Agreement "did not automatically terminate after one year… it simply converted to a holdover tenancy under the same terms and conditions." *Id*. The Receiver also expressly stated in his Reply that "[s]ince the prior term of the lease was one year, the holdover term also becomes one year, by operation of law" *Id*.  Of course, this assertion is in direct conflict with the Receiver's statement in his Motion to Evict that, if the Defendants paid, he would let them stay in the Haverford House "until such future time that the Receiver seeks an Order authorizing the Receiver to sell the Haverford Home or requiring McElhone and LaForte to vacate and surrender the Haverford Home."[5] (*Id*. at p. 3).

Notwithstanding the fact that the Receiver advanced internally inconsistent and irreconcilable arguments in his Motion to Evict and Reply brief, the Court accepted and adopted the analysis set forth in the Receiver's Reply in its Second Haverford Home Order, holding that "the Receiver has clearly explained why the lease agreement between the Defendants and the Receiver has… converted into a holdover tenancy." (ECF 1503, p. 2).  This was the sole basis of the Court's rationale for granting the Receiver's Motion to Evict and requiring the Defendants to pay sums which were purportedly owed pursuant to the "holdover tenancy" or – if not – face eviction from the Haverford Home.

The Defendants respectfully request that the Court reconsider its ruling in the Second Haverford Home Order because the facts and law *do not* support a finding that the Agreement between the Receiver and the Defendants constituted a lease (let alone that such lease was governed by Pennsylvania Law or converted to a holdover tenancy). The purported "lease" consists of a single

---

[5] Thus, the Receiver's statements were not just in conflict with each other – they also failed to account for the portion of the Agreement which stated that it would expire upon the "resolution in the SEC case" – a term not otherwise defined.

email exchange from the Receiver's counsel with the subject line "**3 residential properties –
Receiver's position**." (*See* ECF 1497-1, p. 2) (Emphasis supplied). This email *does not* contain the
essential terms of a lease agreement. First, the email fails to identify the Receiver or anyone else as
the 'lessor' – it merely purports to state the "Receiver's position on the three residences."[6] *Id.*
Similarly, the Agreement did not identify the Defendants as lessees who would have the rights of
tenants – it merely stated that Defendants "may continue to live in Haverford" subject to the terms of
the Agreement. *Id.*

Second, the payment obligations set forth in the email are vague and indefinite in several ways.
The amount of payment is indefinite because the email states that the Defendants will pay the
"carrying costs" for the three properties – but that term is not specifically defined. *Id.* Instead, the
email states that "carrying costs" will include "taxes, homeowners insurance, utilities, maintenance,
homeowner association fees, **etc., as applicable**." (*Id.* at p. 2) (emphasis supplied). Throughout the
course of the Agreement, this ambiguous "carrying cost" provision has been the subject of dispute.[7]

---

[6] The Receiver did not assert that he was acting on behalf of the LLC which owns the Haverford
Home, or on behalf of the owners of the other two residential properties which are identified in and
made a part of the Agreement (the Paupack and Jupiter Homes).

[7] For example, the Defendants hired a trusted landscaper with substantial experience with the property
for the upkeep of the Paupack Home, but the Receiver hired a new (and more expensive) landscaping
company and asserted that the Defendants were responsible for these costs. Similarly, the Receiver
unilaterally decided that it was necessary to replace the Paupack Home's existing and functioning
security system (for reasons unknown) and asserted that the Defendants were responsible for these
costs under the Agreement. These ambiguities and disputes undermine the Receiver's argument that
the Agreement constituted an enforceable lease. Additionally, if the subject Agreement is a lease
governed by Pennsylvania law (which is denied), the Receiver's actions likely infringed on the
Defendants' rights under Pennsylvania's Landlord and Tenant Act. *See* 68 Pa. Stat. Ann. §250.504-A
("It is the intent of this article to insure that the landlord may in no way restrict the tenant's right to
purchase goods, services and the like from a source of the tenant's choosing and as a consequence any
provision in a written agreement attempting to limit this right shall be void and unenforceable in the
courts of this Commonwealth").

Furthermore, the Agreement was silent as to when, and to whom, payments were to be made under the Agreement. Furthermore, the Agreement states that the Defendants "will escrow with the Receiver payment for any other costs that will be due during the term of this agreement." *Id.* However, to the Defendants' knowledge, no assessment of anticipated costs was made, and no escrow account was ever established. Instead, the Receiver would periodically advise Defendants' counsel what he claimed the Defendants owed, and they would arrange to have payment sent directly to the Receiver.

Finally, the Agreement does not appear to be a lease because it does not pertain to a single property (or even property within a single State, since the Jupiter Home is located in Florida). In addition to the provisions regarding the Haverford Home, the Agreement also requires the Defendants to pay "carrying costs" on the Paupack and Jupiter Homes (as a condition of their remaining in the Haverford Home) while expressly stating that the Defendants "will not have access to the Paupack or Jupiter properties [and that t]hose properties will remain vacant during the term of this agreement." *Id.* The inclusion of the Paupack and Jupiter Homes in the Agreement – without the concomitant right to occupy those premises – also demonstrates that the email Agreement was not a lease and was never contemplated to be a lease.[8] Because the Agreement does not include essential lease terms, and is otherwise vague or incomplete, this Court – which sits in equity – erred when it found that the Agreement was an enforceable lease. *In re Cross' Est.*, 319 Pa. 1, 4, 179 A. 38, 40 (1935) ("A court of equity will not enforce a contract, unless it is complete and certain in all its essential elements. The parties themselves must agree upon the material and necessary details of the bargain; and, if any of

---

[8] Indeed, if the Agreement was a lease, the requirement to pay what amounts to rent on the Paupack and Jupiter Homes while being barred from those premises would violate a tenant's right to possession, and the implied covenant of quiet enjoyment, which is well recognized under Pennsylvania law. *See Pollock v. Morelli*, 245 Pa. Super. 388, 392, 369 A.2d 458, 460 (1976).

these be omitted, or left obscure or indefinite, so as to leave the intention of the parties uncertain respecting the substantial terms of the contract, the case is not one for specific performance").

The Court's error was compounded when it accepted the Receiver's disingenuous argument that the "lease" had automatically converted to a holdover tenancy upon its expiration. As the Receiver acknowledged in its Reply, under Pennsylvania law, "possession of the holdover is subject to the same terms, conditions and covenants as the old lease." (*See* ECF 1501, p. 7) (citing *Witmer v. Exxon Corp.*, 394 A. 2d 1276, n. 3 (Pa. Super. Ct. 1978)). Because Pennsylvania law states that a holdover tenancy must be on the same terms as the original lease, and the term of the Defendants' prior "lease" was one year, the Receiver stated in his Reply brief that "the holdover term also becomes one year, by operation of law." *Id*. But this statement is in direct and irreconcilable conflict with the Receiver's Motion to Evict, where the Receiver represented that, if the Defendants pay the obligations they allegedly incurred under the "agreement" (which the Receiver subsequently refashioned as the "holdover tenancy") they would be permitted to continue occupying the Haverford Home only until the Receiver files a subsequent motion to sell the home or make the Defendants "vacate and surrender the Haverford Home to the Receiver." (ECF 1484, p. 3). Defendants were never afforded an opportunity to challenge this cynical and re-fashioned argument.

The Receiver cannot credibly maintain that the Defendants are subject to a one-year holdover tenancy for purposes of their payment obligations but may nevertheless be evicted from the Haverford Home at whatever point in time the Receiver decides. As the Receiver noted in his Reply, a landlord has the option to treat the "holdover tenant" as a tenant for a term or as a trespasser – but once the landlord makes his election, he is bound by it. (*See* ECF 1501, p. 7) (citing *Pagano v. Redevelopment Auth. Of City of Philadelphia*, 376 A. 2d 999, 1005 (Pa. Super. Ct. 1977). Accordingly, if the Receiver elected to treat the Defendants as holdover tenants who were obligated to make a year's worth of rent-

payments (as was apparently his intention), the Defendants would thereby be entitled to occupy the subject property for a one-year period. But this was not what the Court held in its Haverford Home Orders. Instead, the Court held – at the Receiver's specific bequest – that if the Defendants made the payments demanded by the Receiver they could "continue to occupy the Haverford Home, until such future time that the Receiver seeks an order authorizing the Receiver to begin the process of marketing and selling the Haverford Home, or requiring McElhone and LaForte to vacate and surrender the Haverford Home to the Receiver." (*See* ECF 1486, ¶ 4.b).

Finally, the existence of a holdover tenancy is also called sharply into question by the provision of the email chain which specifically states: "No party may change the material terms of this agreement without an Order of the Receivership Court."[9] (ECF 1497-1, p. 3). Here, the extension of the Agreement by a period of one or more years is a "material term" which could not possibly be accomplished automatically (by operation of Pennsylvania holdover tenancy law) because it required this Court's approval.

For all of these reasons, the Defendants respectfully submit that the Court made a material mistake of law when it held that the Agreement between the parties constituted a lease which, by operation of Pennsylvania law, automatically converted to a holdover tenancy upon its expiration.[10]

---

[9] It is curious that this provision was inserted in the email exchange because, to the Defendants knowledge, the Receiver *did not* seek an order from the Court approving the original Agreement (which the Receiver now seeks to refashion as a "lease"). It stands to reasons that, if the Agreement had really been a lease affecting three properties under the Receivership (as the Receiver now contends), the Receiver would have required Court approval to enter such lease agreement.

[10] Likewise, the Agreement is silent on which State's law (if any) governs the rights and obligations of an equitable receiver appointed by a Federal District Court Judge located in Florida and two defendants with respect to three separate properties located in Florida and Pennsylvania.

**2. The Court Erred By Adopting Arguments That Were First Raised in the Receiver's Reply Memorandum of Law**

In addition to the substantive deficiencies with the Haverford Home Orders (discussed above), it was procedurally improper for this Court to accept the Receiver's novel, refashioned and internally inconsistent arguments that the Agreement was a lease which converted to a holdover tenancy under Pennsylvania Law because these arguments were only raised (for the first time) in the Receiver's Reply brief. To be clear, the words "lease" and "holdover tenancy" do not appear anywhere in the Receiver's original Motion to Evict (or anywhere else for that matter). Instead, the Receiver referred to an "agreement" to pay certain obligations on three single-family homes and advised the Court that – if the Defendants paid the obligations that they allegedly owed – he would permit them to continue to occupy the Haverford Home (until such time as he filed a motion to sell the home or evict them). It was not until after the Defendants filed their Response in Opposition – which demonstrated that the subject Agreement had expired on its own terms – that the Receiver invented the argument that the Agreement was really a lease, and that a holdover tenancy with a new one-year term had been created.

As this Court has made crystal clear in its prior orders, "Courts have consistently held that a reply memorandum may not raise new arguments or evidence." (*See* Order Granting In Part Plaintiff's Amended Omnibus Motion for Final Judgment, ECF 1432, p. 21) (citing *Lage v. Ocwen Loan Servicing LLC*, 145 F. Supp 3d 1172, 1181 (S.D. Fla. 2015), *aff'd*, 839 F. 3d 1003 (11th Cir. 2016)) (internal citations omitted); *see also Kellner v. NCL (Bahamas), LTD.*, 753 F. App'x 662, 667 (11th Cir. 2018) ("[I]t is by now clear that we cannot consider arguments raised for the first time in a reply brief." (collecting cases); *JetSmarter Inc. v. Benson*, No. 17-62541-CIV, 2018 WL 2694598, at *8 (S.D. Fla. Apr. 6, 2018), *report and recommendation adopted,* No. 17-62541-CIV, 2018 WL 2688771 (S.D. Fla. Apr. 16, 2018) (declining to consider argument raised for the first time in a reply brief).  In this instance, it is also critical to note that the Court did not conduct oral argument before entering the

Haverford Home Orders, and that the Court entered its Second Haverford Home Order without affording the Defendants an opportunity to respond to the Receiver's new and previously unarticulated arguments. Accordingly, the Defendants had no opportunity to respond to, and rebut, the Receiver's arguments regarding a lease and holdover tenancy before the Court entered its orders. For these reasons, the Court made an error of law when it accepted the holdover tenancy **argument which the Receiver raised for the first time in his Reply**, and entered an order finding it was appropriate to evict the Defendants from their residence.

The consequences of these errors are as grave as they are imminent. In the absence of immediate relief from the Haverford Home Orders, the Receiver will have the right to immediately seek to evict Ms. McElhone and Ms. LaForte from the only home they are able to occupy. A home they purchased with their own funds (not Par's) which they had legally earned. A home which has no mortgage. A home which they have paid well over $400,000 to maintain since the inception of the Receivership – which has conferred a dollar-for-dollar benefit to the Receivership, and by extension, to the Investors, who would otherwise have been saddled with those costs, and who will be responsible for making the required payments for taxes, insurance and maintenance (more than $100,000.00 per year) if the eviction proceeds![11] While the cost to the investors may be an unintended consequence of the Haverford Home Orders, make no mistake it is a consequence nevertheless — and one whose impact will begin to be felt the day after the defendants are forcibly evicted from their home! Accordingly, the substantive and procedural errors which permeate the Haverford Home Orders also carry material adverse financial consequences for the Investors – yet another issue that was not addressed in the Motion to Evict.

---

[11] To be clear, notwithstanding the expiration of the Agreement, the Defendants have continued to pay the taxes, insurance and maintenance on the Haverford Home to this very day. If the Defendants are evicted, these costs will fall on the Receivership.

Finally, there is the real-world impact to the defendants – an impact which may not fairly be ignored by a Court of equity. The Haverford Home Orders pose a danger that the Defendants will be imminently evicted from their home. Such an unconscionable outcome is utterly inconsistent with bedrock principles of multiple centuries of equitable jurisprudence – ever the more so when this draconian outcome is a product of the receiver's flawed legal theories impermissibly raised by the receiver for the first time in a Reply – and accepted by the Court without affording the defendants an opportunity to challenge.  This motion should be granted.

<strong><u>REQUEST FOR HEARING</u></strong>

The Defendants respectfully request that the Court convene a hearing to allow oral argument on the instant motion for reconsideration due to the critical importance of this motion (which seeks to evict the Defendants from their home), and so that the Defendants may address the legal and factual issues presented in the underlying motions and orders pertaining to the alleged lease agreement and holdover tenancy, and the monetary obligation the Defendants allegedly incurred pursuant to same. The Defendants believe that oral argument would assist the Court in addressing the nature and terms of the subject Agreement, which was negotiated and confirmed by counsel for the Receiver and counsel for the Defendants.

<strong><u>CONCLUSION</u></strong>

For all of the foregoing reasons, the Defendants respectfully request that the Court recede and grant relief from its Haverford Home Orders, pursuant to Federal Rules of Civil Procedure 60(b)(1), to the extent those orders required the Defendants to either pay the rent and residential carrying costs the Receiver claims are due and owing, or vacate and surrender the Haverford Home to the Receiver.

**S.D. Fla L. R. 7.1(a)(3p) Certification of Counsel**

Counsel for the Defendants hereby certify that they conferred with counsel for the Receiver,

Timothy A. Kolaya, Esq., in-person, and have confirmed that the Receiver opposes the relief sought

herein. Counsel for the Defendants conferred with counsel for the SEC, Amie Rigley Berlin, Esq., in

emails dated April 25, 2023 and April 26, 2023, but Ms. Berlin has not yet provided the SEC's position

regarding the relief sought in this Motion.

Respectfully submitted,

<table>
<tr>
<td valign="top">

**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
*Attorneys for Defendant Joseph W. LaForte*
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100

By: */s/ David L. Ferguson*
   DAVID L. FERGUSON
   Florida Bar Number:  0981737
   Ferguson@kolawyers.com


**LAW OFFICES OF ALAN S. FUTERFAS**
*Attorneys for Defendant Lisa McElhone*
565 Fifth Avenue, 7th Floor
New York, NY  10017
Telephone: (212) 684-8400

By:  */s/ Alan S. Futerfas*
   ALAN S. FUTERFAS
   asfuterfas@futerfaslaw.com
   *Admitted Pro Hac Vice*

</td>
<td valign="top">

**KAPLAN ZEENA LLP**
*Attorneys for Defendant Lisa McElhone*
2 South Biscayne Boulevard, Suite 3050
Miami, Florida 33131
Telephone: (305) 530-0800
Facsimile: (305) 530-0801

By: */s/ James M. Kaplan*
   JAMES M. KAPLAN
   Florida Bar No.: 921040
   james.kaplan@kaplanzeena.com
   elizabeth.salom@kaplanzeena.com
   service@kaplanzeena.com
   NOAH E. SNYDER
   Florida Bar No.: 107415
   noah.snyder@kaplanzeena.com
   maria.escobales@kaplanzeena.com

</td>
</tr>
</table>

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on this 28<u>th</u> day of April, 2023, I electronically filed the forgoing

document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is

being served this day on counsel of record via transmissions of Notices of Electronic Filing generated

by CM/ECF.

By: <u>/s/ *James M. Kaplan*          </u>
            JAMES M. KAPLAN