## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 23-198** |
| **v.** | : | **DATE FILED:** _____ |
| **JOSEPH LAFORTE** | : | **VIOLATIONS:** |
| a/k/a "Joe Mack," | | |
| a/k/a "Joe Macki," | : | 18 U.S.C. § 371 (conspiracy – 3 counts) |
| a/k/a "Joe Mackie," | | 18 U.S.C. § 1343 (wire fraud – 22 counts) |
| a/k/a "Joe McElhone," | : | 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. |
| **COMPLETE BUSINESS SOLUTIONS** | | § 240.10b-5 (securities fraud – 1 count) |
| **GROUP, INC., d/b/a PAR FUNDING,** | : | 18 U.S.C. § 894(a) (conspiracy to use |
| **JOSEPH COLE BARLETA** | | extortionate means to collect an extension |
| a/k/a "Joe Cole," | : | of credit – 1 count) |
| **JAMES LAFORTE** | | 18 U.S.C. § 894(a) (use of extortionate |
| a/k/a "Jimmy Schillaci," | : | means to collect an extension of credit – |
| **LISA McELHONE** | | 7 counts) |
| | : | 26 U.S.C. § 7201 (tax evasion – 2 counts) |
| | | 26 U.S.C. § 7206(1) (false returns – 2 |
| | : | counts) |
| | | 26 U.S.C. § 7202 (failure to collect and |
| | : | pay over tax – 12 counts) |
| | | 18 U.S.C. § 1623 (perjury – 4 counts) |
| | : | 18 U.S.C. § 1503 (obstruction – 1 count) |
| | | 18 U.S.C. § 1505 (obstruction – 1 count) |
| | : | 18 U.S.C. § 1512(c)(2) (obstruction – 1 |
| | | count) |
| | : | 18 U.S.C. § 1512(a)(2)(A), (B)(i) |
| | | (tampering – 3 counts) |
| | : | 18 U.S.C. § 1513(b)(1) (retaliation – 3 |
| | | counts) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |
| | | Notices of forfeiture |

## SUPERSEDING INDICTMENT

## COUNT ONE
(Conspiracy)

### THE GRAND JURY CHARGES THAT:

#### BACKGROUND

At various times material to this indictment:

1. Defendant COMPLETE BUSINESS SOLUTIONS GROUP, INC., d/b/a PAR FUNDING ("PAR FUNDING"), was incorporated in Delaware in 2011. From at least 2013 through July 2020, the company did business using the fictitious name Par Funding. Its principal place of business was Philadelphia, Pennsylvania.

2. Defendant PAR FUNDING was in the business of funding businesses ("merchant-customers") through short-term financing transactions, which it held out as merchant cash advances ("MCAs"). In these transactions, defendant PAR FUNDING purported to purchase these merchant-customers' future receivables at a discounted price. The purchase price was given to the merchant-customer—typically in a lump sum—with the expectation that the merchant-customer would use the funds to operate its business. The merchant-customer agreed to repay defendant PAR FUNDING the purchase price advanced to it plus an additional amount, which was typically 30% or more of the purchase price. Defendant PAR FUNDING generally collected these deferred repayments in installments through automatic daily or weekly debits from the merchant-customer's bank accounts.

3. Defendant PAR FUNDING frequently entered "reload" agreements with merchant-customers, which were essentially refinancings of pre-existing MCAs. In a reload, defendant PAR FUNDING's new, larger advance typically repaid the amount due on the original advance and provided some additional funding to the merchant-customer.

2

4.     In order to fund these MCAs and enrich its principals, defendant PAR FUNDING raised capital through the solicitation of numerous investors and the issuance of promissory notes. In its early years, the company raised this capital directly, but in or about 2018, defendant PAR FUNDING began to raise capital indirectly through private investment vehicles ("Agent Funds"), which relied in part on information provided and promotional materials prepared by defendant PAR FUNDING.

5.     Defendant PAR FUNDING operated through and in conjunction with several affiliated companies, including Contract Financing Solutions, Inc. ("CFS"), Fast Advance Funding, LLC ("FAF"), and Capital Source 2000, Inc. (collectively, the "Par Funding affiliates"). Defendant PAR FUNDING and the Par Funding affiliates shared common ownership and/or control, and funds were frequently transferred back and forth between these entities.

6.     From at least 2013 through in or about July 2020, defendant JOSEPH LAFORTE controlled the day-to-day operations of defendant PAR FUNDING and the Par Funding affiliates and owned and/or operated them indirectly through nominees, including his wife, defendant LISA MCELHONE, charged elsewhere in this indictment. Nevertheless, defendant JOSEPH LAFORTE was not listed on any corporate documents as defendant PAR FUNDING's Chief Executive Officer or President, despite serving in these roles. This structure was utilized to hide defendant JOSEPH LAFORTE's control of defendant PAR FUNDING and the Par Funding affiliates from the outside world, including from investors, due to his significant criminal convictions, including for financial crimes.

3

7. On or about October 4, 2006, defendant JOSEPH LAFORTE was convicted of state charges in New York for grand larceny and money laundering, and on November 8, 2007, he was sentenced to three to ten years in prison and ordered to pay restitution in the amount of $14.1 million. In or about 2009, defendant JOSEPH LAFORTE pled guilty to federal criminal charges in the District of New Jersey for conspiracy to operate an illegal gambling business. Information regarding these convictions was available on the internet.

8. Defendant JOSEPH LAFORTE was released from jail in or about February 2011. While he was on supervised release, defendant JOSEPH LAFORTE formed defendant PAR FUNDING in defendant LISA McELHONE's name in or about October 2011.

9. Defendant LISA McELHONE functioning as defendant JOSEPH LAFORTE's nominee, owned defendant PAR FUNDING, CFS, and FAF through a trust. She also held the titles Chief Executive Officer and President of defendant PAR FUNDING, although she did not regularly exercise the powers of these offices. Defendant McELHONE was also the nominal owner of Full Spectrum Processing, Inc., the entity to which defendant PAR FUNDING's employees were transferred in early 2017. As a result, as of 2017 she was defendant PAR FUNDING's sole employee, although she was rarely present at its offices. While serving as the nominal owner and executive of defendant PAR FUNDING, defendant McELHONE ran the day-to-day operations of a nail salon in Philadelphia, Pennsylvania.

10. Defendants JOSEPH LAFORTE and LISA McELHONE caused two companies, Heritage Business Consulting, Inc. ("HBC") and Eagle Six Consultants, Inc. ("Eagle Six"), to be created to which they directed much of their income from defendant PAR FUNDING and the Par Funding affiliates. HBC and Eagle Six were formed in Florida in or

4

about 2014 and 2018, respectively.

11. Defendant JOSEPH COLE BARLETA, a/k/a Joe Cole ("JOE COLE") was hired to serve as the Chief Financial Officer of defendant PAR FUNDING in or around 2012. At the time, he had not completed college and had never held an accounting degree. Before he was hired, defendant COLE had worked as a staff accountant for a publicly traded specialty construction company and had moonlighted as a competitive food eater. Defendant COLE served in this role until in or about July 2020. Defendant COLE was an employee of defendant PAR FUNDING until in or about early 2017, when all of the company's employees except defendant LISA McELHONE were converted to employees of Full Spectrum Processing. Nonetheless, he still served as defendant PAR FUNDING's Chief Financial Officer. At all times, defendant COLE reported directly to defendant JOSEPH LAFORTE.

12. Perry Abbonizio, charged elsewhere, raised capital for defendant PAR FUNDING starting in or about Spring 2016. In this role, Abbonizio used the title Principal, even though he did not have an ownership interest in the company. Abbonizio provided information to potential investors about defendant PAR FUNDING, solicited funds directly from investors and prospective investors, and conveyed information about defendant PAR FUNDING to the managers of the Agent Funds. At all times, Abbonizio reported directly to defendant JOSEPH LAFORTE.

13. Defendant JOSEPH LAFORTE (through his nominee defendant LISA McELHONE), defendant JOE COLE, and Perry Abbonizio received compensation from defendant PAR FUNDING through consulting agreements. Pursuant to these agreements, entities controlled by defendants JOSEPH LAFORTE and COLE and Abbonizio were paid

5

quarterly compensation equal to a percentage of the total amount of funding provided by defendant PAR FUNDING and the Par Funding affiliates to its MCA merchant-customers. This compensation structure financially incentivized the defendants to cause defendant PAR FUNDING and the Par Funding affiliates to fund as many MCA transactions as possible.

14.     To generate the capital necessary for defendant PAR FUNDING to fund MCAs to merchant-customers that in turn generated the lucrative consulting payments, defendants JOSEPH LAFORTE, JOE COLE, JAMES LAFORTE, and LISA McELHONE raised approximately $550 million from investors for defendant PAR FUNDING. As a result of these fundraising efforts, defendants JOSEPH LAFORTE and LISA McELHONE received approximately $95 million of consulting payments, defendant JOE COLE received approximately $5 million of consulting payments, and Abbonizio received approximately $13 million of consulting payments.

15.     Defendant JAMES LAFORTE, a/k/a Jimmy Schillaci ("JAMES LAFORTE"), was defendant JOSEPH LAFORTE's younger brother. Defendant JAMES LAFORTE worked for defendant PAR FUNDING and FAF in various capacities. Like defendant JOSEPH LAFORTE, defendant JAMES LAFORTE also had a significant criminal history, including for financial crimes, and used an alias to conceal this fact from outsiders, including potential investors.

16.     Person No. 1 operated an investment company ("Investment Company No. 1"). Through this company, Person No. 1 and his employees recruited individuals to invest in defendant PAR FUNDING and the Par Funding affiliates directly and later indirectly through the Agent Funds, working closely with defendants JOSEPH LAFORTE and JOE COLE and Perry

6

Abbonizio.  Person No. 1 helped various persons ("Agent Funds managers") open a turnkey Agent Fund that issued and sold securities, complete with training, marketing materials, and an Agent Guide, as well as a Private Placement Memorandum, corporate registration, and offering materials provided by Person No. 1's attorney.  Person No. 1 then managed the Agent Funds through one of his companies, working closely with Abbonizio, who oversaw and coordinated the Agent Funds on behalf of defendants PAR FUNDING and JOSEPH LAFORTE.  Person No. 1 also operated two Agent Funds.

17.     The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States that was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of securities, including securities sold through private placement memoranda.  Federal securities laws prohibited fraud in connection with the purchase and sale of securities, including making an untrue statement of material fact or omitting to state a material fact in the information provided to investors.  The promissory notes that defendant PAR FUNDING and the Agent Funds issued were securities.

## I.     Defendant PAR FUNDING Issued Promissory Notes Directly to Investors

18.     From approximately 2012 through in or about December 2017, defendant PAR FUNDING and the Par Funding affiliates raised capital directly from investors to fund its operations. It did so by selling promissory notes directly to investors.  These promissory notes typically had a 12-month duration and provided that the investor would receive annual interest rates ranging from 12% to 44%.  Investors signed a Non-Negotiable Term Promissory Note and an accompanying Security Agreement (collectively, the "Par Funding Notes").  Defendants LISA McELHONE and JOE COLE signed these notes on behalf of defendant PAR FUNDING.

7

19. The Par Funding Notes generally provided that the interest would be paid over twelve months, and then the investor's principal investment would be returned in full to the investor. The Security Agreements granted the investors a security interest in substantially all of the assets of defendant PAR FUNDING, including its accounts receivable.

20. To locate and solicit investors, defendant PAR FUNDING contracted with sales agents through Finders Agreements that defendant LISA McELHONE signed on behalf of the company. The Finders Agreements provided that once defendant PAR FUNDING received investor funds, it would pay the sales agent a one-time distribution.

21. Using information and misinformation that they learned from defendants JOSEPH LAFORTE and JOE COLE, Perry Abbonizio, and Person No. 1, these sales agents met with potential investors and described defendant PAR FUNDING's MCA business and made representations about the expertise of its managers. They also provided potential investors with marketing materials obtained from defendant PAR FUNDING, including multiple brochures. The sales agents rarely disclosed defendant JOSEPH LAFORTE's true name or role at and control over the company, and they did not disclose his criminal history, frequently because it had been concealed from them.

22. By in or about December 2017, defendant PAR FUNDING had raised at least $100 million from investors through the offer and sale of the Par Funding Notes. The investors purchased the Par Funding Notes by sending funds directly to defendant PAR FUNDING or through self-directed IRA accounts.

8

## II. Defendant PAR FUNDING Used Agent Funds To Raise Investor Money and Issued Its Notes to the Agent Funds

23. In or about early 2018, defendants JOSEPH LAFORTE and JOE COLE, Perry Abbonizio, and Person No. 1 restructured the way that defendant PAR FUNDING and its affiliates raised capital to fund its MCA business. In response to a January 2018 subpoena received from the Pennsylvania securities regulators in connection with its investigation of the company's use of unregistered sales agents, defendant PAR FUNDING restructured its offering by converting its sales agents to Agent Fund managers.

24. Under this new structure, defendant PAR FUNDING and its affiliates used Agent Funds to offer and sell promissory notes that the Agent Funds issued to investors. The Agent Funds then funneled investor money to defendant PAR FUNDING and its affiliates, which then issued Par Funding Notes to the Agent Funds (at a higher interest than the notes issued to the investors).

25. Person No. 1, defendant PAR FUNDING's most successful sales agent, proposed this new structure. As a result, when it was implemented, Person No. 1 assisted the defendants in creating, managing, and promoting it. He also operated two of his own Agent Funds.

26. When new Agent Fund managers were identified, Person No. 1 helped them establish their funds, and Perry Abbonizio and Person No. 1 trained them on how to raise money through securities offerings that would ultimately fuel defendant PAR FUNDING. As part of this guidance, Person No. 1 provided Agent Fund managers with an Agent Guide that instructed them how to create an Agent Fund. Defendant PAR FUNDING, through Perry Abbonizio and Person No. 1, also trained the Agent Fund managers. In addition, defendant PAR

9

FUNDING provided them with marketing materials, including brochures, to solicit investors. Perry Abbonizio and Person No. 1 then oversaw the Agent Funds, and Person No. 1 managed them through his company in exchange for 25% of the Agent Funds' profits.

27. As explained in greater detail below, the conspirators concealed various material facts from investors in the Agent Funds. For example, the Agent Funds' private placement memoranda ("PPMs") distributed to potential investors stated that the Agent Funds were raising money to invest in "an MCA company" but did not identify this company as defendant PAR FUNDING and the Par Funding affiliates. The Agent Fund PPMs also did not disclose material information, such as that defendant PAR FUNDING and the Par Funding affiliates were managed by a convicted felon, that the company had been operating at a net cash shortfall since 2016, that the company's insurance was ineffective, and that its purportedly rigorous onsite inspections system was flawed in multiple ways.

28. The Agent Fund managers were told that their funds would be investing in defendant PAR FUNDING, and they often told this to their investors, but the Agent Fund managers did not share many material facts about defendant PAR FUNDING with the investors, generally because the defendants concealed these facts from the Agent Fund managers.

29. As a result of this restructuring, from in or about January 2018 through in or about March 2020, defendant PAR FUNDING raised investor money primarily through Agent Funds, and occasionally by selling its own Par Funding Notes directly to investors. Defendant PAR FUNDING used at least 40 different Agent Fund managers.

30. During this period, defendant PAR FUNDING, through defendants JOSEPH LAFORTE and JOE COLE and Perry Abbonizio, helped solicit investors to invest in

10

the Agent Funds by speaking at events that the Agent Funds, including Investment Company No. 1, organized to raise money from potential investors. In addition, Abbonizio and defendant JOSEPH LAFORTE helped the Agent Funds solicit investors through telephone calls, and defendants JOSEPH LAFORTE and COLE, and Abbonizio, assisted by soliciting investors during meetings the Agent Funds arranged at defendant PAR FUNDING's office. As a result, defendants PAR FUNDING, JOSEPH LAFORTE, and COLE, and Abbonizio caused, directly and indirectly, many of the misrepresentations made to investors and potential investors in the Agent Funds.

## THE CONSPIRACY

31.    From at least in or about early 2016 through in or about August 2020, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**
**COMPLETE BUSINESS SOLUTIONS GROUP, INC.,**
**d/b/a PAR FUNDING,**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

conspired and agreed, together and with Perry Abbonizio and Person No. 1, and others, known and unknown to the grand jury, to commit offenses against the United States, namely:

a.    wire fraud, that is, knowingly and with the intent to defraud, to devise, and to intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises,

11

and to transmit and to cause certain wire communications to be transmitted in interstate and foreign commerce, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

                b.     securities fraud, that is, unlawfully, willfully, knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and the facilities of national securities exchanges, to employ manipulative and deceptive devices and contrivances by: (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of a security, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## MANNER AND MEANS

It was part of the scheme that:

32.     Defendants JOSEPH LAFORTE, JOE COLE, and JAMES LAFORTE, Perry Abbonizio, and Person No. 1 made and caused others to make false and misleading representations to, and concealed and caused others to conceal material facts from, investors and potential investors to deceive them into investing and continuing to invest in defendant PAR FUNDING, the Par Funding affiliates, and the Agent Funds. These misrepresentations and material omissions related to:

12

a.  defendant JOSEPH LAFORTE's true name, his actual role with defendant PAR FUNDING and the Par Funding affiliates, and his criminal history, as well as defendant JAMES LAFORTE's true name, involvement with defendant PAR FUNDING and the Par Funding affiliates, and his criminal history;

b.  the underwriting process at defendant PAR FUNDING and the Par Funding affiliates;

c.  the MCA portfolio of defendant PAR FUNDING and the Par Funding affiliates;

d.  the business performance of defendant PAR FUNDING and the Par Funding affiliates, including their default rate and "Exposure %";

e.  the financial success and profitability of defendant PAR FUNDING and the Par Funding affiliates;

f.  the insurance that the defendants had purchased for defendant PAR FUNDING, the Par Funding affiliates, and certain Agent Funds; and

g.  the self-dealing in which the defendants engaged.

33.  The conspirators were financially incentivized to make and cause others to make these misrepresentation and material omissions for financial gain. For instance, under the Consulting Agreements, entities controlled by defendants JOSEPH LAFORTE, LISA

13

McELHONE, and JOE COLE, as well as Perry Abbonizio, received a commission fee that was a percentage of the funds extended to merchant-customers, regardless of whether the MCAs extended were successful or profitable for defendant PAR FUNDING and the Par Funding affiliates. In addition, defendant JAMES LAFORTE received millions of dollars in compensation as a result of his participation in the conspiracy.

34.     Defendants JOSEPH LAFORTE, JOE COLE, and JAMES LAFORTE, as well as Perry Abbonizio and their co-conspirators, took various efforts to conceal their fraudulent scheme, including the following: (1) using aliases and nominees, including to hide their self-dealing; (2) hiding defendant JOSEPH LAFORTE's role in and control over defendant PAR FUNDING from its external financial auditors; (3) causing an attorney to distribute misleading letters to investors and the media; (4) causing and recording fictitious payments to defendant PAR FUNDING purportedly by merchant-customers in order to make it appear that certain MCAs were not in default; (5) causing merchant-customers to make de minimis MCA repayments to create the false appearance that the customers were not in default; (6) conducting a publicity campaign to conceal negative information regarding defendant JOSEPH LAFORTE; (7) testifying falsely during civil depositions and causing others to testify falsely; and (8) providing and causing others to provide false information in court proceedings.

35.     The defendants used the wires and facilities of interstate and foreign commerce to carry out this scheme.

## I.     **Deception Regarding the Leadership of Defendant PAR FUNDING**

36.     As part of efforts to raise capital for defendant PAR FUNDING, the Par Funding affiliates, and themselves, the defendants and their co-conspirators took various steps to

14

conceal the truth about defendant PAR FUNDING's leadership. This deception included
(i) concealing defendant JOSEPH LAFORTE's true name through false and misleading
statements, as well as material omissions, (ii) making false and misleading statements regarding
his actual role with defendant PAR FUNDING and the roles of others, including defendant LISA
McELHONE, his wife and the nominal owner of defendant PAR FUNDING, defendant JOE
COLE, the Chief Financial Officer of defendant PAR FUNDING, defendant JAMES LAFORTE,
and Perry Abbonizio, and (iii) concealing the criminal history of defendants LAFORTE and
JAMES LAFORTE.

    37. As part of this concealment, defendants JOSEPH LAFORTE and LISA
McELHONE established and operated defendant PAR FUNDING and the Par Funding affiliates
in the name of defendant McELHONE and others, even though defendant JOSEPH LAFORTE
ran the day-to-day operations of the business and regularly referred to the enterprise as his
business and the company's capital as his money.

    38. As part of the conspiracy, defendant JOSEPH LAFORTE used multiple
aliases to conceal his identity and, thereby conceal his background, including his criminal
history. These aliases included "Joe Mack," "Joe Macki," "Joe Mackie," and "Joe McElhone."
As a result of the use of these aliases, many of the employees of defendant PAR FUNDING did
not know defendant JOSEPH LAFORTE's real name until months or years after they began
working at the company, and many outside parties, such as investors, outside attorneys, and
outside accountants, never learned his real name or his role at the company. By using these
aliases with not just investors and potential investors, but also most other persons, defendant

15

JOSEPH LAFORTE and his co-conspirators were better able to conceal defendant JOSEPH LAFORTE's background, including his felony convictions, from the investors and their advisors.

39. As part of the conspiracy, defendant JAMES LAFORTE used the alias "Jimmy Schillaci," and defendant JOSEPH COLE BARLETA used the alias "Joe Cole."

40. As part of the conspiracy, the defendants regularly caused others, including Perry Abbonizio, Person No. 1, and various Agent Fund managers to solicit potential investors and interact with existing investors in ways that concealed defendant JOSEPH LAFORTE's identity and role at defendant PAR FUNDING.

41. As part of this deception, defendant JOSEPH LAFORTE used multiple email addresses that concealed his identity. While using these email addresses, defendant JOSEPH LAFORTE regularly signed the emails that he sent using his aliases. Defendant JOSEPH LAFORTE even had business cards that he distributed with the name Joe Macki.

42. Even after at least two articles were published in December 2018 describing defendant JOSEPH LAFORTE's role at defendant PAR FUNDING, his true name, his criminal history, and his family's alleged connection to an organized crime entity, defendant JOSEPH LAFORTE and his co-conspirators continued to take various efforts to conceal his true name, role, and criminal history, including the following:

a. Defendants JOSEPH LAFORTE and JAMES LAFORTE continued to use aliases or otherwise conceal their true names when interacting with many outside parties, including investors and potential investors.

b. The defendants, Perry Abbonizio, and Person No. 2, another employee of PAR FUNDING and the Par Funding affiliates who reported to defendant JOSEPH

16

LAFORTE caused a lawyer for defendant PAR FUNDING to distribute two false and misleading letters to investors and others in response to the articles published in December 2018.

c. In or about early 2019, the defendants engaged in a deceptive public relations campaign that touted defendant JOSEPH LAFORTE's purported financial and business acumen and his success through defendant PAR FUNDING, but failed to disclose his criminal history. For instance, in or about January 2019, defendant JOSEPH LAFORTE caused a LinkedIn account to be created and registered in his name that contained misleading information regarding his education, experience, and role at defendant PAR FUNDING and failed to disclose his criminal history. In the following months, the conspirators caused numerous online articles, posts, and press releases to be published online. Not only did these publications generally contain misleading information regarding defendant JOSEPH LAFORTE and consistently omit his criminal history, but they also served to bury the unfavorable information that an internet search for his name would yield.

d. Defendants JOSEPH LAFORTE and JOE COLE caused defendant PAR FUNDING to submit false and misleading Form D filings to the SEC for 2019 and 2020. These forms identified defendants LISA McELHONE and JOE COLE, as well as Person No. 3, defendant McELHONE's sister, as "Related Persons" of defendant PAR FUNDING, but failed to identify defendant JOSEPH LAFORTE among the "Related Persons," despite the fact that the forms' instructions stated that this item should include "[e]ach executive officer and director of the issuer and person performing similar functions (title alone is not determinative) for the issuer."

17

43.    During in or about 2019 and 2020, the defendants and their co-

conspirators continued to cause others to conceal defendant JOSEPH LAFORTE's name, role,

and criminal history with misleading statements and material omissions.

## II.    Deception Regarding the Company's Underwriting Process

44.    As part of fundraising efforts, the defendants touted defendant PAR

FUNDING's supposedly robust underwriting process to investors and potential investors in

misleading ways. For instance, the defendants caused marketing brochures to be created and

distributed for defendant PAR FUNDING that described its underwriting process deceptively. In

addition, the defendants caused defendant PAR FUNDING's representatives and the Agent Fund

managers to describe the company's underwriting process in various deceptive ways.

45.    When touting and causing others to tout defendant PAR FUNDING's

underwriting, the conspirators' actions included the following:

        a.    Describing and causing others to describe defendant PAR

FUNDING's underwriting process as rigorous, even though defendant PAR FUNDING had been

steadily decreasing the amount, duration, and quality of its underwriting before funding MCAs;

        b.    Describing and causing others to describe defendant PAR

FUNDING's underwriting process as rigorous, even though at times the company did not

conduct either any underwriting or onsite inspections of potential MCA customers on deals

below certain thresholds;

        c.    Describing and causing others to describe defendant PAR

FUNDING's underwriting process as rigorous, even though defendants JOSEPH LAFORTE and

18

JAMES LAFORTE regularly exempted certain MCAs from any due diligence, including many of the company's largest MCA customers;

d.    Describing and causing others to describe defendant PAR FUNDING's underwriting process as rigorous, even though defendant JOSEPH LAFORTE regularly approved new and reloaded MCAs for entities owned by Customer No. 1 ("Customer No. 1's Entities") without underwriting in exchange for under-the-table cash kickbacks to defendant JOSEPH LAFORTE;

e.    Describing and causing others to describe defendant PAR FUNDING's underwriting process as rigorous, even though defendant JOSEPH LAFORTE incentivized the company's underwriting staff to increase the pace of its approval process through regular off-the-books cash payments; and

f.    Asserting and causing others to assert that defendant PAR FUNDING conducted onsite inspections of merchant-customers on every deal, even though defendant PAR FUNDING regularly did not conduct such inspections and when onsite inspections were performed, a material number of these inspections were inconclusive or negative in terms of the financial health of the merchant-customer, and the merchant-customer was offered an MCA anyway.

III.    **Deception Regarding the Company's MCA Portfolio**

46.    As part of fundraising efforts, the defendants promoted the supposed diversification of defendant PAR FUNDING's MCA portfolio. For example, the conspirators caused marketing brochures for defendant PAR FUNDING to be distributed stating that the company's advances to merchant-customers ranged from $5,000 to $500,000, with the average

19

funding size of $50,000. The conspirators also made similar oral representations to investors and potential investors. Furthermore, the conspirators explained and caused others to explain to investors and potential investors that this supposedly diverse portfolio, consisting of many smaller merchant-customer clients, decreased the risk to their investment.

47. In reality, however, as the defendants knew, a large portion of defendant PAR FUNDING's outstanding accounts receivable was attributable to a small set of merchant-customers whose collective MCAs had grown substantially overtime. For example, by in or about July 2018, at least one third of the company's outstanding accounts receivable were held by a small group of merchant-customer businesses under the control of approximately ten people, each of which owed millions if not tens of millions of dollars to defendant PAR FUNDING. By in or about July 2020, this percentage had grown to approximately 50%. One of these individuals, Customer No. 1, who was paying defendant JOSEPH LAFORTE under-the-table cash kickbacks of approximately 10% of all money extended to his businesses by defendant PAR FUNDING, controlled five merchant-customers (Customer No. 1's Entities) who by in or about July 2018 owed more than approximately $22 million to defendant PAR FUNDING, and who owed in excess of approximately $90 million by in or about July 2020. While promoting the diversity of the company's clients base, the defendants concealed these facts from investors and potential investors.

48. To help conceal the lack of diversification in defendant PAR FUNDING's MCA portfolio, defendants JOSEPH LAFORTE and JOE COLE often caused these large merchant-customers to take multiple MCAs, frequently through different companies that the merchant-customers owned, so that it appeared that the risk was more diversified.

20

## IV. Deception Regarding MCA Performance

49. As part of their fundraising efforts, the defendants made and caused others to make false and misleading claims to investors, potential investors, and others regarding the performance of defendant PAR FUNDING's MCAs. For example, the conspirators frequently represented or caused others to represent that defendant PAR FUNDING's default rate was approximately 1% to 2% and compared extremely favorably to its competitor MCA companies. In reality, as the conspirators knew, defendant PAR FUNDING's default rate was significantly higher than what was represented to investors.

50. On or about December 20, 2018, for example, defendant JOSEPH LAFORTE falsely told investors and potential investors in defendant PAR FUNDING: "I got 6 years of financials that say I have a 1 percent default rate. If you insured a cash advance company it's like insuring a burning house with these other companies. They have 25 percent default rates. So to answer your question . . . I think you can tell your clients that we a 6 going on 7 year track record of less than 1 percent default rate as it is."

51. Defendant JOE COLE created and regularly updated a funding analysis document, which purportedly set forth defendant PAR FUNDING's key performance indicators, including its purported "Exposure %." Defendants COLE and JOSEPH LAFORTE regularly caused this funding analysis document to be provided to investors and potential investors. Although the "exposure" percentage in the funding analysis document was not a percentage of the MCAs that were in default, the conspirators regularly described and caused others to describe this percentage to investors, potential investors, and others as defendant PAR FUNDING's default rate, which was false and misleading. To reinforce this false and misleading definition,

21

the conspirators often stated and caused others to state that this default rate compared extremely favorably with an alleged industry default rate which they claimed was approximately 15 to 25%. Furthermore, even the "Exposure %" set forth in the funding analysis was misleading in several ways.

52. Additionally, defendants JOSEPH LAFORTE and JOE COLE manipulated defendant PAR FUNDING's "Exposure %" (and, thus, its promoted default rate) when they made decisions about which of the company's MCA deals would be recognized as being in default in defendant PAR FUNDING's accounting records. As part of this effort, defendants LAFORTE and COLE conferred on a regular basis regarding which delinquent MCAs should be written off as in default. Rather than applying the company's policy of writing off MCAs for which no payments had been made in six to eight weeks, they exercised a subjective standard to decide whether to write off a delinquent MCA. As a result, they frequently failed to write off MCAs for which no payment had been made in six to eight weeks in order to conceal the company's true performance, thereby keeping its exposure percentage and default rate artificially low.

53. To further manipulate defendant PAR FUNDING's performance indicators, defendants JOSEPH LAFORTE and JOE COLE caused the company to enter numerous new "reload" MCA transactions with merchant-customers that were in default which served to conceal these defaults. In other words, defendant PAR FUNDING's solution for a non-paying MCA customer was often to lend the delinquent customer even more investor money. Through these reloads, delinquent merchant-customers remained out of default, but their obligations to defendant PAR FUNDING escalated rapidly, frequently to amounts that the

22

"reloaded" merchant-customers could not pay. Thus, the conspirators liberal use of reloads further enabled them to avoid declaring many merchant-customers in default and, thus, to conceal defendant PAR FUNDING's true performance.

54. Defendants JOSEPH LAFORTE and JOE COLE also caused fictitious merchant-customer payments to appear on defendant PAR FUNDING's books in order to manipulate its performance indicators, including its "Exposure %" and claimed default rate. Defendants JOSEPH LAFORTE and COLE accomplished this by causing fictitious MCA repayments for overdue MCAs to be recorded on defendant PAR FUNDING's books, thereby creating the false appearance that these delinquent merchant-customers had been making repayments to defendant PAR FUNDING. Defendants JOSEPH LAFORTE and COLE also made these fictitious customer payments to attempt to hide nonperforming MCAs from defendant PAR FUNDING's auditors.

55. In or about late 2018, defendant PAR FUNDING's auditors determined that the company had suffered a loss of approximately $6.6 million in 2017, due in large part to the company failing to write off bad debt that the auditors believed was not collectable. In response to the auditor's conclusion, defendant JOSEPH LAFORTE caused Person No. 2 to demand that the auditors rely on the faulty bad debt calculation of defendants JOSEPH LAFORTE and JOSEPH COLE, which the auditors did in an "adverse opinion" that misleadingly stated that the company had $1.2 million of net income in 2017.

23

## V.    Deception Regarding the Company's Success and Profitability

56.    As part of fundraising efforts, defendants JOSEPH LAFORTE and JOE

COLE made and caused others to make false claims to investors and potential investors

regarding defendant PAR FUNDING's success and profitability, when, in actuality, from 2016

through July 2020 the net cash flow from defendant PAR FUNDING's MCA business was not

sufficient to pay the promised investor returns and business expenses in any of these years,

meaning that the business was operating at a loss, not a profit. For example, in 2018 defendant

PAR FUNDING had a net cash shortfall of approximately $50 million, and in 2019 it had a net

cash shortfall exceeding $70 million. This financial reality notwithstanding, on or about

November 21, 2019, defendant JOSEPH LAFORTE, while in the presence of defendant COLE,

Perry Abbonizio, and Person No. 1, told a large group of investors and potential investors, "And

just to brag a little about the company, we're probably the most profitable cash advance company

in the United States – or maybe the world for that matter, pound for pound."

57.    Despite knowing defendant PAR FUNDING was not profitable,

defendants JOSEPH LAFORTE and JOE COLE continued to raise funds from investors in order

to continue their scheme, receive additional consulting payments, and conceal the fact that

defendant PAR FUNDING's MCA revenue was insufficient to repay investors and its business

expenses.

58.    While raising funds from investors based on these false statements,

defendants JOSEPH LAFORTE and JOE COLE, as well as Perry Abbonizio, concealed from

investors that they were making large distributions to themselves with the investors' funds

24

despite the fact that as a result of these distributions, defendant PAR FUNDING's MCA business generated insufficient returns to pay its operating business and repay investors.

59. To conceal this fraudulent conduct, defendants JOSEPH LAFORTE and JOE COLE often decided not to write off material amounts of defendant PAR FUNDING's accounts receivable as bad debt, despite the fact that no payments had been made on these MCAs in eight weeks.

## VI. Deception Regarding Insurance

60. As part of fundraising efforts, the defendants represented or caused others to represent to investors and prospective investors that defendant PAR FUNDING's MCAs were insured, even though they knew that this insurance would not provide the company or the investors with the protection that they sought.

61. Furthermore, despite learning as early as December 2018 and no later than August 2019 that defendant PAR FUNDING's insurance policy would not cover losses as a result of defendant PAR FUNDING's merchant-customers defaulting on their MCAs, but rather would only cover losses from a traditional factoring arrangement, the defendants, Perry Abbonizio, and Person No. 1 did not correct prior representations, or prevent further misrepresentations, about coverage under the insurance policy.

62. After August 2019, the defendants and their co-conspirators caused defendant PAR FUNDING to distribute a misleading marketing brochure stating that defendant PAR FUNDING carried insurance even though they knew that defendant PAR FUNDING's insurance was ineffectual.

25

63.     After August 2019, the defendants and their co-conspirators caused the

Agent Fund managers to continue making false and misleading representations and material

omissions regarding the company's insurance because they knew that the prior representations

regarding the insurance had been material to existing investors' decisions to invest in defendant

PAR FUNDING.

## VII.  **Deception Regarding Self-Dealing**

64.     During the fundraising efforts directed to investors and potential investors,

the defendants, Perry Abbonizio, and their co-conspirators concealed that they were engaged in

extensive self-dealing to the detriment of investors.

65.     For instance, defendants JOSEPH LAFORTE and JAMES LAFORTE

frequently caused defendant PAR FUNDING and the Par Funding affiliates to enter repeated

"reload" agreements with merchant-customers without adequate due diligence, in circumstances

in which those merchant-customers were unlikely to have the means to repay the continually

increasing amounts due.  As a result of these reload agreements, defendants JOSEPH LAFORTE

and COLE, and Abbonizio received additional consulting payments.

66.     For certain of these merchant-customers, when they were unable to repay

their MCAs to defendant PAR FUNDING and/or the Par Funding affiliates, defendants JOSEPH

LAFORTE, JAMES LAFORTE, and LISA McELHONE obtained personal ownership interests

in these merchant-customers or their successor businesses, often through nominees, including

Person No. 2 and Person No. 3 (defendant McELHONE's sister), in partial or full settlement of

the merchant-customers' obligations to defendant PAR FUNDING and/or the Par Funding

26

affiliates. These merchant-customers included, but were not limited to, Customer No. 2, Customer No. 3, Customer No. 4, and Customer No. 5.

67.     As a result, although the merchant-customers' obligations were due to defendant PAR FUNDING and the Par Funding affiliates (ultimately for the benefit of their investors), defendants JOSEPH LAFORTE and LISA McELHONE received the benefit of these settlements (to the detriment of the investors).

68.     On numerous occasions, defendant JOSEPH LAFORTE caused Customer No. 1 to make large cash payments directly to defendant JOSEPH LAFORTE as a condition of defendant PAR FUNDING continuing to fund Customer No. 1's Entities. Defendant JOSEPH LAFORTE did not account for these cash payments on defendant PAR FUNDING's books and records.

69.     Defendants JOSEPH LAFORTE and JAMES LAFORTE also caused defendant PAR FUNDING to make unjustified and excessively high payments to defendant JAMES LAFORTE, including an approximate $742,645 "commission" paid to defendant JAMES LAFORTE in or about May 2020 for non-CDC approved COVID 19 masks purchased by defendant PAR FUNDING at defendants JOSEPH LAFORTE and JAMES LAFORTE's direction, and an approximate $900,000 payment to defendant JAMES LAFORTE—via defendant JOSEPH LAFORTE's nominee, Person No. 2—from a civil settlement wherein a merchant-customer of defendant PAR FUNDING bought out the personal ownership share that defendant JOSEPH LAFORTE held in that merchant-customer via his nominee, Person No. 2.

70.     In or about June 2020, defendant JAMES LAFORTE also caused defendant PAR FUNDING to make unjustified payments for his own benefit, including

27

approximately $96,000 of investor money paid to an alleged merchant-customer of defendant PAR FUNDING, which payment defendant JAMES LAFORTE caused to be funneled back to a bank account that he controlled.

71. On or about July 27, 2020, after the SEC filed its complaint against defendant JOSEPH LAFORTE in the United States District Court for the Southern District of Florida but while the SEC's motion for a preliminary injunction was still pending, defendant JOSEPH LAFORTE caused defendant PAR FUNDING to enter a fraudulent MCA agreement with Customer No. 1 to funnel approximately $750,000 through one of Customer No. 1's Entities to defendants JOSEPH LAFORTE, LISA McELHONE, and JAMES LAFORTE.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants JOSEPH LAFORTE, PAR FUNDING, JOE COLE, and JAMES LAFORTE, and Perry Abbonizio, Person No. 1, Person No. 2, Person No. 3, Person No. 4, and their co-conspirators committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1. In or about April 2016, after defendants JOSEPH LAFORTE and LISA MCELHONE told Perry Abbonizio about defendant JOSEPH LAFORTE's true name and criminal history, defendant JOSEPH LAFORTE and Abbonizio agreed that during Abbonizio's efforts to raise funds for defendant PAR FUNDING, Abbonizio would conceal defendant JOSEPH LAFORTE's true name and criminal history.

2. On or about July 21, 2017, after receiving a copy of defendant PAR FUNDING's misleading marketing brochure via email, defendant JOSEPH LAFORTE emailed

28

the brochure to another employee to print copies of this brochure for defendant JOSEPH LAFORTE's review.

3.      On or about October 12, 2017, defendant JOE COLE requested a copy of defendant PAR FUNDING's misleading marketing brochure via email from the representative of defendant PAR FUNDING responsible for maintaining this document.

4.      On or about October 12, 2017, defendant JOSEPH LAFORTE caused Person No. 2 to send a misleading email to a representative of defendant PAR FUNDING's accounting firm inaccurately describing the roles of defendants LISA McELHONE and JOE COLE and concealing defendant JOSEPH LAFORTE's role at defendant PAR FUNDING.

5.      On or about April 12, 2018, defendant JOSEPH LAFORTE sent an email directing that revisions be made to defendant PAR FUNDING's misleading marketing brochure, none of which changed the misleading aspects of the brochure.

6.      On or about May 4, 2018, defendant JOSEPH LAFORTE caused Person No. 2 to circulate a revised version of the marketing brochure, which contained updated formatting but the same misleading information.

7.      On or about June 1, 2018, defendant JOE COLE provided misleading information during an interview by defendant PAR FUNDING's auditors, knowing that the auditors were preparing an audit report that would be provided to investors in defendant PAR FUNDING and the Agent Funds.

8.      On or about June 26, 2018, defendant JAMES LAFORTE emailed a copy of defendant PAR FUNDING's misleading marketing brochure to defendant JOSEPH LAFORTE.

29

9. On or about August 7, 2018, defendant JOSEPH LAFORTE obtained a significant personal ownership stake in one of defendant PAR FUNDING's MCA merchant-customers, due to the merchant-customer's failure to make timely payments to defendant PAR FUNDING, which ownership interest he placed in the name of his nominee, Person No. 3, who was defendant LISA McELHONE's sister.

10. On or about September 19, 2018, defendant LISA McELHONE provided misleading information during an interview by defendant PAR FUNDING's auditors, knowing that the auditors were preparing an audit report that would be provided to investors in defendant PAR FUNDING and the Agent Funds.

11. On or about October 5, 2018, defendant JOSEPH LAFORTE sent a text message directing Customer No. 1's driver to come to the offices of defendant PAR FUNDING to deliver a cash kickback.

12. On or about November 8, 2018, defendant JOSEPH LAFORTE sent an email to Person No. 4, a member of defendant PAR FUNDING's accounting staff, directing that an MCA transaction not be written off in order to manipulate defendant PAR FUNDING's default rate and funding analysis.

13. On or about December 20, 2018, defendant JOSEPH LAFORTE, Perry Abbonizio, and Person No. 1 participated in a conference call with Agent Fund managers to provide an update regarding defendant PAR FUNDING. Abbonizio introduced defendant JOSEPH LAFORTE by his alias and failed to disclose his true name and his criminal history. Defendant JOSEPH LAFORTE then made multiple misleading statements to the participants,

30

including regarding his background and defendant PAR FUNDING's default rate, underwriting, insurance, and profitability.

14. On or about December 20, 2018, Perry Abbonizio emailed a misleading letter to one of the Agent Funds managers to address a recent article published regarding defendants PAR FUNDING and JOSEPH LAFORTE.

15. On or about December 21, 2018, defendants JOSEPH LAFORTE and JOE COLE and Perry Abbonizio caused Person No. 2 to email them a misleading letter that would be distributed to various parties, including investors and potential investors in defendant PAR FUNDING and the Agent Funds.

16. In or about January 2019, defendant JOSEPH LAFORTE caused defendant PAR FUNDING to hire a "reputation manager" to help conceal defendant JOSEPH LAFORTE's criminal history from investors and potential investors.

17. In or about February 2019, defendants JOSEPH LAFORTE and JOE COLE caused defendant PAR FUNDING and the Par Funding affiliates to submit misleading Form D filings to the SEC, stating, among other things, that the "Related Persons" of defendant PAR FUNDING and the Par Funding affiliates were defendant LISA McELHONE, defendant JOE COLE, and/or Person No. 3, defendant McELHONE's sister, but omitting defendant JOSEPH LAFORTE, who was operating defendant PAR FUNDING and the Par Funding affiliates on a day-to-day basis.

18. On or about May 9, 2019, defendant JOE COLE sent an email to defendant JOSEPH LAFORTE attaching a version of defendant COLE's funding analysis

31

containing a deceptive and inaccurate "Exposure %," seeking defendant JOSEPH LAFORTE's approval to email the funding analysis to investors.

19.     On or about August 1, 2019, defendant JOSEPH LAFORTE sent an email to Person No. 4, copying defendant JOE COLE, directing that an MCA transaction not be written off in order to manipulate defendant PAR FUNDING's default rate and funding analysis.

20.     On or about August 15, 2019, during a solicitation event in Wildwood, Florida, Perry Abbonizio described the "great team" at defendant PAR FUNDING but failed to disclose that defendant JOSEPH LAFORTE, the leader of the team, was a twice-convicted felon. During this event, Abbonizio also misleadingly touted defendant PAR FUNDING's low default rate.

21.     On or about September 20, 2019, defendant JOSEPH LAFORTE sent a text message to defendant PAR FUNDING's "reputation manager" instructing him to take actions to conceal negative information about defendant JOSEPH LAFORTE on the Internet.

22.     On or about November 21, 2019, at an event in King of Prussia, Pennsylvania, in which hundreds of investors and prospective investors were solicited to invest in defendant PAR FUNDING through Agent Funds, defendants JOSEPH LAFORTE and JOE COLE, Perry Abbonizio, and Person No. 1 made false and misleading representations regarding defendants JOSEPH LAFORTE and PAR FUNDING.

23.     On or about November 22, 2019, defendants JOSEPH LAFORTE and JAMES LAFORTE telephoned a merchant-customer in default (identified below as Extortion Victim No. 10) and requested a small payment compared to the customer's large outstanding

32

obligation to defendant PAR FUNDING to make it appear that the customer was not in default and to deceive defendant PAR FUNDING's auditors (and ultimately its investors).

24. On or about December 5, 2019, defendant JOSEPH LAFORTE, in the presence of counsel for defendant PAR FUNDING, Attorney No. 1, lied under oath about defendant JOSEPH LAFORTE's involvement in, role at, and control over defendant PAR FUNDING during a deposition in a federal civil lawsuit pending against defendant PAR FUNDING.

25. On or about December 18, 2019, defendant JOE COLE sent an email to defendant JOSEPH LAFORTE providing an update on discussions with defendant PAR FUNDING's insurance company. In this email, defendant COLE suggested that defendant PAR FUNDING reduce its insurance "since the only benefit of" the insurance policy was that it permitted Agent Fund managers to "assert that our deals have insurance coverage." Despite recognizing that this insurance provided no useful coverage to defendant PAR FUNDING, defendant COLE did not recommend that investors be notified, but instead commented that Perry Abbonizio was "weaning the fund managers off the insurance pitch to investors."

26. On or about December 19, 2019, defendant JOSEPH LAFORTE responded to defendant JOE COLE's email regarding insurance, agreeing to his suggestion that the amount of insurance be decreased so that defendant PAR FUNDING could still misleadingly promote its ineffective insurance, but for a lower cost.

27. On or about January 3, 2020, defendant JOE COLE sent an email directing Person No. 4 to send a deceptive and circular payment designed to make it appear that merchant-customers that were in default were not in default.

33

28. On or about January 7, 2020, during a meeting at defendant PAR FUNDING's offices in Philadelphia, Pennsylvania, Perry Abbonizio made false and misleading statements to a prospective investor who was actually acting in an undercover capacity regarding, among other things, defendant JOSEPH LAFORTE's role at the company, the company's underwriting process, and the company's default rate.

29. On or about February 11, 2020, defendant JOE COLE, in the presence of Attorney No. 1, lied under oath about defendant JOSEPH LAFORTE's involvement in, role at, and control over defendant PAR FUNDING during a deposition in a federal civil lawsuit pending against defendant PAR FUNDING.

30. On or about March 5, 2020, defendant JOSEPH LAFORTE, in the Attorney No. 1, lied under oath about defendant JOSEPH LAFORTE's involvement in, role at, and control over defendant PAR FUNDING during a deposition in a federal civil lawsuit pending against defendant PAR FUNDING.

31. On or about March 11, 2020, defendants JOSEPH LAFORTE and JOE COLE, along with Attorney No. 1, met with two company employees, Person No. 4 and Person No. 5, and coached them to lie about defendant JOSEPH LAFORTE's involvement in, role at, and control over defendant PAR FUNDING during an upcoming deposition in a federal civil lawsuit pending against defendant PAR FUNDING.

32. On or about March 14, 2020, defendant JOSEPH LAFORTE and Perry Abbonizio caused Person No. 1 to remove any reference to defendant JOSEPH LAFORTE and his role at defendant PAR FUNDING from a promotional video that Person No. 1 had created.

34

33.     On March 27, 2020, defendant JAMES LAFORTE caused defendant PAR

FUNDING to wire approximately $96,000 to a merchant-customer in a sham MCA agreement,

which $96,000 was funneled to an entity controlled by defendant JAMES LAFORTE a few

months later.

34.     On or about April 8, 2020, defendant JOSEPH LAFORTE caused

defendant JAMES LAFORTE to pick up a cash kickback from Customer No. 1's assistant.

35.     On or about April 27, 2020, defendants JOSEPH LAFORTE and JAMES

LAFORTE caused a fake MCA agreement to be created to disguise defendant PAR FUNDING's

purchase of COVID-19 masks as an alleged MCA advance to the mask vendor.

36.     In or about April 2020, defendants JOSEPH LAFORTE and JOE COLE

caused defendant PAR FUNDING and the Par Funding affiliates to submit misleading Form D

filings to the SEC, stating, among other things, that the "Related Persons" of defendant PAR

FUNDING were defendant LISA McELHONE, defendant JOE COLE, and/or Person No. 3, but

omitting defendant JOSEPH LAFORTE, who was operating defendant PAR FUNDING and the

Par Funding affiliates on a day-to-day basis.

37.     On or about May 26, 2020, defendants JOSEPH LAFORTE and JAMES

LAFORTE caused defendant PAR FUNDING to pay defendant JAMES LAFORTE a

"commission" of approximately $742,645 related to the purchase of COVID-19 masks disguised

as an MCA agreement.

38.     On or about June 29, 2020, acting at the direction of defendants JOSEPH

LAFORTE and JOE COLE, Person No. 4 and Person No. 5 lied under oath about defendant

35

JOSEPH LAFORTE's involvement in, role at, and control over defendant PAR FUNDING during a deposition in a federal civil lawsuit pending against defendant PAR FUNDING.

39. On or about July 10, 2020, defendant JOSEPH LAFORTE sent an email copying defendant JOE COLE, approving a deceptive and circular wire transfer designed to make it appear that merchant-customers that were in default were not in default.

40. On or about July 27, 2020, defendants JOSEPH LAFORTE and JAMES LAFORTE caused defendant PAR FUNDING to enter a fraudulent MCA agreement with Customer No. 1 to funnel approximately $750,000 to defendants JOSEPH LAFORTE, LISA McELHONE, and JAMES LAFORTE.

41. On or about July 28, 2020, during the execution of a federal search warrant at the accounting offices of defendant PAR FUNDING, defendant JOSEPH COLE falsely told the FBI that the approximately $21,200 in cash that he had stored in his desk was money to pay Grubhub for lunch, when in fact, as defendant COLE knew, it was money given to him at the direction of defendant JOSEPH LAFORTE that had been earmarked to make fake MCA payments to defendant PAR FUNDING designed to create the false appearance that various delinquent MCA customers were not actually in default.

All in violation of Title 18, United States Code, Section 371.

36

## COUNTS TWO THROUGH TWENTY
(Wire fraud)

## THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraphs 1 through 30 and Overt Acts 1 through 41 of Count One are

incorporated here.

2.   From in or about early 2016 through in or about August 2020, in the

Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**
**COMPLETE BUSINESS SOLUTIONS GROUP, INC.,**
**d/b/a PAR FUNDING,**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

devised and intended to devise a scheme to defraud investors in defendant PAR FUNDING,

the Par Funding affiliates, and the Agent Funds and to obtain money and property by means of

knowingly false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

3.   Paragraphs 32 through 71 of Count One are incorporated here.

## WIRINGS

4.   On or about each of the dates set forth below, in the Eastern District of

Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendants

37

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**
**COMPLETE BUSINESS SOLUTIONS GROUP, INC.,**
**d/b/a PAR FUNDING,**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate commerce the signals and sounds

described below, each transmission constituting a separate offense:

| Count | Appx. Date | Description |
|---|---|---|
| 2 | 7/25/18 | Email from defendant PAR FUNDING representative to Agent Fund manager and Perry Abbonizio with misleading marketing brochure |
| 3 | 11/8/18 | Email from defendant JOSEPH LAFORTE to Person No. 4 regarding manipulating defendant PAR FUNDING's write-offs |
| 4 | 12/20/18 | Conference call among defendant JOSEPH LAFORTE, Perry Abbonizio, Person No. 1, and various Agent Fund managers |
| 5 | 12/20/18 | Email from Perry Abbonizio to Agent Fund manager, forwarding email from Person No. 2 attaching misleading letter in response to a news article |
| 6 | 1/8/19 | Email from defendant PAR FUNDING representative to Agent Fund managers with misleading marketing brochure |
| 7 | 2/14/19 | Email from defendant JOE COLE to defendant JOSEPH LAFORTE regarding defendant PAR FUNDING's misleading Form D filing |
| 8 | 8/1/19 | Email from defendant JOSEPH LAFORTE to Person No. 4 regarding manipulating defendant PAR FUNDING's write-offs |
| 9 | 9/14/19 | Text message from defendant JOSEPH LAFORTE to the reputation manager regarding "do[ing] something w[ith] [his] google related searches," as "[i]t has Gino and the Bloomberg article" |
| 10 | 9/16/19 | Email from defendant JOSEPH LAFORTE to the reputation manager selecting an article for the deceptive publicity campaign |
| 11 | 9/20/19 | Text message from defendant JOSEPH LAFORTE to the reputation manager complaining that his "google search has Bloomberg first and doj second" and instructing the reputation manager to "[g]et this |

| | | shit fixed" |
|---|---|---|
| 12 | 9/21/19 | Text message from the reputation manager to defendant JOSEPH LAFORTE regarding a deceptive publicity campaign |
| 13 | 11/22/19 | Telephone call from defendant JOSEPH LAFORTE and JAMES LAFORTE to Extortion Victim No. 10 |
| 14 | 11/23/19 | Text message from defendant JOSEPH LAFORTE to the reputation manager stating an article about his federal conviction was "hurting [his] business reputation" and asking what could be done |
| 15 | 12/18/19 | Email from defendant JOE COLE to defendant JOSEPH LAFORTE regarding various issues, including insurance |
| 16 | 4/8/20 | Text message from defendant JOSEPH LAFORTE to Customer No. 1's assistant about defendant JAMES LAFORTE picking up a cash kickback |
| 17 | 4/27/20 | Email from defendant JOE COLE to defendant JOSEPH LAFORTE and others regarding new fundings |
| 18 | 7/27/20 | Email notifying defendant PAR FUNDING, copying Person No. 5, that Customer No. 1 viewed an MCA agreement |
| 19 | 7/27/20 | Email notifying defendant PAR FUNDING, and defendant JAMES LAFORTE, that Customer No. 1 signed an MCA agreement |
| 20 | 7/27/20 | Telephone call between defendant JOSEPH LAFORTE and Customer No. 1 regarding a fraudulent MCA agreement |

All in violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY-ONE
(Securities fraud)

### THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One are incorporated here.

2. From in or about early 2016 through in or about August 2020, in the

Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a Joe McElhone,**
**COMPLETE BUSINESS SOLUTIONS GROUP, INC.,**
**d/b/a PAR FUNDING,**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and

instrumentalities of interstate commerce, the mails, and the facilities of national securities

exchanges, used and employed manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b–5, by: (a) employing devices, schemes

and artifices to defraud; (b) making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; and (c) engaging in acts, practices and courses of

business which operated and would operate as a fraud and deceit upon other persons in

connection with purchases and sales of securities in defendant PAR FUNDING and various

Agent Funds that invested in defendant PAR FUNDING.

40

In violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17,

Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code, Section 2.

## COUNT TWENTY-TWO

(Collection of extensions of credit by extortionate means)

### THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 15 of Count One are incorporated here.

2. Renato Gioe, charged elsewhere, worked for the collections department for defendant PAR FUNDING, charged elsewhere in this indictment, and, at the direction of defendant JOSEPH LAFORTE, acted as an "enforcer" and used extortionate means, including express and implied threats of violence, to collect payments from its customers.

3. Defendant JAMES LAFORTE performed work for defendant JOSEPH LAFORTE at defendant PAR FUNDING in a variety of roles, including by identifying merchant-customers to whom defendant PAR FUNDING would make MCA advances. Defendant JAMES LAFORTE, with the knowledge and direction of defendant JOSEPH LAFORTE, also acted as an "enforcer" and used extortionate means, including express and implied threats of violence, to collect payments from defendant PAR FUNDING's customers.

4. Fast Advance Funding (FAF) was one of the Par Funding affiliates. Throughout this conspiracy, FAF's MCAs were underwritten, funded, and collected by the same staff at defendant PAR FUNDING and for all practical purposes functioned as the same entity as defendant PAR FUNDING.

5. Renato Gioe worked for defendant PAR FUNDING from approximately 2013 through 2018 as a contractor for the company's collections department. During this time, Gioe worked out of defendant PAR FUNDING's Philadelphia offices, where he reported to and took direction from defendant JOSEPH LAFORTE. Gioe performed this work through a limited

42

liability company formed in Delaware called Stern Group & Associates. Defendant JOSEPH LAFORTE played a direct role in setting up Stern Group & Associates.

6.     Defendant PAR FUNDING's collections department was responsible for collecting funds from merchant-customers who did not make their payments on time. Defendants JOSEPH LAFORTE and JAMES LAFORTE, and Renato Gioe at defendant JOSEPH LAFORTE's direction, contacted delinquent borrowers via phone calls, text messages, and personal visits to their homes and businesses to make express and implied threats of violence to the merchant-customers and their families, such as threats to stick a fork in a merchant-customer's head or to cut off the merchant-customer's hands. The collections department also used various other techniques to harass delinquent merchant-customers, including by making repeated phone calls and emails to representatives of the merchant-customers, as well as the merchant-customers' family members, friends, neighbors, religious organizations, and schools.

## LOANS MADE BY DEFENDANT PAR FUNDING AND FAF AND COLLECTED BY EXTORTIONATE MEANS

7.     On or about July 22, 2014, FAF, entered into an MCA agreement with, and provided funding to, a barbershop business, Victim Business No. 1, located in Philadelphia, Pennsylvania, and owned by Extortion Victim No. 1. Victim Business No. 1 subsequently entered into additional agreements with FAF and defendant PAR FUNDING, which increased Victim Business No. 1's debt to defendant PAR FUNDING

8.     In or about late November 2015, defendant PAR FUNDING entered into an MCA agreement with, and provided funding to, a technology company, Victim Business No. 2, in Los Angeles, California, and co-owned by Extortion Victims No. 2 and 3. Victim Business

43

No. 2 subsequently entered into additional agreements, which increased Victim Business No. 2's debt to defendant PAR FUNDING by millions of dollars.

        9.      On or about October 7, 2016, defendant PAR FUNDING entered into an MCA agreement with, and provided funding to, to a retail hardware business, Victim Business No. 3, owned by Extortion Victim No. 4, with a business address in Lancaster County, Pennsylvania. Victim Business No. 3 subsequently entered into additional agreements, which increased Victim Business No. 3's debt to defendant PAR FUNDING.

        10.     On or about October 11, 2017, defendant PAR FUNDING entered into an MCA agreement with, and provided funding to, a real estate company, Victim Business No. 4, owned by Extortion Victim No. 5, with a business address in Miami, Florida. Victim Business No. 4 subsequently entered into additional agreements, which increased Victim Business No. 4's debt to defendant PAR FUNDING by millions of dollars.

        11.     In or about February 2018, defendant PAR FUNDING entered into an MCA agreement with, and provided funding to, a manufacturing company, Victim Business No. 5, owned by Extortion Victim No. 6, with a business address in Columbia, Maryland. Victim Business No. 5 subsequently entered into additional agreements, which increased Victim Business No. 5's debt to defendant PAR FUNDING by tens of millions of dollars.

        12.     On or about January 5, 2018, defendant PAR FUNDING entered into an MCA agreement with, and provided funding to, an electrician business, Victim Business No. 6, owned by Extortion Victim No. 8, with a business address in Long Island, New York. Victim Business No. 6 subsequently entered into additional agreements, which increased Victim Business No. 6's debt to defendant PAR FUNDING by hundreds of thousands of dollars.

44

13. On or about April 23, 2018, defendant PAR FUNDING entered into an MCA agreement with, and provided funding to, a residential and commercial solar systems business, Victim Business No. 7, owned in part by Extortion Victim No. 10, with a business address in Cherry Hill, New Jersey. Victim Business No. 7 subsequently entered into additional agreements, which increased Victim Business No. 7's debt to defendant PAR FUNDING by millions of dollars.

14. On or about December 8, 2018, defendant PAR FUNDING entered into an MCA agreement with, and provided funding to, Victim Business No. 8, owned by Extortion Victim No. 11, with a business address in Miami, Florida. Victim Business No. 8 subsequently entered into additional agreements, which increased Victim Business No. 8's debt to defendant PAR FUNDING by millions of dollars.

15. From no later than in or about 2016 until at least in or about July 2020, in the Eastern District of Pennsylvania and elsewhere, defendants

> **JOSEPH LAFORTE,**
> **a/k/a "Joe Mack,"**
> **a/k/a "Joe Macki,"**
> **a/k/a "Joe Mackie," and**
> **a/k/a "Joe McElhone," and**
> **JAMES LAFORTE,**
> **a/k/a "Jimmy Schillaci,"**

knowingly conspired and agreed with Renato Gioe and others, known and unknown to the grand jury, to participate in the use of extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from multiple merchant-customers, including Extortion Victim No. 1, Extortion Victims No. 2 and 3, Extortion Victim No. 4, Extortion Victim No. 5, Extortion Victims No. 6 and 7, Extortion Victims No. 8

45

and 9, Extortion Victim No. 10, and Extortion Victim No. 11, all persons known to the grand jury, in violation of Title 18, United States Code, Section 894(a).

## MANNER AND MEANS

It was part of the conspiracy that:

16.     Defendant JOSEPH LAFORTE made hostile, threatening, and intimidating communications to representatives of the merchant-customers, including at defendant PAR FUNDING's place of business, in an effort to secure MCA payments from these merchant-customers.

17.     Defendant JOSEPH LAFORTE directed Renato Gioe and defendant JAMES LAFORTE to travel throughout the United States to make unannounced personal visits to the businesses and homes of representatives of the merchant-customers, in order to make hostile, threatening, and intimidating communications to these representatives.

18.     Renato Gioe and defendant JAMES LAFORTE traveled throughout the United States and made unannounced personal visits to representatives of merchant-customers and made hostile threatening and intimidating communications to those representatives.

19.     During these collection efforts, and often in conjunction with Renato Gioe's or defendant JAMES LAFORTE's personal visits to representatives of the merchant-customers, defendant JOSEPH LAFORTE made hostile, threatening, and intimidating electronic and telephone communications to these representatives. After Gioe or defendant JAMES LAFORTE visited these representatives of the merchant-customers or otherwise threatened them, defendant JOSEPH LAFORTE continued to collect funds from the merchant-customers and continued to make hostile, threatening, and intimidating electronic and telephone

46

communications as necessary to collect on delinquent credit.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object, defendants JOSEPH LAFORTE and JAMES LAFORTE, along with Renato Gioe and others both known and unknown to the grand jury, committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1.      On multiple occasions beginning no later than in or about early 2016, at a time when Victim Business No. 1 was financially unable to meet defendant PAR FUNDING's repayment terms, Renato Gioe—at the direction of defendant JOSEPH LAFORTE—appeared unannounced at Victim Business No. 1's barbershops in Philadelphia on a weekly basis, where Gioe demanded cash payments from Extortion Victim No. 1.

2.      When Extortion Victim No. 1 did not have sufficient cash to meet Renato Gioe's demands, Gioe made hostile, threatening, and intimidating statements to Extortion Victim No. 1, including that he would physically harm Extortion Victim No. 1. Defendant PAR FUNDING and the Par Funding affiliates continued to collect repayments made by Extortion Victim No. 1 after these threats were made until on or about September 16, 2019.

3.      On or about February 15, 2018, at a time when Victim Business No. 2 was financially unable to meet defendant PAR FUNDING's repayment terms:

a.      At the direction of defendant JOSEPH LAFORTE, Renato Gioe appeared unannounced at Victim Business No. 2's Los Angeles office and demanded to speak with Extortion Victim No. 2. Gioe then spoke to Extortion Victim No. 3 and demanded payment on behalf of defendant PAR FUNDING.

47

b. While at Victim Business No. 2's office, Renato Gioe made hostile, threatening, and intimidating statements to Extortion Victim No. 3, including telling him that the fact that Victim Business No. 2 owed money to defendant PAR FUNDING could affect "wives, households, and children" and could make widows, and telling Extortion Victim No. 3 a story about a suspicious car accident involving another person from whom Gioe was trying to collect money on behalf of defendant PAR FUNDING.

4. On or about February 16, 2018:

a. Renato Gioe returned to Victim Business No. 2's Los Angeles office and again demanded that Extortion Victim No. 3 "just pay the fucking money," while denying that he had threatened Extortion Victim No. 3 the previous day.

b. Gioe participated in a telephone call with defendant JOSEPH LAFORTE in the presence of Extortion Victims Nos. 2 and 3 using the speakerphone function, during which defendant JOSEPH LAFORTE told Gioe and Extortion Victims Nos. 2 and 3 that Gioe knew "what to do with this guy [Extortion Victim No. 3]" and to "take care of him [Extortion Victim No. 3]." Defendant PAR FUNDING continued to collect repayments made by Extortion Victims Nos. 2 and 3 after these threats were made until on or about July 10, 2020.

c. Gioe texted defendant JOSEPH LAFORTE and Person No. 2 in a group message and stated, "I'm on top of [a New York merchant, known to the Grand Jury]. I'll find out tomorrow with you. Let me feel him. By the way [Extortion Victim No. 3] is scared could not believe I arrived." Defendant JOSEPH LAFORTE then replied, in pertinent part, "Get all monies in. Also you got a few others."

48

5. In or about Spring 2017, at a time when Victim Business No. 3 was financially unable to meet defendant PAR FUNDING's repayment terms, Gioe—at the direction of defendant JOSEPH LAFORTE—appeared unannounced at Victim Business No. 3's retail store, where Gioe made hostile, threatening, and intimidating statements to Extortion Victim No. 4 while defendant JOSEPH LAFORTE was listening on the phone, causing Extortion Victim No. 4 to cry. Defendant PAR FUNDING continued to collect repayments made by Extortion Victim No. 4 after these threats were made until in or about April 2018.

6. On or about June 2, 2018, at a time when Victim Business No. 4 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JOSEPH LAFORTE texted Extortion Victim No. 5, stating "U believe I got to send Gino [Gioe] at you on Monday to get my payments. Btw your paying for these trips. He isn't cheap." Defendant JOSEPH LAFORTE then texted Extortion Victim No. 5 along with Gioe, stating that Gioe would visit with Extortion Victim No. 5 on Monday, June 4, 2018, "with the hopes of receiving our funds on Monday by business close." Defendant JOSEPH LAFORTE then asked Extortion Victim No. 5 in a text, "If this cannot be accomplished, would u mind if Gino [Gioe] could be a guest at your home until this can be procured." When Extortion Victim No. 5 responded that he would be willing to let Gioe stay at Extortion Victim No. 5's beach house, defendant JOSEPH LAFORTE responded, "I thought it would be nice if u stayed together."

7. On or about June 4, 2018:

a. At the direction of defendant JOSEPH LAFORTE, Renato Gioe arrived at Extortion Victim No. 5's office in Florida, demanded repayment, acted in a hostile and intimidating manner, and refused to leave for approximately eight hours.

49

b.      While Gioe was at Extortion Victim No. 5's office, Gioe and Extortion Victim No. 5 spoke by phone with defendant JOSEPH LAFORTE about repayment of the funds advanced to Victim Business No. 4. Defendant JOSEPH LAFORTE and Extortion Victim No. 5 also exchanged text messages, during which Extortion Victim No. 5 pleaded with defendant JOSEPH LAFORTE, "Can you please get Gino [Gioe] the fuck out of my office, i can't have this shit! I get it, but this doesn't help and I don't want any kind [of] scene."

c.      Gioe took Extortion Victim No. 5's Rolex watch, which Extortion Victim No. 5 had offered as a gift of appeasement, prompting Extortion Victim No. 5 to plead by text with defendant JOSEPH LAFORTE, "Please call off the hounds.. [sic] and by that I mean that animal [Gioe] you sent down here."

8.      Defendant PAR FUNDING continued to collect repayments made by Extortion Victim No. 5 after these threats were made.

9.      On or about May 6, 2019, at a time when Victim Business No. 5 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JOSEPH LAFORTE met with Extortion Victim No. 6 and her employee, Extortion Victim No. 7, and threatened to "blow up" Extortion Victim No. 6's home if she did not comply with defendant JOSEPH LAFORTE's repayment demands.

10.      Defendant PAR FUNDING continued to collect repayment from Victim Business No. 5 after these threats were made.

11.      In or about February 2019, at a time when Victim Business No. 6 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9—the bookkeeper of Victim Business No. 6 and the

50

spouse of Extortion Victim No. 8—on the phone and said that if Extortion Victim No. 9 did not repay defendant PAR FUNDING, then one day Extortion Victim No. 9 would turn on Extortion Victim No. 9's car and "poof," which Extortion Victim No. 9 understood to be a threat to blow up Extortion Victim No. 9's car.

12.    In or about April 2019, at a time when Victim Business No. 6 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9 on the phone and said that if Extortion Victim No. 9 did not repay defendant PAR FUNDING, then one day when Extortion Victim No. 9 went to pick up Extortion Victim No. 9's children from school, they would not be there.

13.    In or about August 2019, at a time when Victim Business No. 6 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9 on the phone and asked if Extortion Victim No. 9 had ever heard of "cement shoes" and then told Extortion Victim No. 9 that Extortion Victim No. 9 would end up at the bottom of the Hudson River.

14.    In or about November 2019, at a time when Victim Business No. 6 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9 on the phone and told her: "Do you want to take this to the streets? We'll take this to the streets. I'm going to put a bomb in your car and when you turn it on, it's gonna blow and you're going to go with it."

15.    Defendant PAR FUNDING continued to collect repayments from Victim Business No. 6 after these threats were made until on or about February 4, 2020.

51

16.     In or about May 2018, at a time when Victim Business No. 7 had missed a scheduled payment to defendant PAR FUNDING, defendant JAMES LAFORTE spoke to Extortion Victim No. 10 on the phone and demanded an immediate payment to defendant PAR FUNDING and told Extortion Victim No. 10 that he was a "soldier for the family" and that he was not to be messed with because he had torched people's cars and kicked people's teeth in.

17.     Defendant PAR FUNDING continued to collect repayments from Victim Business No. 7 after these threats were made until in or about July 2018.

18.     In or about July 2018, at a time when Victim Business No. 7 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JAMES LAFORTE spoke to Extortion Victim No. 10 on the phone and told him he would kill Extortion Victim No. 10 if he filed for bankruptcy and stopped paying the money owed to defendant PAR FUNDING.

19.     In or about March 2019, at a time when Victim Business No. 8 was financially unable to meet defendant PAR FUNDING's repayment terms, defendant JAMES LAFORTE spoke to Extortion Victim No. 11 on the phone and told him he would kill Extortion Victim No. 11 and his family if he did not pay the money owed to defendant PAR FUNDING. Defendant PAR FUNDING continued to collect repayments from Victim Business No. 8 after these threats were made until in or about March 2020.

All in violation of Title 18, United States Code, Section 894(a).

52

## COUNT TWENTY-THREE
(Collection of extensions of credit by extortionate means)

## THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 14 of Count One and paragraphs 2, 4 through 7, and

16 through 19 and Overt Acts 1 and 2 of Count Twenty-Two are incorporated here.

2. From in or about early 2016 through on or about September 16, 2019, in

the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

and Renato Gioe, charged elsewhere, knowingly used, and aided and abetted the use of,

extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect

and attempt to collect extensions of credit from Extortion Victim No. 1, a person known to the

grand jury.

In violation of Title 18, United States Code, Sections 894(a) and 2.

53

## COUNT TWENTY-FOUR
(Collection of extensions of credit by extortionate means)

## THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 14 of Count One and paragraphs 2, 4 through 6, 8,

and 16 through 19 and Overt Acts 3 and 4 of Count Twenty-Two are incorporated here.

2. From in or about February 2018 through on or about July 10, 2020, in the

Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

and Renato Gioe, charged elsewhere, knowingly used, and aided and abetted the use of,

extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect

and attempt to collect extensions of credit from Extortion Victim Nos. 2 and 3, persons known to

the grand jury.

In violation of Title 18, United States Code, Sections 894(a) and 2.

## COUNT TWENTY-FIVE
(Collection of extensions of credit by extortionate means)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 14 of Count One and paragraphs 2, 4 through 6, 10,

and 16 through 19 and Overt Acts 6 through 8 of Count Twenty-Two are incorporated here.

2.     From in or about June 2018 through in or about April 2019, in the Eastern

District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,
a/k/a "Joe Mack,"
a/k/a "Joe Macki,"
a/k/a "Joe Mackie," and
a/k/a "Joe McElhone,"**

and Renato Gioe, charged elsewhere, knowingly used, and aided and abetted the use of,

extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect

and attempt to collect extensions of credit from Extortion Victim No. 5, a person known to the

grand jury.

In violation of Title 18, United States Code, Sections 894(a) and 2.

55

## COUNT TWENTY-SIX
(Collection of extensions of credit by extortionate means)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 14 of Count One and paragraphs 2, 4 through 6, 11,

and 16 through 19 and Overt Acts 9 and 10 of Count Twenty-Two are incorporated here.

2.     In or about May 2019, in the Eastern District of Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

knowingly used extortionate means within the meaning of Title 18, United States Code, Section

891(7), to collect and attempt to collect extensions of credit from Extortion Victims Nos. 6 and

7, persons known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

56

## COUNT TWENTY-SEVEN

(Collection of extensions of credit by extortionate means)

## THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 14 of Count One and paragraphs 2, 4 through 6, 12,

and 16 through 19 and Overt Acts 11 through 15 of Count Twenty-Two are incorporated here.

2. From in or about February 2019 through in or about February 2020, in the

Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

knowingly used extortionate means within the meaning of Title 18, United States Code, Section

891(7), to collect and attempt to collect extensions of credit from Extortion Victim Nos. 8 and 9,

persons known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

57

## COUNT TWENTY-EIGHT
(Collection of extensions of credit by extortionate means)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 15 of Count One and paragraphs 2 through 6, 13,

and 16 through 19 and Overt Acts 16 through 18 of Count Twenty-Two are incorporated here.

2.     From in or about May 2018 through in or about July 2018, in the Eastern

District of Pennsylvania and elsewhere, defendant

### JAMES LAFORTE,
### a/k/a "Jimmy Schillaci,"

knowingly used extortionate means within the meaning of Title 18, United States Code, Section

891(7), to collect and attempt to collect extensions of credit from Extortion Victim No. 10, a

person known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

58

## COUNT TWENTY-NINE
(Collection of extensions of credit by extortionate means)

### THE GRAND JURY FURTHER CHARGES THAT:

1.       Paragraphs 1 through 15 of Count One and paragraphs 2 through 6, 14,

and 16 through 19 and Overt Act 19 of Count Twenty-Two are incorporated here.

2.       From in or about March 2019 through in or about March 2020, in the

Eastern District of Pennsylvania and elsewhere, defendant

### JAMES LAFORTE,
### a/k/a "Jimmy Schillaci,"

knowingly used extortionate means within the meaning of Title 18, United States Code, Section

891(7), to collect and attempt to collect extensions of credit from Extortion Victim No. 11, a

person known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

59

## COUNTS THIRTY THROUGH THIRTY-TWO
(Wire fraud)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 14, 18 through 30, 32 through 34, and 36 through 71 and Overt Acts 1, 2, 10, 11, 22, 24, 30, and 31 of Count One, and Counts Three, Four, and Seven through Seventeen, are incorporated here.

## BACKGROUND

## I.     The Defendants

2.     From at least 2013 through in or about July 2020, defendant JOSEPH LAFORTE controlled the day-to-day operations of defendant PAR FUNDING, charged elsewhere in this indictment, and the Par Funding affiliates and owned or operated them indirectly through nominees, including his wife, defendant LISA McELHONE. Nevertheless, defendant JOSEPH LAFORTE was not listed on any corporate documents as these entities' Chief Executive Officer or President, despite serving in these roles. This structure was utilized to hide defendant JOSEPH LAFORTE's control of, income from, and work for, defendant PAR FUNDING and the Par Funding affiliates from the outside world, including not only from investors and potential investors, but also the Internal Revenue Service ("IRS") and other taxing authorities.

3.     Defendants JOSEPH LAFORTE and LISA McELHONE earned tens of millions of dollars in taxable personal income from defendant PAR FUNDING and the Par Funding affiliates between tax years 2013 and 2019, only part of which they reported on their personal state and federal tax returns.

60

## II. The Defendants' Residency

4. From at least 2013 through mid-2020, defendants JOSEPH LAFORTE and LISA McELHONE lived and worked in the Commonwealth of Pennsylvania, where defendant JOSEPH LAFORTE ran defendant PAR FUNDING and the Par Funding affiliates and where defendant MCELHONE ran a nail salon.

5. From at least 2014 through in or about 2019, defendants JOSEPH LAFORTE and LISA McELHONE were residents of the Commonwealth of Pennsylvania, having been physically present in Pennsylvania for at least 300 calendar days each year, which is significantly more than half the year, and also having established a permanent place of abode in Pennsylvania. Defendants JOSEPH LAFORTE and McELHONE lived in the city of Philadelphia until in or around June 2016, when they purchased a residence on Ferndale Lane, in Haverford, Pennsylvania.

6. From at least 2013 through in or about 2019, defendants JOSEPH LAFORTE and LISA McELHONE spent significantly less than 184 calendar days in Florida each year.

## III. The Defendants' Tax Filings

7. The Commonwealth of Pennsylvania has a state income tax rate of 3.07%. The State of Florida, however, does not have a state income tax.

8. For tax years 2013 through 2019, defendants JOSEPH LAFORTE and LISA McELHONE retained Accountant No. 1 and Accountant No. 2 of Accounting Firm No. 1

61

to prepare and file their state and federal tax returns, as well as the tax returns of defendant PAR FUNDING.

9.      Defendant LISA McELHONE approved and signed individual state income tax returns using Form PA-40, for tax years 2013 through 2017. These tax returns were prepared by Accountant No. 1 and Accountant No. 2.

10.     Defendant JOSEPH LAFORTE did not file Pennsylvania tax returns for tax years 2014 through 2017.

11.     For tax years 2018 and 2019, defendants JOSEPH LAFORTE and LISA McELHONE approved and signed individual Pennsylvania state income tax returns using Form PA-40, in which they elected the filing status "married filing jointly." These tax returns were prepared and filed by Accountant No. 1 and Accountant No. 2.

12.     Defendant LISA McELHONE approved and signed federal income tax returns using IRS Form 1040s for the tax years 2013 through 2017, in which she elected the filing status of "married filing separately." These tax returns were prepared by Accountant No. 1 and Accountant No. 2.

13.     Defendant JOSEPH LAFORTE did not file federal tax returns for tax years 2014 through 2017.

14.     For tax years 2018 and 2019, defendants JOSEPH LAFORTE and LISA McELHONE approved and signed federal tax returns using IRS Form 1040s, in which they elected the filing status of "married filing jointly." These tax returns were prepared by Accountant No. 1 and Accountant No. 2.

15.     From in or about April 2015 through in or about July 2020, in the Eastern

District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone," and**
**LISA McELHONE**

knowingly executed a scheme to defraud the Commonwealth of Pennsylvania out of money and

property, by means of false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

16.     Although defendants JOSEPH LAFORTE and LISA McELHONE were

residents of Pennsylvania from 2014 through 2019, they approved and signed state and federal

tax returns falsely stating that they were non-residents of Pennsylvania, and in which they falsely

underreported their taxable Pennsylvania income.

17.     Despite Accountant No. 1 and Accountant No. 2 having prepared

defendant LISA McELHONE's PA-40 Pennsylvania state tax return for tax year 2013, which

accurately identified defendant McELHONE as a resident of Pennsylvania, Accountant No. 1

and Accountant No. 2 prepared defendant McELHONE's IRS Form 1040 federal tax return for

tax year 2014 to falsely state that her "home address" was in Miami, Florida, and also prepared

defendant McELHONE's PA-40 Pennsylvania state tax return for tax year 2014 to falsely state

that she was a resident of Florida (living at the same address in Miami, Florida) for at least half

of the year (July 1, 2014 through December 31, 2014).

63

18.     Defendant LISA McELHONE approved and signed her IRS Form 1040 federal tax return for tax year 2014, which falsely listed a home address in Miami, Florida, and defendant McELHONE approved and signed her PA-40 Pennsylvania state tax return for tax year 2014, which falsely stated that she was a resident of Florida for at least half of the year and which listed the address of her alleged Florida home as an address in Miami, Florida, which Accountant No. 1 and Accountant No. 2 filed electronically at her direction on or about April 15, 2015. At all relevant times, the address in Miami, Florida was a four-story commercial property that contained a law firm that did legal work for defendant McELHONE.

19.     For tax year 2014, defendant LISA McELHONE reported her taxable income on her federal tax return as approximately $250,408 and her taxable income to Pennsylvania as approximately $110,373 for the six months that she claimed that she resided in Pennsylvania. Thus, defendant McELHONE did not pay taxes to the Commonwealth of Pennsylvania for the remaining approximately $140,035 that she earned in 2014. This deception resulted a loss of approximately $4,299 to the Commonwealth of Pennsylvania.

20.     Accountant No. 1 and Accountant No. 2 prepared defendant LISA McELHONE's IRS Form 1040 federal tax return for tax year 2015 to falsely state that her "home address" was a condominium in Sunny Island Beach, Florida, and also prepared defendant McELHONE's PA-40 Pennsylvania state tax return for tax year 2015 to falsely state that she was a "nonresident" of Pennsylvania (living at the same address in Sunny Island Beach, Florida).

21.     Defendant LISA McELHONE approved and signed her IRS Form 1040 federal tax return for tax year 2015, which falsely listed her "home address" as a condominium in Sunny Island Beach, Florida, and defendant McELHONE approved and signed her PA-40

64

Pennsylvania state tax return for tax year 2015, which falsely stated she was a "nonresident" of Pennsylvania and listed her Florida home as the condominium in Sunny Island Beach, Florida, and which Accountant No. 1 and Accountant No. 2 filed electronically at her direction on or about April 27, 2016.

22.     For tax year 2015, defendant LISA McELHONE reported her taxable income on her federal return as approximately $273,089, and due to her fictitious status as a non-resident of Pennsylvania, she falsely reported no Pennsylvania income and paid no Pennsylvania income tax. This deception resulted in a loss of approximately $8,383 to the Commonwealth of Pennsylvania.

23.     Accountant No. 1 and Accountant No. 2 prepared defendant LISA McELHONE's IRS Form 1040 federal tax return for tax year 2016 to falsely state that her "home address" was a condominium in Sunny Island Beach, Florida, and also prepared defendant McELHONE's PA-40 Pennsylvania state tax return for tax year 2016 to falsely state that she was a "nonresident" of Pennsylvania, with the same Florida condominium address.

24.     Defendant LISA McELHONE approved and signed her IRS Form 1040 federal tax return for tax year 2016, which falsely listed her "home address" as a condominium in Sunny Island Beach, Florida, and defendant McELHONE approved and signed her PA-40 Pennsylvania state tax return for tax year 2016, which falsely stated she was a "nonresident" of Pennsylvania, with the same Florida condominium address, which Accountant No. 1 and Accountant No. 2 filed electronically at her direction on or about April 15, 2017.

25.     For tax year 2016, defendant LISA McELHONE reported her taxable income on her federal return as approximately $2,411,134, and due to her fictitious status as a

65

non-resident of Pennsylvania, she falsely reported no Pennsylvania income and paid no Pennsylvania income tax. This deception resulted in a loss of approximately $74,021 to the Commonwealth of Pennsylvania.

26.     Accountant No. 1 and Accountant No. 2 prepared defendant LISA McELHONE's IRS Form 1040 federal tax return for tax year 2017 to falsely state that her "home address" was a condominium in Sunny Island Beach, Florida, and also prepared defendant McELHONE's PA-40 Pennsylvania state tax return for tax year 2017 to falsely state that she was a "nonresident" of Pennsylvania, with the same Florida condominium address.

27.     Defendant LISA McELHONE approved and signed her IRS Form 1040 federal tax return for tax year 2017, which falsely listed her "home address" as a condominium in Sunny Island Beach, Florida, and defendant McELHONE approved and signed her PA-40 Pennsylvania state tax return for tax year 2017, which falsely stated she was a "nonresident" of Pennsylvania, with the same Florida condominium address, which Accountant No. 1 and Accountant No. 2 filed electronically at her direction on or about October 15, 2018.

28.     For tax year 2017, defendant LISA McELHONE reported her taxable income on her federal return as approximately $4,729,738. Due to her fictitious status as a non-resident of Pennsylvania, she falsely underreported Pennsylvania income of only approximately $22,839, which resulted in a loss of approximately $144,501 to the Commonwealth of Pennsylvania.

29.     Accountant No. 1 and Accountant No. 2 prepared defendants JOSEPH LAFORTE and LISA McELHONE's joint IRS Form 1040 federal tax return for tax year 2018 to falsely state that their "home address" was a property in Palm Beach, Florida, and also prepared

66

defendants JOSEPH LAFORTE and McELHONE's joint PA-40 Pennsylvania state tax return for tax year 2018, which falsely stated that they were both a "nonresident" of Pennsylvania, with the same Palm Beach, Florida address.

30. Defendants JOSEPH LAFORTE and LISA McELHONE approved and signed their joint IRS Form 1040 federal tax return for tax year 2018, which falsely listed their "home address" as a property in Palm Beach, Florida, which Accountant No. 1 and Accountant No. 2 filed electronically at their direction on or about August 15, 2019. The defendants also approved and signed their joint PA-40 Pennsylvania state tax return for tax year 2018, which falsely stated that they both were a "nonresident" of Pennsylvania, and which listed their address as the same Palm Beach property, which Accountant No. 1 and Accountant No. 2 filed electronically at their direction on or about August 15, 2019. The defendants subsequently filed an amended joint federal tax return, Form 1040X, for tax year 2018, which also listed their "home address" as the property in Palm Beach, Florida. At all relevant times, the Palm Beach address was the address of a realtor that defendants JOSEPH LAFORTE and McELHONE would later use to purchase their first Florida home in mid-December 2019.

31. For tax year 2018, defendants JOSEPH LAFORTE and LISA McELHONE reported their combined taxable income on their joint federal return as approximately $28,125,399. Due to their fictitious status as non-residents of Pennsylvania, they falsely underreported Pennsylvania income of only approximately $1,599,849, which resulted in a loss of approximately $814,344 to the Commonwealth of Pennsylvania.

32. Accountant No. 1 and Accountant No. 2 prepared defendants JOSEPH LAFORTE and LISA McELHONE's IRS Form 1040 federal tax return for tax year 2019 to

67

falsely list a "home address" in Jupiter, Florida. Accountant No. 1 and Accountant No. 2 also prepared defendants JOSEPH LAFORTE and McELHONE's joint PA-40 Pennsylvania state tax return for tax year 2019, which falsely stated that they were both a "nonresident" of Pennsylvania, and which listed their address as the same Jupiter, Florida address.

33.    Defendants JOSEPH LAFORTE and LISA McELHONE approved and signed their joint IRS Form 1040 federal tax return for tax year 2019, which falsely listed a "home address" in Jupiter, Florida, which Accountant No. 1 and Accountant No. 2 filed electronically at their direction on or about July 15, 2020. The defendants approved and signed their joint PA-40 Pennsylvania state tax return for tax year 2019, which falsely stated that they were both a "nonresident" of Pennsylvania, and which listed their address as the same Jupiter property, which Accountant No. 1 and Accountant No. 2 filed electronically at their direction on or about July 15, 2020. Defendants JOSEPH LAFORTE and McELHONE had not purchased the Jupiter property until on or about December 12, 2019, and they did not reside there for the majority of tax year 2019.

34.    For tax year 2019, defendants JOSEPH LAFORTE and LISA McELHONE reported their combined taxable income on their joint federal return as approximately $4,494,849. Due to their fictitious status as non-residents of Pennsylvania, they falsely reported no Pennsylvania income and paid no Pennsylvania income tax. This deception resulted in a loss of approximately $137,991 to the Commonwealth of Pennsylvania.

35.    A summary of the reported taxable income of defendants JOSEPH LAFORTE and LISA McELHONE, along with the defendants' underreported Pennsylvania income and the corresponding tax loss to the Commonwealth of Pennsylvania, is set forth below.

68

| Year | Reported Federal Taxable Income | Reported Pennsylvania Income | Tax Paid to Pennsylvania | Approximate Pennsylvania Tax Loss |
|------|------|------|------|------|
| 2014 | $250,408 | $110,373 (6 months) | $3,388 | $4,299 |
| 2015 | $273,089 | ($109,530) | $0 | $8,383 |
| 2016 | $2,411,134 | ($113,391) | $0 | $74,021 |
| 2017 | $4,729,738 | $22,839 | $701 | $144,501 |
| 2018 | $28,125,399 | $1,599,849 | $49,115 | $814,334 |
| 2019 | $4,494,849 | ($4,692,975) | $0 | $137,991 |
| Total | $40,284,617 | | | $1,183,529 |

36.     The Pennsylvania PA-40 tax returns for tax years 2014 through 2019
caused to be filed by defendants JOSEPH LAFORTE and LISA McELHONE had a signature
section in which the defendants acknowledged having examined the return and declared under
penalty of perjury that the information contained therein was true, correct, and complete, and the
e-authorization forms signed by defendants JOSEPH LAFORTE and McELHONE each year had
a similar acknowledgement and declaration.

37.     Defendants JOSEPH LAFORTE and LISA McELHONE, and others,
known and unknown to the grand jury, knew that the Pennsylvania PA-40 tax returns for
defendants JOSEPH LAFORTE and McELHONE for tax years 2014 through 2019 contained
false information about their residency status, their alleged Florida residences, and their taxable
Pennsylvania income.

38.     Defendants JOSEPH LAFORTE and LISA McELHONE, and others,
known and unknown to the grand jury, understood that by falsely representing that defendants
JOSEPH LAFORTE and McELHONE were non-residents of Pennsylvania in the PA-40 tax
returns for tax years 2014 through 2019, they were affirmatively misrepresenting their residency
status and depriving the Commonwealth of Pennsylvania of information that, had it been

69

accurately provided, would have resulted in defendants JOSEPH LAFORTE and McELHONE

owing substantially more money in taxes to the Commonwealth of Pennsylvania.

## WIRINGS

39.     On or about each of the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone," and**
**LISA McELHONE**

and Accountant No. 1 and Accountant No. 2 and others, known and unknown to the grand jury,

for the purpose of executing the scheme described above, caused to be transmitted by means of

wire communication in interstate commerce the signals and sounds described below for each

count, each transmission constituting a separate count:

| Count | Date | Description |
|-------|---------|-------------|
| 30 | 8/14/19 | Email sent from defendant LISA McELHONE, in Pennsylvania, to Accountant No. 2, in Colorado, with signed tax forms |
| 31 | 7/13/20 | Email sent from Accountant No. 2, in Colorado, to defendant LISA McELHONE, in Pennsylvania, with tax forms for signature |
| 32 | 7/14/20 | Email sent from defendant LISA McELHONE, in Pennsylvania, to Accountant No. 2, in Colorado, with signed tax forms |

All in violation of Title 18, United States Code, Section 1343.

## COUNT THIRTY-THREE

(Evasion of assessment)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 14, 47, 48, 53, 58, 59, 64, 65, and 68 of Count One and paragraphs 12 and 13 of Count Thirty are incorporated here.

2.     Customer No. 1 sought and received an MCA from defendant PAR FUNDING, charged elsewhere in this indictment, for one of his companies ("MCA Company No. 1") in or about May 2015 and received additional MCAs from defendant PAR FUNDING and the Par Funding affiliates for MCA Company No. 1 and other related entities that he owned (Customer No. 1's Entities). Some of the additional MCAs that Customer No. 1 obtained later in 2015 for Customer No. 1's Entities were "reload" agreements that extended money to these entities for the purpose of repaying these entities' previous MCAs. As a result, the payments that Customer No. 1's Entities owed to defendant PAR FUNDING and the Par Funding affiliates became unsustainable.

3.     Due to Customer No. 1's inability to make these payments, in or about early 2016 defendant JOSEPH LAFORTE offered to extend additional and higher amount MCAs to Customer No. 1's Entities if Customer No. 1 would agree to pay defendant JOSEPH LAFORTE cash kickbacks equal to approximately 10% of all money extended to Customer No. 1's Entities by defendant PAR FUNDING and the Par Funding affiliates. Customer No. 1 agreed to this offer.

4.     As a result, from in or about early 2016 through in or about mid-2020, Customer No. 1 made regular cash kickback payments to defendant JOSEPH LAFORTE and defendant JAMES LAFORTE, charged elsewhere in this indictment, on his brother's behalf.

71

5. Over this period, the MCA balance for Customer No. 1's Entities

increased from approximately $1.4 million in early 2016 to approximately $92 million in mid-2020 through numerous new and reload MCA agreements.

6. Due to this kickback arrangement, defendant JOSEPH LAFORTE

received hundreds of thousands of dollars of taxable income during the calendar year 2017, upon which there was an income tax due and owing to the United States of America.

7. From on or about January 1, 2017, through on or about April 15, 2018, in

the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

a resident of Haverford, Pennsylvania, willfully attempted to evade and defeat an income tax due and owing by him to the United States of America for the calendar year 2017 by failing to make an income tax return on or about April 15, 2018, as required by law, to any proper officer of the Internal Revenue Service, and by failing to pay to the Internal Revenue Service this income tax, and by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income through various means, including, among other things:

a. by causing Customer No. 1 to make payments in cash directly to

defendant JOSEPH LAFORTE that were not recorded on the books of defendant PAR FUNDING or the Par Funding affiliates; and

72

        b.     by causing defendant PAR FUNDING and the Par Funding

affiliates to enter new and reload MCA agreements with Customer No. 1's Entities without

undertaking adequate underwriting.

        In violation of Title 26, United States Code, Section 7201.

## COUNTS THIRTY-FOUR THROUGH THIRTY-FIVE

(Making, Subscribing, and Filing a False Return)

### THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 14, 45(d), 47, 48, 53, 64, 65, and 68 and Overt Act 11 of Count One, paragraphs 14 and 29 through 34 of Count Thirty, and paragraphs 2 through 6 of Count Thirty-Three are incorporated here.

2. On or about August 15, 2019, defendant JOSEPH LAFORTE and his wife, defendant LISA McELHONE, charged elsewhere in this indictment, filed an individual income tax return, Form 1040, for tax year 2018, electing "married filing jointly" status. On this return, defendant JOSEPH LAFORTE did not report any income. In addition, defendant JOSEPH LAFORTE did not report any of the cash kickbacks that he received from Customer No. 1, even though he received millions of dollars in cash kickbacks in 2018 from Customer No. 1.

3. On or about October 17, 2019, defendant JOSEPH LAFORTE and his wife, defendant LISA McELHONE, filed an amended individual income tax return, Form 1040X, for tax year 2018, electing "married filing jointly" status. On this joint return, defendant JOSEPH LAFORTE did not report any income, including any of the cash kickbacks that he received from Customer No. 1.

4. On or about July 15, 2020, defendant JOSEPH LAFORTE and his wife, defendant LISA McELHONE, filed an individual income tax return, Form 1040, for tax year 2019, electing "married filing jointly" status. On this joint return, defendant JOSEPH LAFORTE did not report any income. In addition, defendant JOSEPH LAFORTE did not report

74

any of the cash kickbacks that he had received from Customer No. 1, even though he had received millions of dollars in cash kickbacks in 2019 from Customer No. 1.

   5. On or about the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service

the following false United States individual income tax returns, in the name of defendant

JOSEPH LAFORTE and his wife, defendant LISA McELHONE, for the calendar years set forth

below, which were verified by a written declaration that they were made under the penalties of

perjury, which defendant JOSEPH LAFORTE did not believe to be true and correct as to every

material matter. The tax returns reported the married couple's income without including the

substantial cash payments that defendant JOSEPH LAFORTE received from Customer No. 1,

when, as defendant JOSEPH LAFORTE knew, he had received substantial income in the form of

these cash payments from Customer No. 1 in each of these calendar years, each false tax return

constituting a separate count.

75

| Count | Approximate Filing Date | Year | Form | False Item(s) |
|-------|------------------------|------|------|---------------|
| 34 | 10/17/19 | 2018 | 1040X | Schedule 1, Line 21, Other income<br>Schedule 1, Line 22<br>Form 1040, Line 6, Total income<br>Form 1040X, Line 1, Adjusted gross income, columns a and c |
| 35 | 7/15/20 | 2019 | 1040 | Schedule 1, Line 8, Other income<br>Schedule 1, Line 9<br>Form 1040, Line 7a, Other income<br>Form 1040, Line 7b, Total income |

All in violation of Title 26, United States Code, Section 7206(1).

## COUNTS THIRTY-SIX THROUGH FORTY-SEVEN
(Failure to collect and pay over tax)

## THE GRAND JURY FURTHER CHARGES THAT:

1.    Paragraphs 1 through 14, 32, and 45(e) of Count One and paragraphs 2 through 6 of Count Thirty-Three are incorporated here.

At all times material to this indictment:

2.    Full Spectrum Processing was a corporation doing business in Philadelphia, Pennsylvania. Full Spectrum Processing was engaged in the business of providing back-office support to defendant PAR FUNDING, charged elsewhere in this indictment, and the Par Funding affiliates.

3.    Defendant JOSEPH LAFORTE functioned as the Chief Executive Officer and President of Full Spectrum Processing, defendant PAR FUNDING, and the Par Funding affiliates and owned these entities through his nominees, including defendant LISA McELHONE, charged elsewhere in this indictment. Defendant JOSEPH LAFORTE ran the day-to-day operations of these companies, and the Chief Financial Officer of these companies, defendant JOE COLE, charged elsewhere in this indictment, reported to defendant JOSEPH LAFORTE. Among other things, defendant JOSEPH LAFORTE decided what underwriting processes would be taken before funding, which MCA transactions would be funded, and what collections activities would be taken. In addition, Perry Abbonizio, charged elsewhere, the consultant in charge of fundraising for defendant PAR FUNDING, reported to defendant JOSEPH LAFORTE.

4.      The IRS was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

5.      Pursuant to the Internal Revenue Code and associated statutes and regulations, employers are required to withhold amounts from their employees' gross pay including Federal Insurance Contribution Act ("FICA") taxes, which represent Social Security and Medicare taxes, and federal income taxes. Employers were required to remit these taxes (referred to in this indictment collectively as "trust fund taxes" because employers hold the withheld amounts in trust until paid over to the United States) to the IRS on a quarterly basis, no later than the last day of month following the end of the quarter.

6.      In addition to the trust fund taxes that must be withheld from pay, employers are separately required to make contributions under FICA for Social Security and Medicare in amounts matching the amounts withheld from their employees' pay for those purposes. Such employer contributions are likewise required to be remitted to the IRS no later than the last day of the month following the end of the quarter. Collectively, these five components required to be remitted quarterly were commonly referred to as "employment taxes," made up of the trust fund taxes withheld (individual income, Social Security, and Medicare taxes) and the matching amounts contributed by the employer.

7.      Employers are required to file, one month after the conclusion of the calendar quarter, an Employer's Quarterly Federal Tax Return, Form 941 ("Form 941"), setting forth the total amount of income taxes withheld, the total amount of Social Security and Medicare taxes due, and the total tax deposits.

78

8.      A person was responsible for collecting, accounting for, and paying over the employment taxes if he or she had the authority required to exercise significant control over the employer's financial affairs, regardless of whether the individual exercised such control in fact. More than one person may be considered a "responsible person" for the purpose of collecting, accounting for, and paying over employment taxes, including trust fund amounts and employers' matching amounts.

9.      Defendant JOSEPH LAFORTE exercised control over Full Spectrum Processing's financial affairs by, among other acts, approving payments, controlling bank accounts, and supervising the payroll manager; thus, defendant JOSEPH LAFORTE was a responsible person for collecting trust fund taxes, accounting for the employment taxes by filing Forms 941 with the IRS, and paying over to the IRS the employment taxes for Full Spectrum Processing's employees.

10.     Defendant JOSEPH LAFORTE was a person required to collect, account for on quarterly Forms 941, and pay over to the IRS on behalf of Full Spectrum Processing the trust fund taxes imposed on its employees by the Internal Revenue Code.

11.     From at least in or about early 2017 through at least in or about March 2020, defendant JOSEPH LAFORTE, and his agents working at his direction, made cash wage payments to Full Spectrum Processing employees on a regular basis.

12.     From at least in or about early 2017 through at least in or about March 2020, despite making regular cash payments to Full Spectrum Processing employees, defendant JOSEPH LAFORTE caused Full Spectrum Processing to record these employees' wages without

79

including the amount of these cash payments. Defendant JOSEPH LAFORTE also caused Full Spectrum Processing not to collect the required trust fund taxes from these cash wages.

13. As a result, from at least in or about early 2017 through at least in or about early 2020, defendant JOSEPH LAFORTE caused Full Spectrum Processing to file quarterly employment tax returns, Forms 941, that failed to truthfully account for the wages paid to its employees and caused Full Spectrum Processing to fail to pay over all of the trust funds taxes due and owing to the IRS on behalf of its employees.

14. On or about the dates listed in the table below, for each of the calendar quarters listed below, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

willfully failed to collect, truthfully account for, and pay over the trust fund taxes due and owing to the IRS on behalf of the employees of Full Spectrum Processing, each quarter constituting a separate count.

80

| Count | Date Offense (i.e., Date for Filing of Form 941) | Calendar Quarter Ending |
|-------|--------------------------------------------------|-------------------------|
| 36 | April 30, 2017 | March 30, 2017 |
| 37 | July 31, 2017 | June 30, 2017 |
| 38 | October 31, 2017 | September 30, 2017 |
| 39 | January 31, 2018 | December 31, 2017 |
| 40 | April 30, 2018 | March 30, 2018 |
| 41 | July 31, 2018 | June 30, 2018 |
| 42 | October 31, 2018 | September 30, 2018 |
| 43 | January 31, 2019 | December 31, 2018 |
| 44 | April 30, 2019 | March 30, 2019 |
| 45 | July 31, 2019 | June 30, 2019 |
| 46 | October 31, 2019 | September 30, 2019 |
| 47 | January 31, 2020 | December 31, 2019 |

All in violation of Title 26, United States Code, Section 7202.

## COUNT FORTY-EIGHT

(Conspiracy to defraud)

## THE GRAND JURY FURTHER CHARGES THAT:

1.    Paragraphs 1 through 30, 32 through 34, 36 through 43, and 64 through 71 and Overt Acts 1, 4, 8 through 10, 13 through 17, 20 through 22, 24, 28 through 32, 36, and 38 of Count One, paragraphs 2 through 14 and 16 through 35 of Count Thirty, and paragraphs 2 through 8 of Count Thirty-Six are incorporated here.

At all times material to this indictment:

2.    From at least in or about mid-2003 through the third quarter of 2005, defendant JOSEPH LAFORTE participated in the operation of two Florida corporations, that is, Richmond Abstract of Florida, Inc. ("Richmond Abstract") and J & J Property Management of Florida, Inc. ("J & J"), although defendant JOSEPH LAFORTE used nominees to hold these businesses for some of this time.

3.    In or about October 2005, defendants JOSEPH LAFORTE and LISA McELHONE married one another.

4.    In or about February 2007, the IRS assessed trust fund recovery penalties totaling approximately $551,142 against defendant JOSEPH LAFORTE in connection with his role as the responsible person for Richmond Abstract.

5.    In or about May 2008, the IRS levied one of defendant JOSEPH LAFORTE's bank accounts and applied the funds to the trust fund recovery penalties that he had been assessed in connection with Richmond Abstract.

82

6. In or about December 2008, the IRS assessed trust fund recovery penalties totaling approximately $115,773.10 against defendant JOSEPH LAFORTE in connection with his role as the responsible person for J & J.

7. From in or about January 2007 through in or about February 2011, defendant JOSEPH LAFORTE was in custody, serving a prison sentence imposed as a result of New York State and federal convictions. During the time, defendant LISA McELHONE filed individual income tax returns with the IRS for herself, falsely electing the "single" filing status.

8. On or about April 15, 2011, defendant JOSEPH LAFORTE filed an individual income tax return with IRS for himself for tax year 2010, reporting approximately $32,000 in income and requesting a refund of approximately $9,915. Because of defendant JOSEPH LAFORTE's outstanding trust fund recovery penalties for Richmond Abstract and J & J, the IRS did not send this refund to defendant JOSEPH LAFORTE, but instead applied the refund amount to the trust fund recovery penalties that had been assessed against him in connection with Richmond Abstract.

9. From in or about June 2009 through in or about December 2018, in the Eastern District of Pennsylvania and elsewhere, defendants

> **JOSEPH LAFORTE,**
> **a/k/a "Joe Mack,"**
> **a/k/a "Joe Macki,"**
> **a/k/a "Joe Mackie," and**
> **a/k/a "Joe McElhone," and**
> **LISA McELHONE**

conspired and agreed together to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of income taxes.

83

## MANNER AND MEANS

In was part of the conspiracy that:

10.     Defendants JOSEPH LAFORTE and LISA McELHONE concealed and attempted to conceal defendant JOSEPH LAFORTE's income by causing it to be paid to defendant McELHONE and entities held in her name.

11.     Defendants JOSEPH LAFORTE and LISA McELHONE concealed and attempted to conceal defendant JOSEPH LAFORTE's assets by causing them to be held in the name of defendant McELHONE and entities held in her name.

12.     Defendants JOSEPH LAFORTE and LISA McELHONE concealed and attempted to conceal defendant McELHONE's connection to defendant JOSEPH LAFORTE by causing defendant McELHONE to elect filing statuses that were false and/or financially disadvantageous.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, defendants JOSEPH LAFORTE and LISA McELHONE committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1.     In or about 2009, 2010, 2011, and 2012, defendant LISA McELHONE caused individual income tax returns for herself to be filed with the IRS for the tax years 2008, 2009, 2010, and 2011, electing the "single" status when she was in fact married to defendant JOSEPH LAFORTE.

84

2. In or about October 2011, defendants JOSEPH LAFORTE and LISA McELHONE caused defendant PAR FUNDING, charged elsewhere in this indictment, to be formed solely in defendant McELHONE's name.

3. In or about April 2014, defendant LISA McELHONE caused an individual income tax return, Form 1040, to be filed for the tax year 2012 electing "married filing separate" status, claiming defendant JOSEPH LAFORTE's income as her own, and omitting his name and social security number from the return.

4. In or about November 2014, defendants JOSEPH LAFORTE and LISA McELHONE caused Heritage Business Consultants, Inc. ("HBC") to be formed in defendant McELHONE's name, as a nominee for defendant JOSEPH LAFORTE.

5. On or about December 31, 2014, defendants JOSEPH LAFORTE and LISA McELHONE caused defendant PAR FUNDING to enter a contract with HBC to facilitate payments for the work that defendant JOSEPH LAFORTE provided to defendant PAR FUNDING.

6. From at least late 2014 through in or about July 2018, defendants JOSEPH LAFORTE and LISA McELHONE caused defendant PAR FUNDING to make payments to HBC for defendant JOSEPH LAFORTE's work, including the following:

| Approximate Date | Approximate Amount |
|---|---|
| 12/19/14 | $50,000 |
| 12/26/14 | $50,000 |
| 12/29/14 | $50,000 |
| 1/1/15 | $80,000 |
| 1/1/15 | $80,000 |
| 1/1/15 | $80,000 |
| 1/1/15 | $80,000 |

85

| 1/1/15 | $80,000 |
|---|---|
| 1/1/15 | $80,000 |
| 1/1/15 | $80,000 |
| 1/1/15 | $80,000 |
| 10/5/15 | $12,500 |
| 11/4/15 | $12,500 |
| 11/13/15 | $25,000 |
| 11/17/15 | $25,000 |
| 11/19/15 | $25,000 |
| 7/1/16 | $300,000 |
| 1/9/17 | $300,000 |
| 2/14/17 | $91,000 |
| 4/21/17 | $1,261,000 |
| 8/14/17 | $1,070,000 |
| 5/31/18 | $1,400,000 |
| 7/3/18 | $355,000 |

7.     On or about July 25, 2016, defendants JOSEPH LAFORTE and LISA

McELHONE caused Blue Valley Holdings LLC to be established and named defendant

McELHONE as the sole member of this limited liability company.

8.     On or about August 22, 2016, defendants JOSEPH LAFORTE and LISA

McELHONE caused Blue Valley Holdings to purchase their primary residence in Haverford,

Pennsylvania for approximately $2,445,000, with funds earned from defendant JOSEPH

LAFORTE's work for defendant PAR FUNDING.

9.     On or about March 20, 2017, defendants JOSEPH LAFORTE and LISA

McELHONE caused the LME 2017 Family Trust to be established to hold the assets of

defendant JOSEPH LAFORTE.

10.     On or about the following dates, defendants JOSEPH LAFORTE and

LISA McELHONE caused entities held in the name of defendant McELHONE to purchase

properties in the following amounts:

| Appx. Date | Street of Property | Amount |
|---|---|---|
| 8/22/16 | Ferndale Lane, Haverford, PA | $2,445,000 |
| 4/27/17 | N. 2nd Street, Philadelphia, PA | $260,000 |
| 7/3/17 | North 3rd Street, Philadelphia, PA | $645,000 |
| 7/10/17 | North 3rd Street, Philadelphia, PA | $1,485,000 |
| 11/19/17 | North 3rd Street, Philadelphia, PA | $835,000 |
| 8/15/17 | Rebecca Court, Paupack, PA | $2,600,000 |
| 8/31/17 | S. 21st Street, Philadelphia PA | $1,025,000 |
| 11/20/17 | North 3rd Street, Philadelphia, PA | $835,000 |
| 2/1/18 | East Passyunk, Philadelphia, PA | $825,000 |
| 4/30/18 | Spruce Street, Philadelphia, PA | $2,125,000 |
| 5/2/18 | Walnut Street, Philadelphia, PA | $650,000 |
| 9/21/18 | S. 11th Street, Philadelphia, PA | $1,860,000 |
| 8/3/18 | 25th Street, Philadelphia PA | $600,000 |
| 8/10/18 | Melon Street, Philadelphia PA | $7,600,000 |
| 8/15/18 | Market Street, Philadelphia, PA | $4,400,000 |
| 10/3/18 | Christian Street, Philadelphia PA | $870,000 |
| | Total | $29,060,000 |

11.    On or about January 1, 2018, defendants JOSEPH LAFORTE and LISA

McELHONE caused defendant PAR FUNDING to enter a contract with HBC, one of the entities

held in the name of defendant McELHONE, to facilitate payments for the work that defendant

JOSEPH LAFORTE provided to defendant PAR FUNDING.

12.    In or about March 2018, defendants JOSEPH LAFORTE and LISA

McELHONE caused Eagle Six Consultants, Inc. ("Eagle Six") to be formed in defendant

McELHONE's name, as a nominee for defendant JOSEPH LAFORTE.

13.    On or about July 1, 2018, defendants JOSEPH LAFORTE and LISA

McELHONE caused defendant PAR FUNDING to enter a contract with Eagle Six to facilitate

payments for the work that defendant JOSEPH LAFORTE provided to defendant PAR

FUNDING.

87

14. From at least July 2018 through in or about December 2018, defendants JOSEPH LAFORTE and LISA McELHONE caused defendant PAR FUNDING to make payments to Eagle Six for defendant JOSEPH LAFORTE's work, including the following:

| Approximate Date | Approximate Amount |
|---|---|
| 7/20/18 | $30,000 |
| 10/16/18 | $2,500,000 |
| 11/19/18 | $1,500,000 |
| 12/3/18 | $175,000 |
| 12/4/18 | $125,000 |

15. From in or about 2014 through 2018, defendant LISA McELHONE filed individual income tax returns for herself for the tax years 2012 through 2017, electing the "married filing separate" status even though her tax liability would have been less if she elected "married filing jointly" status with defendant JOSEPH LAFORTE.

All in violation of Title 18, United States Code, Section 371.

## COUNT FORTY-NINE

(Evasion of payment)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 30, 32 through 34, 36 through 43, and 64 through 71

and Overt Acts 1, 4, 8 through 10, 13 through 17, 20 through 22, 24, 28 through 32, 36, and 38

of Count One, paragraphs 2 through 14 and 16 through 35 of Count Thirty, paragraphs 2 through

8 of Count Thirty-Six, and paragraphs 2 through 8 and 10 through 12 and Overt Acts 1 through

15 of Count Forty-Eight are incorporated here.

2.     From in or about June 2009 through in or about December 2018, in the

Eastern District of Pennsylvania and elsewhere, defendants

## JOSEPH LAFORTE,
### a/k/a "Joe Mack,"
### a/k/a "Joe Macki,"
### a/k/a "Joe Mackie," and
### a/k/a "Joe McElhone," and
## LISA McELHONE

willfully attempted to evade and defeat the payment of a tax, known as a trust fund recovery

penalty, related to unpaid payroll taxes of Richmond Abstract of Florida, Inc., and J & J Property

Management of Florida, Inc., due and owing by defendant JOSEPH LAFORTE to the United

States of America, for the fourth quarter of 2003 through the third quarter of 2005, by

committing the following affirmative acts, among others:

a.     concealing defendant JOSEPH LAFORTE's income by

incorporating defendant PAR FUNDING in the name of defendant McELHONE in or about

October 2011;

89

b. concealing defendant JOSEPH LAFORTE's income by causing such income to be paid to defendant McELHONE and entities held in her name, and reporting the income in the name of defendant McELHONE and entities held in her name;

c. concealing defendant JOSEPH LAFORTE's income and assets by causing defendant McELHONE to serve as the nominal Chief Executive Officer and President of defendant PAR FUNDING, even though defendant JOSEPH LAFORTE performed this role for the company and defendant McELHONE was merely his nominee and was not actively involved in the operation of the company;

d. concealing defendant JOSEPH LAFORTE's income and assets by minimizing defendant JOSEPH LAFORTE's role at defendant PAR FUNDING, even though defendant JOSEPH LAFORTE ran the operations of the company;

e. concealing defendant JOSEPH LAFORTE's assets by purchasing these assets, including real estate and securities, in the name of defendant McELHONE and entities held in her name;

f. concealing defendant JOSEPH LAFORTE's income and assets by opening bank accounts in the name of defendant McELHONE and entities held in her name, even though defendant JOSEPH LAFORTE controlled those bank accounts;

g. concealing defendant JOSEPH LAFORTE's income and assets by maintaining large amounts of cash at (i) the residence of defendants JOSEPH LAFORTE and McELHONE in Haverford, Pennsylvania, (ii) the couple's vacation properties in Paupack, Pennsylvania, and Jupiter Beach, Florida; and (iii) defendant PAR FUNDING's offices in Philadelphia, Pennsylvania; and

90

        h.        concealing defendant JOSEPH LAFORTE's income and assets by

requiring Customer No. 1 to make regular kickback payments to defendant JOSEPH LAFORTE

in cash.

        In violation of Title 26, United States Code, Section 7201, and Title 18, United

States Code, Section 2.

## COUNT FIFTY
(Perjury)

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41 of Count One, Counts Three through Five, Seven through Nineteen, and Twenty-Two, paragraphs 2 and 3 of Count Thirty, paragraphs 2 through 6 of Count Thirty-Three, and paragraphs 10 through 12 and Overt Acts 2 through 15 of Count Forty-Eight are incorporated here.

2.      On or about February 15, 2018, several plaintiffs filed a civil complaint against defendant PAR FUNDING, charged elsewhere in this indictment, another entity, and various unnamed individuals, alleging, among other things, fraud, RICO violations, civil conspiracy, and breach of contract. The complaint was filed in the United States District Court for the Eastern District of Pennsylvania and was captioned: *Fleetwood Services, LLC, Robert L. Fleetwood, and Pamela A. Fleetwood vs. Complete Business Solutions Group, Inc. d/b/a Par Funding; Prime Time Funding; John and Jane Does* and docketed at Civil Action No. 18-CV-268.

3.      On or about December 5, 2019, in a proceeding ancillary to the civil action referred to in paragraph 2 of this Count, defendant JOSEPH LAFORTE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for defendant PAR FUNDING, Attorney No. 1.

4.      At the oral deposition, defendant JOSEPH LAFORTE was asked a series of questions regarding his work and involvement with defendant PAR FUNDING, as well as the involvement of others, including his wife, at the company.

92

5.      It was a matter material to the litigation to determine who was operating

and responsible for the business activities of defendant PAR FUNDING.

6.      It was also important to the defendants named in Count One of this

indictment to continue hiding defendant JOSEPH LAFORTE's ownership and control of

defendant PAR FUNDING from the outside world, in furtherance of the conspiracy described in

Count One.

7.      On or about December 5, 2019, in Philadelphia, within the Eastern District

of Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

while under oath in a proceeding in the United States District Court for the Eastern District of

Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in

response to questions asked to him with respect to the material matter as described in paragraph

5 of this Count as follows:

Q.      Do you have an ownership interest in CBSG?

A.      I don't.

Q.      Have you ever had an ownership interest in CBSG?

A.      No.

Q.      Have you ever represented to anyone in the public that you are an owner

        of CBSG?

A.      No. Not that I know of, no.

93

Q.      Have you ever represented to an investor or potential investor that are you

        are an owner of CBSG?

A.      No, sales director.

                        * * *

Q.      Okay. Is your wife currently an employee of CBSG?

A.      Yes.

Q.      Has she always been an employee of CBSG since it was founded?

A.      Yes.

Q.      Does she have a title at CBSG?

A.      <u>I don't know what her title is at CBSG.</u>  We're not really big on titles like

        you guys are here, so I don't really think she has a title.

Q.      Do you know if she's an officer or director of CBSG?

A.      <u>I don't know.</u>

                        * * *

Q.      Okay, and as the person that runs the sales side of CBSG, are you familiar

        with CBSG's annual funding?

A.      <u>No.</u>

Q.      Do you know how much money CBSG has funded this year, for instance?

A.      <u>No.</u>

Q.      Do you know how many accounts receivable CBSG has outstanding

        currently, ballpark?

A.      <u>No.</u>

94

\* \* \*

Q. Who is CBSG's CFO?

A. I'm not sure who it is. I am not sure who is in that capacity right now.

Q. Who is the last CFO that you do know worked in that capacity for CBSG?

A. I couldn't say who the last one was.

Q. Do you know who Joe Cole is?

A. Yeah, sure.

Q. Is Joe Cole the current CFO?

A. I wouldn't know.

Q. What is your understanding as to what Mr. Cole does for CBSG?

A. I wouldn't know. I work for Recruiting and Marketing Resources. They keep me in another business. Their operations have nothing to do with me.

\* \* \*

Q. Have you ever been an officer of CBSG?

A. No.

Q. Ever been a director of CBSG?

A. No.

Q. Ever been an employee of CBSG?

A. No.

Q. Ever been an owner of CBSG?

A. No.

95

Q.     Have you ever received any form of profits that were generated by CBSG?

A.     No.

Q.     Have you ever hired or fired any employees of CBSG?

A.     No.

                              * * *

Q:     Does CBSG keep statistics on default rates?

A:     I don't know.

Q:     Do you have any idea what CBSG's current default rate is?

A:     I wouldn't know.

Q:     Do you know what CBSG's default rate was in 2018?

A:     No.

Q:     What about 2017?

A:     No.

8.     The underlined testimony of defendant JOSEPH LAFORTE, as set forth
in paragraph 7 of this Count, as defendant JOSEPH LAFORTE then well knew and believed,
was false, in that defendant JOSEPH LAFORTE knew at the time he made these statements that:

          a.     he had represented to investors, potential investors, and others that
                 he was an owner of CBSG, i.e., defendant PAR FUNDING;

          b.     his wife's title at defendant PAR FUNDING was President;

          c.     he was familiar with defendant PAR FUNDING's annual funding,
                 i.e., the dollar amount of MCA transactions that defendant PAR
                 FUNDING funded on an annual basis;

                              96

d.      he could provide an estimate of defendant PAR FUNDING's outstanding accounts receivable;

e.      defendant JOE COLE, charged elsewhere in this indictment, held the title of Chief Financial Officer ("CFO") at defendant PAR FUNDING and reported to defendant JOSEPH LAFORTE;

f.      he had received profits that were generated from defendant PAR FUNDING;

h.      he had hired and fired employees of defendant PAR FUNDING; and

i.      he was aware that defendant PAR FUNDING kept default rates statistics, he knew its current default rate and its default rates in 2017 and 2018, and he made representations to investors and potential investors in defendant PAR FUNDING regarding the company's allegedly low default rate.

In violation of Title 18, United States Code, Section 1623.

## COUNT FIFTY-ONE
(Perjury)

### THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41 of Count One, Counts Three through Five, Seven through Nineteen, and Twenty-Two, paragraphs 2 and 3 of Count Thirty, paragraphs 2 through 6 of Count Thirty-Three, and paragraphs 10 through 12 and Overt Acts 2 through 15 of Count Forty-Eight are incorporated here..

2. On or about July 26, 2019, plaintiffs filed a civil action against defendant PAR FUNDING, charged elsewhere in this indictment, and FAF, alleging fraud, RICO violations, conspiracy, and breach of contract. The complaint was filed in the United States District Court for the Eastern District of Pennsylvania and was captioned: *HMC Inc. and Kara DiPietro v. CBSG d/b/a Par Funding and Fast Advance Funding*, and docketed at Civil Action No. 19-CV-3285.

3. On or about March 5, 2020, in a proceeding ancillary to the civil action referred to in paragraph 2 of this Count, defendant JOSEPH LAFORTE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for defendant PAR FUNDING, Attorney No. 1.

4. At the oral deposition, defendant JOSEPH LAFORTE was asked a series of questions regarding the business activities of defendant PAR FUNDING and the work and involvement of defendant JOSEPH LAFORTE, as well as defendants LISA McELHONE and JOE COLE, charged elsewhere in this indictment.

98

5.  It was a matter material to the litigation to determine who was operating

and responsible for the business activities of defendant PAR FUNDING.

6.  It was also important to the defendants charged in Count One of this

indictment to continue hiding defendant JOSEPH LAFORTE's ownership and control of

defendant PAR FUNDING from the outside world, in furtherance of the conspiracy described in

Count One of this indictment.

7.  On or about March 5, 2020, in Philadelphia, within the Eastern District of

Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

while under oath in a proceeding the United States District Court for the Eastern District of

Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in

response to questions asked to him with respect to the material matter as described in paragraph

5 of this Count as follows:

Q:  Was CBSG providing merchant cash advances to businesses in 2019?

A:  I don't know.

* * *

Q.  In 2018, what role – strike that. In 2019, what role did Lisa McElhone

have in CBSG?

A:  I don't know.

Q:  Was Lisa McElhone the president of CBSG in 2019?

99

A:     I don't know.

Q:     Did Ms. McElhone work for CBSG in any capacity in 2019?

A:     I don't know anything about any of these questions about CBSG. I don't work for CBSG. I work for Recruiting and Marketing Resources.

                    * * *

Q.     Can you please let me know whether you know whether your wife, Lisa McElhone, had any involvement with CBSG in 2019.

A.     No.

Q.     You don't know or she didn't?

A.     I don't know any answers to these questions about Par Funding/CBSG.

Q.     Did your wife own any businesses in 2019?

A.     I don't know what she owns and doesn't own.

                    * * *

Q.     Okay. You ever hear of a company called Lacquer Lounge?

A.     No, I never heard of Lacquer Lounge.

Q.     Is there a hair salon or nail salon that your wife does own? I may have the name wrong.

A.     Yeah, the name is Lacquer Lounge. Don't ask me ridiculous questions. You're wasting time. She owns a nail salon in Old City.

Q.     When did she purchase the nail salon --

A.     I don't know.

Q.     -- in Old City?

100

A.  I don't know her business.

Q.  If you could please try to let me --

A.  We have a very --

Q.  -- ask my questions.

A.  We have a very private business relationship. She doesn't tell me about her business. I don't tell her my business. We have a very loving, beautiful relationship, two dogs and a house. We don't talk business.

* * *

Q.  What is CBSG's default rate in 2019?

A.  I don't know.

Q.  Have you ever represented to any investor or potential investor that CBSG's default rate is 1 to 2 percent?

A.  I don't remember.

Q.  Do you know if anyone in your presence acting on behalf of CBSG has represented that CBSG's default rate is 1 to 2 percent?

A.  I don't remember.

Q.  What is CBSG default rate?

A.  I don't know.

Q.  Do you know if it's higher or lower than 1 to 2 percent?

A.  I don't know. I don't work there. Are you looking to invest in the company, asking me what the default rate is?

* * *

101

Q.  What employee do you personally know at the company?

A.  <u>I don't know.</u>

Q.  Can you think of anyone other than Ms. Lau?

A.  <u>No.</u>

Q.  Does Mr. Cole work for CBSG?

A.  <u>I don't know.</u>

8.  The underlined testimony of defendant JOSEPH LAFORTE, as set forth in paragraph 7 of this Count, as defendant JOSEPH LAFORTE then well knew and believed, was false, in that defendant JOSEPH LAFORTE knew at the time he made these statements that:

    a.  defendant PAR FUNDING had extended MCAs to businesses in 2019;

    b.  defendant JOSEPH LAFORTE had represented to investors, potential investors, and others that he was an owner of CBSG, i.e., defendant PAR FUNDING;

    c.  his wife's title at defendant PAR FUNDING was President;

    d.  defendant JOE COLE held the title of Chief Financial Officer ("CFO") at defendant PAR FUNDING and reported to defendant JOSEPH LAFORTE; and

    e.  defendant PAR FUNDING kept default rates statistics, he knew its current default rate and its default rates in 2019, and he made representations to investors and potential investors in defendant

102

PAR FUNDING regarding the company's allegedly low default

rate.

In violation of Title 18, United States Code, Section 1623.

## COUNT FIFTY-TWO
(Perjury)

### THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41 of Count One, Counts Seven, Fifteen, and Seventeen, paragraphs 2 and 3 of Count Thirty, paragraphs 2 through 6 of Count Thirty-Three, paragraphs 10 through 12 and Overt Acts 2 through 15 of Count Forty-Eight, and paragraph 2 of Count Fifty are incorporated here.

2. On or about February 11, 2020, in a proceeding ancillary to the civil action referred to in paragraph 2 of Count Fifty, defendant JOE COLE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for defendant PAR FUNDING, Attorney No. 1. Pursuant to Federal Rule of Civil Procedure 30(b)(6), defendant COLE served as a corporate representative of defendant PAR FUNDING, charged elsewhere in this indictment.

4. At the oral deposition, defendant JOE COLE was asked a series of questions regarding the underwriting and approval process of an MCA, including the role of the credit committee of defendant PAR FUNDING, which provided final approval for the terms of the MCA.

5. It was a matter material to the litigation to determine who served on the credit committee of defendant PAR FUNDING.

6. It was also important to the defendants charged in Count One of this indictment to continue hiding defendant JOSEPH LAFORTE's ownership and control of defendant PAR FUNDING from the outside world, in furtherance of the conspiracy described in Count One of this indictment.

104

7.      On or about February 11, 2020, in Philadelphia, within the Eastern District

of Pennsylvania, defendant

**JOSEPH COLE BARLETA,**
**a/k/a Joe Cole,**

while under oath in a proceeding in the United States District Court for the Eastern District of

Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in

response to questions asked to him with respect to the material matter as described in paragraph

5 of this Count as follows:

Q.      When was the credit committee formed?

A.      Near inception when we first started.

Q.      When did you first start?

A.      The end of 2012.

Q.      Can you tell me the names of the individuals that were originally

on the credit committee for CBSG at the formation of the

company?

A.      Yes. Credit committee was Lisa.

Q.      Lisa who?

A.      McElhone. [Person No. 3].

Q.      Anyone else?

A.      No.

Q.      Has anyone -- strike that. Has the composition of the credit

committee changed since that time?

A.      Yes.

105

Q.    When did it change, and how did it change?

A.    It changed a few times. We had different employees some in.

Q.    Can you tell me some of the other individuals that were on the credit committee and what periods of time they served?

A.    We had [S.G.] as part of the credit committee, that was approximately from 2013 to 2017.

Q.    Was she on the committee with [defendant LISA McELHONE and [Person No. 3]?

A.    Yes.

Q.    Okay. About how about [after S.G.] left?

A.    [V.V.] took over. They had some overlap, she was part of the credit committee. [V.V.] has been with us since 2014, I believe, and promoted to that position after two years.

Q.    Is she still on the credit committee?

A.    Yes.

Q.    Is anyone else on the credit committee other than those three women?

A.    Yes.

Q.    Who else?

A.    [A.S.]

Q.    How do you spell [A.S.]'s last name?

A.    [A.S.]

106

Q.     Okay.  When did she get appointed to the committee?

A.     That was about two years ago.

Q.     Okay.  Anyone else?

A.     <u>No.</u>

8.     The underlined testimony of defendant JOE COLE, as set forth in

paragraph 7 of this Count, as defendant COLE then well knew and believed, was false, in that

defendant COLE knew at the time he made these statements that defendant JOSEPH LAFORTE

had served on and in fact ran and controlled the credit committee of defendant PAR FUNDING

since its inception.

In violation of Title 18, United States Code, Section 1623.

107

## COUNT FIFTY-THREE
(Perjury)

### THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41 of Count One, Counts Seven, Fifteen, and Seventeen, paragraphs 2 and 3 of Count Thirty, paragraphs 2 through 6 of Count Thirty-Three, paragraphs 10 through 12 and Overt Acts 2 through 15 of Count Forty-Eight, and paragraph 2 of Count Fifty-One are incorporated here.

2. On or about June 30, 2020, in a proceeding ancillary to the civil action referred to in paragraph 2 of Count Fifty-One, defendant JOE COLE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for defendant PAR FUNDING, Attorney No. 1. Pursuant to Federal Rule of Civil Procedure 30(b)(6), defendant COLE served as a corporate representative of defendant PAR FUNDING, charged elsewhere in this indictment.

3. At the oral deposition, defendant JOE COLE was asked a series of questions regarding his work and involvement with defendant PAR FUNDING, as well as the involvement of others, including defendant JOSEPH LAFORTE.

4. It was a matter material to the litigation to determine who was operating and responsible for the business activities of defendant PAR FUNDING.

5. It was also important to the defendants charged in Count One of this indictment to continue hiding defendant JOSEPH LAFORTE's ownership and control of defendant PAR FUNDING from the outside world, in furtherance of the conspiracy described in Count One.

6. On or about June 30, 2020, in Philadelphia, within the Eastern District of

Pennsylvania, defendant

## JOSEPH COLE BARLETA
### a/k/a Joe Cole,

while under oath in a proceeding in the United States District Court for the Eastern District of

Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in

response to questions asked to him with respect to the material matter as described in paragraph

4 of this Count as follows:

Q. Who is CBSG management?

A. That is myself as CFO, Lisa [McElhone] as president and [Person

No. 3] as treasurer.

\* \* \*

Q. And does Mr. LaForte have any managerial responsibilities over

CBSG through his relationship with Full Spectrum?

A. No.

[Attorney]: Objection.

\* \* \*

Q. Does Mr. LaForte do anything on behalf of Full Spectrum for

CBSG?

A. No.

Q. Does Mr. LaForte have any involvement in CBSG?

A. He works through our sales entity.

Q. What's that?

A.      Recruiting and Marketing Resources.

Q.      Okay. And does Mr. LaForte, through Recruiting and Marketing Resources, have any managerial responsibilities of CBSG?

[Attorney]: Objection.

A.      <u>No.</u>

Q.      No? Does Mr. LaForte have any responsibility for CBSG?

[Attorney]: Objection.

A.      <u>No.</u>

Q.      Through any entity?

A.      <u>No.</u>

* * *

Q.      Got it. Is there anyone other than Lisa who makes decisions on behalf of CBSG?

[Attorney]: Objection.

A:      <u>No.</u>

Q:      She's the sole decision maker?

A.      No. Directors and myself, [Person No. 3] and her.

Q.      Well, I just asked you if there's anyone else who makes decisions on behalf of CBSG and you said no.

A.      I'm not sure what you meant.

Q.      Okay. So --

A.      <u>The directors of the company are Lisa, myself and [Person No. 3].</u>

110

                  Those are the only decision makers in the business.  We do have

                  departments, and it depends on how granular you want to get about

                  decisions, you know.

      Q.     She has -- she has ultimate say, correct?

      A.     Of course.

     7.     The underlined testimony of defendant JOE COLE, as set forth in

paragraph 6 of this Count, as defendant COLE then well knew and believed, was false, in that

defendant COLE knew at the time he made these statements that defendant JOSEPH LAFORTE

made decisions on behalf of defendant PAR FUNDING, ran the day-to-day operations of

defendant PAR FUNDING, and had the "ultimate say" regarding the decisions of defendant PAR

FUNDING.

          In violation of Title 18, United States Code, Section 1623.

111

## COUNT FIFTY-FOUR

(Conspiracy to obstruct justice)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41 of Count One are incorporated here.

At all times material to this indictment:

2.     By in or about 2020, a federal grand jury investigation into the activities of defendants JOSEPH LAFORTE and JAMES LAFORTE, as well as defendants LISA McELHONE, JOE COLE, and PAR FUNDING, charged elsewhere in this indictment, and others, had been opened in the Eastern District of Pennsylvania (the "federal Grand Jury investigation").

3.     On or about July 24, 2020, the U.S. Securities and Exchange Commission (the "SEC") filed a civil complaint in the United States District Court for the Southern District of Florida captioned *SEC v. Complete Business Solutions Group, et al.*, 9:20-cv-81205-RAR (S.D. Fl.) (the "SEC lawsuit") as part of an SEC enforcement action. The defendants in the SEC lawsuit included defendants JOSEPH LAFORTE, LISA McELHONE, and PAR FUNDING, as well as Perry Abbonizio, charged elsewhere.

4.     In connection with the federal grand jury investigation, on or about July 28, 2020, federal law enforcement officers executed search warrants at defendant PAR FUNDING's principal places of business, located at 20-22 N. 3rd Street, Philadelphia, Pennsylvania, and 205 Arch Street, Philadelphia, Pennsylvania, as well as at the residence and vacation homes of defendants JOSEPH LAFORTE and LISA McELHONE. The affidavit in support of the applications for these search warrants described the probable cause that defendants

112

JOSEPH LAFORTE, JAMES LAFORTE, and LISA McELHONE, and others committed various federal criminal violations, including securities fraud, extortionate collection of credit, and tax crimes. Among the sources of information cited in this affidavit was Extortion Victim No. 6, the principal of Victim Business No. 5, a merchant-customer of defendant PAR FUNDING.

5.  On or about July 27, 2020, the Florida district court in the SEC lawsuit appointed attorney R.S. of Stumphauzer Foslid Sloman Ross & Kolaya, PLLC as the receiver (the "Receiver") over defendant PAR FUNDING and several of the Par Funding affiliates. R.S. practices law in Miami, Florida.

6.  On or about July 31, 2020, the Florida district court granted an order permitting G.A., a partner at the law firm Pietragallo Gordon Alfano Bosick & Raspanti, LLP, to enter his appearance on behalf of the Receiver for Par Funding. The office of the law firm Pietragallo Gordon Alfano Bosick & Raspanti, LLP, is located at 1818 Market Street, Philadelphia, Pennsylvania.

7.  On or about August 5, 2020, a grand jury in the Eastern District of Pennsylvania charged defendant JOSEPH LAFORTE by indictment with violating 18 U.S.C. § 922(g) for being a felon-in-possession of multiple firearms recovered during the search of his primary residence. Following the filing of these charges, as part of its disclosure obligations, the government provided defendant JOSEPH LAFORTE with a copy of the affidavit in support of the application for the search warrants, which included information that Extortion Victim No. 6 had provided as a witness.

113

8. From at least July 2020 through in or about May 2023, the federal grand jury for the Eastern District of Pennsylvania continued investigating, among other things, securities fraud, extortionate collection of credit, and tax crimes.

9. Meanwhile, in or about November 2021, defendants JOSEPH LAFORTE and LISA McELHONE settled with the SEC in the SEC lawsuit, and in or about November 2022, the district court ordered them to pay approximately $142,529,980 in disgorgement, $10,694,758 in interest, and $43,700,000 in civil penalties.

10. On or about February 15, 2023, as a result of an ongoing federal grand jury investigation, Perry Abbonizio entered a guilty plea pursuant to an information in the Eastern District of Pennsylvania before Judge Mark A. Kearney for violation of 18 U.S.C. § 371 (conspiracy), *United States v. Perry Abbonizio*, Crim. No. 23-10 (E.D. Pa.). Abbonizio admitted, under oath, to conspiring with defendants JOSEPH LAFORTE and LISA McELHONE, and others, to commit wire fraud and securities fraud in connection with defendant PAR FUNDING. Abbonizio was a consultant for defendant PAR FUNDING who, using the title Principal, was responsible for a significant amount of the company's fundraising efforts from 2016 through mid-2020.

11. On or about February 28, 2023, defendant JOSEPH LAFORTE, his attorneys, and counsel for other parties participated electronically in a video conference with the Florida district court judge in the SEC lawsuit, during which G.A. addressed the Florida district court regarding the need for defendants JOSEPH LAFORTE and LISA McELHONE to pay outstanding rent and other expenses to the Receiver by March 3, 2023, or vacate their home in Haverford, Pennsylvania.

114

## THE CONSPIRACY

12. From on or about no later than February 15, 2023, through on or about

March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

conspired and agreed to commit an offense against the United States, namely, endeavoring to

influence, obstruct, and impede the due administration of justice in official proceedings, that is,

the federal grand jury investigation in the Eastern District of Pennsylvania and the SEC lawsuit

in the Southern District of Florida, by threats and by force, in violation of Title 18, United States

Code, Section 1503(a).

## MANNER AND MEANS

It was party of the conspiracy that:

13. In contemplation of and with actual knowledge of the SEC lawsuit,

defendant JAMES LAFORTE, with the assistance of and in coordination with defendant

JOSEPH LAFORTE, physically assaulted G.A., counsel for the Receiver for Par Funding, to

retaliate against G.A. and the Receiver for their respective roles in their SEC lawsuit, and for the

purpose of attempting to impede those proceedings, including to impede the Receiver's efforts to

remove defendants JOSEPH LAFORTE and LISA McELHONE from their primary residence in

Haverford, Pennsylvania.

14.     In contemplation of and with actual knowledge of the SEC lawsuit and the federal grand jury investigation in the Eastern District of Pennsylvania, defendant JAMES LAFORTE made threats of physical violence to Perry Abbonizio, Abbonizio's family, and Extortion Victim No. 6, for the purpose of impeding those proceedings, including by influencing, delaying, or preventing the testimony of Abbonizio and Extortion Victim No. 6 at those proceedings, and for the purpose of retaliating against Abbonizio and Extortion Victim No. 6 for testimony given, and records produced, by them in those proceedings.

## OVERT ACTS

1.     On or about February 15, 2023, defendant JAMES LAFORTE used his cellphone to view an online article regarding Perry Abbonizio's guilty plea and to conduct a search regarding Abbonizio and one of Abbonizio's adult daughters, and then traveled to defendant JOSEPH LAFORTE's Haverford home the next morning.

2.     On or about the morning of February 26, 2023, defendants JAMES LAFORTE and JOSEPH LAFORTE were together at the Haverford home of defendants JOSEPH LAFORTE and LISA McELHONE, after which defendant JAMES LAFORTE traveled to Philadelphia and spent time in the area around the home of one of Abbonizio's adult daughters.

3.     On or about February 28, 2023:

a.     After spending the night of the Haverford home of defendants JOSEPH LAFORTE and LISA MCELHONE, defendants JAMES LAFORTE and JOSEPH LAFORTE left the Haverford home and drove separately to Philadelphia, where they met and spent several hours together, including a joint meeting with defendant JOSEPH LAFORTE's

116

criminal defense counsel and a visit to a Philadelphia clothing retailer from which, in the presence of defendant JOSEPH LAFORTE, defendant JAMES LAFORTE quickly purchased a winter coat to change into later for a planned attack of G.A. Defendant JOSEPH LAFORTE then left the city and returned to his Haverford home, while defendant JAMES LAFORTE remained in the city.

      b.     Defendant JOSEPH LAFORTE, his attorneys, and counsel for other parties participated electronically in a video conference with the Florida district court judge in the SEC lawsuit, during which G.A. addressed the Florida district court regarding the need for defendants LAFORTE and LISA McELHONE to pay outstanding rent and other expenses to the Receiver by March 3, 2023, or vacate their home in Haverford, Pennsylvania.

      c.     Approximately one minute after the conclusion of the video hearing in the SEC lawsuit, defendant JOSEPH LAFORTE placed a phone call to defendant JAMES LAFORTE, which lasted less than one minute.

      d.     Approximately six minutes after the phone call from defendant JOSEPH LAFORTE, defendant JAMES LAFORTE moved into the area outside G.A.'s Philadelphia office wearing the winter coat that he had purchased from the retailer hours earlier while with JOSEPH LAFORTE, and not the winter coat that he was wearing earlier that day.

      e.     Approximately 30 minutes after moving into position to stalk G.A. outside G.A.'s Philadelphia office, defendant JAMES LAFORTE assaulted and hospitalized G.A. while G.A. was walking home from work, by striking G.A. on the head, from behind, with a hard object.

117

f.      Later that evening, defendant JOSEPH LAFORTE called

defendant JAMES LAFORTE, which call lasted approximately 6 minutes and 59 seconds, after

which defendant JOSEPH LAFORTE called defendant JAMES LAFORTE a second time, which

call lasted approximately 14 minutes and 18 seconds.

4.      On or about March 1, 2023, defendant JAMES LAFORTE returned to the

Haverford home of defendants JOSEPH LAFORTE and LISA McELHONE and spent the night,

while defendant JAMES LAFORTE's car remained in the parking garage in Philadelphia.

5.      On or about March 2, 2023:

a.      In the morning, defendant JAMES LAFORTE left the Haverford

home of defendants JOSEPH LAFORTE and LISA McELHONE and traveled to Philadelphia to

pick up his car, which had been in the Philadelphia parking garage since February 28, 2023, and

then drove to Brooklyn, New York.

b.      In the evening, defendant JAMES LAFORTE caused a telephone

call to be placed to Perry Abbonizio and his wife using a "spoof" telephone number. The caller

made several threatening statements to Abbonizio. For example, the caller told Abbonizio to

"retract those lies or we're coming for the girls." The caller also referenced the streets on which

Abbonizio's daughters reside in Philadelphia. The caller said something about "putting a guy in

the hospital." At this time of this call, Abbonizio was a witness in the federal grand jury

investigation and a witness and party in his own criminal case.

c.      Also in the evening, defendant JAMES LAFORTE caused a

telephone call to be placed to one of Abbonizio's daughters, A.A., using the same "spoof"

number. When A.A. answered the call, the male caller, who appeared to have a Staten Island or

118

New York metropolitan area accent, told A.A. that he knew where she lived. The male called

A.A. back soon afterwards and provided the street name upon which she lived and noted that she

was Abbonizio's daughter.

    d.  Also that evening, defendant JAMES LAFORTE caused a

telephone call to be placed to Extortion Victim No. 6, using the same "spoof" number. The

caller said, "We're coming after you. We're going to split your head open you cunt." At this

time of this call, Extortion Victim No. 6 was a witness in the federal grand jury investigation and

the SEC lawsuit.

    6.  On or about March 3 and 4, 2023, defendant JAMES LAFORTE

conducted internet searches on his cellphone related to his assault upon G.A.

    In violation of Title 18, United States Code, Section 371.

## COUNT FIFTY-FIVE
(Obstruction of justice)

## THE GRAND JURY FURTHER CHARGES THAT:

      1.     Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 9 of Count Fifty-Four are incorporated here.

      2.     From on or about November 16, 2022, through on or about November 30,

2022, in the Eastern District of Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

corruptly and by threat and force endeavored to influence, obstruct, and impede the due

administration of justice in the ongoing federal lawsuit by the SEC in the Southern District of

Florida, by threatening to cause serious bodily injury to O.F.

      In violation of Title 18, United States Code, Section 1503(a).

## COUNT FIFTY-SIX

(Obstruction of proceedings)

## THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 11, 13, and 14 and Overt Acts 1 through 7 of Count

Fifty-Four are incorporated here.

2. From on or about February 15, 2023, through on or about March 6, 2023,

in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,
a/k/a "Joe Mack,"
a/k/a "Joe Macki,"
a/k/a "Joe Mackie,"
a/k/a "Joe McElhone," and
JAMES LAFORTE,
a/k/a "Jimmy Schillaci,"**

corruptly and by threats and force endeavored to influence, obstruct, and impede the due and

proper administration of the law in a proceeding being had before a department or agency of the

United States, that is, an ongoing SEC enforcement action involving defendant PAR FUNDING,

charged elsewhere in this indictment, and other parties, by causing serious bodily injury to G.A.,

a Philadelphia attorney, and by threats of force to Extortion Victim No. 6, a witness in the SEC

enforcement action, and aiding and abetting same.

In violation of Title 18, United States Code, Sections 1505 and 2.

121

## COUNT FIFTY-SEVEN

(Obstruction of justice)

## THE GRAND JURY FURTHER CHARGES THAT:

1.     Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 11, 13, and 14 and Overt Acts 1 through 7 of Count

Fifty-Four are incorporated here.

2.     From on or about February 15, 2023, through on or about March 6, 2023,

in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,
a/k/a "Joe Mack,"
a/k/a "Joe Macki,"
a/k/a "Joe Mackie," and
a/k/a "Joe McElhone," and
JAMES LAFORTE,
a/k/a "Jimmy Schillaci,"**

corruptly attempted to obstruct, influence, and impede an official proceeding, that is, an

anticipated criminal prosecution in the Eastern District of Pennsylvania of defendants JOSEPH

LAFORTE and JAMES LAFORTE, as well as defendant LISA McELHONE, charged elsewhere

in this indictment, by causing serious bodily injury to G.A., a Philadelphia attorney, and causing

threats of violence against witnesses and parties to this proceeding with threats of force and

reference to the recent attack upon G.A., and aiding and abetting same.

In violation of Title 18, United States Code, Sections 1512(c)(2) and 2.

122

## COUNT FIFTY-EIGHT
(Tampering)

### THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 11, 13, and 14 and Overt Acts 1 through 7 of Count

Fifty-Four are incorporated here.

2. From on or about February 15, 2023, through on or about March 6, 2023,

in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

used and attempted to use physical force and the threat of physical force against persons, that is,

G.A., Perry Abbonizio, and Perry Abbonizio's daughters, by causing serious bodily injury to

G.A., a Philadelphia attorney, and causing threatening calls to be made to Perry Abbonizio, his

wife, and his daughters, and aiding and abetting same, with the intent to influence, delay, and

prevent the testimony of Perry Abbonizio in, and to cause and induce Perry Abbonizio to

withhold testimony from, an official proceeding, that is, the federal grand jury investigation in

the Eastern District of Pennsylvania.

In violation of Title 18, United States Code, Sections 1512(a)(2)(A), (B)(i) and 2.

123

## COUNT FIFTY-NINE
(Tampering)

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 11, 13, and 14 and Overt Acts 1 through 7 of Count

Fifty-Four are incorporated here.

2.      From on or about February 15, 2023, through on or about March 6, 2023,

in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

used and attempted to use physical force and the threat of physical force against persons G.A.

and Extortion Victim No. 6 by causing serious bodily injury to G.A., a Philadelphia attorney, and

causing a threatening call to be made to Extortion Victim No. 6, and aiding and abetting same,

with the intent to influence, delay, and prevent the testimony of Extortion Victim No. 6 in, and to

cause and induce Extortion Victim No. 6 to withhold testimony from, an official proceeding, that

is, the federal grand jury investigation in the Eastern District of Pennsylvania.

In violation of Title 18, United States Code, Sections 1512(a)(2)(A), (B)(i) and 2.

124

## COUNT SIXTY
(Tampering)

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.     Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 9 of Count Fifty-Four are incorporated here.

        2.     From on or about November 16, 2022, through on or about November 30,

2022, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone,"**

used and attempted to use the threat of physical force against a person, O.F., with the intent to

influence, delay, and prevent the testimony of O.F. in, and to cause and induce O.F. to withhold

testimony, records, and documents from, an official proceeding, that is, the federal lawsuit by the

SEC in the Southern District of Florida.

        In violation of Title 18, United States Code, Section 1512(a)(2)(A), (B)(i).

## COUNT SIXTY-ONE
(Retaliation)

## THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 11, 13, and 14 and Overt Acts 1 through 7 of Count

Fifty-Four are incorporated here.

2. From on or about February 15, 2023, through on or about March 6, 2023,

in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie," and**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

knowingly engaged in conduct which caused bodily injury to G.A., a Philadelphia attorney, and

aiding and abetting same, with the intent to retaliate against defendant PAR FUNDING, charged

elsewhere in this indictment, the Receiver for defendant PAR FUNDING ("Receiver"), and G.A.

for the attendance of defendant PAR FUNDING and the Receiver at an official proceeding, and

for the testimony and records produced by defendant PAR FUNDING and the Receiver at an

official proceeding, that is, the federal lawsuit by the SEC in the Southern District of Florida.

In violation of Title 18, United States Code, Sections 1513(b)(1) and 2.

## COUNT SIXTY-TWO
(Retaliation)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 11, 13, and 14 and Overt Acts 1 through 7 of Count

Fifty-Four are incorporated here.

2.      From on or about February 15, 2023, through on or about March 6, 2023,

in the Eastern District of Pennsylvania and elsewhere, defendant

### JAMES LAFORTE,
a/k/a "Jimmy Schillaci,"

knowingly threatened to engage in conduct which would cause bodily injury to Perry Abbonizio

and his family members, with the intent to retaliate against Abbonizio for the attendance of

Abbonizio at official proceedings, and for the testimony and records produced by Abbonizio at

official proceedings, that is, (i) the federal grand jury investigation in the Eastern District of

Pennsylvania and (ii) the criminal case *United States v. Perry Abbonizio*, Crim. No. 23-10 (E.D.

Pa.).

In violation of Title 18, United States Code, Section 1513(b)(1).

127

## COUNT SIXTY-THREE
(Retaliation)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 30 and 32 through 71 and Overt Acts 1 through 41

of Count One and paragraphs 2 through 11, 13, and 14 and Overt Acts 1 through 7 of Count

Fifty-Four are incorporated here.

2. From on or about February 15, 2023, through on or about March 6, 2023,

in the Eastern District of Pennsylvania and elsewhere, defendant

### JAMES LAFORTE,
### a/k/a Jimmy Schillaci,"

knowingly threatened to engage in conduct which would cause bodily injury to Extortion Victim

No. 6, with the intent to retaliate against Extortion Victim No. 6 for the testimony and records

produced by Extortion Victim No. 6 at official proceedings, that is, (i) the federal grand jury

investigation in the Eastern District of Pennsylvania and (ii) the ongoing federal lawsuit by the

SEC in the Southern District of Florida.

In violation of Title 18, United States Code, Section 1513(b)(1).

## NOTICE OF FORFEITURE NO. 1

## THE GRAND JURY FURTHER CHARGES THAT:

1. As a result of the violations of Title 18, United States Code, Sections 371

and 1343 and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal

Regulations, Section 240.10b-5, set forth in this indictment, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**
**COMPLETE BUSINESS SOLUTIONS GROUP, INC.,**
**d/b/a PAR FUNDING,**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

shall forfeit to the United States of America any property, real or personal, that constitutes or is

derived from proceeds traceable to the commission of such offenses, including, but not limited

to:

a. Fund up to the amount of $416,395,484 (forfeiture money

judgment);

b. One (1) Cessna Citation Sovereign 680 with Tail Number

N789MJ; and

c. All funds in Charles Schwab account #xxxx-7878 in the name of

Tradewinds South, LLC.

2. If any of the property described above, as a result of any act or omission of

the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred to, sold to, or deposited with a third party;

c. has been placed beyond the jurisdiction of this Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

130

## NOTICE OF FORFEITURE NO. 2

## THE GRAND JURY FURTHER CHARGES THAT:

1.      As a result of the violations of Title 18, United States Code, Section

894(a), set forth in this indictment, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone, and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

shall forfeit to the United States of America any property, real or personal, that constitutes or is

derived from proceeds traceable to the commission of such violations.

2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendants:

- (a)      cannot be located upon the exercise of due diligence;
- (b)      has been transferred or sold to, or deposited with, a third party;
- (c)      has been placed beyond the jurisdiction of the Court;
- (d)      has been substantially diminished in value; or
- (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property subject to forfeiture.

131

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(C).

**A TRUE BILL:**

**FOREPERSON**

**JACQUELINE C. ROMERO**
**UNITED STATES ATTORNEY**

*No.* _ _ _ _ _ _ _ _ _ _

## UNITED STATES DISTRICT COURT

Eastern District of Pennsylvania

Criminal Division

## THE UNITED STATES OF AMERICA

vs.

JOSEPH LAFORTE;
COMPLETE BUSINESS SOLUTIONS GROUP, INC. d/b/a PAR FUNDING;
JOSEPH COLE BARLETA;
JAMES LAFORTE; and
LISA McELHONE

### SUPERSEDING INDICTMENT
Counts

18 U.S.C. § 371 (conspiracy – 3 counts); 18 U.S.C. § 1343 (wire fraud – 22 counts); 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 (securities fraud – 1 count); 18 U.S.C. § 894(a) (conspiracy to use extortionate means to collect an extension of credit – 1 count); 18 U.S.C. § 894(a) (use of extortionate means to collect an extension of credit – 7 counts); 26 U.S.C. § 7201 (tax evasion – 3 counts); 26 U.S.C. § 7206(1) (false returns – 2 counts); 26 U.S.C. § 7202 (failure to collect and pay over tax – 12 counts); 18 U.S.C. § 1623 (perjury – 4 counts); 18 U.S.C. § 1503 (obstruction – 1 count); 18 U.S.C. § 1505 (obstruction – 1 count); 18 U.S.C. § 1512(c)(2) (obstruction – 1 count); 18 U.S.C. § 1512(a)(2)(A), (B)(i) (tampering – 3 counts); 18 U.S.C. § 1513(b)(1) (retaliation – 3 counts); 18 U.S.C. § 2 (aiding and abetting); Notices of forfeiture

Foreperson

Filed in open court this _____ 1 e _____ day,
Of _____ May _____ A.D. 20 2 3

Foreperson

Bail, $ _____