## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-CV-81205-RAR

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

**v.**

**COMPLETE BUSINESS SOLUTIONS GROUP,**
**INC. d/b/a PAR FUNDING, *et al.*,**

      **Defendants.**

_____/

### LISA MCELHONE'S RESPONSE IN OPPOSITION TO THE SEC'S MOTION FOR AN ORDER TO SHOW CAUSE AND MOTION TO STRIKE THE SEC'S RESPONSE TO MS. MCELHONE'S MOTION TO MODIFY THE ASSET FREEZE ORDER

The SEC's Motion for an Order to Show Cause (the "Motion for Order to Show Cause") asks this Court to hold Ms. McElhone in contempt and threaten her with imprisonment because she had the audacity to request that a relatively small sum of money be unfrozen to allow her to pay her outstanding and overdue attorneys' fees. The SEC seeks to position itself as the protector of victimized investors and Ms. McElhone as an unrepentant wrongdoer by falsely asserting that Ms. McElhone has not made any meaningful payments towards the Final Judgment and that she is deliberately seeking to avoid her disgorgement obligations. Neither statement is true. Ms. McElhone has paid nearly $3 Million towards the Final Judgment, and it is the SEC that has repeatedly thwarted Ms. McElhone's attempts to satisfy the Final Judgment using the assets that were seized from her and placed in the Receivership – **even though the purpose of the**

Receivership is to safeguard funds for satisfaction of a disgorgement award.[1]

As discussed herein, the Court should not hold Ms. McElhone in contempt for requesting that limited funds she has no present ability to access be unfrozen and used to meet her financial hardship. Ms. McElhone came to this Court hat-in-hand, and the SEC is asking the Court to put her in shackles – but debtors' prisons were abolished long ago, and for good reason. The SEC's Motion was clearly filed for punitive and retaliatory purposes and should not be countenanced by a Court of equity.

<u>**BACKGROUND**</u>

On October 6, 2023, Ms. McElhone filed a Motion to Modify the Asset Freeze Order (DE 1721, the "Motion to Modify") in which she asks this Court to modify the asset freeze that was entered against her (the "Asset Freeze Order," DE 230) and allow her to access approximately $747,000 held in bank accounts which are not within the Receivership Estate for the purpose of paying her outstanding attorneys' fees in this action and in a related criminal action. The subject bank accounts are owned by Ms. McElhone and two non-Receivership entities she controls, Lacquer Lounge, Inc. and Eagle Union Quest Two, LLC, respectively. In the Motion to Modify, Ms. McElhone explained that her resources have been substantially depleted by years of protracted litigation and that she is unable to pay her attorneys' fees without the requested relief from the Asset Freeze Order. Ms. McElhone's decision to file the Motion to Modify actually demonstrates her respect for and compliance with this Court's Asset Freeze Order. She did precisely what she was supposed to do – apply to this Court through counsel to access assets that she scrupulously preserved even though they were not included in the Receivership Estate.

---

[1] *See e.g.* ECF No. 436 at 2 (granting expansion of the Receivership on the grounds that "tainted funds, which could be the subject of disgorgement, may be found in the entities and properties identified herein").

After Ms. McElhone filed her Motion to Modify, counsel for the SEC repeatedly demanded specific information about the bank accounts at issue (the bank names, account holders, and the account numbers) for the ostensible purpose of a meet-and-confer. When undersigned counsel declined to provide this information, counsel for the SEC advised that it intended to file a motion to hold Ms. McElhone in contempt for failure to pay the Final Judgment against her. The SEC subsequently filed the Motion for Order to Show Cause – which is based exclusively on the SEC's contention that the Motion to Modify demonstrates that Ms. McElhone is aware of the existence of accounts which she purportedly can and should use to pay the Final Judgement.[2]

The SEC also filed a Response to the Motion to Modify (DE 1730) on October 21, 2023 – a day after the Response was due. The SEC's Response is a disingenuous and factually inaccurate attack piece which begins with the assertion that "Lisa McElhone has no shame." *Id.* at 1. The Response asserts that Ms. McElhone "liv[ed] for free in a mansion paid for by the investors through the receivership which paid her mortgage while failing to collect rent from McElhone." *Id.* at 2. None of that is true. Ms. McElhone owned the Haverford home free and clear since 2016 (she had no mortgage) and paid the Receiver over $1 Million in rent for the privilege of living in her own home before she was evicted. The Haverford home was subsequently sold and the proceeds of the sale (as well as the $1 Million plus in rent Ms. McElhone paid before she was evicted) have enriched the Receivership – yet not one penny of this money has been credited to the Judgment against Ms. McElhone. The SEC also asserts that Ms. McElhone is "currently living in a $9,000-per-month penthouse in Philadelphia." *Id*. As proof, the SEC cites a bail modification motion filed

---

[2] A plain reading of the Motion for Order to Show Cause reveals that it is based on, and was filed in response to, Ms. McElhone's Motion to Modify. Indeed, the Motion for Order to Show Cause was filed on the deadline for the SEC to respond to the Motion to Modify (October 20, 2021). The SEC's actual Response to the Motion to Modify (DE 1730), discussed below, was filed a day late and was clearly an afterthought.

by Joseph LaForte which provides the address of an apartment he and Ms. McElhone were forced to take residence in after they were evicted from the Haverford home. *See* 1731. The bail modification motion does not provide any information about the ownership of the apartment, the amount of rent paid, or who is paying that rent. The remainder of the SEC's Response appears to have been copy-pasted from prior filings, as the SEC makes arguments that have no application to the Motion to Modify. *See, e.g.*, *id.* at 3-4 (erroneously asserting that Ms. McElhone is asking the Court to release the Haverford home and $3 Million to her, even though the Motion to Modify *does not* make these requests and the Haverford home has already been sold). For all of these reasons, the SEC's untimely and erroneous Response brief should be stricken,[3] and should be given no weight or consideration by the Court.

## STANDARD OF REVIEW

The Court may enter an order to show cause when the conduct alleged in the motion would constitute a violation of the Court's order. *See Mercer v. Mitchell*, 908 F. 2d 763, 768 (11th Cir. 1990)). It is not sufficient for the movant to establish the mere possibility of a violation. *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1297 (11th Cir. 2002)) (noting that ""maybe" is not close enough when measured against the "clear and unambiguous" standard" the Court must apply).

---

[3] Pursuant to Local Rule 7.1(c)(1), a memorandum in opposition to a motion must be filed no later than 14 days from the date of service. Here, Ms. McElhone filed and e-served the Motion to Modify on October 6, 2023, and the SEC filed an e-served its response on October 21, 2023 – 15 days after the motion was filed. The motion should be struck on those grounds alone. *See Chacon v. El Milagro Child Care Ctr.*, No. 07-22835-CIV-AMS, 2009 WL 1920151, at *2 (S.D. Fla. July 2, 2009) (striking motion for summary judgment because it was not timely filed); *see also Umanzor v. Orlando II Assocs., LP*, No. 6:20-CV-1377-WWB-EJK, 2021 WL 3500816, at *2 (M.D. Fla. Mar. 25, 2021) (granting motion to strike plaintiff's response to a motion to dismiss because it was not timely filed).

"Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor to produce evidence explaining his noncompliance at a 'show cause' hearing." *See F.T.C. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010) (citing *Chairs v. Burgess*, 143 F. 3d 1432, 1436 (11th Cir. 1998)). "Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance." *SEC v. Solow*, 682 F. Supp. 2d 1312, 132 (S.D. Fla. 2010) (citing *Newman v. Graddick,* 740 F.2d 1513,1524 (11th Cir. 1984)). "Therefore, under the Eleventh Circuit's case law, the alleged contemnor may avoid a contempt finding by showing an inability to comply or a good faith effort to comply." *Id.* (citing *Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir. 1990)). "A finding of civil contempt must be supported by clear and convincing evidence that the allegedly violated order was valid and lawful; the order was clear and unambiguous; and the alleged violator had the ability to comply with the order." *Leshin*, 618 F.3d at 1232 (citing *Riccard*, 307 F.3d at 1297)) (internal citations omitted).

## ARGUMENT

### I.      Ms. McElhone is Unable to Pay the Final Judgment, Despite Her Reasonable Efforts

Ms. McElhone does not dispute that she has not fully paid the disgorgement judgment entered against her (which is more than $150 Million) in full, but this does not mean that she has engaged in contumacious conduct. The SEC knows all-too-well that Ms. McElhone is unable to satisfy the Final Judgment or make meaningful payments towards it at this time because virtually all her assets – including, but not limited to, her homes, vehicles, investment properties, art collection, stock accounts, bank accounts and other personalty – have been seized and placed within the Receivership Estate. Indeed, Ms. McElhone is currently having trouble covering her living expenses and is unable to pay her attorneys as a result of the near total asset seizure – which

is the exact reason she filed the Motion to Modify. Under these circumstances, the only way Ms. McElhone will *ever* be able to make meaningful payments towards the Final Judgment (other than winning the Powerball or founding a new billion-dollar company whilst under the cloud of these legal proceedings) will be to apply the assets which were previously seized from her and placed in the Receivership Estate to the Final Judgment.

Recognizing this, Ms. McElhone previously agreed to relinquish her legal and equitable rights to approximately $3 Million dollars within the Receivership *at the SEC's request* so that those funds could be applied towards the Final Judgment. *See* DE 1524 and 1525. But, for reasons that have never been adequately explained, the SEC refuses to credit *any* of the other assets seized from Ms. McElhone to the Final Judgment. In fact, when Ms. McElhone filed a motion seeking to have other assets she owned and controlled prior to the Receivership credited to the Final Judgment (*see* DE 1531), the SEC vehemently opposed the motion. *See* DE 1537 and 1539. Similarly, the SEC vehemently opposed a motion Ms. McElhone filed seeking to have a plane and stock account she had owned or controlled through the LME Trust brought into the Receivership Estate and applied to the Final Judgment. *See* DE 1468 and 1472. Remarkably, the SEC has shown no interest in seeking to obtain these assets (which have a combined value of about $18 Million) for the benefit of Par's investors, yet the SEC contends that Ms. McElhone should be held in contempt and threatened with imprisonment because she asked the Court to unfreeze bank accounts worth $747,000 to allow her to pay her overdue attorneys' fees instead of asking that those accounts be paid over to the SEC in partial satisfaction of the Final Judgment.

The SEC's decision to focus on the $747,000 at issue in the Motion to Modify – while refusing to credit over $150 Million of assets already in the Receivership which are attributable to Ms. McElhone (a very conservative estimate) and turning a blind-eye to Millions of dollars in

additional assets which could and should be brought into the Receivership – evidences the SEC's punitive intent. Likewise, the SEC's assertion that the $747,000 could be used to make "not insignificant payments towards the Court's Judgment" (DE 1729-1 at 6) is unavailing for several reasons. First, on the very same page of the Contempt Motion, the SEC asserts that Ms. McElhone "has not made a significant payment since the Judgment was entered" – despite the fact that she paid nearly $3 Million towards the Final Judgment by surrendering her right to certain property at the SEC's request (as discussed above). The SEC's assertion that a $3 Million payment is insignificant, but Ms. McElhone's failure to pay $747,000 *which she does not actually have access to* is significant enough to warrant a contempt proceeding, speaks volumes. Second, as explained above, the SEC has actively resisted Ms. McElhone's efforts to bring millions of dollars in other assets to bear so that they can be applied to the Final Judgement. Finally, the SEC knows that a $747,000 payment would not even cover a month of post-judgment interest on the Final Judgment and, therefore, would not meaningfully reduce the Final Judgment in any way.

## II.    The SEC's Argument that Ms. McElhone Should be Held in Contempt for Not Using All Reasonable Efforts to Comply with the Final Judgment Fails

The SEC does not allege that Ms. McElhone has the ability to use the $747,000 in frozen assets identified in the Motion to Modify to pay the Final Judgment **because it knows that she cannot**. Instead, the SEC cites *CFTC v. Wellington Precious Metals, Inc.*, 950 F. 3d 1525, 1529 (11th Cir. 1992) as support for its argument that Ms. McElhone failed to discharge her duty to use "all reasonable efforts" to satisfy the Final Judgment because she purportedly knows of assets which can be used to pay the Final Judgment (*i.e.*, the bank accounts identified in the Motion to Modify) but has not disclosed those accounts to the SEC or moved the Court to apply the proceeds of these accounts to the Final Judgment. This argument fails for several reasons.

First, there is no dispute that Ms. McElhone *cannot* use the accounts at issue to make a payment towards the Final Judgment at this time because the accounts are frozen by virtue of the Court's Asset Freeze Order and have also been frozen by the banks themselves (presumably because the SEC or the Receiver sent the banks a copy of the Asset Freeze Order[4]). The SEC has not cited case law to support its argument that Ms. McElhone had a duty to identify the bank accounts at issue or to move the Court to unfreeze those accounts so they could be applied to the Final Judgment, and the SEC's argument is not factually persuasive for all the reasons stated above.

Second, it strongly appears that – even if Ms. McElhone were to identify the bank accounts at issue – the SEC *would not* treat the account funds as assets which could be used to satisfy the Final Judgment. As discussed above, the SEC has repeatedly refused to credit Receivership assets which were owned or controlled by Ms. McElhone against the Final Judgement. For example, the SEC will not credit Receivership cash attributable to Ms. McElhone's Trust (the LME Trust) and/or her consulting companies (HBC and ESC) to the Final Judgment. Likewise, although the Receiver has sold a number of commercial properties Ms. McElhone owned or controlled through the LME Trust, the SEC refuses to apply the proceeds from the sale of those properties to the Final Judgment. Indeed, the SEC has advised that it is not even willing to credit the proceeds from the anticipated sale of Ms. McElhone's home in Jupiter, Florida – which she owns in her individual capacity – to the Final Judgment.[5] Accordingly, there was no reason for Ms. McElhone to believe that the SEC would treat the frozen bank accounts identified in her Motion to Modify – which are owned by Ms. McElhone or entities she controls – as assets that the SEC would agree to apply to

---

[4] Indeed, at the time Ms. McElhone filed the Motion to Modify, she had presumed that the SEC and the Receiver were already aware of these accounts.
[5] That property alone was under contract for approximately $12 Million. *See* DE 1645.

the Final Judgment.

Third, the case law the SEC relies on *is not* factually analogous and *does not* support the SEC's position that Ms. McElhone may be held in contempt for failing to use frozen funds she cannot access to make a partial payment towards the Final Judgment, or for failing to volunteer the location of those funds to SEC. In *Wellington*, a defendant was held in civil contempt for failing to pay a single dollar of a $2.8 Million disgorgement award. *See Wellington*, 950 F. 3d at 1527-30. The defendant tried to demonstrate his inability to pay by introducing evidence that he had spent or loaned out $1.4 Million, but the court found the defendant's evidence unconvincing for several reasons: first, the court found the loans were not arms-length transactions; second, defendant had made no efforts to obtain repayment of the loans; finally, defendant only attempted to account for $1.4 Million of a $2.8 Million disgorgement award, so even if his evidence had been accepted as true, it would not have accounted for all of the funds at issue. *Id*.

The facts in *Wellington* are not at all analogous to the present case. First, *Wellington* did not involve a Receivership, whereas here, the District Court appointed a Receiver who seized virtually all of Ms. McElhone's property and assets (for the express purpose of safeguarding them for disgorgement), and the Receiver is currently in possession of more than $120 Million in cash, a portfolio of real estate worth tens-of-millions of dollars, and various other assets – the vast majority of which were previously owned or controlled by Ms. McElhone. Second, the defendant in *Wellington* had not paid a dollar towards his disgorgement, whereas here, Ms. McElhone relinquished right and title to nearly $3 million in assets so they could be applied to the Final Judgment, and she has sought to have other Receivership assets applied to the Final Judgment through legal filings, but has been thwarted by the SEC's fierce opposition. Finally, and most importantly, *Wellington* involved the concealment and dissipation of funds in the defendant's

control, whereas here, the SEC seeks to hold Ms. McElhone in contempt for failing to pay funds which are subject to the Court's Asset Freeze Order and which have also been frozen by the financial institution where the accounts are held.

The SEC also cites case law for the proposition that it would be appropriate for this Court to incarcerate Ms. McElhone for not paying the Final Judgment – but the cases cited are completely inapposite. In *Solow*, for example, this Court found that the defendant, Mr. Solow, had engaged in "a purposeful campaign of asset dissipation" in which he transferred title to various property to his wife, travelled to Switzerland to hide cash and jewelry, and executed a $5.26 million mortgage on his home and placed these funds in a Cook Islands asset protection trust. *See Solow*, 682 F. Supp. 2d at 1314. The Court found that Mr. Solow's actions warranted a serious contempt finding because he had systematically dissipated his assets while paying only $2,639.24 towards his $3.24 Million disgorgement obligation and continuing to live a luxury lifestyle – which included taking extended trips to a vacation home in Park City, Utah. *Id*. at 1315-1316. Under these (very different) facts, the Court held that incarceration was an appropriate sanction to compel Mr. Solow to cease his campaign of dissipation and pay his disgorgement obligation out of funds which were readily available to him. *See also SEC v. Durante*, No. 01 CIV. 9056 DAB, 2013 WL 6800226 (S.D.N.Y. Dec. 19, 2013) (defendant held in contempt where he had admitted to liquidating $35 Million in assets but paid only $14 Million towards his disgorgement and continued to live a lavish lifestyle while lying about having a limited income); *Schwarz v. ThinkStrategy Cap. Mgmt. LLC*, No. 09 CIV. 9346 PAE, 2015 WL 4040558, at *7 (S.D.N.Y. July 1, 2015) (defendant held in contempt after SEC established he had paid nothing towards disgorgement despite having millions of dollars in Swiss bank accounts, as well as other assets).

In short, the cases the SEC cites for support deal with defendants who completely disregarded the judgments against them and engaged in flagrant campaigns to dissipate their assets. The SEC cannot point to a case where a defendant who was subject to an asset freeze order and had all her assets seized by a Receiver was held in contempt for failing to pay a massive disgorgement award she had no ability to pay. Nor can the SEC cite a case where a defendant was held in contempt for asking a court to unfreeze funds she had no access to in order to address her financial hardship and inability to pay her lawyers. The SEC's request to hold Ms. McElhone in contempt is both legally unsupported and unconscionable.

**III.    Ms. McElhone Has Repeatedly Tried to Satisfy the Final Judgment, in Whole or in Part, out of Assets that were Seized from Her and Placed in the Receivership, but Her Efforts Have Been Opposed and Thwarted by the SEC. Recent Case Law Suggests Her Seized Assets Must be Applied to the Judgment**

The SEC's focus on $747,000 in frozen accounts – an amount which is not even sufficient to cover the post-judgment interest on the Final Judgment from the date the Motion to Modify was filed to the date of this Response – evidences a punitive motive, rather than a genuine desire to see the Final Judgment satisfied.

Were the SEC focused on satisfying the Final Judgment so that the investors can be made whole, the funds required to do so can be found in the Receivership Estate – which is comprised, almost entirely, of property Ms. McElhone owned or controlled at the inception of this case. Ms. McElhone stands ready to relinquish her rights to this Receivership property, on the condition that she receive a dollar-for-dollar credit against her disgorgement obligation under the Final Judgment. This result is both equitable and legally sound.

The Second Circuit's recent decision in *SEC v. Govil* recognizes that "each payment made in satisfaction of disgorgement offsets the overall disgorgement amount… [because] funds returned are not unjust gains." *See SEC v. Govil*, No. 22-1658, 2023 WL 7137291, at *12 (2d Cir.

Oct. 31, 2023) (citing *FTC v. Bronson Partners,* 654 F. 3d 359, 372 (2d Cir. 2011)). Noting that "a wrongdoer returns "value" for purposes of disgorgement whenever he returns property that holds value in his own hands," the Second Circuit held that the defendant's surrender of stock as part of a settlement agreement with the company whose shareholders he had defrauded *had to be credited against his disgorgement obligation* even though the defendant received a release of liability from the company in exchange for his surrender of the stock, and the surrender of stock did not result in any payment directly to the SEC. *Id.* at * 13. In so holding, the Court found that the relevant question was whether defendant's surrender of stock "rights the wrongs to the actual victim of his misconduct." *Id.*

As in *Govil*, here, Ms. McElhone has been divested of significant assets which held value in her hands, and those assets are now in the Receivership where they will be used to make restitution to the investors. Under these circumstances, the assets in the Receivership which were seized from Ms. McElhone and are attributable to her *must* be credited to her disgorgement obligation – and the SEC's continued refusal to apply these assets to the Final Judgment while Ms. McElhone continues to incur millions of dollars in post-judgment interest has caused her real and sustained injury.

## CONCLUSION

Ms. McElhone should not be held in contempt for failing to pay the Final Judgment because she cannot do so. Ms. McElhone does not have access to the frozen bank accounts identified in her Motion to Modify, and the fact that she moved the Court to allow her to use these accounts to pay her attorneys (as a result of her ongoing financial hardship) rather than moving the Court to apply the proceeds of these frozen accounts to the Final Judgment *does not* demonstrate that she failed to use reasonable efforts to satisfy her disgorgement obligation. Furthermore, a finding of contempt

would be particularly inappropriate in this case since Ms. McElhone's inability to pay is the result of the SEC's refusal to recognize the Receivership assets that were seized from Ms. McElhone and credit them towards the Final Judgment. For all of these reasons, and as explained further in this Response, Ms. McElhone respectfully submits that she has shown good cause why she should not be held in contempt.

Dated: November 16, 2023.

**KAPLAN ZEENA LLP**
*Attorneys for Defendant Lisa McElhone*
2 South Biscayne Boulevard, Suite 3050
Miami, Florida 33131
Telephone: (305) 530-0800
Facsimile: (305) 530-0801

By: */s/ James M. Kaplan*
　　JAMES M. KAPLAN
　　Florida Bar No.: 921040
　　james.kaplan@kaplanzeena.com
　　elizabeth.salom@kaplanzeena.com
　　service@kaplanzeena.com
　　NOAH E. SNYDER
　　Florida Bar No.: 107415
　　noah.snyder@kaplanzeena.com
　　maria.escobales@kaplanzeena.com
　　julie.valdes@kaplanzeena.com

**LAW OFFICES OF ALAN S. FUTERFAS**
565 Fifth Avenue, 7th Floor
New York, New York  10017
Telephone:  212-684-8400
asfuterfas@futerfaslaw.com
*Attorneys for Lisa McElhone*

By:  */s/ Alan S. Futerfas*
　　ALAN S. FUTERFAS
　　*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this <u>16</u><sup>th</sup> day of November 2023, I electronically filed the

foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on counsel of record via transmissions of Notices of Electronic

Filing generated by CM/ECF.

By: <u>*/s/  James M. Kaplan*</u>
JAMES M. KAPLAN
