**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 20-CV-81205-RAR**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d/b/a PAR FUNDING, *et al.*

      Defendants.
_____/

**RECEIVER'S MOTION TO (1) APPROVE PROPOSED PLAN OF
<u>DISTRIBUTION AND (2) AUTHORIZE FIRST INTERIM DISTRIBUTION</u>**

# **Table of Contents**

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND ................................................................................................ 4

   A.   Procedural Background ................................................................................. 4

   B.   Sources of Recovery for Distribution to Claimants ..................................... 6

   C.   Proposed Process for Resolving this Motion ................................................ 7

III.   THE COURT HAS BROAD AUTHORITY IN THE CLAIMS PROCESS ..... 7

IV.    DISTRIBUTION PLAN ..................................................................................... 9

   A.   Definitions ..................................................................................................... 9

   B.   Priority of Classification of Claims for Distribution ................................... 10

      1.   Class 1: Administrative Claims / Professional Claims ................................. 11

      2.   Class 2: Government Tax Liabilities of the Estate ....................................... 12

      3.   Class 3: Secured Investors in CBSG under the Exchange Offering ............ 12

      4.   Class 4: Other Defrauded Investors: ........................................................... 13

      5.   Class 5: Employees ....................................................................................... 14

      6.   Class 6: Vendors / Trade Creditors / Governmental Entities ...................... 14

      7.   Class 7: Merchants ....................................................................................... 14

      8.   Class 8: Insider Investors ............................................................................. 15

   C.   The UCC Liens of the Chehebars are Invalid and Their Claims should be
        Subordinated to those of other Claimants based on their Status as Insider
        Investors. ...................................................................................................... 15

      1.   The Chehebars' liens are invalid and unenforceable against the Receivership
           Estate. ........................................................................................................... 16

      2.   The Chehebars' reliance on Wells Fargo is misplaced. ............................... 33

      3.   Equity requires the subordination of the Chehebars' claims, which should be
           classified as Insider Investor claims. ........................................................... 36

   D.   Investors who Accepted the Exchange Offering have Priority Claims Based on the
        Valid UCC Lien Albert Vagnozzi, as Security Agent, Filed on their Behalf. ............ 38

   E.   CS2000 is an "Insider Investor" and, Therefore, Falls within Class 8. ............... 40

   F.   John Gissas and Shannon Westhead are "Insider Investors" and, Therefore, Fall
        within Class 8 ............................................................................................... 43

   G.   Procedures for Making Distributions ........................................................... 45

      1.   Utilization of a Pro Rata Distribution. ........................................................ 45

      2.   Payment Method. .......................................................................................... 47

3.   Duty to Provide Information. ................................................................................ 47

4.   Distributions to Agent Funds. ............................................................................. 47

5.   Interest on Claims. ............................................................................................... 49

6.   No *De Minimis* Distributions. ............................................................................. 49

7.   Unclaimed Distributions. ..................................................................................... 50

8.   Undeliverable Distributions. ................................................................................ 50

9.   Final Distribution. ................................................................................................ 50

H.   Additional Provisions .................................................................................................. 51

1.   Court Approval. .................................................................................................... 51

2.   Right to Modify. ................................................................................................... 51

3.   Payment Effects Release. ..................................................................................... 51

4.   Waiver. .................................................................................................................. 52

5.   Reserve. ................................................................................................................. 52

6.   Retention of Jurisdiction. ..................................................................................... 52

V.   LEGAL ANALYSIS ............................................................................................................ 53

A.   The Court has Broad Authority in Authorizing a Distribution Plan. ............................ 53

B.   Pooling of Receivership Assets .................................................................................... 55

C.   Claim Priority and Classification ................................................................................. 55

VI.   AUTHORIZATION OF INITIAL DISTRIBUTION ......................................................... 57

A.   Total Funds within the Receivership Estate as of August 2, 2024 ............................... 58

B.   Reserves from Cash Availability .................................................................................. 59

C.   The Receiver Recommends Allocating, but Not Distributing, Any Distributions to
Claimants who are Seeking Collateral Sources of Recovery. ....................................... 63

D.   Recommended Interim Distribution Amounts. ............................................................. 64

E.   The Recommended Interim Distribution is Reasonable ................................................ 69

VII.   CONCLUSION ................................................................................................................... 69

Ryan K. Stumphauzer, Esq., Court-Appointed Receiver ("Receiver") of the Receivership Entities,[1] by and through his undersigned counsel, respectfully requests the Court to approve his proposed plan of distribution of assets within the Receivership Estate, and to authorize a first interim distribution. In support thereof, the Receiver states:

## I.   __INTRODUCTION__

CBSG, including its principals, Lisa McElhone and Joseph LaForte, together with certain other individuals, violated the securities laws in an offering that raised hundreds of millions of dollars from investors, including direct investors and through several "agent funds." Based on evidence the Securities and Exchange Commission (the "SEC") submitted, the Court granted various relief, including the appointment of a Receiver to marshal and safeguard assets for the benefit of defrauded investors. *See* Amended Order Appointing Receiver [ECF No. 141] (the "Amended Receivership Order"). The Receiver has made significant progress since his

---

[1] The "Receivership Entities" are Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG"); Full Spectrum Processing, Inc.; ABetterFinancialPlan.com LLC d/b/a A Better Financial Plan; ABFP Management Company, LLC f/k/a Pillar Life Settlement Management Company, LLC; ABFP Income Fund, LLC; ABFP Income Fund 2, L.P.; United Fidelis Group Corp.; Fidelis Financial Planning LLC; Retirement Evolution Group, LLC;, RE Income Fund LLC; RE Income Fund 2 LLC; ABFP Income Fund 3, LLC; ABFP Income Fund 4, LLC; ABFP Income Fund 6, LLC; ABFP Income Fund Parallel LLC; ABFP Income Fund 2 Parallel; ABFP Income Fund 3 Parallel; ABFP Income Fund 4 Parallel; and ABFP Income Fund 6 Parallel; ABFP Multi-Strategy Investment Fund LP; ABFP Multi-Strategy Fund 2 LP; MK Corporate Debt Investment Company LLC; Fast Advance Funding LLC; Beta Abigail, LLC; New Field Ventures, LLC; Heritage Business Consulting, Inc.; Eagle Six Consulting, Inc.; 20 N. 3rd St. Ltd.; 118 Olive PA LLC; 135-137 N. 3rd St. LLC; 205 B Arch St Management LLC; 242 S. 21st St. LLC; 300 Market St. LLC; 627-629 E. Girard LLC; 715 Sansom St. LLC; 803 S. 4th St. LLC; 861 N. 3rd St. LLC; 915-917 S. 11th LLC; 1250 N. 25th St. LLC; 1427 Melon St. LLC; 1530 Christian St. LLC; 1635 East Passyunk LLC; 1932 Spruce St. LLC; 4633 Walnut St. LLC; 1223 N. 25th St. LLC; 500 Fairmount Avenue, LLC; Liberty Eighth Avenue LLC; Blue Valley Holdings, LLC; LWP North LLC; The LME 2017 Family Trust; Recruiting and Marketing Resources, Inc.; Contract Financing Solutions, Inc.; Stone Harbor Processing LLC; LM Property Management LLC; and ALB Management, LLC; and the receivership also includes the property located at 107 Quayside Dr., Jupiter FL 33477.

appointment, recovering or otherwise obtaining control of more than $165 million in cash and tens of millions of dollars in other assets the Defendants obtained with commingled investor funds. The Receiver is also continuing to pursue other recoveries, including a substantial settlement with Eckert Seamans Cherin & Mellott LLC, the law firm that was integrally involved in setting up the agent-fund model CBSG and its primary fundraiser, Dean Vagnozzi, utilized in their fraudulent scheme to raise investor funds through lies and misrepresentations.

Despite these recoveries, the records of the Receivership Entities reflect that, as of the Receiver's appointment, CBSG owed approximately $365 million in principal to its investors. Although CBSG had recorded on its books hundreds of millions of dollars in "profit" based on the accounts receivable for its outstanding merchant cash advances, the Receiver conducted a thorough investigation into the prior operations and current status of the Receivership Estate, and determined that a substantial percentage of these receivables were uncollectable. Nevertheless, CBSG did not write off these uncollectable amounts. To the contrary, CBSG represented to investors that these uncollectable amounts were "profits," promised investors above-market interest rates based on these "profits," and made significant "profits payments" to Lisa McElhone and other insiders based on these purported profits.

When these uncollectable amounts are recognized for what they truly are—substantial losses—the liabilities of the Receivership Estate significantly exceed its assets. Indeed, the Receiver's investigation into CBSG has determined that CBSG was *never* a profitable business and was only able to repay older investors by raising additional funds from newer investors. As of 2019, CBSG owed its investors and client funding creditors $128,823,548 more than the assets available to satisfy these debts. As this Court determined in its Order Granting Receiver's Motion

to (1) Approve Proposed Treatment of Claims and (2) for Ponzi Determination [ECF No. 1976], (the "Order Granting Claims Motion"), CBSG operated as a Ponzi scheme.

Given the financial condition of CBSG, all investors cannot be "made whole" and recover their full principal investment from the company's available assets. As a result, when formulating a process for distributing the available funds, the district court has extremely broad powers and wide discretion "to determine to whom and how the assets of the Receivership Estate will be distributed."[2]  "No specific distribution scheme is mandated so long as the distribution is fair and equitable."[3]  In general, "any distribution should be done equitably and fairly, with similarly situated investors or customers treated alike," and "equity should not permit one group a preference over another, because 'equality is equity.'"[4]

With this backdrop, the Receiver's proposed plan for distributing funds back to investors is aimed at achieving these goals of equity and fairness.  The Court previously approved the Receiver's utilization of the "net investment" methodology in calculating the amounts at which investors' claims were approved.  This methodology accounts for all cash an investor paid into CBSG (or an agent fund), minus all cash the investor received back from CBSG (regardless of whether it was characterized as the payment of interest, the return of principal, or otherwise).

As described more fully below, the Receiver has detailed in this motion his recommendations for how the funds within the Receivership Estate should be distributed, including a summary of the funds within the Receivership Estate that are available for distribution and the proposed priority between and among the various categories of claimants with allowed

---

[2] *See SEC v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992).
[3] *SEC. v. Homeland Communications Corp.*, 07-80802 CIV, 2010 WL 2035326, at *2 (S.D. Fla. May 24, 2010).
[4] *Id.*

claims.  After accounting for an appropriate holdback of funds, the Receiver is proposing a plan that will authorize distributions of more than $110 million to investors with Allowed Claims.  For the reasons stated herein, the Court should approve the Receiver's proposed distribution plan and authorize the Receiver to proceed with an initial interim distribution to claimants of funds from within the Receivership Estate.

## II.   BACKGROUND

### A.   Procedural Background

On July 24, 2020, the SEC filed a complaint (the "Complaint") [ECF No. 1] in the United States District Court for the Southern District of Florida (the "Court"), alleging that the Defendants violated the securities laws by, among other things, making false or materially misleading representations to investors relating to their investment in CBSG.  On July 27, 2020, the Court entered the Order Appointing Receiver which, in relevant part, directed the Receiver to "[t]o take custody, control and possession of all Receivership Entity records, documents, and materials, and to safeguard these items until further Order of the Court."  [ECF No. 36 ⁋ 1].  The Court later entered an Amended Order Appointing Receiver on August 13, 2020, which authorized the Receiver to "develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered and recoverable Receivership Property." [ECF No. 141 ⁋ 52].

On December 21, 2022, the Receiver filed a Motion to Establish and Approve the : (1) Proof of Claim Form; (2) Claims Bar Date and Notice Procedures; and (3) Procedure to Administer and Determine Claims (the "Claims Process Motion") [ECF No. 1467].  The Court entered an Order granting the Claims Process Motion on December 23, 2022 (the "Claims Process Order") [ECF No. 1471].  By granting the Claims Process Motion, the Court approved a procedure for individuals or entities who believed they may have a claim against any Receivership Entity to submit a claim to the Receivership assets.

All claims were due to be filed before March 22, 2023. Thereafter, the Receiver and his professional consultants reviewed and analyzed these Proofs of Claim to determine the validity of each claim and to determine, based on the records of the Receivership Entities, whether the Receiver agreed with the amount each claimant included on the Proof of Claim Form. The Receiver's Claims Agent then began the process of providing each claimant with a Notice of Determination, as well as with the Receiver's determinations on the validity and approved amount of each claim. These Notices of Determination were sent out by U.S. Mail to the address each claimant included on the Proof of Claim Form, as well as by email, if the claimant included an email address on their Proof of Claim Form. Claimants were afforded 30 days to review and, if applicable, object to the Receiver's Notices of Determination.

Thereafter, the Receiver filed his Motion to (1) Approve Proposed Treatment of Claims and (2) for Determination of Ponzi Scheme ("Claims Motion") [ECF No. 1843]. In the Claims Motion, the Receiver requested the Court to determine that CBSG operated as a Ponzi scheme, and to approve his approved treatment of the Proofs of Claim that claimants submitted to the Receiver. After providing all claimants an opportunity to respond to the Claims Motion, the Court entered its Order Granting Claims Motion [ECF No. 1976].

In the Order Granting Claims Motion, the Court determined that CBSG operated as a Ponzi scheme, approved the Receiver's "net investment" methodology for calculating investors' claims, and adjudicated the Receiver's claims determinations for all Proofs of Claim. The Court considered the Receiver's proposed determinations, and either denied, approved, or approved as modified each of the Proofs of Claim. With an approved set of claims, the Court further instructed the Receiver to proceed with preparing and filing a motion to establish a distribution plan and to

seek authorization for an initial distribution.  The Receiver now requests approval of this motion to establish a plan of distribution and to authorize a first interim distribution.

> ### B.    <u>Sources of Recovery for Distribution to Claimants</u>

Following the Court's ruling on the Receiver's Claims Motion, the Receiver has been working with his consultants at Development Solutions, Inc. ("DSI") to analyze the funds and other assets within the Receivership Estate, classify and categorize those funds and assets, and calculate the proposed amounts to be distributed to claimants with allowed claims.  As part of this process, the Receiver has afforded proper consideration to issues relating to the priority of classes of claims, the classification of certain claimants as "insiders," and appropriate holdbacks from the proposed distribution amounts based on disputed issues and claims that are likely to be the subject of appeals and other challenges in the future.

The vast majority of assets recovered to date generally fall into three categories: (1) funds recovered from bank accounts or otherwise collected from individuals or entities that were obligated to pay funds to the Receivership Entities; (2) real estate the Receiver has identified and secured that the Defendants purchased with commingled investor funds; and (3) other property, including vehicles, watercraft, artwork, and luxury watches, that the Defendants obtained with commingled investor funds. The Receiver has been diligently working to sell the real estate and other property, so that the proceeds from the sale of those assets will be available for the proposed distributions.  In addition to the assets secured to date, the Receiver anticipates he will recover additional funds from individuals and entities that have remaining obligations to the Receivership Entities, including tax refunds from the Internal Revenue Service and the State of Florida, and he continues to analyze and pursue other claims against third parties.

C.     **Proposed Process for Resolving this Motion**

Through this motion, the Receiver requests that the Court review and approve his proposed plan for distributing funds to claimants with allowed claims, and to authorize a first interim distribution to claimants.  The Receiver proposes that claimants and other parties be afforded 14 days, should they deem it appropriate, to prepare and file a response to this motion, which should be limited to 10 pages.  Thereafter, the Receiver would request a period of 14 days to prepare and file separate replies to the responses, which shall also be limited to 10 pages.  Although the Receiver requests the ability to file a separate reply to each response, the Receiver would, where appropriate, reply to multiple, similar responses in a single filing to minimize the time and expense of this process.

Thereafter, depending on the responses that are filed, the Receiver suggests that the Court may consider and resolve this Motion, with or without a hearing to address certain disputed issues, such as the arguments from the Chehebar Investors that they purportedly possess superior liens over CBSG's assets by virtue of UCC-1 filings, as well as the Receiver's recommended classification of the Chehebar Investors and Capital Source 2000 as "Insiders."  This process, which comports with the summary procedures permitted under equitable receiverships, affords all interested parties a fair opportunity to present evidence when the facts are in dispute and to make arguments regarding those facts.  *See S.E.C. v. Elliott*, 953 F.2d 1560, 1567 (11th Cir. 1992).

III.    **THE COURT HAS BROAD AUTHORITY IN THE CLAIMS PROCESS**

A district court possesses extremely "broad power to remedy violations of federal securities laws." *Eberhard v. Marcu*, 530 F.3d 122 (2d Cir. 2008); *see also SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) ("The district court has broad powers and wide discretion to determine relief in an equity receivership."); *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 82–83 (2d Cir. 2002) (affirming approval of proposed plan for returning funds to claimants as "within the equitable

discretion of the District Court"). In particular, "[a]s an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits," and, "[o]nce the profits have been disgorged, it remains within the court's discretion to determine how and to whom the money will be distributed, and the district court's distribution plan will not be disturbed on appeal unless that discretion has been abused." *SEC v. Fishbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997).

The Court's power to supervise an equity receivership and determine the appropriate actions to be taken in its administration is extremely broad. *Elliott*, 953 F.2d at 1566. It is appropriate for a receiver to seek guidance from a court when devising a process for distributing funds within an equity receivership, given the importance of such a matter and wide discretion in how such a process could be structured. As has been noted, "[i]t is the court itself which has the care of the property in dispute . . . [and the] receiver is but the creature of the court." *SEC v. Safety Finance Service, Inc.*, 674 F.2d 368, 373 (5th Cir. 1982).

The Court may approve the proposed distribution of the assets of a receivership estate in a manner that it deems fair and equitable. *See Elliot* at 1569–70. In cases involving fraud, some assets may be "fortuitously identifiable by virtue of the liquidation or encumbering of the assets of [certain investors]," but the ability to trace a particular claimant's funds into specific assets within the receivership does not provide a basis for giving priority to one claimant over another. *See SEC v. Credit Bancorp*, 194 F.R.D. at 463; *United States v. Real Property*, 89 F.3d 551, 552, 553 (9th Cir. 1996) (holding that it is inequitable to allow creditors to use tracing fictions to recover full amount of its claim at expense of equally innocent fraud victims). Rather, the goal of any plan of distribution is to ensure that the process is "done equitably and fairly, with similarly situated investors or customers treated alike," and "equity should not permit one group a preference over

another, because 'equality is equity.'" *S.E.C. v. Homeland Communications Corp.*, 07-80802 CIV, 2010 WL 2035326, at *2 (S.D. Fla. May 24, 2010).

## IV.    DISTRIBUTION PLAN

### A.    Definitions

When used in the Receiver's proposed plan of distribution (the "Distribution Plan"), the capitalized terms identified below and their plural forms have the following meanings:

"**Allowed Claim**" means a Claim that a Claimant submitted to the Receiver, and which was determined to be a timely-filed, valid, and allowed claim pursuant to the Court's Order on the Receiver's Claims Motion.   An Allowed Claim is a necessary condition to the receipt of a Distribution.

"**Allowed Claim Amount**" means the maximum amount the Court has determined a Claimant is entitled to receive based on an Allowed Claim, as established in the Order on the Receiver's Claims Motion. The Allowed Claim Amount is not the amount the Claimant will, in fact, receive in Distributions from the Receivership Estate. Rather, it is the maximum amount that the Claimant is entitled to receive from the Receivership Estate, subject to other considerations, if a full recovery is made to all Claimants.

"**Claim**" means any alleged right to a Distribution, regardless of whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed or contingent, asserted or unasserted, matured, disputed, undisputed, legal, secured or unsecured.

"**Claimant**" means the holder of an Allowed Claim.

"**Class**" means a category of Claims as set forth in the Distribution Plan.  As the Receiver administers the Distribution Plan, he reserves the right to move Claims from one Class to another, subject to an Order from the Court approving such reclassification.

"**Court**" means the United States District Court for the Southern District of Florida, before which this action is pending.

"**Distribution**" means any payment the Receiver makes to a Claimant on an Allowed Claim in accordance with the procedures outlined in this Distribution Plan.

"**Person**" means an individual, corporation, partnership, limited liability company, trust, association, retirement or pension plan, or other entity who holds an Approved Claim.

"**Receivership Assets**" means all assets of the Receivership Entities that have or will be collected by the Receiver.

"**Receivership Estate**" means all of the property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly.

**B.**     **Priority of Classification of Claims for Distribution**

The priority of each Allowed Claim will be determined according to its classification, as listed below in decreasing order of priority:

(1) Administrative Claims of the Receivership Estate;

(2) Government Tax Liabilities of the Receivership Estate;

(3) Secured Investors under the Exchange Offering;

(4) Other Defrauded Investors;

(5) Employees;

(6) Vendors / Trade Creditors / Governmental Entities;

(7) Merchants; and

(8) Insider Investors.

Each classification and its corresponding priority status is described in further detail below.

### 1.    Class 1: Administrative Claims / Professional Claims

Class 1 Claims include Administrative Claims for the actual and necessary expenses of administering the Receivership Estate, including fees and expenses paid in connection with operating the Receivership Entities; marshaling, preserving, and distributing Receivership Assets; fees and expenses paid in accordance with the Receivership Orders or other Court Orders; and other related fees and expenses.  All Administrative Claims are subject to the Receiver's review and analysis, and such claims will be paid only after the Receiver determines, in his sole professional judgment, that the total amount claimed is equal to the actual value provided by such Claimant and received by the Receivership Estate.

Class 1 Claims also include Professional Claims for the fees and expenses to the Receiver and his attorneys and consultants that have provided services for the benefit of the Receivership Estate following the appointment of the Receiver.  The Receiver will continue to submit quarterly applications to the Court for payment of Professional Claims and, in accordance with the Court's Orders, satisfy these Professional Claims in the ordinary course.

All current and future Class 1 Claims will be paid in full from funds held in the bank accounts of the Receivership Estate, and shall be accorded priority over all other Claims.  The Receiver will not know the full amount of the Class 1 Claims until the conclusion of this case. Accordingly, the Receiver will, in the exercise of his discretion, hold back a sum to fund the cost of administering the Receivership Estate and to satisfy all future Administrative Claims / Professional Claims.  The Receiver may reserve additional amounts from additional funds he recovers for the benefit of the Receivership Estate, but will endeavor to reserve no more for Administrative Claims and Professional Claims than he reasonably believes to be necessary to pay out such Claims.  Any amount left in reserve for Class 1 Claims at the conclusion of this case shall

be distributed to Claimants in lower priority classifications, pursuant to the terms of this Distribution Plan.

### 2.     Class 2: Government Tax Liabilities of the Estate

This claim category includes all post-Receivership tax and other liabilities that the Receivership Entities owe to a local, state, federal, or foreign governmental body. All current and future Class 2 Claims will be paid in full from funds held in the bank accounts of the Receivership Estate, and shall be accorded priority over all other Allowed Claims.  The Receiver will not know the full amount of the Class 2 Claims until the conclusion of this case.  Accordingly, the Receiver will, in the exercise of his discretion, hold back a sum to satisfy all future Class 2 Claims.  The Receiver may reserve additional amounts from additional funds he recovers for the benefit of the Receivership Estate, but will endeavor to reserve no more for Class 2 Claims than he reasonably believes to be necessary to pay out such Claims.  Any amount left in reserve for Class 2 Claims at the conclusion of this case shall be distributed to Claimants in lower priority classifications, pursuant to the terms of this Plan.  All Class 2 Claims shall have priority over Class 3, 4, 5, 6, 7, and 8 Claims.

### 3.     Class 3: Secured Investors in CBSG under the Exchange Offering

This claim category includes the Allowed Claims of a Claimant that invested money directly with CBSG and obtained an Exchange Note and Security Agreement in 2020, prior to the commencement of this action.  Class 3 is comprised of direct investors and agent funds who invested directly in CBSG's merchant cash advance business based on misrepresentations from CBSG and the agents who touted these investments in the company.

These investors were provided a Security Agreement, pursuant to which a UCC-1 financing statement was filed in April 2020, reflecting these investors' security interest in CBSG's assets. In accordance with the terms of these security agreements and the UCC-1 financing statement that

was recorded on their behalf, all security interests of all Class 3 Claims are of equal priority. Under this Distribution Plan, all Class 3 Claims shall have priority over all Class 4, 5, 6, 7, and 8 Claims, and—with the exception of Class 4 Claims against Receivership Entities other than CBSG, as discussed below—must be paid in full before a Distribution will be made to a lower Class. The Receiver believes that he will be able to make pro-rata Distributions to Class 3 Claimants, but it is uncertain whether he will be able to pay such Claims in full.

### 4.    Class 4: Other Defrauded Investors:

This claim category includes the Allowed Claims of a Claimant that invested money with one or more of the Receivership Entities, but did not obtain a security agreement that is supported by a properly-filed and valid UCC-1 financing statement. All Class 4 Claims shall have priority over all Class 5, 6, 7, and 8 Claims, and must be paid in full before a Distribution will be made to a lower Class.

Based on the current assets within the Receivership Estate, the Receiver will not be able to make pro-rata Distributions to Class 4 Claimants who invested directly in CBSG. Although it is possible, the Receiver believes it is unlikely that future recoveries will permit a pro-rata Distribution from CBSG to Class 4 Claimants who invested directly in CBSG.

The Receiver will, however, be able to make pro-rata Distributions to Class 4 Claimants with Allowed Claims against Receivership Entities other than CBSG (*i.e.*, the ABFP entities, Fidelis Financial Planning, and the Retirement Evolution entities). It is uncertain, however, whether he will be able to pay such Claims in full. Most of these other Receivership Entities, as Class 3 Claimants, will receive a Distribution from CBSG. The Receivership Entity will combine the funds it receives from CBSG with other funds solely attributable to that specific Receivership Entity, and then make these Distributions of the combined funds to Claimants with Allowed Claims against the fund, on a pro-rata basis.

### 5.       Class 5: Employees

This claim category includes the Allowed Claims of a Person who was formerly an employee of the Receivership Entities, seeking wages and other amounts for services they provided to the Receivership Entities prior to the appointment of the Receiver.  All Class 5 Claims shall have priority over all Class 6, 7, and 8 Claims, and must be paid in full before a Distribution will be made to a lower Class. The Receiver believes that no Distributions will be made to Class 5 Claimants.  Should the Receiver be able to make a Distribution to Class 5 Claimants, however, such Distributions will be without consideration for payroll- and wage-related taxes.

### 6.       Class 6: Vendors / Trade Creditors / Governmental Entities

This claim category includes the Allowed Claims of businesses that have not been paid for goods, services, and credit they provided to the Receivership Entities prior to the appointment of the Receiver, credit card companies seeking to collect on unpaid amounts that the Receivership Entities and their owners and representatives incurred prior to the appointment of the Receiver, and governmental entities seeking to collect unpaid taxes for amounts attributable to periods prior to the appointment of the Receiver.  All Class 6 Claims shall have priority over all Class 7 and Class 8 Claims, and must be paid in full before a Distribution will be made to a lower Class. The Receiver believes that no Distributions will be made to Class 6 Claimants.

### 7.       Class 7: Merchants

This claim category includes the Allowed Claims of companies that received funding through merchant cash advance agreements with the Receivership Entities and were parties to litigation against one of the Receivership Entities as of the appointment of the Receiver.  All Class 7 Claims shall have priority over all Class 8 Claims and must be paid in full before a Distribution will be made to a lower Class. The Receiver believes that no Distributions will be made to Class 7 Claimants.

       8.      **Class 8: Insider Investors**

This claim category includes the Allowed Claims of individuals and companies that invested in CBSG, including through other Receivership Entities, but have been determined by the Receiver to be subordinate in priority of payment to Classes 1 through 7, as compelled by the equities of the case and the actions of the relevant Claimant. Class 8 Claims include Claimants who were involved in the underlying fraud scheme or otherwise had access to additional information not made available to the Defrauded Investors.  All Class 8 Claims will be paid after all other Classes are paid in full. The Receiver believes that no Distributions will be made to Class 8 Claimants.

       C.      **The UCC Liens of the Chehebars are Invalid and Their Claims should be Subordinated to those of other Claimants based on their Status as Insider Investors.**

A group of investors, previously defined as the "Chehebars," have asserted that their claims should be paid first, and in full, before any other Claimants receive any distributions in this receivership.  They take this position based on the existence of certain UCC-1 financing statements they filed, which purport to create a lien against all of CBSG's assets. This Court should not grant the Chehebars distributive priority. The Chehebars' purported liens are either expired or directly violate this Court's Order appointing the Receiver. Moreover, even if the purported liens were valid and enforceable, this Court possesses broad equitable powers in overseeing this receivership that allow it to disregard liens from Ponzi-scheme insiders. The Court should disregard the Chehebars' purported liens and approve the Receiver's classification of the Chehebars as Insider Investors.

1. **The Chehebars' liens are invalid and unenforceable against the Receivership Estate.**

   a) **The Court prohibited the Chehebars from renewing, extending, or enforcing their 2017 liens, which expired in 2022.**

In January 2017, in exchange for investing in, and loaning money to, CBSG, four of the Chehebars—GEMJ Chehebar GRAT, LLC, Albert Shehebar, Isaac Shehebar, and Isaac Shehebar 2008 AIJJ Grantor Retained Annuity Trust—executed promissory notes and security agreements, and recorded UCC-1 Financing Statements in Delaware and Pennsylvania against all CBSG's assets. [ECF No. 1889 at 15; ECF No. 1843–3 at 2]. These UCC-1 Financing Statements purported to reflect security interests that those Chehebars held against CBSG's assets (the "2017 liens").

Approximately three-and-a-half years later, in July of 2020, the Court appointed the Receiver. [ECF No. 36 (hereafter, the "Initial Receivership Order" or "IRO")]. At the time the Court entered the IRO, it had identified CBSG and several other companies as the "Receivership Entities." (*Id.* at 1). In the IRO, the Court ordered that the "Receivership Entities and *all persons receiving notice* of this Order *shall not hinder or interfere* with the Receiver's efforts to take control or possession of the ***Receivership Entities' property interests*** identified [in the IRO], or hinder his efforts to preserve them." [*Id.* ¶ 9 (emphasis added)]. The Court defined "persons receiving notice" of the IRO as including "all known officers, directors, agents, employees, shareholders, ***creditors***, debtors, managers, and general and limited partners of each Receivership Entity, as the Receiver deems necessary or advisable to effectuate the operation of the receivership." (*Id.* ¶ 6 (emphasis added)). In addition, the Court defined the "property interests" of the Receivership Entities as including their respective "business affairs, funds, assets, causes of action, and any other property." (*Id.* at 2).

When the Court entered the IRO, the Chehebars were unquestionably "persons receiving notice" thereof; they were creditors of CBSG with interests in Receivership Property by virtue of

their 2017 liens. As such, the Chehebars were precluded from "hinder[ing] or interfere[ing] with the Receiver's efforts to take control or possession of the Receivership Entities' property interests . . . or hinder[ing] his efforts to preserve them." (*Id.* ¶ 9).

The Chehebars cannot plausibly dispute that they received notice of the IRO when it was entered in July 2020. Indeed, only a few days after the Court entered the IRO, then-counsel for CBSG defendants Lisa McElhone, Joseph Barleta, James LaForte, and others (*see* ECF No. 16–18) corresponded with several of the Chehebar Investors with respect to supporting the defendants' opposition to the SEC's motion for a preliminary injunction. (*See* **Exhibit 1**) (emails from attorney Brett Berman to Isaac Shehebar regarding draft declarations). In Isaac Shehebar's and Albert Chehebar's proposed declarations, they identify themselves, their relatives, and one of the Chehebars' foundations (*i.e.,* the JENJ Foundation) as lenders of approximately $48 million to CBSG. (*See* **Exhibit 2**) (draft declarations).[5] Thus, even if the Chehebars did not learn of the IRO on the day it was entered (*i.e.*, July 27, 2020), they received notice of it a few days later (*i.e.*, July 30, 2020), at the latest.

In January 2022, the Chehebar's 2017 liens expired. *See* Del. Code Tit. 6, § 9-515(a) (providing a general effectiveness period of 5 years for financing statements); 13 Pa. C.S. § 9515(a) (same). The Chehebars failed to request leave of Court to file continuation statements for the 2017 liens, and failed to file continuations, as required by both Delaware and Pennsylvania UCC codes to maintain the 2017 Financing Statements' effectiveness. *See* Del. Code Tit. 6, § 9-515(c)–(e); 13 Pa. C.S. § 9515(c)–(e).

---

[5] These attorneys withdrew from representing the corporate defendants, CBSG and Full Spectrum Processing, about a week after corresponding with Isaac Shehebar and Albert Chehebar. (*See* ECF Nos. 139, 158). Subsequently, the Receivership Entities and individual defendants consented to the entry of permanent injunctions, so the proposed declarations were never filed. (*See* ECF No. 391).

The Chehebars previously argued that they were not required to re-record or file continuations for the 2017 liens because the rights of creditors should be considered "fixed" on the date the Receiver was appointed, as is purportedly the case in bankruptcy. (ECF No. 1889 at 16). But there is no support for this position. The Delaware and Pennsylvania UCC codes do not carve out such an exception. Notably, the Chehebars have cited only bankruptcy cases for this argument—they do not identify a single receivership case where this practice was followed. *See Liberte Cap. Grp., L.L.C. v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (distinguishing between bankruptcies, for which "Congress has spoken by setting forth broad and detailed statutes to guide federal courts[,]" and equity receiverships, which "fall outside the statutory bankruptcy proceedings" and are instead governed by "the traditional, common law powers of equity").

Moreover, even in the bankruptcy context, the Chehebars' purported authority, *Toranto v. Dzikowski,* is shaky, at best. *See*, 380 B.R. 96, 100 (S.D. Fla. 2007). *Toranto* relied on a 1987 bankruptcy opinion, *In re Neuenschwander*, 73 B.R. 327 (Bankr. S.D. Fla. 1987), which was decided before the 1994 amendment of the Bankruptcy Code. Subsequent cases have specifically rejected *In re Neuenschwander's* holding, because there is no support in the **current** Bankruptcy Code that "a creditor's rights are frozen on the petition date excusing it from maintaining its secured position during the administration of the case for purposes of an objection to claim." *See In re 800 Bourbon St., LLC*, 541 B.R. 616, 626 (Bankr. E.D. La. 2015). Rather, the current Bankruptcy Code provides that, upon filing a petition for bankruptcy, there is an automatic stay of, among other things, "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. 362(a)(4). The automatic stay "does not operate as a stay," however, of actions "to maintain or continue the perfection of" an interest in property of the estate." 11 U.S.C. 362(b)(3). In other words:

> The Bankruptcy Code specifically allows creditors . . . to file continuation statements without violating the automatic stay. As stated above, property rights are determined by state law. The fact that a lien exists on the petition date does not mean that the lien cannot be lost if the lienholder fails to comply with state law.

*In re 800 Bourbon St., LLC*, 541 B.R. at 627.

Moreover, the Delaware UCC specifically provides that a debtor's entering bankruptcy or other insolvency proceeding ***does not*** toll the lapse of a financing statement. *See* Del. Code Tit. 6, § 9-515, Cmt. 4. Rather, the Delaware UCC "deletes the former tolling provision and thereby imposes a new burden on the secured party: to be sure that a financing statement does not lapse during the debtor's bankruptcy." *Id*. If the secured party wishes to preserve its priority status, it ***must*** file a continuation statement, which can be accomplished in a bankruptcy proceeding without obtaining relief from the automatic stay. *Id*. The Pennsylvania UCC is identical to the Delaware UCC on this issue. *See* 13 Pa. C.S. § 9515, Cmt. 4. In other words, current bankruptcy and UCC law is directly contrary to the arguments the Chehebars previously advanced about whether they were required to take any action to preserve the priority of their 2017 liens.

Similarly, in this receivership action, the Chehebars were obligated to act if they desired to maintain any priority rights that might have existed under their pre-receivership liens. If they intended to continue the effectiveness of those 2017 liens or record new liens—which would have violated the IRO and Amended Receivership Order [ECF No. 141] (the "ARO")—they were required to seek leave of Court to extend the liens. This is no different than the many litigants over the past several years who requested and obtained this Court's permission to pursue litigation or take other action to enforce their legal rights in connection with cases in which Receivership Entities were parties. (*See, e.g.,* [ECF Nos. 1422, 1481, 1325]). But the Chehebar Investors never asked the Receiver for his position on such a request. Nor did they request or obtain this Court's permission to file continuations of the 2017 liens after the Court entered the IRO. Thus, the 2017

liens expired under applicable state law in 2022, five years after they were filed.  *See* Del. Code Tit. 6, § 9-515(a); 13 Pa. C.S. § 9515(a).  Having failed to follow the Court's orders and, as a result, having failed to follow state legal procedures in place to preserve any effectiveness of their 2017 liens, the Chehebar Investors cannot now enforce the invalid and expired 2017 liens.

**b)**   **The Chehebars defied the Court's Order by recording additional liens on Receivership Property in August 2020.**

Ten days after the Court entered the IRO, on August 7, 2020, the Chehebars recorded an additional set of liens (the "2020 liens"). [ECF No. 1889-5]. Four of the 2020 liens were efforts to re-record the interests reflected in the 2017 liens, though not filed as continuations and falling outside the six-month continuation period provided for under Delaware and Pennsylvania law. *See* Del. Code Tit. 6, § 9-515(d); 13 Pa. C.S. § 9515(d). The remaining 2020 liens were newly recorded liens on behalf of the other Chehebars who had not previously recorded a lien, specifically: Michael Chehebar, Ezra Chehebar, Cheric Chehebar, Josef Chehebar, Ezra Shehebar, LLC, Steven Chehebar, and Joyce Chehebar. [ECF No. 1889-5].

Regardless, ***all*** the 2020 liens defied the Court's July 27, 2020 IRO, which prohibited noticed persons—including the Chehebars—from taking action that would:

> . . . ***interfere with the Receiver's efforts*** to take control or possession of the ***Receivership Entities' property interests*** identified [in the IRO], or hinder his efforts to preserve them.

IRO ¶ 9 (emphasis added).

The intent behind the IRO was clear. Indeed, just days later, on August 13, 2020, the Court entered the ARO, which clarified the preexisting provisions in the IRO and expanded it in other ways. Like the IRO, the ARO enjoined certain actions involving "Receivership Property" without the Receiver's ***express and written agreement***, including actions that:

- 20 -

> *. . . **interfere with the Receiver's efforts** to take control, possession, or management of **any Receivership Property**; such prohibited actions **include, but are not limited to**, . . . **creating or enforcing a lien upon any Receivership Property**; . . .*

*Id.* ¶ 29, § (A) (emphasis added).

The Chehebars seem to concede that they were prohibited from recording liens ***after*** the entry of the ARO on August 13, 2020, but have taken positions in this receivership suggesting that they believe they were permitted to record them on August 7, 2020, following the entry of the IRO. [ECF No. 1889 at 16]. This defies logic.  The relevant language in the IRO and the ARO, cited above, is nearly identical. Both Orders forbid interference with the Receiver's efforts to take control, possession, or management of CBSG assets. The ARO merely reiterated the prohibition of interference from the IRO, and included a list of examples of specific actions that would have constituted interference with the Receiver's efforts to take possession of Receivership Property—including creating or enforcing a lien upon any Receivership Property. *See* ARO ¶ 29, § (A).

Despite the IRO's clear intent to prohibit conduct that would hinder the Receiver's efforts to take control of and preserve CBSG's property interests, the Chehebars nevertheless recorded the 2020 liens in August 2020 against *all* CBSG assets, holdings, interests and accounts—in clear violation of the IRO. Because filing the 2020 liens violated this Court's clear Order and directive, they are void *ab initio*. *See* IRO ¶ 9. In addition, for the same reason, they are wrongfully filed under Delaware and Pennsylvania law. *See* Del. Code Tit. 6, § 9-518(a); 13 Pa. C.S.  § 9518(a). The 2020 liens are ineffective and invalid, and this Court should reject the Chehebars' attempts to invoke them to attain distributive priority.

### c)    Prioritizing the Chehebars' claims would frustrate the Receiver's obligation to strive for equitable results benefiting all Ponzi scheme victims.

Even if the Court were to conclude that the Chehebars' 2017 liens had not expired or that their 2020 liens did not defy the Court's Orders—which it should not, for the reasons explained

above—the Receiver should not be forced to honor the Chehebars' liens over the claims of Defrauded Investors because the Chehebars are Insider Investors[6] who aided-and-abetted the Defendants in this case to perpetrate the CBSG Ponzi scheme. As a result, the Court should approve the Receiver's classification of the Chehebars as Insider Investors.

> i. *Courts have broad equitable powers to displace or limit Insider-Investor property interests in receiverships.*

It is often the case in equitable receiverships that "equality is equity." *See Cunningham v. Brown,* 265 U.S. 1, 13 (1924) (circumstances surrounding Charles Ponzi's scheme "call strongly for the principle that equality is equity"). As a result, the exercise of equity powers sometimes results in forfeited or superseded rights. *SEC v. Credit Bancorp, Ltd.*, No. 99-cv-11395, 2000 WL 1752979, at *17 (S.D.N.Y. Nov. 29, 2000) (". . . equitable principles may supersede rights investor would have under other law. . ."). For example, "[a]s an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits [and] . . . determine how and to whom the money will be distributed . . ." *SEC v. Fishbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997); *see also Credit Bancorp*, 2000 WL 1752979, at *19 ("[T]his is a case in which numerous victims of a fraud have competing claims to a limited receivership *res*. The relief sought by the [i]ntervenors would come at the direct expense of the other . . . victims."). A Receivership's equitable powers can also supersede state law rights to recover assets through tracing. *United States v. Vanguard Inv. Co.*, 6 F.3d 222, 226 (4th Cir. 1993) ("[E]ven if entitlement [to trace assets] under state law could be established, that wouldn't end the matter in this federal receivership.").

Consistent with these guiding equitable principles, courts routinely allow receivers to deny claims made by insiders to a fraudulent investment scheme, even where there is insufficient

---

[6] Insider Investors are defined as investors "who provided funding to the Receivership Entities, but were involved in the underlying fraud or otherwise had access to additional information not made available to the Defrauded Investors." [ECF No. 1843 at 10].

evidence regarding the insiders' knowledge of the underlying fraud. *See, e.g., SEC v. Pension Fund of Am. L.C.*, 377 F. App'x 957, 963 (11th Cir. 2001) (upholding plan that excluded sales agent who received commissions for recruiting investors although he had no knowledge that the investment fund was fraudulent); *SEC v. Merrill Scott & Assocs., Ltd*., No. 2:02-cv-39, 2006 WL 3813320, at *11 (D. Utah Dec. 26, 2006) (approving distribution plan that excluded an investor who claimed to have no knowledge of the fraudulent nature of the investment scheme because he was an "insider" who was involved in the operation of the scheme and allowed his name to be used to recruit additional investors).

ii.   *CBSG was a long-running Ponzi Scheme.*

In June 2024, the Court concluded that CBSG operated as a Ponzi scheme. [ECF No. 1976]. To reach that conclusion, the Court carefully considered the "well-developed record," which contained "overwhelming evidence" supporting the Receiver's position that CBSG was a Ponzi scheme from at least as early as 2012 through the Receiver's appointment in 2020. (*Id*. at 11–12).

The Court made several findings of fact in support of its CBSG Ponzi scheme determination. First, the Court concluded that CBSG accepted substantial deposits from investors between 2012 and 2019—at least $478.6 million worth. [ECF No. 1976 at 23]. The Court further concluded that, although ostensibly floating promissory notes, CBSG was in fact soliciting investments subject to the Securities Act. [*Id*., *citing* ECF No. 1032].

Second, the Court found that CBSG conducted little-to-no legitimate business operations. Although some aspects of the business were legitimate, "CBSG's overall operations were not legitimate." [ECF No. 1976]. Indeed, as this Court concluded, CBSG operated at a loss "for eight straight years[,] . . . declined to account for uncollectable debt[,] . . . [and] maintained an artificially higher advance balance through its 'reload' practice, which served no legitimate business purpose." [*Id*. at 23–24].

Third, the Court concluded that CBSG's business operations produced little-to-no business profit. The core of its business resulted in a net-cash deficit of hundreds of millions between 2012 and 2019. External auditors identified millions in losses during their engagements. (*Id*.) Despite significant losses, CBSG continued to distribute tens of millions to its principals and other insiders like the Chehebars. [*Id.*].

Fourth, CBSG's businesses did not generate cash sufficient to cover its operating expenses and thus paid existing investors with funds from new investors. [*Id*. at 25]. From 2012 through 2019, the company suffered a net cash deficit of $301.3 million from its operations and constantly required new investor funds. During this period, CBSG raised $478.6 million in investments and distributed $136.5 million to investors—principal and interest payments that were entirely dependent on newer investor proceeds. [*Id*.].

Given this overwhelming evidence, the Court concluded that CBSG was a "textbook Ponzi scheme." [*Id*.].

### iii.    *The Chehebars were CBSG Insiders.*

For years, the Chehebars were involved and uniquely positioned in CBSG—a "textbook" Ponzi scheme. Under the direction of certain family members who took primary responsibility for overseeing these investments, the Chehebars operated collectively, shared information, and invested as a family. (*See* **Exhibit 2**) (draft declaration of Isaac Shehebar, indicating that Isaac Shehehbar, "[o]n behalf of my family," was "intimately involved in [his] family's loan of approximately $48 million with CBSG."); (s*ee also* **Exhibit 3**) (emails arranging group Zoom meetings between GBSG and the Chehebars).

Two of the most significant misrepresentations that CBSG and its principals made to investors—which were the foundation of the SEC's claims in this case—involved Joseph LaForte's criminal background and the true financial performance of CBSG.  Unlike the defrauded

investors in this case, the Chehebars were aware "from day one" that LaForte had multiple felony convictions in his past.  (*See* **Exhibit 1**) (email from attorney Brett Berman to Isaac Shehebar, attaching draft declarations that were "done based on the notes [Berman] took from the call yesterday").  In fact, "[n]othing was kept secret" from the Chehebars, and they "were fully aware of how CBSG conducted its business and who was involved in the business." (*See* **Exhibit 2**) (draft declarations of Albert Chehebar and Isaac Shehebar, which were intended to support Defendants' opposition to motion for preliminary injunction in this case).

The Receiver has reviewed several categories of evidence, including text messages between various Chehebar family members and CBSG's key insiders, voluminous emails, internal accounting records (*e.g.,* profit-sharing calculations), and bank records. These records evidence the date, amount, and cadence of various investments into, and profit-sharing distributions and commissions received from, CBSG.  Based on that review, and for the reasons articulated below, the Chehebars are markedly different than other investors, and more analogous to CBSG's senior managers.

Indeed, the Chehebars' access to information—much of which information undergirds the Court's determination that CBSG was a Ponzi scheme—was broad and surpassed only by the Defendants; many of whom have been indicted in the United States District Court for the Eastern District of Pennsylvania for their involvement in this fraudulent operation. Abundant evidence supports the Receiver's designation of the Chehebars as CBSG Insider Investors.

(a)    *Access to CBSG Financial Records.*

CBSG was an elaborate ruse to the Defrauded Investors and other outsiders, who believed they were investing in a profitable merchant cash advance business. But CBSG was no mystery to the Chehebars. The Chehebars had near unparalleled access to CBSG's confidential internal accounting records, weekly cash reports, and key performance indicators. For example, CBSG sent

weekly cash summaries to the Chehebars, showed the granular details of the company's financial performance, including the actual versus projected weekly deposits, new funding, and returned payments, as depicted below:

**Par Funding Weekly Cash Summary - 12/09/16**

| | | |
|---|---|---:|
| Cash Accounts: | $ | 1,932,382.90 |
| ACH Reserve: | $ | 1,269,375.57 |
| Outstanding Checks: | $ | (18,501.15) |
| Deals Pending: | $ | (4,223,184.63) |
| Credit Cards: | $ | (14,307.00) |
| Accounts Receivable: | $ | 55,470,454.09 |
| YTD Bad Debt: | $ | 5,165,191.94 |
| **Total:** | **$** | **59,581,411.72** |
| | | |
| Deposits This Week: | $ | 1,909,866.53 |
| Projected Deposits: | $ | 1,649,332.40 |
| **Deposits Needed:** | **$** | **(260,534.13)** |
| | | |
| Funded This Week: | $ | 2,568,508.35 |
| Projected New Funding: | $ | 1,840,416.67 |
| **New Funding Needed:** | **$** | **(728,091.68)** |
| | | |
| Returned Payments This Week: | $ | (30,795.52) |
| Recovered Returned Payments: | $ | 20,213.28 |
| **Net Returned Payments:** | **$** | **(10,582.24)** |
| | | |
| Projected Returned Payments: | $ | (82,466.62) |
| **Returned Payment Difference:** | **$** | **(71,884.38)** |
| **Recovery Percentage:** | | **65.6%** |

**Joe Cole**
**CFO**
PAR
FUNDING.
141 N 2nd St
Philadelphia, PA 19106
Office 1: 215.613.4126
Office 2: 215.922.2636 x106
Cell: 949.232.2463

(*See, e.g.,* **Exhibit 4**) (Chehebar Weekly Cash Summary Report); (*see also* **Exhibit 5**) (emails reflecting Chehebar access to additional financial information). Some CBSG financial records that the Chehebars had access to were not even available to CBSG's auditors or attorneys, let alone the Defrauded Investors.

Moreover, the Chehebars' access to CBSG's financial records went well beyond historical financial information and summary reports. Contemporaneous communications show that CBSG provided the Chehebars with direct access and passwords to view CBSG's bank accounts, providing real-time access to CBSG finances. (*See* **Exhibit 6**) (email from Joe Cole to the

Chehebars, providing them with direct online access to CBSG's bank account). CBSG did not extend this privilege to anyone else, beyond its own senior management.

Finally, beyond informal access, the Chehebars were allowed to send their own accountant to audit CBSG, a privilege not extended to other Investors. (*See* **Exhibit 7**) (emails between Joe Cole, the Chehebars, and their accountant, regarding audit rights into CBSG in 2016). And, in fact, the Chehebars exercised this right, conducting a detailed review of the financial records of CBSG. (*See* **Exhibit 8**) (emails from Joe Cole to the Chehebars and their accountant, providing detailed financial information for review).

The Chehebars' unique access to CBSG's financial accounts and information places them in a far different situation than Defrauded Investors.

> (b)     *The Chehebars profited from recruiting new investors through formal agreements with CBSG.*

As this Court identified in its determination that CBSG was a Ponzi scheme, a defining characteristic of any Ponzi scheme is substantial investment and improper use of new investor proceeds. [ECF No. 1976 at 23–25]. The lead family members of the Chehebars formally assisted CBSG and the CBSG defendants in this regard—for profit. For example, in 2017, Issac Chehebar signed a consulting agreement with CBSG, aimed at the singular purpose of compensating him for bringing in new investor proceeds, which further fueled the Ponzi scheme:

> (1) in consultation with the Company, Consultant shall assist the Company in establishing contact with potential Investors; it being understood that there is no guaranty that Consultant will be able to identify or establish contact with any such potential Investors satisfactory to the Company other than those previously identified;

(*See* **Exhibit 9**) (Issac Chehebar Consulting Agreement).

Under the terms of the five-year consulting agreement, Issac Chehebar was handsomely compensated, receiving a profits-based bonus based in part on ***gross*** funding (*i.e.,* the gross amount

of advances to GBSG's factoring business, regardless of whether such funds were provided by Investors or other sources, and regardless of whether CBSG actually generated a profit on those advances). (*Id.* at 2–3). Between 2017 and 2020, Issac Chehebar received $977,200.99 in commissions for recruiting and raising additional funds from new investors. These new monies played a crucial role in perpetuating the CBSG Ponzi scheme.

Issac Chehebar was not the only Chehebar to sign a consulting agreement. GEMJ Chehebar GRAT, LLC, also served as a recruiter for CBSG pursuant to a consulting agreement. (*See* **Exhibit 10**) (GEMJ Chehebar GRAT, LLC Consulting Agreement). That agreement, executed in January 2017 by manager Josef Chehebar, bearing the same scope of work, using the same gross-funding compensation formula, and offering an even higher profit percentage, helped raise additional investor funds to prop up the CBSG Ponzi scheme. (*Id.*). In return, CBSG paid GEMJ Chehebar GRAT, LLC $1,378,388.25 in "consulting fees." Thus, through their efforts in ensuring additional investor funds were available to keep the Ponzi scheme afloat, the Chehebars, collectively, profited to the tune of $2,355,589.24 in "consulting fees." (*See* **Exhibit 11**) (CBSG Consulting Payments Summary, previously filed as part of McElhone, LaForte and Cole's Notice of Filing Exhibits to Amended Responses in Opposition to Motion for Final Judgments, ECF No. 1330-6).

Courts heavily weigh the existence of such commission-based earning in insider-status determinations, even where no evidence exists that the insider had knowledge of the illicit nature of the Ponzi scheme. *See, e.g.*, *Merrill Scott & Assocs., Ltd.*, 2006 WL 3813320, at *11 (approving distribution plan that excluded an investor who claimed to have no knowledge of the fraudulent nature of the investment scheme because he was an "insider" who was involved in the operation of the scheme and allowed his name to be used to recruit additional investors); *S.E.C. v. Basic Energy & Affiliated Res., Inc.,* 273 F.3d 657, 660–51, 667 (6th Cir. 2001) (upholding distribution

plan that reduced the recovery for any investor who received a commission for referring additional investors); *S.E.C. v. Pension Fund of Am. L.C.,* 377 F. App'x 957, 963 (11th Cir. 2010) (upholding distribution plan that excluded a sales agent who received commissions for recruiting investors when the agent had no knowledge the pension fund was a fraudulent investment scheme). And, in this receivership, this Court has likewise placed great weight on the receipt of commissions by other individuals involved in raising investor funds when deeming them Insiders. [ECF No. 1976 at 35–36] (". . . there is sufficient evidence that [Michael] Tierney was involved in wrongdoing in connection with his actions of raising funds for CBSG. But, even if that were not the case, there would be a sufficient basis for rejecting his claim based on his status as a sales agent and, thus, an insider. . ."). For this reason alone, the Chehebars should be classified as Insider Investors.

*(c)     Access to CBSG Decision-Makers.*

Beyond the Chehebars' near-unqualified informational access and their participation in bringing new money into the Ponzi scheme, the Chehebars had atypical, direct, and continuous access to CBSG's key decision-makers, including Defendants Joseph LaForte, Perry Abbonizio, and Joe Cole. Text messages with the Chehebars—which display a mutual sense of trust, admiration, and loyalty—show that the Chehebars and CBSG's principals worked jointly and cooperatively to solicit investors, analyze non-merchant cash advance investment opportunities, and resolve other business matters. For example, the Chehebars and CBSG principals were engaged in a cannabis venture together. (*See* **Exhibit 12**) (messages between Ezra Chehebar and Joseph LaForte a/k/a "Joe Mack"). Their conversations display extensive collaboration, mutual trust, and common purpose. (*See* **Exhibit 13**) (conversations displaying coordination between Chehebars and CBSG to recruit new investors and launch new businesses); (*see* **Exhibit 14**) (collected correspondence discussing trust and family-like relationship between CBSG principals

- 29 -

and Chehebars); (*see* **Exhibit 15**) (collected correspondence showing access to decision makers and common purpose).

Access to these decision-makers paid dividends throughout the Chehebars' relationship with CBSG. The Chehebars received significant payments from CBSG, recouping "interest" payments totaling more than 50 percent of their invested principal. (*See* **Exhibit 16**) (summary of Chehebar claims in receivership).

> (d)     *Participation in "profit"-sharing pool.*

The nature of the Chehebars' stake in CBSG also weighs in favor of concluding that they were Insider Investors. The Chehebars participated in CBSG's profit-sharing pool, under which they received "waterfall" bonuses. (*See* **Exhibit 17**) (CBSG Profit Sharing 2018 Spreadsheet showing profit sharing for CBSG's inner-sanctum, including Chehebars). Specifically, they received a percentage-based commission calculated from the ***gross*** amount of new merchant cash advances that CBSG ***funded*** on a quarterly basis.  In normal circumstances, and even if the Chehebars had an equity-stake in CBSG, one would expect they would only share in the ***net profits*** CBSG derived from these deals, which inherently account for potential losses associated with non-performing accounts. Not so here. (*See* **Exhibit 18**) (Corrected Declaration of James Klenk dated August 17, 2020, ¶¶ 7–12).

Notably, the Chehebars were the only investors that received these financial incentives. Not even CBSG's largest agent fund managers, including Defendants Dean Vagnozzi and John Gissas, were offered such opportunities.  Indeed, the other people that received these financial incentives were Chuck Frei (a prior "finder" for CBSG, who introduced the Chehebars to CBSG,[7]

---

[7] (*See* **Exhibit 19**, Chehebar-Subp-009153 (introductory meeting between Chuck Frei, Isaac Shehebar, and CBSG in April 2016); Chehebar-Subp-007757 (Joe Cole sending promissory notes and security agreements to Chuck Frei for initial Chehebar investments, and discussing payment of "commissions" to Frei for introduction)).

and who was convicted on three felony counts for defrauding the federal government in an unrelated scheme[8]), and CBSG's senior executives who directly conducted the Ponzi scheme (such as Defendants Joseph Laforte, Lisa McElhone, Perry Abbonizio and Joe Cole, all of whom have been indicted criminally for their involvement in the fraudulent operations of CBSG).

(e)    <i>Facially absurd rates of return.</i>

The Chehebars are sophisticated businesspeople and accredited investors. The family owns Rainbow Shops, a privately-held retail apparel chain "with over 1,000 locations in the United States, Puerto Rico, US Virgin Islands"[9] and, according to its own marketing firm, annual revenues exceeding $1 billion.[10] Moreover, the Chehebars have consistently been represented by elite international law firms in their business dealings.

Yet the Chehebars engaged with CBSG and invested pursuant to promissory notes guaranteeing up to ***30 percent*** in annual interest payments, and for terms as long as six years. (ECF No. 1330-5). The notes' interest rates consistently ranged from 18 percent to 30 percent, with the majority offering 25 percent and 30 percent interest. (*Id.*) In total, the Chehebars received returns of over $28.5 million through these promised rates of return, which far exceed any measure of normal market returns. (*See* **Exhibit 16**) (Summary of Chehebar claims in receivership). Indeed, the Chehebars executed most of these high-interest-rate notes between 2017 and 2020, over a period when prime rates ranged between approximately 3.25 percent to 5.5 percent.[11] Such guaranteed rates of return over long periods in a low-interest-rate environment are absurd, facially

---

[8]  (*See* **Exhibit 20**, Docket Sheet, *United States v. Frei*, Case No. 1:18-cr-00822-JSR-1 (S.D.N.Y.)).

[9]  (*See* **Exhibit 21**, Rainbow Shops Website, "About Us" Page, available at https://www.rainbowshops.com/pages/about-us (last accessed Aug. 23, 2024)).

[10]  (*See* **Exhibit 22**, CB/I Digital Website, "Case Study - Rainbow Shops" Page, available at https://www.cbidigital.com/case-study-rainbowshops (last accessed Aug. 23, 2024)).

[11]  (*See* **Exhibit 23**, Federal Reserve Bank of St. Louis, Historical Bank Prime Loan Rate Changes, available at https://fred.stlouisfed.org/data/PRIME (last accessed Aug 23, 2024)).

unreasonable, signal illegality, and serve as common trademarks of textbook Ponzi schemes—like CBSG. The sophisticated Chehebars nonetheless participated in (and profited from) the Ponzi scheme, formally recruited others to participate, and maintained a close relationship with CBSG's principals.

The Chehebars' continuous access to absurdly high, guaranteed return rates was also exclusive. CBSG's other investors received a fixed percentage pursuant to a promissory note, and that interest rate was slashed at the outset of the COVID-19 pandemic. [ECF No. 1, Compl. at ¶¶ 124-141]. The Receiver has reviewed the records of the Receivership Entities, including communications between CBSG's executives and the Chehebars, and there is no evidence that the Chehebars ever agreed to an "Exchange Offering," whereby these promised rates of return would be reduced significantly for a period of many years.

(f)     <i>VIP Access to CBSG Investment Classes.</i>

Finally, LaForte gave the Chehebars access to invitation-only investments in non-merchant cash advance businesses, such as mining and hemp/marijuana-related ventures. Emails also evidence that some of the Chehebar family members were involved in the management of, and made granular operational decisions for, the non-merchant cash advance businesses they jointly invested in with Laforte. (*See* **Exhibit 24**) (Composite of emails between Chehebars and other CBSG insiders). Indeed, the Chehebars facilitated LaForte's access to exclusive investment opportunities, seemingly in return for equity-type interest in GBSG.

In sum, record evidence provides strong support for the Receiver's conclusion that the Chehebars were Insider Investors at CBSG and should be treated as such in equity. On the other hand, there has been no evidence advanced that would exculpate or materially mitigate the Chehebars' insider involvement with CBSG. The Chehebars—having propped up the Ponzi

scheme and profited from it for many years—should not be entitled to the return of their full investment before the Defrauded Investors receive a pro rata share of their net investment.

### 2.   **The Chehebars' reliance on Wells Fargo is misplaced.**

The Chehebars have relied on *SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339 (11th Cir. 2017), to argue that their purportedly valid 2017 and 2020 liens should grant them priority over other claimants. [ECF No. 1889 at 8–15]. As explained above, neither the 2017 liens nor the 2020 liens are valid.  But even if that were not the case, *Wells Fargo*'s holding does not usurp or limit a district court's inherent equitable power over a receivership. In *Wells Fargo*, the district court established a claims-administration process wherein claimants were required to submit to the receiver "proof of claim" documentation by a certain date. Any claims submitted after the deadline would be barred, without regard to whether the creditors were secured or unsecured. *See Wells Fargo*, 848 F.3d at 1342. Wells Fargo, a creditor, had perfected security interests through mortgages on typical loans it advanced for three receivership properties, but missed the deadline to submit claims on two of the properties. The district court held that, notwithstanding Wells Fargo's status as a secured creditor, it was obliged to follow the claims administration procedures set forth in the court's orders. *Id*. at 1342–43.

The Eleventh Circuit reversed, holding that a district court "does not have the authority to extinguish a creditor's pre-existing state law security interest," and that the court erred by "order[ing] a secured creditor to either file a proof of claim and submit its claim for determination by the Receivership court or lose its secured state-law property right that existed prior to the Receivership." *Id.* at 1344–45. Stated differently, *Wells Fargo* does ***not*** hold that receivers must prioritize purportedly secured claims of insiders to a fraudulent scheme over the unsecured claims of victims.

*Wells Fargo* is distinguishable from the situation here. *Wells Fargo* involved a non-investor, outsider mortgagee whose secured interests in property predated by years the receivership and SEC enforcement action. *Compare Sec. & Exch. Comm'n v. Nadel*, No. 8:09-CV-87-T-26TBM, 2016 WL 398026, at *4 (M.D. Fla. Feb. 2, 2016), *rev'd sub nom. Wells Fargo Bank, N.A.*, 848 F.3d 1339, *with Nadel*, No. 8:09-CV-87-T-26TBM, Decl. Burton W. Wiand, ECF No. 1210 ¶¶ 6–7 (indicating that the secured interests at issue in *Wells Fargo* originated in 2006 and 2008). Unlike *Wells Fargo,* where the underlying legality of the secured interest was not at issue, here, the validity of the Chehebars' purported priority interests is directly at issue. Through these liens—many of which they recorded immediately after CBSG's owners informed them about the SEC's fraud allegations in this case—the Chehebars attempt to enforce purported contractual rights that they obtained in connection with their knowledge of and involvement in, and against property derived from, a Ponzi scheme.

Put differently, the purported contractual rights the Chehebars recorded and seek to enforce arise from the very fraud they were involved in perpetuating. Moreover, Wells Fargo's lien was secured against select, identifiable receivership assets. Here, in contrast, the Chehebars seek to encumber and establish their priority to recover from ***all assets*** of CBSG. Indeed, as detailed above, the Chehebars—without the Receiver's prior authorization and in defiance of this Court's IRO—recorded UCC liens against all CBSG assets. And, most shockingly, the Chehebars are asking this Court to grant them superior lien rights over CBSG's assets based on interests they tried to create ***after*** they learned about the SEC's lawsuit in this case, and after allegations that the company was operating an illegal and fraudulent business became public.

The heightened equity concerns that are present here were not at issue in *Wells Fargo*, a decision fundamentally addressing waiver of an outside party's recorded property interests.

Although the Eleventh Circuit understandably turned to bankruptcy principles to decide *Wells Fargo*, the decision did not address issues bearing on a receivership's considerable equitable powers. The Court should not interpret *Wells Fargo* as curtailing a court's authority to fashion equitable results here. As Judge Altonaga recently explained:

> Certainly, there are cases in which courts fashioning relief in the equity receivership context find 'bankruptcy law . . . analogous and instructive[.]' But the two bodies of law are distinct in that one must acquiesce to the bankruptcy code, while the other serves equity alone.

*SEC v. TCA Fund Mgmt. Grp. Corp.*, No. 20-cv-21964, 2022 WL 17816956, at *4 (S.D. Fla. Dec. 2, 2022) (internal citation omitted) (alterations in original) (quoting *Wells Fargo*, 848 F.3d at 1344); *see also Capwill*, 462 F.3d at 551 (distinguishing between bankruptcy, for which "Congress has spoken by setting forth broad and detailed statutes to guide federal courts[,]" and equity receiverships, which "fall outside the statutory bankruptcy proceedings" and are instead governed by "the traditional, common law powers of equity"), *discussed by TCA Fund,* 2022 WL 17816956, at *4.

Bankruptcy law, while occasionally helpful in equity receivership cases, does not control the result here. *See TCA Fund Mgmt. Grp. Corp.*, 2022 WL 17816956, at *4 (citing *CFTC v. Eustace*, No. 05-cv-2973, 2008 WL 471574, at *7 (E.D. Pa. Feb. 19, 2008)). For example, in *TCA Fund,* the court assessed whether equity "compels preferential treatment" for creditors over defrauded investors with respect to distributions of receivership property. 2022 WL 17816956, at *5. The creditors asked the court to look to the bankruptcy code, "which instructs that creditors must be 'paid in full before any funds can be returned to a bankrupt entity for the benefit of the entity's shareholder or []members.'" *Id.* (citing 11 U.S.C. § 507(a)). Although the court acknowledged that one of the "general principles in bankruptcy law is that creditors are typically paid ahead of shareholders in the distribution of corporate assets," that "firm bankruptcy principle

- 35 -

rests on shakier foundations in the equity context." *TCA Fund,* 2022 WL 17816956, at \*5 (internal citation and quotations omitted) (quoting *In re Am. Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir. 2007)). That is because, when reviewing proposed distribution plans in a receivership, "courts strive for equality, not priority." *TCA Fund,* 2022 WL 17816956, at \*5 (internal citation, quotations and alterations omitted) (quoting *Cunningham*, 265 U.S. at 13).

*Wells Fargo* should not be read to discount the equitable power of a district court when presiding over a receivership. No aspect of that decision calls for such an interpretation. Indeed, to do so would create perverse incentives for insider investors and other culpable parties—upon learning of the impending collapse of the fraudulent scheme—to rush (like the Chehebars did here) to record purported interests and interfere with a Receiver's duties and control over receivership assets.

> **3.     Equity requires the subordination of the Chehebars' claims, which should be classified as Insider Investor claims.**

Regardless of the existence of the Chehebars' liens, questions regarding the validity and priority of the Chehebars' claims would still reduce to whether the Chehebars, as Insiders, are entitled to preferential treatment over all other claimants. Given the above-detailed evidence of the Chehebars' Insider Investor status, the Court should so classify them and reject their requests for preferential treatment.

"[D]istrict courts have very broad powers and wide discretion to fashion remedies and determine to whom and how the assets of the Receivership Estate will be distributed." *SEC v. Homeland Commc'ns Corp.*, No. 07-cv-80802, 2010 WL 2035326, at \*2 (S.D. Fla. May 24, 2010). "This discretion derives from the inherent powers of an equity court to fashion relief." *SEC v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992). And, any action of a trial court supervising a receivership will not be disturbed unless there is a clear showing of abuse." *Bendall v. Lancer*

*Mgmt. Grp., LLC*, 523 F. App'x 554, 557 (11th Cir. 2013). "A distribution plan that is supported by both the SEC and the receiver is entitled to deference from the Court." *SEC v. Quan*, No. 11-cv-723, 2015 WL 8328050, at *6 (D. Minn. Dec. 8, 2015), *aff'd,* 870 F.3d 754 (8th Cir. 2017), *quoted by Alleca*, 2017 WL 5494434, at *2–3. In other words, "no specific distribution scheme is mandated so long as the distribution is fair and equitable." *Homeland*, 2010 WL 2035326, at *2; *see also Elliot,* 953 F.2d at 1570; *SEC v. Drucker*, 318 F. Supp. 2d 1205, 1207 (N.D. Ga. 2004).

As detailed above, the Chehebars' access to information, profit-sharing rights, and access to CBSG decisionmakers and opportunities were nearly unparalleled in the CBSG Ponzi scheme. Some Chehebars were even paid millions of dollars to recruit additional victims whose funds were used to perpetuate the CBSG Ponzi scheme. The Chehebars are unquestionably, at a minimum, Insider Investors, and more analogous to CBSG's senior managers than to Defrauded Investors.

In view of the Chehebars' status as Insider Investors, the Court need not honor their liens—even if the Court determines that the liens are not expired and otherwise enforceable. *See, e.g., Fishbach Corp.*, 133 F.3d at 175 ("[a]s an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits [and] . . . determine how and to whom the money will be distributed . . ."); *Credit Bancorp*, 2000 WL 1752979, at *19 ("[T]his is a case in which numerous victims of a fraud have competing claims to a limited receivership *res*. The relief sought by the [i]ntervenors would come at the direct expense of the other . . . victims."); *Vanguard Inv. Co*., 6 F.3d at 226 ("[E]ven if entitlement [to trace assets] under state law could be established, that wouldn't end the matter in this federal receivership."). To the contrary, fairness and equity require the Court to reject their requests for distributive priority and warrant placing them in a lower class in the distribution plan.  Only after the Defrauded Investors recover their net

investment should insiders like the Chehebars share in any recovery of the money they provided to CBSG to perpetrate this massive Ponzi scheme.

This Court should approve the Receiver's classification of the Chehebars as Insider Investors, subordinating the Chehebars' claims to Class 8, which would be paid under the Receiver's Distribution Plan after all other Classes are paid in full.

### D.   Investors who Accepted the Exchange Offering have Priority Claims Based on the Valid UCC Lien Albert Vagnozzi, as Security Agent, Filed on their Behalf.

Albert Vagnozzi—the manager for an agent fund, Capricorn Income Fund I, LLC and Capricorn Income Fund I Parallel, LLC—recorded a UCC-1 financing statement on April 13, 2020, several months before the SEC filed this action and the Court appointed the Receiver.  (*See* **Exhibit 25**) (UCC-1 Financing Statement dated April 13, 2020).  This UCC-1 financing statement was intended to establish a priority interest over the assets of CBSG for all investors who accepted the "exchange offering" from CBSG in 2020.  Under these exchange notes, CBSG asked its investors to accept a substantially lower interest rate and extended the repayment period on these promissory notes from one year to seven years.

In exchange, CBSG promised these investors that they would be provided a recorded security interest over CBSG's assets. To accomplish this, each of the exchange notes included a provision that identified Albert Vagnozzi as the "Security Agent":

> (i)   "Security Agent" means Albert Vagnozzi, in his capacity as security agent hereunder or any successor Security Agent appointed pursuant to Section 8.01 hereof.

(*See, e.g.,* **Exhibit 26**) (Exchange Note for ABFP Income Fund 3, LLC, at p. 13).  The standard terms in each of the exchange notes and security agreements are identical, including the provisions relating to the creation of these security interests. The security agreements made clear that Albert Vagnozzi, as the Security Agent, would "file a UCC-1 Financing Statement in favor of Secured

Party and the Other Secured Lenders as secured parties having equal priority." (*Id*. at p. 45, 2(c)).

The security agreements further provided the following:

> The security interest granted hereunder shall be *pari passu* with the security interests granted by [CBSG] to the Other Secured Lenders under the Other Restated Loan Documents. . . . [T]he Security Agent, as representative of the Secured Party and the Other Secured Lenders, will file a UCC-1 Financing Statement in favor of Secured Party and the Other Secured Lenders as secured parties having equal priority . . .

(*Id*., Security Agreement at 2(b)–(c)).

The overwhelming majority of Claimants with Allowed Claims against CBSG accepted the exchange offering, which included these terms. In fact, other than the Chehebars and other investors the Chehebars recruited to CBSG (all of whom did not execute an Exchange Note), there are only four other CBSG Claimants with Allowed Claims who did not accept the exchange offering. In other words, excluding the Chehebars and the other investors they recruited, 49 of the 52 Claimants with Allowed Claims against CBSG (which includes direct investors and agent funds) accepted the exchange offering and obtained these security interests of equivalent priority.

CBSG prepared a document titled "Appointment as Security Agent," which was supposed to include an exhibit that identified each of the "Other Secured Lenders" that were intended to receive the benefit of the priority security interest from the UCC-1 that Albert Vagnozzi filed. The Receiver has reviewed the records of the Receivership Entities, but has not been able to locate that exhibit. Nevertheless, it is clear from the express terms of the Exchange Notes, which every single one of the "Other Secured Lenders" executed, that each investor who signed the Exchange Notes was identified as a represented party on whose behalf Albert Vagnozzi would be filing the UCC-1 financing statement.

An agent who is serving in a representative capacity for others is permitted to record a UCC financing statement, and establish a lien, on behalf of the represented parties. *See* Del. Code

Tit. 6, § 9-502 (a financing statement is valid if it, among other things, "provides the name of the secured party *or a representative of the secured party*" (emphasis assed)).  Additionally, it is not necessary for the financing statement to identify who the secured parties are.  *See In re Adirondack Timber Enter., Inc.*, 08-12553, 2010 WL 1741378, at *4 (Bankr. N.D.N.Y. Apr. 28, 2010) ("A financing statement, however, is effective if it names as a secured party the collateral agent and not the actual secured parties, even if it omits the collateral agent's representative capacity.").  Rather, to enforce a recorded security interest on behalf of represented parties, "the alleged representative must be able to demonstrate some source of its authority to be deemed the 'representative of the secured party.'"  *In re QuVIS, Inc.*, 09-10706, 2010 WL 2228246, at *6 (Bankr. D. Kan. June 1, 2010).

Here, the Exchange Notes—all of which were signed by an authorized CBSG representative—clearly state that Albert Vagnozzi was granted the authority to serve as the representative for each of those secured parties.  As such, each of the investors who signed the Exchange Notes and have Allowed Claims possesses a valid recorded security interest that maintains equal priority as of April 13, 2020.  The Receiver thus recommends that these investors who accepted the Exchange Note be afforded a priority claim over CBSG's assets and, therefore, be included in Class 3, as secured investors.[12]

E.      **CS2000 is an "Insider Investor" and, Therefore, Falls within Class 8.**

In the Court's Order on the Receiver's Claims Motion, the claim from Capital Source 2000 Inc. ("CS2000") was determined to be an "Allowed Claim" in the amount of $8,130,039.00.

---

[12] Relatedly, all of the "2020 Liens" that the Chehebars filed in August 2020—after learning about the SEC Complaint and the appointment of a Receiver in this case—were filed several months after April 2020, when Albert Vagnozzi filed his UCC-1 Financing Statement as a "Security Agent" for the investors who agreed to the exchange note.  Thus, even if the Chehebars' 2020 liens were valid they would be junior to the liens of the defrauded investors who executed the Exchange Notes.

Notwithstanding this determination, the Receiver reserved the right, as part of the distribution process or otherwise, to challenge CS2000's ability to receive a distribution in this case due to, among other things, its knowledge of and participation in the fraudulent conduct at issue in the underlying case.

Again, courts uniformly allow receivers to deny claims made by insiders, whether as part of the claims process or the distribution plan. *See, e.g., SEC v. Byers*, 637 F. Supp. 2d 166, 184 (S.D.N.Y. 2009) (approving distribution plan that excluded "those involved in the fraudulent scheme" and describing the plan as "eminently reasonable and [ ] supported by caselaw"); *Basic Energy & Affiliated Res., Inc*., 273 F.3d at 660–61, 667 (upholding distribution plan that reduced the recovery for any investor who received a commission for referring additional investors); *Pension Fund of Am. L.C.*, 377 F. App'x at 963 (upholding distribution plan that excluded a sales agent who received commissions for recruiting investors, even though the agent had no knowledge the pension fund was a fraudulent investment scheme). A claimant can be excluded from receivership distributions as an "insider," or have its claim subordinated to those of other claimants, when they are involved with a scheme at a "more intimate level" than the typical investor, even when the insider had no knowledge the scheme was fraudulent. *Merrill Scott & Assocs., Ltd*., No2006 WL 3813320, at *11 (approving distribution plan that excluded an investor who claimed to have no knowledge of the fraudulent nature of the investment scheme because he was an "insider" who was involved in the operation of the scheme and allowed his name to be used to recruit additional investors); *Pension Fund of Am. L.C.*, 377 Fed. Appx. at 962 (affirming denial of claim from employees, regardless of whether the employees personally committed fraud).

CS2000 was a merchant cash advance company that Joe Cole Barleta created, together with his business partner, William Bromley.  Cole utilized CS2000 to raise additional investor funds

- 41 -

and to collaborate with CBSG in advancing those invested funds to merchants. Specifically, CS2000 participated with CBSG in a syndication arrangement, under which CS2000 would provide the funding for a portion of certain merchant cash advance agreements and share in the amounts CBSG recovered from the merchants under those advances.

Cole was intimately involved in the fraudulent operations of CBSG. Indeed, Cole made the voluntary decision in this case not to contest or dispute liability based on his direct involvement in the operation of CBSG, and consented to the entry of a judgment of disgorgement and a permanent injunction based on his conduct in the fraudulent scheme. [ECF No. 1016]. Cole is also a defendant in a pending criminal case in the United States District Court for the Eastern District of Pennsylvania. According to the indictment in the criminal case, Cole was part of a Racketeer Influenced and Corrupt Organizations Act (RICO) enterprise that conspired to commit a number of predicate crimes, including crimes related to the fleecing of CBSG's many investors and concealing Joseph LaForte's true role as the person operating the company and his significant criminal history from investors. *See* Amended Second Superseding Indictment, ECF No. 136, *United States v. LaForte, et al.*, Case No. 2:24-cr-00065-MAK (E.D. Pa. Feb. 26, 2024). The indictment against Cole also alleges that he committed perjury by lying under oath during his deposition in these proceedings. *Id*.

Cole is unquestionably an "insider" at CBSG and, therefore, CS2000—which Cole operated as a sister company to CBSG—is also properly deemed an insider. As a result of its insider status, the Receiver recommends that CS2000's claim be relegated to a Class 8 Claim. Only if there are sufficient funds to satisfy the Allowed Claims of the Defrauded Investors and other Claimants with superior categories of claims should CS2000 be permitted to recover on its claim against CBSG.

F.     **John Gissas and Shannon Westhead are "Insider Investors" and, Therefore, Fall within Class 8.**

John Gissas, the principal of Retirement Evolution, was named as a Defendant in this case based on his actions in defrauding investors.  Rather than dispute these allegations, Mr. Gissas consented to the entry of a judgment of disgorgement and a permanent injunction based on his conduct in the fraudulent scheme.  [ECF No. 1131].  As part of this consent judgment, Mr. Gissas agreed to a disgorgement judgment in the amount of $1,075,000.00.

Notwithstanding his involvement in the underlying fraud scheme, Mr. Gissas has submitted two claims against the Receivership Estate.  Specifically, Mr. Gissas apparently invested some of his own money in RE Income Fund, which invested in and obtained promissory notes from CBSG.  These investments were through two entities Mr. Gissas wholly owned and controlled, Retirement Evolution Group, LLC and Blue Diamond Fund LLC.

As described above, claims from insiders are properly rejected.  *See, e.g., Byers*, 637 F. Supp. 2d at 184 (approving distribution plan that excluded "those involved in the fraudulent scheme" and describing the plan as "eminently reasonable and [ ] supported by caselaw"); *Basic Energy & Affiliated Res., Inc.*, 273 F.3d at 660–61, 667 (upholding distribution plan that reduced the recovery for any investor who received a commission for referring additional investors); *Pension Fund of Am. L.C.*, 377 F. App'x at 963 (upholding distribution plan that excluded a sales agent who received commissions for recruiting investors, even though the agent had no knowledge the pension fund was a fraudulent investment scheme).  Here, Mr. Gissas should not be permitted to receive any distributions from the Receivership Estate, thereby offsetting the disgorgement and civil penalties he agreed to pay pursuant to his consent.  As a result, the Receiver recommends that the claims of Mr. Gissas, who is undeniably an Insider, be relegated to Class 8 Claims.

Similarly, Shannon Westhead worked for Dean Vagnozzi at ABFP and was placed in charge as an agent fund manager for Pisces Income Fund, LLC.  In that role, Ms Westhead was responsible for soliciting investors for CBSG and managing their investments through Pisces. The SEC has sued Ms. Westhead, alleging that she violated the federal securities laws by offering unregistered securities to investors, and by making material misrepresentations to and omitting material information regarding the CBSG investment from these investors.  *See* Complaint, ECF No. 1, *Securities and Exchange Commission v. Shannon Westhead, et al.*, Case No. 1:23-cv-23749 (S.D Fla. Sep. 9, 2023).

Ms. Westhead has submitted a claim against ABFP Multi Strategy Investment Fund for amount she invested through that fund.  The Court has already concluded that individuals who were involved in raising funds for investment into CBSG, like Ms. Westhead, qualify as insiders. (Order, ECF No. 1976 at 35–36) (". . . there is sufficient evidence that [Michael] Tierney was involved in wrongdoing in connection with his actions of raising funds for CBSG. But, even if that were not the case, there would be a sufficient basis for rejecting his claim based on his status as a sales agent and, thus, an insider. . .").  In fact, regardless of whether Ms. Westhead is found liable for violating the federal securities laws, and regardless of whether she had any knowledge that CBSG was a fraudulent scheme, her claim is properly denied based on her role in recruiting additional investors.  *See Merrill Scott & Assocs., Ltd*., 2006 WL 3813320, at *11 (approving distribution plan that excluded an investor who claimed to have no knowledge of the fraudulent nature of the investment scheme because he was an "insider" who was involved in the operation of the scheme and allowed his name to be used to recruit additional investors); *Pension Fund of Am. L.C*., 377 Fed. Appx. at 962 (affirming denial of claim from employees, regardless of whether

the employees personally committed fraud).   As such, the Receiver recommends that Ms. Westhead's claim be relegated to a Class 8 Claim.

### G.   **Procedures for Making Distributions**

#### 1.   **Utilization of a Pro Rata Distribution.**

In carrying out the Distribution Plan, the Receiver will begin distributing funds on an interim basis to Claimants in accordance with the priority classifications set forth above. The interim Distributions will be calculated based on a "pro rata" amount that will be allocated to each of the Allowed Claims within the various Classes described above, and the Receiver will seek Court approval prior to making any such Distributions.

The Receiver recommends that Claimants with Allowed Claims receive pro rata distributions of their Allowed Claim Amounts.   In establishing a plan of distribution, a district court acts as a court of equity and seeks to do justice under the circumstances for all the defrauded investors. *See SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88–90 (2d Cir. 2002); *SEC v. Forex Asset Mgmt., LLC*, 242 F.3d 325, 331 (5th Cir. 2001). As a general matter, courts have approved distribution plans that provide for the pro rata distribution of assets where victims were similarly situated with respect to the fraudulent operations.  *See, e.g., Credit Bancorp*, 290 F.3d at 89.

Where multiple investors "were defrauded in a similar way" and, therefore, "shared a common fortune and fate," it is appropriate to return funds to the victim investors through a pro rata distribution.  *U.S. Commodity Futures Trading Com'n v. Rolando*, 3:08-CV-0064(MRK), 2008 WL 5225851, at *4 (D. Conn. Dec. 10, 2008).  That is because it would be "inequitable to allow [one investor] to benefit merely because the defendants spent the other victim's funds first . . . all fraud victims were in equal positions and should be treated as such." *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996); *SEC v. Elliott*, 953 F.2d 1560, 1570 (11th Cir. 1992) (finding that it would be inequitable to give some investors preferential treatment over other

similarly situated investors).  Even though the specific details of each investor's dealings and interactions with CBSG might have varied, all investors were defrauded in a similar manner and, therefore, a pro rata distribution is an equitable remedy. *See S.E.C. v. Merrill Scott & Associates, Ltd.*, 2:02 CV 39, 2007 WL 26981, at *2 (D. Utah Jan. 3, 2007).

As described in further detail in Section V, the Receiver recommends a two-step distribution process.  First, the Receiver will distribute CBSG funds on a pro rata basis to those investors with Allowed Claims against CBSG.  These Claimants include direct investors, as well as agent funds.  Regardless of the investor type, the Plan provides for the distribution of a pro rata percentage of the Allowed Claim Amount to the investors within each Class, on a successive basis.

Some of the agent funds are also Receivership Entities.  In those circumstances, the Receiver will first distribute funds from CBSG to the Receivership Entity agent fund through an internal transfer.  The Receiver will then combine those distributed CBSG funds with other assets belonging to the specific Receivership Entity, and make a distribution to the Claimants with Allowed Claims against that Receivership Entity.

For example, ABFP Income Fund 3 will receive a pro rata distribution from CBSG at the same pro rata percentage as other investors in the same class with Allowed Claims against CBSG.  That distribution from CBSG to ABFP Income Fund 3 will be accomplished through an internal accounting transaction, allocating these funds from CBSG to ABFP Income Fund 3.  Those funds would then be combined with the other separate funds attributable solely to ABFP Income Fund 3, and the Receiver would make a distribution of those combined funds to the Claimants with

Allowed Claims against ABFP Income Fund 3,[13] which will be a pro rata distribution to those Claimants.

2.    <strong><u>Payment Method.</u></strong>

The Receiver will issue Distributions under the Distribution Plan by sending a check in the name of the Claimant to the address identified in said Claimant's Claim documentation or to the address specified by any change of address notices the Receiver has received prior to distribution of the funds.  Claimants are required to advise the Receiver, in writing, of any change of address or party in interest.

3.    <strong><u>Duty to Provide Information.</u></strong>

As part of the Proof of Claim form, the Receiver instructed all Claimants to submit appropriate tax forms (*i.e.*, IRS Form W-9) and other documentation.  In the event the Receiver requires additional information or forms from a Claimant prior to making a Distribution, the Receiver may condition any payment upon receiving such information or forms from the Claimant. A Claimant's failure to provide any such information or forms to the Receiver within 60 days after the Receiver's written request for such information will be treated as a forfeiture of that Claimant's Allowed Claim and the Claimant will be barred from receiving any distribution.

4.    <strong><u>Distributions to Agent Funds.</u></strong>

Certain of the Agent Funds that are not Receivership Entities have indicated to the Receiver that they are not equipped to send funds back to their individual investors because, for example, the agent fund entity is no longer active and does not maintain a bank account.  Therefore, these agent funds have requested that the Receiver bypass the Agent Fund and disburse any distribution

---

[13] Certain of the Receivership Entities created a "parallel" fund, which they utilized in connection with the issuance of "exchange notes" to their funds' investors in 2020.  For the purposes of this Distribution Plan, the parallel fund is combined with the prior fund entity.

payments directly to the individual investors within the Agent Fund.  In those circumstances, the Receiver anticipates recommending to the Court that the distribution payments, in fact, be paid directly to the individual investors in that fund, provided the Agent Fund has produced sufficient information to the Receiver to confirm how funds should be allocated to the individual investors within that fund. For example, the Agent Fund will need to provide the Receiver with an IRS Form W-9 for each of its investors and other appropriate documentation. In addition, the Agent Funds should be required to handle any tax obligation for these distributions, including issuing an IRS Form 1099 to each of the investors in their Agent Funds receiving a Distribution.

The Receiver anticipates that some of the Agent Funds will prefer to make distributions directly to their own investors and, in fact, object to any process that allows the Receiver to make payments directly to investors in those Agent Funds.  To ensure that the Agent Funds distribute any funds it receives from CBSG in an equitable fashion, and to hold the Agent Fund Managers directly accountable to the Court, the Receiver intends to draft a detailed document, to be reviewed and approved by the SEC, with instructions for the Agent Fund Managers, including the steps to be performed and the analytical framework to be utilized, in making distributions to their individual investors.  The Receiver anticipates this document would require the Agent Funds, among other things, to (i) identify all current and former investors, (ii) submit a standardized spreadsheet with detailed information regarding the funds received from, and paid to, each of the current and former investors, (iii) identify "net winners" within each fund, and (iv) calculate the pro-rata share to be distributed to each investor within the Agent Fund.  Moreover, the Receiver will propose deadlines and instructions to submit the above materials to the Receiver and SEC to ensure these steps are properly and accurately performed.  Thereafter, the Receiver will request the Court to enter a formal order incorporating these requests and directing the Agent Fund

Managers to follow the proscribed process, either as originally contemplated by the Receiver, or as amended by the Court in a subsequent Order, as a condition precedent to the agent fund receiving any Distribution from the Receivership Estate.

Once the Agent Fund Managers submit the investor information, the transactional history of each investor, and the calculation of the proposed amount to be distributed to each investor, the Receiver will consult with the SEC to determine whether the Agent Fund Managers performed all the requisite steps, provided appropriate supporting documentation, and properly calculated the distribution amounts. Thereafter, the Receiver recommends that the Court be notified in the event of any dispute regarding the proposed distributions of any Agent Funds, but otherwise instruct the Agent Fund Manager to proceed with the proposed distribution plan at the Agent Fund level. The Receiver believes this process will not only hold the Agent Fund Managers accountable to the Court, and ensure that Agent Fund Managers follow a uniform process that is subject to verification by the Receiver and the SEC, but will also minimize the burden on the Court in approving the distribution plans on a fund-by-fund basis.

Under the Receiver's proposed Distribution Plan, the Receiver will not issue an approved Distribution to an agent fund until the agent fund has complied with the procedures or requirements to be established hereunder, or pending a further Order from the Court.

### 5.      <u>Interest on Claims.</u>

Interest will not accrue or be paid on any Claim, and no holder of an Allowed Claim shall be entitled to any interest accruing on any Claim.

### 6.      <u>No *De Minimis* Distributions.</u>

The Receiver is not required to make a Distribution to a Claimant if the total amount to be paid to the Claimant is less than $50.00. The Receiver has determined that the cost involved in making a Distribution in amounts less than $50.00 would not be cost effective. Any holder of an

Allowed Claim that does not receive a Distribution, including an interim Distribution, solely because of this provision will have such payment reserved until that Claimant would receive a Distribution amount of $50.00 or more.

### 7.   Unclaimed Distributions.

Except as otherwise provided herein, any Claimant who fails to deposit any Distribution within 90 days from any payment date shall forfeit all rights to such payment, and the funds at issue will revert back to the Receivership Estate.  The forfeiture of that Distribution shall not preclude the Claimant from receiving a future Distribution, provided the Claimant complies with the procedures under this Distribution Plan for any future Distribution.

### 8.   Undeliverable Distributions.

The Receiver is under no affirmative obligation to attempt to locate a Claimant. Accordingly, if any Distribution is returned to the Receiver as undeliverable and no appropriate forwarding address is received by the Receiver within 90 days after the attempted Distribution, the Receiver will treat the Distribution as forfeited by that Claimant, and the funds at issue will revert back to the Receivership Estate.  The forfeiture of that Distribution shall not preclude the Claimant from receiving a future Distribution, provided the Claimant complies with the procedures under this Distribution Plan for any future Distribution.

### 9.   Final Distribution.

When the Receiver determines that further efforts to liquidate the Receivership Estate are not required or would not be economical, the Receiver will, after receiving authorization from the Court, make a final Distribution. In the event that any payment subject to this final Distribution is unclaimed, undeliverable, or forfeited by any Claimant, the Receiver will donate such funds to a non-denominational charity (to be determined at a later date) if the total amount of such funds does not exceed $10,000. If more than $10,000 remain after this final Distribution, the Receiver will

seek Court approval to determine whether to redistribute such funds to Claimants or to donate the remaining funds to charity in accordance with this provision.

H.   **Additional Provisions**

1.   **Court Approval.**

The provisions of this Plan, upon confirmation of the Court, shall be binding upon all creditors of and parties in interest to the Receivership Estate.

2.   **Right to Modify.**

This Plan may be modified both before and after the Court approves this Plan, on such notice as this Court deems appropriate, or subject to such future Orders as this Court may issue.

3.   **Payment Effects Release.**

If an Allowed Claim, or any portion thereof, is paid by the Receiver pursuant to this Plan, then any and all claims, demands, rights, and causes of action of any nature whatsoever, whether arising at law or in equity, known or unknown, asserted or unasserted, for all damages (whether actual or punitive, known or unknown, latent or patent, foreseen or unforeseen, direct or indirect or consequential, matured or unmatured, and accrued or not accrued), debts, putative interest, and liabilities of whatever nature that are or could be asserted by the Claimant or any other person against the Receiver or his agents, the Receivership Estate, any Receivership Entity, the Securities and Exchange Commission, or any Receivership Assets, are hereby forever discharged, released, extinguished, and satisfied.

Neither the Receiver nor any Person acting at his direction shall have any liability in any respect for having paid or otherwise satisfied an Allowed Claim, nor for any other action taken in good faith under or relating to this Plan or arising out of the processing of any Claim, including but not limited to, any act or omission in connection with or arising out of the administration of Claims or this Plan or the Receivership Estate.  In the event of any Claim being made against the

Receiver for such matters—whether or not willful misconduct is alleged—the Receiver shall be entitled to a defense by counsel of his choice, payable as any other professional expense herein, and the provisions of the Receivership Order shall otherwise apply.

### 4.  Waiver.

The Receiver, his agents, attorneys, accountants, other retained professionals, and employees, whether currently employed by the Receivership Estate or any of the foregoing, or previously employed by the Receivership Estate or any of the foregoing, shall be held harmless for any damages or liability that may arise through the discharge of their duties under the Plan, in accordance with the Court's Amended Order Appointing Receiver dated August 13, 2020, except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties. [*See* ECF No. 141 at ¶ 49].

### 5.  Reserve.

The Receiver is expressly authorized to pay Claims according to the terms of this Plan without regard for the possibility that a Claim may, with good cause, be submitted to the Receiver after the Claims Bar Date. The Court will not expect the Receiver to have accrued Receivership Assets to guard against this possibility. For the purpose of making interim Distributions, the Receiver shall establish, in his discretion and without further order of this Court, reserves for Claims for which there is still a pending good faith dispute at the time of a Distribution. The Receiver shall not be required to segregate such reserved funds in a separate bank account.

### 6.  Retention of Jurisdiction.

This Court shall continue to retain exclusive jurisdiction over the Receiver, the Receivership Estate, and all Receivership Assets. No action taken by or against the Receiver with regard to any pending matter in any other court shall be deemed to have terminated, limited, reduced, waived, or relinquished this Court's exclusive jurisdiction. Moreover, this Plan and the

Order approving this Plan are not, and are not intended to be, either a final adjudication of this matter or a termination, limitation, reduction waiver or relinquishment of this Court's exclusive jurisdiction with regard to all Receivership Assets and all matters in controversy in this case. Instead, this Court shall continue to have and retain exclusive jurisdiction over all matters existing or arising in this receivership or related in any way thereto, including, but not limited to, all matters relating to approving or denying Claims, making Distributions, locating, recovering, and settling claims, and liquidating Receivership Assets.

## V.   **LEGAL ANALYSIS**

### A.   **The Court has Broad Authority in Authorizing a Distribution Plan.**

It is well established that a district court has broad discretion in determining relief in an equity receivership. *S.E.C. v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) (noting that a court has "broad powers and wide discretion" to determine relief in an equity receivership); *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 91 (2d Cir. 2002) (finding that the district court's approval of a plan of distribution was "within the Court's equitable discretion"); *S.E.C. v. Infinity Group Co.*, 226 Fed. App'x 217, 218 (3d Cir. 2007) ("District Courts have wide equitable discretion in fashioning distribution plans in receivership proceedings."); *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (stating that the district court enjoys "broad discretionary power" in shaping equity decrees); *Elliott*, 953 F.2d at 1566–67 ("The district court has broad powers and wide discretion to determine relief in an equity receivership."); *S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991) (stating that the trial court is vested with "broad discretionary power to craft an equitable decree"); *S.E.C. v. Hardy*, 803 F.2d 1034, 1037–39 (9th Cir. 1986) ("[I]t is a recognized principle of law that the district court has broad power and wide discretion to determine the appropriate relief in an equity receivership.") (citations omitted).

Pursuant to these broad discretionary powers, courts tasked with overseeing the administration of a receivership for a Ponzi scheme may authorize any distribution protocol for receivership assets that is "fair and reasonable" in the overseeing court's opinion. *S.E.C. v. Wealth Mgmt. LLC,* 628 F.3d 323, 332 (7th Cir. 2010); *Byers,* 637 F. Supp. 2d at 174 (citing *Wang*, 944 F.2d at 81) ("The Court has the authority to approve any plan provided it is 'fair and reasonable.'"); *S.E.C. v. Enter. Trust Co.*, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").

And, unlike a case arising under Title 11 of the United States Code, there is no statutory mandate that prescribes how the assets recovered in a receivership should be distributed. Thus, it is well within this Court's discretion to approve a distribution plan that utilizes a pro rata approach—such as the one the Receiver has presented—rather than one that attempts to trace a claimant's investment into a fraudulent scheme. *See, e.g.*, *S.E.C. v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017) ("Courts have 'routinely endorsed' the pro rata distribution of assets to investors as the most fair and equitable approach in fraud cases."); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming district court's approval of pro rata distribution plan even though the majority of funds were traceable to specific claimants); *Credit Bancorp, Ltd.*, 290 F.3d at 89 (noting that the use of pro rata distributions "has been deemed especially appropriate for fraud victims of a 'Ponzi scheme'" because whether a customer's assets are traceable is "a result of the merely fortuitus fact that the defrauders spent the money of the other victims first." (quoting *Durham*, 86 F.3d at 72)); *Elliott*, 953 F.2d at 1569 (holding that a district court did not abuse its discretion by disallowing tracing where "certain investors would recoup 100% of their investment while others would receive substantially less").

### B. Pooling of Receivership Assets

For purposes of a distribution plan in an equity receivership, courts may ignore the separate identity of entities that are part of "a unified scheme to defraud." *S.E.C. v. Sunwest Mgmt., Inc.*, 2009 WL 3245879 (D. Or. Oct. 2, 2009) (receivership entities considered "unitary enterprise" for distribution purposes due to extensive commingling of funds); *S.E.C. v. AmeriFirst Funding, Inc.*, 2008 WL 919546, at *4 ("a pooled distribution is equitable when the separate legal entities were involved in a unified scheme to defraud"); *see also S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (affirming plan adopted by district court pooling assets of entities for distribution); *U.S. v. Durham*, 86 F.3d 70, 71-73 (5th Cir. 1996) (same). Here, the funds used by CBSG and its related entities—such as Full Spectrum Processing, Inc.; Heritage Business Consulting, Inc.; Eagle Six Consultants, Inc.; and the other related entities that CBSG's owners created for the purpose of holding other assets, such as the numerous commercial investment properties they purchased—were sourced with commingled investor funds. Indeed, the books and records of CBSG reflect that the company's owners, Lisa McElhone and Joseph LaForte, commingled funds between all of these entities and used investor funds to support the various operations of these related entities. As such, the Court is authorized to treat these various receivership entities "as one substantively pooled estate for the purposes of distribution" under the Plan. *Sec. & Exch. Comm'n v. Detroit Mem'l Partners, LLC*, 2016 WL 6595942, at *6 (N.D. Ga. Nov. 8, 2016) (quoting *S.E.C. v. Founding Partners Capital Mgmt.*, 2014 WL 2993780, at *6 (M.D. Fla. July 3, 2014)). Accordingly, the Receiver proposes distributing funds from CBSG and its related entities under the Distribution Plan from a single pool of Receivership Assets.

### C. Claim Priority and Classification

Under the Distribution Plan, the Receiver proposes classifying different Claims into different priority Classes based on the equities and factual circumstances surrounding each

Claim. When deciding what claims should be recognized and in what amounts, "the fundamental principle which emerges from case law is that any distribution should be done equitably and fairly, with similarly situated investors or customers treated alike." *S.E.C. v. Homeland Commc'ns Corp.*, 2010 WL 2035326, at *2 (S.D. Fla. May 24, 2010) (quoting *S.E.C. v. Credit Bancorp. Ltd.*, 2000 WL 1752979, at *13 (S.D.N.Y. Nov. 29, 2000)). Because the Receiver's analysis of the Claims submitted in this matter show that investors in CBSG were generally situated similarly, the Distribution Plan places the defrauded investors within the same Class and anticipates the same pro rata percentage of distribution.

The Receiver also proposes subordinating certain Claims under the Distribution Plan based on the factual circumstances and equities of each Claim. A court's power to approve a Receiver's decision on claim determinations and priority is well-settled.  *See Elliott*, 953 F.2d at 1566. This power includes the exercise of the court's equitable powers to subordinate claims. *See, e.g.*, *S.E.C. v. Ariz. Fuels Corp.*, 739 F.2d 455, 459 (9th Cir. 1984) "Receivership courts have the general power to use summary procedures in allowing, disallowing, or subordinating the claims of creditors."); *In re Westgate Cal. Corp.*, 642 F.2d 1174, 1177 (9th Cir. 1981) ("Subordination is an equitable power and is therefore governed by equitable principles."). Subordination of a claim is particularly appropriate where the Claimant has engaged in misconduct or participated in, or was mor intimately aware of, the fraudulent scheme. *Durham*, 86 F.3d at 73 ("Sitting in equity, the district court is a 'court of conscience.'") (quoting *Wilson v. Wall*, 73 U.S. 83 (1867)). Accordingly, the Receiver believes it is in the best interest of the Receivership Estate to subordinate certain Claims if, in the Receiver's professional judgment, equity supports placing such Claimants in a subordinate position to other defrauded investors.

## VI.  **AUTHORIZATION OF INITIAL DISTRIBUTION**

As of August 9, 2024, the bank and investment accounts of the Receivership Entities contained a total of $167,252,030.84.  The Receiver intends to distribute as much of these funds as possible, provided that sufficient funds are held back for disputed claims and other ongoing costs and expenses.  There are certain disputed claims from the Chehebar Investors in the amount of approximately $36.5 million that may be the subject of appeals and future challenges, which the Receiver intends to hold back from the proposed initial distribution.  In addition, the Receiver intends to hold back an additional $23.5 million for the anticipated additional costs and expenses of administering the Receivership Estate, including the payment of premiums on the life insurance policies that certain of the Receivership Entities continue to own.

After accounting for those holdbacks, the Receiver intends to make a distribution of $110,009,878.15 to the Claimants identified on **Exhibit 27** (List of First Interim Distributions for All Receivership Entities),[14] in the amounts set forth therein.  These distributions will be on a pro rata basis within each of the Receivership Entities, subject to applicable exceptions, priorities, and other parameters outlined in Section V of this motion, which describes the Distribution Plan.  Because the assets available to each of the Receivership Entities varies, Claimants who have claims against different Receivership Entities will not necessarily receive the same pro rata percentage of their Allowed Claims through this proposed first interim distribution.  This proposed distribution would result in payments ranging from approximately 22.1% to 55.4% of the amount of these Claimants' Allowed Claims.  Those variances are discussed in more detail below.

---

[14] For privacy purposes, the names of individual investors and other individual claimants in this spreadsheet and the other spreadsheets listing the Claimants with Allowed Claims have been abbreviated by their initials.  Claimants with Allowed Claims can locate themselves on these spreadsheets by looking for their unique claim numbers, which are included on all spreadsheets.

A.    **Total Funds within the Receivership Estate as of August 2, 2024**

As of August 2, 2024, the Receiver had a total of $165,347,009.84 in cash.  In addition, one of the Receivership Entities, ABFP Income Fund 2, has $1,905,021.00 in a Charles Schwab investment account, which the Receiver would anticipate liquidating in advance of the first interim distribution. The total cash (including the value of the Schwab investment account) attributable to each of the Receivership Entities is as follows:

| | |
|---|---|
| CBSG: | $152,281,445.84[15] |
| Fast Advance Funding: | $1,631,319.00 |
| ABFP Income Fund/Parallel: | $66,445.96 |
| ABFP Income Fund 2: | $1,934,822.17[16] |
| ABFP Income Fund 3 (Parallel): | $114,362.63 |
| ABFP Income Fund 4 (Parallel): | $84,078.46 |
| ABFP Income Fund 6 (Parallel): | $73,544.99 |
| ABFP MSIF: | $2,769,552.91[17] |
| ABFP MSIF II: | $6,830,785.87 |

---

[15] This amount includes funds held not only in CBSG bank accounts, but also funds in the accounts of the Receiver's qualified settlement fund, as well as the related companies of Contract Financing Solutions, Full Spectrum Processing, Eagle Six Consulting, Heritage Business Consulting, LME 2017 Family Trust, LWP North, Blue Valley Holdings LLC, Recruiting and Marketing Res., Liberty Eighth Avenue, and the various single purpose entities Lisa McElhone set up for the purpose of holding the multiple real estate properties she purchased with commingled funds from CBSG's investors.

[16] As discussed above, this amount includes this entity's investment in a Charles Schwab account that holds cash and stock in FS KKR Capital Corp.  As of August 9, 2024, the total value of this account was $1,905,021.  The Receiver anticipates liquidating this investment account in advance of the fist interim distribution and, therefore, has included the current value of this account within these calculations.

[17] This amount, as well as the amount for ABFP MSIF II only includes the cash these entities have in their bank accounts, and does not include the value of the death benefits for the remaining, unmatured life insurance policies these entities own.

Fidelis Financial Planning:          $195,422.00

Retirement Evolution:                $1,270,251.00

Total:  $167,252,030.84

**B.      Reserves from Cash Availability**

Certain Claimants and other parties have taken the position that they have priority claims against certain of CBSG's assets, or otherwise have claims against the Receivership Entities and should be entitled to recover on those claims under any distribution.  Although the Court has adjudicated all Claimants' objections to the Receiver's claim determinations, some Claimants (such as certain merchant Claimants) have attempted to appeal that ruling [ECF No. 1996], and others have made clear that they intend to challenge the Receiver's proposed Distribution Plan (such as the Chehebar investors).

"Disputed claims against a receivership estate do not prevent a court from authorizing a distribution, provided the receiver sets aside funds sufficient to cover those claims." *SEC v. TCA Fund Mgmt. Grp. Corp.*, No. 20-cv-21964, 2022 WL 3334488, at *17 (S.D. Fla. Aug. 4, 2022), *appeal dismissed,* No. 22-13412, 2024 WL 448385 (11th Cir. Feb. 6, 2024). *See S.E.C. v. Michael Kenwood Cap. Mgmt.*, 630 F.  App'x 89, 91 (2d Cir. 2015) (affirming a district court's approval of a distribution plan that set aside funds equal to what the receiver concluded was the "maximum possible value" of the claims against the receivership entities), *cited by TCA Fund Mgmt.,* 2022 WL 3334488, at *17.

The question of how much a receiver should set aside and reserve for disputed claims is fact dependent and may be subject to modification in the face of changing circumstances. *See In re Reserve Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d 182, 206 (S.D.N.Y. 2009) (approving distribution subject to monitor's retention of funds to make future payments, on a pro rata basis, to shareholders for indemnification expenses and management fees). To that end, in some cases,

the "proper set-aside amount" to be retained by the receiver "is an academic question" at the time the court decides whether to approve a distribution plan, since one or more objectors may file an appeal or decide not to pursue spinoff litigation. *TCA Fund Mgmt.,* 2022 WL 3334488, at *17. In such cases, the receivership court may approve distributions based on the court's approved treatment of claims, and may later reconsider whether it is appropriate to set aside amounts for those disputed claims in the event there is an appeal or further challenge. *See id.* at *17. Moreover, given that the "value of the Receivership Assets will continue to grow and shrink" as the receivership proceedings advance, "[s]peculating whether a set-aside suitable to present conditions will be equally well-suited to future conditions is a fool's errand." *Id*.

With this backdrop, the Receiver believes it is appropriate to hold back funds from the total cash in the Receivership Estate, based on certain disputed claims and other anticipated future expenses and potential contingencies. Specifically, the Receiver intends to hold back from the CBSG funds a sum of $36,513.666.61 for the purported senior secured claims from certain of the Chehebar Investors, $728,486.08 for a claim from the condominium association for the property the Receiver controls at 20 North Third Street in Philadelphia, Pennsylvania,[18] and $20,000,000 for continuing operations and other future expenses and contingencies of the Receivership Estate, including other potential claims against the Receivership Estates. In addition, the Receiver intends to hold back $2,101,641.00 from the ABFP MSIF cash and $829,362.00 from the ABFP MSIF II cash as a reserve of three years of the continuing payment of premiums for the life insurance policies these entities own.

---

[18] This is the current amount of the claim the association is asserting against the entity that owns this condominium unit. The Receiver does not believe the claim should be valued at this amount but, out of an abundance of caution, recommends holding back the full amount of the current claim.

The Chehebar Investors, collectively, have asserted claims against the Receivership Estate in the amount of $50,871.124.89.  As described above in Section IV(C), the Chehebar Investors have asserted that they are entitled to senior secured liens, based on UCC-1 financing statements they recorded, against all of CBSG's assets. The Receiver has responded that these UCC-1 financing statements are invalid, thereby nullifying any priority the Chehebar Investors' claims might have over CBSG's assets.  Moreover, only a portion of the disputed liens of the Chehebar Investors have priority over the UCC-1 that Albert Vagnozzi filed on behalf of the investors who accepted the Exchange Offer.  Specifically, $36,513,666.61 of the more than $50 million in Claims from the Chehebar Investors are for the four Chehebar Investors who filed liens in 2017. The remaining Chehebar Investors recorded their UCC-1 financing statements in August 2020, after the Albert Vagnozzi lien was recorded in April 2020. In addition, the Chehebar Investors' claims are subject to disallowance in their entirety, given their status as Insider Investors.

It would be difficult, if not impossible, to claw back more than $36 million in funds from other Claimants if the Receiver failed to hold back this amount, the Chehebar Investors were successful in an appeal or other challenge to the disallowance or subordination of their claims, and those funds were distributed to other Claimants.  As a result, despite the Receiver's belief in the strength of his arguments on these issues, he nevertheless recommends holding back $36,513,666.61 from the first interim distribution on account of a portion of the Chehebar Investors' claims that allegedly have senior secured status.

In addition, the condominium association for the property the Receiver controls at 20 North Third Street in Philadelphia, Pennsylvania has asserted a claim against the Receivership Entity that owns the property in the amount of $728,486.08.  This claim is for common area expenses the association claims to have incurred for maintenance, repairs, and other costs associated with the

building where CBSG's main office is located in Philadelphia. The Receiver is marketing this property for sale and will likely need to resolve the condominium association's claim prior to entering into an agreement for the sale of this property, or the eventual closing of the sale of that property. If the Receiver does elect to resolve this claim, it will likely resolve for less than the claimed amount. The Receiver anticipates filing a separate motion with the Court in the future, whereby the Receiver will seek to resolve this claim outside of the standard claim and distribution process in this case. Additionally, the proceeds for the sale of that property will more than satisfy the amount of this claim. Nevertheless, the Receiver intends to hold back this sum from the first interim Distribution, out of an abundance of caution, to ensure that there are sufficient funds available to resolve this claim.

The Receiver is still in control of Receivership Entities that are actively involved in collecting on merchant account balances and resolving claims and litigation, and he is also responsible for winding down the operations of these Receivership Entities. Between the operational expenses of these entities, professional fees, other expenses and potential contingencies, and potential additional claims against the Receivership Entities, the Receiver recommends holding back an additional $20,000,000 from the first interim distribution. The Receiver is recommending an extremely conservative amount as a holdback, given the difficulties that would potentially arise if the Receiver failed to hold back a sufficient amount for these unknown costs and expenses. As the distribution process advances, the Receiver will recommend reducing these hold backs and making any amounts left in this reserve available for distribution to Claimants with Allowed Claims as part of subsequent interim distributions.

Finally, ABFP MSIF and ABFP MSIF II continue to own several life insurance policies. These policies have premiums that are payable on a periodic basis (either monthly, quarterly, semi-

annually, or annually, depending on the particular policy).   To avoid a situation where the Receivership Estate is without sufficient cash to pay these premiums when they come due, the Receiver recommends holding back $2,101,641.00 from the ABFP MSIF cash and $829,362.00 (representing three years' worth of policy premiums), to ensure that these policies remain active and do not lapse.

### C.   The Receiver Recommends Allocating, but Not Distributing, Any Distributions to Claimants who are Seeking Collateral Sources of Recovery.

Certain Claimants with Allowed Claims—namely the agent funds that have been described as the "Parker Plaintiffs"—are seeking to recover their investment losses in claims they have asserted against the law firm of Eckert Seamans.  Given that the Receiver's responsibilities in this case involve, among other things, attempting to ensure that any plan of distribution is fair and equitable to all Claimants, the Receiver believes it is appropriate to allocate, but not distribute at this time, any Distributions to the Parker Plaintiffs, given their stated intention to pursue these collateral sources of recovery.

Deferring distributions to claimants who choose to litigate against another party may be "the most equitable and pragmatic method for distributing . . . receivership assets." *United States v. Petters*, No. 08-cv-5348, 2011 WL 281031, at *11 (D. Minn. Jan. 25, 2011) (approving distribution plan, but deferring distribution of a portion of the assets until the resolution of a claw-back action from certain claimants). Indeed, deferred distributions are ideal where the distributions will be subject to future review by the receivership court and immediate distributions may be made to afford relief to harmed investors on a timely basis. *See id.,* at *11. Although some parties may be unsatisfied with this balance, "[w]hen funds are limited, hard choices must be made." *SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (quoting *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006)).

"An equitable plan is not necessarily a plan that everyone will like." *SEC v. Credit Bancorp, Ltd.,* No. 99-cv-11395, 2000 WL 1752979, at \*29 (S.D.N.Y. Nov. 29, 2000). That is because "[n]o plan is capable of erasing the financial and emotional pain caused by [a] massive fraudulent scheme," but a distribution plan that "makes an equitable attempt to ease the devastation of some victims without doing so entirely at the expense of others" should be approved. *Petters*, 2011 WL 281031, at \*7.

The Receiver doubts that the Parker Plaintiffs will ultimately be successful in their separate litigation efforts against Eckert Seamans.  If they are, however, it would be inequitable for the Parker Plaintiffs to receive a sizable Distribution from the Receiver's Distribution Plan, and then obtain a disproportionate additional recovery from another source, which would place their total recovery at a much greater percentage of their net-investment loss than other similarly-situated investors.  To avoid this potential imbalance, the Receiver intends to allocate to the Parker Plaintiffs their proportionate share of the first interim distribution, but not distribute those funds to the Parker Plaintiffs until there is a final resolution and determination regarding their separate claims against (and potential recovery from) Eckert Seamans and its insurers.

### D.        Recommended Interim Distribution Amounts.

After accounting for these holdbacks, the amount of cash attributable to all Receivership Entities that will be available for distribution as part of the Receiver's first interim distribution is $110,009,878.15. As described in the proposed procedures for the Distribution Plan, the first step of this Distribution will be to distribute funds, on a pro rata basis, from CBSG to the Claimants with Allowed Claims against CBSG.  The net cash from CBSG that would be available for this first interim distribution is $98,198,090.45.  Based on the total value of the Allowed Claims against CBSG, a pro rata distribution of this CBSG cash would result in a distribution to each Claimant of approximately 50.7% of their total Allowed Claim Amount.  Attached as **Exhibit 28** is a chart

reflecting these proposed distribution amounts (including distributions to other Receivership Entities).

Fast Advance Funding is a sister company to CBSG that operated a related merchant cash advance company. The only investors with allowed claims against Fast Advance Funding are ABFP MSIF and ABFP MSIF II. As described above, Fast Advance Funding has $1,631,319.00 in cash. After an appropriate allocation of the expenses of the Receivership Estate among the various Receivership Entities, Fast Advance Funding will have $1,502,665.94 available for distribution. Based on the net investment amounts for ABFP MSIF and ABFP MSIF II in Fast Advance Funding, these entities would be entitled to the following pro rata distributions:

| Entity | Allowed Claim Amount | Initial Distribution |
|--------|----------------------|----------------------|
| ABFP MSIF | $4,954,925.02 | $1,402,864.29 |
| ABFP MSIF II | $352,500.02 | $99,801.65 |
| | **Total:** | **$1,502,665.94** |

Given that these two entities are Receivership Entities, the Receiver will make an internal transfer of these amounts from Fast Advance Funding to those two entities. Those distributions would be combined with the other cash those two funds currently maintain in their separate bank accounts. Those entities would then distribute the total amount of those funds on a pro rata basis to the investor Claimants with Allowed Claims against ABFP MSIF and ABFP MSIF II.

Similarly, several of the other Receivership Entities are agent funds that invested in CBSG. Specifically, the following Receivership Entities all obtained promissory notes from CBSG and would be entitled to a distribution from CBSG. Like with the distributions from Fast Advance Funding, the Receiver would make an internal transfer from CBSG to those Receivership Entities, and would then distribute those funds, together with any other funds those entities hold, to the

investor Claimants with Allowed Claims in these other Receivership Entities.  The amounts to be distributed as part of this first interim distribution from CBSG, after an appropriate allocation of the expenses for the administration of the Receivership Estate among these different entities,[19] is as follows:

| Entity | Allowed Claim Amount | Initial CBSG Distribution |
| --- | --- | --- |
| Non-Receivership Entities:[20] | $100,644,648.68 | $51,061,991.63 |
| ABFP Income Fund: | $11,308,368.64 | $5,378,535.83 |
| ABFP Income Fund 2: | $4,305,458.73 | $2,026,467.52 |
| ABFP Income Fund 3: | $24,416,692.50 | $11,770,202.80 |
| ABFP Income Fund 4: | $19,210,105.40 | $9,291,574.10 |
| ABFP Income Fund 6: | $17,875,791.31 | $8,672,755.35 |
| Fidelis Fin. Planning: | $5,673,275.94 | $2,743,524.30 |
| Retirement Evolution: | $10,116,907.10 | $4,862,759.15 |
| Total: | $193,551,246.30 | $95,807,810.68 |

When these amounts that are to be distributed from CBSG are combined with the other available cash within the accounts for those specific Receivership Entities, the total amount available for distribution from each of these other Receivership Entities as part of the first interim distribution would be:

---

[19] The Receiver has allocated a percentage of the costs of administering the Receivership Estate to each of these additional Receivership Entities.  The allocation was calculated based, in part, on the total value of the Allowed Claims for the investors within each of these other Receivership Entities.
[20] This includes Agent Funds that are not Receivership Entities and individuals that invested directly with CBSG, including through the use of a self-directed individual retirement account.

|  | **Investor Claims** | |
| **Entity** | **Allowed Claim Amounts** | **Available for Distribution** |
| ABFP Income Fund: | $14,800,088.32 | $5,444,981.80 |
| ABFP Income Fund 2: | $6,514,135.79 | $3,961,289.69 |
| ABFP Income Fund 3: | $25,477,888.66 | $11,884,565.42 |
| ABFP Income Fund 4: | $18,756,424.60 | $9,375,652.56 |
| ABFP Income Fund 6: | $16,357,741.13 | $8,746,300.34 |
| ABFP MSIF: | $15,727,471.46 | $3,791,180.10 |
| ABFP MSIF II: | $10,669,356.37 | $6,671,960.16 |
| Fidelis Financial Planning: | $5,561,352.18 | $2,938,946.30 |
| Retinement Evolution: | $11,140,444.92 | $6,133,010.15 |
| **Total:** | **$125,409,049.66** | **$58,947,886.52** |

In turn, each of these Receivership Entities would then distribute the funds that are available for Distribution on a pro rata basis to the investor Claimants that have Allowed Claims against those Receivership Entities.  A detailed list of the Allowed Claim Amounts and initial distributions from Fast Advance Funding is attached as **Exhibit 29**, from the ABFP entities is attached as **Exhibit 30**, from Fidelis Financial Planning is attached as **Exhibit 31**, and from Retirement Evolution is attached as **Exhibit 32**.[21]

These pro rata distributions would result in the payment of somewhere in the range of 24.1% (ABFP Multi-Strategy Investment Fund) to 62.5% (ABFP Multi-Strategy Investment Fund 2) of the Allowed Claim Amounts to each of the individual investors with Allowed Claims against these Receivership Entities.  These variances are based on the differences between and among

---

[21] For privacy purposes, these charts identify the individual claimants by Claim ID number, rather than the individual investors' names.  The names of the Agent Funds are included in these charts.

these entities, and the fact that different Receivership Entities have different amounts of cash—separate and apart from the amounts they will be receiving from their merchant cash advance investments—available for distribution to the Claimants with Allowed Claims against those entities.

For example, ABFP Multi-Strategy Investment Fund would be able to distribute a total of $3,791,180.10 to the Claimants with Allowed Claims against that fund.  These payments would reflect a pro rata distribution of 24.1% of those Claimants' Allowed Claim Amounts.  That is because the majority of this entity's investments were in life settlements.  Only a handful of the life insurance policies this fund owns have matured over the past several years.  As a result, the fund has been paying out the premiums to maintain its policies as valid and active, but the value for most of these policies has not yet been converted to cash.  Therefore, most of this fund's assets are still tied up in life settlements, and are not available as cash for distribution to Claimants at the present time.

ABFP Multi-Strategy Investment Fund 2, on the other hand, would be able to make a distribution at the rate of 62.5% of the Claimants' Allowed Claim Amounts.  Like ABFP Multi-Strategy Investment Fund, this fund invested in the merchant cash business, with a small portion also invested in life settlements.  In contrast to the ABFP Multi-Strategy Investment Fund, however, several of the life settlements in ABFP Multi-Strategy Investment Fund 2 have matured over the past four years, bringing several million dollars of additional cash into that fund's bank account from the death benefits on those policies.  Therefore, this fund will be able to make a larger percentage pro rata distribution to the Claimants with Allowed Claims against that fund.

In addition, ABFP Income Fund 2 would distribute a total of $3,961,289.69 to its Claimants with Allowed Claims.  The total amount of all Allowed Claim Amounts for the investors in this

fund is $6,514,135.79. Thus, the proposed pro rata distribution would result in a payment of 60.8% of the Allowed Claim Amounts for the Claimants with Allowed Claims against that fund. As described above, included within this amount is $1,945,093.30 that ABFP Income Fund 2 holds in a Charles Schwab investment account. This investment has remained relatively flat over the past several years. The assets in this investment account have not yet been liquidated, but the Receiver would plan to sell and convert those assets into cash in advance of an initial interim distribution.

The pro rata distributions to Claimants with Allowed Claims against other agent funds that are Receivership Entities, as a percentage of the total Allowed Claim Amounts for investors in those funds, will vary to some degree. But the average distribution to investors in these Receivership Entity agent funds will be in the range of approximately 47% of the Allowed Claim Amounts for the Claimants with Allowed Claims against those funds.

### E.   The Recommended Interim Distribution is Reasonable

This proposed distribution of $110,009,878.15 will provide a significant amount of money to Claimants, while still maintaining adequate funds to cover the ongoing expenses of administering the Receivership Estate and as a hold back for certain disputed claims and other pending issues. The Receiver believes he has reserved an appropriate amount for these purposes, and intends to distribute the excess funds in a future distribution, as appropriate, depending on the outcome of these other pending matters.

### VII.   CONCLUSION

The Receiver requests that this Court grant the relief requested above, including: (1) approving the Receiver's proposed Distribution Plan; and (2) authorizing the Receiver to make the first interim Distribution of assets from the Receivership Estate. The Receiver will file a proposed Order in connection with his reply(ies) to any responses to this Motion.

Dated: August 23, 2024

Respectfully Submitted,

**STUMPHAUZER KOLAYA**
**NADLER & SLOMAN, PLLC**
Two South Biscayne Blvd., Suite 1600
Miami, FL 33131
Telephone:  (305) 614-1400

By:   */s/ Timothy A. Kolaya*
     TIMOTHY A. KOLAYA
     Florida Bar No. 056140
     tkolaya@sknlaw.com

     *Co-Counsel for Receiver*

**PIETRAGALLO GORDON ALFANO**
**BOSICK & RASPANTI, LLP**
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Telephone:  (215) 320-6200

By:   */s/ Gaetan J. Alfano*
     GAETAN J. ALFANO
     Pennsylvania Bar No. 32971
     *(Admitted Pro Hac Vice)*
     GJA@Pietragallo.com
     DOUGLAS K. ROSENBLUM
     Pennsylvania Bar No. 90989
     *(Admitted Pro Hac Vice)*
     DKR@Pietragallo.com

     *Co-Counsel for Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 23, 2024, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

     */s/ Timothy A. Kolaya*
     TIMOTHY A. KOLAYA