UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-81205-RAR

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS
GROUP, INC. *d/b/a* PAR FUNDING, *et al.*,

      Defendants.

_____/

SECOND AMENDED ORDER GRANTING IN PART
PLAINTIFF'S AMENDED OMNIBUS MOTION FOR FINAL JUDGMENT[1]

This case is an enforcement action brought by the Securities and Exchange Commission

("SEC") alleging that Defendants issued, marketed, and sold unregistered, fraudulent securities to

fund short-term loans to small businesses—known as "merchant cash advances."  Before the Court

is the SEC's Amended Omnibus Motion for Final Judgments against Defendants Michael Furman,

Joseph Cole Barleta, Joseph LaForte, and Lisa McElhone, [ECF No. 1252] ("Motion").  The Court

---

[1] Pursuant to Federal Rule of Civil Procedure 60(a), the Court issues this Second Amended Order to correct a scrivener's error in the Amended Order Granting In Part Plaintiff's Amended Omnibus Motion for Final Judgment ("Amended Order"), [ECF No. 1450].  On October 29, 2024, the United States Court of Appeals for the Eleventh Circuit handed down its Mandate, [ECF No. 2058], in *Securities and Exchange Commission v. Complete Business Solutions Group, Inc.*, No. 23-10228, 2024 WL 4100564 (11th Cir. Sept. 6, 2024), which considered the Court's Amended Order, [ECF No. 1450], and the related Amended Final Judgment as to Defendants Joseph LaForte and Lisa McElhone ("Amended Judgment"), [ECF No. 1451]. The Eleventh Circuit affirmed the Court's disgorgement award but vacated and remanded the civil penalties award due to a scrivener's error in the Amended Order that suggested the Court imposed civil penalties on a joint and several basis among Defendants Joseph LaForte and Lisa McElhone.  *Complete Business Solutions Group*, 2024 WL 4100564, at *3.  As the Eleventh Circuit noted, federal securities law prohibits joint and several liability for civil penalties.  *Id.* at *2 (citing *SEC v. Pentagon Cap. Mgmt.*, 725 F.3d 279, 287–88 (2d Cir. 2013)).  Aside from the issue of joint and several liability for civil penalties, the Eleventh Circuit found "no inherent error in the district court's methodology for calculating the penalties." *Id.* at *3 n.3.  Accordingly, with the exception of the removal of references to joint and several liability for civil penalties, this Second Amended Order is identical in all material respects to the Amended Order.

has carefully reviewed the Motion, Defendant Michael Furman's Response in Opposition [ECF No. 1296] ("Furman Response"), Defendants Lisa McElhone, Joseph LaForte, and Joseph Cole Barleta's Amended Response in Opposition, [ECF No. 1329] ("Response"), and Plaintiff's Amended Reply, [ECF No. 1341] ("Reply").  Further, the Court held a lengthy evidentiary hearing on the Motion on September 14, 2022, [ECF No. 1419] ("Disgorgement Hearing").  Having thoroughly reviewed the pleadings, the record, applicable law, and with the benefit of oral argument, it is hereby

**ORDERED AND ADJUDGED** that the Motion is **GRANTED IN PART**.  Each Defendant is ordered to pay disgorgement, prejudgment interest, and civil penalties as set forth herein.  Furthermore, a permanent injunction shall issue against Defendant Furman, preventing him from committing further violations of the securities laws.

## **BACKGROUND**

### I. Procedural Background

The SEC filed this action on July 24, 2020, seeking a temporary restraining order and preliminary injunction, an asset freeze, appointment of a receiver, a permanent injunction, disgorgement, and civil penalties.  *See* Compl. [ECF No. 1].  The SEC filed its Amended Complaint on August 8, 2020.  Am. Compl. [ECF No. 119].  The Court appointed a receiver over certain Defendant entities and issued several subsequent orders expanding the scope of the receivership.  *See* [ECF Nos. 141, 238, 436, 484, 517].  The Court also granted the SEC's request for a temporary restraining order and asset freeze, [ECF No. 42], and held a two-day preliminary injunction hearing.  [ECF Nos. 170, 192].  Following the hearing, each Defendant consented to a preliminary injunction.  [ECF Nos. 173, 176, 187, 200, 201, 221, 255, 336].  On the eve of trial, between November 23, 2021, and November 28, 2021, the parties stipulated to, and the Court

entered, consent judgments against Defendants Perry S. Abbonizio, Dean J. Vagnozzi, Lisa McElhone, Joseph W. LaForte, and Joseph Cole Barleta. *See* [ECF Nos. 999, 1006, 1008, 1010, 1018] ("Consent Judgments").

Pursuant to the terms of their Consent Judgments, the parties agreed that the Court would determine whether to disgorge ill-gotten gains and/or impose a civil penalty pursuant to Section 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(3)]; and, if so, the amount(s) of the disgorgement and/or civil penalty. *See* Consent Judgments at 5. Importantly, for purposes of this Motion, the Consent Judgments state that the allegations in the Complaint shall be accepted and deemed true by the Court. *Id*. Since then, Defendants Vagnozzi and Abbonizio have reached agreements with the SEC as to disgorgement, prejudgment interest, and civil penalties. *See* [ECF Nos. 1160, 1169].

Separately, Defendant Furman proceeded to a jury trial on December 7, 2021. On December 15, 2021, a jury found that Furman violated Section 10(b), Rule 10b-5(a), Rule 10b-5(b), and Rule 10b-5(c) of the Exchange Act; Sections 17(a)(1), 17(a)(2), 17(a)(3), 5(a) and 5(c) of the Securities Act. [ECF No. 1101] ("Jury Verdict").

Accordingly, the Court is left to determine whether disgorgement, prejudgment interest, and/or civil penalties are appropriate for Lisa McElhone, Joseph LaForte, and Joseph Cole Barleta. Further, the Court must determine whether permanent injunctive relief, disgorgement, prejudgment interest, and/or civil penalties are appropriate for Michael C. Furman.

## II.  Factual Background

The Court begins by setting forth the facts as described in the SEC's Amended Complaint—with a particular focus on the remaining Defendants subject to disgorgement.

Defendants McElhone, LaForte, and Cole have agreed that the allegations in the Amended Complaint shall be accepted and deemed true by the Court. *See* Consent Judgments at 5.

Par Funding—a company founded in 2011 by husband-wife duo McElhone and LaForte—was engaged in the business of making "opportunistic loans" to small businesses across the country. *See* Am. Compl. ¶ 1. From approximately August 2012 through mid-2020, to fuel these merchant cash advances ("MCAs"), Defendants raised nearly half a billion dollars through unregistered securities sold to over a thousand investors nationwide. *Id*. The alleged scheme consisted of two primary phases. During the first phase, from August 2012 until around December 2017, Par Funding primarily issued promissory notes and offered them to the investing public directly and through a network of sales agents ("Phase I"). *Id.* ¶ 2.

Then, in early January 2018—after learning it was under investigation by the Pennsylvania Department of Banking and Securities for violating state securities laws through the use of unregistered agents—Par Funding implemented a new way to raise funds for the MCAs ("Phase II"). *Id.* ¶¶ 3–4. Par Funding began relying on "Agent Funds" that were "created for the purpose of issuing their own promissory notes, selling the notes to the investing public through unregistered security offerings, and funneling investor funds to Par Funding." *Id.* ¶ 4. Par Funding would compensate the Agent Funds by offering them promissory notes that had higher rates of return than the notes the Agent Funds sold to investors. *Id.* ¶ 4.

As outlined in the Amended Complaint, McElhone and LaForte "orchestrate[d] the scheme" through Par Funding and McElhone's company, Full Spectrum Processing, Inc., whose employees operated Par Funding. LaForte, Cole (Full Spectrum's CFO), and Abbonizio (Par Funding's investment director and partial owner) solicited investors to invest in the securities. *Id.* ¶ 5. Vagnozzi, through his company ABetterFinancialPlan.com d/b/a A Better Financial Plan

("ABFP"), recruited individuals to create the Agent Funds and provided them training and other materials to assist them with the creation and operation of the funds. *Id.* ¶ 6. Vagnozzi, Furman, and Gissas each operated Agent Funds that raised money for Par Funding through unregistered securities offerings. *Id.* ¶ 7. At trial, the SEC established that Furman, through Fidelis Planning, raised approximately $12.1 million from investors, which Furman funneled through his Agent Fund to Par Funding in exchange for promissory notes. Mot. at 42.

The SEC avers that in addition to violating the federal securities laws by selling unregistered securities, Defendants also made false or misleading statements and omissions concerning the Par Funding offering in violation of the antifraud provisions of the Securities Act and Exchange Act. Am. Compl. ¶¶ 154–294. The misrepresentations alleged by the SEC can be grouped into seven categories:

*First*, Defendants made misrepresentations regarding Par Funding's underwriting process. The Amended Complaint describes a recorded conversation between Abbonizio and an individual posing undercover as an investor where Abbonizio touted Par Funding's underwriting practices. *Id.* ¶¶ 156–57. It also cites a brochure that Furman, Abbonizio, and Vagnozzi distributed to investors emphasizing Par Funding's "Exceptional Underwriting Rigor"; marketing materials where Par Funding claimed it conducted on-site merchant inspections prior to loan approval; and a solicitation event where Abbonizio told investors that Par Funding does on-site inspections 100 percent of the time before approving any loan. *Id.* ¶¶ 158–64. The SEC explains that contrary to these representations, Par Funding did not always conduct on-site inspections before approving an MCA. *Id.* ¶¶ 167–82. It also asserts that Par Funding funded loans "without obtaining information about the merchant's profit margins, expenses, or debts," *id.* ¶ 183, and did not "always assign a

liaison to small businesses or have a liaison who communicate[d] with the small businesses" as it claimed. *Id.* ¶ 184.

**Second**, Defendants made misrepresentations regarding Par Funding's loan default rate. LaForte, Abbonizio, and Vagnozzi represented to prospective investors that Par Funding's loan default rate was around one percent, *id.* ¶¶ 185–90, when in reality, "Par Funding has filed more than 2,000 collections lawsuits against small borrowers for defaulting on the [l]oans Par Funding made to them." *Id.* ¶ 193.  The Amended Complaint asserts that Par Funding claims to have funded more than $600 million in loans and the lawsuits seek to recover over $300 million that the small businesses have allegedly failed to repay. *Id.* ¶ 194.  According to the SEC, "[a]n analysis of these lawsuits reveals that Par Funding's loan default rate is as high as 10%." *Id.*  Further, Par Funding excluded from its default rate "any [l]oan where the borrower is making even a partial payment or is speaking with Par Funding about the loan." *Id.* ¶ 202.

**Third**, Defendants made misrepresentations regarding insurance offered on the MCAs. The brochure that Par Funding distributed to potential investors allegedly misrepresented that Par Funding offered insurance on all its products up to $150,000. *Id.* ¶ 204.  LaForte and Abbonizio also told investors that Par Funding had insurance to back up investor funds. *Id.* ¶¶ 205–06.  In reality, "Par Funding did not offer small businesses insurance on the [l]oans, and thus investor funds were not protected by insurance." *Id.* ¶ 207.

**Fourth**, Defendants made misrepresentations and omissions about LaForte's background to investors.  LaForte, Cole, Abbonizio, and Par Funding touted LaForte's financial and business acumen and success without disclosing that he is a twice-convicted felon who was formerly imprisoned and ordered to pay $14.1 million in restitution for grand larceny and money laundering. *Id.* ¶¶ 213–17.  Further, Par Funding did not disclose LaForte as a "Related Person" in its Form D

filing with the SEC, even though LaForte ran the day-to-day operations of Par Funding and functioned as one of its executives. *Id.* ¶¶ 218–19. At trial, the SEC put forth evidence that Furman held numerous events for potential investors where he made the material misrepresentations and omissions at issue—including discussing Par Funding's management while omitting LaForte's role and background as a convicted felon. Mot. at 43.

*Fifth*, Defendants made misrepresentations to investors regarding Defendants' regulatory history. In November 2018, Pennsylvania securities regulators filed a Consent Agreement and Order against Par Funding for violating the Pennsylvania Securities Act's prohibition on the use of unregistered agents in the offer and sale of securities and fined Par Funding $499,000 ("Pennsylvania Order"). Am. Compl. ¶ 228. Then, in December 2018, the New Jersey Bureau of Securities issued a Cease-and-Desist Order against Par Funding based on its offer and sale of unregistered securities ("New Jersey Order"). *Id.* ¶ 229. Additionally, in February 2020, the Texas State Securities Board issued an Emergency Cease-and-Desist Order against Par Funding and others, alleging fraud and registration violations in connection with its securities offerings through an Agent Fund in Texas ("Texas Order"). *Id.* ¶ 231. The SEC alleges that Par Funding, LaForte, Abbonizio, and Vagnozzi promoted Par Funding's success while failing to disclose to investors that Par Funding had been sanctioned several times for violating state securities laws. *Id.* ¶¶ 220–27. Further, at trial, the SEC established that Furman made misrepresentations about the New Jersey Order to at least one potential investor—who was an undercover individual—falsely claiming that New Jersey had "retracted" its action against Par Funding and that Par Funding was "good" and did not face fines or penalties. Mot. at 43.

*Sixth*, the Amended Complaint asserts that Par Funding made false statements in its Form D filings with the SEC about McElhone and Cole's receipt of funds and Par Funding's payment

of finders' fees and commissions.  Am. Compl. ¶¶ 235–43.  Par Funding filed a Notice of Exempt Offering of Securities on Form D with the SEC on February 19, 2019, and an amended Form D on April 28, 2020.  *Id.* ¶¶ 235–36.  These filings stated that none of the gross proceeds of the offering had been or were proposed to be used for payments to executive officers or others listed on the form as Related Persons.  *Id.* ¶¶ 235–37.  The amended Form D, signed by Cole, also stated that Par Funding had paid no finders' fees and commissions.  *Id.* ¶ 237.  Contrary to these statements made on the Form D filings, both McElhone and Cole received money from the offering, *id.* ¶¶ 240–42, and Par Funding paid finders' fees of at least $3.6 million, as well as $1 million in commissions.  *Id.* ¶ 243.

**Seventh**, the Amended Complaint asserts that LaForte falsely told prospective investors that he had personally invested large sums of money in Par Funding.  *Id.* ¶¶ 244–45.  This was blatantly false, as LaForte had never invested in Par Funding.  *Id*. ¶245.

## LEGAL STANDARDS

Congress has authorized the SEC to enforce the Securities Act and the Exchange Act and to punish securities fraud through administrative and civil proceedings.  *SEC v. Spartan Sec. Grp., Ltd*., No. 8:19-CV-448, 2022 WL 3224008, at *1 (M.D. Fla. Aug. 10, 2022) (citing *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020)).  Once the Court has determined that securities violations have occurred, the Court has broad discretion to fashion appropriate remedies.  *Id*. (citing *SEC v. Lorin*, 76 F.3d 458, 461–62 (2d Cir. 1996)).  Appropriate remedies include injunctive relief, as well as monetary remedies—namely disgorgement, prejudgment interest, and civil penalties.  The Court proceeds by outlining the legal framework applicable for each remedy.

## I.   Monetary Remedies

The Supreme Court has made clear that disgorgement is a well-established equitable remedy for recovering "ill-gotten gains."  *See Liu*, 140 S. Ct. at 1942, 1947. Specifically, a disgorgement award that "does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *Id.* at 1940.  Importantly, disgorgement is not a punitive remedy—it is simply meant to restore the status quo.  *Id.* at 1942–44; *see also SEC v. Tayeh*, 848 F. App'x 827, 828 (11th Cir. 2021) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment from ill-gotten gains and must not be used punitively.").  Shortly after *Liu*, Congress amended the securities remedies statute to expressly permit courts to order disgorgement.[2]  As a result, current federal law states that "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).  Further, "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."  15 U.S.C. § 78u(d)(7).

To be entitled to disgorgement, the SEC must produce a reasonable approximation of a defendant's ill-gotten gains.  *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231–32 (D.C. Cir. 1989)).  "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Id.* (citations and quotation marks omitted).  Once the SEC produces a reasonable approximation of a defendant's ill-gotten gains,

---

[2]  Congress amended the securities remedies statute as part of the National Defense Authorization Act of 2021 ("NDAA").  *See Spartan Sec. Grp.*, 2022 WL 3224008, at *8.  The NDAA applies to "any action or proceeding that is pending on" January 1, 2021. NDAA § 6501(b).  This action was pending on that date.

the burden shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation.[3]  *Id.*

Importantly, courts must restrict disgorgement awards to "net profits from wrongdoing after deducting legitimate expenses."  *Liu*, 140 S. Ct. at 1946.  The Supreme Court has carved out a limited exception to this rule when the "entire profit of a business or undertaking" results from the wrongful activity.  *Id.* at 1945.  "[W]hen the 'entire profit of a business or undertaking' results from the wrongdoing, a defendant may be denied 'inequitable deductions' such as for personal services."  *SEC v. Blackburn*, No. 15-CV-2451, 2020 WL 10787527, at *2 (E.D. La. Nov. 3, 2020) (citing *Liu*, 140 S. Ct. at 1950) (cleaned up).  This exception requires a court to determine "whether expenses are legitimate or whether they are merely wrongful gains 'under another name.'"  *Id.*

## II.  Civil Penalties

Federal securities law permits the imposition of civil penalties for violations of federal securities law.  "Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations."  *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2010). "[T]he Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation."  15 U.S.C. §§ 77t(d)(1).  The penalties that the SEC can seek provide for three tiers of escalating amounts depending on the severity of the violations:

> **(A) First tier**
> The amount of the penalty shall be determined by the court in light of the facts and circumstances.  For each violation, the amount of the penalty shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any

---

[3]  The parties here—as well as courts around the country—all agree that the "reasonable approximation" standard has survived *Liu*.  *See Spartan Sec. Grp.*, 2022 WL 3224008, at *10; *SEC v. de Maison*, No. 21-620, 2021 WL 5936385, at *1–2 (2d Cir. Dec. 16, 2021); *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *15-16 (10th Cir. Dec. 16, 2021).

other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

**(B) Second tier**
Notwithstanding subparagraph (A), the amount of penalty for each such violation shall not exceed the greater of (i) $50,000 for a natural person or $250,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

**(C) Third tier**
Notwithstanding subparagraphs (A) and (B), the amount of penalty for each such violation shall not exceed the greater of (i) $100,000 for a natural person or $500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if—

(I)      the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(II)      such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. §§ 77t(d)(2).  The "Commission need only make 'a proper showing' that a violation has occurred and a penalty is warranted."  *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008). Beyond setting maximum penalties, the statutes leave the amount to be imposed to the discretion of the district judge.  *Monterosso*, 756 F.3d at 1338 (citing *Warren,* 534 F.3d at 1369); *see also SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013), *as amended* (Nov. 26, 2013) (*citing SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005)).  However, courts commonly calculate civil penalties in two ways—by assessing the gross pecuniary gain or by multiplying the number of violations by a specified dollar amount determined by reference to the applicable tier of offense severity.  *SEC v. Am. Growth Funding II, LLC*, No. 16-CV-828, 2019 WL 4623504, at *3 (S.D.N.Y. Sept. 24, 2019).  These penalty amounts are laid out in 15 U.S.C. §§ 77t(d)(2) and adjusted for inflation by the Federal Civil Penalties Inflation Adjustment Act of 1990.  *See* 17 C.F.R. §§ 201.1001.  Some

courts look to the number of "violative transactions" or the number of "investors to whom illegal conduct was directed," while others calculate damages based on the number of statutory violations committed. *Am. Growth Funding*, 2019 WL 4623504, at *3 (citation omitted).

Courts also look to the following general factors when imposing penalties under the civil penalty provisions of the securities laws:

> (1) the egregiousness of the violations at issue; (2) defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Huff*, 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010), *aff'd*, 455 F. App'x 882 (11th Cir. 2012). The Eleventh Circuit has held that, "[a]t most, ability to pay is one factor to be considered in imposing a penalty" and it is not determinative and does not merit significant weight. *Warren*, 534 F.3d at 1370; *see also Monterosso*, 756 F.3d at 1338.

## III. Injunctive Relief

"The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *Calvo*, 378 F.3d at 1216. The SEC bears the burden of proving that a recurrent violation is reasonably likely to occur. *Spartan Sec. Grp. Ltd.*, 2022 WL 3224008, at *1. There are six main indicia that courts look to when determining whether a wrong will be repeated, which include the "egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Calvo*,

378 F.3d at 1216 (quoting *SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1322 (11th Cir. 1982)) (internal citations omitted).

<u>**ANALYSIS**</u>

The Court begins by addressing three key issues affecting all remaining Defendants: (1) whether disgorgement is warranted; (2) whether the SEC has met their burden to provide a reasonable approximation for the disgorgement requested of each Defendant; and (3) whether the Receivership assets should be used to offset the amount of disgorgement owed by Defendants.

First, the Court finds that disgorgement is appropriate in this case. Here, three Defendants have admitted to significant wrongdoing and one Defendant was found liable by a jury of his peers on seven counts of securities violations. *See* Consent Judgments, Jury Verdict. The Court need not belabor the point—Defendants violated the securities laws numerous times over several years, and the SEC is entitled to disgorgement of their ill-gotten gains. *See* 15 U.S.C. § 78u(d)(7); *Liu*, 140 S. Ct. at 1948–49. Further, these ill-gotten gains will be distributed to the victim investors by the Receiver at a later time. Mot. at 29. Therefore, the disgorgement requests at issue are consistent with the applicable statutory provisions and the Supreme Court's admonition that disgorgement should be distributed to harmed investors where feasible. *Liu*, 140 S. Ct. at 1948–49.

Second, the SEC has satisfied its burden to provide a reasonable approximation of the requested disgorgement. The SEC relies on a variety of evidence—including the Amended Complaint (accepted as true by Defendants via their Consent Judgments for the purposes of this Motion), the Receiver's sworn declaration, the underlying books and records of Par Funding analyzed by a credentialed accounting firm, and evidence admitted at Furman's jury trial. *See*

Mot. at 30, 34, 42.[4]  Thus, although the Court is compelled to adjust the amount of disgorgement owed by Defendants as explained below, the SEC has met its initial burden.

Last, Defendants argue that the Court should offset or reduce the amount of disgorgement owed by each Defendant to account for the Receivership assets.  Resp. at 27–29.  Defendants are mistaken.  The sole purpose of disgorgement is to deprive "wrongdoers of their ill-gotten gains." *Liu*, 140 S. Ct. at 1942.  Accordingly, the current amount of Receivership assets has no bearing on the Court's disgorgement analysis.  The Court is charged with determining the profits Defendants received as part of their involvement in the fraudulent scheme and restoring the status quo.  *See id*. at 1942–44; *see also Tayeh*, 848 F. App'x at 828.  Any other claims or set-offs Defendants may assert as to the Receivership estate will be decided later at the claims handling stage of the litigation.  With these preliminary rulings in mind, the Court now turns to the SEC's requests for disgorgement, prejudgment interest, civil penalties, and injunctive relief.

## I. Disgorgement

The SEC seeks to disgorge the following amounts from each Defendant: (A) $226,471,877 from McElhone and LaForte; (B) $13,247,011 from Cole; and (C) $1,834,000 from Furman.  Mot. at 1.  Given that McElhone and LaForte, Cole, and Furman played differing roles in the Par Funding operation, the SEC has employed different methods to calculate disgorgement for each Defendant.  The Court will address each Defendant in turn.[5]

---

[4] Throughout the pendency of this litigation, Defendants have refused to produce a sworn accounting and fulsomely respond to discovery requests.  Mot. at 24, 27, 42.  As a result, the SEC has no better basis by which to calculate Defendants' net profits for purposes of disgorgement.

[5] McElhone and LaForte will be addressed together as the SEC seeks to hold the two (who are married) jointly and severally liable as to disgorgement.  Mot. at 30.  In *Liu*, the Court found that the SEC could seek joint and several liability for partners engaged in wrongdoing.  *See Liu*, 140 S. Ct. at 1949.  And McElhone and LaForte do not dispute the SEC's request to find the two joint and severally liable as to disgorgement. Resp. at 14.

### A.  Lisa McElhone and Joseph LaForte

To begin, the Court must address the SEC's contention that an adverse inference may be drawn against McElhone and LaForte given their repeated invocation of the Fifth Amendment throughout this litigation—as well as the SEC's request that the Court preclude them from introducing previously withheld evidence.  Mot. at 24.  The Court agrees that McElhone and LaForte cannot be permitted to use the Fifth Amendment as a sword and a shield.  *See SEC v. Zimmerman*, 854 F. Supp. 896, 899 (N.D. Ga. 1993) (explaining it is well-settled that "[t]he Fifth Amendment cannot be invoked to oppose discovery and then tossed aside to support a party's assertions").  In civil actions, the Fifth Amendment does not forbid adverse inferences against parties when they "refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).   However, McElhone and LaForte are "free . . . to use any other outside discovered evidence." *Zimmerman*, 854 F. Supp. at 899.  And here, to the extent Defendants wish to "present documentary evidence that the SEC and the Receiver have had from the outset of this case or the testimony of other witnesses who did not assert their Fifth Amendment rights," Resp. at 10, they may do so.  *See Zimmerman*, 854 F. Supp. at 899.

In their opposition to the SEC's disgorgement calculations, McElhone and LaForte argue that the SEC's disgorgement calculation should start with the Quarterly Status Report's figure of $246.4 million provided by the Receiver to the Court on May 2, 2022, [ECF No. 1223], because it is allegedly a "more reliable" snapshot of Par Funding's finances.  *See* Resp. at 14.  The SEC, by contrast, derives its disgorgement figure of $250,217,479 from an in-depth analysis of Par Funding's QuickBooks[6] records memorialized in the sworn declaration of the Receiver, [ECF No. 1214-1] ("Receiver's Declaration"), and the SEC's expert report, [ECF No. 774-1] ("SEC Expert

---

[6]  QuickBooks is an accounting software that businesses use to manage and track their financial health.

Report"). Reply at 3.[7]  The Court is compelled to begin with the SEC's starting figure for several reasons.

The SEC's figure is derived from an its Expert's intensive and multi-year analysis of Par Funding's QuickBooks records.[8]  The SEC's Expert, Melissa Davis, took two years to forensically analyze and reconcile Par Funding's QuickBooks records, bank account records, and promissory note records when issuing her report.  SEC Expert Report ¶ 131; Disgorgement Hr'g at 14:12–25. Melissa Davis is a Certified Public Accountant, Certified Insolvency and Restructuring Advisor, and Certified Fraud Examiner.  SEC Expert Report ¶ 131.  Both parties had access to these records for nearly two years and both parties produced expert reports based on them.  Disgorgement Hr'g at 14:12–25.  The Receiver's Declaration was also based on these same QuickBooks records that the SEC Expert Report relied on.  *Id.* at 14:16–17

By contrast, the May 2, 2022 Quarterly Status Report was produced by Bradley Sharp of Development Specialists, Inc.[9]  [ECF No. 1223-1].  Exhibit 3 of this report contains a one-page cash summary of Par Funding.  [ECF No. 1223-3] ("PF Cash Summary").  While the Quarterly Status Report and PF Cash Summary might have been produced later in time than the SEC's Expert Report, they did not undergo nearly the same level of scrutiny as the SEC Expert Report.  *See* Reply at 3–4.  The Quarterly Status Report and PF Cash Summary are Brad Sharp's unsworn analysis.  These documents have not been reviewed by an accountant; they contradict the

---

[7] Defendants' and the SEC's proposed starting figures are roughly $3.8 million apart.  *See also* Resp. at 14–15.

[8] Throughout the pendency of this litigation, Par Funding's books and records have been in the hands of the Receiver.  The Receiver has relied on these records to update the Court quarterly on Par Funding's finances.  Resp. Ex. 12 at 10–11.

[9] Development Specialists, Inc. ("DSI") is a provider of management consulting and financial advisory services.

QuickBooks figures that both the SEC and Defendants' expert[10] reports relied on; and were produced after the close of discovery in this case.  Reply at 4–5; Disgorgement Hr'g at 14:5–16:4. These facts make it uncertain at best as to whether the Quarterly Status Report and PF Cash Summary provide a "more reliable" snapshot of Par Funding's finances than the Receiver's Declaration and SEC Expert Report.  Because binding caselaw in this Circuit compels resolution of uncertainty against the defrauding party, the Court will begin its disgorgement analysis with the SEC's figure.  *Calvo*, 378 F.3d at 1217; *see also SEC v. Owings Group, LLC*, No. RDB-18-2046, 2021 WL 1909606, at *4 (D. Md. May 12, 2021).

Using the SEC's starting figure, the Court now turns to McElhone and Laforte's arguments for deductions from the total sum of $250,217,479.  The Court arrives at this number by subtracting the total amount the company repaid to investors, including the Agent Funds ($300,108,117), from the total sum that Par Funding raised from investors ($550,325,596).  *See* Receiver's Decl. ¶¶ 6–7.

### i.  *Deductions for Other Disgorgement Awards*

McElhone and LaForte ask the Court to deduct the disgorgement amounts from all other Defendants in this case from their own.  Resp. at 16.  The SEC, in its Motion, agreed that the disgorgement amounts attributed to Abbonizio and Cole should be deducted from McElhone and LaForte's disgorgement amount.  *See* Mot. at 30.  McElhone and LaForte contend additionally, however, that they are entitled to a reduction for any disgorgement obtained from Furman, Gissas, and Vagnozzi.  *Id.*  The SEC explains that it deducted all amounts paid by Par Funding to Furman, Gissas, and Vagnozzi in its initial deduction.  *See* Mot. at 30, n.3; Reply at 6.

---

[10]  Defendant's Expert, Joel Glick, also produced a report that relied on the QuickBooks figures [ECF No. 727-2] ("Defendants' Expert Report").  The figures in the Quarterly Status Report and PF Cash Summary are inconsistent with the numbers in Defendants' Expert Report as well.  Reply at 5.

Based on the allegations in the Amended Complaint, Furman, Gissas, and Vagnozzi were compensated through their Agent Funds. Am. Compl. ¶¶ 6–7. The SEC deducted all distributions made to Agent Funds from their initial calculation. Therefore, Defendants are not entitled to any disgorgement offset because the "ill-gotten" gains of Furman, Gissas, and Vagnozzi have not been attributed to McElhone and LaForte. Any disgorgement sought or obtained from Furman, Gissas, and Vagnozzi is based on their net profits—the difference between the payments Par Funding made to the Agent Funds and the amount the Agent Funds disbursed to their investors—in other words, "the spread" from the fraudulent scheme. *Id.* ¶ 4. Because payments to the Agent Funds have been subtracted from the SEC's calculation of McElhone and LaForte's requested disgorgement, they are not entitled to any further reduction on this point.[11]

This same analysis applies to McElhone and LaForte's request to obtain an offset for any disgorgement the SEC seeks from A.G. Morgan Financial Advisors, LLC, Vincent J. Camarda, and James McArthur. Reply at 6–7. The SEC has already deducted the investor funds sent to those individuals from its calculation of McElhone and LaForte's disgorgement. *Id.* Accordingly, the Court will not make any additional deductions for disgorgement sought from A.G. Morgan Financial Advisors, LLC, Vincent J. Camarda, and James McArthur.

### ii. *Deductions for Balance of Notes to Other Profit Participants*

Next, McElhone and LaForte ask the Court to deduct the balance of notes from a specific subset of note holders. Resp. at 18. Currently, Par Funding owes a family of investors—the Chehebars—$56,600,000 in unpaid notes (*i.e.*, the Chehebars invested $56,600,000 in Par

---

[11] This situation is distinguishable from that of Cole and Abbonizio. Cole and Abbonizio were paid through commissions and consulting fees. Am. Compl. ¶¶ 20–21. As a result, the SEC did not previously deduct their disgorgement from the ill-gotten gains of McElhone and LaForte because their compensation was not a disbursement to investors. *See generally* Mot. at 30 n.4.

Funding).  *Id.*  McElhone and LaForte profited from this investment; however, they argue they should not have to disgorge the monies owed to the Chehebars because the family was well aware of the risks of investing in Par Funding, had consulting agreements with Par Funding, and were profit participants in the company.  *Id.* at 19.  While this may be true, it does not change the fact that McElhone and LaForte profited from their investments and those profits are ill-gotten gains ripe for disgorgement.  Accordingly, McElhone and LaForte are not entitled to the $56,600,000 deduction they seek.

### iii.   *Deductions for Consulting Fees Paid to Outsiders*

McElhone and LaForte claim they are entitled to deduct consulting fees paid to outsiders—consultants who are not parties to this lawsuit.  Resp. at 19.  Because this request warrants a larger discussion regarding whether Par Funding is entitled to deductions for legitimate business expenses, the Court takes the opportunity to address that issue here.

The SEC contends that Par Funding, and therefore McElhone and LaForte, are not entitled to deduct any business expenses from their disgorgement amount because the entire profit of the business resulted from wrongful activity.  Mot. at 33; *see Liu*, 140 S. Ct. at 1945.  The SEC tries to characterize Par Funding as the type of exception case described in *Liu* by arguing that the entire "business resulted from wrongful activity," and therefore "business expenditures are not deducted from the disgorgement figure."  Mot. at 33 (citing the portion of *Liu* enumerating the exception to the general rule that courts sitting in equity may order disgorgement of ill-gotten gains after deducting legitimate business expenses).  The SEC further suggests that it would be impossible to determine if Par Funding had "value independent of fueling a fraudulent scheme."  *Id.*

In the Response, McElhone and LaForte state that Par Funding was a profitable business that incurred legitimate expenses.  Resp. at 20.  Par Funding generated substantial profits from its

MCA operations, employed over 75 employees, and for a time paid hundreds of millions of dollars in principal and interest to noteholders. *Id*. While the Court will not go so far as to say that Par Funding was always a profitable business—after all, forensic analysis of its QuickBooks records shows that it was often breaking even or in the red, *see* SEC Expert Report ¶¶ 71–73—the Court does not find that Par Funding had absolutely no value apart from the fraudulent scheme. Par Funding lent money to legitimate businesses (in addition to some illegitimate ones as well) and collected on some of the loans it made. *See* Resp. at 20; *see also* PF Cash Summary (detailing advances to merchants and payments from merchants). As a result, the Court finds McElhone and LaForte have met their burden to show that the SEC's disgorgement figure is not reasonable insofar as it does not deduct any legitimate business expenses.[12]

The SEC filed a Notice of Supplemental Authority on October 24, 2022, analogizing *SEC v. Fisher*, No. 21-60624, 2022 WL 13650848, at *1 (S.D. Fla. Oct. 21, 2022), to the instant case. [ECF No. 1431]. The SEC contends that *Fisher*—a case where the court denied any deductions for business expenses—bolsters the SEC's arguments here because the defendant in *Fisher* "(1) failed to prove the expenditures had value independent of fueling a fraudulent scheme . . . and (2) operating costs appeared to be costs that would have existed whether or not Defendants sold the

---

[12] Moreover, even if Par Funding had no value independent from the fraudulent scheme, the SEC misapplies *Liu*. The SEC interprets *Liu* to say that the deduction of business expenses is not required when the entire profit of a business or undertaking results from the wrongdoing. Reply at 11. But that interpretation ignores the entirety of the Court's analysis in *Liu*. *See Liu*, 140 S. Ct. at 1945–46. The Court explained that "when the 'entire profit of a business or undertaking' results from the wrongdoing, a defendant may be denied 'inequitable deductions' such as for personal services." *Blackburn*, 2020 WL 10787527, at *2 (quoting *Liu*, 140 S. Ct. at 1945–46). This exception requires the court to determine "whether expenses are legitimate or whether they are merely wrongful gains 'under another name.'" *Id*. (quoting *Liu*, 140 S. Ct. at 1945–46) (citations omitted). Here, the SEC has failed to demonstrate that the entire profit of Par Funding resulted from wrongful activity or that Defendants, in requesting deductions for legitimate business expenses, are making "unconscionable claims for personal services or other inequitable deductions." *Liu*, 140 S. Ct. at 1945 (internal quotations omitted).

securities."  *Id.*  The supplemental filing illustrates an aspect of the SEC's argument prone to opacity and fluctuation.  The Court will take a moment to explain.

The SEC maintains that Par Funding should fit into the exception enumerated by *Liu*, which would prohibit any deductions for business expenses because the "entire profit of [Par Funding] results from [] wrongful activity."  Mot. at 33 (quoting *Liu*, 140 S. Ct. at 1945).  Defendants rebutted this assertion in part by demonstrating that Par Funding's profits did not result entirely from wrongful activity, thereby entitling Defendants to certain legitimate business expense deductions. Resp. at 19–23, 30–45.  Faced with this partial rebuttal, the SEC reframed its argument in its Reply, moving away from the *Liu* exception.  The SEC now avers it does not seek to disgorge profits from the MCA business—the legality of which is not in dispute—just profits derived from the fraudulent promissory notes.  *See* Resp. at 33; Reply at 10–11.  And because the SEC has alleged that "investor funds were used to pay investors" via the fraudulent promissory notes, legitimate business expenses should not be deducted.  Reply at 13.  At the Disgorgement Hearing, the SEC further pursued this argument, and lead trial counsel for the SEC appeared to concede that this theory of disgorgement was not adequately framed in the Motion.[13]

There are both procedural and substantive problems with the SEC's position. Procedurally, the SEC did not raise this argument on business deductions in its underlying Motion, so Defendants were unable to fulsomely respond to it.  Courts have consistently held that "a reply memorandum may not raise new arguments or evidence."  *Lage v. Ocwen Loan Servicing LLC*, 145 F. Supp. 3d 1172, 1181 (S.D. Fla. 2015), *aff'd*, 839 F.3d 1003 (11th Cir. 2016) (internal

---

[13]  Counsel for the SEC stated, "if you look at our motion, the SEC does not seek any—it's just not there. I guess I should have written it.  We are seeking—the basis of our disgorgement is related to the notes only."  Disgorgement Hr'g at 86:3–7.  Notably, in its Notice of Supplemental Authority, the SEC is only able to cite to arguments raised at the Disgorgement Hearing, as opposed to anywhere in its Motion or Reply.

quotations and citations omitted); *see also Kellner v. NCL (Bahamas), LTD.*, 753 F. App'x 662, 667 (11th Cir. 2018) ("[I]t is by now clear that we cannot consider arguments raised for the first time in a reply brief." (internal citation omitted)).  Though the Court benefitted from oral argument on the SEC's Motion in many respects, the SEC cannot expect the Court to adopt a transformed argument at a hearing without having adequately briefed it.

Substantively, the SEC's argument draws an illusory distinction regarding the business of Par Funding.  The promissory notes brought in funds that fueled the MCA portion of Par Funding's business model.  It was all intertwined, which the SEC suggests "sound[s] in fraud."  Reply at 12 (internal quotations and citation omitted).  But instead of attempting to draw out distinctions and propose a business expense deduction calculation that considers the intertwined structure of Par Funding, the SEC opted for an all or nothing approach in its briefing.  The Court finds that based on the record, a portion of Par Funding was a lawful business, and therefore legitimate business expenses must be deducted in accordance with *Liu*.  The Court's viewpoint was further confirmed by the Receiver at oral argument, whose review of the Par Funding records demonstrates that the amount Defendants seek to deduct are operational in nature.  Disgorgement Hr'g at 125:12–126:1.  Such deductions contrast sharply with the extravagant dinners and travel expenses that the defendant in *Fisher* attempted to deduct as legitimate business expenses.  [ECF No. 1431-1] at 5.

Having cleared the threshold to be able to consider legitimate business expenses, the Court must now determine whether these consulting fees paid to "outsiders" qualify for this deduction. The Court finds that they do.  McElhone and LaForte present a breakdown of consulting fees taken from Par Funding's QuickBooks.  Resp. at 21.  These consultants include financial firms, marketers, promotional product companies, and more.  *See SEC v. Almagarby*, No. 17-62255, 2021 WL 4461831, at *2 (S.D. Fla. Aug. 16, 2021), *report and recommendation adopted*, No. 17-62255,

2021 WL 4459439 (S.D. Fla. Sept. 29, 2021), *report and recommendation adopted*, No. 17-62255, 2022 WL 832279 (S.D. Fla. Feb. 15, 2022) (deducting brokerage commissions, fees paid to finders, fees paid for legal opinion, and fees paid to transfer agents from disgorgement award based on gross proceeds from defendant who was found to have violated Section 15(a) of the Securities and Exchange Act of 1934).

While the SEC continues to attack the reliability of McElhone and LaForte's evidence, said evidence is derived from the same books and records that the Receiver has reviewed.  Reply at 16; *see also* Receiver Declaration [ECF No. 1214-1] ¶¶ 4, 8–10.  Moreover, the SEC has not made a sufficient showing that the entire undertaking of Par Funding resulted from wrongdoing such that it would fit into the narrow exception articulated in *Liu* precluding any deductions for legitimate business expenses.  *Liu*, 140 S. Ct. at 1945.  Because the Court views these arms-length consulting fees as legitimate business expenses, the Court deducts **$8,620,102.26** from the SEC's requested disgorgement award.  *See* Resp. at 19.

### iv.  *Deductions for Par Funding's Other Legitimate Business Expenses*

McElhone and LaForte ask the Court to deduct $54,441,665.65 worth of legitimate business expenses from the SEC's requested disgorgement award.  Resp. at 22.  In support, they attach a profit and loss statement showing Par Funding's annual expenses by category, as well as Par Funding's QuickBooks files and other books and records that backup these expenses.  *Id*.  McElhone and LaForte acknowledge that the Receiver in his Quarterly Status Report estimated these operating costs at a lower amount.  Resp. at 23 n.31.  The Receiver identified $42,600,000 worth of operating costs in the PF Cash Summary.  These operating costs excluded all commissions and consulting fees (which are included as a separate line item in the PF Cash Summary).  But given the arguments enumerated above by the SEC that the numbers derived from

the QuickBooks records are more reliable and thoroughly reviewed, the Court declines to rely on the PF Cash Summary and Quarterly Status Report here as well.[14]  Instead, the Court will rely on Defendant's profit and loss statement, based in the QuickBooks records, which provides an itemized list of legitimate business expenses.  *See* Resp. at 21, [ECF No. 1330-7] ("Profit and Loss Statement").  While the SEC contests the validity of deducting legitimate business expenses in general, it does not propose an alternative calculation for this figure.  *See* Reply at 9–14.  Accordingly, the Court deducts **$54,441,665.65** from McElhone and LaForte's total disgorgement.

### v. Deductions for Legitimate Business Expenses of Full Spectrum Processing

Next, McElhone and LaForte ask the Court to deduct the legitimate business expenses of Full Spectrum Processing ("FSP") in the amount of $12,216,749.13.  Since 2017, Par Funding has been operated by FSP.  Am. Compl. ¶ 42.  Par Funding relied on FSP to perform all their back-office functions—including payroll, in-house accounting functions, IT, HR services, and maintaining office space for the operations of Par Funding.  Resp. at 24.  Once again, the SEC counters that McElhone and LaForte present no credible evidence that these were legitimate business expenses, Reply at 16–17, while McElhone and LaForte rely on the records in the hands of both the SEC and the Receiver.  Resp. at 24 n.33.  Upon reviewing the evidence advanced by the parties and questioning the Receiver about the matter at oral argument, the Court is satisfied that FSP represented a legitimate business expense for Par Funding and the amount disbursed to

---

[14] McElhone and LaForte describe their legitimate business expenses in their Response—expenses such as banking fees, computer and internet expenses, insurance costs, janitorial services, legal fees, other professional fees, payroll to non-insiders, and utilities costs.  Resp. at 24.  While the Court is not relying on the Receiver's PF Cash Summary for this calculation, the Court had occasion to question the Receiver at the Disgorgement Hearing about his views on the business expenses that he reviewed.  The Receiver confirmed that the operating expenses he saw were everything from "janitorial supplies to computer stuff . . . . and [he thought] most of what you see in there is [sic] fairly routine expenses."  Disgorgement Hr'g at 125:12–126:1.

FSP does not contain payments to personal entities of McElhone or LaForte that would represent ill-gotten gains. *See* Disgorgement Hr'g at 71:5-72:17 (Receiver confirming his understanding that FSP was a service provider to Par Funding and undertook tasks such as listing emails, processing collections, and updating records). Thus, the Court will deduct **$12,216,749.13** in FSP's business expenses from McElhone and LaForte's total disgorgement amount.

### vi. *Deductions for Taxes*

McElhone and LaForte ask the Court to deduct income taxes paid on behalf of (1) Par Funding and (2) McElhone and her entities incurred on income earned from Par Funding. Resp. at 25. The Court finds that income taxes paid on behalf of Par Funding should be deducted from McElhone and LaForte's disgorgement amount. However, any income tax paid by McElhone as to income she or her various entities earned from Par Funding is not subject to deduction.

Unlike income tax paid on personal income earned, the taxes paid on behalf of Par Funding constitute a legitimate business expense—particularly since the company did do some legitimate business. These taxes are akin to deductions the district court made in *Liu*. *See SEC v. Liu*, No. SACV 16-00974-CJC(AGRx), 2021 WL 2374248, at *6 (C.D. Cal. June 7, 2021), *aff'd sub nom. SEC v. Liu*, No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022). There, District Judge Carney found that tax payments associated with the construction of a building were legitimate business expenses. *Id*. Like Judge Carney, the Court takes a conservative approach in calculating legitimate business expenses given the *Liu* Court's emphasis that disgorgement is not meant to be punitive. To determine the deductible amount of business taxes, the Court relies on the evidence presented by McElhone and LaForte—a reconstruction of tax payments made by Par Funding based on its books and records—and finds that evidence to be credible.

However, McElhone and LaForte's request to deduct personal income taxes from their disgorgement amount is markedly different from income taxes related to Par Funding. On this point, the Court finds the reasoning in *SEC v. Huff* to be instructive:

> The idea behind doing so [requiring defendants to disgorge sums equal to ill-gotten gains used to pay income taxes] comports with the premise of disgorgement not to allow an individual to enjoy ill-gotten gain in that where a person receives income, payment of the income tax on that income bestows a benefit upon the person who received the income: but for the use of the improperly-obtained monies to pay the tax liability on the income, the person receiving the income would have had to have paid the taxes on the sum. In other words, it matters not how the ill-gotten gains were ultimately expended, so long as the spending of the ill-gotten gains bestowed a benefit on the person from whom the monies are to be disgorged.

No. 08-60315, 2011 WL 1102777, at *6 (S.D. Fla. Mar. 23, 2011). Post *Liu*, courts around the country have found that defendants are not entitled to a deduction for personal income taxes paid on their ill-gotten gains. *See SEC v. New, et al.*, No. 18-cv-03975, slip. op. at 8 (S.D. Ind. Apr. 26, 2022); *see also SEC v. Arias*, No. 12-cv-2937 (MKB)(SIL), 2021 WL 7908041, at *6 (E.D.N.Y. Nov. 11, 2021) (collecting cases). Therefore, McElhone and LaForte are only entitled to a deduction for taxes paid as to Par Funding in the amount of **$11,854,776.23**.

In sum, after incorporating deductions for Cole and Abbonizio's disgorgement amounts described below (**$10,055,625** and **$10,498,581** respectively), legitimate business expenses, fees paid to outside consultants, and income taxes paid on behalf of Par Funding, McElhone and LaForte are **ORDERED** to disgorge **$142,529,980**.

### B.  Joseph Cole Barleta

The SEC seeks an award of disgorgement in the amount of $13,247,011 against Cole. Mot. at 1. Cole entered into a Consent Judgment with the SEC. [ECF No. 1016-1]. As a threshold matter, the SEC argues that Cole should be precluded from introducing evidence about his receipt

and use of funds because he refused to provide a sworn accounting after the Court compelled him to do so.  Mot. at 27.  But Cole does not seek to submit such evidence, and therefore, the Court need not address the SEC's concerns.

The SEC supports its requested disgorgement award in two ways: (1) with allegations in the Amended Complaint (accepted as true) and (2) with "records available to the SEC and the Receiver."  Mot. at 34; *see also* Reply at 29.  While this evidence is sufficient to meet the SEC's burden of "reasonable approximation", the Court must engage in a more fulsome analysis to determine Cole's appropriate disgorgement amount.

The Court begins by first referring to the Amended Complaint.  The Amended Complaint alleges that Par Funding transferred funds, which included investor funds, to "companies in which Cole has an ownership interest or otherwise receives financial benefits."  Am. Compl. ¶¶ 19, 240.  Those companies included ALB Management, Beta Abigail, and New Field Ventures, LLC.  *Id*.  Based on the exact language used in the Amended Complaint, Cole did not admit to owning 100 percent of each entity.  Therefore, any presumption by the SEC that all funds disbursed to those three entities can be solely attributed to Cole's ill-gotten gains appears misplaced.  *See* Mot. at 27.

In the Response, Cole admits he had a significant ownership interest in and received distributions through ALB Management and Beta Abigail.  Resp. at 28.  As explained *supra* at 15–16, the Court relies on the SEC Expert Report as the most reliable source from which to determine Par Funding's disbursements.   ALB Management and Beta Abigail received approximately $8,063,304 in total distributions from Par Funding.  SEC Expert Report ¶ 128.  Further, Cole acknowledges that he received approximately $751,000 in salary and bonus payments from Par Funding.  Resp. at 29.  Thus, based upon a review of the distributions and salary, the Court is satisfied that a reasonable approximation of Cole's liability is $8,814,304 worth

of disgorgement. Again, "[e]xactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Calvo*, 378 F.3d at 1217 (citations and quotation marks omitted).

Less clear is the issue of what portion of the funds received by New Field Ventures are attributable to Cole's ill-gotten gains. Resp. at 28. As stated in the Amended Complaint, Abbonizio co-owned New Field with Cole. Am. Comp. ¶ 20. To the Court's best understanding, Abbonizio did not own any other company or entity which received disbursements from Par Funding. It is Cole's contention that he did not receive distributions from New Field. Resp. at 28. His evidentiary support for this contention consists of his own deposition testimony and a purported agreement between Par Funding and New Field. *Id*. The agreement shows that Abbonizio was the manager of New Field. *See* [ECF No. 1330-13] at 6. However, that agreement is not signed and thus provides no probative value to the Court. While the Court cannot say with certainty that Cole received zero distributions from New Field, the Court is persuaded that Cole did not receive 100 percent of the distributions from New Field because it was "Abbonizio's company with Cole." *See* Am. Compl. ¶¶ 19–20; Disgorgement Hr'g at 54:23–56:9 (discussing the SEC's calculations related to Cole's connection to New Field Ventures). Defense counsel maintained that Cole did not profit at all from New Field. Given the allegations in the Amended Complaint, however, some percentage of the New Field distributions must be allocated to Cole. *See id.*

Given the foregoing, the Court must make the following inferences based on the Amended Complaint, the SEC's Expert Report, and the Receiver's analysis of the books and records. Abbonizio was a part-owner of New Field Ventures. Am. Comp. ¶ 20. The Amended Complaint

lacks any other suggestion that Abbonzio received additional funds from Par Funding.  *See generally* Am. Comp.  New Field received $11,739,902 from Par Funding.  SEC Expert Report ¶ 13.  Abbonizio entered into a settlement with the SEC, agreeing to disgorge $10,498,581.00. [ECF No. 1169] at 5.  Based on the Amended Complaint (which alleges that New Field Ventures received approximately $9,500,000), as well as the Receiver's Quarterly Status Report, the Court infers that Abbonizio's disgorgement of ill-gotten gains is reflective of payments made to New Field.  As such, the SEC cannot seek to disgorge all disbursements made to New Field from Cole. Thus, the Court seeks to disgorge from Cole (in relation to his beneficial interest in New Field) the difference between Abbonizio's disgorgement ($10,498,581.00) and the total funds disbursed to New Field Ventures ($11,739,902).  That difference is $1,241,321.

In addition, Cole argues that he should be permitted to deduct the amount he paid in income taxes from his disgorgement amount.  Resp. at 29.  However, for the reasons stated above, the Court declines to deduct personal income taxes from Cole's disgorgement.  *See SEC v. Merch. Cap., LLC*, 486 F. App'x 93, 96 (11th Cir. 2012) (rejecting argument that the district court was required to consider the amount of income taxes paid).  Accordingly, the Court calculates that the appropriate disgorgement amount from Cole is equal to the undisputed $8,814,304 disbursed from Par Funding to Beta Abigail, ALB Management, and Cole personally, in addition to the funds attributable to New Field Ventures in the amount of $1,241,321.  Cole is therefore **ORDERED** to disgorge a total amount of **$10,055,625**.

### C.  Michael C. Furman

The SEC seeks an award of disgorgement totaling $1,834,000 against Furman.  Mot. at 1. Unlike McElhone, LaForte, and Cole, Furman proceeded to trial and a jury handed down a verdict in favor of the SEC on all counts.  As a result, Furman is in a different procedural posture than the

other Defendants discussed herein.  The Court does not have a consent judgment to rely on in assessing the SEC's requested monetary relief.  Instead, the Court relies on the evidence submitted at trial—evidence the jury considered when finding Furman liable on all counts.

As an initial matter, Furman argues that the SEC has not met its burden to establish a reasonable estimate of his ill-gotten gains.  *See* Furman Resp. at 1.  Furman contends the trial testimony of Bradley Sharp and the corresponding trial exhibit, Exhibit 205 [ECF No. 1121-26], are not reliable pieces of evidence.  Given their use and admittance at trial, the Court disagrees. Furthermore, given that Furman wholly "failed to produce any financial documents in response to discovery requests and failed to file the Court-ordered sworn accounting of the funds he received in connection with the violations," the Court is inclined to find that the evidence put forth by the SEC is sufficient to establish a reasonable approximation of damages.  *See* Reply at 32.  The burden now shifts to Furman to demonstrate that the SEC's estimate is not a reasonable approximation. For the reasons that follow, Furman definitively fails to do so.

Similar to McElhone, LaForte, and Cole, the SEC argues that Furman should be precluded from submitting any new evidence in these disgorgement proceedings because he previously failed to produce any type of sworn accounting to the SEC, and repeatedly stated that he did not know how much he profited from the scheme.  Mot. at 42; Reply at 32.  However, distinct from McElhone, LaForte, and Cole, Furman seeks to submit new evidence for the Court's consideration—namely, a declaration presenting his own calculations as to the amount he profited from the scheme; a collection of bank statements; and a few pieces of correspondence between him and his legal counsel.  [ECF No. 1296-1] ("Furman Declaration").  But it is well-established that "[t]he Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions."  *See Zimmerman*, 854 F. Supp. at 899 (citing *McGahee v.*

*Massey,* 667 F.2d 1357, 1362 (11th Cir. 1982)).  Thus, while it is clear the Court need not consider Furman's new evidence—it will do so anyway in order to illustrate the deficiencies in his evidentiary submissions.

Furman fails to provide any evidence (new or otherwise) that the business records presented at trial—and admitted into evidence—were incorrect.  Reply at 32; *see generally* Furman Dec.  Next, Furman argues that if the Court finds the SEC's disgorgement approximation reasonable, he is entitled to deductions for legitimate business expenses.  Furman Resp. at 3–5. However, Furman fails to present concrete and credible evidence to support any legitimate business expenses whatsoever.

The Court has carefully reviewed Furman's Declaration and attached exhibits.  Indeed, the Court attempted to match the business expenses claimed by Furman with the bank statements he submitted.  It was impossible to do so.  At best, Furman's bank records contain line items with descriptions such as "Direct Pay" or "Bills.com Payables."  *See* Furman Dec. Ex. A at 38, 61, 63. Those descriptions do not indicate what bills were being pa*id.  See id.*[15]  As such, the Court cannot verify the expenses alleged in Furman's Declaration and any risk of uncertainty falls on the "wrongdoer whose illegal conduct created that uncertainty."  *See Calvo*, 378 F.3d at 1217; *see also Blackburn*, 2020 WL 10797527, at *5 ("Defendants must bear the burden of any uncertainty in disgorgement awards.").  Moreover, many of the expenses listed in Furman's Declaration—such as business travel expenses, dental expenses, and certain payroll and healthcare expenses—do not qualify as legitimate business expenses.  *See Liu*, 140 S. Ct. at 1945–46 (explaining that a

---

[15]  There is one line item which contains a notation under the Bill.com payables description which reads, "Palm Beach Tax Group" for $333.33.  Furman Dec. Ex. A at 63.  However, this item does not align with the expense attributed to Palm Beach Tax Group in Furman's Declaration.  *Id.* at ¶ 10.  The expense attributed to Palm Beach Tax Group is listed as $3,326.00—a far cry from $333.33.  *Id.*

defendant will not be allowed to diminish net gains through the showing of expenses such as unconscionable claims for personal services, deductions for personal or living expenses, or other expenses that are shown to be merely dividends of profits under another name).[16]

Accordingly, the Court cannot deduct any legitimate business expenses from the SEC's requested disgorgement award for Furman.  *See Tayeh*, 848 F. App'x at 829–30 (holding the district court did not abuse its discretion when it set defendant's disgorgement award equal to defendant's ill-gotten gains where defendant failed to present concrete and credible evidence on purported business expenses and kept inadequate records).  Therefore, Furman is **ORDERED** to disgorge **$1,834,000**.

## II.  Prejudgment Interest

### A.  Lisa McElhone, Joseph LaForte, and Joseph Cole Barleta

The Consent Judgments signed by McElhone, LaForte, and Cole state that "[t]he Defendant further understands that, if disgorgement is ordered, Defendant shall pay prejudgment interest thereon, calculated from August 1, 2020 based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."  *See* [ECF Nos. 1002-2, 1003-2, 1016-1].  The Court has calculated the appropriate prejudgment interest amounts up through the date of this Order and determines that Defendants McElhone, LaForte, and Cole are **ORDERED** to pay prejudgment interest in the following amounts:

---

[16]  To the extent Furman requests an additional opportunity for discovery, that request is denied.  Furman Resp. at 2.  Furman previously raised this concern before Magistrate Judge Reinhart.  [ECF No. 1263].  Magistrate Judge Reinhart held a hearing and issued an Order on Defendant Michael Furman's Request to Take Depositions.  *See* [ECF No. 1276].  In the Order, he explained that discovery closed on September 10, 2021 and unlike Defendants McElhone, LaForte, and Cole, Furman did not enter into a consent agreement which allowed him to take additional discovery past that deadline.  *Id*. at 2.  Importantly, Magistrate Judge Reinhart denied Furman's request to undertake additional discovery without prejudice, allowing Furman to seek leave from this Court to extend the discovery deadline.  *Id*. at 3.  Furman did not do so.

- McElhone and Laforte: **$10,694,758.24**

- Cole: **$754,525.32**

### B. Michael C. Furman

The SEC requests that Furman pay $88,691.74 in prejudgment interest. Mot. at 1. Along with disgorgement, the district court may also award prejudgment interest, and has wide discretion in making that calculation. *SEC v. Lauer*, 478 F. App'x 550, 557 (11th Cir. 2012) (citing *SEC v. Carrillo*, 325 F.3d 1268, 1269 (11th Cir. 2003)). In a conclusory fashion, Furman states that the SEC has no basis to impose prejudgment interest. Furman Resp. at 12. However, the Eleventh Circuit has noted that awards of prejudgment interest are "compensatory, not punitive, and that the district court should make its interest decision through 'an assessment of the equities.'" *Lauer*, 478 F. App'x at 557–58 (citing *Osterneck v. E.T. Barwick Indus., Inc.,* 825 F.2d 1521, 1536 (11th Cir. 1987)).

Based on an assessment of the equities, including treatment of other Defendants in this action, the Court finds that an award of prejudgment interest is appropriate. Moreover, the SEC specifically asks for "prejudgment interest based on the IRS rate for unpaid taxes." *See* Mot. at 42. Courts in this Circuit regularly apply this rate in calculating prejudgment interest on disgorgement awards. *See Spartan Sec. Grp., Ltd*., 2022 WL 3224008, at *12 (citing *Lauer*, 478 F. App'x at 557–58). Accordingly, the Court has calculated the appropriate prejudgment interest up through the date of this Order and determines that Furman is **ORDERED** to pay prejudgment interest in the amount of **$137,614.46**.

### III. Civil Penalties

The Court begins its assessment of civil penalties by addressing each Defendant's relevant conduct. In its Motion and Reply, the SEC includes additional facts, evidence, and conclusions

regarding LaForte, McElhone, and Cole's misconduct. *See* Mot. at 21–24. However, pursuant to the Consent Judgments, the Court will focus its analysis on the allegations found within the Amended Complaint in determining the proper civil penalties for LaForte, McElhone, and Cole. *See* Consent Judgments. Where necessary, and as agreed to by Defendants in their Consent Judgments, the Court determines "issues raised in the Motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standard for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." [ECF No. 1002-2] ¶ 5; [ECF No. 1004-1] ¶ 5; [ECF No. 1016-1] ¶ 5.

The SEC seeks Tier 3 Civil Penalties against each remaining Defendant—$50,000,000 from McElhone, $50,000,000 from LaForte, $5,000,000 from Cole, and $1,834,000 from Furman. Mot. at 1. Defendants McElhone, LaForte, and Cole dispute that Tier 3 penalties are appropriate in this case—arguing for, at most, Tier 2 penalties. Resp. at 47. Furman contends that civil penalties are not appropriate at all. Furman Resp. at 6. Accordingly, the Court will first address whether the SEC has made a proper showing that civil penalties are appropriate.

As to all Defendants, the SEC has established multiple violations occurred, and penalties are warranted. *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008). Defendants McElhone, LaForte, and Cole have admitted to selling unregistered securities and making a litany of serious misrepresentations to investors in violation of the antifraud provisions of the Securities Act and the Exchange Act. Am. Compl. ¶¶ 154–294. Further, a jury found Furman liable for committing seven counts of securities violations. *See* Jury Verdict. This showing is more than sufficient to warrant civil penalties. The Court thus turns to address the appropriate tier of civil penalties.

Tier 3 penalties require violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" that also "directly or indirectly resulted in

substantial losses or created a significant risk of substantial losses[.]" *Am. Growth Funding,* 2019 WL 4623504, at \*3. Defendants argue that Tier 3 penalties are not appropriate because the specific misrepresentations in the Amended Complaint are not causally related to any loss. Resp. at 29–30. But that is not what the statute requires—the statute requires only that the individual's conduct created a "significant risk of loss." *Id.*

Defendants here participated in unregistered securities offerings and made multiple serious misrepresentations to investors—notably, misleading investors as to Par Funding's actual default rate, concealing Par Funding's sordid regulatory history, and concealing LaForte's criminal history—and have left hundreds of millions of investor returns unpa*id. See generally* Am. Compl. These misrepresentations alone create a significant risk of substantial losses to investors. For example, the "low" default rate touted by Defendants was information investors depended on in deciding whether to invest in Par Funding. *See* Am. Compl. ¶¶ 185–203.[17] Further, in deposition testimony, Cole admitted that Par Funding had collected roughly what it had lent out—meaning Par Funding was barely breaking even. Pl. Ex. 4 [ECF No. 1213-4] at 97:18–25. This evidence, in conjunction with the numerous other misrepresentations made by Defendants, convinces the Court that Tier 3 penalties are appropriate for all Defendants in this matter.

Having established the appropriate tier of civil penalties, the Court will proceed by considering (1) the egregiousness of the violations at issue; (2) Defendants' scienter; (3) the repeated nature of the violations; (4) Defendants' failure to admit to their wrongdoing; (5) whether Defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6)

---

[17] The Amended Complaint specifically ties LaForte, Barleta, and Furman to either (a) affirmatively making false statements surrounding the default rate or (2) failing to correct the misrepresentations made by other Defendants in this matter. And again, Furman was found liable for making misrepresentations to investors. *See* Jury Verdict.

Defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to each Defendants' demonstrated current and future financial condition. *See Huff*, 758 F. Supp. 2d at 1364.

### A. Lisa McElhone and Joseph LaForte

The SEC asks the Court to impose civil penalties of $100,000,000—$50,000,000 for McElhone and $50,000,000 for LaForte. Mot. at 36. The SEC argues that McElhone and LaForte engaged in hundreds of separate violations "in connection with their investor solicitations, and they orchestrated this multi-year massive fraud, operated Par Funding with Cole in a fraudulent scheme, controlled Par Funding and its unregistered and fraudulent offerings, and profited handsomely to the tune of at least $100 million." *Id*. Further, they contend that a total of $100 million is less than McElhone and LaForte's pecuniary gain *and* is less than the penalty would be if the SEC counted each statutory violation committed by McElhone and LaForte. *Id*. at 39.

Under the SEC's proposal, the Court should count as one statutory violation a single misrepresentation made to one investor. *Id*. So, at an event with 300 investors, LaForte committed 300 statutory violations when he made misrepresentations while speaking on-stage. *Id*. With Tier 3 penalties amounting to $190,000 per violation, *see* Mot. at 36, multiplying this amount by 300 guests who heard LaForte's fraudulent investment solicitation at one dinner event would generate $57 million in civil penalties. The Court does not find this to be an equitable approach, especially because the SEC has not proven how many of the fraudulent solicitations turned into *transactions*.

Further, in support of its request for $100 million in penalties, the SEC cites *SEC v. Shapiro*, No. 17-24624, 2018 WL 7140669 (S.D. Fla. Dec. 27, 2018). However, in that case, Defendant Robert Shapiro, who operated a $1.2 billion Ponzi scheme, consented to the $100,000,000 penalty with a disgorgement amount of $18,546,643. *Id*. This is factually distinct

from the case at hand, given that the Amended Complaint does not contain allegations of a Ponzi scheme; Defendants have not consented to a civil penalty; and the amount of money raised by investors is less than half of $1.2 billion.

Thus, in order to arrive at an equitable civil penalty supported by the facts of this case, the Court begins by addressing the seven factors often used as guidance for the imposition of penalties under the securities laws, before outlining its methodology and calculations. *See Huff*, 758 F. Supp. 2d at 1364.

***1. Egregiousness of the Violations at Issue****.* McElhone and LaForte founded Par Funding. *See* Am. Compl. ¶ 1. McElhone is Par Funding's President, CEO, and sole formal employee, and has ultimate decision-making authority for Par Funding. *Id.* ¶¶ 11, 16, 37, 42. Defendants raised nearly half a billion dollars through unregistered securities sold to over a thousand investors nationwide. *Id.* LaForte solicited investors to invest in the securities. *Id.* ¶ 5. McElhone and LaForte violated the federal securities laws by selling unregistered securities, and Defendants also made false or misleading statements and omissions concerning the Par Funding offering in violation of the antifraud provisions of the Securities Act and the Exchange Act. *Id.* ¶¶ 154–294.

Specifically, Defendants made misrepresentations regarding Par Funding's underwriting process. While marketing materials sent to investors emphasized Par Funding's "Exceptional Underwriting Rigor," Par Funding did not live up to those expectations. *Id.* ¶¶ 158–64. Par Funding did not always conduct on-site inspections nor obtain information about a merchant's profit margins, expenses, or debts before approving a merchant loan. *Id.* ¶¶ 167–84.

LaForte made misrepresentations regarding Par Funding's loan default rate—namely, that it was one percent. *Id.* ¶¶ 185–90. Analysis done by the SEC reveals that the loan default rate was as high as ten percent. *Id.* ¶ 194. LaForte also misrepresented to investors that Par Funding had

insurance to back up investor funds. *Id.* ¶¶ 205–06. In reality, "Par Funding did not offer small businesses insurance on the [l]oans, and thus investor funds were not protected by insurance." *Id.* ¶ 207. Moreover, LaForte touted his own financial and business acumen and success without disclosing that he was a twice-convicted felon formerly imprisoned and ordered to pay $14.1 million in restitution for grand larceny and money laundering. *Id.* ¶¶ 213–14. And Par Funding did not disclose LaForte as a "Related Person" in its Form D filing with the SEC even though LaForte ran the day-to-day operations of Par Funding and functioned as one of its executives. *Id.* ¶¶ 218–19.

LaForte also promoted Par Funding's success while failing to disclose to investors that Par Funding had been sanctioned several times for violating state securities laws. *Id.* ¶¶ 220–27. Further, Par Funding made false statements in its Form D filings with the SEC about McElhone and Cole's receipt of funds and Par Funding's payment of finders' fees and commissions. *Id.* ¶¶ 235–243. The amended Form D, signed by Cole, also stated that Par Funding had paid no finders' fees and commissions. *Id.* ¶ 237. Contrary to the statements made on the Form D filings, both McElhone and Cole received money from the offering, *id.* ¶ 240–42, and Par Funding paid finders' fees of at least $3.6 million, as well as $1 million in commissions. *Id.* ¶ 243. And LaForte falsely told prospective investors that he had personally invested large sums of money in Par Funding. *Id.* ¶¶ 244–45.

In short, there is no doubt that these violations are egregious. At every turn, LaForte and McElhone (the ultimate decisionmaker at Par Funding) materially misled investors. They withheld or lied about critical information that investors rely on in making investment decisions, thereby placing the money of the investing public at risk. Without question, the frequency and severity of their misrepresentations and omissions warrant significant penalties.

*2. **Scienter**.* Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004) (internal quotations and citation omitted). Scienter can be established by a showing of knowing misconduct or severe recklessness. *Monterosso*, 756 F.3d at 1335. As the Court explained in its Order denying Defendants' Motion to Dismiss, the SEC has alleged enough plausible facts in their Amended Complaint to support a finding of scienter. [ECF No. 583] at 23–28, 33–38. McElhone and LaForte acted with knowing misconduct or, at minimum, extreme recklessness when they engaged in their egregious conduct. To give one example, LaForte's use of a business card and email with a pseudonym is indicative of knowing misconduct. Am. Compl. ¶ 214. And the Court is not persuaded by LaForte's argument that he used this pseudonym to protect his family from possible threats. Resp. at 43. Ultimately, the record is replete with similar examples of a deliberate intent to deceive the investing public through material misrepresentation and omissions.

*3. **Repeated Nature of the Violations**.* The violations at issue were undoubtedly recurrent, taking place over the course of five years. Mot. at 38. McElhone and LaForte continually participated in their unregistered securities offering and engaged or condoned the making of many material misrepresentations over the life of the company.

*4. **Defendants' Failure to Admit to their Wrongdoing**.* The SEC suggests that Defendants have failed to admit their wrongdoing. *Id*. However, McElhone and LaForte both signed Consent Agreements with the SEC, and for purposes of this Motion, have agreed acquiesce to the allegations in the Amended Complaint and take them as true. Resp. at 46–47. Moreover, McElhone and LaForte have acknowledged they could have made additional disclosures—such as including LaForte's real name on their marketing materials. Resp. at 43–44. While these types of

concessions fall short of accepting full responsibility for their actions, McElhone and LaForte have admitted some wrongdoing.

*5. Whether Defendants' Conduct Created Substantial Losses or the Risk of Substantial Losses to Other Persons.* As explained *supra* at 33–34, the Court finds that McElhone and LaForte's conduct clearly created the risk of substantial losses to other persons.

*6. Defendants' Lack of Cooperation and Honesty with Authorities.* The SEC contends that McElhone and LaForte have "utterly refused to cooperate." Mot. at 38. However, McElhone and LaForte have invoked their Fifth Amendment rights and mounted a vigorous defense. The Court does not penalize them for exercising their rights—but also does not credit them for any purported cooperation. Resp. at 47. It is a factor that ultimately has no bearing on the Court's civil penalty decision.

*7. Defendants' Demonstrated Current and Future Financial Condition.* Neither McElhone nor LaForte have provided the Court with a sworn accounting of their assets. Mot. at 39. Given this failure to provide an accurate picture of their financial condition, they avoid advancing any argument for reducing their civil penalties due to financial hardship. *See generally* Resp. Accordingly, the Court does not consider this factor in calculating the appropriate amount of civil penalties for McElhone and LaForte.

In sum, having carefully considered all seven factors listed above, the Court concludes that a $100,000,000 civil penalty is not appropriate against McElhone and LaForte. Specifically, the Court is not persuaded that the proper way to calculate penalties in this case is to count one misrepresentation made at a single event as 300-plus statutory violations. *See, e.g.*, *SEC v. Pattison*, No. C–08–4238, 2011 WL 723600, at *5 (N.D. Cal. Feb. 23, 2011) (holding that "[t]he Court may assess a penalty for each distinct violation, *e.g.*, each time Defendant falsified a record"

but exercising discretion to impose a lesser penalty) (internal quotations and citation omitted)).

Importantly, while the imposition of civil penalties based on the number of statutory violations

may be appropriate in some cases, "the plain language of the statute does not call for such a result."

*SEC v. Pentagon Cap. Mgmt. PLC*, No. 08 Civ. 3324, 2012 WL 1036087, at *3–4 (S.D.N.Y. Mar.

28, 2012), *aff'd in part, vacated in part,* 725 F.3d 279 (2d Cir. 2013).  Ultimately, "the amount of

civil penalty rests squarely in the discretion of the court."  *Id*. at *4 (internal quotations and citation

omitted).

      Here, "[t]he exact number of violations committed by the Defendants is nearly impossible

to determine."  *SEC v. Invest Better 2001,* No. 01 Civ. 11427, 2005 WL 2385452, at *5 (S.D.N.Y.

May 4, 2005).  Indeed, the SEC does not tether its proposal of $100 million in penalties for

McElhone and LaForte to anything other than a rough comparison to the *Shapiro* case.  2018 WL

7140669 at *3; *See* Mot. at 39.  Accordingly, the Court finds the calculation proposed by the SEC

to be inequitable.  As a means of grounding its penalty calculations in the facts of this case, the

Court instead opts to calculate the civil penalty for McElhone and LaForte by looking to the

number of investors who hold unpaid Par Funding promissory notes.  This approach is similar to

the one employed in *SEC v. Kenton Capital Ltd.,* where the court calculated the proper penalty by

"multiplying the maximum third tier penalty for natural persons ($100,000) by the number of

investors who actually sent money to [defendant] (12)."  69 F. Supp. 2d 1, 17 & n.15 (D.D.C.

1998).  Here, the Court will multiply the Tier 3 penalty by the number of investors who hold unpaid

Par Funding promissory notes for both McElhone and LaForte.  The Court believes this method

of computation more equitably captures the nature and scope of McElhone and LaForte's

wrongdoing.

At the commencement of this action, there were 115 notes outstanding on the Investor Log provided to the SEC.  *See* Mot. at 36; Def. Ex. 28 [ECF No. 1330-28].  The maximum statutory penalty for a single violation during the time period at issue, according to the SEC, is $190,000.[18] *See* Mot. at 36 n.9.  Defendants did not challenge the calculation of this penalty amount in their Response nor at oral argument.  Thus, the Court elects to multiply the statutory penalty by the number of unpaid investors (115) for McElhone and LaForte respectively.  Utilizing this method, it is **ORDERED** that McElhone and LaForte are each assessed $21,850,000 in civil penalties for a total penalty of **$43,700,000**.

### B.  Joseph Cole Barleta

The SEC asks the Court to impose civil penalties in the amount of $5,000,000 as to Cole because "Cole's pecuniary gain . . . far exceeds this amount."  Mot. at 40.  Once again, the Court turns to the factors set forth in *Huff* to evaluate the appropriateness of the SEC's request.  *Supra* at 32.

*1. Egregiousness of the Violations at Issue*.  Cole was the Chief Financial Officer for Full Spectrum Processing, Inc., whose employees operated Par Funding.  Am. Compl. ¶ 5.  The SEC avers that in addition to violating the federal securities laws by selling unregistered securities, Cole also made false or misleading statements and omissions concerning the Par Funding offering in violation of the antifraud provisions of the Securities Act and Exchange Act.  *Id.* ¶¶ 215, 238, Notably, McElhone and Cole signed the Par Funding Notes on behalf of Par Funding.  *Id.* ¶ 52.  In

---

[18]   The SEC arrived at this figure by looking to the Federal Civil Penalties Inflation Adjustment Act of 1990, which adjusts the potential penalty amounts to account for inflation based on violation dates. 17 C.F.R. § 201.1001; *see also* SEC, *Inflation Adjustments to the Civil Monetary Penalties Administered by the SEC (as of January 15, 2022)*, https://www.sec.gov/enforce/civil-penalties-inflation-adjustments (last visited October 24, 2022).

addition, Cole signed contracts with sales agents to locate and solicit investors for Par Funding. *Id.* ¶ 55.

Cole signed and filed with the SEC an April 2020 Form D for Par Funding that failed to identify LaForte in the "Related Persons" section, even though the form required identification of "[e]ach executive officer or director of the issuer and person performing similar functions (title alone is not determinative) for the issuer . . ." and "[e]ach person who has functioned directly or indirectly as a promoter of the issuer . . . ." *Id.* ¶¶ 218–19, 238. The Form D also falsely stated that Par Funding: (1) did not pay McElhone or Cole any of the gross proceeds from the securities offering, and (2) did not pay any commissions. *Id.* ¶¶ 237–43. Further, Cole knew LaForte had been convicted of crimes involving dishonesty and actively helped conceal LaForte's identity from investors. *See* Am. Compl. ¶ 215. Cole touted the financial health of Par Funding at a dinner with 300 investors and potential investors. *Id.* ¶¶ 95, 104. And Cole did not correct misrepresentations made to investors that Par Funding's default rate was one percent. *Id.* ¶¶ 198–99.

Thus, like the Court's findings regarding McElhone and LaForte, Cole's misrepresentations, omissions, and failures to disclose were egregious in nature. There is no doubt that Cole's behavior impacted information available to investors and negatively affected the investing public's ability to make sound investment decisions.

*2. Scienter.* As noted in the Court's Order on Defendants' Motion to Dismiss, the SEC has set forth sufficient facts, accepted as true, to support a finding of scienter as to Cole. [ECF No. 583] at 23-28; 33-38. Cole acted with knowing misconduct or, at minimum, extreme recklessness when he engaged in this egregious conduct. The Amended Complaint and Motion are replete with examples of Cole's scienter. In one glaring example, Cole actively assisted in

concealing LaForte's criminal background by "providing LaForte with a Par Funding email address bearing the name of his alias, joemack@parfunding.com, and a Par Funding business card for his alias, Joe Macki." Am. Compl. ¶ 214.

       *3.  Repeated Nature of the Violations.*  Cole's violations were recurrent, beginning at the start of his employment in 2017.  Am. Compl. ¶ 19.  Cole ran many of the day-to-day operations at Par Funding and executed promissory notes for the unregistered offering for years.  Mot. at 41.

       *4.  Defendant's Failure to Admit to his Wrongdoing*.  The SEC suggests that Cole has failed to admit his wrongdoing.  *Id*.  However, Cole signed a Consent Agreement with the SEC, and for purposes of the Motion, has conceded that the allegations in the Amended Complaint are true.  Resp. at 46–47.  Accordingly, Cole has admitted some wrongdoing.

       *5.  Whether Defendant's Conduct Created Substantial Losses or the Risk of Substantial Losses to Other Persons*.  As explained *supra* at 33–34, the Court finds that Cole's conduct related to Par Funding created a risk of substantial losses to other persons.

       *6.  Defendant's Lack of Cooperation and Honesty with Authorities*.  The SEC contends that Cole has "utterly refused to cooperate."  Mot. at 41.  However, Cole invoked his Fifth Amendment right and mounted a vigorous defense.  The Court will not penalize him for doing so. Nor will the Court award Cole any credit for purportedly endeavoring to cooperate early on in this case.  Resp. at 47.  This factor ultimately has no bearing on the Court's civil penalty decision as to Cole.

       *7.  Defendant's Demonstrated Current and Future Financial Condition*.  Cole has failed to provide the Court with a sworn accounting of his assets.  Mot. at 41.  Rightly, he mounts no argument for a reduction in civil penalties due to financial hardship.  *See generally* Resp.

Accordingly, the Court does not consider this factor in calculating the appropriate amount of civil penalties for Cole.

In sum, having carefully considered all seven factors listed above, the Court finds Cole's conduct worthy of civil penalties. In an effort to equitably calculate those penalties while tying its calculations to the facts of this case, the Court looks to the Amended Complaint. Specifically, the Amended Complaint asserts seven statutory violations against Cole. Am. Compl. ¶¶ 268–289. Thus, utilizing the maximum statutory penalty for a single violation during the time period at issue—$190,000—and multiplying that amount by the seven statutory violations in question, it is **ORDERED** that Cole is assessed **$1,330,000** in civil penalties. This sum, when compared to the civil penalties imposed above against McElhone and LaForte, accurately captures Cole's role in the Par Funding scheme. Notably, it reflects the fact that Cole profited far less from the scheme than McElhone and Laforte, as made clear by their respective disgorgement amounts, thereby reflecting Cole's relative culpability when compared to his fellow Defendants.

### C.  Michael C. Furman

The SEC asks the Court to impose on Furman civil penalties in the amount of $1,834,000, which is "equal to his pecuniary gains." Mot. at 42. Once again, the Court turns to the factors set forth in *Huff* to evaluate the appropriateness of the SEC's request. *Supra* at 34.

*1.  Egregiousness of the Violations at Issue*.  On December 15, 2021, a jury found that Furman violated Section 10(b), Rule 10b-5(a), Rule 10b-5(b), and Rule 10b-5(c) of the Exchange Act; and Sections 5(a), 5(c), 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act. Jury Verdict. At trial, the SEC established that Furman held numerous events for potential investors where he made the material misrepresentations and omissions at issue—including discussing Par Funding's management while omitting LaForte's role and background as a convicted felon. Mot. at 43. The

SEC also established that Furman made misrepresentations about the New Jersey Order to at least one potential investor—who was an undercover individual—falsely claiming that New Jersey had "retracted" its action against Par Funding and that Par Funding was "good" and did not face fines or penalties.  Mot. at 43.  These examples demonstrate flagrant and egregious disregard for the securities laws.

2. **Scienter**.  The jury found Furman liable for four securities violations that required a finding of scienter.  Mot. at 43; *see* Jury Verdict.  The Court, therefore, relies on the jury's determinations in this regard.

3. **Repeated Nature of the Violations**.  Furman, via United Fidelis, engaged in repeated securities violations beginning in at least 2017 through the imposition of the receivership in this case.  *See* Am. Compl. ¶ 269; Jury Verdict.

4. **Defendant's Failure to Admit to his Wrongdoing**.  Furman concedes in his Response that he is "unable to accept responsibility for what he has done without losing" significant rights on appeal.  Furman Resp. at 11.  Furman has since withdrawn his appeal, [ECF No. 1430], and has not made any further admissions of wrongdoing.  Furman did, however, accept responsibility for the risk he created for investors.  Furman Decl. ¶ 26.

5. **Whether Defendant's Conduct Created Substantial Losses or the Risk of Substantial Losses to Other Persons**.  As explained *supra* at 33–34, the Court finds that Furman's conduct related to Par Funding created a risk of substantial losses to other persons.  Furman concedes in his Declaration that he holds himself accountable "for the risk to investors."  Furman Decl. ¶ 26.

6. **Defendant's Lack of Cooperation and Honesty with Authorities**.  Furman has demonstrated a lack of cooperation.  He failed to file a sworn accounting in accordance with this Court's orders and did not produce any documents requested in discovery.  Mot. at 44.

***7. Defendant's Demonstrated Current and Future Financial Condition***.  Although the Court denied Furman's Motion to proceed *in forma pauperis* at the beginning of this litigation, the Court is cognizant that Furman has very few assets and a limited ability to pay a large penalty.  *See* Furman Resp. at 11.  Furman represented himself *pro se* in this matter for a period of time.  The Court is also mindful of the relatively small role that Furman played in the overall Par Funding scheme as compared to his co-defendants, McElhone, LaForte, Cole, and others.  In sum, having carefully considered all seven factors listed above, the Court concludes that a $1,834,000 civil penalty is not appropriate against Furman.  *See SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009), *aff'd*, 438 F. App'x 23 (2d Cir. 2011) ("[T]he amount of any civil penalty rests squarely in the discretion of the court.").

Furman raised fewer funds than Defendant Vagnozzi and was significantly less involved in Par Funding than either Vagnozzi or Abbonizio.  *See generally* Am. Compl.  Both Vagnozzi and Abbonizio negotiated civil penalties in the amount of $400,000.  [ECF No. 1165] at 5; [ECF No. 1169] at 5.  Accordingly, based on his financial situation, his relative culpability, his disgorgement amount, and the equitable nature of these proceedings, it is **ORDERED** that one Tier 3 penalty of **$190,000** shall be imposed on Furman.

## IV.   Injunctive Relief Against Furman

In addition to the monetary relief discussed above, the SEC seeks permanent injunctive relief against Furman.  Mot. at 44.  Furman is currently subject to the preliminary injunction the Court put in place at the onset of this action.  *See* [ECF No. 182].  The jury's verdict against Furman on all counts sufficiently meets the requirement that the SEC put forth a *prima facie* case that previous violations have occurred.  *See Spartan Sec. Grp. Ltd.*, 2022 WL 3224008, at *1. Therefore, the Court is left to determine whether the SEC has satisfied its burden to show a

recurrent violation is likely to occur.  The Court turns to the six factors laid out in *Calvo* to make its determination.  *See supra* at 11–12.

The *Calvo* factors related to egregiousness, scienter, repeated violations, and admission of wrongdoing overlap with the *Huff* factors for civil penalties outlined above.  *Compare Calvo*, 378 F.3d at 1216 *with Huff*, 758 F. Supp. 2d at 1364.   The Court need not repeat that analysis here. *See supra* at 42–45.  The Court will, however, address the remaining two *Calvo* factors—the sincerity of Defendant's assurances against future violations and the likelihood that defendant's occupation will present opportunities for future violations.  *Calvo*, 378 F.3d at 1216.  Furman highlights in his Response that he "will accept the [final decision of the Court], whatever it may be."  Furman Resp. at 11.  Moreover, he states that he "holds [himself] accountable for the risk to investors," Furman Decl. ¶ 26, and he "will be extraordinarily cautious" to avoid violating securities laws in the future, *id.* ¶ 27.  The SEC argues that, at a minimum, Furman's past illegal conduct is highly suggestive of the likelihood of future violations.  Mot. at 44–45.  Additionally, the SEC asks the Court to consider that Furman has worked in the securities industry for years— namely, selling investments to investors.  *Id*.

Furman presents no argument as to why he should not be subject to a permanent injunction. *See generally* Furman Resp.  However, even if he had presented a rebuttal argument, the Court would still find that a permanent injunction is necessary to deter Furman from any future securities law violations.  Furman's conduct was egregious; it was recurrent over several years and a jury found he had the requisite scienter for four securities violations.  Further, while the Court appreciates Furman's commitment to helping "as a whistleblower for the SEC in cases" moving forward, Furman Decl. ¶ 21, Furman's assurances that he will be "extraordinarily cautious" to not commit future violations of the securities laws do not sufficiently persuade the Court that an

injunction should not issue, *id* ¶ 27. Accordingly, Furman shall be permanently enjoined from committing further violations of the securities laws.

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiff's Amended Omnibus Motion for Final Judgment, [ECF No. 1252], is **GRANTED IN PART** as follows:

- Defendants McElhone and LaForte are found liable to the SEC for **$43,700,000** in civil penalties and jointly and severally liable to the SEC for **$142,529,980** in disgorgement and **$10,694,758.24** in prejudgment interest.

- Defendant Joseph Cole Barleta is found liable to the SEC for **$10,055,625** in disgorgement, **$754,525.32** in prejudgment interest, and **$1,330,000** in civil penalties.

- Defendant Michael Furman is found liable to the SEC for **$1,834,000** in disgorgement, **$137, 614.46** in prejudgment interest, and **$190,000** in civil penalties.

The Court will enter Final Judgments with respect to each of the aforementioned Defendants by separate order.

**DONE AND ORDERED** in Miami, Florida this 18th day of November, 2024.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**