UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 20-CV-81205-RAR

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d/b/a PAR FUNDING, *et al.*

    Defendants.
_____/

## RECEIVER'S MOTION TO APPROVE SECOND INTERIM DISTRIBUTION

Ryan K. Stumphauzer, Esq., Court-Appointed Receiver ("Receiver") of the Receivership Entities,[1] by and through his undersigned counsel, is pleased to submit this motion to approve a second distribution of $96,871,261.19. As described below, if approved, this distribution will provide for a recovery of up to 100% of the Allowed Claims for certain Class 3 Claimants.

---

[1] The "Receivership Entities" are Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG"); Full Spectrum Processing, Inc.; ABetterFinancialPlan.com LLC d/b/a A Better Financial Plan; ABFP Management Company, LLC f/k/a Pillar Life Settlement Management Company, LLC; ABFP Income Fund, LLC; ABFP Income Fund Parallel LLC; ABFP Income Fund 2, L.P.; ABFP Income Fund 2 Parallel; ABFP Income Fund 3, LLC; ABFP Income Fund 3 Parallel; ABFP Income Fund 4, LLC; ABFP Income Fund 4 Parallel; ABFP Income Fund 6, LLC; ABFP Income Fund 6 Parallel; ABFP Multi-Strategy Investment Fund LP; ABFP Multi-Strategy Fund 2 LP; United Fidelis Group Corp.; Fidelis Financial Planning LLC; Retirement Evolution Group, LLC; RE Income Fund LLC; RE Income Fund 2 LLC; Contract Financing Solutions, Inc.; Fast Advance Funding LLC; Heritage Business Consulting, Inc.; Eagle Six Consulting, Inc.; The LME 2017 Family Trust; Beta Abigail, LLC; New Field Ventures, LLC; Recruiting and Marketing Resources, Inc.; Liberty Eighth Avenue LLC; and 20 N. 3rd St. Ltd.

- 1 -

**INTRODUCTION**

To date, the Receiver has distributed more than $110 million to Claimants in this receivership, which has amounted to an average distribution of 50.7% of the Allowed Claim Amounts for the Class 3 Claimants that invested directly in CBSG. As a result of the Receiver's resolution of other claims and additional recoveries, the Receiver is now prepared to distribute an additional $96,871,261.19 to Class 3 Claimants. This second interim distribution will bring the total distribution to date to $207,739,976.22. It will also result in a recovery for certain of these claimants up to ***100% of their Net Investment Amounts***, with other Class 3 Claimants receiving lesser—but still substantial—total recoveries.

The proposed second interim distribution will leave the Receiver with appropriate cash reserves so that he can address any remaining issues as they arise, and anticipates that at least one additional distribution payment will be made. This proposed distribution is fair and reasonable and consistent with the distribution plan and the first interim distribution the Court previously approved. Accordingly, the Receiver respectfully requests that the Court grant this motion and authorize the Receiver to proceed with issuing these second interim distribution payments.

**FACTUAL BACKGROUND**

**I.     Background / First Distribution Order**

On August 23, 2024, the Receiver filed his Motion to (1) Approve Proposed Plan of Distribution and (2) Authorize First Interim Distribution ("Distribution Motion"), [ECF No. 2014]. On December 16, 2024, after resolving several responses and objections, the Court entered its Order on Receiver's Motion to Approve Proposed Distribution Plan and to Authorize First interim Distribution ("First Distribution Order"), [ECF No. 2078]. Through the First Distribution Order, the Court authorized the Receiver to proceed with distributing a total of $110,868,715.00 to various

Claimants, which amounted to an average distribution of 50.7% of the Allowed Claim Amounts for those individuals and Agent Funds that invested directly in CBSG.

In January 2025, the Receiver's claims agent began mailing checks by U.S. Mail to those Claimants who were entitled to receive a first interim distribution payment. Nearly half of the total amount of the first distribution, or $51,920,828.48, was designated for "Non-Receivership Entity Agent Funds." These are investment funds not under the Receiver's control, which various fund managers established for the express purpose of pooling investor funds for investment into CBSG. Because of the Receiver's concerns about sending funds to the managers of certain of these agent funds, the Receiver initially held back those payments, pending further clarity on how the funds would be distributed to the ultimate investors.

After conferring with each of the fund managers, the Receiver established a plan to ensure that these distribution payments would, in fact, be delivered to the end investors in these agent funds. For certain agent funds, the Receiver determined it would be appropriate to bypass the agent fund and issue the distribution payments directly to the end investors. For others, the Receiver agreed to send the distribution payment to the agent fund, with assurances from the agent fund manager that the entire amount of the distribution would be paid out to the end investors. As a result, on February 27, 2025, the Receiver filed a Motion to Authorize Release of Distribution Payments for Non-Receivership Entity Agent Funds Pursuant to Order on Receiver's Motion to Approve Proposed Distribution Plan and to Authorize First Interim Distribution ("Agent Fund Distribution Motion"), [ECF No. 2117]. On March 11, 2025, the Court entered its Order Granting the Agent Fund Distribution Motion ("Agent Fund Distribution Order"), [ECF No. 2123].

Pursuant to the First Distribution Order and Agent Fund Distribution Order, the Receiver has now sent out first interim distribution payments to all claimants that were eligible to receive a

first interim distribution. In total, the Receiver issued payments to more than 1,600 investors (including those who invested through a Cama Plan IRA account, as well as the individual investors in Non-Receivership Entity Agent Funds), totaling $110,868,715.00. All first interim distribution checks have been negotiated, with the exception of checks the Receiver issued to five (5) investors that total approximately $85,116.57. Some of those checks were returned as undeliverable, and the Receiver also learned that certain of these Claimants are now deceased. As a result, the Receiver attempted to confirm updated address information for those claimants. In addition, the Receiver has been in communication with the relevant trustee/administrator/beneficiary for any deceased claimants to obtain documentation for the reissuance of the distribution payments.

## II.   Holdbacks from First Distribution and Additional Recoveries

In calculating the amount of the first interim distribution payments, the Receiver held back approximately $36.5 million based on disputed claims from a family of investors, referred to as the "Chehebars." Specifically, certain of the Chehebars recorded UCC-1 financing statements through which they purported to obtain priority liens over CBSG's assets. Based on these liens, the Chehebars claimed they were entitled to be paid back first, and in full, for their investments in CBSG. The Receiver and the Chehebars disagreed about the validity of those liens and how their claims should be treated, including whether the Chehebars should be designated as "Insiders," which would have made the Chehebars ineligible to receive any distributions in the receivership.

The Court agreed that the Chehebars' liens had expired or were otherwise invalid and, therefore, the Chehebars were not entitled to priority repayment of their claims. After the Chehebars appealed this ruling, the Receiver was able to reach a settlement with the Chehebars, whereby the Chehebars dismissed their appeal and accepted the Court's ruling on the invalidity of

their liens. In exchange, the Receiver issued an initial distribution payment to the Chehebars of approximately $3.1 million and withdrew his insider allegations against the Chehebars. As a result, the Chehebars have now been recategorized as Class 4 Claimants and may receive a distribution of no more than their Net Investment Amount, but only after CBSG pays its direct Class 3 Claimants up to the full amount of their Net Investment Amounts. Now that this settlement has been finalized, the $36.5 million holdback can be released and included in the second distribution.

In addition, the Receiver has brought additional cash into the Receivership since the time the Court authorized the first interim distribution. Specifically, the Receiver achieved a net recovery of approximately $31 million through the Eckert Seamans settlement,[2] and has received additional cash proceeds related to the sale of several receivership properties, including more than $10 million in net proceeds from the sale of the home in Jupiter, Florida, which has been referred to as the "Quayside Property." Because of these successes, as well as additional recoveries through collections and other sources, and accounting for an appropriate holdback for ongoing expenses, approximately $96.87 million is now available for a second distribution to claimants.

### III. Proposed Second Interim Distribution

### A. Overview of Second Interim Distribution

As of October 30, 2025, the Receivership Estate consisted of a total of approximately $110

---

[2] As part of the Eckert Seamans Settlement, the Receiver entered into a Settlement Agreement with the "Parker Plaintiffs," which are certain Non-Receivership Entity Agent Funds that engaged Eckert Seamans to set up their agent funds and prepare the private placement memorandum and other related materials. As part of that settlement, the Receiver agreed to pay the Parker Plaintiffs an "Enhancement" of $2,000,000 from the Eckert Seamans settlement proceeds. The Enhancement is to be allocated to each of the agent funds comprising the Parker Plaintiffs (and, consequently, to their individual investors) on a pro rata basis. Importantly, however, none of those agent funds may receive more than 100% of their net investment through the distribution process, and the Enhancement was considered in the calculation of the second distribution to ensure that these agent funds do not receive more than 100% of their Allowed Claim Amounts.

million in cash. *See* Receiver's Status Report Dated October 31, 2025, [ECF No. 2181], at 2. The Receiver seeks leave to make a distribution of $96,871,261.19 to the holders of the Class 3 Allowed Claims identified on **Exhibit 1**, on a pro rata basis subject to applicable exceptions, priorities, and other parameters outlined in the First Distribution Order – the same method and parameters used for the first interim distribution.[3] The proposed second distribution will bring the total recovery for many of CBSG's direct Class 3 Claimants to 98% or more of their Allowed Claim Amounts, and some will achieve a 100% recovery of their net investment.

Claimants entitled to participate in the second interim distribution will receive the amounts specified on **Exhibit 1**. The Receiver believes that by distributing approximately $96.87 million, he will be able to provide a significant amount of money to Claimants now, while still maintaining adequate funds to cover the expenses of (1) administering the Receivership, (2) paying the Receiver's professionals for services already provided and yet to be provided, (3) payment of premiums for life insurance policies owned by certain Receivership Entities, and (4) addressing other disputed claims and issues as they arise. The Receiver believes he has reserved an adequate amount and intends to distribute the excess funds in a future distribution, as appropriate, depending on the outcome of these various matters and the receipt of additional recoveries.

### B. Distributions from CBSG

The scope and mechanics of this proposed second interim distribution will be similar to the first interim distribution, as authorized by the First Distribution Order and Agent Fund Distribution Order.  First, CBSG will allocate the $2,000,000 Enhancement to the agent funds comprising the Parker Plaintiffs, as reflected on the attached **Exhibit 2**. Next, CBSG will distribute

---

[3] This distribution includes second distribution payments totaling $96,726,357.76, and a supplemental first distribution payment to FN, a Fidelis investor, in the amount of $144,903.43. The reason for this supplemental first distribution payment is explained in Exhibit 7.

$90,991,034.33 to Class 3 Claimants with Allowed Claims against CBSG, as reflected on the attached **Exhibit 3**. Remarkably, when combined with the first distribution, this second distribution will result in a total pro rata payment from CBSG of approximately ***98.35%*** of the Net Investment Amount for these Class 3 Claimants. Moreover, the addition of the $2 million Enhancement will result in a total pro rata payment of ***100%*** of the Net Investment Amounts for the Parker Plaintiffs.

As with the first interim distribution, some of those payments will be issued to direct investors in CBSG. For the non-Receivership Entity Agent Funds, certain payments will be delivered to the agent fund, and other payments will bypass the agent fund and be delivered directly to the end investors in those funds. A schedule reflecting the breakdown of payments to these non-Receivership Entity Agent Funds, as well as the allocation of those payments for distribution among the end investors, which is consistent with the methodology from the Court's Agent Fund Distribution Order, is attached to the Second Distribution Motion as **Exhibit 4**.[4] Similar to the first distribution, the Receiver requests that the Court require the execution of a Declaration by the fund managers for the three Non-Receivership Entity Agent Funds that will be receiving a distribution payment and then making a similar pro rata distribution to its end investors, as reflected in the attached **Composite Exhibit 5** (comprised of Exhibit 5-A – Mariner Declaration; Exhibit 5-B – STFG Declaration; and Exhibit 5-C – Titan Declaration).

---

[4] Exhibits 4-A through 4-CC detail the payments that will be made from each Non-Receivership Entity Agent Fund to the individual investors in those funds. Consistent with the first interim distribution, the Receiver requests permission to issue distribution payments to the following three non-Receivership Entity Agent Funds, which will then be required to distribute those funds among their individual investors in accordance with these agreed-upon distribution schedule: (1) Mariner MCA Income Fund LLC, (2) STFG Income Fund LLC, and (3) Titan Holdings LLC. The Receiver would then bypass the agent funds and make direct distributions to the individual investors in the remaining Non-Receivership Entity Agent Funds.

### C. Distributions from Receivership Entity Agent Funds to Individual Investors

As described above, certain payments will be allocated for distribution from CBSG to Receivership Entity Agent Funds (*i.e.*, the ABFP Income Funds, Fidelis Financial Planning, and Retirement Evolution Funds). Because the Receiver controls these Receivership Entity Agent Funds, the Receiver will record an internal accounting entry to reflect the distribution payments from CBSG to the appropriate Receivership Entity Agent Fund. The Receiver will then issue payments from the appropriate Receivership Entity Agent Fund to the individual investors within those Agent Funds, consistent with the schedules attached hereto as **Exhibit 6** (ABFP Income Funds), **Exhibit 7** (Fidelis Financial Planning), and **Exhibit 8** (Retirement Evolution Funds).

The pro rata percentages that are scheduled to be distributed to the individual investors in each Receivership Entity Agent Fund and the Non-Receivership Entity Agent Fund vary by fund. That is because the "net investment" calculations are different, depending on the investment activity within a particular agent fund, as compared to the investment activity between CBSG and the agent fund. For example, a typical agent fund might have been receiving 20% interest on the promissory notes it received from CBSG, and then offered 10% interest to its own investors.

The fund manager retained as its "fee/profit" the "spread" between the 20% interest it received from CBSG, and the 10% interest it paid to its individual investors. As a result, if a particular agent fund invested with CBSG over a longer period of time, the fund manager will have retained a larger amount of that spread. Take, for example, a situation where an Agent Fund invested $100,000 of investor funds in CBSG over a one-year period:

- CBSG would pay $20,000 in interest to the Agent Fund in year one, reducing the Agent Fund's Net Investment Amount to $80,000 ($100,000 - $20,000).

- The Agent Fund would pay $10,000 in interest to its individual investors in year one,

- reducing the individual investors' Net Investment Amount to $90,000 ($100,000 - $10,000)
- After the first year, there would be a difference of $10,000 between the Agent Fund's Net Investment Amount in CBSG and the individual investors' Net Investment Amount in the Agent Fund.

If the Agent Fund reinvested those funds in CBSG for an additional year, the disparity would become even larger. The impact in the second year is demonstrated as follows:

- CBSG would once again pay $20,000 in interest to the Agent Fund in year two, further reducing the Agent Fund's Net Investment Amount to $60,000 ($80,000 - $20,000).
- The Agent Fund would pay $10,000 in interest to its individual investors in year two, further reducing the end investors' Net Investment Amount to $80,000 ($90,000 - $10,000)
- There would now be a difference of $20,000 between the Agent Fund's Net Investment Amount in CBSG and the individual investors' Net Investment Amount in the Agent Fund.

Due to this disparity, a distribution from CBSG of 100% of an Agent Fund's Net Investment Amount will not necessarily allow the Agent Fund to distribute to its individual investors 100% of their Net Investment Amount in that fund. Because the Receiver recovered additional funds directly from certain of the Receivership Entity Agent Funds and their principals, which have already been distributed to the individual investors in those agent funds, this disparity has been reduced to some degree. But, as reflected in Exhibit 6, this disparity still results in a difference among the amounts that can be paid to the individual investors in the various ABFP funds.

### D. Distributions from Fast Advance Funding / Multi-Strategy Funds

As the Court will recall, ABFP Multi-Strategy Investment Fund LP ("MSIF") and ABFP Multi-Strategy Fund 2 LP ("MSIF II") (collectively the "Multi-Strategy Funds") invested in a combination of life settlements and the merchant cash advance business (through Fast Advance

Funding LLC ("FAF")). In the same manner as the distributions from CBSG, as described above, the Receiver will distribute similar pro rata payments from FAF to its two Class 3 Claimants, the Multi-Strategy Funds. Because CBSG and FAF were part of "a unified scheme to defraud," the assets of these two companies have been pooled. *See* Distribution Order, [ECF No. 2078], at 47.

Therefore, this second distribution payment from FAF to the two Multi-Strategy Funds will be issued in a manner so that they receive the same total pro rata percentage CBSG will be paying out to its direct investors as a result of the second interim distribution. By distributing $3,717,186.59 from FAF to the Multi-Strategy Funds, the second interim distribution will achieve a total pro rata payment of approximately 98.35% of the Multi-Strategy Funds' net investment in FAF, as reflected on the attached **Exhibit 9**.

Because a significant percentage of the Multi-Strategy Funds' investments were in life settlements, and many of those insurance policies have not yet matured, the total recovery for the individual investors in those two funds, including the second interim distribution, will be 46.2% and 64.8%, respectively, of the individual investors' Net Investment Amount, as reflected on the attached **Exhibit 6**. The Receiver continues to pay the premiums on these policies, and anticipates that the remaining value of the active policies will be addressed as part of a future distribution.

As of the Receiver's most recent status report, [ECF No. 2181], there were six unmatured policies in MSIF, with a total policy face value of $10,204,768. And there are 11 unmatured policies in MSIF II, with a total policy face value of $4,975,407. The Receiver has included policy proceeds in the amount of $2,250,000 ($1,500,000 for MSIF and $750,000 for MSIF II) in his cash reserve to pay the premiums that will continue to become due on these policies, which are payable on either a monthly, quarterly, or annual basis.

### E.  Cash Reserve / Holdback from Second Distribution

After payment of the approximately $96.87 million comprising the second distribution, the Receiver will have distributed a total of $207,739,976.22 to Claimants in this receivership. This will still leave the Receiver with approximately $11 million in general cash reserves and $2.25 million in cash reserves to pay the premiums that will become due on the Multi-Strategy Funds' life insurance policies.  The approximately $11 million in general cash reserves is intended to cover the anticipated additional costs and expenses of administering the Receivership Estate and other pending claims and issues that may arise in the future. Notably, these total cash reserves represent a substantial reduction from the $23.66 million in cash reserves the Receiver held back from the first interim distribution.

### F.  Request for Approval of Second Interim Distribution

The Receiver requests approval to make the second interim distribution payments in the amounts specified on **Exhibit 1** as soon as practicable following the Court's approval. The Receiver will send distribution checks by regular U.S. Mail to these claimants. As with the first distribution, the Receiver requests that claimants be allowed 120 days to negotiate the distribution checks. A deadline for negotiating distribution checks is necessary for the orderly administration of the Receivership Estate. If a check is not negotiated within that time, the Receiver will stop payment on the check and may, in his discretion, determine that the money has reverted to the Receivership.

As noted above, some claimants have deceased during the claims process. Accordingly, the Receiver asks that the Court continue his authority to honor requests to change the name of the claimant/payee of a claim, upon being provided with reasonable notice and substantiation of the new recipient's authority or right to the distribution. Additionally, if the Receiver receives notice

that additional Claimants have deceased, the Receiver requests the continued authority to reissue distribution checks initially made payable to a deceased claimant to the appropriate person(s) or entity if, in the Receiver's discretion, the new payee has provided sufficient proof of its right to receive these distribution payments.

Also as noted in the First Distribution Motion, many investments were made through IRA accounts held by custodians. The Receiver will make relevant distribution payments payable to the custodian for the benefit of the claimant. The distribution payment will be issued either by wire transfer (for CamaPlan) or check (for other IRA custodians) and mailed to the address within the Receiver's updated files. The Receiver anticipates that claimants may continue to change or discharge custodians. The Receiver asks that the Court continue to provide him with authority to honor requests to change custodians if, in the Receiver's discretion, he has been provided sufficient notification and proof of the change of custodian and the individual claimant's entitlement to the proceeds of the claim.

## MEMORANDUM OF LAW

The Receiver asks the Court to approve the second interim distribution as set forth in this motion and in the attached **Exhibit 1**. The Court previously approved the Receiver's plan of distribution and first interim distribution. [*See* ECF No. 2078]. The second interim distribution set forth herein is consistent with the plan of distribution the Court previously approved and the first interim distribution. Further, the relief requested in this motion is in the best interests of the Receivership Estate and the claimants as a whole, and it is fair, reasonable, and equitable.

This is a federal equity receivership. *See, e.g.*, *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992). As such, the Court has "broad powers and wide discretion" to fashion appropriate relief, including to devise a plan for distributing receivership assets. *See, e.g., id*. In resolving claims in

a receivership, courts consider a variety of factors, with the goal of fashioning an equitable system that treats similarly situated claimants equally. *See*, *e.g.*, *S.E.C. v. Homeland Commc'ns Corp.*, No. 07–cv-80802, 2010 WL 2035326, at *1 (S.D. Fla. May 24, 2010) ("[I]n deciding what claims should be recognized and in what amounts, the fundamental principle which emerges from case law is that any distribution should be done equitably and fairly, with similarly situated investors or customers treated alike.") (quotation omitted); *Elliott*, 953 F.2d at 1570 (same).

Put simply, equity requires that similarly situated investors be treated equally. *See*, *e.g.*, *Quilling v. Trade Partners, Inc.*, No. 1:03–CV–236, 2006 WL 3694629, at *1 (W.D. Mich. Dec. 14, 2006). The Court has wide latitude in exercising its inherent equitable power to approve the distribution of receivership funds. *See*, *e.g.*, *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (affirming district court's approval of plan of distribution because court used its discretion in "a logical way to divide the money"); *Trade Partners*, 2007 WL 107669 at *1 (same). In approving a distribution plan, "the district court, acting as a court of equity, is afforded the discretion to determine the most equitable remedy." *Forex*, 242 F.3d at 332. The Court may adopt any plan of distribution that is logical, fair, and reasonable. *S.E.C. v. Wang*, 944 F.2d 80, 83-84 (2d Cir. 1991); *Trade Partners*, 2007 WL 107669 at *1. "Therefore, any action by a trial court in supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse." *S.E.C. v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982) (quotation omitted).

One of the primary purposes of an equity receivership is to promote the orderly and efficient administration of the estate for the benefit of the creditors. *S.E.C. v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). The relief the Receiver is requesting through this motion best serves this purpose. The Receiver believes that the second interim distribution set forth in the motion and

**Exhibit 1** is fair and reasonable and is consistent with the distribution plan and the first interim distribution the Court previously approved.

## CONCLUSION

For these reasons, the Receiver respectfully requests the Court enter an order:

1. Approving and authorizing a second interim distribution of $96,871,261.28, as set forth herein and on **Exhibit 1**, and as further detailed in **Exhibits 2 - 9**;

2. Authorizing the Receiver to honor requests to change the name of the claimant/payee of a claim if, in the Receiver's discretion, he has been provided reasonable substantiation of the new recipient's right to the distribution; and

3. Authorizing the Receiver to reissue distribution checks initially made payable to deceased claimants to the appropriate entity or person(s) if, in the Receiver's discretion, he is provided reasonable substantiation of the new recipient's right to the distribution.

4. Authorizing the Receiver to honor requests to change custodians for investments made through IRA accounts if, in the Receiver's discretion, he has been provided sufficient notification and proof of the change of custodian and the individual claimant's entitlement to the proceeds of the claim.

Attached hereto as **Exhibit 10** is a proposed Order establishing a briefing schedule on this motion, and attached as **Exhibit 11** is a proposed Order granting this motion and authorizing the Receiver to proceed with the second interim distribution.

## CERTIFICATION REGARDING PRE-FILING CONFERENCE

The undersigned counsel has conferred with counsel for the SEC, regarding the relief sought through this motion and certifies that the SEC does not oppose the Receiver's requested relief.

Dated: November 21, 2025

Respectfully Submitted,

**STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC**
Two South Biscayne Blvd., Suite 1600
Miami, FL 33131
Telephone: (305) 614-1400

By:  */s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA
Florida Bar No. 056140
tkolaya@sknlaw.com

*Co-Counsel for Receiver*

**PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP**
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Telephone: (215) 320-6200

By:  */s/ Gaetan J. Alfano*
GAETAN J. ALFANO
Pennsylvania Bar No. 32971
*(Admitted Pro Hac Vice)*
GJA@Pietragallo.com
DOUGLAS K. ROSENBLUM
Pennsylvania Bar No. 90989
*(Admitted Pro Hac Vice)*
DKR@Pietragallo.com

*Co-Counsel for Receiver*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 21, 2025, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA